UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DONGGUK UNIVERSITY, | ) |
| | ) Civil Action No. |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| YALE UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

Plaintiff Dongguk University complaining of defendant Yale University respectfully alleges and says as follows:

## PARTIES

1.      Plaintiff Dongguk University is a private university organized under the laws of Korea and whose principal place of business is in Seoul, Korea.

2.      Upon information and belief, defendant Yale University is a private university organized under the laws of the State of Connecticut and whose principal place of business is in New Haven, Connecticut.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      This Court possesses personal jurisdiction over this matter because Yale University has sufficient contacts with the State of Connecticut.

5.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) inasmuch as a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

### Dongguk University

6.      Plaintiff Dongguk University is one of the most important academic institutions in Korea and has developed a stellar reputation for the quality of its education in its one hundred years of existence.

7.      In 2005, the Korean Council of University Education chose Dongguk University as one of the Best Universities of the Year.

8.      Dongguk University was founded in 1906 by the Jogye Order, a Buddhist monastic order, and is one of the most prestigious Buddhist-affiliated universities in the world.

9.      The Jogye Order, which was established in 1354, is the largest and one of the most influential Buddhist Orders in Korea.  Adherents of the Jogye Order practice Seon (Zen) Buddhism and seek a path to enlightenment and understanding.

10.      One of the paths available to the Jogye Order adherents is to attend Dongguk University because of its impeccable reputation and because of its renowned Buddhist educational programs.

11.      Because of its Buddhist roots, Dongguk University became known for its strong humanist tradition and is known for its spirituality, morality and leadership.

12.      In connection with its oversight of Dongguk University, the Jogye Order established the Dongguk University Foundation, the Board of Directors of which provides general oversight and final approval of certain administrative matters of Dongguk University, including final approval of its proposed faculty members.

13.      While Dongguk University is one of the most well-known universities in the field of Buddhist studies in Korea, it has always been open to students and professors of all faiths and philosophies.

2

14.     Dongguk University currently offers approximately 100 undergraduate programs and over 100 graduate programs.  It has about 23,750 students and 900 faculty members from various parts of the world.

15.     Dongguk University has greatly contributed to the development of the basic sciences in Korea.  It has been ranked number one in Korea in the Basic Science Research Achievement Survey conducted by the Ministry of Science and Technology and the Korea Science and Engineering Foundation.

16.     Dongguk University is also known for its literature and cultural programs. Among its graduates are world-famous novelists and poets such as Jeong Rae Cho, Seok Young Hwang and Chong Ju So, who was nominated for the Nobel Prize five times.

17.     Dongguk University's alumni hold important and prestigious positions in Korean business, cultural, and governmental organizations.

18.     Through year-end 2006, Dongguk University's alumni and corporate donor contributions, government grants and student applications increased on an annual basis.

### Yale University

19.     Yale University, which was founded in 1701, is the third oldest institution of higher education in the United States and is a member of the Ivy League.

20.     Yale University's graduate programs, including those offered by Yale's Graduate School of Arts and Sciences, are internationally acclaimed.

21.     In 1861, Yale University's Graduate School of Arts and Sciences became the first school in the United States to award a Doctorate of Philosophy ("Ph.D.")

22.     Since 1861, Yale University's Graduate School of Arts and Sciences, as well as its other graduate schools, have awarded numerous Ph.D.'s to graduate students from around the world.

3

23.     Upon information and belief, because of Yale University's academic standing and reputation, Yale University has long been aware that unscrupulous individuals will falsify their academic records in order to assert that they have received graduate or post-graduate degrees from Yale University.

24.     Upon information and belief, Yale University, like other academic institutions, is concerned about its reputation and does not want individuals to represent themselves falsely as having received graduate or post-graduate degrees from Yale University.

25.     Upon information and belief, because Yale University receives numerous inquiries from academic institutions as well as other inquirers for verification of Ph.D.'s and other degrees purportedly awarded by Yale University, Yale University has established certain protocols regarding the verification of Ph.D.'s and other degrees claimed to have been awarded by Yale University.

26.     Upon information and belief, in developing these protocols, Yale University was at all times aware of the importance of complying with these protocols and the need to provide accurate information to the academic institutions and other inquirers who have sought to verify whether Yale University had awarded graduate or post-graduate degrees to particular individuals.

27.     Upon information and belief, Yale University, like other academic institutions, does not want to employ faculty members who have falsified their records by erroneously claiming that they have received degrees that they did not receive.

28.     Upon information and belief, just as Yale University receives inquiries seeking to verify whether an individual has received a degree from Yale University, Yale University regularly and routinely contacts other academic institutions in order to verify the academic credentials of individuals who are seeking faculty positions at Yale University.

4

29.     Upon information and belief, the information received from such academic institutions contacted by Yale University is relied upon by Yale University when determining whether to hire the individual about whom Yale University has inquired.

### Jeong Ah Shin

30.     Upon information and belief, Jeong Ah Shin ("Shin") is a citizen of Korea born in 1972.

31.     In 1997, at the age of 25, Shin became a part-time employee at the Kumho Art Museum.

32.     The Kumho Art Museum is a highly regarded Korean art museum that was established by the Kumho Cultural Foundation in 1996.

33.     Since its opening, the Kumho Art Museum has held numerous art exhibitions involving over 350 internationally renowned artists.

34.     Shin was promoted to curator of the Kumho Art Museum and, as curator, Shin was responsible for numerous museum shows and exhibitions.

35.     On March 16, 2001, Korea Economic Daily selected Shin as one of the women leaders in the field of curatorship.

36.     Shin served as curator of the Kumho Art Museum until December 2001 when she was hired by Sungkok Art Museum as its chief curator.

37.     The Sungkok Art Museum, which was founded by the Sungkok Art and Culture Foundation in 1995, is one of Korea's best-known modern art museums.

38.     The Sungkok Art Museum has also held exhibitions featuring the works of leading modern art artists from around the world and, as chief curator of the Sungkok Art Museum, Shin planned the exhibitions of many of these artists.

39.     In 2003, Wolganmisool, a Korean art magazine, awarded the Grand Prize to Shin for her achievement in exhibition planning.

40.     Upon information and belief, while employed by the Sungkok Art Museum, Shin taught graduate and undergraduate school classes at a number of universities in Korea, including but not limited to Hongik University, Hanyang University, Chung-Ang University, Kukmin University, Ihwa Women's University, and Sangmyung University.

41.     From 2004 to 2007, Shin frequently wrote art columns for Korean newspapers in which she discussed various topics including art, exhibitions, and her experience as a curator.

42.     On May 8, 2005, Kukmin Ilbo, a Korean newspaper, ran an article stating that Shin had obtained a Ph.D. in Western Art History from Yale University's Graduate School of Arts and Sciences.

**Dongguk University's Decision To Expand Its Art History Department**

43.     In 2005, Dongguk University was planning to increase its faculty by inviting individuals who could expand the reach of its cultural and art history academic offerings.

44.     Individuals who are asked by Dongguk University to join its faculty are known as "special hiring candidates."

45.     During the summer of 2005, Dongguk University began to search for individuals who would qualify as "special hiring candidates" for these additional academic positions.

46.     In connection with these efforts, Dongguk University received resumes from a number of individuals who could expand Dongguk University's academic offerings.

47.     Shin's resume was among the resumes received by Dongguk University.

48.     Upon review of Shin's resume, Ki Sam Hong, the then-President of Dongguk University, determined that Shin was qualified to be a "special hiring candidate" for Dongguk University's Art History Department.

49.     On August 4, 2005, Shin submitted a faculty position application form to Dongguk University, which contained her employment background, a listing of awards that she had received, and her academic credentials.

50.     With respect to her academic credentials, Shin stated that in 2005, she had received a Ph.D. from Yale University.

51.     As part of the application process, Shin also provided Dongguk University with a letter dated May 27, 2005, which was signed by "Pamela Schirmeistr [sic]" on Yale University letterhead (the "Certification Letter"), certifying the following information:

| | |
|---|---|
| NAME: | Jeong Ah Shin |
| DATE OF BIRTH: | April 28, 1972 |
| MAJOR: | History of Art (Twentieth Century Art) |
| DATE OF ADMISSION: | August 1996 |
| DATE OF GRADUATION: | May 2005 |
| DEGREE RECEIVED: | Ph.D |

52.     Pamela Schirmeister ("Schirmeister") is an Associate Dean in Yale University's Graduate School of Art and Sciences.

53.     Based upon Shin's experience and academic credentials, Dongguk University decided to move forward with Shin's application.

54.     In accordance with Dongguk University's standard procedures for "special hiring candidates," Shin's application was forwarded to Dongguk University's Faculty Hiring/Promotion Committee for approval.

55.     On August 12, 2005, the Faculty Hiring/Promotion Committee agreed with the President's recommendation that Shin was eligible to become an assistant professor in Dongguk University's Art History Department.

56.     On August 16, 2005, Dongguk University's Office of Academic Affairs submitted Shin's name, as well as the names of six other "special hiring candidates," to Dongguk University Foundation's Board of Directors for final hiring approval.

57.     Shin and the other six "special hiring candidates" were approved at the Dongguk University Foundation's Board of Directors' meeting that was held on August 30, 2005.

### Yale University's Verification Of Shin's Ph.D.

58.     On September 1, 2005, Shin was officially hired by Dongguk University as an assistant professor although she was not scheduled to teach any classes until the spring 2006 semester.

59.     In early September 2005, Dongguk University received information that raised questions regarding the accuracy of Shin's statement that she had received a Ph.D. from Yale University.

60.     In order to verify the fact that Shin had received a Ph.D. from Yale University, on September 6, 2005, Hyung Taik Ahn ("Ahn"), a member of Dongguk University's Administration Team, sent a registered letter dated September 5, 2005 (the "September 5 Registered Letter") to Yale University together with a copy of the Certification Letter provided by Shin.

61.     Ahn's September 5 Registered Letter states in pertinent part:

> *I would like to confirm whether you can verify the contents of the enclosed letter issued by your University for Ms. Jeong-Ah Shin.*
>
> *Since this is being done as part of internal procedure for employing a faculty member at Dongguk University*, your verification will be kept confidential.  It would be very kind of you to send us the information we have requested as soon as possible.  (Italics supplied.)

62.     The September 5 Registered Letter was received by Schirmeister, the Associate Dean who had supposedly signed the Certification Letter on behalf of Yale University.

8

63.     On September 22, 2005, Schirmeister sent Ahn a three-page fax consisting of a transmittal sheet as well as a copy of Ahn's September 5 Registered Letter and the Certification Letter that had been provided to Dongguk University by Shin (the "September 22 Fax").

64.     Schirmeister's September 22 Fax stated:

> As requested *I am confirming that the attached letter* [i.e. the Certification Letter] *was issued by the Yale Graduate School and signed by me.* (Italics supplied.)

65.     Relying on the September 22 Fax sent by Schirmeister on behalf of Yale University that attested to the fact that Shin had received a Ph.D. from Yale University, Dongguk University concluded that Shin had received a Ph.D. from Yale University as she had represented and that the rumor was therefore baseless.

66.     Shin began teaching classes at Dongguk University in the spring semester of 2006 and continued to do so until 2007.

### Shin's Dissertation Rumors

67.     On June 4, 2007, Euiyon Cho ("Cho"), a Dongguk University official, was provided with documents suggesting that Shin had not written a dissertation titled "Guillaume Apollinaire: Catalyst for Primitivision For Picabia and Duchamp" ( "Shin's Dissertation"), which was the basis for her Ph.D., and that Shin's Dissertation had been plagiarized.

68.     Because the documents questioning Shin's Dissertation that had been provided to Cho were not dispositive, on June 7, 2007, Cho sent a website inquiry to Yale University asking whether it had a copy of Shin's Dissertation.

69.     Later that day, a Yale University librarian sent an e-mail to Cho stating that Yale University had no record of Shin's Dissertation and advising Cho to contact Yale University's Department of Art History.

70.     On June 11, 2007, Cho sent an e-mail to Susan Emerson ("Emerson"), the Registrar of Yale University's Department of Art History.  In his e-mail, Cho again sought to determine whether Yale University had a record of Shin's Dissertation.

71.     In his June 11, 2007 e-mail, Cho also asked Emerson whether Shin "earned her Ph.D. degree from your department of the Graduate School."

72.     Later that day, Emerson sent an e-mail to Cho informing him that according to her records, "Jeong Ah Shin did not receive a Ph.D. in our department at Yale University."

73.     In June 2007, the rumors regarding Shin's Dissertation reached the Korean press and by late June 2007, several Korean newspapers began writing articles questioning whether Shin had written her dissertation and whether she had in fact obtained a Ph.D. from Yale University.

74.     In response to the newspaper articles questioning Shin's academic credentials, on July 2, 2007, Dongguk University officials held a press conference defending Dongguk University's decision to hire Shin, explaining that Dongguk University had taken steps to verify Shin's Ph.D. and stating that it had received the September 22 Fax from Yale University confirming the fact that Shin had obtained a Ph.D. from Yale University.

75.     Nevertheless, concerned that it had received "contradictory" information from Yale University concerning Shin's Ph.D., on July 5, 2007, Youngkyo Oh, the President of Dongguk University ("President Oh"), wrote to Richard Levin, the President of Yale University ("President Levin"), a letter about Shin.

76.     In his July 5 letter, President Oh asked President Levin the following questions:

> (1)  Did Yale University award a Ph.D. degree to Ms. Jeong Ah Shin in the major of History of Art in 2005?
>
> (2)  If the answer to the inquiry (1) is "No," then I am curious as to how Pamela Schirmeister came to issue the Ph.D. certification letter for

Ms. Jeong Ah Shin.

(3) If Ms. Shin received a Ph.D. degree from your school, then would you let us know what department she was enrolled in and who was the academic and thesis adviser?

77.     On July 6, 2007, Cho sent an e-mail directly to Schirmeister asking Schirmeister to explain the contradiction between Schirmeister's September 22 Fax confirming that Shin had received a Ph.D. from Yale University and the June 11, 2007 e-mail from Emerson stating that Shin had not received a Ph.D. from Yale University.

78.     Schirmeister never responded to this e-mail.

### Yale University Denies Sending The September 22 Fax

79.     Susan L. Carney ("Carney"), a Deputy General Counsel in Yale University's Legal Department, was given responsibility for writing a responsive letter to President Oh on behalf of President Levin that would answer President Oh's questions.

80.     On July 10, 2007, Carney responded to the first two questions posed by President Oh (the "July 10 Letter").

81.     In response to President Oh's first question, Carney stated that Shin did not receive a Ph.D. from Yale University and that the Certification Letter was a forgery.

82.     In response to President Oh's second question, Carney stated that the September 22 Fax sent by Schirmeister, which attested to Shin's Ph.D., "is not authentic" and that Yale University had no "knowledge currently regarding the creation or issuance" of the September 22 Fax.

83.     In fact, the statements contained in Carney's July 10 Letter regarding the September 22 Fax were false when made and were recklessly given.

84.     By July 10, 2007, Yale University was fully aware that the Korean press had written about Dongguk University's employment of Shin and was aware of Dongguk

University's statement that in employing Shin, it had relied on the September 22 Fax attesting to Shin's Ph.D.

85.     By July 10, 2007, Yale University was aware of the importance of providing truthful, accurate and complete information to the Korean media regarding the communications between Dongguk University and Schirmeister, on behalf of Yale University, about Shin.

86.     Yale University knew or should have known that if it did not provide truthful, accurate and complete information regarding its communications with Dongguk University about Shin, that Dongguk University would be vilified in the Korean media, that its reputation would be significantly tarnished, and that it would suffer severe consequences.

87.     Instead of acknowledging that the September 22 Fax was authentic, Yale University embarked on a campaign designed to distance itself from any responsibility regarding Shin by denying any knowledge of Dongguk University's efforts to verify Shin's Ph.D.

88.     Beginning on July 10, 2007, in a series of press interviews as well as in e-mails and press releases disseminated to the Korean media, Yale University made a series of knowingly false statements regarding Dongguk University's efforts to verify Shin's Ph.D.

89.     On July 10, 2007, the same day that Carney sent her July 10 Letter, a reporter from the Chosun Ilbo, one of Korea's best known newspapers, had an interview with Gila Reinstein ("Reinstein"), an Associate Director of Yale University's Office of Public Affairs.

90.     In the July 10 interview, Reinstein informed the Chosun Ilbo reporter that Shin had never received a Ph.D. from Yale University.

91.     On July 11, 2007, in response to the Korean press inquiries as to why Dongguk University did not know that Shin had not received a Ph.D. from Yale University, Dongguk University officials explained that it had received the Certification Letter from Yale University.

92.     In a July 12, 2007 Chosun Ilbo published an article explaining that the

Certification Letter:

> . . . is a fax message Dongguk University sent to Yale University as an
> inquiry in September 2005 – the time the school hired Professor Shin –
> and Yale University's reply to the inquiry.

93.     The July 12, 2007 Chosun Illbo article also quoted the Certification Letter and

stated that Schirmeister had (i) verified the fact that Yale University had "issued" the

Certification Letter and (ii) acknowledged that she had "signed it."

94.     In an effort to verify the accuracy of Dongguk University's explanation, Korean

reporters contacted Reinstein who informed them that the September 22 Fax was "forged."

95.     On July 13, 2007, the Chosun Ilbo printed an article, which stated in pertinent

part:

> *The fax that "Dongguk University has been claiming to have received
> from Yale University," which was the decisive factor in the mystery of the
> forged doctorate degree of Dongguk University's Professor Jeong Ah
> Shin, was confirmed to have been forged.*  Our newspaper sent an e-mail
> message including this fax on the 12th, requesting [the school's]
> authentication, and in response, Ms. Gila Reinstein of Yale University's
> Public Affairs said "This document is in a different format from Yale
> University's academic record verification, and it is a forged document."
> She said in a telephone conversation, "Professor Pamela Schirmeister,
> whose signature is included in the letter, is presently away, but verification
> with her Assistant Professor *confirmed that Professor Schirmeister never
> signed such a letter.*
>
>                                   * * *
>
> This fax was used as a confirmation for the academic record when
> Professor Shin was hired as a Professor of Dongguk University in 2005
> and named the Art Director of Kwangju Biennale 2008.  Now that it is
> determined to be a falsified [document], it is very possible that it was
> forged in Korea.  (Italics supplied.)

96.     On July 14, 2007, the Chosun Ilbo published on its website an English version of

its July 13, 2007 article in which it stated that:

> A document that was used to show that a Dongguk University art professor had a doctoral degree from Yale has turned out to be a forgery.

97.     The Chosun Ilbo's July 14, 2007 website article went on to state:

> *However, in response to an e-mail inquiry by the Chosun Ilbo, Gila Reinstein at Yale University's Office of Public Affairs said, "The document has a different format from that of Yale University's official certificate. The document is a fake."*

> She said, "*I couldn't contact Pamela Schirmeister, associate dean of Yale Graduate School, whose signature was on the faxed document.* However her assistant said Prof. Schirmeister had never signed her name to such a document." (Italics supplied.)

### Yale University Rebuffs Dongguk University's Efforts To Prove That The September 22 Fax Was Authentic

98.     Troubled by Yale University's statement that the September 22 Fax was not authentic, Cho sent an e-mail to Carney on July 15, 2007, in an effort to learn why Yale University had reached that conclusion.

99.     In his July 15 e-mail, Cho pointed out that the September 22 Fax contained a fax telephone number and he inquired whether the fax telephone number was "a Yale number."

100.    On July 16, 2007, Carney sent Cho an e-mail assuring Cho that Yale's "investigators" were examining the September 22 Fax and would be "making further inquiries."

101.    In her July 16, 2007 e-mail, Carney confirmed that the fax number on the September 22 Fax "is assigned as the fax number for the Yale Graduate School Associate Dean's Office."

102.    However, Carney went on to say in her July 16 e-mail:

> Because documents can so easily be fabricated with available software programs these day, it appears that the fax line may have been added to a copy, but may not be the case. The investigators will examine this question.

103.    Notwithstanding Carney's promise to further investigate the matter, no further investigation was done at that time.

104.   On July 16, 2007, the DongA Ilbo, another major Korean newspaper, published an article entitled "Yale Decides Against Investigating 'Jeong Ah Shin's Fake Fax.'"

105.   The DongA Ilbo article was based upon an interview with Reinstein who was quoted as saying that even if the September 22 Fax and the Certification Letter were "faxed from Yale University, it does not change the fact *they were all fake documents that were not prepared by Yale University.*" (Italics supplied.)

106.   On July 18, 2007, Reinstein gave an interview to the Korea Economic Daily, another Korean newspaper, in which Reinstein stated, "Yale is the biggest victim of this case" and that Yale University was "considering legal action."

### Yale University Denies Receiving
### The September 5 Registered Letter

107.   In addition to claiming that the September 22 Fax was a fake, Reinstein also falsely informed the Korean media that Yale University had not received the September 5 Registered Letter asking whether Shin had received a Ph.D. from Yale University.

108.   On July 18, 2007, the Hankook Ilbo, another Korean newspaper, printed an article which noted that Yale University had made a public statement that the September 22 Fax was forged and which opined that Dongguk University may never have actually done anything to verify Shin's Ph.D.

109.   On July 19, 2007, the Chosun Ilbo wrote an article based in large part on an interview with Reinstein in which she stated that Dongguk University had never contacted Yale University about Shin.

110.   The July 19 Chosun Ilbo article stated in pertinent part:

> Associate Director Gila Reinstein of Yale University's Public Affairs Office stated, "Dongguk University said that it mailed a letter for an inquiry of her academic record, so we looked into it, *but we (Art History*

*Department Graduate School of Yale University) never received (the letter).*" (Italics supplied.)

111.     The July 19 Chosun Ilbo article went on to state:

Did Dongguk University really send the mail? – Associate Director Reinstein said, "we have a system that verifies each student's degree, so had we received the letter, we would have replied according to the process," adding, "We never received the letter."

112.     Also on July 19, 2007, the Joong Ang Ilbo, another Korean newspaper, printed

the results of a July 17, 2007 interview with Reinstein in which Reinstein gave the following

answer to the following question:

Dongguk University is claiming to have forwarded an academic record verification request to Yale University.  Did you receive it?

"I looked for it repeatedly in the Department of Art history and the Graduate School with no success.  A document such as a request for verification of academic records is a very important matter so we keep a book to record it. *The fact that we couldn't find such an important document means that we didn't receive it.  I do not know what happened."* (Italics supplied.)

113.     The public statements made by Reinstein on behalf of Yale University stating that

the September 22 Fax was a fake and that the September 5 Registered Letter was never received

by Yale University were picked up by virtually all of the major Korean newspapers and

broadcast companies.

114.     Yale University's statement that the September 22 Fax was a fake and that the

September 5 Registered Letter was never received by Yale University was also picked up and

republished by news agencies from around the world.

115.     As a consequence, numerous articles were published in print and on websites in

and outside of Korea about Dongguk University's supposed failure to verify Shin's credentials.

116.     Upon information and belief, by mid-July 2007, the information provided by

Reinstein on behalf of Yale University had been widely circulated to the Korean

16

population-at-large, many of whom believed that Dongguk University had improperly hired Shin, that it had never contacted Yale University, and it had tried to cover up its inaction by reliance on a forged document, i.e. the September 22 Fax.

117.    Because Yale University refused to acknowledge the truth and admit that it had sent the September 22 Fax verifying Shin's Ph.D., on July 18, 2007, the Dongguk University Foundation's Board of Directors publicly stated that it would "discipline all the faculty members involved in the forgery case for failed verification of [Shin's] doctorate when she was selected."

118.    Also on July 18, 2007, President Oh issued a statement publicly apologizing for the scandal involving Shin.

119.    Dongguk University, which has spent one hundred years building its impeccable reputation, continued to be severely criticized in the Koren press and on broadcast television.

120.    On August 4, 2007, Munhwa Broadcasting Corporation ("MBC"), one of the most important television stations in Korea, broadcast a "60 Minutes"-type exposé publicly criticizing Dongguk University's role in the Shin scandal.

121.    In connection with the forty-five minute broadcast, Reinstein was interviewed and a clip of her interview was aired.

122.    In her publicly aired television interview, Reinstein, on behalf of Yale University, once again claimed that Yale University had never received an inquiry from Dongguk University asking about Shin's Ph.D.

123.    The Korean television broadcast also reported that Yale University continued to assert that it had never sent the September 22 Fax.

124.    Yale University's failure to acknowledge the truth about its communications with Dongguk University concerning Shin continued to have severe consequences in Korea.

125. On August 31, 2007, a group of monks belonging to the Jogye Order publicly called for the dismissal of all of the directors of Dongguk University Foundation's Board of Directors because of their responsibility in approving Shin as a "special hiring candidate."

126. On September 3, 2007, the Korea Times, in an article entitled "Factional Feud Deepens in Buddhist Groups," reported that the "diploma scandal of a university professor has initiated a factional feud between Buddhist groups" affiliated with the Jogye Order.

### Dongguk University's Continued Efforts To Have Yale
### University Acknowledge Its Role In the Shin Matter Are Rebuffed

127. In or about early August 2007, the Seoul Western District Prosecution Office (the "Korean Prosecutors") commenced a criminal investigation into the circumstances surrounding Shin's contention that she had been awarded a Ph.D. by Yale University.

128. Among other things, the Korean Prosecutors were interested in Dongguk University's relationship with Shin and whether Dongguk University had verified Shin's Ph.D. as it had claimed.

129. In view of mounting public criticism and the pending criminal investigation, Dongguk University continued to communicate with Yale University in its effort to prove that Yale University had received the September 5 Registered Letter and that the September 22 Fax attesting to Shin's Ph.D. was authentic.

130. On August 31, 2007, Cho sent Carney an e-mail stating that Dongguk University had located the United States Postal Service's tracking record that established that the September 5 Registered Letter was signed for by "M Moore YCM," and that "M Moore" was Michael Moore, one of the YCM staff members.

131. In his August 31 e-mail, Cho stated that he "was hopeful" that this "new evidence" would enable Yale University to establish the authenticity of the September 22 Fax.

132.    Later that day, Carney sent a responsive e-mail to Cho stating:

Dear Director Cho,

The material that you have provided below does not support the
conclusion that any package from Dongguk University was ever delivered
to Dean Schirmeister. The Yale Graduate School advises that there was
no one by the name "Michael Moore" working there in 2005. In addition,
"YCM" is not an acronym related to the Graduate School Dean's office,
where Dean Schirmeister works. All that the receipt you provided
indicates is that it was delivered in New Haven CT and signed for by "M
Moore YCM."

133.    In a return e-mail, Cho informed Carney that the acronym "YCM" stands for

"Yale Central Mailroom" and he provided a website link to Yale University's website that

established that Michael Moore was a person employed by Yale University in the Yale Central

Mailroom.

134.    Rather than accept this evidence, on September 1, 2007, Carney sent Cho an

e-mail asking for a "copy of the actual receipt" from the U.S. Postal Service.

135.    On September 3, 2007, Cho sent a copy of the mailing label that was affixed to

the September 5 Registered Letter.

136.    On September 4, 2007, Carney sent an e-mail to Cho complaining that the mailing

label was not completely in English and asking for a copy of the receipt containing Michael

Moore's "actual signature"-- something that she should have known would not be in the

possession of Dongguk University.

137.    By September 12, 2007, in its effort to prove that the September 5 Registered

Letter had been received by Yale Univeristy, Dongguk University had provided Carney with:

(a)     a copy of the U.S. Postal Service's Track & Confirm Receipt stating that the
        September 5 Registered Letter had been received by "M Moore YCM;"

(b)     a website link to Yale University's Central Mailroom which established that Yale
        University's mailroom was staffed by, among others, Michael Moore; and

(c)     a copy of the mailing label that was put on the package that contained the September 5 Registered Letter.

138.    In addition, Dongguk University had previously provided Carney with the Yale University fax telephone number that was on the September 22 Fax.

139.    Having received the information that had been provided to her by Cho, Carney should have been able to determine that the September 5 Registered Letter had been received by Yale University and that the September 22 Fax was authentic.

140.    In the same September 12 e-mail, Cho informed Carney of the Korean Prosecutors' interest in the matter and he told Carney that it would be a "great help" to him to know whether the new material helped Carney establish that the September 5 Registered Letter had been received.

141.    Cho's September 12 e-mail also asked Carney to inform Dongguk University whether the information that had been sent to her enabled her to determine whether the September 5 Registered Letter had been received by Yale University.

142.    Carney never responded to Cho's September 12 e-mail.

143.    Rather than correct its false statements and admit the truth, on September 21, 2007, Yale University issued an Official Statement stating, *inter alia*, that all documents supporting Shin's claim were forgeries and therefore "are fake."

144.    Yale University's Official Statement was reported in an article published by the DongA Ilbo newspaper on September 23, 2007.

145.    As a result of Yale University's continued public statements denying any involvement with the Shin matter, in late September 2007 and in early October 2007, Dongguk University's Professors Association issued a number of formal statements, all of which were reported in the Korean press, demanding the resignation of Dongguk University's President and

Vice President as well as the resignation of the Dongguk University Foundation's Board of Directors.

146.    Based upon Yale University's continued public statements that the September 5 Registered Letter and the September 22 Fax were forgeries, the Korean Prosecutors focused their attention on Dongguk University's supposed failure to verify Shin's Ph.D credentials.

147.    Numerous Korean newspapers and other media outlets informed the Korean population-at-large of the Korean Prosecutors' investigation of Dongguk University's purported role in the Shin matter.

**Yale University Finally Admits That**
**The September 22 Fax Is Authentic**

148.    On October 11, 2007, Shin was arrested by the Korean Prosecutors, was accused of fabricating a doctorate degree and other documents from Yale University, and is presently incarcerated in a Korean prison pending her trial.

149.    In connection with the then-upcoming criminal trial of Shin, in or around November 2007, the Korean Prosecutors issued a document subpoena to Yale University in an effort to obtain copies of Yale University's records that might be related to the Shin matter.

150.    As a result of this document subpoena, Yale University finally admitted that it had received the September 5 Registered Letter and that the September 22 Fax attesting to Shin's Ph.D. was authentic.

151.    On November 29, 2007, Carney sent a letter by e-mail to President Oh of Dongguk University in which she stated:

> During Yale's preparation of the recent response to a document subpoena issued in the matter of Jeong Ah Sin, it has come to light that I inadvertently provided one piece of incorrect information when I wrote to you about this matter on July 10, 2007.

152.    In her November 29, 2007 letter, Carney informed President Oh that "it now appears from a document discovered by Ms. Schirmeister" that the September 22 Fax is *"indeed authentic."* (Italics supplied.)

153.    According to Carney, she had just learned that Schirmeister had, supposedly in "the rush of business," sent the September 22 Fax to Dongguk University attesting to the validity of Shin's Ph.D.

154.    Extremely upset by this letter, on December 28, 2007, Cho, on behalf of President Oh, e-mailed a letter to Carney which stated in pertinent part:

> . . . if Yale University had revealed the fact in your first reply of July 10, 2007, Dongguk University would not have received a lot of harsh criticism from the public.  Your inaccurate information of July 10, 2007 has ruined our one hundred year-long built reputation.  What was worse was that in September 2005, we had no choice but to take the facsimile document sent by Ms. Schirmeister as an authentic one as it is now, and officially believed that Yale University awarded a Ph.D. to Jeong Ah Shin in May, 2005 on the basis of the document that Ms. Schirmeister sent us in September 2005.

155.    On the next day, December 29, 2007, one month after Carney sent her November 29 letter acknowledging Yale University's error and almost six months after Yale University denied receiving the September 5 Registered Letter and sending the September 22 Fax, Yale University finally issued a formal public statement that it "deeply regrets" its "error and the resulting *inconvenience* to Dongguk University." (Italics Supplied.)

156.    Having spent almost six months publicly denying any role in the Shin matter and contending that Dongguk University had never contacted Yale University, Yale University's December 29 statement did not undo the damage suffered by Dongguk University.

**Dongguk University's Reputation**
**Was Destroyed by Yale's False Statements**

157.     As a result of Yale University's public statements that Dongguk University had never contacted it about Shin, that the September 5 Registered Letter was never received by Yale University and that the September 22 Fax was a fake, Dongguk University was publicly humiliated and deeply shamed in the eyes of the Korean population.

158.     In Korean culture, one's reputation affects not only the level of respect he, she or it can expect from others, but also affects the dignity, credibility, social status and core identity of that person or entity.

159.     In its history of 100 years, Dongguk University had built a reputation based upon its strong sense of morality that was grounded upon its Buddhist philosophy.

160.     Because of the false statements made by Yale University, the Korean media reported and significant segments of the Korean population believed, that Dongguk University had improperly hired Shin, that it had never contacted Yale University and that it had tried to cover up its inaction by relying on a forged document, i.e. the September 22 Fax.

161.     In Korean culture, where the identity of an individual is particularly closely associated with the group to which he or she belongs, living up to the group's norms and values is extremely important.

162.     In Korean culture, damage to one individual's reputation is often imputed to the reputation of the group to which he or she belongs.

163.     Therefore, disgrace to an individual member of the society tends to be taken personally by other members of the society, who often fear that the inadequacies of that person or entity will be imputed to the society as a whole and further imputed to themselves as members of that society.

164.    Based upon Yale University's false statements to the Korean media, the Korean media and population-at-large concluded that Dongguk University was dishonest and incompetent and that Dongguk University's role in the scandal had tarnished the reputation of Korea as a country.

165.    Consequently, significant segments of the Korean population concluded that Dongguk University's alleged dishonest behavior was a disgrace to Korean society and that Dongguk University had undermined Korean social values.

166.    On September 17, 2007, KMAC, a prominent Korean consumer service consulting organization, notified Dongguk University that because of Dongguk University's reported role in the Shin scandal, it wold not be receiving KMAC's prestigious 2007 Customer Satisfaction Management Grand Award.

167.    In so doing, KMAC stated that:

Reasons

There is no question that [Dongguk University] demonstrated exemplary effort by becoming the first college to implement the concept of customer satisfaction under outstanding leadership.

For a school, customers include not only its students who receive direct service, but it must consider the social benefits, such as industrial and citizen communities, which means that a high quality service must be offered directly and indirectly to the students – the receiver of service , industrial society, citizens, etc.  In that aspect, *considering the recent social issue pertinent to the employment of the teaching staff in the aspect of the quality management of education service, the Evaluation Committee reached the final resolution that found the awarding to be inappropriate.* (Italics supplied.)

168.    As a direct result of the publication of the false statements made by Yale University, the amount of  money received from Dongguk University's alumni and from corporate donors decreased.

169.    In addition, the number of student applications for admission to Dongguk University decreased and the amount of government grants made to Dongguk University decreased.

170.    Further, as a direct result of the public criticism aimed at Dongguk University by reason of Yale University's public misstatements, Dongguk University was humiliated and shamed and, as a consequence, several of its personnel lost their positions.

171.    Because of Yale University's public misstatements, Dongguk University was also forced to expend a substantial amount of money defending itself against the claim that it had acted improperly because it had supposedly failed to verify Shin's Ph.D.

172.    Most recently, Dongguk University was notified by the Korean government that it would not be added to the list of academic institutions permitted to open a "U.S. style" law school.

**FIRST CLAIM FOR RELIEF**
**(Negligence)**

173.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

174.    In responding to the inquires of academic institutions and other inquirers as to whether Yale University has awarded a degree to a particular person, Yale University has a duty to take all necessary and appropriate steps that will enable it to accurately determine whether such person has in fact received a degree from Yale University.

175.    In responding to the September 5 Registered Letter, Schirmeister, acting on behalf of Yale University, was negligent and careless in that she did not exercise the requisite degree of care in determining whether Shin had been awarded a Ph.D. from Yale University.

176.    Moreover, in responding to the July 5, 2007 letter from President Oh inquiring about the legitimacy of Schirmeister's September 22 Fax, Yale University had a duty to take all responsible and appropriate steps that would enable it to accurately determine whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

177.    In responding to President Oh's July 5, 2007 Letter, Carney, acting on behalf of Yale University, was negligent and careless in that she did not take the requisite degree of care in determining whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

178.    Thereafter, in its September 21 "Official Statement," Yale University was negligent and careless in that it did not take the requisite degree of care in determining whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

179.    As a direct result of Yale University's negligence, Dongguk University has suffered damages in an amount no less than $50,000,000.

### SECOND CLAIM FOR RELIEF
### (Reckless and Wanton Conduct)

180.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

181.    In responding to the inquiries of academic institutions and other inquirers as to whether Yale University has awarded a degree to a particular person, Yale University has a duty to take all necessary and appropriate steps that will enable it to accurately determine whether such person has received a degree from Yale University.

182.    In responding to Ahn's September 5 Registered Letter, Schirmeister did not follow Yale University's protocols regarding the verification of graduate degrees nor did she

make any effort to research Yale University's records to determine whether Shin had been awarded a Ph.D. from Yale University.

183.    Schirmeister's failure to follow Yale University's protocol and her failure to do any research was a reckless and wanton disregard of Dongguk University's rights and interests.

184.    Relying on the September 22 Fax sent by Yale University that attested to the fact that Shin had received a Ph.D. from Yale University, Dongguk University did not take further action and Shin's faculty appointment was not overturned.

185.    Upon information and belief, as of the time that Carney was preparing her response to President Oh, no one from Yale University actually contacted Schirmeister to ask her whether the September 22 Fax was authentic.

186.    Having sent the September 22 Fax, Schirmeister was at all times aware that the September 22 Fax was authentic.

187.    Had Schirmeister been asked about the authenticity of the September 22 Fax, she would have acknowledged its authenticity.

188.    Yale University's failure to contact Schirmeister directly between July 2007 and October 2007, was a reckless and wanton disregard of Dongguk Univeristy's rights and interests.

189.    Despite possessing evidence to the contrary, beginning from July 15, 2007 through September 21, 2007, Yale University wantonly and recklessly issued press releases, gave interviews, sent emails and made an Official Statement falsely stating that it had never received the September 5 Registered Letter and never sent the September 22 Fax.

190.    As a direct result of Yale University's wanton and reckless conduct, Dongguk University has suffered damages in an amount no less than $50,000,000.

### THIRD CLAIM FOR RELIEF
### (Implied Contract)

191.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

192.    By establishing protocols to be used in verifying whether Yale University has awarded graduate or post-graduate degrees to particular individuals, Yale University has agreed to be bound by such protocols.

193.    Yale University was at all times aware that institutions would be relying on Yale University's responses to inquiries as to whether a particular individual had been awarded a graduate or post-graduate degree by Yale University.

194.    Based upon their dealings with one another, Yale University and Dongguk University entered into an implied contract.

195.    By sending Dongguk University the September 22 Fax, which erroneously confirmed the fact that Shin had been awarded a Ph.D. by Yale University, Yale University breached its implied contract with Dongguk University.

196.    As a direct result of Yale University's breach of the implied contract, Dongguk University has suffered damages in an amount no less than $50,000,000.

### FOURTH CLAIM FOR RELIEF
### (Defamation)

197.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

198.    As heretofore set forth in detail, on July 10, 2007, July 12, 2007, July 17, 2007, July 18, 2007, August 4, 2007 and September 21, 2007, Yale University maliciously told various Korean newspapers and/or broadcast media that:

(a)    It had never received the September 5 Registered Letter;

(b)     It never informed Dongguk University that this had been awarded a Ph.D. from Yale University; and

(c)     The September 22 Fax was a "fake" and a "forgery."

199.     As heretofore set forth in detail, the statements made by Yale University to the Korean press and to the Korean broadcast media were made verbally as well as in writing.

200.     The aforesaid statements are false and defamatory.

201.     As heretofore set forth in detail, by reason of such false and defamatory statements, Dongguk University has been labeled as being dishonest and has been held up to disgrace and ridicule.

202.     As a direct consequence, Dongguk University's stellar reputation has been severely tarnished.

203.     As heretofore set forth in detail, in addition to suffering damage to its reputation, Dongguk University has suffered actual financial harm.

204.     As a direct result of Yale University's defamatory statements, Dongguk University has suffered damages in an amount no less than $50,000,000.

WHEREFORE, plaintiff Dongguk University requests that this Court grant the following relief:

(1)     As to the first claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus interest;

(2)     As to the second claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus punitive damages in an amount to be determined;

(3)     As to the third claim for relief, a judgment in its favor against defendant Yale

University for damages in an amount to be determined at trial but not less than

$50,000,000;

(4)     As to the fourth claim for relief, a judgment in its favor against defendant Yale

University for damages in an amount to be determined at trial but not less than

$50,000,000 plus punitive damages in an amount to be determined; and

(5)     Such other and further relief as this court deems just and proper together with

costs and disbursements of this action.

Dated: March 24, 2008

JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.

By: _____
     Ira Grudberg
     350 Orange Street
     New Haven, Connecticut  06511
     (203) 951-3720

*Attorneys for Plaintiff Dongguk University*

Of Counsel:

Robert A. Weiner
Jin Yung Bae
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173-1922
(212) 547-5400