1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONGGUK UNIVERSITY,              .     Case No. 3:08-CV-00441
                                .     (RNC)
                Plaintiff,      .
                                .     Hartford, Connecticut
        v.                      .     July, 15, 2008
                                .
YALE UNIVERSITY,                .
                                .
                Defendant.      .
. . . . . . . . . . . . . . . .

   ORAL ARGUMENT ON DEFENDANT'S MOTION TO STAY DISCOVERY
                       (DOC. #12)
         BEFORE THE HONORABLE DONNA F. MARTINEZ
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      McDermott, Will & Emery, LLP
                        By:  ROBERT A. WEINER, ESQ.
                        50 Rockefeller Plaza
                        340 Madison Avenue
                        New York, NY 10173

                        Jacobs, Grudberg, Belt, Dow
                        & Katz, P.C.
                        By:  IRA B. GRUDBERG, ESQ.
                        350 Orange Street
                        P.O. Box 606
                        New Haven, CT 06503

For the Defendant:      Attorney General's Office
                        Public Safety & Special Revenue
                        By:  STEVEN R. STROM, AAG
                        MacKenzie Hall
                        110 Sherman Street
                        Hartford, CT 06106

Official Court
Reporter:               MR. STEPHEN C. BOWLES

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1              (Proceedings commenced at 10:35 a.m.)

2                   THE COURT:  Morning.

3                   COUNSEL:  Good morning, Your Honor.

4                   THE COURT:  This is Dongguk University v.

5        Yale University, 3:08-CV-441, assigned to Chief Judge

6        Chatigny.

7                   Will you identify yourselves for the record?

8                   MR. GRUDBERG:  If the Court please, Ira

9        Grudberg for the plaintiff.

10                  I'd like to introduce Robert Weiner, who is

11       our chief counsel here, and he will introduce the

12       others.

13                  MR. WEINER:  Good morning, Your Honor.

14                  I'm here with In Young Lee, one of my

15       partners; Jin Young Bae, who is referred to by -- as --

16       Jean Bae is her American name, and I have brought a

17       summer associate, Ali Matthews, with us, as well, so

18       she can watch --

19                  THE COURT:  Welcome.

20                  MR. WEINER:  -- the proceedings.

21                  THE COURT:  All right.  Welcome.

22                  MR. SPRINGER:  Good morning, Your Honor.

23       Felix Springer and Howard Fetner appearing on behalf of

24       Yale University.

25                  THE COURT:  All right.

1          We have pending before us this morning, the
2    defendant's motion to stay discovery.
3          There is also pending, the defendant's motion
4    to dismiss, but that has not been referred to me, so
5    I'll hear you on the defendant's motion to stay
6    discovery.
7          MR. SPRINGER:  Thank you, Your Honor.
8          THE COURT:  You're welcome to use the lectern
9    if you'd like to, but you need not.
10          MR. SPRINGER:  I think I'm spread out here --
11          THE COURT:  All right.
12          MR. SPRINGER:  -- probably comfortable.
13          I think my voice will carry, but tell me if
14    it doesn't.
15          THE COURT:  I have no doubt.
16          MR. SPRINGER:  Thank you, Your Honor.
17          Your Honor, as this Court well knows, a
18    motion to stay discovery turns on three factors, and
19    Dongguk has conceded two of them.
20          Discovery will be unusually burdensome for
21    the parties and for the Court here, and a stay of
22    discovery will not prejudice Dongguk.  Those factors
23    have been conceded.
24          What remains is the third factor which, as
25    this Court knows from it's decision in Cuatero and the

1    Anti-Monopoly case, that factor, as stated by

2    Magistrate Judge Peck, is whether the motion to dismiss

3    appears to have substantial grounds, and as this Court

4    articulated it in Cuatero, whether it appears to raise

5    substantial issues.

6           Your Honor, we believe that our motion to

7    dismiss will succeed on all of Dongguk's claims, but

8    even if it does not, and it's -- as Your Honor knows,

9    it's not your task to decide whether it will succeed,

10   but even if it does not, we maintain that our initial

11   memorandum in support of the motion to dismiss makes

12   clear, that we have substantial arguments for dismissal

13   on all of Dongguk's claims.

14          In ten or so days, we're going to file a

15   reply brief which will further indicate those

16   substantial grounds, and indicate, as well, why we

17   think, in large part, the plaintiff's opposition helps

18   us, and I'm prepared to go into the substance of that

19   this morning, and discuss each of the grounds that we

20   seek dismissal on, why we seek it, and why they're

21   substantial grounds, and also address some of the key

22   arguments that the plaintiff has made in their

23   opposition.

24          Before I do that, I just want to take a step

25   back and discuss two things, in part to give you a

1    flavor of why discovery will be so burdensome.

2           Bob Weiner and I had a conversation yesterday

3    that illustrates again, why it be burdensome.

4           As this Court knows, we cited part of the

5    criminal record, actually it was Dongguk's internal

6    investigation of what occurred, which we thought, you

7    know, reported some very interesting things.

8           Mr. Weiner indicated to me that he thought,

9    and he believed legal counsel confirmed, that it was

10   illegal under Korean law, to produce this record of

11   Dongguk's internal investigation from the criminal

12   proceeding.  We got a contrary opinion from counsel.

13          So, we now have dueling opinions perhaps,

14   under Korean law, but one of the issues, of course, is

15   -- you know, a further issue is, "What relevance is

16   Korean law at all, to whether this is admissible

17   under," you know, this -- "the law that governs this

18   case?"

19          The complications here, I think, are endless,

20   and yet another part of the conversation with Mr.

21   Weiner illustrates that, as well.

22          He made the suggestion, which I thought was a

23   good suggestion, that where the parties agree, we may,

24   together -- to spare the expense of translation, which

25   will be an extraordinary here, to spare, or at least

1    reduce, I should say, the expense of translation, that

2    where the parties agree on the documents that should be

3    in the case, that we split the costs of translation.

4            One of the things, of course, is that we

5    can't concede that the translation will necessarily be

6    accurate and, indeed, another issue has arisen about

7    the accuracy of translations here, and we're all

8    interested, as I told Mr. Weiner, in accurate

9    translations, and if we can resolve them, so much the

10   better, but I suspect that also will be -- come before

11   the Court, as well as the issue of, "Should the expense

12   be shared on these documents, or not?", and whether

13   those documents, even with a joint translator, may be

14   inaccurate.  We certainly can't -- a priority, consider

15   those accurate and, you know, as well as all of the

16   burden that we've indicated, as well, that will exist,

17   in our papers, that I need not repeat, including

18   navigating the shoals of, you know, Korean law, with

19   regard to whether, in fact, third-party discovery is

20   even permissible here.

21           It may well be that we need, and we think,

22   quite frankly, we will need, this Court's aid in what

23   we understand will need to be a case-by-case

24   presentation on third-party discovery, and we may need

25   the Court's aid in seeking to persuade the Korean

1    courts that third-party discovery is possible, if they

2    even grant it, and we expect -- as Mr. Weiner has

3    indicated, we disagree already, about the scope of

4    discovery here, in light of all the allegations that

5    have been mentioned and, you know, I think, Your Honor,

6    it is -- I've raised all of this because it's one thing

7    in the  -- on the cold paper, to put the burdens of

8    discovery, but I think as we take even baby steps in

9    this proceeding, I think the burdens are enormous.

10         Nor is -- You know, going to the third point

11   just briefly, that, you know, neither in the surreply,

12   and neither in the opposition, have there been any

13   indication of prejudice and, you know, what will occur

14   is -- here, what is, you know, a few-month delay while

15   the motion to dismiss is decided, and for those

16   reasons, Your Honor, those two grounds.

17         And then, let me take up, you know, again,

18   one more preliminary matter that -- I call it

19   "Preliminary."  I think the plaintiff would disagree.

20   They may maintain it goes to the heart of their

21   argument.

22         The preliminary matter is -- in both the

23   opposition and in the surreply, I think the arguments

24   are virtually identical.  They invey against our use of

25   newspaper articles that they rely on, and are integral

1    to their complaint.

2           They also invey and oppose our use of the

3    judgment, where we asked Judge Chatigny, in the motion,

4    to dismiss to take judicial notice of that judgment,

5    and the indictment.

6           Your Honor, with regard to those points,

7    again, which they make central, and we're a bit puzzled

8    by that, it is clear from the motion to dismiss, that

9    none of our arguments depend on the truth of the

10   contents of any of the news articles, or on the Korean

11   judgment.

12          Despite several opportunities, many

13   opportunities really, Dongguk has not, you know,

14   identified a single one of our argument depends

15   (phonetic) on the truth of any of those statements in

16   any of the documents.  They simply do not.

17          The Court may consider those news articles

18   because Dongguk has relied upon them in its Complaint,

19   has repeatedly relied on them, has cited them and

20   relied on them, not for their truth, but as Dongguk

21   acknowledges, and like the plaintiffs in the Cortec and

22   Oppenheimer cases, which we cite, where matters there,

23   not cited in the Complaint, not appended, not within

24   the four corners were relied on, and the Court utilized

25   them and said, "As long as the plaintiffs relied on

1    them, they were, in essence, fair game."

2          What they are relied on here by Dongguk and

3    by us is, "What is reported?  What was said?", the

4    context of all it.

5          Certainly, in their -- in fact, three of

6    their four counts, Your Honor, except for the implied

7    contract count, the negligence, the reckless and wanton

8    count, and the defamation count, all rely on those news

9    articles, and they are integral to their complaint here

10   and, you know, what is -- you know, I think if you look

11   at it, it could not be clearer, the reliance in the

12   citations, and for the defamation count, in order to

13   get the defamatory comments in the context, we present

14   those, and when I get to the defamation count,

15   interestingly, although we lay out the defamatory

16   statements that are there, they are not addressed by

17   Dongguk.

18         And so, the Korean judgment is to be

19   considered, Your Honor, for the same reasons.  We do

20   not rely on that -- the truth of it, rather, it is

21   simply -- and we have not asked the Court to do that.

22   We simply rely on the fact of the existence of that

23   indictment, and the judicial notice that the Court,

24   under the law that's clear, and I think the parties

25   agree on that, that may be taken with regard to that.

1          That's part of the underbrush, I think, that

2    ought to be cleared out here, and again, we do not rely

3    on the truth of any of those reports.

4          The other point I guess I need to make is, so

5    much of their brief treats our motion to dismiss as if

6    it were a motion for summary judgment or, in their

7    view, should have been a motion for summary judgment.

8    They certainly take great pains to try to turn it into

9    that.  Indeed, a considerable portion of their brief

10   tries to turn it into a summary judgment motion, but

11   those should not succeed.

12         For one, again, the case law that we rely on,

13   in Cortec and Oppenheimer, and a host of other cases,

14   you know, makes clear that we can use this.  The Court

15   may -- you know, it may be provided to the Court for

16   the purposes for which the plaintiff and we provide it

17   to the Court, and then, it is also not summary judgment

18   because we really are dealing here, in classic fashion,

19   in a motion to dismiss, with the sufficiency of the

20   allegations in the Complaint.  That is what we're

21   dealing with under each of the counts here.

22         Plaintiff needs to make sufficient

23   allegations and, in our view, has not.

24         Your Honor, if I could then turn, if you

25   would, to the various counts, and here we maintain that

1    Dongguk cannot state a negligence claim because -- and

2    these are the reasons.

3            Yale had no duty to protect Dongguk from

4    purely economic loss.  I think, Your Honor, if you look

5    at both Restatement 323, 324(a) that we cite, and

6    interestingly enough here, the plaintiffs cite a

7    treatise that we don't see the relevance of, it doesn't

8    deal with the issue of physical harm, which we -- they

9    -- we maintain needs to be part of the allegations

10   here, cannot obviously be part of the allegations here,

11   as well as, you know, if you look at that case law and,

12   you know, the Connecticut Supreme Court discussion of

13   the Yale and Doe matter, where it -- you know, in a

14   case they dismiss with the back of their hand, but

15   should not be, it cites -- in essence it indicates that

16   as a matter of public policy, it would not recognize a

17   legal duty to prevent inadequate education unless there

18   is physical harm.

19           We maintain, Your Honor, that not only the

20   better reasoned cases, but even the cases they cite,

21   which are construction and real estate case (phonetic),

22   implicitly contained the risk of physical harm and, you

23   know, and what we maintain here is that if you look at

24   the better reasoned cases, negligence in the -- this

25   context, certainly, should not exist for pure economic

1    harm, that Yale had no duty, nor could Yale have

2    reasonably foreseen the harm of the sort that Dongguk

3    had alleged here.

4           As we point out, it could not have foreseen,

5    in fact, that, you know, a hundred year reputation when

6    Pam Schirmeister first got this fraudulent letter

7    ginned up, apparently by Shin, it could not have

8    foreseen this.  At no point do we maintain that they

9    could have seen the nature of harm that was claimed

10   here, and even Dongguk, in its brief, repeatedly refers

11   to the fact that it would not have hired Shin, not

12   employed Shin, but for Yale's actions but, in fact, it

13   had hired her.  It had not checked on her references.

14   It had hired her prior to Yale being even sent that

15   letter, or "Certification letter," as it's known.

16          So, we think we have a substantial argument

17   on that basis, as well.

18          What we also argue is public policy does not

19   favor imposing a duty upon Yale.  In essence, to have

20   uncovered the fraud here, and protected Dongguk from

21   Shin's fraud, public policy does not, and what is

22   interesting in Dongguk's reply brief, is that they

23   indicate that they agree with Yale, that there is a

24   societal interest in encouraging universities to verify

25   academic degrees.  What we maintain, and we think there

1   is a substantial argument for this, Your Honor, is

2   encouraging universities, in the way of -- by allowing

3   Dungguk's claim here would, in fact, as a matter of

4   public policy, discourage universities from verifying

5   degrees.

6          We maintain that what would happen is, faced

7   with a $50 million lawsuit for what occurred here; that

8   is, the fraud that was perpetrated on Dongguk and Yale,

9   and to hold Yale, in these circumstances, to have a

10  claim and a duty, would go against public policy.  It

11  would be the exact opposite affect.  It would be

12  extraordinarily chilling.

13         I maintain, Your Honor, that it would be

14  similar to employee references, the chilling effect

15  that liability creates there, and where people no

16  longer can be forthright with each other because of the

17  risk of the liability.

18         There are still further substantial issues

19  that we maintain are raised with regard to the

20  negligence count.

21         Yale was not a cause, in fact, of Dongguk's

22  alleged harm, because that alleged harm would have

23  occurred regardless of Yale's alleged negligence.

24         As the Complaint indicates, and we maintain,

25  Your Honor, Shin was already hired.  The opprobrium,

1     the damage to Dongguk's reputation was put in place.

2     This would have occurred, as we argue and maintain,

3     regardless of what Yale did.

4            Similarly, we maintain that it was not the

5     proximate cause of Dongguk's alleged harm, because Yale

6     did not create the risk of harm to Dongguk, rather,

7     Shin did by committing fraud, and Dongguk did by hiring

8     Shin without checking her credentials.

9            Your Honor, in short, we have five arguments.

10    We need succeed only on one, with regard to indicating

11    then, the negligent count is insufficient.  All of

12    those are elements of the cause of action here.  I

13    think it is certainly the appearance of raising

14    substantial issues under the law, that would govern

15    this motion to stay.

16           Let me then, if I could, turn to the reckless

17    and wanton case matter.

18           There, Your Honor, even more patently, the

19    risk of bodily harm, or physical harm and danger is a

20    required element of that count.  There is no case that

21    Dongguk cites or that we cite, where there is a finding

22    of reckless and wanton conduct that does not include

23    that element.

24           In fact, if you look at all the cases, they

25    are often liquor cases or automobile cases, and they

1    require that.

2          What Dongguk tries to do because of that, is

3    change the standard here, Your Honor, and what they try

4    to do is indicate that there's a negligence standard,

5    really, here, and if you look at their memorandum, at

6    32, where they cite no authority, they try to turn it

7    into a negligence standard by arguing that the test is

8    whether the Complaint contains sufficient allegations

9    to show that Yale knew, or should have known, I'll put

10   a bracket in there, the language of negligence, as a

11   reasonable person, again the language of negligence, of

12   substantial risk or danger to Dongguk, that could be

13   caused by its failure to exercise duty of due care in

14   making such statements.  That is not at all what

15   reckless and wanton requires.

16         Indeed, Your Honor, we would recommend and

17   commend to your attention, the case of Craig v.

18   Driscoll, and what's interesting about Craig is that

19   the -- Dongguk cites the appellate court case, and what

20   it cites, it -- Well, in Craig, Your Honor, the

21   plaintiffs allege that the defendant had intentionally

22   instituted a policy of serving alcohol to intoxicated

23   patrons who would be driving, including the man who

24   killed plaintiff's decedent in a car crash.

25         Understandably there, the Court found that

1    the plaintiffs had alleged reckless conduct.

2         Then, Dongguk cites the Supreme Court

3    decision in Craig, but if you look at the two sentences

4    immediately following the ones that Dongguk cites, what

5    we have here is what is, you know, taken and well-

6    established in Connecticut courts, as establishing

7    reckless and wanton conduct, and this is what it says

8    after that:

9              "As set forth previously, the plaintiff's

10             Complaint alleges conduct that constitutes an

11             extreme departure from ordinary care in a

12             situation that involves a high degree of

13             danger.

14             The allegation of a specific policy to

15             continue to serve alcohol to a particular

16             patron who is known to have an excessive

17             drinking problem, while that patron is

18             already intoxicated, with the knowledge that

19             the patron would be operating a motor vehicle

20             upon leaving the bar, reflects willful,

21             wanton and reckless conduct sufficient to

22             survive a motion to strike."

23        Dongguk cannot, and has not, of course, made

24   any such allegations here.  Instead, as I mention, it

25   seeks to modify the standard by having it be a

1  negligence standard, which gets us, Your Honor, if you

2  will, to the implied contract.

3          Here, Your Honor, there are lots of arguments

4  to be made.  Our essential arguments are that the

5  parties did not enter into any contract, and no

6  dealings they had, or any facts surrounding their

7  relationship, or what occurred here, or what is

8  alleged, you know, indicates that there is an implied

9  contract, and further, Yale provided no consideration

10  for that contract, nor have they alleged any.

11          Your Honor, at various points, what occurs

12  here is that -- On page 32, for instance, and I'll make

13  a number of points about this implied contract claim

14  because it -- there are a lot of points to be made

15  about it.

16          They argue custom here.  They make the

17  allegation that -- sufficient allegations that -- I'm

18  sorry.  I think I have the wrong page here.  It is

19  actually 33, okay?

20          They maintain, by citing paragraphs 24 and 25

21  and 28 and 29, that there is a well-established custom.

22  Those allegations support no custom, Your Honor.

23          Similarly, in -- on the same page, they

24  allege an understanding -- not that they allege, they

25  argue -- I should correct that.

1              The brief argues for a custom.  There is no

2     custom alleged in the Complaint.  The brief argues for

3     an understanding.  There is no understanding alleged in

4     the Complaint.  It does not support it.

5              They argue that there are dealings, and

6     that's on page 33, argues that:

7                   "Based upon their dealings with each other,

8                   Yale and Dongguk entered into an implied

9                   contract."

10             There aren't any dealings, as such, from

11    which an implied contract could be derived, Your Honor,

12    there simply aren't, and if you look at this, the

13    necessary implication of Dongguk's argument under the

14    implied contract, is that unbeknownst to all of them,

15    Your Honor, every academic institution in the world has

16    entered into an enforceable contract with every other

17    academic institution, even if they don't know them, or

18    had no basis for knowing of them before contact.

19             Dongguk does not argue that the alleged

20    contract between Yale and Dongguk resulted or arose as

21    the result of any interactions between the two

22    institutions, rather, they argue that it arose as the

23    result of Yale's practice of requesting and performing

24    degree verification, generally.

25             According to Dongguk's theory, every academic

1    institution has an obligation to respond to every other

2    institution's degree verification requests, meaning

3    that Yale would have been in breach of this contract,

4    even if it had never responded.  That's the necessary

5    implication here.  It just doesn't make sense, nor does

6    this implied contract count make sense.

7           Similarly, Your Honor, there is just no

8    consideration and -- you know, and that becomes evident

9    from the argument in the plaintiff's memorandum.

10          At 34, they argue -- without even citing the

11   Complaint, they argue that they have asserted

12   sufficient facts to show that Yale has -- was provided

13   with the consideration for the implied contract.

14          You know, again, without citing the

15   Complaint, they argue, a page later, that they pleaded

16   that the parties had promised to each other, upon a

17   request of one party, the other party will verify and

18   provide accurate information as to whether the

19   purported degrees were actually awarded by it or not.

20   The Complaint doesn't include such an allegation, nor

21   could they make such an allegation in good faith here.

22          What's glaring, Your Honor, is that they need

23   to make arguments based on facts that don't exist, and

24   allegations that are not communicated.

25          Let me turn then, to the defamation count,

1    and I think, Your Honor, all of the arguments that we

2    raised with the implied contract count, indicate that

3    we, you know, certainly appear to have substantial

4    grounds, and with regard to the defamation count, we

5    make two essential arguments here, that there are no

6    defamatory statements, and that they have failed to

7    sufficiently allege malice.

8           With regard to the defamatory statements, and

9    here is where those articles meet.  They rely on them.

10   We refer to them.  They provide context.  They provide

11   what the statements are, in some instances, because

12   they say they've -- you know, as Dongguk readily

13   admits, it's relying on them for the falsity, and

14   what's reported.

15          We cite and analyzed them, Your Honor, and I

16   think we walked through them fairly carefully, to show

17   that they are not defamatory and, Your Honor, I don't

18   -- I think it is fairly clear under the law here, that

19   is applicable, that that can be decided as a matter of

20   law, that -- whether or not these are defamatory.

21          You know, one of the interesting things is,

22   on page 36 Dongguk cites Mix v. Woodward, a case

23   involving defamation, obviously, and what it cites it

24   for is this proposition:

25          "Even where a statement made by defendant

1            does not mention a defamed party on its face,

2            Connecticut courts allow the extrinsic facts

3            to show that the statement refers to

4            plaintiff."

5        You may remember, Your Honor, and I

6    apologize, I should have mentioned this, in our

7    defamation claim, we maintain that Dongguk is not

8    defamed.  There are no statements about Dongguk

9    defaming it, and so what is interesting in the <u>Mix</u> case

10   is, you know, here, unlike in the <u>Mix</u> case, Dongguk has

11   alleged no statements in which it is ambiguously

12   described, what it cites the <u>Mix</u> case for.  Rather,

13   this case; that is, the Dongguk and Yale case,

14   exemplifies another rule that is noted in <u>Mix</u>, and is

15   cited shortly thereafter:

16            "Now, it is undoubtedly true, as has been

17            already intimated, that words may be, in

18            themselves, so vague and uncertain that they

19            cannot be intended to apply to any person,

20            and in such case, no action may be

21            maintained."

22        We would maintain, Your Honor, that's our

23   case, that, you know, there are no defamatory

24   statements about Dongguk, and we think we've made a

25   substantial showing in our analysis, that that's true.

1              With regard to the malice issue, Your Honor,

2      we -- you know, what's interesting there is, again,

3      Dongguk, in its brief, seeks to import a negligence

4      standard, and makes -- you know, and believes its

5      conclusory remark about maliciousness should carry the

6      day.

7              Conclusory remarks in motions to dismiss do

8      not carry the day, particularly, we maintain, Your

9      Honor, in this Complaint, where there are ample

10     allegations to indicate that there was no malice at

11     issue, in contrast to the Morron case that they cite.

12             Here, Your Honor, in contrast to that nasty

13     case with regard to policemen, and the issues of

14     liability there, here, what we have are civilized

15     responses, correspondence, an investigation, disclosure

16     of a mistake, an apology by Yale for its administrative

17     mistakes, all indicia that no malice arises, all

18     undermining whether malice, you know, has been

19     sufficiently alleged here, and again, you know, the

20     conclusory allegation without facts, and with facts to

21     the contrary being alleged, we believe, makes a

22     substantial showing in this matter, the defamation, for

23     that reason, as well, is -- you know, is insufficiently

24     alleged here.

25             Your Honor, if I may just pause for one

1    moment?

2              THE COURT:  Yes, please.

3         (Pause.)

4              MR. SPRINGER:  Your Honor, I have nothing

5    else at this point.

6              THE COURT:  All right.

7              Mr. Weiner?

8              MR. WEINER:  Your Honor, we should go back to

9    the beginning and the standard you need to look at.

10             Mr. Springer is correct, we're not claiming

11   prejudice here.  He is not correct regarding the scope

12   of discovery.  There is actually a fairly divergent

13   view as to the scope of discovery, but we did not think

14   it was appropriate, in the context of this motion, to

15   argue that divergent view.

16             We disagree fairly strongly, that the

17   standard that Your Honor must apply in determining

18   strength of the motion to dismiss, the cases that are

19   cited, not only in our brief, but are cited in the Yale

20   brief, is that it has to be a strong showing, not

21   merely the filing of a motion, and saying, "We've done

22   enough," and just to go back, historically, a little

23   bit.

24             The first brief that was submitted to Your

25   Honor had a single paragraph on the merits.  It did not

1    attach either the Complaint, nor did it attach the

2    motion to dismiss itself, which is significant.

3           What it did attach were a bunch of newspaper

4    articles that had nothing to do with the pleadings in

5    this case.  They were different from the ones that were

6    ultimately attached to the motion to dismiss, and in

7    that brief they began to weave a different story of

8    what occurred, but that's not what Your Honor is

9    charged with.  What Your Honor is charged with, is

10   reviewing the Complaint and reviewing the motion to

11   dismiss, to determine whether or not strong showing --

12   a strong showing has been made.

13          What we provided to Your Honor, gave you a

14   copy of the Complaint, we gave you a copy of their

15   motion, and we gave you a very detailed brief in

16   opposition, that addressed every single point made in

17   the motion to dismiss, and that brief is divided into

18   two parts, Your Honor.

19          The first was to show Your Honor that the

20   motion to dismiss was procedurally ineffective because

21   it was -- fatal because it attached stuff outside of

22   the pleadings, and when Mr. Springer says that the

23   Court can consider other materials, such as a judgment,

24   such as newspaper articles, on a motion to dismiss, he

25   is dead wrong, Your Honor.

1           In our surreply brief we cited the Time

2     Warner case which they have cited in their reply brief,

3     and if Your Honor goes back to that case, it's a Second

4     Circuit case, where the Second Circuit took pains to

5     state when you can consider matters outside the

6     pleadings, and when you cannot, and what the procedural

7     posture has to be, and in that case they made very

8     clear that the only time that a reviewing court can

9     consider matters outside of the pleading, is when the

10    documents themselves, the so-called, "extra Complaint

11    documents," are dispositive on their face, and the

12    examples of that are the three cases in which the

13    Second Circuit has done that.

14           One case involved a breach of contract, and

15    the contract itself, which was not attached to the

16    Complaint, was dispositive of the parties' rights.

17           In the other two cases, there were some other

18    corporate documents which were, again, dispositive of

19    the parties' rights.  Subject to that, the Second

20    Circuit said, "Any other documents that are attached to

21    a motion to dismiss convert the motion to dismiss into

22    a summary judgment motion."

23           So, when Mr. Springer says, "Why are we

24    treating this like a summary judgment motion?", we're

25    treating this like a summary judgment motion because

1    the Second Circuit and the Federal Rules of Civil

2    Procedure make it very clear that's what you have to do

3    when documents are attached to a motion to dismiss.

4           We then analyzed those documents and we

5    presented to Your Honor, the fact that the documents

6    themselves are actually inadmissible hearsay, both with

7    respect to the judgment and respect to the newspaper

8    articles.

9           Now, Mr. Springer said today, "We're not

10   relying on the truth of those articles, we're simply

11   relying on the fact that they were published."  Well,

12   if that's the case, they have no bearing on the motion

13   to dismiss.  They are, quite frankly, irrelevant to the

14   motion to dismiss, but the fact of the matter is he is

15   relying on those articles for their truth.  Indeed, in

16   his summary judgment -- in his argument on the

17   negligence claim, and why it should be granted, he

18   said, you know, "Dongguk had not checked other

19   references."  That was taken from newspaper articles.

20   He argued that a fraud was perpetrated on Yale.  That's

21   outside of the pleadings, as well.

22          Basically, his entire argument is based upon

23   facts that he's trying to elicit from these newspaper

24   articles and from this judgment which, by the way, if

25   you read the judgment, the one claim that may be

relevant, there was an acquittal, and what they cited
to in their brief, Your Honor, was so-called, "indicted
facts," which the Court did not find as true.  So,
putting aside that it's inadmissible in the first
place, it doesn't even say what they say it says.

Going on to the deficiencies in their motion.
We then presented to Your Honor, just taking their
brief, their motion to dismiss brief, probably 20 fact
issues that would mandate the denial of their motion to
dismiss if it was converted into a summary judgment
motion, based upon the articles and the judgments that
they attached to their belief.  So procedurally, alone,
their motion is defective.

Next, we then approached the case.  Well,
let's put all of that away.  Let's look at the
Complaint, and whether the Complaint measures up to
appropriate pleading practices and, Your Honor, we
have, in this case, as you know, filed, I think, a 30-
some-odd page Complaint.  It is probably as detailed a
Complaint as you can possibly see.  It's spells out in
detail, each of our claims, factually and legally, and
it is our position that the reviewing court, Judge
Chatigny, will have to review that Complaint, in view
of the pleading requirements of the federal rules
which, as Your Honor knows, is notice pleading.

1          We go far beyond notice pleading, far beyond

2     that, and when Mr. Springer argues to you, "Well, we're

3     gonna win on the motion to dismiss the negligence

4     claim" -- Actually, let me back up one second.

5          The one thing I think we do agree about,

6     about discovery, is that the discovery for each claim

7     in this case is probably the same as any other claim in

8     this case, so that by dismissing one claim, or two

9     claims, or three claims, only one other claim, the

10    fourth claim, survives.  The same amount of discovery

11    is going to be taken in this case, whether it was one

12    claim or four claims, and that's a very significant

13    point, because while we do disagree on one part of the

14    standard, it is our reading of the cases, that you've

15    got to prevail on all of the claims asserted.

16          I think Mr. Springer has identified two Judge

17    Leisure cases, where the judge indicated that he was

18    granting a stay because one claim, which was the

19    subject of the motion, was so overwhelmingly involved

20    in the discovery, if the claim was dismissed, the whole

21    tenor of discovery would change, and that's the only

22    exception that we could find, that where a motion is

23    not totally dispositive, if you can make a showing that

24    discovery truly will be narrowed because of that one

25    meritorious motion on that particular claim, then there

1    is some rationale to stay discovery.

2              So, in effect, whether we're correct that you

3    have to dismiss all four claims, or whether he is

4    correct that certain claims can be dismissed, he then

5    has a additional burden to show you that the remaining

6    claims' scope of discovery will significantly differ,

7    and he can't do that and he won't do that, because the

8    fact of the matter is he's made it very clear to you

9    that discovery in this case is going to be complicated,

10   no matter what, and to a certain degree, we agree with

11   that.

12             So now let's move to the so-called,

13   "procedural defects" with the Complaint.

14             So the standard for Judge Chatigny now

15   becomes a very simple standard, "Do the words of the

16   Complaint, on their face, set forth claims for

17   relief?", not whether we're going to win them at the

18   end of the case, but whether we have pleaded them

19   properly.

20             Now, you were told that with respect, for

21   example, with negligence, there are four defects.

22             The first defect was there's no duty without

23   -- if there's only economic loss.  Mr. Springer told

24   you that's an issue that's not even settled in

25   Connecticut.  There are cases that go both ways on that

issue.  We cited the cases that say economic loss is
sufficient.  He cited the cases that say you need more
than that, but the point is we pleaded it, there's no
question about that, and at some point the Second
Circuit, or maybe the Supreme Court in Connecticut will
resolve the issue, but it's well supported by
Connecticut case law.

          The other things he mentions, that Dongguk
had not checked on references, that's a fact issue.
It's outside the pleadings, and that's also a fact
issue.

          Then he says, as another reason, the injury
wasn't foreseen.  We provided to you, case law.
Foreseeability is an issue for the jury.  It's a fact
issue to be determined by the jury.

          Was Yale also defrauded by Shin?  Another
factual issue.  We would suggest that's not the case
because they figured out that they didn't give her a
degree two years later, but that's a fact issue.

          The issue of public policy.  We have
competing public policy issues.  That doesn't get
resolved on a motion to dismiss.

          Then he says, "No cause in fact."  By
definition, that's a fact issue, whether the injury or
the harm was caused and -- by their conduct, and again,

1  we cited a multitude of cases, that all of these issues

2  are for the jury, they're not for a judge determining

3  the issue on the motion to dismiss, when he has to

4  accept all of the allegations as true.

5          We then move to reckless and wanton conduct.

6  Again, we provided Your Honor that the issue of whether

7  this is reckless and wanton conduct is a fact issue

8  and, by the way, there is a high negligence standard,

9  and we cite the cases in our brief that say that, as

10 well.

11         And this is probably a good point to say it

12 was interesting that in their reply brief, not once did

13 they attack any of the cases that we cited to Your

14 Honor.  We served a 30-some-odd page brief, chock full

15 of cases, and in their reply brief, they don't take --

16 they don't attack any of those cases.  They don't

17 challenge those cases.

18         The first time I've heard anything about

19 those cases is at this argument today, but the fact of

20 the matter is they're provided in that brief, and I

21 don't want to reiterate, it's a long brief, the

22 allegations.  We tied those allegations to each

23 Connecticut element of law, and provided to you, the

24 case law which demonstrates that all of these issues

25 that he's talking about today, are issues for jury, and

1    not for a judge on a motion to dismiss.

2            We move on to the implied contract.  The same

3    thing, whether the conduct of the parties is sufficient

4    to be a contract is a fact issue to be determined by a

5    jury.

6            And finally, on the defamation, and he cites

7    to the Mix case, all of those issues was, "Could the

8    alleged statement have been attributable to the

9    plaintiff, or the defamed plaintiff?"  That's a fact

10   issue.  It's not an issue that you resolve on motion.

11           And finally, he talks about that we didn't

12   plead malice correctly, and let me just see if I can

13   find a reference in my brief on that, Your Honor.

14       (Pause.)

15           MR. WEINER:  Your Honor, we provided the

16   Court with a courtesy copy of our motion in opposition

17   to the motion to dismiss.  I don't know if you received

18   it yet.  I think you should have.  If you haven't, I'll

19   make sure you get it, but because he had made that

20   point, in our motion -- opposition to the motion to

21   dismiss, we went back and we covered the malice point a

22   little more thoroughly, and we cited a Second Circuit

23   case called Boyd v. National Mutual Insurance Company,

24   208 F.3d 406, at 410; and the second case, Dougherty v.

25   Town of Hempstead Board of Zoning, 282 F.3d 83, at 91.

1            Both those cases talk about the pleading

2    requirements for malice, and they say that there is a

3    slightly heighten pleading requirement under 9(b), but

4    that it was sufficient for a plaintiff to generally

5    cover -- to revert -- "To assert malice as to a

6    defendant's state of mind," and that generalization is

7    picked up by the Morron case that Mr. Springer did

8    refer to, and in that case, the Court found that a

9    allegation that four statements were made maliciously,

10   intentionally, willfully, wantonly, and/or with

11   reckless disregard of the truth, was sufficient to

12   satisfy the pleadings standard.

13           So, in other words, you just have to simply

14   say, "They were made maliciously," and, Your Honor, in

15   paragraph -- Let me see if I can get the paragraph,

16   paragraph 198 of the Complaint, we allege that all of

17   these statements were made maliciously.  That satisfies

18   the malice standard.  This is the pleading.

19           In addition to having satisfied that narrow

20   standard, we provided, which is not required, all of

21   the detail regarding Yale's conduct.

22           So, Your Honor, I would suggest that that

23   issue should not be a significant issue for the

24   reviewing Court, but putting it -- again, aside that --

25   and that was the only issue that attacked the pleading.

1    Everything else that Mr. Springer said, is a fact

2    issue, "Were we defamed?  Were we damaged?  Could this

3    article have been interpreted as referring to Dongguk

4    had spoke to somebody else?"  Those are all fact

5    issues.

6              Ironically, from the articles that he

7    attached to his brief, and to the brief before Judge

8    Chatigny, it was very clear that everyone understood

9    that Dongguk was being referred to, because those

10   articles began to write about Dongguk's failure to

11   verify, and Dongguk's failure to do that.  So the very

12   material that he provided with his briefs, demonstrate

13   that everyone reading these articles understood they

14   were referring to Dongguk.

15             So, Your Honor, I go back to where I began

16   in the beginning, which is that he has to make a strong

17   showing, and that showing is something that -- I'm not

18   asking you to decide the motion to dismiss, that's not

19   your job, we all understand that, but it is your job to

20   review the Complaint.  It is your job to review --

21   generally review the motion papers, and based upon that

22   review, come to a conclusion, and I think that every

23   case that we cited, and every case that they cited, the

24   magistrate judge or, in some instances, the judge

25   himself, did exactly that review.

1          We believe that you can do that review fairly

2     easily, by reading the Complaint, let alone anything

3     else, that you'll have to conclude that he's not gonna

4     prevail on each and every claim and, quite frankly, I

5     don't think he's gonna prevail on any of them, but that

6     once you reach a conclusion that he's not going to

7     prevail on each and every claim, that we move forward

8     with discovery, because the discovery is not gonna

9     change, whether it's one claim or four claims.

10         THE COURT:  On the negligence count, is the

11    question of whether Yale had a duty to the plaintiff,

12    something that requires a jury finding on a fact?

13         MR. WEINER:  No, duty is an issue of law,

14    Your Honor, and we provided case law as to why there is

15    a duty here.  Basically, it's a gratuitous undertaking.

16    Once you take -- When you begin to take steps to do

17    something, then you have created a duty, as a matter of

18    law.

19         THE COURT:  Uh-huh.

20         MR. WEINER:  So, if Yale had simply ignored

21    the request, and done nothing, then we would have

22    nothing to talk about, but once Yale undertakes the

23    obligation, then you create that duty, and we cite case

24    law that supports that, Your Honor.

25         THE COURT:  All right.

1           You want some rebuttal time?

2           MR. SPRINGER:  Just briefly, Your Honor.

3           These become fact issues for the jury only if

4    there were sufficient allegations made.  We maintain

5    repeatedly, and throughout our brief, and in my

6    argument, that insufficient allegations were in this

7    Complaint.

8           One of the points, only because Mr. Weiner

9    said it was important, is that the different claims are

10   based on different factual allegations.  For example,

11   the implied contract claim does not implicate Yale's

12   alleged statements in 207 -- 2007, or any other actions

13   after Pam Schirmeister allegedly sent the September

14   22nd, 2005 fax to Dongguk.

15          The defamation claim does not implicate

16   Yale's alleged degree of verification protocols or the

17   parties' alleged communications.  Discovery may be

18   vastly different, depending on what is left here.

19   Nonetheless, Your Honor, we have not argued and we

20   don't argue that we haven't made a substantial showing

21   on all of these, that there are insufficient

22   allegations of facts to warrant -- Well, those

23   insufficient allegations warrant dismissal and, Your

24   Honor, with regard to the reply brief, we maintain in

25   that -- you know, we knew we'd have an opportunity

1    today.  We knew we'd have an opportunity in the reply
2    to the motion to dismiss, to point out all the
3    deficiencies in the opposition, and also why these fact
4    issues are insufficient, in other words, they're
5    insufficient factual allegations.
6            That's about it.  Thank you.
7            THE COURT:  All right.
8            Anything else we should do here today?
9            MR. WEINER:  Your Honor, I believe that there
10   is a 16(b) order from Judge Chatigny, that we were to
11   meet and -- meet with you to --
12           THE COURT:  All right.
13           MR. WEINER:  -- to set up a schedule.
14           THE COURT:  All right.
15           MR. WEINER:  So I would think we should cover
16   that today.
17           THE COURT:  All right.
18           Well, do you want to be heard here in open
19   court, or shall we retire to chambers to discuss that
20   informally?
21           MR. WEINER:  Whatever Your Honor's preference
22   is.
23           MR. SPRINGER:  Your preference, Your Honor.
24           THE COURT:  Why don't we go into chambers.
25       (Proceedings concluded at 11:30 a.m.)

CERTIFICATE

I hereby certify that the foregoing 37 pages are a complete and accurate transcription of my original stenomask voice notes taken of the Oral Argument on Defendant's Motion to Stay Discovery (Doc. #12), in the matter of: DONGGUK UNIVERSITY, Plaintiff, versus YALE UNIVERSITY, Defendants, Civil Action Number 3:08-CV-00441 (RNC), which was held before the Honorable Donna F. Martinez, United States Magistrate Judge, at the Federal Building, 450 Main Street, Hartford, Connecticut, on July 15, 2008.


_____                July 21, 2008
STEPHEN C. BOWLES
Official Court Reporter