1

2                    UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF CONNECTICUT

4     - - - - - - - - - - - - - - - - x
                                      :
5     DONGGUK UNIVERSITY              :   No. 3:08CV441(RNC)
                                      :
6                      Plaintiff,     :
                                      :
7              vs                     :
                                      :
8     YALE UNIVERSITY                 :
                                      :   HARTFORD, CONNECTICUT
9                      Defendant.     :   JANUARY 30, 2009
                                      :
10    - - - - - - - - - - - - - - - - x

11                         MOTIONS HEARING

12         BEFORE:

13             HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

14    APPEARANCES:

15         FOR THE PLAINTIFF:

16                 MCDERMOTT WILL & EMERY
                        50 Rockefeller Plaza
17                      340 Madison Avenue
                        New York, New York 10173-4613
18             BY:  ROBERT A. WEINER, ESQ.
                    JEAN BAE, ESQ.
19
           FOR THE DEFENDANT:
20
                   DAY PITNEY LLP
21                      242 Trumbull Street
                        Hartford, Connecticut 06103-1212
22             BY:  FELIX J. SPRINGER, ESQ.
                    HOWARD FETNER, ESQ.
23
           ALSO PRESENT:  AUDREY LU
24

25                                  Darlene A. Warner, RDR-CRR
                                    Official Court Reporter

1

2                          <u>10:00 A.M.</u>

3

4          THE COURT:  Good morning.  Would you please

5    state your appearances.

6               MR. WEINER:  Robert Weiner, McDermott, Will &

7    Emery, for the plaintiff.  Jean Bae is a colleague.  And I

8    have a young associate who has not attended an oral

9    argument before but I'd ask she sit at counsel table if

10   it's okay with Your Honor.

11              THE COURT:  Welcome.

12              MR. SPRINGER:  Felix Springer of Day Pitney on

13   behalf of Yale University along with --

14              MR. FETNER:  Howard Fetner, also on behalf of

15   Day Pitney, Your Honor.

16              THE COURT:  Good morning.

17              We're here for argument on the pending motions.

18   I've read your papers, and I'll be glad to hear whatever

19   additional presentations you would like to make.

20              Mr. Springer?

21              MR. SPRINGER:  Thank you, Your Honor.  Good

22   morning.

23              This is, as you've seen from the papers, isn't

24   your garden variety tort claim.  And what I thought might

25   be most helpful to the Court is if in fact I focused on

1    the key issues that I think divide the parties.  And what

2    I thought I would do is first focus on the issue of

3    whether the news articles may be considered on a motion to

4    dismiss without turning it into a motion for summary

5    judgment.  I think that's one of perhaps the key issues --

6    the key overarching issue that divides the parties.  It's

7    certainly one that Dongguk spends a good deal of its

8    papers on.

9            I then thought I would move backward through the

10   complaint and talk about the key issues that divide the

11   parties and point out the degree to which Dongguk doesn't

12   engage with its allegations and how important it is in

13   this matter to focus on the allegations and the reasonable

14   inferences drawn from them.

15           Contrary to Dongguk's papers, we don't disagree

16   with the standard on a motion to dismiss.  But in this

17   over 200 paragraph complaint, there are a wealth of

18   allegations, and it is particularly easy to confuse some

19   of the documents and what is said about them and the

20   context in which it is said.  So I wanted to walk through

21   and, you know, with Your Honor's indulgence, I would do

22   that.  I will try to be as brief as possible, nonetheless,

23   I think I have to spend some time with some specific

24   focus.

25           Yale maintains that the Court -- this Court can

1    and should consider the news articles on the motion to

2    dismiss.  Dongguk argues, in essence, that such

3    consideration turns the motion to dismiss into a motion

4    for summary judgment and that there are numerous issues of

5    fact that arise as a consequence.  They put a lot of eggs

6    in that basket.

7         But I think the Second Circuit law is fairly

8    clear here, Your Honor, that if the articles are relied on

9    and if they are integral to Dongguk's complaint, then this

10   Court may consider them and may consider them on a motion

11   to dismiss.

12        And in fact, Dongguk's complaint does rely on

13   the news articles.  The recklessness and defamation claims

14   are explicitly based on what is said in the news articles,

15   and the news articles are used to frame the other claims

16   as well.

17        And I want to point out right at the outset,

18   although I'll say something more about this, Yale does not

19   rely on the news articles for their truth.  It's

20   irrelevant to our arguments whether the statements

21   reported in the news articles are true.  We use the news

22   articles for the same reason that Dongguk does, namely to

23   what is reported out there.

24        And if you look at both the Chambers case and

25   the other case involving misrepresentation about financial

1      matters -- and I'll get to the name of that shortly --

2      both of them use the articles in the same way.  And that

3      case, by the way, is Pincus v. Oppenheimer where it was

4      alleged that the statements included in the prospectus at

5      issue in that case constituted the defendant's alleged

6      securities fraud.

7           Your Honor, I think even the pleading standard

8      for defamation shows why these news articles are integral.

9      Plaintiff must plead the actual words spoken.  They must

10     plead what the defamatory statements were that were made

11     concerning the plaintiff, when they were made and to whom

12     they might have been made.

13          It is that standard that points out why the

14     articles are integral to the complaint.  Dongguk was

15     required to plead the contents of those articles in order

16     to state a claim for defamation.  What could be more

17     integral to a defamation claim than the defendant's

18     allegedly defamatory statement?

19          Again, Your Honor, I think we discussed the

20     cases fairly carefully in our briefs, Chambers v. Times

21     Warner, the Cortec case, the Pincus one that I've just

22     referred to, Oppenheimer, and the United States v.

23     International Longshoreman's Association.

24          I want to pause just a bit on the last case

25     because it's cited by the plaintiffs.  But the plaintiff

```
 1      only cites half of it and only refers to what is not

 2      relied on because -- rather than what is relied on.  They

 3      say that a news article that was used to try to -- for the

 4      truth to contradict the allegations couldn't be used, and

 5      we agree with that.  That's not what's at issue here.  But

 6      the Longshoreman's case also indicated that the

 7      constitution and the code of ethics that were relied upon

 8      could be considered in those cases.

 9            Let me just -- so we're very clear or I'm very

10      clear about how Yale used those articles -- it used them

11      to show that the Korean media would have criticized

12      Dongguk regardless of Yale's alleged negligence, in other

13      words, for what was reported and to show that Yale's

14      alleged statements could not reasonably be considered

15      defamatory.

16            Again, if you look at those cases, those

17      articles, the complaint doesn't rely on them for the

18      truth.  Plaintiffs don't have to rely on the news articles

19      for the truth.  That's what the case law says.  That's

20      what the Pincus and the Cortec case holds as well as

21      Chambers.

22            In arguing that it has not relied on the news

23      articles for their truth, as Dongguk does at its

24      memorandum at the end, 33 to 36, Dongguk attacks the

25      strong end.  We have not again cited those articles for
```

```
1      their truth.  And again you need not rely on, as a
2      plaintiff, those articles for that.
3              It also cites pages of our brief and claims that
4      we -- that many of Yale's legal arguments are based on the
5      information contained in the newspaper articles.
6              Your Honor, as we maintain in our reply brief at
7      page 9, none of those pages, nor any other portion of
8      Yale's brief, rely on the truth of the statements
9      contained in any of the articles.
10             And by the way, Dongguk has not identified any
11     way in which any of Yale's argument depend on the truth of
12     the statements in any extra complaint document.
13             And I might just in passing as a last point just
14     mention the Korean a judgment.  Similarly, we don't rely
15     on any facts underlying that judgment.  We simply rely on
16     the fact that it was made for a brief, if you will, point
17     about public policy in our brief.
18             So if those articles are relied on as they
19     should, then we need to go to the complaint itself.  And
20     what I want to point out is that consistently and
21     repeatedly in the opposition, their opposition and in
22     their arguments, they refuse to engage with their own
23     allegations.  It's true of every cause of action.
24             And I want to start with defamation because it
25     affords the best -- well, there are other good examples,
```

1    but among them significantly, it wrongly summarizes the

2    allegations, and I'll get to that in the opposition on 27.

3    And it also concludes that it has pleaded facts that would

4    permit a jury to conclude Yale's statements were made with

5    malice.

6              Remember our argument, Your Honor, is -- and

7    I'll walk through these -- is that there are five

8    statements that Yale made that are being relied on for the

9    defamation claim and we also maintain there is no malice.

10   I'd like, if I could, because it becomes important to the

11   argument, to go over Exhibits B and C with Your Honor.  If

12   you have them handy.  Otherwise I have copies of them.

13             THE COURT:  I have them.

14             MR. WEINER:  I would appreciate a copy.

15             MR. SPRINGER:  Sure.

16             MR. WEINER:  Thank you.

17             MR. SPRINGER:  I mention these, Your Honor,

18   because I think it behooves all of us to pay careful

19   attention to these documents.  They are confused in the

20   complaint, they are confused in the brief.  And the

21   context in which they're mentioned and how they're

22   mentioned by Yale in its alleged statements I think show

23   that there are no cause of action.

24             No question Yale made mistakes here, and the

25   point is we're not arguing, you know, the issue of breach

1    here.  We're arguing no duty and we're arguing no

2    defamation, et cetera.

3            So if you look at the first document, B, that is

4    the certification letter, okay?  And this is signed by Pam

5    Shirmeister on Yale heading.  It is repeatedly referred to

6    as the certification letter but sometimes referred to as a

7    fax.  And it again has Yale University stationery.

8            If you look at C, that contains -- and that is

9    dated May 27th, 2005 -- that contains a three-page

10   document and it is -- the first document is Professor

11   Shirmeister's fax transmittal sheet.  "As requested, I am

12   confirming that the attached letter was issued by Yale

13   graduate school and signed by me."

14           The next is the certification letter.

15           And the third is the letter of inquiry dated

16   September 5th by Dongguk.

17           And I point out why it is important because it

18   is, if you look for instance at paragraphs 97 -- 94

19   through 97 of the complaint, and particularly 95, 94 says

20   that Reinstein informed the reporters that the fax was

21   forged.  But if you look at 95, it is very clear that

22   Reinstein is referring to in fact the certification letter

23   that was forged and it is not the September 22nd fax that

24   was forged.  That is, her fax without a signature but

25   rather it is the certification letter.  This document is

1    in a different format from Yale's University academic

2    record verification, and it is a forged document.

3            By the way, there is no controversy that it is a

4    forged document and that Shirmeister made a mistake in

5    sending the -- you know, taken in by the fraud -- made a

6    mistake in sending the September 22nd fax.

7            But I point this out because it becomes

8    important as to what is reported.  For instance, if you

9    look at Exhibit F, which is where all of this occurs, the

10   newspaper conflates those too, where she says the document

11   has a different form than that of Yale University's

12   official certificate.  The document is fake.  And it is

13   not the September 22nd document in that context that is

14   fake.

15           Now, Yale -- and I point that out because there

16   is yet another, if you will, confusion.  Others might

17   claim it's a misrepresentation.  But if you look at the

18   plaintiff's brief in opposition at page 8, it says at the

19   top first full paragraph, based upon Yale's continued

20   public statements, that the September 5th registered

21   letter and the September 22nd fax were forgeries.  There

22   has not been any statement in the allegation whatsoever

23   that the September 5th registered letter was a forgery,

24   Your Honor.  The only two statements that Yale has made is

25   that it was not received.  This is based on the knowledge

1    that they had that it was not received.  And this becomes

2    important as we'll see for the defamation claim.

3            And it is true that the September 22nd fax in a

4    couple of statements were said to be a fake, but those

5    statements where it was said to be a fake are always in

6    the context of Shin's fraud.  And that's why we maintain

7    any of the statements related to Yale's saying it hadn't

8    received the September 5th letter from Dongguk or that the

9    September 22nd fax was a fake, have -- don't at all

10   besmirch, if you will, or even implicate whatsoever

11   Dongguk or its reputation.

12           So if we could, Your Honor, look for instance --

13   and we do deal with these allegations.  If you would

14   look -- or you don't need to look, I'm sorry -- at page 30

15   of our brief, our initial brief, we point out all of the

16   statements that were made.  And again there are only two

17   statements that essentially are being relied on that the

18   certification letter was not -- I'm sorry, the

19   certification letter was not received and that the

20   September 22nd fax was a fake.  But not that Dongguk, you

21   know, didn't receive it.

22           And that becomes important because if you look

23   at our argument, Reinstein's acknowledgment is that the

24   September 22nd, 2005 fax may have been faxed from Yale

25   University, and that's at the complaint at 105 and our

1    brief at 32.  The point being that the inference to be

2    drawn is it is very much contrary to any inference that

3    Dongguk had forged the fax, but it also bolsters what

4    Dongguk was saying, that it received the fax.

5           So what we have here is Yale not contradicting,

6    look you're saying you received it based on what we know,

7    you know, it could have been sent to you.  We believe at

8    this point it's a fake.  We believe at this point it's a

9    fake.  And so if you look at these statements, what they

10   essentially do is make those statements, but they never

11   implicate Dongguk.  And I think that becomes clear.

12          And what is interesting again is that Dongguk

13   never engages with those allegations or those paragraphs

14   of the complaint.  All of those statements again are made

15   in the context of Shin's forgery and her fraud, not any

16   statement of forgery or fraud or misdealing by Dongguk.

17          To counter Yale's statements, what Dongguk says

18   in its opposition at 27 is, in essence, by stating that

19   the September 5th letter had never been received by Yale

20   and that the September 22nd fax was never sent to Dongguk

21   and that both documents were fakes and forgery, Dongguk

22   was -- Yale was calling Dongguk a liar, publicly.

23          Again, there is no allegation that that

24   September 5th letter, that is Dongguk's letter of inquiry,

25   was a fake or forgery.  We point that out in our footnote

1    in our reply.  And secondly, there's no allegation that

2    the September 22nd fax was not sent, only that it was not

3    prepared by Yale as the complaint says at 105.

4         And what's key here is not only are the facts

5    misrepresented, but by not bothering to explain how Yale's

6    alleged statements could be interpreted as calling Dongguk

7    a liar, that's the only way that Dongguk can claim that

8    the allegations are sufficient to state a claim of

9    defamation.  Looked at I think with all reasonable

10   inferences, nothing implicates Dongguk and certainly

11   nothing defames them.

12        Your Honor, Dongguk tries the same strategy, if

13   you will, with regard to the issue of malice.  There's a

14   bald assertion in the brief on page 27 without citation to

15   anything in the complaint that Yale's statements were made

16   maliciously.  But because there's no citation in the

17   allegation, there's no inference that could reasonably be

18   drawn that Yale made any statements about Dongguk with

19   knowledge that they were false or with a reckless

20   disregard of the truth.  There are summary conclusory

21   remarks in the brief that this is malice, but there's

22   nothing that is relied on in the complaint.

23        What we do in our brief, to the contrary, is

24   address the allegations that Dongguk made that show a lack

25   of malice.  And those are prompt investigation,

1    correspondence from Yale back and forth with Dongguk that

2    seeks the truth or attempts to find out what's happened

3    here, prompt acknowledgment of its mistake once it was

4    discovered.  And again, Yale made mistakes here and the

5    issue is, you know, was a cause of action stated in any

6    regard in any of these four claims.  And it promptly

7    acknowledged that and then it apologized.  All of those

8    are indicia of a lack of malice.  I'll -- and again,

9    dealing with the complaint you get there.

10            The contract claim is another example, I

11   believe, Your Honor, where Dongguk refuses to engage with

12   its own allegations and seeks to mask their insufficiency

13   by mischaracterizing them.

14            Dongguk claims that it alleged that there was an

15   understanding between Yale and other academic institutions

16   that they would rely on each other in determining whether

17   to hire the individuals about which they inquired.  There

18   are three paragraphs cited by Dongguk, this time 26, 29

19   and 193 of the complaint.  Those paragraphs contain no

20   such allegation of understanding between Yale and other

21   academic institutions.  No reasonable inference can be

22   drawn of that.  They're just simply not there.  More

23   importantly, Your Honor, there are no allegations of an

24   understanding between Yale and Dongguk.

25            If you remember, we make two arguments with

1    regard to contract, essentially there's no meeting of the

2    minds, there's no understanding between the two and

3    there's no custom that is alleged as Dongguk would

4    maintain from which a contract can be inferred, and

5    there's no consideration.

6            To say, as Dongguk repeatedly does, that whether

7    a contract exists is a question of fact, it is to miss the

8    point and it's to miss the threshold inquiry.  It's a

9    question for this Court as a matter of law as to whether

10   Dongguk has alleged the existence of a contract.

11           The issue of consideration, again, I believe

12   shows Dongguk refusing to engage with the allegations of

13   its own complaint.  It argues, and here it is at the

14   opposition at 24, that mutual promises may be sufficient

15   consideration, but there is no allegation that Dongguk

16   made any promise to Yale.  There just isn't.  There's no

17   basis for the claim of mutual promises.  It may be a

18   correct statement of law, but there's nowhere in the

19   complaint does that occur.

20           And again, without citing its complaint, Dongguk

21   argues that Dongguk has pled that the parties had promised

22   to each other that upon request of one party the other

23   party will verify and provide accurate information as to

24   whether the reported degrees were actually awarded by it

25   or not.  Again, there is no such allegation and the lack

1    of citation on page 27 makes clear that this is, you know,

2    I think just a mask for the transparent insufficiencies of

3    the complaint.

4           Your Honor, I'm going to now just briefly

5    address the reckless and wanton conduct claim.

6           Here there's I think a lack of engagement with

7    the essential element of that cause of action.  And it

8    does require a conscious choice of a course of action.

9    And what Dongguk puts forth is only a negligence standard,

10   a should have known standard.  And it misunderstands the

11   legal standard by saying it need not allege that

12   Shirmeister, Carney and Reinstein knew that their

13   statements were untrue.  Unless they knew that their

14   statements were untrue or recklessly disregarded that,

15   there can be no conscious choice of a course of action.

16   There can be, according to the, you know, Sheiman and the

17   Connecticut Appellate Court, no claim for reckless and

18   wanton conduct.

19          Again, they claim that it is a question of fact

20   to be determined by the trier of fact.  Again they put the

21   cart before the horse.  The issue is whether they have

22   alleged reckless and wanton conduct, and that's a question

23   for this Court and it's a question of law.

24          I should point out with regard to the reckless

25   and wanton conduct claim, that they have not even

1   addressed Yale's argument that it cannot state a claim for

2   reckless and wanton conduct because Yale's alleged actions

3   entailed no risk of physical harm to Dongguk.  And Dongguk

4   does not deny that every case to recognize a claim for

5   reckless and wanton conduct has involved a risk of

6   physical danger.  And indeed each case that Dongguk cites

7   in its opposition brief at 20 to 22 involves physical

8   danger.

9           Finally, Your Honor, I would turn to negligence.

10   And we make, if you will, five arguments with regard to

11   negligence and three as to why there is no duty, and two

12   why -- one why there's no causation in fact and why there

13   is no proximate cause here.

14           Our first argument is that Yale had no duty to

15   prevent Dongguk's pure economic harm.  And as we point out

16   in a footnote and as we try to be candid with the Court,

17   no Connecticut appellate court has addressed that issue

18   directly.  However, we would maintain if one looks at both

19   the Restatement at Prosser, Restatement Sections 323 and

20   324A, Prosser, you look at the Waters, the Supreme Court

21   case in Waters, you look at the Doe v. Yale case, all of

22   those, you know, indicate -- granted they may not hold --

23   certainly indicate that in Connecticut, which follows a

24   great many other states in this regard, that in the

25   absence of physical harm, there cannot be -- there's no

1    duty to prevent purely economic alleged loss here.  And,

2    Your Honor, I will tell you that I, you know, read these

3    cases in an attempt to discern what the rationale was.

4            I think if you look at the other states' cases

5    and what's going on here, I think the cases want to draw a

6    line between tort and contract.  And some of the cases

7    basically say, if you wanted to, you know, as it were,

8    protect your economic expectancy, you should have entered

9    into a contract.  We are not going to blur the line, we

10   are going to make a distinction here, certainly where

11   things are gratuitous.

12           The other reason I think is if you look here,

13   what's at issue are statements.  And plaintiff -- and

14   plaintiffs typically have other causes of action for

15   statements.  And in fact, this plaintiff has chosen one of

16   those other causes of action, which is defamation.  They

17   could not plead negligent misrepresentation here because

18   they couldn't fulfill the -- those -- the elements of that

19   claim which requires a business interest.  It's applicable

20   mostly unfortunately to people like me in the legal

21   profession and accountants and such.

22           But the point being, I think there is a

23   rationale for this.  And I think the real weight of

24   authority in this regard indicates that there should not

25   be a duty for purely economic alleged loss here.

1          Your Honor, then if I could turn to the

2    foreseeability argument.

3          THE COURT:  Mr. Springer, let me interrupt you

4    at this point just briefly.

5          Once Yale undertook to respond to the letter of

6    inquiry, did it have any duty at all?

7          MR. SPRINGER:  We maintain that it did not, both

8    for the reasons I've just mentioned, but also because of,

9    in this instance, because of foreseeability issues, Your

10   Honor, and because of public policy.

11         THE COURT:  Did it have a duty to act honestly?

12         MR. SPRINGER:  It did act honestly based on the

13   knowledge that it had, Your Honor.

14         THE COURT:  But you don't concede that it had a

15   duty to do even that?

16         MR. SPRINGER:  I don't think there is any

17   allegation here that there was a dishonest action.  And

18   when you ask do I not concede, I'm rapidly going through

19   my brain to recognize what the implications may be.

20         I think, Your Honor, if it did not act honestly,

21   there would be a fraud claim available here, perhaps.  And

22   there is no basis for that fraud claim.

23         THE COURT:  So if an academic institution

24   inquires of Yale, it can reasonably expect that Yale will

25   act honestly?

1           MR. SPRINGER:  Because they would have a fraud

2   claim.  But it can't be a guarantee of accuracy.  And

3   that's one of the public policy arguments I want to make.

4           We're looking at a large research institution,

5   Your Honor, where if you had that standard as the

6   plaintiff wants to impose, and I think it's paragraph 174,

7   that it has to respond accurately here.

8           Looking over with many schools, 50 years of

9   records, receiving vague inquiries.  Did Jane Doe graduate

10  from Yale?  Can you provide us more information?  I'm not

11  sure.  Names that change, names that are inaccurately

12  given, all of that, it does, I think, you know, respond

13  honestly, but I don't think there's any allegation nor can

14  there be that it, based it on the knowledge it had at the

15  time, the standard that the plaintiff wants to impose and

16  the damages it wants to impose, make this, you know, a

17  case where if a duty is found by this Court, I think it

18  would be contrary to public policy.  And one of the

19  reasons is to impose a 50 million-dollar, as it were,

20  penalty for making a mistake would basically have, you

21  know, as Mr. Weiner said in the argument on the motion to

22  stay, look, if they'd ignored it, there wouldn't be a

23  problem here.  You want people to respond, you want them

24  to respond with the knowledge they have and honestly.  But

25  they may make mistakes.

1             Here, to punish that and to hold out that

2    punishment, one, the threat of that liability is so

3    enormous, two, I don't think a university could, given the

4    fact that we're dealing with human beings, design a system

5    so foolproof that you could prevent a mistake.  And

6    furthermore, the cost of seeking to design a system would

7    be enormous.

8             So that's why I'm saying public policy for

9    innocent mistake -- and we maintain it is an innocent

10   mistake -- and if you will based on the knowledge, and an

11   honest mistake.  We're not saying that dishonesty should

12   not be, you know, dealt with.  But there's no allegation

13   nor can there be of that.

14            And also I guess when you said honest, you know,

15   Your Honor, all is, I recognize it's a bald statement.  I

16   recognize you're dealing and trying to understand the

17   implications of any law that you may fashion here, but

18   again it's all contextual for me and I'm referring back to

19   the complaint.

20            Let me then, if I could -- and I hope I've

21   answered your question.

22            THE COURT:  Let me ask you to stay with me for a

23   moment longer.

24            MR. SPRINGER:  Sure.

25            THE COURT:  You state that of course it's

1    socially desirable for a university to be able to respond

2    to a request for verification.  You state that because

3    it's socially desirable, we need to be very careful not to

4    create a chilling effect.

5          I take it you agree that what is socially

6    desirable is that the university not only respond, but

7    that it exercise some degree of care in responding?

8          MR. SPRINGER:  Your Honor, I think we are at the

9    point where we can talk about making an honest response,

10   and my concern is that the camel's nose get under the tent

11   here, that there will be a chilling effect and some degree

12   of care of course is in the eye of the beholder.  Dongguk

13   may say some degree of care is to ensure that the response

14   is accurate.

15         THE COURT:  All necessary and appropriate steps

16   to ensure that it's accurate.

17         MR. SPRINGER:  Well, you know, again that may,

18   you know, what are all -- that may -- people may differ

19   about that particularly with a large university where

20   someone gets relied on that you have a reasonable basis

21   for relying.  So I don't think you can be as prescriptive

22   as that, because I worry that that becomes a slippery

23   slope for a standard here and I don't think you are -- I

24   don't think -- I think the chilling effect you worry about

25   will occur particularly if we -- if Yale is subject to

1    $50 million in damages.

2            THE COURT:  In the area of negligent

3    misrepresentation, under the restatement of torts, the

4    principles that have been developed aim to confine

5    potential liability for the misinformation --

6            MR. SPRINGER:  They do.

7            THE COURT:  -- to that transaction.  And you

8    mention that here the plaintiff could not plead a cause of

9    action for negligent misrepresentation.  Whether that's

10   true or not, looking at this limitation on liability, if

11   you will, could something like that be fashioned to

12   address the situation here?  Namely, a situation in which

13   it is socially desirable that a response be provided, it

14   is socially desirable that a response be made not

15   willy-nilly but after the exercise of some appropriate

16   degree of care without exposing the supplier of the

17   information to the kind of vast liability that the

18   plaintiff would seek to impose upon Yale in this case.  Is

19   there a way to follow the guidance provided by the law in

20   the area of negligent misrepresentation to achieve that

21   end?

22           MR. SPRINGER:  I don't think so, Your Honor, and

23   I will tell you why.

24           You're talking about Section 552 of the

25   Restatement which -- B of the Restatement.  And what

1   becomes important is the elements of a negligent

2   misrepresentation claim.  And I don't think you can import

3   because of those elements that Restatement to 323 and

4   324A, which I think are applicable here and which set the

5   standard and don't provide the guidance, in part because

6   one of the elements of the negligent misrepresentation

7   claim is -- and this is why I said it applies to lawyers

8   and accountants -- one who in the course of his business,

9   profession or employment or in any other transaction in

10  which he has a pecuniary interest.  And I think that

11  supplies false information.  And I think that because of

12  the nature of that cause of action and because of the

13  pecuniary interest and because it's in the business

14  profession or employment, you know, or with a pecuniary

15  interest.

16        That's not true here.  There is no pecuniary

17  interest.  There is a gratuitous undertaking by Yale.  And

18  I think what fits are the -- essentially the strictures

19  that are in 323 and 324A.

20        THE COURT:  Just supposing that we can get past

21  the elements of negligent misrepresentation claim and

22  consider that rule that limits liability for providing

23  incorrect information, focusing on that, is there a way to

24  import such a limitation into the situation we have here?

25        MR. SPRINGER:  I don't think so without a

1    slippery slope.  I really do not.  I think that's why we

2    have the economic loss.  That's why we talk about privity.

3    That's why we talk -- and I don't think there is here.  I

4    think it's an either/or, as it were, game.

5         THE COURT:  In this situation, Yale knew or

6    should have known from the contents of the letter of

7    inquiry that the university was considering hiring this

8    person.  And in that context, Yale responded as it did.

9         Let's take a hypothetical case.  Let's say that

10   the inquiring party was the University of Kansas and this

11   person is being hired for a particular position on the

12   faculty and that information is disclosed and the

13   verification proves to be inaccurate.  In the meantime,

14   the person has been given an opportunity to teach and it

15   comes to light that the person is in fact not a graduate

16   of Yale and the person is terminated.  That's it.  There's

17   no publicity.  It's just as simple as that.

18        In that circumstance, generally speaking, what

19   would be the harm to the University of Kansas that might

20   warrant some recovery from Yale?

21        MR. SPRINGER:  I don't know that there

22   necessarily is any harm to Kansas from someone who, you

23   know, has falsified the degree and works and then is

24   terminated.  I don't know that there necessarily is any

25   harm.  I'm thinking of lawyers who get hired who don't,

1    you know, have the credentials they say or, you know,

2    we -- and then we --

3              THE COURT:  What about that?

4              First off, I trust that in your research you

5    find no case on point, that is, no case in which an

6    academic institution responding to this type of inquiry,

7    provides incorrect information and winds up getting sued

8    for pecuniary harm?

9              MR. SPRINGER:  We have not, Your Honor.

10             THE COURT:  No case?

11             MR. SPRINGER:  No case, Your Honor.

12             THE COURT:  And you mention attorneys.  What

13   about cases involving employers who are contacted for

14   verification of prior employment and respond with

15   incorrect information and wind up getting sued?  Any cases

16   like that?

17             MR. SPRINGER:  There may be some, but what has

18   happened, there is -- the advice that goes out is, don't

19   respond to the request unless you get a release.  And that

20   is fairly uniform advice in the employment bar these days,

21   because you don't know what may be claimed with regard to

22   that, and it's a tricky issue as you might gather.  So

23   there's -- I don't think there's guidance there.

24             The other thing I would mention, is in your

25   example, one of the issues here is again that this was

1    fraud.  The certification letter had her signature, it had

2    Yale's letterhead and I don't think there was any question

3    taken in by that.  But the point being Yale -- and we

4    argue this in our brief -- as a matter of public policy --

5    I just want to briefly get back to the foreseeability --

6    as a matter of public policy is not, you know, to protect

7    Dongguk from Shin's fraud.  And it is literally Shin's

8    fraud throughout all of this.  Because without Shin's

9    fraud, none of this occurs.  None of this occurs.  And,

10   you know, it is repeated frauds, a stack of, you know,

11   fraudulent documents that Yale is privy to and that we

12   cite in I believe it's Footnote 8 of our brief, our main

13   brief.

14           THE COURT:  Would the case be different if -- I

15   hope I didn't interrupt you there.

16           MR. SPRINGER:  No, no, no.

17           THE COURT:  Would the case be different if in

18   the letter of inquiry, the university stated, "We have

19   reason to suspect that this person is not a graduate of

20   Yale"?

21           MR. SPRINGER:  It might be, Your Honor.  The

22   issue then would be, you know -- it might, although I'm,

23   you know, I'm trying -- certainly it would be a different

24   case and there might be a different argument to be made if

25   other -- and as we point out as a public policy matter,

1    Dongguk could have made it easier on Yale.  It had other

2    information.  It had other documents, you know.  And, you

3    know, in part it's the fraud that it was put before

4    Shirmeister.

5              One of the issues there is I suppose -- I'm

6    worried again about a slippery slope.  Certainly not our

7    case.  And if it had been done, maybe there's another

8    argument to be made here, but, you know, I don't know that

9    it imposes a duty.  I can't see it necessarily imposing a

10   duty without more.  And I don't know what the more

11   necessarily is.  And we may talk about that.

12             THE COURT:  I'm wondering if a party in the

13   shoes of the university submitting this letter of inquiry

14   is obliged to disclose the information in order for law to

15   protect whatever expectancy it might have, and that's why

16   I ask.

17             MR. SPRINGER:  Well, one --

18             THE COURT:  If you know or reasonably suspect

19   that the person you're dealing with is a con artist and

20   you submit a request to Yale without telling Yale, what is

21   your reasonable expectancy as a matter of law?  That you

22   can hold Yale fully responsible for whatever might flow

23   from an incorrect verification?

24             MR. SPRINGER:  That's what we argue as a matter

25   of public policy, Your Honor, in our brief, that Yale, you

1   know -- Dongguk had more information.  It certainly had

2   enough information to be very suspicious of Shin and, you

3   know, according to the allegations in the complaint and

4   what's in the newspapers, it did not and --

5            THE COURT:  I mean, realistically, and here

6   we're getting a bit far afield, but realistically, if in

7   the letter of inquiry, Yale was informed that the

8   university was concerned about the legitimacy of this

9   claim and it was a matter of extreme importance because

10  this applicant, in fact this recent hire, had a very high

11  profile and the university did not want to be embarrassed

12  because the damage to its reputation given the nature of

13  the culture could be extremely significant, what would

14  Yale have done?  Realistically.

15           MR. SPRINGER:  Realistically, I think it is

16  realistic to believe that Shirmeister would not have been

17  taken in by the fraud and fooled by that.

18           THE COURT:  Would she have responded?

19           MR. SPRINGER:  Your Honor, I think that when you

20  say responded --

21           THE COURT:  Would she treat that as just another

22  day at the office in the ordinary course of business,

23  we'll just send something back?

24           MR. SPRINGER:  No, I don't think so.  I mean, I

25  think she would have -- it's my belief -- when you say

```
 1     realistically -- I don't think she would have made the
 2     mistake she did.
 3              THE COURT:  I think that's probably right.  I
 4     mean logically that sounds right.
 5              MR. SPRINGER:  Yeah.
 6              THE COURT:  So in that context, what should the
 7     rule be?
 8              MR. SPRINGER:  Well --
 9              THE COURT:  You want to encourage universities
10     to provide verification, we want them to act with an
11     appropriate degree of care in the circumstances, but we
12     don't want to expose them to liability that would chill
13     this process.
14              What circumstance or set of circumstances could
15     give rise to that kind of liability?
16              You've got a con artist who was bent on doing
17     who knows what, but if the university hiring this con
18     artist receives misinformation from Yale, it will trust
19     that the person is not a con artist and we go from there.
20     It seems to me as a matter of public policy, if you were
21     crafting rules or protocols, you would certainly focus on
22     the obligation of the requesting party to tell Yale what
23     it knows.
24              I mean, the requesting party is asking Yale to
25     do this gratis, like it's just another day at the office,
```

1    nothing special, with no disclosure of the particulars

2    which would be significant to a reasonable person in

3    Yale's position.

4              MR. SPRINGER:  I think that's right.

5              THE COURT:  By the way, does Yale have

6    protocols?

7              MR. SPRINGER:  They do, Your Honor.  We haven't

8    done discovery and we haven't -- you're asking me, and it

9    does have protocols.

10              I will simply say again that Shirmeister was

11    taken in by the fraud, and it is my -- and maybe I should

12    state it's my belief that this was, you know, as you look

13    at this, it had her signature.  And if you look at what

14    she responded to it, that she was fooled by the forgery

15    and simply acknowledged that it was hers, there's a

16    little -- there's not an exact meeting of what was asked

17    for here.  So that's why I say that she was fooled by the

18    forgery.

19              Without getting further and, you know, I think

20    one possibility, let me put it that way, is that it was

21    not taken as a request for verification because of the

22    forgery.  Did you sign -- here's your signature, Yale

23    letterhead.  You know, get us a response.  Yeah, this is

24    mine.  You know?

25              And again, it is -- with the forgery and the

1   fraud here, Yale is put in a difficult position.  And we

2   maintain, as we do in our brief, that, you know, that for

3   public policy reasons, it should not be in a position to

4   protect Dongguk, particularly as we also argue Dongguk was

5   in a position to protect itself better than it did with

6   regard to the inquiry it made of Yale, that it made it

7   difficult.

8           Two brief points, Your Honor, if you would, and

9   I'm happy to answer further questions.  It is to say the

10   least, as I said, not your garden variety tort claim.

11          In any event, just two questions.  On

12   foreseeability here, it is harm of the -- it is -- and I

13   probably should, you know, look at it, because Dongguk

14   conflates the standard about foreseeability.

15          What is true here is that Yale could not foresee

16   the harm of the general type that occurred, namely this

17   devastating effect on Dongguk's reputation.  Remember, the

18   only harm is reputation.  All of the rest flow from that.

19   Because the law school doesn't get authorized, the award

20   doesn't get made because of the reputation.  But neither

21   Shirmeister, as we point out, nor Carney, nor Reinstein,

22   nor is alleged -- you know, could foresee that harm.

23   Dongguk talks about -- you know, reverses it.  It's in

24   their brief, and it's in part because I don't want to

25   spend that much more time and I think it is in the brief,

1    as you will see.

2              And lastly on causation, Your Honor, we would

3    maintain that the harm would have occurred anywhere.  As

4    you rightly point out, and I noted, she had been hired

5    anyway, there would have been criticism for that.  The

6    Shingate incident with the trial and the convictions of

7    the, you know, the Chairman of the Board of Trustees and

8    the government minister and Shin herself, all, you know,

9    were focused on the hiring before Yale got in.

10             And so if you look at the news articles -- and

11   again what was reported not for the truth but what was

12   reported -- it all focuses on that and those.  So that the

13   harm we maintain was not either caused in fact or

14   proximately caused by Yale.

15             Thank you.

16             THE COURT:  Thank you.

17             MR. WEINER:  Your Honor, I actually would like

18   to address some of the comments and questions that you

19   raise.  But I want to just focus you in June of 2007.

20             And when Your Honor is concerned, and rightfully

21   so, with what is the impact, the chilling effect in terms

22   of verification, that's not really what this case is just

23   about.  This case is about what happened in June and July

24   and August of 2007.  If Yale had simply said when the

25   Korean press first raised the issue with them, yes, we

1    made a mistake.  We sent by mistake -- and they knew at

2    this point that she did not have a Ph.D..  We made a

3    mistake when we verified the Ph.D., this case wouldn't be

4    here.

5           My client simply said when we made our --

6    decided to hire Ms. Shin when we made this inquiry from

7    Yale and received this inquiry saying that she had, we

8    went forward.  If Yale had said at the time in June or

9    July of 2007, yes, that is true, they did speak to us.  In

10   fact we have now learned that we made a mistake at that

11   time, we wouldn't then have suffered the damages.

12          What happened is that that --

13          THE COURT:  You're not withdrawing Count One,

14   are you?

15          MR. WEINER:  No.  Remember, all our counts cover

16   Yale's mistakes, not just the mistakes regarding 2005.

17          THE COURT:  In all seriousness -- and this was a

18   question that I wanted to ask you -- looking at your case

19   in full, comparing and contrasting your claim based on

20   Ms. Shirmeister's response in September of 2005 with the

21   events that occurred later, I gather you view the

22   Shirmeister part of the case as relatively unimportant.

23          MR. WEINER:  No.  It's a predicate act.

24          You can look at this case on a variety of

25   negligence or reckless acts and then ultimately defamatory

1     acts and we did not allege fraud because we did not have

2     sufficient information to allege fraud then.  Maybe

3     discovery will point that out.  If it does, I will come

4     back to you and say I would like an amendment.  But

5     essentially I think she was at the very least reckless.

6     And let me just briefly --

7          THE COURT:  You -- and I don't want to interrupt

8     and prevent you from even getting started -- but you said

9     that if Yale had acknowledged its mistake, we wouldn't be

10    here.  So that's --

11         MR. WEINER:  I said if Yale had acknowledged its

12    mistake publicly that in fact Dongguk had gone to them,

13    that Dongguk had received a fax from Yale which verified,

14    although mistakenly, verified Ms. Shin as having gotten a

15    Ph.D. from Yale, my client would have -- that's what

16    happened.  That's what they were telling the press.  But

17    when Yale comes in and says none of that is true --

18         THE COURT:  So --

19         MR. WEINER:  They never contacted us, we never

20    told them she had a Ph.D., then my client becomes a

21    subject of a potential criminal and a criminal

22    prosecution.  Then it's vilified in the press for having

23    lied about why it hired Ms. Shin in the first place.

24         So this is a series of serious mistakes.  Not

25    just at the very beginning.  These mistakes continued.

```
 1              THE COURT:  So if I were to raise the
 2    possibility of certifying this case to the Connecticut
 3    Supreme Court for advice, indeed for controlling law on
 4    whether you have a negligence claim against Yale based on
 5    what Ms. Shirmeister did, you would say, I take it, please
 6    don't do that because that's really not why we're here?
 7              MR. WEINER:  No.  I would say there are a number
 8    of negligence acts in this case, not just what
 9    Ms. Shirmeister did.
10              THE COURT:  But that's sort of -- well, it
11    happened first in time.
12              MR. WEINER:  It happened first in time.
13              THE COURT:  At this stage of the case, it's the
14    tail on the dog.  Don't send the case to the Connecticut
15    Supreme Court to address the tail.  Let's keep the case
16    here and look at the dog.  The dog being what happened
17    when they failed to acknowledge their error.  That's what
18    this case is really about.  Is that --
19              MR. WEINER:  In essence that's correct
20    because -- when Your Honor raised for example what kind of
21    damages would Dongguk have suffered for simply having
22    received misinformation from Yale, I would have told you
23    probably not a lot because maybe they could recover for
24    the wages they paid her, maybe they could find some other
25    type of damages they may have suffered.  But the real
```

1    damage occurs in beginning in June and July when Yale

2    says, we don't know what you're talking about, we never

3    contacted you, we never told you she had a Ph.D. from

4    Yale, in fact, we never received any letter from you in

5    the first place.

6          So while I believe this is -- you know, what

7    Shirmeister did or didn't do was obviously very important

8    to some of our claims.  The core of this case occurs as to

9    what happened and why did Yale say in June and July and

10   August and September, particularly in the face of having

11   received information from my client saying, you know, I

12   think you're making a mistake here, could you please tell

13   the Korean press and the prosecutors, by the way, that in

14   fact you did get an inquiry from us and you sent back to

15   us a fax.  Even if in the face of being told we were

16   facing criminal prosecution, Yale continued to deny and

17   claimed that it had never received the communication from

18   my client and it had never sent any communication back.

19   And that's the core of this case.  It's the core takes

20   place in 2007, not 2005.  That's the predicate.

21          I'm not withdrawing my claims that it impacts

22   that.  But if you're trying to truly analyze this case,

23   the damages flow from the acts that occurred in 2007.

24          If Yale had simply said, you know what, we made

25   a mistake, then, before all the press, before they went on

1    TV, before they issued press releases, before they issued

2    official statements denying everything, then I suspect we

3    wouldn't be here.  But that's what they did.  And it's

4    undisputable.

5         We have the press releases.  We have the 60

6    Minutes type of television presentation that they made.

7    We have their official statements.  All of which they

8    deny, stating that the letter that they sent was a

9    forgery, the fax was a forgery.  I disagree with my

10   adversary as to that, as to what the newspapers said.  And

11   they also deny having received any inquiry from my client.

12        What makes it reckless, which takes it to the

13   next step, is my client kept sending them additional

14   information saying, we think you're wrong, here's the fax

15   number, here's the person in the mail room who received

16   our inquiry.  And in the face of this continuing

17   information that we sent to them, they continued to issue

18   false statements to the press.

19        So when you analyze this case, that's what I

20   think you have to look at.

21        Now, in terms of protection in terms of public

22   policy, the fact of the matter is that's why we have Good

23   Samaritan laws.  I'm not suggesting -- I happen to agree

24   with Mr. Springer that there is no limitation.  I don't

25   think we'd prove a lot of damages if we were just relying

1    on Shirmeister's mistake.  So I don't think there's a

2    specter of huge damages on that.  But there is huge

3    damages that run from the negligent or reckless

4    misstatements that were made in 2007 or defamatory

5    statements that were made in 2007, and we believe we have

6    pleaded them correctly under Connecticut law.

7            Now, I would like to briefly address some of the

8    points that Mr. Springer did make.

9            He started off his argument by referring Your

10   Honor to Chambers v. Time Warner, Inc. 282 F.3d 147 as a

11   seminal case as to when you can rely on documents outside

12   of the pleadings, the actual complaint documents.  And

13   that's actually a case I agree you should read.  Because

14   in that case, the Second Circuit took pains to distinguish

15   as to when you can do that and when you cannot do that.

16           And essentially what the Second Circuit has said

17   is that under Rule 10(c), a Court can consider extra

18   complaint documents if they are dispositive of the claims

19   before it.  For example, the cases that Mr. Springer

20   referred you to were cases involving contract disputes or

21   securities claims where the prospectus on the contract, on

22   the face of those documents, were dispositive of the

23   plaintiff's claim.  And under those very narrow

24   circumstances, the district court is permitted to use and

25   rely on those documents.  However, in Chambers, the Second

1    Circuit went on to state that's a very narrow exception,

2    and our rule on this has been in many respects

3    misinterpreted by district courts so we're going to say it

4    again.

5            And I believe, Your Honor, if we go to page --

6    let me get that page for you -- pages 153 and 154, it

7    explains why you have this narrow exception.  And then it

8    goes on to state, "Once the district court was presented

9    with matters outside the pleadings, Rule 12(b)" -- not

10   10(c) -- "Rule 12(b) afforded two options."  You can

11   exclude the documents and not consider them and rule on

12   the motion to dismiss, or if you're going to consider

13   them, then you must turn it into a summary judgment

14   motion, you must give the adversary notice of that fact

15   and treat it as a summary judgment motion.  Which is why

16   we argued, Your Honor, that essentially by relying on

17   newspaper articles -- this is what I heard Mr. Springer

18   say -- those are not the type of dispositive documents

19   that dispose of this case.  They simply quite frankly

20   raise issues of fact.

21           Neither side is endorsing them as having truth

22   to the statements.  We're saying they're defamatory.

23   They're saying they're not even relying on the truth.

24           Beyond that --

25           THE COURT:  What strikes me -- more accurately,

1    what struck me at first blush when I looked at the

2    pleadings, is how different this is from what the rules

3    contemplate.  I don't want to waste your time, but it

4    might be helpful to explain a bit more what has been in my

5    mind so that you can understand my perspective.

6            In the appendix of forms that accompanies the

7    West version of the civil rules, there is a form complaint

8    in negligence and it is a notice of pleading, it's a

9    barebones document, it is literally a couple of

10   paragraphs.  On X date the defendant negligently ran his

11   vehicle against the plaintiff causing damage, period.  The

12   forms are there to illustrate what a notice pleading is

13   supposed to look like.

14           It seems to me that an awful lot of thought and

15   careful writing went into the preparation of this 30-page

16   complaint which tells the story in great detail.  Without

17   implying any criticism of that approach, I hope you can

18   understand why, to my eye, it reads like a press release

19   that one would issue to the Korean press to explain the

20   whole saga from the Plaintiff's point of view.  It's not a

21   notice pleading for purposes of litigation.  It's a

22   statement to the world for purposes of perhaps mitigating

23   the harm that has been done to the plaintiff.  But that's

24   not what I'm here for.  That's where it begins.

25           And Mr. Springer on behalf of Yale decides,

1    well, they've told their side of the story, now I'll make

2    a motion to dismiss and we'll tell ours.

3              MR. WEINER:  That's perfectly fine.

4              THE COURT:  And here I am, a guy who's supposed

5    to get a notice of pleading that's not more than a few

6    pages long, and if I get a motion to dismiss it's supposed

7    to be because the complaint itself contains a

8    self-defeating allegation which, if credited, destroys the

9    purported cause of action or omits in some glaring way an

10   essential statement of an element of a claim.

11             MR. WEINER:  Well, Your Honor --

12             THE COURT:  I'm not supposed to be calling upon

13   you to prove your case and I'm not supposed to be asking

14   Mr. Springer to disprove your case.  That's not what we're

15   supposed to be doing.  But here we are.

16             MR. WEINER:  That's correct, Your Honor.  I

17   think the only thing that Mr. Springer says, I didn't add

18   to my complaint, that somehow we didn't add the term

19   "malicious" or we didn't use it correctly.

20             THE COURT:  It's in there though.

21             MR. WEINER:  It's in paragraph 198.

22             THE COURT:  Right.

23             MR. WEINER:  So the complaint does tell our

24   position, that is true, Your Honor.  But under Bell v.

25   Twombly, there is a standard that suggests that you need

1    to be -- even though the courts have gone since then --

2    since then they've come back and said notice of pleadings

3    still exists, but there clearly is some question in an

4    adversary's mind as to how much to put in.

5         And when you're dealing with a defamatory case,

6    although there is negligence and reckless disregard and

7    reply contract claims, you need to tell very specifically

8    in terms of what your defamation is and it has to be a

9    context to it.  So I think that we have fulfilled that

10   obligation.

11        And, Your Honor, the fact of the matter is, this

12   is not a summary judgment motion.  If it had been a

13   summary judgment motion, I would have been happy to

14   respond with affidavits and documents that will

15   substantiate my client's case.  In particular the e-mails

16   exchanged and the other documents that are involved here.

17        What I think Mr. Springer has done is raised, as

18   you said, the other side.  He says there are a lot of

19   arguments that we have here that have to be resolved.

20   This is not a slam dunk for the plaintiff.  Let me tell

21   you what those arguments are.

22        So he has effectively -- if you feel that we've

23   told our side, he's effectively told his side.  But this

24   is not a motion for summary judgment, this is a motion on

25   the sufficiency of the pleadings.  I believe that we have

1    sufficiently stated in our brief that we have met every

2    pleading requirement, every element that is necessary to

3    sustain a cause of action on each of the claims that we've

4    asserted.  And I think that's what we're about to do in

5    this stage.

6            If Your Honor would like to convert it to a

7    summary judgment motion, we would do it.

8            THE COURT:  I already have far too many of

9    those, thank you.

10           MR. WEINER:  So just a few points, Your Honor.

11           So I believe I covered the malice point.

12           I believe all of the -- the vast majority of

13   Mr. Springer's arguments were based upon factual

14   contentions as to how he read the newspaper articles or

15   how he views the facts.  Those are the facts that will

16   have to be resolved either at a future summary judgment

17   motion, if discovery shows one side or the other has no

18   bases for them, or at a trial.

19           The statement of the law, let me just briefly

20   discuss this negligence issue.

21           The only Connecticut case that we have found

22   that says that you need physical harm, is the latest case

23   which came down in 1993, DeVillegas v. Quality Roofing and

24   that's a Superior Court case that came down in 1993.

25           Subsequent to that particular case, two other

1    Connecticut cases, Reiner & Reiner, which came down in

2    1995, and those are cited in my brief as well, and Darien

3    Asphalt.  And both of those subsequent cases stated very

4    clearly that Connecticut does not have this economic

5    loss -- this doctrine that prevents a party from recovery

6    unless there's physical injury.

7              So I think the law is -- goes both ways in

8    Connecticut, but the more recent cases go the way that we

9    suggest that they should go.

10             We also cited out of state cases.

11             THE COURT:  Generally speaking, Connecticut

12   Supreme Court embraces the Restatement, and the

13   Restatement incorporates the economic loss rule, does it

14   not?

15             MR. WEINER:  Depends on what you look at.

16             The Connecticut Law of Torts I don't believe

17   does.  And the Second Circuit, by the way, has -- and I

18   don't have the cite in front of me, but there's a Second

19   Circuit case that has actually said that Connecticut is

20   unsettled on this point and they did not send it off to

21   the Connecticut court to find out.  But the Reiner case --

22             THE COURT:  Do you think I should send it to the

23   Connecticut court?

24             MR. WEINER:  I don't know if it will change the

25   nature of this case if you do that, Your Honor.  I think

1    the discovery is going to be exactly the same.  I think

2    everything's going to be exactly the same.  We can find

3    out.

4          But at the end of the day, one of the things I

5    was going to get to in terms of the motion to stay, is

6    that all of the claims that are before you arise out of

7    the same basic set of facts.  So even if you knocked out

8    this particular claim or that particular claim, it's not

9    going to dispose of the case in terms of discovery.  You

10   might shorten discovery.

11         I'm happy for you to send it off to the

12   Connecticut Supreme Court for determination, but I would

13   urge that we continue the case with discovery and move

14   forward on that.

15         The case was filed I believe last April.  We

16   have not had any discovery at all.  And for purposes of

17   ultimate disposition of negligence claims, certainly that

18   would be beneficial to note, but I don't think that will

19   dispose of the defamation claims.

20         The reckless claims may go with the negligence

21   claims, so that's a possibility.

22         THE COURT:  That was a question I wanted to ask

23   you.  If the negligence claim went out of the case, would

24   the reckless and wanton misconduct claim follow?

25         MR. WEINER:  If you ingraft that limitation,

1    possibly.  But the Sheiman case, that was a case where

2    someone sued for both negligence and reckless disregard

3    where a bank negotiated a check that didn't have a proper

4    endorsement and as a result of that negotiation of the

5    check the plaintiffs lost a lot of money.  Person who

6    received the money was long gone apparently.  So they sued

7    the bank for negligence and for reckless disregard.  And

8    the Court there -- and I believe that was an appellate

9    decision, by the way.

10          The Court there did not say, oh, by the way,

11   there's no physical injury here, therefore you don't have

12   either a negligence claim or a reckless disregard claim.

13   They actually found for the defendant on the question of

14   duty.  There was no duty established.

15          So I would think that the Connecticut courts

16   recognize that you could have reckless disregard and

17   negligence and that is at the appellate level without any

18   physical harm.

19          But again, I think if you want to present both

20   of those issues to the Connecticut court, I could

21   understand why you would feel that way since there is --

22   the lower court on the negligence side cases go in two

23   directions.  But I think it will come out that there is no

24   limitation on physical liability, and it makes a lot of

25   sense.  People can commit negligence in a variety of ways

1    that do not have economic consequences, just property

2    damage or physical damage.

3            Reiner & Reiner was a perfect example.  Court

4    there -- somebody was in an office building, had rented a

5    lot of space, and next door a contractor was working,

6    caused a gas leak that made -- the building had to be

7    vacated, and the person who was -- the office owner, the

8    person owning the business, sued for negligence saying,

9    hey, I had to pay all my people, I lost all this business

10   because of your negligence impacted my ability to conduct

11   my business.  In Reiner the court said, absolutely

12   appropriate to have negligence in this action here.  The

13   fact you did not suffer property damage, you did not

14   suffer physical damage doesn't, in our view, mean that the

15   person who caused the gas leak should not be held

16   responsible, and they held that person responsible.

17           So I think that the better reasoned decisions is

18   that there is no limitation of property damage or on

19   personal injury.

20           THE COURT:  It seems that these limitations have

21   been crafted to limit what might otherwise be excessive

22   liability.

23           MR. WEINER:  I don't know -- I don't think I've

24   seen anything that would suggest that.  I think the law

25   evolved and law has continued to evolve.  At least the

1    initial cases would involve personal injury or property

2    damage.  But as cases were brought involving simply

3    economic harm, the courts said, well, there are situations

4    where someone can do a negligent act and cause economic

5    harm.  Reiner was one.  And the court said, no problem,

6    saying they were liable.

7              THE COURT:  It makes sense in principle, but

8    what about the concern evident here that liability can

9    become unmoored from the underlying misstep?

10             I mean, putting aside your defamation claims,

11   because we're not talking about those at the moment,

12   Ms. Shirmeister doesn't look closely enough, she's too

13   busy, too distracted, she's got a funeral to go to, who

14   knows, and the next thing you know, Yale's facing a

15   50 million-dollar lawsuit.

16             MR. WEINER:  Not just because of what

17   Shirmeister did, Your Honor.  If it was limited to that,

18   then the damages wouldn't be $50 million.

19             But under negligence law, thin skull.  Ever

20   since I've been in law school, if you commit a negligent

21   act and someone has a thin skull, you have substantial

22   liability.  But our liability flows, really in terms of

23   damages, damages really flow from what happened in 2007.

24   And when you begin to actively -- and this was an active

25   role by Yale, this wasn't just passive -- issue press

1    releases that are wrong, make these statements that are

2    wrong, give press interviews that are wrong, issue

3    official statements that are wrong, then you may have

4    substantial liability.  This wasn't just the innocent

5    mistake by someone who didn't have reason to investigate

6    it.

7         By that time, Your Honor, they had reason to

8    investigate, and by that time, we were providing them with

9    information saying you were wrong so please correct what

10   you said, and they didn't and wouldn't.

11        THE COURT:  Well, from a pragmatic point of

12   view, which I believe is a legitimate way of thinking

13   about any case, particularly given the command of Rule 1,

14   we're supposed to try to bring about a just, speedy and

15   inexpensive resolution of the case, I question the wisdom

16   of spending a lot of time, effort and money litigating the

17   negligence and implied contract claims, which really seem

18   to be addressed to Ms. Shirmeister's response, if the core

19   of the case is the defamation claim and the claim for

20   reckless and wanton disregard of the plaintiff's

21   interests.

22        MR. WEINER:  The reason why you cannot so simply

23   separate out the negligence claim -- maybe you can in an

24   implied contract claim, because the implied contract claim

25   is really just more focused in what happened in 2005.

1           THE COURT:  It only refers to that, it doesn't

2    refer to anything else.

3           MR. WEINER:  That's correct.

4           2007, the acts that occurred could be

5    defamatory, jury can find them to be negligent and not

6    defamatory.  Those were mistakes.  Now, whether they were

7    mistakes that rose to the level of being defamatory will

8    be something for the jury to determine.  As to whether

9    they were simply limited to negligence as to what occurred

10   in 2007, is simply a jury issue, and the same thing with

11   reckless disregard.

12          So 2005 encompasses both implied contract as

13   well as negligence as well as perhaps reckless disregard.

14   The reckless disregard and negligence claims continue into

15   2007 on a continuing basis between July -- June or July

16   through September.

17          THE COURT:  Okay.  While we're on the subject of

18   implied contract -- and I'm going to need to give our

19   reporter a break -- but while we're on the topic of

20   implied contract, your complaint alleges that Yale has

21   established protocols and by virtue of that fact has

22   agreed to be bound by them.

23          Can you clarify what you mean by that?

24          MR. WEINER:  It is our understanding from

25   articles at Yale, it was quoted in the Yale -- the daily

1    news -- I don't know what the local paper is, is that they

2    have protocols, they were not followed in this case, and

3    as a result they were revisiting their protocols and

4    determining what to do.

5              In my view, having looked at the cases, that

6    creates -- the fact that you have protocols that you

7    undertake, you know, to follow those protocols and

8    universities share this information back and forth, in our

9    view that creates an implied contract between the parties

10   that, you know, we will send you inquiries and we expect

11   you to provide us accurate information and you send us

12   inquiries and we will send you accurate information, is an

13   implied contract.

14             THE COURT:  Prior to this case there were no

15   dealings between these two universities as far as we know.

16             MR. WEINER:  As far as we know, that's correct.

17             THE COURT:  When you say in the complaint,

18   "Based on their dealings with one another, Yale and

19   plaintiff entered into an implied contract," what dealings

20   are you referring to?

21             MR. WEINER:  I'm referring to the fact once we

22   made an inquiry knowing full well that universities like

23   Yale -- even though we hadn't done one why with Yale --

24   have protocols, that those protocols would be followed, we

25   would get accurate information.  That's why we exchange

1    information with one another.

2              And just to digress for a moment, Your Honor,

3    because you were discussing about Ms. Shin and being

4    someone who is a scam artist or whatever.  I think if you

5    look back at the complaint in paragraphs 30 to 42, you

6    will see impeccable credentials from this woman.  She was

7    a major curator -- curator of several major museums, she

8    had put on hundreds of well-regarded exhibitions, she was

9    featured in the Korean Art Press.  She had taught at other

10   universities in Korea.  So we're not talking about someone

11   who was just a fly by night.

12             And what occurred in September, as we said, was

13   an unfounded rumor that came in a couple days after

14   saying, we don't think she has a Ph.D. from Yale.  Not

15   that any of the other credentials were at all wrong.  And

16   it was at that point my client sends a letter saying,

17   Could you please verify it?  I don't think that's

18   inappropriate under the circumstances and I'm not sure

19   there's an obligation or should be an obligation as to

20   say, Oh, by the way we heard an unfounded rumor, so please

21   verify it.  But that I think is something ultimately a

22   jury would have to determine as to whether we were acting

23   reasonably in terms of our conduct.

24             THE COURT:  Perhaps.

25             So dealing with the implied contract claim, it's

1    your position that the allegation that Yale has protocols

2    is sufficient to support the existence of an implied

3    contract once a another academic institution calls and

4    inquires?

5              MR. WEINER:  Yes.  That the two universities are

6    forming an implied contract whereby Yale will fulfill --

7    follow its protocols and provide accurate information.

8              THE COURT:  Does this implied contract include a

9    provision whereby the person requesting the information

10   will tell Yale what it knows that causes it to make the

11   inquiry?

12             MR. WEINER:  I don't know -- and this could be

13   one of the things we can certainly look into -- but I

14   don't believe that universities will provide information

15   for the very reason that Mr. Springer said.  "We think

16   that so and so is a fake," I think creates its own issues.

17             They didn't think she was a fake.  They actually

18   thought this was going to be nothing -- this was just an

19   unfounded rumor, they'd get their verification from Yale

20   and move forward.  This wasn't as if we believed there was

21   a real problem here.

22             So the answer to your question, Your Honor,

23   would be no unless you have some real hard evidence that

24   you think that someone was fabricating their degree.  We

25   didn't have any reason to believe that this would come

1    back with anything other than, yes, she got a Ph.D. from

2    Yale, based upon the information that was already in the

3    public record.

4              THE COURT:  If I had an application from

5    somebody who purported to be a Yale graduate and I called

6    for verification and they incorrectly responded that, yes,

7    this person is a Yale graduate, would that violate an

8    implied contract?

9              MR. WEINER:  If you just called and you didn't

10   go through the -- ask for a verification.

11             THE COURT:  I'd do what the university did

12   except it's me, I am not the university, I'm not an

13   academic university.  I'm a perspective employer in a

14   different field.

15             MR. WEINER:  Possibly.  I think it would depend

16   somewhat on the circumstances.

17             But one of the reasons why people ask for

18   references -- I mean to say for verification -- is they

19   can have significant impact.

20             You suggested, you know, the University of

21   Kansas analogy, but supposing I wanted to know whether

22   someone had received a medical degree from Yale because I

23   was going to put someone to work in a hospital.

24             THE COURT:  As a brain surgeon.

25             MR. WEINER:  To me those verifications are

1    significant and there needs to be some consequences.  And

2    I don't think, you know -- talking about liability and

3    whether they should be shielded from liability, I think

4    will depend on the circumstances.

5              THE COURT:  There's no case law involving a

6    similar situation?  People seek references and

7    verification from others continually and this is the first

8    time?

9              MR. WEINER:  I actually think there are cases in

10   the employment field where there are defamation cases and

11   other cases.  We didn't research those cases for purposes

12   of this particular motion because we viewed it as a motion

13   on the pleadings and whether we met the standards.  But I

14   believe, Your Honor, when you raise that question, yes,

15   there are cases.

16             I'm not an employment lawyer, but I'm aware of

17   them with dealing with my firm, we are very careful about

18   what we say about former employees because we know we can

19   get sued if we give wrong information.  And the reason

20   why, as Mr. Springer said to you, what people do is they

21   don't say anything because then they won't get sued if

22   they're wrong.  But in fact here Yale did so.

23             But as I said earlier, the core of my case isn't

24   just that.  It goes into 2007.

25             THE COURT:  This is my point.  I think that the

1    claims that you make based on Ms. Shirmeister's incorrect

2    response distracts attention from what you regard as the

3    core of your case because they entail all of these

4    uncertainties and raise all of these questions,

5    uncertainties under the law and questions about public

6    policy.

7         If that's really not what the case is about, why

8    should we immerse ourselves in them?  What do you gain?

9         MR. WEINER:  Well, I need the facts for sure.  I

10   got no question about that.  And at trial, if we come to

11   the point where what claims do I want to press, I'll make

12   that decision.

13        But I'll tell you something else, Your Honor,

14   and we didn't put it to the pleadings, but we have heard

15   that Ms. Shin was working with someone within Yale to get

16   this done.  I don't have proof of it.  I didn't plead it.

17   It will certainly be the subject of discovery.  And it may

18   well be that Ms. Shirmeister was not simply the innocent

19   person who made the mistake.

20        And one of the things that is really sort of

21   interesting in this case is that she sort of disappeared

22   from the scene.  In June, when we heard contrary

23   information from Yale's librarian that in fact Shin did

24   not receive a degree from Yale, my client contacted

25   Ms. Shirmeister, tried to reach her, to have her explain

1    how it was that she had sent this fax.  Ms. Shirmeister

2    never responded.

3              If you look at -- and then it became interesting

4    to us --

5              THE COURT:  She learned not to respond.

6              MR. WEINER:  She learned not to respond.

7              And how is it that Yale said in early July that

8    Shirmeister never sent the letter?  It was a fake?  Did

9    she tell that to Yale?  So we don't know what

10   Ms. Shirmeister's role was.

11             It shouldn't have been very difficult for Yale

12   to figure out that Shirmeister sent the fax.  All it had

13   to do was to ask her.

14             So yes, Your Honor, it may be a sideshow.  I

15   just don't know enough yet.  I haven't had the opportunity

16   to take discovery.

17             THE COURT:  All right.  Why don't we take a

18   short break and I'll go through my notes and see if

19   there's anything more that I'd like to ask while I have

20   you here.  And why don't we say we'll come back in 20

21   minutes?  Is that all right?

22             MR. WEINER:  Thank you, that's fine, Your Honor.

23                  (Whereupon, a recess followed)

24             THE COURT:  Mr. Weiner?

25             MR. WEINER:  Yes.

1          THE COURT:  We took a recess while you were at

2     the podium.  I wanted to follow up with you on the

3     defamation claim.

4          The motion to dismiss that claim makes two basic

5     points:  First, that the statements cannot reasonably be

6     interpreted as defamatory of the plaintiff; and second,

7     that the plaintiff is a public figure and we don't see

8     allegations to support a finding of actual malice.

9          Dealing with the first point.  In the memorandum

10    submitted by Yale in support of a motion, we see at

11    page 29 the section entitled, "Yale Made No Defamatory

12    Statements About Dongguk."

13         Going over to the next page, page 30, Yale sets

14    out what it describes as the statements underlying the

15    defamation claim.  It then proceeds to look at each of

16    these, and for reasons given, urges me to find that none

17    is defamatory.  I'd like to give you a chance to comment

18    on each of these.

19         But first let me ask:  Are we in agreement that

20    these are indeed the statements underlying the claim?

21         MR. WEINER:  No, we are not.

22         The statements that are quoted -- and I'd rather

23    go through the complaint than Yale's characterization of

24    them.  But if you look throughout the complaint, I suggest

25    we look at, I guess for example, paragraph 95, paragraph

1    97, paragraph --

2           MR. SPRINGER:  I'm sorry, I didn't hear the

3    first one.

4           MR. WEINER:  95, 97 and -- 96, 97, 110, 112,

5    111, the official statement, which is 143.  Those are just

6    my quick reading of the complaint, Your Honor, but let me

7    just go to the core of the argument.

8           Core of the argument is that on their face

9    they're not defamatory and I would disagree with that, but

10   that's a jury question.  However, under Mix v. Woodward,

11   which is a longstanding Connecticut case, and cases that

12   follow it, this is called liable or defamation by

13   extrinsic fact.  And what they're saying is Dongguk is not

14   necessarily mentioned by name, therefore how could it be

15   defamatory.  And by extrinsic fact, and this is a

16   longstanding liable doctrine, that if someone had reason

17   to know who you were referring to when you say, "I never

18   received that from him" -- and they know who "him" is --

19   that's enough.  And it's a determination of the jury then

20   to determine whether in fact the "him" can reasonably be

21   identified as us.

22          But the interesting thing is that if you read

23   the articles that Mr. Springer has attached to his

24   pleadings, they all make very clear they're talking about

25   Dongguk.  Just not -- I didn't quote the entire article.

1     But if you read the articles themselves in their entirety,

2     you're going to see they're talking about Dongguk.  So as

3     a matter of law, it's not a basis to dismiss, and as a

4     matter of fact, he's actually provided to Your Honor the

5     entire articles which provide the detail.

6              Now going to your second question, which I

7     believe was whether we had asserted enough for malice.

8              As we cited to Your Honor, there are two cases,

9     both Connecticut, one is Morron at 464 F. Supp. 2d 111,

10    and the other is Dougherty at 282 F.3d 83, and in each of

11    those cases, and going back to Your Honor's statement to

12    me about notice pleading, that is sufficient to meet the

13    malice requirement by simply putting into the complaint

14    that the statements, the alleged defamatory statements

15    were made maliciously, which we did.

16             Now, having said that, the complaint goes on in

17    detail, in our view, to provide what we believe was

18    reckless that would satisfy the malice standard, in

19    particular the actions that occurred through the summer

20    and September of 2007 in which Yale was making these

21    statements at the very time it knew or had reason to

22    know -- and I would say knew -- that the statements were

23    false because of the information that my clients had

24    provided to them regarding the proof that had been

25    received by Yale, fax number and all that stuff.

1          So not only have we pleaded malice in a way

2     that's appropriate, but we've also provided you with the

3     evidentiary detail, which we didn't have to do but we did

4     it anyway.

5          THE COURT:  Okay.  Let me detain you and ask you

6     to go through this while it's fresh in my mind.  I would

7     be interested to have your thoughts, of course.

8          In the section of the memorandum in support of

9     the motion to dismiss that I referred to earlier starting

10    at pages 29 and continuing on to page 30, we see what Yale

11    offers in support of its argument that the claim should be

12    dismissed.

13         Focusing on page 30, Yale lists the statement by

14    Reinstein that the certification letter had been formed.

15    With regard to this, Yale argues that this refers to the

16    certification letter, not the fax, and Yale continues,

17    "Even if Yale said that the fax was a forgery, this would

18    not defame Dongguk."

19         MR. WEINER:  You look at paragraph 111, Your

20    Honor, just for an example, and also paragraph 110, which

21    by the way I don't believe is specifically referred to on

22    page 30, on July 19th, it quotes Reinstein, this is a

23    Korean publication, paragraph 110, "Dongguk University

24    said it mailed a letter for inquiry, so we looked into it,

25    but we never received the letter."  That I think is pretty

1    explicit.  And if you read the next paragraph, it

2    basically says the same thing.

3              So we did an plea and the complaint does contain

4    the defamatory language and it does refer to Dongguk.  And

5    I think what Yale has provided to you, Your Honor, is an

6    interpretation in basically trying to draw inferences of

7    fact from the words, which is really the province of the

8    jury.

9              THE COURT:  Please be patient as I review these

10   documents.

11             Are you suggesting that one can reasonably

12   interpret the statements set out in these paragraphs of

13   the complaint as referring to the letter of inquiry as

14   distinct from the certification letter?

15             MR. WEINER:  Yes.  I mean, it says, but -- I

16   just read it into the record -- mailed a letter for

17   inquiry for academic letters, so we looked into it but we

18   never received the letter.

19             THE COURT:  So that's a reference to what we

20   will refer to as the letter of inquiry?

21             MR. WEINER:  Correct.

22             THE COURT:  As distinct from the certification

23   letter?

24             MR. WEINER:  That's correct, Your Honor.

25             THE COURT:  Okay.  And so one could interpret

1    these statements to mean that Dongguk did not send the

2    letter of inquiry?

3            MR. WEINER:  And it lied when it said it did.

4            THE COURT:  All right.  Going back to the

5    memorandum in support of the motion to dismiss, at page

6    30, the first Reinstein statement referred to cites

7    paragraphs 95 to 97 of the complaint, a July 13, 2007

8    article.

9            MR. WEINER:  Your Honor, if you look at

10   paragraph 95, in the complaint itself, Reinstein is quoted

11   as saying, Professor Shirmeister, whose signature's

12   included in the letter, is presently away, but

13   verification with her assistant professor confirmed that

14   Professor Shirmeister never signed such a letter.  That's

15   referring to Shirmeister's fax, not to the earlier

16   certification.

17           THE COURT:  Right, right.

18           And this is --

19           MR. WEINER:  Again a lie that we said we had

20   received a letter from Yale saying signed by Shirmeister.

21           THE COURT:  Yale's point seems to be that this

22   is not reasonably susceptible to the defamatory

23   construction because it doesn't suggest that Dongguk

24   forged anything or even that Dongguk is lying about what

25   it did or did not receive but rather simply means that

1    somebody, presumably Shin, forged it.

2              MR. WEINER:  That may be their theory, but the

3    words don't say that, Your Honor.  And the context of

4    this, as we said in the complaint, when Dongguk was called

5    to task by the media and explained that it had sent a

6    letter of inquiry and received one back from Yale which

7    said that Ms. Shin had received her Ph.D., and then they

8    contact Yale to verify whether what we said was true,

9    which is what happened at that point, and Yale says, no,

10   we never received an inquiry and we never sent the letter,

11   that basically calls my client a liar publicly, and that's

12   defamation by extrinsic fact -- if it's not clear they are

13   referring to us, the articles are clear they were

14   referring to us.  You're essentially calling my client a

15   liar, and that's defamatory.

16             THE COURT:  So your point is while possibly a

17   jury could construe this as Yale has construed it, that's

18   not what matters at this stage?

19             MR. WEINER:  That's not what we're here for.

20   And I would say to Your Honor, as I said earlier, even if

21   these were not defamatory, at a minimum, in our view they

22   were reckless or negligent.  That's why all three of those

23   claims are present.

24             THE COURT:  Understood.

25             Continuing, the next statement on page 30 in

1    Yale's memorandum references paragraph 105 of the

2    complaint.

3              The news article at issue in --

4              MR. WEINER:  There clearly, yeah, this is what

5    the quoted language says, we refer to the September 22nd

6    fax and the certification letter, and they followed by,

7    quote, faxed from Yale University.  Faxed from Yale

8    University.  Certification letter, as I understand, was

9    not -- the original Ph.D. letter was not faxed, as I

10   understand it.  But what we said what we received was

11   faxed.  And then it goes on to quote, "They were all fake

12   documents that were not prepared by Yale University." It

13   incorporates everything.  And if they want to argue that

14   that was only referring to the first document, I would say

15   that the word "all" would encompass more than the first.

16   So, again, defamatory.

17             THE COURT:  So the documents, plural, referred

18   to as fake, include the letter of inquiry?

19             MR. WEINER:  I'm not sure I would argue that

20   necessarily.  I would have to do some discovery of that.

21   Certainly included the fax coming back.

22             THE COURT:  Your point would be that a jury

23   could reasonably construe this statement to mean that

24   Dongguk itself fabricated one or more documents?

25             MR. WEINER:  No, no.  I'm saying that when you

1    read the context of this in the chronology that these

2    things occur, is that my client was continually being

3    called a liar by Yale.  And as these things were coming,

4    as Reinstein was makes these statements, in the background

5    we were sending Yale information, said, by the way, you're

6    not right, please correct it.  And they continued to make

7    these statements.  And they continued to say they never

8    received our letter and that what we did receive from Yale

9    was not by Yale.  It's calling us liars on a regular

10   consistent basis even though they had evidence to the

11   contrary.

12            Your Honor, I think there was one more in that

13   group that I'd like to briefly address.  That's the last

14   bullet point on page 30, 143.

15            THE COURT:  Yes.

16            MR. WEINER:  I'd like to focus Your Honor first

17   on paragraph 140 in the complaint.  And paragraph 140

18   you'll see that in the September 12th e-mail, we advise

19   Yale of the fact that the Korean prosecutors were now

20   actively looking at my client for having been a

21   participant in this and having covered it up and having

22   somehow lied about having contacted Yale.  So it's a

23   little more urgent here.

24            If you go back to 137, by this time my client

25   had provided the mailroom information, the fax number, the

1   website, the mailing label, all to Yale.  And what do they

2   do?  And that's when we get to the paragraph that

3   Mr. Springer was referring to.  Let me get that paragraph

4   again, page 30.

5            THE COURT:  143.

6            MR. WEINER:  143.  That's when Yale, despite all

7   this evidence, issues an official statement saying all the

8   documents were forged.  And again, going back -- or fake.

9   Excuse me, forgeries and are fake.  And I don't have the

10  article, the official statement in front of me, but again

11  making very clear to the world that we lied.  And that's

12  why we believe we have a defamation claim as well as the

13  other claims that we're asserting.

14           THE COURT:  Let me see if I have anything

15  further for you.

16               (Pause)

17           THE COURT:  I think I'm all set.  Thank you.

18           MR. WEINER:  Thank you, Your Honor.

19           THE COURT:  Mr. Springer, I'll give you the last

20  word for today anyway.

21           MR. SPRINGER:  Thank you, Your Honor.  I will

22  try to be brief.

23           Your Honor, there was discussion of two stories

24  being told.  As I'm sure you well know, this would not

25  have been our complete story.  We really have responded to

1   their story based on their allegations and documents.

2   We've got more of a story to tell, and it is because we

3   think that's -- what they have said really has, you know,

4   been insufficient for all the reasons we've mentioned and

5   I won't belabor them, I just didn't want you to think that

6   we had gotten our story out there.

7           THE COURT:  There's more to this story?

8           MR. SPRINGER:  There is a lot more to this

9   story.

10          But as you point out, and I think it is -- there

11  are no claims in this regard.  We have researched them.

12  There are no universities suing universities over this.

13  The employment context is different for those.  And

14  Mr. Weiner's right, as you know I am an employment lawyer,

15  and there are those suits and that's why I mention

16  employers sometimes do what I said, obtain release before

17  providing information.

18          THE COURT:  Let me ask you for your help on

19  that.

20          I realize we're talking about academic

21  institutions, but we're also talking about employment.

22          A new employer having recently hired this person

23  contacts someone else to verify that the person's

24  representation about her qualifications is correct.  In

25  the employment context when you have just regular everyday

1    business entities as opposed to academic institutions,

2    does the Good Samaritan rule apply?

3            MR. SPRINGER:  Well, because there is fear that

4    it doesn't, it's why people don't respond.  It's precisely

5    because of that chilling effect now, that you obtain

6    releases, you don't talk and, you know, you are leery of

7    doing it.  If there's any wisdom, it does have a chilling

8    effect because there has been talk about those lawsuits

9    and some do exist.

10           THE COURT:  And the upshot of that I guess is a

11   net loss to the public interest.

12           MR. SPRINGER:  I think that's right.  I think

13   that's right.  But people like me, counsel, employers all

14   the time are not to take the risk without an ironclad

15   release about providing information, even to your good

16   buddy who's in the industry because you never know what

17   that person hears and that person says.  It's just being

18   cautious.

19           THE COURT:  Thank you.

20           MR. SPRINGER:  Sure.

21           I wanted to pick up just briefly on Mr. Weiner's

22   point about Dongguk and it's in response to your question

23   not having an obligation to tell what it knew about

24   hearing the rumor which is said to be unfounded but turned

25   out to be founded and that, you know, that Dongguk should

1    have no obligation despite having all the interest here.

2            And I think going back to your point, I think

3    there -- if Yale is to have an obligation, Dongguk

4    certainly should have an obligation in the first instance

5    to provide what it knows.  And as we point out, there's a

6    public policy reason for not, you know, going forward with

7    the negligence claim.  I think it's just a troubling

8    statement to hear that Dongguk should have no obligation

9    under these circumstances.

10           Mr. Weiner talked about the statements and said

11   that we had provided the newspaper articles.  With regard

12   to the core of this complaint, as he repeatedly mentioned,

13   I believe, the June, the July, the August, September,

14   actions.  If that's the core the complaint, then I don't

15   see how those newspaper articles aren't integral.

16           We would argue that Chambers doesn't require

17   dispositive, that you know, the documents be dispositive.

18   But even if it does require that they be dispositive, that

19   would be fine here because those articles do contain the

20   defamatory statements and are dispositive.  That's where

21   they come from and, you know, even as we looked, and I

22   think we, as, you know, cite all those articles.  So I

23   just -- one, it's integral and, two, it -- if need be,

24   it's dispositive.

25           I want to say again, and I'm always leery

 1    about -- I want to be careful about how I say this --

 2    Mr. Weiner repeatedly mentioned that Yale accused Dongguk

 3    in essence of lying with its statements.  I think if -- I

 4    think if you look at the statements -- and again all the

 5    ones Mr. Weiner cited are ones that we cited on page 30

 6    and then explained.  I think if you engage with those

 7    statements, engage with -- and I won't walk through them,

 8    although I'm happy to.  You've been awfully kind and

 9    generous to provide us all this time, Your Honor.  I think

10    if you look at those, I don't think you can reasonably

11    infer that they're defamatory.  Even the last statement on

12    paragraph 143, if you look at the newspaper article, which

13    is Exhibit U, it doesn't even mention Dongguk.  It doesn't

14    even mention Dongguk.  And so, you know, where it cites

15    it.

16            Yale was very careful to deal with the issue of

17    what it was faced with, which was a great deal of a great

18    many documents that were fraudulent.  And yes, it made a

19    mistake, but it didn't attribute the fakery or the forgery

20    to Dongguk nor can it be reasonably inferred.  And I think

21    if you look at all that, it's there.

22            And just a couple of more brief points.

23            On the motion to stay, and it was just mentioned

24    briefly, there are three prongs, as you know.  One is the

25    burden of discovery which I think is -- there's no dispute

1    it will be enormous.  I will tell you just because it's

2    ironic, Mr. Fetner received an e-mail indicating that the

3    Korean Supreme Court had ruled that Ms. Shin now needs to

4    stand trial on the claim of forgery which had been

5    dismissed on a technicality.  So we have a hundred

6    thousand Korean documents already from that criminal

7    proceeding.  We are now going to have more documents.  The

8    burden, you know, that we laid out in our papers, you

9    know, in some ways are extraordinary here and, you know,

10   we laid out some of them but, you know, there's going to

11   be difficulties at every step of the way.

12           And Mr. Weiner has not indicated -- it's been 10

13   months, but there's been no prejudice.  And I think we've

14   made some substantial arguments with regard to the

15   viability of these claims.  And for those reasons, I think

16   the motion to stay should be granted at this point.

17           And one last thing about -- Mr. Weiner

18   speculated about a third party.  It's obviously not in the

19   complaint.  I note that I have trouble remembering what I

20   did last week.  There may be an issue of memory here with

21   regard to Ms. Shirmeister over two years and it's all

22   speculation at this point.  We want to focus on the story

23   they told and the documents that they made integral to the

24   complaint.

25           And I think, Your Honor, if those allegations

1    are engaged with, I think our arguments have some force

2    and I believe persuasive again.  Thank you for your time

3    and attention.

4              THE COURT:  Thank you.

5              MR. WEINER:  Your Honor, there just maybe,

6    may --

7              THE COURT:  Yes.

8              MR. WEINER:  In essence, the motion to stay in

9    some ways has been granted since this case was filed in

10   April or so.

11             THE COURT:  I apologize for that.  I referred

12   the case to the magistrate judge.

13             MR. WEINER:  And then there was a disclosure and

14   that caused an issue, but that motion was actually argued

15   in August and we hadn't gotten a decision on that.

16             I do believe that there will be a number of

17   discovery issues that will require either another

18   magistrate or Your Honor's time.  For example, issue of

19   Ms. Shin's criminal trial.

20             This case really doesn't -- we all know what

21   Ms. Shin did.  Really the issue from our perspective --

22   I'm not sure why all this discovery is part of this case,

23   other than to frighten the Court as to how much discovery

24   has to be done -- is the jury will determine whether the

25   statements were made negligently, recklessly or

1    defamatorily.  It's not that complicated.  It's not that

2    big discovery case.  Yes, there are facts that involve

3    Ms. Shin.  She was originally the person that caused all

4    this.  But the notion that we have to get into her

5    criminal trial as to whether or not she forged the

6    document, we all accept it.  The document was forged.  We

7    don't need to go down that road.

8            So I think the specter -- and I would

9    stipulate -- the specter of this huge amount of discovery

10   that needs to be done in Korea I think has been overstated

11   and I do think it would be appropriate to have a

12   conference, at least a conference.  At least let's get

13   moving on a discovery plan or something.  Because this

14   case has sat.

15           THE COURT:  My thought would be to convene a

16   telephone conference next week at which time I would give

17   you a ruling on the pending motions and we would see where

18   we stand and go from there.  But I don't want to keep you

19   waiting any longer for a ruling on the motion to dismiss.

20   Accordingly, if you're free toward the end of next week,

21   Thursday or Friday?

22           MR. SPRINGER:  Those are the two days I'm taking

23   a short vacation, Your Honor.

24           THE COURT:  Vacation?

25           MR. SPRINGER:  It's the first in a long time.

1    It's five days only.

2            THE COURT:  What's happened to the standards at

3    Day Pitney?

4            MR. SPRINGER:  I apologize, Your Honor.  It's,

5    you know, it is spousal request.

6            MR. WEINER:  Your Honor, I never have a problem

7    with another lawyer's vacation.  So if you want to push it

8    into the week after that, that's certainly fine.

9            THE COURT:  All right.  Are you around on

10   Wednesday, by any chance?

11           MR. WEINER:  That's Wednesday the 13th?

12           THE COURT:  No, no.

13           MR. SPRINGER:  Wednesday, the 4th.

14           THE COURT:  Next Wednesday.

15           MR. SPRINGER:  I am in New Jersey preparing a

16   witness for a deposition but I could certainly break free.

17   It just would be inconvenient.  That's the --

18           THE COURT:  Are you planning to be there all

19   day?

20           MR. SPRINGER:  I am.  Part of the juggling act.

21   If there were a way, I, you know -- if you want to -- it

22   is an all day session that is planned.  But I can

23   interrupt or -- if you want.

24           MR. WEINER:  I'm available.

25           THE COURT:  You're available more or less any

1    time Wednesday?

2             MR. WEINER:  Other than 12:30 lunch that I have

3    and a very early MRI which is going to be 7:30, which I

4    don't think the Court would be calling, I'm fine.

5             THE COURT:  You eat lunch, you go on vacation.

6    What am I doing wrong?

7             MR. WEINER:  This is what the legal profession

8    has come to.

9             THE COURT:  Well, we'll get back to you this

10   afternoon and see if we can set something up for

11   Wednesday.  If not, then we'll go to the following week.

12            MR. WEINER:  Okay.  I will be driving back to

13   New York City, so I expect to be back 3:30, 4:00.  So your

14   chambers can contact me, or let me give you a cell phone

15   number:  917-690-1488.

16            THE COURT:  Would you please repeat that.

17            MR. WEINER:  917-690-1488.

18            THE COURT:  Thank you.  We'll set up a time for

19   that telephone conference.  Until then, thank you very

20   much.

21                   (Proceedings adjourned at 12:50 p.m.)

22

23

24

25

1

2

3                          C E R T I F I C A T E

4

5                      In Re: DONGGUK  vs. YALE

6

7

8          I, Darlene A. Warner, RDR-CRR, Official Court

9   Reporter for the United States District Court for the

10  District of Connecticut, do hereby certify that the

11  foregoing pages are a true and accurate transcription of

12  my shorthand notes taken in the aforementioned matter to

13  the best of my skill and ability.

14

15

16

17

                     /s/_____
18
                       DARLENE A. WARNER, RDR-CRR
19                       Official Court Reporter
                       450 Main Street, Room #223
20                     Hartford, Connecticut 06103
                          (860) 547-0580
21

22

23

24

25