UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x
                                :
DONGGUK UNIVERSITY              :   No. 3:08CV441(RNC)
                                :
            Plaintiff,          :
                                :
        vs                      :
                                :
YALE UNIVERSITY                 :
                                :   HARTFORD, CONNECTICUT
            Defendant.          :   FEBRUARY 4, 2009
                                :
- - - - - - - - - - - - - - - - x



TELEPHONE CONFERENCE


    BEFORE:

        HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.






                        Darlene A. Warner, RDR-CRR
                        Official Court Reporter

APPEARANCES:

    FOR THE PLAINTIFF:

        MCDERMOTT WILL & EMERY
            50 Rockefeller Plaza
            340 Madison Avenue
            New York, New York 10173-4613
        BY:  ROBERT A. WEINER, ESQ.
            JEAN BAE, ESQ.

        JACOBS, GRUDBERG, BELT, DOW & KATZ, P.C.
            350 Orange Street, P.O. Box 606
            New Haven, Connecticut 06503-0606


    FOR THE DEFENDANT:

        DAY PITNEY LLP
            242 Trumbull Street
            Hartford, Connecticut 06103-1212
        BY:  FELIX J. SPRINGER, ESQ.
            HOWARD FETNER, ESQ.


    ALSO PRESENT:  Audrey Lu

1                            2:00 P.M.

2

3              THE COURT:  Hello.  Is everybody on?

4              MR. WEINER:  Yes, Your Honor, we are all on.

5              THE COURT:  Okay, great.  I'm going to ask you

6       to state your appearances for the record, please.

7              MR. WEINER:  Robert Weiner, McDermott Will &

8       Emery for the plaintiff Dongguk University, here with Jean

9       Bae and Audrey Lu?

10             MR. GRUDBERG:  Ira Grudberg, Judge, also for the

11      plaintiff.

12             MR. SPRINGER:  Felix Springer, Day Pitney, Your

13      Honor, for the defendant, Yale University.

14             MR. FETNER:  And Howard Fetner also of Day

15      Pitney for defendant.

16             THE COURT:  Thank you all.

17             I have not had as much time as I expected to

18      review the parties' papers and prepare a ruling for you,

19      which I regret.  I know that it's important for you to get

20      a ruling as soon as possible, but I want to be careful to

21      avoid making a mistake that could prove costly to you.

22             So what I want to do right now is ask you to

23      help clarify some things for me and tell me how you would

24      like to proceed in certain particulars.

25             I know from the discussion at the oral argument

1    that as far as the plaintiff is concerned, the core of the

2    case concerns the statements that were made by Yale

3    between June and September of 2007.

4             I have looked very carefully at those

5    statements, both as alleged in the body of the complaint

6    and in the articles that are referred to in the complaint,

7    and it seem to me that one or more of these statements

8    provides a basis for a claim.

9             I recognize that Yale takes the position that no

10   statement was defamatory because nobody said in so many

11   words the plaintiff never sent the letter of inquiry nor

12   did anybody say in so many words that the plaintiff forged

13   the fax reply.

14            Recognizing that, Yale's position is not

15   frivolous.  At the same time I think a reasonable juror

16   could construe one or more of these statements as a

17   statement that a very careful search had been conducted by

18   Yale looking for the letter of inquiry and nothing had

19   been found, which caused Yale to believe that no letter

20   had been received and implied that no letter had been

21   sent.

22            The difficulty that Yale faces is a function of

23   the context in which these statements were made.  The

24   statements viewed in isolation without regard to context

25   may be as Yale describes them, but when placed in their

1    appropriate context as spelled out in the allegations of

2    the complaint, there appears to be some basis for the

3    plaintiff's complaint that Yale was deliberately

4    distancing itself from any responsibility for the Shin

5    matter and making it appear that the plaintiff at a

6    minimum was to blame for accepting a forged fax and maybe

7    for failing to make an inquiry in the first place.

8              I think an objective, fair-minded neutral

9    looking at the sequence of events and considering the

10   statements in context could understand the plaintiff's

11   view that Yale behaved in a manner that violates

12   reasonable standards.

13             So I have no difficulty with the idea that the

14   plaintiff has brought this suit.  I have no doubt that

15   there is a legitimate basis for a complaint.

16             The case is so unusual that figuring out what

17   cause of action precisely applies is somewhat difficult.

18             I'm satisfied that the complaint adequately

19   pleads a defamation claim because one or more of these

20   statements are susceptible to this construction, and

21   accordingly I'm not going to dismiss that claim.  Harking

22   back to where I started, recognizing that this is the core

23   of the case, I appreciate that this is a significant

24   ruling, but that is the right ruling in my view.

25             With regard to the other claims, I think that

1    the negligence and implied contract claims predicated on

2    Ms. Shirmeister's fax reply are tenuous essentially for

3    the reasons that we touched on at oral argument.  I am

4    sympathetic to Yale's concern that recognizing a cause of

5    action for negligence or implied contract based solely on

6    Ms. Shirmeister's fax reply would create a significant

7    chilling effect.  At the same time, I think that the harm

8    to the plaintiff was foreseeable insofar as a failure to

9    exercise due care could, and likely would, cause the

10   inquiring party to hire or retain on its faculty somebody

11   who was in fact unscrupulous.  Foreseeability is in the

12   modern law critically important in deciding whether a

13   cause of action for negligence applies.

14            With regard to the implied contract claim, I'm

15   concerned that the claim is really no different in its

16   present form than the negligence claim.

17            And Mr. Weiner, you may not be prepared to

18   address this particular point at this moment, but I fail

19   to see any difference between the two and I'm wondering if

20   you can identify a difference between the two that matters

21   for purposes of this motion to dismiss.

22            MR. WEINER:  I'm not sure -- obviously the two

23   claims arise out of the same set of facts, same incidents,

24   but until -- quite frankly, Your Honor, until we have

25   discovery of Yale's protocols and processes and

1    procedures, it's really very hard for me to comment on

2    that.

3          It may well be that the contract claim

4    supersedes the negligence claim or vice versa.  And for

5    pleading purposes, I believe I'm permitted to assert

6    alternative theories of relief.  At some point I may be

7    asked to make my choice but it's not at the pleadings

8    stage.

9          So my view on that one, Your Honor, is, you

10   know, if we had our discovery and you came to me after the

11   discovery and said, okay, you know, you can't have it both

12   way, you have a negligence claim and a contract claim, I'd

13   probably be in a much better position to respond.  But,

14   you know, in terms of pleading my -- what I call my

15   possible causes of action, I pleaded the causes of action

16   that I felt fit the facts.

17         I don't know if that respond to Your Honor, but

18   that's what my thinking was.

19         THE COURT:  Okay, well at the oral argument, we

20   touched on the question whether it would make sense to

21   certify to the Connecticut Supreme Court questions

22   relating to the negligence claim.  These questions would

23   also bear on a claim for reckless and wanton conduct,

24   specifically, whether under Connecticut law Yale owed a

25   duty to the plaintiff to exercise due care in responding

1    to the letter of inquiry and whether a cause of action

2    lies for negligence or reckless and wanton conduct in the

3    absence of physical harm.

4         MR. WEINER:  That's fine, Your Honor.

5         One point I would like to make is that the

6    negligence and reckless disregard claims are not just

7    based upon the 2005 failure to provide accurate

8    information but also are in 2007 regarding what Yale did

9    over the course of those three or four months.  Despite

10   the fact that they had information that clearly provided

11   them with evidence that they had in fact, one, received

12   the inquiry, and two, sent out Ms. Shirmeister's fax to my

13   client.

14        THE COURT:  Right.  Just so we're all on the

15   same page, so to speak, the complaint does plainly allege,

16   as you say, that Yale was negligent not only in the first

17   instance when Ms. Shirmeister responded to the letter of

18   inquiry, but subsequently when Ms. Carney responded to the

19   letter from President Oh and ultimately when it made its

20   official statement.

21        Similarly, with regard to reckless and wanton

22   conduct, the complaint does allege that Ms. Shirmeister

23   was reckless in failing to follow Yale's protocols for

24   responding to such inquiries; that Carney was reckless in

25   failing to contact Shirmeister to find out if in fact she

1    had sent the fax; that Yale was reckless in failing to

2    contact Shirmeister any time between July and

3    October 2007; and that Yale was reckless in issuing its

4    public statements that it had never received the

5    registered letters and never received the fax reply

6    despite evidence to the contrary.

7              So you're right, and I suppose that complicates

8    matters somewhat because the issues that arise with regard

9    to the negligence claim based on Shirmeister's fax reply

10   also are pertinent to the negligence claims based on the

11   subsequent events and the recklessness claims based on all

12   the events.

13             Was there a duty under Connecticut law to

14   exercise due care to avoid causing harm to the plaintiff's

15   interest?  And does this duty apply notwithstanding the

16   absence of physical injury or the prospect of physical

17   injury?  Is foreseeability of harm enough?

18             MR. WEINER:  Your Honor, just one other point on

19   that.  Yes, we did discuss the public policy issues

20   regarding 2005 fairly at length and I think competing

21   public policies on that particular point.  I don't believe

22   the same public policy interest is in seven.

23             THE COURT:  Right.  This is what I'm thinking

24   and I'd like to give you an opportunity to comment, if not

25   right now, then at another time.

1          I don't want to put you in a position of having

2     to litigate in two different places, here and in the

3     Connecticut Supreme Court, unless it's reasonably

4     necessary and something that you want to do.  I don't want

5     you to be incurring unnecessary expense and delay if I can

6     help it.  And so I'm somewhat reluctant to certify any

7     such questions, although certainly willing to consider a

8     request that I do so.

9          It seems to me that another way of dealing with

10     this rather unusual case would be for me to transfer it to

11     another judge.

12          Just kidding, just kidding.  That was just a

13     playful aside.

14          Another way of dealing with this would be for me

15     to deny the motion to dismiss the other claims and revisit

16     the legal sufficiency of the claims after discovery, at

17     which time we would know what Yale's protocols look like,

18     we would know what was going on in the real world during

19     the initial period as well as the six months that are at

20     issue in 2007, and I would hope to be able to provide you

21     with a better, considered better reasoned ruling at that

22     time.

23          I think that for me to certify the questions

24     without providing the Connecticut Supreme Court with a

25     better developed factual record might prove to be very

1    unsatisfactory to them.  I think when you're called on to

2    determine whether a common law theory provides a cause of

3    action for an injured party, you naturally want to know as

4    much as you can about the factual context in which this

5    claim arises.  And that's particularly true when you're

6    being asked to consider whether there was a duty and

7    whether the duty was breached.

8              So that would be my preference.

9              MR. SPRINGER:  Your Honor, I don't mean to

10   interrupt.  This is Felix Springer.

11             I think in light of the, as it were, question

12   you have posed, I would like a little time to consider

13   that.  And the reason is, you know, contrary to Bob

14   Weiner's statement, discovery for Yale in Korea is going

15   to be very considerable.  We've got issues of damages,

16   we've got causation, we've got reputation, we've got

17   contributory negligence, all of which are complicated.

18   And I'm not sure -- and this is what I want to take very

19   seriously in light of what Your Honor's statement is -- is

20   to how much more factual context that will be helpful to

21   the Connecticut Supreme Court may be developed.

22             Our own view of course is that the protocols

23   are -- may be irrelevant here.  And, you know, and this

24   may be the appropriate factual context in light of these

25   allegations.  At least it is a very serious question, as

1     Your Honor put it very early on in this conversation, with

2     serious implications.  So I guess I'd like to ponder it a

3     little bit and come up with a little more of a reasoned

4     response or at least a little more of a considered

5     response.

6             And I point out as well perhaps and, you know,

7     without getting astray, that the public policy reasons

8     that we had offered would apply to, you know, the events

9     in 2007 as well as kind of the fruits of what occurred

10    here.  But that's at least my initial thought that, you

11    know, waiting perhaps a week and getting back to you for,

12    you know, a considered response here makes some sense.

13            THE COURT:  That's fine.  That's fine.

14            MR. WEINER:  I don't have any problem with that.

15    I do -- I would like to address the discovery side of this

16    case.

17            Essentially we have had a stay of discovery

18    since the time we have filed the complaint.  Your Honor

19    has I believe correctly determined that there is a -- at a

20    minimum there's a defamation claim that's been asserted.

21    And as I understand the case law on motions to stay

22    discovery, which is the other motion that's before you,

23    that unless you're going to prevail on all grounds, on

24    your motion to dismiss, or unless you can establish that

25    discovery would be greatly curtailed by dismissing certain

1    claims but not others, there is no reason to have a stay.

2    And for sure if defamation claims survive, which I think

3    you said they will, the discovery is broad.

4         Mr. Springer has already told me that he wants

5    broad discovery on reputational damages.  He wants broad

6    discovery on other aspects of the claim.  So while we may

7    be pondering whether or not there is a negligent disregard

8    or an implied contract claim, those claims are not going

9    to be additional discovery if they are upheld.  They will

10   simply be the same discovery.  So I would urge the Court

11   that we move forward on discovery.

12        And I will also mention to the Court, we have

13   not even had Rule 26(a) disclosures in this case.

14        MR. SPRINGER:  Your Honor, I would only disagree

15   in this sense:  That if some of the counts are out of the

16   case, such as the implied contract, we won't be dealing

17   with protocols and we may not be dealing with certain

18   other issues.  I think waiting a week and having a better

19   sense or having a better sense of what remains in the case

20   and what course of action, as it were, or what course, I

21   should say, the case will take, will give everybody a

22   better sense of how to frame what they're going to be

23   doing.

24        I just think it's better to have as much

25   information as you can when you're -- and particularly in

1    this -- as we've all said, this is not your typical case.

2    There are a lot of judgment calls to be made because all

3    of the, you know -- again, there's a lot of expense

4    associated with all of it and consequences.

5         So I think it may be worth at least delaying

6    that one week so that we can all get a better sense of

7    where we're going.

8         THE COURT:  Okay.  Well, I am sympathetic to the

9    plaintiff's concern that discovery has not proceeded at

10   all.  I'm sorry that the magistrate judge wasn't able to

11   keep the case and move it along but I'll do what I can to

12   move it along now.

13        The point I'm trying to make is that the case is

14   not going to be dismissed.  The core of the case will be

15   litigated.  In light of that, I think in fairness the

16   plaintiff should be allowed to get started in earnest with

17   discovery.

18        If people are willing to wait until we know

19   whether we're going to be certifying one or more questions

20   to the Supreme Court and have an opportunity to take that

21   into account in deciding how to proceed with discovery,

22   perhaps that makes sense, but to my mind if the core of

23   the case is going to be litigated, referring of course to

24   the defamation claim based on the series of statements in

25   the second half of 2007, then it seems to me the discovery

1   is bound to be very wide ranging.

2           For instance, the plaintiff's theory is that

3   Yale -- well, rather than try to paraphrase it, maybe I

4   can just pull it up on my screen.

5           The plaintiff says that as of July 10, 2007,

6   Yale knew that the Korean press had written about the

7   plaintiff's employment of Shin and knew that the plaintiff

8   had told the press that in employing Shin it had relied on

9   the fax reply.  The plaintiff alleges that Yale knew the

10  importance of providing accurate information to the press

11  regarding its communications with the plaintiff.  The

12  complaint alleges that Yale knew or should have known that

13  if it did not provide accurate and complete information

14  regarding its communications with the plaintiff about Shin

15  that the plaintiff would be vilified in the Korean media,

16  its reputation significantly tarnished, and that the

17  plaintiff would suffer severe consequences.

18          And then the plaintiff says, "Instead of

19  acknowledging that the fax was authentic, Yale embarked on

20  a campaign designed to distance itself from any

21  responsibility regarding Shin by denying any knowledge of

22  plaintiff's efforts to verify Shin's Ph.D.."

23          It might well be that under Rule 8 I'm obliged

24  to credit the accuracy of that allegation, that is an

25  allegation of fact, not law.  That's an allegation of

1    fact.  In the context set out in the complaint, I'm sorry

2    to say, it's plausible.

3         So if that's the plaintiff's theory, then it

4    seems to me, even if there was no negligence claim based

5    on Ms. Shirmeister's alleged failure to exercise due care

6    in the first place, the plaintiff would certainly be

7    entitled to depose Ms. Shirmeister concerning what she

8    did.  The plaintiff would be entitled to full discovery on

9    Yale's protocols.  Why?  Well, the theory is Yale knew it

10   was responsible and distanced itself from its

11   responsibility or at least tried to.  In order for the

12   plaintiff to be able to demonstrate that, the plaintiff

13   would, of course, have an undoubted right to demonstrate

14   exactly what Yale does or does not do when it receives a

15   request for verification of a degree.

16         If the plaintiff could prove that Yale has

17   protocols because it recognizes the significance of these

18   inquiries and wants to be careful to be accurate, then

19   that only helps the plaintiff's claim.  So in that regard,

20   I don't see how discovery is going to be significantly

21   altered by a ruling on the viability of the negligence and

22   implied contract claims insofar as they're based on

23   Ms. Shirmeister's conduct in September of '05.

24         MR. SPRINGER:  You know, Your Honor, I hear your

25   theory.  I think that the events of 2007 certainly

1    implicate whatever protocols existed far less than the

2    implied contract claim and the allegations there.

3            I think with regard to those allegations in

4    2007, I don't mean to argue the point at any length, I

5    just think they are -- the scope of discovery would be far

6    less in light of the allegations about the implied

7    contract and the degree to which they implicate the

8    protocols.  And here we're looking at 2007 and at best a

9    very limited inquiry.

10           THE COURT:  Okay, well --

11           MR. WEINER:  May I just quickly respond to that?

12           First of all, I agree with Your Honor's

13   analysis, but putting that aside, this is not a broad

14   discovery.  The protocols exist or they don't.  There are

15   probably a bunch of documents that aren't a lot.  So we're

16   not talking about it broadens discovery in some

17   significant way.

18           THE COURT:  Well, why don't we do this:  For

19   today we'll leave it that the motion to dismiss the

20   defamation claim is denied.  The motion to stay discovery

21   relating to that claim is denied.  The parties are invited

22   to let me know within a reasonable period of time what

23   they would like me to do with regard to certifying one or

24   more questions to the State Supreme Court.  Until I hear

25   from you on that, I'm not going to issue a ruling on the

1    other claims.  And with regard to discovery, I will assume

2    that counsel will talk in light of today's discussion and

3    try to come up with a mutually agreeable approach to the

4    discovery that's going to have to be done with regard to

5    the defamation claim.

6              I will be available to speak with you if you

7    need to speak with me in the next week or two.

8              MR. SPRINGER:  Okay, Your Honor.  As you may

9    remember, I also am heading out of the country tomorrow.

10             THE COURT:  Oh, right, right, I forgot.

11             MR. WEINER:  Could we set a date for -- a fixed

12   date for your response, you know, maybe -- Felix, since

13   you're going to be away, a week from Monday, that is the

14   16th.

15             MR. SPRINGER:  Could I just ask it be the 17th?

16   That will allow me one day in the office.

17             MR. WEINER:  No problem at all.  And we can talk

18   whenever you're free at your convenience to talk about

19   discovery and scheduling.

20             Your Honor, we did do a Rule 26(f).

21             MR. SPRINGER:  We did.

22             MR. WEINER:  What we didn't agree on is when the

23   discovery would start, but I think we did talk at length

24   about different things, and perhaps we can now address

25   that in terms of specific dates.

1          MR. SPRINGER:  I think also, Your Honor, there

2     were some areas of disagreement, as I remember it, with

3     regard to the 26(f), and unfortunately we may have to --

4     we may have to work with those, but we'll try to work it

5     out and see where we can get on our own certainly.

6          MR. WEINER:  And my last question is under

7     26(a), which I didn't think was really covered by the

8     motion to stay, I think the parties really should respond

9     to that 26(a) ruling requirements in terms of initial

10    disclosures at this point.

11         THE COURT:  That sounds right to me.

12         MR. SPRINGER:  Yeah, I just, you know -- here

13    again it's just requiring a little time to do that.

14         THE COURT:  Well, I'll leave it to you to work

15    that out.  I know that you have a lot of other things

16    going on and I won't presume to force anybody's hand

17    unless and until you've had a chance to try to work it

18    out.

19         MR. SPRINGER:  Sure.

20         THE COURT:  Okay.  Just as a final point.  I

21    want to say that I have not overlooked the defendant's

22    repeated point about causation.  At the oral argument, we

23    talked about what harm would be foreseeable in the

24    ordinary course if a university like Yale were to

25    incorrectly verify that a person had received a Ph.D. and

1    we reckoned that there probably wouldn't be much.  We did

2    not talk at length about the harm that would be

3    foreseeable in the circumstances that arose in June, July,

4    August and September of 2007.

5         I think the circumstances described in the

6    complaint would lead a reasonable person to think that

7    harm was certainly foreseeable insofar as the plaintiff's

8    reputation is concerned.  Yet, without taking anything

9    away from that basic point, it does seem remarkable to

10   think that Yale, could be confronted with a demand for

11   literally scores of millions or even hundreds of millions

12   of dollars.

13        Why am I saying this?  Well, we are encouraged

14   to present our views to counsel at each and every step of

15   the way if they could help influence the parties to settle

16   a case.  And I may be stating the obvious, but if the

17   plaintiff is at this time motivated to forge ahead in the

18   belief that that kind of recovery is realistically

19   available, I don't mean to imply by anything I've said

20   today that I necessarily agree.  It seems to me that the

21   touchstone should be reasonableness all the way around.

22   What was the plaintiff's reasonable expectation when it

23   submitted the letter of inquiry to Yale in September of

24   2005?  What could one reasonably expect of Yale at that

25   time in that situation?  What was the plaintiff's

1    reasonable expectation in mid-2007 when it alerted Yale

2    that there were concerns about the legitimacy of this

3    individual whose degree had been verified by Yale?  What

4    could one reasonably expect of Yale in that situation?  On

5    the face of it, it's hard to avoid the question, gee, why

6    didn't somebody call Ms. Shirmeister?

7              Even assuming that Yale really missed the boat

8    here, it really didn't do what it should have done, is it

9    responsible for the total destruction of a university, a

10   100 year old university?

11             That might be an exaggerated view, I

12   respectfully submit, and I would urge you to ask what is

13   reasonable?  What makes sense now?

14             You know, this saga has evolved to this point.

15   What is done is done.  Where we go from here is, you know,

16   not just a matter of the fickle finger of fate.  It's

17   within the power of all of us to do something sensible and

18   bring about a sensible conclusion to this saga.

19             So I leave you with that thought.

20             MR. WEINER:  Your Honor, just so you're aware,

21   and I don't know if you are, we had a -- at the request of

22   Yale -- a day long session to try and settle this case

23   before the magistrate.  As a result of that, the vice

24   chancellor, my client, flew to the United States to meet

25   with the magistrate and Yale and its counsel.  And in

1    anticipation of that settlement meeting, we were asked to

2    provide the magistrate with a damage analysis which would

3    basically as much as possible pinpoint the bases for our

4    claim.

5              And Your Honor should be aware that there are a

6    number of things that were in that analysis that I'd like

7    to bring to your attention.  Among other things, there

8    were, I think, three or five million dollars worth of

9    donations that had been pledged that were canceled as a

10   direct -- as a result of this incident.  A law school for

11   which the university has spent I believe in excess of

12   $10 million in construction costs, among other things, the

13   government did not give them permission to open that law

14   school despite the fact it was one of the top qualified

15   universities for purposes of opening a law school.  So not

16   only do you lose the expense of the investment to the law

17   school itself, you also lose all the revenues and other

18   things that come from a successful law school, and as I'm

19   sure Your Honor knows, the universities are very much

20   moneymakers for those schools.

21             In addition, job fairs which the university

22   holds on an annual basis, major Korean companies refused

23   to attend those job fairs because of this situation.

24             In Korea reputation is taken very seriously.

25   And we will have both actual proof of damages as well as

1     expert testimony on this point, but you might want to

2     think about it in the context of, if you remember, for

3     example, the 60 Minutes story on the Audi 5000 where

4     supposedly the brakes didn't work, someone would step on

5     the accelerator, whatever.  It ruined that brand

6     permanently.

7                And so, Your Honor, I believe that the damage

8     side here -- and I would, you know, hope that you aren't

9     prejudging the damage side.  We're happy to discuss it

10    with you at any point, but this isn't just a pulled out

11    number that we made up.  There are a lot of serious

12    elements and that doesn't even take into account what's

13    called brand rehabilitation damages which occur in

14    defamation situations where someone has to restore their

15    good name, and what needs to be done in order to do that.

16               So we understand our burdens in this regard and

17    we've been talking about them quite frankly for some

18    period of time and I'm sure they will be the subject of

19    discovery.

20               So I mean, we do believe we have a damages

21    claim.

22               MR. SPRINGER:  Your Honor, what troubles me is I

23    think you're right, you know, what is reasonable and where

24    is causation here where the chair of the board is

25    convicted and what reputation is affected?  And

1    Mr. Weiner's words, which I think, you know, are really

2    unrealistic, and unfortunately in the settlement

3    discussions we also saw unrealistic expectations, but it

4    also points out why discovery here will be so onerous and

5    why the parties are unfortunately at this point very, very

6    far apart in what is reasonable and realistic.

7              I think Your Honor's words, you know, couldn't

8    be more appropriate.  Unfortunately there is a great

9    divide and a much different view of -- and, you know, from

10   my point of view, Your Honor, no willingness, you know, to

11   recognize that there may even be causation issues, that

12   it's all Yale's fault.  We have a press release and we

13   have a continued campaign, even after settlement

14   negotiations, to blame Yale and make Yale a scapegoat and

15   gain all of this, and it's troublesome.

16             So I think there is this dynamic which makes

17   this case very difficult that I know you're by no means

18   impervious to.

19             THE COURT:  I wish there were a way we could

20   address this great divide short of the kind of effort that

21   would otherwise be necessary if it were to be litigated in

22   the ordinary course.  I'm trying to think if there is a

23   way.  I don't know if an early summary jury trial or some

24   such alternative would be at all helpful.

25             MR. WEINER:  I don't think so without the

1    discovery, Your Honor.  We really want to know what's

2    going on on the Yale side.  I'm sure Mr. Springer wants to

3    know more about our damage and reputational claims.

4              MR. SPRINGER:  Among other things.

5              MR. WEINER:  Among other things.

6              THE COURT:  Right, right.

7              MR. WEINER:  This is a case where I believe that

8    the discovery as to what went on in Yale is going to be

9    eye opening.  I mean, it's very hard for me to understand

10   how they never spoke to Shirmeister or --

11             MR. SPRINGER:  Well, you know, that's the

12   allegation, Bob, that's just the allegation.

13             MR. WEINER:  Okay, well, then if they did, why

14   she didn't say, oh, by the way, I did say this, instead of

15   having three months' worth of --

16             MR. SPRINGER:  Well --

17             MR. WEINER:  But, Your Honor, I think at this

18   point the parties did spend a considerable amount of time

19   in August trying to resolve this, and nothing has changed

20   since August because we've been waiting for the motions to

21   be decided.  So I think the next step is to go forward

22   with discovery.

23             THE COURT:  Okay.

24             MR. GRUDBERG:  A long way up from zero, Judge.

25             MR. SPRINGER:  Ira, that's not what happened in

1    the settlement conference and you know it.

2             MR. GRUDBERG:  Zero plus an apology.

3             MR. SPRINGER:  No, it was considerably more than

4    that.  And in the realm of reasonableness I think that was

5    a fair beginning anyway.

6             THE COURT:  Okay, well, if there's anything that

7    you need from me in the next week, I know, Felix, you're

8    going to be away, but if somebody needs to call me for any

9    reason, don't hesitate.  Otherwise I'll expect to hear

10   from you on the 17th.

11            In fact, it might make sense if we just

12   scheduled another conference for then or perhaps later in

13   that week.  I could do something on the 17th and I could

14   also do something on Friday the 20th.  It might be that

15   what we ought to do is talk on the 17th and then talk

16   again on the 20th.

17            MR. WEINER:  That's fine, Your Honor.  I am

18   available, other than the lunch period, I'm available all

19   day on the 17th.  The 20th I have a deposition.  So if

20   it's at all possible, do it very early or very late would

21   be better for me.

22            THE COURT:  Why don't we leave it this way:

23   I'll plan on speaking with you on the 17th at a time to be

24   determined and I'll also plan on speaking with you on

25   Friday the 20th.  What I have in mind is I'll hear from

```
 1    you on Tuesday the 17th about where you stand with regard
 2    to certification and any of the other matters we've left
 3    open.  Then, having heard from you on those matters on
 4    that day, I'll give you definitive answers, hopefully, on
 5    the 20th.
 6                MR. WEINER:  Could we arrange on the 17th -- and
 7    perhaps, Felix, you and I could talk on the 16th with
 8    regard to discovery and if we have issues we can raise
 9    them on the 17th and decide how to proceed from there.
10                MR. SPRINGER:  Fair enough.
11                MR. WEINER:  Felix, I know it's your first day
12    back, let me know what works best for you.
13                MR. SPRINGER:  I will indeed.  Thank you.
14                THE COURT:  All right.  Thank you all.
15                   (Proceedings adjourned at 2:55 p.m.)
16
17
18
19
20
21
22
23
24
25
```

```
1
2
3                       C E R T I F I C A T E
4
5                    In Re: DONGGUK  vs. YALE
6
7
8            I, Darlene A. Warner, RDR-CRR, Official Court
9   Reporter for the United States District Court for the
10  District of Connecticut, do hereby certify that the
11  foregoing pages are a true and accurate transcription of
12  my shorthand notes taken in the aforementioned matter to
13  the best of my skill and ability.
14
15
16
17
                     /s/_____
18
                        DARLENE A. WARNER, RDR-CRR
19                        Official Court Reporter
                        450 Main Street, Room #223
20                      Hartford, Connecticut 06103
                            (860) 547-0580
21
22
23
24
25
```