```
                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - x
                                 :
DONGGUK UNIVERSITY               :   No. 3:08CV441(RNC)
                                 :
                 Plaintiff,      :
                                 :
          vs                     :
                                 :
YALE UNIVERSITY                  :
                                 :   HARTFORD, CONNECTICUT
                 Defendant.      :   March 30, 2009
                                 :
- - - - - - - - - - - - - - - - x
```

                          TELEPHONE CONFERENCE


      BEFORE:

          HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

APPEARANCES:

      FOR THE PLAINTIFF:

              MCDERMOTT WILL & EMERY
                  50 Rockefeller Plaza
                  340 Madison Avenue
                  New York, New York 10173-4613
              BY:  ROBERT A. WEINER, ESQ.
                   JEAN BAE, ESQ.

              JACOBS GRUDBERG BELT DOW & KATZ
                  350 Orange Street
                  P.O. Box 606
                  New Haven, Conneticut 06503-0606
              BY:  IRA B. GRUDBERG, ESQ.

      FOR THE DEFENDANT:

              DAY PITNEY LLP
                  242 Trumbull Street
                  Hartford, Connecticut 06103-1212
              BY:  FELIX J. SPRINGER, ESQ.
                   HOWARD FETNER, ESQ.

                              Darlene A. Warner, RDR-CRR
                              Official Court Reporter

1                          2:30 P.M.

2              THE COURT:  Hello.

3              MR. SPRINGER:  Hello, Your Honor.

4              MR. GRUDBERG:  Hi, Judge.  Ira.

5              MR. WEINER:  Good afternoon, Your Honor, Robert

6    Weiner.

7              THE COURT:  Good afternoon.  Did everybody get a

8    chance to identify themselves for the record?

9              MR. SPRINGER:  I don't think I did, Your Honor.

10   Felix Springer, and with me is Howard Fetner for Yale

11   University.

12             MR. WEINER:  Robert Weiner, McDermott, Will &

13   Emery.  I'm here with Audrey -- excuse me -- Jane Bae for

14   Dongguk.

15             MR. GRUDBERG:  Ira Grudberg also for Dongguk

16   University.

17             THE COURT:  Thank you very much.  We set up this

18   telephone call to discuss the dispute you're having with

19   regard to the plaintiff's disclosure of its computations

20   of claim damages.  I've read your correspondence,

21   including its attachments.  Where does the matter stand at

22   the moment?

23             Mr. Springer?

24             MR. SPRINGER:  I think you have our last letter

25   which I believe was sent to you Thursday.  We have had no

1    further correspondence.  And all we have at this point,

2    Your Honor, is the initial disclosures or are the initial

3    disclosures, I suppose.

4                THE COURT:  Okay, all right.

5                Mr. Weiner, do you have any suggestions as to

6    how we might be able to resolve this problem?

7                MR. WEINER:  First of all, Your Honor, I think

8    that the disclosures are detailed, and I'd like to go

9    through them for the record.

10                Mr. Springer complained in his last letter to

11    you, he has no idea from reading his disclosures as to how

12    we came up with $50 million worth of damages.  And if you

13    look at the disclosures, at pages 11 and 12, we explain

14    the losses in detail:  $16 million for the first year.  At

15    page 10, we explain that we lost $8 million of grants in

16    the first year.  At page 14, we explain that we incurred

17    $18 million in expenses in constructing a new law school

18    and everything that goes along with that.  And that law

19    school did not come into fruition because of the

20    situation.  And then we explained that there was probably

21    $5 million per year of lost revenues that would have been

22    received from the law school.

23                So just taking those hard damages, which are

24    expenses and revenues, we are somewhere over $40 million.

25                But we also explained in detail in our

1    disclosures that the university suffered intangible

2    damages in the form of loss of reputation, and we gave

3    examples as to how that occurred.  University --

4    corporations not coming to the university job fair, fall

5    off in applications, diminution in quality of students who

6    were applying.  And we explained that those are intangible

7    damages which are not easily calculated and which will

8    require expert testimony in terms of valuing that.

9         And then we also explained there's another

10   category of damages for which we will also need expert

11   testimony, which is brand rehabilitation damages.  Where a

12   corporation suffers a reputational damage, they have to

13   undergo certain expenses in terms of marketing and

14   promotion in order to restore their reputation.  And

15   again, that will be the subject of expert testimony.

16        And we also explained, Your Honor, that -- if

17   you read the request for production of documents and the

18   interrogatories that Yale has served, certainly beginning

19   on page 17 and that's attached to my letter -- there are

20   multiple document requests and interrogatories which were

21   based upon these disclosures.  So we think we have

22   provided what we can provide.  And quite frankly, Your

23   Honor, we had no further information beyond what we put in

24   there.

25        This is going to be an ongoing process.  We will

1    be able to supplement as we obtain our expert testimony

2    and reports and we will certainly supplement as we get

3    additional information on an ongoing basis in terms of

4    loss of revenues or grants, things of that nature.  But I

5    don't have any further information, the client doesn't

6    have any further information, and we put that together

7    initially at the request of Magistrate Martinez who in

8    asking that the parties come together and try and resolve

9    the case, wanted us to be as complete as we could possibly

10   be so that she understood the magnitude of the damages as

11   of that time, which is, you know, maybe six months ago.

12   Things have not dramatically changed.

13           So I'm not sure where we go from our end.  We

14   think we have complied.

15           THE COURT:  Mr. Springer?

16           MR. SPRINGER:  Thank you, Your Honor.  Let me

17   start at the end.

18           Although there are numbers there, there are no

19   computations of damages.  And I'll go back through it, but

20   I think it helps that Mr. Weiner has gone specifically

21   through.  And the last he mentioned was brand

22   rehabilitation damages.

23           What we have here is a statement that there will

24   be brand rehabilitation damages, which are the moneys that

25   Dungguk will need to expend to rehabilitate its brand name

1    and will have to engage in a series of public relations

2    and marketing activities to rehabilitate its brand name.

3    As we said in our correspondence, we want to know what

4    damages they can compute to date with regard to that.   If

5    it is zero, Your Honor, we ought to know that at this

6    point.  All we are asking for here is what they've

7    expended.   That information is in Dongguk's hands.

8    Presumably they have receipts, they have canceled checks.

9    And if they have expended nothing in the 18 months since

10   Yale noted that it made a mistake back in November of

11   2007, we ought to know that as well.  We ought to know

12   that one because Rule 26(a) requires them to do so at this

13   time.

14          And they have been, you know -- at the time they

15   filed this complaint over a year ago, they could have

16   reasonably expected to provide this information because

17   they claimed $50 million in damages in that complaint.

18   And so -- and furthermore -- you know -- so if they've got

19   zero, if they've expended nothing, if they have done

20   nothing with regard to a series of public relations and

21   marketing activities -- quite frankly, we are puzzled by

22   the need to retain an expert to determine the amount of

23   damages in this category because it's going to be a series

24   of expenditures that they have made.  We see nothing of

25   that.  And, you know, if they're going to spend some stuff

1    in the future, monies in the future, that's fine.  All we

2    want, as we've said in our papers, and all Rule 26

3    requires, and we agree, that they tell us what damages

4    they've incurred to date.

5            THE COURT:  All right, all right, I think that

6    clear enough.

7            Mr. Weiner, can you tell us?

8            MR. WEINER:  They have not engaged in a brand

9    rehabilitation program as of now because it requires

10   engaging a person who's expert in having to do that.  And

11   which is as I've said to Mr. Springer since we met in

12   August, this is something that we are in the process --

13   and quite frankly met and continuing to meet with people,

14   and we will select someone -- but it is not something we

15   have spent to date.  It is something that will be a future

16   expense.

17           And the type of detail that Mr. Springer is

18   talking about -- and we have now researched this pretty

19   thoroughly -- there is no case law that supports

20   Mr. Springer's position that essentially we have to

21   provide the actual receipts and things of that nature.

22           Rule 26 is there to -- for Mr. Springer to

23   understand the categories of our damages, not for us to

24   have all of our proof of our damages in that disclosure.

25   And not only -- we actually have some lower court cases

1     that we could provide to Your Honor on that.  But we have

2     in hand as much detail as we now know, and we will

3     continue to supplement that.  I have nothing further to

4     provide to him.

5              THE COURT:  Okay, so Mr. Springer --

6              MR. SPRINGER:  Your Honor, if I just might --

7     all we're asking for is what Rule 26(a) requires, which is

8     a computation of each category of damages and the making

9     available for inspection, as copying, the documents or

10    other evidentiary material, unless privileged or protected

11    from disclosure, on which each computation is based.  And

12    that's all we're asking for, Your Honor.  What it

13    requires.

14             The reason there's no case law is people comply

15    with this.  I've never had a problem with this in the

16    hundreds, if not more, cases in federal court.

17             The other thing I want to point out is, contrary

18    to what Mr. Weiner said here, the expert here is not being

19    retained according to the initial disclosure statement

20    with regard to determining what it needs to do to

21    rehabilitate its image.  Its basically, as it said in the

22    disclosure, is in the process of retaining an expert to

23    determine the amount of damages in this category.  And

24    again, I don't see what that could be except adding

25    invoices.  If that's -- and there's no expert that's

1    needed for that.

2          That's contrary to what Mr. Weiner just said

3    about the need to retain an expert to determine how to

4    rehabilitate now 18 months after Yale has issued its

5    apology in essence.

6          MR. GRUDBERG:  If the Court please, you know,

7    the expert needn't be the same person.  If you have to get

8    somebody to tell you what the best way is in Korea to

9    rehabilitate the name of Dongguk, which has, we believe,

10   has been trashed here, that's not necessarily someone

11   who's going to testify as to what it costs and how much it

12   should cost and so forth.  They could be two different

13   people that Bob is talking about.

14         MR. SPRINGER:  My point, Ira, is what the

15   initial disclosure said and what we're entitled to.  We

16   understand the other point that's being made.

17         MR. GRUDBERG:  Well, we've told them that

18   nothing has been put out on that because we're not ready

19   to waddle around in the water crazily until someone tells

20   us how best to go about this, as I understand what

21   Mr. Weiner said.

22         MR. WEINER:  That's exactly right, Your Honor.

23   We -- if I had further information, which is pretty

24   detailed --

25         MR. SPRINGER:  That's fine --

1          MR. WEINER:  May I finish, Felix?

2          If I had additional information to give to

3    Mr. Springer, I would give it to him.  I'm not holding

4    anything back.  I've given him as much as I can in terms

5    of the revenues, loss revenues, incurred expenses, loss

6    donations.  And the documents that he has requested are

7    the ones we're going to provide to him.

8          He's asking me for Yale to say something that I

9    can't say.  I don't know what the rehabilitation plan will

10   encompass nor do we know at the moment what its cost will

11   be.  It's one of the things we've engaged our experts

12   about.

13         THE COURT:  Mr. Springer, I think we have an

14   answer with regard to brand rehabilitation damages.

15         MR. SPRINGER:  Fair enough.  I understand it to

16   be zero.

17         THE COURT:  Right.

18         MR. WEINER:  It's not a zero.  It's not yet

19   calculated.

20         THE COURT:  It's zero as of today.

21         MR. WEINER:  It's not yet calculated as of today

22   because we don't -- we're not in a position to calculate

23   it because we need someone to tell us how to go about

24   doing it.

25         THE COURT:  Right.  To be clear, based on your

1    understanding, Mr. Weiner, the plaintiff has thus far

2    incurred zero expense with regard to brand rehabilitation.

3    You expect that once you have an expert, there will be

4    expenses incurred for brand rehabilitation, but as of

5    today, the actual amount incurred is zero.

6              MR. WEINER:  As far as I understand, that's

7    correct, Your Honor.  The only exception is I think we

8    placed one ad at one point in time, but I don't know the

9    cost of that.

10             THE COURT:  Okay.

11             MR. WEINER:  They brought that ad to us when we

12   met with the magistrate.

13             THE COURT:  Mr. Springer, where would you like

14   to turn now?

15             MR. SPRINGER:  I might as well start at the

16   beginning, Your Honor, with regard to these categories.

17   Injury relating to students' perception of Dongguk

18   University.

19             THE COURT:  All right.

20             MR. SPRINGER:  Your Honor, my difficulty is

21   there is a statement here -- all of these.  There's a

22   decrease in the number of student applications for the

23   graduate and undergraduate programs as a result of the

24   Shin incident.  There's a decrease in the Dongguk

25   University, satisfaction with Dongguk University.  Those

1    two, there is no computation in damages, and I'm at a loss

2    to see what further information Mr. Weiner would need to

3    be able to tell us tell us at this point what those --

4    what's the computation of damages is and, in essence,

5    documents that support that or tell us how they arrived at

6    that.  We have the information.  I'm at a loss to --

7    there's certainly no computation here.

8            MR. WEINER:  I'm not sure what Mr. Springer

9    would expect me to do.  These are reputational damages and

10   this is part of the defamation claim.  It's not the kind

11   of loss profit analysis or loss of revenues or increased

12   expenses.  This is a jury -- a jury should have to

13   determine based upon these facts what it determines the

14   reputation value to be.  I could put any number on it, but

15   it's not a computation.  It's not anything I can come up

16   with a fixed dollar amount.  It's totally in the province

17   of a jury in a defamation per se case, which this is, and

18   I don't think there's any law out there -- it's totally in

19   the jury's domain.

20           THE COURT:  What would you ask the jury to do

21   with regard to the decrease in the number of student

22   applications depicted on page 8?

23           MR. WEINER:  One of the things, we were asked to

24   give categories.  We would ask a jury to put a dollar

25   value on the diminution of -- on the diminution of

1   reputation.  This goes to the overall reputation of the

2   university.

3        We are trying to show how the reputation of the

4   university has been negatively impacted and there are

5   indicia that show that.  One is loss of application.  Two

6   is a lower quality student.  These are the intangible

7   aspects of a reputational damage case.

8        I could put any number on it but it's not a

9   calculation in the traditional way, and I'm not sure what

10  more we can do.  It's -- ultimately -- that's why we

11  started the case the way we did.  It could be one dollar,

12  it could be a million dollars, it can be $10 million, but

13  it's not that kind of calculation.

14       THE COURT:  Do you propose to offer evidence

15  that would allow a jury to make a reasoned determination

16  as opposed to a speculative guess with regard to the

17  relationship between the defamation and the decrease in

18  the number of applicants?

19       MR. WEINER:  I think that is evidence.  The fact

20  that we can establish that there has been an adverse

21  impact on the faculty, an adverse impact on the students

22  that would apply on the student body, that is evidence

23  that the jury can consider in determining that their

24  reputation has been diminished.  And once they have made

25  that determination, then they will take those factors into

1    consideration in reaching a number.

2           But getting beyond that, we do expect to have

3    evidence that will go into reputational damages.  And I

4    understand there are, in the trademark area or any of

5    these areas, that there are intangible damages that need

6    to be calculated.  Again, the subject of expert testimony.

7           THE COURT:  So dealing just with decline in the

8    number of applications, you report a drop of approximately

9    4,000 between 2006 and 2008.  Your position today, as I

10   understand it, is that a jury could reasonably find that

11   some number of those are attributable to the defamation.

12   And were a jury to make that finding, what would you

13   expect the jury to do?  How much would each one be worth?

14          Let's say you -- let's say the jury concluded

15   that a thousand people who would have applied, but for the

16   defamation did not apply?  What would that be worth?

17          MR. WEINER:  I would expect that the jury, in

18   terms of its deliberation, to make that determination

19   based upon its view of -- I mean, I can't -- I'm not

20   trying my case right now.  I have no discovery.  So what I

21   would expect it to do, is make the determination that the

22   reputation of the university has been diminished, and

23   then, like in any case where you have intangible damages,

24   I would expect the jury to come up with a number they

25   believe was appropriate to award to the person whose

1    reputation was diminished.

2          MR. GRUDBERG:  Such as a usual defamation case,

3    it's very, very difficult to put a number, a hard number

4    to a jury.

5          The plaintiff stands up and says as much as it

6    can say about the indicia that would show that the

7    reputation has been diminished, like a very significant

8    lowering of number of applicants.  Hopefully we'll be able

9    to determine or we'll be able to show that because of the

10   diminution in applicants, the overall student body isn't

11   as good as it would have been, which impacts on the

12   school.

13         You've got the figures on faculty, acceptances

14   and non-acceptances.  And it just seems to me that if

15   you've got a university that -- in Korean terms, we think

16   we can show was flying pretty high and all of a sudden

17   it's hurting -- spent a bunch of money on a law school,

18   which it can't open now, that overall the number is up to

19   a jury.  Bob or I can stand up and say we think it's worth

20   10,000,000.  Felix can stand up and say we don't think

21   it's worth anything.  But reputation damage typically

22   is -- and the hurt imposed to a reputation, is something

23   that really is a jury's camp.

24         We can stand up and say numbers that the Court

25   or the jury may think is silly or they may not.  But it

1    just seems to me that it's not the kind of thing that is

2    subject to the kind of calculation in a narrow sense that

3    Mr. Springer's talking about as far as 26(a).

4              MR. SPRINGER:  Your Honor, if I may?

5              THE COURT:  Sure.

6              MR. SPRINGER:  I didn't know who I was

7    interrupting, I hope it wasn't you.

8              MR. GRUDBERG:  It was me.

9              THE COURT:  No, no, go right ahead.

10             MR. SPRINGER:  The issue I think, as Your Honor

11   is indicating, is this is a strange case and here

12   reputation damages arguably have practical consequences.

13   And what we're looking at is presumably the damages

14   calculations and what is being set forth here.  And what

15   Mr. Weiner and Mr. Grudberg are talking about is that the

16   reputation damages in these categories have had practical

17   consequences.  And I think your questions, Your Honor, are

18   exactly the right ones.  You know, if there is a practical

19   consequence here, how are you calculating the damages?

20             For instance, you know, does the loss of a --

21   what's the cost of a loss of student?  Arguably in C, the

22   decrease with Dongguk University's student satisfaction,

23   the practical consequence of that was to bring additional

24   revenue into the school because these students had to take

25   an additional course, which is exactly why we think for

1    these practical consequences we ought to get computations.

2            THE COURT:  It seems to me that to the extent

3    the damages are subject to a reasonable computation, the

4    plaintiff needs to provide one.  If the plaintiff --

5            MR. WEINER:  Your Honor, I think we have.

6            THE COURT:  Mr. Weiner, if the plaintiff's

7    position is, look, they really are not subject to that

8    kind of computation, then the plaintiff should say so.

9            As I listen to the statements that have been

10   made today, I recognize that there is some truth to what

11   you have said to some degree, these damages are not

12   subject to calculation in the way that special damages

13   typically are calculated.  I think that we might be able

14   to advance the case if you were to think about it that way

15   and provide Mr. Springer with a clearer understanding of

16   how you see it.

17           MR. WEINER:  Your Honor, I think we did exactly

18   that.  Maybe we should go directly to the disclosures.

19           THE COURT:  Well, okay.

20           MR. WEINER:  Okay?  I mean, I would like to walk

21   you through it then.

22           THE COURT:  Let me see if I can help.

23           In this part of your disclosure -- and I'm

24   referring to page 8 -- you point out that you've

25   experienced a decline in applications and I'm wondering --

1          MR. WEINER:  Just so you understand our thinking

2     on this, Your Honor, the first -- pages 8 and 9 and the

3     first half of 10, go to the reputational damages that we

4     were just talking about.

5          THE COURT:  Right.

6          MR. WEINER:  Then when you go to the next

7     element on page 4 -- Number 4 on 10, where Mr. Springer

8     asks for the practical impact, where it actually comes

9     into actual dollars, where we can determine, then we talk

10    about it.  We talk about the loss of grants, corporations,

11    donations, sponsorships and individual donations, and we

12    spell out the dollar amounts.

13         THE COURT:  Right.

14         MR. WEINER:  And then if you go through there,

15    we actually show there were $20 million promised and

16    $5 million received.  And we have the actual numbers for

17    Mr. Springer.

18         THE COURT:  Right.

19         MR. WEINER:  It continues into page 12, and we

20    were very specific about the campaigns that were involved.

21    And then you get to page 13, which talks about the law

22    school in very specific terms, about the losses that were

23    incurred and the loss revenues that were resulted from the

24    fact that we can't open a law school.

25              And then we move on to the intangible damages in

1    terms of brand rehabilitation.

2              THE COURT:  Okay.

3              MR. WEINER:  I think we have provided, again,

4    what we can provide.

5              THE COURT:  So --

6              MR. WEINER:  We gave it to them.

7              THE COURT:  Are you saying, in other words, that

8    for those items that appear on pages 8, 9, and 10, under

9    Numbers 1, 2 and 3, you do not believe that they are

10   subject to the kind of computation that you provide for

11   Items 4 and 5.

12             MR. WEINER:  That's what I'm saying, Your Honor.

13             THE COURT:  Mr. Springer?

14             MR. SPRINGER:  Well, this is my difficulty with

15   that, Your Honor:  With regard to our -- are we then

16   saying that when I think of practical consequence, I look

17   at the decrease in student applications?

18             And let's just assume, as we must for this

19   exercise, that they're claiming all of this is

20   attributable to Yale, and we then look -- and I want to

21   know what profit they make on each additional student

22   here.

23             For instance, if the class size went down to

24   2,727, how many fewer faculty did they higher in fact as a

25   result of this?  May it have been more profitable for the

1    university to operate?  Or, you know, did they -- I don't

2    know what they did in relationship to this decreased size.

3            Similarly, you know, the increase in the

4    students who rejected the offer of admission, leaving

5    aside all the causation arguments, you know, what

6    practical effect did that have?  Did it have any effect on

7    enrollment?  Couldn't we get back to A?

8            Similarly, I want discovery with regard to C

9    and, you know, what practical effect?  But what I'm

10   hearing is the presentation at trial will say, you know,

11   in essence this is, you know, injury to reputation and

12   this is one of the fallouts and we really can't provide

13   any computation or any guidance for you and we will leave

14   it in the realm of speculation because that's where we see

15   it, Your Honor.  And, you know, if I can come up with

16   these suggestions, and I'll go through the numbers, by the

17   way, for 4 and 5 because I think we're a long way from a

18   damage computation on those even though there are numbers

19   set forth.  But here we're essentially being told the jury

20   can speculate.  And by the way, Mr. Springer, you're

21   discovery may well be irrelevant to all of this.

22            MR. GRUDBERG:  That's not what we're saying at

23   all, Judge.

24            MR. SPRINGER:  Then why not provide computations

25   along those lines or show us where the practical

1     consequences play out?  And not leave it in the realm of

2     speculation?

3               MR. GRUDBERG:  The 26(a) doesn't end discovery,

4     it sort of begins it.  You put something out there, the

5     things that Mr. Springer is talking about, we want to know

6     what the profit is per student, we want to know this, that

7     and the other, he's entitled to depose people, he's

8     entitled to get documents, all of those things.  But 26(a)

9     is not supposed to be a volume of a zillion pages.  And

10    just because he thinks he would calculate damages somewhat

11    differently than Mr. Weiner has, he's entitled.  But he's

12    entitled to get discovery and so forth.

13              But we just started this.  I don't think that's

14    what 26(a) is about.  We put in a calculation, of the

15    things we feel we can't calculate --

16              MR. SPRINGER:  That's not a calculation, Ira.

17              MR. GRUDBERG:  Well, in terms of the numbers of

18    Mr. Weiner throughout the writing of the $40 million, it's

19    a calculation.  It's an addition.  And it points out they

20    had 21,000,000 in pledges and they had 5,000,000 in change

21    in computer payments.  Now, you know, whatever else may

22    have happened to Dongguk, he can look into that.  But it

23    is a calculation.

24              We added two or three numbers and came up to

25    $40 million.  And to say that, just guessing -- unless the

1    feeling is going to be just because Dongguk is an

2    institution, it can't have general damages to its

3    reputation, which may not be fully shown in the various

4    smaller piles of money we thought that we had, that we

5    otherwise would have had.  We believe Dongguk is not

6    entitled because it's a corporation, because it's an

7    entity to general damages.  General damages are just that.

8    Who knows what pain and suffering are worth.  It's up to

9    what a jury tells us it's worth.  There will be testimony

10   concerning it, and however compelling or winning it is,

11   we'll see in front of a jury, if it comes to that.

12           But it just seems to me that just because we

13   can't put a number on general damages, reputation damages,

14   would mean that no libel action could ever go to a jury on

15   general damages.  And we know that's not the law.

16           MR. SPRINGER:  Your Honor, if I may, one thing

17   you said, Ira, you said that Mr. Weiner and I may

18   calculate damages differently.  The difficulty here is

19   there is no computation or calculation of any damages and

20   we are left in the dark and we are left to think that all

21   that is going to occur is speculation.  There is no

22   calculation or computation with regard to 1, 2, or 3, and

23   I would maintain with regard to 4 and 5 as well.

24           THE COURT:  Would you please tell me why you

25   view 4 and 5 that way so we can better understand the

1    dispute with regard to those items?

2              MR. SPRINGER:  Sure, Your Honor.  Let me start

3    with 5 because it's easier, and we can go to 4.

4              We'll start also with the back, which is D, if

5    we could.  This is on page 14.

6              THE COURT:  Yes.

7              MR. SPRINGER:  The damages in this category

8    include the following:  Reconstruction of the law

9    department building, okay?  And it says $8.7 million.  Are

10   we to understand -- that's a number that is put out there,

11   okay?  And if we're being told that's the damages, then

12   we're to assume that this building has no other use,

13   cannot be resold, has no value at all; that the

14   reconstruction has no -- similarly for the new

15   construction of the law library and mock court, 2.4, that

16   these have no value whatsoever without a law school.  And

17   similarly for the purchase of real estate and construction

18   of a law school dormitory, that these have no value

19   whatsoever.

20             What we understand is this is an expense that

21   has been laid out, but to call it damages is to tell us

22   that these have no value, can't be sold, there is no

23   utility for Dongguk.  That is my difficulty with the

24   numbers.

25             THE COURT:  Okay.

1        MR. SPRINGER:  And the newly hired law school

2    faculty members and the salaries provided them, are they

3    not teaching anything else?  Have they not taught anything

4    else?  You know, is this -- is that what we are being

5    told?  And that's why we want a calculation.

6        If we're being told these are the damages and

7    that's what it is, that's fine, but just to have a number

8    doesn't tell us the damage calculation.

9        Similarly, if you go back now to loss of annual

10   earnings, that presumably is a calculation that in essence

11   there are expenses and there are revenues related to that

12   and there would be documents that we would be able to see

13   beginning in 2008, so presumably it occurred last year and

14   presumably the law school they claim would have opened in

15   2008.  You know, something I have difficulty with.

16       The loss of annual government grants,

17   3.5 million.  Are we saying that there are no expenses

18   whatsoever related to any of these?  If that's so, that's

19   fine, but typically, you know, Your Honor -- and I serve

20   on lots of non-profits and deal with lots of educational

21   institutions -- grants come with requirements and

22   expenses.  So it is not, you know, a simple matter of, you

23   know, them losing these.  And if they're telling us these

24   are essentially gifts to which, you know, are being given

25   to Dongguk, that's not what it says.  It says grants.

1          Then loss of projected annual donation which

2     would come from law school alumnae.  So we are finding out

3     that every year, starting before they have graduated

4     maybe, because we're asking for it now, we're going to get

5     $2,000 from each graduate.  The first class, even if it

6     opened in '08, presumably if it's a U.S. style is three

7     years, is, you know, going to start in 2011.

8          I raised funds for three educational

9     institutions.  You know, Your Honor, maybe Harvard because

10    of its grants gets 2,000 a year, but that's a different

11    story.

12         Let them estimate what they will, but that's my

13    difficulty.  We have a number here that is not a damage

14    calculation, it's a number thrown out, as you were, for an

15    item without taking into account what the value is to

16    Dongguk.  If there's nothing that's fine.

17         And similarly, then, with regard to these, what

18    expenses are associated with an item.  That's Number 5.

19         You know, I'm happy to go to Number 4 and talk

20    about the same matter there.

21              THE COURT:  Let's stick with Number 5.

22              MR. WEINER:  May I respond, Your Honor?

23              THE COURT:  Yes, please.

24              MR. WEINER:  First of all, this isn't what

25    Rule 26 requires.  Mr. Springer is raising his problems

1   with the damages that we have going forward.  He thinks

2   we've overstated them.  That's his prerogative.  These are

3   the damages we believe were appropriate.  We put them in

4   there for that reason.

5           Now, we've -- also it was attached, Your Honor,

6   to my letter, from Mr. Springer's document request.  And

7   if you look, beginning at page 17 of that request, for the

8   next five or six pages, and then further on in his

9   request, he has sought the very type of detail he is now

10  saying that a party must provide in a Rule 26(a)

11  disclosure.  There's no authority for that.

12          We have complied with this rule as far as we can

13  do.  If he wants to argue at trial that our damages are

14  overstated because we didn't take into account certain

15  expenses or certain uses for a building that might be used

16  for some other reason, he has asked for that in discovery,

17  but it's not my obligation to agree with him that my

18  damages should be discounted under his theories.

19          THE COURT:  Let's see if we can figure out how

20  best to proceed from here.

21          MR. WEINER:  Why can't we go to the discovery

22  requests and provide him with the discovery he's seeking?

23  This is not a matter where he doesn't know what he's

24  looking for.  He knows very well what he's looking for.

25  We have to provide him with that detail.  He's already

1    asked for that.

2          THE COURT:  Let's just talk this through a

3    little bit more and maybe it will wind up benefiting all

4    concerned.

5          Focusing on part five, taking each point in the

6    order in which the points were made, I gather, Mr. Weiner,

7    that with regard to the $8.7 million claimed for

8    reconstruction of the law department building, what we see

9    is a number, 8.7 million.  That, as far as you know, is

10   the cost to reconstruct the building?

11         MR. WEINER:  Correct.

12         THE COURT:  And similarly, the 2.4 million for

13   the new construction of a law library and mock court is

14   the number that you have received from your client and it

15   reflects just that, the cost to build this library and

16   mock court?

17         MR. WEINER:  Right.

18         THE COURT:  So stepping back from this, am I

19   right, you have prepared this document in conjunction with

20   a settlement conference?

21         MR. WEINER:  The initial -- yes.  The initial

22   request from Magistrate Martinez in anticipation of the

23   settlement conference was for us to spell out as best we

24   could the basis for our damages.

25         THE COURT:  This was its intended purpose at the

1    time you pulled these figures together, which is a

2    distinctly different purpose from the one Mr. Springer has

3    in mind, which is satisfying the requirements of Rule 26

4    insofar as it calls upon you to provide a computation of

5    each category along with documents and other evidentiary

6    material on which each computation is based.

7              MR. WEINER:  I don't see there being any

8    difference, Your Honor.  In fact, I would say Rule 26 is

9    less demanding than Judge -- Magistrate Judge Martinez's

10   order.

11             THE COURT:  Okay, well, let's think practically

12   about this situation.

13             Mr. Springer, hopefully you have a better

14   understanding with regard to exactly what you're looking

15   at, and on that assumption, would you be content to seek

16   the type of detail that you believe should have been

17   included but was not through the discovery process and in

18   that way, you know, expect to receive the detail that you

19   have not yet been given?

20             MR. SPRINGER:  The difficulty I have with that,

21   Your Honor, is that I hear what you're saying and, you

22   know, I don't want to create more work for all of us than

23   is needed, but the difficulty I have here is that

24   Rule 26(a)(1)(A)(iii) provides for, as you've read and

25   I've read now, copies of the documents or other

1    evidentiary material upon which these computations are

2    based.  We will now know in advance to that what --

3    assuming we have heard that these are the damages now

4    claimed, we will now get those documents in response to

5    that.

6            What I am concerned about, Your Honor, is the

7    answers to the requests for production or even

8    interrogatories may not yield the same information.  I

9    fear we may get objections.  We will be derailed.  And

10   this is a clear path to that than what ought to be

11   provided.

12           Presumably this was done with the 8.7 million

13   and the 2.4.  We ought to get this information so that,

14   you know, we don't have to worry about future fights, we

15   don't have to worry about whether the interrogatories map

16   this exactly.  If we have a dispute in the future, we can

17   refer, as often we do, to the responses to initial

18   disclosures.

19           And that's my concern, Your Honor, that by not

20   honoring this, I'm left with, you know, having now to

21   speculate as to what necessarily would have been produced

22   here.  And whether they map exactly, whether I have

23   everything and it creates a lot more work and quite

24   frankly a lot more anxiety than it would to get responses

25   to these -- to these initial disclosures to which again we

1    believe we're entitled, particularly if these are now the

2    claimed damages, it's kind of easy to set forth what the

3    documents are.  Presumably they looked at some documents

4    to come up with these numbers and we can get them.

5              MR. WEINER:  Your Honor, I don't understand what

6    Mr. Springer is saying.  The rules, the advisors' notes to

7    the rules, Moore's on federal procedure and any Court that

8    has construed these rules has made it very clear that the

9    burden on the plaintiff to provide these types of

10   disclosures is in the detail.  We gave more detail than

11   those rules even require.  And beyond that, it was for the

12   other side to have an opportunity so they had -- they can

13   frame their discovery requests, so they know what to look

14   for in discovery.

15              It is not a substitute for discovery, and that's

16   exactly what Mr. Springer just said to you.  He said, we

17   can't rely on and trust discovery so we want this all done

18   today.  That's not what's appropriate under this rule.

19   The rule is set forth so that Mr. Springer understands my

20   categories of damages, which he does; he understands how

21   I've calculated my damages, to the extent he can; he also

22   understands that there are intangible reputational damages

23   that I can't calculate at the moment.  He has therefore

24   now served his discovery request.  Is he now going to

25   withdraw them because they're no longer necessary?  I

1   doubt that.

2            He has -- and we've provided them to you, Your

3   Honor -- he has category after category after category of

4   document requests based upon our disclosures and

5   interrogatories based upon our disclosures.  It is not my

6   burden at this point in the proceeding to take into

7   account all of the arguments that he has made as to why my

8   client's damages should be discounted.

9            He has enough -- we'll argue that to the jury

10   when the time comes -- but we believe that when we say

11   that we spent $8.7 million on a building, we're entitled

12   to be compensated for it, when we say we spent

13   $2.4 million on a library, we're entitled to it.  We've

14   complied with our burden.

15            THE COURT:  Mr. Weiner, you may want to repeat

16   the last part of your statement because the reporter

17   couldn't keep up with you.

18            MR. WEINER:  I'm sorry, when we gave the

19   categories and we were very specific with the amounts, 8.7

20   for the new building, 2.4 for the building and mock court,

21   6.3 for the law school dormitory as well as the other

22   specific elements, they were put in there because they

23   were specific computations of damages which we believe our

24   client has suffered.

25            Mr. Springer understandably has arguments why

1    those numbers should be discounted, but I have fulfilled

2    my burden in complying with Rule 26(a) by providing him

3    with the categories and our computations.  That's why we

4    now have discovery, he will see whether he's correct that

5    these were used for other purposes or could be used for

6    other purposes and that those damages should be

7    diminished, assuming that we win on liability.

8              But in terms of where we are at this point, it

9    seems to me we should move on to the discovery phase which

10   he's already served.

11             THE COURT:  All right.  May reaction to all of

12   this is as follows:  I hark back to the discussion we had

13   about how to try to tackle this very unusual case in a way

14   that would hopefully promote the goal of achieving a

15   prompt, reasonable, inexpensive disposition, to the extent

16   those goals can be achieved.

17             Right now our focus is not on damages but on

18   liability.  Damages are in the picture because we hope

19   that you can have a meaningful settlement conference at

20   the end of this initial phase.  But the main focus is on

21   liability.

22             It is conceivable that the plaintiff will

23   encounter great difficulty trying to impose any liability

24   on Yale, but whatever the case may be, the objective is to

25   enable all of us to get a better handle on that as soon as

1    possible so that people don't spend a lot of time and

2    effort and money needlessly.

3            With that in mind, I don't think the plaintiff

4    should be ordered to produce additional work product

5    reflecting the details that one can at least arguably

6    contend are called for by Rule 26(a)(1)(A)(iii).

7            Mr. Springer, I would leave it to you to follow

8    up with your discovery requests in this context and

9    request another conference if you think that the

10   information you received through discovery is insufficient

11   to enable you to prepare adequately for a meaningful

12   settlement conference, because of course I want to do what

13   I can to lay the groundwork for a meaningful settlement

14   conference.

15           If the case settles, fine, if it doesn't settle,

16   then I guess we will be confronting potentially thorny and

17   even frustratingly complicated questions about damages.

18   Where one draws the line between sufficient evidence to

19   support a reasonable estimate by a jury on the one hand,

20   and on the other, impermissible speculation and folded

21   into that would be issues relating to causation, as you

22   mentioned.

23           So rather than enter the order that you request,

24   I'm going to leave you to the discovery process given the

25   particular concerns we have in this case and our

1    particular objectives in this first phase.

2            I think we know that with regard to Items 1, 2

3    and 3, there is no computation available and I don't see a

4    need to insist on having one done, particularly if it

5    diverts attention from the main event here in this phase,

6    which is liability.

7            With regard to Items 4 and 5, I recognize that

8    these numbers raise lots of questions and I expect that

9    you will be able to get answers to those questions, if not

10   through formal discovery, then perhaps informally.  But

11   certainly you do have legitimate questions as you have

12   demonstrated in your statement regarding 5.

13           While I have you all on the phone, perhaps it

14   would be helpful, Mr. Springer, if you expressed your

15   thoughts on Item 4.

16           MR. SPRINGER:  Well, they're similar, Your Honor

17   to Item 5.

18           What we have here is we have two sets of

19   numbers.  We have a total approximate donation amount that

20   has been promised and then a total approximate donation

21   amount that was actually received.

22           THE COURT:  Right.

23           MR. SPRINGER:  We have a difference of

24   $15.6 million.  They are saying that, you know -- one of

25   the immediate questions is:  What is the typical yield on

1    these sorts of pledges?  Do they always get 100 percent?

2    And why do they think 100 percent is warranted here?

3             We -- there are the same kinds of questions.

4    There is absolutely no discounting, and we suspect that

5    some of the donors to get out of their pledges would have

6    indicated something like personal issues.  That's been my

7    experience.  A loss in the stock market, a business

8    reversal, all sorts of reasons come into play.  But they,

9    like their estimates in Number 5, are basically saying

10   that there is no discounting for the hosts of reasons that

11   occurs here.  And that's their calculation.  We understand

12   that now that this is their calculation of damages.

13             They've indicated on the next page 3, categories

14   of donations and what was the target amount, and then the

15   amount promised.

16             So one -- those are essentially the questions

17   that, to my mind Your Honor, fall in the same category as

18   we had with the real estate, if you will.  Why is there no

19   discounting in these circumstances?  And if you're

20   claiming 100 percent, that's fine.

21             And all attributable to Yale?

22             THE COURT:  That appears to be the case.

23             MR. SPRINGER:  That's what I'm understanding,

24   Your Honor.  That's fine.

25             THE COURT:  All right.  It seems to me that if

1    we are going to have a meaningful settlement conference

2    and if the plaintiff is going to claim these figures as

3    the basis for its demand, then at some point in advance of

4    that conference, the plaintiff should provide us with the

5    information that Mr. Springer has requested.  Perhaps the

6    plaintiff doesn't need to provide all of the detail that

7    one could dream up in a set of interrogatories or

8    deposition questions for an expert witness, but the

9    plaintiff does have an obligation to prove causation.  The

10   plaintiff does have an obligation to mitigate damages.

11           I think the plaintiff would be serving the

12   interest of all concerned, including the plaintiff, if

13   further information were provided.

14           MR. GRUDBERG:  It's possible also, Judge, that

15   further information could go the other way from the way

16   Mr. Springer is trying to push it.  The fact is, you don't

17   often spend $40 million to go to law school on dorms and a

18   library and so on and so forth without borrowing money.

19   If you didn't borrow money, if you had the money to put

20   up, the loss of the use of the money, and the fact is that

21   if they knew they weren't going to have a law school right

22   away, they probably wouldn't have built it.

23           MR. SPRINGER:  But Ira that's precisely the kind

24   of calculation we're entitled to.  If you're borrowing the

25   money and you're paying interest on it, that's exactly

1    what should happen.  Don't speculate and tell me that.  It

2    should be in 26(a).

3              MR. GRUDBERG:  It shouldn't be in 26(a).  You

4    ask for it in your discovery for God's sakes.  I've never

5    seen a 26(a) as complete as the one Bob put together on

6    this one in my almost 50 years of practicing law.  And as

7    he says, you ask for it and you get it.

8              But I'm just pointing out that at this stage of

9    the game if you figure in interest problems and so forth,

10   the number may be higher rather than lower, that's all.

11             MR. WEINER:  Your Honor, we're happy to provide

12   Mr. Springer with the backup documents that support every

13   number that we put into our disclosures.  But again

14   Mr. Springer continues to argue why these numbers should

15   be discounted.  That's his prerogative.

16             Just so we're clear, while he's taking issue

17   that we may be attributing 100 percent to Yale, he's also

18   attributing 0 percent to Yale.  Maybe there's a middle

19   ground out there that we can reach when it comes to trying

20   to resolve this case, but this is not just a one-way

21   street.

22             THE COURT:  Well, we don't have a jury here.  We

23   have a difficult case to contend with, and to try to

24   resolve.  I think Mr. Springer has made some good points.

25   They seem to me to be fair and reasonable.  If the

1    plaintiff believes in good faith that it can claim every

2    dime it cost to build the law school, okay.  If the claim

3    is that the facility is essentially useless, okay.  But

4    that doesn't sound fair and reasonable to me and I doubt

5    that's going to be the plaintiff's position.

6            Similarly, Mr. Springer points out that the

7    plaintiff can't realistically maintain that Yale is

8    responsible for every single lost donation to the last

9    penny, and clearly such a claim would be absurd.  Let's

10   speak frankly.  That would be ridiculous.  I don't think

11   the plaintiff intends to be ridiculous.  So further

12   information along that line is clearly in order.

13           While, you know, we can accept for today the

14   reality that Items 1 through 3 are advanced simply to

15   sensitize Yale to the practical consequences that one can

16   discern in these numbers, a decline in population, decline

17   in student body, increased dissatisfaction among the

18   student body, et cetera, you know, you don't have anything

19   you can offer today that would be in the nature of a

20   calculation of damages.  But still to be clear, the

21   numbers are put out there simply to sensitize Yale, not to

22   suggest that at some point in time the plaintiff is going

23   to try to hold Yale responsible for each and every student

24   who decided not to go to this university, et cetera.

25           I mean, I think, speaking plainly, that's what's

1    going on.  That's not the end of the world, but please, I

2    hope that we will be able to have a surer, more realistic,

3    more balanced statement of damages in advance of the hoped

4    for settlement conference that's going to come along in a

5    matter of months.

6         So I would urge the plaintiff to take these

7    matters into account.  I do think that it's a whole lot

8    more effective for lawyers to exchange views and

9    information in a conference than it is through the

10   formality of written discovery requests and responses.  I

11   would hope that you would take advantage of the time we

12   have to engage in that sort of back and forth off the

13   record in advance of the settlement conference, and I

14   volunteer to be available to help facilitate that if you

15   wanted to have that kind of an exchange with me.

16        MR. WEINER:  Your Honor, we would appreciate any

17   efforts that you can make.  I do think that both sides

18   have served their first wave of the document requests,

19   interrogatories and notices to admit and that will help

20   the parties, I would presume, to reach an accommodation,

21   if we can.

22        And in terms of Dongguk's calculation, as I'm

23   sure Your Honor is aware, often as cases progress, both

24   sides' view of damages will change.  The defendants often

25   go up and the plaintiffs often go down, but there needs to

1    be a flow of information in order to get there.

2              MR. SPRINGER:  We would agree with that.

3              THE COURT:  I think we all understand what you

4    have just said, and I know that you're all very

5    experienced and very capable.  I know that you have the

6    emotional intelligence, not just the legal acumen and

7    experience, to put yourself in the other person's

8    position, and I hope you will do that, because to me, you

9    know, that's what separates the really good lawyers from

10   the rest and that's what promotes fair, just and speedy

11   resolutions of cases, especially difficult cases.  So I

12   hope that you will use your resources to make progress in

13   the weeks and months ahead.

14             On that note, I will let you go and wish you

15   luck and remind you that I'm here if you need me.

16             MR. SPRINGER:  We appreciate that very much,

17   Your Honor.  It's why we came to you this time, and I

18   think this conference has been beneficial.  I would hope

19   Mr. Weiner feels the same way.

20             MR. WEINER:  We do, Your Honor.

21             THE COURT:  All right, good.

22             MR. GRUDBERG:  Thanks, Judge.

23             THE COURT:  You're most welcome.

24                  (Proceedings adjourned at 2:40 p.m. p.m.)

25

1

2

3                        C E R T I F I C A T E

4

5              In Re: DONGGUK UNIV.  Vs. YALE UNIV.

6

7

8              I, Darlene A. Warner, RDR-CRR, Official Court

9    Reporter for the United States District Court for the

10   District of Connecticut, do hereby certify that the

11   foregoing pages are a true and accurate transcription of

12   my shorthand notes taken in the aforementioned matter to

13   the best of my skill and ability.

14

15

16

17
                        /s/_____
18
                           DARLENE A. WARNER, RDR-CRR
19                           Official Court Reporter
                           450 Main Street, Room #223
20                         Hartford, Connecticut 06103
                              (860) 547-0580
21

22

23

24

25