# EXHIBIT F

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Düsseldorf  Houston  London  Los Angeles  Miami  Milan
Munich  New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Robert A. Weiner
Partner
rweiner@mwe.com
+1 212 547 5408

August 6, 2009

**VIA E-MAIL AND REGULAR MAIL**

Howard Fetner, Esq.
Day Pitney LLP
1 Audubon Street
New Haven, CT 06511

Re:   <u>Dongguk University v. Yale University, No. 3:03-CV-00441 (RNC)</u>

Dear Howard:

First, I write concerning your July 6, 2009 letter and first set of production of documents. Our review of Yale's document production has revealed numerous deficiencies in your responses to our First Set of Requests for the Production of Documents. These deficiencies in turn raise serious concerns regarding your compliance with the Federal Rules of Civil Procedure ("Fed. R. Civ. Pro.") in collecting and producing electronically stored information ("ESI").

Additionally, I will address your July 2, 2009 letter regarding Yale's Objections and Responses to Dongguk's First Set of Requests for Admission and Dongguk's Objections and Responses to Yale's Requests to Admit, and your July 8, 2009 letter regarding Yale's Objections and Answers to Dongguk's Interrogatories and Dongguk's Objections and Answers to Yale's Interrogatories.

## I. General Deficiencies In Yale's Responses To Dongguk's First Requests For Production

We have reviewed Yale's July 6 letter and Yale's initial production of documents in response to Dongguk's First Set of Requests for the Production of Documents ("Requests"). Your letter and document production raise several issues. A cursory review of the subjects covered by the letter shows that Yale has only taken the barest of efforts to respond in compliance with Dongguk's Requests.

As a preliminary matter, your July 6 letter identifying the Bates ranges of the documents included in the document production does not comply with the Instructions included in both parties' Requests. Dongguk's Requests Instruction 3 states "For each Request for Production, Yale shall identify, by Bates numbers, all documents that Yale is producing in response to that

U.S. practice conducted through McDermott Will & Emery LLP.
340 Madison Avenue  New York, New York  10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444  www.mwe.com
NYK 1216930-9.081817.0011

Howard Fetner, Esq.
August 6, 2009
Page 2

Request for Production."[1] However, your letter merely identifies broad categories of documents by Bates ranges. In contrast, our June 25, 2009 letter accompanying our first set of responses complies with your Instruction 5(a) and identifies to which Requests and/or Interrogatories each document is responsive, as does our July 24, 2009 letter accompanying our second set of responses. Thus, please provide us with a supplemental letter identifying the Requests and/or Interrogatories to which the documents you produced are responsive.

Second, we are confused by the documents you have labeled in your July 6 letter as "documents numbered YALE000002124–YALE00005964" which are "September 2005 communications to and from Pamela Schirmeister, Edward Barnaby, and Alicia Grendziszewski." The vast majority of these documents do not seem to correspond to any of Dongguk's Requests and/or Interrogatories. Please confirm to which Requests and/or Interrogatories this set of documents is responsive.

Finally, to the extent that you claim that any documents that are responsive to the Requests are privileged, please identify them as such on a privilege log in accordance with Fed. R. Civ. Pro. 26(b)(5)(A).

## II. Specific Deficiencies In Yale's Responses To Dongguk's First Requests For Production

A review of Yale's individual responses and the documents actually produced by Yale reveals that Yale's document production fails to respond to many of Dongguk's Requests either in whole or in part, and that therefore, Yale's response is woefully inadequate. These deficiencies are addressed below.

**Request 1.** We disagree with your objection that the Request for documents relating to any part of Yale other than the Graduate School of Arts and Sciences ("GSAS") is not reasonably calculated to lead to the discovery of admissible evidence. As explained in prior correspondence, the implied breach of contract claim is based in large part on Yale's conduct and practices as a whole. Furthermore, Yale's response to this Request is deficient. Yale has only produced a few e-mails containing the draft language for a verification protocol that had been revised in light of the Shin scandal. See YALE00005965–67; YALE00005971–72. However, Yale has conspicuously failed to produce any final versions of the verification protocol or any prior versions of the verification protocol in effect prior to this revision. Moreover, YALE00005969 mentions that a memorandum addressing the verification protocols was being prepared, yet we have not received a copy of this memorandum.

**Request 2.** We disagree with your objection that the Request for documents relating to any part of Yale other than the GSAS is not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Yale's response to this Request is deficient. While we requested documents for the period beginning January 1, 2005 through March 25, 2008, Yale has

---

[1] Yale's Requests Instruction 5(a) states: "For each Request for Production, please identify, by Bates number, all documents that you are producing in response to that Request for Production."

Howard Fetner, Esq.
August 6, 2009
Page 3

only produced degree verification files for the period of August 2007 through April 2008. Accordingly, please produce responsive documents for the period of January 2005 through July 2007.

**Request 3.** We disagree with your objection that the Request for documents relating to any part of Yale other than the GSAS is not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, we have serious doubts concerning your statement that Yale does not have any responsive documents. We find it hard to believe that an institution such as Yale does not have any formal or informal policies, protocols, or procedures for verifying the degrees of individuals seeking a faculty and/or research position at Yale. Accordingly, please provide any documents reflecting the protocols and procedures used by Yale, even if only on an ad hoc basis by department, for verifying the academic credentials of individuals seeking positions at Yale.

**Request 4.** We disagree with your objection that the Request for documents relating to any part of Yale other than the GSAS is not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, we have serious doubts concerning your statement that Yale does not have any responsive documents. We find it incredible that an institution such as the GSAS would have no communications whatsoever to verify the degrees of individuals seeking faculty and/or research positions from January 1, 2005 through March 25, 2008. One can only conclude that either Yale has hired no one for a research or faculty position for this time period, or Yale simply takes its applicants' résumés at face value—and both propositions are highly unlikely.

**Request 5.** We disagree with your objection to limit the Request to September 2005 only and again demand that you produce any documents relating to degree verification inquiries received for the period beginning January 1, 2005 through March 25, 2008. Documents relating to inquiries received by Pamela Schirmeister ("Schirmeister") to verify an academic degree awarded by the GSAS are clearly relevant to establishing the general procedure employed by the GSAS in processing such inquiries, whether that inquiry was received in January 2005 (prior to the key events in question occurring), September 2005, or March 2008. Furthermore, even under Yale's own greatly narrowed scope, which we do not accept, Yale has failed to produce any responsive documents.

**Request 6.** We disagree with your objection to limit the Request to those letters sent or received by Schirmeister, Edward Barnaby ("Barnaby"), or Alicia Grendzizsewski ("Grendzizsewski"). Thus, we again demand that you produce letters, as that word was used by Carney in her January 31, 2008 letter to Euiyon Cho ("Cho"), sent or received by any and all employees of the GSAS. Furthermore, Yale's response to this Request is deficient. While Yale has produced all September 2005 e-mails for Schirmeister, Barnaby, or Grendzizsewski, as discussed above, these documents are not specifically responsive to any requests—including this one, to which the production was presumably aimed. The Request seeks "letters" as that word is used by Carney in her January 31, 2008 letter to Cho. Referring to the January 31, 2008 letter,

Howard Fetner, Esq.
August 6, 2009
Page 4

this Request clearly seeks the 70 letters, on Yale letterhead and sent or received daily by the Office of the GSAS, with which the September 5, 2005 registered letter could have been confused. We only have received a handful of these letters, nowhere near the 70 per day (or nearly 1400 letters for the month of September alone) mentioned by Carney in her January 31, 2008 letter.

**Request 7.** We disagree with your objection to limit the Request to documents concerning Schirmeister. Furthermore, Yale's response to this Request is deficient. In particular, several documents we have received reflect incomplete e-mail chains or other inquiries to which one would expect to have an answer. See, e.g., YALE00002210, 2367. This deficiency raises serious concerns regarding Yale's collection of relevant ESI, discussed further below.

**Request 8.** Yale's response to this Request appears to be deficient. We have received the original envelope for the September 5, 2005 registered letter, a few documents from the United States Postal Service indicating that the September 5, 2005 registered letter was delivered to the GSAS, and Yale's response to the Department of Justice subpoena. In further response to this request, however, we would expect to receive subsequent e-mails, letters, and other documents, particularly internal correspondence, concerning Yale's receipt of the September 5, 2005 registered letter and the discovery of the original September 5, 2005 registered letter. This deficiency also raises serious concerns regarding Yale's collection of relevant ESI, discussed further below.

**Request 9.** Aside from the September 22 Fax itself, we have not received anything in response to this Request.

**Request 11.** Yale's response to this Request is deficient. Aside from a copy of the September 22, 2005 facsimile itself, we have not received anything in response to this Request. In particular, we would expect to receive, at the very least, the original document which had been faxed (i.e., a document without the fax transmission lines) and/or an electronic copy of the cover sheet.

**Request 12.** Yale's response to this Request is deficient. Among other things, we are missing (i) some e-mails sent to or received by Susan Emerson and Cynthia Ostroff in June 2007, (ii) the July 6, 2007 email from Cho to Schirmeister, and Schirmeister's away message in response; and (iii) e-mails to Michael Moore ("Moore") from Cho in August 2007. Additionally, while we do seem to have e-mails between Carney and Cho in July 2007 through February 2008, we do not have three copies of each email sent by Carney (from her own e-mail account, and e-mails from the accounts of Barnaby and Sergeant Peter Brano ("Brano"), whom she cc'd and bcc'd). Again, this deficiency raises serious concerns regarding Yale's collection of relevant ESI, as discussed further below.

**Requests 13–22.** Yale's responses to these Requests are deficient. Besides the unexpectedly small number of documents that have been produced, we are missing

Howard Fetner, Esq.
August 6, 2009
Page 5

communications that would naturally have occurred. For example, we have very few internal communications among and between the employees of Yale's Office of Public Affairs, the Office of the President, and/or the Office of the General Counsel. Moreover, we are missing documents that reflect the internal investigation Yale claims it was conducting. For example, we are missing e-mails sent to and from Brano. Likewise, we do not have any communications with third-party investigators, any copies of investigation reports, notes, interviews, or documents comprising or concerning any investigation files that were generated. Finally, we are missing any and all internal communications to and from Carney regarding her investigation and involvement in the investigation. Again, this deficiency raises serious concerns regarding Yale's collection of relevant ESI, discussed further below.

**Request 23.**   Yale's response to this Request is deficient. Yale has produced only a single employee performance evaluation for Gila Reinstein ("Reinstein") from 2007 that provides her job responsibilities only in relation to show she performed certain projects. At a minimum, we would expect to receive other employee evaluations for Reinstein. We also would expect responsive documents to include employee manuals, employee guidelines and protocols, as well as any job descriptions created for the hiring process.

**Request 24.**   We have serious doubts concerning your statement that Yale does not have any responsive documents. Numerous documents would provide some description of the responsibilities of the Office of Public Affairs. For example, we would expect to receive web pages regarding the Office of Public Affairs, a campus directory, press release information, including drafting requirements, documents given to media contacts, or even individual e-mails or other correspondence delineating what the Office of Public Affairs does or does not do.

**Request 25.**   Yale's response to this Request is deficient. We have not received any internal correspondence that would reflect how Reinstein or the Office of Public Affairs received information concerning the September 5, 2005 registered letter, the September 22, 2005 fax, or Yale's attempts to verify Jeong Ah Shin's ("Shin") degree. Even if this information was communicated by telephone, we would expect to receive electronic copies of any notes taken on computer and hard copies of any notes taken by hand.

**Request 26.**   Yale's response to this Request is deficient. We have very little internal correspondence among employees of the Office of Public Affairs or any other department involved in decisions (such as the Office of the President or the Office of the General Counsel) concerning press statements, press interviews, or the facts behind them. Likewise, we have not received any drafts of press statements or accompanying notes, whether in electronic or hard copy. Furthermore, we do not have any calendars that reflect scheduled press statements, press releases, or other communications.

**Request 27.**   Yale's response to this Request appears to be deficient. While we have received documents containing or reflecting some communications between Yale and members of the media, we have not received everything. For example, YALE00000488 is a complete e-mail

Howard Fetner, Esq.
August 6, 2009
Page 6

chain. However, we do not have the individual e-mails that comprise the complete chain. Likewise, we have internal communications discussing statements to and/or communications with members of the media, but we do not have those statements. For example, YALE00000517, is a July 24, 2007 e-mail from Reinstein to George Joseph listing "the media contacts [Reinstein has] spoken to so far regarding Jeong Ah Shin," yet we do not have evidence of those communications. Finally, we have not received any notes, electronic or hand-written, taken from such communications, which we would expect to be in existence even if such communications mostly took place by telephone. Again, this deficiency raises serious concerns regarding Yale's collection of relevant ESI, discussed further below.

**Requests 28–30.** Yale's responses to these Requests appear to be deficient. While we have received a few e-mails between Reinstein and Chosun Ilbo reporter Kyu Rhee, as well as an e-mail with its New York bureau chief Kevin Kim, Yale should have more documents concerning the Chosun Ilbo articles dated July 12, 13, and 14, 2007. For example, we have not received any notes, whether electronic or hard copies, concerning such articles.

**Request 31.** We have not received anything specific to this article. We would expect to receive, at the very least, communications with the reporter and any corresponding notes, whether in electronic or hard copy, regarding what should be said to the reporter or what was said.

**Request 32.** We have serious doubts concerning your statement that Yale does not have any responsive documents. Even if Yale only communicated with the reporter for Maeil Business Newspaper by telephone, we would expect Yale to have documented the conversation in some manner, whether in electronic or hard copy.

**Request 34.** We have not received anything specific to this article. We would expect to receive, at the very least, communications with the reporter and notes, whether in electronic or hard copy, regarding what should be said to the reporter or what was said.

**Request 35.** We have not received anything specific to this article. We would expect to receive, at the very least, communications with the reporter and notes, whether in electronic or hard copy, regarding what should be said to the reporter or what was said.

**Request 36.** We have serious doubts concerning your statement that Yale does not have any responsive documents. First and foremost, we doubt that no written communications were exchanged between Yale and MBC in preparation for the interview. Furthermore, we would expect to receive notes, a calendar entry scheduling the interview, contact information with MBC, or drafts of prepared statements. Additionally, since this was such a key interview, we would expect emails between and among employees of Yale in various departments regarding what Reinstein should say during the interview.

**Request 37.** We have not received anything specific to this interview. In addition to the notes, calendar entries, contact information, and drafts of prepared statements, as described regarding Request 36, we also demand a copy of the video of the interview.

**Request 38.** While we have received a few e-mails suggesting the text for the September 21, 2007 statement and then asking that it be posted to the website and released to the media (see YALE00000559, 561, 563), we are certain that the release of such as statement would require many more documents. We would expect to receive notes, drafts, e-mails discussing the statement, and authorization for the statement. Again, this raises serious concerns regarding Yale's collection of relevant ESI, discussed further below.

**Request 41.** We remain perplexed as to how Yale could obtain Dongguk's internal investigation file of its hiring of Shin. We demand that these documents be produced, and that Yale, as requested above, identify the responsive documents by Bates number.

**Request 42.** We disagree with your objection that this Request is not calculated to lead to the discovery of admissible evidence and again demand that Yale produce documents concerning the manner by which it obtained Dongguk's internal investigation file.

**Request 44.** We disagree with your objection that this Request is not calculated to lead to the discovery of admissible evidence and again demand that Yale produce documents concerning the manner by which it obtained documents concerning the Korean Court Proceedings.

**Request 45.** We disagree with your objection that this Request is not calculated to lead to the discovery of admissible evidence and again demand that Yale produce documents concerning communications with any Persons involved with the Korean Court Proceedings.

**Requests 46–66.** While Yale may have produced many of the documents which are responsive to these Requests, we are unable to assess Yale's production properly until Yale identifies the documents which are responsive to each Request, as instructed by Dongguk's Request for Production Instruction 3.

### III. Electronically Stored Information

The deficiencies addressed above raise serious concerns about Yale's compliance with the Federal Rules of Civil Procedure in collecting and producing electronically stored information, as does your July 2 letter regarding Yale's Responses to Dongguk's Requests for Admission.

In your letter, you state that Yale cannot respond to Dongguk's Requests for Admission 15–19 because Yale purportedly has "no knowledge of the alleged e-mail messages upon which" those Requests for Admission are based. You further state that "searches of [Schirmeister's] hard drive and Yale's server revealed no evidence of them."

Howard Fetner, Esq.
August 6, 2009
Page 8

      The e-mails in question were attached as Exhibit A to Jean Bae's letter to you dated June 22, 2009. The e-mails indicate that: (i) on July 6, 2007, Cho sent an e-mail to Schirmeister; (ii) Cho's e-mail was received by Yale's e-mail system; and (iii) an automatic away message was generated in response by Schirmesiter's e-mail system. Clearly these e-mails exist because we have them in our possession. Our IT specialist has explained to us that the only way for these three e-mails not to be on Yale's server or Schirmeister's hard-drive is if they were actively deleted by someone at Yale, or if they were automatically deleted in connection with a retention policy.

      This raises serious concerns because these three e-mails are from 2007, which as you know, is one of the critical time periods at issue in the lawsuit. Moreover, as you are fully aware, Yale's "obligation to preserve evidence [arose] when it [had] notice that the evidence is relevant to litigation or when [it] should have known that the evidence may be relevant to future litigation." *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 216, 217 (S.D.N.Y. 2003).

      Here, Yale was on notice that potential litigation would ensue no later than December 2007, as indicated by the attached Yale Daily News article. Thus, Yale was under an obligation to take steps then, if not earlier, to make sure that no relevant e-mails or other documents were lost. We are concerned that other relevant e-mails or other ESI may have been deleted.

      Thus, to aid us in determining whether Yale has fully complied with its document preservation and production obligations, please provide to us the following immediately:

1. Yale's document retention policy, from 2005 through present;

2. Yale's e-mail retention policy, from 2005 through present;

3. Yale's server logs for July 1, 2007 through July 31, 2007 demonstrating any e-mails from the domain "dongguk.edu" on Yale's e-mail server;

4. Any retention or litigation hold letters/notices sent to Yale and its employees concerning this litigation; and

5. A detailed explanation of Yale's document collection procedure and protocol used in this matter, including any oral or written instructions provided to the individuals (including IT personnel) who collected the e-mails and documents.

      Because of the issues that have been discussed above, we now repeat our request, as first stated in our May 5, 2009 letter, that Yale run its search terms over each and every custodian's e-mail account and other local or network locations reasonably likely to contain responsive ESI. Given the deficiencies which we have identified, we fear that Yale's stated plan of allowing individuals to search their own accounts does not capture all documents responsive to Dongguk's requests.

Howard Fetner, Esq.
August 6, 2009
Page 9

### IV. Yale's Responses To Dongguk's Discovery Requests

#### 1. Yale's Responses To Dongguk's Requests For Admission

**Requests For Admission Numbers 22, 25, 26, 27, 30, 31, 38, 41, 42, 51, 52, 53, 56, 57, 58, 61, 62**

Your response is utterly baffling to us. How is it possible that Reinstein does not remember whether she made statements to the media? A cursory review of the documents you have already produced clearly indicates that Reinstein spoke to several members of the Korean media during this time period. Thus, we again request that, if Yale maintains that a "reasonable inquiry" was made, please let us know what steps were taken in attempting to answer this Request.

**Requests For Admission Numbers 24, 29, 40, 45, 50, 55, 60**

Contrary to your contention, we are not asking Yale to seek the opinion of a third party in answering these Requests. We are directly asking Yale itself to confirm whether it agrees with the translation, which, as we stated in our June 22, 2009 letter, is proper for a request. *See, e.g., Meyers v. Hermans Sporting Goods, Inc.*, Nos. MDL 777 88-7403 (RO), 87 Civ. 7837 (RO), 1989 U.S. Dist. LEXIS 6956, at *3-4 (S.D.N.Y. June 23, 1989) (holding a request that "seek[s] admission as to the content of certain documents" "is a proper use" of the Rule); *Sec. and Exch. Comm'n v. Thrasher*, 92 Civ. 6987 (JFK), 1996 U.S. Dist. LEXIS 13016, at *20 (S.D.N.Y. Sept. 6, 1996) ("[I]t is not improper for a party to request that his adversary admit or contest the requesting party's interpretation of a document."). We merely suggested that, if Yale or its employees, cannot verify the translation, that one of its hired translators would be able to do so. Thus, please supplement Yale's responses to these Requests.

**Requests For Admission Numbers 48, 49, 54**

We are confused by your response because a cursory review of the documents you have already produced clearly indicates that Reinstein spoke to a reporter from the Maeil Business Newspaper in July 2007. Thus, the case law you cite is again irrelevant because Reinstein clearly has personal knowledge of her own statements to the reporter. As such, please supplement your answer to the Request for Admission.

#### 2. Yale's Answers To Dongguk's Interrogatories

**Interrogatories 1 and 2**

You still have not answered these Interrogatories "in detail" and have not answered the questions asked in our June 29, 2009 letter. Additionally, as discussed above, limiting its

Answer to only the GSAS is improper because the implied breach of contract claim is based in large part on Yale's conduct and practices as a whole, and not merely GSAS.

### Interrogatories 4 and 6

Your statement that "countless employees reviewed or otherwise had knowledge of those documents" in 2007 proves our point precisely. Each of these individuals may be critical to the decisions Yale made in determining how to handle the situation in 2007. Furthermore, as Yale full well knows, how Yale decided to handle this situation in 2007 is a key issue in this case.

Also, you still have not answered why Yale's Answer states "based on information received from Dongguk, Michael Moore." Yale should have independent knowledge as to whether Moore received the September 5 Registered Letter.

We also again request that Yale confirm in a supplemental interrogatory answer that between July 1, 2007 and October 18, 2007, no search of Schirmeister's files had been conducted.

### Interrogatory 8

Contrary to your position, Yale's Answer to this Interrogatory is thoroughly incomplete. The information requested in our June 29, 2009 letter is specifically encompassed by the Interrogatory, and Yale's Answer clearly fails to answer any of those questions. Thus, please respond to the questions asked in our June 29, 2009 letter and supplement your Interrogatory Answer appropriately.

### Interrogatories 9 - 10

We disagree with Yale's position that these Interrogatory responses are complete.

### Interrogatories 16, 17, 18, and 19

We still do not understand the basis for your objection to these Interrogatories as you continue to consistently refer to documents from the criminal case in your discovery requests to us. Thus, we again request that you respond to these Interrogatories.

### V. Dongguk's Responses To Yale's Discovery Requests

### 1. Dongguk's Responses To Yale's Requests To Admit

### Requests for Admission 24, 25, and 26

As stated before, and contrary to Yale's demand, Dongguk is not required to admit or deny these Requests because the only way for Dongguk to answer the Requests would be to rely

Howard Fetner, Esq.
August 6, 2009
Page 11

on the copy of the Korean judgment provided to us by Yale, which Dongguk has no way of authenticating. The only way to admit to the precise crimes Shin, Yang Kyun Byeon ("Byeon"), and Yong Taek Lim ("Lim") were convicted of is to rely on the judgment. Additionally, your contention that we have knowledge of the convictions based on the fact that Shin was a faculty member and Lim the Chairman of the Foundation are incorrect. Shin was no longer a faculty member at the time she was convicted and the University does not have control over the Foundation's Board of Directors.

## 2. Dongguk's Answers To Yale's Interrogatories

### Interrogatory 1

Dongguk's answer to this Interrogatory is complete. As we stated in our June 29, 2009 letter, we reiterate that Dongguk has no obligation to make such a request to the Foundation. Thus, your question regarding whether Dongguk has "either sought or obtained information or documents from the Dongguk University Foundation" is irrelevant.

### Interrogatory 5

As discussed in our original answer to Interrogatory 5, as part of the hiring process, Dongguk requested that Shin submit her transcripts, and continued to do so.

### Interrogatories 7 and 21

Dongguk's Answer to these Interrogatories are complete. Again, as we stated in our June 29, 2009 letter, we reiterate that Dongguk has no obligation to make such a request to Mr. Hong. Thus, your question regarding whether Dongguk has "sought or obtained information and documents from Mr. Hong" is irrelevant. Additionally, as Yale full well knows the title of professor emeritrus is merely an honorary title. Thus, Mr. Hong is not an employee of Dongguk University, and it does not have any control over him.

The correct date of the disciplinary action is June 25, 2008.

Finally, we again emphasize that, based upon the documents and the information known to Dongguk University, Ms. Shin never tendered her resignation in 2005. She merely requested and was granted a temporary leave of absence.

### Interrogatory 15

Dongguk's answer to this Interrogatory is complete. Again, as discussed in Interrogatory 4, President Hong's professor emeritus title was removed.

Howard Fetner, Esq.
August 6, 2009
Page 12

### Interrogatories 23 and 24

Dongguk's answers to these Interrogatories is complete. In our June 25, 2009 letter, we identified the Bates range of documents which both contain articles and other media reports that criticized or vilified Dongguk or harmed its reputation and which contained documents that contain false statements made by Yale concerning Dongguk.

\* \* \*

In light of the significant discovery issues between the parties discussed above, we suggest that after you have reviewed this letter, we arrange a Meet and Confer.

Sincerely yours,

*B of*

Robert A. Weiner

cc: Felix J. Springer, Esq.
Ira Grudberg, Esq.
Nathanael Kelley, Esq.
Audrey Lu, Esq.

NYK 1216930-9.081817.0011