UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------------------------- x
DONNGUK UNIVERSITY,                                    :   No. 3:08-CV-00441 (TLM)
                                                       :
                  Plaintiff,                           :
                                                       :
                                                       :
        v.                                             :
                                                       :
YALE UNIVERSITY,                                       :
                                                       :
                  Defendant.                           :
----------------------------------------------------- x
```

### AFFIDAVIT OF ROBERT A. WEINER

```
STATE OF NEW YORK     )
                      ) ss:
COUNTY OF NEW YORK    )
```

Robert A. Weiner, having been duly sworn, deposes and states as follows:

1.       I am a member of McDermott Will & Emery LLP and lead counsel for plaintiff Dongguk University ("Dongguk") in its lawsuit against Yale University ("Yale") in the above-captioned action.  I have personal knowledge of the facts set forth herein.

2.       Yale's Memorandum of Law submitted in opposition to Dongguk's Motion to Compel asserts that Dongguk's motion should be denied for a number of reasons including the supposed facts that (i) Yale's counsel made reasonable efforts to collaborate with Dongguk, (ii) Dongguk has twice abandoned its electronically stored information ("ESI") claims, and (iii) Dongguk's counsel did not satisfy their obligation to confer in good faith to eliminate or reduce the controversy.  In support of these contentions, Yale has submitted the affidavit of Felix J. Springer dated July 15, 2010.

3.       I have reviewed Mr. Springer's affidavit.  As will be discussed in detail below,

Mr. Springer's affidavit is woefully incomplete.  I am attaching to this affidavit a complete set of

documents detailing my firm's continuing efforts to obtain ESI from Yale and to resolve in good

faith all outstanding issues.  Additionally, I am attaching documents that reflect Yale's counsel's

continued representations that Yale had produced all of its relevant ESI and also documents from

Yale's two most recent productions that demonstrate that, despite Yale's counsel's

representations, Yale had not produced all ESI that it was required to produce.

4.       The subject of ESI was first discussed with Yale's counsel on April 7, 2009,

before either party produced any ESI.  As set forth in an April 9, 2009 letter (Exhibit 1 hereto)

memorializing the conversation, my partner, Andrew Kratenstein, reiterated a suggestion he had

made during the telephone conference with Yale's counsel.  Mr. Kratenstein's letter stated in

pertinent part:

> I suggested that the parties exchange proposed lists of search terms
> for the purpose of collecting and reviewing potentially responsive
> electronically stored information ("ESI").  We agreed that the
> parties will exchange proposed search term lists by April 15, 2009.
> Dongguk will provide Yale with the terms that Dongguk proposes
> using on Dongguk's ESI (with Korean translation) and Yale will
> propose a list of terms that it intends to use to search Yale's ESI.
> We will then negotiate over the lists and, after reaching agreement,
> run the search terms over our clients' respective ESI.  If either
> party has a reason to believe based on the volume of "hits" that a
> particular term is generating too many false positives, it will advise
> the other side and attempt to negotiate a reasonable modification to
> the search term that results in fewer false positives.

On April 15, 2009, my associate, Jean Bae, sent Howard Fetner an e-mail (Exhibit 2 hereto)

containing over 20 search terms that we believed would be appropriate for the case.

5.       Later that day, Mr. Fetner sent an e-mail to Ms. Bae (Exhibit 3 hereto) taking

issue with our proposed search terms and suggested that the terms be limited to only seven terms,

2

five of which were names.  In an April 17, 2009 e-mail, Mr. Kratenstein responded and asked

Mr. Fetner when he would "be in position to exchange proposed revisions to each other's lists?"

6.      In addition, Mr. Kratenstein's e-mail went on to say:

> We think the most sensible approach is to:  (i) agree on our
> respective initial search term lists; (ii) run the search terms and, if
> there are too many false positives for particular terms, negotiate
> reasonable modifications that result in fewer false positives;
> (iii) review and produce the responsive, non-privileged ESI; and
> (iv) reserve the right to make reasonable additions or amendments
> to the opposing party's search terms based on subsequently
> discovered information, the opposing party would run the
> supplemental search terms and then makes a supplemental ESI
> production.

Unfortunately, Yale declined to work with us on ESI production.

7.      On April 23, 2009, Mr. Fetner sent an email (Exhibit 4 hereto) responding to

Mr. Kratenstein's e-mail which stated in pertinent part:

> We appreciate the value of a cooperative discovery process, but we
> are nevertheless not entirely comfortable with the approach that
> you have proposed.

At that point, all efforts to cooperate ended.

8.      Mr. Fetner's April 23, 2009 e-mail went on to make the following statement

which is the root of the ESI production problems that Dongguk has experienced:

> We have already instructed all custodians who might have ESI
> relevant to this case to gather all of that information and provide it
> to us.  Since the individual custodians know their own documents
> best, we left it up to each custodian to apply the search method that
> was most likely to uncover all potentially relevant ESI.

As is clear from Mr. Fetner's e-mail, Yale's counsel had no intention of providing any oversight

over the ESI collection process; instead Yale's counsel intended to leave it up to each individual

custodian to use search protocols that each individual custodian deemed appropriate.

3

9.     Surprised by this position, we immediately asked Mr. Fetner to participate in the
first of a number of "meet and confers." As set forth in an e-mail exchange attached hereto as
Exhibit 5, the "meet and confer" was scheduled for May 1, 2009. At the May 1, 2009 "meet and
confer" we objected to Mr. Fetner's proposed methodology.

10.     On May 5, 2009, Ms. Bae wrote Mr. Fetner a letter (Exhibit 6 hereto)
memorializing our concerns about the manner in which Yale intended to proceed with gathering
ESI. As stated in Ms. Bae's May 5 letter:

> I write to confirm the matters we discussed during our telephone
> conference on May 1, 2009.
>
> * * *
>
> In addition, you mentioned that Yale does not intend to run search
> terms over all of its custodians' ESI and that, in certain cases, Yale
> plans to rely on each custodian to search and gather his or her own
> relevant ESI. I am concerned that this approach is insufficient
> because a custodian may not properly segregate all responsive
> documents. We request that Yale run search terms over each and
> every custodian's e-mail account and other local or network
> locations reasonably likely to contain responsive ESI. This would
> allow Yale to ensure that it identifies all potentially responsive ESI
> and hopefully avoid future disputes over the completeness of
> Yale's ESI search. Please let me know if you will comply with our
> request.

In addition, Ms. Bae's letter contained a list of comments and suggestions on Yale's proposed
search terms. Notwithstanding our concerns, suggestions and comments, Yale proceeded to
collect ESI in the manner previously described by Mr. Fetner.

11.     On June 12, 2009, Yale responded to Dongguk's Requests to Admit. Among the
requests were Requests 15, 16, 17, 18 and 19 about a July 6, 2010 e-mail sent to Pamela
Schirmeister ("Schirmeister") regarding prior 2005 verification of Shin's Ph.D. and the

4

contradicting information received from Yale in 2007 (Exhibit 7 hereto) and her response

(Exhibit 8 hereto).  In its response to these five requests (Exhibit 9 hereto), Yale stated:

> **RESPONSE:**  Yale lacks knowledge or information sufficient to enable it to admit or deny.  After making reasonable inquiry, the information that Yale knows or can readily obtain is insufficient to enable it to admit or deny.

12.     Since Dongguk's e-mail files contained the e-mails, we continued to be concerned

about the adequacy of Yale's ESI search.  Accordingly, on June 22, 2009, Ms. Bae sent

Mr. Fetner a letter (Exhibit 10 hereto) which stated in pertinent part:

> **Requests for Admission Numbers 15, 16, 17, 18, 19**
>
> These Requests ask Yale to admit or deny: (i) that Euiyon Cho sent a July 6, 2007 e-mail to Pamela Schirmeister, and the contents of the e-mail, (ii) that an automatic response was generated by Schirmeister's e-mail system, and the contents of the automatic response, and (iii) that Schirmeister did not respond to the July 6, 2007 e-mail.  Your response to each Request states that "Yale lacks knowledge or information sufficient to enable it to admit or deny.  After making reasonable inquiry, the information that Yale knows or can readily obtain is insufficient to enable it to admit or deny."
>
> We cannot understand why Yale cannot answer these Requests. The answer to each can easily be determined.  Specifically, if Yale searched its e-mail server, or even less, searched the e-mail inbox and outbox of Schrimeister, it would be able to respond to this Request.  Furthermore, Yale could simply ask Schirmeister about the e-mails in these Requests.  Thus, we do not understand what possible "reasonable inquiry" was made by Yale in claiming that it cannot admit or deny this Request.
>
> To aid in your reasonable inquiry, we are attaching hereto as Exhibit A copies of the July 6, 2007 e-mail from Cho to Schirmeister and the July 6, 2007 automatic response from Schirmeister. If Yale still maintains that a "reasonable inquiry" was made, please let us know what steps were taken in attempting to answer this Request.

13.     On July 2, 2009, Mr. Fetner sent Ms. Bae a letter (Exhibit 11 hereto) with the

following response:

> **Requests for Admission 15-19**
>
> Yale's responses to these Requests are accurate and complete.
> Yale has no knowledge of the alleged e-mail messages upon which
> Requests 15-19 are based. Schirmeister has no recollection of such
> e-mail messages, and searches of her hard drive and Yale's server
> revealed no evidence of them.

As discussed in paragraph 36 below, as a result of a document production made by Yale on

*July 2, 2010*, we now know that the Schirmeister e-mails were received and sent by Yale

notwithstanding Mr. Fetner's letter and Yale's response to Dongguk's Requests to Admit.

14.     In July 2009, Yale made its initial document production and produced a number

of e-mails. A review of Yale's e-mail production and Mr. Fetner's July 6, 2009 response caused

us to conclude that Yale's ESI search procedures were probably inadequate.

15.     Accordingly, on August 6, 2009, I wrote Mr. Fetner a detailed letter (Exhibit 12

hereto) which states in pertinent part:

> In your [July 2] letter, you state that Yale cannot respond to
> Dongguk's Requests for Admission 15–19 because Yale
> purportedly has "no knowledge of the alleged e-mail messages
> upon which" those Requests for Admission are based. You further
> state that "searches of [Schirmeister's] hard drive and Yale's
> server revealed no evidence of them."
>
> The e-mails in question were attached as Exhibit A to Jean Bae's
> letter to you dated June 22, 2009. The e-mails indicate that: (i) on
> July 6, 2007, Cho sent an e-mail to Schirmeister; (ii) Cho's e-mail
> was received by Yale's e-mail system; and (iii) an automatic away
> message was generated in response by Schirmesiter's e-mail
> system. Clearly these e-mails exist because we have them in our
> possession. Our IT specialist has explained to us that the only way
> for these three e-mails not to be on Yale's server or Schirmeister's
> hard-drive is if they were actively deleted by someone at Yale, or
> if they were automatically deleted in connection with a retention
> policy.

This raises serious concerns because these three e-mails are from 2007, which as you know, is one of the critical time periods at issue in the lawsuit. Moreover, as you are fully aware, Yale's "obligation to preserve evidence [arose] when it [had] notice that the evidence is relevant to litigation or when [it] should have known that the evidence may be relevant to future litigation." *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 216, 217 (S.D.N.Y. 2003).

Here, Yale was on notice that potential litigation would ensue no later than December 2007[1], as indicated by the attached Yale Daily News article. Thus, Yale was under an obligation to take steps then, if not earlier, to make sure that no relevant e-mails or other documents were lost. We are concerned that other relevant e-mails or other ESI may have been deleted.

16.     My August 6 letter went on to state:

Thus, to aid us in determining whether Yale has fully complied with its document preservation and production obligations, please provide to us the following immediately:

1. Yale's document retention policy, from 2005 through present;

2. Yale's e-mail retention policy, from 2005 through present;

3. Yale's server logs for July 1, 2007 through July 31, 2007 demonstrating any e-mails from the domain "dongguk.edu" on Yale's e-mail server;

4. Any retention or litigation hold letters/notices sent to Yale and its employees concerning this litigation; and

5. A detailed explanation of Yale's document collection procedure and protocol used in this matter, including any oral or written instructions provided to the individuals (including IT personnel) who collected the e-mails and documents.

---

[1] In its Memorandum of Law, Yale contends that its obligation to preserve evidence arose on or about March 25, 2008, the day that it was served with the Complaint. In fact, as reflected in the December 28, 2007 issue of the Yale Daily News (Exhibit 13 hereto), Yale was aware on that date that Dongguk "may sue Yale for libel." In addition, Yale's General Counsel, Dorothy Robinson, was directly informed on December 28, 2007 of the threat of a potential lawsuit by Dongguk for defamation (Exhibit 37 hereto).

7

17.     Finally, in my August 6 letter I continued to question Yale's ESI search

methodology.  As I stated:

> Because of the issues that have been discussed above, we now
> repeat our request, as first stated in our May 5, 2009 letter, that
> Yale run its search terms over each and every custodian's e-mail
> account and other local or network locations reasonably likely to
> contain responsive ESI.  Given the deficiencies which we have
> identified, we fear that Yale's stated plan of allowing individuals
> to search their own accounts does not capture all documents
> responsive to Dongguk's requests.

18.     On August 26, 2009, Mr. Fetner wrote me a letter (Exhibit 14 hereto) responding

to my August 6 letter.  Not only did Mr. Fetner refuse to provide me with the information that I

requested, he rejected all of my concerns.  As stated by Mr. Fetner:

> . . . your "concerns" about Yale's production of electronically
> stored information are completely unwarranted and have no basis
> in fact.  As explained in more detail below, many of the documents
> that you apparently expected to find in Yale's initial production are
> included in the production enclosed with this letter, and many
> more simply do  not exist, and never did.  Your insinuations that
> Yale may have destroyed documents are similarly baseless.  The
> only documents that you even allege to have been "lost" were,
> according to your own allegation, dated many months before Yale
> had any reason whatsoever to suspect potential litigation.

Mr. Fetner's response, such as it was, was patently inadequate.

19.     Accordingly, on September 21, 2009, I again wrote Mr. Fetner a letter (Exhibit 15

hereto) in which I reiterated the facts and the law regarding ESI search methodology.  My

September 21 letter stated in pertinent part:

> Your response regarding Yale's production of electronically-stored
> information ("ESI") fails to alleviate our concerns and, indeed,
> fails to respond to our inquiries at all.  As explained previously, we
> have copies of at least three emails that were sent electronically by
> Yale to our client; yet Yale has denied any knowledge of these
> emails.  Yale's response highlights the fact that Yale has not
> adequately searched its electronic records for emails.

Rather than do a complete electronic search of documents, it appears that Yale has simply asked its employees to check their email files and print out copies of emails. The search process typically requires more than just a review of a few key individuals' email systems. Courts have imposed upon responding parties the obligation to take affirmative action to preserve ESI by, for example, disabling network maintenance tools that may delete ESI; search any and all depositories of potentially relevant ESI, including hard drives, email accounts, archive files, and servers; and create keyword searches with the cooperation of the custodians and opposing counsel.

As stated in *William Gross Constr. Assocs. v. Am. Mfrs. Mut. Insur. Co.*, 256 F.R.D 134, 135 (S.D.N.Y. 2009), a party "at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested to assure accuracy in retrieval." *See also Peskoff v. Faber*, 251 F.R.D. 59, 62 (D.D.C. 2008); *Peskoff v. Faber*, 240 F.R.D. 26, 31 (D.D.C. 2007) (noting obligation to search "all depositories of electronic information in which one may reasonably expect to find all emails" and ordering a "more complete search" where defendant failed to search relevant hard drives, other email accounts, and an archive file); *Toussie v. County of Suffolk*, No. CV 01-6716, 2007 WL 4565160, at *1 (E.D.N.Y. Dec. 21, 2007) (on a motion to compel, directing defendant to "conduct a system wide search for responsive emails ... on [defendant]'s servers" because it had failed to do so in initially). The failure to conduct an adequate ESI search has led to cost-shifting, adverse inferences, and other sanctions. *See Peskoff*, 251 F.R.D. at 63; *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 200–201 (S.D.N.Y. 2007).

20.     In addition, in my letter I advised Mr. Fetner that pursuant to Fed. R. Civ. Proc. 26(f)(3)(C), I wanted to discuss "the adequacy of Yale's ESI search" at a "meet and confer." My letter went on to state:

> . . . in anticipation of our meet and confer, please provide us with the following information:
>
> 1.  Yale's document retention policy from 2005 through present;
>
> 2.  Yale's email retention policy from 2005 through present;

9

3. Yale's server logs for July 1, 2007 through December 31, 2007 demonstrating any emails from the domain "dongguk.edu" on Yale's email server;

4. Any retention or litigation hold letters/notices sent to Yale and its employees concerning this litigation; and

5. A detailed explanation of Yale's ESI collection procedure and the protocols, if any, used in this matter, including the following:

   (a) any oral or written instructions provided to the individuals (including IT personnel) who collected the emails and documents;

   (b) a list of the sources which were searched; and

   (c) a list of keywords used in any searches.

In addition, I informed Mr. Fetner that if he refused "to provide us with the information, we will raise this issue with the Court."

21.     In paragraph 4 of his affidavit, Mr. Springer refers to the fact that the "meet and confer" was held on October 7, 2009. However, Mr. Springer neglects to mention what occurred at the October 7 "meet and confer" and fails to apprise the Court about what occurred after the October 7 "meet and confer." According to Mr. Springer, he concluded that the ESI issues had been "resolved." As will be shown, to the extent the ESI issues were "resolved," they were temporarily resolved because of our reliance on Mr. Fetner's misstatements.

22.     Although Mr. Fetner refused to provide me with the materials that were requested, we did discuss ESI at the October 7 "meet and confer." During the "meet and confer," I reiterated our concerns regarding the adequacy of Yale's ESI collection. In response, Mr. Fetner asked me to provide him with our specific concerns regarding Yale's document production and to identify the specific deficiencies that we noted in Yale's ESI production.

10

23.     In accordance with Mr. Fetner's request, on October 19, 2009, I sent Mr. Fetner a detailed letter (Exhibit 16 hereto) setting forth the deficiencies that we noted.  Among other things, I provided Mr. Fetner with:

- a list of e-mails with missing pages
- a list of e-mails with missing attachments,
- a list of e-mails produced by Dongguk but not by Yale
- a list of e-mails referred to in a chain of e-mails, but not independently produced
- a list of e-mails where cc's, bcc's, senders' or recipients' e-mails were not produced

As to the last category, I explained:

> For example, YALE00005965 (attached as Exhibit N) is a December 30, 2007 email from Butler to seven (7) other individuals.  However, only a single copy from Stephen Goot's email files was produced.  In other words, copies from the seven people are missing, including from the sender Butler.

> At a minimum, it is essential that we receive all senders' emails since only those emails will reflect whether a blind copy of the email was sent.  As to emails where the "cc" copies were not produced or where the recipient's email was not produced, we are concerned that the ESI for those people were not properly searched which would explain why Yale did not produce all emails which should have existed in the files of employees who sent or received emails.

24.     Significantly, in my October 9, 2009 letter, I also provided Mr. Fetner with a list of individuals from whom we did not believe we had received "a complete e-mail production."  The list included Pamela Schirmeister and Gila Reinstein.  My October 19 letter also contained a list of "key individuals" whose "ESI and documents have not been searched at all."  This list included, among others, Susan Emerson.

25.     As Mr. Springer correctly states, on November 6, 2009 he sent me a letter (Exhibit 17 hereto) regarding the upcoming depositions.  However, Mr. Springer neglects to state that in his November 6 letter he told me that I would be receiving a separate letter from Mr. Fetner "addressing" the ESI issues that I raised in my October 19 letter.  Moreover, Mr. Springer failed to attach Mr. Fetner's letter which was actually sent to me on November 9, 2009 and which was the reason why we went forward with the three depositions.

26.     To begin with, in Mr. Fetner's November 9, 2009 letter (Exhibit 18 hereto), Mr. Fetner represented to me that Yale has *"produced all responsive email."*  Mr. Fetner went on to explain that Yale had changed its e-mail system and server in 2008 and that "Yale faculty and staff e-mail that was stored on the old server was transferred to the faculty and staff members' hard drives."[2]

27.     According to Mr. Fetner, Yale's "custodians who searched their hard drives for responsive e-mail after the server migration searched the data that had been stored on their hard drives and the applicable server."  Mr. Fetner went on to state that "[w]e have not searched back-ups because they would not contain any data beyond what has already been searched and we would have no obligation to collect and search back-up data in any event."

28.     Accepting Mr. Fetner's representation to me that all responsive e-mails had been produced was true and believing his explanation of what was done, we proceeded with the depositions.  In short, rather than "abandon" my concerns regarding Yale's ESI production, I relied on Mr. Fetner's representations.  However, during the depositions, I learned that not all

---

[2] Based on the affidavit of Morrow Long submitted by Yale in opposition to Dongguk's motion, it now appears that Mr. Fetner's explanation may be incorrect or incomplete.

responsive e-mails had been produced and that the information provided to me by Mr. Fetner was not accurate and that an adequate ESI search had not been done.

29.     As I was preparing for Gila Reinstein's deposition, the last of the three depositions that we were permitted to take, I reviewed a February 4, 2008 e-mail sent by Ms. Reinstein to George Joseph, another Yale employee. Reinstein's February 4, 2008 e-mail (Exhibit 19 hereto) made reference to "examples of confirmation letters" provided to Reinstein by Schirmeister.

30.     Since I had never seen the "examples" referred to in Reinstein's e-mail nor had I seen a document transmitting them, I asked my associate, Audrey Lu, to e-mail Mr. Fetner and obtain production of them. On February 3, 2010, Ms. Lu sent Mr. Fetner an e-mail (Exhibit 20 hereto) requesting production of the missing documents. Later that day, Mr. Fetner responded with an e-mail (Exhibit 21 hereto) stating in pertinent part:

> As we have previously told you, we have produced all responsive
> e-mails and attachments in Yale's possession.

As we later learned, Yale had not produced all responsive e-mails in its possession.

31.     As reflected at pages 14 and 15 of Reinstein's deposition transcript (Exhibit 22 hereto), Reinstein confirmed that she had received "examples of confirmation letters" and that she had put them in a "temporary file." Since I had never seen those documents despite the fact that they were in a category of documents that had been previously requested, on February 5, 2010, we served another document request (Exhibit 23 hereto) specifically focused on the "examples of confirmation letters" referenced in Reinstein's February 4, 2008 e-mail.

32.     On March 8, 2010, Yale served its response to the new document request (Exhibit 24 hereto) and produced additional documents. Among the new documents that Yale produced

13

were the "examples of confirmation letters" sent by Schirmeister to Reinstein.  In addition, Yale

also produced for the first time an e-mail dated July 17, 2007 (Exhibit 25 hereto) from

Schirmeister to Reinstein which referenced not only the "examples," referred to in the e-mail as

"templates," but referenced another e-mail sent to Schirmeister by her assistant – an e-mail that

has yet to be produced.

33.     The production of the July 17, 2007 e-mail confirmed to us that Yale's ESI search

procedure was flawed and that Mr. Fetner's previous assurances and representations regarding

the thoroughness and completeness of Yale's ESI search were, at the very least, unreliable.

Suffice it to say, neither Mr. Fetner nor anyone else has explained how the important July 17

e-mail between two critical witnesses was missed during Yale's ESI collection.

34.     Only one of two explanations is possible.  Either the e-mails were deleted by

Reinstein or Schirmeister or both and the e-mails were located on Yale's server or both Reinstein

and Schirmeister did not adequately search their hard drives.  Whatever the explanation is, the

fact remains that Mr. Fetner's representation to us that all responsive e-mail had been produced

was wrong.

35.     Greatly concerned about the adequacy of Yale's ESI collection methodology and

procedure on March 9, 2010, I wrote Mr. Springer a detailed letter (Exhibit 26 hereto) that stated

in pertinent part:

> Our concerns about the thoroughness of Yale's email production
> continues to this day.  We just received a supplemental document
> production from Yale which consists of emails that should have
> been produced months ago.  Suffice it to say, Yale has not
> provided an explanation as to why these new documents (Bates-
> stamped number 00008553-00008560) were found at this time and
> why they were not previously produced.

14

I then proceeded to set forth a list of detailed questions regarding Yale's ESI collection. Ironically, my March 9 letter mirrored requests about Dongguk's ESI collection procedures that were contained in a letter sent to me by Mr. Springer on February 25, 2010 (Exhibit 27 hereto).

36.     Because Yale did not answer any of the questions asked in my March 9, 2010 letter,[3] at the May 24, 2010 conference with the Court, I asked the Court to order Mr. Springer to answer the questions posed in my March 9, 2010 letter. On June 8, 2010, Mr. Springer purportedly answered the questions asked in my March 9 letter.

37.     In fact, a review of Mr. Springer's June 8, 2010 letter (Exhibit 29 hereto) reveals that Mr. Springer did not respond to many of the questions that were asked. Nevertheless, Mr. Springer's June 8, 2010 letter revealed further inadequacies in Yale's ESI collection process and raised additional questions about the accuracy of the information previously provided to me by Mr. Fetner and in the affidavit of Morrow Long, Yale's Information Security Officer.

38.     According to paragraphs 3 and 5 of Mr. Long's affidavit, "at all times relevant to this lawsuit," Yale "had a highly decentralized computer system" and "Yale had no central server for electronic documents." Yet, according to Mr. Springer's June 8, 2010 letter, "Yale preserved all *centrally* held e-mail . . .." Either Mr. Long is wrong or Mr. Springer is wrong.

39.     If we accept the accuracy of Mr. Long's statements, nothing was done to preserve e-mails that were contained in the non-existent central server. Even if there is a central server, it is clear from Yale's counsel's correspondence that the central server was never searched.

40.     What Mr. Springer's June 8 letter does confirm is that despite Mr. Fetner's earlier statements to me, no uniform search terms were used. Rather, each custodian used a different

---

[3] As shown by my March 16, 2010 letter to Mr. Springer (Exhibit 28 hereto), I answered all of Mr. Springer's questions about Dongguk's ESI collection procedures.

search method, used different search terms and searched different things. Some custodians searched folders; others searched hard drives. Moreover, Yale's counsel had no involvement whatsoever in the ESI search process.

41.     Therefore, it is not surprising that Yale continues to find e-mails that had not been previously produced. On July 2, 2010, after this motion was made, I received a letter (Exhibit 30 hereto) from Mr. Springer advising me that additional new e-mails had been found. According to Mr. Springer, the hard drive of Susan Emerson had been recently searched and that Yale had just located additional e-mails regarding Emerson and her contact with the Korean media (Exhibit 31 hereto) that had never before been produced. The production of these newly produced e-mails demonstrates beyond question why it is essential that Yale's servers be searched and why Mr. Fetner's assurances that there is no need to search them is nonsense.

42.     But this is not the worst of it. Among the e-mails produced by Yale for the first time was the July 6, 2007 e-mail sent by Dongguk to Schirmeister (Exhibit 32 hereto) which was the subject of Dongguk's Request to Admit and related correspondence. As explained above at paragraphs 11 through 13, Yale had refused to acknowledge that it had received this e-mail.

43.     Significantly, the July 6, 2007 e-mail had not only been sent to Schirmeister, copies of it were sent to two other Yale employees Christine Mehring and Emerson. Neither the copies nor the original sent to Schirmesiter were previously produced. Clearly, neither Schirmeister's nor Mehring's hard drive was searched.

44.     At Schirmeister's deposition, I specifically asked Schirmeister if she had received the July 6, 2007 e-mail which was marked as Schirmeister Exhibit 25 (Exhibit 33 hereto). As reflected at page 100 of her deposition transcript (Exhibit 34 hereto), when asked if she ever

16

received the July 6 e-mail, Schirmeister responded "No." Had I had Yale's recent production of

the July 6, 2007 e-mail I would have impeached her with the documents.

45.      Yale's late production of this and the other new e-mails not only proves the

inadequacy of Yale's ESI search, but raises a host of new questions. Accordingly, On July 7,

2010, I wrote Mr. Springer a letter (Exhibit 35 hereto) which stated in pertinent part:

> . . . the latest production contains a document Bates-stamp
> numbered YALE00008604-05, which is the July 6, 2007 e-mail
> sent by Euiyon Cho, a Dongguk administrator, to Pamela
> Schirmeister ("Schirmeister"). As you may recall, Dongguk first
> raised the non-production of this e-mail in a June 22, 2009 letter
> from Jean Bae to Howard Fetner. We again raised the issue in an
> August 6, 2009 letter, and again on September 21, 2009, and again
> at the October 9, 2009 meet and confer.
>
> The only response you have provided us was that "searches of
> [Schirmeister's] hard drive and Yale's server revealed no evidence
> of them." However, the production of this e-mail now can only
> mean that Schirmeister and/or Christine Mehring ("Mehring"),
> who Yale claims have run complete searches and provided
> complete productions, deleted their copies of the e-mail from their
> hard-drives, and that Yale's server was not searched.
>
> Other examples of Yale's inadequate search are reflected in the
> production of documents Bates-stamp numbered YALE00008596,
> YALE00008597, YALE00008598, YALE00008596, and
> YALE00008601. These are four separate e-mails from a journalist
> at the Yonhap News Agency, dated between July 4, 2007 and July
> 9, 2007. Two of the e-mails were sent to Mehring, Timothy
> Barringer, Emerson, "history.dgs@yale.edu," and Marcy Kaufman.
> The other two emails were, in addition to the prior individuals, also
> sent to Schirmeister and Tom Conroy. Despite being clearly
> relevant to this litigation and despite being sent to several
> individuals at Yale, these four e-mails from 2007 had never been
> produced until yesterday.
>
> While it was obvious before, Yale's latest production confirms to
> us that Yale's plan to rely on each custodian to search and gather
> his or her own relevant ESI has failed and is blatantly insufficient.
> Accordingly, we again request that Yale perform a proper search
> as outlined in the cases in our recent brief in support of our ESI
> motion.

17

46.     Rather than answer the questions raised in my letter, on July 20, 2010, almost two

weeks after I sent my letter, Mr. Springer sent me the following response (Exhibit 36 hereto):

> Dear Bob:
>
> I write in response to your July 7, 2010 letter concerning Yale's
> July 2 document production/ As I stated in my July 2 letter that
> accompanied the document production, the documents number
> YALE00008561 – YALE00008610 were recovered from a backup
> of Susan Emerson's hard drive.  Contrary to the assertions in your
> July 7 letter, these are not "documents from others"; rather, they
> were recovered from the backup of Ms. Emerson's hard drive.

Taking Mr. Springer at his word that only the back-up of Emerson's hard drive was searched, it

is imperative that the hard drive of the other Yale custodians be searched as well by attorneys or

other responsible people other than the custodians themselves.

47.     Finally, I will address Yale's contention that Dongguk has somehow delayed

bringing the ESI issue to the Court's attention.  As the Court is aware, there has been no

magistrate judge on this case until recently.  I promptly raised the ESI issue on May 24, 2010,

the first time that the parties were before Magistrate Judge Fitzsimmons.

Robert A. Weiner

Sworn to this 22nd
day of July, 2010

Notary Public

MONICA S ASHER
Notary Public State of New York
No. 02AS6213906
Qualified in New York County
Commission Expires Nov. 23, 2013

18