# EXHIBIT 15

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf Houston London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Robert A. Weiner
Partner
rweiner@mwe.com
+1 212 547 5408

September 21, 2009

**VIA EMAIL AND REGULAR MAIL**

Howard Fetner, Esq.
Day Pitney LLP
1 Audubon Street
New Haven, CT 06511

Re:   Dongguk University v. Yale University, No. 3:03-CV-00441 (RNC)

Dear Howard:

This letter is in response to your August 26, 2009 letter. I will also respond to Yale's
purported "additional" Production of Documents. Since I do not believe that we can resolve
discovery issues by letter, I suggest that we discuss all open discovery issues during our meet
and confer. Please let us know your availability next week.

### Yale's Production Of Electronically Stored Information Is Patently Insufficient

Your response regarding Yale's production of electronically-stored information ("ESI")
fails to alleviate our concerns and, indeed, fails to respond to our inquiries at all. As explained
previously, we have copies of at least three emails that were sent electronically by Yale to our
client; yet Yale has denied any knowledge of these emails. Yale's response highlights the fact
that Yale has not adequately searched its electronic records for emails.

Rather than do a complete electronic search of documents, it appears that Yale has simply
asked its employees to check their email files and print out copies of emails. The search process
typically requires more than just a review of a few key individuals' email systems. Courts have
imposed upon responding parties the obligation to take affirmative action to preserve ESI by, for
example, disabling network maintenance tools that may delete ESI; search any and all
depositories of potentially relevant ESI, including hard drives, email accounts, archive files, and
servers; and create keyword searches with the cooperation of the custodians and opposing
counsel.

As stated in *William Gross Constr. Assocs. v. Am. Mfrs. Mut. Insur. Co.*, 256 F.R.D 134,
135 (S.D.N.Y. 2009), a party "at a minimum must carefully craft the appropriate keywords, with
input from the ESI's custodians as to the words and abbreviations they use, and the proposed
methodology must be quality control tested to assure accuracy in retrieval." *See also Peskoff v.
Faber*, 251 F.R.D. 59, 62 (D.D.C. 2008); *Peskoff v. Faber*, 240 F.R.D. 26, 31 (D.D.C. 2007)
(noting obligation to search "all depositories of electronic information in which one may

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue  New York, New York 10173-1922  Telephone: +1 212 547 5400   Facsimile: +1 212 547 5444   www.mwe.com
NYK 1223988-6.081817.0011

Howard Fetner, Esq.
September 21, 2009
Page 2

reasonably expect to find all emails" and ordering a "more complete search" where defendant
failed to search relevant hard drives, other email accounts, and an archive file); *Toussie v. County
of Suffolk*, No. CV 01-6716, 2007 WL 4565160, at *1 (E.D.N.Y. Dec. 21, 2007) (on a motion to
compel, directing defendant to "conduct a system wide search for responsive emails ... on
[defendant]'s servers" because it had failed to do so in initially). The failure to conduct an
adequate ESI search has led to cost-shifting, adverse inferences, and other sanctions. *See
Peskoff*, 251 F.R.D. at 63; *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 200–201 (S.D.N.Y. 2007).

Fed. R. Civ. Proc. 26(f)(3)(C) requires the parties to meet and confer on the disclosure
and discovery of ESI, including topics such as the preservation of ESI, the sources which should
be searched, and the form of production. *See* 2006 Advisory Committee Notes to FRCP 26 at
¶¶ 21–22; *see also William Gross Constr. Assocs.*, 256 F.R.D. at 135 ("Electronic discovery
requires cooperation between opposing counsel and transparency in all aspects of preservation
and production of ESI."). Therefore, we intend to raise the adequacy of Yale's ESI search at the
"meet and confer."

Thus, in anticipation of our meet and confer, please provide us with the following
information:

1) Yale's document retention policy from 2005 through present;

2) Yale's email retention policy from 2005 through present;

3) Yale's server logs for July 1, 2007 through December 31, 2007 demonstrating any
   emails from the domain "dongguk.edu" on Yale's email server;

4) Any retention or litigation hold letters/notices sent to Yale and its employees
   concerning this litigation; and

5) A detailed explanation of Yale's ESI collection procedure and the protocols, if
   any, used in this matter, including the following:

   a) any oral or written instructions provided to the individuals (including IT
      personnel) who collected the emails and documents;

   b) a list of the sources which were searched; and

   c) a list of keywords used in any searches.

If you refuse to provide us with the information, we will raise this issue with the Court.

### Yale's Failure To Safeguard Its Documents

To the extent that Yale asserts that it has conducted a proper search of its ESI, then this
raises concerns about the preservation of Yale's relevant documents. As shown by Yale's own
document production, Yale knew of litigation possibilities even as early as June 2007. *See*

Howard Fetner, Esq.
September 21, 2009
Page 3

YALE 00006992, June 15, 2007 email from Susan Emerson to Susan Carney ("I don't know how Yale handles such matters but it seems to have 'litigation' written all over it.")  Therefore, from June 15, 2007 forward, all documents relevant to any potential litigation with Dongguk University should have been preserved.  For any relevant documents that were not preserved, Yale must, as instructed in Dongguk's Requests Instruction 4, state the disposition of the unpreserved documents.

In particular, we are concerned that relevant documents may have been improperly destroyed because of the obvious gap in your production of internal communications between and among Yale employees, particularly in the Office of Public Affairs, that undoubtedly should have occurred between June and December 2007.  In this regard, we note that Yale's privilege logs reflect the existence of numerous emails that were prepared between October 2007 and November 2008.  In contrast, Yale has produced very few internal emails and other documents for the period June through September 2007.

As both parties recognize, the period between June and September 2007 is highly relevant as most of the press and public relations efforts, and the internal investigations, occurred during this time period.  Thus, it is hard to believe that Yale employees did not and would not have generated emails or other internal documents relevant to the case.  Assuming that they do not now exist, we are entitled to know why.

### Yale's Initial Responses To Dongguk's First Requests For Production And "Additional" Production Of Documents Are Inadequate

We do not understand Yale's continued failure to identify the Bates numbers of documents responsive to each Request.  Yale's identification of "categories" fails to follow Dongguk's Requests Instruction 3, which states "For each Request for Production, Yale shall identify, by Bates numbers, all documents that Yale is producing in response to that Request for Production."  As noted previously, Yale has a nearly identical instruction included with its First Set of Requests for Production, with which, as explained in more detail below, Dongguk has complied with.

While the identification by Bates number is important to all Requests, the identification is particularly important for Requests 41 and 44–66.  For these Requests, Yale's use of its own categorization provides no indication of the documents to which Yale was referring in its Initial Disclosures and Motion to Dismiss.  Thus, Dongguk cannot even review Yale's production for completeness.  Accordingly, Dongguk again requests that Yale identify by Bates number the documents which are responsive to each Request and that Yale also identify the custodian of the notes produced at YALE 00007886–7899.

Moreover, contrary to your stated assertion, Yale's latest document production has certainly not fully addressed our concerns regarding the sufficiency of Yale's document production.  These continuing deficiencies are addressed below:

Howard Fetner, Esq.
September 21, 2009
Page 4

**Request 1.** We again disagree with your objection that the Request for Documents relating to any part of Yale other than the Graduate School of Arts and Sciences ("GSAS") is not reasonably calculated to lead to the discovery of admissible evidence. While the actions of the GSAS caused the breach of the implied agreement between Yale and Dongguk, the interaction between Dongguk and Yale as a whole created the implied contract, thus making the conduct and policies of Yale, not just the GSAS, highly relevant. Furthermore, Yale's response to this Request is still deficient. Yale has still failed to produce any past or current final versions of the verification protocol. Moreover, YALE00005969 mentions that a memorandum addressing the verification protocols was being prepared, yet we have not received a copy of this memorandum.

**Request 2.** As discussed under Request 1, we disagree with your objection that the Request for Documents relating to any part of Yale other than the GSAS is not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, as Yale obviously keeps records of its responses to requests to verify degrees issued by Yale, we must conclude that Yale has destroyed its records for January 2005 through July 2007 or only began keeping records in August 2007. Please confirm whether Yale ever had such records for January 2005 through July 2007.

**Request 4.** As discussed under Request 1, we disagree with your objection that the Request for Documents relating to any part of Yale other than the GSAS is not reasonably calculated to lead to the discovery of admissible evidence. If indeed Yale has no responsive documents, please confirm that either (1) Yale or the GSAS did not verify the degrees of individuals seeking faculty and/or research positions from January 1, 2005 through March 25, 2008, or that (2) Yale or the GSAS did not hire anyone for a research or faculty position for this time period.

**Request 5.** We again disagree with your objection to limit the Request to September 2005 only and again demand that you produce any documents relating to degree verification inquiries received for the period beginning January 1, 2005 through March 25, 2008. The Request clearly seeks the procedure used in practice by Pamela Schirmeister and other employees of the GSAS, and thus reference to Yale's published verification procedures is unresponsive. The actual steps taken by Schirmeister and others at any time is relevant to Dongguk's claim for breach of the implied contract.

**Request 6.** As you know, Carney's January 31, 2008 letter to Cho states, in pertinent part:

Because the letter was <u>on Yale Graduate School letterhead</u> and did in fact bear an exact replica of <u>her</u> signature, she did not look more closely and mistakenly confirmed it had been issued by her office. At that time of year, in September, <u>her office sends approximately 70 letters a day</u>, and tries to respond promptly to every inquiry. Accordingly, we do feel that it was the press of business and the effectiveness of the fraudulent document that led to this error. (emphasis added.)

Howard Fetner, Esq.
September 21, 2009
Page 5

Dongguk is entitled to know whether the "press of business" explanation was true or simply another misstatement of fact. Accordingly, we are entitled to obtain copies of each of the "70 letters a day" in order to ascertain the truth. Alternatively, is Yale prepared to stipulate that this statement was not true?

**Request 11.** Your statement that other documents relating to the September 22, 2005 fax do not exist does not make any sense. As we indicated in our August 6, 2009 letter, it is common knowledge that in preparing and transmitting a fax, there must be an original document without any fax transmission lines and/or an electronic version of the cover sheet. Yale has only produced a copy of the fax transmittal that already includes a fax number line. Failure to produce any other documents in connection with this fax again raises serious issues about document preservation and production.

**Request 12.** Yale's response to this Request remains deficient. Among other things, we are still missing (i) the July 6, 2007 email from Cho to Schirmeister, and Schirmeister's out of office message in response; and (ii) emails to Michael Moore from Cho in August 2007. Again, this raises the issue of the adequacy of Yale's ESI search.

**Requests 13–22.** Yale's responses to these Requests are still incomplete. Among other things, we remain concerned about the relatively small number of documents and the absence of documents that reflect the internal investigation Yale claims it was conducting, either with the Yale Police Department or through third-party investigators, such as copies of investigation reports, notes, interviews, or documents comprising or concerning any investigation files that were generated.

**Request 23.** Yale's response to this Request remains deficient. Yale still has not produced other employee evaluations for Reinstein. Employee manuals and guidelines are responsive to the extent that they describe Reinstein's job responsibilities, and we request their prompt production.

**Request 24.** The single page print out of a web page describing the Office of Public Affairs fails to demonstrate consideration of other documents which provide its responsibilities. For example, we would expect to receive campus directory information, website materials, press release information, including drafting requirements, documents given to media contacts, or even individual emails or other correspondence delineating what the Office of Public Affairs does or does not do.

**Requests 31–33; 35.** Yale's responses to these Requests remain deficient. We still have not received anything concerning these media articles. We would expect to receive, at the very least, communications with the reporter and any corresponding notes, whether in electronic or hard copy, regarding what should be said to the reporter or what was said.

**Requests 42; 44–45.** We still disagree with your objection that this Request is not calculated to lead to the discovery of admissible evidence and again demand that Yale produce documents concerning the manner by which it obtained Dongguk's internal investigation file.

Howard Fetner, Esq.
September 21, 2009
Page 6

The case law cited in your August 26th letter is inapposite. *Marubeni Am. Corp. v. Tenneco Resins, Inc.*, No. 82 Civ. 7548, 1984 U.S. Dist. LEXIS 15493, at *3–4 (S.D.N.Y. June 27, 1984) and *Honeycutt v. Aetna Ins. Co.*, 510 F.2d 340, 348–49 (7th Cir. 1975) both only discuss relevance to admissibility at trial, not discoverability or even relevance to the case in chief.

**Requests 46–66.** As discussed above, Dongguk's Instructions to its Requests for Production require Yale to identify by Bates number the documents responsive to each Request. Yale's reference to generic categories is insufficient. Accordingly, we again request that Yale identify the documents which are responsive to each Request, as instructed by Dongguk's Request Instruction 3.

### Dongguk's Responses To Yale's Requests For Production

**A.    Dongguk's Responses Generally**

First, your claim that Dongguk's production is deficient in any way is ludicrous. As of the date of this letter, Dongguk has gone above and beyond its obligations under the F.R.C.P. as evidenced by its nearly 375,000 page production in response to Yale's 115 Requests for Production, and in direct contrast to Yale's own production.

Furthermore, although you complain greatly about the alleged "deficiencies" that you claim "pervade Dongguk's responses," it is quite apparent that you have not even reviewed a fraction of the documents that Dongguk has produced. (Letter from Fetner to Weiner dated 8/26/09 at 4.) In fact, your August 26, 2009 letter admits that you have not yet completed your review of Dongguk's productions dated July 24, 2009 or August 18, 2009 (not to mention Dongguk's latest production on September 11, 2009).

Specifically, you state that you "reserve comment" on Dongguk's responses to Requests for Production 1-6, 8-10, 13, 19-26, 35, 38, 42, 50-54, 63-67, 70-74, 95, 98-100, 103, 105, and 107-108, which is nearly half of Yale's requests. (Letter from Fetner to Weiner dated 8/26/09 at 6.) Those two productions alone include over 240,000 pages responsive to Yale's requests. Even more so, as indicated below, those two productions along with Dongguk's Fourth Production resolve many of the issues discussed in your letter.

Second, it is incredible that you are complaining that Dongguk has failed to specifically identify the documents that are responsive to Yale's requests, where Yale itself has failed to comply with this instruction and agreement entirely. Additionally, contrary to your assertion, we have fully complied with our obligation under F.R.C.P. Rule 34, which requires that "(i) [a] party must produced documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request; (ii) [i]f a request does not specify a form for production electronically stored information, a party must produced it in a form or forms in which it is ordinarily maintained or in a reasonably usuable form or forms . . .". (emphasis added).

Howard Fetner, Esq.
September 21, 2009
Page 7

As Dongguk has produced all its documents as they were kept in the usual course of business and as they were ordinarily maintained, Dongguk has fulfilled its obligations. However, as you know, the parties agreed, and the Requests for Production Instructions of both parties direct, that each party would identify the documents which are responsive to particular requests. Only Dongguk has lived up to this agreement.

In this regard, I note that you complain that Dongguk has not complied with its obligation because it has stated that certain documents respond to more than one request and that based upon your review, you have concluded that this is not true. Suffice it to say, you have not provided us with any examples where we have stated that a document relates to more than one request when it does not. We continue to believe that the documents that we produced during the first production accurately states the request(s) to which they respond. This is not surprising since a review your Document Requests makes clear that they are often redundant or are so broadly drafted that in many instances they overlap one another.

For example, Document Request Nos. 27-30, 68-69, and 78-94 request newspaper articles and media reports concerning Jeong Ah Shin and/or statements made by Yale to the media regarding the Jeong Ah Shin matter. DONGGUK0001985-86, an article regarding Yale's claim that the verification fax that Dongguk received from Yale was fake, clearly falls under this scope. Additionally, Document Request Nos. 40, 55, and 96 request documents dealing with faculty and student satisfaction with Dongguk. DONGGUK0002155-2334, which are results from a faculty/student satisfaction survey regarding Dongguk that was administered by KMAC, clearly responds to these requests.

Similarly, Document Request Nos. 56 and 57 request documents regarding job opportunities for Dongguk students. DONGGUK0004553-4929, documents regarding the March 2005 - February 2006 recruiting period, including companies' recruiting information and student recommendations, clearly falls under this scope. Of course, these are only a few examples that illustrate Dongguk's First Production of Documents complied with the parties' agreement.

Moreover, as I am sure you are aware, a party has the option of either providing documents in the manner in which they are kept in the ordinary course of business or to produce documents specifically in response to an enumerated document request. Because of the number of documents requested in certain categories, Dongguk decided to produce those documents in the way they were kept in the ordinary course of business. Specifically, the documents responsive to Document Request Nos. 3, 4, 8, 9, 10, 19, 20, 21, 22, 23, 24, 25, 26, 35, 38, 42, 53, 54, 73, 74, 95, 98, 103, 107 and 108 were "produced as they are kept in the usual course of business," in full compliance with Rule 34 of the F.R.C.P.

Third, as we have indicated in our previous correspondence (e.g., letter from Bae to Fetner on 6/29/09 at 1), and contrary to your repeated assertion, Dongguk has no obligation to produce information and documents not "under its control." *See Twentieth Century Fox Film Corp. v. Marvel Enters.*, 01 Civ. 3016, 2002 U.S. Dist. LEXIS 14682, at *10 (S.D.N.Y. Aug. 6, 2002). As discussed previously, Dongguk's responses to Yale's Requests for Production are

Howard Fetner, Esq.
September 21, 2009
Page 8

based on the files maintained in Dongguk's possession and the information in the possession of its employees.

Fourth, your claims that we have not produced documents in response to many of Yale's requests and/or our responses are incomplete is baseless, especially considering your acknowledgement that you have not reviewed most of Dongguk's production. Further, as discussed in detail below and in the letters accompanying Dongguk's Second, Third, and Fourth Production of Documents, Dongguk has now produced documents responsive to all of Yale's requests, as it has stated that it would.

Fifth, we have invoked Korean privacy laws when appropriate, any assertion otherwise is baseless. Moreover, please refer to Dongguk's Third and Fourth Production of Documents for all responsive emails. As indicated, Dongguk has requested the consent of faculty members and other employees with potentially responsive information. Any and all documents and emails maintained by individuals who provided consent and that are responsive have been produced. Thus, attached as Exhibit A, please find a list of all persons from whom Dongguk sought consent, those who provided consent, and those who did not provide consent. Please note that while two individuals did not provide consent, they informed us that they do not have any documents responsive to Yale's requests.

Sixth, your complaint that many of the produced documents are irrelevant is absurd. As discussed above, the documents produced with Nathanael Kelley's July 24, 2009 letter were produced as they are "kept in the usual course of business," in full compliance with Rule 34 of the F.R.C.P. If you have reviewed them and determined they are not useful to your defense, you can simply ignore them or discard them.

**B.    Dongguk's Responses Specifically**

   **Requests For Production 17, 31, 39, 75, 76, 101, 106, 110, 114, and 115.** In direct contradiction to your claim that we stated we would produce documents responsive to these Requests and have not done so, please see Audrey Lu's September 11, 2009 letter for documents responsive to these Requests and Dongguk's Fourth Production of Documents.

   **Requests For Production 16, 97, and 102.** While Dongguk's April 17, 2009 Response to Yale's Requests for Production 16, 97, and 102 stated Dongguk would produce document responsive to these requests, after a review the documents, we have determined that there are no documents responsive to these Requests.

   **Requests For Production 7 and 15.** Documents responsive to these Requests will be produced to Yale shortly in a subsequent production.

   **Requests For Production 11, 12, 14, 32, 46, 77.** While Dongguk's April 17, 2009 Response to Yale's Requests for Production 12, 14, 32 and 46 did state that we were determining whether third parties had responsive documents and would produce them if we could obtain

Howard Fetner, Esq.
September 21, 2009
Page 9

them, as discussed above, Dongguk's obligation is to produce information and documents "under its control." *See Twentieth Century Fox Film Corp.*, 2002 U.S. Dist. LEXIS 14682, at *10.

Additionally, documents responsive to Request for Production 11 were produced with Dongguk's Fourth Production of Documents. Please see Audrey Lu's September 11, 2009 letter for documents responsive to this request.

Moreover, as stated in Dongguk's April 17, 2009 Response to Yale's Request for Production 77 concerning a July 2, 2007 press conference, Dongguk does not have any documents responsive to this request. Please disregard the fact that Audrey Lu's June 25, 2009 and September 11, 2009 letters included documents that were responsive to Request for Production 77.

**Request For Production 18.** We again emphasize that, as explained in Dongguk's April 17, 2009 Response to Yale's Requests for Production 18, Dongguk does not have any documents regarding Jeong Ah Shin's resignation in 2005.

**Request For Production 23.** As stated in Dongguk's April 17, 2009 Response to Yale's Request for Production 23, Dongguk does not have any documents responsive to this request. Please disregard the fact that Nathanael Kelley's July 24, 2009 letter included documents that were responsive to Request for Production 23.

**Request For Production 28.** As Yale's Request for Production 28 requests "all documents concerning any false statements made by Yale University about Dongguk University," Dongguk has produced and identified all documents responsive to this request.

**Request For Production 30.** As Yale's Request for Production 30 requests "all documents concerning any articles published...," Dongguk has produced and identified all documents responsive to this request.

**Request For Production 33.** As explained in Dongguk's April 17, 2009 Response to Yale's Request for Production 33, Dongguk objects to this request regarding "any communications between any representative of Dongguk University and any representative of Yale University" as overly broad, unduly burdensome, and that it seeks the production of documents that are not reasonably calculated to lead to the discovery of admissible evidence.

Thus, aside from any documents produced in response to Request for Production 26 regarding communications between Euiyon Cho and Yale, Dongguk objects to this request entirely.

**Request For Production 34.** Please see Audrey Lu's September 11, 2009 letter for documents responsive to this request regarding "any communications between any representative of Dongguk University and any representative of the University of Kansas" and Dongguk's Fourth Production of Documents.

NYK 1223988-6.081817.0011

Howard Fetner, Esq.
September 21, 2009
Page 10

      **Request For Production 41.** As explained in Dongguk's April 17, 2009 Response to Yale's Request for Production 41, Dongguk objects to this request regarding "any criminal investigation of, or criminal charges brought against, Dongguk University..." as overly broad, unduly burdensome, and that it seeks the production of documents that are not reasonably calculated to the discovery of admissible evidence. Thus, Dongguk objects to this request entirely.

      **Requests For Production 43 and 44.** As we have previously stated sin Dongguk's April 17, 2009 Response to Yale's Requests for Production 18, Dongguk does not have any documents responsive to these requests regarding the criminal investigations and charges against Yang Kyun Byeon and/or Yong Taek Lim.

      **Request for Production 55, 58, and 99.** Contrary to your contention that Dongguk's production regarding the discovery requests are incomplete, please see Audrey Lu's September 11, 2009 letter for documents responsive to these requests and Dongguk's Fourth Production of Documents for additional documents responsive to these requests.

      **Requests for Production 56, 57, 59, 60, 61 and 62.** Contrary to your contention that the above requests are incomplete, please see Dongguk's Third Production of Documents and Audrey Lu's August 18, 2009 letter, and Dongguk's Fourth Production of Documents and Audrey Lu's September 11, 2009 letter for additional documents responsive to these requests.

Sincerely yours,

Robert A. Weiner

cc:    Felix J. Springer, Esq.
       Ira Grudberg, Esq.
       Nathanael Kelley, Esq.
       Audrey Lu, Esq.

**Dongguk University  v. Yale University, No. 3:08-CV-00441-RNC**
**List of Potential Custodians and Consent Received**

| | NAME | CONSENT |
|---|---|---|
| 1 | Ahn, Hyung Taik | Yes |
| 2 | Byun, Minwoo | Yes |
| 3 | Cho, Eulyon | Yes |
| 4 | Cho, Soon Sik | Yes |
| 5 | Cho, Won Sang | No |
| 6 | Choi, Moon Gyu | Yes |
| 7 | Chung, Woo Thak | Yes |
| 8 | Chung, Ye Kyung | Yes |
| 9 | Han, Jin Soo | Yes |
| 10 | Hong, Ki Sam | Yes |
| 11 | Hong, Sung Jo | Yes |
| 12 | Hwang, Jong Yeon | Yes |
| 13 | Im, Jo Kyung | Yes |
| 14 | Im, Yong Taik | Yes |
| 15 | Jeon, Byoung Geon | Yes |
| 16 | Jin, Hyeok Jin | Yes |
| 17 | Jung, Dong Hyun | Yes |
| 18 | Kang, Hyung Seok | Yes |
| 19 | Kim, Bong Hyun | Yes |
| 20 | Kim, Byung Ho | Yes |
| 21 | Kim, Hae Dukk | Yes |
| 22 | Kim, Hyung Bae | Yes |
| 23 | Kim, Jiwoo | Yes |
| 24 | Kim, Juntae | Yes |
| 25 | Kim, Kyung Hee | Yes |
| 26 | Kwak, No Sung | No |
| 27 | Lee, Sang Il | Yes |
| 28 | Lee, Sun In | Yes |
| 29 | Lee, Young Myun | Yes |
| 30 | Oh, Won Bae | Yes |
| 31 | Oh, Young Kyo | Yes |
| 32 | Park, Myung Kwan | Yes |
| 33 | Rhee, Jongtae | Yes |
| 34 | Shim, Ik Sup | Yes |
| 35 | Yang, Sung Woong | Yes |
| 36 | Yoo, Jin | Yes |
| 37 | Yoo, Seuck Cheun | Yes |