UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DONGGUK UNIVERSITY,                :    No. 3:08-CV-00441 (TLM)
                                   :
         Plaintiff,                :
                                   :
    v.                             :
                                   :
YALE UNIVERSITY,                   :
                                   :
         Defendant.                :    AUGUST 1, 2011
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DEFENDANT YALE UNIVERSITY'S EXHIBITS TO MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| Exhibit | Document |
|---------|----------|
| 1 | Pl. Dongguk University's Answers and Objections to Def. Yale University's Fourth Set of Interrogs. (selected pages) |
| 2 | Tr. of 1/7/08 Trial Testimony of Ki Sam Hong in Seoul Seobu District Court |
| 3 | Notice of Teacher Appointment of 9/1/05 (DONGGUK0358382-83) |
| 4 | Pl. Dongguk University's Answers and Objections to Def. Yale University's Third Set of Reqs. for Admission (selected pages) |
| 5 | Pl. Dongguk University's Supplemental Answers and Objections to Def. Yale University's Third Set of Reqs. for Admission (selected pages) |
| 6 | Dep. of Euiyon Cho as Fed. R. Civ. P. 30(b)(6) Designee of Dongguk University of 7/26/10 and 1/18/11 (selected pages) |
| 7 | Curriculum Vitae of Shin Jeong-ah (DONGGUK0259804-05) |
| 8 | Pl. Dongguk University's Answers and Objections to Def. Yale University's First Set of Interrogs. (selected pages) |
| 9 | Appointment and Service Progress for Jeong Ah Shin (DONGGUK0318153-55) |
| 10 | Certification Letter of 5/27/05 (DONGGUK0357992) |
| 11 | Letter from Ahn to Graduate School of 9/5/05 (DONGGUK0358385-86) |
| 12 | Facsimile from Schirmeister to Ahn of 9/22/05 (DONGGUK0358387-89) |
| 13* | Request for Disciplinary Action of a Teacher of 7/13/07 (DONGGUK0357913-14) |
| 14 | Dep. of Pamela Schirmeister of 1/28/10 (selected pages) |
| 15 | Compl., Dongguk University v. Yale University |
| 16 | Electronic Inquiry from Cho to Yale Library of 6/7/07 (DONGGUK0260220-22) |
| 17 | E-mail from Cho to Emerson of 6/10/07 (DONGGUK0262837-38) |
| 18 | E-mail from Emerson to Cho of 6/11/07 (DONGGUK0262839-41) |
| 19 | E-mail from Mehring to Cho of 6/13/07 (DONGGUK0262845-47) |
| 20 | Results of Fact-finding Investigation Regarding Professor Jeong Ah Shin's Falsified Academic Credentials of 7/20/07 (DONGGUK0314382-93) |
| 21 | "Controversy of Inappropriate Professor Appointment in Dongguk University," |

| | *Buddhism Newspaper*, 6/30/07 (DONGGUK0000851-52) |
|---|---|
| 22 | Letter from Oh to Levin of 7/5/07 (DONGGUK0357917-18) |
| 23 | E-mail from Carney to Oh of 7/10/07 (DONGGUK0277522-24) |
| 24 | E-mail from Carney to Oh of 11/30/07 (DONGGUK0277531-32) |
| 25 | Dep. of Edward Barnaby of 8/19/10 (selected pages) |
| 26 | E-mail from Grendziszewski to Park of 7/10/07 and succeeding messages (YALE00007661-62) |
| 27 | E-mail from Rhee to Reinstein of 7/10/07 and succeeding messages (YALE00000488-91) |
| 28 | E-mail from Rhee to Reinstein 7/13/07 and succeeding messages (YALE00000493-95) |
| 29 | Dep. of Gila Reinstein of 2/4/10 and 4/26/11 (selected pages) |
| 30 | E-mail from Kaplan to Conroy of 10/15/07 and succeeding messages (YALE00007436-38) |
| 31 | Transcription of "NEWS WHO" Television Program (DONGGUK0072852) |
| 32 | E-mail from Schirmeister to Reinstein of 7/20/07 and succeeding messages (YALE00000708-10) |
| 33 | Letter from Rose to Runowicz of 10/29/07 (YALE0007995-8000) |
| 34 | Dep. of Jin Soo Han as Fed. R. Civ. P. 30(b)(6) Designee of Dongguk University of 7/30/10 and 8/2/10 (selected pages) |
| 35 | "Key Presidential Aide Behind Fake Dongguk Professor," *Korea Times*, 8/24/07 (DONGGUK0000064) |
| 36 | "'Roh's Aide Tried to Cover Up Diploma Forgery,'" *Korea Times*, 8/24/07 (DONGGUK0000065) |
| 37 | "Biennale Director Sacked for Academic Forgery," *Korea Times*, 7/12/07 (DONGGUK0000923-24) |
| 38 | "All of Gwangju Biennale Director Jeong-Ah Shin's Degrees 'Fake'(Overview)," *Yonhap News*, 7/11/07 (DONGGUK0000871-72) |
| 39 | "University of Kansas Has No Record of Verification of Shin's Diplomas," *Korea Times*, 7/18/07 (DONGGUK0001127-28) |
| 40 | "Dongguk University 'Investigation on Jeong Ah Shin' 'There is nothing it exposed,' *Yonhap News*, 7/20/07 (DONGGUK0001039-40) |
| 41 | "Dongguk failed to check records of discredited art professor," *Hankyoreh*, 7/14/07 (DONGGUK0001758-60) |
| 42 | "Shin, Roh's Aide Had Close Relations," *Korea Times*, 9/10/07 (DONGGUK0000159-60) |
| 43 | "Shin Exploited Relations With Roh's Former Aide," *Korea Times*, 9/12/07 (DONGGUK0000210) |
| 44 | "Shin Jeong-ah Confesses to Affair with Byeon," *Dong-A Ilbo*, 12/4/07 (DONGGUK0001278-79) |
| 45 | "No outside pressure? … Dongguk University President Oh's Lies Exposed," *Chosun.com*, 9/13/07 (DONGGUK0000249) |
| 46 | "Ex-leader of Dongguk takes stand," *JoongAng Daily*, 1/8/08 (DONGGUK0001681) |
| 47 | "Byeon ordered funds to aid Dongguk monk," *JoongAng Daily*, 9/20/07 |

| | (DONGGUK0001611-12) |
|---|---|
| 48 | "Former art professor Shin sentenced to jail," *Korea Herald*, 4/1/08 (DONGGUK0002131) |
| 49 | "2007: A year marred by endless scandals," *news.naver.com*, 12/26/07 (DONGGUK0000731-35) |
| 50 | Criminal Complaint filed by Dongguk University, Educational Corporation against Jeong-Ah Shin (DONGGUK0259392-405) |
| 51 | Facsimile from Runowicz to Rose of 10/17/07 |
| 52 | Dep. of Bong Hyun Kim of 2/10/11 (selected pages) |
| 53* | Letter from Cho to Carney of 12/28/07 (DONGGUK0378534-35) |
| 54 | Statement by Yale University Office of Public Affairs of 12/29/07 (YALE00000360) |
| 55 | Gila Reinstein's Communications to the Media |
| 56 | E-mail from Reinstein to Kong of 9/21/0 (YALE00000571-72) |
| 57 | Yale University Rejects Shin's Fake PhD Claim, *Dong-A Ilbo*, 9/23/07 (DONGGUK0001119) |
| 58 | "Dongguk University Professor Jeong-Ah Shin's Forged Doctorate ... What Did the University Do?," *No-Cut News*, 7/11/07 (DONGGUK0000898-900) |
| 59 | "'It was thought to be impossible...' Circle of fine arts 'shocked by Jeong Ah Shin'," *Munhwa Daily Culture*, 7/12/07 (DONGGUK0001991) |
| 60* | "Cinderella of Fine Arts Circle 'Fake Doctor' Controversy," *Chosun Daily*, 7/12/07 (DONGGUK0314719) |
| 61 | "Who sent the 'fake verification form' of doctorate degree," *JOINS*, 7/16/07 (DONGGUK0001982-83) |
| 62 | "Snowball of lies," *news.naver.com*, 7/20/07 (DONGGUK0001030-31) |
| 63 | "Former Dongguk University president Ki Sam Hong will be summoned soon," 9/4/07 (DONGGUK0000137) |
| 64 | "'Yale University Received Letter Requesting Confirmation of Jeong-Ah Shin's Degree' (Overview)," *Yonhap News*, 9/3/07 (DONGGUK0000133-34) |
| 65 | "Jeong-Ah Shin: Did She Send the Fax Herself?," *MBC News*, 9/4/07 (DONGGUK0000838) |
| 66* | "Dongguk University Internal Investigation Ends in 'Whitewash'," *Chosun.com*, 7/21/07 (DONGGUK034638-41) |
| 67 | "'Yale University documents received at the time of Jeong Ah Shin's appointment are fake,'" 7/14/07 (DONGGUK0000967) |
| 68* | "Yale University decided not to investigate 'Jeong Ah Shin's fake fax,'" 7/16/07 (DONGGUK0314721) |
| 69 | "Degree scandals highlight holes in hiring process," *news.naver.com*, 8/10/07 (DONGGUK0001097-1100) |
| 70 | "Dongguk University Chairman, 'openly sides with' Jeong Ah Shin," 9/5/07 (DONGGUK0000141) |
| 71 | "Jeong Ah Shin, Goes Into Hiding after Returning Home," 7/16/07 (DONGGUK0000984) |
| 72 | "Are Prosecutors Reluctant to Investigate Jeong-Ah Shin Case?," *Chosun Ilbo*, 9/4/07 (DONGGUK0000139) |

| 73 | Articles That Allegedly Harmed Dongguk's Reputation |
|---|---|
| 74 | Dongguk University's Damages Analysis of 7/23/10 |
| 75 | E-mail from Schirmeister to Reinstein of 7/24/07 (YALE00000006-7) |
| 76 | E-mail from Schirmeister to Reinstein of 7/17/07 (YALE00008557-60) |
| 77 | Proposed Am. Compl., Dongguk University v. Yale University |
| 78 | Corrected Mem. of Law in Opp'n to Def.'s Mot. to Dismiss (Parts 1-3), Dongguk University v. Yale University |
| 79 | Tr. of 1/30/09 Mots. Hr'g, Dongguk University v. Yale University |
| 80 | Pl. Dongguk University's Second Supplemental Answers and Objections to Def. Yale University's First Set of Interrogs. (selected pages) |
| 81 | Pl. Dongguk University's Revised Fourth Supplemental Answers and Objections to Def. Yale University's First Set of Interrogs. (selected pages) |
| 82 | Supplemental Information Regarding the Yale Lawsuit (DONGGUK0265339-40) |
| 83* | Final List of Selected Humanities Projects for the Humanities Korea Project (DONGGUK0230010) |
| 84 | Dep. of Byoung Geon Jeon as Fed. R. Civ. P. 30(b)(6) Designee of Dongguk University of 8/9/10 and 8/11/10 (selected pages) |
| 85* | Pl. Dongguk University's Fourth Supplemental Answers and Objections to Def. Yale University's First Set of Interrogs. (selected pages) |
| 86* | A word of thanks from the President (DONGGUK0310984) |
| 87 | Dep. of Sun In Lee as Fed. R. Civ. P. 30(b)(6) Designee of Dongguk University of 10/27/10 and 10/28/10 (selected pages) |
| 88 | Oh Hyun Kim statement of 5/24/10 (DONGGUK0381478) |
| 89 | Pl. Dongguk University's Objections and Resps. to Def. Yale University's Fourth Set of Reqs. for Produc. (selected pages) |
| 90 | E-mail from Lu to Fetner of 10/26/10 and succeeding message |
| 91 | Jin Moon Kim statement of 12/5/07 (DONGGUK0381479) |
| 92 | Jin Sik Choi statement of 5/20/10 (DONGGUK0381480) |
| 93 | Jun-Hyeong Park statement of 5/28/10 (DONGGUK0381481) |
| 94 | Hyeon-Jeong Kang statement of 5/31/10 (DONGGUK0381482) |
| 95 | Compl., Corporation Dongguk University v. Minister of Education, Science and Technology (DONGGUK0378590-603) |
| 96* | Announcement of Applications for Establishment of Specialized Graduate Law Schools, 10/30/07 ( DONGGUK0273411-20) |
| 97 | Letter from Lu to Fetner of 1/8/10 |
| 98* | Supreme Court Judgment, Dongguk University School Foundation v. Minister of Education, Science and Technology (DONGGUK0379938-43) |
| 99 | Tr. of 3/30/09 Telephone Conference, Dongguk University v. Yale University |
| 100* | E-mail from Dongguk University Public Relations Office to Seong of 3/12/07 (selected pages) (DONGGUK0337521-22 and DONGGUK0337573-76) |
| 101* | Plan for Dongguk University UI Renewal Project (DONGGUK0367925-28) |
| 102* | Dongguk UI (University Identity) Renewal Program Progress Report (DONGGUK0368046-49) |
| 103 | Dep. of Young Kyo Oh of 9/15/10 (selected pages) |
| 104* | Results of Initial Survey on UI Development (DONGGUK0367947-55) |

| 105 | Media Response Plan (DONGGUK0384859-61) |
|---|---|
| 106 | E-mail from Lee to Kim of 10/26/09 and succeeding message (DONGGUK0385512-13) |
| 107 | Proposal Prepared by Fleishman-Hillard (DONGGUK0383979-85) |
| 108* | Memorandum from Kim to President, Dongguk University of 9/17/07 (DONGGUK0314723) |
| 109 | http://www.dongguk.edu/eng_html/about/greeting.jsp |
| 110* | Tables concerning Dongguk University's Undergraduate and Graduate Admissions (DONGGUK0317493) |
| 111* | Report of Results of Academic Credit Withdrawal for Courses Taught by Jeong-Ah Shin (DONGGUK0260327) |
| 112 | Dep. of Byoung Ho Kim as Fed. R. Civ. P. 30(b)(6) Designee of Dongguk University of 8/6/10 (selected pages) |
| 113* | "Chairman Yeongbae, Resign at Once to Restore the Honor of Dongguk University," Faculty Senate of Dongguk University, 12/14/07 (DONGGUK0314401-02) |
| 114 | Statement, Association of Alumni Professors Supporting Dongguk University, 10/22/07 (DONGGUK0314368) |
| 115 | Statement of Dongguk University Buddhist Professors' Association (DONGGUK0314371) |
| 116 | E-mail from Cho to Goot of 6/10/07 (DONGGUK0262835-36) |
| 117 | E-mail from Cho to Emerson of 6/12/07 (DONGGUK0262842-44) |
| 118 | E-mail from Cho to Schirmeister of 7/6/07 (DONGGUK0262848-49) |
| 119 | E-mail from Cho to President's Office of 7/10/07 (DONGGUK0262858) |
| 120 | E-mail from Cho to Carney of 7/15/07 (DONGGUK0262861) |
| 121 | E-mail from Cho to Carney of 7/15/07 and succeeding messages (DONGGUK0262865-67) |
| 122 | E-mail from Cho to Carney of 7/18/07 and succeeding messages (DONGGUK0262874-78) |
| 123 | E-mail from Cho to Carney of 8/1/07 and succeeding messages (DONGGUK0262889-94) |
| 124 | E-mail from Cho to Carney of 8/31/07 (DONGGUK0262907-09) |
| 125 | E-mail from Cho to Carney of 8/31/07 and succeeding messages (DONGGUK0262915-17) |
| 126 | E-mail from Cho to Carney of 9/3/07 and succeeding messages (DONGGUK0262929-34) |
| 127 | E-mail from Cho to Carney of 9/3/07 and succeeding messages (DONGGUK0262940-44) |
| 128 | E-mail from Cho to Carney of 9/12/07 (DONGGUK0262945) |
| 129 | E-mail from Cho to Moore of 8/30/07 (DONGGUK0262905) |
| 130 | E-mail from Cho to Moore of 8/31/07 (DONGGUK0262910-12) |
| 131 | "Biennale Curator's Degree Revealed a Forgery," *Chosun Ilbo*, 7/13/07 (YALE00000760) |
| 132 | E-mail from Reinstein to Choi of 7/19/07 and succeeding message (YALE00000500-01) |

| | |
|---|---|
| 133 | E-mail from Reinstein to Choi of 7/20/07 and succeeding message (YALE00000513-14) |
| 134 | "Korea battles resume fakers," *Yale Daily News*, 9/5/07 (DONGGUK0001328-29) |
| 135 | E-mail from Reinstein to Park of 9/21/07 and succeeding message (YALE00000567-68) |
| 136 | E-mail from Reinstein to Choi of 9/21/07 and succeeding message (YALE000000569-70) |
| 137 | E-mail from Reinstein to Yu of 9/21/07 and succeeding message (YALE00000573-75) |
| 138 | "Biennale Art Director Accused of Phony Credentials," *Chosun Ilbo*, 7/12/07 (DONGGUK0000920; YALE00000178) |
| 139 | "Art luminary forged her academic credentials," *JoongAng Daily*, 7/12/07 (DONGGUK0001548-49) |
| 140 | "Fake Degree … Fabricated dissertation… Severe moral hazard for the artistic community," *Herald Business*, 7/12/07 (DONGGUK0002001-02) |
| 141 | "The 'Fake Doctor' Scandal for the Cinderella of the Art World," *Chosun.com*, 7/12/07 (YALE00000753-54) |
| 142 | "'Suspicion of Academic Record Falsified by Jeong Ah Shin' Officially Presented at Her Appointment in 2005," *Yonhap News*, 7/13/07 (DONGGUK0000931-32) |
| 143 | "'Special Hiring of a Western Art History Specialist, at a School that Teaches Buddhist Art'," *Chosun Ilbo*, 7/13/07 (DONGGUK0000951) |
| 144 | "Art world shocked over curator's forged degrees," *Korea Herald*, 7/13/07 (DONGGUK0001357-60; YALE00000372-73) |
| 145 | "Mystery behind hiring of shamed art professor," *JoongAng Daily*, 7/13/07 (DONGGUK0001550-51; YALE00000180-81) |
| 146 | "The talented Ms. Shin," *The Independent*, 7/13/07 (DONGGUK0001784-86; YALE00000183-85) |
| 147 | "Stroke of luck, raw talent fueled Shin's ascent," *JoongAng Daily*, 7/14/07 (DONGGUK0000963-66; YALE00000187-91) |
| 148 | "Professor Jeong-Ah Shin's Hiring Process Also 'Suspicious'," *Chosun Ilbo*, 7/14/07 (DONGGUK0000969) |
| 149 | "Biennale Curator's Degree Revealed a Forgery," *Chosun Ilbo*, 7/14/07 (DONGGUK0000971) |
| 150 | "Dongguk Univ. to Fire Prof Who Forged Her Degrees," *KBS World News*, 7/14/07 (YALE00000186) |
| 151 | "'Academic record falsification,' Will it be investigated by Dongguk's own efforts," *Yonhap News*, 7/16/07 (DONGGUK0000974-75) |
| 152 | "Yale University Won't Probe Source of Shin's False Certificate," *Dong-A Ilbo*, 7/16/07 (DONGGUK0001200-01) |
| 153 | "The Rise and Fall of a Korean Success Story," *Asia Sentinel*, 7/17/07 (DONGGUK0000995-98) |
| 154 | "Dongguk University didn't really 'check Kansas State academic record'," *DongA Ilbo*, 7/18/07 (DONGGUK0001009) |
| 155 | "'Fake Doctor' Ms. Jeong-Ah Shin's Manhattan Whereabouts Unknown," *JoongAng Ilbo*, 7/18/07 (DONGGUK0001010) |
| 156 | "Dongguk University Administration Suspected of 'Covering for Jeong-Ah Shin'," |

| | |
|---|---|
| | *Chosun Ilbo*, 7/18/07 (DONGGUK0001013) |
| 157 | "'Growing Suspicion' Dongguk University being deceived or protected?," *Hankook Ilbo*, 7/18/07 (YALE00000771-72) |
| 158 | "'Dongguk University received 'confirmation of Jeong-Ah Shin's fakery' months ago but ignored it'," *Yonhap News*, 7/19/07 (DONGGUK0001016-17) |
| 159 | "Fake Diplomas," *Korea Times*, 7/20/07 (DONGGUK0001041) |
| 160 | "Dongguk University Fires Bogus Professor," *Korea Times*, 7/20/07 (DONGGUK0001042-43; YALE00000204-05) |
| 161 | "Dongguk University Suspected of Ignoring Evidence Regarding 'Fake Doctor' Ms. Jeong-Ah Shin This April," *Chosun Ilbo*, 7/20/07 (DONGGUK0001052) |
| 162 | "Dongguk University's 'Jeong-Ah Shin Investigative Committee,' made up of university personnel, reports 'no corruption' after superficial investigation," *DongA Ilbo*, 7/21/07 (DONGGUK0001050) |
| 163 | "Former university president takes the heat on art fraud," *JoongAng Ilbo*, 7/21/07 (DONGGUK0001564-65) |
| 164 | "Dongguk U. Sacks Bogus Prof. Shin Jeong-Ah," *Korea Times*, 8/3/07 (DONGGUK0001092; YALE00000208) |
| 165 | "Suspicions Grow Over Shin's Diploma Forgery," *Korea Times*, 8/27/07 (DONGGUK0000079) |
| 166 | "Growing Suspicions," *Korea Times*, 8/29/07 (DONGGUK0000101) |
| 167 | "Clearing up a Scandal," *news.naver.com*, 8/30/07 (DONGGUK0000108-09) |
| 168 | "GNP accuses Biennale of endorsing Shin," *news.naver.com*, 8/30/07 (DONGGUK0001393-97) |
| 169 | "Factional Feud Deepens in Buddhist Groups," *Korea Times*, 9/3/07 (DONGGUK0000135-36) |
| 170 | "Monk Urges Dongguk Directors to Resign," *Korea Times*, 9/6/07 (DONGGUK0000146; YALE00000235) |
| 171 | "Ex-professor's home and office raided in probe on degree forgery," *news.naver.com*, 9/6/07 (DONGGUK0000142-43) |
| 172 | "Lie After Lie," *Korea Times*, 9/11/07 (DONGGUK0000168-69) |
| 173 | "Dongguk Professors Call for Resignation of Directors," *Korea Times*, 9/16/07 (DONGGUK0000365) |
| 174 | "Probe Triggers Backlash from Buddhists," *Korea Times*, 9/22/07 (DONGGUK0000535) |
| 175 | "'Jeong-Ah Shin's US college record not checked during hiring'," *Yonhap News*, 7/17/07 (DONGGUK0000993-94) |
| 176 | "Korean professor accused of forging Yale art degree," *Yale Daily News*, 10/16/07 (DONGGUK0001330-31) |
| 177 | "Dongguk board chairman to resign," *JoongAng Daily*, 10/17/07 (DONGGUK0001650) |
| 178 | "Brief: Art history professor charged with forgery of doctorate indicted by authorities," *Yale Daily News*, 11/1/07 (DONGGUK0001332) |
| 179 | "Byeon, Shin Deny Charges in 1st Trial," *Korea Times*, 11/12/07 (DONGGUK0000709-10) |
| 180 | "A Very Good Step," *news.naver.com*, 12/7/07 (DONGGUK0000717-18) |

| 181 | "Deception Sums Up Year of 2007," *Korea Times*, 12/23/07 (DONGGUK0000725-26) |
| 182 | "Fax on ex-art professor's Yale doctorate degree found to be genuine," *Yonhap News*, 12/28/07 (YALE00000335) |
| 183 | "Dongguk vs. Yale," *Korea Times*, 9/24/08 (DONGGUK0001186-87) |
| 184 | "Poison Ivy: Cleaning up a Korean Art Conspiracy," *ArtAsia Pacific* (DONGGUK0000795) |
| 185 | "Forged Credentials and Korean Employment Law: What to Do With Professor Shin," *Korea Law Blog*, 7/18/07 (DONGGUK0001007-08) |
| 186 | "Cancelling Chosun Ilbo Subscriptions," *Hankyoreh*, 10/16/07 (DONGGUK0001302-03) |
| 187 | "DGU sues Yale," *Dongguk-In*, 4/18/08 (DONGGUK0001749-54) |
| 188 | E-mail from Emerson to Carney of 6/15/07 and succeeding messages (YALE00007000-02) |

\* = Filed under seal.

DEFENDANT YALE UNIVERSITY

By:

Felix J. Springer (#ct05700)
Howard Fetner (#ct26870)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275-0100 (phone)
(860) 275-0343 (fax)
fjspringer@daypitney.com
hfetner@daypitney.com

Its attorneys

## CERTIFICATION

This is to certify that a copy of the foregoing and the attached exhibits was sent this 1st

day of August, 2011, via overnight mail, postage prepaid, to the following counsel of record:

Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz P.C.
350 Orange Street
New Haven, CT 06511

Robert A. Weiner
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173-1922

Howard Fetner

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------ x
DONGGUK UNIVERSITY,                 :

              Plaintiff,            :    No. 3:08-CV-00441 (TLM)

      v.                            :

YALE UNIVERSITY,                    :

              Defendant.            :
------------------------------------ x
```

### PLAINTIFF DONGGUK UNIVERSITY'S ANSWERS AND OBJECTIONS TO DEFENDANT YALE UNIVERSITY'S FOURTH SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff Dongguk University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby responds to defendant Yale University's ("Yale") First Set of Interrogatories (the "Interrogatories") as follows:

### RESERVATION OF RIGHTS

1.      Dongguk's answers and objections are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve all questions as to their competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the answers or subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

2.      Dongguk preserves the right to object on any ground to the use of said answers, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

3.      Dongguk reserves the right to supplement or amend these answers in light of facts or information that may be discovered or brought to light after submission of these answers.

University and Sang Myung University confirming her work experience as a lecturer; the May

27, 2005 letter from Yale certifying Shin's Ph.D. in art history ("Certification Letter"); and; the

certificate of graduation from the University of Kansas dated May 23, 1996 confirming Shin's

Master of Business Administration in degree from the School of Liberal Arts and Bachelor of

Fine Arts degree. In compliance with the special hiring procedures, President Hong and Suk

Chun Yoo ("Yoo"), who was the Chairman of the Office of Planning Affairs at the time,

reviewed the application materials submitted by the special hiring candidates and determined that

Shin was eligible for the interview.

On August 8, 2005, the following individuals interviewed Shin: President Hong; Byung

Shik Kim, who was the Vice President at the time; Young Ho Lee, who was the Chairman of

Jeonggak Won (Dongguk's Buddhist Center); Yoon Kil Seo, who was the Dean of the Graduate

School; and; Yoo. After the interview process was completed, the same interviewers selected

thirteen special hiring candidates, including Shin, who were qualified to be Dongguk's faculty

members.

On August 12, 2005, the Faculty Hiring/Promotion Committee, which consists solely of

professors, voted on the hiring of the special hiring candidates, including Shin. Hyung Taik

Ahn, Sung Gu Cho, Kwang Pyo Hong, Young Dong Kim, Sang Il Lee, Jae Hyun Son and Yoo

were the committee members that participated in the meeting. The committee members

unanimously consented to the hiring of Shin.

**INTERROGATORY 3:**

Identify all recommendations concerning Jeong Ah Shin that Dongguk received on or

before September 1, 2005, including for each recommendation the person who made the

recommendation, the date of the recommendation, the Dongguk employee(s) to whom the

- 5 -

recommendation was made, the form of the recommendation (e.g., letter, e-mail, telephone), and the substance of the recommendation.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk states as follows: During a June 2005 meeting, President Hong met with Byeon Yang Kyun, during which Byeon orally recommended Shin to Dongguk. Byeon told President Hong that Shin had just received her Ph.D. in art history from Yale, was currently the curator and art director for the Sungkok Art Museum, and that he thought Shin would make a good university professor.

**INTERROGATORY 4:**

Please state whether you, your attorney, or any other representative has any statements of witnesses, signed or otherwise in writing adopted or approved by the person making it, or any stenographic, mechanical, electronic, or other recording or a transcription thereof, made by a party or non-party declarant regarding the subject matter of this case or concerning the actions of any party or witness therein except statements made by a party to his or her attorney, and identify all such statements, including for each the declarant, any person who has custody of the statement, and any person who obtained the statement from the declarant.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Interrogatory to the extent that it seeks information not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Dongguk specifically objects to this Interrogatory to the extent that it is overly broad and unduly burdensome in that it requires identification of "any person who has custody of the statement" and "any person who obtained the statement from the declarant."

## VERIFICATION

I, _Jin-Soo Han_, hereby certify that I have reviewed the above

Interrogatories and supplemental responses thereto and that they are true and accurate to the best

of my knowledge and belief.

Name: _Jin-Soo Han_

Title: _Vice President_

Subscribed and sworn to before me this _2nd_ day of _November_ , 2010.

NOTARY PUBLIC _Daniel Lee_

# EXHIBIT 2

1

Seoul Seobu District Court

Witness Interrogatory (Part of 5th Public Trial Protocol)

| Case | 2007kodan2270 Bribery, etc. | |
|---|---|---|
| Witness | Name | Ki Sam Hong |
| | Date of birth | 12/20/1940 |
| | Residence | Kwangjang Apt. 8-606, Yeoido-dong, Yongdungpo-ku, Seoul |

Judge

     Asked the witness whether Korea Criminal Procedure Code Article 148 or Article 149 applied to him, and he acknowledged that the above did not apply to him and was warned of the punishment of perjury and made to take an oath as in the written oath of the attachment.

Prosecutor (Chan Seok Moon)

To the witness

Q: Did the current chief director of Dongguk University Foundation priest Young Bae (Yong Taik Im) and priest Young Dam (Hak Kyu Im) support the witness when the witness took the office president of Dongguk University?

A: Yes, there were a number of persons.

Q: They say that priest Young Bae and priest Young Dam are the powerhouse of Dongguk University Foundation. Is it true?

A: While they lead the University, because it is not an institution of authority, I cannot say that they are the powerhouse.

713

Q: Then do they have any influence?
A: They are very influential.

Q: What is the relationship of the witness with the defendant Yang Kyun Byun?
A: It is a social relationship.

Q: Is it specifically a personal acquaintance?
A: While I cannot say that our personal acquaintance has been great, we have met through Buddhist organizations and were co-representatives once in a Buddhist event.

Q: Have you done it as the president of Dongguk University?
A: Yes.

Q: Was the relationship such that you met for personal reasons in occasions other than official ones or shared personal friendship?
A: I should think it existed somewhat. It may be interpreted in a wide meaning that we are friends who walk together under the common values of Buddhism.

Q: The witness has stated in response to the question on the relationship with the defendant Yang Kyun Byun during the prosecution investigation, "Other than several official meetings for religious events of Chogye Order, we did not have the relationship of meeting privately and there was no reason for us to meet privately." Do you recall?
A: It's similar.

714

Q: Is there a difference between what the witness said as above during the prosecution investigation and what the witness answered in the court a little while ago?
A: There is not much difference.

Q: The witness has been a literary critic as Korean literature scholar. So are you somewhat introverted?
A: I cannot say that I am very extroverted but tend to be introverted.

Q: The witness said that the witness had been asked by the defendant Yang Kyun Byun to hire the defendant Jeong Ah Shin as professor of Dongguk University. When do you recall it happened?
A: I think it was around June 2005.

Q: Did the defendant Yang Kyun Byun call first? Or did the witness call first?
A: I got the call first.

Q: Who decided on the place?
A: I do not recall who decided on the place.

Q: Was there any special issue at the time that prompted the witness and the defendant Yang Kyun Byun to meet with each other?
A: He often asked to have lunch together so we set the time and I went out to have lunch without giving it a second thought.

Q: Does that mean that there was not any special issue?
A: There was not anything special beforehand.

715

4

Q: Do you recall the conversation you two had at the time you met with the defendant Yang Kyun Byun?

A: Yes, I recall most of it.

Q: Please state as much as you recall.

A: While it is difficult to recall in detail, he said, "There is a good talent who could become a college professor. This person graduated from Yale University and did her doctorate at Yale University, and she currently works at the Sunggok Art Museum as its curator and art director, and has good reputation and outstanding talents." In Dongguk University there are the department of fine arts and department of fine arts history, and although there were so many who majored in fine arts in the graduate school of education, because there was not a single person who majored in fine arts history, we needed a person who had majored in fine arts history. Nevertheless, because there were many processes for professor invitation, I could not say on the spot that I would invite her as professor right away so I said I would try to put her in the process and to promote it.

Q: The witness stated, "When the defendant Yang Kyun Byun has said that Jeong Ah Shin was from Yale University and a very outstanding talent, I also told him the story that it was sometimes difficult to appoint outstanding talents as professors as the existing faculty staff rejected them." Is that correct?

A: Yes.

Q: In addition, the witness said that "Dongguk University was under difficult financial situations so tried in all directions to secure it." Did you say this as well?

716

A: It is ambiguous whether I have made such statement or not because of minister Yang Kyun Byun. In fact, there is the saying in the US that a university president will follow even to hell if there is a sign of money, but I don't ever recall saying to the minister of a nation first that I would request for financial support, especially in relation with the personnel matter, and I did not say so.

Q: Does it mean that the witness does not recall having said anything like the above?
A: No, the witness has never said that.

Q: Did the defendant Yang Kyun Byun say that it would help the university's finances if the defendant Jeong Ah Shin was hired?
A: Yes.

Q: Was the financial situation very difficult at the time when the witness took office as president?
A: All but a few universities are having difficulties. It is more so for the universities in non-urban areas, and while it is not exceptionally difficult in the case of Dongguk University, it has always been the first priority to secure its finances. At the time, Yang Kyun Byun had never made such a conditional statement to the witness saying, 'I will provide support if Jeong Ah Shin is hired as professor.' However, he did hint that 'it would help with the finances,' which could, for example, make one expect that 'if the person were to be hired, she would give good lectures. She would guide students well.'

Q: While the defendant Yang Kyun Byun at the time said, 'I would help with the university finances if Jeong Ah Shin is hired,' how did the witness interpret the meaning of such statement?

717

A: The witness is a person who thinks that invitation of a college professor is a very sacred matter. It is because the person is one who opens the future for many and unspecified persons, so there should not be any condition therein, and moreover there should never be such that a financial condition is forced to be connected, and I think it is a disgrace itself that I have been misunderstood that way. While I did not mean to, it is a fact that the witness was made to have such expectation briefly without knowing that there might be a great help for the University legally and had such a thought.

Q: The witness has stated at the presentation, "Minister Byun is the person who supervises the national finances, and Dongguk University at the time was greatly expecting financial support from the government, so I gave a positive answer to look into the matter and then promoted appointing Jeong Ah Shin as professor." Does such a statement have a thread of connection with the previous answer in terms of meaning?
A: It may be considered to have a common connection included. It is because it is extremely proper and natural on the position of a person operating a university that such possibility is always open to many persons as long as it does not harm the university.

Q: Do you recall that you stated as above at the prosecution?
A: Yes, I recall. At the time the witness stated that it was a very inclusive matter.

Q: While the witness stated at the prosecution, "As the president who is in charge of the finances of the University, I could not but be concerned about the aftermath if I had rejected the request for hiring made by the minister of Planning and Budget Administration, and a thought came to my mind that projects funded by the government might be ruined,' do you recall it?

718

A: I was asked that way. When I thought about the question afterward, I was able to make such judgment that there might be personal judgment as for myself, but it was not so good to go against the minister of Planning and Budget Administration from the position of a person operating the University.

Q: Do you mean you stated as above based on such judgment?
A: While I cannot say it is exactly like that, it may be interpreted that way if you would.

Q: While the witness and the defendant Yang Kyun Byun do not have such personal relationship with great personal depth, Yang Kyun Byun all of a sudden asked to meet with the witness and abruptly asked to hire Jeong Ah Shin as professor. Do you think this is correct?
A: I think our relationship was such that we could have lunch together.

Q: It was that the witness could never expect the defendant Yang Kyun Byun to say so, wasn't it?
A: No, I did not expect it.

Q: What thought came to your mind when you heard it?
A: While it is the same with a company or other organizations, the University appreciates first when an excellent talent is recommended to it. If an unqualified person was recommended by force based on power or authority, the witness never succumbed to it, but stopped them under any circumstances. In this case, the University has many from renowned universities, but did not have one from Yale University at the time, and absolutely needed a person who had majored in fine arts history. In addition, the press made special mention about her, and moreover, minister Yang Kyun Byun made the recommendation, and I even thanked him for recommending a talent at the time.

719

Q: From whom did the witness receive the resume or other data required for hiring about the defendant Jeong Ah Shin?
A: I asked a member of staff to go to the Sunggok Art Museum and get the documents.

Q: By member of staff, do you mean an employee of the personnel team or the secretary's office?
A: I talked to the personnel team and the chief of the secretary's office.

Q: How did you tell them?
A: I said, "There is a good candidate for professor and let's get the resume first and review it," and asked them to go and get the resume.

Q: So do you mean that the employee went to the Sunggok Art Museum and obtained the resume of the defendant Jeong Ah Shin?
A: That's how I understood it.

Q: Did the employee obtain the resume of the defendant Jeong Ah Shin and give it back to the witness?
A: I got an oral report, and the planning and personnel office kept it.

Q: You stated at the prosecution, "I instructed the section chief who was in charge of approving the instructor supplementation plan for the 2006 school year to obtain and check the data concerning Jeong Ah Shin via the secretary's office in early July." Is that correct?
A: Yes.

Q: While the date when the instructor supplementation plan was approved is marked as 7/6 or 7/8, do you recall how much time had elapsed before the approval was made after having heard about it from the defendant Yang Kyun Byun?

720

A: The witness invited 293 professors while in office, and there were so many other duties to take care of that I forgot about it and did not take care of it right away. As I handled it after about two weeks had elapsed, I had to be speedy about it. I don't know whether that would look unreasonable to outsiders, but there were no discrepancies with the procedure.

Q: How much later did you make the professor appointment after you had met with the defendant Yang Kyun Byun at the Capital Hotel and heard about the defendant Jeong Ah Shin?
A: I don't think I handled it right away but I did it after a little time had elapsed.

Q: Is it then correct that you met him in the beginning or middle of June 2005?
A: Yes. I don't recall the exact date.

Q: Are there modes of open invitation for application and for special hiring when a professor is hired by the Dongguk University?
A: Yes. There are two modes.

Q: In case of the open hiring, there should be a recommendation made by the department. Is it that the person cannot be hired as professor no matter how capable he/she is unless the department makes a recommendation?
A: No, it doesn't.

Q: Is it the special hiring mode in which the president has been awarded the discretionary right to recommend a talent to complement this drawback?
A: Yes. It is a top-down mode, and may be viewed like the concept of scouting in typical organizations.

Q: In case of the special hiring, once the president encourages a department to make a recommendation, hiring can be made following examination as long as the applicable department agrees. Is that correct?

721

A: That's right.

Q: Then in case of the special hiring, is it impossible to hire if the professors of the applicable department do not agree, no matter how much the president encourages it?
A: That's right.

Q: Then this means that whether it is the open hiring or special hiring, a person may not be appointed as professor unless the professors of the applicable department give recommendations and agreement, no matter how qualified and capable he/she is.
A: That's correct.

Q: The witness stated at the prosecution, "Because no matter how capable a person is intellectually, he/she should get along with the existing faculty members in the applicable department before the University can proceed, it is extremely difficult to make special appointments and causes unreasonableness after forcing an applicable department to accept a person who is not the candidate recommended by the department."
A: Yes.

Q: Is that correct?
A: It is the spirit behind the special hiring I mentioned earlier that one may not look at it in only that way. As for the special hiring, because the department-based egotism that defends against and keeps capable professors from being hired has been inflated in the universities, when the department does not accept a professor candidate who is advantageous for the advancement of the University, it causes serious conflicts in the college and becomes very painful for a person who holds the right to hire.

722

Q: Is it the special hiring mode by which the defendant Jeong Ah Shin was hired, wherein the witness as president encouraged the department of fine arts history to make recommendation and professors in the department of fine arts history were made to make recommendations upon obtaining their agreement before her appointment was achieved?

A: That's correct. I worked hard and kept persuading those who were reluctant so that an appointment recommendation might be sent up.

Q: There were no plans for hiring professors in the department of fine arts history or department of fine arts while the defendant Jeong Ah Shin majored in the field of western fine arts history.

A: While there was no plan for hiring professors, we really needed one.

Q: While the witness at first tapped the opinion from the department of fine arts history after asking the department to hire the defendant Jeong Ah Shin, the professors objected so you didn't receive recommendation from the department of fine arts history at all.

A: While the witness talked about it once or twice, I was told that the course of western fine arts history would be taught by its full-time instructor, so I gave up on it there. And, as it is known outside, it is not the department of Buddhism fine arts history but the department of fine arts history, and there was no one who majored in fine arts history in the department of fine arts history, and while there were two active professors, one of them was on sick leave, and the other one was running the department. There was no way that one person could advise 56 masters and doctorate students. Students must learn about western fine arts history before they can learn about baroque and cubism before graduation, and I thought that it was irresponsible for the University not to offer such lectures, even though the University charged expensive tuition, so I made the judgment that a person who had majored in western fine arts history was absolutely needed, so persuaded the department before it agreed.

723

Q: The department of fine arts history objected to giving the recommendation at first.
A: Yes, it objected.

Q: So the witness mentioned that her department affiliation would be switched to another department following her appointment and one professor TO would be given to the department of fine arts history before professor Woo Taik Jung reluctantly recommended the defendant Jeong Ah Shin.
A: It represents belittlement. There is no way that a president would say, "Hire this person then I'll give you something else." They said first, "Then please give a person to the Buddhism fine arts history as well." So I said, "Good. I'll do it." That's how it happened. Because there would be three professors after Jeong Ah Shin was hired, and the department should have at least 4 to 5 professors, it was decided to do so.

Q: Did you decide to change her affiliation to another department after her appointment?
A: That is correct.

Q: Is it then correct that at, the request of professor Woo Taik Jung, one more professor TO would be given to the department of fine arts history later?
A: Yes.

Q: The witness did not propose this first, but because professor Woo Taik Jung would not agree, an agreement as above was reached during the discussion.

724

A: Yes.

Q: Was it around 07/22/2005 when the witness encouraged professor Woo Taik Jung of the department of fine arts history to recommend the defendant Jeong Ah Shin?
A: I think so.

Q: Are you aware that while professor Woo Taik Jung had agreed with the witness to recommend the defendant Jeong Ah Shin, he did not submit a letter of recommendation to the personnel management team even on the morning of August 4, which was the deadline for filing the documents for appointment application, and that later, after the manager of the planning office, Seok Cheon Yoo, became aware of the fact and urged him, he submitted the letter of recommendation close to the deadline late in the afternoon?
A: Yes.

Q: The defendant Jeong Ah Shin did not have a lecture assigned by professor Woo Taik Jung after she was appointed as professor.
A: Yes, it is so terrible. While I as president did not get involved in such matters and did not have enough time so was not aware of it, if the experiences and academic credentials of Jeong Ah Shin had been true, it was a very intentional and terrible matter not to assign lecture hours, even though there were many applicable subjects such as western fine arts history and planning and exhibition theory.

Q: Doesn't that mean that the department of fine arts history was so passive and negative concerning recommendation?
A: That's correct.

725

Q: A letter of recommendation is a formal and official notice affixed with the stamp of an affiliate department dean or the stamp of an affiliate graduate school dean that should be filed with the personnel management team, isn't it?

A: That's correct.

Q: Then looking at the documents that were submitted in relation with personnel affairs at the time, the recommendation letters for other appointment applicants were filed with the personnel management team as official notices affixed with the stamp of an affiliate department dean or the stamp of an affiliate graduate school dean, but in contrast, the recommendation letter for the defendant Jeong Ah Shin was filed with the recommendation from professor Woo Taik Jung, but without any official notice affixed with the stamp of the graduate school dean. Are you aware of this fact?

A: Yes. I am aware.

Q: Was it because there had not been sufficient discussion with the graduate school dean?

A: It was not sufficient.

Q: Graduate school dean Yoon Kil Seo became very angry about the matter.

A: There are approximately 50 departments in Dongguk University, and all of them are undergraduate while only the department of fine arts history belongs to the graduate school. So this represents a case wherein working level individuals misunderstood because there was no dean there, so thought it was alright to submit as was, but the working level individuals later realized that it should have been approved by the graduate school dean instead of the department dean because it belonged to the graduate school, so told the graduate school dean later, and he thought he had been ignored, so became very angry, but became very satisfied after the interview.

Q: Is it prescribed by the rules for instructor appointment at Dongguk University that only the holder of a doctorate degree can be appointed as assistant professor or higher?

726

A: Yes.

Q: The above rule was amended in July 2005 or so, wasn't it?
A: Yes, it is the provision that allows an invitation as an assistant professor instead of full-time lecturer upon appointment so as to strengthen our competitiveness.

Q: Cho Kyung Im, who is a member of the personnel management team, stated that the defendant Jeong Ah Im did not submit documents at the time of filing the recommendation letter, but submitted duplicates of the certificate of graduation from the University of Kansas and the certificate of Doctorate degree from the graduate school of Yale University only on the day prior to her interview, and did not submit duplicates of her B.A., Master's, nor Doctorate diplomas, nor her academic records, which were required for appointment application, and reported such facts to the leader of personnel management team, Hyung Taik Ahn. Has the team leader Hyung Taik Ahn reported such facts to the witness?
A: I do not recall well.

Q: Looking at the instructor appointment procedures of Dongguk University, an interview examination is conducted by interview members after the recommendation letter from the department has been filed.
A: Yes.

Q: Looking at the interview card for the defendant Jeong Ah Shin, her personal details and degrees including B.A., master's, and doctorate and majors are recorded, and evaluation items include ① educational mission and personal character, ② general knowledge and understanding of education, ③ language skills and capability to express oneself, ④ teaching capabilities for major courses and computer-related knowledge, and ⑤ academic and Buddhism outlook, and interview scores are given based on these five items. Is that correct?

727

A: Yes.

Q: Based on the interview card opinion section for the defendant Jeong Ah Shin filled out by the interview member Byung Sik Kim, who participated in the interview at the time, it was recorded such that "taking the areas of 1. expertise and expressiveness, 2. experience and credentials, and 3. contributions to cultural content into account, she is judged to be appropriate for instructor appointee of the University so the finding is given as above," and in the same section was additionally recorded "MBA, etc." The witness also recorded in his interview finding indicating that "confidence and passion for her own major is sufficient..." So it appears that in-depth examination was conducted on major, experiences, credentials, and expertise during the interview process. Is that correct?
A: That's correct.

Q: Looking at the interview data available when the defendant Jeong Ah Shin was interviewed for her appointment, it is verified that interview examinations were conducted on 14 applications and 7 of them were eliminated. So is the interview examination conducted with such depth and gravity?
A: That's correct.

Q: After the interview examination procedure, a discussion by an instructor personnel committee follows, doesn't it?
A: Yes.

Q: What role does the instructor personnel committee play?
A: It is a type of checking apparatus that reviews whether the process, from selection and examination of a professor candidate conducted by the president and enforcement part through the interview, has been appropriate and lawful and whether any issues have been raised.

728

Q: The instructor personnel committee is the place where various documents submitted by those who have applied for professor appointment and interview examination records are reexamined as a whole, isn't it?

A: Everything is reviewed inclusively, but it might not perform the dissertation examination.

Q: Are there cases wherein one who has passed the interview examination is eliminated during the examination process conducted by the instructor personnel committee?

A: It does not have the authority to eliminate, but sometimes raises issues.

Q: Once a person passes the examination by the instructor personnel committee, the president makes recommendation on appointment to the chief director of the Foundation before a resolution of the foundation board of directors is followed. Is that correct?

A: That's correct.

Q: What data does the foundation board of director review on an appointment subject to decide whether an appointment is appropriate?

A: Various written opinions are attached, and several data used to determine whether a person is appropriate as instructor are attached, and they include, for example, the written opinion of director Jung Gak. While seven candidates were introduced on the agenda for approval by the board of directors at the time when Jeong Ah Shin was hired, one person was eliminated, and six persons passed the board of directors.

Q: Do you mean that the foundation board of directors reviews once more by itself and holds discussions to arrive at an opinion?

A: That's correct. And, it also converges the general consensus.

Q: Had you ever told the foundation chief director priest Hyun Hae and the foundation director priest Young Bae at the time that the minister of Planning and Budget Administration Yang Kyun Byun had recommended appointment of the defendant Jeong Ah Shin?

729

A: I reported this to the chief director priest Hyun Hae and I think I probably told several directors in the form of personal conversation.

Q: Does it mean that you reported with your recommendation to make a report to the priest Hyun Hae?
A: Yes, I reported with my recommendation.

Q: Do you recall that you told priest Young Bae?
A: I think I did not tell him at the time.

Q: Do you mean that you talked to the priest Young Bae afterward?
A: Yes.

Q: When did you tell him afterward?
A: While I don't recall very well, I think it might be about that time, but there wasn't much response. I think the priest Young Bae did not have room to be concerned with professor appointment because there was internal conflict on the board of directors.

Q: While the witness remembers the exact period in time when he told the priest Hyun Hae, concerning the part that he told to the priest Young Bae, he stated initially during the prosecution investigation, "I don't remember the period in time well, but I think I told him right after her appointment or thereabouts," but said later at the second or third attendance, "I think I reported when I recommended the appointment." Which is accurate?
A: What I stated earlier would be accurate.

730

Q: Do you mean that it is correct you told him but that you think you told him after her appointment?

A: There was no reason for me to tell it to the priest Young Bae when I recommended the appointment.

Q: Did professor Won Bae Oh of the undergraduate fine arts program tell the witness in early September 2005 that there was suspicion that the academic credentials of Jeong Ah Shin were false, and ask you to verify them?

A: I immediately instructed verification on the spot.

Q: Did the witness hear the story from professor Won Bae Oh?

A: I think so.

Q: Then was professor Won Bae Oh the first person in Dongguk University who raised suspicion about falsified academic credentials of professor Jeong Ah Shin?

A: I think it is professor Won Bae Oh who said that he heard about such rumor, and it is later when the director Yoon Chang said so.

Q: At the time the leader of personnel management team Hyung Taik Ahn said that he logged into the homepage of Yale University in person to check the list of its degree holders but found the name of professor Jeong Ah Shin was not listed, so reported the fact to the witness, who was then Vice President. Do you recall that you received such a report?

A: Yes. I think there was such a report, but I do not recall who made it, and we have shared an opinion and said, "If she completed the degree in the first semester of 2005, it might have not been listed yet, so verification may be made once more at the beginning of the second semester of 2005." Then, as was recently disclosed, I was told that it was a fact that Yale University did verification and sent its outcome.

731

Q: A written inquiry on academic credentials was forwarded by Dongguk University to Yale University as international registered mail dated 09/06/2005, wasn't it?
A: Yes.

Q: Did Jeong Ah Shin submit a written resignation after the witness had instructed professor Hyung Taik Ahn to verify the academic credentials of the defendant Jeong Ah Shin in person?
A: While I don't know well about the relationship, the witness heard and received the report that she might have submitted a written resignation because course assignment had not been made properly and professors in the department of fine arts or department of fine arts history had treated her terribly.

Q: Why wasn't a written inquiry on academic credentials sent to the University of Kansas at the time?
A: Documentation affairs end with the leader of the personnel management team, who is professor Hyung Taik Ahn, and the present did not have the energy to handle it, and when I asked about it later, the working level staff said that an approval had been made to send a written inquiry on academic credentials to the University of Kansas as well, but that after the verification on her doctorate degree was faxed from Yale University, it was no longer necessary to check her undergraduate and graduate records, so that was omitted.

Q: Did the defendant Jeong Ah Shin submit a written resignation to the office of the witness?
A: That's correct.

Q: Isn't the written resignation supposed to be submitted to the personnel management department upon resigning?
A: It is usually submitted to the president. The usual order is that it is submitted to a dean and the dean brings it to the president, but there are some cases in which it is submitted to the president in person.

Q: Did you say that immediately after the defendant Jeong Ah Shin submitted a written resignation, there was a call from the defendant Yang Kyun Byun?

732

A: Yes, there was a call.

Q: What did the defendant Yang Kyun Byun say at the time?
A: While I still do not comprehend it well even now, I clearly recall that it was a very rude and one-sided call. Because the witness received such a phone call only once during the term, it was an affair that I could never forget and I thought there would be a call for apology afterward, but there were not any phone calls afterward. As for the details of the call, the witness remembers taking a cellular phone call in the middle of a meeting, and he said something like, "What happened to Dongguk University? The president must resolve this well." At the time, the witness tried to persuade Jeong Ah Shin to change her mind and made preparations for her reinstatement, and thought that while a verification document had been sent to Yale University, it would be useless slander, and determined to appoint her as our professor and treat her well, but I received such a call from Yang Kyun Byun. The witness is senior to Yang Kyun Byun by over ten years and not an officer or employee of an agency under Planning and Budget Administration, so I wonder how he could call me on the phone in such a one-sided way. Even after this trial is over and time has passed, an apology should be made to the witness for it.

Q: What did the defendant Yang Kyun Byun say specifically on the phone?
A: While I do not recall precisely, the key point was that "Why did Dongguk University do such a thing." As the witness interprets it, he seemed to be concerned that the professors in the related departments harassed Jeong Ah Shin and made her feel the sense of insult, and meant that I as the president could not govern and control such behavior and said, "Please take care of the problem as the president."

733

Q: The witness stated during the investigation at the prosecution that Minister Yang Kyun Byun raised his voice and said in an arguing tone, "What happened to Dongguk University? Would you please resolve it as president?" Is what you have just testified the same as the above?
A: Yes.

Q: In addition, you said that the telephone attitude of the defendant Yang Kyun Byun was very rude.
A: Yes.

Q: The witness stated, "Having received the phone call, I felt so unpleasant and embarrassed that I even thought how such a thing could happen to me." Is that correct?
A: Yes, that's correct. The witness has seldom received such calls, and like most of the intellectuals, I have to be sensitive to language, and it is a fact that I felt a sense of insult.

Q: Looking at the content of the e-mail that the member of the personnel management team, Cho Kyung Im, forwarded to the defendant Jeong Ah Shin as of 9/21/2005, she said, "The president said to handle it as a leave of absence without pay, so I wonder what to do..." and based on the details indicating that a procedure concerning the leave of absence action was described, the date on which the witness instructed the personnel management team to handle the case of Jeong Ah Shin as leave of absence ex officio was verified to be earlier than 09/21 at the latest, and in response to the written inquiry on academic credentials forwarded from Dongguk University, the reply fax from Yale University was sent to Dongguk University as of 09/23/2005. Then is it correct that you had instructed that the leave of absence be handled before the reply fax from Yale University arrived?

734

A: That's correct.

Q: Looking at the articles of incorporation of Dongguk University and its regulations on instructor appointment, the case of the defendant Jeong Ah Shin was not covered under the reasons for a leave of absence. Was the witness not aware of this fact?

A: When I reviewed it, there was no provision requiring that such a case was not covered by the leave of absence action. So it was the thought of a working level representative that the president had discretion to that extent within the scope of the president's duties, and the witness agreed to it as well. And, the documents had already been prepared to report to the Ministry of Education, and her professor status had been finally affirmed by the board of directors. Then it would not make sense that the president would approve a written resignation as soon as the board of directors passed it, and her talents were clearly visible during the interview, which was agreed upon by other members involved in the examination. While it seems so outrageous thinking about it now, it is true that I tried to hold Jeong Ah Shin in Dongguk University, having heard the rumor that she would go to a different university. In addition, it was said at the time that the president could do it within the scope of presidential duties, so it was decided to wait for 6 months without pay, and it would be handled easily once the doctorate degree from Yale University would be found false as in the rumor. Unfortunately, Yale University made an outrageous mistake, so that it has come to this.

Q: Didn't the personnel management team report that it was not covered by the reasons for leave of absence?

A: There are many similar cases. While it does not completely coincide with such similar cases, but it had been mentioned that the reason for leave of absence was not appropriate, the persons involved in the regulations had a meeting again and said, "This is doable within the scope of presidential duties. Nevertheless, it is somewhat unreasonable."

735

Q: Was the intent such that the president could do it within the scope of his duties but it was somewhat unreasonable after a meeting was held because it was said that the reason for leave of absence was not appropriate according to the articles of incorporation or regulations on instructor appointment?

A: Yes.

Q: Do you mean that it was still handled as a leave of absence without pay after all that?

A: Yes. It was decided to wait for the results from Yale University afterward. At the time, the University became qualified for the government funded projects based on the rate of instructor supplementation that was promoted by the ministry of education when its TO would be increased even by one person. So we were in the position to bring in more people even if it meant just one person.

Q: Professor Hyung Taik Ahn of Dongguk University filed the duplicate of her doctorate diploma submitted by the defendant Jeong Ah Shin in English and mailed two sheets, and looking at the reply received from Yale University on 09/23/2005 afterward, there were three pages of fax, and one page of the deals with verification by Shirmeister indicating that 'It is I who signed' on the cover page, while the other two pages were sent by Dongguk University. Is that correct?

A: Yes.

Q: When a document is prepared in a foreign country, it is usually signed, but this fax has one line and a half of typed text, without any signatures. So it is excessively poor as the verification document from the world-class Yale University. Did you ever suspect its reliability?

A: There was no one who was suspicious of its reliability.

736

Q: The witness said that it could be treated as a resignation if the defendant Jeong Ah Shin submitted a written resignation and said, concerning the part dealing with the leave of absence action at the prosecution, "Because he (defendant Yang Kyun Byun) supervises the national finances, I thought that if he has ill feelings toward Dongguk University, there may be serious interference with various government supported projects of Dongguk University." Is that correct?
A: I thought I could interpret it that way after I was asked such a question.

Q: Professor Chong Yeon Hwang is one whom the witness holds dearly as your student. Isn't he?
A: Yes.

Q: Professor Chong Yeon Hwang said that after he was called to the president's office around late August 2005 and went there, the defendant Jeong Ah Shin was there, and while the witness was introducing Jeong Ah Shin, you told him to help her so that she might adapt to the University quickly. Is that correct?
A: That's correct.

Q: Are other professors given such consideration once they are appointed?
A: I have not done so particularly. I did so because while I intended to assign professor Jeong Ah Shin to the General Education Academy, professor Chong Yeon Hwang was the director of the General Education Academy, and also because the General Education Academy does not have any affiliate department. In addition, since she was specially recommended by Yang Kyun Byun, I could not ignore her, and because she exhibited much talent and knowledge. I wanted to hold her dearly as our professor so I gave considerations so that she might settle down as soon as possible and feel stable to become interested in her work at the University and make contributions to its advancement with all her passion.

737

Q: Had you made up your mind at the time to change the affiliation of the defendant Jeong Ah Shin to the General Education Academy later?

A: Yes, that's correct. While it did not work out in reality, I thought that having heard the report that a person who had majored in fine arts history was needed for the national project, it could be nice and help her become acquainted to transfer her to the General Education Academy, and that since there was a course on western fine arts in major areas, it would not matter if she lectured in the department of fine arts history after such transfer was made. While a list of participating professors is frequently required when a project is submitted to the government, the names of the professors are frequently needed.

Q: Chong Yeon Hwang said that when he was called by the president Soon Kyung Ha (witness) and went to his office around late November 2005, he was instructed to transfer the defendant Jeong Ah Shin to the General Education Academy, so requested the affiliate change of Jeong Ah Shin as of 12/26, and the affiliate change was approved as of 02/16 upon acquiring presidential approval on 02/01/2006. Is that correct?

A: That's correct.

Q: According to professor Chong Yeon Hwang, the witness said around January or February of 2007, "The degree of Jeong Ah Shin's is suspicious, so check it." Did you said that?

A: Yes, I did.

Q: So Chong Yeon Hwang was instructed by the witness and asked the defendant Jeong Ah Shin to bring her diploma and academic records. She said she could not bring her diploma but presented outrageous documents of computer output instead, so he was so flabbergasted that he sent Jeong Ah Shin back and reported the fact to the witness. Did you ever receive such a report?

738

A: Yes.

Q: When and from whom did the witness hear that hear degree was suspicious?
A: They also talked about it in the board of directors meeting.

Q: Does this refer to the board of directors meeting dated 02/15?
A: At that time it was more detailed, but I think such a story had come out before. When there is a capable professor in a university, there are many who become jealous, which is one of the terrible elements that disturb a university. The witness thought it was such an element. The witness did not suspect a lot because she was recommended by minister Yang Kyun Byun, and would never even think that there would be any trouble with her academic credentials. While I don't recall where I heard about it, the story kept spreading a little at a time, so I told the director of the General Education Academy that it would be better for the Principal to verify it and said, "What is an intellectual without honesty. So it must be checked very thoroughly." Then because I was approaching my retirement at the time, the witness did not take any actions in person.

Q: So did you have professor Chong Yeon Hwang verify it?
A: Yes.

Q: Then professor Chong Yeon Hwang reported that Jeong Ah Shin's degree looked suspicious. Didn't he?
A: While he reported it, he did it ambiguously. He did not say 'No,' but he said to such an extent that 'something is strange.'

739

Q: Did the witness think that the hearsay at the time was slander because of the reply sent from Yale University?

A: Yes. Such slander in a university is extremely serious whenever a professor appointment is made.

Q: Did the witness ever meet with the defendant Jeong Ah Shin at the American restaurant of Chosun Hotel to have lunch for the two of you around early June 2007?

A: Yes, I did.

Q: Why did you meet?

A: I think the witness might have wanted to cheer up Jeong Ah Shin who was without a job after my retirement.

Q: Did the defendant Jeong Ah Shin call you first?

A: I don't remember well.

Q: Please state the conversation you had at the time as you recall.

A: I don't recall anything that could be an issue, but we parted after the lunch.

Q: The witness said during the investigation at the prosecution that the defendant Jeong Ah Shin asked about the situations going on in the foundation at the time. Is that correct?

A: While she might have asked so, it is not accurate.

Q: It was the time when the issue related to her degree was raised in the University. Was it ever mentioned?

740

A: I think it was. While the board of directors meeting was held around February 2007, director Yoon Chang raised suspicion seriously, so I think I might have talked about it when I met with Jeong Ah Shin at Chosun Hotel in early June.

Q: In about two days after meeting with the defendant Jeong Ah Shin, the witness said that priest Young Dam Hak Kyu Im called the witness to say, "I had my student in the US look into Jeong Ah Shin's degree, and the degrees for Yale as well as the undergraduate might be falsified."
A: Yes, I heard so.

Q: Was it in the beginning or middle of June 2007 when you heard the above?
A: While I do not remember the date, I think it is roughly correct. The head professor was not completely interested in the school, and I was tremendously shocked after having heard the story. So because it was a private channel and not an official verification procedure at the time, I just registered what I heard.

Q: The witness exercised his right to recommend during his term, and the defendant Jeong Ah Shin became a professor. Then didn't the witness at least call Jeong Ah Shin to verify what you had heard from priest Young Dam?
A: I did not call and ask, and I just couldn't ask about what has not been verified, I had never thought about falsification of academic credentials, but continued to believe that it was slander.

Q: According to the telephone usage data, the witness and the defendant Jeong Ah Shin had one phone call around late June 2007. Do you recall the call?

741

A: I called her out of curiosity at the time, but I just could not say it and probably hung up the phone without asking.

Q: Were you aware that the defendant Jeong Ah Shin frequently visited the office of the chief director?
A: I was not aware of it but heard about it later.

Q: How did you hear about it?
A: I heard that she sometimes paid a visit on account of business.

Q: Didn't you know why she visited there?
A: No, I didn't.

Q: Did the defendant Jeong Ah Shin often visit the office of the president?
A: Yes, she sometimes visited the office of the president.

Q: While the witness was investigated three times at the prosecution, did the witness check whether the details of the report in which contents of the investigation were recorded were same as what the witness stated and sign it?
A: Yes

Attorney of defendant Yang Kyun Byun
To the witness
Q: When the witness was questioned at the prosecution about meeting with the defendant Yang Kyun Byun at the Capital Hotel around June 2005, you replied, "It is common that someone asks to have lunch together, so I went out to meet without any special thought." Does the intent behind 'being common' mean that Yang Kyun Byun and the witness have often had lunch?

742

A: I mean that ministers or important individuals sometimes ask me to have lunch together as I operate a university.

Q: Has the witness ever stated at the prosecution with the intent that 'I had no choice but to hire Jeong Ah Shin as professor because the minister of planning and budget Yang Kyun Byun would provide financial assistance?'
A: As I said previously, I testified that Yang Kyun Byun never told the witness in such a mean way that he would help financially if I would hire Jeong Ah Shin as professor. That part of the report might have been exaggerated or interpreted differently.

[At this time, the investigation record page 1757 was presented]

Q: According to the statement made by the witness at the prosecution, it says that 'I had no choice but to hire her because he would provide assistance financially.' How do you think about it?
A: It was not what I meant. What the witness stated was that it was not that I had no choice but to do it because assistance would be provided financially, but that the witness accepted the talk of potential financial assistance inclusively.

Prosecutor (Chang Seok Moon)
To the witness
Q: The intent of the statement made by the witness is not that 'You hire Jeong Ah Shin as I provide assistance financially' but that it would help financially in the process of conversation in its entirety.

743

A: Yes.

Judge
To the witness
Q: Did you 'have no choice' but to hire?
A: It is not that I had no choice but to hire.

Attorney of the defendant Yang Kyun Byun
To the witness
Q: While the witness stated at the prosecution, "As the president who is in charge of the finances of the University, I could not but be concerned about the aftermath if I had rejected the request for hiring made by the minister of Planning and Budget Administration, and a thought came to my mind that projects funded by the government might be ruined." The answer does not represent an active statement of the witness but you had to answer that way because the investigator questioned so. Isn't that so?
A: The witness had said previously with such intent, and while there is no reason for a person who operates a university to go against the minister of planning and office administration, I don't think I was directly concerned about any government funding support. Nevertheless, I meant that even that could be viewed that way inclusively.

744

Judge

To the witness

Q: Did the same thought come to your mind when you met at the Capital Hotel?

A: That thought never came to me when I met at the Capital Hotel, and recommendation of a good talent was the end of it.

Attorney of defendant Yang Kyun Byun

To the witness

Q: Was there one more person for the special hiring mode at the time in addition to Jeong Ah Shin?

A: There were 15 persons at the time, and they were reduced to about half after a preliminary examination, and total of 7 persons were up for special hiring.

Q: When the defendant Yang Kyun Byun introduced or recommended Jeong Ah Shin to the witness, he said, "She is also from Yale, and we sometimes meet at the alumni association." Is that correct?

A: Yes, it is correct.

Q: When the witness answered during the prosecution examination, you used the expression that 'minister Yang Kyun Byun holds dearly and has recommended.' What did you think?

A: The intent was that the witness interpreted so.

Q: When you felt that she was held dearly, did you feel that way at the Capital Hotel?

745

A: Yes. While holding dearly is not a matter between a man and a woman and also talked about in Buddhism, what a teacher or senior should do is to guide his/her capable juniors to the right way and recommend them as talent, so it might be a must as senior.

Q: The witness stated that he never met with the defendant Yang Kyun Byun privately to eat together except the lunch when the two met at the Japanese restaurant of the Capital Hotel around June 2005. Is that correct?
A: Yes, I think so.

Q: Has the witness had dinner with the defendant Yang Kyun Byun together with 2-3 group executives of the Chogye Order around spring of 2003?
A: I do not know about it exactly, because there could be several meetings on the same evening.

Q: Was the defendant Yang Kyun Byun appointed as adjunct professor in the graduate business school (night) from fall 2003 to fall 2004?
A: Yes.

Q: And the adjunct professor is appointed by the president, isn't it?
A: Yes.

Q: Is that why there is no way that the witness was not aware that the defendant Yang Kyun Byun gave lectures as adjunct professor? What do you think?
A: I do not recall. Because there are several hundred distinguished professors, adjunct professors, and invited professors, I do not remember all of them.

746

Q: At the time, the defendant Yang Kyun Byun was the vice minister of planning and budget administration. Wasn't he visible with that rank?

A: Because current title may or may not be on an instruction recommendation form, I cannot tell exactly if the current title is not listed.

Q: When the defendant Yang Kyun Byun gave lectures as adjunct professor, he had dinners with several department professors and student association executives twice or so, and the witness was also known to attend them. Is that correct?

A: I probably did so.

Q: At the time the defendant Yang Kyun Byun, witness, and dean of the graduate school had dinner and drinks together at the Ambassador Hotel in Jangchung-dong about three times. What did you think?

A: I do not remember all of them but we had drinks as well.

Q: The witness brought the ginseng liquor and served it at such meetings, and also asked to go there later. Do you recall?

A: Yes, there was such an occasion, too.

Q: At the time, the dean of the graduate school collected 100 million won as advancement fund and said to the witness and the president that he would hand it over to the witness, and the defendant Yang Kyun Byun also attended the delivery ceremony for the advancement fund. Do you recall?

A: I do not recall it.

Q: You were the co-representative of the priest Seong Cheol 100-day conference talks from June 2004 to September the same year so that students of Buddhism might study. Isn't that correct?

747

A: Yes.

Q: So you met with the defendant Yang Kyun Byun because of the event.
A: It was the first time I met with him. While I might have met Yang Kyun Byun before, I think we were formally introduced at the general affairs office.

Defendant Yang Kyun Byun
To the witness
Q: It was summer of 2004 when we met during the conference talks of the priest Seong Cheol 100-day, and the three of them, including the dean of the business graduate school who had been a reporter and could not drink well, the witness, and the defendant Yang Kyun Byun, had drinks together from fall of 2003 to spring. In addition, when we met another time, it was said that the advancement fund of 100 million won was collected and would be delivered to the president. So a ceremony of delivery was held later, and the three of us met at the Japanese restaurant of the Ambassador Hotel next to Dongguk University and even drank together. Then do you mean that you do not recall meeting with the defendant Yang Kyun Byun at the time?
A: While it may have significance, it is true that I do not recall.

Attorney of the defendant Yang Kyun Byun
To the witness
Q: There remains the record that the witness had visited the office of vice minister in the planning and budget administration to meet with the defendant, Yang Kyun Byun, on 09/23/2004, for what purpose did you visit the defendant Yang Kyun Byun at the time?

748

A: While I do not recall well, I think I might have brought the gifts from the University as it was close to Thanksgiving.

Q: Did you by any chance drop by and have tea as you were on your way to offer condolences at the St. Mary Catholic Hospital behind the planning and budget administration?
A: I do not recall well but I might have done so.

Q: Did the witness have lunch at the Chinese restaurant in the Tower Hotel annex where you frequently went around fall of 2005 after the defendant Yang Kyun Byun became the minister of Planning and budget administration?
A: I do not recall every detail.

Q: At the time, you were asked by the defendant Yang Kyun Byun to 'recommend someone with good handwriting skills' so you introduced Yong Beom Lee.
A: Yes.

Q: When you were asked to recommend someone with good handwriting skills, it was not asked by phone but asked during the meal at the Chinese restaurant. Isn't that correct?
A: Then I must change my memory. The witness thinks he was asked by phone, but if we had that conversation during a meal, it might be so. Nevertheless, the witness does not recall it well.

Q: Afterward, the witness and the defendant Yang Kyun Byun dined at the Chinese restaurant of the Tower Hotel about twice or so and shared such conversation concerning "Yong Beom Lee recommended by the witness," "worries about the 100th anniversary event of Dongguk University that the witness had," "Buddhism," and "literature." Do you recall them?

749

A: While I do not recall well, it is probably true if you say so. It was mentioned that the writer was a person who would arrange autobiographies and speeches at first, so I remember recommending one of the writers who had switched his occupation to writing.

Q: Wasn't the overall intent of the mention at Capital Hotel that the defendant Yang Kyun Byun asked the witness to hire Jeong Ah Shin as professor to mean that she was to be hired even if her qualifications were lacking?
A: No, it was not.

Q: The witness understood it to mean that it would mutually beneficial to hire her as professor as she was a good talent. Didn't you?
A: Yes.

Q: After having met with the defendant Yang Kyun Byun, the witness checked around about the defendant Jeong Ah Shin and said that she was an active curator.
A: Yes.

Q: Is it correct that the witness stated, "Jeong Ah Shin can become a professor at Dongguk University if she is judged based on her objective capabilities."
A: Yes.

Q: And, Yoon Kil Seo who was the dean of the graduate school said, "She said she graduated from Yale University, and she spoke well and naturally during the interview. While the procedure has been violated, I still give high marks and it is overwhelming that a person who holds a doctorate degree from Yale University comes to Dongguk University, which must be welcome, I think." Considering the above, it appears that Jeong Ah Shin had sufficient qualifications to be hired as professor based on the interview outcome.

750

A: Yes.

Q: The instructor appointment regulations concerning professor appointment were amended at Dongguk University. Such amendment was never intended to give special favor to the defendant Jeong Ah Shin. Is that correct?
A: Yes, that's out of question.

Q: After the defendant Jeong Ah Shin was hired as professor, you were never treated to any free meals or rounds of golf to express gratitude for 'hiring Jeong Ah Shin as professor.' You didn't even get a call. Isn't that correct?
A: Yes, that's correct.

Q: Did the defendant Yang Kyun Byun clearly say, "It would be great help financially for the University if Jeong Ah Shin is hired as professor"?
A: Yes, he did.

Q: How did you perceive the intent behind what he said?
A: As I said previously, I never asked, "How will you help the University?" At the time, the witness might think about two ways ambiguously, one way would be that as Jeong Ah Shin was very active, she could diligently help raise donations, which I felt was the suggestion. The other way would be that someone who could attract donations was introduced instead of any government support that the witness was not aware of. I thought about it vaguely and did not pay much attention to it. During my term as president, I have not met many who actually provided assistance though they talked about donations a lot, and because it would be an extremely difficult task, I heard about it a lot but I did not pay much attention.

751

Q: The intent of the statement that it would help with university finances was that its focus was not placed on government support. Is that correct?

A: Yes, there was never such a focus.

Q: Because the ministry of education chooses the university as a target for support following discussion by the committee based on each project, the planning and budget administration does not allocate its budget directly. Is that correct?

A: Concerning that aspect, the witness cannot help regretting. The witness has never mentioned the word 'government' to Yang Kyun Byun, not even once. The administration mechanism works via the planning and budget administration, via the prime minister and minister of education, via working level officials, and then via the committee, and committee members are active professors of other universities, so they would not be moved according to the will of one person. Such an aspect results from not knowing the different natures of the bureaucracy and university and can never happen.

Q: While a university may go to the ministry of education to obtain budgetary support from the position of the university, there is no way it would go to the planning and budget administration.

752

A: Yes, that's correct. Our members and the witness have never had any ideas concerning the government funded project.

Q: As Dongguk University has obtained its budgetary support for the structure reform guide university support project and capital area university characterization project, it has never requested assistance from the defendant Yang Kyun Byun. Is that correct?
A: While the witness was in the office, he had never operated so terribly.

Q: Dongguk University was able to receive such a budget after it satisfied the terms so as to become rated high enough for such evaluation items including TO reduction and instructor supplementation, and in case of the structure reform guide university support project, it reduced its TO by 500 persons and received the support of 8 billion won over two years, so it could not be considered as special privileges. Rather it was a financial loss.
A: Yes. It is a tremendous financial loss based on four years, while it is similar based on two years.

Q: Had the budgetary support for 2005 already been decided before the defendant Jeong Ah Shin was appointed as professor?
A: Yes, it was carried out in its entirety before that.

Q: Is the witness senior to the defendant Yang Kyun Byun by ten years?
A: Yes.

Q: The defendant Yang Kyun Byun used to bow respectfully rather than looking in the eye when he met the witness, and let the witness get into the car and leave first when they parted. He has shown respect to the witness. Is that correct?

753

A: That's correct. He is an elite bureaucrat, and has good manners, so I was favorably impressed.

Q: The witness stated at the prosecution that the defendant Yang Kyun Byun called right after Jeong Ah Shin had turned in a written resignation and said in a rude and threatening tone, "What happened to Dongguk University? I would ask the president to resolve the matter nicely." Is it correct that the defendant said it that way?
A: That's correct.

Q: While the defendant Yang Kyun Byun calls Dongguk University as "Dongguk Univ" and has never expressed it as "Dongguk," is it correct that the defendant Yang Kyun Byun has used the expression of 'Dongguk'?
A: The witness calls it as 'Dongguk' or 'Dongguk Univ,' so if others call it 'Dongguk Univ,' the witness may remember it as 'Dongguk.'

Q: The defendant Yang Kyun Byun introduced the defendant Jeong Ah Shin to the witness that she was also from Yale University and they sometime met at alumni association meetings. Nevertheless, he was so rude to the witness concerning that the defendant Jeong Ah Shin was treated terribly at Dongguk University, even though their relation was trivial as indicated above. Is it definitely correct that he said so?
A: Yes, absolutely.

Q: Did the defendant Yang Kyun Byun ask the witness not to process the resignation from the defendant Jeong Ah Shin but to take the action of leave of absence instead?
A: It was not so specific.

Q: The action for leave of absence was taken for the defendant Jeong Ah Shin because if a report on professor appointment was made to the ministry of education and then her resignation was processed right away, it would damage reliability of the University, and because when the General Education Academy was established, she would be allowed to give lectures there. That's why it was handled as a leave of absence. Isn't that correct?

754

A: That's correct.

Q: According to the statement made by Chong Yeon Hwang, the witness said, "Jeong Ah Shin is a great talent that the University needs. Why was she allowed to leave?" He said so with the intent that it was a mistake to let her go. Isn't that correct?
A: That's correct.

Q: In relation with the written resignation from Jeong Ah Shin, have you ever received a report from Yoon Kil Kim, who was the leader of the planning and budget team of Dongguk University, indicating that 'because there is precedence after talking to the staff of the personnel management team, it would not be a great problem to take the action for a leave of absence?'
A: That's correct.

Q: Concerning the relationship between the defendant Yang Kyun Byun and the Chogye Order, the witness stated in the beginning of investigation, "I don't know specifically what relationship Yang Kyun Byun has with the Order." Do you recall that?
A: Yes.

Q: Then he said during the second investigation, "I am well acquainted with the mainstream of the Order.' What did you think?
A: I came to know about it after reading a newspaper between the first statement and the second statement.

755

Q: Is it the intent that the first statement is the accurate statement which the witness is aware of?
A: Yes.

Q: Is the intent of the second statement that the fact was noted from the newspaper in-between as stated?
A: Yes. The witness is never interested in the power structure of the religious circle.

Q: Is the intent of the statement that he is well acquainted with the mainstream of the Order that statement was made after reading the newspaper in-between?
A: Yes.

Q: Concerning the aspect that the written resignation submitted by the defendant Jeong Ah Shin was treated as leave of absence, the witness stated, "Minister Byun called, and thinking that he is well acquainted with the mainstream of the Order that is in conflict with the Foundation, I became dizzy thinking that Dongguk University and its Foundation may suffer great losses. While directors of the Foundation that have ties with the mainstream of the Order have interfered with efforts for advancement of the University, it would be really terrible if the minister of planning and budget administration, who is well acquainted with the mainstream of the Order, were to become hostile to Dongguk University." The above statement represents a statement on the thought of the witness after the call was received and before the action of the leave of absence was taken for Jeong Ah Shin, and is different from the statement that the witness read a newspaper later and became aware that the defendant Yang Kyun Byun was acquainted with the mainstream of the Order. What do you think?
A: It is the story that the witness told during the second or third statement, and because different perspectives and many psychological motives may act in a complicated mode to interpret an event, the witness merely agreed to the question by the prosecution that such a factor could be present.

756

Judge

To the witness

Q: Your intent was not that you had that thought at the time, but that you stated one could think that way as well since the question was presented by the prosecution later. Is that correct?

A: Yes. At the time I had not gone there yet, and as I talked to prosecutor Chan Seok Moon previously, Yang Kyun Byun is a rare leader in the Buddhism circle, so I could not but think that there was no need to be estranged from the minister of planning and budget administration.

Attorney of defendant Yang Kyun Byun

To the witness

Q: In relation with reinstatement of the defendant Jeong Ah Shin, Chong Yeon Hwang stated, "At the time, Jeong Ah Shin was not in favor of coming back to Dongguk University, but the University was rather working hard to invite professor Jeong Ah Shin, so I proposed to professor Jeong Ah Shin whether she would return to the University if she was allowed to work as curator of the Sunggok Art Museum as well, and professor Jeong Ah Shin said a few days later that she would return then." Is that what happened really?

757

A: Yes, the witness also said the same. While the University has a provision regarding dual positions, it is disallowed only if the president does not agree. Dual positions are allowed if it is useful for field studies or advancement of students. The dual position was granted because the art museum was definitely helpful for fine arts and students.

Attorney of defendant Jeong Ah Shin
To the witness
Q: How many professors have been hired as special appointment during the four years the witness served as president of Dongguk University?
A: I recall there were about 36 persons.

Q: How many of them were hired in the so called top-down mode by which the president encourages each department to hire?
A: While it does not mean that the president is involved in the selection process, I think 36 persons were hired by the top-down mode.

Q: In such cases, hiring is made after internal procedures are followed, including discussion by the instructor personnel committee and approval by the board of directors, and it is not that the witness makes a hiring decision arbitrarily.
A: The structure can never allow such an arbitrary decision. Both top-down and bottom-up must follow the same process, but only the teaching in front of students is exempted.

Q: From the positions of professor in an applicable department, the top-down mode reduces influence of the professors so there is the fundamental tendency to object regardless of the qualifications of a person recommended.

758

A: That's correct.

Q: No matter how much a president recommends, a professor appointment cannot be made if any of such internal procedures including agreement by an applicable department, discussion by the instructor personnel committee and approval by the board of directors is not fulfilled. Is that correct?
A: Yes, that is correct.

Q: Did the witness tap opinions from the department of undergraduate fine arts history and the department of graduate fine arts history to recommend the defendant Jeong Ah Shin as professor?
A: Yes.

Q: The department of undergraduate fine arts indicated that it could handle lectures of fine arts history by its own personnel. Because the head professor of the department of Buddhist fine arts history died several years ago leaving one vacant TO, it was decided to find out about hiring the defendant Jeong Ah Shin to the department of graduate fine arts history considering a number of planning affairs and the 100th anniversary of Dongguk University. Is that correct?
A: That's correct.

Q: While there were only two professors in the department of fine arts history, because one professor was sick and could not handle the lectures properly, operations of the department and lectures did not take place properly so that dissatisfaction of its students was high and supplementation of new professor was required as well.
A: Yes. The students expressed their dissatisfaction in the office of president, and because there were 56 master's and doctorate students, five professors were required.

759

Q: Are five professors appropriate for the department of fine arts history?

A: The appropriate number instructors is 4.7-4.8 persons, so it may be five.

Q: The witness had the thought that the department of fine arts history must need a professor who majored in western fine arts history, considering that Dongguk University is relatively weak compared to other universities in terms of western fine arts history.

A: That's correct.

Q: The witness, after the defendant Jeong Ah Shin was recommended by the defendant Yang Kyun Byun, checked her credentials and talents and evaluations by the fine arts circle and academia on his own and judged based on the results that she had qualifications as professor, so recommended her to the department. Is that correct?

A: That's correct.

Q: If the defendant Jeong Ah Shin lacked qualifications or was not equipped with all the appropriate conditions as professor, there was no reason to recommend her, even though the defendant Yang Kyun Byun recommended the defendant Jeong Ah Shin at the time. Is that correct?

A: Yes.

Q: At the time, the department of Buddhism find arts history or the department of fine arts objected to hiring the defendant Jeong Ah Shin because the department of Buddhism fine arts history did not need a person who had majored in western fine arts and not because the defendant Jeong Ah Shin lacked qualifications or had any other reasons for disqualification. Is that correct?

A: It is not so. It's not the department of Buddhism fine arts history, but the department of fine arts history. That's why a person who majored in western fine arts history must teach students so they can take one or two courses before they graduate, and they deserve to be students of fine arts history. The department of Buddhism fine arts history is out of the question. There are courses for western fine arts history and planning and exhibition theory, and the curator of western fine arts history was very appropriate if the academic credentials and experience of Jeong Ah Shin had been true.

760

Q: Did the witness interview the defendant Jeong Ah Shin in person for professor appointment?
A: Yes, five persons including the witness interviewed her.

Q: While Dongguk University was planning for various events to commemorate its 100th year anniversary, did the witness think that planning capabilities of defendant Jeong Ah Shin would help with such events?
A: That's correct. My expectations were very high.

Q: Did you discover, based on the interview results, that the defendant Jeong Ah Shin lacked qualifications as professor or that there were other reasons for her disqualification so that you would not have hired her as professor if there had been no recommendation from the defendant Yang Kyun Byun?
A: There was nothing like that.

Q: Did the witness say that the defendant Yang Kyun Byun asked at the time when you encouraged the director of planning office Seok Cheon Yoo and professors of the department to recommend the defendant Jeong Ah Shin?
A: I did not.

Q: How many members are there on the instructor personnel committee?
A: It consists of approximately 10 persons, and the number may vary slightly with each semester.

761

Q: How many directors are there on the board of directors?
A: There are 13 directors, including 9 priests and 4 Buddhists staying home.

Q: Then the director of planning office, professors of the department of fine arts history, members of the instructor personnel committee, and directors of the board of directors agreed or decided on hiring the defendant Jeong Ah Shin based on their own judgment, without knowing about the recommendation from the defendant Yang Kyun Byun. Is that correct?
A: While the witness alone was always conscious of the fact that minister Yang Kyun Byun recommended, because I did not tell working level representatives about it, others newer knew about it.

Q: Did the witness send an official notice requesting verification of the degree of the defendant Jeong Ah Shin to Yale University by fax around 09/23/2005?
A: Yes.

Q: In response, you received the official reply from Yale University that the degree of the defendant Jeong Ah Shin was true. Is that correct?
A: Yes.

Q: While Yale University claimed later that the above fax was not authentic, it recently reversed the above claim again, and sent a mail to Dongguk University indicating that the verification fax above in the name of assistant dean Shirmeister was genuine and the fax was sent by Yale University. Is the witness aware of this fact?
A: Yes, it stated that they made a mistake regarding the verification.

762

Judge

To the witness

Q: During the prosecution examination in relation with the action of leave of absence when Jeong Ah Shin submitted a written resignation, you stated, "Because he (dependant Yang Kyun Byun) is the person who oversees the national finances, if he has ill feeling toward Dongguk University, I think it would seriously interfere with various government funded projects of Dongguk University," and you answered yes to the question whether the above statement was correct. Did you have that thought at the time?

A: I did not have that thought at the time.

Q: When the prosecution asked based on such intent afterward, you answered yes because you thought you could think that way. Is that correct?

A: I agreed that I could think that way inclusively, though it was vague.

Q: Do you have anything to add?

A: Dongguk University represents our own private college with a history of over 100 years, and this is the first time that it has suffered so greatly after being closed down twice because of its independence movement under Japanese imperialism. The 100-year history was marred and its 200,000 colleagues are trembling with shame, while thousands of professors and employees have been so disappointed and discouraged that they are at a loss. Students cannot focus on academics because of the anger that they feel. While a university is not such a feeble existence, it has been greatly affected by this case. I think that the problem would not have become so complicated if Yang Kyun Byun had been frank and honest in the first place and disclosed the problem with confidence like an elite bureaucrat and as a person who was at the center of power and authority.

763

While the witness has been incessantly pictured as an accomplice of a wicked and vicious villain by the press and so has no future whatsoever, it may be put aside as it is the personal problem of the witness, but a person who was once in charge of a school cannot help becoming enraged because he has not stated one word of apology about this matter the University has suffered, and even now I do not know why he tried to cover up the fact. While it may reduce his punishment somewhat, I think it would increase his pain and poison his conscience. Some day when an opportunity arises, the defendants should apologize to Dongguk University deeply and ask forgiveness for the rest of their lives. The injuries suffered by one university are not such a simple matter.

01/07/2008

Assistant Court Clerk Sik Nai Cho [seal]
Judge            Myung Seop Kim [seal]

764

서울서부지방법원

증인신문조서(제5회 공판조서의 일부)

사　　　건　　　2007고단2270　뇌물수수 등

증　　　인　　　이　　름　　　홍기삼

　　　　　　　　생년월일　　　1940. 12. 20.

　　　　　　　　주　　거　　　서울 영등포구 여의도동 광장아파트 8동 606호

판　　　사

　　　　증인에게 형사소송법 제148조 또는 제149조에 해당하는가의 여부를 물어 이

　　　에 해당하지 아니함을 인정하고 위증의 벌을 경고한 후 별지 선서서와 같이

　　　선서를 하게 하였다.

검　　　사(문찬석)

　　　　증인에게

문　　　증인이 동국대 총장으로 취임할 때에 현재 동국대 재단이사장인 영배스님 임용

　　　택과 영담스님 임학규가 선거에서 증인을 지원했었지요.

답　　　예, 여러 분들이 있었습니다.

문　　　영배스님과 영담스님은 동국대 재단의 실세라고 하는데, 맞는가요.

답　　　학교를 끌어가는 분들이기는 하지만 권력기관이 아니기 때문에 실세라고 말할

수는 없습니다.

문    그러면 영향력은 있는가요.

답    영향력은 큰 분들입니다.

문    증인은 피고인 변양균과 어떤 관계인가요.

답    사회적 관계입니다.

문    구체적으로 개인적인 친분이 있는가요.

답    개인적 친분이 두터웠다고 말할 수는 없지만 불교단체에서 만난다든지, 불교행

      사에서 한번 공동대표를 함께 한 적이 있습니다.

문    그것은 동국대 총장으로서 한 것이지요.

답    그렇습니다.

문    공식적인 자리 이외에 개인적으로 만나거나 인간적인 교분을 나누는 관계였는

      가요.

답    다소 있었다고 보아야 됩니다. 불교라는 공동의 가치를 가지고 함께 걸어가는

      도반의 하나라고 광의로 해석할 수 있겠습니다.

문    증인은 검찰조사 시 피고인 변양균과의 관계에 대한 질문에 "조계종 종교행사

      에서 몇 차례 공식적으로 만난 것 외에는 서로 사적으로 만나는 사이가 아니었

      고, 서로 인간적으로 만날 이유도 없었던 관계이다."라고 진술한 적이 있는데,

      기억하는가요.

답    비슷합니다.

문  검찰조사 시 위와 같이 말한 것과 증인이 조금 전에 본 법정에서 답변한 것과

는 차이가 있는가요.

답  별 차이가 없습니다.

문  증인은 국문학자로서 문학평론을 전공으로 삼아 지내왔는데, 성격이 좀 내성적

인가요.

답  대단히 의향적이라고 말할 수는 없고, 내성적인 편입니다.

문  증인은 피고인 변양균으로부터 피고인 신정아를 동국대 교수로 채용해 달라는

부탁을 받았다고 하였는데, 그때가 언제쯤으로 기억하는가요.

답  2005. 6.경으로 생각됩니다.

문  피고인 변양균이 먼저 전화를 하였는가요, 증인이 먼저 전화를 하였는가요.

답  먼저 전화를 받았습니다.

문  장소를 정한 것은 누구인가요.

답  누가 장소를 정하였는지는 기억나지 않습니다.

문  그때 증인과 피고인 변양균이 둘이서 만날 만한 무슨 특별한 현안이 있었는가

요.

답  점심을 먹자고 하는 것은 흔한 일이라서 별 생각 없이 점심식사를 하러 시간을

잡아서 나갔습니다.

문  특별한 현안은 없었다는 말인가요.

답  사전에 특별한 일이 없었습니다.

문    그때 피고인 변양균을 만나서 어떤 말을 주고받았는지 기억나는가요.

답    예, 대충 기억납니다.

문    기억나는 대로 말씀해 주십시오.

답    소상하게 기억하기는 힘들어도 '대학 교수를 할 만한 좋은 인재가 한 사람 있
      다. 예일대학 출신으로 예일대에서 박사를 한 후배인데 현재 큐레이터 겸 학예
      실장으로 성곡미술관에 있고, 평판이 좋고, 재능이 탁월한 사람이다.'라고 하였
      습니다. 동국대는 미술학과도 있고, 미술사학과도 있고, 교육대학원에 미술전공
      이 그렇게 많이 있음에도 미술사 전공자가 한 명도 없었기 때문에 우리로서는
      미술사 전공자가 필요하였습니다. 하지만 교수 초빙에는 여러 가지 과정이 있기
      때문에 증인이 총장이라고 하더라도 그 자리에서 당장 교수로 초빙하겠다는 말
      은 할 수 없어서 그 과정에 한번 넣어보겠다, 추천해 보겠다는 이야기를 하였습
      니다.

문    증인은 "피고인 변양균이 신정아가 예일대 출신으로 아주 우수한 인재라는 말
      을 하기에 우리나라 대학에서는 종종 우수한 인재들이 기존 교수진들이 거부하
      여 교수로 임용하기 어려운 경우가 있다는 이야기도 해 주었다."라고 진술하였
      는데, 맞는가요.

답    예.

문    또 동국대가 재정이 어려워 그 확충을 위해서 백방으로 노력하고 있다는 말도
      하였다고 하였는데, 그런 이야기도 하였는가요.

답     그런 이야기는 변양균 장관이기 때문에 했는지 안 했는지는 모호합니다. 사실

대학총장이라는 것은 미국에서는 돈만 보면 지옥까지 쫓아간다는 이야기가 있

을 정도로 열을 올리고 있지만 일국의 장관에게 더군다나 인사 문제와 관련해

서 먼저 재정지원을 요청한다고 이야기한 기억도 없고, 그렇게 말하지 않았습니

다.

문     증인이 위와 같이 말한 기억은 없다는 것인가요.

답     예, 증인이 말한 적은 없습니다.

문     피고인 변양균이 신정아를 채용하면 학교 재정에 도움이 될 것이라고 말했는가

요.

답     예.

문     증인이 총장으로 취임할 당시에는 동국대의 재정상태가 많이 어려웠는가요.

답     몇 개 대학을 빼놓고는 모든 대학이 다 어렵습니다. 특히 지방대학은 말할 것도

없고, 동국대의 경우에도 아주 예외적으로 어려운 대학은 아니나 재정 확충에는

언제나 제1순위로 두고 있는 상황입니다. 당시 변양균은 증인에게 '신정아를 교

수로 채용해 주면 지원을 하겠다.'라는 조건부로 야비한 이야기를 한 적은 없습

니다. 다만 '재정에 도움이 될 것이다.'라는 이야기를 지나가는 것처럼 하였는데

이를 테면 '그 사람을 채용하면 강의를 잘 할 것이다. 학생 지도를 잘 할 것이

다.'라는 정도의 예측을 가능하게 하는 이야기였습니다.

문     당시 피고인 변양균이 '신정아를 채용하면 학교 재경에 도움이 될 것이다.'라고

717

이야기하였다고 하였는데, 그때 증인은 위 의미를 어떻게 받아들였는가요.

답    증인은 대학교수 초빙이라는 것을 아주 신성한 일로 생각하는 사람입니다. 그
      이유는 불특정다수의 젊은이들의 미래를 열어주는 사람이기 때문에 거기에는
      어떤 조건이 있어서는 안 되고, 더군다나 재정적 조건이 강제로 연결되는 것은
      있을 수 없고, 그런 오해를 받은 것 자체를 치욕이라고 생각합니다. 그런 것은
      아닌데, 무언가 증인이 모르게 합법적으로 학교에 큰 도움이 될 수 있을지도 모
      르겠다는 기대를 잠깐 갖게 하고 그런 생각을 가졌던 것은 사실입니다.

문    증인은 검찰에서 "변 장관이 국가의 재정을 총괄하는 분이고 당시 동국대는 정
      부의 재정 지원을 크게 기대하고 있는 상황이었으므로 알아보겠다고 긍정적으
      로 대답하고 신정아의 교수 임용을 추진한 것입니다."라고 진술한 적이 있는데,
      이와 같이 진술한 것이 종전에 답변한 것과 일맥상통하는 의미가 있는가요.

답    포괄적으로 상통한다고 볼 수 있겠습니다. 왜냐 하면 대학을 운영하는 사람의
      입장에서는 학교에 해가 되지 않는 한은 여러 사람에게 그런 가능성을 늘 열어
      두고 있는 것은 극히 온당하고 당연한 일입니다.

문    검찰에서 위와 같이 진술한 것은 기억하는가요.

답    예, 기억합니다. 그때 증인이 아주 포괄적인 것이라고 이야기하였습니다.

문    증인은 검찰에서 "대학의 재정을 책임지는 총장으로서 기획예산처 장관의 채용
      부탁을 거절하면 그 여파를 걱정하지 않을 수 없었으며 동국대의 국고지원 사
      업을 망칠 수 있다는 생각이 들었습니다."라고 진술한 적이 있는데, 기억하는가



요.

답   그렇게 질문을 받았습니다. 질문을 받고 생각을 해 보니까 개인적으로 보아서는 개인적 판단이 있을 수 있으나 학교를 운영하는 사람의 입장에서는 기획예산처 장관과 등을 지는 일이 그다지 좋은 일이 아니라는 판단을 가질 수 있었습니다.

문   그런 판단에 위와 같이 말하였다는 것인가요.

답   꼭 그렇다고 할 수는 없으나, 해석하자면 그렇게도 해석은 되겠습니다.

문   증인과 피고인 변양균은 개인적으로 깊이 있는 인간관계는 없는 사이인데, 변양균이 갑자기 증인을 만나자고 해서는 불쑥 신정아를 교수로 채용해 달라는 부탁을 한 것인데, 어떤가요.

답   점심을 먹자고 할 정도의 사이는 되었던 것 같습니다.

문   증인으로서는 피고인 변양균이 그런 말을 하리라고는 전혀 예상하지 못했을 것이 아닌가요.

답   예, 예상하지 못하였습니다.

문   그런 말을 들었을 때 어떤 생각이 들던가요.

답   기업이나 다른 조직도 마찬가지이지만 대학에서는 우수한 인재를 추천해 주면 일단 고맙게 생각합니다. 무자격자를 억지로 권력이나 직권을 이용해서 추천할 경우에는 증인은 어떤 경우라도 굴하지 않고 다 막아냈습니다. 이 경우에는 우리가 명문대 출신은 많지만 마침 예일대 출신이 없었고, 미술사 전공자가 극히 필요하였고, 언론에서도 대서특필하였고, 더군다나 변양균 장관이 추천하였고,

당시 좋은 인재를 추천해 주어서 고맙다는 이야기까지 하였습니다.

문    증인은 피고인 신정아의 이력서나 기타 채용에 필요한 자료를 누구로부터 받았

는가요.

답    직원을 통해서 성곡미술관에 가서 서류를 받아오라고 하였습니다.

문    직원이라면 인사팀이나 비서실 직원을 말하는 것인가요.

답    인사팀과 비서실장에게 이야기하였습니다.

문    어떻게 이야기하였는가요.

답    '좋은 교수 후보감이 있는데 이력서부터 받아보고 검토하자.'라고 하고 이력서를

받아오라고 하였습니다.

문    그래서 직원이 성곡미술관에 가서 피고인 신정아의 이력서를 받아왔다는 것인

가요.

답    그런 것으로 알고 있습니다.

문    직원이 피고인 신정아의 이력서를 받아와서 증인에게 주던가요.

답    구두 보고를 받고 기획인사처에서 가지고 있었습니다.

문    검찰에서는 "7월 초경에 2006학년도 교원확보계획을 결재하는 과정에서 비서실

을 통하여 신정아에 대한 자료를 받아 보라고 지시했다."라고 진술한 바 있는

데, 맞는가요.

답    예.

문    교원확보계획을 결재한 날짜가 7. 6. 또는 7. 8.이라고 되어 있는데, 피고인 변양





균으로부터 이야기를 듣고 얼마나 지난 후에 결재를 하였는지 기억하는가요.

답    증인이 재임 중에 293명의 교수를 초빙하였고, 다른 업무도 워낙 많다 보니까

깜박하여서 바로 처리하지 못하고 2주 정도 지나서 처리를 하다 보니까 속도를

내야만 되었습니다. 그것이 외부에는 무리하게 비추어졌을지 모르나, 절차에는

하자가 없었습니다.

문    캐피탈호텔에서 피고인 변양균을 만나서 피고인 신정아에 대한 이야기를 듣고

얼마 정도 후에 교원 임용을 하였는가요.

답    바로 처리하지는 못한 것 같고, 조금 시간이 지난 뒤에 하였습니다.

문    그러면 2005. 6. 초순 또는 중순경 만난 것은 맞는가요.

답    그렇습니다. 날짜는 정확하게 기억하지 못합니다.

문    동국대에서 교수를 채용할 때에는 공개채용과 특별채용 방식이 있지요..

답    예, 두 가지가 있습니다.

문    공개채용의 경우에는 반드시 학과에서 추천해서 올라와야 하는데, 학과에서 추

천하지 않으면 아무리 유능한 인재도 교수로 채용 할 수 없는 것인가요.

답    예, 안 됩니다.

문    이런 단점을 보완하기 위하여 총장에게 인재 추천의 재량권을 부여한 것이 특

별채용 방식이지요.

답    예, 탑다운방식으로 일반 조직체에서는 스카우트 개념으로 보면 됩니다.

문    특별채용의 경우 총장이 소속 학과에 추천을 권유하면 소속 학과에서 동의하는

경우에 한해서 심사를 거쳐 채용이 가능하도록 되어 있는 것이지요.

답  그렇습니다.

문  그러면 특별채용의 경우에 총장이 아무리 추천을 권유해도 소속 학과 교수들이 동의하지 않는 경우에는 채용이 불가능한 것인가요.

답  그렇습니다.

문  그럼 결국 공개채용이든 특별채용이든 소속 학과 교수들이 추천하지 않고 동의하지 않으면 아무리 유능하고 실력이 있는 사람이라도 교수에 임용될 수가 없는 것이지요.

답  그렇습니다.

문  증인은 검찰에서 "아무리 지적으로 유능한 사람이라고 해도 해당 학과의 기존 교수진과 화합하여야 대학이 발전하는 것이기 때문에 기본적으로 해당 학과에서 추천하는 후보가 아닌 사람을 위에서 해당 학과에다가 추천하라고 하여 특별임용 시키는 것은 대단히 어렵고 학내에서 무리가 따르는 일입니다."라고 진술하였는데, 기억하는가요.

답  예.

문  맞는가요.

답  그렇게만 볼 수 없는 것이 아까 말씀드린 특별채용의 정신입니다. 특별채용이라는 것이, 유능한 교수를 방어하고 못 들어오게 하는 대학의 학과이기주의가 팽만해 있기 때문에 인사권자가 볼 때는 분명히 여러 가지 판단을 하여서 학교

문    발전에 유익한 교수 후보가 있는데 학과에서 받아들이지 않는 경우에는 각 대

학마다 갈등이 굉장히 심하기 때문에 인사권자로서는 고통스럽습니다.

문    피고인 신정아가 채용된 방식은 증인이 총장으로서 미술사학과에 추천을 권유

하고 미술사학과 교수들의 동의를 얻어서 추천하도록 하여 임용이 이루어진 특

별채용 방식이지요.

답    그렇습니다. 달가워하지 않는 것을 설득하고 설득하여서 임용 추천이 올라오도

록 노력하였습니다.

문    당시 피고인 신정아가 전공했다는 서양미술사 분야는 미술사학과나 미술학과

모두 교수 채용계획이 없었지요.

답    교수채용계획은 없었는데, 정말 필요하였습니다.

문    증인은 처음에는 미술학과에 피고인 신정아를 추천하라고 의사 타진을 해 보았

으나, 교수들이 반대해서 미술학과에서는 아예 추천을 받지 못하였지요.

답    증인이 한두 번 이야기하다가 서양미술사를 전임이 강의한다고 하여서 거기는

포기하였습니다. 그리고 세상에 알려진 것처럼 불교미술사학이 아니라 미술사학

과인데, 미술사학과에 서양미술사 전공자가 없고 현직 교수가 2명인데 그 중 1

명은 병결이고 나머지 1명이 학과를 운영하고 있었는데 56명이나 되는 석박사

를 혼자서 끌고 갈 도리가 없습니다. 서양미술사를 배워야 바로크가 무엇인지,

큐비즘이 무엇인지 알고서 졸업을 할 텐데 그런 강의가 이루어지지 않는다는

것은 대학이 비싼 등록금을 받아가면서 무책임하게 교육을 하는 것이라고 생각

해서 서양미술사 전공자는 꼭 필요하다고 판단하여 설득을 한 결과 학과에서

받아들인 것입니다.

문      미술사학과도 처음에는 추천에 반대하였지요.

답      예, 반대하였습니다.

문      그래서 증인은 임용된 후에 다른 학과로 소속을 변경시키고, 미술사학과에 교수

TO를 1명 더 주겠다는 언질을 해 주고서야 정우택 교수가 마지못해 피고인 신

정아를 추천하게 된 것이지요.

답      그것은 비하한 이야기입니다. 총장이라는 자가 '너 뭐 하나 더 줄 테니까 이 사

람을 써 달라.'라는 식으로 이야기하는 법은 없습니다. 자기네가 먼저 '그러면

저희 불교미술사에도 한 사람 주십시오.'라고 하여서 '좋습니다. 그렇게 하겠습

니다.'라고 한 것입니다. 왜냐 하면 신정아를 교수로 채용해 보았자 3명인데, 최

소한 4~5명의 교수가 있어야 되는 학과이기 때문에 그렇게 하기로 한 것입니

다.

문      임용된 후에 다른 학과로 소속을 변경시키기로 하였는가요.

답      그렇습니다.

문      그 다음에 정우택 교수의 요구에 의해 나중에 미술사학과에 교수 TO를 1명 더

주겠다고 한 것은 맞지요.

답      예.

문      증인이 먼저 제의한 것이 아니라 정우택 교수가 동의를 하지 않기 때문에 이야

기를 하다가 위와 같이 합의를 본 것이지요.

답    예.

문    증인이 미술사학과 정우택 교수에게 피고인 신정아를 추천하도록 권유한 것은

2005. 7. 22.경 무렵인가요.

답    그런 것 같습니다.

문    정우택 교수는 증인에게 피고인 신정아를 추천하는 것에 동의해 놓고도 임용신

청 서류 접수 마감일인 8. 4.에 그것도 그날 오전까지도 인사관리팀에 추천서를

제출하지 않고 있다가 이런 사실을 안 유석천 당시 기획처장이 독촉하니까 오

후 늦게 마감시간 임박해서야 추천서를 제출한 것을 알고 있는가요.

답    예.

문    피고인 신정아는 교수로 임용 받은 후에 정우택 교수로부터 강의도 배정받지

못하였지요.

답    예, 참 나쁜 일입니다. 총장이 일일이 그것까지는 개입하지 못하고, 시간이 없어

서 잘 알지 못하였는데, 만약 신정아의 이력과 학력이 사실이었다면 서양미술사

기획전시론과 같이 정확하게 해당되는 과목이 많이 있었음에도 불구하고 시간

배정을 하지 않은 것은 아주 의도적으로 고약한 일입니다.

문    그만큼 미술사학과에서는 추천에 소극적이고 부정적이었다는 이야기가 아닌가

요.

답    그렇습니다.

문    추천서는 소속 학과장의 직인이 찍힌, 또는 소속 대학원장의 직인이 찍힌 정식

      공문으로 인사관리팀에 접수되어야 하는 것이지요.

답    그렇습니다.

문    그런데 당시 제출된 인사관련 서류들을 보면 다른 임용신청자들에 대한 추천서

      는 소속 학과장이나 대학원장의 직인이 찍힌 정식 공문으로 인사관리팀에 접수

      되었는데, 이에 반해 피고인 신정아에 대한 추천서는 대학원장의 직인이 찍힌

      공문이 없이 정우택 교수의 추천서만 달랑 인사관리팀에 접수되었는데, 그런 사

      실을 알고 있는가요.

답    에, 알고 있습니다.

문    대학원장과 협의가 충분히 이루어지지 못하였기 때문 아닌가요.

답    충분히 이루어지지 못하였습니다.

문    그 일로 서윤길 대학원장이 몹시 화를 냈었지요.

답    동국대에 약 50개의 학과가 있는데 그것은 전부 학부인데 반해 미술사학과만

      유일하게 대학원 소속입니다. 그래서 실무자들이 여기에는 학장이 없으니까 그

      냥 내도 되는 것으로 착각한 측면이 있어서 나중에 이것은 학장이 결재해야 될

      몫을 대학원 소속이니까 대학원장에게 해야 된다는 것을 뒤늦게 실무자들이 깨

      닫고 대학원장에게 늦게 이야기하였더니 자기를 무시했다고 대단히 분노하였다

      가 면접을 하고 나서는 대단히 흡족해 한 경우입니다.

문    동국대는 박사학위 소지자만 조교수 이상에 임용할 수 있도록 교원임용규정에

규정되어 있지요.

답    예.

문    위 규정은 2005. 7.경 개정되었지요.

답    예, 대외경쟁력을 강화하기 위해서 임용과 동시에 전임강사를 주지 않고 조교수
     로 초빙한 규정입니다.

문    인사관리팀 직원 임조경은 피고인 신정아가 추천서 접수 당시 서류를 제출하지
     않다가 면접 직전 날에서야 캔사스대학 졸업증명서, 예일대학교 대학원 박사학
     위증명서 사본만 제출하고, 임용신청서류로서 필수적인 학사, 석사, 박사학위기
     는 물론 성적증명서도 제출하지 않았고, 그런 사실을 안형백 인사관리팀장에게
     보고했다고 하는데, 증인은 그런 사실을 안형택 팀장에게 보고 받은 적이 있는
     가요.

답    잘 기억나지 않습니다.

문    동국대 교원 임용 절차를 보면 학과 추천서가 접수된 후에 면접위원들의 면접
     심사를 하지요.

답    예.

문    피고인 신정아에 대한 면접카드를 보면 인적사항과 학사, 석사, 박사 등 학위와
     전공이 기재되어 있고, 평가항목으로는 ①교육적 사명감 및 인품 ②교육에 대한
     일반적인 지식 및 이해 ③언어능력과 표현력 ④전공교과 교수능력 및 컴퓨터관
     련 지식 정도 ⑤건학이념 및 불교관, 이렇게 5개 항목으로 면접 점수를 주게 되

어 있는데, 맞는가요.

답  예.

문  당시 면접에 참여했던 김병식 면접위원의 피고인 신정아에 대한 면접카드 소견 란에는 "1. 전문성, 표현력 2. 이력, 경력 3. 문화컨텐츠 분야 기여도 등을 고려 할 때 본교 교원임용자로서 적정하다고 판단하여 상기와 같이 소견을 냄"이라 고 기재되고, 같은 란에 "MBA 등등"이 부기되어 있고, 증인도 면접소견으로 "자신의 전공에 대한 자신감과 열정이 충분하며..."라는 내용의 기재를 하였는 데, 면접심사 과정에서 전공이나 이력, 경력, 전문성에 대한 상당히 심도 있는 심사가 이루어진 것으로 보이는데, 맞는가요.

답  그렇습니다.

문  피고인 신정아에 대한 임용 당시 면접 자료를 보면 14명에 대한 면접 심사를 해서 그 중 7명을 탈락시킨 것으로 확인되는데, 그만큼 면접 심사가 비중 있고 심도 있게 진행되는가요.

답  그렇습니다.

문  면접심사 절차 후에는 교원인사위원회의 심의를 거치게 되어 있지요.

답  예.

문  교원인사위원회는 어떤 역할을 하는 것인가요.

답  총장과 집행부에서 교수 후보자를 선정 · 심사하여 면접까지 오는 과정이 합당 하였는지, 적법하였는지를 검토하고 문제 제기를 하는 일종의 견제기구입니다.

문    교원인사위원회가 교수 임용 신청한 사람들이 제출한 각종 서류와 면접심사기

록까지를 전체적으로 재심사하는 곳인가요.

답    개괄적으로는 전부 다 보지만 논문심사까지는 하지 못할 것입니다.

문    면접심사를 통과하였어도 교원인사위원회 심의 과정에서 탈락하는 경우도 있는

가요.

답    탈락 권한은 없고, 문제 제기를 하는 경우가 간혹 있습니다.

문    교원인사위원회 심의를 통과하면 총장이 재단이사장에게 임용을 재청하여 재단

이사회의 의결을 거치지요.

답    그렇습니다.

문    재단이사회에서는 임용대상자에 대한 어떠한 자료를 검토하여 임용 적정 여부

를 의결하는가요.

답    각종 소견서들이 첨부되고, 교원으로서 적합한지 여부를 판단할 몇 가지 자료들

이 첨부되는데 이를 테면 정각원장의 소견서도 그 중의 하나입니다. 신정아를

채용할 당시에도 7명이 이사회 승인 안건으로 상정되었는데 1명은 탈락하고 6

명은 이사회를 통과하였습니다.

문    재단이사회에서는 나름대로 또 한 번 검토하고 토론하여 의견을 거친다는 이야

기이지요.

답    그렇습니다. 그리고 여론 수렴도 합니다.

문    당시에 재단이사장 현해 스님과 재단이사 영배 스님에게 변양균 기획예산처 장

관이 피고인 신정아 임용을 추천하였다고 말해 준 적이 있는가요.

답  이사장인 현해스님에게 보고를 하였고, 아마 이사 몇 분에게도 사담 형식으로 이야기를 했던 것 같습니다.

문  현해스님에게 보고를 하였다는 것은 재청을 하면서 보고하였다는 것인가요.

답  예, 재청을 하면서 보고하였습니다.

문  영배스님에게도 이야기한 기억이 있는가요.

답  그때는 이야기하지 않은 것 같습니다.

문  그 후에 영배스님에게 이야기하였다는 것인가요.

답  예.

문  나중에 언제 이야기하였는가요.

답  잘 기억나지 않지만 아마 그 무렵이 아닌가 생각하는데, 별 반응이 없었습니다. 영배스님은 그때 이사회 내분이 있어서 아마 교수채용에는 신경을 쓸 여유가 없었을 것입니다.

문  증인은 현해스님에게 이야기한 것은 정확한 시기를 기억하고 있는데, 영배스님 에게 말한 부분에 대해서는 최초에 검찰조사 시에는 '시기가 잘 기억나지 않는 데 임용된 직후 무렵에 이야기해 준 것 같다.'라고 진술하다가 그 후 2회나 3회 출석 시에는 '임용 재청을 할 때 보고해 준 것 같다.'라고 이야기하였는데, 어느 것이 정확한 것인가요.

답  먼저 말한 것이 정확한 것일 것입니다.

문     이야기해 준 것은 맞는데 임용된 후에 해 준 것 같다는 말이지요.

답     임용 재청 때는 영배스님에게 말씀드릴 이유가 없었습니다.

문     2005. 9. 초순경 미술학부 오원배 교수가 증인에게 신정아 학력이 가짜라는 의

       혹이 있다면서 확인해 보라고 말했는가요.

답     즉시 그 자리에서 확인을 지시하였습니다.

문     증인은 오원배 교수에게 이야기를 들었는가요.

답     그런 것 같습니다.

문     그러면 신정아 교수의 가짜학위 의혹을 최초로 제기한 사람은 동국대에서는 오

       원배 교수인가요.

답     그런 소문을 들었다는 이야기를 한 것은 오원배 교수인 것 같고, 장윤이사가 말

       한 것은 나중입니다.

문     그때 안형택 인사관리팀장은 자기가 직접 예일대 홈페이지에 들어가 학위자 명

       단을 보니 신정아 교수 이름이 없었고, 그런 사실을 총장인 증인에게 보고했다

       고 하는데, 그런 보고를 받은 기억이 있는가요.

답     예, 보고를 한 것 같은데 누가 했는지는 기억나지 않지만 '2005. 1학기에 학위를

       하였으면 아직 등재되지 않을 수도 있을 테니 2005. 2학기 초에 한 번 더 확인

       을 할 수 있지 않겠느냐.'라는 의견을 나눈 적이 있습니다. 그런데 최근에 밝혀

       진 바와 같이 예일대에서 자기들이 확인을 해서 보낸 것이 사실이라는 이야기

       를 해 왔습니다.





문   동국대에서는 2005. 9. 6.자로 예일대에 학력조회 의뢰서를 국제등기우편으로 발

송하였지요.

답   예.

문   증인이 안형택 교수에게 피고인 신정아의 학력을 예일대에 직접 확인해 보라고

지시한 이후에 신정아가 사표를 제출했는가요.

답   그 관계는 잘 모르겠으나, 증인이 듣기로는 과목 배정도 제대로 해 주지 않고

미술과나 미술사학과 교수들이 냉대를 해서 사표를 낸 것 같다는 보고를 받은

적이 있습니다.

문   그때 왜 캔사스대학교에는 학력조회서를 보내지 않았는가요.

답   문서담당은 안형택 교수 인사관리팀장 선에서 끝이지 총장이 그것까지 할 여력

은 없었고, 나중에 물어보았더니 캔사스대학까지 학력조회서를 보내려고 결재를

해 놓았는데 예일대에서 박사학위 확인 팩스가 오니까 학부 대학원은 따질 필

요도 없어서 생략하였다는 것이 실무자들의 이야기였습니다.

문   피고인 신정아가 사표를 증인의 사무실에 제출했는가요.

답   그렇습니다.

문   사직할 때에는 인사관리부서에 사표를 제출하는 것이 아닌가요.

답   보통 총장에게 합니다. 보통 학장에게 제출해서 총장에게 가져오는 것이 순서인

데, 총장에게 와서 직접 내는 경우도 가끔 있습니다.

문   피고인 신정아가 사표를 제출한 직후 피고인 변양균으로부터 전화가 왔다고 했

지요.

답   에, 전화가 왔습니다.

문   그때 피고인 변양균이 뭐라고 말하던가요.

답   지금까지도 이해가 잘 안되는데, 아주 무례하고 일방적인 전화였다는 것은 확실하게 기억됩니다. 증인이 임기 중에 딱 한 번 그런 전화를 받았기 때문에 도저히 잊을 수가 없는 일이고, 그 뒤로 한 번쯤 사과 전화가 있을 줄 알았는데 그 뒤로도 전화가 한 번도 없었습니다. 통화 내용인즉, 증인이 회의를 하다가 전화가 와서 휴대전화를 받은 기억이 나는데 '동대 왜 그러느냐. 총장님이 이것을 잘 해결해 주어야 된다.'라는 식으로 이야기하였습니다. 그때 증인은 신정아의 마음을 돌려서 복직을 할 준비도 하였고, 예일대에 확인 문건을 보내긴 하였지만 그것은 공연한 모함일 것이라고 생각하고 어떻게든지 우리 교수로 위촉해서 잘 모셔야겠다고 생각하고 있는 중에 변양균에게 그런 전화를 받은 것입니다. 증인이 변양균보다 나이도 십여 살 위이고, 기획예산처 산하기관의 임직원도 아닌데, 어떻게 그렇게 일방적인 전화를 할 수 있었을까 의심이 갑니다. 이 재판이 끝나고 세월이 지난 뒤라도 그 점은 증인에게 사과를 해야 됩니다.

문   피고인 변양균이 구체적으로 전화로 뭐라고 하던가요.

답   정확하게는 기억나지 않습니다마는 골자는 '동대 왜 그러느냐.'라고 하였습니다. 증인이 해석하기로는 관련학과 교수들이 신정아를 괴롭히고 모욕감을 느끼게 한 것에 대해서 이야기한 듯 하고, 총장으로서 그런 것 하나 제압하고 컨트롤하

733

지 못하느냐는 뜻으로 '총장이 잘해 주시오.'라고 이야기한 것 같습니다.

문   증인은 검찰에서 조사를 받으면서 "변양균 장관이 목소리 톤을 높이며 따지는

석으로 '동국대 왜 그래요. 총장님이 알아서 잘 해결하세요.'라고 말했다."라고

진술하였는데, 지금 증언한 것이 이런 내용인가요.

답   예.

문   그리고 피고인 변양균의 전화 태도가 상당히 무례했다고 하였지요.

답   예.

문   증인은 "그 전화를 받고 어쩌나 불쾌하고 당황했던지 '살다가 뭐 이런 일이 다

있나.'하는 생각까지 했었다."라고 진술하였는데, 맞는가요.

답   예, 그렇습니다. 증인은 그런 전화를 받아본 적도 별로 없고, 대부분의 지식인이

그렇겠지만 언어에 대해서 민감할 수밖에 없는데 모욕감을 느꼈던 것이 사실입

니다.

문   인사관리팀 직원 임조경이 2005. 9. 21.자로 피고인 신정아에게 발송한 이메일

내용을 보면 "총장님께서 무급휴직 처리를 하라고 말씀하셔서 어떻게 해야 하

는지..."라고 하면서 휴직 처리에 관한 절차를 말해주는 내용이 있는 것으로 보

아서, 증인이 인사관리팀에 신정아를 직권 휴직 처리하라고 지시한 날짜가 늦어

도 9. 21. 이전인 것으로 확인되고, 동국대에서 발송한 학력조회 의뢰서에 대한

예일대 측의 답변 팩스는 2005. 9. 23.자로 동국대로 송부되어 왔는데, 예일대

회신 팩스가 오기 전에 휴직 처리하라고 지시한 것이 맞는가요.

답    맞습니다.

문    동국대의 정관이나 교원임용규정을 보면 규정상 피고인 신정아의 경우에는 휴
      직사유에 해당하지 않는데, 증인은 그런 사실을 알지 못했는가요.

답    검토를 했습니다만 그런 경우에 휴직처리가 안 된다는 조항도 없었습니다. 그래서
      총장의 직무범위 내에서 그 정도의 재량이 있다는 것이 실무자의 생각이었고
      증인 역시도 그랬습니다. 그리고 이미 교육부에 보고가 될 서류가 준비되어 있
      는 상태이고, 이사회에서는 최종적으로 교수 신분으로 확정이 된 상태입니다.
      그런데 이사회를 통과를 하자마자 총장이라는 사람이 바로 사직서를 수리한다
      는 것은 말이 안 되고, 그때 면접을 하면서 재능이 돋보였고, 심사를 한 다른
      사람들도 의견 일치가 되었습니다. 지금 생각하면 어처구니가 없습니다만 신정
      아가 다른 대학으로 간다는 소문이 들려서 빼앗길까 봐 동국대가 잡아두기 위
      해서 노력한 것은 사실입니다. 그리고 그때 직무범위 안에서 그 정도는 총장이
      할 수 있다고 하여서 월급 없이 6개월만 보고, 예일대에서 학위가 소문처럼 사
      실이 아니라면 간단하게 처리되는 것입니다. 그런데 불행하게도 예일대학이 엉
      뚱한 실수를 하는 바람에 이 꼴이 되었습니다.

문    당시 인사관리팀에서 휴직사유에 해당하지 않는다고 보고하지 않던가요.

답    그런 비슷한 사례는 많이 있습니다. 비슷한 사례와 완전히 일치하지는 않지만
      휴직사유가 마땅치 않다는 이야기를 하여서 다시 규정 관련자들과 회의를 한
      결과 '총장 직무범위 내에서 이 정도는 가능하다, 그러나 다소 무리다.'라는 이

야기는 하였습니다.

문   정관이나 교원임용규정상 휴직사유가 마땅치 않다고 하여서 회의를 해 보니까

총장이 직무범위 내에서 할 수는 있지만 다소 무리라고 의견이 있었다는 취지

인가요.

답   예.

문   그러고 나서도 무급휴직으로 처리하도록 결정하였다는 것인가요.

답   예, 그러고 나서 예일대 결과도 보기로 하였습니다. 그때 대학은 1명이라도 TO

를 늘려야 교육부가 추진하는 교원확보율에 따른 국고지원사업에 자격을 얻습

니다. 그러니까 한 분이라도 더 모셔야 되는 입장이었습니다.

문   동국대 안형택 교수가 영문으로 피고인 신정아가 제출한 박사학위기 사본을 편

철하여 우편으로 2장을 보냈고, 그 후 2005. 9. 23. 예일대로부터 수신한 회신문

이라는 것을 보면 팩스 3장이 왔는데 그 중 1장은 팩스 표지에 '내가 사인한 것

이 맞다.'라고 하는 쉬마이스터의 확인해 주는 내용이고, 나머지 2장은 동국대에

서 보낸 것이지요.

답   예.

문   통상 외국에서 문서를 작성하면 서명을 하는데, 이 팩스에는 서명도 없고 타이

핑만 1줄 반 정도 되어 있는데, 세계적인 대학인 예일대에서 확인해 주는 문서

로서는 지나치게 조악한데, 신빙성을 의심해 보지 않았는가요.

답.   신빙성을 의심한 사람은 아무도 없었습니다.

문  증인은 피고인 신정아가 사표를 냈으면 사직처리를 하면 되는데 휴직처리를 한

부분에 대해서 검찰에서는 "그분(피고인 변양균)이 국가의 재정을 총괄하시는 분

이기 때문에 동국대에 대하여 좋지 않은 감정을 가지게 된다면 동국대의 각종

국고지원사업 등에 있어 심각한 지장을 있을 수도 있다고 생각하였다."라고 진

술하였는데, 맞는가요.

답  그런 질문을 받고 그렇게 해석할 수도 있다고 생각한 것입니다.

문  황종연 교수는 증인이 제자로서 무척 아끼는 사람이지요.

답  예.

문  황종연 교수는 증인이 2005. 8. 하순경에 총장실로 불러서 가보니까 피고인 신

정아가 있었고, 증인이 신정아를 소개해 주면서 학교에 빨리 적응할 수 있도록

도와주라고 했다는데, 맞는가요.

답  맞습니다.

문  다른 교수들도 임용이 되면 그렇게 배려를 하는가요.

답  별로 그렇게 하지 않았습니다. 신정아 교수를 교양교육원으로 배정하려고 하였

는데 황종연 교수가 교양교육원 원장이어서 그랬고, 또 하나는 교양교육원이 학

과 소속이 없기 때문입니다. 그리고 변양균이 각별히 추천한 사람인데 소홀히

할 수도 없고, 또 본인도 여러 가지 재능과 지식여성으로서의 모습을 보여서 우

리 교수로서 아끼고 싶은 마음이 있었기 때문에 하루속히 마음을 잡고 안정을

해서 학교에 재미를 붙이고 열의를 다해서 학교 발전에 참여할 수 있도록 배려

하였습니다.

문    그 무렵에 피고인 신정아를 나중에 교양교육원 소속으로 바꾸려고 마음을 먹고
      있었는가요.

답    에, 그렇습니다. 실제 이루어지지는 않았지만 국책 프로젝트에 미술사 전공자가
      필요하다는 보고를 듣고 교양교육원에 옮겨주는 것이 융화도 잘 되고 좋겠다는
      생각이었고, 전공에도 서양미술에 관한 과목이 있어서 그렇게 해 놓고 미술사학
      과에서 강의를 해도 상관없었습니다. 프로젝트를 국가에 낼 때는 참여교수 명단
      이 많이 들어가는데 그럴 때 교수들의 이름이 많이 필요합니다.

문    황종연은 2005. 11. 하순경 총장(증인)이 불러 가보니 피고인 신정아를 교양교육
      원으로 전직토록 하라고 지시를 받았고, 그래서 12. 26.자로 신정아의 소속 변경
      을 요청하였고, 2006. 2. 1. 총장 결재를 받아서 2. 16.자로 소속 변경 승인이 났
      다고 하는데, 맞는가요.

답    그렇습니다.

문    황종연 교수 말에 의하면 2007. 1. 또는 2.경에 증인이 '신정아 학위가 이상하니
      확인해 봐라.'라고 하였다는데, 그런 적이 있는가요.

답    예, 있습니다.

문    그래서 황종연이 증인의 지시를 받고 피고인 신정아를 불러서 학위기와 성적증
      명서를 가져오라고 했더니, 신정아가 학위기를 찾을 수 없다고 하며 컴퓨터 출
      력물이라면서 엉성한 서류를 주기에 하도 기가 막혀서 신정아를 돌려보내고, 그

런 사실을 증인에게 보고했다는데, 그런 보고를 받은 적이 있는가요.

답    예.

문    증인은 학위가 이상하다는 말을 언제, 누구에게 들었는가요.

답    이사회에서도 그런 이야기가 나왔습니다.

문    그것은 2. 15. 이사회를 말하는 것인가요.

답    그때는 본격적인 것이고, 그전에도 그런 이야기가 나온 적이 있을 것입니다. 대
      학에는 유능한 교수가 있으면 그것을 시샘하는 사람이 많이 있어서 대학을 어
      지럽히는 고약한 요소 중의 하나인데, 증인은 그런 것으로 알았습니다. 증인은
      변양균 장관이 추천한 사람이라 별로 의심을 하지 않았고 학력에 하자가 있으
      리라고는 추호도 생각하지 않았으나, 어디서 들었는지 기억나지 않지만 자꾸 이
      야기가 조금씩 들려오니까 교양교육원장에게 본인을 위해서라도 확인하는 것이
      좋다고 하면서 '지식인이라는 것이 정직성 하나를 빼놓으면 뭐냐. 그러니 아주
      엄밀하게 알아보아야 한다.'라고 이야기하였는데 증인은 그때 이미 퇴임 무렵이
      다가왔기 때문에 증인이 직접 어떻게 하지는 못하였습니다.

문    그래서 황종연 교수를 시켜서 확인시켜 본 것인가요.

답    예.

문    그래서 황종연 교수가 신정아의 학위가 이상하다고 보고를 하지 않았는가요.

답    보고를 하기는 하였는데 불분명하게 하였습니다. '아니다.'라고 한 것도 아니고
      '뭐가 좀 이상합니다.'라는 정도의 이야기는 한 것 같습니다.

문   증인은 예일대에서 온 회신 때문에 당시 들리던 이야기를 음해성이라고 생각하

　　였다는 것인가요.

답   예, 학교의 음해라는 것은 교수 채용을 할 때마다 굉장히 심각합니다.

문   증인은 2007. 6. 초경쯤 해서 피고인 신정아를 조선호텔 양식당에서 둘이서 만

　　나 점심식사를 한 적이 있는가요.

답   예, 있습니다.

문   왜 만났는가요.

답   퇴임하고 나서 아마 증인이 백수로 있는 신정아를 위로해 주려고 하였던 것이

　　아닌가 싶습니다.

문   피고인 신정아가 먼저 전화를 했던가요.

답   잘 기억나지 않습니다.

문   그때 어떤 말을 주고받았는지 기억하는 대로 이야기해 보세요.

답   특별히 문제가 될 만한 이야기를 한 기억은 없고, 그냥 점심을 먹고 헤어졌습니

　　다.

문   검찰조사 시 증인은 당시 피고인 신정아가 재단 돌아가는 사정을 물어보았다고

　　이야기하였는데, 맞는가요.

답   그랬을 지도 모르겠지만 정확하지 않습니다.

문   당시에는 학내에서 학위 관련 문제가 되고 있던 시기였는데, 전혀 그런 언급이

　　없었는가요.

답    있었던 것 같습니다. 2007. 2. 중순에 이사회가 열렸는데 거기서 장윤 이사가 극

심하게 의혹제기를 한 일이 있어서 그 점에 관해서는 6월 초 조선호텔에서 신

정아를 만났을 때 아마 이야기를 하지 않았나 싶습니다.

문    증인은 피고인 신정아를 만나고 한 이틀쯤 지나서 영담스님 임학규가 증인에게

전화해서 '미국에 있는 제자를 통해서 신정아 학위를 알아봤는데, 예일대 뿐 아

니라 학부까지 전부 가짜 같다.'라고 말해 주었다고 이야기하였지요.

답    예, 그런 이야기를 들었습니다.

문    위와 같은 이야기를 들은 것이 2007. 6. 초순이나 중순경인가요.

답    날짜는 역시 기억하지 못하지만 대충 그렇지 않을까 싶습니다. 전임이 학교에

대해서 완전히 관심을 갖고 있지 않았고, 그 이야기를 듣고 상당한 충격이었습

니다. 그러나 그때까지만 해도 사적채널로 공식적인 확인 절차가 아니었기 때문

에 들어만 두었습니다.

문    증인이 총장 재직 시절 추천권을 행사하여 피고인 신정아가 교수가 된 것인데,

증인은 영담스님에게 이야기를 듣고 신정아에게 전화로라도 물어보고 확인해

보지 않았는가요.

답    전화로 물어보지 않았고, 확인도 안 된 일을 가지고 차마 물어볼 수 없었으며,

학력위조라는 것은 전혀 생각하지 않았고 음해라고 계속 믿어왔던 것입니다.

문    통화내역조회 자료를 보면 2007. 6. 하반기 무렵 증인과 피고인 신정아가 한 번

통화한 것이 나오는데, 전화한 기억이 없는가요.

답    그때 궁금해서 전화를 하였는데 차마 이야기하지 못하고 그냥 끊었을 것입니다.

문    피고인 신정아가 이사장실에 자주 출입한다는 것은 알고 있었는가요.

답    잘 모르다가 나중에 들었습니다.

문    어떻게 들었는가요.

답    간혹 일 때문에 출입을 한다는 이야기를 들었습니다.

문    무슨 일 때문에 출입하는지는 물랐는가요.

답    예, 물랐습니다.

문    피고인 신정아가 총장실에도 자주 출입했는가요.

답    예, 총장실에도 간혹 출입하였습니다.

문    증인은 검찰에서 3회 조사를 받았는데, 그때 조사받은 내용이 기재된 조서 내용
      이 모두 증인이 말한 바와 같은지 확인하고 서명날인 하였는가요.

답    예.


피고인 변양균의 변호인

증인에게

문    증인은 검사 신문 시 2005. 6.경 캐피탈호텔에서 피고인 변양균을 만난 것에 대
      해 물었을 때 '점심을 먹자고 하는 것은 흔한 일이라서 특별한 생각 없이 만나
      러 나갔다.'라고 답변하였는데, '흔한 일이라는 것'은 변양균과 증인이 가끔 점심
      식사를 하는 일들이 있었기 때문이라는 취지인가요.

답    대학을 운영하다보면 각 부처의 장관이나 주요 인사들이 간혹 점심을 먹자는

이야기가 있다는 뜻입니다.

문    증인은 검찰에서 '변양균 기획예산처 장관이 재정적 도움을 준다기에 신정아를

교수로 어쩔 수 없이 채용하였다.'라는 취지로 진술한 적이 있는가요.

답    아까도 말한 것처럼 변양균이 증인에게 신정아를 교수로 채용해 주면 재정적으

로 도와주겠다고 야비하게 이야기한 적은 없다고 증언하였습니다. 조서는 과장

되었거나 아마 달리 해석된 부분일 것입니다.

[이때 수사기록 제1757쪽을 제시하고]

문    증인의 검찰 진술을 보면 '자신이 동국대에 재정적으로 도움을 준다기에 어쩔

수 없이 채용한 것이며'라고 되어 있는데, 어떤가요.

답    이런 뜻은 아니었습니다. 증인이 진술한 것은 재정적으로 도움을 준다기에 어쩔

수 없이 한 것이 아니라, 재정적으로 도움이 될 수 있다는 이야기를 포괄적으로

증인이 받아들였다고 이야기한 것입니다.


검    사(문찬석)

증인에게

문    증인의 진술 취지는 피고인 변양균이 '내가 재정적으로 도움을 줄 테니까 신정

아를 채용하십시오.'라는 취지로 말하였다는 것이 아니라 전체적으로 이야기하

는 과정에 재정적으로 도움이 될 것이라는 이야기도 하였다는 것이지요.

답     예.


판     사

       증인에게

문     '어쩔 수 없이' 채용한 것인가요.

답     어쩔 수 없이 채용한 것은 아닙니다.


피고인 변양균의 변호인

            증인에게

문     증인의 검찰진술 시 '대학의 재정을 책임지는 총장으로서 기획예산처 장관의 채

       용 부탁을 거절하면 그 여파를 걱정하지 않을 수 없었으며 동국대의 국고지원

       사업을 망칠 수 있다는 생각이 들었다.'라는 답변은 증인이 적극적으로 진술한

       것이 아니라, 수사하는 분이 그렇게 질문을 하니까 그에 응하여 대답을 하는 형

       식이었지요.

답     증인이 아까 그런 취지로 이야기하였는데, 대학을 운영하는 사람이 기획예산처

       장관과 등을 돌리고 살아야 될 이유는 없습니다만 그것이 국고지원을 직접 우

       려하였던 것 같지는 않습니다. 하지만 그것까지도 포괄적으로 그렇게 볼 수 있

       지 않았을까 하는 뜻이었다는 것입니다.

판    사

　증인에게

문    캐피탈호텔에서 만났을 당시에도 그런 생각이 들었는가요.

답    캐피탈호텔에서 만났을 때는 전혀 그런 생각이 없었고, 좋은 인재를 추천해 준

　　　것으로 끝이었습니다.



피고인 변양균의 변호인

　　　증인에게

문    당시 피고인 신정아 외에 1명이 더 특별채용 방식으로 있었지요.

답    당시 15명이었는데, 예심에서 반쯤 줄었고, 총 7명이 특별채용으로 올라왔었습니

　　　다.

문    캐피탈호텔에서 피고인 변양균이 증인에게 신정아를 소개 또는 추천할 때 "예

　　　일대 후배이고 동문회 등에서 가끔 만나는 사이이다."라고 이야기하였다고 하는

　　　데, 맞는가요.

답    예, 맞습니다.

문    증인은 검사신문 시 답변을 하면서 '변양균 장관이 각별히 아끼고 추천한 사람

　　　이다.'라는 표현을 썼는데, 어떤가요.

답    증인이 그렇게 해석을 하였다는 취지입니다.

문    각별히 아낀다는 느낌을 받은 것은 캐피탈호텔에서의 느낌이었는가요.

답    예, 각별히 느낀다는 것은 남녀 간의 문제가 아니라 불교에서도 그런 이야기를

하닙니다만 스승이나 선배가 해야 할 일은 유능한 후배를 바른길로 이끌어주고

인제로 추천하는 일이기 때문에 그것은 선배로서는 당연한 일일 수 있습니다.

문    증인은 피고인 변양균과는 2005. 6.경 캐피탈호텔 일식당에서 만나 점심식사를

함께 한 것 외에는 그 전후로 일체 사적으로 만나 식사를 한 적이 없었다고 진술

했는데, 맞는가요.

답    예, 그런 것 같습니다.

문    증인은 2003년 봄경에 조계종단 간부 2~3명을 포함하여 피고인 변양균과 함께

저녁식사를 한 적이 있는가요.

답    하룻밤에도 모임이 여러 개 있기 때문에 그것은 정확하게 모르겠습니다.

문    피고인 변양균은 2003. 가을부터 2004. 가을까지 경영대학원(야간)에 겸임교수로

임명되어 강의를 한 적이 있지요.

답    예.

문    그리고 겸임교수는 총장이 발령을 내지요.

답    예.

문    그렇기 때문에 피고인 변양균이 겸임교수로서 강의를 하는 것을 증인이 몰랐을

리가 없어 보이는데, 어떤가요.

답    기억하지 못합니다. 석좌교수부터 겸임교수, 초빙교수가 수백 명이기 때문에 그

것을 다 기억하지는 못합니다.

문     당시에는 피고인 변양균이 기획예산처 차관 시절인데, 그런 정도라면 눈에 띄지

       않았는가요.

답     강사재청서에 현재 직위가 있는 경우도 있고, 없는 경우도 있기 때문에 현재 직

       위가 없으면 잘 알 수가 없습니다.

문     피고인 변양균이 겸임교수로서 강의를 다닐 때에 학과교수들 및 학생회 간부

       몇 명과 함께 저녁회식을 2차례 정도 하였고, 이때 증인도 참석을 하였다는데,

       맞는가요.

답     아마 그랬을 것입니다.

문     그 무렵 피고인 변양균, 증인, 그리고 대학원장 등이 함께 장충동 앰배서더 호

       텔에서 술자리를 겸해서 저녁식사를 한 것이 3회 정도 된다는데, 어떤가요.

답     다 기억하지 못하지만 술자리도 있었습니다.

문     증인이 그런 회식자리에 재배해서 한 산삼주를 갖고 와서 대접하고 나중에 한

       번 가보자는 이야기도 있었다는데, 기억하는가요.

답     예, 그런 일도 있었습니다.

문     당시 대학원장은 1억 원의 발전기금을 모금하였으며 이를 총장인 증인에게 전

       달하겠다는 말을 하였었고, 그 발전기금 전달식에도 피고인 변양균이 참석하였

       다는데, 기억하는가요.

답     기억하지 못합니다.

문     2004. 6.부터 같은 해 9. 사이에 재가불자하안거논강 성철스님 100일 법문회의

공동대표를 하였지요.

답    예.

문    그러면서 그 행사 때문에 피고인 변양균을 만났지요.

답    그때 처음 만난 것입니다. 그전에도 변양균을 만났을지는 모르나, 총무원에서

인사를 제대로 나눈 것 같습니다.



**피고인 변양균**

    증인에게

문    재가불자하안거논강 성철스님 100일 법문회의 때 만난 것은 2004. 여름경이고,

그전에 2003. 가을부터 봄까지 기자출신으로 술을 잘 마시지 못하는 경영대학원

장과 증인, 피고인 변양균 3명이 술을 마신 적이 있고, 또 한 차례 모였을 때는

1억 원을 발전기금을 모금했으니 총장님에게 드리겠다고 하고 나중에 전달식도

하였으며, 동국대 옆에 있는 앰버서더호텔 일식당에서 3명이 술까지 같이 마셨

는데, 그때 피고인 변양균을 만난 것을 기억하지 못한다는 것인가요.

답    그것이 중요한 의미를 갖는지는 모르겠지만 기억이 나지 않는 것이 사실입니다.

**피고인 변양균의 변호인**

    증인에게

문    증인 2004. 9. 23. 기획예산처 차관실로 피고인 변양균을 방문한 기록이 남아 있

던데, 그때 어떤 일로 피고인 변양균을 찾아간 것인가요.

답    잘 기억나지 않지만 추석 무렵이라 학교에서 돌리는 선물을 가져가지 않았나

생각합니다.

문    혹시 그때 기획예산처 뒤에 있는 카톨릭성모병원에 문상을 가는 길에 잠깐 가

서 차 한 잔을 마시고 온 것이 아닌가요.

답    잘 기억나지 않는데, 그랬을지도 모르겠습니다.

문    증인은 피고인 변양균이 기획예산처 장관이 된 후인 2005. 봄경에 증인이 자주

다니는 타워호텔 별관 중식당에서 점심식사를 한 적이 있지요.

답    일일이 기억하지 못합니다.

문    그때 피고인 변양균으로부터 '주변에서 글 솜씨가 좋은 분을 추천해 줘라.'라는

부탁을 받고, 이용범을 소개시켜 주었지요.

답    예.

문    글 솜씨가 좋은 분을 추천해 달라고 부탁한 것이 전화로 부탁한 것이 아니라

중식당에서 식사를 하면서 부탁한 것이라고 하는데, 맞는가요.

답    그러면 기억을 바꾸어야 될 것 같습니다. 증인은 전화로 받은 것 같은데, 식사

를 하면서 그런 이야기를 하였다면 그렇게 보아야 되겠지만 증인은 잘 기억나

지 않습니다.

문    그 이후에도 증인과 피고인 변양균은 타워호텔 중식당에서 2차례 정도 식사를

함께 하면서 "증인이 추천한 이용범에 대한 이야기", "동국대 100주년 행사에

대한 증인의 걱정", "불교이야기", "문학이야기" 등의 대화를 나누었다는데, 기

억하는가요.

답  기억은 잘 나지 않지만 그랬다면 사실일 것 같습니다. 글을 쓰는 사람은 처음에

자서전이나 연설문 같은 것들을 정리하는 사람이라고 하였고, 전업작가로 유능

한 작가 중 한 사람을 추천한 기억이 있습니다.

문  캐피탈호텔에서 피고인 변양균이 증인에게 피고인 신정아를 교수로 채용해 달

라는 말의 전체적인 취지는, 자격이 부족하더라도 교수로 채용해 달라는 것이

아니었지요.

답  예, 그런 것이 전혀 아닙니다.

문  증인은 좋은 인재니까 교수로 채용하면 서로 좋은 것이 아니냐는 뜻으로 받아

들였지요.

답  그렇습니다.

문  증인은 피고인 변양균을 만난 후에 피고인 신정아에 대해서 나름대로 알아보았

더니 활동을 활발히 하는 큐레이터라고 하였지요.

답  예.

문  증인은 '신정아가 객관적인 능력으로만 본다면 동국대 교수를 할 수 있다'라고

진술하였는데, 맞는가요.

답  예.

문  그리고 서윤길 대학원장도 '예일대학교 출신이라고 하고, 면접 때 보니까 말도

750



자연스럽게 잘하여 절차를 위반하기는 하였지만 후한 점수를 주었고, 예일대학

교 박사학위 소지자가 동국대학교에 오는 것은 과분한 것으로 환영할 만한 일

이라고 생각한다.'라고 하고 있는 것을 보면, 면접 결과 신정아가 교수로 채용될

만한 자격이 충분하다는 판단이 내려진 것이지요.

답   예.

문   동국대학교가 교수채용에 관한 교원임용규정을 개정한 것은, 피고인 신정아에게

특혜를 주기 위해서 개정한 것은 절대 아니지요.

답   예, 말도 안 됩니다.

문   피고인 신정아가 교수로 채용된 이후에 피고인 변양균으로부터 '신정아를 교수

로 채용해 주어서 감사하다.'라는 뜻에서 식사나 골프 대접을 받기는커녕 전화

인사조차 받은 일이 없지요.

답   예, 그렇습니다.

문   피고인 변양균이 '신정아를 교수로 채용해 주면 재정적으로도 학교에 큰 도움이

될 것이다.'라는 말을 분명히 하였는가요.

답   예, 했습니다.

문   증인은 그 말을 어떤 취지로 받아들였는가요.

답   아까도 이야기했습니다만 '어떤 식으로 우리 대학을 도와줄 것이냐.'라는 이야기

는 한 적이 없습니다. 당시 증인이 막연하게 두 가지로 생각할 수 있었는데, 하

나는 신정아가 대단히 활동적이니까 신정아가 부지런하게 기부금을 유치할 수

있을 것이라는 암시로도 느껴졌고, 또 하나는 증인이 알지 못하는 무슨 국고지원 같은 것이 아니라 기부금 유치가 가능한 누구를 소개해 준다든지 이런 것도 막연하게만 생각하였지 거기에는 별로 신경 쓰지 않았습니다. 그리고 총장을 하면서 기부를 앞세우는 사람 중에 실제로 도와준 사람은 거의 없고 그것이 광장히 힘든 일이기 때문에 그런 이야기는 많이 들어도 유의해서 듣지도 않았습니다.

문   대학교 재정에 도움이 될 것이라는 말에서 국고지원을 염두해 둔 것은 아니라는 취지인가요.

답   예, 전혀 아닙니다.

문   교육부에서 각 사업별로 위원회 심의를 거쳐 지원 대상 학교를 선정하는 것이기 때문에 기획예산처에서 직접 예산을 배정하는 것은 아니지요.

답   그 점에 대해서는 증인이 통탄을 금할 수가 없는데, 증인은 변양균과 단 한 번이라도 '국'자조차 꺼낸 적이 없습니다. 행정 메커니즘이 기획예산처를 통해서, 교육부장관 부총리를 통해서, 실무자를 통해서, 그 다음에 위원회를 통해서 하는 것이고, 위원들은 다른 대학의 현직 교수들인데 그 사람들이 누구의 마음대로 움직일 사람들이 아닙니다. 이것은 관료사회와 대학의 특성을 너무 구분하지 못하는 일이고, 있을 수가 없는 일입니다.

문   대학교의 입장에서는 예산지원을 받기 위해 교육부를 찾아갈 일은 있을지 몰라도 기획예산처를 찾아갈 일은 없지요.

답    예, 그렇습니다. 우리 구성원이나 증인은 국고지원 사업과 관련해서는 그런 발

상조차 가진 적이 없습니다.

문    동국대학교가 구조개혁선도대학 지원사업, 수도권대학특성화사업 등에서 예산지

원을 받음에 있어서 피고인 변양균에게 도움을 요청한 적이 없지요.

답    증인이 일하는 동안에는 그렇게 야비하게 일한 적이 없습니다.

문    동국대는 자체적으로 정원감축 및 교원확보 등의 평가항목에서 점수를 받을 만

큼 조건을 충족시킨 결과 그런 예산을 받을 수 있었던 것이고, 구조개혁선도대

학 지원사업의 경우에는 정원을 500명이나 감축하고 2년에 걸쳐서 80억 원을

지원받는 것이기 때문에 특혜라고 할 수 없는 것이고 오히려 재정적으로는 오

히려 손해이지요.

답    예, 재정적으로 4년을 치면 어마어마한 손해이고, 2년을 치면 비슷합니다.

문    2005년도 예산지원은 피고인 신정아의 교수임용 이전에 이미 결정되어 있던 것

이지요.

답    예, 그 이전에 다 이루어진 일입니다.

문    증인이 피고인 변양균보다 10년이나 연배가 위이지요.

답    예.

문    피고인 변양균은 평소 증인을 만날 때에 목례 정도로 하는 것이 아니라 허리를

숙여서 인사를 하고, 헤어질 때는 자동차도 증인이 먼저 타고 떠나도록 하는 등

증인을 깍듯이 예우를 하였다는데, 맞는가요.

답    그렇습니다. 엘리트 관료출신으로 예절도 바르고 좋은 인상을 받았습니다.

문    증인은 검찰에서 '피고인 신정아가 사표를 낸 직후에 피고인 변양균이 전화를
      해서 "동대 왜 그래요, 총장님이 잘 해결하세요."라는 무례하고 협박성 말을 했
      다'고 진술하였는데, 피고인 변양균이 그런 말을 한 것이 맞는가요.

답    맞습니다.

문    피고인 변양균은 동국대학교를 지칭할 때 "동국대"라고 하지, "동대"라고 표현
      해 본 적이 없다는데, 피고인 변양균이 '동대'라는 표현을 쓴 것이 맞는가요.

답    증인은 '동대'라고도 하고 '동국대'라고도 해서 다른 사람이 '동국대'라고 했어도
      증인이 '동대'라고 기억할 수도 있습니다.

문    피고인 변양균은 증인에게 피고인 신정아를 예일대 후배이고, 동문회 등에서 가
      끔 만나는 사이라는 정도로만 소개하였는데, 그런 관계에 불과한데 피고인 신정
      아가 동국대에서 홀대를 받았다는 것에 대해서 증인에게 그렇게 무례하게 말할
      수가 있다는 것이 상식적으로 맞지 않는 것 같은데, 그렇게 말한 것이 분명한가
      요.

답    분명합니다.

문    피고인 변양균이 증인에게 피고인 신정아의 사표를 수리하지 말고 휴직처리를
      해달라는 부탁을 하였는가요.

답    그런 구체적인 이야기는 아닙니다.

문    피고인 신정아를 휴직 처리한 이유는 교육부에 교수채용신고까지 했는데 바로



사직처리를 하는 것이 대학의 신뢰에 문제가 있다고 생각했고, 또한 교양교육원이 설립되면 그곳에서 강의를 하도록 할 생각을 가지고 있었기 때문에 휴직으로 처리했던 것이지요.

답  그렇습니다.

문  황종연의 진술을 보면, 증인은 '신정아가 아주 훌륭한 인재로 학교로서는 필요한 인재인데 나가서 어떻게 하나.'라고 하면서 신정아를 놓치기 아깝다는 취지로 말을 하였다고 하는데, 맞지요.

답  그렇습니다.

문  동국대학교 기획예산팀장 김윤길로부터 신정아의 사표처리와 관련하여 '인사관리팀 직원과 얘기해 보니 선례가 있기 때문에 휴직처리를 하는 것은 큰 문제는 없을 것 같습니다.'라는 보고를 받은 적이 있는가요.

답  그렇습니다.

문  증인은 피고인 변양균과 조계종단과의 관계에 대해서, 수사 처음에는 '변양균이 종단과 어떤 관계인지에 관해 구체적으로는 알지 못한다.'라고 진술하였는데, 기억하는가요.

답  예.

문  그런데 두 번째 조사 때는 '종단 주류 인사들과 교분이 두텁다'고 하였는데, 어떤가요.

답  그것은 1차 진술과 2차 진술 사이에 신문을 보고 알게 되었습니다.

문   처음에 진술한 것이 증인이 아는 대로 정확한 진술이라는 취지인가요.

답   예.

문   두 번째 진술은 그 사이에 신문보도를 보고 알게 된 사실을 진술한 것이라는
     취지인가요.

답   예, 증인은 교계의 권력관계에 대해서 전혀 관심이 없습니다.

문   종단 주류 인사들과 교분이 두텁다고 한 말은 그 사이에 신문에 보도된 내용을
     보고 진술하였다는 취지이지요.

답   예.

문   증인은 피고인 신정아가 사직서를 제출하였는데도 휴직처리만 한 점에 대해서
     '변 장관이 전화를 하고, 그분이 우리 재단과 대치 상태에 있는 종단 주류와 친
     분이 많은 분이라는데 생각이 미치자 잘못하면 동국대와 재단에 큰 피해를 입
     을 수도 있겠다는 생각이 들어 아쉬하였습니다. 안 그래도 일부 종단 주류측 재
     단 이사들이 학교 발전을 위한 노력에 찬물을 끼얹는데, 종단 주류 인사들과 교
     분이 두터운 기획예산처 장관마저 동국대에 적대감을 갖는다면 정말 큰일이었
     던 것입니다.'라고 진술되어 있고, 위와 같은 말은 전화를 받고 신정아에 대한
     휴직처리 사이에 증인의 생각을 진술한 것으로써 증인이 사후에 신문을 보고
     피고인 변양균이 종단 주류 측과 친분이 있다는 것을 알게 되었다고 한 진술과
     는 다른데, 어떤가요.

답   증인이 두 번째 또는 세 번째 진술에서 한 이야기인데, 한 사태를 해석하는 데

에는 여러 가지 관점과 여러 심리적 계기가 복합적으로 작용할 수 있기 때문에 그런 요소도 있을 수 있지 않느냐는 검찰의 질문에 증인이 동의한 것뿐입니다.

판    사

증인에게

문    당시 그런 생각이 있었다는 뜻이 아니라, 나중에 검찰에서 그런 식으로 물어보아서 그렇게도 생각할 수 있겠다고 진술한 것이라는 취지인가요.

답    예, 당시에는 거기까지 가지 않았고, 아까 문찬석 검사와 이야기한 바와 같이 변양균은 불교계에 드문 리더 중의 한 사람인데, 기획예산처 장관과 그렇게 소원할 필요가 없다는 생각이야 갖지 않을 수 없었습니다.

피고인 변양균의 변호인

증인에게

문    피고인 신정아의 복직과 관련하여서 황종연은 검찰에서 '당시 신정아는 동국대로 오고 싶어 하는 분위기가 아니었고, 오히려 학교에서 신정아 교수를 초빙하려고 애를 쓰던 상황이었는데, 그래서 제가 신정아 교수에게 성곡미술관 큐레이터를 겸직하게 해주면 학교로 돌아오겠느냐고 제의를 했고 며칠 후 신정아 교수가 "그러면 돌아가겠다.'라고 해서 복직이 되었다'는 취지로 진술하였는데, 사실이 그렇게 이루어진 것이 맞는가요.

답      예, 증인도 그 이야기를 하였습니다. 학교에 겸직 규정이 있는데, 총장이 동의하

        지 않을 경우에만 겸직이 안 되고, 총장이 동의하면 겸직이 되는데, 학생들의

        현장 실습이나 진출을 위해서 유용한 경우에는 겸직을 허용합니다. 미술관은 미

        술과 학생들에게 분명히 도움이 되기 때문에 겸직을 허용하였습니다. 


피고인 신정아의 변호인

                증인에게

문      증인이 동국대학교 총장으로 재직한 약 4년간 특채형식으로 채용한 교수가 몇

        명이나 되는가요.

답      36명 정도 되는 것으로 기억합니다.

문      이중 총장이 각 학과에 채용을 권유하는 형식, 소위 탑다운(top-down) 방식으

        로 채용한 교수는 몇 명이나 되는가요.

답      꼭 총장이 인선을 한다는 뜻은 아닙니다마는 탑다운 방식으로 한 것이 36명 정

        도 된다는 것입니다.

문      그런 경우에도 교원인사위원회의 심의절차, 이사회 승인 등의 내부절차를 거쳐

        채용을 하는 것이지, 증인이 독단적으로 채용하는 것은 아니지요.

답      독단적으로 할 수 있는 구조가 전혀 안됩니다. 탑다운이든, 바텀업이든 전부 똑

        같은 과정을 거치고, 다만 학생들 앞에서 수업하는 것만 면제가 됩니다.

문      해당 학과 교수들의 입장에서 볼 때 탑다운 방식은 교수들의 영향력이 감소하

는 것이므로 추천받은 인사의 자질 여하에 관계없이 반대하려는 경향이 기본적

으로 있지요.

답    그렇습니다.

문    아무리 총장이 추천하는 인사라 하더라도 해당 학과의 동의, 교원인사위원회의

심의, 이사회 승인 등 내부절차의 어느 한 가지라도 충족이 되지 않으면 교수채

용을 할 수 없지요.

답    예, 그렇습니다.

문    증인은 피고인 신정아를 교수로 추천하기 위해 학부 미술학과와 대학원 미술사

학과를 대상으로 그들의 의사를 타진하였지요.

답    예.

문    학부 미술학과에서는 미술사학의 강의를 자체 인원으로 감당할 수 있다고 하여

몇 년 전 주임 교수가 작고한 후에 불교미술사학과이지만 T.O.가 한 자리 났기

때문에 동국대학교 100주년 맞이하여 여러 기획 관련 일로 피고인 신정아 채용

을 대학원 미술사학과 쪽으로 알아보게 되었지요.

답    그렇습니다.

문    당시 미술사학과에는 교수가 2명밖에 없었는데 그나마 1명의 교수는 몸이 아파

강의를 제대로 할 수가 없었기 때문에, 학과 운영과 강의가 제대로 이루어지지

않아 학생들의 불만도 높았고, 새로운 교수의 충원이 필요한 상황이었지요.

답    예, 총장실에 와서 학생들의 불만이 많았고, 석사와 박사만 56명이었기 때문에

5명 정도의 교수가 필요한 상황이었습니다.

문    미술사학과의 적정 교수 수는 5명 정도인가요.

답    교원적정수를 따지는 것이 4.7~4.8명 정도 되니까 5명이라고 볼 수 있습니다.

문    증인은 동국대학교가 다른 대학에 비해 상대적으로 서양미술사학이 약한 것을
      고려해서 미술사학과에는 서양미술사를 전공한 교수도 반드시 필요하다는 생각
      을 갖고 있었지요.

답    그렇습니다.

문    증인은 피고인 변양균으로부터 피고인 신정아를 추천받은 후, 나름대로 피고인
      신정아의 경력과 자질, 미술계나 학계의 평가 등에 관해 알아보았고, 그 결과
      교수로서의 자질이 있다고 판단하여 학과에 추천을 한 것이지요.

답    그렇습니다.

문    만일 당시 피고인 신정아를 아무리 피고인 변양균이 추천하였다고 하더라도 피
      고인 신정아 자신이 자질이 부족하거나 교수로서 적절한 모든 여건을 갖지 않
      았다면 추천할 이유가 없었지요.

답    예.

문    당시 불교미술사학과나 미술학과에서 피고인 신정아의 채용을 반대한 것은 불
      교미술사학과에 서양미술사 전공자가 필요 없다는 것이었지, 피고인 신정아의
      자질이 부족하다거나 기타 다른 결격사유가 있었기 때문은 아니었지요.

답    그것은 아니고, 불교미술사학과가 아니라 미술사학과입니다. 그렇기 때문에 서

양미술사 전공자가 적어도 학생들을 가르쳐서 한두 과목이라도 듣고 나가야 미술사학과를 다닌 학생답지, 불교미술사학과라고 하는데 천만의 말씀입니다. 서양미술사 과목이 다 있고, 기획전시론도 있고 큐레이터 서양미술사는 신정아의 학력과 경력이 사실이었다면 아주 적합한 경우였습니다.

문    증인은 교수임용을 위해 피고인 신정아를 직접 면접하였지요.

답    예, 증인을 포함하여 5명이 면접을 하였습니다.

문    당시 동국대학교는 100주년 기념사업으로 각종 행사를 기획하고 있었는데, 증인은 이러한 행사에 피고인 신정아의 기획능력이 도움이 될 수 있다고 생각하였는가요.

답    그렇습니다. 대단히 기대를 크게 하였습니다.

문    면접 결과 피고인 신정아의 교수로서의 자질이 부족하다거나 피고인 변양균의 추천이 없었다면 교수로 채용하지 않았을 만한 다른 결격사유를 발견한 것이 있었는가요.

답    그런 것은 없었습니다.

문    증인이 유석천 기획처장이나 학과 교수들에게 피고인 신정아의 추천을 권유하였을 때 피고인 변양균의 부탁이 있었다는 말을 그 당시 하였는가요.

답    하지 않았습니다.

문    교원인사위원회는 몇 명의 위원으로 구성되어 있는가요.

답    약 10여명으로 구성되어 있고, 학기마다 조금씩 다를 수 있습니다.

문    이사회는 몇 명의 이사로 구성되는가요.

답    이사는 13명인데 그 중 9명이 스님, 4명이 재가자입니다.

문    결국 기획처장, 미술사학과 교수들, 교원인사위원회 위원들, 이사회 이사들은 모두 피고인 변양균의 추천이 있었는지 여부를 모른 채 자신들의 판단에 의해 피고인 신정아의 채용을 동의 또는 결정한 것이 아닌가요.

답    증인 혼자만 변양균 장관이 추천하였다는 것을 늘 의식하였지만 겉으로 실무자들에게는 그 이야기를 하지 않았기 때문에 다른 사람들은 전혀 몰랐습니다.

문    증인은 2005. 9. 23.경 예일대 측에 피고인 신정아의 학위에 대해 검증을 요청하는 공문을 팩스로 보냈지요.

답    예.

문    이에 대해 예일대 측으로부터 피고인 신정아의 학위가 진실이라는 답신 공문을 팩스로 받았지요.

답    예.

문    예일대는 나중에 위 팩스가 진실한 것이 아니라고 주장하였으나, 최근 다시 위 주장을 번복하고, 셔마이스터 부학장 명의의 위 확인팩스는 진정한 것이고, 예일대에서 보낸 팩스가 맞다는 내용의 우편을 동국대에 보내왔는데, 증인도 이 사실을 알고 있는가요.

답    예, 자기들이 실수로 확인을 해서 보냈다고 왔습니다.

판     사

증인에게

문     신정아가 사표를 냈을 때 휴직처리를 한 것과 관련한 검찰 신문에서 "검찰에서

는 그분(피고인 변양균)이 국가의 재정을 총괄하는 분이기 때문에 동국대에 관하

여 좋지 않은 감정을 가지게 된다면 동국대의 각종 국고지원사업에 있어 심각

한 지장이 있을 수 있다고 생각하였다고 진술하였는데, 맞는가요."라는 질문에

맞다고 답변하였는데, 당시에도 이런 생각이 있었는가요.

답     당시에는 그런 생각이 없었습니다.

문     나중에 검찰에서 그러한 취지로 물어보았을 때 그렇게 생각할 수도 있다고 생

각되어서 맞다고 한 것인가요.

답     막연하게나마 포괄적으로 그렇게 생각할 수도 있다고 동의하였습니다.

문     더하고 싶은 말이 있는가요.

답     동국대학은 100년이 넘은 민족사학인데, 일제 때 민족운동을 한다고 2번 폐교를

당한 이후에 이렇게 큰 고통을 겪은 것은 처음입니다. 100년 역사에 오점이 남

겨졌고, 20만 동료는 수치심 때문에 치를 떨고 있고, 수천 명의 교수와 직원들

은 현재 실의와 절망감에 빠져서 어찌할 바를 모르고 있으며, 학생들은 분노와

흥분으로 공부도 제대로 이루어지지 않고 있습니다. 한 대학이라는 것이 그렇게

호락호락한 것이 아닌데, 이 사건으로 인해서 말할 수 없는 상처를 입었습니다.

변양균이 처음부터 털고 솔직하게 나오고 엘리트 관료 출신답게, 권력의 핵심에



있는 사람답게, 당당하게 이 문제를 밝히고 나왔다면 이렇게까지 문제가 복잡해

지지는 않았을 것이라는 생각입니다. 증인은 지금 흉악무도한 사건의 공범자처

럼 언론에 끊임없이 비추어져서 앞길이 다 막혔지만 그것은 증인의 개인적인

문제이니까 그렇다 하더라도 한 학교가 당한 이 일에 대해서 단 한마디 사과가

없다는 것은 한 학교의 책임자였던 증인으로서는 분개하지 않을 수가 없고, 어

째서 지금 와서도 그 사실을 은폐하는지 모르겠습니다. 이렇게 되면 다소 형량

은 줄일지 모르지만 양심의 고통과 양심의 독은 더하다는 생각입니다. 언제 기

회가 닿으면 동국대에 대해서는 피고인들이 깊이 사과를 하고, 평생 사죄를 해

야 됩니다. 한 대학이 입은 상처는 그렇게 간단한 일이 아닙니다.


2008.        1.        7.


법 원 주 사 보          조  식  레



판        사        김  명  섭

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated the Hong Trial Testimony from the Korean language into the English language.

I further certify that translation of the Hong Trial Testimony from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_____
Kwang Park
**Professional Translator**

Subscribed and sworn to before me on _____27_____ day of _July_ , _2011_ (year)

_____
(Signature of Notary)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Notary Stamp)

# EXHIBIT 3

[DONGGUK0358382]

School Corporation Dongguk University

26 Pil-dong, 3-ga, Jung-gu, Seoul (100-715) / TEL (02) 2260-3010 / FAX (02) 2260-8973
Corporation Office Manager: Kye Hyun Kim, Section Head: Kyu Hwan Kim, Representative:
Jin Soo Park (E-mail: jspark@dongguk.edu)

| Document No.: Enforcement | Donghak 2005-384 | Approval | President | [signature] | Instruct-ion | | |
|---|---|---|---|---|---|---|---|
| Date: (via) | 9/1/2005 (Year    ) | Filing | Date & Time | 9/1/2005 | Approval · Circula-tion | Dept. Mana-ger | Vaca nt |
| To: | President, Dongguk University | | No. | 291 | | Team leader | [signa -ture] |
| CC: | | Processing Team | Personnel Management Team | | | | |
| | | Representa-tive | Sung Hum Yang (seal) | | | | |

Subject:       Notice of teacher appointment

According to the resolution from the 212th board of directors' meeting (8/30/2005) of this
Corporation, the personnel appointment is given as in the attachment and notified.

Attachment: List of teacher appointment, 1 copy, END.

[stamp:]
Filed
No. 908
9/1/2005
Dongguk University

Chairman, School Corporation Dongguk University [seal]

[DONGGUK0358383]

## List of Teacher Appointments

1. New Appointments

A. Special Employments

| No. | Name | Details of Appointment | Date of Appointment | Appointment Term | Remarks |
|-----|------|------------------------|---------------------|------------------|---------|
| 1 | Jeong Ah Shin | Appointment: Assistant Professor Fine Arts History Dept., Graduate School | 9/1/2005 | 9/1/2005 - 8/31/2008 | |
| 2 | REDACTED | Appointment: Assistant Professor History Dept., College of Liberal Arts | 9/1/2005 | 9/1/2005 - 8/31/2008 | |
| 3 | | Appointment: Associate Professor Law Dept., College of Law | 9/1/2005 | 9/1/2005 - 8/31/2008 | |
| 4 | | Appointment: Associate Professor Law Dept., College of Law | - | - | Date and term of appointment to be determined |
| 5 | | Appointment: Associate Professor Biochemical Engineering Dept., College of Engineering | 9/1/2005 | 9/1/2005 - 8/31/2008 | |
| 6 | | Appointment: Associate Professor Medical Dept., Medical School | 9/1/2005 | 9/1/2005 - 8/31/2008 | |

\* New appointment of associate professor Paul Grusendorf in the department of law of College of Law was approved, but the date and term of his appointment were delegated to the chairman by the board of directors so that he might be appointed according to the time frame of law school application, so the personnel decision will be recommended depending upon its future progress.

B. Foreign teachers

| No. | Name | Details of Appointment | Date of Appointment | Appointment Term |
|-----|------|------------------------|---------------------|------------------|
| 1 | REDACTED | Appointment: Associate Professor Chinese Literature Dept., College of Liberal Arts | 9/1/2005 | 9/1/2005 - 8/31/2006 |
| 2 | | Appointment: Associate Professor Chinese Literature Dept., College of Liberal Arts | 9/1/2005 | 9/1/2005 - 8/31/2006 |
| 3 | | Appointment: Full-time Instructor International Education Academy | 9/1/2005 | 9/1/2005 - 8/31/2006 |

| 4 | | Appointment: Full-time Instructor<br>International Education Academy | 9/1/2005 | 9/1/2005 - 8/31/2006 |
|---|---|---|---|---|
| 5 | REDACTED | Appointment: Full-time Instructor<br>International Education Academy | 9/1/2005 | 9/1/2005 - 8/31/2006 |
| 6 | | Appointment: Full-time Instructor<br>International Education Academy | 9/1/2005 | 9/1/2005 - 8/31/2006 |
| 7 | | Appointment: Full-time Instructor<br>International Education Academy | 9/1/2005 | 9/1/2005 - 8/31/2006 |

41

# 학 교 법 인   동 국 대 학 교

| ⑩100 - 715   서울시 중구 필동 3가 26번지   /전화 (02) 2260-3010 /전송 (02) 2260 - 8973 |
|---|
| 법인사무처   부장 김계현   과장 김규환   담당 박진수(E-mail  jspark@dongguk.edu) |

문서번호  동학 2005-384호

시행일자  2005. 9.  1.(    년)

(경 유)

수    신   동국대학교 총장

참    조

제    목   교원 인사발령 통보

| 선결 | 총 장 | (서명) | 지시 | | |
|---|---|---|---|---|---|
| 접수 | 일자시간 | 2005. 9. 1 | 결재 | 처 장 | 공람 |
| | 번호 | 2091 | 공람 | 팀 장 | (서명) |
| 처리과 | 인사연락팀 | | | | |
| 담당자 | 양 성동 | | | | |

　　　　본 법인 제212회 이사회(2005. 8. 30) 결의에 따라 붙임과 같이 인사발령하고
통보합니다.

────────────────────────────────────

첨    부   교원인사발령자 명단 1부. 끝.



학 교 법 인   동 국 대 학 교   이 사 

Confidential

DONGGUK0358382

# 교원인사발령자 명단

## 1. 신규임용

### 가. 특별채용

| 번호 | 성명 | 발령내용 | 발령일자 | 임용기간 | 비고 |
|---|---|---|---|---|---|
| 1 | 신정아 | 임. 조교수<br>명. 대학원 미술사학과 | 2005.9.1 | 2005.9.1~2008.8.31 | |
| 2 | | 임. 조교수<br>명. 문과대학 사학과 | 2005.9.1 | 2005.9.1~2008.8.31 | |
| 3 | | 임. 부교수<br>명. 법과대학 법학과 | 2005.9.1 | 2005.9.1~2008.8.31 | |
| 4 | REDACTED | 임. 부교수<br>명. 법과대학 법학과 | - | - | 발령일자 및<br>임용기간 미정 |
| 5 | | 임. 부교수<br>명. 공과대학 생명화학공학과 | 2005.9.1 | 2005.9.1~2008.8.31 | |
| 6 | | 임. 조교수<br>명. 의과대학 의학과 | 2005.9.1 | 2005.9.1~2008.8.31 | |

※법과대학 법학과 부교수 폴 그루센도르프의 신규임용은 승인하되, 발령일자 및 임용
기간은 로스쿨신청시기에 맞추어 임용할 수 있도록 이사회에서 이사장에게 위임하였
기에 향후 진행상황에 따라 인사 재청할 것.

### 나. 외국인 교원

| 번호 | 성명 | 발령내용 | 발령일자 | 임용기간 |
|---|---|---|---|---|
| 1 | | 임. 부교수<br>명. 문과대학 중어중문학과 | 2005.9.1 | 2005.9.1~2006.8.31 |
| 2 | | 임. 부교수<br>명. 문과대학 중어중문학과 | 2005.9.1 | 2005.9.1~2006.8.31 |
| 3 | | 임. 전임강사<br>명. 국제교육원 | 2005.9.1 | 2005.9.1~2006.8.31 |
| 4 | REDACTED | 임. 전임강사<br>명. 국제교육원 | 2005.9.1 | 2005.9.1~2006.8.31 |
| 5 | | 임. 전임강사<br>명. 국제교육원 | 2005.9.1 | 2005.9.1~2006.8.31 |
| 6 | | 임. 전임강사<br>명. 국제교육원 | 2005.9.1 | 2005.9.1~2006.8.31 |
| 7 | | 임. 전임강사<br>명. 국제교육원 | 2005.9.1 | 2005.9.1~2006.8.31 |

41

Confidential

DONGGUK0358383

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0358382-83 from the Korean language into the English language.

I further certify that translation of DONGGUK0358382-83 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Kwang Park
**Professional Translator**

State of California, County of _RIVERSIDE_
Subscribed and sworn to (or affirmed) before me
on this _29_ day of _JULY_, 20 _11_,
by _KWANG PARK_,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature: _____

Subscribed and sworn to before me on _____ day of _____ , _____ (year)

(Signature of Notary)

WILLIAM BROWN
COMM. #1934369
Notary Public · California
Riverside County
My Comm. Expires Apr. 29, 2015

(Notary Stamp)