# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------ x

DONGGUK UNIVERSITY,                  :

        Plaintiff,                :   No. 3:08-CV-00441 (TLM)

     v.                              :

YALE UNIVERSITY,                     :

        Defendant.

------------------------------------ x

## PLAINTIFF DONGGUK UNIVERSITY'S ANSWERS AND OBJECTIONS TO DEFENDANT YALE UNIVERSITY'S THIRD SET OF REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, plaintiff Dongguk University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby submits the following answers and objections to defendant Yale University's ("Yale") Third Set of Requests to Admit (the "Requests") as follows:

## RESERVATION OF RIGHTS

1.      Dongguk's answers and objections are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve all questions as to their competency, authenticity, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the answers or subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

2.      Dongguk preserves the right to object on any ground to the use of said answers, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

3.      Dongguk reserves the right to supplement or amend these answers in light of facts or information that may be discovered or brought to light after submission of these answers.

- 1 -

REQUEST FOR ADMISSION NO. 2

The Legal Education Committee appointed by the Korean Ministry of Education awarded

the following scores to the following universities' applications for permission to open "U.S.

style" law schools:

| University | Total Score | Quantitative Score | Qualitative Score |
|---|---|---|---|
| Seoul National University | 934.6 | 599.3 | 335.3 |
| Yonsei University | 904.3 | 588.4 | 315.9 |
| Sungkyunkwan University | 896.5 | 595 | 301.5 |
| Korea University | 892.5 | 581 | 311.5 |
| Ihwa Women's University | 888.7 | 586 | 302.7 |
| Hanyang University | 879.7 | 589.3 | 290.4 |
| Kyunghee University | 869.1 | 576.3 | 292.8 |
| University of Seoul | 864 | 588.5 | 275.5 |
| Chung-Ang University | 863.1 | 578.9 | 284.2 |
| Hankuk University of Foreign Studies | 861.4 | 568.1 | 293.3 |
| Sogang University | 860.5 | 577.7 | 282.8 |
| Konkuk University | 857.8 | 582.2 | 275.6 |
| Ajou University | 848.5 | 558.9 | 289.6 |
| Dongguk University | 834.9 | 553.2 | 281.7 |
| Inha University | 834.2 | 578.7 | 255.5 |
| Kookmin University | 824.8 | 564.3 | 260.5 |
| Hongik University | 820.3 | 561.4 | 258.9 |
| Dankook University | 801.1 | 550.6 | 250.5 |
| Kangwon University | 800 | 544.1 | 255.9 |
| Sookmyung Women's University | 793.8 | 543.8 | 250 |
| Soongsil University | 773.3 | 539.9 | 233.4 |
| Myungji University | 730.4 | 521.8 | 208.6 |
| Sungshin Women's University | 690.4 | 502.8 | 187.6 |
| Kyonggi University | 677.8 | 480.1 | 197.7 |

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk states that it lacks

knowledge or information sufficient to enable it to admit or deny the request.  Specifically,

while Dongguk requested that the Korean Ministry of Education provide to Dongguk an

original of the list of scores awarded to the universities in their applications for permission to

open "U.S. style" law schools, the Korean Ministry of Education refused to do so.  Instead, the

Korean Ministry of Education submitted a non-original version of the score sheet.  Dongguk cannot determine if the version submitted is accurate.  Accordingly, after making reasonable inquiry, the information that Dongguk knows or can readily obtain is insufficient to enable it to admit or deny the request.

## REQUEST FOR ADMISSION NO. 3

Among the 24 universities in the Seoul Metropolitan Region that applied for permission to open "U.S. style" law schools, Dongguk's qualitative score ranked twelfth.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request to the extent the phrase "in the Seoul Metropolitan Region" is vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Based on the reasons set forth in Request for Admission No. 2, Dongguk understands that it received a qualitative score of 250, which after the sub-division, was the lowest qualitative score in the Seoul District.

Prior to the unexplained sub-division by the Korean Ministry of Education, fifteen universities in the Seoul Metropolitan Region, based on the combined quantitative and qualitative scores, were slotted to be permitted to open "U.S.-style" law schools.  Prior to the sub-division, Dongguk's combined total ranked it fourteenth (14) in the Seoul Metropolitan Region.  However, after the sub-division, because Dongguk received the lowest combined score within its sub-division (Seoul District), the Korean Ministry of Education did not grant it permission to open a U.S.-style law school.  Universities that had combined scores lower than that of Dongguk prior to the sub-division, such as Kangwon University, were permitted to open law schools.

into the following districts:  Seoul District, Kyonggi District, Incheon District, and Kangwon

District.  After the Legal Education Committee further sub-divided the Seoul Metropolitan

District into four districts, Inha University was the only university in the Incheon District that

received permission to open a "U.S. style" law school.

## REQUEST FOR ADMISSION NO. 7

Kangwon University is the only university in the Kangwon District that has received

permission to open a "U.S. style" law school.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request to the extent the phrase "in the Kangwon

District" is vague and ambiguous.  Subject to and without waiving the foregoing specific

objection and General Objections, Dongguk denies this request.  In 2007, the Legal Education

Committee initially grouped universities that were applying for permission to open "U.S. style"

law schools into five districts based on geography.  After the universities had been ranked based

upon quantitative and qualitative scores within those five districts, for no apparent or stated

reason, the Legal Education Committee further sub-divided only the Seoul Metropolitan District

into the following districts:  Seoul District, Kyonggi District, Incheon District, and Kangwon

District.  After the Legal Education Committee further sub-divided the Seoul Metropolitan

District into four districts, Kangwon University was the only university in the Kyonggi District

that received permission to open a "U.S. style" law school.

## REQUEST FOR ADMISSION NO. 8

The document attached hereto as Exhibit A lists the factors upon which the Legal

Education Committee appointed by the Korean Ministry of Education relied to determine the

quantitative and qualitative scores of the universities that applied for permission to open "U.S.

style" law schools.

<u>OBJECTIONS AND ANSWER:</u>

Subject to and without waiving the General Objections, Dongguk denies this Request. Exhibit A is an informal English translation created by Dongguk of the factors the Legal Education Committee apparently relied on to determine quantitative and qualitative scores of the universities that applied for permission to open "U.S. style" law schools. Attached hereto is the Korean version of the document created by Dongguk, of which Exhibit A is a translation.

<u>REQUEST FOR ADMISSION NO. 9</u>

The document numbered DONGGUK0273415 — DONGGUK0273420 (attached hereto as Exhibit B) lists the factors upon which the Legal Education Committee appointed by the Korean Ministry of Education relied to determine the quantitative and qualitative scores of the universities that applied for permission to open "U.S. style" law schools.

<u>OBJECTIONS AND ANSWER:</u>

Dongguk specifically objects to this Request to the extent the word "relied" is vague and ambiguous. Subject to and without waiving the foregoing specific objection and General Objections, Dongguk admits that the authenticity of Exhibit B. However, Dongguk states that it lacks knowledge or information to enable it to admit or deny what factors the Legal Education Committee actually relied on to determine the quantitative and qualitative scores of the universities that applied for permission to open "U.S. style" law schools.

<u>REQUEST FOR ADMISSION NO. 10</u>

Jeong Ah Shin did not provide a copy of her purported Yale diploma to Dongguk before 2007.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk admits this Request.

**REQUEST FOR ADMISSION NO. 11**

Dongguk did not receive a copy of Jeong Ah Shin's purported Yale diploma before 2007.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk admits this Request.

**REQUEST FOR ADMISSION NO. 12**

Jeong Ah Shin never provided copies of her purported University of Kansas diplomas to Dongguk.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Request to the extent the phrase "purported University of Kansas diplomas" is vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this request.  In 2005, at the time she applied for a position with Dongguk, Shin provided to Dongguk copies of certification letters as proof of her diplomas from the University of Kansas.

**REQUEST FOR ADMISSION NO. 13**

Dongguk never received copies of Jeong Ah Shin's purported University of Kansas diplomas.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk admits this Request.

**REQUEST FOR ADMISSION NO. 14**

The chart below identifies the total number of companies that participated in Dongguk recruiting events and/or job fairs in 2006-2009 and the number of top 100 companies that

participated in those events in those years.  (If a company participated in both a job fair and a recruiting event, it is counted only once.)

|  | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Total Number of Companies | 37 | 54 | 75 | 105 |
| Number of Top 100 Companies | 19 | 27 | 27 | 21 |

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk admits this Request.

**REQUEST FOR ADMISSION NO. 15**

In 2002, 60.61% of Dongguk students had jobs prior to graduation.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Request as vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Dongguk states that 60.61% of Dongguk's undergraduate students in the class graduating in February 2002 had accepted job offers from employers prior to graduation.  The survey was conducted between April and May 2002.

**REQUEST FOR ADMISSION NO. 16**

In 2003, 60.7% of Dongguk students had jobs prior to graduation.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Request as vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Dongguk states that 60.7% of Dongguk's undergraduate students in the class graduating in February 2003 had accepted job offers from employers prior to graduation.  The survey was conducted between April and May 2003.

## REQUEST FOR ADMISSION NO. 17

In 2004, 61% of Dongguk students had jobs prior to graduation.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request as vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Dongguk states that 61% of Dongguk's undergraduate students in the class graduating in February 2004 had accepted job offers from employers prior to graduation.  The survey was conducted between April and May 2004.

## REQUEST FOR ADMISSION NO. 18

In 2005, 60% of Dongguk students had jobs prior to graduation.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request as vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Dongguk states that 60% of Dongguk's undergraduate students in the class graduating in February 2005 had accepted job offers from employers prior to graduation.  The survey was conducted between April and May 2005.

## REQUEST FOR ADMISSION NO. 19

In 2006, 70.9% of Dongguk students had jobs prior to graduation.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request as vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Dongguk states that 70.9% of Dongguk's undergraduate students in the class

graduating in February 2006 had accepted job offers from employers prior to graduation. The survey was conducted between April and May 2006.

## REQUEST FOR ADMISSION NO. 20

In 2007, 73.1% of Dongguk students had jobs prior to graduation.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request as vague and ambiguous. Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request. Dongguk states that 73.1% of Dongguk's undergraduate students in the class graduating in February 2007 had accepted job offers from employers prior to graduation. The survey was conducted between April and May 2007.

## REQUEST FOR ADMISSION NO. 21

In 2008, 72.7% of Dongguk students who had jobs prior to graduation.

### OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request as vague and ambiguous. Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request. Dongguk states that 72.7% of Dongguk's undergraduate students in the class graduating in February 2008 had accepted job offers from employers prior to graduation. The survey was conducted between April and May 2008.

## REQUEST FOR ADMISSION NO. 22

In 2009, 67.8% of Dongguk students who had jobs prior to graduation.

OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Request as vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this Request.  Dongguk states that 67.8% of Dongguk's undergraduate students in the class graduating in February 2009 had accepted job offers from employers prior to graduation.  The survey was conducted between April and May 2009.

Dated: February 28, 2011

                                           MCDERMOTT WILL & EMERY LLP

                                           By: _____
                                               Robert A. Weiner
                                               Audrey Lu
                                               340 Madison Avenue
                                               New York, New York 10173-1922
                                               (212) 547-5400
                                               *Attorneys for Plaintiff Dongguk University*

Of Counsel:
Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz, P.C.
350 Orange Street
New Haven, Connecticut 06511
(203) 951-3720

## VERIFICATION

I, _Jin-Soo Han_, hereby certify that I have reviewed the above Requests for Admission and responses thereto and that they are true and accurate to the best of my knowledge and belief.

Name: Jin-Soo Han

Title: Vice President

Subscribed and sworn to before me this _28_ day of _Feb_, 2011.

NOTARY PUBLIC

Keong Hee Ryu

- 15 -

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------ x

DONGGUK UNIVERSITY,                          :

        Plaintiff,                         :   No. 3:08-CV-00441 (TLM)

        v.                                 :

YALE UNIVERSITY,                             :

        Defendant.                         :

------------------------------------ x

**PLAINTIFF DONGGUK UNIVERSITY'S SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANT YALE UNIVERSITY'S THIRD SET OF REQUESTS FOR ADMISSION**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, plaintiff Dongguk University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby submits the following answers and objections to defendant Yale University's ("Yale") Third Set of Requests to Admit (the "Requests") as follows:

## RESERVATION OF RIGHTS

1.      Dongguk's answers and objections are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve all questions as to their competency, authenticity, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the answers or subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

2.      Dongguk preserves the right to object on any ground to the use of said answers, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

3.      Dongguk reserves the right to supplement or amend these answers in light of facts or information that may be discovered or brought to light after submission of these answers.

## GENERAL OBJECTIONS

The following General Objections apply to and are hereby incorporated in each of Dongguk's answers to the Requests and shall have the same force and effect as if set forth in full in response to each individually numbered Request. The stated General Objections shall be deemed continuous throughout the answers to the specific Requests that follow even though not specifically referred to therein.

1.      Dongguk objects to the Requests to the extent they request information that is protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Dongguk hereby claims such privileges and protections to the extent implicated by any of the Requests or any other subsequent request and Dongguk shall exclude privileged and protected information from its answers to the Requests. Any disclosure of any privileged or protected information in response to any such Request is inadvertent and not intended to waive any privilege or protection.

2.      Dongguk objects to the Requests to the extent they purport to impose obligations on Dongguk that are beyond those set forth in Rules 26 and 36 of the Federal Rules of Civil Procedure. Dongguk will fully comply with Rules 26 and 36 of the Federal Rules of Civil Procedure in answering the Requests served by Yale.

## SPECIFIC OBJECTIONS AND ANSWERS TO REQUESTS FOR ADMISSION
## REQUEST FOR ADMISSION NO. 12

Jeong Ah Shin never provided copies of her purported University of Kansas diplomas to Dongguk.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Request to the extent the phrase "purported University of Kansas diplomas" is vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk denies this request.  In 2005, at the time she applied for a position with Dongguk, Shin provided to Dongguk copies of certification letters as proof of her diplomas from the University of Kansas.

**SUPPLEMENTAL ANSWER:**

Subject to and without waiving the General Objections, Dongguk admits this Request.

Dated: March 8, 2011

MCDERMOTT WILL & EMERY LLP

By: _____
     Robert A. Weiner
     Audrey Lu
340 Madison Avenue
New York, New York 10173-1922
(212) 547-5400
*Attorneys for Plaintiff Dongguk University*

Of Counsel:
Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz, P.C.
350 Orange Street
New Haven, Connecticut 06511
(203) 951-3720

## VERIFICATION

I, _Jin-Sun Han_ , hereby certify that I have reviewed the above Requests for Admission and responses thereto and that they are true and accurate to the best of my knowledge and belief.

Name: _Jin-Sun Han_

Title: _Chairman, Judicial Affairs Committee_

Subscribed and sworn to before me this _8th_ day of _March_ 2011.

NOTARY PUBLIC

Kwang Joong Kwon

# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)


------------------------x   VOLUME I

DONGGUK UNIVERSITY,          :

      Plaintiff,         :

   -versus-                  :

YALE UNIVERSITY,             :

      Defendant.         :

------------------------x


      Rule 30(b)(6) Deposition of EUIYON CHO,

taken pursuant to the Federal Rules of Civil

Procedure, at the law offices of Day Pitney LLP,

1 Audubon Street, New Haven, Connecticut, before

James A. Martone, L.S.R. #00248, and a Notary

Public in and for the State of Connecticut, on

July 26, 2010, at 10:27 a.m.

DONGGUK UNIVERSITY v. YALE UNIVERSITY

July 26, 2010

19   (Pages 70 to 73)

Page 70

1   the point when the prosecutor started their
2   investigation, which was answer to your previous
3   question.
4       Q.   What does Dongguk University believe --
5   Tell me, Mr. Cho, all of Dongguk University's
6   reasons -- other than what you claim is that the
7   investigation came after your correspondence with
8   Susan Carney, okay, the government investigation, tell
9   me all the reasons you believe the government's
10  investigation of Dongguk's finances relating to
11  government subsidies had anything to do with Yale.
12          MR. WEINER:   Well, first of all, he's
13  not here to speak for the university on that point.
14  He can answer in his individual capacity is fine with
15  me.
16          MR. SPRINGER:   We'll determine what
17  capacity he's answering in.
18      Q.   Go ahead, Mr. Cho, speak from, my point of
19  view, on behalf of Dongguk University.  Go ahead.
20          THE INTERPRETER:   I state again, when
21  you asked about the question about what point -- at
22  what point the prosecutor started investigation on
23  government subsidies, to my recollection, I'm just
24  giving you where I stand on that issue, not where
25  Dongguk University stands on that issue.  I paid

Page 71

1   attention at that point, strongly, whether Yale
2   received verification request for Jeong-Ah Shin or
3   not.
4          So I'm giving you the answer that that
5   was around the time when prosecutors began their
6   investigation, the issues relating to government
7   subsidies.  So, I'm not giving you any certain date
8   because I don't recall a date, I'm just giving you the
9   answer best of my knowledge.  I'm following the
10  events.
11      Q.   Okay.  Does Dongguk University have any
12  reasons to believe, other than timing, that the
13  government's investigation of its finances related to
14  subsidies it received had anything to do with Yale?
15      A.   To what extent?  If I --
16          MR. WEINER:   Do it in Korean so it's
17  clear.
18          MR. SPRINGER:   The witness can decide,
19  Bob.
20          MR. WEINER:   No, no, you know what, I
21  would prefer that it be really complete and we get the
22  right language.  These are important questions,
23  important answers.
24      A.   I'll do it in Korean.
25          THE INTERPRETER:   I believe the

Page 72

1   investigation was related to Shin Jeong-Ah at the
2   time.  Also, they related to Yale, so I suppose it was
3   not only directly related to Yale, but in a global
4   sense, it was directly related to Yale, at the matter
5   of the heart.
6       Q.   Any other reasons Dongguk has?
7       A.   No.
8           THE INTERPRETER:   No.
9       Q.   Now with regard to this investigation by the
10  prosecutor of finances, do you know what documents the
11  prosecutor seized?
12          THE INTERPRETER:   I do.
13      Q.   Who?  What?
14          THE INTERPRETER:   It was about the
15  planning, remodeling on the structure.
16      Q.   What structure?
17          MS. KIM:   He said so remodeling of the
18  structure of schools, universities.
19      A.   Since it's not the problem of translation,
20  it's the problem of wording, I think.  It's about the
21  project to be given to the leading universities of
22  reforming the academy structure.  That's the first
23  one.
24          And the second one was about project in
25  specialization of academy programs.

Page 73

1           The third one is about also
2   specialization in humanities program and culture.  And
3   those three things are the major government grants
4   given to Dongguk University at that time.
5       Q.   And that is what the prosecutor was
6   investigating, as far as you knew, that is, as far as
7   Dongguk University knew?
8       A.   Yes.
9       Q.   Now in the indicted facts here, it says
10  Dongguk University's financial situation was
11  weakening.  This is in 2006.  Does Dongguk agree that
12  its financial situation was weakening?
13      A.   No.  I don't know why they state this way.
14      Q.   Do you know what the prosecutor did to
15  investigate Dongguk's financial situation, in 2006?
16  That is -- 2005, and planning for the 100th year
17  anniversary event in 2006?
18          THE INTERPRETER:   I believe that the
19  heart of the investigation by prosecutors at the time
20  was whether Dongguk received any special favor from
21  the government to receive publicly known affairs or
22  grants.
23      Q.   Does Dongguk have any knowledge why the
24  prosecutor stated its, Dongguk's financial situation
25  was weakening in 2005?

DONGGUK UNIVERSITY v. YALE UNIVERSITY

July 26, 2010

24  (Pages 90 to 93)

---

**Page 90**

1    A.  They -- At first, Dongguk University
2  thought they were investigating about Shin's case,
3  Miss Shin's case, but later, they sent some of the
4  letters to Dongguk saying they are going to have some
5  people interviewed about projects that you mentioned
6  earlier.
7    Q.  About Dongguk's finances?
8    A.  About the project that Dongguk applied for
9  government grant.
10    Q.  So the subsidies that Dongguk received?
11    A.  Yeah, the government grants that Dongguk
12  received.
13    Q.  Okay.  Other than the prosecutor
14  investigating the government grants that Dongguk
15  received, was Dongguk the subject of any other
16  criminal investigation by the prosecutor in 2007?
17    A.  No.
18    Q.  You mentioned some letters that Dongguk
19  received.  What are those letters?
20    A.  Those letters --
21    Q.  If it helps to refer to the notebook, that's
22  fine, if they're in the notebook.
23    A.  The letters were about the kinds of document
24  they want to look at.
25    Q.  Was that a subpoena?

---

**Page 91**

1    A.  Part of that include.
2    Q.  Okay.  And when were those letters or --
3  Let me try to be clear.  I want to make sure that we
4  don't have a problem here.
5          Was it a subpoena that was issued?  Do
6  you understand what a subpoena is?
7    A.  Yes.
8    Q.  What is your understanding of what a
9  subpoena is?
10    A.  My understanding --
11    Q.  What is Dongguk's understanding of what a
12  subpoena is?
13    A.  Yeah.
14        MR. WEINER:  That's --
15        MR. SPRINGER:  Fair enough.
16    Q.  What's your understanding of what a subpoena
17  is?
18    A.  Okay.  Let me ask the translator to put
19  "subpoena" in Korean.  Then my understanding.
20    Q.  I'm going to try to short-circuit this,
21  Mr. Cho.  What documents did Dongguk receive --
22    A.  The documents --
23    Q.  Please let me finish.
24        What documents did Dongguk receive that
25  notified it that it was the subject of an

---

**Page 92**

1  investigation with regard to its finances concerning
2  the grants it received?
3        MR. WEINER:  He didn't say "finances."
4  You keep adding that word.  He said the grants
5  themselves.  So let's be precise.
6    A.  Okay.  My best recollection is the documents
7  that the prosecutors sent us reads like this.  In
8  investigating the forgery of Shin and obstruction made
9  by Shin, we need to have documents about, for example,
10  government grants that given to leading -- for
11  example, given to the project leading University of
12  reforming academy programs, for example.
13    Q.  Okay.  Do you have those documents in that
14  notebook?
15    A.  Yes.
16    Q.  What are they?
17    A.  What are they?
18    Q.  Yeah, what are they?  Tell me all the
19  documents you have with regard to the government's
20  investigation, and you can -- what we use is you will
21  see a number at the bottom of the document.
22    A.  Yup.
23    Q.  And so all I would like you to do is tell us
24  which documents they are.
25        (Pause in proceedings.)

---

**Page 93**

1    Q.  If it's helpful for you to have an index --
2        MR. SPRINGER:  I will represent to
3  Mr. Weiner, I don't want to see that index at this
4  point.  I know that you have one, and -- rather than
5  having Mr. Cho fumble through the documents.
6    A.  Okay.  I have it now.
7    Q.  Okay, good.  Tell me which documents they
8  are.
9    A.  Okay.  It's Dongguk 0344808.
10    Q.  0344808.
11    A.  Right.
12    Q.  Anything else that represents the documents
13  Dongguk received notifying it of the investigation?
14    A.  Also 0344810.
15    Q.  Anything else?
16    A.  Do I need to go on, if there is?
17    Q.  I want to know all the documents Dongguk
18  received notifying it of the investigation.
19        MR. WEINER:  Well, I'm not sure that
20  we -- we did go through them all.  He has what he
21  has.  He certainly doesn't have a personal or
22  corporate recollection of each precise document, but
23  we'll give you what's in there.
24        MR. SPRINGER:  Okay.
25    A.  0344813.  Yeah.  Those are the documents

---

DONGGUK UNIVERSITY v. YALE UNIVERSITY

July 26, 2010

25  (Pages 94 to 97)

---

Page 94

1    that the university got.
2       Q.  Does Dongguk know if there are any other
3    documents it may have received notifying it of the
4    prosecutor's investigation?
5       A.  Other than these?
6       Q.  Yes.
7       A.  No.
8       Q.  Okay.  Tell me, if you will, what Dongguk
9    understood the prosecutors to be investigating based
10   on those documents.
11      A.  First, what I can say is Dongguk refused
12   some of the documents they asked, because as the
13   investigation went on, we realized what they were
14   investigating has nothing -- had nothing to do with
15   Shin's forgery and Shin's obstruction of the school.
16      Q.  Let me ask it this way:  What suspected
17   crimes, if any, were the prosecutors investigating
18   with regard to Dongguk?  What crimes could -- was
19   Dongguk -- did Dongguk understand were being
20   investigated with regard to it?
21      A.  Okay.
22      Q.  If any?
23      A.  Later --  At this moment, if I am allowed to
24   correct myself, I said the investigation, that the
25   earlier investigation began late July, 2007, but at

---

Page 95

1    that time, the investigation was about Shin's forgery
2   and obstruction, mainly focused, but not about the
3   ones that you are asking, and the school thought
4   they -- the prosecutors were investigating whether
5   there were any preferential favor given to Dongguk
6   about the project, the government project that Dongguk
7   got.  That's the answer to you.
8      Q.  Okay.  And what crime was that?  What crime
9   did Dongguk understand was being investigated?
10      A.  No crime, but only the suspicion that
11   prosecutors had whether there were, as I said,
12   preferential or special favor given to Dongguk
13   concerning the project that Dongguk got from the
14   government.
15      Q.  And the -- was Dongguk's understanding that
16   this investigation of special favors was as a result
17   of the hiring of Shin?  Is that correct?
18      A.  Yes.
19      Q.  And also because Byeon was an influential
20   government minister?
21      A.  No.
22      Q.  That didn't have anything to do with the
23   government's investigation of the special favors?
24      A.  Since I'm -- I'm representing Dongguk.
25   Dongguk couldn't say whether Shin was influential

---

Page 96

1    about that or not.
2         MR. WEINER:  You mean Byeon?
3      A.  Byeon, sorry.
4         MR. WEINER:  Just so we understand
5    culturally, we have a little different concept.  You
6    have individual or private knowledge and then you have
7    public knowledge vis-a-vis what a company knows.  You
8    can explore that or not, but I'm trying to help you
9    out on that.
10        MR. SPRINGER:  I'm sure you are.
11        MR. WEINER:  Okay.
12      Q.  What did the investigation of Dongguk
13   consist of?  In other words, what did the prosecutors
14   do to investigate these grants?
15      A.  They just wanted to have -- have the
16   documents related, and they just went through the
17   documents and just, they just interviewed some people
18   related to the project, and that's all.
19      Q.  Okay.  What documents did they review?
20      A.  There are very -- there are -- in fact, I
21   couldn't count the numbers of documents.
22      Q.  Is there a list somewhere of the documents
23   they reviewed?
24      A.  Yes.
25      Q.  Where is that?  Do you have that list?

---

Page 97

1      A.  Yes.
2      Q.  And what is that list?
3      A.  I need to look at it.
4      Q.  Okay.  Is it in one document?
5      A.  Yeah, about the list.
6      Q.  Okay.
7      A.  It has on DONGGUK 03 14794, 95, as it goes,
8    96, 97, 98.
9      Q.  Okay.  And that is the complete list of
10   documents that was provided by Dongguk University to
11   the prosecutors for this investigation?
12      A.  Yes.  Those are the ones that we provided.
13      Q.  Okay.  Now you said certain people were
14   interviewed with regard to these grants.
15      A.  Yes.
16      Q.  Who was interviewed?
17      A.  If I just refer to the documents, is it
18   okay?
19      Q.  That's fine.
20      A.  The names are on the list that I just gave.
21      Q.  In there?
22      A.  Yes.
23      Q.  Okay.  And how many people were interviewed?
24      A.  I need to number them.
25      Q.  Okay.

---



Page 98

1    A.  Count them, sorry.
2        (Pause in proceedings.)
3    A.  According to the documents, it's about 17
4  people.
5    Q.  Okay.
6    A.  Concerning the projects that we are talking
7  about now.
8    Q.  Were any of them members of the Dongguk
9  University Foundation board of directors?
10    A.  No.
11    Q.  Any of them former members of the Dongguk
12  University board of directors?
13    A.  No.
14    Q.  Were there any of them former employees of
15  Dongguk?
16    A.  No.
17    Q.  What questions did the prosecutors generally
18  ask in connection -- Withdraw that.
19        What questions did the prosecutors
20  generally ask of these employees of Dongguk
21  University?
22    A.  We don't have the records that -- what kind
23  of questions were given to those people, but we have
24  just the subject discussed.
25    Q.  And what documents show the subject

Page 99

1  discussed?
2    A.  The documents that I gave you.  That
3  includes the date, the people interviewed, the subject
4  discussed.
5    Q.  Okay.  Did you speak to any of the people
6  interviewed about what they were asked by the
7  prosecutors?
8    A.  No.
9        MR. WEINER:  At any time?
10       THE WITNESS:  No.
11       MR. WEINER:  Okay.
12    Q.  Do you know if the prosecutors asked about
13  Dongguk's hiring of Jeong-Ah Shin in these interviews?
14    A.  You mean about the project?
15    Q.  About the projects, what you're calling the
16  projects, do you know if the prosecutors asked about
17  Dongguk's hiring of Jeong-Ah Shin in those interviews?
18    A.  Not in those interviews.
19    Q.  Okay.  And when I say "you," I mean Dongguk
20  University.
21    A.  Yes.
22    Q.  Do you know whether Dongguk University
23  knows?
24    A.  Yes.
25    Q.  And your answer is not in those interviews;

Page 100

1  is that correct?
2    A.  No.
3    Q.  That is, to Dongguk University's knowledge?
4    A.  Yes.
5    Q.  Okay.  Did the prosecutors ask about Byeon's
6  role in Dongguk's hiring of Jeong-Ah Shin in those
7  interviews?
8    A.  I don't know.
9    Q.  When you say you don't know, Dongguk has no
10  knowledge?
11    A.  Dongguk has no knowledge.
12    Q.  And again, we've always said one way or
13  another, whether it's accurate or inaccurate; is that
14  correct?
15       I'm sorry, you have no knowledge of
16  what was asked in the interview; is that correct?
17    A.  No knowledge about that.
18    Q.  Okay.  Did the prosecutors, to Dongguk's
19  knowledge, ask about Shin's relationship with Byeon in
20  those interviews?
21    A.  I have no knowledge about that.
22    Q.  And when you say you have no knowledge --
23    A.  Dongguk doesn't have any knowledge about
24  that.
25    Q.  Okay.

Page 101

1        MR. WEINER:  I need to ask him
2  something.
3        (Pause in proceedings.)
4    Q.  Your attorney has asked you to mention
5  something.  Why don't you mention it.
6    A.  There was separate interviews about the
7  hiring process.
8    Q.  Okay.
9    A.  So he just recommended to mention that.
10    Q.  And that's in the investigation of Jeong-Ah
11  Shin's criminal activity; is that correct?
12    A.  Right.
13    Q.  Okay.  We'll get to that.
14    A.  Yes.
15    Q.  Okay.
16    A.  So I thought --
17    Q.  I just --
18    A.  Your questions are separate from those.
19    Q.  I want to know what you know with regard to
20  these.  Do you know whether the prosecutors in these
21  interviews, with regard to this investigation of the
22  grants, asked about Hong's meetings or communications
23  with Byeon?  That is, does Dongguk University know if
24  that subject was raised?
25    A.  Dongguk University has never heard about

DONGGUK UNIVERSITY v. YALE UNIVERSITY                                    July 26, 2010

27 (Pages 102 to 105)

Page 102

1   that.
2       Q.  Okay.  In other words, you have no knowledge
3   of what was asked in these --
4       A.  It means no knowledge, because Dongguk
5   University has never heard about that.
6       Q.  Okay.  Did the prosecutors ask about
7   Dongguk's verification of Shin's purported Yale Ph.D
8   in these interviews?
9       A.  You mean in -- when you say "in this," about
10  the projects?
11      Q.  That's correct.
12      A.  No.
13      Q.  Did the prosecutors ask about Dongguk's
14  receipt of a fax from Yale in September of 2005 in
15  these interviews with regard to the projects?
16      A.  I have -- Dongguk has never heard about such
17  questions, yes.
18      Q.  Did the prosecutors ask about Yale's
19  statement that the September 2005 fax was a fake in
20  these interviews about the project?
21      A.  Dongguk has never heard about that.
22      Q.  Okay.  Have you heard -- Does Dongguk know
23  whether there are any communications in these
24  interviews between the project and Dongguk personnel
25  concerning Yale or any statements made by Yale?

Page 103

1       THE WITNESS:  Would you translate?
2       THE INTERPRETER:  Could you repeat
3   that?
4       MR. SPRINGER:  You know, if it's
5   easier, let me try to make it more clear, if I could.
6       THE INTERPRETER:  Thank you.
7       Q.  Does Dongguk know whether in these
8   interviews by the prosecutors of --
9       A.  The projects.
10      Q.  -- Dongguk personnel concerning the
11  projects, any questions were asked about Yale or any
12  statements made by Yale?
13      A.  About the interviews, relating to projects,
14  Dongguk has never heard such information.
15      Q.  Okay.  Did the prosecutors inform Dongguk of
16  the results of their investigation of Dongguk
17  concerning the projects, what you have called the
18  projects?
19      A.  No.  They informed about the results of the
20  investigation, but in the statement about the reasons,
21  there were no statements, no items relating to the
22  project that you are discussing now.
23      Q.  What did the prosecutors inform Dongguk with
24  regard to the results?
25      A.  It was about the indictment of Shin,

Page 104

1   Miss Shin.
2       Q.  Okay.  Let me try to be clear here.
3       A.  Forgery and obstruction of the university
4   and some other crimes committed, they think, by
5   Mrs. Shin.
6       Q.  Okay.  I want to be clear that we'll talk
7   about --
8       A.  We have the documents here.  I can mention
9   it if you want.
10      Q.  Why don't you tell me the Bates numbers of
11  the documents and then I'll try to get some clarity
12  later, okay?  Tell me the numbers of the documents
13  that you're referring to.
14      A.  Okay.  DONGGUK 0357732.
15      Q.  Okay.  And what does that document say?
16      A.  It says, "We are informing the reasons
17  relating to the incidents 2007, the number 30688, that
18  you filed complaint.
19      Q.  And what did they tell you --  What's the
20  date of that document, Mr. Cho?
21      A.  December 14th, 2007.
22      Q.  Okay.  And what results did they inform you
23  of?
24      A.  The ones relating to Dongguk are the forgery
25  of a private document and obstruction of the

Page 105

1   university.  That's the only two results relating to
2   the school, and there are other names, but they are
3   not related to Dongguk, because it's about Shin
4   Jeong-Ah.
5       Q.  And to whom is the document addressed?
6       A.  It was addressed to the alternate office
7   that Dongguk asked.
8       Q.  So it was to Dongguk's attorney's office?
9       A.  Yes.
10      Q.  Now, Mr. Cho, Dongguk had filed a criminal
11  complaint against Jeong-Ah Shin, had it not?
12      A.  Yes, it did.
13      Q.  And what were the charges in that criminal
14  complaint?
15      A.  Forgery of private documents that came
16  from -- that related to Yale and also the obstruction
17  of the university in the course of hiring a professor.
18      Q.  Okay.  And when did it file that complaint?
19      A.  We filed that, if I remember the exact day,
20  July 23rd, 2007.
21      Q.  Okay.  And is that letter of December that
22  you have just referred to in response to the complaint
23  that Dongguk -- the criminal complaint Dongguk had
24  filed against Jeong-Ah Shin?
25      A.  Yes.

Sanders, Gale & Russell
(203) 624-4157

DONGGUK UNIVERSITY v. YALE UNIVERSITY

July 26, 2010

29 (Pages 110 to 113)

---

Page 110

1    media reports of what the prosecutors did with regard
2    to the investigation of the projects, as you have
3    called it, did Dongguk ever hold a press conference,
4    issue a press release, or otherwise make a public
5    statement as a result of the prosecutor's
6    investigation of Dongguk?
7        A.  I don't recall at this moment whether there
8    was a press conference by Dongguk after that or before
9    that.
10       Q.  So Dongguk has no knowledge as to whether a
11   press conference or a press release or any other
12   statement, any other public statement, was made as a
13   result of the media reports of the results of the
14   prosecutor's investigation; is that correct?
15       A.  Dongguk has.  Dongguk has the knowledge, as
16   I had said.  Dongguk has the knowledge that the -- in
17   the media, the prosecutors said there were no special
18   favors given to Dongguk concerning the projects.  So I
19   happen to see that just the media report, that's just
20   right on the table.
21       Q.  Okay.
22       A.  So you can reference to that.
23       Q.  Okay.
24       A.  It's just on the first page of the document.
25       Q.  Now, and my question to you is, as a result

---

Page 111

1    of that media, what you call that media report, my
2    question is:  Did Dongguk have a press conference or
3    issue a public statement or otherwise issue a press
4    release with regard to the results of of what was
5    reported in the media about the government's
6    investigation of what you have called the projects?
7        A.  To my knowledge, no, because our concern was
8    about the fax that Shin Jeong-Ah submitted -- sorry,
9    the fax that we believed that Yale sent at that time,
10   whether the fax was really sent by Yale, because Yale
11   said it's not authentic.  So Yale said they have --
12   there was no letter about the verification about
13   Shin's degree that came from Dongguk.  Dongguk's only
14   concerned about those two things, whether -- what fax
15   were there.
16           MR. SPRINGER:  Okay.  I'm going to move
17   to strike that as nonresponsive.
18       Q.  And ask you to answer my question, and let
19   me go back to my question, Mr. Cho.
20           MR. WEINER:  I think he said no.
21           MR. SPRINGER:  What?
22           MR. WEINER:  He said no, they didn't
23   have.
24       A.  The reason was --
25           MR. WEINER:  You don't have to give the

---

Page 112

1    reason.  The answer was "yes" or "no."
2        A.  No, all right.
3        Q.  Did Dongguk think that the media reports of
4    the prosecutor's investigation were adequate?
5        A.  You mean the --
6        Q.  Media report of prosecutor's
7    investigation of the projects, did Dongguk think that
8    what the media said was sufficient with regard to what
9    occurred?
10       A.  Dongguk couldn't say whether there was
11   sufficient or not, but since Dongguk was trying to
12   prove that it was by all Dongguk's effort for the
13   grants that we got, so even though Dongguk couldn't
14   consider whether that's enough or not, but in a way,
15   we found it acceptable.
16       Q.  What was Dongguk's understanding of who
17   might be providing special favors?
18           MR. WEINER:  As the prosecutor was --
19           MR. SPRINGER:  Yes.  Pardon?  Go ahead.
20       A.  So, would you go again?  Sorry.
21       Q.  What was Dongguk's understanding of who
22   might be providing special favors in light of the
23   prosecutor's investigation of that subject.
24       A.  Since the investigation that we are talking
25   about was done relating to, in a way, in a way, Shin,

---

Page 113

1    we, university, thought it might be related to
2    Mr. Byeon.
3        Q.  Other than his relationship to Miss Shin,
4    was there any other reason that the university thought
5    Mr. Byeon might be providing the special favors -- the
6    prosecutor thought that Mr. Byeon might be providing
7    special favors?
8            I'll simplify it.  I'll try to simplify
9    it, if I could.  You have testified that because of
10   the relationship with Miss Shin, the university
11   thought that the prosecutor may be suspecting
12   Mr. Byeon of providing special favors; is that
13   correct?
14       A.  Yes.
15       Q.  Now other than the relationship with
16   Miss Shin, is there any other reason the university
17   thought that Mr. Byeon might be providing special
18   favors?
19       A.  There is -- there is no reason.
20       Q.  When did the Seoul Western District
21   prosecution's office investigation of Jeong-Ah Shin
22   begin?
23           MR. WEINER:  Asked and answered.
24           MR. SPRINGER:  No, it isn't.
25       Q.  You can answer.

---

Sanders, Gale & Russell
(203) 624-4157

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)

-------------------------------x

DONGGUK UNIVERSITY,                    :

   Plaintiff,               :

 -versus-                          :      VOLUME IV

YALE UNIVERSITY,                       :

   Defendant.               :

-------------------------------x


   Continued Rule 30(b)(6) Deposition of

EUIYON CHO, taken pursuant to the Federal Rules

of Civil Procedure, at the Law Offices of Day

Pitney, LLP, 1 Audubon Street, New Haven,

Connecticut, before James A. Martone, LSR #248,

and Notary Public, in and for the State of

Connecticut, on January 18, 2010, at 10:34 a.m.

DONGGUK v. YALE UNIVERSITY                                      January 18, 2011

Page 465

1    Hong's suggestion that the Art History Department
2    expand to include Western art?
3        A.  But he accepted as you see later, under
4    the condition to satisfy his interest only.
5        Q.  Well, my question for the moment is,
6    during the initial conversation between President
7    Hong and Professor Jeong, Professor Jeong
8    resisted President Hong's suggestion that the Art
9    History Department expand?
10       A.  I don't know whether I'm in the
11   position of accepting that expression, resisting.
12   I don't see it.
13       Q.  Okay.  Well, that was the word you used
14   a moment ago.
15       A.  So I need to make it -- correct it.
16       Q.  When President Hong suggested to
17   Professor Jeong that the Art History Department
18   expand, how did Professor Jeong respond?
19       A.  He was -- as is stated here, I couldn't
20   paraphrase his mode of speech because I was not
21   in the place at the time.
22       Q.  Do you have any more knowledge about
23   that conversation beyond what is stated in this
24   document?
25       A.  No knowledge about that.

Page 466

1        Q.  If you'll look at the next paragraph,
2    under item 1.  It describes a July 22nd, 2005
3    meeting between President Hong and Professor
4    Jeong.  Do you see that?
5        A.  Yes.
6        Q.  In which President Hong underlines the
7    university's need to recruit talents like Shin
8    Jeong-Ah for the cultural content Seoul
9    Metropolitan Area Specialization project.  Do you
10   see that?
11       A.  Yes.  I see it.
12           MS. LU:  Hold on one second.  He
13   should look at the Korean version.
14       Q.  During that meeting, according to this
15   document, "Professor Jeong once more stressed the
16   department's focus on Asian (Buddhist) Art
17   History and refused to hire anyone whose
18   expertise was in Western Art History."  Do you
19   see that?
20       A.  Yes.
21       Q.  Do you have any reason to doubt that
22   that was, in fact, Professor Jeong's response to
23   President Hong during that meeting?
24       A.  Sorry, again?
25       Q.  Do you have any reason to doubt that

Page 467

1    what is described here was, in fact, Professor
2    Jeong's response to President Hong during that
3    meeting?
4        A.  I have no reason to doubt that.
5        Q.  According to the document, Professor
6    Jeong then suggested to President Hong that the
7    Department of Fine Arts might be more willing to
8    hire experts in Western Art History or exhibition
9    planning, and President Hong talked to a Fine
10   Arts professor on the phone.  Does Dongguk have
11   any knowledge about President Hong's discussion
12   with the Fine Arts professor that's described
13   here?
14       A.  To my knowledge, it was Professor Oh.
15       Q.  What was said during that conversation?
16       A.  I have no knowledge about what happened
17   during the conversation itself.  But --
18       Q.  Do you now know that it was Professor
19   Oh who President Hong spoke to?
20       A.  Because you asked whether that could
21   be.  On the basis of the record, President Hong
22   made a call to a professor at Fine Art.  Right?
23       Q.  Well, I didn't ask if it could be.  I
24   asked if you have any actual knowledge about what
25   happened.

Page 468

1        A.  No.  I have no knowledge about what
2    happened.
3        Q.  So you don't actually know that
4    President Hong called Professor Oh?
5        A.  No.  No knowledge about that.
6        Q.  According to the next paragraph of this
7    document, August 3rd, 2005, Dean of Planning Yu
8    Seok Cheon called and asked to meet with
9    Professor Jeong.  Does Dongguk have any knowledge
10   of that conversation beyond what's reported in
11   this document?
12       A.  No knowledge about that beyond this
13   record.  Report, sorry.
14       Q.  According to the document, Dean Yoo
15   said the university intended to hire Shin through
16   the special hiring process and Professor Jeong
17   declined, citing the same reason as before.  Do
18   you have any basis for disputing that that was,
19   in fact, what occurred during that conversation?
20       A.  No.
21       Q.  Further down in this paragraph,
22   according to the document, Dean Yoo later
23   informed Professor Jeong that an additional hire
24   for the Art History Department was not feasible,
25   and Professor Jeong proposed that Shin be

11  (Pages 465 to 468)

DONGGUK v. YALE UNIVERSITY                                                      January 18, 2011

Page 493

1  the basis for the hiring.
2      Q.  Other than the documents that you
3  identified earlier, was there any other basis for
4  Dongguk's decision to hire Ms. Shin?
5      A.  Not only to Ms. Shin, but also to other
6  applicants for the special hiring process.
7      Q.  Well, I'm asking --
8      A.  It applies the same rule.
9      Q.  I'm asking for the moment about
10 Ms. Shin.  Other than the documents you
11 identified earlier, were there any other bases
12 for Dongguk's decision to hire her?
13     A.  We have no knowledge because that's the
14 reason why we ask each applicant to submit
15 materials.
16     Q.  What is the reason?
17     A.  We need to see what credentials she or
18 he has.
19     Q.  Are there any other candidates who were
20 specially hired in the fall of 2005, who failed
21 to submit academic transcripts, aside from
22 Ms. Shin?
23     A.  We have no knowledge about that.
24     Q.  After Ms. Shin submitted the
25 application materials, who reviewed them at

Page 494

1  Dongguk?
2      A.  It's reviewed by the personnel
3  promotion committee or something like that.
4  There is a committee that reviews the documents.
5      Q.  Other than that committee, did anyone
6  else at Dongguk review Ms. Shin's application
7  materials?
8      A.  When they have an interview, they also
9  are supplied with the materials, so that's the
10 also case, that there is a chance for those
11 interviewers to review the materials.
12     Q.  Other than the interviewers, is there
13 anybody else who --
14     A.  As I had said, the committee.
15     Q.  Right, other than the committee and the
16 interviewers, does anybody else, or in Ms. Shin's
17 case, did anybody else at Dongguk review her
18 application materials?
19     A.  I have no knowledge about that, other
20 than those.
21     Q.  Did the faculty of the Art History
22 Department review Ms. Shin's application
23 materials?
24     A.  I have no knowledge about that.
25     Q.  Do you know if all of the members of

Page 495

1  the Personnel Promotion Committee actually
2  reviewed Ms. Shin's application materials?
3      A.  If they participated in that process,
4  we have no reason to doubt there is someone who
5  didn't review.
6      Q.  Did any members of that committee
7  question why Ms. Shin hadn't submitted a
8  transcript?
9      A.  No, so since that's not the violation
10 of the rule.
11     Q.  Apart from Ms. Shin's, the documents
12 that she submitted, was Dongguk aware of her work
13 experience independently?
14     A.  What do you mean by Dongguk?
15     Q.  Well, I guess I mean anyone at Dongguk
16 who participated in the decision to hire her,
17 either President Hong or Mr. Yoo, or the members
18 of the committee you mentioned a moment ago, or
19 the Art History Department faculty, or the people
20 that interviewed her, did they have any
21 independent knowledge of her work, either her art
22 museums or universities or any other work that
23 she may have done?
24     A.  I have no knowledge about that.
25     Q.  I don't recall if I asked you this

Page 496

1  question earlier, Mr. Cho, but when did
2  Ms. Shin -- or strike that.  At any point did
3  Ms. Shin submit a copy of her purported
4  dissertation to Dongguk?
5      A.  You mean dissertation --
6      Q.  I mean the actual dissertation itself?
7      A.  We have no knowledge about that.
8          MR. FETNER:  Let's take a break so
9  the videographer can change the tape.
10         THE VIDEOGRAPHER:  Off the record
11 at 12:39.
12         (RECESS TAKEN)
13         THE VIDEOGRAPHER:  We're back on
14 the record at 12:46.  This is the second tape.
15     Q.  Before Dongguk hired Ms. Shin, did it
16 solicit any opinions or references concerning her
17 work at Korean art museums or art galleries?
18     A.  We have no information about that.
19     Q.  Before Dongguk hired Ms. Shin, did
20 anyone at Dongguk communicate with anyone at the
21 Korean universities, where she had taught?
22     A.  We have no record about that.
23     Q.  Before Dongguk hired Ms. Shin, did
24 anyone at Dongguk communicate with anyone at
25 either the University of Kansas or Yale

18  (Pages 493 to 496)

DONGGUK v. YALE UNIVERSITY                                    January 18, 2011

Page 497

1  University, to inquire about her?
2     A.  That's not the general procedure.  So I
3  don't think we have such record about that.
4     Q.  Other than Mr. Byun, did anyone outside
5  of Dongguk University recommend her in any way
6  before Dongguk hired her?
7     A.  We have no record about that.
8     Q.  Did Ms. Shin submit or identify any
9  sort of references concerning her academic or
10 employment background to Dongguk?
11    A.  We don't ask such references in
12 written.
13    Q.  So she did not do that?
14    A.  No.
15    Q.  Did she do that orally?
16    A.  I have no information about that.
17    Q.  If I've asked you this question
18 already, I apologize, but could you just describe
19 the process when -- I know you've told me in
20 early August of 2005, Ms. Shin submitted her
21 application documents.  At that point?  Are they -- in other
22 documents at that point?  Are they -- in other
23 words, are they sent to a particular person or
24 department in order to move the application along
25 to the next step?  How does it work?

Page 498

1     A.  When people submit their applicants for
2  the special hiring processes, to the faculty
3  personnel office, that office reviews the
4  documents enough to pass to another stage.  And
5  when that decision is made by the department, by
6  the office of faculty personnel, then they
7  submit, then they decide who to be interviewed
8  and they set an interview date and interviews by
9  the President and the Vice-President and Dean of
10 the Graduate School and the Dean of the Strategy
11 and Planning Department, and the highest monk in
12 my university, go for interview.
13       If -- in the interview, each
14 interviewer grades on the basis of the material,
15 and on the basis of the powerfulness the
16 interviewee does.  If there is no failure agreed
17 upon by the members of the interviewing session,
18 then the applicants -- I mean the process goes to
19 the next stage.
20       The -- in the next stage, all the
21 materials reviewed before and all the materials
22 submitted by the applicant are reviewed by the
23 promotion, Faculty Promotion or whatever
24 committee.  And they go over each applicant's
25 status.

Page 499

1        If there is no objection by the
2  committee, then they are recommended to the Board
3  of the Trustees.  That's the general processes
4  for the special hiring process.
5     Q.  Is the committee that you mentioned a
6  moment ago, after the interviews, you said if
7  there's no failure at the interview?
8     A.  I said if there is no objection.
9     Q.  I'm talking about before that, I
10 believe you said if the candidate is interviewed,
11 and the interviewers agree that the candidate
12 didn't fail the interview, is that -- am I
13 misunderstanding what you said?
14    A.  That's what I said.
15    Q.  Okay.  At that point then you say then
16 the application materials would go to the Faculty
17 Promotion Committee; is that right?
18    A.  Yes.
19    Q.  Is that a different committee from the
20 committee that you had mentioned that reviews the
21 materials before the interview?  I believe you
22 referred to the Office of Faculty Personnel,
23 that's a different body from the Faculty
24 Promotion Committee?
25    A.  Different body, yeah.

Page 500

1     Q.  Okay.  What is the Faculty Promotion
2  Committee?  Who are the members of that
3  committee?  I'm not asking for the names of the
4  individuals, I just mean generally what's the
5  function of that committee?
6     A.  It consists of just general professors
7  from each college.  One from each college in
8  general.
9     Q.  And how are the members of that
10 committee selected?
11    A.  When the Office of the Faculty
12 Personnel -- I don't know how they select, but
13 they select and they recommend it to the
14 President, and under the consent of the
15 President, the committee is formed.
16    Q.  When the Office of Faculty Personnel
17 reviews application materials in the first
18 instance, what is that office reviewing them for?
19 In other words, what analysis does that office
20 do?
21    A.  They just go over relevant materials
22 for the interview, whether are submitted or not.
23    Q.  So it's simply a question of are the
24 documents submitted?
25    A.  Yes.

                              19  (Pages 497 to 500)

Page 513

1    means or implies her application materials were
2    reviewed.
3        Q.  Were those materials reviewed by anyone
4    at Dongguk other than Mr. Ahn?
5        A.  I'm not -- I have no knowledge about
6    that.
7        Q.  Did Mr. Ahn raise any concerns about
8    anything in Ms. Shin's application materials?
9        A.  We have no record of that.
10       Q.  Did anyone else at Dongguk raise any
11   concerns about anything in Ms. Shin's application
12   materials?
13       A.  Because if Mr. Ahn finds there is no
14   problem in her application, why would he raise
15   any problem?  Because even to my -- from my point
16   of view she has no problem in -- there is no
17   inconsistency.
18       Q.  I'm not asking if there's an
19   inconsistency.  I'm asking if anyone other than
20   Mr. Ahn raised any concerns about the documents
21   in 2005?
22       A.  He didn't raise any question.  He just
23   sent a verification to Yale.
24       Q.  I understand, and I'm saying other than
25   Mr. Ahn, did anyone else raise any concerns about

Page 514

1    the documents that Ms. Shin submitted?
2        A.  I have no knowledge about that.
3        Q.  Before Dongguk hired Ms. Shin, did
4    anyone at Dongguk read all or part of her
5    dissertation?
6        A.  To my knowledge, her dissertation was
7    not submitted.  So there is no one possibly.
8            MR. FETNER:  Mark this.
9            (Defendant's Exhibit 22 marked
10   For identification)
11       Q.  Mr. Cho, I'm showing you what's been
12   marked as Exhibit 22.  I note that this document
13   was produced by Dongguk in this litigation and
14   each of the pages bears a Dongguk Bates number.
15   Do you know when and from where Dongguk obtained
16   this document?
17       A.  To my knowledge, I'm the one who
18   obtained this document.
19       Q.  When did you obtain it?
20       A.  It was early June, from Professor Oh,
21   in art, Fine Art Department.
22       Q.  Early June of what year?
23       A.  2007.
24       Q.  So before June of 2007, Dongguk had no
25   copy of Ms. Shin's purported dissertation; is

Page 515

1    that correct?
2        A.  Yes.  That's correct.
3        Q.  I note also that Exhibit 22 is only a
4    part of Ms. Shin's purported dissertation.  Did
5    you obtain the entire document or only the pages
6    that are included here?  I can represent that
7    these are the only pages of the document that
8    Dongguk has produced in the litigation.
9        A.  To my recollection, the dissertation
10   Professor Oh handed me at the time was not the
11   complete one.  So I don't know whether it has
12   more than this, but what I'm sure is that was not
13   a complete one.
14       Q.  And at any time did Ms. Shin herself
15   submit either all or part of her dissertation to
16   Dongguk?
17       A.  She was not in a position to submit
18   that.  So we have no record about that.
19       Q.  To your knowledge -- strike that.  To
20   Dongguk's knowledge, before June of 2007, had
21   anyone at Dongguk read any part of Ms. Shin's
22   purported dissertation?
23       A.  We have no knowledge, and no record
24   about that.
25       Q.  At any time did Ms. Shin submit

Page 516

1    undergraduate, Master's or Graduate School
2    transcripts to Dongguk?
3        A.  She was not required to submit that.
4        Q.  I'm not asking if she was required to.
5    I'm asking if she ever did.
6        A.  Dongguk doesn't have any possession of
7    that.  So that means she did not submit that.
8        Q.  Mr. Cho, you testified earlier about
9    the process by which special hiring candidates
10   are interviewed.  And I believe you mentioned the
11   individuals who actually interviewed Ms. Shin.
12           Is there any general guideline for
13   what questions are asked during interviews of
14   special hiring candidates or what sorts of
15   questions are asked?
16       A.  There is no guidelines for them to
17   follow.  So Dongguk doesn't have no knowledge --
18   Dongguk has no knowledge about that.
19       Q.  I guess just generally, I'm not asking
20   specifically about the case of Ms. Shin but
21   generally, what is the purpose of the interviews
22   of special hiring candidates?  What does Dongguk
23   hope to accomplish in those interviews?
24       A.  In our society, that interview has
25   nothing to do with her specialization area.  That

23  (Pages 513 to 516)

DONGGUK v. YALE UNIVERSITY

January 18, 2011

Page 517

1  interview has to do with whether that person is
2  willing to serve the school in a passionate way,
3  for example. So when we say -- translation
4  please, we say --
5        THE INTERPRETER: We evaluate
6  one's commitment level. Commitment level.
7     A. The purpose of interview at that level
8  is to evaluate the level of commitment to the
9  school. And religion too. Religious attitude
10  toward the school.
11     Q. Are those the only purposes of the
12  interview?
13     A. To my knowledge, yes. What I'm sure is
14  that's not the interview to know how successful,
15  how capable the applicant is in her or his
16  specialized area. So the committee consists of
17  the President and Vice-President, the highest
18  monk at Dongguk. And the person who is in charge
19  of the personnel office.
20     Q. Did anyone at Dongguk conduct any
21  interview of Ms. Shin for purposes of determining
22  how successful she would be in her specialization
23  field?
24     A. That was proven, for example, by the
25  list of her publications, by the list of her

Page 518

1  exhibits, and by the record that issued by the
2  colleges, that she -- where she lectured. Also
3  in the area of art exhibition, Shin was in a way
4  established person in Korean society at that
5  time. In that area.
6     Q. That wasn't the area in which she would
7  be working at Dongguk though, was it?
8     A. Pardon me?
9     Q. I had said that wasn't the area in
10  which she was going to be working at Dongguk, was
11  it?
12     A. But that's relevant area of art.
13     Q. My initial question, Mr. Cho, was
14  whether anyone at Dongguk interviewed Ms. Shin
15  for purposes of determining --
16     A. Because there is no such --
17     Q. Can I just finish the question please.
18  Did anyone at Dongguk interview Ms. Shin for
19  purposes of determining how successful she would
20  be in her field?
21     A. She will be or she was?
22     Q. Yes. How successful she would be at
23  Dongguk. You testified earlier that the
24  interview that was conducted by the President and
25  the Vice-President and the head monk, was not

Page 519

1  conducted for purposes of determining how
2  successful she would be in her field of Art
3  History, and my question is, apart from those
4  individuals, did anyone at Dongguk conduct an
5  interview of Ms. Shin for that purpose?
6     A. You know, it's not the case of
7  either/or or black or white for the purpose of
8  interview at that level. I just used a general
9  terminology that I asked the translator, the
10  level of commitment. Because she submitted the
11  relevant materials for her career, and for her
12  work experience and her expertise.
13        The purpose of the interview is to
14  see whether the applicant will contribute in his
15  or in her area not only to the school, so your
16  question -- my answer might be applicable to your
17  question.
18     Q. Your answer might be applicable to my
19  question?
20     A. Because you decide whether that's the
21  answer that you expected or what.
22     Q. I'm not expecting a particular answer.
23  But I do want some answer that responds to the
24  question.
25     A. Okay. As a relevant one. I misused

Page 520

1  the expression. As a relevant answer or not.
2     Q. Did anyone interview Ms. Shin about any
3  substantive Art History subject?
4     A. Because there wasn't, because there
5  wasn't because also in the special hiring
6  processes, as I said before, there is no such
7  procedure. Not only in Ah Shin's case but also
8  in other applicants for the special hiring
9  process in 2005.
10     Q. I want to be sure the record is clear.
11  My understanding of your testimony is that no one
12  at Dongguk interviewed Ms. Shin about any
13  substantive Art History subject; is that correct?
14        MS. LU: I don't think that was a
15  complete description of what he just said.
16        MR. FETNER: But that's my
17  question.
18     A. Because there was no procedure for
19  that.
20     Q. Mr. Cho; is that correct?
21     A. Would you like to repeat the question.
22  (Testimony repeated by interpreter)
23        MR. FETNER: Did you just repeat
24  the question?
25        THE INTERPRETER: I translated

24 (Pages 517 to 520)

Sanders, Gale & Russell
(203) 624-4157

DONGGUK v. YALE UNIVERSITY                                          January 18, 2011

Page 521

1    your question.
2        Q.  I can repeat it in English just so
3    we're all on the same page.  My understanding of
4    your earlier testimony is that no one at Dongguk
5    interviewed Ms. Shin concerning any substantive
6    Art History subject; is that correct?
7        A.  Because -- yes, because there was no
8    required such process for the special hiring
9    processes.  That is my answer.  Yes.
10       Q.  So it is correct, that there was no
11   such interview?
12       A.  Yes.  That's not required.
13       Q.  Other than the interview that you
14   described earlier involving the President and the
15   Vice-President and the head monk, were there any
16   other interviews of Ms. Shin on any subject?
17       A.  I have -- the school doesn't have any
18   record about that.
19       Q.  Did anyone from the Art History
20   Department interview Ms. Shin before she was
21   hired?
22       A.  An officer you mean?
23       Q.  I mean in any form?  Did anyone from
24   the Art History Department, any faculty members
25   from the Art History Department interview or

Page 522

1    speak to Ms. Shin at all before Dongguk hired
2    her?
3        A.  According to the investigation report,
4    yes.  The head of the department did.
5        Q.  That's Professor Jeong?
6        A.  Yes.
7        Q.  When did he speak to Ms. Shin?
8        A.  I have no recollection about the date.
9        Q.  But sometime before she was hired?
10       A.  Yes.
11       Q.  What did Professor Jeong talk to
12   Ms. Shin about?
13       A.  I have no knowledge about that.
14       Q.  Other than what you've just testified,
15   is there any more information you can provide
16   about any conversation or communication between
17   Professor Jeong and Ms. Shin before she was
18   hired?
19       A.  No information at all that I can do.
20       Q.  And other than that one conversation,
21   did anyone from Dongguk's Art History Department
22   interview Ms. Shin or talk to her or communicate
23   with her in any way before she was hired?
24       A.  We have no knowledge about that.
25           MR. FETNER:  Mark this.

Page 523

1            (Defendant's Exhibit marked
2        For identification.)
3        Q.  Mr. Cho, I'm going you what's been
4    marked Exhibit 23, which according to the English
5    translation, is a interview schedule for new
6    faculty special appointment for 2nd semester
7    2005.  Is that an accurate description of this
8    document?
9        A.  Yes.
10       Q.  And I'm really only interested in the
11   very first item of the document, which is the
12   interview schedule for Jeong Ah Shin.  Do you see
13   that?
14       A.  Yes.
15       Q.  According to the document, if you look
16   down below the table, above the schedule, you'll
17   see three bullet points.  Do you see that?
18       A.  Yes.
19       Q.  And the second one identifies
20   interviewers for Seoul interviews, do you see
21   that?
22       A.  Yes.
23       Q.  Is that an accurate list of the people
24   who interviewed Ms. Shin?
25       A.  I think so.

Page 524

1        Q.  Okay.  And when that bullet point lists
2    deans of the relevant schools, for Ms. Shin, that
3    would have been the Dean of the Graduate School;
4    is that correct?
5        A.  Yes.
6        Q.  According to the document, if you look
7    back up at the top, for Ms. Shin, her interview
8    was scheduled to be conducted August 8th, 2005.
9    Do you see that?
10       A.  Yes.
11       Q.  Is that in fact when she was
12   interviewed?
13       A.  I have no knowledge whether that was
14   the time she was, in fact, interviewed.
15       Q.  So you have no basis for disputing
16   that?
17       A.  No, no basis for that, disputing that.
18       Q.  And if you look in the second column,
19   under Time, the interview for Ms. Shin was
20   scheduled from 1520 to 1540.  Do you have any
21   basis for disputing that is when her
22   interview occurred?
23       A.  Nor any other record against that.
24       Q.  So it seems that Ms. Shin was
25   interviewed for 20 minutes?

25 (Pages 521 to 524)

DONGGUK v. YALE UNIVERSITY                                    January 18, 2011

Page 553

1      Q.  You testified this morning that in
2  preparing for this deposition, you spoke with Kim
3  Byung Ho concerning the current special hiring
4  process, correct?
5      A.  Yes.
6      Q.  And what did he tell you?
7      A.  The basic procedure is not changed from
8  President Hong to the current President Oh.
9  That's what he basically told me.
10     Q.  So the same process that you've
11 described basically throughout this deposition is
12 the same process that Dongguk currently uses for
13 special hiring candidates?
14     A.  In terms of big frame.
15     Q.  I understand there might be specific
16 differences in, from case to case, but the
17 general process?
18     A.  Yes.
19     Q.  Did the process that Dongguk used in
20 hiring Ms. Shin differ in any way from the usual
21 special hiring process that Dongguk follows?
22     A.  No.
23     Q.  Has Dongguk changed the extent to which
24 it relies on special hiring over the years?  That
25 is, has it either increased or decreased the

Page 554

1  number of professors it hires through the special
2  hiring process?
3      A.  The number of the faculty members who
4  were hired through the process of special hiring
5  has increased, yeah.
6      Q.  Approximately how many professors does
7  Dongguk now hire each year due to the special
8  hiring process?
9      A.  I don't have the exact number, but if I
10 give an opinion about which one has more faculty
11 members hired, I mean the -- for the regular
12 process and the special hiring process, during
13 President Oh's office, the number of faculty
14 members are hired through the special hiring is
15 much higher than the general process.  Much
16 higher.
17     Q.  Was that not the case under President
18 Hong?
19     A.  I have no opinion about that.  But
20 compared to Hong's case with the current Oh's
21 case, yes.
22     Q.  The number of the faculty members hired
23 through the special hiring process is much
24 enlarged now?
25     A.  Yeah.

Page 555

1      Q.  What was the deadline for special
2  hiring applications for the fall of 2005, when
3  Ms. Shin applied?
4      A.  As it is now, also at that time for the
5  special hiring processes, there is no specific
6  deadline set up.  So when needed, it takes place.
7      Q.  You mentioned earlier that Ms. Shin
8  submitted her application materials in early
9  August of 2005.  Was that earlier or later than
10 when other special hiring candidates submitted
11 their application materials in 2005?
12     A.  I have no record of that.
13     Q.  In order for a faculty member to be
14 hired in time for the fall semester, wouldn't
15 there have to be some deadline for the process to
16 begin?
17     A.  Yes.  It comes from when the last
18 meeting of the Board of Trustees will be.  So
19 because the school needs to get approval from the
20 Board of the Trustees.  So if they settle, for
21 example, they are gonna have the meeting to
22 approve for the promotion of the newly hiring
23 faculty members, for example, around mid-August,
24 then the whole process of hiring process must be
25 finished before two weeks prior to that Board of

Page 556

1  the Trustees meeting.
2      Q.  And does Dongguk inform the special
3  hiring candidates of what that timing is?
4      A.  Usually, yes.  I think so.
5      Q.  Did Dongguk inform Ms. Shin of a
6  particular date by which she was required to
7  submit her application materials?
8      A.  I have no record about that.
9      Q.  Did Dongguk make any attempt at all or
10 any efforts at all to verify Ms. Shin's academic
11 credentials before she was hired?
12     A.  No, because any verifications about the
13 newly employed faculty members is done usually
14 after three or six months later.
15     Q.  After Dongguk hired Ms. Shin, did it
16 make any efforts to verify her undergraduate and
17 Master's Degrees?
18     A.  Dongguk is not in the position to
19 verify that, because the only degree to be
20 verified is the final degree of each applicant.
21 So Shin claimed at the time she holds a degree
22 from Yale for Ph.D., the school is only
23 interested in verifying her final degree.
24     Q.  So Dongguk made no effort to verify her
25 undergraduate or Master's Degrees?

33  (Pages 553 to 556)

# EXHIBIT 7

[DONGGUK0259804]

[Handwritten: "Art history"]

Curriculum Vitae

Name: Shin Jeong-ah
Resident Registration Number: 720428-2777911
Date of birth: April 28, 1972 (33 years of age)
Address: Sungkok Art Museum, 1-101 Sinmullo 2-ga, Jongno-gu
Telephone: 737-8643 (work), 010-6267-3555 (cell)
E-mail: shindarc@hanmail.net

Education

| 1994 | Graduated from University of Kansas, College of Art (Western-style painting & engraving, BFA) |
| 1995 | Graduated from University of Kansas, Graduate School of Business (MBA) |
| 2005 | Ph.D. in Art History, Yale University (20th century art history) |

Experience

1994   Honor Student, Hoover, Helen & Kelvin Memorial Award
       Miss Irene Nunemaker Award
       Nelson Museum of Art - Internship
1995   Hallmark Card Co - Internship
       Entered Yale University art history Ph.D. program
       Museum of Modern Art, New York - Internship
1997–  Head curator at Kumho Museum of Art
2001   Instructor at Hongik University Graduate School, Hanyang University Graduate School, Chung-Ang University Graduate School, Kookmin University Graduate School, Hongik University Graduate School executive course
2002–  Head of art and culture office, Sungkok Art Museum
Present     Instructor at Hongik University Graduate School, Hanyang University Graduate School, Chung-Ang University Graduate School, Kookmin University Graduate School, Ewha Women's University Graduate School, Sangmyung University Graduate School

Awards
Grand Prize (exhibition curation), 8th Monthly Art Awards, sponsored by Samsung Cultural
Foundation & JoongAng Ilbo

Dissertation
Guillaume Appollinaire: Catalyst for Primitivism, For Picabia and Duchamp

[DONGGUK0259805]

Principal Special Exhibitions Curated
1997   Joan Miró
1998   Title – Untitled – No Title
       Korea Underground Comics Festival (comics, animation, painting, sculpture)
       Drawing Crossover Exhibition (drawing exhibition for sculptors, painters and
       photographers)
       Same Kind and Different Kinds (video, installations)
       The Frame is Better than the Picture (contemporary Korean art history from the 1950s)
1999   Children's program "Keulluki and Dumbakhae I"
       Middle and high school program "Open Art"
       $1^{320}$, celebrating gallery's 10th anniversary (True-view landscape painting room, human
       room, mind room)
2000   Korean History (second part) (Korea's modern and contemporary history in documents)
       Music in Art (Bonjour Dufy, The Magic Flute, Pour La Musique)
2001   Children's program "Keulluki & Dumbakhae II" (Hansel & Gretel, play room, beanbag
       room)
2002   The Beginning of Art - Open Art
       Understanding Abstract Painting
2003   I · You · Us · [in Korean and English]
       New York's Multinational Designers
       The Beginning of Art V – How Contemporary Art Is Made
       Finding "Beauty" in Contemporary Art
       Reading the Six CODEs of Six Photographers
2004   Kanagawa Biennial World Children's Art Exhibition
       look & see (absolutely landscape)
       How do you see the future?
2005   Japanese Design Today Show
       Cool & Warm
       A Journey in Happy Pictures
       Leaving with John Burningham + Anthony Browne



# 이    력    서

성명 : 신정아 (申貞娥)
주민등록번호 : 720428-2777911
생년월일:1972년 4월 28일 (만33세)
주소: 종로구 신문로 2가 1-101 성곡미술관
전화번호: 737-8643(직장), 010-6267-3555(핸드폰)
E-mail : shindarc@hanmail.net

## 학    력
1994   캔사스주립대학 미술대학 졸업(서양화&판화, BFA)
1995   캔사스주립대학 경영대학원 졸업(MBA)
2005   예일대학 미술사 박사 (20세기 미술사)

## 경    력
1994   Honor Student, Hoover,Helen&Kelvin Memorial Award
       Miss Irene Nunemaker Award
       Nelson Museum of Art - Internship
1995   Hallmark Card Co - Internship
       예일대학 미술사 박사과정 입학
       Museum of Modern Art, New York - Internship
1997-  금호미술관 수석큐레이터
2001   홍익대대학원, 한양대대학원, 중앙대대학원,국민대대학원,
       홍익대대학원 최고위 과정 강사
2002-  성곡미술관 학예연구실장
현재   홍익대대학원, 한양대대학원, 중앙대대학원, 국민대대학원,
       이화여대대학원, 상명대대학원 강사
       홍익대 최고위 과정 강사

## 수    상
삼성문화재단&중앙일보 주최 제8회 월간 미술 대상 수상 (전시기획부분)

## 논    문
Guillaume Appollinaire : Catalyst for Primitivism, For Picabia and Duchamp





주요특별전 기획

1997  호안 미로
1998  타이틀-언타이틀-노타이틀
       대한민국 언더그라운드 만화페스티발(만화, 에니메이션, 회화, 조각)
       드로잉횡단전(조각, 회화, 사진작가들의 드로잉전)
       Same Kind and Different Kinds (비디오, 설치)
       그림보다 액자가 더 좋다(50년대 이후 한국현대미술사)
1999  어린이를 위한 기획 '쿨룩이와 돔박해Ⅰ'
       중고생을 위한 기획 '열린미술'
       개관 10주년 $1^{330}$ (진경산수의방,인간의방,정신의방)
2000  국사(하) (자료로 보는 한국, 근·현대사)
       미술속의 음악 (봉쥬르뮤피, 마술피리, 음악이야기)
2001  어린이를 위한 기획 '쿨룩이와 돔박해Ⅱ' (헨젤과 그레텔,놀이방,오자미방)
2002  미술의 시작-열린미술
       추상화의 이해
2003  아이·유·어스·i·you·us
       뉴욕의 다국적 디자이너들
       미술의 시작Ⅴ-현대미술, 어떻게 만들어지나
       현대미술에서 찾아보는 '아름다움'
       여섯 사진 작가의 여섯 개의 CODE 읽어보기
2004  가나가와 세계 어린이 비엔날레
       look & see (absolutely landscape)
       How do you see the future?
2005  일본 현대 디자인전
       Cool & Warm
       행복한 그림책 여행
       존버닝햄 + 엔서니 브라운과 함께 떠나요

796

Confidential                                                    DONGGUK0259805

## CERTIFICATE OF TRANSLATION

I, Samuel Henderson, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0259804-05 from the Korean language into the English language.

I further certify that translation of DONGGUK0259804-05 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Samuel Henderson
Professional Translator

Subscribed and sworn to before me on ___27th___ day of ___July___, ___2011___ (year)

(Signature of Notary)

Official Seal
LAKETRA N. WILLIAMS
Resident of Lake County, IN
My commission expires
September 4, 2016
(Notary Stamp)

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DONGGUK UNIVERSITY,

                    Plaintiff,

            v.

YALE UNIVERSITY,

                    Defendant.

Civil Action No. 3:08-CV-00441-RNC

## PLAINTIFF DONGGUK UNIVERSITY'S ANSWERS AND OBJECTIONS TO DEFENDANT YALE UNIVERSITY'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff Dongguk University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby responds to defendant Yale University's ("Yale") First Set of Interrogatories (the "Interrogatories") as follows:

### RESERVATION OF RIGHTS

1.      Dongguk's answers and objections are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve all questions as to their competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the answers or subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

2.      Dongguk preserves the right to object on any ground to the use of said answers, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

3.      Dongguk reserves the right to supplement or amend these answers in light of facts or information that may be discovered or brought to light after submission of these answers.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Interrogatory to the extent the phrase "after the first application deadline" is vague and ambiguous. Subject to and without waiving the specific objection and the General Objections, Dongguk states that no special hiring candidates were added to the special hiring process after the first application deadline.

The special hiring process may be initiated whenever the need for it arises. Moreover, Dongguk allows for a flexible schedule of the special hiring process based on the needs and conditions of Dongguk as well as the special hiring candidates. Therefore, there is no application "deadline" that must be followed. While Dongguk often sets forth a date by which it encourages the special hiring candidates to submit their application forms for the purpose of administrative convenience, it is not mandatory for the candidates to abide by such a date, and Dongguk does not keep records of the candidates who submitted the application forms or other required documents after such a date.

**INTERROGATORY NO. 3**

Describe the process that Dongguk University used to evaluate Jeong Ah Shin's application for a faculty position in 2005, including but not limited to identifying all documents that Dongguk University received or created in connection with the application, the review of the application, or the decision to hire Shin; all persons who participated in the evaluation of Shin, her credentials, or her application and their role in that evaluation; all persons who participated in the decision to hire Shin and their role in that decision; and all reasons for Dongguk University's decision to hire Shin.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk states that it followed the following process in evaluating Shin's application for a faculty position in 2005:

In 2005, Dongguk applied for the Korean government's university sponsorship program titled "Metropolitan Area University Specialization Project" ("Specialization Project"). In order to meet the requirements of the program, Dongguk planned to increase its faculty by inviting individuals who could expand the reach of its cultural and art history academic offerings. Dongguk received resumés from a number of individuals, including Shin, who might qualify as special hiring candidates. Upon reviewing Shin's resumé, Ki Sam Hong, the then-President of Dongguk ("President Hong"), determined that she was qualified to be a special hiring candidate for the art history department. He suggested the hiring of Shin to Woo Taik Jung and Ye Kyung Jung, who are professors in the art history department at Dongguk. Both professors agreed with President Hong and submitted a recommendation form supporting Shin as a special hiring candidate. They noted in the recommendation form that the hiring of Shin was necessary to diversify Dongguk's academic offerings and strengthen its cultural studies program. They further noted that Shin had the credentials Dongguk was looking for in connection with its application for the Specialization Project.

On August 4, 2005, Shin submitted her application for a faculty position, together with a list of her accomplishments, including the art exhibitions in which she had participated and the dissertation she claimed to have written for her Ph.D. Shin further submitted the following documents: her résumé; the career certificates from Sungkok Art Museum and Kumho Art Museum confirming her work experience as a curator; the career certificates from Ehwa Women's University, Hongik University, Chung Ang University, Kookmin University, Hanyang University and Sang Myung University confirming her work experience as a lecturer; the May

- 6 -

27, 2005 letter from Yale certifying Shin's Ph.D. in art history ("Certification Letter"), and; the certificate of graduation from the University of Kansas dated May 23, 1996 confirming Shin's Master of Business Administration in degree from the School of Liberal Arts and Bachelor of Fine Arts degree.  In compliance with the special hiring procedures, President Hong and Suk Chun Yoo ("Yoo"), who was the Chairman of the Office of Planning Affairs at the time, reviewed the application materials submitted by the special hiring candidates and determined that Shin was eligible for the interview.

On August 8, 2005, the following individuals interviewed Shin: President Hong; Byung Shik Kim, who was the Vice President at the time; Young Ho Lee, who was the Chairman of Jeonggak Won (Dongguk's Buddhist Center); Yoon Kil Seo, who was the Dean of the Graduate School, and; Yoo.  After the interview process was completed, the same interviewers selected thirteen special hiring candidates, including Shin, who were qualified to be Dongguk's faculty members.

On August 12, 2005, the Faculty Hiring/Promotion Committee, which consists solely of professors, voted on the hiring of the special hiring candidates, including Shin.  Hyung Taik Ahn, Sung Gu Cho, Kwang Pyo Hong, Young Dong Kim, Sang Il Lee, Jae Hyun Son and Yoo were the committee members that participated in the meeting.  The committee members unanimously consented to the hiring of Shin.

Subject to and without waiving the General Objections, Dongguk will identify non-privileged, non-confidential documents that are responsive to this Interrogatory at the time of production.  Upon execution of the confidentiality stipulation, Dongguk will further identify bates numbers of all non-privileged, confidential documents, if any, that are responsive to this Interrogatory.

- 7 -

## VERIFICATION

I, _Jin-Soo Han_ hereby certify that I have reviewed the above

Interrogatories and responses thereto and that they are true and accurate to the best of my full

knowledge and belief.

Name: Jin-Soo Han
Title: Vice president

Subscribed and sworn to before me this _05_ day of _June_, 2009.

NOTARY PUBLIC   Young Kyoo Kong

# EXHIBIT 9

[DONGGUK0318153]

Appointment and Service Progress for Jeong Ah Shin

1. Process of special appointment discussion with department of fine arts history prior to 8/4/2005
   A. Centered on statement by professor Woo Taik Jung
   B. At the time of approval by former president Ki Sam Hong in relation with department affairs in late June 2005, president Hong presented needs for academic versatility for the department of fine arts history, so I said that the first priority of our department of fine arts history is specification of the area of oriental (Buddhism) fine arts.
   C. Had an interview upon the request by president Hong on 7/22/2005. At the time, former president Hong mentioned that our university must have a talent like Jeong Ah Shin for the "Business of Cultural Contents Capital Zone Specification." At the time, he also mentioned specification of the oriental (Buddhism) fine arts history area and mentioned that it would be impossible to hire any faculty members for the area of western fine arts history. The department of fine arts told president Hong that it tended to be positive to hire faculty for western fine arts history or the exhibition planning area. President Hong talked to the professor of the department of fine arts on the phone.
   D. Manager of the planning office, Seok Chun Yoo, requested an interview on the phone on 8/3/2005. He presented the resume of Jeong Ah Shin and said he would hire Jeong Ah Shin this semester by special invitation. I said that it would be impossible for the same reasons as before. I was asked to cooperate, indicating that this special invitation would hire someone who would play a big role in obtaining a large-scale project for the School. I decided to accept it, as it was related to advancement of the School, and requested the T/O of one teacher in the department of fine arts history as a premise. Afterward, the manager of the planning office informed that it would be impossible to increase T/O. The department of fine arts history requested for Jeong Ah Shin to be hired as a special appointment in the current semester, but that her affiliation be changed within 1 year. The condition of the affiliation change was accepted by the School.
   E. A special invitation application was signed by professor Ye Kyung Jung at the request of the School on 8/4/2005, and a recommendation was sent to the teacher personnel affairs team.

2. 8/4/2005: Special invitation application filed.
   A. Professor Woo Taik Jung informed the teacher personnel affairs team on the phone that only the recommendation for Jeong Ah Shin of the fine arts history department would be filed, and other documents would be submitted by professor Jeong Ah Shin. (A representative of the teacher personnel affairs team called professor Woo Taik Jung.)

B.  Documents other than certificates of her academic record and degrees were submitted to the teacher personnel affairs team in person on the following day or prior to an interview examination.

[DONGGUK0318154]

3.  8/8/2005: Interview examination (President, Interview member)

4.  8/12/2005: The teacher personnel affairs committee at the time reviewed and approved the
    special invitation and other issues.

5.  8/16/2005: The teacher personnel affairs team sent an official letter of recommendation for
    personnel affairs to the School Corporation (approved by the president).

6.  8/30/2005: Her appointment was approved at the 212th board of directors' meeting.

7.  9/5/2005: Inquiry on the academic records of Jeong Ah Shin
    A.  Professor Won Dae Oh of the fine arts department raised doubts about the academic
        record of Jeong Ah Shin to president Ki San Hong, and since the director position of the
        planning office was vacant at the time, the president ordered verification of her academic
        history from the teacher personnel affairs team leader, Hyung Taik Ahn.
    B.  The teacher personnel affairs team prepared an official document stating that it would
        make inquiries to Yale University and the University of Kansas regarding her academic
        records, and sent a letter regarding the academic record inquiry of Jeong Ah Shin to only
        the Graduate School of Yale University via the school post office on September 6. (The
        first priority was verification of her final academic record.)

8.  9/22/2005: Reply to the academic record inquiry (Statement by team leader Hyung Taik Ahn)
    A.  The reply document regarding the academic record inquiry was received from the
        Graduate School of Yale University. The fax arrived with the written verification of the
        doctorate degree submitted by Jeong Ah Shin and the letter sent from our school to Yale
        University attached.
    B.  It was verified that she had acquired a doctorate degree from Yale University, and team
        leader Hyung Taik Ahn reported this to the president.

9.  Early September 2005: Jeong Ah Shin submitted her resignation to the president.

10. 9/29/2005: Personnel decision of suspension for Jeong Ah Shin recommended.

[DONGGUK0318155]

    A. Suspension without pay for 6 months was recommended to the Corporation. At the time, for the official letter of personnel affairs recommendation, various specification businesses and the previous case that a teacher was appointed and then suspended were taken into consideration, and it was handled as a 6-month suspension without pay (approved by the president).

    B. It was thought that it was not a suspension pursuant to the customary regulations, but a suspension based on the judgment of a policy maker.

11. Early 10/11/2005: Suspension approved by the Corporation.

12. 12/26/2005: Her affiliation changed to the academy of liberal arts education

    A. The academy of liberal arts education requested a change in her affiliation. It was identified that the decision was made upon discussion with the then-director of the liberal arts education academy, Jong Yeon Hwang, and the president Ki Sam Hong.

    B. The reason for her affiliation change was indicated on the official letter of request for affiliation change in that a part of the capital zone specification business was performed at the liberal arts education academy, so professor Jeong Ah Shin was found to be an appropriate person.

    C. The above does not constitute a problem with administration nor does it violate the regulations.

13. 2/16/2006: Affiliation change approved.

14. 2/22/2006: Reinstatement was approved by the Corporation.

15. 3/1/2006: Reinstated as a professor affiliated with the liberal arts education academy.

# 신정아 임용 및 복무 경과 과정

1. 2005년 8월 4일 이전 미술사학과와 특별채용 논의과정

가. 정우택 교수 진술을 중심으로

나. 2005년 6월 하순경 학과 관련 업무로 홍기삼 전 총장의 결재 시 홍 총장님이 미술사학과의 학문의 다변화 필요성 제기하였고, 우리대학 미술사학과는 동양(불교)미술사분야의 특성화가 우선이라고 이야기함.

다. 2005년 7월22일 홍 총장의 호출로 면담. 당시 홍기삼 전 총장이 우 리대학은 '문화컨텐츠 수도권 특성화 사업'으로 신정아 같은 인재가 꼭 필요하고 언급함. 당시도 동양(불교)미술사분야의 특성화를 언급하고 서양미술사분야 교원채용은 불가함을 언급함. 미술학과에서는 서양미 술사 또는 전시기획분야의 교원채용은 긍정적인 편이라고 홍 총장에 게 이야기함. 홍 총장이 미술학과 교수와 통화함.

라. 2005년 8월3일 유석천 기획처장이 전화로 면담을 요청함. 신정아의 이력서를 제시하며 신정아를 이번 학기 특별초빙으로 채용하고자 한 다고 말함. 종전과 동일한 사유로 불가하다고 말함. 이번 특별초빙이 학교의 대형 프로젝트 수주에 큰 역할을 할 사람을 채용하는 것이다. 협조해 달라는 요청을 받음. 학교의 발전과 관계된 일이라 수용하기로 하고 전제로 미술사학과 교원 T/O 1석을 요청함. 이후 기획처장이 T/O 증원은 불가함을 전해옴. 미술사학과에서 금 학기 특별초빙으로 신정아를 채용하되 1년 안에 소속변경을 요청함. 소속변경 조건을 학 교에서 수용함.

마. 2005년 8월 4일 학교의 요청에 의해 특별초빙 신청서에 정예경 교수 와 날인하고 추천서를 교원인사팀에 보냄.

2. 2005년 8월 4일 : 특별초빙 신청서 접수

가. 미술사학과의 신정아 특별초빙 추천서만 접수되고, 기타 서류는 신정 아 교수가 제출할 것이라고 정우택교수가 전화통화로 교원인사팀에 말함.(교원인사팀 담당자가 정우택 교수에게 전화를 함).

나. 성적증명서 및 학위기를 제외한 서류가 다음날 또는 면접심사전까지

Confidential

DONGGUK0318153

신정아로부터 직접 교원인사팀에 제출됨.

3. 2005년 8월 8일 : 면접심사(총장, 면접위원).

4. 2005년 8월12일 : 교원인사위원회에서 당시 특별초빙 및 기타 안건에 대한 심의 동의를 함.

5. 2005년 8월16일 : 교원인사팀에서 학교법인에 인사제청 공문 보냄(총장결재)

6. 2005년 8월30일 : 제212회 이사회에서 임용 승인.

7. 2005년 9월 5일 : 신정아 학력조회
  가. 미술학과 오원배 교수가 홍기삼 총장에게 신정아의 학력의혹을 제기하고, 당시 기획처장이 공석인 관계로 안형택 교원인사팀장에게 총장이 학력검증을 지시함.
  나. 교원인사팀에서 예일대학교 및 캔사스대학에 학력조회를 하겠다는 공문을 작성하고, 9월 6일 학교 우체국을 통해 예일대학교 대학원으로만 신정아의 학력조회 우편을 발송함. (최종학력 검증이 우선임)

8. 2005년 9월22일 : 학력조회 회신(안형택 팀장 진술)
  가. 예일대학원에서 학력조회에 대한 회신문서를 접수. 신정아가 제출한 박사확인서와 우리대학에서 예일대학로 보낸 서신문이 첨부된 팩스가 도착.
  나. 예일대학교 박사학위 취득자임을 확인하고, 안형택 팀장이 총장에게 보고함.

9. 2005년 9월 초 : 신정아가 총장에게 사직을 표명함.

10. 2005년 9월29일 : 신정아 휴직 인사제청

Confidential

DONGGUK0318154

　가. 법인에 6개월 무급휴직을 제청함. 당시 인사제청 공문에는 각종 특성
　　화 사업 및 타 교원의 임용 후 휴직의 선례가 있는 점을 고려하여 6
　　개월간 무급휴직 처리함. (총장결제)

　나. 통상적인 규정에 의한 휴직이 아니고, 정책권자의 판단에 의한 휴직
　　이라고 판단함.

11. 2005년10월11일 : 법인으로부터 휴직 승인.

12. 2005년12월26일 : 교양교육원으로 소속변경

　가. 교양교육원에서 소속변경을 요청. 당시 황종연 교양교육원장과 홍기
　　삼 총장의 논의를 거쳐 결정된 깃으로 파악되었음.

　나. 소속변경 사유는 수도권 특성화 사업의 일부를 교양교육원에서 수행
　　하고 있어, 신정아 교수가 이에 적합한 인물로 판단하였다고 소속변경
　　요청공문에 적시되었음.

　다. 행정적으로 문제가 되거나, 규정에 위배되는 사항은 아님.

13. 2006년 2월16일 : 소속변경 승인

14. 2006년 2월22일 : 법인으로부터 복직 승인됨.

15. 2006년 3월 1일 : 교양교육원 소속 교수로 복직.

Confidential

DONGGUK0318155

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0318153-55 from the Korean language into the English language.

I further certify that translation of DONGGUK0318153-55 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_____
Kwang Park
**Professional Translator**

Subscribed and sworn to before me on ___27___ day of __July__, _2011_ (year)

_____
(Signature of Notary)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Notary Stamp)

# EXHIBIT 10

Yale University *New Haven, Connecticut 06520*

GRADUATE SCHOOL

May 27 2005

Ms. Jeong Ah Shin
Sungkok Art Museum
1-101 Shinmoonro 2Ga
Jongrogu, Seoul, Korea

FOR STUDENT CERTIFICATION PURPOSES

NAME : Jeong Ah Shin

DATE OF BIRTH : April 28, 1972

MAJOR : History of Art (Twentieth Centry Art)

DATE OF ADMISSION : August 1996

DATE OF GRADUATION : May 2005

DEGREE RECEIVED : Ph.D

THIS IS TO CERTIFY THAT THE ABOVE STATEMENT IS TRUE AND

CORRECT

Pamela Schirmeistr
Associate Dean
Graduate School

cc:  Professor Christine Mehring
     History of Art Department, DGS

*19*

Confidential

DONGGUK0357992

# EXHIBIT 11

 

# DONGGUK UNIVERSITY

Office of Planning   Affairs
Dongguk University
26, Pil-dong 3-ga, Chung-gu
Seoul, 100-715 Korea
TEL) 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-3853,3858
FAX) 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-3857

September  5, 2005

Graduate School
Yale University
New Haven, CT 06520
USA

To Whom It May Concern:

I would like to confirm whether you can verify the contents of the enclosed letter issued by your University for Ms.  Jeong-Ah Shin

Since this is being done as a part of internal procedure for employing a faculty member at Dongguk University, your verification will be kept confidential.  It would be very kind of you to send us the information we have requested as soon as possible.

Sincerely yours,

Prof. Dr. Hyung Taik, Ahn
Department Manager, Dongguk Univ. Personnel Administration Team

Confidential

DONGGUK0358385



Yale University *New Haven, Connecticut 06520*

GRADUATE SCHOOL

May 27 2005

Ms. Jeong Ah Shin
Sungkok Art Museum
1-101 Shinmoonro 2Ga
Jongrogu, Seoul, Korea

FOR STUDENT CERTIFICATION PURPOSES

NAME : Jeong Ah Shin
DATE OF BIRTH : April 28, 1972
MAJOR : History of Art (Twentieth Centry Art)
DATE OF ADMISSION : August 1996
DATE OF GRADUATION : May 2005
DEGREE RECEIVED : Ph.D

THIS IS TO CERTIFY THAT THE ABOVE STATEMENT IS TRUE AND

CORRECT

Pamela Schirmeistr
Associate Dean
Graduate School

cc:  Professor Christine Mehring
      History of Art Department, DGS

Confidential

DONGGUK0358386

# EXHIBIT 12

SEP-22-2005  13:30      YALE-GRAD SCHOOL     A              203 432 6904     P.01

# YALE UNIVERSITY
## GRADUATE SCHOOL OF ARTS & SCIENCES

### FACSIMILE TRANSMITTAL SHEET

| TO: Prof. Dr. Hyung Taik, Ahn | FROM: Dean Pamela Schirmeister |
|---|---|
| COMPANY: Dongguk University | DATE: 9/22/2005 |
| FAX NUMBER: 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-3857 | TOTAL NO. OF PAGES INCLUDING COVER: 3 |
| | PHONE NUMBER: 203-436-2628 |
| | FAX NUMBER: 203-432-6904 |

NOTES/COMMENTS:

As requested I am confirming that the attached letter was issued by the Yale Graduate School and signed by me.



[CLICK HERE AND TYPE RETURN ADDRESS]

Confidential

DONGGUK0358387

SEP-22-2005  13:31        YALE GRAD SCHOOL      A                    203 432 6904      P.03

# DONGGUK UNIVERSITY

Office of Planning   Affairs
Dongguk University
26, Pil-dong 3-ga, Chung-gu
Seoul, 100-715 Korea
TEL) 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-3853,3858
FAX) 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-3857

September  5, 2005

Graduate School
Yale University
New Haven, CT06520
USA

To Whom It May Concern:

I would like to confirm whether you can verify the contents of the enclosed letter issued by your University for Ms.  Jeong-Ah Shin

Since this is being done as a part of internal procedure for employing a faculty member at Dongguk University, your verification will be kept confidential.  It would be very kind of you to send us the information we have requested as soon as possible.

Sincerely yours,

Prof. Dr. Hyung Taik, Ahn
Department Manager, Dongguk Univ. Personnel Administration Team

Confidential

DONGGUK0358388

SEP-22-2005  13:30          YALE GRAD SCHOOL   A                    203 432 6904      P.02

Yale University New Haven, Connecticut 06520

GRADUATE SCHOOL

May 27 2005

Ms. Jeong Ah Shin
Sungkok Art Museum
1-101 Shinmoonro 2Ga
Jongrogu, Seoul, Korea

**FOR STUDENT CERTIFICATION PURPOSES**

NAME : Jeong Ah Shin

DATE OF BIRTH : April 28, 1972

MAJOR : History of Art (Twentieth Centry Art)

DATE OF ADMISSION : August 1996

DATE OF GRADUATION : May 2005

DEGREE RECEIVED : Ph.D

THIS IS TO CERTIFY THAT THE ABOVE STATEMENT IS TRUE AND

CORRECT

Pamela Schirmeistr
Associate Dean
Graduate School

cc:  Professor Christine Mehring
     History of Art Department, DGS

Confidential

DONGGUK0358389

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

DONGGUK UNIVERSITY v. YALE UNIVERSITY                                    January 28, 2010

Page  1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)


------------------------x

DONGGUK UNIVERSITY,          :

            Plaintiff,       :

      -versus-               :-

YALE UNIVERSITY,             :

            Defendant.       :

------------------------x



            Deposition of PAMELA SCHIRMEISTER,

      taken pursuant to the Federal Rules of Civil

      Procedure, at the law offices of Jacobs,

      Grudberg, Belt, Dow & Katz, PC, 350 Orange

      Street, Connecticut, before James A. Martone,

      L.S.R. #00248, and a Notary Public in and for

      the State of Connecticut, on January 28, 2010,

      at 9:39 a.m.

DONGGUK UNIVERSITY v. YALE UNIVERSITY

**Page 30**

1  happened.
2      Q.  Okay.
3      A.  It is not my memory of what happened.
4      Q.  I'm confused by that answer.  Were you
5  making it up?  Were you surmising?  Or were you
6  telling Mr. Butler, who I think you said is your
7  boss, what happened?
8      A.  I was telling him what I believed had
9  happened, based on the only explanation that made
10  sense to me.
11      Q.  Okay.  What you believed had happened is
12  that you received this document, the fax, you looked
13  at it, correct?
14      A.  I don't remember receiving it, so I
15  can't -- I can't make a statement about what
16  happened when I received it.
17      Q.  I think you just told me you wrote in this
18  e-mail what you believed had happened.
19      A.  But not what I remembered.
20      Q.  I'm simply going on what you believed what
21  happened.  What you believed happened was you
22  received this document and you looked at it; that's
23  what you believed had happened, correct?
24      A.  Yes.
25      Q.  Okay.  And when you looked at it, you said

**Page 31**

1  that the attached letter, you believed, this is your
2  belief, looked like a degree audit that you had
3  already done; am I correct?
4      A.  Yes.
5      Q.  Okay.  And you don't have an actual
6  recollection of receiving it, but that's what you
7  think happened, right?
8      A.  That's the only explanation that makes
9  sense to me.
10      Q.  "I am guessing that the mistake," when you
11  use the word "mistake," what are you referring to?
12          MR. SPRINGER:  I'm sorry, did you --
13      Q.  "I didn't do the audit again.  I would not
14  normally have done so," that's what you wrote.
15  Right?
16      A.  Yes, that's what it says.
17      Q.  And then you say, "I do not remember
18  receiving the fax two and a half years ago, but I am
19  guessing that the mistake occurred because on
20  September 5th, amidst the general chaos of the start
21  of the semester, I did not read the audit itself
22  carefully."
23          What did you mean by "mistake"?
24      A.  I mean that I mistakenly confirmed that I
25  had issued that letter.

**Page 32**

1      Q.  And you mistakenly confirmed that you
2  confirmed the letter because of general chaos?
3          MR. SPRINGER:  Objection.
4      A.  The letter says what the letter says.
5      Q.  I understand.
6      A.  The general chaos of the start of the
7  semester.
8      Q.  Well, you, in fact, confirmed it on
9  September 22nd; am I correct?
10      A.  I confirmed -- I'm sorry, what are you
11  asking that I confirmed?
12      Q.  When you -- You didn't confirm the fax,
13  the request on September 5th; am I correct?
14      A.  I'm sorry, I'm just confused about which
15  thing you're referring to.
16      Q.  You are?  You sent out a document that
17  confirmed -- I've given that to you as Exhibit --
18      A.  Exhibit 7.
19      Q.  7.  And that was sent on September 22nd,
20  on September 5th; am I right?
21      A.  Correct.
22      Q.  So I'm trying to understand what the
23  reference to September 5th is?
24      A.  The reference to September 5th is the date
25  that is on the original request.

**Page 33**

1      Q.  But it wasn't received on September 5th,
2  it was sent on September 5th?
3      A.  That's correct.
4      Q.  Okay.  So what does the chaos regarding
5  September 5th have to do with anything?
6          MR. SPRINGER:  Objection.
7      A.  I don't recall writing this e-mail, but I
8  believe that I'm referring to the chaos that
9  characterizes the beginning of the school year.
10      Q.  And when does the school year begin,
11  typically?
12      A.  Normally shortly before Labor Day.
13  Shortly after Labor Day.
14      Q.  So at the time that you confirmed the
15  document, it was September 22nd, was there still the
16  type of chaos that you're referring to?
17      A.  Yes.
18      Q.  What does that chaos consist of?
19      A.  It consists of all of the returning
20  students requiring what they require to have their
21  registration, to have their outstanding grades
22  corrected or recorded, to submit their -- I mean,
23  there are many, many kinds of requests that come
24  from students at that time of the year, and there
25  are many requests that come from faculty at that

Page 38

1    Q.  Okay.
2    A.  That's what the sentence says, that it's a
3  conjecture.
4    Q.  Okay.  Do we have any other explanation?
5    A.  For --
6    Q.  For what happened.
7    A.  No.  I believe that what happened is that
8  I saw the letterhead, I saw my signature, and I was
9  taken in by fraud.
10   Q.  Well, the whole purpose of the
11 verification process is to avoid fraud, isn't it?
12 That's why the policy of Yale is to go back to the
13 original records?
14   A.  Yes.
15   Q.  Okay.  So wasn't the correct procedure for
16 you, upon receipt of this document, was to send it
17 to the registrar?
18   A.  No.
19   Q.  No, that was not the correct procedure?
20   A.  Not if this conjecture was correct.
21   Q.  You received a letter, which states, "I
22 would like to confirm whether you can verify the
23 contents of the enclosed letter."
24        The enclosed letter purports,
25 purports, to show that Yale awarded a degree, right?

Page 39

1    A.  Yes.
2    Q.  Okay, and it is the Yale policy that you
3  never rely on any documents that are sent to you to
4  verify degrees; isn't that correct?
5        MR. SPRINGER:  Objection.
6    A.  I do not understand this to be a degree
7  verification.
8    Q.  Could you answer the --
9        MR. SPRINGER:  Please let her finish.
10       MR. WEINER:  I will move to --
11       MR. SPRINGER:  No, no, no, please let
12 her finish.
13       MR. WEINER:  Finish -- I would move
14 to strike whatever is nonresponsive.
15       MR. SPRINGER:  You can move whatever
16 you want.
17       MR. WEINER:  I know.
18   Q.  Go ahead.
19   A.  I state in this letter that I did not
20 understand this to be a request for a degree
21 verification, because the verification appeared,
22 or -- and appears already to have been done.
23   Q.  The policy that Yale has is that all
24 verifications must be based upon records within Yale
25 University; is that correct?

Page 40

1    A.  Yes.
2    Q.  And not on anything that is sent by the
3  person making the inquiry; is that correct?
4    A.  Yes.
5    Q.  Okay.  And what you received was a letter
6  seeking verification and something that purported to
7  be a Yale verification; is that right?
8    A.  That's -- I -- In the context of what we
9  know now, I believe it could be interpreted that
10 way.
11   Q.  I'll read it so it's clear for the record.
12        "To whom it may concern:  I would
13 like to confirm whether you can verify the contents
14 of the enclosed letter issued by your university for
15 Ms. Jeong Ah Shin.  Since this is being done as part
16 of internal procedure for employing a faculty member
17 at Dongguk University, your verification will be
18 kept confidential.  It would be very kind of you to
19 send us the information we have requested as soon as
20 possible."
21        This letter seeks a verification of
22 whether someone obtained a degree from Yale; isn't
23 that correct?
24       MR. SPRINGER:  Objection.
25   A.  This letter includes the verification.

Page 41

1    Q.  And they're asking --
2        MR. SPRINGER:  Please let her
3  finish.
4    A.  The letter to which the inquiry on the
5  first page refers, which is the letter dated May
6  27th, 2005 --
7    Q.  Right.
8    A.  -- appears to include a verification that
9  had been done already on May 27th.
10   Q.  Right, which may or may not be authentic,
11 correct?
12   A.  We know that now.
13   Q.  You knew it then, any time -- Let me
14 finish my question.
15   A.  Sorry.
16   Q.  Any time someone sends a request for
17 verification, the policy is it's to go to the
18 registrar, correct?
19       MR. SPRINGER:  Objection; asked and
20 answered.  We've been over this.
21        You can answer.
22   A.  That is the policy.
23   Q.  And the policy is also that you never
24 verify based upon the documents that are sent to
25 you?

Page 166

```
 1      A.  Yes.
 2      Q.  But you just don't remember when?
 3      A.  Correct.
 4      Q.  Could it have been August?
 5      A.  Could it have been August?
 6      Q.  Yes.
 7      A.  Yes, it could have been August.
 8      Q.  Could it have been September?
 9      A.  I don't believe so.
10      Q.  How about July?
11      A.  That's possible.
12      Q.  What makes you able to determine that it
13  was July or August but not September?
14      A.  Now, what makes me certain about that?  I
15  don't remember when I asked her.
16      Q.  But you were able to somehow give me a
17  range of dates, somewhere in July or August.  What
18  makes you believe it was in that range as opposed to
19  let's say September or October?
20      A.  What makes me believe that now is that in
21  September and October, we would be very busy, and I
22  would not be doing that at that time.
23      Q.  Were you aware that your assistant
24  actually did search the files in October --
25      A.  Yes.
```

Page 167

```
 1      Q.  -- at your request?
 2      A.  Yes.
 3      Q.  So was that the request?
 4      A.  No.
 5      Q.  You requested her to do it twice?
 6      A.  Yes.
 7      Q.  Why?
 8      A.  I don't remember.
 9      Q.  You didn't believe her the first time when
10  she said she didn't find it?
11      A.  No, I didn't disbelieve her.
12      Q.  Well, you just told me that you asked her
13  to search sometime in July or August, and she told
14  you she couldn't find anything, correct?
15      A.  Yes.
16      Q.  And then you asked her again in October,
17  when you were in a very busy period?
18      A.  Yes.
19      Q.  You didn't believe her response the first
20  time?
21      A.  I did believe her response the first time.
22      Q.  Then why did you ask her a second time, in
23  October?
24      A.  I believe I was asked again to do it.
25      Q.  You were asked to do what?
```

Page 168

```
 1      A.  To look through the files again.
 2      Q.  Who asked you?
 3          MR. SPRINGER:  I'm going to object at
 4  this point.  It involves attorney-client privilege.
 5          MR. WEINER:  Why is that a
 6  privilege?
 7          MR. SPRINGER:  Sure it's a privilege.
 8          MR. WEINER:  That she was asked to
 9  search her files?
10          MR. SPRINGER:  Beyond that.
11      Q.  Well, I'm asking you who asked you to
12  search the files in October?
13      A.  I believe that Harold Rose did.
14      Q.  And did you search the files in October?
15      A.  I did not.  I asked my assistant to do
16  that.
17      Q.  Same thing you had asked her to do
18  earlier?
19      A.  Yes.
20      Q.  But somehow this time she found it?
21      A.  She did find it in October.
22      Q.  Okay.  Let me show you exhibit -- Did I
23  give you 55?  I think I may have?
24          MR. SPRINGER:  You did.
25      A.  Yes.
```

Page 169

```
 1      Q.  Could you tell me what you were referring
 2  to when you refer to this fraudulent application
 3  from a Chinese student?
 4      A.  Yes.  We run a random credentials check on
 5  like 5 percent of our applicants, and in the course
 6  of doing that, one of them it turned out had forged,
 7  or fabricated, the documents in his application to
 8  the graduate school.
 9      Q.  What is a random credential check?
10      A.  What I referred to before, we -- we
11  randomly choose 5 percent of the applications to
12  check.  We run a credential check on them.
13      Q.  And how long has that been done?
14      A.  I'm not sure.
15      Q.  More than two years, three years, five
16  years?
17      A.  I believe it has been done since I have
18  been there, but I don't know when the practice was
19  started.
20      Q.  At least from the time that you were there
21  in 1991?
22      A.  No.  I started in '99.
23      Q.  '99, excuse me.
24      A.  I don't -- I don't know if we did it in
25  1999.
```

Page 186

1    July 20th, 2007. I believe that's in response to
2    her -- your e-mail back to Gila Reinstein. Do you
3    see it?
4        A.  Yes, I see it.
5            MR. WEINER: I'm going to break now
6    and we'll discuss this document after you've changed
7    the tape.
8            THE VIDEOGRAPHER: Off the record at
9    2:52 p.m.
10           (Recess: 2:52 to 2:59 p.m.)
11           THE VIDEOGRAPHER: Back on the record
12   at 2:59 p.m. This begins disk No. 3.
13   BY MR. WEINER:
14       Q.  Mrs. Schirmeister, the exhibit we were
15   just discussing, Schirmeister Exhibit 61, begins
16   with your request from the reporter of the Buddhist
17   Weekly newspaper. And we had discussed the earlier
18   e-mails about who was going to respond to the
19   reporter.
20           In this e-mail do you see where
21   Ms. Reinstein says that she will respond?
22       A.  Yes, I do.
23       Q.  Okay. And do you recall that you received
24   her response to you?
25       A.  I don't specifically recall receiving it.

Page 187

1        Q.  Do you have any reason to believe you did
2    not receive it?
3        A.  No.
4        Q.  Okay. And she says at 10/14 a.m. on July
5    20th, 2007, "Okay, I'll reply to the journalist and
6    repeat the usual."
7            Do you know what she meant when she
8    said "repeat the usual"?
9        A.  The colon indicates that what follows is
10   the usual.
11       Q.  Which was the usual response that Yale was
12   giving to Korean reporters at that time regarding
13   these documents; is that correct?
14       A.  I don't know if this was the usual
15   response they were given.
16       Q.  Well, when she says "repeat the usual,"
17   you did not know what she meant?
18       A.  I'm saying grammatically, what follows the
19   colon is -- "the usual" refers to that, so that is
20   what is the usual.
21       Q.  Then you were aware at the time that that
22   was the usual response?
23           MR. SPRINGER: Objection.
24       A.  I -- I don't know if I was aware of that
25   or not. I don't know if that's the case or not.

Page 188

1        Q.  Did you and Miss Reinstein discuss this
2    matter at all during July of 2007?
3        A.  Yes.
4        Q.  And what did you and she discuss?
5        A.  We discussed what we thought had
6    happened.
7        Q.  Specifically what did you discuss?
8        A.  I don't remember specifically what we
9    discussed.
10       Q.  Do you have any recollection in form or
11   substance what she said to you and what you said to
12   her?
13       A.  No.
14       Q.  She then goes on after she says repeat the
15   usual, "Shin was never a student here." Now that
16   was true, was it not?
17       A.  Yes. That's true.
18       Q.  "Neither Pam Schirmeister nor any other
19   Yale official signed documents about her."
20           Now that's technically true because
21   you didn't sign the September 22nd fax, so that
22   could be technically true; is that correct?
23       A.  Yes.
24       Q.  "Yale has no record of her at all." Now,
25   that would not be correct?

Page 189

1            MR. SPRINGER: Objection.
2        Q.  Yale had a record of her September 22nd,
3    2005 fax, correct?
4            MR. SPRINGER: Objection.
5        A.  I think it depends what's meant by
6    "record," which I don't know.
7        Q.  You don't know what the word "record"
8    means, when she is referring to it in this e-mail?
9        A.  No, I don't.
10       Q.  Do you think that the Korean media, to
11   whom this usual response was given, understood what
12   the word "record" meant, when Miss Reinstein on
13   behalf of Yale says, "Yale has no record of her at
14   all"?
15       A.  I -- I don't know how they understood it.
16       Q.  Okay. The phone and fax numbers on the
17   false documents are correct but readily available.
18   The phone and fax number on -- fax number on the
19   first page of Exhibit 7 is not a false document, is
20   it?
21           MR. SPRINGER: Objection.
22       A.  I'm sorry?
23       Q.  Exhibit 7?
24       A.  Repeat the whole question again.
25       Q.  Sure, I'll be glad to.

DONGGUK UNIVERSITY v. YALE UNIVERSITY

January 28, 2010

50  (Pages 194 to 197)

Page 194

1     A.  Yes.
2     Q.  And you respond, "No, that sounds fine to
3   me," right?
4     A.  Yes.
5     Q.  So it sounded fine to you, that the false
6   documents -- that the cover sheet was a false
7   document?
8          MR. SPRINGER:  Objection.
9     A.  I don't know.
10    Q.  You thought her language was fine?
11    A.  That's -- that's what the e-mail says.
12    Q.  And you thought it was fine to imply that
13  Yale had not received the September 5th, 2005 letter
14  from Dongguk; that was okay with you, too?
15         MR. SPRINGER:  Objection.  Which
16  question are you asking?  You're asking multiple
17  questions with each question now.
18         MR. WEINER:  Could I just hear the
19  last two questions?
20         (Record read.)
21    Q.  Is that okay with you, to imply, to send
22  out to the Korean reporter a statement that implied
23  that Yale had not received the September 5th, 2005
24  request?
25         MR. SPRINGER:  Objection.

Page 195

1     A.  I'm saying here that what she says below
2   sounds fine.  Anything else, no.
3     Q.  Okay.  As far as you were concerned, what
4   she was saying was accurate, even though it was not?
5          MR. SPRINGER:  Objection.
6     A.  As I say, I don't recall having read this
7   e-mail specifically.
8     Q.  All right.  Let me show you Exhibits 62
9   and 63.  62 is an e-mail from you to a Korean
10  reporter, dated July 19th, 2007, Bates-stamped 701
11  through 702.
12         And 63 is a similar e-mail from the
13  Korean reporter to Gila Reinstein, and it bears
14  Bates stamp 503.
15         And the reason I'm giving them to you
16  together, you'll see it's very difficult to read the
17  document that Yale produced, but I believe that the
18  language in the body of the two e-mails are the
19  same.
20         Do you recall seeing either of these
21  two e-mails prior to today?
22    A.  I do not.
23    Q.  If you look at what is No. 2 on Exhibit
24  62, which is difficult to read, but if you look at
25  the corresponding No. 2 on Exhibit 63, I think you

Page 196

1   will find that they are the same?
2     Q.  Well, the Korean reporter, do you have any
2          MR. WEINER:  And, Howie, if there is
3   a better copy of the exhibits, I'd appreciate it.
4          MR. SPRINGER:  I'm sure if they were,
5   we would have given them to you.
6          MR. WEINER:  Okay.
7     Q.  And No. 2 reads, "As you may know, it is
8   one of the biggest issues in Korea, that Ms. Shin
9   has been a professor with her falsified
10  certification.  Do you have any cases similar to
11  this, Ms. Shin's case, in your university?"
12         Were you aware, in July, that the
13  issues regarding Ms. Shin were among the biggest
14  issues in Korea?
15    A.  I don't remember.
16    Q.  Well, would it be likely that you did read
17  your e-mail and therefore had been aware of that?
18         MR. SPRINGER:  Objection.
19    A.  It would be likely that I would read my
20  e-mail.
21    Q.  And therefore, if you -- reading your
22  e-mail, you would know that the Shin issue was "one
23  of the biggest issues in Korea"?
24    A.  No, I would not know that.
25    Q.  Why would you not know that?

Page 197

1     A.  I don't know if that's true.
2     Q.  Well, the Korean reporter, do you have any
3   reason to disbelieve that?
4     A.  It's an evaluation.  It's a subjective
5   statement.
6     Q.  I know what it is.  Do you have any reason
7   to disbelieve it?
8     A.  I have no reason to believe it.
9     Q.  You have no reason to believe it, you had
10  been getting e-mails from reporters for weeks on
11  end, it had been a matter that had been referred to
12  the Office of Public Affairs and to the in-house
13  counsel at Yale, and you had been receiving copies
14  of documents that had your name on it, and you had
15  no reason to believe this was one of the biggest
16  issues in Korea when someone tells you that?
17    A.  No.
18    Q.  You had been receiving e-mails from your
19  colleagues containing references to the articles in
20  Korea and that still didn't tip you off that this
21  was a major issue?
22         MR. SPRINGER:  Objection.
23    A.  "Major issue" is not the same phrase as
24  one of the biggest issues.
25    Q.  Did you challenge that statement?  Did you

DONGGUK UNIVERSITY v. YALE UNIVERSITY

January 28, 2010

59  (Pages 230 to 233)

Page 230

1    A.  "Approximately" means near to.
2    Q.  And you were not only involved in June,
3  you were involved in a somewhat detailed way in
4  June, you were receiving e-mails from Susan Emerson,
5  Steven Goot, Jon Butler, Ed Barnaby, all about the
6  fax, and we went through this earlier, the professor
7  from the University of Missouri had indicated that
8  you had sent some materials.
9          So you had learned at that time, in
10  mid June, through a variety of different sources,
11  that the September 22nd fax was being attributed to
12  you, correct?
13    A.  That's correct.  I -- I would maintain
14  that my statement is accurate.  "Approximately"
15  means near to.  June is near to July.
16    Q.  I see.  "And she says she believes it was
17  from the Yale General Counsel's office but is not
18  certain," that's not correct either?  You knew you
19  had -- from your colleagues in your department,
20  received this information and from the registrar?
21    A.  This what I remember to have been the
22  case, and I do qualify it with I -- this is what I
23  think, I'm not certain.
24    Q.  And then "She read about the issue on a
25  webpage on the computer."  What did you read about,

Page 231

1  what webpage?
2    A.  I don't know.
3    Q.  What issue?
4    A.  The question of Miss Shin having or not
5  having a degree.
6    Q.  So your memory three and a half months or
7  four months or five months after you actually got
8  involved, pretty sketchy?
9          MR. SPRINGER:  Objection.
10    A.  No, I wouldn't characterize it that way.
11    Q.  Okay.  "After the issue came to light, she
12  requested the Graduate School Registrar's Office to
13  check their files for the name of Jeong Ah Shin."
14          When did you do that?
15          MR. SPRINGER:  Are you now skipping?
16          MR. WEINER:  Yes.
17          MR. SPRINGER:  Okay.  Can you tell
18  us where you skipped to?
19          MR. WEINER:  Sure, the bottom of the
20  first page.
21    A.  I don't remember the date.  In the summer,
22  in the summer of 2007.
23    Q.  You actually requested the graduate school
24  registrar's office to check their files?
25    A.  That's what it says.

Page 232

1    Q.  I know what it says.  I'm asking did you
2  do it?
3    A.  That's what I remember to have done then.
4    Q.  Did you, in fact, do that?
5    A.  I don't remember that now.
6    Q.  You have a document that reflects that
7  request?
8    A.  I don't know if I do or not.
9    Q.  Now it goes on, the second page,
10  "Schirmeister further explained that when she
11  examined the copy of the certification letter that
12  was provided by Dongguk University, she found that
13  it did bear Yale University letterhead, along with
14  the specific...information that the certification
15  document would contain."
16          What is a certification document?
17    A.  I think that it's referring to the
18  certification document that was provided by Dongguk.
19    Q.  That is the July 5th, 2005 letter that was
20  annexed to the September 5th, 2005 inquiry request?
21          MR. SPRINGER:  Objection.
22          MR. WEINER:  I'm trying to understand
23  what she's referring to.
24          MR. SPRINGER:  Well, you're stating
25  the wrong dates.

Page 233

1    A.  The certification letter is the one that
2  is written, or not -- I don't know when it's
3  written.  It's dated May 27th.
4    Q.  Okay.
5    A.  And I found that it did have the
6  letterhead, that, that letter, and that it did have
7  specific brief information that the document
8  contained.
9    Q.  I guess I'm confused by your testimony.
10  Is the May 27th, 2005 certification letter a
11  template, or created by a template?
12    A.  No.  Well, I don't know if it's created by
13  a template.  It's not created by a template that we
14  have.
15    Q.  So you now have a -- Did you have a
16  recollection of what you did in September of 2005 at
17  the time that you spoke to Sergeant Brano in 2007?
18    A.  No, I did not.
19    Q.  And when he says you further explained,
20  were you simply hypothesizing as to what you did?
21    A.  I was reconstructing, to the best of my
22  understanding, what must have happened, because it
23  would be the only thing that would make sense.
24    Q.  So when he says you explained what had
25  occurred -- I'll rephrase that.

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONGGUK UNIVERSITY, | ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| YALE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Dongguk University complaining of defendant Yale University respectfully

alleges and says as follows:

**PARTIES**

1.      Plaintiff Dongguk University is a private university organized under the laws of

Korea and whose principal place of business is in Seoul, Korea.

2.      Upon information and belief, defendant Yale University is a private university

organized under the laws of the State of Connecticut and whose principal place of business is in

New Haven, Connecticut.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1332 because there exists complete diversity of citizenship between the parties and the amount

in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      This Court possesses personal jurisdiction over this matter because Yale

University has sufficient contacts with the State of Connecticut.

5.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) inasmuch as

a substantial part of the events giving rise to the claims asserted herein occurred in this judicial

district.

## FACTS COMMON TO ALL COUNTS

### Dongguk University

6.      Plaintiff Dongguk University is one of the most important academic institutions in Korea and has developed a stellar reputation for the quality of its education in its one hundred years of existence.

7.      In 2005, the Korean Council of University Education chose Dongguk University as one of the Best Universities of the Year.

8.      Dongguk University was founded in 1906 by the Jogye Order, a Buddhist monastic order, and is one of the most prestigious Buddhist-affiliated universities in the world.

9.      The Jogye Order, which was established in 1354, is the largest and one of the most influential Buddhist Orders in Korea.  Adherents of the Jogye Order practice Seon (Zen) Buddhism and seek a path to enlightenment and understanding.

10.      One of the paths available to the Jogye Order adherents is to attend Dongguk University because of its impeccable reputation and because of its renowned Buddhist educational programs.

11.      Because of its Buddhist roots, Dongguk University became known for its strong humanist tradition and is known for its spirituality, morality and leadership.

12.      In connection with its oversight of Dongguk University, the Jogye Order established the Dongguk University Foundation, the Board of Directors of which provides general oversight and final approval of certain administrative matters of Dongguk University, including final approval of its proposed faculty members.

13.      While Dongguk University is one of the most well-known universities in the field of Buddhist studies in Korea, it has always been open to students and professors of all faiths and philosophies.

2

14.    Dongguk University currently offers approximately 100 undergraduate programs and over 100 graduate programs.  It has about 23,750 students and 900 faculty members from various parts of the world.

15.    Dongguk University has greatly contributed to the development of the basic sciences in Korea.  It has been ranked number one in Korea in the Basic Science Research Achievement Survey conducted by the Ministry of Science and Technology and the Korea Science and Engineering Foundation.

16.    Dongguk University is also known for its literature and cultural programs. Among its graduates are world-famous novelists and poets such as Jeong Rae Cho, Seok Young Hwang and Chong Ju So, who was nominated for the Nobel Prize five times.

17.    Dongguk University's alumni hold important and prestigious positions in Korean business, cultural, and governmental organizations.

18.    Through year-end 2006, Dongguk University's alumni and corporate donor contributions, government grants and student applications increased on an annual basis.

### Yale University

19.    Yale University, which was founded in 1701, is the third oldest institution of higher education in the United States and is a member of the Ivy League.

20.    Yale University's graduate programs, including those offered by Yale's Graduate School of Arts and Sciences, are internationally acclaimed.

21.    In 1861, Yale University's Graduate School of Arts and Sciences became the first school in the United States to award a Doctorate of Philosophy ("Ph.D.")

22.    Since 1861, Yale University's Graduate School of Arts and Sciences, as well as its other graduate schools, have awarded numerous Ph.D.'s to graduate students from around the world.

3

23.     Upon information and belief, because of Yale University's academic standing and reputation, Yale University has long been aware that unscrupulous individuals will falsify their academic records in order to assert that they have received graduate or post-graduate degrees from Yale University.

24.     Upon information and belief, Yale University, like other academic institutions, is concerned about its reputation and does not want individuals to represent themselves falsely as having received graduate or post-graduate degrees from Yale University.

25.     Upon information and belief, because Yale University receives numerous inquiries from academic institutions as well as other inquirers for verification of Ph.D.'s and other degrees purportedly awarded by Yale University, Yale University has established certain protocols regarding the verification of Ph.D.'s and other degrees claimed to have been awarded by Yale University.

26.     Upon information and belief, in developing these protocols, Yale University was at all times aware of the importance of complying with these protocols and the need to provide accurate information to the academic institutions and other inquirers who have sought to verify whether Yale University had awarded graduate or post-graduate degrees to particular individuals.

27.     Upon information and belief, Yale University, like other academic institutions, does not want to employ faculty members who have falsified their records by erroneously claiming that they have received degrees that they did not receive.

28.     Upon information and belief, just as Yale University receives inquiries seeking to verify whether an individual has received a degree from Yale University, Yale University regularly and routinely contacts other academic institutions in order to verify the academic credentials of individuals who are seeking faculty positions at Yale University.

4

29.     Upon information and belief, the information received from such academic institutions contacted by Yale University is relied upon by Yale University when determining whether to hire the individual about whom Yale University has inquired.

### Jeong Ah Shin

30.     Upon information and belief, Jeong Ah Shin ("Shin") is a citizen of Korea born in 1972.

31.     In 1997, at the age of 25, Shin became a part-time employee at the Kumho Art Museum.

32.     The Kumho Art Museum is a highly regarded Korean art museum that was established by the Kumho Cultural Foundation in 1996.

33.     Since its opening, the Kumho Art Museum has held numerous art exhibitions involving over 350 internationally renowned artists.

34.     Shin was promoted to curator of the Kumho Art Museum and, as curator, Shin was responsible for numerous museum shows and exhibitions.

35.     On March 16, 2001, Korea Economic Daily selected Shin as one of the women leaders in the field of curatorship.

36.     Shin served as curator of the Kumho Art Museum until December 2001 when she was hired by Sungkok Art Museum as its chief curator.

37.     The Sungkok Art Museum, which was founded by the Sungkok Art and Culture Foundation in 1995, is one of Korea's best-known modern art museums.

38.     The Sungkok Art Museum has also held exhibitions featuring the works of leading modern art artists from around the world and, as chief curator of the Sungkok Art Museum, Shin planned the exhibitions of many of these artists.

39.     In 2003, Wolganmisool, a Korean art magazine, awarded the Grand Prize to Shin for her achievement in exhibition planning.

40.     Upon information and belief, while employed by the Sungkok Art Museum, Shin taught graduate and undergraduate school classes at a number of universities in Korea, including but not limited to Hongik University, Hanyang University, Chung-Ang University, Kukmin University, Ihwa Women's University, and Sangmyung University.

41.     From 2004 to 2007, Shin frequently wrote art columns for Korean newspapers in which she discussed various topics including art, exhibitions, and her experience as a curator.

42.     On May 8, 2005, Kukmin Ilbo, a Korean newspaper, ran an article stating that Shin had obtained a Ph.D. in Western Art History from Yale University's Graduate School of Arts and Sciences.

### Dongguk University's Decision To Expand Its Art History Department

43.     In 2005, Dongguk University was planning to increase its faculty by inviting individuals who could expand the reach of its cultural and art history academic offerings.

44.     Individuals who are asked by Dongguk University to join its faculty are known as "special hiring candidates.",

45.     During the summer of 2005, Dongguk University began to search for individuals who would qualify as "special hiring candidates" for these additional academic positions.

46.     In connection with these efforts, Dongguk University received resumes from a number of individuals who could expand Dongguk University's academic offerings.

47.     Shin's resume was among the resumes received by Dongguk University.

48.     Upon review of Shin's resume, Ki Sam Hong, the then-President of Dongguk University, determined that Shin was qualified to be a "special hiring candidate" for Dongguk University's Art History Department.

6

49.     On August 4, 2005, Shin submitted a faculty position application form to Dongguk University, which contained her employment background, a listing of awards that she had received, and her academic credentials.

50.     With respect to her academic credentials, Shin stated that in 2005, she had received a Ph.D. from Yale University.

51.     As part of the application process, Shin also provided Dongguk University with a letter dated May 27, 2005, which was signed by "Pamela Schirmeistr [sic]" on Yale University letterhead (the "Certification Letter"), certifying the following information:

> NAME:                Jeong Ah Shin
> DATE OF BIRTH:       April 28, 1972
> MAJOR:               History of Art (Twentieth Century Art)
> DATE OF ADMISSION:   August 1996
> DATE OF GRADUATION:  May 2005
> DEGREE RECEIVED:     Ph.D

52.     Pamela Schirmeister ("Schirmeister") is an Associate Dean in Yale University's Graduate School of Art and Sciences.

53.     Based upon Shin's experience and academic credentials, Dongguk University decided to move forward with Shin's application.

54.     In accordance with Dongguk University's standard procedures for "special hiring candidates," Shin's application was forwarded to Dongguk University's Faculty Hiring/Promotion Committee for approval.

55.     On August 12, 2005, the Faculty Hiring/Promotion Committee agreed with the President's recommendation that Shin was eligible to become an assistant professor in Dongguk University's Art History Department.

7

56.     On August 16, 2005, Dongguk University's Office of Academic Affairs submitted

Shin's name, as well as the names of six other "special hiring candidates," to Dongguk

University Foundation's Board of Directors for final hiring approval.

57.     Shin and the other six "special hiring candidates" were approved at the Dongguk

University Foundation's Board of Directors' meeting that was held on August 30, 2005.

### Yale University's Verification Of Shin's Ph.D.

58.     On September 1, 2005, Shin was officially hired by Dongguk University as an

assistant professor although she was not scheduled to teach any classes until the spring 2006

semester.

59.     In early September 2005, Dongguk University received information that raised

questions regarding the accuracy of Shin's statement that she had received a Ph.D. from Yale

University.

60.     In order to verify the fact that Shin had received a Ph.D. from Yale University, on

September 6, 2005, Hyung Taik Ahn ("Ahn"), a member of Dongguk University's

Administration Team, sent a registered letter dated September 5, 2005 (the "September 5

Registered Letter") to Yale University together with a copy of the Certification Letter provided

by Shin.

61.     Ahn's September 5 Registered Letter states in pertinent part:

> *I would like to confirm whether you can verify the contents of the enclosed
> letter issued by your University for Ms. Jeong-Ah Shin.*
>
> *Since this is being done as part of internal procedure for employing a
> faculty member at Dongguk University,* your verification will be kept
> confidential.  It would be very kind of you to send us the information we
> have requested as soon as possible.  (Italics supplied.)

62.     The September 5 Registered Letter was received by Schirmeister, the Associate

Dean who had supposedly signed the Certification Letter on behalf of Yale University.

63.    On September 22, 2005, Schirmeister sent Ahn a three-page fax consisting of a transmittal sheet as well as a copy of Ahn's September 5 Registered Letter and the Certification Letter that had been provided to Dongguk University by Shin (the "September 22 Fax").

64.    Schirmeister's September 22 Fax stated:

> As requested *I am confirming that the attached letter* [i.e. the Certification Letter] *was issued by the Yale Graduate School and signed by me.*
> (Italics supplied.)

65.    Relying on the September 22 Fax sent by Schirmeister on behalf of Yale University that attested to the fact that Shin had received a Ph.D. from Yale University, Dongguk University concluded that Shin had received a Ph.D. from Yale University as she had represented and that the rumor was therefore baseless.

66.    Shin began teaching classes at Dongguk University in the spring semester of 2006 and continued to do so until 2007.

**Shin's Dissertation Rumors**

67.    On June 4, 2007, Euiyon Cho ("Cho"), a Dongguk University official, was provided with documents suggesting that Shin had not written a dissertation titled "Guillaume Apollinaire: Catalyst for Primitivision For Picabia and Duchamp" ( "Shin's Dissertation"), which was the basis for her Ph.D., and that Shin's Dissertation had been plagiarized.

68.    Because the documents questioning Shin's Dissertation that had been provided to Cho were not dispositive, on June 7, 2007, Cho sent a website inquiry to Yale University asking whether it had a copy of Shin's Dissertation.

69.    Later that day, a Yale University librarian sent an e-mail to Cho stating that Yale University had no record of Shin's Dissertation and advising Cho to contact Yale University's Department of Art History.

9

70.   On June 11, 2007, Cho sent an e-mail to Susan Emerson ("Emerson"), the Registrar of Yale University's Department of Art History. In his e-mail, Cho again sought to determine whether Yale University had a record of Shin's Dissertation.

71.   In his June 11, 2007 e-mail, Cho also asked Emerson whether Shin "earned her Ph.D. degree from your department of the Graduate School."

72.   Later that day, Emerson sent an e-mail to Cho informing him that according to her records, "Jeong Ah Shin did not receive a Ph.D. in our department at Yale University."

73.   In June 2007, the rumors regarding Shin's Dissertation reached the Korean press and by late June 2007, several Korean newspapers began writing articles questioning whether Shin had written her dissertation and whether she had in fact obtained a Ph.D. from Yale University.

74.   In response to the newspaper articles questioning Shin's academic credentials, on July 2, 2007, Dongguk University officials held a press conference defending Dongguk University's decision to hire Shin, explaining that Dongguk University had taken steps to verify Shin's Ph.D. and stating that it had received the September 22 Fax from Yale University confirming the fact that Shin had obtained a Ph.D. from Yale University.

75.   Nevertheless, concerned that it had received "contradictory" information from Yale University concerning Shin's Ph.D., on July 5, 2007, Youngkyo Oh, the President of Dongguk University ("President Oh"), wrote to Richard Levin, the President of Yale University ("President Levin"), a letter about Shin.

76.   In his July 5 letter, President Oh asked President Levin the following questions:

(1) Did Yale University award a Ph.D. degree to Ms. Jeong Ah Shin in the major of History of Art in 2005?

(2) If the answer to the inquiry (1) is "No," then I am curious as to how Pamela Schirmeister came to issue the Ph.D. certification letter for

10

Ms. Jeong Ah Shin.

(3) If Ms. Shin received a Ph.D. degree from your school, then would you let us know what department she was enrolled in and who was the academic and thesis adviser?

77.     On July 6, 2007, Cho sent an e-mail directly to Schirmeister asking Schirmeister to explain the contradiction between Schirmeister's September 22 Fax confirming that Shin had received a Ph.D. from Yale University and the June 11, 2007 e-mail from Emerson stating that Shin had not received a Ph.D. from Yale University.

78.     Schirmeister never responded to this e-mail.

### Yale University Denies Sending The September 22 Fax

79.     Susan L. Carney ("Carney"), a Deputy General Counsel in Yale University's Legal Department, was given responsibility for writing a responsive letter to President Oh on behalf of President Levin that would answer President Oh's questions.

80.     On July 10, 2007, Carney responded to the first two questions posed by President Oh (the "July 10 Letter").

81.     In response to President Oh's first question, Carney stated that Shin did not receive a Ph.D. from Yale University and that the Certification Letter was a forgery.

82.     In response to President Oh's second question, Carney stated that the September 22 Fax sent by Schirmeister, which attested to Shin's Ph.D., "is not authentic" and that Yale University had no "knowledge currently regarding the creation or issuance" of the September 22 Fax.

83.     In fact, the statements contained in Carney's July 10 Letter regarding the September 22 Fax were false when made and were recklessly given.

84.     By July 10, 2007, Yale University was fully aware that the Korean press had written about Dongguk University's employment of Shin and was aware of Dongguk

11

University's statement that in employing Shin, it had relied on the September 22 Fax attesting to Shin's Ph.D.

85.     By July 10, 2007, Yale University was aware of the importance of providing truthful, accurate and complete information to the Korean media regarding the communications between Dongguk University and Schirmeister, on behalf of Yale University, about Shin.

86.     Yale University knew or should have known that if it did not provide truthful, accurate and complete information regarding its communications with Dongguk University about Shin, that Dongguk University would be vilified in the Korean media, that its reputation would be significantly tarnished, and that it would suffer severe consequences.

87.     Instead of acknowledging that the September 22 Fax was authentic, Yale University embarked on a campaign designed to distance itself from any responsibility regarding Shin by denying any knowledge of Dongguk University's efforts to verify Shin's Ph.D.

88.     Beginning on July 10, 2007, in a series of press interviews as well as in e-mails and press releases disseminated to the Korean media, Yale University made a series of knowingly false statements regarding Dongguk University's efforts to verify Shin's Ph.D.

89.     On July 10, 2007, the same day that Carney sent her July 10 Letter, a reporter from the Chosun Ilbo, one of Korea's best known newspapers, had an interview with Gila Reinstein ("Reinstein"), an Associate Director of Yale University's Office of Public Affairs.

90.     In the July 10 interview, Reinstein informed the Chosun Ilbo reporter that Shin had never received a Ph.D. from Yale University.

91.     On July 11, 2007, in response to the Korean press inquiries as to why Dongguk University did not know that Shin had not received a Ph.D. from Yale University, Dongguk University officials explained that it had received the Certification Letter from Yale University.

12

92.     In a July 12, 2007 Chosun Ilbo published an article explaining that the

Certification Letter:

> . . . is a fax message Dongguk University sent to Yale University as an
> inquiry in September 2005 – the time the school hired Professor Shin –
> and Yale University's reply to the inquiry.

93.     The July 12, 2007 Chosun Ilbo article also quoted the Certification Letter and

stated that Schirmeister had (i) verified the fact that Yale University had "issued" the

Certification Letter and (ii) acknowledged that she had "signed it."

94.     In an effort to verify the accuracy of Dongguk University's explanation, Korean

reporters contacted Reinstein who informed them that the September 22 Fax was "forged."

95.     On July 13, 2007, the Chosun Ilbo printed an article, which stated in pertinent

part:

> *The fax that "Dongguk University has been claiming to have received*
> *from Yale University," which was the decisive factor in the mystery of the*
> *forged doctorate degree of Dongguk University's Professor Jeong Ah*
> *Shin, was confirmed to have been forged.* Our newspaper sent an e-mail
> message including this fax on the 12th, requesting [the school's]
> authentication, and in response, Ms. Gila Reinstein of Yale University's
> Public Affairs said "This document is in a different format from Yale
> University's academic record verification, and it is a forged document."
> She said in a telephone conversation, "Professor Pamela Schirmeister,
> whose signature is included in the letter, is presently away, but verification
> with her Assistant Professor *confirmed that Professor Schirmeister never*
> *signed such a letter.*
>
>                              * * *
>
> This fax was used as a confirmation for the academic record when
> Professor Shin was hired as a Professor of Dongguk University in 2005
> and named the Art Director of Kwangju Biennale 2008. Now that it is
> determined to be a falsified [document], it is very possible that it was
> forged in Korea. (Italics supplied.)

96.     On July 14, 2007, the Chosun Ilbo published on its website an English version of

its July 13, 2007 article in which it stated that:

13

A document that was used to show that a Dongguk University art professor had a doctoral degree from Yale has turned out to be a forgery.

97.    The Chosun Ilbo's July 14, 2007 website article went on to state:

*However, in response to an e-mail inquiry by the Chosun Ilbo, Gila Reinstein at Yale University's Office of Public Affairs said, "The document has a different format from that of Yale University's official certificate. The document is a fake."*

She said, "*I couldn't contact Pamela Schirmeister, associate dean of Yale Graduate School, whose signature was on the faxed document.* However her assistant said Prof. Schirmeister had never signed her name to such a document." (Italics supplied.)

### Yale University Rebuffs Dongguk University's Efforts To Prove That The September 22 Fax Was Authentic

98.    Troubled by Yale University's statement that the September 22 Fax was not authentic, Cho sent an e-mail to Carney on July 15, 2007, in an effort to learn why Yale University had reached that conclusion.

99.    In his July 15 e-mail, Cho pointed out that the September 22 Fax contained a fax telephone number and he inquired whether the fax telephone number was "a Yale number."

100.    On July 16, 2007, Carney sent Cho an e-mail assuring Cho that Yale's "investigators" were examining the September 22 Fax and would be "making further inquiries."

101.    In her July 16, 2007 e-mail, Carney confirmed that the fax number on the September 22 Fax "is assigned as the fax number for the Yale Graduate School Associate Dean's Office."

102.    However, Carney went on to say in her July 16 e-mail:

Because documents can so easily be fabricated with available software programs these day, it appears that the fax line may have been added to a copy, but may not be the case. The investigators will examine this question.

103.    Notwithstanding Carney's promise to further investigate the matter, no further investigation was done at that time.

14

104.    On July 16, 2007, the DongA Ilbo, another major Korean newspaper, published

an article entitled "Yale Decides Against Investigating 'Jeong Ah Shin's Fake Fax.'"

105.    The DongA Ilbo article was based upon an interview with Reinstein who was

quoted as saying that even if the September 22 Fax and the Certification Letter were "faxed from

Yale University, it does not change the fact *they were all fake documents that were not prepared

by Yale University."*  (Italics supplied.)

106.    On July 18, 2007, Reinstein gave an interview to the Korea Economic Daily,

another Korean newspaper, in which Reinstein stated, "Yale is the biggest victim of this case"

and that Yale University was "considering legal action."

**Yale University Denies Receiving
The September 5 Registered Letter**

107.    In addition to claiming that the September 22 Fax was a fake, Reinstein also

falsely informed the Korean media that Yale University had not received the September 5

Registered Letter asking whether Shin had received a Ph.D. from Yale University.

108.    On July 18, 2007, the Hankook Ilbo, another Korean newspaper, printed an article

which noted that Yale University had made a public statement that the September 22 Fax was

forged and which opined that Dongguk University may never have actually done anything to

verify Shin's Ph.D.

109.    On July 19, 2007, the Chosun Ilbo wrote an article based in large part on an

interview with Reinstein in which she stated that Dongguk University had never contacted Yale

University about Shin.

110.    The July 19 Chosun Ilbo article stated in pertinent part:

> Associate Director Gila Reinstein of Yale University's Public Affairs
> Office stated, "Dongguk University said that it mailed a letter for an
> inquiry of her academic record, so we looked into it, *but we (Art History*

15

*Department Graduate School of Yale University) never received (the letter)*." (Italics supplied.)

111.    The July 19 Chosun Ilbo article went on to state:

> Did Dongguk University really send the mail? – Associate Director Reinstein said, "we have a system that verifies each student's degree, so had we received the letter, we would have replied according to the process," adding, "We never received the letter."

112.    Also on July 19, 2007, the Joong Ang Ilbo, another Korean newspaper, printed the results of a July 17, 2007 interview with Reinstein in which Reinstein gave the following answer to the following question:

> Dongguk University is claiming to have forwarded an academic record verification request to Yale University. Did you receive it?
>
>     "I looked for it repeatedly in the Department of Art history and the Graduate School with no success. A document such as a request for verification of academic records is a very important matter so we keep a book to record it. *The fact that we couldn't find such an important document means that we didn't receive it. I do not know what happened.*" (Italics supplied.)

113.    The public statements made by Reinstein on behalf of Yale University stating that the September 22 Fax was a fake and that the September 5 Registered Letter was never received by Yale University were picked up by virtually all of the major Korean newspapers and broadcast companies.

114.    Yale University's statement that the September 22 Fax was a fake and that the September 5 Registered Letter was never received by Yale University was also picked up and republished by news agencies from around the world.

115.    As a consequence, numerous articles were published in print and on websites in and outside of Korea about Dongguk University's supposed failure to verify Shin's credentials.

116.    Upon information and belief, by mid-July 2007, the information provided by Reinstein on behalf of Yale University had been widely circulated to the Korean

population-at-large, many of whom believed that Dongguk University had improperly hired Shin, that it had never contacted Yale University, and it had tried to cover up its inaction by reliance on a forged document, i.e. the September 22 Fax.

117.    Because Yale University refused to acknowledge the truth and admit that it had sent the September 22 Fax verifying Shin's Ph.D., on July 18, 2007, the Dongguk University Foundation's Board of Directors publicly stated that it would "discipline all the faculty members involved in the forgery case for failed verification of [Shin's] doctorate when she was selected."

118.    Also on July 18, 2007, President Oh issued a statement publicly apologizing for the scandal involving Shin.

119.    Dongguk University, which has spent one hundred years building its impeccable reputation, continued to be severely criticized in the Koren press and on broadcast television.

120.    On August 4, 2007, Munhwa Broadcasting Corporation ("MBC"), one of the most important television stations in Korea, broadcast a "60 Minutes"-type exposé publicly criticizing Dongguk University's role in the Shin scandal.

121.    In connection with the forty-five minute broadcast, Reinstein was interviewed and a clip of her interview was aired.

122.    In her publicly aired television interview, Reinstein, on behalf of Yale University, once again claimed that Yale University had never received an inquiry from Dongguk University asking about Shin's Ph.D.

123.    The Korean television broadcast also reported that Yale University continued to assert that it had never sent the September 22 Fax.

124.    Yale University's failure to acknowledge the truth about its communications with Dongguk University concerning Shin continued to have severe consequences in Korea.

125.    On August 31, 2007, a group of monks belonging to the Jogye Order publicly called for the dismissal of all of the directors of Dongguk University Foundation's Board of Directors because of their responsibility in approving Shin as a "special hiring candidate."

126.    On September 3, 2007, the Korea Times, in an article entitled "Factional Feud Deepens in Buddhist Groups," reported that the "diploma scandal of a university professor has initiated a factional feud between Buddhist groups" affiliated with the Jogye Order.

### Dongguk University's Continued Efforts To Have Yale University Acknowledge Its Role In the Shin Matter Are Rebuffed

127.    In or about early August 2007, the Seoul Western District Prosecution Office (the "Korean Prosecutors") commenced a criminal investigation into the circumstances surrounding Shin's contention that she had been awarded a Ph.D. by Yale University.

128.    Among other things, the Korean Prosecutors were interested in Dongguk University's relationship with Shin and whether Dongguk University had verified Shin's Ph.D. as it had claimed.

129.    In view of mounting public criticism and the pending criminal investigation, Dongguk University continued to communicate with Yale University in its effort to prove that Yale University had received the September 5 Registered Letter and that the September 22 Fax attesting to Shin's Ph.D. was authentic.

130.    On August 31, 2007, Cho sent Carney an e-mail stating that Dongguk University had located the United States Postal Service's tracking record that established that the September 5 Registered Letter was signed for by "M Moore YCM," and that "M Moore" was Michael Moore, one of the YCM staff members.

131.    In his August 31 e-mail, Cho stated that he "was hopeful" that this "new evidence" would enable Yale University to establish the authenticity of the September 22 Fax.

18

132.    Later that day, Carney sent a responsive e-mail to Cho stating:

> Dear Director Cho,
>
> The material that you have provided below does not support the
> conclusion that any package from Dongguk University was ever delivered
> to Dean Schirmeister. The Yale Graduate School advises that there was
> no one by the name "Michael Moore" working there in 2005. In addition,
> "YCM" is not an acronym related to the Graduate School Dean's office,
> where Dean Schirmeister works. All that the receipt you provided
> indicates is that it was delivered in New Haven CT and signed for by "M
> Moore YCM."

133.    In a return e-mail, Cho informed Carney that the acronym "YCM" stands for

"Yale Central Mailroom" and he provided a website link to Yale University's website that

established that Michael Moore was a person employed by Yale University in the Yale Central

Mailroom.

134.    Rather than accept this evidence, on September 1, 2007, Carney sent Cho an

e-mail asking for a "copy of the actual receipt" from the U.S. Postal Service.

135.    On September 3, 2007, Cho sent a copy of the mailing label that was affixed to

the September 5 Registered Letter.

136.    On September 4, 2007, Carney sent an e-mail to Cho complaining that the mailing

label was not completely in English and asking for a copy of the receipt containing Michael

Moore's "actual signature"-- something that she should have known would not be in the

possession of Dongguk University.

137.    By September 12, 2007, in its effort to prove that the September 5 Registered

Letter had been received by Yale Univeristy, Dongguk University had provided Carney with:

(a)     a copy of the U.S. Postal Service's Track & Confirm Receipt stating that the
        September 5 Registered Letter had been received by "M Moore YCM;"

(b)     a website link to Yale University's Central Mailroom which established that Yale
        University's mailroom was staffed by, among others, Michael Moore; and

(c)    a copy of the mailing label that was put on the package that contained the September 5 Registered Letter.

138.    In addition, Dongguk University had previously provided Carney with the Yale University fax telephone number that was on the September 22 Fax.

139.    Having received the information that had been provided to her by Cho, Carney should have been able to determine that the September 5 Registered Letter had been received by Yale University and that the September 22 Fax was authentic.

140.    In the same September 12 e-mail, Cho informed Carney of the Korean Prosecutors' interest in the matter and he told Carney that it would be a "great help" to him to know whether the new material helped Carney establish that the September 5 Registered Letter had been received.

141.    Cho's September 12 e-mail also asked Carney to inform Dongguk University whether the information that had been sent to her enabled her to determine whether the September 5 Registered Letter had been received by Yale University.

142.    Carney never responded to Cho's September 12 e-mail.

143.    Rather than correct its false statements and admit the truth, on September 21, 2007, Yale University issued an Official Statement stating, *inter alia*, that all documents supporting Shin's claim were forgeries and therefore "are fake."

144.    Yale University's Official Statement was reported in an article published by the DongA Ilbo newspaper on September 23, 2007.

145.    As a result of Yale University's continued public statements denying any involvement with the Shin matter, in late September 2007 and in early October 2007, Dongguk University's Professors Association issued a number of formal statements, all of which were reported in the Korean press, demanding the resignation of Dongguk University's President and

Vice President as well as the resignation of the Dongguk University Foundation's Board of Directors.

146.     Based upon Yale University's continued public statements that the September 5 Registered Letter and the September 22 Fax were forgeries, the Korean Prosecutors focused their attention on Dongguk University's supposed failure to verify Shin's Ph.D credentials.

147.     Numerous Korean newspapers and other media outlets informed the Korean population-at-large of the Korean Prosecutors' investigation of Dongguk University's purported role in the Shin matter.

**Yale University Finally Admits That**
**The September 22 Fax Is Authentic**

148.     On October 11, 2007, Shin was arrested by the Korean Prosecutors, was accused of fabricating a doctorate degree and other documents from Yale University, and is presently incarcerated in a Korean prison pending her trial.

149.     In connection with the then-upcoming criminal trial of Shin, in or around November 2007, the Korean Prosecutors issued a document subpoena to Yale University in an effort to obtain copies of Yale University's records that might be related to the Shin matter.

150.     As a result of this document subpoena, Yale University finally admitted that it had received the September 5 Registered Letter and that the September 22 Fax attesting to Shin's Ph.D. was authentic.

151.     On November 29, 2007, Carney sent a letter by e-mail to President Oh of Dongguk University in which she stated:

> During Yale's preparation of the recent response to a document subpoena issued in the matter of Jeong Ah Sin, it has come to light that I inadvertently provided one piece of incorrect information when I wrote to you about this matter on July 10, 2007.

152.    In her November 29, 2007 letter, Carney informed President Oh that "it now appears from a document discovered by Ms. Schirmeister" that the September 22 Fax is *"indeed authentic."* (Italics supplied.)

153.    According to Carney, she had just learned that Schirmeister had, supposedly in "the rush of business," sent the September 22 Fax to Dongguk University attesting to the validity of Shin's Ph.D.

154.    Extremely upset by this letter, on December 28, 2007, Cho, on behalf of President Oh, e-mailed a letter to Carney which stated in pertinent part:

> . . . if Yale University had revealed the fact in your first reply of July 10,
> 2007, Dongguk University would not have received a lot of harsh criticism
> from the public.  Your inaccurate information of July 10, 2007 has ruined
> our one hundred year-long built reputation.  What was worse was that in
> September 2005, we had no choice but to take the facsimile document sent
> by Ms. Schirmeister as an authentic one as it is now, and officially
> believed that Yale University awarded a Ph.D. to Jeong Ah Shin in May,
> 2005 on the basis of the document that Ms. Schirmeister sent us in
> September 2005.

155.    On the next day, December 29, 2007, one month after Carney sent her November 29 letter acknowledging Yale University's error and almost six months after Yale University denied receiving the September 5 Registered Letter and sending the September 22 Fax, Yale University finally issued a formal public statement that it "deeply regrets" its "error and the resulting *inconvenience* to Dongguk University." (Italics Supplied.)

156.    Having spent almost six months publicly denying any role in the Shin matter and contending that Dongguk University had never contacted Yale University, Yale University's December 29 statement did not undo the damage suffered by Dongguk University.

**Dongguk University's Reputation**
**Was Destroyed by Yale's False Statements**

157.    As a result of Yale University's public statements that Dongguk University had never contacted it about Shin, that the September 5 Registered Letter was never received by Yale University and that the September 22 Fax was a fake, Dongguk University was publicly humiliated and deeply shamed in the eyes of the Korean population.

158.    In Korean culture, one's reputation affects not only the level of respect he, she or it can expect from others, but also affects the dignity, credibility, social status and core identity of that person or entity.

159.    In its history of 100 years, Dongguk University had built a reputation based upon its strong sense of morality that was grounded upon its Buddhist philosophy.

160.    Because of the false statements made by Yale University, the Korean media reported and significant segments of the Korean population believed, that Dongguk University had improperly hired Shin, that it had never contacted Yale University and that it had tried to cover up its inaction by relying on a forged document, i.e. the September 22 Fax.

161.    In Korean culture, where the identity of an individual is particularly closely associated with the group to which he or she belongs, living up to the group's norms and values is extremely important.

162.    In Korean culture, damage to one individual's reputation is often imputed to the reputation of the group to which he or she belongs.

163.    Therefore, disgrace to an individual member of the society tends to be taken personally by other members of the society, who often fear that the inadequacies of that person or entity will be imputed to the society as a whole and further imputed to themselves as members of that society.

23

164.    Based upon Yale University's false statements to the Korean media, the Korean media and population-at-large concluded that Dongguk University was dishonest and incompetent and that Dongguk University's role in the scandal had tarnished the reputation of Korea as a country.

165.    Consequently, significant segments of the Korean population concluded that Dongguk University's alleged dishonest behavior was a disgrace to Korean society and that Dongguk University had undermined Korean social values.

166.    On September 17, 2007, KMAC, a prominent Korean consumer service consulting organization, notified Dongguk University that because of Dongguk University's reported role in the Shin scandal, it wold not be receiving KMAC's prestigious 2007 Customer Satisfaction Management Grand Award.

167.    In so doing, KMAC stated that:

> Reasons
>
> There is no question that [Dongguk University] demonstrated exemplary effort by becoming the first college to implement the concept of customer satisfaction under outstanding leadership.
>
> For a school, customers include not only its students who receive direct service, but it must consider the social benefits, such as industrial and citizen communities, which means that a high quality service must be offered directly and indirectly to the students – the receiver of service , industrial society, citizens, etc.  In that aspect, *considering the recent social issue pertinent to the employment of the teaching staff in the aspect of the quality management of education service, the Evaluation Committee reached the final resolution that found the awarding to be inappropriate.* (Italics supplied.)

168.    As a direct result of the publication of the false statements made by Yale University, the amount of  money received from Dongguk University's alumni and from corporate donors decreased.

169. In addition, the number of student applications for admission to Dongguk University decreased and the amount of government grants made to Dongguk University decreased.

170. Further, as a direct result of the public criticism aimed at Dongguk University by reason of Yale University's public misstatements, Dongguk University was humiliated and shamed and, as a consequence, several of its personnel lost their positions.

171. Because of Yale University's public misstatements, Dongguk University was also forced to expend a substantial amount of money defending itself against the claim that it had acted improperly because it had supposedly failed to verify Shin's Ph.D.

172. Most recently, Dongguk University was notified by the Korean government that it would not be added to the list of academic institutions permitted to open a "U.S. style" law school.

### FIRST CLAIM FOR RELIEF
### (Negligence)

173. Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

174. In responding to the inquires of academic institutions and other inquirers as to whether Yale University has awarded a degree to a particular person, Yale University has a duty to take all necessary and appropriate steps that will enable it to accurately determine whether such person has in fact received a degree from Yale University.

175. In responding to the September 5 Registered Letter, Schirmeister, acting on behalf of Yale University, was negligent and careless in that she did not exercise the requisite degree of care in determining whether Shin had been awarded a Ph.D. from Yale University.

25

176.    Moreover, in responding to the July 5, 2007 letter from President Oh inquiring about the legitimacy of Schirmeister's September 22 Fax, Yale University had a duty to take all responsible and appropriate steps that would enable it to accurately determine whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

177.    In responding to President Oh's July 5, 2007 Letter, Carney, acting on behalf of Yale University, was negligent and careless in that she did not take the requisite degree of care in determining whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

178.    Thereafter, in its September 21 "Official Statement," Yale University was negligent and careless in that it did not take the requisite degree of care in determining whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

179.    As a direct result of Yale University's negligence, Dongguk University has suffered damages in an amount no less than $50,000,000.

## SECOND CLAIM FOR RELIEF
### (Reckless and Wanton Conduct)

180.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

181.    In responding to the inquiries of academic institutions and other inquirers as to whether Yale University has awarded a degree to a particular person, Yale University has a duty to take all necessary and appropriate steps that will enable it to accurately determine whether such person has received a degree from Yale University.

182.    In responding to Ahn's September 5 Registered Letter, Schirmeister did not follow Yale University's protocols regarding the verification of graduate degrees nor did she

make any effort to research Yale University's records to determine whether Shin had been awarded a Ph.D. from Yale University.

183.   Schirmeister's failure to follow Yale University's protocol and her failure to do any research was a reckless and wanton disregard of Dongguk University's rights and interests.

184.   Relying on the September 22 Fax sent by Yale University that attested to the fact that Shin had received a Ph.D. from Yale University, Dongguk University did not take further action and Shin's faculty appointment was not overturned.

185.   Upon information and belief, as of the time that Carney was preparing her response to President Oh, no one from Yale University actually contacted Schirmeister to ask her whether the September 22 Fax was authentic.

186.   Having sent the September 22 Fax, Schirmeister was at all times aware that the September 22 Fax was authentic.

187.   Had Schirmeister been asked about the authenticity of the September 22 Fax, she would have acknowledged its authenticity.

188.   Yale University's failure to contact Schirmeister directly between July 2007 and October 2007, was a reckless and wanton disregard of Dongguk Univeristy's rights and interests.

189.   Despite possessing evidence to the contrary, beginning from July 15, 2007 through September 21, 2007, Yale University wantonly and recklessly issued press releases, gave interviews, sent emails and made an Official Statement falsely stating that it had never received the September 5 Registered Letter and never sent the September 22 Fax.

190.   As a direct result of Yale University's wanton and reckless conduct, Dongguk University has suffered damages in an amount no less than $50,000,000.

### THIRD CLAIM FOR RELIEF
### (Implied Contract)

191.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

192.    By establishing protocols to be used in verifying whether Yale University has awarded graduate or post-graduate degrees to particular individuals, Yale University has agreed to be bound by such protocols.

193.    Yale University was at all times aware that institutions would be relying on Yale University's responses to inquiries as to whether a particular individual had been awarded a graduate or post-graduate degree by Yale University.

194.    Based upon their dealings with one another, Yale University and Dongguk University entered into an implied contract.

195.    By sending Dongguk University the September 22 Fax, which erroneously confirmed the fact that Shin had been awarded a Ph.D. by Yale University, Yale University breached its implied contract with Dongguk University.

196.    As a direct result of Yale University's breach of the implied contract, Dongguk University has suffered damages in an amount no less than $50,000,000.

### FOURTH CLAIM FOR RELIEF
### (Defamation)

197.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 172 as though they were set forth in full herein.

198.    As heretofore set forth in detail, on July 10, 2007, July 12, 2007, July 17, 2007, July 18, 2007, August 4, 2007 and September 21, 2007, Yale University maliciously told various Korean newspapers and/or broadcast media that:

(a)    It had never received the September 5 Registered Letter;

28

(b)     It never informed Dongguk University that this had been awarded a Ph.D. from Yale University; and

(c)     The September 22 Fax was a "fake" and a "forgery."

199.    As heretofore set forth in detail, the statements made by Yale University to the Korean press and to the Korean broadcast media were made verbally as well as in writing.

200.    The aforesaid statements are false and defamatory.

201.    As heretofore set forth in detail, by reason of such false and defamatory statements, Dongguk University has been labeled as being dishonest and has been held up to disgrace and ridicule.

202.    As a direct consequence, Dongguk University's stellar reputation has been severely tarnished.

203.    As heretofore set forth in detail, in addition to suffering damage to its reputation, Dongguk University has suffered actual financial harm.

204.    As a direct result of Yale University's defamatory statements, Dongguk University has suffered damages in an amount no less than $50,000,000.

WHEREFORE, plaintiff Dongguk University requests that this Court grant the following relief:

(1)     As to the first claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus interest;

(2)     As to the second claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus punitive damages in an amount to be determined;

29

(3)     As to the third claim for relief, a judgment in its favor against defendant Yale
        University for damages in an amount to be determined at trial but not less than
        $50,000,000;

(4)     As to the fourth claim for relief, a judgment in its favor against defendant Yale
        University for damages in an amount to be determined at trial but not less than
        $50,000,000 plus punitive damages in an amount to be determined; and

(5)     Such other and further relief as this court deems just and proper together with
        costs and disbursements of this action.

Dated: March 24, 2008

JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.

By _____
    Ira Grudberg
    350 Orange Street
Of Counsel:                         New Haven, Connecticut  06511
                                    (203) 951-3720
Robert A. Weiner
Jin Yung Bae                        *Attorneys for Plaintiff Dongguk University*
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173-1922
(212) 547-5400

30