# EXHIBIT 16



ASK A REFERENCE QUESTION

Name: Euiyon Cho, Ph.D

E-mail Address: choey@dgu.edu

Phone#: 82-2-2260-8804

Affiliation: Foreign Country

Status: Other

Type Reference Question:
> Would you please check whether you have the
> Ph.D dissertation titled as "Guillaume
> Apollinaire: Catalyst for Primitivism, For
> Picabia and Duchamp" written by Jeong Ah SHIN,
> who, according to the record she had given us,
> received Ph.D degree from the Department of the

[ SEND ]  [ CLEAR ]

AskLive online reference service (Service available Monday-Friday 1-5 pm, Wednesday and Sunday 5-11 pm)

Return to the Art + Architecture Library

http://www.library.yale.edu/art/ask.html                    2007-06-07

Confidential                                                                    DONGGUK0260220



The following email message was sent.

To: art.library@yale.edu
Subject: Arts Library Reference Question
From: choey@dgu.edu
 Name:
Euiyon Cho, Ph.D
Email:
choey@dgu.edu
Phone:
82-2-2260-8804
Affiliation:
Foreign Country
Status:
Other
Reference question:
Would you please check whether you have the Ph.D dissertation titled as "Guillaume Apollinaire: (

Return to the Art + Architecture Library

*cgiemail 1.6*

Confidential                                                                                    DONGGUK0260221

 동국대학교 **Webmail System**
DONGGUK UNIVERSITY

choey@dongguk.edu(조의연님) 반갑습니다.

메일 파일박스

☒ 메일 홈으로 가기　✎ 편지쓰기　✉ 편지읽기　✔ 수신확인　📖 주소록　🔧 환경설정

∷∷ 동국대학교 웹메일-2 > 받은 편지함 > 편지 읽기

■편지목록　◨ 이전편지　◧ 다음편지

**편지함** [추가/관리]
- 받은 편지함 48/6
- 보낸 편지함
- 임시 보관함
- 지운 편지함 25  비움
- 차단 편지함 3   비움
- 외부 POP 계정

**파일박스**
📁 사용량 0M | 300M
　　(0.0% 사용중)
📁 폴더 : 1개
📄 파일 : 1개

📧 메일 가져오기
❓ 도움말
🗑 스팸 관리
🚪 로그아웃

[답장] [전체답장] [전달] [삭제] [완전삭제]　선택된 편지를 보낸 편지함　▾　[이동]

보낸 사람　MSSA ASSIST <mssa.assist@yale.edu>
받는 사람　choey@dgu.edu
날　짜　2007년 06월 08일 01시 22분
제　목　Yale dissertation

June 7, 2007

Dear Euiyon Cho,

I am writing in response to your message forwarded to us from The Yale Art and Architecture Library on June 7, 2007 regarding a Ph.D. dissertation by Jeong Ah Shin.

I do not see a record of this dissertation in our online Yale University Library online catalog, Orbis. The newest dissertations from this year's 2007 graduating class will not yet be in the catalog. You may have to contact the Department of Art History to see if Jeong Ah Shin is receiving her Ph.D. with this year's class.

I am pasting a link to the "Ph.D. Program in the History of Art" home page, where there are links to all dissertations granted and in progress (please scroll to list in blue type under the illustration and click on "Dissertations in Progress" and "History of Disseratations"). There is also contact information for the department listed on this page.

I am sorry I could not better answer your question. If you have additional questions, please do not hesitate to contact us.

Sincerely,

Cynthia Ostroff
Manager, Public Services
Manuscripts and Archives
Yale University Library

[답장] [전체답장] [전달] [삭제] [완전삭제]　선택된 편지를 보낸 편지함　▾　[이동]

⌒ 20214465 연극과 박성종 입니다.

예뻐해조 <coolwolfy@

Confidential

DONGGUK0260222

# EXHIBIT 17

| From: | "조의연" [choey@dongguk.edu] |
|---|---|
| Sent: | 2007년 6월 10일 일요일 오후 11:03 |
| To: | susan.emerson@yale.edu |
| Subject: | a verfication asked |

Dear Susan Emerson,

I am writing this email to ask you to give us a verification on a recently hired faculty member of our university, Jeong Ah SHIN.  Ms. Shin submmited a diploma from Yale University and her Ph.D disseration titled as "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp."  when she applied for the position.  According to her resume which she submitted, the dissertation was completed in May 2005  and the thesis adviser is Dr. Chrstine Mehring of the Department of History of Art.

But our current confirmation process has shown that her dissertation is the same with the one from the University of Virginia, "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp" written by Samaltanou-Tsiakma, Ekaterini as Ph.D thesis in 1981 at the University of Virginia.  Moreover, we could not find her dissertation on the webpage of "the history of  dissertation' of your department.   This is the reason why we should ask you a verification on her dissertation,   to know whether she really earned her Ph.D. degree from your deparment of the Graduate School.

Your help on this matter will be greatly appreciated.  I am looking forward to hearing from you as soon as possible

Sincerely yours,

Euiyon Cho, Ph.D
Director
Office of Management and Supervision
Dongguk University
Seoul, Korea

fax: 82-2-2260-3694
phone: 82-2-2260-8803
cellular phone: 82-10-4761-2280

CONFIDENTIAL

DONGGUK0262837

Euiyon Cho, Ph.D

Professor

Department of English,
Director

Office of Management and
Supervision

26,3 pil-dong, chung gu, seoul 100-715, korea

E-mail : choey@dongguk.edu

CONFIDENTIAL

DONGGUK0262838

# EXHIBIT 18

| | |
|---|---|
| From: | Susan Emerson [susan.emerson@yale.edu] |
| Sent: | 2007년 6월 11일 월요일 오전 11:56 |
| To: | "조의연" |
| Cc: | Christine Mehring |
| Subject: | Re: a verfication asked |
| Attachments: | 8a940e2d.jpg; 8a940e7b.jpg; 8a940e9b.jpg |

Dear Professor Cho,

According to my records, Jeong Ah Shin did not receive a Ph.D. in our department at Yale University. I will copy Professor Christine Mehring to determine whether she can shed any light on this matter.

Sincerely yours,

Susan Emerson


At 07:03 PM 6/10/2007, you wrote:


Dear Susan Emerson,


I am writing this email to ask you to give us a verification on a recently hired faculty member of our university, Jeong Ah SHIN. Ms. Shin submmited a diploma from Yale University and her Ph.D disseration titled as "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp." when she applied for the position. According to her resume which she submitted, the dissertation was completed in May 2005 and the thesis adviser is Dr. Chrstine Mehring of the Department of History of Art.


But our current confirmation process has shown that her dissertation is the same with the one from the University of Virginia, "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp" written by Samaltanou-Tsiakma, Ekaterini as Ph.D thesis in 1981 at the University of Virginia. Moreover, we could not find her dissertation on the webpage of "the history of dissertation' of your department. This is the reason why we should ask you a verification on her dissertation, to know whether she really earned her Ph.D. degree from your deparment of the Graduate School.


Your help on this matter will be greatly appreciated. I am looking forward to hearing from you as soon as possible.

CONFIDENTIAL

DONGGUK0262839

Sincerely yours,


Euiyon Cho, Ph.D

Director

Office of Management and Supervision

Dongguk University

Seoul, Korea


fax: 82-2-2260-3694

phone: 82-2-2260-8803

cellular phone: 82-10-4761-2280


Euiyon Cho, Ph.D

Professor

Department of English,

Director

Office of Management and Supervision

26,3 pil-dong, chung gu, seoul 100-715,korea
E-mail : choey@dongguk.edu





지구를 두드리는 큰 사람! 

Susan Emerson
Registrar
Department of the History of Art
Yale University
203.432.2669
http://www.yale.edu/arthistory

CONFIDENTIAL

DONGGUK0262841

# EXHIBIT 19

| | |
|---|---|
| **From:** | christine.mehring@yale.edu |
| **Sent:** | 2007년 6월 13일 수요일 오후 12:28 |
| **To:** | "¡ ¿«ø¨'" |
| **Subject:** | Fwd: Re: a verfication asked |
| **Attachments:** | 8a940e2d.jpg; 8a940e7b.jpg; 8a940e9b.jpg |

Dear Professor Cho,

I have not advised this dissertation and do not know Jeong Ah Shin.

Sincerely,

Christine Mehring

> Date: Mon, 11 Jun 2007 07:56:21 -0400
> To: "¡ ¿«ø¨'" <choey@dongguk.edu>
> From: Susan Emerson <susan.emerson@yale.edu>
> Subject: Re: a verfication asked
> Cc: Christine Mehring <christine.mehring@yale.edu>
> X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
> X-Scanned-By: MIMEDefang 2.52 on 130.132.50.7
> Status:
>
> Dear Professor Cho,
>
> According to my records, Jeong Ah Shin did not receive a Ph.D. in our department at Yale University. I will copy Professor Christine Mehring to determine whether she can shed any light on this matter.
>
> Sincerely yours,
>
> Susan Emerson
>
>
>
> At 07:03 PM 6/10/2007, you wrote:
>
> Dear Susan Emerson,
>
>
> I am writing this email to ask you to give us a verification on a recently hired faculty member of our university, Jeong Ah SHIN. Ms. Shin submmited a diploma from Yale University and her Ph.D disseration titled as "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp." when she applied for the position. According to her resume which she submitted, the dissertation was completed in May 2005 and the thesis adviser is Dr. Chrstine Mehring of the Department of History of Art.

CONFIDENTIAL

DONGGUK0262845

But our current confirmation process has shown that her dissertation is the same with the one from the University of Virginia, "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp" written by Samaltanou-Tsiakma, Ekaterini as Ph.D thesis in 1981 at the University of Virginia.  Moreover, we could not find her dissertation on the webpage of "the history of  dissertation' of your department.  This is the reason why we should ask you a verification on her dissertation,  to know whether she really earned her Ph.D. degree from your deparment of the Graduate School.


Your help on this matter will be greatly appreciated.  I am looking forward to hearing from you as soon as possible.


Sincerely yours,


Euiyon Cho, Ph.D

Director

Office of Management and Supervision

Dongguk University

Seoul, Korea


fax: 82-2-2260-3694

phone: 82-2-2260-8803

cellular phone: 82-10-4761-2280


Euiyon Cho, Ph.D

Professor

Department of English,

Director

Office of Management and Supervision

CONFIDENTIAL

26,3 pil-dong, chung gu, seoul 100-715,korea
E-mail : choey@dongguk.edu



DONGGUK UNIVERSITY



지구를 두드리는 큰 사람! 

Susan Emerson
Registrar
Department of the History of Art
Yale University
203.432.2669
http://www.yale.edu/arthistory

CONFIDENTIAL

DONGGUK0262847

# EXHIBIT 20

[DONGGUK 0314382]

Results of Fact-finding Investigation regarding Professor Jeong Ah Shin's Falsified Academic Credentials

July 20, 2007 (Friday)

Dongguk University
Fact-finding Investigation Committee

Confidential

[DONGGUK 0314383]

I. Fact-finding Investigation Overview
1. Details of suspicion
      Concerning falsehood of the doctorate degree from Yale University for Professor Jeong Ah Shin, who was specially invited and appointed in the department of fine arts history in the graduate school of the University, and the background on professor appointments and its entire process.

2. Personal details
      A. Name and year of birth: Jeong Ah Shin, Born in 1972.
      B. Affiliation: General Education Academy
      C. Title: Assistant professor
      D. Date of appointment: 09/01/2005

3. Investigation committee organization and investigation subjects
A. Committee members: Jin Soo Han (Vice President),
      Sang Il Lee (Student Affairs Support Headquarters Director),
      Ui Yeon Cho (Management Control Office Manager),
      Myung Kwang Park (General Education Academy Director),
      Won Saing Cho (Student Affairs Support Headquarters, Academic Affairs Team Leader)

B. Investigation subjects
      Ki Sam Hong (former president), current chief director (director at the time), Young Bae Lim (Buddhist priest), two who were managers of the planning office at the time, and 9 others.

C. Scope of investigation
1) Hiring background and process
2) Presence of any external pressure in the hiring process
3) Presence of any procedural faults in the hiring process
4) Academic credentials verification process
5) Processes for leave of absence, reinstatement and affiliation change

II. Investigation Details

1. Invitation background and circumstances at the time

      A. When university policies and special support projects conducted by the department of educational human resources were applied for at the time, the 'rate of securing educational personnel' was the qualification requirement that had the highest priority.

      B. In 2005, the University had been selected for the 'Capital Area Characterization Project' of the Ministry of Education, Science and Technology, so was actively engaged in invitation of distinguished scholars in related academic fields with the purpose of successfully promoting the 'Integrated Humanities Characterization Project Group' and 'Choongmuro Visual Culture Business Group,' make preparations for the graduate law school, participate in the BK21 project, etc.

      C. At the time, Jeong Ah Shin had credentials as curator of a well-known art museum and also gave lectures on fine arts at undergraduate and graduate schools of major private colleges (six) located in Seoul.

      D. Based on the successful curator credentials, academic records, and educational credentials of Jeong Ah Shin, former president Ki Sam Hong was said to have judged that she was an appropriate person for promoting the 'Integrated Humanities Characterization Project' and 'General Education Enhancement.'

[DONGGUK 0314384]

E. At the time, the fine arts history curricula of the University overemphasized oriental and Buddhist fine arts history, and the organization of its staff of professors also excessively overemphasized these same fields, which resulted in a severe imbalance.

2. Appointment details of Jeong Ah Shin
A. Recommendation details

    1) It was said that former president Ki Sam Hong received recommendations on Jeong Ah Shin from a number of experts in the fine arts circle via various pathways in the process of searching for elite manpower in the fields of culture and arts in order to successfully accomplish the CT characterization project, which was one of the 'Capital Area Characterization Projects' for the University at the time.

    2) The former president judged that the academic records and credentials of Jeong Ah Shin were very excellent so decided on a special invitation.

    3) There was the fact that, in response to an active request from the president, the department was opposed to her appointment because of her major area, but the president persuaded them of the need based on an interview with the department chair and promised support for additional T/O of professor positions before it was decided to proceed with a hiring examination.

B. Hiring details

    1) As a part of the special invitation process, an application for appointment and recommendations for Jeong Ah Shin were received from the department of fine arts history as of 08/04/2005. An interview examination was conducted on August 08. On August 16, the instructor personnel committee discussed and agreed. On August 30, the new instructor appointment for the second semester of the same year was approved in the 212th board of directors meeting, and appointment as professor of the graduate fine arts history department was made as of September 1 the same year.

    2) It was verified that there was not a voluntary recommendation from the department but an oral instruction from former president Ki Sam Hong during this process. It was also verified that such instruction represented unreasonable promotional efforts on the parts of the president and an applicable associate dean. At the time, a total of six persons including Jeong Ah Shin were appointed in the form of special invitation.

3. Process and details of the academic credentials inquiry in September 2005

A. Presentation of suspicion in the academic credentials inquiry and inquiry process

    1) It was verified that following the issue presented by the active professor in the University, and by the instruction from the former president Ki Sam Hong, the personnel management team leader and working level representative at the time conducted verification on the academic credentials of Jeong Ah Shin.

    2) On September 5 of the same year, the personnel management team requested an inquiry on the doctorate degree credentials of Jeong Ah Shin to the graduate school of Yale University. On September 22 of the same year, the faxed verification document in question was received. As the personnel management team leader reported to the former president Ki Sam Hong based on the details of the document faxed at the time that the award of a doctorate degree had been verified, the former president judged that the controversy on the suspected academic credentials was settled for the time being.

    3) While the draft proposal for the academic credentials inquiry on B.A./Master degrees from University of Kansas was approved, according to the practice that verification on the final academic credential should customarily take place first, the personnel management team leader at the time forwarded the inquiry document to Yale University alone.

[DONGGUK 0314385]

 4) It has been verified that the personnel management team leader at the time, based on the judgment that award of the degree had been verified based on the document faxed from Yale University, judged that there was no need to make further inquiries on the B.A. and Master's degrees from University of Kansas.

 5) The mail sent to Yale University was sent as international registered mail and forwarded from the post office in Dongguk University on 09/06/2005. Its registration number and the receipt on which its receiving station was described are being kept. While the fact-finding investigation committee tried in various aspects to verify its recipient address, its expiration term of the registered mail was one year based on the records of the post office, and the reply obtained was that it was impossible to verify it.

 6) It was said that only the registration number and target country were usually recorded on the receipt of an item of international registered mail forwarded from a post office, and that a recipient address was not recorded, unlike domestic registered mail.

 7) As for the faxed document that became an issue (dated 09/22/2005), it is said that an in-house investigation is in progress by Yale University, as was already announced. Its investigation outcome is scheduled to be announced as soon as it is delivered to the University.

 8) Furthermore, under the circumstance that no official evidence information supporting the fact of falsifying academic credentials was presented until May 2007, there was no choice but to depend upon details of the document faxed from Yale University in September 2005. (* see Attachment for case progress journal)

4. Required documents for invitation not submitted
A. Documents required for special invitation
 1) Appointment recommendation
 2) Appointment application
 3) Records on academic credentials and certificate of graduation
 4) List of research achievements
 5) Credentials and other related certificates
 6) Research achievements and other evidence data
B. Certificates of academic records on B.A., master's, and doctorate degrees were missing among the documents required for invitation of professor Jeong Ah Shin.
C. Supplementation process of incomplete documents
 1) Although the personnel representative had requested following the appointment that the missing certificates of academic records be submitted quickly, it was said to be a difficult

circumstance for pressing on the request because she stayed in the US after suspension and appointment were processed at the same time.

2) The fact was verified that upon reinstatement on 03/01/2006, submission for the certificates of academic records was repeatedly urged through her affiliate institution, the General Education Academy. At the time, Jeong Ah Shin became very irritated with such urging from the University and said, "I have already submitted them to the General Education Academy and you are asking me to submit them twice" and continued putting off submission of the missing documents, and it was verified in the process of the fact-finding investigation that the additional documents submitted were only duplicates of her degrees. Therefore, it was verified that her status on document submission was incomplete at the time of instructor invitation and after the invitation. This was determined to be a serious administrative mistake.

[DONGGUK 0314386]

3) As a reference, the University does not utilize the 'certificate of doctorate degree report completion' issued by the National Research Foundation of Korea as a document requirement not only for special appointment but also for open invitation of employment application. It is because the 'certificate of doctorate degree report completion' represents a voluntary report item of an individual and is not verified by a host institution.

5. Leave of absence

A. Reasons for leave of absence of an instructor consist of a total of 11 items, as required by the regulations, and the leave of absence for a certain period is recently allowed in colleges and universities due to environmental changes in the society and colleges for such reasons related to hiring excellent teachers, including an appointment in a foreign university prior to his/her appointment, establishment of venture capital by a faculty member, and other cases that benefit advancement of a university.

B. It was determined by the University at the time that even one full-time instructor had absolute influence on the rate for securing instructors and that it was under such a difficult situation that it could not even apply for various national policy projects if the annual rate for securing instructors required by the Ministry of Education, Science and Technology was not met.

C. Therefore, the leave of absence for Jeong Ah Shin was processed according to prior cases and the policy decision made by the former president.

6. Affiliation changes

A. As for the affiliation change, there was the opinion that the department of fine arts history had difficulties because there was no course available that matched with her major and her hiring was promoted by the headquarters initially, but since the appointment procedure was already in progress at the time, the situation was impossible to change.

B. It was verified that prior coordination on affiliation changes to the department of fine arts history and General Education Academy had been made in part even prior to her appointment.

C. At the time the General Education Academy was the department that would drive production of the 'core education curriculum reorganization project' which was one part of the humanities characterization project of the University and was judged to be qualified for the CT characterization project, so it was verified that her affiliation would be changed to the General Education Academy.

D. Based on the above, the fact that special hiring promotion followed in the form of passing the word down was verified.

7. Investigation results

A. No evidence whatsoever was verified indicating that there existed solicitation absurdities based on external pressure or monetary values during the hiring process.

B. Nevertheless, it is judged that such results have been caused by the unreasonable and exceedingly ambitious way of carrying out projects that the former president Ki Sam Hong employed during this process.

C. Furthermore, it was verified that there was a serious administrative mistake involved in the process of filing and checking the documents related to academic credentials.

[DONGGUK 0314387]

III. Recent Progress: See appendix data

1. Issue presentation

On 06/05/2007, a current professor of the University unofficially submitted the data related to plagiarized papers and falsified academic credentials of Jeong Ah Shin to the manager of the management control office. As reliability of the applicable data was suspected at the time of submission (the recipient of the applicable e-mail was unknown and there were signs that it had been altered), disclosure of additional data was requested. However, the applicable professor had no conviction on it and requested that the above details not be disclosed. Nevertheless, an in-house investigation was conducted on Jeong Ah Shin, including verification of authenticity of the above data.

2. Basic investigation and investigation process of each issue

A. Process and results of verification investigation on the academic degree from Yale University

- 06/07-08/2007: After an inquiry had been made to the library of Yale University concerning whether it owned the applicable papers, it replied that it had no such papers.

- 06/10/2007: An inquiry on academic credentials was made to Mr. Sprowson, who was the representative for academic records of Yale University graduate school.

- 06/11/2007: An inquiry on academic credentials was made to Susan Emerson, who was in charge of the academic records in the department of fine arts history of Yale University. A reply arrived indicating that she was not a holder of doctorate degree in fine arts history of said university.

- 06/14/2007: It was received from Dr. Mehring that 'he/she had never advised her in writing dissertation and was not acquainted with the person mentioned.'

- 06/15/2007: Results of the basic investigation were reported to the president.

- The applicable doctoral dissertation was not kept in the library of Yale University.

- While verification on applicable details was carried out in the applicable department, there was no reply concerning verification details from the department of the graduate school.

- The conclusion was reported that verification of authenticity of the doctorate degree would be needed from the administrative unit of the graduate school or higher.

- Furthermore, the need was presented for face-to-face questioning of professor Jeong Ah Shin concerning the details identified above.

B. To carry out individual verification on principal Jeong Ah Shin following the basic investigation

- 06/20/2007: Face to face questioning of professor Jeong Ah Shin was made in relation to the authenticity of her degrees and dissertation. Professor Jeong Ah Shin denied all the facts.

- 06/25/2007: Professor Jeong Ah Shin resigned (Acceptance of her resignation was put on hold for disciplinary actions).

- 07/04/2007: It was decided to conduct a fact-finding investigation on the case of suspected false academic credentials of Jeong Ah Shin. It was decided to make an official inquiry to the president of Yale University.

C. Verification investigation on authenticity of the faxed document in question.

[DONGGUK 0314388]

- 07/06/2007: The mail requesting verification of the authenticity of her academic degree was forwarded to the president of Yale University. Verification of the applicable document was requested from assistant dean Schirmeister of the graduate school via e-mail.

- 07/10/2007: An answer on the authenticity of the academic degree from Yale University arrived.

- The applicable certificate of academic degree was falsified.

- She is not a holder of a doctorate degree from Yale University, and had never even registered.

- The written verification of academic degree certificate and the cover of verification fax are not the forms used by Yale University.

- It would investigate how transmission of the fax on academic credentials inquiry reply dated 09/22/2005 was made.

- 07/15/2007: An inquiry was made on the authenticity of the investigation results in relation to fax transmission of the reply to the academic credentials inquiry made to Yale University and the telephone number recorded on the reply fax transmission.

- 07/17/2007: It was verified by Yale University that the applicable fax number used for the applicable transmission verification belonged to the office of the assistant dean of the graduate school in Yale University. However, it was also notified that investigators would examine whether the number had been manipulated.

D. Filing of forwarded data on Jeong Ah Shin and results of verification of their details

- 07/18/2007: Mail from Jeong Ah Shin arrived.

- Location of sender: Sent from the post office in the Incheon Airport dated 07/16.

- Details: Letter of admission to Yale University, data on library use, etc.

- 07/18/2007: The duplicate of the 'Letter of admission to Yale University' and duplicates of library use data sent by Jeong Ah Shin were forwarded to Yale University by e-mail and fax.

- 07/19/2007: A reply was received that the above additional data would be handed over to the Yale University investigation team of the case.

3. Fact-finding investigation results on academic credentials inquiry

A. There are no facts indicating admission to nor graduation from the Yale University doctorate program.

B. Dropped out from an undergraduate program at the University of Kansas after 3 years. No fact indicating that she studied for a master's program.

C. The written verification of academic degree certificate and the cover of the verification fax are not the forms used by Yale University.

D. Yale University continues to investigate how transmission of the fax on academic credentials inquiry reply dated 09/22/2005 was made.

IV. Results on the Suspicion Presented by the Press

1. Concerning the presence of external pressure

A. The invitation of Jeong Ah Shin as professor represented the issue that had progressed according to the judgment and conviction of then-president Ki Sam Hong, and no fact whatsoever was verified indicating that there existed any external pressure during the process. It was evaluated at the time that Jeong Ah Shin had great external qualifications including academic credentials, experience, and reputation, and there were recommendations from outside including the circle of fine arts and a number of verifications.

[DONGGUK 0314389]

Therefore, it has been verified that the president was convinced about such verification results and actively promoted the invitation with an objective of securing excellent instructors. In addition, the former president testified that he had never made any personnel decisions influenced by external pressure while he was in office.

B. While the current chief director Young Bae of Dongguk University was serving as executive director, he resigned prior to the appointment of Jeong Ah Shin. Therefore, he was not in a position to exercise influence on a professor appointment for Jeong Ah Shin, which was verified in the investigation process on the chief directors Young Bae and former president Ki Sam Hong.

2. Concerning the claim that suspicion raised by an outside institution was ignored

The claim that the Korea College Art Association officially submitted the data on professor Jeong Ah Shin to the University through a certain professor of the University in April or May 2007 is very different from the facts. It was in early June that the data were delivered to the University for the first time, and even then the data had been edited and submitted, so lacked reliability in part, and because verification of the identify of the provider and official presentation of the data were denied, it was determined to be one means of data presentation. However, the University performed investigations on them in different aspects a number of times and via all the institutions, and conducted investigation on the principal Jeong Ah Shin during the process. The official data submitted by the National College Art Association were received not several months ago (5 months ago) that some press had reported but on July 10, which was after the time at which the University began its official investigation. Therefore, the suspicion that the information provided by the National College Art Association to the University in April was completely ignored is clearly different from the facts.

3. Concerning the claim that the fact-finding investigation committee may not investigate fairly

The present issue is to accurately identify the truth and to prepare countermeasures to prevent recurrence by Dongguk University, taking its damaged reputation into account. Accordingly, the University organized the fact-finding investigation committee with its vice president serving as committee chair, chose independent persons as its members and awarded complete authority. During the process, not only the working officials related to personnel affairs at the time, but also the current chief director and former president were investigated without any reservations whatsoever. The Committee was organized by thoroughly excluding the personnel of the departments related to faculty hiring affairs at the time, and the student affairs support

headquarters director Sang Il Lee was the assistant dean of school affairs at the time, so was not involved in faculty hiring affairs. At the time, the planning office was involved in faculty hiring affairs.

V. Future Action Plan

     1. Verification tasks will continue to be carried out concerning any unverified details including the details on transmission of the faxed document that is under the in-house investigation of Yale University.

[DONGGUK 0314390]

     2. In relation to the present case, it was decided in the board of directors' meeting this morning to subject Jeong Ah Shin to the disciplinary committee on dismissal. The University is scheduled to review legal aspects and then take action.

     3. A system for reverification of past results of academic credential inquiries and future systematic verification of personnel will be supplemented within a short period.

[DONGGUK 0314391]

Case Progress Journal

I. Appointment Process

    1. 08/04/2005: A written recommendation on Jeong Ah Shin for special invitation of the department of fine arts history was filed.

    2. 08/08/2005: Interview examination (president, interview members).

    3. 08/12/2005: Instructor personnel committee discussed and agreed.

    4. 08/16/2005: The personnel decision was recommended to the University Corporation.

    5. 08/30/2005: Appointment approved in the 212th meeting.

    6. 09/05/2005: Inquiry on her academic credentials was made to the graduate school of Yale University.

    7. 09/22/2005: The reply document on the academic credentials inquiry was received from the graduate school of Yale University.

    8. 09/29/2005: Leave of absence without pay for 6 months was recommended to the Corporation.

    9. 10/11/2005: Leave of absence was approved by the Corporation.

    10. 12/26/2005: Director of the General Education Academy requested an affiliation change.

    11. 02/16/2006: Affiliation change approved (changed from the graduate department of fine arts history to the General Education Academy).

    12. 02/22/2006: Reinstatement approved by the Corporation (dated 03/01/2006) <Attached>.

    13. 03/01/2006: Reinstated as professor belonging to the General Education Academy.

II. Tip Filing and Basic Investigation Process

    1. 06/05/2007: The manager of the management control office received an unofficial tip from a certain professor of the University. A question was raised to the informer in regard to the reliability and authenticity of the data offered.

    2. 06/07/2007: Questions were asked of the library of Yale University concerning the existence of the applicable doctorate dissertation as the beginning of the unofficial basic investigation.

    3. 06/08/2007: Details were received from the library of Yale University indicating that it did not have the applicable dissertation.

    4. 06/10/2007: An inquiry on academic credentials was made to Mr. Sprowson, who was the representative for academic records of the Yale University graduate school.

5. 06/11/2007: An inquiry on academic credentials was made to Susan Emerson, who was in charge of the academic records in the department of fine arts history of Yale University. A reply arrived indicating that she was not a holder of doctorate degree in fine arts history of said university.

6. 06/11/2007: The reply arrived from Susan Emerson, indicating that Jeong Ah Shin was not included in the list of doctorate degree recipients for fine arts history.

7. 06/11/2007: Susan Emerson delivered the applicable question to the dissertation advisor of Jeong Ah Shin, Dr. Mehring.

8. 06/14/2007: Face to face questioning of professor Jeong Ah Shin was made in relation to the authenticity of her degrees and dissertation. Professor Jeong Ah Shin denied all the facts.

9. 06/15/2007: Details of the basic investigation were reported to the current president.

10. 06/20/2007: Face to face questioning of professor Jeong Ah Shin was made in relation with authenticity of her degrees and dissertation. Professor Jeong Ah Shin denied all the facts.

[DONGGUK 0314392]

    11. 6/25/2007: Professor Jeong Ah Shin resigned (Acceptance of her resignation was put on hold for disciplinary actions).

    12. 07/04/2007: It was decided to conduct a fact-finding investigation on the case of suspected false academic credentials of Jeong Ah Shin. It was decided to make an official inquiry to the president of Yale University.

III. Fact-finding Investigation Process

    1. 07/06/2007:

    - The mail requesting verification of authenticity of her academic degree was forwarded to the president of Yale University (DHL).

    - Verification on the applicable document was requested from assistant dean Schirmeister of the graduate school via e-mail.

    2. 07/06/2007: An automatic reply was received that Schirmeister would be absent until July 16.

    3. 07/09/2007: An official notice of truth examination on the applicable issue was received from the National College Art Association.

    4. 07/10/2007: An answer regarding the authenticity of the academic degree from Yale University arrived.

    - The applicable certificate of academic degree was fabricated.

    - She is not a holder of the doctorate degree from Yale University and had never even registered.

    - The written verification of academic degree certificate and the cover of the verification fax are not the forms used by Yale University.

    - It would investigate how transmission of the faxed reply on academic credentials inquiry dated 09/22/2005 was made.

    5. 07/11/2007: Members of the fact-finding investigation committee officially appointed.

    6. 07/11/2007: Press conference by the director of student affairs support headquarters.

    7. 07/12/2007: First meeting of the fact-finding investigation committee opened (direction of the investigation determined).

    8. 07/13/2007: Second meeting of the fact-finding investigation committee opened (related individuals investigated).

    9. 07/13/2007: It was resolved in the policy meeting to request the dismissal of Jeong Ah Shin.

    10. 07/15/2007:

- An inquiry was made on the authenticity of the investigation results in relation with fax transmission of the reply to the academic credentials inquiry made to Yale University and the telephone number recorded on the reply fax transmission.

- An e-mail of academic credentials inquiry was sent to the University of Kansas.

11. 07/16/2007: Third meeting of the fact-finding investigation committee opened (related individuals investigated).

12. 07/16/2007: A request for attendance to the fact-finding investigation committee was forwarded to Jeong Ah Shin by content-certified mail.

13. 7/16/2007: The official notice of certified content above was also sent by e-mail.

14. 07/16/2007: A request for reverification was made because no reply to the e-mail sent to Mr. Sprowson of Yale University on June 10 had yet been received.

15. 07/17/2007: Jeong Ah Shin received the e-mail of the request for attendance sent by the University in the US.

16. 07/17/2007: It was verified by Yale University that the applicable fax number used for the applicable transmission verification belonged to the office of the assistant dean of the graduate school of Yale University. However, it was also notified that investigators would examine whether the number had been manipulated.

[DONGGUK 0314393]

     17. 07/17/2007: An inquiry was made to Mr. Sprowson on the e-mail dated June 10, and subsequently the possibility was notified that the applicable mail had not been received due to spam mail filtering.

     18. 07/17/2007:

     - Results of the academic credentials inquiry made to the University of Kansas were received.

     - She was registered from the spring semester of 1972 to the fall semester of 1996, but did not graduate.

     - There is no fact indicating that she was admitted to the MBA program of the University of Kansas.

     19. 07/17/2007: Fourth meeting of the fact-finding investigation committee opened (related individuals investigated).

     20. 07/18/2007: Mail from Jeong Ah Shin arrived.

     - Location of sender: Sent from the post office in the Incheon Airport dated 07/16.

     - Details: Letter of admission to Yale University, data on library use, etc.

     21. 07/18/2007: A duplicate of the 'letter of admission to doctorate program' and duplicates of library use data that had been sent by Jeong Ah Shin were sent to Yale University and a request was made to determine their authenticity.

     22. 07/19/2007: A reply was received from Yale University stating that they would hand over the doctorate program letter of admission to the Yale University investigation team.

     22 [23]. 07/19/2007: Former president Ki Sam Hong and then-director and current chief director priest Young Bae Im investigated.

END

# 신정아 교수 허위 학력
# 진상조사 결과

2007. 7. 20(금)

동국대학교
진상조사위원회

Confidential

## Ⅰ. 진상 조사 개요

### 1. 의혹 내용
본교 대학원 미술사학과에 특별초빙·임용된 신정아 교수의 예일대학 박사학위
의 허위 여부 및 교수 임용 배경과 진행과정 일체.

### 2. 인적사항
가. 성명 및 생년 : 신정아 , 1972년생
나. 소속 : 교양교육원
다. 직급 : 조교수
라. 임용일자 : 2005년 9월 1일

### 3. 조사위원회 구성 및 조사대상자
가. 조사위원 : 한진수 부총장, 이상일 학사지원본부장, 조의연 경영관리실장
　　　　　　　박명관 교양교육원장, 조원생 학사지원본부 교무팀장
나. 조사대상자
　홍기삼 전 총장, 현 이사장(당시 이사) 임영배 스님, 당시 기획처장 2인 외 9인
다. 조사범위
　1) 채용배경 및 과정
　2) 임용과정의 외압 여부
　3) 임용과정 절차상의 하자 유무
　4) 학력 검증 과정
　5) 휴·복직 및 소속변경 과정


## Ⅱ. 조사 내용

### 1. 초빙배경 및 당시 상황
가. 당시 교육인적자원부에서 실시하는 모든 대학정책과 특별지원사업 신청시 '교
　원 확보율'은 가장 우선시 되는 자격 요건이었음.
나. 2005년 당시 우리대학은 교육인적자원부의 '수도권 특성화사업'에 선정되어
　'통합인문학 특성화사업단' 및 '충무로 영상문화사업단'의 성공적인 추진과 법
　학전문대학원 준비, BK21사업 참여 등을 목적으로 관련 학문분야의 석학들
　에 대해 적극적인 초빙을 진행하고 있었음.
다. 당시 신정아씨는 유명 미술관 큐레이터 경력과 함께 서울 소재 주요 사립대
　학(6개)의 학부 및 대학원 미술 관련 강의 경력이 있었음.
라. 신정아씨의 성공적인 큐레이터 경력과 학력 및 교육 경력을 토대로 전 홍기

Confidential
DONGGUK0314383

삼 총장은 '통합인문학 특성화사업'과 '교양교육강화' 추진에 적합한 인물로 판
단하였다고 함.

마. 당시 우리대학 미술사 분야는 동양 및 불교미술사로 교과과정이 편중되었고,
교수진의 구성도 상기 분야로 지나치게 편중되어 있어 심한 불균형을 초래하
고 있었음.

## 2. 신정아의 임용 경위

가. 추천 경위

1) 홍기삼 전 총장이 당시 우리대학의 '수도권 특성화 사업'중의 하나인 CT특성
화 사업의 성공적인 수행을 위해 문화예술 분야의 우수 인력을 찾는 과정에
서 신정아를 미술계 여러 전문가들로부터 다양한 경로를 통해 추천받았다고
함.

2) 전 총장은 신정아의 학력 및 경력 등이 매우 우수하다고 판단하여 특별초빙
하기로 결정함.

3) 총장의 적극적인 요청에 대해 학과에서는 전공과목 등의 사유로 임용을 반대
한 사실이 있었고, 총장은 학과장과의 면담을 통해 필요성을 설득, 추가적인
학과교수 T/O 충원을 약속하고 채용심사를 진행하기로 함.

나. 임용 과정

1) 특별초빙 과정의 일환으로 2005년 8월 4일자로 미술사학과로부터 신정아의
임용지원서와 추천서 접수. 8월 8일 면접심사. 8월 16일 교원인사위원회 심
의 및 동의, 8월 30일 제212회 이사회에서 동년 2학기 신규 교원 임용이 승
인되었고, 동년 9월 1일자로 대학원 미술사학과 교수로 임용됨.

2) 이 과정에서 학과의 자발적인 추천이 아닌 홍기삼 전 총장의 구두지시가 있
었음을 확인. 이 같은 지시는 총장과 관련처장의 무리한 업무추진으로 확인
됨. 당시 신정아를 포함한 총 6명이 특별초빙 형태로 임용되었음.

## 3. 2005년 9월 학력조회 과정 및 내용

가. 학력조회 의혹제기 및 조회과정

1) 교내 재직교수의 문제제기에 따라 홍기삼 전 총장의 지시로 당시 인사관리팀
장 및 실무담당자가 신정아씨 학력검증을 진행한 것으로 확인.

2) 동년 9월 5일 인사관리팀에서 신정아씨의 박사학위 학력조회를 예일대학교
대학원으로 의뢰, 동년 9월 22일 문제의 팩스확인문서 수신. 당시 수신된 팩
스문서의 내용을 토대로 인사관리팀장이 홍기삼 전 총장에게 박사학위취득
사실이 검증되었음을 보고함에 따라, 전 총장은 학력의혹에 관한 논란은 일단
락되었다고 판단하였음.

3) 캔사스대의 학사/석사 학위의 학력조회에 대한 기안결재는 이루어졌지만, 통
상적으로 최종학력에 대한 검증을 우선적으로 실시하는 관례에 따라 당시 인

Confidential

DONGGUK0314384

사관리팀장은 예일대학교에만 조회문서를 발송.

4) 예일대 팩스문서에 근거해 학위취득이 확인되었다는 판단에 따라 켄사스대학교의 학/석사 학력조회의 추가확인이 필요했다고 당시 인사관리팀장이 판단한 것으로 확인됨.

5) 예일대학교로 보낸 우편은 국제등기우편으로서 2005년 9월 6일에 동국대학교내 우체국에서 발송, 등기번호 및 수신국이 기재된 영수증은 현재 보관 중임. 진상조사위원에서 수신처 주소를 확인하기 위해 다방면으로 노력하였으나, 우체국 기록상에 등기우편의 보존 기간은 1년이며, 현재로서는 확인이 불가능하다는 답변을 얻음.

6) 통상 우체국에서 발송하는 국제등기우편 영수증에는 등기번호와 대상 국가명만 기재되며, 국내등기와 달리 수신처 주소는 기재하지 않는다고 함.

7) 문제가 된 FAX 문서(2005년 9월 22일자)에 대해서는 이미 발표한 바와 같이 예일대학교에서 자체조사가 진행중이라고 함. 조사결과가 우리학교에 전달되는 대로 발표할 예정임.

8) 아울러, 2007년 5월까지도 허위 학력 사실을 뒷받침할 공식적인 증거 자료가 제시되지 않는 상황에서 2005년 9월 예일대학의 팩스문서 내용에 의존할 수밖에 없었음. (※사건경과일지 별첨 참조)

## 4. 초빙에 필요한 서류 미제출

가. 특별초빙 제출 서류

1) 임용추천서

2) 임용지원서

3) 학력에 관한 성적 및 졸업증명서

4) 연구업적 리스트

5) 경력 및 기타 관련 증명서

6) 연구업적물 및 기타 증빙자료

나. 신정아 교수 초빙시 반드시 제출하여야 하는 서류중 학사, 석사, 박사과정의 성적증명서가 누락됨.

다. 미비서류 보완 과정

1) 미비된 성적증명서는 임용 이후 인사담당자가 조속히 제출할 것을 요청했음에도, 임용과 동시에 휴직처리 된 이후에는 미국에 체류중이어서 제독촉이 어려운 상황이었다고 함.

2) 2006년 3월 1일자 복직 후, 소속기관인 교양교육원을 통해서 성적증명서의 제출을 계속 독촉한 사실을 확인함. 당시 신정아는 학교의 이 같은 독촉에 이미 "교양교육원에 제출하였는데 이중으로 내라고 한다"고 무척 짜증을 내면서 미비서류 제출을 계속 미루어 왔으며, 확인결과 추가 제출 서류는 학위기 사본뿐이었음을 진상조사과정에서 확인함. 따라서 교원초빙시와 초빙이후 서

– 4 –

DONGUK0314385

류미제출 상태로 있었음이 확인됨. 이는 중대한 행정적 과실로 판명됨.
3) 참고로 우리대학은 학술진흥재단에서 발급하는 '박사학위신고필증'을 특채뿐
만 아니라 공채에서도 교수임용의 필수서류로 활용하지 않고 있음. '박사학위
신고필증'은 개인의 자발적인 신고사항으로서 주관기관에서도 이를 검증하고
있지 않기 때문임.

**5. 휴직**

가. 규정상 교원 휴직의 사유는 총 11개의 항목으로 구성되고 있으며 사회환경
및 대학의 환경변화로 최근 각급 대학에서는 우수교원채용과 관련하여 임용
전 외국대학에 재직중인 교수나, 교원의 벤쳐기업 창업, 대학발전에 도움이
되는 기타 등의 사유로 학교의 정책적 판단에 따라 일정기간 동안의 휴직을
허용하고 있음

나. 당시 우리대학은 1명의 전임교원도 교원확보율에 절대적 영향을 주고 있었
고, 교육인적자원부에서 요구하는 년도별 교원확보율 미충원시 각종 국책사
업에 지원 조차할 수 없는 어려운 상황에 처해 있다고 판단함.

다. 따라서 신정아의 휴직은 유사 선례와 학교의 전 총장의 정책적 판단에 따라
진행이 되었음.

**6. 소속변경**

가. 소속변경은 초기에 본부 주도하여 채용이 추진됨에 따라 미술사학과에서는
전공에 맞는 강좌가 없어서 어려움을 겪고 있다는 의견이 있었으나, 당시에는
이미 임용절차가 진행중에 있었으므로 중간 변경은 불가능한 상황이었음

나. 이에 따라 임용전부터 미술사학과와 교양교육원으로 소속변경에 대한 일부
사전 조율이 이루어졌음을 확인

다. 당시 교양교육원은 우리학교의 인문학 특성화 사업의 한 분야인 '핵심교양교
육과정 개편사업'추진을 주관하는 부서이고, CT특성화 사업에 적임자라 판단되
어 소속 학과장, 대학원장, 교육양교육원의 합의하에 교양교육원으로 소속을
변경하기로 결정한 것으로 확인함.

라. 이러한 점들을 볼 때 상의하달식의 특채 추진이 뒤따랐다는 사실을 확인함.

**7. 조사결과**

가. 채용과정에 외압이나 금품에 의한 청탁비리가 있었다는 어떠한 증거도 확인
하지 못했음.

나. 다만, 이 과정에 홍기삼 전 총장의 무리하고도 지나치게 의욕적인 업무추진
방식이 이와 같은 결과를 초래했다고 판단됨.

다. 아울러 학력관련 서류를 접수 및 확인하는 과정에서 행정상의 중대한 과실이
있었음을 확인함.

– 5 –

Confidential

Ⅲ. 최근의 과정 : 별첨자료 참조

1. 문제제기
2007년 6월 5일 교내 재직 교수가 경영관리실장에게 비공식적으로 신정아의 논문표절 및 허위학력관련 자료를 제출함. 접수당시 해당자료의 신빙성에 대해 의심이 되었던 바(해당 이메일 수신자 불명 및 편집의 흔적이 있었음) 추가적인 자료공개를 요청하였음. 그러나 해당교수가 이에 대한 확신이 없었고, 상기 내용을 비공개할 것을 요청함. 그럼에도 불구하고 상기자료들의 진정성 확인을 포함한 신정아에 대한 내사 실시함.

2. 기초조사 및 사안별 조사과정
가. 예일대학교 학위 진위여부 확인조사 과정 및 결과
  - 2007년 6월 7일/8일 : 예일대학교 도서관에 해당논문 소장여부의 질의결과 논문이 없음을 통보해옴.
  - 2007년 6월10일 : 예일대학교 대학원 학적 담당자 Mr. Sprowson에게 학력 조회 의뢰.
  - 2007년 6월 11일 : 예일대학교 미술사학과 학적 담당 Susan Emerson에게 력조회 의뢰. 동일 미술사학과 박사학위자가 아니라는 회신 도착.
  - 2007년 6월14일 : Dr. Mehring으로부터 '논문지도한 사실이 없었고 해당자를 모른다'는 내용을 수신함.
  - 2007년 6월15일 : 총장에게 기초조사 보고
  - 예일 대학교 도서관은 해당 박사학위논문 소장하지 않고 있음.
  - 해당 학과에서는 해당 내용 확인이 이루어졌으나 대학원 교학과에서는 확인 내용에 대한 회신이 없었음.
  - 대학원 이상의 행정단위에 박사학위 진위 확인 요청이 필요하다는 결론 보고.
  - 아울러 위에 파악된 내용에 대해 신정아 교수에게 직접 대면 질의 필요 제기.

나. 기초조사 후 신정아 본인에 대한 개별확인 실시
  - 2007년 6월20일 : 학위소지 여부 및 논문 진위와 관련 신정아 교수 대면 질의함. 신정아 교수는 모든 사실을 부인함.
  - 2007년 6월 25일 : 신정아 교수 사표 제출(징계처리를 위해 사표수리 보류).
  - 2007년 7월 4일 : 신정아 허위학력 의혹사건을 진상조사하기로 결정함. 예일대학교 총장에게 공식적으로 질의하기로 결정함.

다. 문제의 팩스문서 진위여부 확인조사

– 6 –

DONGGUK0314387

- 2007년 7월 6일 : 예일대학교 총장에게 학위 진위여부 확인 요청 우편 발송. 대학원 부원장 Schirmeister에게 해당 문서 확인을 이메일로 요청함.
- 2007년 7월10일 : 예일대학교로부터 학위 진위여부에 대한 회신 도착.
- 해당 학위증명서는 조작된 것임.
- 예일대학교 박사학위 소지자 아니며 등록 사실 조차 없음.
- 학위증명 확인서 및 확인 팩스 표지는 예일 서식이 아님.
- 2005년 9월22일자 학력조회 회신 팩스 발송은 어떻게 이루어졌는지 조사할 것임.
- 2007년 7월15일 : 예일대의 학력조회 회신 팩스 발송관련 조사 결과 및 회신 팩스 전송지에 기재된 전화번호의 진위 여부 문의
- 2007년 7월17일 : 예일대학교로부터 해당의 전송 확인 팩스 번호는 예일대학교 대학원 부학장실 번호임을 확인해 옴. 그러나 그 번호가 조작되었는지 여부는 조사관들이 조사할 것임을 통보해 옴.

라. 신정아의 자료송부 접수 및 내용확인 결과
- 2007년 7월18일 : 신정아로부터 우편물 도착.
- 발송지 : 7월 16일 인천공항 우체국.
- 내  용 : 예일대학교 입학허가서 및 도서관 이용 자료 등.
- 2007년 7월18일 : 예일대학교에 신정아가 보낸 '입학허가서' 사본 및 도서관 열람자료 사본을 이메일 및 팩스로 송부해 줌.
- 2007년 7월19일 : 이 추가 자료를 이 사건의 예일대 조사팀에 넘기겠다는 회신 수신.

**3. 학력조회에 관한 진상조사결과**
 가. 예일대학교 박사과정 입학 및 졸업사실이 없음.
 나. 캔사스대학교 학사 3년 중퇴, 석사재학사실 없음.
 다. 학위증명 확인서 및 확인 팩스 표지는 예일대학교 서식이 아님.
 라. 2005년 9월22일자 학력조회 회신 팩스 발송이 어떻게 이루어졌는지는 예일대학교에서 계속 조사하고 있음.


# Ⅳ. 언론이 제기한 의혹에 관한 결과


**1. 외압존재여부에 대하여**
 가. 신정아의 교수 초빙은 당시 홍기삼 총장의 판단과 확신에 따라 진행된 사안이었으며, 그 과정에서 외압이 있었다는 어떠한 사실도 확인되지 않았음. 당시 신정아는 학력, 경력, 평판 등 외형적 자질이 훌륭한 것으로 평가되었고 미

Confidential

DONGGUK0314388

숨게 등을 포함한 외부의 추천과 많은 확인이 있었음.

따라서 총장은 이러한 확인결과에 대해 확신을 가지고 우수교원을 확보한다는 목적에서 적극적으로 초빙하였던 것으로 확인됨. 또한 전임 총장은 재임시절 외압에 의한 인사를 단 한건도 한 적이 없다고 증언하였음.

나. 현 동국대학교 영배 이사장은 상임이사로 재직하고 있었으나, 신정아 임용전에 사직서를 제출한 상태였음. 따라서 신정아 교수임용에 영향력을 행사할 위치가 아니었으며 이는 영배 이사장과 흥기삼 전 총장의 조사과정에서 확인됨.

## 2. 외부기관의 의혹제기를 묵살했다는 주장에 대하여

대학미술협의회에서 우리대학 모 교수를 통해 2007년 4월 또는 5월중에 학교측에 신정아 교수의 자료를 공식적으로 제출하였다는 주장은 사실과 전혀 다름. 처음으로 그 자료가 학교에 전달된 날짜는 6월 초였으며, 그나마 일부 신뢰성이 없는 편집자료를 제출한 것이고, 제공자의 신원확인과 공식적인 자료제공을 거부하였기 때문에 하나의 자료제공 수준으로 판단하였음. 그러나 우리대학은 그에 대한 조사를 다방면으로, 수차례, 모든 기관을 통해 시행하였으며, 중간에 신정아 당사자에 대한 조사도 실시하였음. 대학미술협의회가 제출한 공식자료는 일부 언론에서 보도하고 있는 몇 달전(5월전)이 아니라, 학교가 이미 공식조사를 시작한 이후인 7월 10일에 수신된 것임. 따라서 대학미술협의회가 4월중 학교측에 제공한 정보를 묵살했다는 의혹은 명백히 사실과 다름.

## 3. 진상조사위원회가 공정하게 조사할 수 없다는 주장에 대하여

이번 사안은 동국대학교가 실추된 명예를 감안할 때 진실을 정확하게 파악하고, 재발방지의 대책을 시급히 마련하는 것임. 이에 따라 학교는 부총장을 진상조사위원장으로 하는 위원회를 구성하고 독립적인 인사를 위원으로 선발하여 전권을 부여했음. 이 과정에서 당시 인사관련실무자는 물론 현 이사장과 전임 총장에 이르기까지 성역없는 조사를 하였음. 당시 교원채용업무와 유관한 부서 근무자들을 철저히 배제하여 위원회를 구성하였으며, 이상일 학사지원본부장은 당시 교무처장으로 교원인사업무를 담당하지 않았음. 당시 교원인사업무는 기획처에서 담당하였음.

## V. 향후 조치계획

1. 예일대학교가 자체 조사중인 팩스문서 발송경위 등 미확인된 내용에 대해서는 계속적으로 검증작업을 진행할 것임.

Confidential

DONGGUK0314389

2. 본 사건과 관련하여 신정아는 오늘 오전 이사회에서 파면에 대한 징계위원회 회부를 결정하였음. 학교당국은 법률검토를 거쳐 고발조치할 예정임.

3. 과거 학력조회 결과들에 대한 재검증 및 향후 체계적인 인사검증시스템을 조속한 시일내에 보완할 것임.

– 9 –

Confidential

DONGGUK0314390

## 사 건 경 과 일 지

### Ⅰ. 임용과정

1. 2005년 8월 4일 : 미술사학과의 신정아 특별초빙 추천서 접수.
2. 2005년 8월 8일 : 면접심사(총장, 면접위원).
3. 2005년 8월12일 : 교원인사위원회 심의 동의.
4. 2005년 8월16일 : 학교법인으로 인사제청.
5. 2005년 8월30일 : 제212회에서 임용 승인.
6. 2005년 9월 5일 : 예일대학교 대학원에 학력조회 의뢰.
7. 2005년 9월22일 : 예일대학원에서 학력조회에 대한 회신문서를 접수.
8. 2005년 9월29일 : 법인에 6개월 무급휴직을 제청함.
9. 2005년10월11일 : 법인으로부터 휴직 승인.
10. 2005년12월26일 : 교양교육원장에서 소속변경을 요청함.
11. 2006년 2월16일 : 소속변경 승인(대학원 미술사학과에서 교양교육원으로).
12. 2006년 2월22일 : 복직이 법인으로부터 승인(2006.3.1일자)<별첨>.
13. 2006년 3월 1일 : 교양교육원 소속 교수로 복직.

### Ⅱ. 제보접수 및 기초조사 과정

1. 2007년 6월 5일 : 교내 모교수로부터 경영관리실장이 비공식 제보를 받음.
   제보자에게 제보자료의 신빙성 및 진정성에 대해 의문 제기함.
2. 2007년 6월 7일 : 비공식 기초조사의 시작으로 예일대학교 도서관에 해당 박사
   논문 존재 여부 질의.
3. 2007년 6월 8일 : 예일대학교 도서관으로부터 해당 논문 미소장 내용 수신.
4. 2007년 6월10일 : 예일대학교 대학원 학적담당 Mr. Sprowson에게 학력조회
   질의.
5. 2007년 6월11일 : 예일대학교 대학원 미술사학과 학적담당 Susan Emerson에
   게 학력조회 의뢰.
6. 2007년 6월11일 : Susan Emerson으로 부터 신정아는 미술사학과 박사학위 취
   득자 명단에에 포함되어있지 않았다는 회신 도착.
7. 2007년 6월11일 : Susan Emerson이 신정아의 지도교수인 Dr. Mehring에게
   해당 질의 내용 전달.
8. 2007년 6월14일 : Dr. Mehring으로부터 '논문지도 없었고 해당자 모른다'는
   내용을 수신함.
9. 2007년 6월15일 : 기초조사 내용을 현 총장에게 보고.
10. 2007년 6월 20일 : 학위소지 여부 및 논문 진위와 관련 신정아 교수 대면 질

Confidential

DONGGUK0314391

의함. 신정아 교수는 모든 사실을 부인함.

11. 2007년 6월 25일 : 신정아 교수 사표 제출 (징계처리를 위해 사표 보류)
　　　　　　　　　　 기초조사 자료 및 2005년 임용당시 자료 내부 검토 시작.

12. 2007년 7월 4일 : 신정아 허위학력 의혹사건을 공개 진상조사하기로 결정함.
　　　　　　　　　　 예일대학교 총장에게 공식적으로 질의하기로 결정함.

## III. 진상조사 경과 과정

1. 2007년 7월 6일 :
   – 예일대학교 총장에게 학위 진위여부 확인 요청 우편 발송(DHL)
   – 대학원 부원장 Schirmeister에게 해당 문서 확인을 이메일로 요청함.

2. 2007년 7월 6일 : Schirmeister가 7월 16일까지 부재하다는 자동 회신을
   수신함.

3. 2007년 7월 9일 : 대학미술협의회로부터 해당 사안에 대한 진술규명 요청공문
   수신.

4. 2007년 7월 10일 : 예일대학교로부터 학위 진위여부에 대한 회신 도착.
   – 해당 학위증명서는 조작된 것임.
   – 예일대학교 박사학위 소지자 아니며 등록 사실 조차 없음.
   – 학위증명 확인시 및 확인 팩스 표지는 예일 서식이 아님.
   – 2005년 9월 22일자 학력조회 회신 팩스 발송은 어떻게 이루어졌는지
     조사할 것임.

5. 2007년 7월 11일 : 진상조사위원회 위원 공식 위촉.

6. 2007년 7월 11일 : 학사지원본부장의 기자회견.

7. 2007년 7월 12일 : 1차 진상조사위원회 개최 (조사방향 결정).

8. 2007년 7월 13일 : 2차 진상조사위원회 개최 (관련자 조사).

9. 2007년 7년 13일 : 정책회의에서 신정아의 파면요구 결의

10. 2007년 7월 15일 :
    – 예일대의 학력조회 회신 팩스 발송관련 조사 결과 및 회신팩스 전송지에 기재
      된 전화번호의 진위 여부 문의
    – 캔사스대학교에 학력조회 이메일 발송.

11. 2007년 7월 16일 : 3차 진상조사위원회 개최 (관련자 조사).

12. 2007년 7월 16일 : 신정아에게 진상조사위원회 출석요청 내용증명 발송.

13. 2007년 7월 16일 : 위 내용증명공문을 이메일로도. 발송.

14. 2007년 7월 16일 : 예일대학교에 6월 10일자로 Mr. Sprowson에게 발송한 이
    메일에 대한 회신이 아직 없음을 재확인 요청함.

15. 2007년 7월 17일 : 대학이 보낸 출석요구서 이메일을 신정아가 미국에서 수신.

16. 2007년 7월 17일 : 예일대학교로부터 해당의 전송 확인 팩스 번호는 예일대학
    교 대학원 부학장실 번호임을 확인해 옴. 그러나 그 번호가 조작되었는지 여

Confidential

부는 조사관들이 조사할 것임을 통보해 옴.

17. 2007년 7월 17일 : 6월 10일자 이메일에 대해 Mr. Sprowson에게 문의 결과, 해당 메일이 스팸 메일 필터링에 의해 수신되지 않았을 가능성을 통보해 왔음.

18. 2007년 7월17일 :
   - 캔사스대학교에서 학력조회결과 수신.
   - 1992년 봄학기부터 1996년 가을학기까지 등록을 하였으나 졸업은 못함.
   - 캔사스대학교 MBA는 입학한 사실이 없음.

19. 2007년 7월17일 : 4차 진상조사위원회 개최(관련자 조사).

20. 2007년 7월18일 : 신정아로부터 우편물 도착.
   - 발송지 : 7월 16일 인천공항 우체국.
   - 내용 : 예일대학교 박사과정입학허가서 및 도서관 이용 자료 등.

21. 2007년 7월18일 : 예일대학교에 신정아가 보낸 '박사과정입학허가서' 사본 및 도서관 열람자료 사본을 송부하여 진위여부 확인 요청.

22. 2007년 7월19일 : 예일대학에서 신정아의 박사입학허가서를 이 사건의 예일대 조사 팀에 넘기겠다는 회신 수신.

22. 2007년 7월19일 : 홍기삼 전 총장 및 당시 이사이며 현 이사장 임영배 스님 조사.

-------------------------------이 상 임-----------------------------

Confidential

DONGGUK0314393

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0314382-93 from the Korean language into the English language.

I further certify that translation of DONGGUK0314382-93 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

**Kwang Park**
**Professional Translator**

State of California, County of _RIVERSIDE_
Subscribed and sworn to (or affirmed) before me
on this _29_ day of _JULY_ , 20 _11_ .
_BY WILLIAM BROWN_ KWANG PARK
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.
Signature: _William Brown_

Subscribed and sworn to before me on _____ day of _____ , _____ (year)

WILLIAM BROWN
COMM. #1934369
Notary Public - California
Riverside County
My Comm. Expires Apr. 29, 2015

(Signature of Notary)                    (Notary Stamp)

# EXHIBIT 21

[DONGGUK0000851]

Welcome to Internet Bulgukjungto sajahoo.com                         Page 1 of 2

HOME | LOGIN | SIGN | ADMIN | CONTACT US

| [Logo] Jogye Order of Korea Buddhism Traditional Temple  Mt. Sangwang Bowonsa | About Temple | Relics & Ruins | Buddhism Info | Temple Gallery |
| --- | --- | --- | --- | --- |

Buddhism Info                          Buddhism News

Buddhist Priesthood Search         Buddhism News Home > Order News

Buddhism News                                                 ▣To List      ⊞ Zoom In ⊟

Buddhist Terms

Controversy of Inappropriate Professor Appointment in Dongguk University

        After the controversy of an inappropriate professor appointment that had been settled by dismissal of the Dongguk University director Buddhist priest Yoon Jang resurfaced again, the former director Buddhist priest Yoon Jang held a press briefing last June 29 and said, "The fact has been verified that the professor concerned neither had a doctorate degree nor completed a foreign university program. Chairman of the board Buddhist priest Yongbae and other school individuals involved should be responsible for this issue."

        This incident broke out when then director Buddhist priest Yoon Jang presented an issue against professor Shin who had been appointed in September 2005. Buddhist Priest Yoon Jang stated that the doctorate degree of Yale University professor Shin had claimed to have obtained was forged, and it was disclosed in the 228th board of directors meeting held at the Dongguk University that it was not true based on verification, so Buddhist priest Yoon Jang was dismissed on the grounds of distributing false information

        On the same day, Buddhist priest Yoon Jang said, presenting evidence data, "Professor Shin does not have a doctorate degree from Yale University and also plagiarized other dissertations for her doctorate dissertation." According to the data, 1. Professor Shin is not on the list of doctorate holders for the recent 4-5 years submitted by Yale University, 2. Her advisor professor has never heard her name upon being inquired of, and 3. Her doctorate dissertation in 2005 was identical to a 1981 dissertation from the University of Virginia in terms of title, table of contents, and details.

        Professor Shin, who has become the subject of controversy, said that she acknowledged her moral responsibility and turned in her resignation before leaving for the US. In response to the above, a person concerned with the board of directors of Dongguk University disclosed on the 29th day, "There have been no procedural problems with her appointment as professor, and her doctorate degree has been confirmed with Yale University."

Reported by Ha Young Kim

[Buddhism News No. 2340 / July 4]

Buddhism Newspaper [06/30/2007]

▤To List                                    ⊞ Zoom In ⊟ Zoom Out

| |
|---|
| Urgent head priest meeting held in the national headquarters on October 5 … 09/23/2007 |
| Jogye order reemphasized, "will take strong actions against misleading press and form public opinion"  … 09/23/2007 |
| Jogye order commended, "Irresponsible report ... will take legal actions" ... 09/21/2007 |

02/25/2008

[DONGGUK0000852]

| "Jeong Ah Shin incident, turned into organized stab in the back for the circle of Buddhism" ... 07/21/2007 |
| --- |
| Field / Training for head priest operating temple stay program ... 09/21/2007 |
| Order's disciplinary system reorganized, Order regulations amendment promoted ... 09/21/2007 |
| Field Broadcast / The 4th Ganhwaseon seminar ... 09/21/2007 |
| Jogye order achievement conservation committee, 'improves' on its expertise ... 09/21/2007 |
| Women who entered priesthood significantly decreased ... 09/21/2007 |
| "Practice Zen meditation if you want to live happily" ... 09/21/2007 |

Mt. Sangwang Bowonsa
Copyright (C) 2005 www.bowonsa.or.kr All Rights Reserved.  Design by Jiahn
Address: 143 Yonghyun-ri, Unsan-myon, Seosan-si, CHungnam

2/25/2008

인터넷 불국정토 사자후닷컴에 오신것을 환영합니다                              Page 1 of 2


대한불교조계종 신/중/사/찰
**상왕산 보원사**

사찰소개          유적과유물          불교정보          사찰갤러리



**불교정보**          ➤ 불교뉴스

법문검색          불교뉴스 홈 > 종단뉴스                    ☰리스트로가 ➕글자크게 ➖

불교뉴스

불교용어          ## 동국대 교수 임용 부적절 논란

학교법인 동국대 이사 장윤스님의 해임으로 마무리됐던 교수 임용 부적절 논란이 다시 수면 위로 떠오르
전 이사 장윤스님은 지난 6월29일 기자간담회를 열고 "해당교수가 박사학위가 있을 뿐 아니라, 외국 대
도 않았다는 사실이 확인됐다"며 "이사장 영배스님 등 학교 관계자들은 이 사안에 대해 책임져야 한다"

이번 사건은 지난 2005년 9월 임용된 신 모 교수에 대해 지난 2월 당시 이사였던 장윤스님이 문제를 제
다. 장윤스님은 신 모 교수가 2005년에 취득한다는 예일대 박사학위가 위조됐다고 밝힌했고, 동국대 이
열린 228회 이사회에서 확인 결과 사실이 아닌 것으로 밝혀졌다며 장윤스님을 허위사실 유포 등을 이유
해임했다.

장윤스님은 이날 "신 모 교수는 예일대 박사학위가 없을 뿐 더러 학위논문도 다른 논문을 그대로 베껴 L
증명자료들을 내놓았다. 자료들에 따르면 △예일대가 제출한 최근 4~5년간 박사학위자 명단에 신 모 그
고 △지도교수에게 문의 결과 이름을 들어본 적이 없다는 답변 △2005년 학위논문이 1981년 버지니아
목, 목차, 내용이 모두 동일하다는 내용이 포함돼 있다.

문제가 되고 있는 신 모 교수는 "도덕적 책임을 인정한다"며 사표를 제출하고 미국으로 출국한 것으로 ?
해 동국대 이사회 관계자는 29일 "교수임용에는 절차상 아무런 문제가 없으며 예일대로부터 박사학위0
도 거쳤다"고 밝혔다.

김하영 기자


[불교신문 2340호/ 7월4일자]

불교신문 [2007-06-30]

☰리스트로가 ➕글자크게 ➖글지

| 10월5일 긴급 전국교구본사 주지회의 개최..2007-09-23 |
| 조계종 "왜곡언론 강력대응 여론형성" 재강조..2007-09-23 |
| 조계종 "무책임한 보도…법적 대응" 논평..2007-09-21 |

DONGGUK0000851

인터넷 불국정토 사자후닷컴에 오신것을 환영합니다

"신정아 사건, 불교계에 대한 조직적 음해로 변질"..2007-09-21

현장/ 템플스테이 운영사찰 주지연수..2007-09-21

종단 징계제도 정비 종법개정 추진..2007-09-21

현장중계 / 제4차 간화선 세미나..2007-09-21

조계종 성보보존위원회 전문성 '향상'..2007-09-21

여성 출가자 현격히 줄었다..2007-09-21

"행복하게 살고 싶으면 참선하세요"..2007-09-21

兜率山 普願寺

Copyright (c) 2005 www.bowonsa.or.kr All Rights Reserved. Design by Jiahn.
주소 : 충남 서산시 운산면 용현리 143번지

DONGGUK0000852

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0000851-52 from the Korean language into the English language.

I further certify that translation of DONGGUK0000851-52 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Kwang Park
**Professional Translator**

Subscribed and sworn to before me on _____27_____ day of _July_ , _2011_ (year)

(Signature of Notary)

(Notary Stamp)



FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

# EXHIBIT 22

 

 東 國 大 學 校
DONGGUK UNIVERSITY

100-715 서울 中區 茨洞 3街 26, 東國大學校
26, 3ga, Pil-dong, Chung-gu, Seoul 100-715, Korea
TEL:+82-2-2260-3875~7  FAX:+82-2-2260-3878

July 5, 2007

Richard C. Levin
President
Yale University
New Haven, CT 06520

Dear President Levin,

I am writing this letter in need of verification on the status of a Ms. Jeong Ah Shin on whether she received a Ph.D. degree from Yale University. The reason for this request is because we have received contradictory documents from Yale University.

In May 2005, Ms. Shin applied for a faculty position at Dongguk University in Seoul, Korea, where she submitted a copy of her Ph.D. diploma from Yale University and a copy of a certification letter signed by Associate Dean Pamela Schirmeister of Yale University Graduate School. These documents are enclosed numbered 1 and 2, respectively. We also received a fax from Pamela Schirmeister, numbered 3, confirming that the Ph.D. degree certification letter was written by her.

Recently, Korean College Art Association has informed us that Ms. Shin's Yale Ph.D. dissertation titled as *Guillaume Apollinaire: Catalyst for Primitivism, for Picabia and Duchamp* is identical to that of Samaltanou-Tsiakma's *Guillaume Apollinaire: Catalyst for Primitivism, for Picabia and Duchamp* from the University of Virginia. Documents 4 and 5 show this fact. Faced with this fact, we contacted via email Susan Emerson, registrar of the Department of the History of Art on June 10, 2007. Susan Emerson's reply stated that Ms. Jeong Ah Shin did not receive a Ph.D. in the Department of the History Art. Moreover, Professor Christine Mehring, to whom the Yale letter by Pamela Schirmeister was carbon copied, as shown in the document 2, emailed saying that she did not advise the dissertation and does not know Ms. Shin.

I sincerely ask for the verification of the following inquiries:

(1) Did Yale University award a Ph.D. degree to Ms. Jeong Ah Shin in the major of History of Art in 2005?
(2) If the answer to the inquiry (1) is 'No,' then I am curious as to how Pamela

*61*

Confidential

DONGGUK0357917

 


**DONGGUK UNIVERSITY**

100-715 서울 中區 筆洞 3街 26, 東國大學校
26, 3ga, Pil-dong, Chung-gu, Seoul 100-715, Korea
TEL:+82-2-2260-3975~7  FAX:+82-2-2260-3978

Schirmeister came to issue the Ph.D. certification letter for Ms. Jeong Ah Shin.

(3) If Ms. Shin received a Ph.D. degree from your school, then would you let us know what department she was enrolled in and who was the academic and thesis adviser?

It will be very kind of you if you will let us know the answers to the above questions as soon as possible. Especially, your quick answer to the first one will be greatly appreciated.

Sincerely,

Youngkyo Oh, Ph.D.
President
Dongguk University
Seoul, Korea 100-715

youngfive@dongguk.edu

cc: Jon Butler, Dean of the Graduate Studies
   Pamela Schirmeister, Associate Dean
   Susan Emerson, Registrar of the Department of the History of Art
   Christine Mehring, Professor of the History of Art

62

Confidential

DONGGUK0357918

# EXHIBIT 23

| | |
|---|---|
| **From:** | Susan Carney [susan.carney@yale.edu] |
| **Sent:** | 2007년 7월 10일 화요일 오후 10:00 |
| **To:** | youngfive@dongguk.edu |
| **Cc:** | edward.barnaby@yale.edu |
| **Subject:** | response to your inquiry |
| **Attachments:** | Pres Oh ltr 7-10-07.pdf |

Dear President Oh:

Attached please find my response to your email and your letter to Yale President Richard Levin, received in New Haven earlier today, and referred to me for reply.

We are attempting to send the letter by facsimile as well, and are encountering some difficulty. We will try again tomorrow. Tomorrow, we will also send you a hard copy of this letter, by international delivery service.

Sincerely,
//Susan Carney

* * * * * * * * * * * * * * * * * * * * * * * * * *
Susan L. Carney        *Regular mail:*
Deputy General Counsel  P.O. Box 208255
Yale University        New Haven, CT 06520-8255
T: (203) 432-4949      *Overnight mail:*
F: (203) 432-7960      2 Whitney Avenue, 6th Fl.
susan.carney@yale.edu  New Haven, CT 06510

*NOTE: This email communication may be privileged and confidential. If it is not clear that you are an intended recipient, please promptly notify the sender of your receipt of this email and delete the transmittal and any attachments. If you have received this email in error, you are not permitted to review, copy, or distribute this email or any attachments. If this communication concerns a proposed agreement, be advised that this message and electronic signature do not constitute an acceptance of any proposed terms.*

CONFIDENTIAL

# Yale University

*Office of the Vice President*
*and General Counsel*
*P.O. Box 208255*
*New Haven, Connecticut 06520-8255*

*Campus address:*
*Whitney Grove Square*
*2 Whitney Avenue, 6th Floor*
*New Haven, Connecticut 06510*
*Telephone: 203 432-4949*
*Fax: 203 432-7960*

July 10, 2007

VIA FACSIMILE
011-82-2-2260-3878

VIA EMAIL: youngfive@dongkuk.edu

Youngkyo Oh, Ph.D.
President
Dongguk University
Seoul, Korea 100-715

Dear President Oh:

President Levin has asked the Office of the Vice President and General Counsel to reply to your letter to him dated July 5, 2007, and your email dated July 10, 2007.

An examination of Yale University records shows that the University did not award a Ph.D. in History of Art to a Ms. Jeong Ah Shin in 2005 or any other year. Indeed, Yale has not identified any record showing that Ms. Jeong Ah Shin matriculated as a student at Yale.

The package transmitted by you to President Levin includes several documents that on their face might appear to have been issued by Yale University. The document numbered "1," which appears to be a copy of a Yale diploma, is not a copy of a real Yale University diploma. This is quickly apparent to us at Yale because, although the degree purports to have been awarded in 2005 ("MMV"), the "Praeses," or President, is shown as "Howard R. Lamar," and the "Scriba," or Secretary, is shown as Sheila Wellington. But in 2005, Richard C. Levin was President and Linda K. Lorimer was Secretary. Howard R. Lamar was President of Yale and Sheila Wellington Secretary in 1992-93. In addition, the diploma also refers to the year of Yale's existence as "Universitatis Yalensis CCXCII." This refers to 1993, not to 2005.

Document "2," ostensibly a certificate on Yale Graduate School letterhead and bearing the date May 27, 2005, similarly is not authentic. Among other indicia of inauthenticity, it does not follow the format used in the Graduate School for responding to inquiries for degree confirmation, and Dean Schirmeister's name is misspelled. Document "3," apparently a Yale Graduate School facsimile transmittal sheet and bearing the date 9/22/2005, similarly is not authentic and does not follow Graduate School format.

CONFIDENTIAL

DONGGUK0277523

We have no knowledge, currently, regarding the creation or issuance of these documents, nor their provision to Dongguk University. Accordingly, the University is investigating this matter locally.

The responses sent by Professor Mehring and Susan Emerson to Dongguk Director of Management and Supervision Cho, in June 2007, advising that no degree had been issued by Yale to Ms. Jeong Ah Shin, were authentic and correct.

I hope that this clarifies the record. I may be reached at 203-432-4949 if you or one of your Directors would like to call me to confirm the substance of this letter.

Sincerely,

Susan L. Carney
Deputy General Counsel

cc:     Richard C. Levin, President
        Jon Butler, Dean of the Graduate School
        Pamela Shirmeister, Associate Dean of the Graduate School
        Susan Emerson, Registrar of the Department of the History of Art
        Christine Mehring, Professor of the History of Art

2

CONFIDENTIAL                                                        DONGGUK0277524

# EXHIBIT 24

| | |
|---|---|
| From: | Susan Carney [susan.carney@yale.edu] |
| Sent: | 2007년 11월 30일 금요일 오후 8:51 |
| To: | youngfive@dongguk.edu |
| Subject: | Letter dated Nov. 30, 2007 |
| Attachments: | Pres. Oh Letter 11-30-07.pdf |

Dear President Oh:

Please see the attached letter.

Thank you.

Sincerely,
//Susan L. Carney

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
Susan L. Carney          *Regular mail:*
Deputy General Counsel  P.O. Box 208255
Yale University          New Haven, CT 06520-8255
T: (203) 432-4949        *Overnight mail:*
F: (203) 432-7960        2 Whitney Avenue, 6th Fl.
susan.carney@yale.edu  New Haven, CT 06510

*NOTE: This email communication may be privileged and confidential. If it is not clear that you are an intended recipient, please promptly notify the sender of your receipt of this email and delete the transmittal and any attachments. If you have received this email in error, you are not permitted to review, copy, or distribute this email or any attachments. If this communication concerns a proposed agreement, be advised that this message and electronic signature do not constitute an acceptance of any proposed terms.*

CONFIDENTIAL

DONGGUK0277531

# Yale University

Office of the Vice President
and General Counsel
P.O. Box 208255
New Haven, Connecticut 06520-8255

Campus address:
Whitney Grove Square
2 Whitney Avenue, 6th Floor
New Haven, Connecticut 06510
Telephone: 203 432-4949
Fax: 203 432-7960

November 29, 2007

VIA EMAIL: youngfive@dongguk.edu
And REGULAR MAIL

Youngkyo Oh, Ph.D.
President
Dongguk University
Seoul, Korea 100-715

Dear President Oh:

During Yale's preparation of the recent response to a document subpoena issued in the matter of Jeong Ah Shin, it has come to light that I inadvertently provided one piece of incorrect information when I wrote to you about this matter on July 10, 2007.

In reliance upon information provided me by the Graduate School, I wrote that the document "3," a facsimile cover sheet bearing the date 9/22/2005, was "not authentic and did not follow Graduate School format." It now appears from a document discovered by Ms. Schirmeister that the facsimile sheet bearing that date was indeed authentic, and Ms. Schirmeister had in fact, in the rush of business, sent document "3."

Everything else that I wrote to you on July 10, 2007 – that Yale did not award a degree to Ms. Shin, that the diploma presented with her name on it was not a valid Yale diploma, and the certificate on Yale Graduate School letterhead bearing the date May 27, 2005 is inauthentic -- is correct.

I regret any inconvenience that this misstatement may have caused.

Sincerely,

Susan L. Carney
Deputy General Counsel

cc:     Richard C. Levin, President
        Jon Butler, Dean of the Graduate School
        Pamela Schirmeister, Associate Dean of the Graduate School
        Susan Emerson, Registrar of the Department of the History of Art
        Christine Mehring, Professor of the History of Art

CONFIDENTIAL

DONGGUK0277532

# EXHIBIT 25

0001
1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF CONNECTICUT

3  CIVIL ACTION 3:08-CV-00441 (RNC)

4  -------------------------------x

5  DONGGUK UNIVERSITY,            :

6       Plaintiff,          :

7    -versus-                :

8  YALE UNIVERSITY,              :

9       Defendant.         :

10  -------------------------------x

11

12          Deposition of EDWARD BARNABY,

13  taken pursuant to the Federal Rules of Civil

14  Procedure, at the Law Offices of Day Pitney, LLP,

15  1 Audubon Street, New Haven, Connecticut, before

16  James A. Martone, LSR #248, and Notary Public, in

17  and for the State of Connecticut, on August 19,

18  2010, at 11:00 a.m.

19

20

21

22

23

24

25

0092

1  the pages following that letter.  Of course these

2  are documents provided by Professor Oh in his

3  letter I assume, so I don't know what version of

4  these documents they are, but I discussed issues

5  regarding the diploma, certification letter,

6  facsimile at some point with Susan Carney.

7      Q.  Let's stick with the facsimile.  And

8  that's Yale Bates stamp 6989; is that correct?

9      A.  Yes.

10     Q.  And that's the September 22nd, 2005

11  fax; is that correct?

12     A.  Yes.

13     Q.  Okay.  Did you inform Ms. Carney that

14  this fax was not authentic?

15     A.  Yes.  It appeared to me to be

16  inauthentic.

17     Q.  When did you tell her that?

18     A.  I don't recall.

19     Q.  And why did you tell her that?

20     A.  Because it appeared to me to be

21  inauthentic.

22     Q.  Well, what about it caused you to

23  believe that it was inauthentic?

24     A.  The fact that it seems like a very

25  informal reply to a hard copy or a letter that we

# EXHIBIT 26

X-Mailer: QUALCOMM Windows Eudora Version 7.0.1.0
Date: Tue, 10 Jul 2007 11:15:13 -0400
To: jhpark@kwangju.co.kr
From: Alicia Grendziszewski <alicia.grendziszewski@yale.edu>
Subject: Re: about Ms Shin's dissertation
Cc: "Pamela Schirmeister" <pamela.schirmeister@yale.edu>
X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
X-Scanned-By: MIMEDefang 2.52 on 130.132.50.54

Please contact the Public Affairs Office: http://www.yale.edu/opa/

thank you,
Alicia
At 01:47 AM 7/9/2007, you wrote:

Hello. Ms Grendziszewski.

I sent mail to Ms Pamela Schimester last Saturday, she will be away from office for a while. Instead, she informed to me your mail address. You will answer my question, so I'm mailing you.

My name is JinHyun Park and I'm working for Kwangjullbo(newspaper) as a reporter in Korea. The reason why I'm sending this mail is to get your comments on Ms Shin's Dissertation. The dissertation is titled "Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp" written by Jeong Ah Shin, Ph.D, in 2006.

Ms Shin was chosen as Director of Gwangjubiennale 2008 recently. But there is a controversy about her dissertation.

According to the second page of the book we have, it was presented to the faculty of the Graduate School of Yale University on Candidacy for the Degree of Docter of Philosophy.

The dissertation was presented in May 2005 and approved by Dr. Christine Mehring, Dr Richard B.Murray, and Dr.Pamela Schimester.

We searched for this particular dissertation in Yale's online library, but couldn't find any reference to it .


So, I was wondering if you could confirm your approval of this dissertation, and your role as an advisor for Ms Jeong Ah Shin.

Did you remember this dissertation?

If you can confirm, it would be very nice.

I'm look forward to receiving response . Thank you.


Sincerely

JinHyun Park


Alicia Grendziszewski
Assistant to Dean Pamela Schirmeister
and Dean Edward Barnaby

file://C:\DOCUME~1\ps253\LOCALS~1\Temp\eud19C.htm                    4/14/2008

YALE00007661

Yale Graduate School
320 York Street
PO Box 208236
New Haven CT 06520-8236

tel: 203.432.7598
fax: 203.432.6904

Confidentiality Notice: This e-mail message and any attachments are for the sole use of the
intended recipient (s) and may contain proprietary, confidential, or privileged information. Any
unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law.
If you are not the intended recipient or a person responsible for delivering this message to an
intended recipient, please contact the sender by reply email and destroy all copies of the
original message immediately.

file://C:\DOCUME~1\ps253\LOCALS~1\Temp\eud19C.htm                    4/14/2008

YALE00007662

# EXHIBIT 27

From: "Kyu Hyon Rhee" <kyuh@chosun.com>
Subject: Re: from Kyu, the art reporter
X–IP: 127.0.0.1
X–FROM–DOMAIN: chosun.com
X–FROM–EMAIL: kyuh@chosun.com
Date: Tue, 10 Jul 2007 11:38:20 +0900
To: gila.reinstein@yale.edu
X–YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)

Dear Gila Reinstein,


Thank you very much for your reply.

What really confuses me is that Dongguk University, where Jeong Ah Shin works for rihgt
now, has a document that Pamela Schirmeister, Associate Dean of Graduate School,
verified her degree. Would you please confirm whether the letter I attached this mail is
written by Pamela Schirmeister?



Sorry, and thank you.

Best regards,

Kyu



----- Original Message -----
From: Gila Reinstein <gila.reinstein@yale.edu>
To: "Kyu Hyon Rhee" <kyuh@chosun.com>
Date: 2007-07-10 06:37:19
Subject: Re: from Kyu, the art reporter

Dear Kyu,

Yale University has no record of a student named Jeong Ah Shin, in any department or
program. There is no record that she ever enrolled as a student and no record that she
earned a degree.

Best,
Gila Reinstein
Assistant Director

YALE00000488

Office of Public Affairs

Dear Gila Reinstein,

Thank you for your kind answer.

Would you please double check whether Jeong Ah Shin has ever been a student of any other department, then?

It is really serious if she ever faked her educational achievement.

This is the letter I had written to the department of History of Art.

– – –

To whom it may concern:

My name is Kyu, an art reporter from Chosunilbo Dailynewspaper, Seoul, Korea. My newspaper is the leading paper in Korea.

I am writing this letter to ask you whether you can verify a student's certification.

Her name is Jeong Ah Shin(DOB April 28, 1972). She is known to have received Ph. D from Yale. (Major: History of Art)

She is recently appointed as the director of Gwangju Biennale 2008, but is criticized to have fabricated her certification for her Ph. D. degree. Would be very much appreciated if you can verify the below contents. This is very important for my article which will be influential to Gwangju Biennale's decision.

I will look forward to hearing from you.

Best Regards,

YALE00000489

Kyu

---

Name: Jeong Ah Shin

Date of Birth: April 28 1972

Major: History of Art

Date of Admission: August 1996

Da! te of Graduation: May 2005
Degree Received: Phd



?볍엡? 석?? 을?? ??
Kyu Hyon Rhee
Staff writer
Culture News Desk
Chosunilbo Dailynews, Seoul, Korea

82-2-724-5375

(fax) 82-2-724-5308



YALE00000490



조선일보 문화부 이규현 기자
Kyu Hyon Rhee
Staff writer
Culture News Desk
Chosunilbo Dailynews, Seoul, Korea
82-2-724-5375
(fax) 82-2-724-5308



YALE00000491

# EXHIBIT 28

From: "Kyu Hyon Rhee" <kyuh@chosun.com>
Subject: Re: from Kyu, the art reporter
X-IP: 127.0.0.1
X-FROM-DOMAIN: chosun.com
X-FROM-EMAIL: kyuh@chosun.com
Date: Fri, 13 Jul 2007 00:12:40 +0900
To: gila.reinstein@yale.edu
X-Yale-Not-Spam: For more info see: http://www.yale.edu/email/spam/content.html
X-Yale-Spam-Score: * (1.848)
X-Yale-Filter-Score: 1.848
X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)

Thank you very much for your time.

You have been very helpful.

Thank you again.


Kyu

----- Original Message -----
From: Gila Reinstein <gila.reinstein@yale.edu>
To: "Kyu Hyon Rhee" <kyuh@chosun.com>
Date: 2007-07-12 23:51:06
Subject: Re: from Kyu, the art reporter

The letter that supposedly came from Yale is not authentic. It does not conform to the format that we use when verifying a degree. For example, a letter from the Yale Graduate School of Arts and Sciences would not use the term "Major" to describe someone's field of study. It would say "Department or Program." It would not include date of birth. We would not send an important piece of documentation with spelling errors (Schirmeister, Century). I hope this gives you the information you need.
Gila


Dear Gila Reinstein:



Thank you so much for your help.

I am sorry this thing happened.

YALE00000493

Would be very much appreciated if you reply to me to confirm how and why this documentation is not authentic.

Best Regards,

Kyu

?법엡? 석?? 을?? ??
Kyu Hyon Rhee
Staff writer
Culture News Desk
Chosunilbo Dailynews, Seoul, Korea
82-2-724-5375
(fax) 82-2-724-5308



YALE00000494

Attachment converted: Macintosh HD:two 1.jpg (JPEG/?C? (001C1AA4)
Attachment converted: Macintosh HD:one 1.jpg (JPEG/?C? (001C1AA5)

Attachment converted: Macintosh HD:three 1.jpg (JPEG/?C? (001C1AA6)

조선일보 문화부 이규현 기자
Kyu Hyon Rhee
Staff writer
Culture News Desk
Chosunilbo Dailynews, Seoul, Korea
82-2-724-5375
(fax) 82-2-724-5308



YALE00000495

# EXHIBIT 29

DONGGUK v. YALE                                         February 4, 2010

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)


--------------------------x

DONGGUK UNIVERSITY,          :

       Plaintiff,        :

   -versus-                  :

YALE UNIVERSITY,             :

       Defendant.        :

--------------------------x


Deposition of GILA REINSTEIN,

taken pursuant to the Federal Rules of Civil

Procedure, at the law offices of Jacobs,

Grudberg, Belt, Dow & Katz, PC, 350 Orange

Street, Connecticut, before James A. Martone,

L.S.R. #00248, and a Notary Public in and for

the State of Connecticut, on February 4, 2010,

at 9:40 a.m.

DONGGUK v. YALE                                                    February 4, 2010

Page 38

1   answers, and conveyed the answer to the question.
2       Q.  During your 14 years at Yale, on how many
3   occasions did you give out inaccurate information to
4   the media, other than this one?
5           MR. SPRINGER: Objection.
6       A.  I don't know.
7       Q.  Can you think of one?
8       A.  No.
9       Q.  And so other than what you told me is
10  basically what you recall -- what you told me is
11  basically what you recall; is that correct?
12      A.  Yes.
13      Q.  When you say you did appropriate research,
14  what did that research consist of?
15      A.  Ordinarily, when I get a question asking
16  me to confirm whether someone has earned a degree
17  from Yale, I contact the Office of Alumni Records
18  and get the answer.  In most cases, the answer is
19  yes.  In this case, the answer was no.
20      Q.  Do you recall being asked by anyone from
21  the Korean media whether Dean Schirmeister had sent
22  a fax dated September 22nd, 2005, confirming Shin's
23  degree?
24          MR. SPRINGER: Objection.
25      A.  At -- No, I don't remember.

Page 39

1       Q.  Don't remember that?
2       A.  Only in the most general sense.  I don't
3   have a vivid, specific memory of someone who asked
4   it or when they asked it.
5       Q.  Okay.  I'd like you to go back to Exhibit
6   4 and look at the bottom of the first page, and
7   that's an e-mail which we identified earlier as
8   Nicole Chardiet forwarding to you an e-mail that she
9   had received; is that correct?
10      A.  Yes.
11      Q.  And she had received an e-mail from a
12  Roderick Whitfield; is that right?
13      A.  I don't see that either.
14      Q.  You go to where it says "From."
15      A.  Oh, yes, that's the origin of the e-mail.
16      Q.  Correct.  And down the page -- And by the
17  way, do you know who Youngsook Pak is?
18      A.  No.
19      Q.  It says in the e-mail to you that he was a
20  visiting professor; is that right?
21          MR. SPRINGER: Where are you looking?
22      A.  Right at the top.  That's what Nicole
23  e-mailed to me.
24      Q.  And she sent you an e-mail that she
25  received from him informing her, and she then

Page 40

1   informed you, that this matter "has become a matter
2   of national importance."  Do you see that at the
3   bottom of the page?
4       A.  Yes.  I see that.
5       Q.  So the very first day that you became
6   involved, you were aware that this matter had become
7   a matter of national importance; isn't that correct?
8           MR. SPRINGER: Objection.
9       A.  I -- Based on this e-mail, I was informed
10  that, according to someone named Youngsook, in
11  communication to someone named Nicole, it -- in that
12  person's opinion, it was a matter of national
13  importance.
14      Q.  Okay.  Well, to your knowledge, was it a
15  matter of national importance, based upon your
16  experience during that summer?
17          MR. SPRINGER: Objection.
18      A.  This -- To my knowledge, on Monday, July
19  9th, I -- I don't remember.
20      Q.  But that's what you were being told?
21          MR. SPRINGER: Objection.
22      A.  Someone was telling someone else, and that
23  someone else forwarded the e-mail.
24      Q.  And that was on July 9th?
25      A.  Yes.

Page 41

1       Q.  Let me show you another document also
2   dated July 9th, 2007, which we have previously
3   marked as Schirmeister 42, which is a fax addressed
4   to your attention from Hongnam Kim, who is director
5   general of the National Museum of Korea, re
6   Ms. Shin, Jeong Ah.  Did you ever see that?
7       A.  I'm sorry, what?
8       Q.  Do you see that document?
9       A.  Yes, I see that document.
10      Q.  Do you recall receiving it?
11      A.  Yes, I do.
12      Q.  And in the first sentence, it goes, "Dear
13  Dr. Reinstein, thank you for your kind assistance in
14  investigating this grievous matter."
15      Q.  Do you know what he's referring to
16  when he uses the term "grievous matter"?
17      A.  I don't remember.
18      Q.  And he states, "It will be greatly
19  appreciated if you can send us whatever facts found
20  in writing as in our telephone conversation."
21          Do you recall having a telephone
22  conversation with Mr. Hongnam Kim?
23      A.  No, I don't recall.
24      Q.  And he forwards to you, in connection with
25  his fax, three documents; is that right?  Or four

Sanders, Gale & Russell
(203) 624-4157

DONGGUK v. YALE                                          February 4, 2010

---

Page 42

1  documents, four pages.
2      A.  I see that.
3      Q.  And the first page is a September 22nd,
4  2005 fax cover sheet that states, "As requested, I
5  am confirming that the attached letter was issued by
6  the Yale Graduate School and signed by me," and it's
7  from Dean Pamela Schirmeister.  Do you see that?
8      A.  I do.
9      Q.  So that as of July 9th, or July 10th, I
10  think, is when this fax was received, you were aware
11  that there was a fax out there that said it was from
12  Dean Schirmeister, dated September 22nd, 2005,
13  stating, "As requested, I am confirming that the
14  attached letter was issued by the Yale Graduate
15  School and signed by me."  Is that right?
16      A.  Yes.
17      Q.  And attached to the fax cover sheet were
18  three documents.  The first is a May 27, 2005 letter
19  or certification on the letterhead of Yale, the
20  second is a letter from Dongguk University, dated
21  September 5th, 2005; and the third is another
22  document.
23          Could you describe, if you can, what
24  the third document is?
25          MR. SPRINGER:  I'm going to object to

---

Page 43

1  that question, particularly the start of the
2  question.
3          You can answer.  Just make sure you
4  have the question in mind.
5      A.  You asked me to describe --
6      Q.  Do you know what the third document is?
7      A.  The third document, the one beginning
8  "Praeses et Socii"?
9      Q.  Yes.
10      A.  Okay.  That purports to be a diploma from
11  the graduate school.
12      Q.  Okay.  Now between the time that you
13  received this fax and the time you had received the
14  e-mail on July 9th, had you had a telephone
15  conversation with Hongnam Kim?
16      A.  I don't recall.
17      Q.  If you don't recall the conversation, I
18  take it you don't recall what was discussed in the
19  conversation?
20      A.  That's correct.
21      Q.  Okay.  Now as part of your investigation,
22  or appropriate research as you put it, did you do
23  appropriate research to determine whether the
24  September 22nd, 2005 fax was authentic?
25          MR. SPRINGER:  Objection to the form.

---

Page 44

1      A.  Yes.
2      Q.  Okay.  What did you do and when did you do
3  it?
4      A.  I -- At some point, and I don't know the
5  date, I asked Pamela Schirmeister whether these
6  materials had come from her office; and I don't
7  remember the details, but the gist of it was no.
8      Q.  When you say "the gist of it," what did
9  she say?
10      A.  I don't remember the words.
11      Q.  And earlier I showed you the e-mail that
12  you sent in February, where Ms. Schirmeister had
13  forwarded you some examples of certifications.  Was
14  this the time that she had forwarded you samples of
15  certifications?
16      A.  I don't remember.
17      Q.  Okay.  Do you recall when she forwarded
18  you those samples?
19          MR. SPRINGER:  Objection.
20      A.  No.  I don't remember the dates.  It would
21  have been in the -- sometime after July 9th.
22      Q.  In the month of July, month of August,
23  September?
24      A.  I don't remember.
25      Q.  Okay.  Now did you review these documents

---

Page 45

1  yourself at the time that you received them by fax
2  from Mr. Kim?
3      A.  Yes.
4      Q.  And did you review them for purposes of
5  determining whether they were real?
6          MR. SPRINGER:  Objection.
7      A.  No.  My purpose -- Well, my purpose was
8  to answer the question, my function was to answer
9  the question, did Ms. Shin earn a doctorate from
10  Yale University.  I established that through the
11  various offices that I consulted, that Yale had no
12  record of her.  These were just sort of incidental
13  to that.
14      Q.  So at this point in time, the focus was on
15  whether Ms. Shin had gotten a degree; is that
16  correct?
17      A.  Yes.
18      Q.  Okay.  Let me show you Schirmeister
19  Exhibit 43, and Schirmeister Exhibit 43 is dated
20  July 10th, 2009, and it's an e-mail from you to
21  Susan Carney.  Do you see that, a copy to
22  Mr. Conroy?
23      A.  Yes.
24      Q.  And what it does is forward an e-mail that
25  you got from Mr. Kim; is that correct?

---

12  (Pages 42 to 45)

DONGGUK v. YALE                                                    February 4, 2010

Page 46

1     A.  Yes.
2         Q.  Why did you forward the e-mail that you
3    got from Mr. Kim to Susan Carney?
4     A.  I don't recall.
5         Q.  The e-mail that you got from Mr. Kim
6    begins, "Dear Dr. Gila Reinstein, Thank you very
7    much for the verification which will be of great
8    help in closing the case for good. It is very
9    unfortunate and sad. The only question remains
10   personally to me is that how the certification along
11   with diploma could have been sent by the fax number
12   of Associate Dean's office, which is clearly printed
13   on the top of the transmitted pages."
14            Do you see that?
15    A.  I see that.
16        Q.  Okay. So that was a question that was
17   asked of you; is that correct?
18            MR. SPRINGER: Objection.
19    A.  No.
20        Q.  No?
21    A.  No.
22        Q.  Well, did you understand, when you read
23   this, that Mr. Kim was -- that there was a question
24   that existed as to how it was that the fax number on
25   the top of the September 22nd, 2005 fax came to be

Page 47

1    placed on there?
2     A.  In my reading of this text, Kim, who I
3    believe is a woman incidentally, had a personal
4    question about how the certification, et cetera, et
5    cetera. That was not a question for me.
6         Q.  Well, let's go to the second page of the
7    document. Mr. Kim is actually responding to your
8    e-mail; is that correct, which appears on the second
9    page of the document?
10    A.  Apparently, yes.
11        Q.  Where you said, "Dear Dr. Kim, there is no
12   record that Jeong Ah Shin was ever a student at Yale
13   University or that she earned a degree here."
14            Well, was September 22nd, 2005 fax, a
15   document within Yale's files?
16            MR. SPRINGER: Objection.
17    A.  I'm sorry, could you repeat that? I didn't
18   hear you.
19        Q.  Is the September 2000 -- September 22nd,
20   2005 fax a document within Yale's files?
21            MR. SPRINGER: Objection.
22    A.  Is that something -- Are you asking did I
23   know that at -- on this date?
24        Q.  I'm not asking what you knew at that
25   date. Is it, in fact, a document that was in Yale's

Page 48

1    files as of that date?
2             MR. SPRINGER: Objection.
3     A.  I had no way of knowing. I do not know.
4    I've been told since then that it was.
5         Q.  Okay. So to the best of your knowledge,
6    as you sit here today, it was, in fact, existing in
7    Yale's files at that time?
8             MR. SPRINGER: Objection; asked and
9    answered.
10        Q.  Correct? Is that fair? You can answer
11   it.
12            MR. SPRINGER: It's the same answer.
13        Q.  The answer is "yes"?
14            MR. SPRINGER: No, it's not.
15    A.  The answer is I didn't know it then. I've
16   been told since then that it is in the files.
17        Q.  So it would be fair to state that when you
18   state, "There is no record that Jeong Ah Shin was
19   ever a student at Yale University, or that she
20   earned a degree here," that's not an accurate
21   statement; isn't that true?
22            MR. SPRINGER: Objection.
23    A.  I -- I need to ask you to ask me that
24   question in a different way. I'm not certain I'm
25   understanding what you're getting at.

Page 49

1             MR. WEINER: Could you read the
2    question back.
3         Q.  And tell me what it is about the question
4    that you don't understand. I think it just calls
5    for a "yes" or "no" answer.
6             (Record read.)
7             MR. SPRINGER: Objection.
8         Q.  I'll restate the question.
9     A.  Thank you.
10        Q.  Would it be fair to state that when you
11   state -- I'm going to start again.
12            Would it be fair to state that when
13   you state, "There is no record that Jeong Ah Shin
14   was ever a student at Yale University or that she
15   ever earned a degree here," your statement was
16   wrong?
17            MR. SPRINGER: Objection.
18    A.  I disagree.
19        Q.  Why do you disagree?
20    A.  This is not an authentic record. This is
21   something made up.
22        Q.  The September 22nd, 2005 fax is not an
23   authentic record?
24            MR. SPRINGER: She was pointing. She
25   was pointing, and I want the record to be very clear

13  (Pages 46 to 49)

Page 54

1    8406; is that correct? 8407, excuse me.
2        A.  I see these documents here.  I don't
3    remember them, but yes.
4        Q.  And what those documents are is the
5    September 25th, 2005 cover sheet that
6    Ms. Schirmeister had sent along with the documents
7    that she sent with it; is that correct?
8        A.  Yes.
9        Q.  And they also reflect the fact that the
10   Biennale planning team had faxed them, with the
11   header on them; is that correct?
12       A.  I see that.
13       Q.  Okay.  And the reporter writes you on July
14   10th; is that correct, writes you an e-mail?  Is
15   that right?
16       A.  I see that.
17       Q.  And then you inform the reporter that
18   "Yale University has no record of a student named
19   Jeong Ah Shin in any department or program.  There
20   is no record that she enrolled as a student and no
21   record that she had earned a degree."
22       A.  That's correct.
23       Q.  Now as of that time, had you spoken with
24   Ms. Schirmeister?
25       A.  I don't remember.

Page 55

1        Q.  And you considered the three documents
2    that were -- I'm sorry, the four documents -- make
3    it three documents that were attached to the
4    reporter's e-mail as not being Yale University
5    records; is that correct?
6            MR. SPRINGER: Objection.
7        A.  Yes.
8        Q.  Each and every one of them; is that
9    correct?
10       A.  Yes, based on the knowledge that I had.
11           MR. SPRINGER: You've answered the
12   question.
13       A.  Thank you.
14       Q.  And then Mr. Kyu writes you an e-mail.  In
15   his e-mail, he says, "Thank you very much for your
16   reply.  What really confuses me is that Dongguk
17   University where Jeong Ah Shin works for right now
18   has a document that Pamela Schirmeister, associate
19   dean of graduate school, verified her degree.  Would
20   you confirm whether the letter I attached to this
21   e-mail is written by Pamela Schirmeister"?
22       A.  I --
23       Q.  Do you see that?
24       A.  I do.
25       Q.  That was a media inquiry directed at you

Page 56

1    to ask you to confirm whether the September 22nd fax
2    was sent by Schirmeister; isn't that correct?
3            MR. SPRINGER: Objection.
4        A.  I see that.
5        Q.  That's what you understood, right?
6        A.  Yes.
7            MR. SPRINGER: Objection.
8        Q.  And what did you do to answer that
9    question?
10       A.  To the best of my recollection, I
11   contacted the graduate school, but I don't remember
12   the -- I don't remember what I sent them.  And the
13   gist of the answer was no, this was not authentic.
14   This did not come from the graduate school.  We have
15   no record.
16       Q.  Well, could you put a name and a date on
17   your inquiry?  Who did you speak to?
18       A.  I don't remember.
19       Q.  Was it Ms. Schirmeister directly?
20       A.  I don't remember, but I think she was on
21   vacation.
22       Q.  You don't remember if she was on vacation?
23       A.  I don't remember who I spoke to.
24       Q.  You don't know if it was Mr. Barnaby?
25       A.  I don't remember.

Page 57

1        Q.  But based upon that response, did you
2    respond to the reporter that it was never sent?
3            MR. SPRINGER: Objection.
4        A.  I was informed that it had not been sent
5    by the graduate school, and I relayed that
6    information.
7        Q.  Okay.  Now I'm still trying to understand
8    why is it you sent this to Susan Carney?
9            MR. SPRINGER: Objection.
10       A.  I don't remember.
11       Q.  What was Susan Carney's role regarding
12   this matter at that time?
13       A.  I don't remember.
14       Q.  Had you discussed this matter with Susan
15   Carney at that time?
16       A.  Not to my memory.  Not to my recollection.
17       Q.  Did someone tell you to forward this to
18   Susan Carney?
19       A.  I don't remember.
20       Q.  Let me show you Reinstein Exhibit 6.  Have
21   you seen this document prior to today?
22           It's an e-mail from the Office of
23   Public Affairs to FAS registrar, which forwards an
24   e-mail received from Mr. Kyu written to the Office
25   of Public Affairs.

Sanders, Gale & Russell
(203) 624-4157

Page 66

1           MR. SPRINGER: Objection.
2      A.  I don't recall exactly.
3      Q.  Do you have any reason to believe this is
4  inaccurate?
5           MR. SPRINGER: Objection.
6      A.  I don't know how to answer that.  I --
7      Q.  Now if you look at the item that's in the
8  square on the first page, you see that?  And you
9  look at the original article itself.  Can you make
10  out the fax cover sheet from Ms. Schirmeister?
11      A.  I see two documents.  Well, sort of a
12  vague impression of two documents.  One is the cover
13  sheet and the other is the document that concerned
14  me, which was forged, or fake authentication --
15      Q.  But --
16      A.  -- certification.
17      Q.  But would it be fair to state that the
18  September 22nd, 2005 fax cover sheet is not a forged
19  document; isn't that true?
20           MR. SPRINGER: Objection.
21      A.  I did not know that then.
22      Q.  Well, as you sit here today, your
23  statement was incorrect; is that true?
24           MR. SPRINGER: Objection.
25      A.  I answered it according to the knowledge I

Page 67

1  had at the time.
2      Q.  As you sit here -- as you sit here today,
3  the statement that is attributed to you is
4  incorrect; isn't that true?
5           MR. SPRINGER: Objection.  What
6  statement?
7      A.  Which statement?
8      Q.  That Gila Reinstein of Yale University's
9  Public Affairs said, "This document," referring to
10  the September 22nd fax --
11      A.  No.
12      Q.  Oh, really?  That's not what it's
13  referring to?
14      A.  It's referring to the academic record
15  verification.
16      Q.  Where does it say that?
17      A.  I'm reading it.
18      Q.  Why don't you look at the headline, "The
19  fax from Yale University to Dongguk University is
20  also forged"?
21           MR. SPRINGER: Objection.
22      Q.  Quote, "The fax," the first sentence of
23  that document refers to the fax, "that Dongguk has
24  been claiming to have received."  That's what's
25  being referred to, isn't it?

Page 68

1           MR. SPRINGER: Objection.
2      A.  Well, the -- Yes.
3      Q.  And your statement regarding that fax was
4  incorrect?
5           MR. SPRINGER: Objection.
6      Q.  Isn't that true?
7      A.  Based on what I know now, it was incorrect.
8           MR. SPRINGER: What statement are we
9  referring to?
10      Q.  Let me show you what has been marked as
11  Reinstein Exhibit 12.
12           MR. SPRINGER: We're in 10.  What
13  statement were you referring to?  If it's the same
14  statement, she's already testified to that.
15           MR. WEINER: Well, Felix, you're not
16  allowed to testify.
17      Q.  Let me show you Exhibit 12.
18           Have you seen Reinstein Exhibit 12
19  prior to today?
20           It's entitled -- It comes from
21  Yale's documents.  It's a translation provided by
22  Yale of the document which is attached to it,
23  entitled "Yale Decides Against Investigating 'Jeong
24  Ah Shin's Fake Fax.'"  You see that?
25      A.  I see what you're looking at.

Page 69

1      Q.  And it goes on to state, "Yale University
2  decided not to conduct an investigation on the false
3  doctorate confirmation which Dongguk University
4  received through fax from Yale University in
5  September 2005 when recruiting Shin."
6           Do you see that?
7      A.  I see that.
8      Q.  Do you know what that's referring to?
9      A.  I interpret it to read the false doctorate
10  confirmation being the confirmation -- the falsified
11  confirmation letter.
12      Q.  "Yale University decided not to conduct an
13  investigation on the false doctorate confirmation
14  which Dongguk University received through fax," you
15  are interpreting that as the May letter that's
16  attached to the fax; is that correct?
17      A.  That's how I would read it, the false
18  doctorate confirmation.
19      Q.  Okay.  Who made the determination that
20  Yale University would not conduct any investigation
21  on that?
22           MR. SPRINGER: Objection.
23      Q.  To your knowledge?
24      A.  I don't know.
25      Q.  Well, who told you?

18  (Pages 66 to 69)

DONGGUK v. YALE                                                    February 4, 2010

Page 82

1  there was the September 5th, 2005 letter; isn't that
2  correct?
3     A.  The September 5th --
4     Q.  5th, 2005 letter that Dongguk says it sent
5  to you.
6     A.  I -- No, I don't remember.
7     Q.  Okay.  And when you state, "We never
8  received this," would it be fair to state that Yale
9  did, in fact, receive the September 5th, 2005
10 letter?
11    A.  I did not know that at the time.
12    Q.  I didn't ask you that.
13    A.  The September -- you know, I'm -- The
14 September 5th letter was sent from whom?
15    Q.  From Dongguk University.
16    A.  May I see that letter again?  I'm blank --
17 I'm getting rattled.
18    Q.  Actually, it's attached to the September
19 22nd fax, which includes that letter.  So if we
20 can just find one of those exhibits.
21       Let's just look at Schirmeister
22 Exhibit 42.
23    A.  I don't know -- Oh.
24    Q.  If you want, I'll just show you my copy.
25    A.  Thank you.

Page 83

1     Q.  It's highlighted.  That's okay.
2     A.  Okay, thank you.
3     Q.  Okay.  Now you say that someone told you
4  that the September 5th, 2005 letter had not been
5  received?
6        MR. SPRINGER:  Objection.
7     A.  Yes.
8     Q.  Okay.  Who told you?
9     A.  I don't remember.
10    Q.  Well, you told me it was your practice to
11 investigate the facts; is that correct?  That's
12 f-a-c-t-s.
13    A.  Yes.
14    Q.  And regarding the September 5th, 2005
15 letter, what did you do to investigate as to whether
16 it had been received by Yale?
17    A.  To the best of my recollection now, I
18 contacted the graduate school.  I do not remember in
19 what form I contacted the graduate school, or to
20 whom I communicated, but the answer that I got was
21 that there was no -- nothing, there was no
22 information on this person.
23    Q.  No letter of inquiry?
24    A.  I don't remember.
25    Q.  Well, I just want to try and understand.

Page 84

1  Did you ask specifically -- Dongguk was saying that
2  they had a receipt from a letter that it had sent.
3  You're now responding to that statement, and you
4  state on television you never received the letter.
5        MR. SPRINGER:  Objection.
6     Q.  If you want me to just say it again.  To
7  the best of my knowledge, this letter, which is a --
8  they have on the TV, a copy of the 9 -- September
9  5th, '05 letter, never arrived at Yale, we never
10 received this.
11    A.  I don't remember the -- The best I can
12 say is someone -- I asked and someone said we never
13 received it.  I don't make up information.  I get
14 information and I pass it along.
15    Q.  I'm trying to understand the circumstances.
16 What was the reason why you asked someone that
17 question in the first place?
18    A.  Which question?
19    Q.  As to whether Yale had ever received the
20 September 5th, 2005 letter.
21       MR. SPRINGER:  Objection.
22    A.  I don't remember.
23    Q.  Yale had already said that Shin hadn't
24 received a degree, correct?
25    A.  Correct.

Page 85

1     Q.  And that was part of a statement; is that
2  correct?
3     A.  I don't remember the order of things, but
4  yes, we had made that statement.
5     Q.  Why was it necessary to tell the press and
6  go on Korean TV to say the September 5th, 2005
7  letter was never received by Yale?
8        MR. SPRINGER:  Objection.
9     Q.  Why do you feel that was important to
10 add?
11       MR. SPRINGER:  Objection.
12    A.  I do not remember.
13    Q.  Well, by saying that, weren't you saying
14 that Dongguk University had not told the truth?
15       MR. SPRINGER:  Objection.
16    Q.  That it had a document that indicated that
17 Yale had received the letter?
18       MR. SPRINGER:  Objection.
19    A.  I had no information about that.
20    Q.  Well, the article says, Exhibit 74, that
21 Dongguk University officials stated that they had a
22 receipt of the registered mail as evidence that it
23 had sent a letter of inquiry.  And then you state,
24 "We never received it."  Weren't you then saying
25 that Dongguk wasn't telling the truth --

22   (Pages 82 to 85)

Page 90

1      A.  Looking at this now, I -- I'm assuming
2   it's the cover sheet and the following
3   documentation.
4      Q.  Okay.  And that was an incorrect statement
5   by Yale, when it said it never sent such a fax;
6   isn't that right?
7          MR. SPRINGER:  Objection.
8      A.  I now know that that is true, but at the
9   time I did not.
10     Q.  Did you reach a conclusion that the format
11  of the fax cover sheet was somehow incorrect?
12     A.  No.
13     Q.  And by the way, is that a picture of you
14  in the right-hand column?
15     A.  Probably.
16     Q.  With your age?
17     A.  My age then.
18     Q.  Okay.
19     A.  Also my gender.
20     Q.  And your gender.  Do you recall having an
21  interview with Special Correspondent Kyu Hoon Kim?
22     A.  No.
23     Q.  Let me show you Carney Exhibit 73, which
24  is a translation of an article that appeared on --
25  in the Joongang newspaper, on July 19th, excuse me,

Page 91

1   2007.  Do you see that?
2      A.  I see the article, yeah.
3      Q.  And you see where it states, in the second
4   column, there was an interview with you on July
5   17th, local time?
6      A.  I see that.
7      Q.  Do you recall that interview?
8      A.  No.
9      Q.  Did you, in fact, have an interview?
10         MR. SPRINGER:  Objection.
11     A.  I had many interviews.  I don't recall
12  individual, the individual ones.
13     Q.  Many interviews with Korean press?
14     A.  Lots of interviews with Korean press, yes.
15     Q.  Okay.  Do you see the last column?  It
16  states -- And this purports to be a question and
17  answer with you.  Do you see that, where it says in
18  the second column, "Shown below is the Q and A with
19  her," referring to you?
20     A.  I see where it says that.
21     Q.  "Dongguk University is claiming to have
22  forwarded an academic record verification to Yale
23  University" --
24     A.  Excuse me, I don't where you're reading
25  from.

Page 92

1      Q.  Last column on the right.
2      A.  Okay.
3      Q.  "Dongguk University is claiming to have
4   forwarded an academic record verification from Yale
5   University.  Did you receive it?"  Do you see that
6   question?
7      A.  I do.
8      Q.  Then it says, the answer:  "I looked for
9   it repeatedly in the Department of Art History and
10  the graduate school with no success."
11         Did you say that, that you looked for
12  it repeatedly in the Department of Art History and
13  the graduate school with no success?
14     A.  I -- This is a translation of a
15  translation.  I am all but certain I never said
16  that.
17     Q.  A translation of a translation.  It's a --
18         MR. SPRINGER:  Will you please stop
19  interrupting her?  Did we get the last part of that?
20     A.  That's right, and the question is --
21         MR. SPRINGER:  Just wait, please.  I
22  would like to have it read back because I do want it
23  of record what she said.
24         MR. WEINER:  Okay.
25         (Record read.)

Page 93

1      Q.  When you say a translation of a
2   translation, what is a translation of a translation?
3      A.  I was interviewed in English.
4      Q.  Yes.
5      A.  The article, to the best of my knowledge,
6   was written in Korean and then translated back into
7   English.  This doesn't reflect language that I
8   remember saying.
9      Q.  What did you say?
10     A.  I don't remember the exact words that I
11  said.
12     Q.  Well, how do you know this wasn't what you
13  said?
14         MR. SPRINGER:  Objection.
15     A.  I wouldn't have said this, because I
16  didn't do that.
17     Q.  Well, did anyone ever send a letter to
18  Jeong Ah Ilbo saying you were misquoted?
19     A.  No, not to -- not to my knowledge.
20     Q.  You think the reporter just made it up?
21         MR. SPRINGER:  Objection.
22     A.  I have no idea.
23     Q.  So let's continue, and I'll repeat what I
24  just said, "I looked for it repeatedly in the
25  Department of Art History and the graduate school

Sanders, Gale & Russell
(203) 624-4157

Page 94

1   with no success. A document such as a request for
2   verification of academic records is a very important
3   matter so we keep a book to report it."
4            Is it an important matter?
5       A. Yes.
6       Q. "The fact that we couldn't find such an
7   important document means we didn't receive it." Did
8   you say that?
9            MR. SPRINGER: Objection.
10      A. I don't recall.
11      Q. Any different than what you said on
12  television, "We never received it?"
13           MR. SPRINGER: Objection.
14      A. They're saying that we record it in a
15  book. I certainly didn't say that. We don't record
16  it in a book. I don't know where these words came
17  from.
18      Q. But to your knowledge, no one ever sent a
19  correction at any time that this was wrong?
20           MR. SPRINGER: Objection.
21      Q. Is that right?
22      A. I don't know.
23      Q. Well, did you, at some point in time, find
24  out that the September 5th, 2005 -- I'm sorry,
25  September 5th, 2005 letter had, in fact, been

Page 95

1   received by Yale?
2       A. Yes.
3       Q. And that was after your interview on
4   television in August; is that correct?
5       A. Yes.
6       Q. Did anyone from Yale ever contact anyone
7   in the Korean media and say, "Oh, by the way, when
8   Ms. Reinstein was on television in August, she was
9   wrong in what she said"?
10           MR. SPRINGER: Objection.
11      A. I don't know.
12      Q. As you sit here today, you're unaware that
13  ever happened; is that correct?
14           MR. SPRINGER: Objection.
15      A. Correct.
16      Q. Let me show you Schirmeister Exhibits 5
17  and 6 and ask you if you know what they are.
18      A. Yes, I know what they are.
19      Q. What are they?
20      A. The first page appears to be a letter from
21  the Office of Planning Affairs at Dongguk University
22  to the Graduate School of Yale University, asking
23  for confirmation of the contents of the enclosed
24  letter, which I presume is the second page.
25           The second page is purporting to be a

Page 96

1   certification of Jeong Ah Shin's receiving a Ph.D
2   degree.
3       Q. And Exhibit 6?
4       A. This appears to be the outside of an
5   envelope addressed to the Graduate School of Yale
6   University.
7       Q. And this is the September 5th, 2005 letter
8   that you said had never been received by Yale; isn't
9   that correct?
10           MR. SPRINGER: Objection.
11      A. Yes.
12      Q. And this is the September 5th, 2005 letter
13  that was sitting in Yale's files at the very time
14  that you made the statement on August 4th, 2007,
15  when you appeared on Korean TV; is that correct?
16           MR. SPRINGER: Objection.
17      A. Yes.
18           MR. WEINER: We have five minutes
19  left on the tape, so why don't we take a break so we
20  can change it.
21           THE VIDEOGRAPHER: We are off the
22  video record.
23           (Recess: 11:40 to 11:51 a.m.)
24           THE VIDEOGRAPHER: It's 11:51 a.m.
25  We are back on the video record. This is tape

Page 97

1   No. 2.
2   BY MR. WEINER:
3       Q. Let me show you Schirmeister Exhibit 64,
4   which is an e-mail responding to an individual by
5   the name of W.H. Choi, with the Hankyoreh Korean
6   newspaper. Do you recall sending Exhibit 64?
7       A. I don't recall, but I have no reason to
8   question it.
9       Q. And if you look at the third paragraph,
10  where it states, "The form Shin claims was faxed
11  from the Yale Graduate School to confirm that she
12  earned her degree does not resemble the document
13  Yale issued for that purpose."
14           And do you know what document you're
15  referring to there?
16      A. Yes.
17      Q. What document is that? Is that the second
18  page of exhibit --
19      A. It's the document that says for student
20  certification purposes dated May 27th, 2005.
21      Q. So let's look at that. And you're
22  informing the reporter that the -- that document is
23  not a Yale document, it's a false document; is that
24  correct?
25      A. That's correct.

Page 98

1    Q.  And by the way, when you use the term
2    "false documents," you see at the bottom, you don't
3    say "false document," singular, you're referring to
4    both the diploma and the July -- May 27th, 2005
5    certificate?
6    A.  That is correct.
7    Q.  Now just focusing on the July -- on the
8    May 27th, 2005 certificate, you had reviewed that
9    document; is that correct?
10   A.  That's correct.
11   Q.  And based upon your review and the
12   information that you had received, it was not a Yale
13   document; is that correct?
14   A.  That's correct.
15   Q.  What's wrong with it?
16   A.  Well, the first thing is that I already
17   knew that Jeong Ah Shin had not been a student at
18   Yale, and had not earned a degree.  So I looked at
19   it, looking for evidence of that.  There are several
20   things wrong with it.
21        In -- Shall I enumerate?
22   Q.  Yes.
23   A.  Pamela Schirmeister's name is misspelled
24   when -- below her signature.  The word "Century" in
25   20th Century Art, is misspelled.  This document

Page 99

1    refers to a major for the History of Art.  The
2    graduate school does not use that terminology.  A
3    student studies in a department or a program, not
4    a -- doesn't have a major.
5        Those were the technical mistakes
6    that I saw on this form.
7    Q.  What about date of birth?
8    A.  I had never seen date of birth on
9    documentation of -- from Yale, so I thought that was
10   also in -- unlikely to be there, but it didn't
11   belong there.
12   Q.  In fact, your e-mail states, "Her document
13   contains inappropriate information (her birth date,
14   for example) that we do not include"; is that right?
15   A.  Correct.
16   Q.  Now as of this time, as of July 19, 2007,
17   had you received those sample certification letters
18   from Dean Schirmeister?
19   A.  I -- I don't have a specific recollection,
20   but in that I said it does not resemble the document
21   Yale issues for that purpose in this e-mail, I have
22   to conclude that I had already seen them.
23   Q.  And as of July 19th, do you recall whether
24   Ms. Schirmeister had returned from her trip?
25   A.  I don't recall.

Page 100

1    Q.  Okay.
2    A.  I think she came back around the 16th, but
3    I don't remember.
4    Q.  Did you, in fact, have a conversation with
5    her?
6    A.  That takes us into the "I must have," so I
7    have to say I don't remember.
8    Q.  Well, as part of your normal practice,
9    would it have been your practice to actually, when
10   you're making inquiries, to talk to people?
11   A.  Either by phone or by e-mail, yes.
12   Q.  Let me show you a document we have
13   previously marked as Schirmeister Exhibit 59 for
14   identification and ask whether you recall seeing
15   this prior to today, and it is an e-mail chain which
16   begins with a request to Ms. Schirmeister from Yu
17   Eung-oh on the staff of Buddhist Weekly Newspaper
18   that was dated July 20th, 2007, and then forwarded
19   to you.  Do you see that?
20   A.  Yes.
21   Q.  You sent an e-mail --
22   A.  I see that.
23   Q.  -- asking who should handle the inquiry;
24   is that right?
25   A.  Yes.  I do see that.

Page 101

1    Q.  Now if you turn to the second page, do you
2    see that the -- Hold on one second.
3        On the second page of the document,
4    there is a question that's being asked of
5    Ms. Schirmeister?
6    A.  I see numerous questions.
7    Q.  But you see that the second question
8    asked, "Did you send documents confirming Shin's
9    doctorate by facsimile on September 22nd, 2005?"  Do
10   you see that question?
11   A.  I do.
12   Q.  And that was a question which had been
13   asked of you before; is that right, or asked of
14   Ms. Schirmeister or you before?
15       MR. SPRINGER:  Objection.
16       MR. WEINER:  I'll rephrase it.
17   A.  According to -- I don't remember, but,
18   yes, I've seen the documentation.
19   Q.  Right.  This was a question that was being
20   asked by a number of different reporters; isn't that
21   right?
22   A.  Yes.
23   Q.  And Ms. Schirmeister says to you, "Should
24   I answer it, or should you?"  Or actually, you --
25   A.  No.

26 (Pages 98 to 101)

DONGGUK v. YALE

February 4, 2010

Page 102

1    Q.  You say to her, "Do you want to handle
2  this inquiry or should you," Ms. Reinstein,
3  "answer"; is that correct?
4    A.  Correct.
5    Q.  Do you know who -- And I want to go back
6  to the first page where it states, at the bottom of
7  it, "The documents are incorrect because" -- Let me
8  get where I need to be.
9          There is a reference to the September
10  5th official document which asks for confirmation
11  and the confirmation of the degree on September
12  22nd.
13          You see that, the last line or two of
14  the document?
15    A.  Let me just read that, okay?
16    Q.  Yes.
17    A.  I see that.
18    Q.  Okay.  And did you, in fact, respond to
19  this reporter and answer the questions that he
20  asked?
21    A.  I believe I responded to the reporter with
22  a statement reaffirming that Jeong Ah Shin had never
23  attended Yale.  I don't remember answering the rest
24  of the questions, "Have you ever signed Shin's
25  thesis," for example.

Page 103

1    Q.  So let me show you Schirmeister Exhibit
2  61.  Now the reporter is specifically asking you, or
3  Ms. Schirmeister, about the authenticity or
4  legitimacy of the September 22nd, 2005 fax; is that
5  correct?
6          MR. SPRINGER:  Objection.
7    Q.  That's according to the questions he
8  specifically asked; is that right?
9          MR. SPRINGER:  Objection.
10    A.  Among other questions.
11    Q.  Yes.  That's one of the questions he
12  asked?
13    A.  Uh-huh.
14    Q.  And you respond to him with the statement
15  that's contained in Exhibit 61, Schirmeister 61?
16    A.  I -- I believe I did, yeah.
17    Q.  You say to Ms. Schirmeister, "Okay, I'll
18  reply to the journalist and repeat the usual.  Shin
19  never was a student here.  Neither Pam Schirmeister
20  nor any other Yale official signed documents about
21  her.  Yale has no record of her at all."
22          When Yale -- When you state that
23  Yale has no record of her at all, are you referring
24  to the question as to whether Yale had sent a fax
25  dated September 22nd, 2005?

Page 104

1    A.  No.
2    Q.  Well, what are you referring to?
3    A.  To the absence of any record in the
4  registrar's registry, the art history department and
5  so on.
6    Q.  So when you continue with your statement,
7  that "the phone and fax numbers on the false
8  documents are correct, but readily available," you
9  are not informing the reporter that the September
10  22nd, 2005 fax was never sent by Yale?
11          MR. SPRINGER:  Objection.
12    A.  I repeat, when I wrote Yale has no record
13  of her at all, I was talking about a registrarial
14  record that she had ever been a student at Yale or
15  earned a degree at Yale.
16          Then I went on to the next point,
17  which is correct, the phone and fax numbers on the
18  false documents are correct but readily available.
19  At the time I understood that the September 22nd fax
20  was false.
21    Q.  You were not referring to the September
22  22nd, 2005 fax as being false?
23    A.  I was.
24    Q.  Okay.
25    A.  That's what I believed at the time.

Page 105

1    Q.  Okay.  So you were informing the reporter
2  that the answer to his question was false, it was
3  never sent, correct?
4          MR. SPRINGER:  Objection.
5    A.  That's one piece of what I was saying.
6    Q.  Okay.  And then the last sentence of this
7  statement that is the usual, you say, "If Yale had
8  received a request, confirm that Shin earned a
9  degree from the Graduate School, we would have
10  responded that she did not."
11          What did you mean by that?
12    A.  Just what it says.  To the best of my
13  knowledge, when a request for verification comes in,
14  it's responded to.
15    Q.  Are you informing the reporter that Yale
16  had never received a request from Dongguk asking to
17  confirm Shin's degree?
18          MR. SPRINGER:  Objection.
19    A.  On July 20th, 2007, that was my
20  understanding.
21    Q.  And that's what you were informing the
22  reporter; is that correct?
23          MR. SPRINGER:  Objection.
24    A.  Yes.
25    Q.  And that's the usual statement that you

27  (Pages 102 to 105)

DONGGUK v. YALE                                                    February 4, 2010

---

Page 110

1         MR. SPRINGER: Objection.
2     A.  I don't remember.
3     Q.  Were they given to you?
4         MR. SPRINGER: Objection.
5     A.  I don't remember.
6     Q.  And they reflect business cards of Korean
7  reporters?
8     A.  That's what they seem to be, yes.
9     Q.  Okay.  And you just have no recollection
10 how they came to be in Yale's files?
11    A.  I don't know.
12    Q.  I show you Carney Exhibits 44, 45, 52, 53,
13 23, and 24, and ask whether you've seen these
14 documents prior to today?
15        MR. SPRINGER: Wait, we haven't
16 gotten the copies yet.
17        THE WITNESS: Okay.
18        MR. WEINER: I believe if you give me
19 the last document back, I'm going to staple it.
20 This page goes to it.
21        (Document handed to attorney.)
22    A.  Okay.  What's your question, please?
23    Q.  Do you know if Susan Carney was involved
24 in an investigation with respect to the issue of
25 whether Dean Schirmeister had sent a September 22nd,

---

Page 111

1  2005 fax cover sheet with some documents attached to
2  it and received -- and Yale had received a letter
3  dated September 5th, 2005, from Dongguk University?
4         MR. SPRINGER: Objection.
5     A.  I think I learned about this when we were
6  preparing for the deposition.
7     Q.  Prior to your preparing for the
8  deposition, were you aware of that?
9     A.  No.
10    Q.  What contact, if any, did you and Susan
11 Carney have in the months of July and August of 2007
12 regarding Dongguk University and Ms. Shin?
13    A.  I cannot remember.
14    Q.  Did you have any contact?
15    A.  I don't remember.
16    Q.  As you sit here today, did you come to
17 learn that by early September of 2007, a
18 representative from Dongguk University had provided
19 Ms. Carney with documents that indicated that Yale
20 University had received the September 5th, 2005
21 letter of inquiry?
22        MR. SPRINGER: Objection.
23    A.  I'm not entirely sure what I'm looking at
24 here.  These are documents I haven't seen before.
25    Q.  You have never seen these before today?

---

Page 112

1     A.  Most of them, no.
2     Q.  Okay.  Let me show you Reinstein Exhibit
3  19, which is an article which appeared in the
4  September 5th, 2007 Yale Daily News.
5         Do you recall giving a statement to
6  the Yale Daily News on or about September 5th, 2007,
7  regarding Ms. Shin?
8     A.  No, I don't remember.
9     Q.  Do you see where it states in the fourth
10 paragraph "Shin is now being investigated by Korean
11 prosecutors and could face time in prison for
12 forgery.  A Yale spokeswoman, Gila Reinstein, said,
13 'The university has no record of Shin ever attending
14 the university.'"
15    A.  I see that.
16    Q.  Did you make that statement at that time?
17    A.  I don't remember.
18    Q.  Did you make it your practice to get
19 updates on investigations that might have been
20 occurring regarding matters that you were working
21 'on?
22    A.  No.
23    Q.  How did you know that the information that
24 you would be providing reporters let's say in
25 September or October was still accurate?

---

Page 113

1         MR. SPRINGER: Objection.
2     A.  I received updates.  I did not request
3  updates.
4     Q.  So would it be fair to state that you have
5  no recollection of Ms. Carney updating you as to
6  what was going on in terms of what she was doing?
7     A.  That's correct.
8     Q.  And you never sought to find out from her
9  what she was doing?
10    A.  That's correct.
11    Q.  Okay.
12        MR. WEINER: Why don't we break for
13 lunch here.
14        MR. SPRINGER: Okay.
15        MR. WEINER: So I can organize this
16 to make sure we get done today.
17        MR. SPRINGER: Good.
18        THE VIDEOGRAPHER: We are off the
19 video record at 12:16.
20        (Luncheon: 12:16 to 1:21 p.m.)
21        THE VIDEOGRAPHER: 1:21 p.m., we are
22 back on the video record.
23 BY MR. WEINER:
24    Q.  Ms. Reinstein, let me show you Reinstein
25 Exhibit 20, which is dated September 17th, 2007, and

---

29 (Pages 110 to 113)

Page 126

1   What was going back and forth?
2          MR. SPRINGER: Objection.
3      A. I only know about faxes that I received
4   beginning July of '07.
5      Q. Okay. You didn't recall during the
6   summer -- I thought we talked about this this
7   morning -- knowing about the September 22nd, 2005
8   fax cover sheet and the documents attached to it?
9      A. Yes.
10     Q. And you remember you did take an oath to
11  tell the truth? Do you recall that?
12     A. Yes.
13     Q. Do you think he's referring to that?
14         MR. SPRINGER: Objection.
15     Q. Excuse me?
16     A. Okay.
17     Q. Do you think he's referring to that
18  document?
19     A. That's a reasonable assumption.
20     Q. As you sit here today, that's what your
21  reasonable assumption is?
22         MR. SPRINGER: Objection.
23     A. I'm willing to grant that that was what he
24  meant.
25     Q. Okay. Now did you, in fact, prepare a

Page 127

1   statement?
2      A. I believe I did, a draft statement.
3      Q. Let me show you Carney -- I'm sorry,
4   Carney Exhibit 60. Do you know what that is?
5          Just for the record, while we're
6   reviewing it, Carney Exhibit 60 is an e-mail from
7   you to Helaine Klasky, dated September 20th, 2007,
8   stating, "How's this? It answers most of
9   the...questions, but maybe covers too much." And
10  then contains a statement; is that correct?
11         MR. SPRINGER: You omitted the word
12  "current."
13     Q. "It answers most of the current questions
14  but maybe covers too much." Is that the statement
15  you drafted?
16     A. Yes. Apparently this is the statement
17  that I drafted.
18     Q. It begins with "Jeong Ah Shin was never
19  enrolled as a student at Yale University and did not
20  earn a Ph.D or any other degree from this
21  university. Any document purporting to support her
22  claim is false and was not issued by Yale
23  University."
24         That is part of the statement,
25  correct?

Page 128

1      A. That is correct.
2      Q. And that's the same statement you had
3   previously made?
4          MR. SPRINGER: Objection.
5      Q. Is that correct?
6      A. I think so.
7      Q. Okay. Now at the time that you drafted
8   this statement, did you call Susan Carney and ask
9   her what, if anything, she was doing to investigate
10  the Shin matter?
11     A. No.
12     Q. Now as of this time, to your knowledge,
13  had anyone at Yale University searched Yale's files
14  to determine whether it had received the September
15  5th, 2005 letter of inquiry?
16     A. No, I -- I didn't. I did not know at that
17  time.
18     Q. You don't know if anyone had actually done
19  that; is that right?
20     A. Correct.
21     Q. Did you ever ask anyone in Yale, did
22  anyone actually look in Yale's files to determine
23  whether a letter of inquiry dated September 5th,
24  2005, had been received by Yale?
25     A. No.

Page 129

1      Q. As of the date that you drafted this
2   statement, did you ever ask anyone at Yale
3   University whether the files had been searched to
4   determine whether Yale had sent a fax dated
5   September 22nd, 2005, to Dongguk University?
6          MR. SPRINGER: Objection to the form.
7   You can answer.
8      A. No.
9      Q. To your knowledge, had anyone searched the
10  files to determine that fact?
11     A. I don't know.
12     Q. When you prepare statements, don't you
13  want to make sure that they're accurate?
14         MR. SPRINGER: Objection.
15     A. Yes.
16     Q. What did you do on September 20th, 2007,
17  to ensure the fact that the statement that you had
18  prepared was accurate?
19     A. I do not recall.
20     Q. Was it accurate?
21     A. To the best of my knowledge, that's what I
22  would have done.
23     Q. I'm not trying understand that answer.
24  Was it accurate? Was the statement accurate in
25  fact? Not what you believe it was. Was it accurate

33 (Pages 126 to 129)

Page 130

1  in fact?
2      A.  It was accurate according to the
3  information I had at that time.
4      Q.  Was it accurate as a matter of fact?
5          MR. SPRINGER:  Objection.
6      A.  Do you want to go sentence by sentence?
7      Q.  Sure.
8      A.  "Jeong Ah Shin was never enrolled as a
9  student at Yale University and did not earn a Ph.D
10 or any other degree from this university."
11     Q.  That's accurate?
12     A.  That is accurate in fact.
13     Q.  Okay.
14     A.  "Any document purporting to support her
15 claim is false and was not issued by Yale
16 University."
17     Q.  That is not accurate?
18     A.  I was referring to —
19         MR. SPRINGER:  Let her answer.
20     Q.  You were referring to?
21     A.  I was referring to the certification, the
22 purported certification letter, and to the fake --
23 the falsified diploma.  Those -- When I talk about
24 documents purporting to support her claim, those are
25 the documents that I was referring to.

Page 131

1      Q.  I see.  Even though you had received from
2  the reporter, if you go back to Reinstein Exhibit
3  30, a specific question from that reporter, "I would
4  be delighted if you (Reinstein and Conroy) would let
5  me know whether the fax sent in September 2005 was
6  really sent," you understood that the questions that
7  were being asked of you were whether the September
8  22nd fax had been sent by Yale; isn't that correct?
9          MR. SPRINGER:  Objection.
10     A.  I see that here, but I was asked to draft
11 a statement.
12     Q.  Well, was --
13         MR. SPRINGER:  When you say -- Well,
14 never mind.
15     Q.  Was say Mr. Park sent a copy of your
16 statement as a response to his e-mail?
17     A.  I don't know to whom, I don't recall to
18 whom the statement was sent.
19     Q.  Let me show you Carney Exhibit 61, to
20 Michael Helfenbein from Gila Reinstein, dated
21 September 21, 2007:  "Please post the following
22 statement on our website."  You see that?
23     A.  I do.
24     Q.  "Check with Helaine where she would like
25 it."  You see that?

Page 132

1      A.  Yes.
2      Q.  "I will send it to the Korean media who
3  have contacted me recently."
4      A.  Uh-huh.
5      Q.  Is that what you did?
6      A.  Yes.
7      Q.  And you sent it to Mr. Sowoon Park, who
8  had contacted you two days before; isn't that
9  correct?
10         MR. SPRINGER:  Objection.
11     A.  I don't remember, but --
12     Q.  Yes?
13     A.  But that's a logical conclusion.
14     Q.  And let me show you Reinstein exhibits --
15         MR. SPRINGER:  Just answer the
16 question that's asked, please.
17     Q.  Reinstein Exhibits 31, 32, 33 and 34, and
18 can you tell me what they are?  They're all dated
19 September 21, 2007.
20     A.  These are statements sent to four Korean
21 reporters.
22     Q.  The statement that you drafted?
23     A.  Yes.
24     Q.  Okay.  And the first one, Exhibit 31,
25 Reinstein Exhibit 31, is sent back to Mr. Sowoon

Page 133

1  Park; is that correct?
2      A.  Yes.
3      Q.  In response to his question?
4          MR. SPRINGER:  Objection.
5      Q.  Isn't that correct?
6      A.  In response to his e-mail.
7      Q.  Which raises the questions that he asked,
8  correct?
9          MR. SPRINGER:  Objection.
10     A.  He raises a bunch of questions.
11     Q.  In response to the questions that he
12 asked, correct?
13         MR. SPRINGER:  Objection.
14     A.  The statement was sent to him, yes.
15     Q.  And the statement was meant to answer the
16 questions that he asked, correct?
17     A.  The -- the statement was meant to state
18 Yale's position.
19     Q.  And do you know if the statement that you
20 sent was picked up by the Korean press?
21     A.  I don't recall.
22     Q.  Let me show you Reinstein Exhibit 35 and
23 ask you whether that refreshes your recollection.
24 It's dated September 23rd, 2007, and it's an article
25 in the DongA Ilbo newspaper.  Do you see that?

34  (Pages 130 to 133)

DONGGUK v. YALE                                                    February 4, 2010

Page 142

1         MR. WEINER: What's privileged?
2         MR. SPRINGER: I believe --
3         MR. WEINER: What's privileged? A
4    public fact is privileged?
5         MR. SPRINGER: You've answered that
6    question. I just want to know what's being sought
7    here.
8         MR. WEINER: What's the advice?
9         MR. SPRINGER: I don't know. That's
10   my whole point.
11   Q. Did anyone tell you, in or about October
12   of 2007, that Yale had located the September 22nd,
13   2005 fax cover sheet and attachments that had been
14   sent to Dongguk University?
15   A. I don't remember any details about it.
16   Q. Is that answer you don't recall one way or
17   the other?
18        MR. SPRINGER: Objection.
19   A. Until I was preparing for the deposition,
20   I had forgotten that completely.
21   Q. Had forgotten what?
22   A. When I had learned that that -- those
23   documents were found.
24   Q. Well, was it in October of 2007, when they
25   were, in fact, found?

Page 143

1    A. That's what I was reminded of in the
2    preparation for the deposition.
3         MR. SPRINGER: You should not be --
4    Q. Going back to October of 2007, you had, up
5    until that time, been in contact with the Korean
6    media about both of those subjects; is that
7    correct? Issuance of the September 22nd, 2005 fax
8    cover sheet and attachments, and the receipt of the
9    September 5th, 2005 request; is that correct?
10   A. I had -- I had had many e-mails and phone
11   calls from Korean reporters on the Jeong Ah Shin
12   case -- situation. I don't remember -- I remember
13   a cluster in July, and then it began to peter out.
14   I don't remember --
15   Q. Peter out -- Go ahead, finish.
16   A. Yeah. I don't remember the details.
17   Q. Well, on September 22nd or so, another
18   statement was issued by you, about a month before;
19   is that correct?
20        MR. SPRINGER: Objection.
21   A. Yes. I've looked at those documents.
22   Q. And we have shown you this morning and
23   this afternoon documents that you authored,
24   statements that you made regarding the September
25   5th, 2005 letter of inquiry. Do you recall that?

Page 144

1         MR. SPRINGER: Objection.
2    A. You have -- Please repeat. Restate that.
3    Q. Sure. Do you recall that I've shown you,
4    for example, the video that you -- that contains
5    your appearance on Korean TV where you denied, where
6    you said that Yale never received the September 5th,
7    2005 letter of inquiry?
8         MR. SPRINGER: Objection.
9    A. In that video, I said to the best of my
10   knowledge, Yale had not received it. I was relaying
11   information that had been given to me.
12   Q. You didn't say "to the best of my
13   knowledge" in that video, did you?
14   A. I believe I did.
15        MR. SPRINGER: Yes, she did.
16   Q. Well, did you ever issue a statement or,
17   to your knowledge, did anyone at Yale issue a
18   corrective statement to the Korean press, in October
19   of 2007, when you learned that, in fact, the letter
20   had been received by Yale?
21        MR. SPRINGER: Objection.
22   A. I have no recollection of that.
23   Q. Would it be fair to state it never
24   happened?
25        MR. SPRINGER: Objection.

Page 145

1    A. I know nothing about it. If it happened,
2    I don't know about it.
3    Q. Well, you made the statements; am I
4    correct?
5    A. I was asked to draft some statements.
6    Q. You made statements to the Korean press,
7    in the course of your interviews and in the course
8    of your television appearances; isn't that correct?
9    A. Yes.
10   Q. And you also sent them e-mails; isn't that
11   correct?
12   A. Yes.
13   Q. And in those statements, whether they were
14   in writing or verbal, you have told me earlier today
15   they were wrong as a matter of fact, irrespective of
16   your belief; isn't that correct?
17        MR. SPRINGER: Objection. Objection.
18   A. They were accurate according to what I
19   knew when I said or wrote them.
20   Q. Let's not play with words. You have a
21   Ph.D.
22        MR. SPRINGER: What have you been
23   doing for four days?
24        MR. WEINER: Oh, please, Felix, save
25   it for the jury. As you would say, save it for the

37  (Pages 142 to 145)

DONGGUK v. YALE                                                    February 4, 2010

<table>
<tr><th>Page 146</th><th>Page 148</th></tr>
</table>

Page 146

1  jury.
2           MR. SPRINGER: No. I couldn't
3  resist.
4      Q.  You have a Ph.D from Yale; isn't that
5  correct?
6      A.  I do.
7      Q.  Well, do you remember that before Columbus
8  discovered America, people thought the world was
9  flat, that was their best belief?  Does that mean
10 they were correct?
11          MR. SPRINGER: Objection.
12     Q.  As a matter of fact?
13          MR. SPRINGER: Objection. Is there a
14 question there?
15          MR. WEINER: Yes.
16          MR. SPRINGER: Are you asking her
17 whether people believed, prior to 1492, the world
18 was flat?
19     A.  I wasn't --
20     Q.  You think this is funny?
21          MR. SPRINGER: No, no. I'm think
22 I'm -- you know, if you're on the same --
23          MR. WEINER: You find this humorous,
24 Felix?
25          MR. SPRINGER: I find that question

Page 147

1  ridiculous.
2           MR. WEINER: Fine.
3      Q.  So would it be fair to state the
4  statements, and I think you've already testified and
5  the record will reflect it, that the statements that
6  you made were inaccurate, whether you believed them
7  to be true or not; isn't that correct?
8           MR. SPRINGER: Objection. Objection.
9      A.  I later learned that one statement, one
10 piece of what I said, was inaccurate. The rest was
11 accurate.
12     Q.  It was accurate that Ms. Schirmeister
13 never sent the September 22nd fax cover sheet?
14          MR. SPRINGER: Objection. Where is
15 that statement?  Where is that statement?
16          MR. WEINER: Felix, save your
17 arguments, and your objections are limited to
18 objection. Okay?
19     A.  Could you please show me where I said
20 that?
21     Q.  Look, Ms. Reinstein, I'm not here to show
22 you, I'm here to ask the questions.
23          As you sit here today, is it your
24 testimony that the statements that you made to the
25 Korean press, on television, in writing and in

Page 148

1  interviews, weren't accurate as a matter of fact?
2  Not as a matter of belief, but as a matter of fact.
3  Is that your testimony?
4           MR. SPRINGER: Objection; asked and
5  answered.
6      A.  Did I -- Yes, they were accurate.
7      Q.  Okay, and therefore, is it your testimony
8  that since in your view, they were accurate, you had
9  no obligation to go to the Korean press in October
10 of 2007 and correct anything that you had said to
11 them in the past. Is that your position?
12          MR. SPRINGER: Objection as to form.
13     A.  That's not part of what I do. What I
14 was -- what my job was.
15     Q.  If you make misstatements, you don't think
16 it is part of your job to correct them?
17          MR. SPRINGER: Objection.
18     A.  It was not part of my job at Yale.
19     Q.  Well, whose job is it at Yale if someone
20 makes a misstatement to correct?
21     A.  I don't know.
22     Q.  And you've never made any such corrections?
23          MR. SPRINGER: Objection.
24     Q.  Right?
25     A.  I never made any such corrections.

Page 149

1      Q.  And to your knowledge, no one else did
2  either?
3           MR. SPRINGER: Objection.
4      Q.  Is that correct?
5      A.  I have no knowledge of it.
6      Q.  Okay. Let me show you Schirmeister
7  Exhibit 81 for identification and ask whether you've
8  seen that document prior to today?
9      A.  The question was have I seen this before?
10     Q.  Yes.
11     A.  No.
12     Q.  And that's a letter dated October 29th,
13 2007, from Yale University to the Office of the U.S.
14 Attorney responding to the questions that had been
15 asked by the Korean prosecutors.
16          Let me show you Carney Exhibits 62
17 and 63 and ask whether you've seen these documents
18 prior to today.
19     A.  No.
20     Q.  Records of Yale University's mailroom,
21 which were faxed on Harold Rose on October 18th,
22 2007.
23          Let me show you Schirmeister Exhibit
24 82 for identification and ask you whether you've
25 seen that document prior to today. That's the

                                          38  (Pages 146 to 149)

DONGGUK v. YALE                                         February 4, 2010

---

Page 174

1       MR. SPRINGER: Where are you reading
2  from?
3       Q. Let me get it exactly. "Will no longer,"
4  it's the second paragraph, that "The university will
5  no longer confirm or deny whether a person holds a
6  degree from Yale based upon any external documents
7  they are presented."
8       Where did you get that information,
9  that up until that time, they could look at external
10 documents?
11      MR. SPRINGER: Objection.
12  A. I do not remember where I got that from.
13  Q. And did you check to make sure it was
14 accurate?
15  A. No. I got it from a reliable source, but
16 I don't remember who it was.
17      MR. WEINER: Let's take a break.
18      THE VIDEOGRAPHER: We're off the
19 video record.
20      (Recess: 2:33 to 2:44 p.m.)
21      THE VIDEOGRAPHER: It is 2:44 p.m.
22 We are back on the video record.
23 BY MR. WEINER:
24  Q. Let me show you what has been marked as
25 Reinstein Exhibit 44 and Reinstein Exhibit 43. And

---

Page 175

1  Reinstein Exhibit 43, which is an e-mail dated
2  general 4th, 2008, you send an e-mail to George
3  Joseph and Helaine Klasky: "I will send both the
4  Korean and English language translation to our list
5  of Korean media."
6       And that's in response to an e-mail
7  that was sent to you. "I am attaching the Dongguk
8  statement translated into Korean. Both Word and PDF
9  files are attached. If you are on a Mac, the Korean
10 characters may not appear properly so use the PDF
11 version of the distribution."
12      Do you see that?
13  A. I do.
14  Q. Would you look at Exhibit 44? Is that the
15 Yale University Office of Public Affairs statement
16 translated into Korean?
17  A. I have no way of knowing.
18  Q. Did you send, as you stated that you would
19 do, the Korean and English language versions to
20 Yale's list of Korean media?
21  A. I don't remember.
22  Q. Do you have any reason to believe you did
23 not do that?
24  A. No.
25  Q. I show you Reinstein Exhibit 46, which is

---

Page 176

1  an article which appeared in the New Haven Register,
2  entitled "Yale to tighten degree scrutiny." Do you
3  recall seeing that?
4   A. Yes, I do.
5   Q. Do you recall seeing that article prior
6  to -- dated January 3, 2008?
7   A. I don't remember.
8   Q. Now in that article, you are referred to.
9  Do you see that?
10  A. Yes.
11  Q. And it says, towards the bottom of the
12 first page, about two-thirds of the way down, "Gila
13 Reinstein, Associate Director of Public affairs at
14 Yale, said that when she first heard about the Shin
15 situation in July, she called the Art History
16 Department, which has a faculty of 19."
17      Is that a correct statement?
18  A. I don't remember.
19  Q. Is that something you told the New Haven
20 Register?
21  A. I don't remember.
22  Q. Did the New Haven Register get it wrong?
23      MR. SPRINGER: Objection.
24  A. I, for example, have no recollection of
25 saying how many people or faculty members were in

---

Page 177

1  the History of Art Department.
2   Q. The author of the article is Abram Katz.
3  Do you think he made it up?
4       MR. SPRINGER: Objection.
5   A. No. That's information that's readily
6  available online.
7   Q. Then it goes on to state, "Reinstein then
8  checked registrar and alumni records." Did you do
9  that?
10  A. I checked with the registrar and with the
11 Office of Alumni Records.
12  Q. Doesn't Say Reinstein checked with the
13 registrar, it says Reinstein checked registrar and
14 alumni records. Did you do it?
15      MR. SPRINGER: Objection.
16  A. I checked with the registrar, and I
17 checked with the Office of Alumni Records. I don't
18 know why Abe Katz wrote it this way.
19  Q. In the top part of the article, in the
20 third or fourth paragraph, it states, "To prevent
21 this kind of confusion in the future, Yale will no
22 longer verify degrees based upon submitted
23 documents, or sign off on any documents presented to
24 the school, according to the University's Office of
25 Public Affairs."

---

45 (Pages 174 to 177)

Page 186

1    Q. Question: "Why did Associate Dean Pamela
2  Schirmeister sign the fax sent by Dongguk University
3  in September 2005, confirming that Ms. Shin had
4  earned a Yale Ph.D?"
5          Answer: "Dean Schirmeister took a
6  quick look at the form faxed to her" -- Did she
7  tell you that?
8          MR. SPRINGER: Objection.
9    Q. "Yes" or "no"?
10   A. I don't -- I don't remember who told me
11  that.
12   Q. Do you recall whether she told you that?
13   A. I do not recall.
14          MR. SPRINGER: Objection.
15   Q. -- and erroneously thought it was
16  authentic" -- and did she tell you that?
17          MR. SPRINGER: Objection.
18   A. I don't recall.
19   Q. -- "since it was on graduate school
20  letterhead and bore a signature that resembled her
21  own." Did she tell you that?
22          MR. SPRINGER: Objection.
23   A. I don't remember.
24   Q. "Responding quickly to what appeared to be
25  a routine request, she mistakenly relied on the

Page 187

1  letterhead and signature on the purported May 2005
2  letter and failed to recognize it as fabricated."
3          Did she tell you that?
4    A. I don't remember who told me that.
5    Q. Let me show you Schirmeister Exhibit 9.
6  Have you ever seen that document prior to today? It
7  is an e-mail from Pamela Schirmeister dated January
8  1, 2008, to Jon Butler.
9    A. No. I never saw this before.
10   Q. See where she states, "I think it should
11  be on the record that we have always based our
12  verifications on consultation of original records,
13  and we have never used documents sent to us as part
14  of the verification process"?
15   A. Yes, I see where it says that.
16          MR. WEINER: I think we have to
17  change the tape.
18          THE VIDEOGRAPHER: We're off the
19  video record.
20          (Recess: 2:58 to 3:03 p.m.)
21          THE VIDEOGRAPHER: It's 3:03 p.m.
22  We're back on the video record. This is tape
23  No. 3.
24  BY MR. WEINER:
25   Q. Would you look at the last question and

Page 188

1  answer on the first page of Reinstein Exhibit 46.
2    A. I'm sorry, which exhibit?
3    Q. The Q and A. 45, excuse me.
4    A. Thank you. Uh-huh.
5    Q. Where it states, "What is Yale doing to
6  prevent this from happening again?"
7          And you respond, or you write, "The
8  university will no longer verify degrees by means of
9  documents (letters, faxes) that had been supplied by
10  other institutions or individuals. In the future,
11  Yale will issue its own documents to verify
12  degrees."
13          Would it be fair to state that when
14  you wrote this, you didn't contact Mr. Butler to
15  determine the accuracy of your statement?
16          MR. SPRINGER: Objection.
17   A. This language was supplied to me and I
18  don't remember by whom.
19   Q. So the answer is yes, you did not?
20   A. I did not correct -- I did not contact
21  Butler, Dean Butler.
22   Q. Nor did you contact Pamela Schirmeister?
23   A. Correct.
24   Q. To your knowledge, did Yale ever issue a
25  correction?

Page 189

1          MR. SPRINGER: Objection?
2    A. I'm sorry?
3    Q. To your knowledge, did Yale ever issue a
4  correction and advise all of the people to whom you
5  sent the December 29th, 2007 statement, people to
6  whom you spoke about that statement, that Yale had
7  misspoken and Yale's procedure was that it had
8  always required that verifications be based upon
9  internal documents and it would be a violation of
10  policy to rely on any external documents?
11          MR. SPRINGER: Objection to the form
12  of that question.
13   A. To my knowledge, no such statement was
14  issued.
15   Q. Now I had asked you earlier as to when you
16  became aware of the fact that the September 5th,
17  2005 letter from Dongguk was in Yale's files. I
18  think you told me that Harold Rose told you that?
19   A. Yes.
20   Q. How did that come about?
21   A. I had forgotten completely until I was
22  reminded yesterday.
23   Q. Who reminded you?
24          MR. SPRINGER: I'm going to object to
25  that.

48  (Pages 186 to 189)

DONGGUK v. YALE                                              February 4, 2010

Page 190

1       MR. WEINER: On what basis?
2       MR. SPRINGER: Attorney-client
3    privilege.
4       MR. WEINER: What's the
5    attorney-client privilege?
6       MR. SPRINGER: What's the question?
7       MR. WEINER: The question is who
8    reminded her.
9       MR. SPRINGER: She's already stated
10   that.
11      Q. Can you tell me the name of the person who
12   reminded you?
13      A. Harold Rose.
14      Q. And Mr. Rose told you that. Do you now
15   have a recollection of that?
16      A. No.
17      Q. So how do you know that's correct?
18      MR. SPRINGER: Objection.
19      Q. How do you know what Mr. Rose told you was
20   correct?
21      MR. SPRINGER: Objection.
22      A. I have no reason to doubt him.
23      Q. How do you know what he told you was
24   correct?
25      MR. SPRINGER: Objection. She's

Page 191

1       A. How do I know that what he told me is
2    correct? I trusted that what he told me is correct.
3       Q. So let me -- As you sit here today, you
4    have no memory of being told by Mr. Rose; am I
5    correct?
6       A. I have no specific, vivid, dated memory.
7       Q. What do you recall generally Mr. Rose
8    telling you?
9       MR. SPRINGER: Objection.
10      A. I don't recall the -- I don't recall.
11      Q. Okay. So you don't know if Mr. Rose told
12   you in October?
13      MR. SPRINGER: Objection.
14      Q. Based upon your own recollection?
15      A. I do not recall the circumstances of being
16   told.
17      Q. And you don't know if he told you in
18   October; is that correct?
19      A. I do not recall the specifics of the
20   circumstances of being told.
21      Q. I'm just asking for a "yes" or "no." You
22   don't recall whether he told you, in October of
23   2007, that Yale had found the September 5th, 2005
24   record; isn't that correct?

Page 192

1       MR. SPRINGER: Objection.
2       A. Correct.
3       MR. WEINER: I have no further
4    questions.
5       MR. SPRINGER: I have no questions.
6       THE VIDEOGRAPHER: We're off the
7    video record.
8       (Time noted: 3:07 p.m.)

Page 193

1       I, GILA REINSTEIN, have read the foregoing
2    transcript of the testimony given at my deposition
3    on February 4, 2010, and it is true and accurate to
4    the best of my knowledge and belief as originally
5    transcribed and/or with the changes as noted on the
6    attached correction sheet.
7
8       GILA REINSTEIN
9
10
11      SUBSCRIBED AND SWORN TO BEFORE ME,
12   the undersigned authority, on this
13   the      day of         , 2010.
14
15
16
17   My commission expires:

49  (Pages 190 to 193)

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

--------------------------x

DONGGUK UNIVERSITY,            :

          Plaintiff,   :

     -versus-            : No. 3:08-CV-00441(RNC)

YALE UNIVERSITY,              :        VOL. II

         Defendant.   :

--------------------------x

       Continued deposition of PHYLLIS GILA
REINSTEIN, taken pursuant to Federal Rules of Civil
Procedure, at the law offices of Day Pitney LLP, One
Audubon Street, New Haven, Connecticut, before
Jacqueline McCauley, RPR/CSR, License #40, a Notary
Public in and for the State of Connecticut, on April
26, 2011, at 2:06 p.m.

DONGGUK v. YALE                                                    April 26, 2011

Page 215

1   the two letters that are attached to Schirmeister
2   Exhibit 95?
3         MR. SPRINGER: Objection.
4      A. I don't remember.
5      Q. Any reason to believe that there were
6   others?
7      A. No.
8      Q. So would it be logical to conclude that
9   those were the letters you were referring to?
10        MR. SPRINGER: Objection.
11     A. That's a logical conclusion.
12     Q. Going back to the statement that I asked
13  you about, what is the statement, the one that you
14  gave to the Korean media that you are referring to?
15     A. Referring to in here are statements?
16     Q. "Here are statements I gave to Korean
17  media." Are those all three?
18     A. I don't remember what I intended when I
19  wrote this, but that would be a logical assumption, a
20  logical conclusion.
21     Q. And the statements that you gave to the
22  Korean media were based upon what Ms. Schirmeister
23  told you at the time?
24        MR. SPRINGER: Objection.
25        MR. WEINER: As well as the

Page 216

1   confirmation letters that she sent to you?
2         MR. SPRINGER: Objection.
3      A. I don't recall.
4      Q. Would that be a logical conclusion?
5         MR. SPRINGER: Objection.
6      A. Not necessarily. There might have been
7   additional sources of information.
8      Q. What did you mean then when you state to
9   George Joseph "here are statements I gave to Korean
10  media including one asserting that the infamous fax
11  was false, based upon what Pam told me at the time and
12  examples of confirmation letters she sent me at the
13  time"? What were you telling Mr. Joseph?
14     A. I was sharing with him letters that were
15  sent to the Korean media.
16     Q. Anything else?
17     A. I'm not sure what you want to know.
18        MR. SPRINGER: Well, just answer the
19  question. Don't speculate as to what he wants to
20  know.
21        MR. WEINER: Now, you attach to this
22  e-mail that you sent to Mr. Joseph on February 4, 2006
23  an e-mail that you sent on July 20 to someone in
24  Korea; is that correct?
25        MR. SPRINGER: Objection.

Page 217

1      A. I am copied and pasted in here, yes, or
2   cut and pasted in, yeah.
3      Q. It's from you and the subject is Question
4   from Korea. Do you see that?
5      A. I do.
6      Q. And you then in the second paragraph state
7   in this e-mail that you sent to the individual in
8   Korea -- and by the way, do you know if this
9   individual was a member of the Korean media?
10     A. I don't remember. I don't know.
11     Q. In any event, your e-mail states, "Neither
12  Pam Schirmeister nor any other Yale official signed
13  documents affirming that she earned a degree." Where
14  did you get that information from?
15     A. I don't --
16        MR. SPRINGER: I will object to
17  this. This is -- you've gone over this before. You
18  have --
19        MR. WEINER: No. I want to find out
20  if the confirmation letters were the basis for --
21        MR. SPRINGER: Then ask that
22  question.
23        MR. WEINER: I'll ask the question
24  in the way I would like.
25        MR. SPRINGER: Not to go over

Page 218

1   previous territory, Bob.
2         MR. WEINER: You have your
3   objection.
4         MR. SPRINGER: Well, I'm giving you
5   notice again.
6      Q. Thank you.
7      A. I need to hear the question again.
8      Q. Could you read it back?
9         (Whereupon, the question was read
10        back.)
11        MR. SPRINGER: Objection.
12     A. I don't remember.
13     Q. Well, then you go down further in the next
14  paragraph where you say, "The documents Shin supplied
15  are clearly false." Do you see that?
16     A. I do.
17     Q. And you go on to state, "The fax that
18  supposedly came from Associate Dean Pamela
19  Schirmeister bears no resemblance to the letter her
20  office sends to confirm a degree." Do you see that?
21     A. I do.
22     Q. What does "the letter her office sends to
23  confirm a degree" refer to?
24     A. I don't -- I don't know.
25     Q. Is the letter that she sends to confirm a

7  (Pages 215 to 218)

Page 219

1  degree, the letter that's next to the e-mail that's
2  sent to you by Ms. Schirmeister, the first of the two
3  examples or template, as she uses the word?
4      A.  That's a logical conclusion, yes.
5          MR. SPRINGER:  That's not the
6  question, okay?  He's not asking -- just answer the
7  question.
8          MR. WEINER:  I think she did answer
9  the question.
10         MR. SPRINGER:  No, I don't --
11 well --
12     Q.  By the way, the letter that you were
13 referring to that contains the misspelling of
14 Schirmeister, do you see that in addition the fax
15 misspells Schirmeister, among other errors?
16     A.  Yes.
17     Q.  Would you look at the May 27, 2005
18 certification?
19     A.  Yes.
20     Q.  Is that the document and fax that
21 misspells Schirmeister?
22     A.  Yes.
23     Q.  And that is the document that you were
24 talking about in this paragraph when you state, "the
25 fax that supposedly came from Associate Dean

Page 220

1  Schirmeister bears no resemblance to the letter her
2  office sends to confirm a degree."  Is that right?
3          MR. SPRINGER:  Objection.
4      A.  I don't remember.
5      Q.  What do you think you were referring to?
6      A.  I think I was referring to this, but I
7  don't have a --
8      Q.  This being?
9      A.  But I don't remember.  This for student
10 certifications purposes.
11     Q.  Dated May 27 --
12     A.  Dated May 27, 2005.
13     Q.  And you had compared the language -- would
14 it be fair to state you had compared the language in
15 the May 27, 2005 certification with the template that
16 was provided to you by Dean Schirmeister attached to
17 that e-mail and bearing the Bates stamp 8559 to see if
18 there were any differences?
19         MR. SPRINGER:  Objection.
20         MR. WEINER:  -- as part of your
21 investigation?
22         MR. SPRINGER:  Objection.
23     A.  I don't remember.
24     Q.  But isn't that essentially what you were
25 telling the individual in Korea that you had done and

Page 221

1  made a determination or someone had helped you make a
2  determination --
3          MR. SPRINGER:  Objection.
4          MR. WEINER:  -- regarding the
5  authenticity or legitimacy of the May 27, 2005
6  certification?
7          MR. SPRINGER:  Objection.
8      A.  That's what it says here.
9      Q.  Okay.  Now, you didn't just communicate
10 that to the individual you sent the e-mail to on July
11 20.  You also told that to the Korean press; isn't
12 that correct?
13         MR. SPRINGER:  Objection.
14     A.  I don't remember the specifics.
15     Q.  Can I have Carney Exhibit 74?  Do you see
16 up in the block at the top of the page, and do you see
17 where it says, "Certificate of degree submitted to
18 Dongguk University by Professor Jeong-Ah Shin.  Yale
19 University stated this certificate is a falsified
20 one, and that the certificate uses a formal
21 difference, a format different from that of Yale
22 University.  Yale University stated "This certificate
23 shows Professor Shin's date of birth, but Yale
24 University never records the date of birth to protect
25 privacy.'"  Do you know who told that to the Korean

Page 222

1  press?
2          MR. SPRINGER:  Objection.
3      A.  No.
4      Q.  In fact, weren't you interviewed by The
5  Chosen Ilbo in connection with the article that
6  appears in Carney Exhibit 74?
7      A.  I don't remember.
8      Q.  Is that a picture of you on the right?
9      A.  Could be me.
10     Q.  Could be you.  It identifies Gila
11 Reinstein (female, 62, photo.)
12     A.  So it does.
13     Q.  Have any reason to believe it's not you?
14     A.  No.
15     Q.  And it then quotes you as saying,
16 "Documents concerning Ms. Jeong-Ah Shin's academic
17 records are completely falsified."  Did you say that?
18         MR. SPRINGER:  Objection.  Don't
19 answer that.  We've gone through this, Bob.  This has
20 nothing to do with certification letters.
21         MR. WEINER:  Well, it does, because
22 we want to know the basis for that discussion.
23         MR. SPRINGER:  Well, then ask her.
24         MR. WEINER:  I want to establish the
25 fact that she said it.

8  (Pages 219 to 222)

Page 231

1  the May 27 one doesn't give the day of the month.
2  Those are the main differences.
3       Q. And in your statements to the press you
4  had informed them that the May 27, 2005 document was
5  not authentic; is that correct?
6       A. Yes.
7       Q. Was that statement based upon the
8  information, in whole or in part, that Ms.
9  Schirmeister provided to you in her July 17, 2007
10  e-mail?
11       MR. SPRINGER: Objection.
12       A. I don't remember.
13       Q. Well, what was the basis then for your
14  stating that it was false, the May 27, 2005 document
15  was false?
16       MR. SPRINGER: Objection.
17       A. The -- I had ascertained that Jeong-Ah
18  Shin never attended Yale University. So inevitably
19  any documentation saying that she earned a degree or
20  was enrolled had to be false. That was completely
21  separate. We discussed that, I know, at the last
22  deposition.
23       Q. Then why was it that you stated to
24  Mr. George on February 4, 2008 that "here are one
25  statements I gave to Korean media including one

Page 232

1  asserting that the infamous fax was false based on
2  what Pam told me at the time and examples of
3  confirmation letters she sent me" --
4       MR. SPRINGER: Objection.
5       MR. WEINER: -- if it was based upon
6  what Pam told you at the time, it wasn't based upon
7  any other search of Yale's records; isn't that
8  correct?
9       MR. SPRINGER: Objection.
10       A. I don't know how to answer that question.
11       Q. Well, what is it about the question you
12  don't know how to answer?
13       MR. SPRINGER: Why don't you
14  rephrase the question?
15       Q. Why don't you tell me what you don't
16  understand and I'll rephrase it?
17       A. I'm not sure what you're asking me.
18       Q. You just told me you didn't make a
19  decision based upon the May, the words of the May 27,
20  2005 certification letter. Why don't we go back and
21  get precisely what it is you said. Go back about five
22  or six questions when the witness said she didn't have
23  to look at the letter because of other information.
24       (Whereupon, the previous answer was
25       read back.)

Page 233

1       MR. WEINER: How did you ascertain
2  that Jeong-Ah Shin never attended Yale University?
3       MR. SPRINGER: Objection. Asked and
4  answered at the last deposition.
5       A. To the best of my recollection I contacted
6  alumni, the Office of Alumni Records, and I contacted
7  the History of Art Department. Neither them had
8  any record of Jeong-Ah Shin's ever being in attendance
9  at Yale or enrolled at Yale.
10       Q. But that's not what you told George Joseph
11  on February 4, 2008, is it?
12       MR. SPRINGER: Objection.
13       A. Correct.
14       Q. What you told him was "here are statements
15  I gave to Korean media, including one asserting that
16  the infamous fax was false based upon what Pam told
17  me at the time and examples of confirmation letters
18  she sent me. Gila." That's what you told him.
19       A. Yes.
20       Q. Were you telling him the truth?
21       A. This was also the truth.
22       Q. Oh. There are two versions of the truth,
23  what you told him at the time and what you told me
24  here today?
25       A. No.

Page 234

1       Q. Were you trying --
2       A. It's a larger truth.
3       Q. No further questions.
4       MR. SPRINGER: No questions.
5       MR. BROWN: Off the record 2:57.
6       (Whereupon, this deposition was
7       concluded for the day at 2:57 p.m.)

11 (Pages 231 to 234)

# EXHIBIT 30

# Redacted

To: Tom Conroy <tom.conroy@yale.edu>
From: Thomas Kaplan <thomas.kaplan@yale.edu>
Subject: Fwd: fake Yale degrees
Date: Mon, 15 Oct 2007 10:27:37 -0400
X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
Tom -- I had sent this to Gila this morning, but I understand she is out of the office.  Can you help, or is there any way I can reach her?

Thanks,
Tom

Begin forwarded message:

**From:** Thomas Kaplan <thomas.kaplan@yale.edu>
**Date:** October 15, 2007 10:25:58 AM EDT
**To:** Gila Reinstein <gila.reinstein@yale.edu>
**Subject: Re: fake Yale degrees**

Gila, just a quick question for the YDN if you don't mind.  We're running an update on the Shin Jeong-ah situation in light of her arrest in South Korea, and I just wanted to verify a few things --

The University still has no record of her attending Yale, correct?  And has Shin ever contacted the University or visited here, as promised, or was Yale contacted by investigators?

Thanks,
Tom

---------- Forwarded message ----------
**From: Gila Reinstein** <gila.reinstein@yale.edu>
Date: Sep 4, 2007 5:24 PM
Subject: fake Yale degrees

YALE00007436

To: tyler.hill@yale.edu
Cc: helaine.klasky@yale.edu, tom.conroy@yale.edu
  Tyler,

Helaine Klasky asked me to respond to your request. Over the summer, I handled this issue for the Office of Public Affairs.

Shin Jeong-ah was never enrolled as a student at Yale University. The Graduate School Registrar has no record of her. The History of Art Department, which is quite small, has no record of her. Both offices maintain careful records.

I've seen the fax that supposedly confirms that Shin earned a degree from Yale. It bears no resemblance to the letter that Dean Pamela Schirmeister sends when she is actually confirming someone's degree. It even misspells the dean's name. In addition, Shin created a fake diploma supposedly showing that she earned her PhD from Yale. Unfortunately, the diploma she concocted has flagrant errors: although dated 2005, it bears the signature of Howard Lamar who was President of Yale for one year,  1992-93, immediately before President Levin.  You can copy the faked fax and diploma if you like. I have them in my office and shared them with the Korean reporters who descended on Yale over the summer.

The Korean press informed me some weeks ago that Shin was coming to Yale to sort out this "misunderstanding," but she has not arrived, to date.

I'll be in the office tomorrow from 9 a.m. to 5:30 p.m. You can call me here: 432-1325.

Gila

Gila Reinstein
Associate Director
Office of Public Affairs
Yale University



Date: Tue, 4 Sep 2007 16:50:11 -0400
From: "Tyler Hill" <tyler.hill@yale.edu>
Sender: tylerwhill@gmail.com
To: "Helaine Klasky" <helaine.klasky@yale.edu>,
    "Tom Conroy" <tom.conroy@yale.edu>
Subject: fake Yale degrees
X-Google-Sender-Auth: e31bfbcbec32e459
X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
X-Yale-Not-Spam: For more info see: http://www.yale.edu/email/spam/content.html
X-Yale-Spam-Score: (0.945)
X-Yale-Filter-Score: 0.945
X-Scanned-By: MIMEDefang 2.52 on 130.132.50.54

YALE00007437

Tom Conroy, 10:59 AM 10/15/2007, Fwd: fake Yale degrees

Could either of you comment on the Korean degree scandal that unfolded this summer?
The reporter working on the story has a few questions:

Can you confirm that Shin Jeong-ah never attended the University?

 Do you know anything about the supposed fax that the University sent over to Korea two
years ago that verified her credentials?  The fax was supposedly from Pamela
Schirmeister, associate dean of the Graduate School, and said Shin had attended Yale
from 1996 to 2005 and graduated with a Ph.D. in art history.  Also, Shin said over the
summer that she was coming to the U.S. to visit Yale and prove she received a degree;
can you confirm this?

Thanks
tyler
--
Tyler W Hill
Yale College 2009
P.O. Box 204122
New Haven, CT 06520

770.757.0385


--


----------------------------------------------------------
Helaine S. Klasky
Associate Vice President & Director of Public Affairs
Yale University
Phone: 203.432.1345
Fax: 203.432.1323


--
Tyler W Hill
Yale College 2009
P.O. Box 204122
New Haven, CT 06520

770.757.0385

YALE00007438

# EXHIBIT 31

"NEWS WHO"

Reporter Do Han Yoon (Host):

Jeong Ah Shin, 35 years old this year, who used to be called a rising star in the circle of fine arts, already became a university professor. There have been so many strange incidents.

Dongguk University, which appointed Jeong Ah Shin as a professor, did not have her submit the required academic record certificates nor did they inquire about Shin's academic history. Before Jeong Ah Shin had become a professor, reporters of major press agencies who were acquainted with Shin even lobbied for her. We tracked how Jeong Ah Shin has emerged as celebrity in such a short period. "News Who" will be back shortly.

Narrator:

This Cinderella in the circle of fine arts, who has become the art director for Kwangju Biennale at the young age of thirty-five, is also the head curator of Sungkok Art Museum and a professor at Dongguk University.

However, her entire background and experience that have made her what she is today are being revealed as fakes.

Professor Jin Sung Chang/department of fine arts history of Seoul National University:

As soon as I saw it, I absolutely knew it was a fake.

Narrator:

The falsified resume of bachelor's, master's and doctorate degrees from Seoul National University to the University of Kansas and on to the doctorate degree from Yale University... How could she become the head curator of a major art museum of Korea?

Professor Young Taik Park/Department of fine arts management in Kyunggi University:

Art museums affiliated with corporations in Korea are usually supervised by relatives or daughter-in-laws of the owner. So they do not hire professionals, but tend to use an employee who is more or less obedient or does not cause much friction.

Narrator:

As it turned out, she had been fired by a museum in the past after her falsified academic records were exposed. Nevertheless, she did not stop, but continued her colorful flapping of wings...

Person connected to Kumho Art Museum:

I don't think we are responsible with regard to whether an employee fired here could be employed elsewhere or not.

Narrator:

The university authority who appointed her as professor based on her forged background and experiences.

Vice president Jin Soo Han/Dongguk University:

In fact, we did not send it to University of Kansas but we made an announcement incorrectly by saying "We sent it" in the press conference on the 11th...

Narrator:

They even turned down the opportunity to screen her out easily beforehand...

Jong Hak Kim/Chairman of Korea Fine Arts Association:

I think that if there were any will to find out, they could have known easily enough... I cannot understand it, either.

Narrator:

In the end, she even grabbed the director position of the international fine arts event that represented Korea. So there are lots of theories suggesting that someone is backing her...

Kap Soo Han/Chairman of Kwangju Biennale:

Jeong Ah Shin had been a professor in a large university for 2 years and was the director of letters and arts in a major art museum, Sungkok Art Museum... So I could not imagine that there were any problems with her academic degrees.

Narrator:

Disgrace that spread worldwide. The principal who had left the country to prove her degrees and then disappeared without trace.

Jeong Ah Shin:

There is nothing I can say to the press that has concluded that I am a high school graduate because of a plagiarized dissertation.

Narrator:

Is she a Cinderella, or fraud of the century? "News Who" focused on and tracked Jeong Ah Shin and all sorts of suspicions surrounding her.

Reporter Do Han Yoon:

Jeong Ah Shin had worked part-time at Kumho Art Museum for a month and half. Her job was to be a guide who offered tours in English. Then the director of this art gallery suddenly appointed part-timer Shin, who had no experience, as its curator. From then on, the circle of fine arts in Korea has been manipulated by Jeong Ah Shin. The incident of Jeong Ah Shin shows irregularities of our society in a condensed fashion, including the supremacy of academic cliques, the problems of a private academic foundation, and corrupt relations between reporters and news sources.

Reporter Jang Kyung Sung.

Reporter Jang Kyung Sung:

Yes.

Reporter Do Han Yoon:

Well, because of the broadcast of other programs, "News Who" was not on the air for two weeks, so the incident of Jeong Ah Shin is going to be broadcast this week. Has there been any progress made in the incident so far?

Reporter Jang Kyung Sung:

Since Jeong Ah Shin left for the USA on July 16, she has not revealed herself yet. In the meantime, Dongguk University held a disciplinary action committee meeting yesterday to finalize the dismissal action on Shin while Jeong Ah Shin was absent. I looked back over the events that have recently occurred because of one person – Shin.

Reporter Do Han Yoon:

Yes.

Narrator:

At New York's JFK Airport on the 16th of last month, a woman who was wearing a cap to cover herself was surrounded by a team of reporters. While she was trying not to say a word, she eventually uttered one word to the reporters as if she could no longer keep silent.

Jeong Ah Shin:

There is nothing I can say to the press that has concluded I was a high school graduate because of a plagiarized dissertation.

Narrator:

Jeong Ah Shin, who is both professor of Dongguk University and the director of letters and arts of Sungkok Art Museum and was appointed as the art director of the largest fine arts exhibition in Korea, Kwangju Biennale, appointed less than ten days ago. She had been called the Cinderella in the circle of fine arts and envied by many fine arts professionals, but was last seen in the airport the day before she disappeared.

During the week right before Shin left the country, things had been very busy at Kwangju Biennale, for which she was appointed as the new director of arts.

Professor Sang Il Lee/Academic affairs support headquarters of Dongguk University:

Yale University disclosed that the record of academic degree professor Shin had submitted to Dongguk University was false. Furthermore, it also informed that not only had Yale University never conferred a doctorate degree with the major of fine arts history to professor Shin, but also that she had never been enrolled as student of Yale University.

Kap Soo Han/Chairman of Kwangju Biennale Foundation:

I intend to cancel the decision made in the last 98th board of directors meeting in which Jeong Ah Shin of Dongguk University was appointed and invited to become the Korean director candidate of the 7th Kwangju Biennale.

Narrator:

This was followed by dismissal of Shin from her professorship, cancellation of her appointment as art director, and filing complaints with the prosecution, which has made both parties go through turmoil. There was something else she left behind by leaving the country all of a sudden. Shin sent three sheets of documents to Dongguk University from Inchun Airport right before she boarded the flight to New York. What are the documents that Shin sent to Dongguk University after she told her family members that she would go and get the data proving her academic degree? They were a copy of the admission letter that was supposed to have been sent by Yale University, a copy of a 1-day entry pass to the library, and a plan for courses of Yale University. They represent her obsession in that she could not give up her

lingering attachment but would prove that she had studied at Yale University. Nevertheless, such documents were very far from those that could prove her acquisition of a doctorate degree. DRS indicated on the admission letter represents a short-term course of 6 months to one year and a special course not related to an academic degree. Furthermore, the signature by the associate dean of the graduate school on the admission letter is exactly same as the signature on the written verification of academic degree in terms of its size and even dot location, and it was later revealed to be a forged document. Such exactness also indicates a high probability of forgery.

When we arrived at the address listed on the envelope, it was the home of a person working at the airport.

Inchun Airport Employee:
I was asked to run an errand to the post office so I asked if she needed to write in her address. Then she told me to write any address. It sounded a little strange and I didn't know what to write, so put down my address and ran the errand...

Narrator:
He said that Shin sent a fax somewhere at the airport.

Inchun Airport Employee:
She faxed a lot. She sent the fax twice, and about 17 pages each time.

Reporter:
Did she send the same documents to different places?

Inchun Airport Employee:
Yes, one place and then another place... Right, I think she sent two items to the same place.

News reporter:
Do you happen to know about details of the documents?

Inchun Airport Employee:
No, I was not at all concerned about them.

Narrator:

To where, and what data did she send? What would she try to prove after her lies had been exposed to the entire world? This is from the column Jeong Ah Shin wrote for one newspaper: She wrote that she would hand out a task entitled "Who are you?" to her students when she begins her lecture every semester:

Narrator reads the newspaper article:

This is intended to really look for my true name. As I am looking for 'myself' in this way, I am able to discover different appearances of myself taking a number of forms that have been hidden under the fragments of my appearance that have been revealed so far.

Narrator:

Who are you really? That is the very question we want to ask her right now.

Reporter Do Han Yoon:

Reporter Jang Kyung Sung?

Reporter Jang Kyung Sung:

Yes.

Reporter Do Han Yoon:

It seems to be true that everyone has been deceived. But I begin to sort of doubt whether some of us wanted to be deceived. By the way, one cannot but become curious about the type of person she is.

Reporter Jang Kyung Sung:

Right. As Jeong Ah Shin had taken some huge positions at her young age, a number of rumors have been floating around. There was the rumor that "her mother is an important supporter for the circle of Buddhism" so she could become a professor of Dongguk University, a Buddhist foundation, and there were various unconfirmed stories, including one that said there was an influential figure in the political circle who was supporting Jeong Ah Shin. I followed her tracks to find out what type of person she was.

Narrator:

Chungsong-kun in Kyungbuk Province where Jeong Ah Shin spent her childhood days. This is the elementary school from which Shin graduated. Shin was the school president during

her 6th grade year. An alumnus of her elementary school whom the reporter met recalled that Shin was smart and very sociable.

Dong Yup Shin/Elementary school Alumnus of Jeong Ah Shin:

She was such a friend who was always willing to give. I think that was why she was a school president, isn't it? I think so. Jeong Ah had many friends... She had more boy friends than girl friends.

Narrator:

In addition, it was mentioned that she was particularly talented in fine arts.

Dong Yup Shin/Elementary school Alumnus of Jeong Ah Shin:

We were able to observe and recognize that she was more talented at fine arts than others...

Narrator:

While it is true that she spent her childhood in a relatively affluent condition, in that her father ran a small taxi company and a gas station, it was an exaggerated rumor that she was the daughter of a local financial conglomerate. He said that the financial condition of her family began to go down after her father died.

Neighbor of Jeong Ah Shin's hometown:

I think it kept on going downhill after his death. I mean her household... They didn't have income. They sold the gas station...

Narrator:

This is where Shin was known to attend her middle school until the first semester of 7th grade, and they only vaguely remember her parents.

School Staff:

I hear that her parents were influential in the area. Very influential...

Middle school vice president:

I don't think so... As far as I recall, her father died... He used to live here. He used to live in Jinbo-myon, Chungsong, and ran a taxi company.

Narrator:

Shin's mother, who was rumored to be a bigwig in the circle of Buddhism, is running a childcare center in Chungsong.

News reporter:

Anybody here? Is the owner…

Employee:

She is not here.

News reporter:

Where did she go?

Employee:

She is on a vacation.

News reporter:

Is it possible to contact her?

Employee:

I don't know.

Narrator:

It was said that she was living in a house attached to a small Buddhist temple, so we went to look for her but could not meet her.

News reporter:

Did she go out perhaps?

Person connected to the Buddhist temple:

I think she tries to avoid. She has been bothered a lot…

Narrator:

Shin's uncle, who runs a private music academy, refused to be interviewed.

News reporter:

 I've been waiting to meet with you.

Uncle of Jeong Ah Shin:

 I don't want to meet.

News reporter:

 Could you say something concerning what happened to Jeong Ah Shin?

Uncle of Jeong Ah Shin:

 I really do not want to talk about her position. Perhaps we can talk later.

Narrator:

 Jeong Ah Shin moved to Seoul when she was a freshman in her middle school, and entered a high school in Seoul. The school office verified only the fact that Shin graduated in '91 to the news reporter.

News reporter:

 Is it correct that Jeong Ah Shin graduated from this school?

Person connected to the high school:

 Definitely. Here is her photograph in the school record book.

News reporter:

 Is it possible to find her home room teacher at that time?

Person connected to the high school:

 How can we? Even if we know, we are not allowed to talk about it.

Narrator:

 Jeong Ah Shin's path for the 5 years from '92 to '96 may be found from the University of Kansas in the USA. And the name of Jeong Ah Shin emerged at the time of the incident in June '95 when Sampoong Department Store collapsed. Her name is found on the list of the injured printed in the newspaper at the time. Whenever the opportunity arose, Shin used to reveal to those around her that she was buried under concrete for 24 h and then miraculously survived and that the Sampoong incident changed her introverted personality.

Byung Hak Ryu/Curator in Germany:

I asked her, "Can you really stand it? You need to plan a large scale exhibition and meet with many artists. Is it possible? Do you really want to do it?" Then she told that she came back to life after being buried for 24 h at the time of the Sampoong Department Store incident so that she was determined to tackle anything...

Narrator:

Those around her said that she did not spare her money when socializing with people. She usually met with her guests in upscale hotel restaurants and sometimes gave them expensive gifts. In particular, Jeong Ah Shin has been known to reporters of major press agencies and well-known senior artists as a polite and kind curator. On the other hand, it is known that she has not shared a great deal of friendship with her fellow curators or young artists.

Reporter Do Han Yoon:

Reporter Jang Kyung Sung?

Reporter Jang Kyung Sung:

Yes.

Reporter Do Han Yoon:

It appears that Jeong Ah Shin was very talented at making friends of those who might be helpful for her career.

Reporter Jang Kyung Sung:

That is what people say.

Reporter Do Han Yoon:

Jeong Ah Shin became a curator and then emerged as Cinderella in the circle of fine arts. What does a curator do?

Reporter Jang Kyung Sung:

Well, the English word of curator may be explained as a researcher of letters and arts. The curator is responsible for planning an exhibition, recruiting artists for an exhibition, writing stories about the exhibition and sometimes doing public relations work in person. In particular, because an art museum instead of a small scale gallery is the exhibition space preferred by artists,

the curator of a famous art museum like Jeong Ah Shin becomes powerful in the circle of fine arts and the target of envy. Jeong Ah Sin began to lie after she became the curator of an art museum.

Narrator:

This is the resume that Jeong Ah Shin submitted to the organization committee of the Kwangju Biennale in early July. In September 1997, a young woman visits Kumho Art Museum located at Sagan-dong, Seoul. She said that she had majored in western fine arts and obtained an MBA in the USA and returned home, and that she wanted to work in an art museum. Professor Young Taik Park, who was then the curator of Kumho Art Museum, recalled the time as follows:

Professor Young Taik Park/Department of fine arts management in Kyunggi University (Then curator of Kumho Art Museum):

She came to see me around September '97 and brought her resume with her. She said she wanted to find a job in an art museum or work in an internship or a part-time position... At the time there were many like her. Because the art museum was large in its scale...

Narrator:

In about a month, a part-time student who could speak English was needed by the Museum in its exhibition hall, so Shin's name came up.

Professor Young Taik Park:

In October we were having the exhibition of Joan Miro, who was a Spanish artist... At the time, we expected a lot of foreign guests so were looking for part-timers who could speak a little English. Then there was the resume of Jeong Ah Shin, so Jeong Ah Shin was hired as part-time worker.

Narrator:

The part-timer Jeong Ah Shin, however, is totally converted to the curator who is in charge of overall exhibition activities for the Museum on her resume. The exhibition planned by Kumho Art Museum in October '97, the exhibition of Joan Miro. While she merely ran some errands and worked as an English guide as a part-timer, Shin turned the exhibition into one that she had planned.

Professor Young Taik Park:

You may think about her duties. She merely acted as an English-speaking guide in the exhibition hall for foreign guests. There was no way I would discuss nor do anything else with such a part-timer about some exhibition plan.

Narrator:

In December of the same year, the curator Young Taik Park resigned from Kumho Art Museum following the exhibition because of conflict with the Museum, and the director Kang Ja Park of Kumho Art Museum appointed Jeong Ah Shin, who had been a part-time worker, as the next curator in January the following year, which is an exceptional decision. It was the very moment when a girl of twenty-five years of age who had not had any experience in planning exhibitions or written any articles related to fine arts emerged triumphantly in the circle of fine arts just a month and half after she started a part-time job in an art museum. The seeds of tragedy were thus planted.

Professor Young Taik Park:

The fact that a person without any experience or background had been hired as a curator itself caused a great problem to occur. I think that when an immature person with so much greed suddenly won the title of art museum curator, she became irrational.

Narrator:

What was the background behind which a part-time worker was surprisingly hired as curator, the position right under the director? Director Kang Ja Park of Kumho Art Museum persistently avoided the reporters who were asking for the reason.

Professor Young Taik Park:

In a corporate conglomerate, the art museum simply belongs to its owner. Right? It belongs to the family. Corporate art museums in Korea are usually controlled by relatives or daughters-in-law of the corporation owner. Under such circumstances, a professional is not hired, but any employee who is obedient and does not seem to cause friction is hired, just like employees are hired in a company.

Narrator:

Jeong Ah Shin, who suddenly became a curator, begins to look at the exhibition ideas that were planned by the former curator. Then what grabbed her attention was the title, "The frame is better than the picture." This exhibition represents a fresh idea in which our history of

fine arts is examined focusing on the frame rather than the picture and is one of the exhibitions that were greatly praised by the press, critics and visitors at the time.

Jeong Ah Shin:

Its focus was on how western-style frames were accepted or excluded and how pictures without frames began to emerge in the modern and contemporary fine arts of Korea. This exhibition, which Shin claimed to have planned herself, was one that had been prepared by curator Byung Hak Ryu, who was active in Germany for one year upon a request made by the former curator of Kumho Art Museum.

Byung Hak Ryu/Curator in Germany:

Because the exhibition entitled 'The frame is better than the picture' had been proposed by a predecessor, I made its preparations for one year. After I had been making preparations for one year and the former curator of the Kumho Art Museum resigned, Jeong Ah Shin, who was working there at the time, took over the exhibition.

Narrator:

This is the brochure for the exhibition held in November '98. Other than the two-page introduction on the exhibition written by Jeong Ah Shin, all the rest was written by Byung Hak Ryu. It was not Jeong Ah Shin but Byung Hak Ryu who selected the artists and directed the exhibition hall. However, Shin claimed this exhibition was her own plan.

Byung Hak Ryu/Curator in Germany:

I felt empty. A conscientious person should not have done it that way. I personally wonder whether it had to be done that way...

Narrator:

After Jeong Ah Shin had earned the trust of the Museum with several exhibitions held at Kumho Art Museum, she began to tell those around her that she was studying for her doctorate degree at Yale University.

Eventually the story reached Sung Yong Park, who was the chairman of its art museum foundation and also the CEO of Kumho Group. CEO Park, who was then the chairman of the Yale alumni association in Korea, figured out right away she was lying. It is because he was well aware that Yale did not have programs allowing one to work in Korea while at the same time

also studying for his/her doctorate degree. CEO Park instructed to have her resign right away, and Shin was asked to resign and kicked out of the Kumho Art Museum in two days.

Person connected to the Kumho Group:

She seemed to tell people that she was studying at Yale University while she was working as curator at the art museum. It is not that she was hired based on her academic records from Yale University. She did not cheat on her academic record to get hired, but she began to tell such lies after she was hired, which became the problem.

Narrator:

Nevertheless, Shin was hired by another well-known art museum, Sungkok Art Museum, the following year in 2002. A person involved in the circle of fine arts who knew the circumstances well said that Shin mobilized the entire human network she had built previously to knock on the door of Sungkok Art Museum for over two months.

Person connected to Sungkok Art Museum at the time:

Many recommended her. She was well acquainted with senior photographers, critics, and reporters of major newspapers. A few reporters said, "Give her a chance." It was not easy for me during those two months. We needed to hire people for the art museum anyway…

Narrator:

While her experiences as curator for Kumho Art Museum had been fully taken into consideration in the process of hiring Shin at Sungkok Art Museum, the reason why she had quit Kumho Art Museum was never discussed at all. Afterward, Jeong Ah Shin, who became the curator of Sungkok Art Museum, became active and let her name be known in the circle of fine arts. It was said that she had been very capable, in particular, at securing the financial resources required for exhibitions.

Person connected to Sungkok Art Museum at the time:

You know there exists sponsorship involved in organizing exhibition space, such as the location where a work of art is to be placed. It is labeled as LG, Samsung, Hanhwa and so on. It seems to be clear that she was very capable at being diplomatic.

Narrator:

Newspapers and broadcasting companies were busy introducing the exhibitions planned by Shin, and there were a number of interview articles. Chosun Daily, Donga Daily and Seoul

Daily even published columns about Jeong Ah Shin for some time. In one of her interviews held last May, she even criticized irregularities involved in the fine arts contest and the circle of fine arts. Kookmin Daily announced the birth of the first curator with a doctorate degree from Yale University in May 2005.

Narrator reads the newspaper article:
 "Not counting the airfare to the USA, I wished there were two of me whenever my dissertation preparation overlapped with exhibition planning."

 While some of the courses were exempted in lieu of my work experience at the art museum, I attended my classes, and I worked on my dissertation without sleeping at night for the last year, and communicated with my advisor by email.

Professor Young Taik Park/Department of fine arts management in Kyunggi University:
 I can say that Jeong Ah Shin managed the reporters superbly. She seemed to be really good at it. She is capable, but an academic degree is the problem… Reporters have defended her so much concerning the above. Cinderella in the circle of fine arts… Well, it is out of question…

Narrator:
 There was a rush of requests for her lectures by universities including Hongik University, Hanyang University and Ewha Women's University. Her work experience built in well-known art museums, including Kumho and Sungkok, and her well-established human networks, including both artists and reporters, have made her become the young powerhouse in the circle of fine arts, and the number of people who would try to seek favor with Shin increased.

Professor in the department of fine arts at OO University:
 I met her on the school campus. I asked her why she had come to the school, and she told me she was teaching… According to one young professor, someone invited Shin as speaker perhaps because he tried win favors from her. There are such professors in some universities. You know curators are really busy. Why do you think they give consideration to her? They try to win favors.

Professor Young Taik Park:
 People go around and ask for favors… Want to be invited for an exhibition… And, in the circle of fine arts, if you are invited by a big name art museum to participate in an exhibition, you go around to show off as if you are an important artist. That's why everyone wants to have

his/her exhibition at an art museum. So you need to lobby with its director or curator... That's why they have to praise Jeong Ah Shin. It makes sense. Don't you think so? You need to have a good relationship with the curator of an art museum.

Narrator:

With time, Jeong Ah Shin had established herself as the young bigwig in the circle of fine arts. The doubts about her concerning why she left Kumho Art Museum had already been forgotten.

Reporter Do Han Yoon:

Since Jeong Ah Shin has a doctorate degree from Yale University, she must have her doctoral dissertation. Could Dongguk tell easily whether her doctoral dissertation was genuine by examining it?

Reporter Jang Kyung Sung:

Yes, it could. At first, the issue was raised about whether her dissertation had been plagiarized based on the doctoral dissertation of someone else, but all of sudden the dissertation was found to be a fake and could not be found at Yale University. I examined why it was a fake.

Reporter Do Han Yoon:

Yes.

Narrator:

The dissertation was entitled "Guillaume Apollinaire: Primitivism, Catalysis of Picabia and Duchamp." This is the dissertation she submitted to the Dongguk University claiming that she wrote it when she was appointed as assistant professor in September 2005. This dissertation has the same title as the doctoral dissertation written by Ekatarini Samaltanou Triakma at the University of Virginia. Furthermore, the two dissertations are identical not only in their titles, but also in their abstracts, word for word. Suspicion of plagiarism was naturally raised. When Jeong Ah Shin acknowledged the fact of the plagiarized dissertation in part, she argued that it does not deserve to become a big issue.

Jeong Ah Shin:

It is limited to the first 30 pages only. I received help from a few people in Korea and the USA, and that's how a doctoral dissertation is written. Even if it has been plagiarized as they say, I think all that is required is to clearly identify the plagiarized parts.

Narrator:

Plagiarizing a dissertation is so serious that the dissertation may be cancelled. Nevertheless, a greater issue than plagiarism was raised. The issue is that the dissertation itself is a fake. Professor Jin Sung Chang, who received his doctorate degree of fine arts history from Yale University in 2004, worked in the Yale University Museum before he was appointed as professor of Seoul National University in 2005. Upon looking at the dissertation of Jeong Ah Shin, he firmly said it was a fake. He said that even its cover was not in the format required by Yale University.

Professor Jin Sung Chang/Department of fine arts history of Seoul National University:

Her advisor's name is omitted between the submission dates. If you look at my doctoral dissertation, my advisor's name is placed between the presenter and the date.

Reporter:

Is this for Yale...

Professor Jin Sung Chang:

It's the regulation. Because it is the official regulation, any doctoral dissertations that are in violation of the official regulations will not pass. The contents are also important, but the format is required by the regulations...

Narrator:

On the second page of the dissertation are listed three committee members, including her advisor professor. Professor Chang explained that according to the regulations of Yale University, the name of an advisor is not disclosed and an advisor may not become a member of the dissertation committee.

Reporter:

Do you mean this is not the way it's done, like writing down a name and getting a signature?

Professor Jin Sung Chang:

Right. Never. That's why I said it was a fake as soon as I saw it. It was a fake no matter what.

Narrator:

Professor Christine Mebring of Yale University, whom Jeong Ah Shin identified as her dissertation advisor, disclosed that she had never heard of the name Jeong Ah Shin and that the signature on her dissertation was not hers. Furthermore, President Lamar, whose signature was on Shin's dissertation, was its president in '92 and '93. In 2005, when her dissertation was claimed to be passed, the president of Yale was Richard Levine, the current president. While every situation indicates that her dissertation is a fake, Jeong Ah Shin keeps on arguing that there may the question of plagiarism on her dissertation but that it is a definite fact that she obtained her doctorate degree in fine arts history from Yale University in 2005.

Jeong Ah Shin:

It is not easy to talk about plagiarism, but I think that one writes a dissertation based on excerpts from good sources. So it is fine as long as such parts are identified, and what is important is that they were approved when I received my degree. I received the degree.

Narrator:

The reporting staff inquired about these facts from Yale University. Yale University disclosed that after its academic affairs records were searched, it could not find any proof that a Korean named Jeong Ah Shin was ever admitted to its undergraduate or graduate school or that she was in a doctorate program.

Gila Reinstein/Assistant director of public relations office in Yale University:

The registrar at Yale University has no record of anyone with this name ever having enrolled as a student. There never was any 'Jeong Ah Shin' enrolled as a student at Yale University.

Narrator:

Jeong Ah Shin claimed to have received a BA degree with majors in western fine arts and printmaking from the University of Kansas in '94 and an MBA a year later in '95. However, The University of Kansas also confirmed that the name of Shin could not be found in the graduate lists of its undergraduate or graduate school. But it informed the fact that Shin was admitted in the spring semester of '92 and also finally enrolled in the fall of '96 when she was a junior. If she had been an undergraduate student in the fall of '96, it does not match with her claim that she was admitted to the doctorate program at Yale University in August '96. Her claim that she was a student of Oriental studies at Seoul National University but quit the school because of the objections of her father was revealed to be a fake.

Professor Kyung Beom Kim/Admission management office in Seoul National University:

I checked for the school years '90, '91 and '92. She was on the list of neither enrolled nor admitted students.

Narrator:

It would be a fantastic academic background if one majors in fine arts at an undergraduate school in US, obtains MBA from a graduate school, and even obtains a doctorate degree from the prestigious Yale University. However, everything was found to be false.

Reporter Do Han Yoon:

Reporter Jang Kyung Sung?

Reporter Jang Kyung Sung:

Yes.

Reporter Do Han Yoon:

In such movies as 'Plein Soleil' and 'Catch me if you can,' you can see that the signatures are forged, verifications are forged, and academic records are also forged. So I think that Jeong Ah Shin imitated in the real world what she had seen after watching such movies. By the way, apart from Shin, the doubt is really amplifying because Dongguk University has not taken any action for the last two years.

Reporter Jang Kyung Sung:

That's right. Since it is difficult to acquire the position of professor, we tend to think that a person who has been appointed professor must have gone through a thorough verification process. It was done so loosely at Dongguk University, and it is not excessive to say that it did not have such a verification process. That's why such doubts are continually raised that someone is secretly protecting Shin.

Reporter Do Han Yoon:

Yes.

Narrator:

In fact, the suspicion about Shin's doctorate degree began to emerge as soon as she was appointed professor of Dongguk University in September 2005.

Jong Hak Kim/Chairman of the Korean Fine Arts Association:

It's odd… Even if it is not verified through an official letter, it did not show up when I accessed the home page of the fine arts department, and those who study fine arts history strongly raised their doubts, so we almost thought that they were right.

Narrator:

They said that it was impossible to receive a degree from an American university while staying in Korea.

Professor/Fine arts department of OO University:

It is true that people had doubts about Jeong Ah Shin. Because she claimed that she received a degree while working at an art museum. If you are familiar with college courses, you know you must stay there for at least 3 years to take courses. But she did not have that.

Narrator:

After a lot of questions were raised about her, Dongguk University sent a registered letter to Yale University requesting verification, and received a fax a few days later. It was signed by the associate dean of the Yale University Graduate School, Schirmeister, indicating that it was correct that Jeong Ah Shin had received a doctorate degree from Yale University. This one-page fax is known to have been sent from Yale University. That was all the action Dongguk University had taken to verify Jeong Ah Shin's academic degree. Nevertheless, the controversy about her faked degree did not disappear afterward. In February this year, one of the directors of Dongguk University, Buddhist priest Jang Yoon, claimed that Shin's doctorate degree had been forged. Buddhist priest Jang Yoon presented as evidence the email from the Yale University professor indicating that she had never taught such a student and a list of its doctorate degree holders. Nevertheless, it was of no use.

Buddhist priest Jang Yoon/Former director of Dongguk University:

'Can you take responsibility for what you said?' 'I'll take responsibility if the situation allows me to do so.'

He told me even before the board of directors meeting ended that it was definitely true.

Narrator:

The evidence that the School presented was also the fax that it had received in September 2005. Buddhist priest Jang Yoon was dismissed last May for the reason that he raised false

doubts concerning professor Jeong Ah Shin. Shin even mentioned this case after the controversy of her false academic record broke out in full scale in early July.

Jeong Ah Shin:

If my degrees were false, I should have been dismissed. But he was dismissed. Isn't it right? Officially...

Narrator:

She looked confident even at the last minute.

Jeong Ah Shin:

You'll find out whether my resignation is processed or I'll become suspended. I have been receiving these types of calls a few dozen times a day overseas, which really makes me feel irritated, to be frank with you.

Narrator:

Whenever several press agencies raised doubts on the doctorate degree of Jeong Ah Shin's afterward, Dongguk University and its Foundation just repeated that there would not be any problems. However, it was recently verified that the fax in question that had been presented by Dongguk University as definite evidence was a fake.

Gila Reinstein:

Yale would not send out a document like that. Yale would not give a birth date. That's not the information that we are permitted to provide. So, this is... this is a false document. I don't know how it came into existence. But it's not from Yale.

Narrator:

Yale University disclosed that it had never received a letter requesting verification from Dongguk University in September 2005 and that it had naturally never sent a reply by fax to Dongguk University.

Gila Reinstein:

To the best of my knowledge, this letter never arrived at Yale. We never received it.

Jin Soo Han/Vice President of Dongguk University:

"The cover of the fax we received on 9/22/2005 was not the cover page used by our graduate school at Yale University." However, they do not know how the reply fax concerning

the academic record inquiry dated September 22 was transmitted, so they will investigate it. These are the contents of the fax.

Narrator:

Then how did it happen? The sender number of the fax is definitely that of Yale University. Furthermore, the person called Schirmeister who signed the fax was verified to be working at Yale University. Nevertheless, Yale University indicated that it had never received a letter or sent a fax. This means they are faked. It is possible to infer that someone in the USA conspired with Shin to send a faked fax. It was revealed that Dongguk University did not verify through the Korea Research Foundation at the time of Shin's appointment whether she had acquired a doctorate degree or not.

Jin Soo Han/Vice President of Dongguk University:

In the case of the Korea Research Foundation, our university does not collect a certificate of doctorate degree report as a requirement during an open employment application. For the Korea Research Foundation, a certificate of doctorate degree report is a voluntary report item, and the host agency does not verify it.

Narrator:

Jeong Ah Shin also makes the same claim.

Jeong Ah Shin:

Then why didn't I report my doctorate degree? Most artists do not know whether they should report it, and in case of my major, I didn't necessarily have to have a doctorate degree when the school made the appointment. There are no academic degrees for fine arts management area in the first place, I mean a doctorate degree. But I did my doctorate degree on fine arts history. That's all there is to it.

Narrator:

However, it is already disclosed on the home page of Dongguk University, concerning the notice of professor appointment, that an academic degree holder of a foreign university must be verified by the Korea Research Foundation. In addition, Dongguk University requires submission of a certificate of academic record for each degree before a teaching appointment can be made, and this provision was not fulfilled, either.

Jin Soo Han/Vice President of Dongguk University:

While requests were made to submit required documents a number of times, Jeong Ah Shin herself testified that she had become angry at the representative. At any rate, it was verified that some documents were not submitted at the time of or even after the teaching invitation, which was found to be a serious administrative mistake.

Narrator:

The certificate of academic record from Yale University is printed on special paper so it cannot be duplicated or forged. This means that if such a certificate of academic record had been received, this incident could have easily been prevented. The fact finding investigation committee of Dongguk University is handing over the entire responsibility to the then-president Ki Sam Hong, who resigned and persistently stresses that there has been no background of protective force.

Jin Soo Han/Vice President of Dongguk University:

According to our investigation, no such evidence was verified that there existed external pressure or corruption based on money or other valuables in the process of the appointment. However, it has been determined that the unreasonable and aggressive way of handling business adopted by former president Ki Sam Hong caused such results today.

Narrator:

And, Buddhist priest Young Bae, who is the chairman of Dongguk University Foundation, keeps silent, whereas he had said that he would resign if it was revealed that Jeong Ah Shin's academic degree were to be found to be fake.

Reporter (Jang Kyung Sung):

Mr. Chairman. Haven't you said previously that you would take responsibility for this incident?

Reporter Do Han Yoon:

Reporter Jang Kyung Sung?

Reporter Jang Kyung Sung:

Yes.

Reporter Do Han Yoon:

I read the newspaper column Jeong Ah Shin wrote. According to the column, she called herself Shin of Arc, comparing herself to Joan of Arc. Don't you think that this Shin of Arc had been prepared at Kumho Art Museum and completed at Dongguk University and has finally soared to become an international figure, the art director for Kwangju Biennale?

Reporter Jang Kyung Sung:

Yes, it is correct. Kwangju Biennale is the international fine arts exhibition that represents Korea, and its art director represents such a high position that is said to be representative of our country's exhibition planning. There are so many doubts concerning how Jeong Ah Shin, with so little experience, could become the art director, and about who recommended Jeong Ah Shin, but the Kwangju Biennale keeps silent after giving an incomprehensible explanation.

Reporter Do Han Yoon:

Right.

Narrator:

The board of directors' meeting for the Kwangju Biennale was held on the 18th. It was held to cancel the appointment of Jeong Ah Shin as its art director and to prepare follow-up measures. They expressed their frustration and unfairness for a long period during the board of directors' meeting.

Gong Sam Lee/Director of Kwangju Biennale:

In some ways, Kwangju Biennale is a victim. We trusted the reliable school and press and a number of things approved based on social standards. If you call it a crime, then we committed a crime.

Jong Un Park/Director of Kwangju Biennale:

If it is said in a verification stage that he/she teaches at a university, there is no way but to trust it, objectively speaking. We are not God, but human...

Narrator:

Is Kwangju Biennale just a victim and free from any responsibility for this incident as they claim? The organization committee of Kwangju Biennale held its selection sub-committee three times to appoint its art director who would be responsible for its exhibition next year. After

appointment was not decided in the first and second meetings, the 3rd selection sub-committee chose nine candidates, including Jeong Ah Shin, and sent them to the chairman. Chairman Kap Soo Han explains in so many words why he had no choice but to choose Jeong Ah Shin. Four of them said no, and four of them were disqualified as they were thought to have some problems, so the only one remaining was professor Jeong Ah Shin.

Kap Soo Han/Chairman of Kwangju Biennale:
        That's why I had to contact professor Jeong Ah Shin. I called professor Jeong Ah Shin in the USA...

Narrator:
        Nevertheless, those in the circle of arts who observed the appointment process have extremely negative views.

Professor of fine arts department at OO University:
        There exist ties to power. Kwangju Biennale has always been tied to power so individuals involved in fine arts have no power.

Narrator:
        Who recommended Jeong Ah Shin? Even several directors express their doubts.

Yeon Kyung Kang/Director of Kwangju Biennale:
        Why wouldn't they disclose those who recommended the art director? If sun shines, and wind blows, mold does not form. It would've been fine if it were transparent. I think that it is not necessary to hide them.

Narrator:
        Nevertheless, chairman Kap Soo Han, who is familiar with the entire process, has sealed his lips firmly.

Kap Soo Han/Chairman of Kwangju Biennale Foundation:
        I cannot disclose the list of those who made recommendations. If I do disclose the list of those who made recommendations, Kwangju Biennale cannot choose its art director for good. Who will make recommendations? What can they trust in making recommendations when a current university professor is said to have a faked degree? That's why I don't disclose it. Not because there is some doubt on the list...

Narrator:

Jong Sang Lee (artist), who was the chairman of the second and third selection committee, points his arrow to the press.

News Reporter:

Do you mean that you have never personally made a recommendation?

Jong Sang Lee/Chairman of the second and third selection committee of Kwangju Biennale:

No, go and ask him. I am the chairman.

News Reporter:

Do you mean that you have never recommended any one person specially?

Narrator:

Kwangju Biennale, which will have its 7th anniversary next year, is an international fine arts event. The festival was established with the intent to inherit the cultural spirit of the Kwangju Mass Struggle. It is the leading fine arts event that connects Korea to the world, and its budget alone is as much as 10 billion won. The art director of Kwangju Biennale is a core position that is responsible for the overall planning and progress of Biennale and executing most of its budget, and prominent figures in the circle of fine arts have taken the position. That is why some in the circle of arts are raising suspicion about the background of appointing young Jeong Ah Shin, who does not have much experience in international exhibitions.

Professor of fine arts department at OO University:

Weren't there nine candidates? If Jeong Ah Shin could do it, any one of them could do it, too. The art director position could be held by any one of remaining eight. It does not matter. It's where you get your driver's license. The position of art director… Who made it that way? Whose fault is it?

Narrator:

Jeong Ah Shin has denied all the doubts to the end and left for the USA to bring back evidence, and disappeared without trace. If her lies had not been exposed like in the past, she would have been active as the art director of the Kwangju Biennale now.

Reporter Do Han Yoon:

    Reporter Jang Kyung Sung?

Reporter Jang Kyung Sung:

    Yes.

Reporter Do Han Yoon:

    I think that since Kwangju Biennale is such an event that has a budget of 10 billion won, recommendation and appointment processes for its art director must become transparent. By the way, what is really strange is that Jeong Ah Shin, who should have been investigated, was allowed to leave for the USA. What is going on in the investigation?

Reporter Jang Kyung Sung:

    As you said, if either Dongguk University or Kwangju Biennale had filed a complaint against Shin to the prosecution just a little earlier, or a ban on her leaving the country had been imposed, the prosecutor could have investigated Shin directly. Both Dongguk University and Kwangju Biennale ended up giving time for Shin. While the prosecutors at Seoul and Kwangju are conducting investigation, it appears that the investigation must be limited because Shin has gone into hiding abroad.

Reporter Do Han Yoon:

    Yes.

뉴스 후

윤도환 기자 (진행자):
미술계의 떠오르는 별로 불렸던 올해 서른다섯 살의 신정아 씨, 2년 전에 벌써
대학교수가 되었습니다. 그런데 이상한 일들이 너무나 많습니다.

신정아 씨를 교수로 임명한 동국대 측은, 필수사항인 신씨의 성적증명서를 제출 받지도
않았고, 신씨의 학력을 조회하지도 않았습니다. 신정아 씨가 대학교수가 되기 전, 신씨와
어울렸던 유력 언론사의 기자들은 신씨를 위해서 청탁을 하고 다니기도 했습니다.
신정아 씨가 도대체 어떻게 그 짧은 기간 동안 유명인사로 떠오르게 됐는지
추적했습니다. 뉴스 후, 잠시 뒤에 뵙겠습니다.

나레이터:
서른다섯 젊은 나이에 광주 비엔날레의 예술감독 자리에 오른 미술계의 신데렐라,
성곡미술관 수석큐레이터 겸 동국대학교 교수 신정아
그러나 그녀의 오늘이 있게 한 이력이 모두 거짓이었던 것으로 드러나고 있다.

장진성 서울대 미술사학과 교수:
이것을 딱 보는 순간, 아 이건 가짜다, 무조건 가짜다

나레이터:
서울대에서 캔사스대, 예일대의 박사학위에 이르기까지 학사, 석사, 박사로 이어지는
거짓 이력들. 어떻게 그녀는 국내 굴지의 미술관에 수석 큐레이터로 들어갈 수
있었을까?

박영택 경기대 미술 경영학과 교수:
우리나라의 기업 미술관이라고 하는 게 대개 그룹의 오너들의 친인척들이나 며느리들이
관장을 하고 있잖아요. 그러다 보니까 전문인력을 갖다 쓰는 게 아니라, 그냥 뭐, 자기
말을 잘 듣거나 크게 마찰이 없을 만한 직원을 갖다 쓰려고 하죠.

나레이터:
알고 보니 그녀는 과거에 이미 거짓 학력이 드러나 미술관측으로부터 해고된 적도
있었지만, 그때뿐, 화려한 날갯짓은 계속 되었고...

금호 미술관 관계자:
그 해고한 직원이 다음에 어떤 기업으로 취직이 됐는지 안 됐는지에 대해서 저희들이
책임져야 할 부분은 아닌 것 같아요.

나레이터:
날조된 경력을 믿고 그녀를 교수로 임용한 대학 당국.

한진수 동국대학교 부총장:
실지로 캔사스 대학은 안 보냈고, 그래서 11일 기자회견에서 "했다"라고 잘못 발표했기 때문에…

나레이터:
사전에 충분히 걸러낼 수 있는 기회마저도 외면하고 말았다는데…

김종학 대한미술협회 회장:
알아 보려는 의지가 있었으면 충분히 알아볼 수 있지 않았겠는가… 그것은 저도 이해를 못하겠어요.

나레이터:
급기야 한국을 대표하는 국제적 미술행사에 감독 자리까지 거머쥔 그녀. 그래서 그 배경에 누가 있다는 배후설이 무성한데…

한갑수 광주 비엔날레 이사장:
신정아 교수가 동국대학교에… 큰 대학에 교수로, 그것도 2년 동안 재직을 했고 또 메이저 미술관인 성곡 미술관에 학예실장을 하고 해서… 학위에 하자가 있으리라고는 생각을 못했습니다.

나레이터:
전 세계로 뻗친 망신살. 자신의 학위를 증명해 보이겠다며 출국한 뒤 종적을 감춘 당사자.

신정아:
논문 표절을 고졸 학력으로 단정 짓는 언론에게 저는 아무 할 말이 없습니다.

나레이터:
신데렐라인가, 희대의 사기꾼인가? 신정아, 그녀를 둘러싼 갖가지 의혹을 뉴스 후가 집중 추적했습니다.

윤도한 기자:
신정아 씨는 금호 미술관에서 한달 반 동안 아르바이트를 했습니다. 영어로 안내를 하는 일이었습니다. 그런데 이 미술관의 관장은 아무런 경력도 없는 아르바이트생 신씨를 느닷없이 큐레이터로 임명했습니다. 대한민국 미술계는 이때부터 신정아 씨에게 휘둘리기 시작했습니다. 신정아 씨 사건은 학벌 지상주의와 사학 재단의 문제, 기자와 취재원과의 유착관계 등, 우리 사회의 부조리를 응축해서 보여주고 있습니다. 성장경 기자.

성장경 기자:
예.

윤도한 기자:
이, 다른 프로그램 방송 때문에 뉴스 후가 두 주 동안 방송이 안 되는 바람에, 신정아 씨
사건을 이번 주에 방송을 하게 됐는데, 그 동안 사건이, 뭐, 진전된 내용이 있습니까?

성장경 기자:
신정아 씨는 지난 7 월 16 일 미국으로 출국한 뒤에 아직도 여전히 모습을 드러내지 않고
있습니다. 이런 가운데 동국대 측은 바로 어제, 신정아 씨가 불참한 가운데,
징계위원회를 열어서 신씨에 대한 파면 조치를 확정지었습니다. 그 동안 신씨 한
사람으로 인해 일어났던 최근의 일들을 돌아봤습니다.

윤도한 기자:
네.

나레이터:
지난 달 16 일 뉴욕 JFK 공항. 모자를 깊숙이 눌러 쓴 한 여성이 취재진에게
둘러싸였습니다. 입을 꼭 다물고 있던 그녀는 끈질기게 질문을 던지는 기자들에게 더
이상은 참지 못하겠다는 듯 한마디를 던집니다.

신정아:
논문 표절을 고졸 학력으로 내린 언론에게 저는 아무 할 말이 없습니다.

나레이터:
동국대 교수이면서, 성곡미술관의 학예연구실장, 불과 열흘 남짓 전에는 국내 최대의
국제 미술전 광주 비엔날레의 예술감독으로 선임된 신정아 씨, 미술계의 신데렐라로
불리며 미술인들의 부러움을 샀던 그녀는 이날 공항에서의 모습을 마지막으로 자취를
감췄습니다.

신씨가 출국하기 직전 일주일 동안 그가 몸 담았던 동국대와 그를 새로 예술감독으로
선임한 광주 비엔날레는 무척 바쁜 날들을 보내야 했습니다.

이상일 교수/동국대 학사지원본부:
예일대학교는 신 교수가 동국대학교에 제출한 학위기가 허위임을 밝혀왔습니다. 아울러
신교수에게 미술사학 전공의 박사학위를 수여하지도 않았을 뿐만 아니라 예일대학
학생으로 등록한 기록이 없다고 알려왔습니다.

한갑수 광주비엔날레 재단 이사장:
지난 98 차 이사회에서 신정아 동국대학교 교수를 제 7 회 광주 비엔날레 내국인 감독
후보로 선임 의뢰한 것을 취소하고자 합니다.

나레이터:
이후 신씨를 교수직에서 파면하고, 예술감독 선임을 취소하고, 검찰에 고소하느라, 양쪽
모두 난리를 쳤습니다. 그러나 돌연 출국한 그녀가 남긴 것은 또 있었습니다. 신씨는

뉴욕행 비행기를 타기 직전 인천 공항에서 동국대로 석 장의 서류를 보냈습니다. 가족들에게 박사학위를 증명할 자료를 가지러 간다고 한 신씨가 동국대에 보낸 이 서류들은 뭘까? 예일대에서 보내왔다는 입학 허가서 사본과 도서관 1 일출입증 사본, 그리고 예일대 수업계획서입니다. 그건 마지막 순간까지 미련을 버리지 못하고 자신이 예일대에 다녔다는 걸 증명하려는 집착이었습니다. 그러나 모두 다 박사학위 취득을 증명하는 서류와는 거리가 멀어도 한참 먼 것들입니다. 입학허가서에 표기된 DSR 은 6 개월에서 1 년짜리 단기 수업 과정으로 학위와는 관련이 없는 특별과정입니다. 또, 입학 허가서에 있는 대학원 부원장의 서명은 나중에 위조 문서로 드러난 학위 확인서의 서명과 크기, 점의 위치까지 너무나 똑같습니다. 이 역시 위조됐을 가능성이 높아 보이는 부분입니다.

우편봉투에 있는 주소로 찾아 갔더니 공항에서 일하는 사람의 집이었습니다.

인천공항 직원:
우체국에서 심부름을 해주길 부탁을 하시길래, 주소를 적으셔야 돼지 않냐 그랬더니, 그냥 주소는 아무거나 적어 달라고 저한테 그러더라구요. 그래서 조금 찜찜하긴 했지만 그냥 어떻게 적을 게 없어서 일단 저희 집 주소를 적은 다음에 제가 심부름만 한 건데...

나레이터:
그는 신씨가 공항에서 어딘가로 팩스를 보냈다고 말합니다.

인천공항 직원:
팩스를... 되게 많이 보내셨어요. 한 17 장씩을 두 번 보냈거든요.

기자:
다른 곳에 똑 같은 내용을요?

인천공항 직원:
네. 한 곳, 한 곳... 아, 똑 같은 곳에 두 개를 보냈던 것 같아요.

기자:
어딘지, 무슨 내용인지는 잘 모르구요?

인천공항 직원:
예, 그런 건 전혀 저희가 신경 안 쓰죠.

나레이터:
무슨 자료를, 또, 어디에 보낸 것일까? 만천하에 자신의 거짓말이 드러 났는 데도 그녀는 대체 무엇을 증명하겠다는 걸까? 신정아 씨가 한 신문에 쓴 칼럼입니다. 그녀는 매 학기 강의를 시작할 때, 학생들에게 "당신은 누구인가?"라는 제목의 과제를 내준다고 했습니다:

나레이터가 신문기사를 읽음:
정말 나의 진정한 이름을 찾아보자는 것이다.  그렇게 '나'를 찾아가다 보면 그 동안 겉으로 보여주었던 단편의 모습 외에 숨어 있는 여러 형태의 또 다른 나의 모습을 찾을 수 있다.

나레이터:
당신은 도대체 누구인가?  지금 우리가 그에게 던지고 싶은 질문이다.

윤도환 기자:
성장경 기자.

성장경 기자:
예.

윤도환 기자:
모두가 속은 건 사실인 것 같구요.  그런데 그 중의 일부는, 일부러 속은 건 아닌지 뭐 그런 의문도 들어요.  그런데, 이 신정아 씨가 과연 어떤 인물인지 궁금증이 일지 않을 수가 없어요.

성장경 기자:
네.  신정아 씨가 젊은 나이에 굵직굵직한 자리들을 차지하다 보니까 여러 가지 소문들이 많았습니다.  불교 재단인 동국대에 들어간 것부터가, "어머니가 불교계의 큰손이라서 그렇다더라"하는 소문부터에서, 정치권의 유력한 인사가 신정아 씨의 뒷배를 봐주고 있다라는 확인되지 않은 이야기들까지 소문이 무성했습니다.  실제의 신정아 씨는 어떤 사람이었는지 따라가 봤습니다.

나레이터:
신정아 씨가 어린 시절을 보낸 경북 청송군.  신씨가 졸업한 초등학교입니다.  신씨는 6 학년 때 전교 어린이회장을 지냈습니다.  취재진이 만난 신씨의 초등학교 동창은 그녀를 똑똑하고 사교성이 좋은 친구로 기억하고 있었습니다.

신동엽, 신정아 초등학교 동창:
항상 베풀 줄 아는 그런 친구였으니까, 그 정도 되니까 어린이 학생회장을 하는 것 아닙니까?  그죠?  저는 그렇다고 봐요.  정아가 그만큼 마당발이니까...  친구들이 여자 친구보다 남자 친구들이 많았습니다.

나레이터:
그리고 특히 미술 쪽에 남다른 재능이 있었다고 말합니다.

신동엽, 신정아 초등학교 동창:
우리가 옆에서 지켜 봤기 때문에, 참, 남들보다 미술공부 쪽으로 아주 뛰어난 재질이 있었다고...

나레이터:
작은 택시회사와 주유소를 경영하는 아버지 밑에서 비교적 유복한 어린 시절을 보낸 건
맞지만, 지방의 유력한 재벌 집 딸이라는 소문은 과장된 것이었습니다.  아버지가
돌아가고 나선 가세가 기울었다고 합니다.

신정아 고향 주민:
돌아가시고 나선 계속 내리막길을 걸었다고 봐야죠.  집안이 다... 버는 게 없잖아요.
주유소 팔았지...

나레이터:
1 학년 1 학기까지 다녔다는 이곳 중학교에선 신씨의 부모에 대해서만 어렴풋이
기억하고 있었습니다.

교직원:
그 부모님이 지역유지이었다고 하더라고요.  굉장히...

중학교 교감:
그 정도는 아니었을 건데... 제가 알기로는 아버지는 돌아가셨는데요.  여기 계셨어요,
여기.  여기 계셨었는데 청송 진보면에 계셨는데 택시를 하셨을 겁니다.

나레이터:
불교계의 큰손이라는 소문이 돌기도 했던 신씨의 어머니는 청송에서 어린이 집을
운영하고 있습니다.

취재 기자:
계신가요?  원장 선생님...

직원:
안 계신데요.

취재 기자:
어디 가셨나요?

직원:
휴가 가셨어요.

취재 기자:
연락 좀 가능한가요?

직원:
몰라요.

나레이터:
작은 사찰이 딸린 집에서 기거한다고 해서 찾아가 봤지만, 만날 수는 없었습니다.

취재 기자:
어디 지금 출타하셨나 보네요?

사찰 관계자:
피하시는 것 같아요. 자꾸 귀찮게 하고 이러니까...

나레이터:
음악학원을 운영하고 있는 신씨의 삼촌은 인터뷰를 거절했습니다.

취재 기자:
선생님을 뵈려고 좀 있었거든요?

신정아 삼촌:
전 뵙고 싶지 않거든요.

취재 기자:
삼촌께서는 신정아 씨가 그렇게 된 부분에 대해 말씀해 주실 수 있나요?

신정아 삼촌:
저도 그 입장에 대해서는 별로 얘기하고 싶지 않네요. 나중에 좀 더 있다가 얘기합시다.

나레이터:
신정아 씨는 중학교 일 학년 때 상경해서 서울에 있는 고등학교에 들어갔습니다.
학교측은 찾아간 취재진에게 신씨가 91년에 졸업한 사실만을 확인해주었습니다.

취재 기자:
신정아 씨가 여기를 졸업한 거는 맞는 거죠?

고등학교 관계자:
확실해요. 사진하고 이렇게 생활 기록부에 사진이 있어요.

취재 기자:
그때 담당 선생님이나 그런 것을 알 수 있지 않아요?

고등학교 관계자:
어떻게 알아요? 알아도 가르쳐 줄 수가 없는 데...

나레이터:
이후 92년부터 96년까지 5년간 신정아 씨의 행적은 미국 캔자스 대학에서 찾을 수
있습니다. 그리고 그 중간 95년 6월 삼풍 백화점 붕괴 사고 때 신정아 씨의 이름이

등장합니다.  당시 신문에 실린 부상자 명단에서입니다.  신씨는 기회 있을 때마다 주변
사람들에게, 자신이 콘크리트 속에서 24시간 동안 깔려 있다가 극적으로 살아 났다며,
삼풍 사고가 자신의 내성적인 성격을 바꿔놨다고 밝히곤 했습니다.

류병학 재독일 큐레이터:
"네가 정말 버틸 수 있느냐? 기획을 하는데 스케일도 큰 전시이고 많은 작가들도 만나야
되는데 가능성이 있겠느냐, 정말 해볼 마음이냐" 물어봤더니, 그때 저한테 얘기했던 게
자기가 사실은 삼풍 백화점 붕괴 당시 거기에 24시간 죽음 속에서 다시 되살아난 그런
사람이기 때문에 무엇이든지 각오가 되어 있다…

나레이터:
주변 사람들은, 그녀가 사람들 사귀는 데는 돈을 아끼지 않았다고 말합니다.  주로 고급
호텔 레스토랑에서 손님들을 만나고 명품 선물도 곧잘 했다고 합니다.  특히 주요 언론사
기자들과 유명 원로 작가들에게 신정아 씨는 공손하고 싹싹한 큐레이터로 인식돼
있습니다.  반면에 동료 큐레이터나 또래의 젊은 작가들과는 교류가 그리 많지 않았다고
합니다.

윤도환 기자:
성장경 기자.

성장경 기자:
예.

윤도환 기자:
신정아 씨가 자기 앞길에 도움이 되는 사람을 자기 편으로 만드는 재주는 뛰어났던 것
같은데요.

성장경 기자:
그렇다고 합니다.

윤도환 기자:
신정아 씨가 큐레이터가 되면서 미술계의 신데렐라로 떠올랐는데, 이 큐레이터라고 하는
게 도대체 어떤 일을 하는 겁니까?

성장경 기자:
네, 큐레이터라는 영어 단어를 가장 가깝게 풀이한 것이 학예연구사라는 단어입니다.
전시를 기획하고 전시 작가를 섭외하고 전시에 관한 글도 쓰고 때로는 홍보도 직접
담당하기도 합니다.  특히 소규모 화랑이 아닌 미술관은 화가들이 선호하는 전시
공간이기 때문에, 신정아 씨처럼 유명 미술관의 큐레이터는 미술계 내에서도 힘이 있고,
또, 선망의 대상입니다.  신정아 씨가, 바로 이 미술관 큐레이터가 될 때부터 거짓말이
시작됐습니다.

나레이터:
지난 7 월 초, 광주 비엔날레 조직위원회에 제출한 신정아 씨의 이력서입니다.  지난 1997 년 9 월 서울 사간동에 있는 금호 미술관에 한 젊은 여성이 찾아옵니다.  미국에서 서양화를 전공하고 경영학 석사를 받아 한국에 돌아왔는데 미술관에서 일하고 싶다는 것이었습니다.  당시 금호 미술관의 큐레이터였던 박영택 교수를 그때를 이렇게 기억합니다.

박영택 교수 / 경기대 미술경영학 (당시 금호미술관 큐레이터):
97 년 9 월인가 저를 찾아 왔는데 그때 이력서를 들고 왔어요.  미술관에 취업을 하거나 인턴이나 아르바이트를 하고 싶다고...  그런데 그때 그런 친구들은 굉장히 많았어요.  왜냐하면 미술관이 규모가 컸었기 때문에...

나레이터:
한달 뒤, 마침 전시장 내 영어 아르바이트생이 필요했던 미술관은 미국에서 공부하고 왔다던 신씨의 이름을 떠올렸습니다.

박영택 교수:
10 월에 저희가 '호안 미로' 전시를 했었거든요.  스페인 작가...  그때 아무래도 외국 손님들도 많이 올 것 같아서 영어를 조금 할 수 있는 아르바이트생을 구하다 보니까 그 신정아 이력서가 있어서, 신정아를 아르바이트생으로 썼었죠.

나레이터:
아르바이트생 신정아는, 그러나 이력서에서는 미술관의 전시 업무를 총괄하는 큐레이터로 둔갑합니다.  97 년 10 월 금호 미술관이 기획한 전시회, 호안 미로 전.  아르바이트생으로 심부름과 영어 안내만을 했을 뿐인데, 신씨는 이 전시회를 자신이 기획한 것으로 부풀렸습니다.

박영택 교수:
그런데 일이라고 하는 것이, 생각해보세요.  그냥 전시장에서 외국 손님들이 오면 영어로 간단하게 안내하고 그런 정도니까... 그런 아르바이트생하고 제가 무슨 전시기획을 논의하거나 이럴 수는 없었죠.

나레이터:
그 해 12 월, 전시가 끝나고 큐레이터 박영택 씨는 금호미술관 측과의 갈등으로 그만 두게 되는데 박강자 금호미술관 관장은 이듬해 1 월, 아르바이트생이었던 신정아 씨를 파격적으로 후임 큐레이터로 임명합니다.  전시를 기획한 경력도, 미술 관련 글을 써본 적도 전혀 없는 스물다섯 살의 아가씨가 미술관 아르바이트를 시작한지 한달 보름 만에 화려하게 미술계에 등장하는 순간이었습니다.  불행의 씨앗은 이렇게 잉태되었습니다.

박영택 교수:
완전히 경력이 없는 친구를 큐레이터로 앉힌 것 자체가 큰 문제를 발생시킨 거죠. 그렇게
욕심이 많은 애가 미술관의 큐레이터라는 직함을 갑자기 얻게 되니까 무리수를 둔 것
같아요.

나레이터:
아르바이트생을 관장 바로 아래인 큐레이터로 전격 채용한 배경은 무엇이었을까?
금호미술관 박강자 관장은 이유를 묻는 취재진을 한사코 외면했습니다.

박영택 교수:
그룹에서 미술관의 오너들은... 그냥 자기 거예요. 그렇죠? 우리 집안 거예요. 우리나라
기업 미술관이라고 하는 것이 대개 그룹의 오너들의 친인척들이나 며느리들이 관장을
하고 있잖아요. 그러다 보니까 전문 인력을 갖다 쓰는 게 아니라 그냥 기업에서 직원
채용하듯이, 또는 자기 말을 잘 듣거나 크게 마찰이 없을 만한 직원을 갖다 쓰려고 하는
것이죠.

나레이터:
갑자기 큐레이터가 된 신정아 씨는 전임 큐레이터가 계획해 두었던 전시안들을
찾아봅니다. 그러다 눈에 들어온 것이, "그림보다 액자가 더 좋다"라는 제목이었습니다.
이 전시는 그림이 아닌 액자에 주목해서 우리나라 회화사를 되 살펴보자는 참신한
아이디어로, 당시 언론과 평단, 관객 모두로부터 호평을 받은 전시로 꼽힙니다.

신정아:
국내 근현대 회화에서, 어떤 식으로 서구식 액자가 수용이 되고 배제가 되었는지, 또한
액자가 없는 그림은 어떻게 나타났는지, 거기에 초점을 두고 있습니다. 신씨가 자신의
기획이라고 밝힌 이 전시는, 그러나 사실은, 독일에서 활동하던 큐레이터 류병학 씨가
금호미술관 전임 큐레이터였던 박영택 씨의 의뢰를 받아 1 년 전부터 준비해온
전시였습니다.

류병학 재독일 큐레이터:
'그림보다 액자가 더 좋다' 전은 어차피 그전에 전임자가 전시 제안을 했기 때문에 제가
1 년 준비를 한 거 거든요. 1 년 준비를 하면서, 전임자가 금호미술관을 그만두면서,
거기에 일을 하고 있었던 신정아 씨가 그 전시를 다시 받게 된 거죠.

나레이터:
98 년 11 월에 열린 당시 전시회 도록입니다. 신정아 씨가 쓴 두 쪽 분량의 전시회 소개
글 외엔, 모두 류병학 씨가 쓴 글입니다. 작가 선정과 전시관 연출을 맡아 한 사람도
신정아 씨가 아닌 류병학 씨였습니다. 그러나 신씨는 이 전시회를 자신의 기획으로
내세웠습니다.

류병학 재독일 큐레이터:
허탈했죠. 그것은 사실 양심적 차원에서 있을 수 없는 일이니까. 그건 저 개인적으로
봤을 때 의아한 점이고, 그렇게까지 꼭 했어야만 되는가...

나레이터:
금호미술관에서 개최한 몇몇 전시회를 통해 미술관측의 신임을 얻은 신정아 씨는, 그
무렵 주변 사람들에게 자신이 예일대 박사학위 과정을 밟고 있다고 얘기하기 시작합니다.
그리고 그 얘기는 미술관 재단이사장이었던 금호그룹 박성용 회장 귀에까지 들어갑니다.
당시 예일대 한국 동창회장이었던 박 회장은 단박에 신씨가 거짓말을 하고 있다고
알아챘습니다. 예일대엔 신씨 주장처럼 한국에서 일을 해가면서 박사학위를 딸 수 있는
프로그램이 없다는 걸 잘 알고 있었기 때문입니다. 박 회장은 당장 사표를 받으라는
지시를 내렸고, 신씨는 이틀 만에 권고사직 형식으로 금호미술관에서 쫓겨났습니다.

금호 그룹 관계자:
미술관 소속으로 있으면서, 큐레이터로 있으면서, 밖으로 다니면서 내가 예일대에
다니고 있다고 얘기를 하고 다녔던 것 같아요. 입사할 때 예일대 학력을 가지고 들어간
것이 아니었어요. 학력을 속이고 들어오거나 이런 상황은 아니었던 것 같은데, 들어와서
좀 그런 거짓말을 하고 다니면서 문제가 되었던 것 같아요.

나레이터:
신씨는 그러나 이듬해인 2002년 다른 유명 미술관인 성곡미술관으로 들어갑니다. 당시
상황을 잘 아는 미술계 관계자는, 신씨가 그 동안 쌓아둔 인맥을 총동원해 두 달 여 동안
성곡미술관의 문을 두드렸다고 말합니다.

당시 성곡 미술관 관계자:
추천을 많이 했어요. 원로 사진작가라든지... 평론가라든지... 그리고 기자들, 메이저
신문 기자들하고 잘 알아가지고, 기자들 몇 분이 얘기를 하더라고요. "저 친구 써 봐라"
두 달 동안 제가 좀 힘들었습니다. 미술관은 어차피 사람을 써야 되는 입장이고...

나레이터:
성곡 미술관에 채용되는 과정에서 신씨의 금호미술관 큐레이터 경력이 십분 고려됐지만,
그녀가 금호미술관을 그만두게 된 이유 같은 건 전혀 거론되지 않았습니다. 이후 성곡
미술관 큐레이터 신정아 씨는 활발한 활동을 펼치며 미술계에 이름을 알리기 시작합니다.
특히 전시를 위한 재원 마련에는 탁월한 능력을 보였다고 합니다.

성곡 미술관 관계자:
전시 공간 구성부터 작품 거는데는... 여기다 걸지, 저기다 걸지, 그런 후원이 있잖아요.
LG, 삼성, 한화... 이렇게 나와 있잖아요. 대외적인 능력이 컸던 것은 확실한 것 같아요.

나레이터:
신문과 방송은 앞다퉈 신정아 씨의 전시를 소개했고, 인터뷰 기사도 줄을 이었습니다.
조선일보, 동아일보, 서울신문은 한동안 신정아 씨의 칼럼을 싣기도 했습니다. 지난 5월

한 인터뷰에서는, 미술대전의 비리를 지적하며 미술계를 꾸짖기도 했습니다.
국민일보는 2005년 5월, 최초의 예일대 박사 출신 큐레이터의 탄생을 알렸습니다.

나레이터가 신문기사를 읽음:
"미국을 왔다갔다 하는 항공료는 논외로 치더라도 논문작성과 전시기획이 겹치는 때에는
몸이 두 개였으면 좋겠다는 생각까지 들었다"

미술관 근무 경력을 인정 받아 일부 과목을 면제받기도 했지만 현지 수업에 빠지지 않고
참가했으며 논문은 최근 1년간 밤잠을 자지 않고 이메일을 통해 첨삭을 받는 방식으로
지도교수의 지도를 받았다.

박영택 교수:
신정아가 아주 탁월하게 기자들을 그렇게 관리했다고 할까요. 그런 걸 아주 너무너무
잘했던 것 같아요. 그러니까 지금 능력은 있는데 학위 때문이다... 그 동안 이것도 다
기자들이 얼마나 옹호했습니까? 미술계의 신데렐라라든가... 뭐, 그, 말도 안 되는 것...

나레이터:
홍익대와 한양대, 이화여대 등 대학들의 강의 요청도 쇄도했습니다. 금호와 성곡, 내노라
하는 미술관에서 쌓은 경력, 작가와 기자를 망라하는 폭넓은 인맥은 신정아를 미술계의
젊은 실력자로 만들었고, 신씨에게 잘 보이려는 사람들이 점점 늘어났습니다.

OO 대학교 미술학과 교수:
신정아를 학교 교정에서 만났어. 웬일인가 했더니 수업 나온다고 그래서... 그러면서
거기 누구 젊은 교수 얘기로는, 아무개가 걔한테 잘 보이려고 그러는지 그런 애한테
시간까지 줘서 나오더라고... 그러니까 교수들도 보면, 몇 개 대학이 그래요. 다 시간...
그 뭐, 큐레이터나 뭐 이런 사람들 바쁘거든요. 시간까지 바쁜 사람 배려하는 게 그
원인이 다 어디 있겠어요. 다 잘 보이려는 거지.

박영택 교수:
가서 부탁하고... 거기 초대전 받고 싶어하고... 그리고 미술계에서는, 그 잘난
미술관에서 초대전을 받으면 자기가 마치 중요한 작가로 인정되는 것처럼 과시하고
다니고. 그러니까 다들 미술관에서 전시하고 싶어하고... 그러니까 관장이라든가
큐레이터한테 로비하게 되고... 그러니까 신정아를 다들 떠받들 수 밖에 없겠죠.
당연하죠. 그렇지 않겠어요? 미술관의 큐레이터인데. 잘 보여야 되니까.

나레이터:
시간이 흐르면서 미술계의 젊은 거물로 자리 잡은 신정아 씨. 금호 미술관에서 나올 때
일었던 학위 관련 의혹 따위는 이미 잊혀진 일이 되어버렸습니다.

윤도환 기자:
그런데 신정아 씨에 예일대 박사라고 하면, 그 박사 논문이 있을 텐데, 동국대 측이 그
박사 논문을 살펴 보면 진짜인지 여부를 쉽게 알 수 있지 않았습니까?

성장경 기자:
예. 그렇습니다. 처음에는 이 논문이 다른 사람의 박사학위 논문을 도용한 표절이다 - 이런 문제가 불거졌다가, 급기야는 논문 자체가 예일대에서는 찾아볼 수 없는 가짜인 것으로 밝혀졌습니다. 왜 가짜인지 따져봤습니다.

윤도환 기자:
예.

나레이터:
"기욤 아폴리네르: 원시주의, 피카비아와 뒤샹의 촉매"라는 제목의 논문. 신정아 씨가 2005년 9월 동국대 조교수로 임용될 때 자신이 쓴 박사학위 논문이라며 대학 당국에 제출한 논문입니다. 이 논문은 지난 1981년에 나온 에카테리니 사말타노우 치알크마(Ekatarini ? Triakma)의 버지니아대 박사학위 논문과 제목이 똑같습니다. 그리고 두 논문은 제목뿐 아니라 첫 머리에 쓴 논문 요약 부분도 단어 하나하나까지 일치합니다. 당연히 표절 의혹이 불거졌습니다. 신정아 씨는 그러나 논문 표절 사실을 일부 인정하면서도 크게 문제 삼을 일은 아니지 않느냐고 항변합니다.

신정아:
그건 앞의 30페이지 부분이고요. 그것도 마찬가지로 제가 한국하고 미국 왔다갔다하면서 쓰면서 이 사람 저 사람 도움을 받기는 받았는데, 논문이란 게 그렇잖아요. 그리고 막말로 그게 그 사람들이 얘기하는 것처럼 표절이라 하더라도, 표절 부분에 대해서 명확히 밝히면 되는 거고 그렇잖아요.

나레이터:
논문 표절은 학위가 취소될 수 있는 중대한 문제입니다. 그러나 표절보다 더 큰 문제가 불거졌습니다. 학위 논문 자체가 가짜라는 겁니다. 지난 2004년 예일대에서 미술사 박사학위를 받았고, 2005년 서울대 교수로 오기 전 예일대 박물관 연구원으로 있었던 장진성 교수. 신정아 씨의 논문을 보더니 한 눈에 가짜라고 못을 박습니다. 표지부터 예일대에서 요구하는 논문 양식이 아니라는 겁니다.

장진성 교수 / 서울대 미술사학과
제출 날짜 사이에 지도 교수의 이름이 빠져있습니다. 제 박사 논문을 보면 제출자와 날짜 사이에 지도 교수의 이름이 들어가 있고요.

취재 기자:
이게 예일의...

장진성 교수:
규정입니다. 정식 규정이기 때문에 정식 규정을 위배한 박사 논문은 어떤 박사 논문도 통과시키지 않습니다. 내용도 중요하지만 형식이 이렇게 딱 규정집에 있기 때문에...

나레이터:
논문 두 번째 쪽에는 논문 지도교수를 포함한 심사위원 세 명의 서명이 적혀있습니다. 장 교수는 그러나 예일대의 규정상 심사위원의 이름은 논문에 밝히지 않으며 지도교수는 심사위원이 될 수 없다고 설명합니다.

취재 기자:
이런 식으로 그냥 이름을 쓰고 서명을 받고 이런 게 없다는 거죠?

장진성 교수:
예, 전혀 없어요. 서명이. 그래서 이거 이렇게 딱 두 개를 보는 순간 이건 가짜다. 무조건 가짜다…

나레이터:
신정아 씨가 논문 지도교수라고 밝힌 예일대학의 크리스틴 메링(Christine Mehring) 교수는, 신정아라는 학생의 이름을 들어본 적이 없으며 논문에 있는 서명도 자신의 것이 아니라고 밝혀왔습니다. 거기가 신씨의 박사학위 위에 서명한 것으로 되어 있는 라마 (Lamar)총장은 92 년과 93 년 당시 총장이었습니다. 학위 논문이 통과됐다는 2005 년 당시 예일대 총장은 리처드 레빈 현 총장입니다. 모든 정황이 이렇게 가짜 논문이라는 걸 말해주는 데도, 신정아 씨는 논문에 대한 표절 논란이 있을 수는 있지만 자신이 2005 년에 예일대학 미술사 박사 학위를 딴 것만큼은 분명한 사실이라고 우기고 있습니다.

신정아:
표절이라는 게 얘기하기가 애매하지만, 논문이라는 게, 어, 원래 좋은 글들 발췌해가지고 쓰는 거잖아요. 대신에 그 부분만 명확하게 밝히면 되고. 중요한 건 제가 그걸 학위 받을 때 검증된 문제고, 그건 제가 학위를 받은 거구요.

나레이터:
취재진은 예일대학 측에 사실 관계를 문의했습니다. 예일대 측은 학사 기록을 조사해 본 결과, 박사 과정을 밟은 것은 고사하고 학부와 대학원 어디에서도 신정아라는 이름의 한국인이 입학한 사실은 발견할 수 없었다고 밝혔습니다.

길라 라인스타인 예일대 대회협력 담당 부국장:
예일대학의 기록에는 이런 이름의 사람이 학생으로 등록한 적이 없다.
신정아 씨는 예일대 학생이었던 적이 없다.
(The registrar at Yale University has no record of anyone of this name ever having enrolled as a student.  There never was any 'Jeong Ah Shin' enrolled as a student at Yale University.)

나레이터:
94 년 켄사스 대학에서 서양화와 판화 전공으로 학사학위를 받았고, 1 년 뒤인 95 년 도에 경영대학원에서 석사학위를 취득했다는 신정아 씨. 그러나 켄사스 대학에서도 학부와

대학원 졸업생 명단 어디에도 신씨의 이름이 없다고 확인해주었습니다. 다만 신씨가
92 년 봄학기에 입학해 96 년 가을, 학부 3 학년 때 마지막 등록을 한 사실은 있다고
알려왔습니다. 96 년 가을에 학부생이었다면, 이 역시 96 년 8 월 예일대 박사과정에
입학했다는 자신의 주장과는 맞아떨어지지 않습니다. 서울대 동양학과에 다니다
아버지의 반대로 중퇴했다는 평소 주장도 거짓으로 드러났습니다.

김경범 교수 / 서울대 입학관리부:
90 년도, 91 년도, 92 년도까지 확인했습니다. 역시 등록생 가운데도 없고 합격생
가운데도 없습니다.

나레이터:
미국 대학 학부에서 미술 실기를 전공한 뒤 대학원에선 경영학 석사를 따고 미술사로
명문 예일대에서 박사학위까지 취득했다면 큐레이터선 그야말로 환상적이라고 할 수
있는 학력입니다. 그러나 모든 게 거짓말로 드러나고 말았습니다.

윤도환 기자:
성장경 기자.

성장경 기자:
예.

윤도환 기자:
영화 가운데요, '태양은 가득히'나 'Catch me if you can', 뭐 이런 영화를 보면은, 뭐,
서명도 위조하고, 수표도 위조하고 또 학력도 위조하는데, 신정아 씨가 이런 영화를 보고
현실 세계에서 따라 한 거 아닌가 이런 생각까지 들어요. 그런데, 신씨는 그렇다
치더라도, 동국대가 지난 2 년 동안 아무런 조치를 취하지 않은 걸 보면 의혹은 더욱 정말
증폭되고 있어요.

성장경 기자:
그러게 말입니다. 대학교수 자리가 얻기 힘든 만큼, 일단 대학교수가 됐다고 하면
대부분이 당연히 철저한 검증을 거쳤을 거라고 여기기 마련인데요. 이상하게 동국대는
그런 검증 절차가 없었다고 해도 과언이 아닐 정도로 허술하게 이루어졌습니다. 그래서
누군가 신씨를 비호하고 있는 것 아닌가 이런 의혹들이 계속해서 제기되고 있습니다.

윤도환 기자:
네.

나레이터:
사실 신정아 씨의 박사학위에 대한 의혹은 2005 년 9 월 그녀가 동국대 교수로 임용될
때부터 나오기 시작했습니다.

김종학 대학미술협회 회장:
이상하다... 공문을 통해서 확인을 안 해봐도 미술사학과 홈페이지에 들어갔을 때
거기에도 안 나타나고, 미술 사학을 한 분들이 강력하게 의혹 제기를 하시니까 저희는
거의 그렇다고 봤죠.

나레이터:
한국에 머물면서 미국대학 학위를 받았다는데, 그게 불가능하다는 거였습니다.

미대교수:
원래는 뭐 신정아 그 친구에 대해서는 전에부터 사람들이 의혹을 갖고 있었던 거는
사실이었고요.  왜냐하면 미술관에 있으면서 학위를 받았다고 그러는데, 코스워크를
혹시 아시는지 모르겠는데, 코스워크를 하기 위해서는 최소한 3 년 정도 거기서 수업을
제대로 듣고 그래야 되는데 그런 기간이 없었던 거죠, 그 친구한테는요.

나레이터:
뭔가 이상하다는 얘기가 자꾸 들려오자, 동국대는 예일대에 확인 요청을 하는
등기우편을 보냈고, 며칠 뒤 팩스 한 장을 받았습니다.  Schirmeister 라는 예일대 대학원
부원장이 서명한 것으로, 신정아 씨가 예일대에서 박사학위를 받은 게 맞다는
내용이었습니다.  예일대로부터 받았다는 이 팩스 한 장.  동국대가 신정아 씨의 학위
검증을 위해 취한 조치는 그게 전부였습니다.  그러나 가짜 학위 논란은 이후로도
수그러들지 않았습니다.  올 2 월엔 동국대 이사 가운데 한 명인 장윤 스님이 신씨의
박사학위가 위조됐다고 주장했습니다.  장윤 스님은, 그런 학생을 가르친 적 없다는
예일대 교수의 이메일과 박사학위자 명단을 증거로 제시했습니다.  하지만 소용이
없었습니다.

장윤 스님 / 동국대 전 이사:
'책임질 수 있느냐, 그 말에 대해서'. '책임질 수 있는 상황이면 내가 책임지겠다'.
이사회가 끝나기도 전에 틀림이 없다고 저한테 얘기를 했어요.

나레이터:
학교측이 내세운 근거는, 이번에도 2005 년 9 월에 받은 그 팩스였습니다.  장윤 스님은
신정아 교수에 대한 허위 의혹을 제기했다는 이유로 지난 5 월 해임됐습니다.  신씨는
7 월 초 본격적으로 학력 허위 논란이 일자, 이 사건을 들먹이기도 했습니다.

신정아:
만약에 제 학위가 틀렸으면 제가 학교에서 해임이 됐지, 왜 그분이 됐겠어요,
그렇잖아요?  공식적으로...

나레이터:
마지막 순간에도 그녀는 당당했습니다.

신정아:
제 사표가 수리가 되는지 휴직이 되는지 앞으로 보시면 아시잖아요. 사실은 이거 해외에 나와 가지고 내가 지금 이런 전화 지금 하루에 수십 번 받고 있는데 정말정말 짜증나요, 솔직히.

나레이터:
동국대와 재단 측은 이후 몇몇 언론이 신정아 씨의 박사학위에 대해 의혹을 제기했을 때도 문제될 게 없다는 말만 되풀이했습니다. 동국대가 그 동안 확실한 근거라며 내세운 문제의 팩스는, 그러나 최근 가짜임이 확인됐습니다.

길라 라인스틴:
Yale would not send out document like that. Yale would not give a birth date. That's not information that we are permitted to provide. So, this is… this is a false document. I don't know how it came into existence. But it's not from Yale.

나레이터:
예일대 측은 동국대로부터 2005 년 9 월 확인을 요구하는 우편물을 받은 적이 없으며, 따라서 당연히 동국대에 팩스를 답장으로 보낸 일도 없다고 밝혔습니다.

길라 라인스틴:
To the best of my knowledge, this letter never arrived at Yale. We never received it.

한진수 동국대 부총장:
2005 년 9 월 22 일에 저희들이 받은 팩스 표시는 예일대학교 Graduate school 에서 사용하는 커버 페이지 서식이 아니다. 다만, 그런데 9 월 22 일자 학력조회 회신 팩스 발송이 어떻게 이루어졌는지는 자기들도 모르니 조사를 하겠다라는 내용이었습니다.

나레이터:
그렇다면 어떻게 된 일일까? 팩스의 발신 번호는 분명 예일대 것이 맞습니다. 또 팩스에 서명을 한 Schirmeister 라는 사람도 예일대에 재직 중인 것으로 확인됐습니다. 그런데 예일대 측은 우편을 받은 적도 팩스를 보낸 적도 없다. 그러면 가짜라는 얘긴데, 미국 내의 누군가가 신씨와 짜고 가짜 팩스를 만들어 보낸 게 아니냐는 추론이 가능해집니다. 동국대학교는 신씨를 임용할 당시 학술진흥재단에 박사학위 취득 여부를 확인하지 않은 것으로 드러났습니다.

한진수 동국대 부총장:
학술진흥재단의 경우 우리 대학은 공채시 필수 서류로 박사학위 신고증을 받지 않습니다. 학술진흥재단에서도 박사학위 신고필증은 자발적인 신고 사항이고 주관 기관에서도 이를 검증하고 있지 않음을 알려드립니다.

나레이터:
신정아 씨도 같은 주장을 하고 있습니다.

신정아:
왜 그러면 박사 신고를 안 했냐... 그거는 예술하는 사람들은 그런 거 신고해야 되는 줄도
모를 뿐더러 제 전공 같은 경우는 저희 학교에서 채용을 할 때 굳이 제가 박사학위가
없어도 돼요. 미술 경영 쪽은 원래 학위가 없잖아요, 박사 학위가.  그런데 저는 미술사로
박사를 한 거구요.  그게 전부예요.

나레이터:
그러나 동국대 홈 페이지에 교수 임용 공고에는 해외 학위 소지자는 학술진흥재단의
확인이 필요하다고 분명히 밝히고 있습니다.  동국대는 또, 교원 채용 시 학위에 따른
성적 증명서를 반드시 제출하도록 하고 있지만, 이 규정 역시 지키지 않았습니다.

한진수 동국대 부총장:
여러 번 미비된 서류에 대해서 제출 요구를 하였지만, 신정아 씨 자신이 담당직원에게
많은 짜증을 냈다는 증언을 하였습니다.  여하튼 교원 초빙 시, 또 초빙 이후 서류 미제출
상태로 있었음이 확인되었고, 이는 중대한 행정적 과실로 판명되고 있습니다.

나레이터:
예일대의 성적증명서는 특수 용지로 만들어져 복사나 위조가 불가능합니다.  그러니
애초에 성적증명서만 받았어도 이런 사태는 사전에 충분히 막을 수 있었다는 얘기입니다.
동국대 진상 조사 위원회는 퇴직한 홍기삼 당시 총장에게 모든 책임을 넘기면서
배경이나 비호 세력이 없었다는 점을 부단히 강조하고 있습니다.

한진수 동국대 부총장:
저희들 조사로는 채용 과정에서 외압이나 금품에 의한 청탁 비리가 있었다는 어떠한
증거도 확인하지 못하였습니다.  다만 이 과정에 홍기삼 전 총장의 무리한 그리고
의욕적인 업무 추진 방식이 오늘이 결과를 초래하였다고 판단하고 있습니다.

나레이터:
그리고 신정아 씨의 학위가 가짜로 밝혀지면 책임을 지겠다고 했던 동국대 재단이사장
영배 스님은 입을 꾹 다물고 있습니다.

취재 기자 (성장경):
이사장님 지난 번에 이번 사태가 잘못되면 책임지겠다고 말씀하신 부분이 있지
않습니까?

윤도한 기자:
성장경 기자.

성장경 기자:
네.

윤도한 기자:
신정아 씨가 신문에 쓴 칼럼을 보니까요. 스스로를 잔다르크에 비유해서 신다르크로
칭했던데, 이 신다르크는 금호 미술관에서 만들어져서 동국대에서 완성됐고 결국 광주
비엔날레 예술감독이라는 국제적 인물로 날아오르게 된 것 아닙니까?

성장경 기자:
예, 그렇습니다. 광주 비엔날레는 우리 나라를 대표하는 국제 미술전이고 여기에
예술감독은 우리 나라의 전시기획을 대표한다고 해도 과언이 아닐 정도로 무거운
자리입니다. 경험도 적은 신정아 씨가 어떻게 이런 예술감독의 자리에 오를 수 있었는지,
누가 신정아 씨를 추천을 했는지 많은 의혹이 일었지만, 광주 비엔날레 측은 석연치 않은
해명만 한 채, 아직도 입을 다물고 있습니다.

윤도한 기자:
네.

나레이터:
지난 18 일 광주 비엔날레 이사회가 열렸습니다. 신정아 씨의 예술감독 선임을 취소하고
후속 대책을 마련하기 위한 자리였습니다. 이사회에서는 억울하다는 하소연이 한참
동안이나 이어졌습니다.

이종삼 광주 비엔날레 이사:
어떻게 생각하면 저희 광주 비엔날레는 피해자입니다. 그리고 우리가 믿었던 것은
공신력 있는 학교와 언론과 그리고 사회 통념상 공인된 여러 가지 드러난 것들을 믿었던
것이 죄라면 죄가 되겠습니다.

박종운 광주 비엔날레 이사:
검증 단계에서 일반적으로 대학에 근무한다고 그러면 객관적으로 다 믿을 수 밖에
없어요. 우리가 뭐 신입니까? 인간이지...

나레이터:
그들이 주장하는 것처럼 과연 광주 비엔날레 재단 측은 피해자일 뿐이고 이번 사태에
대한 책임에서 자유로운 걸까? 광주 비엔날레 조직위원회는 내년 전시회를 책임질
예술감독을 뽑기 위해 세 차례에 걸쳐 선정 소위원회를 열었습니다. 일차, 이차에서
선임이 이루어지지 않자 3 차 선정 소위원회는 신정아 씨를 포함해 아홉 명의 후보를
선정해 이사장에게 올렸습니다. 한갑수 이사장은 그 중에서 왜 신정아 씨를 택할 수 밖에
없었는지 구구절절 설명합니다. 네 명은 고사했고, 네 명은 문제가 있다고 판단해서
탈락시키고 나니 남는 사람이 신정아 교수뿐이었다는 것입니다.

한갑수 광주 비엔날레 재단 이사장:
그래서 어쩔 수 없이 신정아 교수한테 연락을 한 겁니다. 미국에 있는 신정아 교수한테...

나레이터:
그러나 선임 과정을 지켜 봤던 미술계 인사들의 시선은 지극히 부정적입니다.

OO 대학 미술학과 교수:
권력하고 밀착되어 있는 거예요.  원래 광주 비엔날레는 권력하고 밀착이 되어 있어
미술인들 개개인들은 아무 힘이 없는 거예요.

나레이터:
누가 신정아 씨를 추천한 걸까?  몇몇 이사들 조차 의문을 나타냅니다.

강연균 광주 비엔날레 이사:
왜 감독 추천한 사람을 밝히지 않아요?  가령 해가 비치고 바람이 통하고 투명하면
곰팡이가 안 생깁니다.  투명했으면 되는데, 그걸 또 숨길 필요는 없다고 저는 생각합니다.

나레이터:
하지만 모든 과정을 알고 있는 한갑수 이사장은 입을 굳게 다물고 있습니다.

한갑수 광주 비엔날레 재단 이사장:
제가 추천인 명단을 밝힐 수 없다는 것은, 만일 이번에 추천인 명단을 밝히면 앞으로 광주
비엔날레는 영원히 감독을 선정을 못합니다.  누가 추천하겠습니까?  대학교 현직 교수가
엉터리 박사학위라고 하는데 뭘 믿고 추천하겠습니까?  그래서 밝히지 않는 겁니다.
거기에 무슨 의혹이 있어서가 아니고...

나레이터:
이차, 삼차 선정 소위원장이었던 이종상 화백은 언론 쪽으로 화살을 돌립니다.

취재 기자:
개인적으로 추천하신 일은 없다는 말씀이시죠?

이종상 광주 비엔날레 2, 3 차 감독 선정 소위원회 위원장:
아니, 저 양반한테 가서 여쭤 보세요.  난 위원장이에요.

취재 기자:
직접 한 사람을 특별히 추천하신 적은 없다는 말씀이시죠?

이종상:
아니, 왜 나한테 그런 걸 물어요.  묻는 자체부터가 잘못이지.  신정아를 이렇게 칭찬해
놓은 게 누구예요?

취재 기자:
그럼 선생님께서 개인적으로 추천하신 일은 없냐는 말씀이죠.

나레이터:
내년으로 7회째를 맞는 광주 비엔날레는 광주 항쟁의 문화 정신을 이어받자는 취지로 만든 국제 미술 축제입니다. 한국과 세계를 연결하는 대표적인 미술 행사로서 예산만도 백억 원 가까이 됩니다. 광주 비엔날레의 예술감독은 비엔날레의 전체 기획과 진행을 책임지고 예산의 대부분을 집행하는 핵심적인 자리로, 그 동안 내노라 하는 미술계의 중진들이 거쳐갔습니다. 그런 만큼 미술계 일각에선 젊고 국제 전시 경험도 별로 없는 신정아 씨의 선임 소식에 반드시 뭔가 배경이 있지 않느냐는 의혹을 제기하고 있습니다.

OO 대학 미술학과 교수:
9명의 후보가 있잖아? 신정아가 될 정도면 나머지 8명 중에 아무나 해도 돼. 나머지 8명 중에 아무나 해도 상관 없는 게 예술감독... 거긴 운전면허 따는 데예요. 예술감독 자리는... 누가 그렇게 만들어 버렸느냐 예요. 누가 그렇게 만들어 버렸어?

나레이터:
끝까지 모든 의혹을 부인하며 증거를 가져 오겠다고 미국으로 건너가 자취를 감춰버린 신정아 씨. 지나온 십 년처럼 거짓말이 들통나지 않았다면 그는 지금 한창 광주 비엔날레 예술감독으로 활약하고 있었을 겁니다.

윤도한 기자:
성장경 기자.

성장경 기자:
네.

윤도한 기자:
광주 비엔날레는 국가 예산 백억 원이 들어가는 행사인 만큼 예술감독 추천, 선임 과정이 명백히 밝혀져야 될 것 같은데요. 근데 정말 이상한 건 조사를 받아야 될 신정아 씨가 미국으로 그냥 출국할 수 있도록 내버려 둔 건데요. 수사는 도대체 어떻게 돼가고 있는 겁니까?

성장경 기자:
말씀하신 대로 동국대든 광주 비엔날레든 조금만 더 일찍 신씨를 검찰에 고발을 했더라면, 또 출국 금지가 됐더라면 신씨를 상대로 검찰이 직접 수사를 할 수 있었을 텐데요. 동국대와 광주 비엔날레가 결국은 신씨에게 시간을 벌어준 셈이 되고 말았습니다. 지금 광주와 서울 두 군데 검찰이 수사를 벌이고 있습니다만 신씨가 국외로 잠적한 상태에서 수사에 한계가 있을 수 밖에 없을 걸로 보입니다.

윤도한 기자:
네.

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated and transcribed DONGGUK0072852 from the Korean language into the English language.

I further certify that translation and transcription of DONGGUK0072852 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

**Kwang Park**
**Professional Translator**

Subscribed and sworn to before me on _____ 27 _____ day of ___July___ , _2011_ (year)

(Signature of Notary)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Notary Stamp)

# EXHIBIT 32

Gila Reinstein, 11:39 AM 7/20/2007, Re: Korean Buddhist Weekly Newspaper

To: Gila Reinstein <gila.reinstein@yale.edu>
From: Pamela Schirmeister <pamela.schirmeister@yale.edu>
Subject: Re: Korean Buddhist Weekly Newspaper
Cc:
Bcc:
Attached:

No--that sounds fine to me. Susan Carney still has not called me back, but when she does, I'll ask her about replying.

At 10:14 AM 7/20/2007, you wrote:
OK, I'll reply to the journalist and repeat the usual:
Shin never was a student here. Neither Pam Schirmeister nor any other Yale official signed documents about her. Yale has no record of her at all. The phone and fax numbers on the false documents are correct, but readily available. We don't know how the false documents supposedly sent from Yale were created, and they are not valid. If Yale had received a request to confirm that Shin earned a degree from the Graduate School, we would have responded that she did not.
Anything else?


I don't mind to do it, but I referred him to you originally because I was told that no one should answer any questions except OPA. Susan Carney left me a message last night, so perhaps I should ask her when we manage to talk with each other?

At 09:49 AM 7/20/2007, you wrote:
Do you want me to handle this inquiry, or will you? – G.
X-Originating-IP: [61.73.132.10]
From: "arche442" <arche442@hanmail.net>
Organization:
To: <gila.reinstein@yale.edu>
Subject: Dear Pamla schirmeister (from Buddhist Weekly Newspaper in korea)
Date: Fri, 20 Jul 2007 19:47:36 +0900 (KST)
X-HM-UT: 7nMGvruaAnnB1GCCY8YJlOrB6EdW92yowGOsRZzGS+s=
X-Hanmail-Attr:
X-ATTFILE-SIZE: 0
X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
X-Yale-Not-Spam: For more info see:  http://www.yale.edu/email/spam/content.html
X-Yale-Spam-Score: ** (2.667)
X-Yale-Filter-Score: 2.667
p {margin-top:0px;margin-bottom:0px;}
        Dear Pamla schirmeister

YALE00000708

Gila Reinstein, 11:39 AM 7/20/2007, Re: Korean Buddhist Weekly Newspaper

I am Yu Eung-oh on the staff of Buddhist Weekly Newspaper.

I write to you, who is an utter stranger for me, in order to find out details of the alleged forgery of academic degrees by Dongguk University assistant professor Shin Jeong-ah.

Recently Korean society is very unrest with the case of Shin; please take time to answer my questions.

Ms. Shin Jeong-ah was specially employed as a professor for Dongguk University on September 1, 2005. At that time, Shin submitted documents with your signature on them as a ground for a doctorate from Yale University. The documents are incorrect with wrong characters of 'Pamla schirmeistr' for your name. Later, as a rumor that Shin forged her academic degrees spread, Dongguk University Economics professor Ahn Gyeong-taek, who was in charge of appointment, mailed an official document which asked confirmation to Yale University School of Arts on September 5 and you confirmed the degrees on September 22.

As the allegation of Shin's forgery of academic degrees persisted with time, Dongguk University director Rev. Jangyun asked Shin to submit her doctoral thesis and she presented <Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp> as her own thesis for a doctorate. The thesis also had your signature. However, the investigation revealed that the thesis was identical with that of University of Virginia in 1981, which led to the increase in suspicion; therefore, this journal interviewed Seoul National University professor Jang Jin-seong, who got a doctorate from Yale University, revealing that Shin's thesis was against the rules of Yale University in many ways. As the case progressed, another newspaper! publishing company reported that Shin failed to get even a bachelor's or master's degree.

Now Korean people are so curious about the process of Shin's forging a doctorate; so I will ask you a few questions as follows:

Â¢ Did you send documents confirming Shin's doctorate to the Sungkok Art Museum on May 27, 2005? And did you sign them?

Â¢ Did you send documents confirming Shin's doctorate by facsimile on September 22, 2005?

Â¢ Have you ever signed Shin's thesis?

Â¢ Does the place you worked at as of September 2005 have a telephone number of 203-436-2628 and a fax number of 203-432-6904?

Â¢ Are you acquainted with Ms. Shin?

Even if you feel annoyed at answering my questions, please make sincere replies for this journal that makes efforts to inquire into the truth of this case and Korean people who want to know the truth.



YALE00000709

[„L¿« LÛ¿Ã†í…Ø½Æ, «-½Þ¿¶] [æL¿Ã‡†¼Þ…¼2007]ø° ø©…Ø†-¿ª ˆ ¥í«'¥í¥L !

Pamela Schirmeister
Associate Dean
The Graduate School
Yale University

P.O. Box 208236
New Haven CT 06520-8236
203-432-9098

Confidentiality Notice: This e-mail message and any attachments are for the sole use of the intended recipient (s) and may contain proprietary, confidential, or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, please contact the sender by reply email and destroy all copies of the original message immediately.

Pamela Schirmeister

Associate Dean

The Graduate School

Yale University

P.O. Box 208236

New Haven CT 06520-8236

203-432-9098

Confidentiality Notice: This e-mail message and any attachments are for the sole use of the intended recipient (s) and may contain proprietary, confidential, or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, please contact the sender by reply email and destroy all copies of the original message immediately.

YALE00000710

# EXHIBIT 33

# Yale University

*Office of the Vice President*
*and General Counsel*
*P.O. Box 208255*
*New Haven, Connecticut 06520-8255*

*Campus address:*
*Whitney Grove Square*
*2 Whitney Avenue, 6th Floor*
*New Haven, Connecticut 06510*
*Telephone: 203 432-4949*
*Fax: 203 432-7960*

**BY HAND DELIVERY**

October 29, 2007

Michael E. Runowicz, Assistant United States Attorney
Office of the United States Attorney
Connecticut Financial Center
157 Church St.
New Haven, CT 06510

    Re:    <u>Response to Commissioner's Subpoena</u>

Dear Mr. Runowicz:

    On behalf of President Richard C. Levin, and upon reasonable investigation, I provide Yale University's responses to the questions and document request attached to the Commissioner's Subpoena that the University received from you by fax on October 17, 2007. Please note the following:

- It is my understanding that the reference in Question 6 to "Ph.D. on Art History in the name of Pamela Shirmeistr at the Graduate School of Yale University" is meant to refer to the letter of May 27, 2005 attached to the Commissioner's subpoena, and I have answered that question accordingly.
- It is my understanding that the reference in Question 7 to a "Doctorate Dissertation" is meant to refer to the diploma attached to the Commissioner's subpoena, and I have answered that question accordingly.
- It is my understanding that the reference in Question 13 to a "doctorate credential" is meant to refer to a standard letter from Yale confirming that a person has received a Yale doctoral degree, and I have provided an example of such a letter.
- It is my understanding that the reference in Question 13 to a "doctoral dissertation" is meant to refer to a diploma conferring a doctoral degree, and I have provided an example of such a document.

1.    Has Jeong Ah Shin, with a date of birth of April 28, 1971, ever enrolled at the Graduate School of Yale University?

    <u>Answer</u>:  Yale University has no record indicating that a person named Jeong Ah Shin, with a birth date of April 28, 1971, ever enrolled at the Yale Graduate School.

YALE00007995

2.     What did Jeong Ah Shin major in at Yale University?

       <u>Answer</u>:  See answer to Question 1.

3.     Did Jeong Ah Shin complete the whole graduate course at Yale University?

       <u>Answer</u>:  See answer to Question 1.

4.     Did Jeong Ah Shin receive a doctorate degree from the Graduate School of Yale
       University?

       <u>Answer</u>:  No.

5.     What is the major of the doctorate degree which has been granted to Jeong Ah
       Shin?

       <u>Answer</u>:  See answer to Question 4.

6.     Do the attached form, contents and entitled signature of Ph.D. on Art History in
       the name of Pamela Shirmeistr at the Graduate School of Yale University match
       with any genuine article by Yale University?

       <u>Answer</u>:  The letter dated May 27, 2005, purportedly signed by "Pamela
       Schirmeistr" [sic] and attached to the Commissioner's Subpoena, does not match
       the template Yale University uses to respond to requests for the confirmation of
       degrees.  (See document attached in response to Question 13.)  Moreover, the
       letter dated May 27, 2005 misspells the name of Pamela Schirmeister, and the
       stationery on which the letter is written is different than the stationery that Ms.
       Schirmeister uses.

7.     Do the attached form, contents and entitled signature of a copy of Doctorate
       Dissertation in the Name of the President of the Graduate School of Yale
       University match with a genuine article issued by Yale University?

       <u>Answer</u>:  The document purporting to be a Yale University diploma signed by
       Sheila Wellington and Howard R. Lamar and attached to the Commissioner's
       Subpoena does not match any genuine diploma awarded by Yale University.
       Please note that the Secretary of Yale University in 2005 was Linda Koch
       Lorimer, not Sheila Wellington, and the President of Yale University in 2005 was
       Richard C. Levin, not Howard R. Lamar.  (See document attached in response to
       Question 13.)

8.     Did Yale University receive an international mail enquiry related to academic
       reference of Jeong Ah Shin from Dongguk University in September 2005?

2

YALE00007996

<u>Answer</u>: Yes. In September 2005, Yale University received a letter dated September 5, 2005, with receipt number RR 062 260 601 KR, from Prof. Dr. Hyung Taik Ahn, Department Manager, Dongguk University, Personnel Administration Team.

9. Who at Yale University received an international mail enquiry in September 2005?

<u>Answer</u>: According to the "Track & Confirm Search Results" attached to the Commissioner's Subpoena, the letter described in response to Question 8 was received by Michael Moore, an employee in Yale University's Central Mailroom. Yale University has no record to confirm that Mr. Moore was the person who received the letter.

10. Upon receipt, whom did the staff member of Yale University deliver the above mail to?

<u>Answer</u>: Yale University mail delivery records indicate that the letter described in response to Question 8 was delivered to Shalentia Moore, an office assistant in the Yale Graduate School.

11. Has the international enquiry been answered? (If yes, when was this reply dispatched?)

<u>Answer</u>: Yes. On September 22, 2005, at 13:29 E.D.T., Associate Dean of the Yale Graduate School, Pamela Schirmeister, sent a fax in reply to the letter described in response to Question 8.

12. What was the answer in response to the enquiry?

<u>Answer</u>: The fax said, "As requested I am confirming that the attached letter was issued by the Yale Graduate School and signed by me." Dean Schirmeister now believes that this answer was an error.

13. Provide 1 copy of the specimen of the doctorate credential of Art History in the name of Pamela Shirmeistr [sic], Vice President of the Graduate School of Yale University and 1 copy of a specimen of doctoral dissertation in the name of the President of Yale University.

Enclosed as Attachment A, please find an example of a letter that the Yale Graduate School uses to confirm the credentials of a student who has received a Ph.D. The Graduate School maintains copies of these letters without signatures, but Pamela Schirmeister signed this copy on October 23, 2007 in order to provide an example of her signature. The attached copy certifies a Ph.D. in Music, but it is similar to a letter that would be sent certifying a Ph.D. in Art History. Information that would identify the student has been removed from this letter.

3

YALE00007997

Enclosed as Attachment B, please find a facsimile of a Yale University Ph.D. diploma granted in 2005.

Sincerely,

Harold Rose
Associate General Counsel

4

YALE00007998

ATTACHMENT A

# Yale University

*Graduate School*
*320 York Street*
*P.O. Box 208236*
*New Haven, Connecticut 06520-8236*

May 24, 2005

University of Minnesota
School of Music
200 Ferguson Hall
2106 4th Street
Minneapolis MN 55455

This is to certify that                         has completed all course
requirements for the Ph.D. degree in the Department of Music and
he received his degree on May 23, 2005.

If you have any questions please contact me at (203) 432-7598.

Sincerely,

*Pamela Schirmeister*

Pamela Schirmeister
Associate Dean

cc:    Registrar, Department Music

YALE00007999

ATTACHMENT B

# PRAESES ET SOCII

## UNIVERSITATIS YALENSIS

IN NOVO PORTU IN RE PUBLICA CONNECTICUTENSI OMNIBUS
AD QUOS HAE LITTERAE PERVENERINT SALUTEM IN DOMINO
SEMPITERNAM NOS PRAESES ET SOCII HUIUS UNIVERSITATIS

### STUDENT'S NAME HERE

AMPLIORIS HONORIS ACADEMICI CANDIDATUM AD GRADUM
TITULUMQUE PHILOSOPHIAE DOCTORIS
ADMISIMUS EIQUE CONCESSIMUS OMNIA IURA PRIVILEGIA
INSIGNIA AD HUNC HONOREM SPECTANTIA
IN CUIUS REI TESTIMONIUM HIS LITTERIS UNIVERSITATIS
SIGILLO IMPRESSIS NOS PRAESES ET SCRIBA ACADEMICUS
SUBSCRIPSIMUS A.D. X KAL. IUN. ANNO DOMINI MMV
ET UNIVERSITATIS YALENSIS CCCIV

*Richard C. Levin*
PRAESES

*Jonathan Rock Levin*
SCRIBA

YALE00008000

# EXHIBIT 34

DONGGUK v. YALE UNIVERSITY                                    July 30, 2010

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)


------------------------x VOLUME I

DONGGUK UNIVERSITY,          :

        Plaintiff,          :

   -versus-                  :

YALE UNIVERSITY,             :

        Defendant.          :

------------------------x


        Rule 30(b)(6) Deposition of JIN SOO HAN,

taken pursuant to the Federal Rules of Civil

Procedure, at the law offices of Day Pitney LLP,

1 Audubon Street, New Haven, Connecticut, before

James A. Martone, L.S.R. #00248, and a Notary

Public in and for the State of Connecticut, on

July 30, 2010, at 9:56 a.m.

DONGGUK v. YALE UNIVERSITY                                    July 30, 2010

---

Page 106

1     Q.  No, I'm asking if at that press conference
2  Dongguk told the press that Yale had told Dongguk that
3  the fax was a fake?
4         THE INTERPRETER:  I have to rely on my
5  memory on that matter.  I believe going back to that
6  date of the press conference, I believe that the
7  information was released to press stating that the fax
8  cover we believed from Yale was not authentic.
9     Q.  Way did Dongguk say that to the press?
10        THE INTERPRETER:  Because we received
11 letter containing that information.
12    Q.  My question is why did Dongguk --
13        MR. WEINER:  He just explained.
14    Q.  Why did Dongguk want to share that
15 information with the press?
16        THE INTERPRETER:  Well, we certainly
17 thought it has to be released to the press, because
18 Yale verified the fax was a fake, and also, the Yale
19 denied receiving any inquiry from us, so we thought we
20 should do that.
21    Q.  Why?
22        MR. WEINER:  He just said why.
23    A.  I told you we thought this so important to
24 the public at that time.
25        MR. WEINER:  I also note that this was

---

Page 107

1  actually the same question and answer was asked before
2  the lunch break at least twice, if not three times.
3         MR. FETNER:  The question was not asked
4  previously and I'm still waiting for an answer.
5         MR. WEINER:  He explained why they had
6  the press conference.  He explained why --
7         MR. FETNER:  I'm not asking why they
8  had the press conference.
9         MR. WEINER:  And, Howie, I mean, why?
10 Because they received information from Yale that
11 contradicted what was believed before that.  He said
12 it.
13        MR. FETNER:  I'm asking the witness.
14        MR. WEINER:  I understand.  You got the
15 answer.  You don't like it.  You don't get to ask the
16 question three or four times.
17        MR. FETNER:  I'm not asking why they
18 held a press conference.  I'm asking why they made a
19 particular statement at the press conference.
20        MR. WEINER:  And he said it.
21        Note my objection; asked and answered
22 and harassment.
23        THE INTERPRETER:  You have to
24 understand, going back to those dates, and Shin
25 Jeong-Ah incident was one of the hottest issues in

---

Page 108

1  Korea.  So whether she has ever received her degree or
2  not was very important issue at that time.  So since
3  we received some information from Yale, we had to
4  release it.
5     Q.  What do you mean by the "Shin Jeong-Ah
6  incident"?
7         THE INTERPRETER:  Well, I called that
8  as Jeong-Ah Shin incident.  Anything related to
9  Jeong-Ah Shin, I would call it as Jeong-Ah Shin
10 incident.
11    Q.  Outside of press conferences and press
12 releases, are there particular Dongguk personnel who
13 are authorized to speak to the media on behalf of
14 Dongguk University?
15        THE INTERPRETER:  To my recollection, I
16 don't recall any particular person was appointed for
17 that, to play that role; however, if any questions
18 received regarding that incident, I believe there's --
19 the guideline was made, that question has to be
20 directed to the strategy and public relation
21 department.
22    Q.  Who made that decision?
23        THE INTERPRETER:  I believe through the
24 meeting we held, the president made a decision.
25    Q.  Is that the same meeting you mentioned

---

Page 109

1  earlier, where the president decided to hold the July
2  11th press conference?
3         THE INTERPRETER:  I don't recall.
4         MR. FETNER:  Let's mark this.
5         (Defendant-Han Exhibit 3 marked for
6  identification.)
7         MR. FETNER:  I'm going to mark three
8  others as long as we're here.
9         (Defendant-Han Exhibits 4, 5 and 6
10 marked for identification.)
11 BY MR. FETNER:
12    Q.  Mr. Han, you've now been handed four
13 documents, Exhibits 3, 4, 5 and 6.  Do you have all
14 four documents?
15    A.  Yes.
16    Q.  And the four documents are Korean documents
17 that have English translations attached to them.  I'd
18 like you to focus on the Korean document.
19    A.  Yes.
20    Q.  Have you seen the document labeled Exhibit 3
21 previously?
22    A.  No.
23    Q.  Do you know what that document is?
24    A.  Yes.
25    Q.  What is it?

---

28  (Pages 106 to 109)

Page 128

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)


------------------------x VOLUME II

DONGGUK UNIVERSITY,          :

       Plaintiff,          :

   -versus-                 :

YALE UNIVERSITY,             :

      Defendant.          :

------------------------x



      Continued Rule 30(b)(6) Deposition of

JIN SOO HAN, taken pursuant to the Federal Rules

of Civil Procedure, at the law offices of Day

Pitney LLP, 1 Audubon Street, New Haven,

Connecticut, before James A. Martone, L.S.R.

#00248, and a Notary Public in and for the State

of Connecticut, on August 2, 2010, at 10:21 a.m.

Sanders, Gale & Russell
(203) 624-4157

Page 209

1  articles proves that all the damages inflicted on
2  Dongguk was the result of Yale's response.
3          MR. FETNER: My question wasn't about
4  Yale's response, my question was about the news
5  articles.
6          MR. WEINER: He just answered.
7          THE INTERPRETER: Well, after Yale's
8  response, these articles started appearing, and these
9  articles created an image of Dongguk as an unreliable,
10  lying institution. Naturally, the reputation and all
11  the ensuing harms were done.
12      Q. Mr. Han, is that Dongguk's -- Strike that.
13          Does Dongguk have any more information
14  in response to the question how Dongguk knows that
15  these articles caused the harm that you described?
16          THE INTERPRETER: It's natural, after
17  these articles, there were the following articles
18  further accusing Dongguk as a questionable
19  institution, and because of all this climate, people
20  no longer respected or trust Dongguk as an educational
21  institution.
22      Q. Is that Dongguk's complete answer?
23      A. Yes.
24      Q. Mr. Han, I'm now going to turn back to what
25  we've marked as Exhibit 12, which should be in the

Page 210

1  pile of documents in front of you. My question for
2  you about Exhibit 12 is the same question I asked
3  about the previous document, that is, how did this
4  article harm -- or, strike that.
5          First, specifically what within this
6  article does Dongguk claim harmed its reputation?
7          (Pause in proceedings.)
8          THE INTERPRETER: Well, general
9  direction of this article, in which I mean the style
10  of the article, was written that -- written in such a
11  way that it gives an impression that Dongguk is doing
12  something shady.
13          Let me point out the headline. Well,
14  in general, once a school verifies the final
15  qualification, final degree, then one doesn't go into
16  the intermediary records to this degree, but because
17  they brought this as a -- as a headline, it already
18  start giving an impression that Dongguk was doing
19  something improper.
20          Let me bring your attention to the
21  second paragraph.
22          No, let's go back to the first one. In
23  the second line, I explained this to you earlier on
24  today, if you look at the second line, in the middle
25  of it, Dongguk -- it reads Dongguk University claimed

Page 211

1  it had sent to verify her school diploma.
2          But I explained to you earlier on that
3  Mr. Lee retracted this and corrected by saying that it
4  was due to his misunderstanding. Still this newspaper
5  article carries this. And I also would like to point
6  out the expression here, in the second paragraph, as a
7  result, questions have been flared.
8          The last sentence of the second
9  paragraph, Jeong-Ah got Bachelor's and Master's
10  degrees when she was recruited by the local
11  university, but I must point out to you that this is
12  not a necessary process once one's final degree is
13  confirmed; but if someone reads this paragraph, one
14  would have the impression that here we go, Dongguk did
15  something wrong again, and that is not correct.
16          I like to go to the
17  fifth-from-the-bottom paragraph. At the end, it says,
18  the mail -- "sent the mail to Yale and Kansas." We
19  certainly sent the mail to Yale, and we had the proof
20  for that, but this article is creating an impression
21  that Dongguk never sent anything to Yale or Kansas.
22  But as you know, we certainly sent a mail to Yale and
23  kept the proof.
24          The next sentence, "Dongguk did not
25  confirm even whether the document reached the

Page 212

1  university in due time at that time." This is not
2  necessary action for a university to take, but by
3  writing this sentence, it's as if Dongguk was engaged
4  in some kind of negligence.
5          Well, the bottom line, because of
6  Yale's failure to, actually not failure, denied that
7  they received our inquiry, all these -- all these
8  articles that has harming Dongguk appeared. Well, we
9  certainly inquired with Yale in 2005, and Yale
10  responded affirmatively. Then by 2007, Yale denied
11  their verification.
12          So now Dongguk and Yale were insisting
13  differently. When that took place, everybody in
14  Korea, including news media and public, believed Yale;
15  and thus, news media started writing articles that
16  says as if Dongguk never tried to verify the academic
17  credentials in 2005, instead, Dongguk was lying.
18          And from that negative viewpoint, all
19  sorts of harmful events and rumors started piling up
20  against Dongguk.
21          The one more thing I would like to
22  point out. The next page, second from the last, the
23  last sentence, there's a last sentence that reads,
24  "The prosecution would ban Shin from overseas trip if
25  the university brought the cases to the prosecution,

22  (Pages 209 to 212)

DONGGUK v. YALE UNIVERSITY

August 2, 2010

Page 213

1   critics said."
2        What this is doing is Shin fled
3   overseas because university protected Shin and did
4   not, or neglected to bring the case against Shin to
5   the prosecution, which -- but this was not true.
6        Speaking of the sequence, as of the
7   time of the newspaper articles, there was nothing that
8   Dongguk would do. Dongguk started internal
9   investigation as of July 10th, and then we came up
10  with an intermediary investigation result on July
11  20th. And finally, we brought charges against Shin as
12  of July 23rd based on the results of the internal
13  investigation.
14       Even that charges would not have been
15  necessary by us if only Yale admitted that there was a
16  verification effort by Dongguk with them in 2005.
17    Q. Mr. Han, my question to you was what
18  specifically in this document harmed Dongguk's
19  reputation?
20       MR. WEINER: He had not completed his
21  answer.
22    A. I'm trying to answer your question.
23       MR. WEINER: He's answering your
24  question.
25    Q. Is there anything else in this document

Page 214

1   that --
2        MR. WEINER: No, no, no, no, no, no.
3    Q. -- Dongguk claims harmed Dongguk's
4   reputation?
5        MR. WEINER: Continue your answer. He
6   can't cut you off.
7        THE INTERPRETER: Well, the foundation
8   of Dongguk University as an institution was totally
9   shaken because of this kind of article that accused
10  Dongguk as an institution that neglected and --
11  neglected the finding of the fax and denies that, or
12  lying.
13    Q. Is there anything else in Exhibit 12 that
14  Dongguk claims harmed its reputation?
15       THE INTERPRETER: That's all.
16       MR. FETNER: Okay. There's five
17  minutes left on the tape. Why don't we take a short
18  break.
19       MR. WEINER: Okay.
20       THE VIDEOGRAPHER: Off the record,
21  3:40.
22       (Recess: 3:40 to 3:52 p.m.)
23       THE VIDEOGRAPHER: On the record, 3:52.
24       MR. FETNER: Mark this.
25       (Defendant-Han Exhibit 19 marked for

Page 215

1        identification.)
2   BY MR. FETNER:
3    Q. Mr. Han, I'm showing you what's been marked
4   Han Exhibit 19. Please take your time to review the
5   document and let me know what specifically in that
6   document does Dongguk claim harmed its reputation?
7    A. Okay.
8        (Pause in proceeding.)
9        THE INTERPRETER: First of all, by not
10  saying what they had to say, they harmed Dongguk -- I
11  mean Yale, by not saying what they were supposed to
12  say, and that was a damage to Dongguk.
13       This is dated September 23rd, right?
14  By this time, a real issue was not whether or not
15  Jeong-Ah Shin received a degree from Yale but whether
16  or not Dongguk ever sent a verification inquiry to
17  Yale in connection with Shin Jeong-Ah's degree.
18       Because Yale declared that Shin
19  Jeong-Ah's assertion is untrue, as of July 10, 2007,
20  everybody became aware that Shin Jeong-Ah's background
21  was a fake, but general public's interest goes way
22  beyond that. That is, they were more interested in
23  whether or not Dongguk ever inquired with Yale about
24  Shin Jeong-Ah in 2005.
25       Yale sent a letter to Dongguk on July

Page 216

1   10th, 2007, saying that they had never received the
2   inquiry from Dongguk in 2005. After that, Korean
3   media made their own direct inquiry with Yale as to
4   whether or not Dongguk had sent an inquiry to Yale in
5   2005.
6        And yet, Yale continued to deny the
7   fact that Dongguk had sent the inquiry, and then they
8   sent the fax in 2005, so Dongguk asked Yale how was it
9   that Yale had sent fax response to Dongguk in 2005,
10  and Yale's response was that they will conduct an
11  investigation and come back with the answer. And we
12  have yet to receive that so-called answer from Yale.
13       We believed at that time, in other
14  words, as of 2007, Yale should have let the Korean
15  media know that there had been an incident like that
16  to be responsible. Instead, what they notified Korean
17  media was that Shin's academic credential was not
18  true, it's a fake one.
19       And then it led the public to believe
20  that Dongguk never ran a background inquiry on Shin in
21  2005. Because of the crucial mistake or negligence
22  committed by Yale on July 10th, 2007, all these
23  disastrous outcomes has come out to Dongguk.
24    Q. Mr. Han, looking at Exhibit 19, is there any
25  specific paragraph or sentence you can point to that

23   (Pages 213 to 216)

Page 217

1   Dongguk claims harmed its reputation?
2          THE INTERPRETER: The problem is not
3   what you said, it's the thing that -- it's about what
4   you didn't say. By not saying that, you leading the
5   public to believe that Dongguk did something that
6   Dongguk shouldn't have done.
7          MR. WEINER: Why don't you go through
8   the article and see if there's any -- he wants to know
9   if there's anything in the article itself, not what's
10  not said but what is said.
11  Q. My question for the moment is the words that
12  are actually printed in the article.
13         THE INTERPRETER: There are portions
14  that I do not know the truth about its polarities.
15  Q. I'm not asking whether or not the statements
16  are true, I'm asking if Dongguk claims that any of
17  these particular sentences or paragraphs harmed its
18  reputation regardless of whether it's true.
19         THE INTERPRETER: No, based on these
20  sentences alone.
21  Q. Mr. Han, when you testified earlier that the
22  harm to Dongguk's reputation came from what was left
23  out of this article, can you please tell me what it is
24  that was left out, that is, what you claim Yale should
25  have said?

Page 218

1          THE INTERPRETER: I told you. It was
2   just a sentence being incomprehensible, not properly
3   formed. Then translator cannot translate consistently.
4          MR. FETNER: You're saying his answer
5   was incomprehensible?
6          THE INTERPRETER: Right, because of the
7   sentence structure in Korean, which have reverse
8   sentence structure. So when it's not fully stated,
9   then it's left to the imagination of interpreter,
10  which I would like to avoid. He has to speak in full
11  sentence.
12         MR. WEINER: Okay. You need to be very
13  clear in Korean about what you mean with stating the
14  subject, not inferring certain things, which is what I
15  think you're saying. So be very precise.
16  A. Okay.
17  Q. The question again, Mr. Han, is what does
18  Dongguk claim is left out of this article, what Yale
19  should have said but did not say?
20         MR. WEINER: I think he did say
21  earlier. Other than what he said?
22         MR. FETNER: Well, it's not entirely
23  clear to me what he said earlier.
24         THE INTERPRETER: You should have
25  carried the portion that reveals that Dongguk had

Page 219

1   indeed run a background check of Shin as of 2005.
2   Q. In this article?
3   A. Yes.
4          MR. WEINER: You may recall he
5   mentioned the date of the article.
6   Q. Mr. Han, I'm not now asking you about a
7   particular news article but about Dongguk's claim in
8   this lawsuit generally. What aspect or aspects of
9   Dongguk's reputation does it claim were damaged by
10  Yale?
11         MR. WEINER: Other than what he already
12  said?
13         MR. FETNER: Well, I don't think he's
14  answered that question, and I'm certain I haven't
15  asked it.
16         MR. WEINER: You can ask him, but I
17  think you got a 10-minute answer last time, you're
18  going to get the same 10-minute answer again, I
19  suspect.
20  Q. No, no, no. Mr. Han, I'm not asking you for
21  specific examples of ways in which Dongguk suffered
22  damages, I'm asking you strictly with respect to
23  Dongguk's reputation. That is, does Dongguk claim
24  that its academic reputation was harmed or its
25  religious reputation, or some other type of

Page 220

1   reputation? That's what I'm trying to understand.
2          THE INTERPRETER: In every respect.
3   Q. Can you tell me specifically?
4          THE INTERPRETER: I told you that.
5          MR. WEINER: Say it again.
6          THE INTERPRETER: Do I tell you again?
7   Q. Yeah,. I would like to know every respect
8   in which Dongguk claims its reputation was damaged.
9          THE INTERPRETER: First, Dongguk was a
10  very respected institution, the university based on
11  Buddhist spirit, and respected for its transparency,
12  and enjoyed the reputation of reliable institution.
13  Because Yale created a liar of -- out of Dongguk,
14  reliability or honor has been robbed.
15         Because of Yale's failure to do what
16  they were supposed to do, Dongguk became an
17  institution of liar. The fund-raising result was so
18  much lower than what we had expected, including from
19  the alumnus.
20         MR. WEINER: He's not asking about the
21  impact. He's asking simply in what ways was the
22  University's reputation damaged.
23         THE INTERPRETER: Reliability, hundred
24  years' old brand quality, honor, have been completely
25  destroyed.

                          24   (Pages 217 to 220)

# EXHIBIT 35

Untitled Document                                     페이지 1 / 1

08-24-2007 11:30                           PRINT

## Key Presidential Aide Behind Fake Dongguk Professor

A key presidential aide is alleged to have attempted to protect the sacked Dongguk University professor who forged her degrees.

Byun Yang-kyun, 58, senior presidential secretary of economic affairs, reportedly appealed to a former board director of the university "not to take issue about Prof. Shin Jeong-ah, 35," amid allegations of forgery of her bachelor's and doctorate degrees, on two occasions, Chosun Ilbo, an influential local daily, reported Friday.

The former board director is Monk Jang Yoon, who was sacked after he insisted that Prof. Shin forged her doctorate of Yale University in the U.S., according to reports.

Presidential secretary Byun was quoted as telling Monk Jang Yoon in an international call in Guatemala, "(I) will settle the matter if "you" remain calm," the daily reported, quoting Jang, his close colleagues and other Buddhist sources.

Byun was accompanying President Roh Moo-hyun, who stayed in the Central American nation from July 2-5 to lobby for the bid to host the 2014 Winter Olympics. Jang made public the forgery case on June 29.

The daily also said they have attempted to contact Byun for comment, but he has not responded although they have made calls since Aug. 22.

http://www.koreatimes.co.kr/www/news/include/print.asp?newsIdx=8...   2007-12-24

DONGGUK0000064

# EXHIBIT 36

Untitled Document  페이지 1 / 2

08-24-2007 18:06      ⫶⫶⫶ PRINT

## 'Roh's Aide Tried to Cover Up Diploma Forgery'



Byeon Yang-kyoon      Shin Jeong-ah

By Kim Tae-jong
Staff Reporter

The prosecution plans to investigate the allegations that a presidential aide attempted to cover up a scandal involving a university professor forging her school diplomas in July, government sources said Friday.

Byeon Yang-kyoon, director general for policy planning at Cheong Wa Dae, allegedly pressed Buddhist priest Jang Yoon to keep mum about his suspicions over the authenticity of the educational background of assistant professor Shin Jeong-ah, 35, at Dongguk University.

But Byeon Friday denied the allegations through Cheon Ho-seon, the Cheong Wa Dae spokesman.

``Byeon doesn't know her personally, and it is not true that he met the monk to persuade him not to disclose Shin's fake diplomas,'' Cheon said.

Byeon, as a director of the Cheong Wa Dae Buddhist association, simply tried to express his hope that problems regarding the university would be settled smoothly, Cheon said.

The Chosun Ilbo newspaper also claimed that Byeon's action suggested high-ranking officials were involved in the controversial appointment of Shin as a Dongguk professor.

Prosecutors, who have been investigating the diploma forgery case at the request of the university, will verify the report, but have failed to contact the monk so far, prosecution sources said.

Rev. Jang Yoon said on June 29 that Shin forged her bachelor's, master's and doctoral diplomas before she was hired by the university. The revelation came after the monk was sacked as member of the school's board of directors on May 29 after he first raised suspicions on Shin's academic credentials.

DONGGUK0000065

# EXHIBIT 37

Case 3:08-cv-00441-TLM   Document 257-2   Filed 08/04/11   Page 184 of 204

07-12-2007 17:26                                                          PRINT

# Biennale Director Sacked for Academic Forgery

By Seo Dong-shin
Staff Reporter



Gwangju Biennale Thursday withdrew its
decision to appoint Shin Jeong-ah, an
assistant professor at Dongguk University as
the artistic director of the 2008 biennale due
to her forgery of academic records.

``We're sorry to those who have nurtured the
Gwangju Biennale as it is today _ Gwangju
citizens and people who love culture and
arts,'' said Han Kap-su, executive chairman
of the nation's foremost art biennale, in a
press conference in Gwangju. Claiming the
executive board of the biennale knew nothing
about Shin's forgery, he said, ``We're
seeking to take legal action against Shin.''

Shin Jeong-ah

In a series of dramatic revelations, elite academic records of Shin all turned out to be
false. She has been known as ``Cinderella'' in art circles because she reached
several coveted major positions at age 35.

Her bachelor's and master's degrees from the University of Kansas did not exist; she
dropped out after attending from spring in 1992 to fall in 1996, according to a
university spokesman.

Therefore she could not have had a doctor's degree from the department of the
history of art at Yale University, which she claimed to have obtained in 2005 with a
thesis titled ``Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and
Duchamp.'' A paper with the same title was actually submitted in 1981 to the
University of Virginia by author Katia Smaltanos.

Shin, who has been staying in Europe recently, denied allegations of academic
forgery in an initial telephone interview with a Buddhist newspaper last week.

But her academic records were confirmed false by relevant university authorities.
Officials at Dongguk University, a Buddhist-funded institution, claimed that they
received a fax message confirming Shin's doctoral degree from Yale University when
employing Shin as professor in September 2005. But on Tuesday, Dongguk
University admitted that upon a renewed request, Yale University sent a reply this
week informing them that Shin had never been enrolled there.

Allegations of possible influence-peddling in Shin's appointments as a professor at
Dongguk University and the director for the Gwangju Biennale are snowballing,
although the two institutions deny such suspicions. They have refused to disclose the
procedures on her hiring. After being appointed assistant professor at Dongguk
University despite some internal opposition two years ago, Shin was briskly tapped as
co-director of the 7th Gwangju Biennale this month, along with Okwui Enwezor, dean
of academic affairs and senior vice president of the San Francisco Art Institute.

Shin serves as a chief curator at the Sungkok Art Museum in Seoul. Exhibitions
organized by her include the 40th anniversary exhibition of John Burningham, the
internationally acclaimed British children's book author and illustrator, last year and
American art photographer William Wegman's ``Funney & Strange'' exhibition which
is currently under way.

DONGGUK0000923



Untitled Document

페이지 2 / 2

She also frequently wrote columns in local dailies on art and life. She claimed to have survived the 1995 Sampoong Department Store collapse after eight hours of confinement under broken concrete. She called it a traumatic experience that made her pursue good for the rest of her life, and recalled how things started to look easy after that.

Art critics as well as citizens are expressing shock and awe at the unprecedented trickery, some dubbing her the ``female Hwang Woo-suk of art circles" and questioning whether this is the sole case of academic records forgery for a career boost in art circles. Shin has said that she will take legal action to prove her innocence.

saltwall@koreatimes.co.kr

DONGGUK0000924

# EXHIBIT 38

[DONGGUK0000871]

Upright Press, Fast News: Internet Yonhap News                    Page 1/2

Yonhap News                                                       Print Close

## All of Gwangju Biennale Director Jeong-Ah Shin's Degrees "Fake" (Overview)

Dongguk University: "Yale University confirmed fraudulent doctorate" "Will take action on persons involved in hiring following conclusion of inquiry"

[Seoul = Yonhap News] Reporter Eun-Jin Lim = It has been confirmed that the bachelor's, master's and doctoral degrees of Gwangju Biennale artistic director and assistant professor in the Dongguk University General Education Institute, Jeong-Ah Shin (35, female), who has been under suspicion for forging her doctorate and plagiarizing her dissertation, are all fake.

Sang-Il Lee, head of the Dongguk University Office of Academic Support, held a press conference at Dongguk University in Jung-gu, Seoul, on the 11th, and announced that "Yale University today informed us that the Yale art history doctorate submitted by Professor Jeong-Ah Shin is fraudulent. They further stated that there is no record that Professor Shin was ever registered as a Yale University student."

Taken together with the confirmation obtained by Yonhap News that Ms. Shin's bachelor's and master's degrees from the University of Kansas were fraudulent, this means that Ms. Shin's bachelor's, master's and doctoral record has been found to be entirely fake.

Mr. Lee stated that "we will impose administrative penalties on persons involved in Ms. Shin's hiring through the investigation," and that "there is always the possibility of criminal punishment of these people, through charges of interference with official duties and fraud."

Ms. Shin has claimed that she received a doctorate from the Yale University faculty of art history in May 2005 for a dissertation titled "Guillaume Apollinaire: Catalyst for Primitivism, for Picabia and Duchamp."



(Gwangju = Yonhap News) Reporter Min-Woo Hyeong = Commemorative photo of Dongguk University professor Jeong-Ah Shin (left), appointed artistic co-director of the 7th Gwangju Biennale, with Okui Enwezor, head of the San Francisco Art Institute, taken in the Biennale conference room on the 4th.
minu21@yna.co.kr
(END)

Mr. Lee said that "issues were raised regarding suspicions of forgery of her doctorate and plagiarism of her dissertation at the time Professor Shin was hired in September 2005, and accordingly the Dongguk University academic human resources team sent an official request for confirmation by registered mail directly to the Yale University graduate school, and received a fax from Yale University stating that "Ms. Shin received a doctorate," and that "at the time, this fax was judged to be trustworthy, and Ms. Shin was accordingly hired."

[DONGGUK0000872]

Upright Press, Fast News: Internet Yonhap News                    Page 2/2

Regarding the fact that the response was received by fax, he explained "we had urgently requested Yale University to confirm whether or not Professor Shin's doctorate was genuine, and at the time, we believed that Yale had provided confirmation by fax for this reason," and "it would have been better if Yale had sent the document by postal mail, but at the time, a fax appeared to be sufficient confirmation of the facts."

He stated that the failure of Dongguk University to confirm the fact that the foreign doctorate which Ms. Shin claimed to have acquired had not been declared to the Korea Research Foundation (KRF) was due to the urgency of special hiring of superior personnel.

He said that while "it appears that an effort was made, in view of the urgency of special hiring by the school at that time, to hire Professor Shin first, and have her submit any missing documents later," "nonetheless, KRF is not a system for verifying degrees."

Regarding the change in Professor Shin's affiliation to the General Education Institute in March 2006, after Ms. Shin had gone on leave immediately after being hired in September 2005, in violation of the policies governing hiring of academic staff, Mr. Lee stated that "my understanding is that in general, the President can order a leave of absence. However, this matter is also under investigation."

According to the policies governing the hiring of academic staff, academic staff can go on leave only after being employed for at least 10 years, or for special reasons such as small children.

Mr. Lee stated that "an internal investigative committee was officially set up and a letter requesting confirmation of Professor Shin's doctorate was sent to the president of Yale University, by order of Dongguk University president Young-Kyo Oh, on the 5th," and "professor Shin's resignation submitted on the 25th of last month will be taken up by the Board of Trustees based on the findings of the investigative committee."

Regarding the dismissal of Trustee J, who had raised suspicions of Ms. Shin's degree forgery and dissertation plagiarism, Mr. Lee stated that "my understanding is that this was not due solely to the matter of Professor Shin."

He said that "Dongguk University will take transparent and strict personnel measures based on the findings of the investigation, and will establish a more thorough system for hiring of new academic personnel to prevent a recurrence."

solatido@yna.co.kr

engine@yna.co.kr

(END)

<Copyright © Yonhap News, Unauthorized reproduction – redistribution prohibited.>

(Posted 17:09, July 11, 2007)

Yonhap News

This report may not be reproduced in whole or in part except by contract with Yonhap News.
Copyright © 2005 YonhapNews. All rights reserved.



## 연합뉴스       🖨인쇄|🗙닫기

## 광주비엔날레 감독 신정아 교수 학위 모두 '가짜'(종합)

동국대 "예일대 박사학위 허위 확인" "진상조사후 채용관련자 조치"

(서울=연합뉴스) 임화섭 임은진 기자 = 박사학위 위조와 논문표절 의혹을 받아온 광주비엔날레 예술감독이자 동국대 교양교육원 조교수 신정아(35·여)씨의 학사·석사·박사학위가 모조리 가짜인 것으로 확인됐다.

이상일 동국대 학사지원본부장은 11일 서울 중구 동국대에서 기자회견을 열고 "예일대는 오늘 신 교수가 동국대에 제출한 예일대 미술사학과 박사학위가 허위임을 밝혀왔다. 아울러 신 교수가 예일대 학생으로 등록한 기록이 없다고 알려왔다"라고 밝혔다.

이로써 연합뉴스가 미국 캔자스 대학(University of Kansas) 등으로부터 신씨의 학사와 석사학위가 허위라는 사실을 확인한 것까지 종합하면 신씨의 학사, 석사, 박사학위 경력은 모두 가짜로 판명된 셈이다.



(광주=연합뉴스) 형민우 기자 = 4일 제7회 광주 비엔날레 공동예술감독으로 선임된 신정아 동국대 교수(왼쪽)과 오쿠이 엔위저(Okui Enwezor) 미국 샌프란시스코 미대 학장이 비엔날레 회의실에서 기념촬영을 하고 있다.

minu21@yna.co.kr
(끝)

이 본부장은 "진상조사를 통해 신씨와 채용 관련자들을 인사징계를 할 것"이라며 "업무방해와 사기 등의 혐의로 이들을 형사 고발할 가능성도 언제나 열려있다"고 밝혔다.

신씨는 그 동안 2005년 5월 예일대 미술사학과에서 '기욤 아폴리네르:원시주의, 피카비아와 뒤샹의 촉매(Guillaume Apollinaire: Catalyst for Primitivism, For Picabia and Duchamp)'란 논문으로 박사학위를 받았다고 주장해 왔다.

이 본부장은 "2005년 9월 신 교수를 채용할 당시 박사학위 위조와 논문표절 의혹에 대한 문제제기가 있어 동국대 교원 인사팀에서 확인요청 공문을 등기우편으로 예일대 대학원에 직접 발송을 했으며, 예일대로부터 '신씨가 박사학위를 받았다'는 팩스를 받았다"며 "당시로서는 이 팩스가 신뢰할 수 있는 자료라고 판단돼 신씨를 채용했다"고 말했다.

DONGGUK0000871

그는 답신을 팩스로 받은 것에 대해 "당시 동국대에서 신 교수의 박사학위 여부를 애일대 측에 긴급히 요청했으며 이 때문에 애일대에서 팩스로 확인해 온 것으로 이해했다"며 "애일대에서 우편으로 서류를 발송했으면 더 좋았겠지만 당시엔 팩스로 사실 확인이 충분히 됐다고 봤다"고 설명했다.

그는 신씨가 취득했다고 주장하는 외국 박사학위가 한국학술진흥재단(학진)에 신고되지 않았다는 사실을 임용 당시 동국대 측이 확인하지 않은 것은 우수한 재원을 특별채용하려고 서둘렀기 때문이라고 밝혔다.

그는 "당시 학교에서 좋은 분을 특별채용하려고 서두르다보니 신 교수를 우선 채용하고 미비한 서류는 추가로 제출케 하려고 했던 것으로 보인다"며 "그러나 학진은 학위를 검증하는 시스템은 아니다"고 반박했다.

이 본부장은 교원 임용과 관련한 규정을 위반해 2005년 9월 임용된 신씨가 바로 휴학한 뒤 2006년 3월부터 교양교육원으로 소속을 변경한 점에 대해선 "포괄적으로 총장이 휴직을 시킬 수 있는 것으로 알고 있다. 그러나 이 정도 조사 대상이다"라고 말했다.

동국대의 교원 임용과 관련한 규정에 따르면 이 대학 교원은 10년 이상 보직했거나 육아 등의 사유가 있을 때 휴직을 할 수 있다.

이 본부장은 "지난 5일 동국대 오영교 총장 명의로 애일대 총장에게 신 교수의 박사학위 여부를 확인해달라는 공문을 보내면서 공식적으로 교내 진상조사위원회가 꾸려진 셈"이라며 "지난달 25일 신 교수가 제출한 사표는 진상조사위의 조사결과를 바탕으로 이사회에서 수리될 것"이라고 말했다.

한편 이 본부장은 신씨의 학위위조와 논문표절 의혹을 제기한 J이사의 해임에 대해 "신 교수 사안 때문만은 아니라고 알고 있다"고 밝혔다.

그는 "동국대는 진상조사 결과에 따라 투명하고도 엄정한 인사상의 조치를 취할 것이며 앞으로 재발방지를 위해 신임교원 채용시 보다 철저한 시스템을 구축할 것"이라고 말했다.

sclatido@yna.co.kr
engine@yna.co.kr
(끝)

<저 작 권 자(c)연 합 뉴 스. 무 단 전 재-재 배 포 금 지.>                [2007-07-11 17:09 송고]



본 기사는 연합뉴스와의 계약없이 선본 또는 일부의 전재를 금합니다.
Copyright (c) 2005 YonhapNews All rights reserved.

DONGGUK0000872

## CERTIFICATE OF TRANSLATION

I, Samuel Henderson, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0000871-72 from the Korean language into the English language.

I further certify that translation of DONGGUK0000871-72 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Samuel Henderson
Professional Translator

Subscribed and sworn to before me on ___27th___ day of __July__ , _2011_ (year)

(Signature of Notary)

Official Seal
LAKETRA N. WILLIAMS
Resident of Lake County, IN
My commission expires
September 4, 2016

(Notary Stamp)

# EXHIBIT 39



# THE KOREA TIMES | Nation

News Online

- **Nation**
  Photo News
  Political Digest
  Nation Digest
  North Korea
  Foreign Affairs / Defense
  Airline News
  Obituary
- **Biz/Finance**
- **Technology**
- **Arts & Living**
- **Sports**
- **Opinion**
- **Community**
- **Special**

- **The Learning Times**
  Editorial Listening
  Easy Korean Series
  Dear Abby
  Domestic News
  Foreign News
  Screen English
  TOEIC
  Grasping Vocab

- **Jobs for Koreans**
- **Jobs for Foreigners**

2007-07-18                    

## University of Kansas Has No Record of Verification of Shin's Diplomas

The American university, a key to the "faked" doctorate scandal of a local professor, did not receive the document that Dongguk University claimed it had sent to verify her chool diplomas, it was revealed Tuesday.

As a result, questions have been flared about the contention of Dongguk that it had sent document asking the University of Kansas to verify that assistant profesor Shin Jeong-ah, 35, got bachelor's and master's degrees when she was recruited by the local university.

Todd Cohen, director of the university relations, the University of Kansas, told Yonhap news agency in an interview that there were no records that Dongguk requested for the verification at the U.S. National Student Clearinghouse, with which the university has entrusted management of academic affairs.

The clearinghouse is a non-profit organization providing agent service for academic affairs, such as verification of degrees and enrolment of students and transcripts, from some 2,900 colleges and unversities representing more than 91 percent of the total in the United States.

Yonhap quoted Cohen as saying that if Dongguk requested that the university verify academic achievements he could confirm it at the clearinghouse. But there was no such record there, Cohen was quoted as saying.

Dongguk has maintained that it has made efforts to verify Shin's academic performance, saying, "In early September, 2005, our university sent the documents asking Yale and the Kansas to confirm the academic achievements via air mail.

But the registered mail receipt Dongguk claims to preserve has no registration number and no address of the mail, except for the name of the country which might receive the document. As a result, there is no record left to neutrally confirm whether it sent the mail to Yale and Kansas.

Dongguk did not confirm even whether the document reached the universities in due time at that time.

"We have had no stones unturned but we have been unable to confirm it. It is true that the mail was sent to the U.S. but without address. As a result, it is impposible to force Yale to confirm (whether it received the document in 2005)," said an Dongguk official, who refused to be identified.

"In our university record, the U.S. was only put down as the country which received the registered mail, whchthe chief of the faculty affairs signed to send to Yale, to verify her doctorate. Although there is no address of the receiver, we believe that it might be sent to Yale," said the official.

The doubt has been growing whether Dongguk sent the document to verify bachelor's and master's degree she claims to get from the Unversity of Kansas due to remarks different by officials of the Korean university.

DONGGUK0001127

"We could not confirm (Shin's diplomas) as we did not receive answer to the inquiry we sent to the University of Kansas in early September, 2005," Lee Sang-il, chief of the academic affairs department of Dongguk told reporters in an official press conference on July 11, in the wake of the doctorate-fake scandal.

But Prof. Ahn Hyung-taek, who was the chief of the personnel affairs team between February and September, 2005, made a remark quite different from Lee's. "We did not send a mail to Kansas inquiring into her academic achievement at the outset but sent a mail to Yale, where Shin obtained her final academic degree or doctorate, for the final academic degree" Ahn said.

"At that time, we told the school that it needed more documents as there were no transcripts and others. However, 'top level' told us to wait a little," he said. However, he refused to disclose who was the 'top level.'

Meanwhile, Lee said that the university has no plan to call in the prosecution to investigate Shin's case.

"It is our basic position that we would settle down this scandal on the outcome of the investigation by ourselves rather than bringing the case to the prosecution," said Lee, adding that the media is leading the case to the prosecution's investigation.

"It is too much embarassing what to to do in the current circumstances. But there has been nothing we have decided on," he said, concerning question that Shin eventually fleed out of the country to New York. The prosecution would ban Shin from overseas trip if the university brought the case to the prosecution, critics said.

" Official papered document arrived from Yale yesterday (Monday), which will prove whether Shin's doctorate has been falsified or not," he said.

---

▷저 한국일보      스포츠한국      서울경제      소년한국일보      주간

About Times  |  Privacy Policy  |  Media Kit  |  Contact Us  |  Subscription  |  Location

사업자 등록번호 : 102-81-15074  통신사판매업 신고번호 : 제 01-2832호   대표자 : 박두중
서울 특별시 중구 중무로 3가 중무로 회의 (주)The Korea Times   FAX : 02-736-4061   홈페이지 관리자 : 인터넷 사업부

Copyright@ KoreaTimes.co.kr  All rights reserved.

DONGGUK0001128

# EXHIBIT 40

[DONGGUK0001039]

Accurate Press and Fast News Internet Yonhap News                    Page 1/2

[Logo] Yonhap News                                     🖨 Print  ☒ Close

<Dongguk University 'Investigation on Jeong Ah Shin'  "There is nothing it exposed">



(New York = Yonhap News) Hyun Joon Kim, Special Correspondent = After assistant professor Jeong Ah Shin (35) of Dongguk University, who had caused the controversy of the 'fake doctor,' arrived at John F. Kennedy Airport in New York, US, via Korean Airline flight No. KE81 from the Inchun Airport on the 16th (local time), she is leaving the airport while avoiding answering the questions from reporters concerning her feelings.

(END)

(Seoul = Yonhap News) Reported by Hwa Sop Im and Eun Jin Im = While Dongguk University announced the outcome of its internal investigation on the case of academic record forgery for professor Jeong Ah Shin on the 20th, it is not particularly different from what the press has verified and reported so far, and the 'concealment suspicion' has not been properly investigated so that such criticism has erupted that it was nothing more than giving indulgence.

In particular, it has been pointed out that it would be difficult to comprehend why Dongguk University organized its fact finding investigation committee entirely with its school personnel and did not even investigate its then-chairman Hyun Hai (Buddhist priest) to conclude that there was not any "external pressure or irregularities."

Dongguk University attempted 'verification' after the evidence suggesting that Shin's doctorate degree was a fake was acquired through a person concerned with the University Fine Arts Council in September 2005.

Nevertheless, after the document (verified to be a fake) proving Shin's doctorate degree in the name of the associate dean of the graduate school of Yale University arrived by fax on 9/22/2005, Dongguk University stated that verification on her doctorate degree was achieved and did not check its source and did not even start verification on her bachelor's and master's degrees.

[DONGGUK0001040]

While the required documents including academic records and her bachelor's, master's and doctorate degrees had not been submitted since September 2005, Dongguk University had not made it an issue until its suspicion became known by the press.

After the suspicion of academic record forgery by Shin began to spread, centered on the circle of Buddhism, from the end of last month to the beginning of this month, Dongguk University has shown doubtful movement.

In particular, chairman Yong Taik Im (Buddhist name: Young Bae) and others concerned with the School stated that "the verification process ended" after the unofficial internal investigation started, and continued to defend Shin openly.

After Dongguk University announced on the 11th that it would organize a fact finding investigation committee to initiate investigation on the incident of academic record forgery by Shin, it has not even undertaken any simple verification procedures including transmission of an official letter for inquiry on Shin's academic record, but delayed the progress.

Dongguk University sent an official letter of verification to the University of Kansas hurriedly on the 15th, after 4 days had elapsed from the time when Yonhap News received official verification from the authority of the University of Kansas and reported that Shin's bachelor's and master's degrees were faked.

The above makes one suspect whether Dongguk University had a genuine intent to determine the fact and moved too quickly.

The reason why Dongguk University has repeated such behavior that is difficult to comprehend by common sense may be easily identified from the current aspects of its fact finding investigation committee and disciplinary action committee, as has been pointed out.

Although the decisive witness statement proving forgery of Shin's academic record had emerged, its academic affairs vice president, Jin Soo Han, who is currently the chairman of its fact finding investigation committee, did not even conduct additional investigation but declared that Shin's degree was genuine.

After suspicion of the forged academic record of Shin was raised again by the circle of Buddhism, Vice President Han also attended the informal gathering held by chairman Yong Taik Im (Buddhist name: Young Bae) on the 2nd of this month to support chairman Im and protect Shin by saying, "verification of Shin's doctorate degree was completed."

A member of the fact finding investigation committee and the academic affairs support director, Sang Il Lee, reported in the board of directors' meeting on May 29, "Shin's academic degree was verified in various ways, and it was revealed that there were not any irregularities." So he contributed to dismissal of director Yoon Jang who had raised the doubt on Shin's falsified academic record.

Chairman of the disciplinary action committee and director Hak Kyu Im (Buddhist name: Young Dam) was known to drive resolution of the issue for dismissal of director Jang Yoon in the board of directors' meeting at the time, together with chairman Yong Taik Im (Buddhist name: Young Bae) and director Myung Soo Park (Buddhist name: Hye Rim).

solatido@yna.co.kr
engine@yna.co.kr
(END)

<copyright(C) Yonhap News.  Unauthorized reproduction or redistribution prohibited.>
[Manuscript sent 07/20/2007 16:58]

[Logo] Yonhap News
This article is prohibited from reproduction in whole or part without consent from Yonhap News
Copyright © 2005 Yonhap News. All rights reserved.

바른언론 빠른뉴스 인터넷 연합뉴스

 연합뉴스

🖨인쇄 | 🗙닫기

<동국대 '신정아 조사' "밝혀낸 것이 없다">



(뉴욕=연합뉴스) 김현준 특파원 = '가짜 박사' 파문으로 논란을 빚고 있는 신정아(35) 동국
대 조교수가 16일(현지시간) 인천공항발 대한항공 KE81편을 타고 미국 뉴욕의 존 F 케네디
공항에 도착한뒤 현재의 심정 등을 묻는 기자들의 질문에 대답을 피한채 공항을 빠져 나가
고 있다.

(끝)

(서울=연합뉴스) 임화섬 임은진 기자 = 동국대가 20일 신정아 조교수의 학력위조 사건에 대한 자체
조사 결과를 발표했으나 언론이 이미 확인해 보도한 내용 이외에는 별다른 것이 없고 '은폐의혹'은
제대로 조사되지도 않아 면죄부 주기에 불과한 것이 아니냐는 비판이 나오고 있다.

특히 동국대가 진상조사위원회를 전원 학내 인사로 구성하고 임용 당시 이사장인 현해 스님을 조
사조차 하지 않고 "외압이나 비리가 없었다"는 결론을 내린 것은 납득하기 어렵다는 지적을 받고 있
다.

동국대는 신씨의 박사학위가 가짜임을 시사하는 증거가 2005년 9월 대학미술협의회 관계자를 통
해 입수된 뒤 '검증'을 시도했다.

하지만 동국대는 2005년 9월 22일 팩스로 예일대 대학원 부원장 명의로 신씨의 박사학위를 증명
하는 문서(가짜로 확인됨)가 날아오자 박사학위에 대한 검증이 이뤄졌다며 출처 확인조차 하지 않았
고 학·석사 검증은 아예 시도조차 하지 않았다.

DONGGUK0001039

바른언론 빠른뉴스 인터넷 연합뉴스

필수 서류인 학·석·박사과정 성적표는 2005년 9월부터 지금까지 제출되지 않았으나 동국대는 언론보도로 의혹이 외부에 알려질 때까지 이를 문제삼지 않았다.

지난달 말과 이달 초에 걸쳐 불교계를 중심으로 신씨의 학력위조 의혹이 확산되기 시작한 뒤에도 동국대는 석연치 않은 행보를 보였다.

특히 임용택(법명 영배) 이사장 등 학교 관계자들은 비공식 내부조사가 개시된 이후에도 "검증이 끝났다"라며 신씨를 공개적으로 비호하는 발언을 계속했다.

동국대는 지난 11일 진상위원회를 구성해 신씨의 학력위조 사건 조사를 개시한다고 발표한 뒤에도 신씨의 학위 조회를 위한 공문 발송 등 간단한 확인절차조차도 하지 않은채 늑장을 부렸다.

동국대는 연합뉴스가 캔자스대 당국의 공식 확인을 받아 신씨의 학·석사학위가 가짜라고 보도한지 4일이나 지난 15일에야 부랴부랴 캔자스대 당국에 최초로 확인 공문을 발송했다.

동국대가 과연 진상 규명 의지를 갖고 신속히 움직였는지 의심케 하는 대목이다.

동국대가 이처럼 상식적으로 납득하기 어려운 행보를 거듭하고 있는 이유는 현재 진상조사위원회와 징계위원회의 면면을 보면 쉽게 알 수 있다는 지적도 나온다.

현재 진상조사위원장인 한진수 학사부총장은 신씨의 학력위조를 입증하는 결정적 증인이 나온 상황이음에도 불구하고 추가 조사조차 하지 않고 신씨의 학위가 진짜라고 공언했었다.

한 부총장은 불교계에서 신씨 학력위조 의혹이 다시 제기되자 임용택(법명 영배) 이사장이 이달 2일 연 간담회에 참석해 "신씨의 박사학위에 대해 검증을 거쳤다"라며 임 이사장을 거들고 신씨를 감싸기도 했다.

진상조사위원인 이상일 학사지원본부장은 5월 29일 이사회에서 "신씨 학위를 여러 방법으로 검증했으며 아무런 이상이 없는 것으로 드러났다"고 보고해 신씨 허위학력 의혹을 제기한 장윤 이사가 해임되는 데 일조했다.

징계위원장인 임학규(법명 영담) 이사는 당시 이사회에서 임용택(법명 영배) 이사장과 박명수(법명 혜림) 이사와 함께 징윤 이사 해임 안건 의결을 주도했던 것으로 알려져 있다.

solatido@yna.co.kr
engine@yna.co.k
(끝)

<저 작 권 자(c)연 합 뉴 스. 무 단 전 재-재 배 포 금 지.>        [2007-07-20 16:58 송고]

 연합뉴스

본 기사는 연합뉴스와의 계약없이 전부 또는 일부의 전재를 금합니다.
Copyright (c) 2006 YonhapNews All rights reserved.

DONGGUK0001040

## CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0001039-40 from the Korean language into the English language.

I further certify that translation of DONGGUK0001039-40 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_____
Kwang Park
**Professional Translator**

Subscribed and sworn to before me on ___27___ day of _July_ , _2011_ (year)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Signature of Notary)                                        (Notary Stamp)