# EXHIBIT 68

# FILED UNDER SEAL

# EXHIBIT 69

네이버뉴스 인쇄하기      인쇄하기   닫기

## Degree scandals highlight holes in hiring process

[코리아헤럴드 2007-08-10 10:02]

Reports of university professors faking their own degrees have shocked the nation this past month.

Some academics and politicians are calling out for a better organized background verification system, admitting that there are too many holes in the current procedures.

Many education experts say those in the academic field must rethink the situation and move toward creating a society which values competency and ability, rather than concentrating on the school the person graduated from.

Meanwhile, some others claim the process of hiring professors should be made transparent.

"All information must be forced to be publicized when hiring professors," said Kim Chang-yong, a professor with the school of communication and political science at Inje University. "The public should know what steps were taken to select that particular professor."

Earlier this week, Lee Chang-ha, a lecturer with the space remodeling department at Kimcheon Science College in North Gyeongsang Province, offered to resign from his teaching post after a local television program reported that his degrees were false. Lee is a famous interior designer who gained popularity after appearing on a series of national television shows that renovated houses for people in need.

Lee, who served as the head of department at KSC from 2002, said he graduated from the business administration department at the University of Suwon. He also said he was admitted to the fine arts college at Seoul National University in 1976 but that he had to give it up because of financial problems.

That wasn't the end of his lies. In his book published in 2003, he claims to have received a degree in fine arts at the New Bridge University in California by attending the school from 1992 to 1996.

However, it was found that a business administration department did not exist at

DONGGUK0001097

the University of Suwon. Lee's name did not appear in any SNU documents and the NBU was a school that was established in 1995.

In an e-mail, Lee, who is currently on a business trip in Italy, did not deny any of the suspicions held against him and agreed to step down from his post at the university.

"I truly feel sorry for my students who believed in me and depended on me with their studies but I'll resign from my current position at the school," he said. "I finished a one-year research program at Suwon University and moved on to NBU later but I wasn't successful in taking all required classes there."

This comes after the Shin Jeong-ah case, which prompted the probe of fake degrees.

Dongguk University officially fired Shin, assistant professor at the school, last week when it confirmed that she forged three degrees and plagiarized a thesis to gain employment at the university in 2005.

Shin, who has taken a long business trip to Europe, said she received a bachelor's degree and completed a Master of Business Administration at the University of Kansas, and a doctorate from Yale University School of Arts, but her name was nowhere to be found in the list of graduates at either school.

She was the youngest-ever professor to have been appointed as director of Korea's biggest bienniale art festival – the Gwangju Biennale for 2008 – earning the nickname "the art world's Cinderella."

Since then, the police have launched a probe of hagwons, focusing the investigations on areas crowded with hagwons, or private institutions, such as Gangnam, Noryangjin and Mok-dong in Seoul.

The Songpa Police Station is currently investigating 31 hagwon instructors for forging or purchasing documents such as their bachelor's degree, its officials said.

Such problems occur because the backgrounds of the nominees are often not checked thoroughly when hiring university professors or hagwon teachers, many education experts said.

The government instructs those who receive foreign doctoral degrees to report to

DONGGUK0001098

the state-run Korea Research Foundation within the first six months upon their arrival in Korea, according to officials at the foundation.

No administrative or financial restrictions are issued to those who fail to report to the body and the foundation still takes in any reports even if deadlines were not kept, foundation officials said.

A doctoral thesis, an immigration identification form and an academic record should be submitted online along with documents including a graduation certification form.

The foundation checks to confirm that the school is a certified school but the institutions are not contacted individually, foundation officials said.

Holes are found at universities as well

Universities, for instance, are allowed to set their own professor qualification standards and selection processes as long as the schools post their notice of employment a month ahead, an official at the university policy division at the Education Ministry said.

He added that one-third of the judges also have to be officials from outside the university.

A number of the universities rely on official documents sent from foreign universities to verify attendance at the school without making any direct attempts at verification.

Dongguk University was a good example. The university received a document from Yale University stating that Shin was a graduate of that school. It was sent from a Yale University fax number but found out later to be fake.

However, no clear solutions for the situation are being provided at this point.

KRF is looking into requesting foreign universities to send official documents such as academic records - of those who completed doctoral studies abroad - directly to the foundation, but more discussion is needed regarding this issue, foundation officials said.

"In order for us to sufficiently review the doctoral degree system of foreign universities and figure out whether it's a fake or a real degree, we will need more

DONGGUK0001099

time, budget and people on staff," the foundation officials said.

A change of attitude for educators will be another starting point, Kim said.

"Forgery and plagiarism are the biggest enemy for educators regardless of their true competencies," he added. "We won't be able to step up to become an advanced nation unless the society realizes that being fake is equal to giving up the job as an educator."

By Cho Ji-hyun

(sharon@heraldm.com)

---

✿ 이 기사 주소 : http://news.naver.com/news/read.php?mode=LOD&office_id=044&article_id=0000066561

---

[🖨 인쇄하기]   [닫기]

DONGGUK0001100

# EXHIBIT 70

[DONGGUK0000141]

Dongguk University Chairman, 'openly sides with' Jeong Ah Shin

 <Buddhist priest Young Bae>

<u>This Newspaper obtained the minutes of the board of directors' meeting</u>

"Met with Shin and listened to her explanation… I'll take responsibility if it is a fake"
Buddhist priest Jang Yoon who raised the question on 'faked academic degree' is pushing for her dismissal

It was found on the 4th that after the issue of the 'faked academic degree' of Jeong Ah Shin (35, F) had been presented at Dongguk University, Dongguk University Foundation chairman Buddhist priest Young Bae [in photograph] stepped forward to side with Shin in person and even met with Shin in person in the process of the 'faked academic degree' controversy.

Further, it was revealed that Buddhist priest Young Bae actively drove dismissal of the director Buddhist priest Jang Yoon who first presented the issue of the faked academic degree of Shin in the board of directors' meeting in spite of objections raised by some directors. Accordingly, suspicion is being raised about the background concerning why the chairman stepped forward to meet with Shin in person instead of the University officials or its president, and also unreasonably sought to dismiss Buddhist priest Jang Yoon as well.

The above fact was revealed from the minutes of the 228th board of directors' meeting of Dongguk University held on May 29 when the 'faked academic degree' issue became a controversy. According to the meeting minutes obtained exclusively by this Newspaper, regarding the claim made in the meeting by Buddhist priest Jang Yoon that "Shin is not on the list of doctorate degree holders of Yale University," Buddhist priest Young Bae sided with Shin saying that "(Shin is not on the list of doctorate degree holders) because it was checked based on our standards." Further, Buddhist priest Young Bae disclosed, "I had an interview with the person involved (Shin)," suggesting that he had met with Shin in person and listened to her explanation in the process of the faked academic degree controversy.

In relation with the above, a person concerned with Jogye Order of Dongguk University disclosed, "I understand that Buddhist priest Young Bae had met with Shin in person one day prior to the board of directors' meeting."

Buddhist priest Young Bae said, "(If Shin's academic degree is found to be a fake) I'll take responsibility," and sided with Shin mentioning the responsibility of the chairman.

Buddhist priest Young Bae was forcefully driving the issue of dismissal by 'taking the responsibility for it' in the voting process of dismissal of Buddhist priest and director Jang Yoon while some directors suggested, "After (Shin's faked academic degree) is verified again, let's handle (the dismissal issue) in the next board of directors' meeting." This Newspaper attempted to call Buddhist priest Young Bae, but he could not be reached.

In the minutes, the academic affairs support director of Dongguk University, Sang Il Lee, said, "There is absolutely no problem with Shin's academic degree. It was verified with the school registrar of Yale University directly and a document of verification was also received." Nevertheless, it was revealed that while Dongguk University had officially requested an academic record inquiry on Shin from Yale University on 9/6/2005, an official answer was not received. Instead, on September 22 of the same year, it received the faked certificate of academic degree and faked academic record (graduation certificate) by fax, on forms that were different from those used at Yale University.

Buddhist priest Jang Yoon, who was known to have been asked by the director of policy implementation in Chungwadae, Yang Kyung Byun, 'not to make an issue' in the process of the faked degree controversy of Shin, submitted the minutes of board of directors meeting to the trial requesting for 'provisional disposition of director dismissal prohibition' against Dongguk University held in early July and prevailed, so became reinstated as its director.

Reported by in Dong Lee [illegible]
Reported by Sang Jin Chang [illegible]

Client Doc

A10  2007년 9월 5일 수요일 4판  사회  조선일보

# 동국대 이사장, 신정아씨 '노골적 두둔'

본지, 이사회 회의록 입수

"신씨 만나 해명들어… 가까워 내가 책임져"
'가짜 학위' 제기한 장윤스님 해임 밀어붙여



장병욱 기자

## 교육부 '내신반영 제재 방침' 왜 말 바꾸나

# 말 안듣는 사립대 '손보기'

이준혁 기자

### 2008학년도 대학입시 내신 논란 일지

## "로또 神내렸다" 14억 챙긴 무속인

'당첨' 미끼로 금품 꾸던 7명 속여



고객으로부터 돈을 받아내며 점을 쳐 주는 장면이 담겨 있는 동영상의 한 장면. /SBS 화면 캡처

신현묵 기자

## 정성진 신임 법무 "大選 중립 전력"

## 진수희 의원 기소

청와대 명예훼손 혐의

## '高3대비 전국 모의고사' 16일 실시

현대드림투어
02) 723-2233

가족과 함께 즐기는 일본전세기 여행
출·발·일 9/21, 9/22, 9/23

H 종 국
H 유 럼
H 동남아
H 남태평양
H 미 주

DONGGUK0000141



# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0000141 from the Korean language into the English language.

I further certify that translation of DONGGUK0000141 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_____
**Kwang Park**
**Professional Translator**

Subscribed and sworn to before me on ___27___ day of __July__ , _2011_ (year)

_____
(Signature of Notary)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Notary Stamp)

# EXHIBIT 71

[DONGGUK0000984]

Jeong Ah Shin, Goes Into Hiding after Returning Home

Dongguk Univ., requests for dismissal from its Foundation… Disciplinary action committee meeting on the 27th
'Fake academic degree' dissertation, publication contract with domestic company.

It became known that professor Jeong Ah Shin (F, 35), who has caused criticism due to her faked Yale University doctorate degree, secretly returned home last week. Professor Shin has cut off any contact with the outside world and gone into hiding.

According to those concerned with the police and the airport, a woman who had the same name and date of birth as those of professor Shin arrived at the Inchun Airport from France via an Air France flight around 7:30 AM on the 12th. On the same day, appointment of professor Shin as the co-director of Kwangju Biennale was withdrawn, and on the following day, Dongguk University officially announced the fact that professor Shin's doctorate degree was a forgery. At present, professor Shin has turned off her cellular phone and is not receiving any calls. It was confirmed that she moved out from her known address of a villa in Daisin-dong, Seodaimun-ku, Seoul about 5 months ago.

Academic affairs support director Sang Il Lee of Dongguk University disclosed, "In order to deliver a written request for attendance to professor Shin on the 16th, her whereabouts are being identified but no contact has been made yet." Dongguk University submitted a request for dismissal regarding professor Shin from its Foundation in the name of president Young Kyo Oh on the 14th. A board of directors' meeting surrounding this issue is scheduled to be held on the 20th before the disciplinary action committee meeting, which is scheduled on the 27th. Further, Dongguk University is known to have requested an investigation of professor Shin from an investigation agency.

It was verified that Dongguk University, which is conducting a fact finding investigation on the appointment process of professor Shin, found the receipt for the international mail sent to Yale University by Dongguk at the time in September 2005. It has been determined that the fax that had been verified to be a 'fake' had not been manipulated in Korea. In relation with this, the spokesperson of Yale University and assistant manager of its public relations office, Gila Reinstein, disclosed during the interview with the domestic press, "I have not been notified by the headquarters about what type of fact finding investigation will be additionally conducted," to indicate that Yale University might not conduct an additional fact finding investigation on the "faked" fax (written verification of academic record) of professor Shin.

However, director Sang Il Lee revealed, "Because the president's office clearly indicated its position that an internal investigation on the fax would be conducted, an answer will be given after waiting [illegible.]"

On the other hand, it was revealed that professor Shin had signed a contract with a large domestic publisher to publish the Korean edition of her Yale University doctoral dissertation about year ago."

Reported by Kyun Hyun Lee [illegible]
Reported by Nyun [illegible]

Cliᴇnt Doc ⑪-6

A8   2007년 7월 10일 월요일   제9호   조선일보   사회

# 親北문건 수백건 인터넷 올린 30代 체포

운동권 출신… 촛불선전기관 사이트로 자료 다운받아
올해 대선 앞두고 '反한나라당 세대 결집' 내용 담아



## 약대 편입 실패 명문대 졸업생 자살



### 아기 60명 키운 '엄마'

### 신정아씨, 귀국후 잠적

동국대·재단에 피면 요청… 27일 징계철
'가짜학위' 논문 국내 업체와 출판계약도

### 태풍은 비켜갔지만… 오늘 전국 장맛비

장미전선 이틀째로 물러갔다





### 탈모, 그대로 멈·춰·라

현대약품(주)

탈모치료, 가장 궁금한 점 7가지!

Q1. 정말 머리가 나나요?

Q2. 현상유지도 가능한건가요?

Q3. 유전성이 아닌 탈모에도 효과가 있나요?

Q4. 마이녹실 바르고 머리를 다시 길어야하나요?

Q5. 마이녹실, 약국에서 구입할수있나요?

Q6. 탈모의 환경때문무서 있는 여성분도, 마이녹실해도되나요?

Q7. 마이녹실 3%, 5% 둘 중에 뭐가 좋은가요?

마이녹실



DONGGUK0000984

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0000984 from the Korean language into the English language.

I further certify that translation of DONGGUK0000984 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_Kwang Park_
**Kwang Park**
**Professional Translator**

Subscribed and sworn to before me on _____27_____ day of _July_ , _2011_ (year)

_Frances Fuentes_

(Signature of Notary)

```
*************************************
*  *         FRANCES FUENTES       *
*  M            COMM #1849867       *
*  S       NOTARY PUBLIC - CALIFORNIA *
*  C          RIVERSIDE COUNTY      *
*  1   My Commission Expires May 18, 2013 *
*************************************
```

(Notary Stamp)

# EXHIBIT 72

[DONGGUK0000139]

A10 September 4, 2007 Tuesday           Society           Chosun Ilbo No. 25965

**Are Prosecutors Reluctant to Investigate Jeong-Ah Shin Case?**
**Despite political involvement, assigned to regular criminal prosecutor, not special prosecutor**

**Ms. Shin may have sent the "fake Yale fax"**

Some are claiming that although a series of circumstances in the course of the Jeong-Ah Shin fake degree scandal, including the involvement of Blue House policy chief Yang-Gyun Byeon in the cover-up, point to political protection of Ms. Shin, the prosecutor's response is inappropriate, assigning the case to a criminal division that processes criminal litigation and indictments. Although suspicions of political involvement are growing louder, the prosecutors' investigation continues to focus only on Ms. Shin's fake degree and the professorial hiring process.

A highly-placed person in the prosecutor's office stated on the 3rd that "with it being only a charge of interference with duties, in Ms. Shin's absence, there is no reason for investigation by a special division."

However, a former prosecutor and attorney retorted that "of course the Seoul district prosecutor's special division needs to be involved when suspicions of political protection have been raised." A lawyer in Beopjo Town, Seocho-dong, Seoul said "it's inappropriate to rule in advance that this is only a case of interference with duties, without conducting an investigation," and "it's incomprehensible that they would assign a case with suspicions of political protection to the criminal division."

An attorney and former special prosecutor explained, "there is a strong likelihood of political involvement in both the process of Ms. Shin's hiring at Dongguk University and her selection as a director of the Gwangju Biennale, and if she is being protected, it is likely to be by one person, so it is inappropriate for these to be examined separately by the Seoul Western District prosecutor and the Gwangju District prosecutor," and "it seems as if the prosecutor's office is finding this troublesome in some way." This has been unfavorably compared to the swift investigation of Grand National Party candidates, when it was said that "we will declare the genuine truth and present the people with a basis for decision-making." An attorney and former prosecutor indicated that "if Secretary Byeon was involved in the Dongguk University hiring and Gwangju Biennale director selection processes, this could constitute a charge of abuse of power against a high-ranking public official; it's peculiar to assign that to the criminal division,"

continuing, "I don't understand why a special prosecutor doesn't investigate promptly, as they did in the case of the Grand National Party candidates." This attorney also said, "It's likely that the delay in bringing charges until Ms. Shin fled to the USA was secretly arranged between the forces protecting her and the complainant; this needs to be clarified through an investigation."

The Seoul Western District prosecutor's office announced that on September 22, 2005, when Dongguk University received a fax stating that "Ms. Shin's doctorate is authentic," Ms. Shin was not in Korea, and that they were investigating the possibility that she might have sent the fake fax from America herself. According to the prosecutors, it has been confirmed that Ms. Shin left Korea for Paris, France on September 15, 2005, and after about ten days, entered the US at New York.

Reporter Jin-Dong Lee jaydlee@chosun.com
Reporter Woo-Sung Kim raharu@chosun.com



A10　2007년 9월 4일 화요일 다　　　　　　　　社會　　　　　　　　조선일보

# 검찰, 신정아 사건 수사에 몸사리나

### 권력개입 정황정후 특수부 아닌 형사부 배정
### '가짜 예일대 팩스' 보낸 것도 신뢰성 가능성

## "학교도 경영컨설팅 필요… 교원평가제 하자
## 전교조, 학생 잘 가르치자는 초심 되찾아야"

### 현직 전교조 교사 '학교 기조든' 출간

## 2억 수회 교육부 간부, 구두밑창에 차명통장 숨겨



## 김성호 법무장관 의원실 '봉기껍' 소신 대시 발휘



## 귀 막고 입 닫은 이택순 경찰청장

### 한화·황총경사 등 입장 곤란한 브리핑 취소

## 올여름 열대야 예년의 2배

### 강수량은 작은 편… 폭우 내린 남은 더 많아



## 2007 대학평가 종합 최우수(대학 선정

# 꼭! 필요한 人 딱! 맞는 材

남서울대학교는
세상이 먼저 찾는 인재(人材),
세상이 손짓하는 인재(人材)를 키워 갑니다.

## 2008 수시2 신입생 모집

원·접수·면접 : 2007. 9. 7(금) ~ 18(화)
・합 격 : 2007. 9. 17(월) ~ 19(수)
입학상담 · TEL : (041)580-2250~9
・URL : www.namseoul.net

## 섬기는 리더
# 남서울대학교

## CERTIFICATE OF TRANSLATION

I, Samuel Henderson, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0000139 from the Korean language into the English language.

I further certify that translation of DONGGUK0000139 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Samuel Henderson
Professional Translator

Subscribed and sworn to before me on _____ day of _____, 2011 (year)

_____
(Signature of Notary)

Official Seal
LAKETRA N. WILLIAMS
Resident of Lake County, IN
My commission expires
September 4, 20__
(Notary Stamp)

# EXHIBIT 73

## Articles That Allegedly Harmed Dongguk's Reputation

Dongguk has identified the 58 documents in the table below as "a complete listing of all newspaper articles or other media reports that harmed Dongguk's reputation" (Ex. 74 at 9-11) and as "all newspaper articles or other media reports that criticized or vilified Dongguk University or harmed Dongguk University's reputation." (Ex. 80 at 22-25.) Since there is no evidence showing that Yale published defamatory falsehoods concerning Dongguk with actual malice, the information in the table demonstrates that Yale is entitled to judgment as a matter of law on all of Dongguk's claims.

| Document | Statement(s) Attributed to Yale | Evidence that Yale Made Statement(s) | Evidence that statement(s) are false | Are statement(s) of and concerning Dongguk? | Are statement(s) defamatory toward Dongguk? | Evidence that statement(s) made with actual malice |
|---|---|---|---|---|---|---|
| DONGGUK0000851* (Ex. 21.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000920; YALE00000178 (Ex. 138.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000923* (Ex. 37.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001548* (Ex. 139.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0002001* (Ex. 140.) | Gila Reinstein asked, "What on Earth is going in on in Korea?" | None. | N/A | N/A | N/A | N/A |
| YALE00000753 (Ex. 141.) | Gila Reinstein said that "no student by the name of Jeong Ah Shin ever enrolled in any courses or obtained a doctorate degree from Yale." | (Ex. 27 at 1.) | None. | No. | No. | None. |
| DONGGUK0000931* (Ex. 142.) | None. | N/A | N/A | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| DONGGUK0000951* (Ex. 143.) | Christine Mehring said, "It's not mine (The signature on the sheet you sent is NOT mine)." | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001357; YALE0000372* (Ex. 144.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001550; YALE00000180* (Ex. 145.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001784; YALE0000183* (Ex. 146.) | "Yale issued a terse statement yesterday stating that Shin did not graduate with a doctorate in 2005, as she had claimed, and had, in fact, never been registered with the university at all." | None. | N/A | N/A | N/A. | N/A |
| DONGGUK0000963; YALE0000187* (Ex. 147.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000969* (Ex. 148.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000971 (Ex. 149.) | Gila Reinstein said, "The document has a different form from that of Yale University's official certificate. The document is a fake." <br><br> Gila Reinstein said, "I couldn't contact Pamela | None. | N/A | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Schirmeister, associate dean of Yale's Graduate School, whose signature was on the faxed document. However her assistant said Prof. Schirmeister had never signed her name to such a document. | | | | | |
| YALE00000186* (Ex. 150.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000974* (Ex. 151.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001200* (Ex. 152.) | Gila Reinstein said, "I have not received any orders from the school's headquarters for a supplementary investigation into this case."<br><br>Gila Reinstein said, "We already revealed that Shin was not a Yale student through a precise investigation. This is the biggest outcome of our investigation."<br><br>Gila Reinstein said, "I think there are many ways to make people believe that it was faxed | None.<br><br><br><br><br>None.<br><br><br><br><br><br>None. | N/A<br><br><br><br><br>N/A<br><br><br><br><br><br>N/A | N/A<br><br><br><br><br>N/A<br><br><br><br><br><br>N/A | N/A<br><br><br><br><br>N/A<br><br><br><br><br><br>N/A | N/A<br><br><br><br><br>N/A<br><br><br><br><br><br>N/A | N/A<br><br><br><br><br>N/A<br><br><br><br><br><br>N/A |

| Document | Statement | | | | |
|---|---|---|---|---|---|
| DONGGUK0001758* (Ex. 41.) | "from Yale University. Even if it was faxed from Yale University, it is very true that the document was a forgery that were [sic] not issued by Yale University." | None. | N/A | N/A | N/A |
| DONGGUK0000994 [sic – 995] (Ex. 153.) | "Yale also said the fax that supposedly confirmed Shin's credentials was a fake." | None. | N/A | N/A | N/A |
| DONGGUK0001009* (Ex. 154.) | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001010* (Ex. 155.) | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001013* (Ex. 156.) | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001127* (Ex. 139.) | None. | N/A | N/A | N/A | N/A |
| YALE00000771 (Ex. 157.) | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001016* (Ex. 158.) | Christine Mehring said, "I have never heard of any such student (Jeong-Ah Shin) or any such dissertation (the fake doctoral dissertation that Ms. Jeong-Ah Shin submitted to Dongguk University at the time of her hiring)." (Ex. 188 at 2.) | None. | No. | No. | None. |

| | | | | | |
|---|---|---|---|---|---|
| DONGGUK0001030* (Ex. 62.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001039* (Ex. 40.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001041* (Ex. 159.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001042; YALE00000204* (Ex. 160.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001052* (Ex. 161.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001050* (Ex. 162.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001564* (Ex. 163.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001092; YALE00000208* (Ex. 164.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000079* (Ex. 165.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001101* (Ex. 166.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000108* (Ex. 167.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001393* (Ex. 168.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001135* (Ex. 169.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001328 (Ex. 134.) | "A Yale spokeswoman, Gila Reinstein, said the University has no record of Shin ever attending the University." | N/A | N/A | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| | "A University spokesperson said the alleged facsimile was not in the typical format used by Schirmeister to confirm the alumni degrees and did not even spell the dean's name correctly." | (Ex. 30 at 2.) | None. | No. | No. | None. |
| | "Meanwhile, the degree Shin presented as her own 'has flagrant errors,' Reinstein said. Although it was dated 2005, the year Shin claimed to have received her doctorate, the signature on the diploma was that of former president Howard Lamar, who left office in 1993, Reinstein said." | None. | N/A | N/A | N/A | N/A |
| | "Reinstein said she has not yet come to Yale as promised." | None. | N/A | N/A | N/A | N/A |
| DONGGUK0000146; YALE0000235* (Ex. 170.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000142* (Ex. 171.) | None. | N/A | N/A | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| DONGGUK0000168* (Ex. 172.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000365* (Ex. 173.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000535* (Ex. 174.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001119[1] (Ex. 57.) | "Yale University said on September 21 that Shin Jeong-ah did not register as a student, did not attend any classes, and did not receive a doctoral degree. The university revealed that all documents supporting Shin's assertion of receiving a doctoral degree at Yale University were forgeries." | (Ex. 56 at 1.) | (Ex. 24 at 2.) | No. | No. | None. |
| | "Yale University said the university didn't allow private teachers to write papers, mentioning 'Any student has to write a thesis by him/herself in order to receive a doctoral degree at Yale University; moreover the paper should be | (Ex. 56 at 1.) | None. | No. | No. | None. |

---

[1] Dongguk has admitted that this article, which did not even mention Dongguk, did not harm its reputation. (Ex. 34 at 216-17.)

| | | | | | | |
|---|---|---|---|---|---|---|
| creative.'" "Yale University revealed, 'there is no person named John Tracey in the art history department. In addition, the university said, 'Yale has no relationship with brokers and the concept of broker is alien to Yale University.'" | None. | (Ex. 56 at 1.) | None. | No. | No. | None. |
| DONGGUK0000993* (Ex. 175.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001330* (Ex. 176.) "[T]he University said there is no record of her ever attending Yale." | None. | N/A | N/A | N/A | N/A | N/A |
| "She never came, and the University does not believe she ever matriculated at Yale, University spokesman Tom Conroy said in an e-mail Monday." | None. | N/A | N/A | N/A | N/A | N/A |
| "The document did not even spell 'Schirmeister' correctly, a University spokeswoman said." | None. | N/A | N/A | N/A | N/A | N/A |
| "The degree Shin allegedly concocted was | None. | N/A | N/A | N/A | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| | flawed, Yale officials said when the scandal broke." | | | | | |
| DONGGUK0001650* (Ex. 177.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0001332 (Ex. 178.) | "A Yale spokeswoman repeated Wednesday that there is no record of Shin's ever having attended the University." | None. | N/A | N/A | N/A | N/A |
| | "That fax was apparently a fabrication, too, and misspelled 'Schirmeister', according to a University spokeswoman." | None. | N/A | N/A | N/A | N/A |
| DONGGUK0000709* (Ex. 179.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000717* (Ex. 180.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000725* (Ex. 181.) | None. | N/A | N/A | N/A | N/A | N/A |
| YALE0000335* (Ex. 182.) | "In July, however, when suspicions over Shin's document forgery rocked South Korea, Yale said the fax was fake and Shin was never registered as a student there." | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001186* (Ex. 183.) | None. | N/A | N/A | N/A | N/A | N/A |
| DONGGUK0000795* | None. | N/A | N/A | N/A | N/A | N/A |

| (Ex. 184.) | | | | | |
|---|---|---|---|---|---|
| DONGGUK0001007* (Ex. 185.) | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001302* (Ex. 186.) | None. | N/A | N/A | N/A | N/A |
| DONGGUK0001749*[2] (Ex. 187.) | "Yale mistakenly announced to media that the fax it sent on September 22nd was a fake made by DGU." | None. | N/A | N/A | N/A | N/A |
| | "Gila Reinstein replied that the fax which had been delivered to DGU on 22 September was inauthentic on the ground that the certificate design of Shin's was totally different from that of Yale." | None. | N/A | N/A | N/A | N/A |
| | "Also professor Schirmeister's assistant said Schirmeister had never signed nor sent a confirmation document to DGU." | None. | N/A | N/A | N/A | N/A |

---

[2] This article is not actionable because it was published by Dongguk. (Ex. 52 at 163.) See Cweklinsky v. Mobil Chem. Co., 267 Conn. 210, 218 (2004) (no claim for self-publication defamation exists).

\* = Dongguk does not claim that these articles contain any false statements made by Yale. (See Ex. 74 at 11-13 (containing "a complete listing of all newspaper articles or other media reports that contained false statements by Yale or its employees"); Ex. 80 at 26-28 (identifying "all documents that [Dongguk] contend[s] contain false statements that Yale University made concerning Dongguk University").)

# EXHIBIT 74

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DONGGUK UNIVERSITY, | Civil Action No. 3:08-CV-00441-TLM |
| Plaintiff, | |
| v. | |
| YALE UNIVERSITY, | |
| Defendant. | |

## DONGGUK UNIVERSITY'S DAMAGES ANALYSIS

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure ("FRCP") and the May 25, 2010 Order of Magistrate Judge Holly Fitzsimmons (Dkt #158), Plaintiff Dongguk University ("Dongguk") hereby submits the following Damages Analysis.

### I.        BACKGROUND FACTS

This case centers around the false statements and allegations made by Yale University ("Yale") to the Korean media in a university-wide cover-up of its negligent and reckless behavior, in denying that it ever provided Dongguk with a statement confirming that it had awarded a Ph.D. to Jeong Ah Shin ("Shin"). Dongguk has asserted against Yale claims of: (i) negligence, (ii) reckless and wanton conduct and (iii) defamation.

Specifically, Dongguk asserts that Pamela Schirmeister ("Schirmeister"), an Associate Dean in Yale's Graduate School of Art and Sciences, failed to follow Yale's protocols for verifying post-graduate degrees purportedly awarded by Yale. Dongguk also asserts that Schirmeister violated Yale's protocols and, as a consequence, authenticated what turned out to be a forged document that Shin had provided to Dongguk as proof that she received a Ph.D. from Yale.

Dongguk also asserts that beginning in July 2007 and throughout September 2007, Yale, through its Office of Public Affairs ("OPA"), in its initial media campaign, made a series of false and defamatory statements when it informed the Korean media that Yale had not verified Shin's degree and that Dongguk had never asked Yale to verify Shin's Ph.D. Dongguk further asserts that Yale compounded its wrongful behavior by failing to correct its false statements even after Dongguk provided Yale it with proof that Yale's statements to the Korean media was false.

### II.       STANDARDS REGARDING DAMAGES

#### A.        Libel Per Se

At the outset, it is important to note that a defamatory statement that injures a plaintiff in its profession or calling is libel *per se*. *See* Sec. 146, Wright, Fitzgerald, Ankerman, *Connecticut Law of Torts*, 3d. Ed. (1991) (a defamatory statement that imputes "improper conduct or lack of

skill or integrity in a profession or business" is libel *per se*). Accordingly, special damages do not have to be pleaded nor proved. *Id*. Thus, a jury will have wide latitude in determining the amount of Dongguk's damages.

### B.    Standards For Economic And Non-Economic Damages

A jury can award economic damages for defamation based on evidence submitted by a party. *Cantu v. Flanigan*, 341 Fed. Appx. 694, 696 (2d Cir. 2009) (upholding $38 million economic damages award).

Courts have held that "in calculating non-economic damages in a defamation case . . . a jury may properly consider a number of factors" including:

> (i) the plaintiff's standing in the community;
>
> (ii) the nature of the defendant's statements made about the plaintiff;
>
> (iii) the extent to which the statement were circulated;
>
> (iv) the tendency of the statement to injure a person such as the plaintiff;
>
> (v) all of the other facts and circumstances in the case. *Cantu v. Flanigan*, Civ. No. 05-3580, 2010 WL 1486433, at *6 (E.D.N.Y. Apr. 14, 2010) (affirming jury's award of $150 million for non-economic damages).

Thus, a jury will have wide latitude in determining the amount of Dongguk's non-economic damages.

*     *     *     *

Based upon our review of the facts and analysis of the injury suffered by Dongguk, we have determined that the damages suffered by Dongguk fall into three distinct categories:  (i) economic damages, (ii) non-economic damages, and (iii) punitive damages.

## III.    ECONOMIC DAMAGES

### A.    Government Grants

Two research project applications submitted for the Humanities Korea Support Grants ("HK Grants") were rejected in the fall semester of 2007 despite the fact that Dongguk had superior qualifications compared to other applicants. The first project was titled "East Asian Buddhism—Interchange, Consilience and Synergy," initiated by Dongguk's Korea Buddhist Research Institute. The second project was titled "Discovery and Creation of Cultural Identity of Korean Nation in the Age of Globalization," initiated by Dongguk's Cultural Research Center.

As a Buddhist academic institution with over 100 years of history, Dongguk is one of the leaders in the field of Buddhist studies. The Korea Buddhist Research Institute was established in 1962 and is known for its active involvement in academic research and the quality of its articles that have been published over the last 45 years. Its journal, Buddhist Bulletin, was selected as one of the leading journals in the field by Korea Research Foundation, the government institution that in fact initiated and ultimately awarded the HK Grants in 2007. The

2

Korea Buddhist Research Institute is the only Buddhist research institute in Korea that have held over ten international symposiums since 2002.

In comparison, the Buddhist Culture Research Center of Geumgang University, who was the actual recipient of the HK Grants in 2007, is still in the early stage of its development. The Buddhist Culture Research Center was established in 2003 and had published just one issue of journal at the time of application.

Both of the applications were turned down in the fall semester of 2007. Dongguk's applications were rejected at the first preliminary review stage in September 2007. The impact of the loss of the two major grants was significant, at $8 million each. Accordingly, Dongguk lost a total amount of 16,000,000,000 Korean Won. Using a currency conversion rate of 1 U.S. Dollar : 1,000 Korean Won, this loss amounted to $16 million.

**B.      Donations**

**1.      Background**

As a result of Yale's inaccurate statements to Dongguk and the media concerning Dongguk's efforts to contact Yale and verify Jeong Ah Shin's Ph.D. allegedly awarded by it, the amount of corporate and individual donations provided to Dongguk has decreased.

In February 2007, Dongguk appointed Youngkyo Oh President of Dongguk. President Oh is the former Chairman of the Korean Trade-Promotion Agency, the former Vice Minister of Commerce, Industry and Energy and the former Minister of Government Administration & Home Affairs. Typically, universities in Korea experience a significant increase in donations when the university hires a former CEO with expertise in business management as its new president. One of President Oh's major goals was to raise $100 million in donations through various campaigns over the four (4) year period of his term (from 2007 to 2010).

Despite President Oh's efforts, the amount of pledged donations actually received decreased after Yale's misstatements about Dongguk were widely reported in the media. In fact, as a result of the stain on Dongguk's reputation, a majority of donors have revoked their promises, resulting in a 50% decrease in the amount of donations that were actually received. Such a large-scale reduction in donation amount in such a short period is unprecedented in Dongguk's history.

*Unit: Million Dollars

| Year | 2007 | 2008 | 2009 | 2010 | Total |
|------|------|------|------|------|-------|
| Goal | 20 | 20 | 30 | 30 | 100 |
| Amount Received | 6.3 | 10.2 | 21.3 | --- | 37.8 |
| Percentage (%) | 31.5% | 51% | 71% | --- | |

<Amount of Donation in Comparison to the Goal>

The chart below, which summarizes the pledged amount and the amount received for each accounting year from 1998 until 2009, reflects the difficulties Dongguk has experienced in raising donations as a result of the Shin incident despite President Oh's active involvement in donation campaigns since 2007. The calculation of the amount received is based upon the amount received for each accounting year, regardless of when the corresponding pledge for the received amount has been made.

3

*Unit: 10,000,000 won (rounding off to the unit amount)

| Category | Donors | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pledged | Alumni | 31 | 30 | 49 | 279 | 60 | 114 | 144 | 125 | 144 | 130 | 205 | 304 |
| | Corporate | 134 | 111 | 66 | 108 | 107 | 92 | 41 | 255 | 521 | 251 | 1,108 | 288 |
| | Others | 298 | 173 | 387 | 363 | 397 | 260 | 117 | 292 | 169 | 328 | 309 | 1,884 |
| | Total | 463 | 314 | 502 | 750 | 564 | 466 | 302 | 672 | 834 | 709 | 1,622 | 2,476 |
| Received | Alumni | 19 | 25 | 45 | 53 | 100 | 69 | 128 | 72 | 90 | 104 | 110 | 182 |
| | Corporate | 166 | 115 | 66 | 116 | 105 | 83 | 38 | 166 | 324 | 324 | 666 | 308 |
| | Others | 280 | 127 | 365 | 379 | 291 | 187 | 154 | 158 | 178 | 228 | 241 | 1,754 |
| | Total | 465 | 267 | 476 | 548 | 496 | 339 | 320 | 396 | 592 | 656 | 1,017 | 2,244 |

<Donations Pledged and Received Every Year>

## 2. Individual Campaigns

The graph below provides an example of the loss of proposed donations from three major campaigns during 2007.

| Campaign Name | Amount Pledged By Donors (Won) | Amount Received from Donors (Won) | Amount in Lost Donations (Won) |
|---|---|---|---|
| Buddhist Youth Leaders Education Fund | 90,000,000 | 80,000,000 | 10,000,000 |
| Tuition Donation for Dongguk Juniors | 520,000,000 | 200,000,000 | 320,000,000 |
| COME TOGETHER with 108 Project | 2,600,000,000 | 500,000,000 | 2,100,000,000 |
| TOTAL | 3,210,000,000 | 780,000,000 | 2,430,000,000 |

<Result of Donation Campaigns in 2007>

Thus, for these three campaigns alone, Dongguk's lost donations was $2,430,000.

Dongguk also launched the 100th Year Anniversary Development Fund Campaign from 2005 until 2006 with donors' promises to be fulfilled in subsequent years. Instead, many pledges have not resulted in fulfillment. As shown in the chart below, only 67.8% of the pledged donation amount has been received by Dongguk.

4

| Accounting Year | 2005 | 2006 | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|---|---|
| Pledged (Won) | 2,400,000,000 | 3,340,000,000 | 70,000,000 | 0 | 0 | 5,810,000,000 |
| Received (Won) | 560,000,000 | 2,560,000,000 | 410,000,000 | 100,000,000 | 310,000,000 | 3,940,000,000 |

< 100th Year Anniversary Development Fund Campaign Result>

Thus, Dongguk's lost donations for this campaign was at least $1,870,000.

In August 2007, Dongguk had planned to launch the Dongguk President Members Campaign, President Oh's most ambitious campaign, aimed at large donations from Dongguk alumni. However, as a result of the extremely negative response from its alumni, Dongguk was forced to cancel the campaign entirely.

A significant decrease in the donation amounts received is also reflected in donation campaigns aimed at smaller amount donations from students, alumni, and other interested people. For example, the Tuition Donation Campaign was held from March 2006 until the end of 2007. As shown in the chart below, which is based on the amount pledged and received for each accounting year, there was a noticeable decrease in both the pledged amount and the amount received in 2007.

| Accounting Year | 2006 | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|---|
| Pledged (Won) | 430,000,000 | 90,000,000 | 0 | 0 | 520,000,000 |
| Received (Won) | 130,000,000 | 70,000,000 | 50,000,000 | 30,000,000 | 280,000,000 |

Dongguk's lost donations for this campaign was another $340,000. While this loss appears to be small in comparison to larger campaigns, it reflects the fact that many individuals who otherwise would have supported Dongguk no longer do so.

### 3.    Cancelled Donations And Cancelled Pledges

In addition, several donors have informed Dongguk that they chose not to donate to Dongguk or cancelled their pledged donations because they believed Yale's misstatements.

Three donors have told Dongguk that they decided not to make donations to Dongguk in the following amounts:

- Jin Sik Cho:  5 billion Korean won ($5 million)
- Joon Hyung Park:  4.5 billion Korean won ($4.5 million)
- Hyun Jung Kang:  1 billion Korean won ($1 million)

Two other alumni have cancelled their pledged donations to Dongguk in the following amounts:

- Mr. Oh Hyun Kim:  500 million Korean won ($500,000)
- Jin Moon Kim:  1 billion Korean won ($1 million)

### C.    Law School

The reputational injury suffered by Dongguk as a result of Yale University's inaccurate statements resulted in Dongguk not being selected as a university entitled to open a U.S. style "law school." The following explains some of the loss that has resulted from Dongguk's exclusion from the list of universities that were allowed to open U.S. style law schools.[1]

### 1.    Loss Of Revenue

a)    Loss of annual earning (revenue minus expenses) of 1,350,000,000 won beginning 2010 ($1.35 million)[2]

b)    Loss of annual government grants and other sponsorship of 3,500,000,000 won ($3.5 million)

(1)    The damages in this category include projected Jogye Foundation sponsorship in the amount of 2,700,000,000 won ($2.7 million), projected corporate sponsorship in the amount of 500,000,000 won ($500,000), and projected government grants in the amount of 300,000,000 won ($300,000).

c)    Loss of projected annual donation that would have come from law school alumni: 260,000,000 won ($260,000) every year

(1)    Had Dongguk been able to open a U.S. style law school, it would have been able to receive general donations in the amount of approximately 2,000,000 won ($2,000) from each alumni every year. Because there are 80 students in each class, Dongguk believes that the projected annual donation from law school alumni would have been in the amount of approximately 160,000,000 won ($160,000). Dongguk further believes that it would have been able to receive event sponsorship and other types of special donations in the amount of approximately 100,000,000 won ($100,000) each year.

### 2.    Expenditures

a)    Amount expended by Dongguk in preparation of the law school application: 21,451,313,000 won ($21.451 million). The damages in this category include the following:

(1)    Reconstruction of the law department building: 7,737,000,000 won ($7.737 million)

---

[1] In 2006, Dongguk was selected as one of the 10 universities to open U.S. style MBA programs as well as one of the 27 universities to open U.S. style medical (graduate) schools. It is extremely unusual for a university that received permission to open *both* the MBA program *and* the medical school to be denied permission to open the law school. Additionally, in 2010, Dongguk obtained permission to open a college of pharmacy.

[2] The annual earning would likely have been lower for the first two years (2008 and 2009) because the school would not have had its full three-year classes yet.

(2)    New construction of law library and mock court: 1,436,000,000 won ($1.436 million)

(3)    Purchase of real estate and construction of law school dormitory: 6,283,000,000 won ($6.283 million)

(4)    Newly hired law faculty members and salaries provided to them: 5,480,000,000 won and increasing (the total amount of salaries that were paid to 22 newly hired faculty members for law school from 2004 until 2009) ($5.48 million)

(5)    Administrative expense relating to application and evaluation: 515,313,000 won ($515,313)

b)    Amount expended during lawsuit against Ministry regarding refusal to allow Dongguk to open law school:  74,465,420 won ($74,465)

## D.    Brand Rehabilitation

### 1.    Costs To Date

| Category | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|
| Updating University Logo | 51,587,650 | 113,066,010 | 2,310,240 | 166,963,900 |
| Advertising spent on miscellaneous brand rehabilitation | 45,947,000 | 216,197,200 | 43,952,650 | 306,096,850 |
| Strengthening of media PR activities | 25,873,080 | 47,313,150 | 44,702,040 | 117,888,270 |
| Reputation rehabilitation project/fees paid to outside PR firm | | | 157,393,532 | 157,393,532 |
| Brand rehabilitation-related brochure production | 15,950,000 | 27,760,000 | 137,907,600 | 181,617,600 |
| **Total** | **139,357,730** | **404,336,360** | **386,266,062** | **929,960,152 ($929,960)** |

### 2.    Future Brand Rehabilitation Costs

As discussed above, to date, Dongguk has spent a significant amount in order to merely begin rehabilitating its brand name.  However, those damages do not cover the entirety of the brand rehabilitation that Dongguk will have to engage in to fully rehabilitate its brand name.  It is clear that Dongguk must continue to engage in a series of public relations and marketing activities to rehabilitate its brand name in the future.

Dongguk has retained the services of two firms engaged in the business of brand rehabilitation, and intends to introduce expert testimony regarding the amount Dongguk will

need to spend and what it needs to do in order to fully rehabilitate its brand name.  It is the understanding that Dongguk will have to continue to expend significant resources in rehabilitating its brand name.

### E.    Summary Of Economic Damages

| COMPONENT OF ECONOMIC LOSS | VALUE OF DAMAGE |
|---|---|
| Grants | $16,000,000 |
| Donations | *at a minimum* $12,000,000 |
| Law School | $26,636,000 |
| Brand Rehabilitation Costs | *at a minimum* $929,960 |
| TOTAL | *at a minimum* $55,565,960 |

## IV.    NON-ECONOMIC DAMAGES

### A.    Dongguk's Standing In The Community

Dongguk was founded in 1906 by the Jogye Order, a Buddhist monastic order, and is one of the most prestigious Buddhist-affiliated universities in the world, and one of the most well-known universities in the field of Buddhist studies in Korea.  The Jogye Order that established Dongguk is the largest and one of the most influential Buddhist Orders in Korea.  Adherents of the Jogye Order practice Seon (Zen) Buddhism and seek a path to enlightenment and understanding.  One of the paths available to the Jogye Order adherents is to attend Dongguk because of its impeccable reputation and because of its renowned Buddhist educational programs.  Because of its Buddhist roots, Dongguk has become known for its strong humanist tradition and is known for its spirituality, morality and leadership.

In its one hundred-plus years of existence, Dongguk has become one of the most important academic institutions in Korea and has developed a stellar reputation for the quality of its education.  In addition to being known for Buddhist studies, Dongguk has greatly contributed to the development of the basic sciences in Korea and is also known for its literature and cultural programs.  Because of this reputation for quality education, Dongguk has won several awards, including being ranked number one in Korea in the Basic Science Research Achievement Survey conducted by the Ministry of Science and Technology and the Korea Science and Engineering Foundation, and in 2005, was chosen as one of the Best Universities of the Year by the Korean Council of University Education.

### B.    Yale's Statements Made About Dongguk

Yale's statements were directed at Dongguk and about Dongguk's truthfulness.  Specifically, while Dongguk had repeatedly stated that in 2005 it had sent a request for verification of Shin's degree to Yale, Yale stated to the media on several occasions that it had never received the request.

8

For example, on July 19, 2007, the Joong Ang Ilbo printed the results of a July 17, 2007 interview with Gila Reinstein ("Reinstein") in which Reinstein gave the following answer to the following question:

> Dongguk University is claiming to have forwarded an academic record verification request to Yale University.  Did you receive it?

> I looked for it repeatedly in the Department of Art history and the Graduate School with no success.  A document such as a request for verification of academic records is a very important matter so we keep a book to record it. *The fact that we couldn't find such an important document means that we didn't receive it.*  (Italics supplied.)

Furthermore, in her publicly aired television interview on MBC, Reinstein, on behalf of Yale, once again claimed that Yale had never received an inquiry from Dongguk asking about Shin's Ph.D.

The below is a complete listing of all newspaper articles or other media reports that harmed Dongguk's reputation:

| Bates No. | Medium | Title | Date Published | Name of Publication |
|---|---|---|---|---|
| DONGGUK0000851 | Web Article | Debate over Dongguk's Faculty Hiring Process | 6/30/2007 | Bowonsa |
| DONGGUK0000920; YALE00000178 | Web article | Biennale Art Director Accused of Phony Credentials | 7/12/2007 | Chosunilbo |
| DONGGUK0000923 | Web article | Biennale Director sacked for Academic Forgery | 7/12/2007 | Korea Times |
| DONGGUK0001548 | Web article | Art luminary forged her academic credentials | 7/12/2007 | JoongAng |
| DONGGUK0002001 | Web Article | Falsified Academic Degree...Fabricated Dissertation... Serious Moral Hazard in Culture Industry | 7/12/2007 | Herald Business |
| YALE00000753 | Web article | The Fake Doctor Scandal for the Cinderalla of the Art World | 7/12/2007 | Chosunilbo |
| DONGGUK0000931 | Web Article | Suspicions about Jeong Ah Shin's Falsified Academic Degree Officially Suggested When Hiring in 2005 | 7/13/2007 | Yonhap News |
| DONGGUK0000951 | Print Article | Dongguk University's "Weird" Faculty Hiring | 7/13/2007 | Chosun Ilbo |
| DONGGUK0001357; YALE00000372 | Web article | Art world shocked over curator's forged degrees | 7/13/2007 | The Korea Herald |
| DONGGUK0001550; YALE00000180 | Web article | Mystery behind hiring of shamed art professor | 7/13/2007 | JoongAng |
| DONGGUK0001784; YALE00000183 | Web article | The talented Ms Shin | 7/13/2007 | The Independent |
| DONGGUK0000963; YALE00000187 | Web article | Stroke of luck, raw talent fueled Shin's ascent | 7/14/2007 | JoongAng |
| DONGGUK0000969 | Print Article | Hiring Process of Shin "Full of Questions" | 7/14/2007 | Chosun Ilbo |

9

| DONGGUK0000971 | Web article | Biennale Curator's Degree Revealed a Forgery | 7/14/2007 | Chosunilbo |
|---|---|---|---|---|
| YALE00000186 | Web Article | Dongguk Univ. to Fire Prof Who Fored Her Degrees | 7/14/2007 | KBS World News |
| DONGGUK0000974 | Web Article | Would Dongguk's Internal Investigation Closely Examine "Academic Forgery" | 7/16/2007 | Yonhap News |
| DONGGUK0001200 | Web article | Yale University Won't Probe Source of Shin's False Certificate | 7/16/2007 | Dong-A Ilbo |
| DONGGUK0001758 | Web article | Dongguk failed to check records of discredited art professor | 7/16/2007 | The Hankyoreh |
| DONGGUK0000994 | Web article | The Rise and Fall of a Korean Success Story | 7/17/2007 | Asia Sentinel |
| DONGGUK0001009 | Print Article | Dongguk "Did Not Send A Request to Kansas" | 7/18/2007 | Donga Ilbo |
| DONGGUK0001010 | Print Article | "Fake Dr." Shin Disappeared in Manhattan  "I will Stay for One Month to Avoid the Passing Rain" | 7/18/2007 | JoongAng Ilbo |
| DONGGUK0001013 | Print Article | Dongguk Top Management Suspicious of "Covering Shin" | 7/18/2007 | Chosun Ilbo |
| DONGGUK0001127 | Web article | University of Kansas Has No Record of Verification of Shin's Diplomas | 7/18/2007 | Korea Times |
| YALE00000771 | Web Article | "Growing Suspicion" Dongguk University being decieved or protected | 7/18/2007 | Hankook Ilbo |
| DONGGUK0001016 | Web Article | Dongguk Remained Silent After Receiveing Confirmation of Shin's Fake Degree A Few Months Ago | 7/19/2007 | Yonhap News |
| DONGGUK0001030 | Web article | Snowball of Lies | 7/20/2007 | news.naver.com |
| DONGGUK0001039 | Web Article | Dongguk University 'Shin Investigation "Nothing Discovered" | 7/20/2007 | Yonhap News |
| DONGGUK0001041 | Web article | Fake Diplomas | 7/20/2007 | Korea Times |
| DONGGUK0001042; YALE00000204 | Web article | Dongguk University Fires Bogus Professor | 7/20/2007 | Korea Times |
| DONGGUK0001052 | Print Article | Shin's "Fake Doctoral Degree" Evidence  Dongguk Might Have Kept Silent Since This April | 7/20/2007 | Chosun Ilbo |
| DONGGUK0001050 | Print Article | After Shallow Investigation, "There Was No Absurdity" | 7/21/2007 | Donga Ilbo |
| DONGGUK0001564 | Web article | Former university president takes the heat on art fraud | 7/21/2007 | JoongAng |
| DONGGUK0001042; YALE00000208 | Web article | Dongguk U. Sacks Bogus Prof. Shin Jeong-Ah | 8/3/2007 | Korea Times |
| DONGGUK0000079 | Web article | Suspicions Grow Over Shin's Diploma Forgery | 8/27/2007 | Korea Times |
| DONGGUK0000101 | Web article | Growing Suspicions | 8/27/2007 | Korea Times |
| DONGGUK0000108 | Web article | Clearing up a Scandal | 8/30/2007 | news.naver.com |
| DONGGUK0001393 | Web article | GNP accuses Biennale of endorsing Shin | 8/30/2007 | news.naver.com |
| DONGGUK0000135 | Web article | Factional Feud Deepend in Buddhist Groups | 9/3/2007 | Korea Times |

| DONGGUK0001328 | Web article | Korea battels resume fakers | 9/5/2007 | Yale Daily News |
|---|---|---|---|---|
| DONGGUK0000146; YALE00000235 | Web article | Monk urges Dongguk Directors to Resign | 9/6/2007 | Korea Times |
| DONGGUK0000142 | Web article | Ex-professor's home and office raided in probe on degree forgery | 9/8/2007 | news.naver.com |
| DONGGUK0000168 | Web article | Lie After Lie | 9/11/2007 | Korea Times |
| DONGGUK0000365 | Web article | Dongguk Professors Call for Resignation of Directors | 9/16/2007 | Korea Times |
| DONGGUK0000535 | Web article | Probe Triggers Backlash from Buddhists | 9/22/2007 | Korea Times |
| DONGGUK0001119 | Web article | Yale University Rejects Shin's Fake Ph.D. Claim | 9/23/2007 | Dong-A Ilbo |
| DONGGUK0000993 | Web Article | Did Not Verify Academic Degree When Hiring | 10/4/2007 | Yonhap News |
| DONGGUK0001330 | Web article | Korean professor accused of forging Yale art degree | 10/16/2007 | Yale Daily News |
| DONGGUK0001650 | Web article | Dongguk board chairman to resign | 10/17/2007 | JoongAng |
| DONGGUK0001332 | Web article | Brief:  Art history professor charged with forgery of doctorate indicted by authorities | 11/1/2007 | Yale Daily News |
| DONGGUK0000709 | Web article | Byeon, Shin Deny Charges in 1st Trial | 11/12/2007 | Korea Times |
| DONGGUK0000717 | Web article | A Very Good Step | 12/7/2007 | news.naver.com |
| DONGGUK0000725 | Web article | Deception Sums Up Year of 2007 | 12/23/2007 | Korea Times |
| YALE00000335 | Web article | Fax on ex-art professor's Yale doctorate degree found to be genuine | 12/28/2007 | Yonhap News |
| DONGGUK0001186 | Web article | Dongguk v. Yale | 9/24/2008 | Korea Times |
| DONGGUK0000795 | Web article | Poison Ivy:  Cleaning up a Korean Art Conspiracy | N/A | ArtAsiaPacific Magazine |
| DONGGUK0001007 | Blog | Forged Credentials and Korean Empoyment Law | N/A | Korean Law Blog |
| DONGGUK0001302 | Web article | Cancelling Chosun Ilbo Subscriptions | N/A | The Hankyoreh |
| DONGGUK0001749 | Web article | DGU sues Yale | N/A | Dongguk-In |

The below is a complete listing of all newspaper articles or other media reports that contained false statements by Yale or its employees:

| Date | Type | Description | Name of Publication (if any) |
|---|---|---|---|
| 7/9/2007 | E-mail | E-mail from G. Reinstein to Director General of the National Museum of Korea | |
| 7/10/2007 | E-mail | E-mail from G. Reinstein to Chosun Ilbo reporter | |
| 7/10/2007 | Letter | Letter from S. Carney to E. Cho | |

| 7/12/2007 | Web article | Biennale Art Director Accused of Phony Credentials | Chosunilbo |
|---|---|---|---|
| 7/12/2007 | Web Article | "Cannot be..." Art Industry "Shin Shock" | Munhwa Ilbo |
| 7/12/2007 | Web article | The Fake Doctor Scandal for the Cinderalla of the Art World | Chosunilbo |
| 7/13/2007 | Print Article | Jeong Ah Shin Mystery "Fax Dongguk Received from Yale" Also Fake | Chosun Ilbo |
| 7/13/2007 | Web Article | Dongguk Ignored All the "Shin Suspicions" | Segye |
| 7/13/2007 | Web Article | Did Dongguk Know Shin's Diplomas Were Fake | Munhwa Ilbo |
| 7/13/2007 | Web Article | Jeong Ah Shin "Fax from Yale" Also Fake.  Yale Answers "Different Form"...Possibly Fabricated Domestically | Herald Business |
| 7/13/2007 | Web Article | "Jeong Ah Shin Mystery" Fax Regarding Degree Also Fabricated | Herald Business |
| 7/13/2007 | Web Article | Diploma Confirmation Fax Dongguk Received from Yale is Also Fake | CBS Nocut News |
| 7/14/2007 | Web article | Biennale Curator's Degree Revealed a Forgery | Chosunilbo |
| 7/14/2007 | Print Article | "Document Dongguk Received from Yale at the Time of Hiring is Fake" | Donga Ilbo |
| 7/15/2007 | E-mail | E-mail from S. Carney to E. Cho | |
| 7/16/2007 | Web Article | "Fake Dr." Jeong Ah Shin, Review of Investigation Request" | MBC |
| 7/16/2007 | Print Article | Yale Will Not Investigate "Shin Falsified Fax" | Donga Ilbo |
| 7/16/2007 | Print Article | Yale University Fax Mystery | JoongAng Ilbo |
| 7/16/2007 | Print Article | Jeong Ah Shin Hiding After Returning to Korea | Chosun Ilbo |
| 7/16/2007 | Web Article | Who Sent the "Falsified Confirmation Fax" of Doctorol Degree | Joins |
| 7/16/2007 | E-mail | E-mail from Chosun Ilbo reporter to P. Schirmeister | |
| 7/17/2007 | Web article | The Rise and Fall of a Korean Success Story | Asia Sentinel |
| 7/17/2007 | E-mail | E-mail from G. Reinstein to H. Klasky | |
| 7/17/2007 | E-mail | E-mail from P. Schirmeister to J. Bulter and R. Sleight | |
| 7/18/2007 | Web Article | "Increasing Suspicions" Dongguk, Deceived or Protected. Dongguk, Did Not Verify Academic Degrees of Shin | Hankook Ilbo |
| 7/18/2007 | Web Article | Jeong Ah Shin. Solve "Degree Verifying Fax From Yale" Mystery | CBS Nocut News |
| 7/19/2007 | Print Article | "Shin Incident" Yale "Did Not Receive Dongguk's Request for Shin's Academic Degree Verification" | Chosun Ilbo |
| 7/19/2007 | Web Article | Yale Considering A Legal Action Against Shin | Maeil Business Newspaper |
| 7/19/2007 | E-mail | E-mail from G. Reinstein to The Hankyoreh reporter | |

| 7/20/2007 | Web Article | "Shin's Academic Forgery" Dongguk Internal Investigation Committee Q&As | Yonhap News |
|-----------|-------------|------------------------------------------------------------------------|------------|
| 7/20/2007 | Web Article | "Shin's Academic Forgery" Dongguk Internal Investigation Committee Q&As | Donga Ilbo |
| 7/20/2007 | Web Article | Dongguk Will Dismiss and Accuse Shin | Hankook Ilbo |
| 7/20/2007 | E-mail | E-mail from G. Reinstein to The Hankyoreh reporter | |
| 7/21/2007 | Web Article | Fake Dr.' Shin Dismissed...Request for Investigation | Joins |
| 8/4/2007 | TV Interview | Munhwa Broadcasting Corporation interview | MBC |
| 8/20/2007 | Web Article | [World] (1) Amplifying Suspicions About Shin's Falsified Degrees | MBC |
| 9/4/2007 | Web Article | Did Shin Send the Fax | MBC |
| 9/4/2007 | E-mail | E-mail from G. Reinstein to Yale Daily News reporter | |
| 9/5/2007 | Web article | Korea battels resume fakers | Yale Daily News |
| 9/19/2007 | Web article | Yale University Embarassed by Shin's Claim | Dong-A Ilbo |
| 9/21/2007 | Statement | Official Statement by Yale University (and all copies distributed to Korean media) | |
| 9/23/2007 | Web article | Yale University Rejects Shin's Fake Ph.D. Claim | Dong-A Ilbo |
| 10/16/2007 | Web article | Korean professor accused of forging Yale art degree | Yale Daily News |
| 11/1/2007 | Web article | Brief: Art history professor charged with forgery of doctorate indicted by authorities | Yale Daily News |
| 12/28/2007 | Web article | Following scandal with Korean professor, University revises degree-verification procedure | Yale Daily News |
| 12/29/2007 | Statement | Public Statement by Yale University | |
| 1/3/2008 | Web article | Yale to be more careful about verifying graduate degrees | boston.com |
| 1/3/2008 | Web article | Yale raises bar on credentials | New Haven Register |
| 1/3/2008 | Web article | Yale to be more careful about verifying graduate degrees | The AP |
| 1/14/2008 | Web article | Yale revamps degree-verification procedure | Yale Daily News |
| 1/31/2008 | Letter | Letter from S. Carney to E. Cho | |
| 2/4/2008 | Web article | Yale to be sued over Shin case | Yale Daily News |

## C.   The Extent To Which The Statements Were Circulated

The Shin story, and in particular, Yale's misstatements that it had not received Dongguk's request for verification of Shin's degree and had not verified Shin's degree, was covered by the media worldwide. According to a December 2007, Yale Daily News article, in Korea alone, the Shin story was the ninth most-publicized story in 2007. Newspapers in Korea

13

covered the story almost daily, and included coverage by such publications as the DongA Daily, the Chosun Daily, the JoongAng Daily, three of the largest newspapers in Korea. Elsewhere in the world, stories were written by the New York Times, the Yale Daily News, the New Haven Register, the Washington Post, and the BBC. Furthermore, all of these publications posted their stories on the world-wide web. There was also extensive tv coverage by Seoul Broadcasting Company and Munhwa Broadcasting Corporation.

### D.   The Tendency Of The Statement To Injure Dongguk

There is no question that Yale's statements damaged Dongguk's reputation. The statements that were made by Yale were believed because Ivy League universities are revered in Korea. The statements challenged Dongguk's truthfulness as well as its competency and integrity, qualities expected of a Buddhist institution. Yale's misstatements spawned untrue and unverified stories about Dongguk and its senior administrators.

Dongguk was nearly immediately thrust into the spotlight and its reputation began to be destroyed. For example, in 2007, Dongguk was denied the KMAC Customer Satisfaction Award because while "there is no question that your school demonstrated exemplary effort by becoming the first college to implement the concept of customer satisfaction under outstanding leadership,"

> considering the recent social issue pertinent to the employment of the teaching staff in the aspect of the quality management of education service, the Evaluation Committee reached the final resolution that found the awarding to be inappropriate.

Moreover, to determine whether Dongguk's "brand" (i.e. reputation) was damaged, Dongguk retained a nationally recognized expert in marketing surveys. In late 2008, months after this lawsuit was filed, the expert working with the Korean office of one of the world's largest custom research firms conducted a survey to gauge the Korean adult population's view of Dongguk as a result of Yale's misstatements about the September 5 registered letter and the September 22 fax. The survey was designed and conducted in accordance with the seven-factor framework cited in the Federal Judicial Center's Manual For Complex Litigation, Fourth.

Based upon the survey results, Dongguk's concerns about the damage to its reputation were confirmed and Dongguk learned, among other things, that despite Yale's ultimate acknowledgement that it sent the September 22 fax, over 50% of the adult population of South Korea still believes that Dongguk lied about the September 22 fax and the September 5 registered letter. Indeed, the survey showed that less than 10% of the Korean adult population believes that Dongguk had told the truth when Dongguk said that it had sent the September 5 registered letter and received the September 22 fax. In short, there is no doubt that Dongguk's "brand" name in Korea has been badly tarnished by Yale's conduct.

### E.   All Of The Other Facts And Circumstances In The Case

#### 1.   Criminal Investigation Of Dongguk

Because of Yale's statements denying it had received a request for verification from Dongguk, the Korean Prosecutors' office commenced an investigation into Dongguk's role in

Shin's hiring. During the investigation, the prosecutors re=-opened old investigations that had been closed and found to be untrue.

### 2.    Yale's Knowledge Of The Falsity Of Its Statements

Despite being provided with evidence by late August 2007 that demonstrated that Yale had received Dongguk's request for verification and Yale had sent a fax confirming that Shin had received a Ph.D. from Yale, Yale continued to issue false statements to the Korean media.

Moreover, on October 17, 2007, Yale received a subpoena from the United States Department of Justice ("Justice Department Subpoena"). Although Yale had for months publicly denied that it had ever verified Shin's degree and it ignored the proof that Dongguk had provided, on October 18, 2007, Yale was able to establish that it had received a verification request from Dongguk and had, in fact, verified Shin's Ph.D.

Rather than immediately revealing the truth to the Korean media and to Dongguk, Yale waited ten weeks before it notified Dongguk. In addition, pursuant to a carefully planned public relations and media campaign, Yale waited until Saturday evening, December 30, 2007, to inform the media that it had erred when it denied receiving Dongguk's request and sending the fax confirming Shin's Ph.D.

### 3.    The Importance Of Korean Culture

Elements such as "saving face," "honor," "esteem," and "shame" are not easily calculated, but are of great importance in Korean society.

For example, from the results of the survey discussed above, Dongguk also learned that almost half of the adult population of South Korea believes that because Dongguk had lied, it had "brought shame" on its students, its alumni, its faculty and/or even the Republic of Korea.

Dongguk intends to introduce expert testimony to testify regarding the importing of these factors on reputation in Korean culture.

### 4.    Students' Perception Of Dongguk

#### a)    Student Applications

In 2007, Dongguk began to experience a significant decrease in the number of its student applications. In Korea, university student applications for each class year are submitted generally in November or December of the previous year. The students who have been offered admission generally have until February of their class year to determine whether to enroll at Dongguk or not. However, because of Yale's misstatements, Dongguk has been unable to fill its class by accepting only students from the December round of applications.

The diminution in the number of December round applications is particularly damaging to Dongguk since the December round of applications includes the most qualified students. The December round applicants not only have higher academic achievements, but they generally adjust better to a university setting and are better hiring candidates for future employers. Moreover, because the quality of applicants in the December round is one of the most commonly used factors to determine the quality of a university itself, the decrease in the number and quality

of applicants from the December round has had a negative impact on the public perception of Dongguk.

The chart below shows (i) the decrease in the number of students that applied for and/or enrolled at Dongguk since the Shin incident was publicized in 2007 and (ii) the decrease in December applications.

| Application Year | Class Size | Number of Applications in the December Round | Total Number of Applications |
|---|---|---|---|
| 2001 | 2,938 | 16,234 | 21,516 |
| 2002 | 2,957 | 15,231 | 25,707 |
| 2003 | 2,951 | 10,570 | 21,001 |
| 2004 | 2,948 | 12,372 | 27,820 |
| 2005 | 2,884 | 12,304 | 28,832 |
| 2006 | 2,841 | 11,038 | 29,294 |
| 2007 | 2,727 | 9,109 | 24,949 |
| 2008 | 2,747 | 8,533 | 34,821 |
| 2009 | 2,717 | 10,638 | 44,740 |

<Number of Student Applications Submitted to Dongguk's Undergraduate Program>

| Application Year | Class Size | Total Number of Applicants |
|---|---|---|
| 2003 | 866 | 1,547 |
| 2004 | 866 | 1,138 |
| 2005 | 866 | 1,184 |
| 2006 | 866 | 1,210 |
| 2007 | 841 | 1,267 |
| 2008 | 841 | 1,314 |
| 2009 | 851 | 1,383 |

<Number of Student Applications Submitted to Dongguk's Graduate Programs>

**b)      Rejection Of Offers Of Admission**

The chart below summarizes the number of admission offers to Dongguk's undergraduate programs and the number of students who accepted or rejected such offers for each year from 1999 until 2009. As shown below, the number of rejections dramatically increased in 2007.

| Application Year | Number of Admission Offers | Number of Students Who Accepted Offers | Number of Students Who Rejected Offers |
|---|---|---|---|
| 1999 | 3,781 | 2,965 | 816 |
| 2000 | 3,611 | 2,944 | 667 |
| 2001 | 3,720 | 2,919 | 801 |
| 2002 | 3,803 | 2,944 | 859 |
| 2003 | 3,738 | 2,941 | 797 |
| 2004 | 3,690 | 2,937 | 753 |
| 2005 | 3,588 | 2,868 | 720 |
| 2006 | 3,568 | 2,829 | 739 |
| 2007 | 3,915 | 2,692 | 1,223 |

16

| 2008 | 3,458 | 2,720 | 738 |
| 2009 | 3,388 | 2,687 | 701 |

<Number of Rejections of Admission Offers to Undergraduate Programs>

c)      **Student Satisfaction**

The Shin incident has negatively impacted the morale of Dongguk students. The sense of shame that Dongguk students feel because they have been taught by a "fake" professor at the university that was alleged to have covered up Shin's fraud still exists. In fact, many of the four hundred students who had taken Shin's classes in 2006 and 2007 have given up the academic credits that they received from Shin's class. These students have taken an additional class in order to avoid being associated with the Shin incident at the time of their job applications.

The dissatisfaction and frustration of the students has resulted in tension between Dongguk and the students. For instance, according to the Korea Economic Daily article on September 18, 2007, Dongguk's students' association demanded in its online statement that the former President apologize and the current President take action to protect the students from the impact of the Shin incident. *See* Daewon Kim & Sowoon Park, "'Jeong Ah Shin Syndrome'... Sorrow of Young Dongguk University Students," Korea Economic Daily, September 18, 2007.

5.      **Faculty Members' Perception Of Dongguk**

a)      **Faculty Member Applications**

Because of its tarnished reputation, Dongguk has experienced difficulties in attracting candidates for its faculty positions. The number of applicants, irrespective of the number of hiring positions, has consistently decreased since 2007. The fact that the largest decrease in the number of applicants occurred between March and September 2007 demonstrates that Dongguk's damaged reputation, which was caused by Yale's misstatements, is thus responsible for the applicants' decision to avoid Dongguk.

The below chart shows the decrease in the number of faculty who applied for an accepted faculty positions at Dongguk as a result of the Shin incident.

| Year | Mar. '07 | Sept. '07 | Mar. '08 | Sept. '08 |
|---|---|---|---|---|
| Number of Open Faculty Positions | 32 | 19 | 34 | 27 |
| Number of Faculty Applicants | 389 | 191 | 285 | 151 |

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Hiring Positions | 57 | 81 | 117 | 68 | 86 | 114 | 102 | 109 | 151 | 104 | 79 | 91 |
| Number of Applications | 319 | 323 | 526 | 326 | 312 | 395 | 398 | 708 | 1320 | 662 | 503 | 322 |

17

**b)      Faculty Satisfaction**

The relationship between the faculty and the administration as a result of the Shin incident. Starting from July 13, 2007, the professors at Dongguk issued a total of 25 official statements concerning the Shin incident calling for, among other things, the resignation of the President, Vice President, Dean of Academic Affairs, Board of Directors, and the Chairman of the Board of Directors.

**6.      Employment Opportunities Available To Dongguk Students**

Dongguk experienced an overall decrease in the quality of employment opportunities that it provides to its students as a result of its loss of reputation.  In 2007, Dongguk had geared up to provide more employment opportunities for its students by hosting, among other things, a job fair where students could easily gather hiring information or submit their application by visiting different companies' booths in one place.

As shown below, while Dongguk has been making persistent efforts to improve the quality of recruiting events for its students, the ratio of the top 100 corporations attending recruiting events at Dongguk has dramatically decreased since 2007.

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|------|------|------|------|
| Ratio | 75.0% | 47.8% | 50.0% | 51.4% | 50.0% | 36.0% | 20.0% |

<Ratio of the Number of Top 100 Companies to the Total Number of Participating Employers>

**7.      Loss Of Law School**

As discussed above, Dongguk has suffered significant economic damages resulting from not being excluded from the list of Universities permitted to open U.S.-style law schools in Korea.   However, Dongguk's reputation has also suffered non-economic damages from not being permitted to open a law school, including:

- the prestige of being selected as one of only 25 universities allowed to open a U.S. style law school;

- social influence of law school alumni;

- the increase in pride of students, faculty, and alumni; and

- the increase in the overall educational quality due to new faculty members, research projects and financial support received by the government, corporations and individual donors.

**V.      PUNITIVE DAMAGES**

As stated in Dongguk's Complaint, Dongguk will seek an award of punitive damages by such amount as determined by the jury's sound judgment and discretion to fairly and sufficiently punish Defendant for its egregious conduct and will deter Defendant and others from acting in a similar tortuous manner in the future. *See Infeld v. Sullivan*, 151 Conn. 506, 509 (1964) (holding a plaintiff that can show wanton misconduct may be entitled to either punitive damages because the actions are "of such a conscious choice of a course of action either with knowledge of the

serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.").

Dated: July 23, 2010

McDERMOTT WILL & EMERY LLP

By: _Robert A. Weiner_

Robert A. Weiner
Audrey Lu
340 Madison Avenue
New York NY 10173
Phone: 212-547-5400
Fax: 212-547-5444

*Attorneys for Plaintiff Dongguk University*

Of Counsel:

Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz PC
350 Orange Street
New Haven CT 06511
Phone: 203-951-3720
Fax: 203-772-1691
Email: igrudberg@jacobslaw.com

NYK 1329256-2.081817.0011

19

# EXHIBIT 75

Gila Reinstein, 02:37 PM 7/24/2007, Fwd: question

To: Gila Reinstein <gila.reinstein@yale.edu>
From: Pamela Schirmeister <pamela.schirmeister@yale.edu>
Subject: Fwd: question
Cc: nancy.sonzoni@yale.edu
Bcc:
Attached:


Dear Gila,


We have no record of having admitted her or of her ever having registered in any way.

Best,
Pam




Date: Tue, 24 Jul 2007 13:07:28 -0400
To: nancy.sonzoni@yale.edu
From: Gila Reinstein <gila.reinstein@yale.edu>
Subject: question
X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
X-Scanned-By: MIMEDefang 2.52 on 130.132.50.10

Hi Nancy,
Thanks for your voice message. Can you confirm if Jeong Ah Shin (or Shin, Jeong Ah) was
ever in the DSR program? Steve Goot already confirmed that she was never enrolled as a
student. She's claiming that she earned a PhD from Yale in 2005! When that backfired, she
started to let out that she was enrolled in the DSR. I doubt that's true, but need to confirm it.
She has caused a major scandal in Korea...
Gila

Nancy Sonzoni
Deputy Registrar's Office
Yale University
Graduate School of Arts and Sciences
320 York St  HGS Rm 113
New Haven, CT 06511
phone: 203-432-2743
fax: 203-432-8644

*It's not having what you want,*
*It's wanting what you've got*


Pamela Schirmeister

Printed for Pamela Schirmeister <pamela.schirmeister@yale.ed...                    1

YALE00000006

Gila Reinstein, 02:37 PM 7/24/2007, Fwd: question

Associate Dean
The Graduate School
Yale University

P.O. Box 208236
New Haven CT 06520-8236
203-432-9098

Confidentiality Notice: This e-mail message and any attachments are for the sole use of the intended recipient (s) and may contain proprietary, confidential, or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, please contact the sender by reply email and destroy all copies of the original message immediately.

YALE00000007

# EXHIBIT 76

| | |
|---|---|
| **From:** | Pamela Schirmeister <pamela.schirmeister@yale.edu> |
| **Sent:** | Tuesday, July 17, 2007 1:33 PM |
| **To:** | gila.reinstein@yale.edu |
| **Subject:** | Fwd: degree verification |

Dear Gila,

Here are the two templates we use to indicate that a student has a degree. The first is used for students who have the degree in hand. The second is used for students who have gotten jobs that require them to have the degree, but who, because of when they've submitted, haven't yet received the degree. These letters are usually requested by the student and sent to dept. chairs at other institutions.

Pam

> X-Mailer: QUALCOMM Windows Eudora Version 7.0.1.0
> Date: Tue, 17 Jul 2007 13:26:15 -0400
> To: "Pamela Schirmeister" <pamela.schirmeister@yale.edu>
> From: Alicia Grendziszewski <alicia.grendziszewski@yale.edu>
> Subject: degree verification
> X-YaleITSMailFilter: Version 1.2c (attachment(s) not renamed)
> X-Scanned-By: MIMEDefang 2.52 on 130.132.50.7

Pam: I have attached two templates

Alicia Grendziszewski
Assistant to Dean Pamela Schirmeister
and Dean Edward Barnaby
Yale Graduate School
320 York Street
PO Box 208236
New Haven CT 06520-8236

tel: 203.432.7598
fax: 203.432.6904


Confidentiality Notice: This e-mail message and any attachments are for the sole use of the intended recipient (s) and may contain proprietary, confidential, or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, please contact the sender by reply email and destroy all copies of the original message immediately.

YALE00008557

Pamela Schirmeister
Associate Dean
The Graduate School
Yale University

P.O. Box 208236
New Haven CT 06520-8236
203-432-9098

Confidentiality Notice: This e-mail message and any attachments are for the sole use of the
intended recipient (s) and may contain proprietary, confidential, or privileged information. Any
unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law.
If you are not the intended recipient or a person responsible for delivering this message to an
intended recipient, please contact the sender by reply email and destroy all copies of the
original message immediately.    date-sent 1184693589 flags 33815681 sender Pamela Schirmeister
<pamela.schirmeister@yale.edu>  subject Fwd: degree verification  to gila.reinstein@yale.edu

YALE00008558

September 20, 2004


To Whom It May Concern:


This is to certify that -------- has completed all course requirements for the Ph.D. degree
in English Language and Literature and submitted her dissertation on March 15, 2004.
The dissertation was approved by all of the selected readers and she received her degree
on May 24, 2004.

If you have any questions please contact me at (203) 432-7598.


Sincerely,



Pamela Schirmeister
Associate Dean


cc:     Registrar, Department of English Language and Literature

YALE00008559

7 October 2004

Chair
Department of Economics
Harvard University


Dear X,

I am writing to certify that ----- has completed all of the degree requirements for the
Ph.D. in Economics at Yale University as of October 7, 2004. Due to our own internal
deadlines, his degree will not be certified by the Yale Corporation until its December
meeting, but that approval is purely pro forma. He should be considered now as having
his degree in hand.

If you have any questions about this matter, please feel free to contact me directly at
(203)-432-9098 or at Pamela.schirmeister@yale.edu.

Thank you.

Sincerely,

Pamela Schirmeister
Associate Dean


cc:     Truman Bewley, DGS, Economics

YALE00008560

# EXHIBIT 77

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DONGGUK UNIVERSITY, ) | |
| ) | No. 3:08-CV-00441(RNC) |
| Plaintiff, ) | |
| ) | **AMENDED COMPLAINT** |
| v. ) | |
| ) | <u>**JURY TRIAL DEMANDED**</u> |
| YALE UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

Plaintiff Dongguk University complaining of defendant Yale University respectfully

alleges and says as follows:

## <u>PARTIES</u>

1.      Plaintiff Dongguk University is a private university organized under the laws of

Korea and whose principal place of business is in Seoul, Korea.

2.      Upon information and belief, defendant Yale University is a private university

organized under the laws of the State of Connecticut and whose principal place of business is in

New Haven, Connecticut.

## <u>JURISDICTION AND VENUE</u>

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1332 because there exists complete diversity of citizenship between the parties and the amount

in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      This Court possesses personal jurisdiction over this matter because Yale

University has sufficient contacts with the State of Connecticut.

5.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) inasmuch as

a substantial part of the events giving rise to the claims asserted herein occurred in this judicial

district.

## FACTS COMMON TO ALL COUNTS

### Dongguk University

6.      Plaintiff Dongguk University is one of the most important academic institutions in Korea and has developed a stellar reputation for the quality of its education in its one hundred years of existence.

7.      In 2005, the Korean Council of University Education chose Dongguk University as one of the Best Universities of the Year.

8.      Dongguk University was founded in 1906 by the Jogye Order, a Buddhist monastic order, and is one of the most prestigious Buddhist-affiliated universities in the world.

9.      The Jogye Order, which was established in 1354, is the largest and one of the most influential Buddhist Orders in Korea.  Adherents of the Jogye Order practice Seon (Zen) Buddhism and seek a path to enlightenment and understanding.

10.     One of the paths available to the Jogye Order adherents is to attend Dongguk University because of its impeccable reputation and because of its renowned Buddhist educational programs.

11.     Because of its Buddhist roots, Dongguk University became known for its strong humanist tradition and is known for its spirituality, morality and leadership.

12.     In connection with its oversight of Dongguk University, the Jogye Order established the Dongguk University Foundation, the Board of Directors of which provides general oversight and final approval of certain administrative matters of Dongguk University, including final approval of its proposed faculty members.

13.     While Dongguk University is one of the most well-known universities in the field of Buddhist studies in Korea, it has always been open to students and professors of all faiths and philosophies.

2

14.    Dongguk University currently offers approximately 100 undergraduate programs and over 100 graduate programs. It has about 23,750 students and 900 faculty members from various parts of the world.

15.    Dongguk University has greatly contributed to the development of the basic sciences in Korea. It has been ranked number one in Korea in the Basic Science Research Achievement Survey conducted by the Ministry of Science and Technology and the Korea Science and Engineering Foundation.

16.    Dongguk University is also known for its literature and cultural programs. Among its graduates are world-famous novelists and poets such as Jeong Rae Cho, Seok Young Hwang and Chong Ju So, who was nominated for the Nobel Prize five times.

17.    Dongguk University's alumni hold important and prestigious positions in Korean business, cultural, and governmental organizations.

18.    Through year-end 2006, Dongguk University's alumni and corporate donor contributions, government grants and student applications increased on an annual basis.

### Yale University

19.    Yale University, which was founded in 1701, is the third oldest institution of higher education in the United States and is a member of the Ivy League.

20.    Yale University's graduate programs, including those offered by Yale's Graduate School of Arts and Sciences, are internationally acclaimed.

21.    In 1861, Yale University's Graduate School of Arts and Sciences became the first school in the United States to award a Doctorate of Philosophy ("Ph.D.")

22.    Since 1861, Yale University's Graduate School of Arts and Sciences, as well as its other graduate schools, have awarded numerous Ph.D.'s to graduate students from around the world.

3

23.     Upon information and belief, because of Yale University's academic standing and reputation, Yale University has long been aware that unscrupulous individuals will falsify their academic records in order to assert that they have received graduate or post-graduate degrees from Yale University.

24.     Upon information and belief, Yale University, like other academic institutions, is concerned about its reputation and does not want individuals to represent themselves falsely as having received graduate or post-graduate degrees from Yale University.

25.     Because Yale University receives numerous inquiries from academic institutions as well as other inquirers for verification of Ph.D.'s and other degrees purportedly awarded by Yale University, Yale University has established certain protocols regarding the verification of Ph.D.'s and other degrees claimed to have been awarded by Yale University.

26.     According to Yale's longstanding verification protocols, all verifications must, among other things, be based "only on consultation of original Yale records" and no documents submitted with a request for verification "can be employed to support" the requested verification.

27.     In developing these protocols, Yale University was at all times aware of the importance of complying with these protocols and the need to provide accurate information to the academic institutions and other inquirers who have sought to verify whether Yale University had awarded graduate or post-graduate degrees to particular individuals.

28.     Upon information and belief, Yale University, like other academic institutions, does not want to employ faculty members who have falsified their records by erroneously claiming that they have received degrees that they did not receive.

29.     Upon information and belief, just as Yale University receives inquiries seeking to verify whether an individual has received a degree from Yale University, Yale University

4

regularly and routinely contacts other academic institutions in order to verify the academic credentials of individuals who are seeking faculty positions at Yale University.

30.    Upon information and belief, the information received from such academic institutions contacted by Yale University is relied upon by Yale University when determining whether to hire the individual about whom Yale University has inquired.

### Jeong Ah Shin

31.    Upon information and belief, Jeong Ah Shin ("Shin") is a citizen of Korea born in 1972.

32.    In 1997, at the age of 25, Shin became a part-time employee at the Kumho Art Museum.

33.    The Kumho Art Museum is a highly regarded Korean art museum that was established by the Kumho Cultural Foundation in 1996.

34.    Since its opening, the Kumho Art Museum has held numerous art exhibitions involving over 350 internationally renowned artists.

35.    Shin was promoted to curator of the Kumho Art Museum and, as curator, Shin was responsible for numerous museum shows and exhibitions.

36.    On March 16, 2001, Korea Economic Daily selected Shin as one of the women leaders in the field of curatorship.

37.    Shin served as curator of the Kumho Art Museum until December 2001 when she was hired by Sungkok Art Museum as its chief curator.

38.    The Sungkok Art Museum, which was founded by the Sungkok Art and Culture Foundation in 1995, is one of Korea's best-known modern art museums.

39.     The Sungkok Art Museum has also held exhibitions featuring the works of leading modern art artists from around the world and, as chief curator of the Sungkok Art Museum, Shin planned the exhibitions of many of these artists.

40.     In 2003, Wolganmisool, a Korean art magazine, awarded the Grand Prize to Shin for her achievement in exhibition planning.

41.     Upon information and belief, while employed by the Sungkok Art Museum, Shin taught graduate and undergraduate school classes at a number of universities in Korea, including but not limited to Hongik University, Hanyang University, Chung-Ang University, Kukmin University, Ihwa Women's University, and Sangmyung University.

42.     From 2004 to 2007, Shin frequently wrote art columns for Korean newspapers in which she discussed various topics including art, exhibitions, and her experience as a curator.

43.     On May 8, 2005, Kukmin Ilbo, a Korean newspaper, ran an article stating that Shin had obtained a Ph.D. in Western Art History from Yale University's Graduate School of Arts and Sciences.

### Dongguk University's Decision To Expand Its Art History Department

44.     In 2005, Dongguk University was planning to increase its faculty by inviting individuals who could expand the reach of its cultural and art history academic offerings.

45.     Individuals who are asked by Dongguk University to join its faculty are known as "special hiring candidates."

46.     During the summer of 2005, Dongguk University began to search for individuals who would qualify as "special hiring candidates" for these additional academic positions.

47.     In connection with these efforts, Dongguk University received resumes from a number of individuals who could expand Dongguk University's academic offerings.

48.     Shin's resume was among the resumes received by Dongguk University.

6

49.     Upon review of Shin's resume, Ki Sam Hong ("President Hong"), the then-President of Dongguk University, determined that Shin was qualified to be a "special hiring candidate" for Dongguk University's Art History Department.

50.     On August 4, 2005, Shin submitted a faculty position application form to Dongguk University, which contained her employment background, a listing of awards that she had received, and her academic credentials.

51.     With respect to her academic credentials, Shin stated that in 2005, she had received a Ph.D. from Yale University.

52.     As part of the application process, Shin also provided Dongguk University with a letter dated May 27, 2005, which was signed by "Pamela Schirmeistr [sic]" on Yale University letterhead (the "Certification Letter"), certifying the following information:

| | |
|---|---|
| NAME: | Jeong Ah Shin |
| DATE OF BIRTH: | April 28, 1972 |
| MAJOR: | History of Art (Twentieth Century Art) |
| DATE OF ADMISSION: | August 1996 |
| DATE OF GRADUATION: | May 2005 |
| DEGREE RECEIVED: | Ph.D |

53.     Pamela Schirmeister ("Schirmeister") is an Associate Dean in Yale University's Graduate School of Art and Sciences.

54.     Based upon Shin's experience and academic credentials, Dongguk University decided to move forward with Shin's application.

55.     In accordance with Dongguk University's standard procedures for "special hiring candidates," Shin's application was forwarded to Dongguk University's Faculty Hiring/Promotion Committee for approval.

7

56.     On August 12, 2005, the Faculty Hiring/Promotion Committee agreed with the

President's recommendation that Shin was eligible to become an assistant professor in Dongguk

University's Art History Department.

57.     On August 16, 2005, Dongguk University's Office of Academic Affairs submitted

Shin's name, as well as the names of six other "special hiring candidates," to Dongguk

University Foundation's Board of Directors for final hiring approval.

58.     Shin and the other six "special hiring candidates" were approved at the Dongguk

University Foundation's Board of Directors' meeting that was held on August 30, 2005.

### Yale University's Verification Of Shin's Ph.D.

59.     On September 1, 2005, Shin was officially hired by Dongguk University as an

assistant professor although she was not scheduled to teach any classes until the spring 2006

semester.

60.     In early September 2005, Dongguk University received information that raised

questions regarding the accuracy of Shin's statement that she had received a Ph.D. from Yale

University.

61.     In order to verify the fact that Shin had received a Ph.D. from Yale University, on

September 6, 2005, Hyung Taik Ahn ("Ahn"), a member of Dongguk University's

Administration Team, sent a registered letter dated September 5, 2005 (the "September 5

Registered Letter") to Yale University together with a copy of the Certification Letter provided

by Shin.

62.     Ahn's September 5 Registered Letter states in pertinent part:

> *I would like to confirm whether you can verify the contents of the enclosed
> letter issued by your University for Ms. Jeong-Ah Shin.*
>
> *Since this is being done as part of internal procedure for employing a
> faculty member at Dongguk University, your verification will be kept*

8

confidential. It would be very kind of you to send us the information we
have requested as soon as possible. (Italics supplied.)

63.     According to Yale University's mail delivery records, the September 5 Registered

Letter, which had been delivered to the Yale University Central Mailroom on September 20,

2005, was forwarded on that date to Shalentia Moore, an office assistant in the "Yale Graduate

School."

64.     The September 5 Registered Letter was then delivered to Schirmeister, the

Associate Dean who had supposedly signed the Certification Letter on behalf of Yale University.

65.     Although Schirmeister was fully aware that Yale University protocols required

that any verification of a graduate degree be based upon a review of Yale University's internal

records, Schirmeister made no effort to and did not review any internal Yale University records

in determining whether Shin had received a Ph.D. from Yale University.

66.     Rather, in violation of Yale University's protocols, Schirmeister merely reviewed

the documents attached to the September 5 Registered Letter and concluded that Shin had, in

fact, received a Ph.D. from Yale University.

67.     Schirmeister's review was so cursory that she did not even notice that her name

had been misspelled on the documents that she was reviewing.

68.     On September 22, 2005, at 13:29 E.D.T., Schirmeister sent Ahn a three-page fax

consisting of a transmittal sheet as well as a copy of Ahn's September 5 Registered Letter and

the Certification Letter that had been provided to Dongguk University by Shin (the "September

22 Fax").

69.     Schirmeister's September 22 Fax stated:

> As requested *I am confirming that the attached letter* [i.e. the Certification
> Letter] *was issued by the Yale Graduate School and signed by me.*
> (Italics supplied.)

9

70. Upon the issuance of the September 22 Fax, Schirmeister caused the September 22 Fax and the original of the September 5 Registered Letter, including its attachments and the envelope in which it was sent, to be placed in her files at Yale University.

71. Relying on the September 22 Fax sent by Schirmeister on behalf of Yale University that attested to the fact that Shin had received a Ph.D. from Yale University, Dongguk University concluded that Shin had received a Ph.D. from Yale University as she had represented and that the rumor was therefore baseless.

72. Shin began teaching classes at Dongguk University in the spring semester of 2006 and continued to do so until 2007.

**Shin's Dissertation Rumors**

73. On June 4, 2007, Euiyon Cho ("Cho"), a Dongguk University official, was provided with documents suggesting that Shin had not written a dissertation titled "Guillaume Apollinaire: Catalyst for Primitivision For Picabia and Duchamp" ( "Shin's Dissertation"), which was the basis for her Ph.D., and that Shin's Dissertation had been plagiarized.

74. Because the documents questioning Shin's Dissertation that had been provided to Cho were not dispositive, on June 7, 2007, Cho sent a website inquiry to Yale University asking whether it had a copy of Shin's Dissertation.

75. Later that day, a Yale University librarian sent an email to Cho stating that Yale University had no record of Shin's Dissertation and advising Cho to contact Yale University's Department of Art History.

76. On June 10, 2007, Cho sent an email to Susan Emerson ("Emerson"), the Registrar of Yale University's Department of Art History. In his email, Cho again sought to determine whether Yale University had a record of Shin's Dissertation.

77.     In his June 10, 2007 email, Cho also asked Emerson whether Shin "earned her Ph.D. degree from your department of the Graduate School."

78.     Later that day, Emerson sent an email to Cho informing him that according to her records, "Jeong Ah Shin did not receive a Ph.D. in our department at Yale University."

79.     Some time in mid-June 2007, the rumors regarding Shin's Dissertation reached the Korean press and Korean journalists began to investigate the question of whether Shin had written her dissertation and whether she had in fact obtained a Ph.D. from Yale University.

80.     On June 12, 2007, a reporter from the Korean Broadcasting System sent an email to Emerson informing Emerson that there was doubt in Korea whether Shin had received "her doctor's degree from the Graduate School of Yale University" and that the Korean reporter wanted to know whether Shin had written a dissertation and had received a Ph.D. from Yale University.

81.     On the same day, Emerson forwarded Cho's June 10 email and the Korean reporter's June 12 email to a number of people within Yale University including the chairman of Yale University's History of Art Department and the deputy registrar of Yale University's Graduate School of Arts and Sciences.

82.     On June 13, 2007, Emerson sent Yale University's deputy registrar a follow-up email stating in pertinent part:

> . . . I don't know how Yale handles such matters but it seems to have "litigation" written all over it.

### Yale University Sets Up An Internal Response Team

83.     On June 14, 2007, Myoung Lee ("Lee"), a professor in the Department of Economics at the University of Missouri-Columbia, contacted Edward Barnaby ("Barnaby"), an Associate Dean in Yale University's Graduate School of Arts and Sciences.

11

84.     Lee informed Barnaby that she was contacting him on behalf of Dongguk University and that she was seeking "help" in "verifying whether Shin attended Yale University and received a Ph.D." and that she would provide Barnaby with copies of the September 5 Registered Letter and the September 22 Fax.

85.     In order to assist Barnaby, on June 15, 2007, Lee faxed a copy of the September 5 Registered Letter and the September 22 Fax that had been sent to Schirmeister to Dongguk University.

86.     On June 15, 2007, Yale University received additional inquires from the Korean press regarding whether Shin had been awarded a Ph.D. by Yale University.

87.     On June 15, 2007, Barnaby forwarded Lee's email as well as the copies of the September 5 Registered Letter and September 22 Fax that he had received from Lee to Susan Carney ("Carney"), Yale University's Deputy General Counsel.

88.     Neither Barnaby nor Carney sought to determine whether the September 5 Registered Letter and the September 22 Fax were authentic by having Yale University's files searched.

89.     Because he was concerned about Yale University's reputation, on June 15, 2007, Barnaby sent an email to, among others, Emerson and Schirmeister, with a copy to Carney, that gave instructions about how to handle inquiries regarding Shin.

90.     Barnaby's email stated in pertinent part:

> This matter has been referred to the Office of General Counsel. It will be assigned a representative from the Office of Public Affairs. Should anyone contact you regarding Jeong ah Shin, please decline to offer information. Once a contact in Public Affairs has been named, you can refer inquiries to that person. I will be in touch with the contact's information as soon as I receive it.

12

91.     Within a half hour of this email, Yale University assigned Tom Conroy, the

Deputy Director of Yale University's Office of Public Affairs, to handle all Korean media

inquiries regarding Shin.

92.     During late June 2007, Korean journalists continued to contact Yale University to

ask about Shin. All such calls were referred to Yale University's Office of Public Affairs for

response.

### Dongguk University And Other Korean Institutions
### Question Yale University About The September 22 Fax

93.     By the end of June 2007, articles began appearing in the Korean press questioning

whether Shin had written her dissertation, whether Shin had received a Ph.D. from Yale

University and whether Dongguk University had contacted Yale University in order to verify

Shin's Ph.D.

94.     In response to the newspaper articles questioning Shin's academic credentials, on

July 2, 2007, Yong Taek Im, the Chairman of the Dongguk University Foundation's Board of

Directors, held a press conference defending Dongguk University's decision to hire Shin,

explaining that Dongguk University had taken steps to verify Shin's Ph.D. and stating that it had

received the September 22 Fax from Yale University confirming the fact that Shin had obtained

a Ph.D. from Yale University.

95.     Nevertheless, concerned that it had received "contradictory" information from

Yale University concerning Shin's Ph.D., on July 5, 2007, the President of Dongguk University,

Youngkyo Oh ("President Oh"), wrote to the President of Yale University, Richard Levin

("President Levin"), a letter about Shin ("President Oh's Letter").

96.     In his July 5 letter, President Oh asked President Levin the following questions:

> (1) Did Yale University award a Ph.D. degree to Ms. Jeong Ah Shin in
> the major of History of Art in 2005?

13

(2) If the answer to the inquiry (1) is "No," then I am curious as to how Pamela Schirmeister came to issue the Ph.D. certification letter for Ms. Jeong Ah Shin.

(3) If Ms. Shin received a Ph.D. degree from your school, then would you let us know what department she was enrolled in and who was the academic and thesis adviser?

97.     On July 6, 2007, Cho sent an email directly to Schirmeister asking Schirmeister to explain the contradiction between Schirmeister's September 22 Fax confirming that Shin had received a Ph.D. from Yale University and the June 11, 2007 email from Emerson stating that Shin had not received a Ph.D. from Yale University.

98.     Schirmeister never responded to Cho's July 6, 2007 email.

99.     On July 6, 2007, the President of the Gwangju Biennale Foundation, a world-renowned Korean art institution, sent an "urgent" fax to the Dean of Yale University's Graduate School asking that Yale University verify Shin's Ph.D. since Shin was being considered as the Artistic Director of the 2008 Gwangju Biennale.

100.    In a separate fax sent on July 6, 2007, the Gwangju Biennale Foundation faxed to Yale University a copy of the September 22 Fax that had been sent to Dongguk University by Schirmeister.

101.    By July 8, 2007, Yale University's Department of Public Affairs had received numerous requests for information about Shin from the Korean press and it was fully aware that the Shin matter had erupted into a national scandal in Korea.

102.    On July 9, 2007, the Director General of The National Museum of Korea ("National Museum"), sent a fax to Yale University asking for assistance in determining whether Shin had received a Ph.D. from Yale University.

14

103.    Among the documents that the National Museum provided to Yale University were additional copies of the September 22 Fax and a copy of the September 5 Registered Letter.

104.    Even though the original September 22 Fax was in Yale University's files, on July 9, 2007, Barnaby wrote a letter to the President of the Gwangju Biennale Foundation stating that Yale University had "no record of a student with [Shin's] name having enrolled in the Graduate School of Arts and Sciences."

## Yale University Seeks To Distance Itself From The Shin Scandal

105.    On July 9, 2007, Christine Mehring, one of the Yale University professors supposedly involved in awarding Shin a Ph.D. from Yale University, informed the Chairman of Yale University's Art History Department that she was receiving numerous phone calls from reporters about the Shin matter.

106.    By this time, Yale University was receiving inquiries about Shin from Yale University alumni living in Korea.

107.    On July 9, 2007, Gila Reinstein ("Reinstein"), an Assistant Director of Yale University's Office of Public Affairs and the person responsible for the public affairs of Yale University's Graduate School of Arts and Sciences, was assigned to the Yale University team responding to the Korean press inquiries.

108.    On or about July 9, 2007, a reporter from the Chosun Ilbo, one of Korea's best known newspapers, sent an email to Schirmeister informing her that the Gwangju Biennale Foundation was in possession of a document stating that Schirmeister had verified Shin's Ph.D. in September 2005 and asking whether Schirmeister had "verified" Shin's Ph.D.

109.    Because Schirmeister did not respond to the reporter's email, on July 9, 2007, the same reporter emailed Schirmeister's assistant copies of the September 5 Registered Letter and the September 22 Fax.

15

110.    Neither Schirmeister nor her assistant responded to the Chosun Ilbo reporter's emails.

111.    On July 9, 2007, Reinstein wrote an email to the Director General of the National Museum falsely stating that "the documentation you faxed to me adds no credibility to the claim that Ms. Shin earned a Ph.D. from Yale in the History of Art . . ."

112.    In an email dated July 10, 2007, the Director General thanked Reinstein for her response but pointed out that the copy of the September 22 Fax in its possession contained "the fax number of Associate Dean's office which is clearly printed on top of the transmitted pages."

113.    Also on July 10, 2009, the Chosun Ilbo reporter who had previously contacted Schirmeister sent Reinstein an email asking whether Shin had ever been a student at Yale University.

114.    Unaware that the September 22 Fax was in Yale University's files, Reinstein erroneously informed the Korean reporter that Yale University had "no record that [Shin] earned a degree."

115.    In response, the Chosun Ilbo reporter sent Reinstein an email attaching another copy of the September 22 Fax and told her that Dongguk University had stated that the September 22 Fax, which had been sent to it by Yale University, was proof that Schirmeister had verified Shin's Ph.D.

116.    In his July 10 email, the Chosun Ilbo reporter specifically asked Reinstein to confirm whether Schirmeister had in fact sent the September 22 Fax to Dongguk University verifying Shin's Ph.D.

117.    On July 10, 2007, Reinstein forwarded to Carney the Chosun Ilbo reporter's email together with the copy of the September 22 Fax and informed Carney that she had also received

16

"faxes of the same documents (plus the fake diploma) from Hongnam Kim, director-General of the National Museum of Korea."

118. Thus, by July 10, 2007, not only were the originals of the September 5 Registered Letter and the September 22 Fax readily accessible in Yale University's files, Yale University had received at least four copies of the same documents from other Korean sources.

119. By July 10, 2007, Yale University was also fully aware that the Korean press had written about Dongguk University's employment of Shin, that Dongguk University had stated that in employing Shin, it had relied on the September 22 Fax attesting to Shin's Ph.D. and that the Korean press wanted to know if Dongguk University had told the truth.

120. Consequently, by July 10, 2007, Yale University was aware of the importance of providing truthful, accurate and complete information to the Korean media regarding the communications between Dongguk University and Schirmeister, on behalf of Yale University, about Shin.

### Yale University Denies Sending The September 22 Fax

121. Carney was given responsibility for writing a responsive letter to President Oh's Letter on behalf of President Levin that would answer President Oh's questions.

122. In responding to President Oh's Letter, Yale University knew or should have known that if it did not provide truthful, accurate and complete information regarding its communications with Dongguk University about Shin, that Dongguk University would be vilified in the Korean media, that Dongguk University's reputation would be significantly tarnished, and that it would suffer severe consequences.

123. While preparing the response, Carney sent an email to Barnaby stating:

> I remain concern [sic] about the apparent fax lines on the document transmittal sheets and the apparent receipt within the Dean's office of the 2005 inquiry. (But maybe that is false, too.)

17

124.   Nevertheless, at no time on or before July 10, 2007, did Carney or anyone else at Yale University make any effort to review Yale University's files to determine whether the September 5 Registered Letter and the September 22 Fax were authentic.

125.   On July 10, 2007, Carney sent a letter responding to the questions posed by President Oh (the "July 10 Letter").

126.   In the July 10 Letter, Carney stated that (i) Shin did not receive a Ph.D. from Yale University, (ii) the Certification Letter was a forgery, (iii) the September 22 Fax was "not authentic" and (iv) Yale University had no "knowledge currently regarding the creation or issuance" of the September 22 Fax.

127.   The statements contained in Carney's July 10 Letter regarding the September 22 Fax were false when made and were recklessly given.

128.   One day after she sent her July 10 Letter, Carney began to suspect that Yale University had received the September 5 Registered Letter and might have sent the September 22 Fax.

129.   In an email dated July 11, 2007, Carney stated:

> Ed Barnaby and I were troubled about the fax line at the top of some of the purported Yale correspondence, although it's pretty easy to make up fake documents including such lines these days.  Also, I had not seen the 2005 inquiry sent by fax to the Dean's office before; that, too, is troubling.

130.   Although Carney was "troubled" by the fax line and even though Carney and others within Yale University were aware that the Shin "incident [was] all over the Korean news," neither she nor anyone else at Yale University contacted Yale University's Central Mailroom or searched Yale University's files to determine whether the September 5 Registered Letter and the September 22 Fax were authentic.

18

131.   Rather than conduct an investigation to learn the truth, in a series of press interviews as well as in emails and press releases disseminated to the Korean media throughout July and August 2007, Reinstein on behalf of Yale University made a series of knowingly false statements regarding Dongguk University's efforts to verify Shin's Ph.D.

132.   When Reinstein made her statements, Reinstein was well-aware that "the issue of the Korean art historian who falsely claim[ed] to have earned her PhD from Yale [was] still on the front burner in the Korean media."

133.   In an effort to verify whether Dongguk University was telling the truth when it said it had received the September 22 Fax from Schirmeister, Korean reporters contacted Reinstein who on numerous occasions informed them that the September 22 Fax was "forged" or was a "fake."

134.   On July 13, 2007, the Chosun Ilbo printed an article, which stated in pertinent part:

> *The fax that "Dongguk University has been claiming to have received from Yale University," which was the decisive factor in the mystery of the forged doctorate degree of Dongguk University's Professor Jeong Ah Shin, was confirmed to have been forged.* Our newspaper sent an email message including this fax on the 12th, requesting [the school's] authentication, and in response, Ms. Gila Reinstein of Yale University's Public Affairs said "This document is in a different format from Yale University's academic record verification, and it is a forged document." She said in a telephone conversation, "Professor Pamela Schirmeister, whose signature is included in the letter, is presently away, but verification with her Assistant Professor *confirmed that Professor Schirmeister never signed such a letter.*
>
> * * *
>
> This fax was used as a confirmation for the academic record when Professor Shin was hired as a Professor of Dongguk University in 2005 and named the Art Director of Kwangju Biennale 2008. Now that it is determined to be a falsified [document], it is very possible that it was forged in Korea.  (Italics supplied.)

19

135.    On July 14, 2007, the Chosun Ilbo published on its website an English version of

its July 13, 2007 article in which it stated that:

> A document that was used to show that a Dongguk University art
> professor had a doctoral degree from Yale has turned out to be a forgery.

136.    The Chosun Ilbo's July 14, 2007 website article went on to state:

> *However, in response to an email inquiry by the Chosun Ilbo, Gila
> Reinstein at Yale University's Office of Public Affairs said, "The
> document has a different format from that of Yale University's official
> certificate. The document is a fake."*
>
> She said, *"I couldn't contact Pamela Schirmeister, associate dean of Yale
> Graduate School, whose signature was on the faxed document.* However
> her assistant said Prof. Schirmeister had never signed her name to such a
> document." (Italics supplied.)

137.    On July 16, 2007, the DongA Ilbo, another major Korean newspaper, published

an article entitled "Yale Decides Against Investigating 'Jeong Ah Shin's Fake Fax.'"

138.    The DongA Ilbo article was based upon an interview with Reinstein who was

quoted as saying that even if the September 22 Fax and the Certification Letter were "faxed from

Yale University, it does not change the fact *they were all fake documents that were not prepared*

*by Yale University.*" (Italics supplied.)

**Yale University Should Have Known That**
**It Was Disseminating False Information**

139.    Troubled by Yale University's statement that the September 22 Fax was not

authentic, Cho sent an email to Carney on July 15, 2007, in an effort to learn why Yale

University had reached that conclusion.

140.    In his July 15 email, Cho pointed out that the September 22 Fax contained a fax

telephone number and he inquired whether the fax telephone number was "a Yale number."

141.    On July 16, 2007, Carney sent Cho an email assuring Cho that Yale's

"investigators" were examining the September 22 Fax and would be "making further inquiries."

20

142.    In her July 16, 2007 email, Carney confirmed that the fax number on the

September 22 Fax "is assigned as the fax number for the Yale Graduate School Associate Dean's

Office."

143.    However, Carney went on to say in her July 16 email:

> Because documents can so easily be fabricated with available software
> programs these day, it appears that the fax line may have been added to a
> copy, but may not be the case. The investigators will examine this
> question.

144.    The "investigators" whom Carney referred to in her email was the Yale

University Police Department, which, according to another email sent by Carney, was "busy at

the moment (unfortunately, with break-ins . . .)"

145.    Notwithstanding Carney's promise to investigate the matter further, no further

investigation was done by the Yale University Police Department to determine whether the

September 22 Fax was authentic or whether the September 5 Registered Letter had been received

by Yale University.

146.    Had  Carney or anyone in the Yale University Police Department searched Yale

University's files or contacted the Yale University Central Mailroom, they would have

discovered that the September 5 Registered Letter and the September 22 Fax were authentic.

### Yale University Continues To Disseminate False Information

147.    On July 17, 2007, Reinstein sent an email to Helaine Klasky ("Klasky"), who was

Yale University's Director of Public Affairs and Special Assistant to the President, asking

permission to make the following statement which would be emailed or faxed to Korean

reporters:

> Jeong-Ah Shin was never enrolled as a student at Yale University and did
> not earn a Ph.D. or any other degree from this university.  Any document
> purporting to support her claim is false and was not issued from Yale.

21

148.    The proposed statement was false because the September 22 Fax, which supported Shin's "claim" had been issued by Yale University was authentic.

149.    Klasky approved Reinstein's suggested language and the false statement was sent or otherwise transmitted by Reinstein to the Korean media.

150.    In addition to claiming that the September 22 Fax was a fake, Reinstein also falsely informed the Korean media that Yale University had not received the September 5 Registered Letter asking whether Shin had received a Ph.D. from Yale University.

151.    On July 18, 2007, the Hankook Ilbo, another Korean newspaper, printed an article which noted that Yale University had made a public statement that the September 22 Fax was forged and which opined that Dongguk University may never have actually done anything to verify Shin's Ph.D.

152.    On July 19, 2007, the Chosun Ilbo wrote an article based in large part on an interview with Reinstein in which she stated that Dongguk University had never contacted Yale University about Shin.

153.    The July 19 Chosun Ilbo article stated in pertinent part:

> Associate Director Gila Reinstein of Yale University's Public Affairs Office stated, "Dongguk University said that it mailed a letter for an inquiry of her academic record, so we looked into it, *but we (Art History Department Graduate School of Yale University) never received (the letter)*." (Italics supplied.)

154.    The July 19 Chosun Ilbo article went on to state:

> Did Dongguk University really send the mail? – Associate Director Reinstein said, "we have a system that verifies each student's degree, so had we received the letter, we would have replied according to the process," adding, "We never received the letter."

155.    Also on July 19, 2007, the Joong Ang Ilbo, another Korean newspaper, printed the results of a July 17, 2007 interview with Reinstein in which Reinstein gave the following answer to the following question:

> Dongguk University is claiming to have forwarded an academic record verification request to Yale University.  Did you receive it?
>
> I looked for it repeatedly in the Department of Art history and the Graduate School with no success.  A document such as a request for verification of academic records is a very important matter so we keep a book to record it.  *The fact that we couldn't find such an important document means that we didn't receive it.  I do not know what happened.* (Italics supplied.)

156.    Believing that Yale University was telling the truth, on July 18, 2007, the Dongguk University Foundation's Board of Directors publicly stated that it would "discipline all the faculty members involved in the forgery case for failed verification of [Shin's] doctorate when she was selected."

157.    Believing that Yale University was telling the truth, on July 18, 2007, President Oh issued a statement publicly apologizing for the scandal involving Shin.

### Yale University Continues Its Aggressive Public Relations Efforts

158.    Yale University continued to make false statements to the Korean media about the September 5 Registered Letter and the September 22 Fax and public criticism of Dongguk University intensified.

159.    On July 20, 2007, Reinstein sent an email to a reporter from another Korean newspaper, The Hankyoreh, who sought information about the September 5 Registered Letter and the September 22 Fax.

160.    Reinstein's July 20 email stated in pertinent part:

> *Neither Pam Schirmeister nor any other Yale official signed documents affirming that she earned a degree.*  The phone and fax numbers on the false documents are correct, but that information is public knowledge.  *If Yale had received a request* to confirm that Shin earned a degree from the

23

Graduate School, Yale would have responded that she did not. (Italics supplied.)

161. On July 24, 2007, Klasky decided that Yale University should take an even more aggressive position with the Korean media.

162. By that date, Reinstein had already spoken to Seoul Broadcasting Company, Munhwa Broadcasting Corporation, Chosun Ilbo, JoongAng Ilbo, Dong-A Daily and other Korean media outlets about Yale University's supposed lack of involvement in the Shin matter.

163. In her conversations with the Korean press, Reinstein "shared" the September 22 Fax "with the Korean reporters" and told them it was fake because the September Fax did not bear any "resemblance to the letter that [Dean Pamela Schirmeister] sends to confirm a degree."

164. The public statements made by Reinstein on behalf of Yale University stating that the September 22 Fax was a fake and that the September 5 Registered Letter was never received by Yale University were picked up by virtually all of the major Korean newspapers and broadcast companies.

165. Yale University's statement that the September 22 Fax was a fake and that the September 5 Registered Letter was never received by Yale University was also picked up and republished by news agencies from around the world.

166. As a consequence, numerous articles were published in print and on websites in and outside of Korea reporting Dongguk University's supposed failure to verify Shin's credentials.

167. By late-July 2007, the information provided by Reinstein on behalf of Yale University had been widely circulated to the Korean population-at-large, many of whom believed that Dongguk University had improperly hired Shin, that it had never contacted Yale

24

University, and that it had tried to cover up its inaction by reliance on a forged document, *i.e.* the September 22 Fax.

168. As a result of Reinstein's continued statements to the Korean press, Dongguk University continued to be severely criticized in the Korean press and on broadcast television.

169. On August 4, 2007, Munhwa Broadcasting Corporation, one of the most important television stations in Korea, broadcast a "60 Minutes"-type exposé publicly criticizing Dongguk University's role in the Shin scandal.

170. In connection with the forty-five minute broadcast, Reinstein was interviewed and a clip of her interview was aired.

171. In her publicly aired television interview, Reinstein, on behalf of Yale University, once again claimed that Yale University had never received an inquiry from Dongguk University asking about Shin's Ph.D.

172. The Korean television broadcast also reported that Yale University continued to assert that it had never sent the September 22 Fax.

173. On August 20, 2007, Klasky sent a memo to President Levin in connection with a interview that President Levin was scheduled to have with an editor of Monthly JoongAng, a prominent Korean current affairs magazine.

174. In the August 20 memo, Klasky focused President Levin on "the tremendous attention that Yale has received (and continues to receive) in the Korean press surrounding the Shin incident" and reminded President Levin, that, if asked, President Levin should "simply re-state the facts as outlined in Susan Carney's [July 10, 2007] letter."

175. At the time Kalsky sent her August 20 memo to President Levin, Yale University still had not searched its files in order to determine whether the September 22 Fax was authentic.

176.    Yale University's failure to acknowledge the truth about its communications with Dongguk University concerning Shin continued to have severe consequences in Korea.

177.    On August 31, 2007, a group of monks belonging to the Jogye Order publicly called for the dismissal of all of the directors of Dongguk University Foundation's Board of Directors because of their responsibility in approving Shin as a "special hiring candidate."

178.    On September 3, 2007, the Korea Times, in an article entitled "Factional Feud Deepens in Buddhist Groups," reported that the "diploma scandal of a university professor has initiated a factional feud between Buddhist groups" affiliated with the Jogye Order.

179.    On September 17, 2007, KMAC, a prominent Korean consumer service consulting organization, notified Dongguk University that because of Dongguk University's reported role in the Shin scandal, it wold not be receiving KMAC's prestigious 2007 Customer Satisfaction Management Grand Award.

180.    In so doing, KMAC stated that:

Reasons

There is no question that [Dongguk University] demonstrated exemplary effort by becoming the first college to implement the concept of customer satisfaction under outstanding leadership.

For a school, customers include not only its students who receive direct service, but it must consider the social benefits, such as industrial and citizen communities, which means that a high quality service must be offered directly and indirectly to the students – the receiver of service , industrial society, citizens, etc.  In that aspect, *considering the recent social issue pertinent to the employment of the teaching staff in the aspect of the quality management of education service, the Evaluation Committee reached the final resolution that found the awarding to be inappropriate.* (Italics supplied.)

**Dongguk University's Continued Efforts To Have Yale
University Acknowledge Its Role In the Shin Matter Are Rebuffed**

181.    In or about early August 2007, the Seoul Western District Prosecution Office (the
"Korean Prosecutors") commenced a criminal investigation into the circumstances surrounding
Shin's contention that she had been awarded a Ph.D. by Yale University.

182.    Among other things, the Korean Prosecutors were interested in Dongguk
University's relationship with Shin and whether Dongguk University had verified Shin's Ph.D.
as it had claimed.

183.    In view of mounting public criticism and the pending criminal investigation,
Dongguk University continued to communicate with Yale University in its effort to prove that
Yale University had received the September 5 Registered Letter and that the September 22 Fax
attesting to Shin's Ph.D. was authentic.

184.    On August 31, 2007, Cho sent Carney an email stating that Dongguk University
had located the United States Postal Service's tracking record that established that the September
5 Registered Letter was signed for by "M Moore YCM," and that "M Moore" was Michael
Moore, one of the YCM staff members.

185.    In his August 31 email, Cho stated that he "was hopeful" that this "new evidence"
would enable Yale University to establish the authenticity of the September 22 Fax.

186.    Later that day, Carney sent a responsive email to Cho stating:

> Dear Director Cho,
>
> The material that you have provided below does not support the
> conclusion that any package from Dongguk University was ever delivered
> to Dean Schirmeister. The Yale Graduate School advises that there was
> no one by the name "Michael Moore" working there in 2005. In addition,
> "YCM" is not an acronym related to the Graduate School Dean's office,
> where Dean Schirmeister works. All that the receipt you provided
> indicates is that it was delivered in New Haven CT and signed for by "M
> Moore YCM."

27

187.    In a return email, Cho informed Carney that the acronym "YCM" stands for "Yale Central Mailroom" and he provided a website link to Yale University's website that established that Michael Moore was a person employed by Yale University in the Yale Central Mailroom.

188.    Rather than accept this evidence, on September 1, 2007, Carney sent Cho an email asking for a "copy of the actual receipt" from the U.S. Postal Service.

189.    On September 3, 2007, Cho sent a copy of the mailing label that was affixed to the September 5 Registered Letter.

190.    On September 4, 2007, Carney sent an email to Cho complaining that the mailing label was not completely in English and asking for a copy of the receipt containing Michael Moore's "actual signature"-- something that she should have known would not be in the possession of Dongguk University.

191.    By September 12, 2007, in its effort to prove that the September 5 Registered Letter had been received by Yale Univeristy, Dongguk University had provided Carney with:

(a)    a copy of the U.S. Postal Service's Track & Confirm Receipt stating that the September 5 Registered Letter had been received by "M Moore YCM;"

(b)    a website link to Yale University's Central Mailroom which established that Yale University's mailroom was staffed by, among others, Michael Moore; and

(c)    a copy of the mailing label that was put on the package that contained the September 5 Registered Letter.

192.    In addition, Dongguk University had previously provided Carney with the Yale University fax telephone number that was on the September 22 Fax.

193.    In the same September 12 email, Cho informed Carney of the Korean Prosecutors' interest in the matter and he told Carney that it would be a "great help" to him to know whether the new material helped Carney establish that the September 5 Registered Letter had been received.

194.    Cho's September 12 email also asked Carney to inform Dongguk University whether the information that had been sent to her enabled her to determine whether the September 5 Registered Letter had been received by Yale University.

195.    Having received the information that had been provided to her by Cho, Carney should have easily been able to determine that the September 5 Registered Letter had been received by Yale University and that the September 22 Fax was authentic.

196.    Carney neither responded to Cho's September 12 email nor did she take any further steps to determine whether the September 5 Registered Letter and the September 22 Fax were authentic.

## Yale University Continues To Disseminate
## False Information About The Shin Incident

197.    On or around September 17, 2005, Shin was arrested and her Korean attorney announced that he would prove that Shin has been duped by someone who worked at Yale University.

198.    Upon hearing this news, Klasky, concerned that Yale University's name was "getting dragged through the mud," sent an email to George Joseph ("Joseph"), the individual within Yale University's Office of International Affairs responsible for Asia, recommending that Yale University issue "another statement" about Yale University's non-involvement in the Shin matter that would be sent "to all the Korean papers."

199.    Joseph responded on September 18, 2007 by stating:

> Since this story is now going in a different direction than where it was two days ago, I concur.

200.    On September 19, 2007, Reinstein and one of her colleagues received an email from a Korean reporter from the Maeil Business Newspaper which stated in pertinent part:

29

Hello my name is Park, Sowoon, and I am a journalist of Maeil Business Newspaper in Korea. About two months ago, I talked with Reinstein on the phone. These days, the scandal of Shin Jeong-ah, who allegedly faked her Yale diploma to become a professor, still graces the headlines of newspapers. *Therefore, I would be delighted if you (Reinstein and Conroy) let me know whether the fax sent in Sep. 2005 was really sent at Yale or not.* (Italics supplied.)

201.    In order to respond to the Maeil Business Newspaper reporter's question and respond to similar inquiries made by other Korean reporters, Reinstein prepared another Yale University official statement ("Official Statement").

202.    As of September 20, 2007, the time when Reinstein prepared the Official Statement, no one connected with Yale University had searched Yale University's files to determine whether the September 22 Fax was authentic nor had anyone from Yale University used the information provided by Cho to Carney in early September 2007 to determine whether the September 5 Registered Letter had been received by Yale University's Central Mailroom.

203.    On September 21, 2007, the Official Statement that had been prepared by Reinstein was approved by Klasky, and Reinstein was authorized to send it "to the Korean media" who had contacted her and to have it posted on Yale University's website.

204.    The Official Statement stated in pertinent part:

Jeong Ah Shin was never enrolled as a student at Yale University and did not attend classes or earn a Ph.D. or any other degree from this university. *Any document or statement purporting to support her claim is false and was not issued by Yale University.* (Italics supplied.)

205.    The Official Statement was false because the September 22 Fax, which supported Shin's claim was not "false" because it had been "issued by Yale University."

206.    On September 21, 2007, Reinstein responded to the Maeil Business Newspaper reporter's question about the authenticity of the September 22 Fax by sending him an email containing the Official Statement.

30

207.    On or about September 21, 2007, Reinstein spoke with a reporter from DongA Ilbo about the Shin incident and explained to the reporter that Yale University had no involvement in that matter.

208.    Reinstein immediately emailed a copy of the Official Statement to the DongA Ilbo reporter.

209.    Also on September 21, 2007, Reinstein sent the Official Statement to a reporter from the Buddhist Weekly Newspaper in response to the reporter's question as to whether Schirmeister sent "documents confirming Shin's doctorate by facsimile on September 22, 2005."

210.    On September 23, 2007, DongA Ilbo reported that Yale University had issued an Official Statement stating, *inter alia*, that all documents supporting Shin's claim were forgeries and therefore "are fake."

211.    As a result of Yale University's dissemination of the Official Statement which continued to deny the authenticity of the September 22 Fax, Dongguk University's reputation continued to be -- in Yale University's terms -- "dragged through the mud."

212.    In late September 2007 and in early October 2007, Dongguk University's Professors Association issued a number of formal statements, all of which were reported in the Korean press, demanding the resignation of Dongguk University's President and Vice President as well as the resignation of the Dongguk University Foundation's Board of Directors.

213.    Based upon Yale University's continued public statements that the September 5 Registered Letter and the September 22 Fax were forgeries, the Korean Prosecutors focused their attention on Dongguk University's supposed failure to verify Shin's Ph.D credentials.

214.    Numerous Korean newspapers and other media outlets informed the Korean population-at-large of the Korean Prosecutors' investigation of Dongguk University's purported role in the Shin matter.

31

### Yale University Discovers That
### The September 22 Fax Is Authentic

215.     On October 11, 2007, Shin was arrested by the Korean Prosecutors, and was accused of fabricating a doctorate degree and other documents from Yale University.

216.     In connection with the then-upcoming criminal trial of Shin and at the request of the Korean Prosecutors, on October 17, 2007, the United States Department of Justice served an information subpoena ("Information Subpoena") on Yale University in order to obtain information contained in Yale University's files that might be related to the Shin matter.

217.     The Information Subpoena was sent to Harold Rose ("Rose"), one of Yale University's Associate General Counsel.

218.     The Information Subpoena required Yale University to answer the following questions:

> Did you receive an international mail enquiry related to academic reference of the suspect from Dongguk University in September 2005?
>
> Upon receipt, whom did the staff member of Yale University deliver the above mail to?
>
> Has the international enquiry been answered?  (If yes, when was it?)
>
> What did you answer in response to the enquiry?

219.     Upon receipt of the Information Subpoena, Yale University's General Counsel's Office commenced an immediate investigation in order to answer the questions posed in the Information Subpoena.

220.     On October 18, 2007, one day after it had received the Information Subpoena, Rose received documents from Yale University's Central Mailroom, which confirmed that the September 5 Registered Letter had been received by Yale University's Central Mailroom on September 20, 2005 and had been forwarded to Yale University's Graduate School of Arts and Sciences on that day.

32

221.    On the same day, October 18, 2007, Schirmeister's assistant searched

Schirmeister's files and found the original of the September 22 Fax as well as the original

September 5 Registered Letter including the envelope in which it had been sent.

222.    Even though as of October 18, 2007, Yale University knew that the September 5

Registered Letter and the September 22 Fax were authentic, that it had continually provided false

information about these documents to the Korean media between July and October 2007, and

that Dongguk University had been the subject of unrelenting criticism in Korea because of Yale

University's false statements to the Korean press, Yale University did not take any action to

correct its false statements.

223.    Rather than disclosing the true facts to the Korean media and to Dongguk

University, beginning on October 18, 2007, members of Yale University's General Counsel's

Office and Office of Public Affairs met to develop a "strategy" designed to minimize the impact

of Yale University's errors.

224.    On October 29, 2007, Rose sent a letter (the "October 29 Letter") to the United

States Department of Justice that contained Yale University's response to the Information

Subpoena.

225.    Among other things, the October 29 Letter provides the following answers to the

following questions:

> 8. Did Yale University receive an international mail enquiry related to
> academic reference of Jeong Ah Shin from Dongguk University in
> September 2005?
>
> <u>Answer</u>: Yes. In September 2005, Yale University received a letter dated
> September 5, 2005, with receipt number RR 062 260 601 KR, from Prof.
> Dr. Hyung Taik Ahn, Department Manager, Dongguk University;
> Personnel Administration Team.
>
> &ast; &ast; &ast;

33

10. Upon receipt, whom did the staff member of Yale University deliver the above mail to?

Answer: Yale University mail delivery records indicate that the letter described in response to Question 8 was delivered to Shalentia Moore, an office assistant in the Yale Graduate School.

11. Has the international enquiry been answered? (If yes, when was this reply dispatched?)

Answer: Yes. On September 22, 2005, at 13:25 E.D.T., Associate Dean of the Yale Graduate School, Pamela Schirmeister, sent a fax in reply to the letter described in response to Question 8.

12. What was the answer in response to the enquiry?

Answer: The fax said, "As requested I am confirming that the attached letter was issued by the Yale Graduate School and signed by me." Dean Schirmeister now believes that this answer was an error.

226.   Even though the October 29 Letter formally acknowledged that Yale University had received the September 5 Registered Letter and had sent the September 22 Fax, Yale University did not issue an official statement correcting its past errors or take any corrective action whatsoever.

227.   Finally, on November 29, 2007, more than six weeks after Yale University knew the truth, Carney sent a terse letter by email to President Oh of Dongguk University in which Yale University acknowledged that it had been in error when it stated that the September 22 Fax was a fake.

228.   In her November 29, 2007 letter, Carney informed President Oh that "it now appears from a document discovered by Ms. Schirmeister" that the September 22 Fax is *"indeed authentic."* (Italics supplied.)

229.   In an effort to explain away Schirmeister's actions, Carney stated that the September 22 Fax had been sent in "the rush of business."

34

230.    At that time, Yale University did not inform the Korean media that Yale University had committed an error when it continually told the Korean media that neither the September 5 Registered Letter nor the September 22 Fax were authentic.

231.    On December 27, 2007, Dongguk University held a press conference announcing that Yale University had sent Dongguk University a letter stating that the September 22 Fax was authentic.

232.    It was only after the Korean media reported the statements at Dongguk University's press conference that Yale University determined that it had to issue a public statement regarding its "error".

233.    On December 29, 2007, approximately two and one-half months after Yale University discovered its error and almost six months after Yale University denied receiving the September 5 Registered Letter and sending the September 22 Fax, Yale University finally issued a formal public statement that it had committed an "error."

234.    Yale University's December 29 public statement stated in pertinent part:

> In a facsimile response sent to Dongguk, also in September 2005, the Graduate School confirmed, erroneously, that the letter was issued by the Yale Graduate School and signed by a Yale Associate Dean. Responding quickly to what appeared to be a routine request, Yale's staff mistakenly relied on the letterhead and signature on the purported May 2005 letter and failed to recognize it as fabricated.

235.    The December 29 public statement failed to state that by relying "on the letterhead and signature" in order to verify Shin's Ph.D., "Yale's staff" had violated Yale University's longstanding verification protocols.

236.    The December 29 public statement went on to state that:

> Yale has undertaken an extensive examination of its documents related to this matter in the past several months and has changed its protocols for verifying graduate degrees. Yale's review of the Shin matter in Summer 2007 at Dongguk's request suggested at first that the September 2005

35

facsimile had not been sent to the Graduate School, because the format of the facsimile was not customary, and Yale so advised Dongguk. This conclusion raised further questions, and a more thorough investigation and document search concluded that Yale indeed erroneously verified the purported May 2005 letter as a result of an administrative error.

237.     Yale University's December 29 public statement was false because as of the time of its dissemination, Yale University had not "changed its protocols for verifying graduate degrees" and did not conduct a "thorough investigation" based upon Dongguk University's request.

238.     Rather, Yale University had not changed its protocols and had only discovered the true facts because it had to comply with the Information Subpoena it had received from the Untied States Department of Justice on October 17, 2007.

239.     Having spent almost six months publicly denying any role in the Shin matter and contending that Dongguk University had never contacted Yale University, Yale University's December 29 public statement did not undo the damage suffered by Dongguk University.

240.     On December 28, 2007, Cho, on behalf of President Oh, emailed a letter to Carney which stated in pertinent part:

> . . . if Yale University had revealed the fact in your first reply of July 10, 2007, Dongguk University would not have received a lot of harsh criticism from the public.  Your inaccurate information of July 10, 2007 has ruined our one hundred year-long built reputation.  What was worse was that in September 2005, we had no choice but to take the facsimile document sent by Ms. Schirmeister as an authentic one as it is now, and officially believed that Yale University awarded a Ph.D. to Jeong Ah Shin in May, 2005 on the basis of the document that Ms. Schirmeister sent us in September 2005.

241.     Cho then asked for an explanation of why it took so long for Yale University to discover the true facts.

242.     On January 31, 2008, Carney sent a letter responding to Cho's December 28, 2007 letter and in that letter Yale University again failed to tell the truth.

36

243.    In explaining why Schirmeister had verified Shin's Ph.D., Carney explained that at "that time of the year, in September, her office sends approximately 70 letters a day, and tries to respond promptly to every inquiry."

244.    In fact, Schirmeister's "office" did not send "70 letters a day" and Schirmeister's "error" was due to her failure to follow established Yale University protocols.

245.    Carney also attempted to explain why it took so long for Yale University to discover that the September 5 Registered Letter and the September 22 Fax were authentic by stating:

> . . . at the time, we were not aware of any evidence establishing that Dongguk University's inquiry of September 2005 had ever been delivered to the Graduate School office. That evidence became available only later, at the end of August and early September, when you located a delivery tracing document and provided it to us.  Thereafter, our renewed inquiry turned up the original September 22, 2005 facsimile cover sheet.

246.    In fact, the documentation that Cho sent to Carney had nothing to do with Yale University's discovery of its errors nor was there a "renewed inquiry" based upon such documentation.

247.    Rather, it was only because Yale University received the Information Subpoena that it conducted a thorough investigation and discovered that the September 5 Registered Letter and the September 22 Fax had always been in Schirmeister's files.

### Dongguk University's Reputation Was Destroyed by Yale University's False Statements

248.    As a result of Yale University's public statements that Dongguk University had never contacted it about Shin, that the September 5 Registered Letter was never received by Yale University and that the September 22 Fax was a fake, Dongguk University was publicly humiliated and deeply shamed in the eyes of the Korean population.

37

249.    In Korean culture, one's reputation affects not only the level of respect he, she or it can expect from others, but also affects the dignity, credibility, social status and core identity of that person or entity.

250.    In its history of 100 years, Dongguk University had built a reputation based upon its strong sense of morality that was grounded upon its Buddhist philosophy.

251.    Because of the false statements made by Yale University, the Korean media reported that Dongguk University had improperly hired Shin, that it had never contacted Yale University and that it had tried to cover up its inaction by relying on a forged document, *i.e.* the September 22 Fax.

252.    In Korean culture, where the identity of an individual is particularly closely associated with the group to which he or she belongs, living up to the group's norms and values is extremely important.

253.    In Korean culture, damage to one individual's reputation is often imputed to the reputation of the group to which he or she belongs.

254.    Therefore, disgrace to an individual member of the society tends to be taken personally by other members of the society, who often fear that the inadequacies of that person or entity will be imputed to the society as a whole and further imputed to themselves as members of that society.

255.    As a result of Yale University's continued false statements to the Korean media and notwithstanding Yale University's apology, over 50% of the Korean population concluded that Dongguk University did not tell the truth when it stated that it had contacted Yale University and that Yale University had verified Shin's degree.

256.    Moreover, over 45% of the Korean population believed that Dongguk University's failure to tell the truth tarnished the reputation of Korea as a country.

38

257.     Based upon their belief that Dongguk University lied about Yale University's participation in the verification process, almost 40% of the Korean population now have a negative view of Dongguk University.

258.     As a direct result of the publication of the false statements made by Yale University, the amount of money received from Dongguk University's alumni and from corporate donors decreased.

259.     In addition, the number of student applications for admission to Dongguk University decreased and the amount of government grants made to Dongguk University decreased.

260.     Further, as a direct result of the public criticism aimed at Dongguk University by reason of Yale University's public misstatements, Dongguk University was humiliated and shamed and, as a consequence, President Hong, the former-President of Dongguk, was publicly humiliated and was stripped of his professor emeritus title—a significant event in Korea.

261.     Because of Yale University's public misstatements, Dongguk University was also forced to expend a substantial amount of money defending itself against the claim that it had acted improperly because it had supposedly failed to verify Shin's Ph.D.

262.     Most recently, Dongguk University was notified by the Korean government that it would not be added to the list of academic institutions permitted to open a "U.S. style" law school.

### FIRST CLAIM FOR RELIEF
#### (Negligence)

263.     Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 262 as though they were set forth in full herein.

264.    In responding to the inquires of academic institutions and other inquirers as to whether Yale University has awarded a degree to a particular person, Yale University has a duty to take all necessary and appropriate steps that will enable it to accurately determine whether such person has in fact received a degree from Yale University.

265.    In responding to the September 5 Registered Letter, Schirmeister, acting on behalf of Yale University, was negligent and careless in that she did not exercise the requisite degree of care in determining whether Shin had been awarded a Ph.D. from Yale University.

266.    Moreover, in responding to the July 5, 2007 letter from President Oh inquiring about the legitimacy of Schirmeister's September 22 Fax, Yale University had a duty to take all responsible and appropriate steps that would enable it to accurately determine whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

267.    In responding to President Oh's July 5, 2007 Letter, Carney, acting on behalf of Yale University, was negligent and careless in that she did not take the requisite degree of care in determining whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

268.    Thereafter, in its September 21 "Official Statement," Yale University was negligent and careless in that it did not take the requisite degree of care in determining whether the September 22 Fax had been created and sent by Schirmeister on behalf of Yale University.

269.    As a direct result of Yale University's negligence, Dongguk University has suffered damages in an amount no less than $50,000,000.

### SECOND CLAIM FOR RELIEF
### (Reckless and Wanton Conduct)

270.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 262 as though they were set forth in full herein.

40

271.    In responding to the inquiries of academic institutions and other inquirers as to whether Yale University has awarded a degree to a particular person, Yale University has a duty to take all necessary and appropriate steps that will enable it to accurately determine whether such person has received a degree from Yale University.

272.    In responding to Ahn's September 5 Registered Letter, Schirmeister did not follow Yale University's protocols regarding the verification of graduate degrees nor did she make any effort to research Yale University's records to determine whether Shin had been awarded a Ph.D. from Yale University.

273.    Schirmeister's failure to follow Yale University's protocol and her failure to do any research was a reckless and wanton disregard of Dongguk University's rights and interests.

274.    Relying on the September 22 Fax sent by Yale University that attested to the fact that Shin had received a Ph.D. from Yale University, Dongguk University did not take further action and Shin's faculty appointment was not overturned.

275.    Upon information and belief, as of the time that Carney was preparing her response to President Oh, no one from Yale University contacted the Yale University Central Mailroom for evidence that the September 5 Registered Letter was received or searched Yale University or Schirmeister's files for the September 5 Registered Letter or September 22 Fax to determine their authenticity.

276.    Yale University's failure to perform an adequate search or investigation regarding the September 5 Registered Letter or September 22 Fax between June 2007 and October 2007 was a reckless and wanton disregard of Dongguk Univeristy's rights and interests.

277.    Despite possessing evidence to the contrary, beginning from July 15, 2007 through September 21, 2007, Yale University wantonly and recklessly issued press releases,

41

gave interviews, sent emails and made an Official Statement falsely stating that it had never received the September 5 Registered Letter and never sent the September 22 Fax.

278.    As a direct result of Yale University's wanton and reckless conduct, Dongguk University has suffered damages in an amount no less than $50,000,000.

### THIRD CLAIM FOR RELIEF
#### (Defamation)

279.    Dongguk University repeats and realleges the allegations contained in paragraphs 1 through 262 as though they were set forth in full herein.

280.    As heretofore set forth in detail, through the summer of 2007 and, in particular, on July 9, 2007, July 10, 2007, July 12, 2007, July 13, 2007, July 14, 2007, July 16, 2007, July 17, 2007, July 18, 2007, July 19, 2007, July 20, 2007, August 4, 2007 and September 21, 2007, Yale University falsely and maliciously told various Korean newspapers and/or broadcast media that:

(a)    It had never received the September 5 Registered Letter;

(b)    It never informed Dongguk University that Shin had been awarded a Ph.D. from Yale University; and

(c)    The September 22 Fax was a "fake" and a "forgery."

281.    As heretofore set forth in detail, the statements made by Yale University to the Korean press and to the Korean broadcast media were made verbally as well as in writing.

282.    The aforesaid statements are false and defamatory.

283.    As heretofore set forth in detail, by reason of such false and defamatory statements, Dongguk University has been labeled as being dishonest and has been held up to disgrace and ridicule.

284.    As a direct consequence, Dongguk University's stellar reputation has been severely tarnished.

285.   As heretofore set forth in detail, in addition to suffering damage to its reputation, Dongguk University has suffered actual financial harm.

286.   As a direct result of Yale University's defamatory statements, Dongguk University has suffered damages in an amount no less than $50,000,000.

WHEREFORE, plaintiff Dongguk University requests that this Court grant the following relief:

(1)   As to the first claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus interest;

(2)   As to the second claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus punitive damages in an amount to be determined;

(3)   As to the third claim for relief, a judgment in its favor against defendant Yale University for damages in an amount to be determined at trial but not less than $50,000,000 plus punitive damages in an amount to be determined; and

(4)     Such other and further relief as this court deems just and proper together with

costs and disbursements of this action.

Dated: October __, 2009

JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.

By:_____

        Ira Grudberg
        350 Orange Street
Of Counsel:                     New Haven, Connecticut  06511
                                (203) 951-3720
Robert A. Weiner
Nathanael Kelley                *Attorneys for Plaintiff Dongguk University*
Audrey Lu
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173-1922
(212) 547-5400

44

# EXHIBIT 78

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONGGUK UNIVERSITY, | ) | No. 3:08-CV-00441(RNC) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY, | ) | |
| Defendant. | ) | July 17, 2008 |

## CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York 10173-1922
(212) 547-5400

JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.
350 Orange Street
New Haven, Connecticut 06511
(203) 772-3100
*Attorneys for Plaintiff Dongguk University*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF THE ALLEGATIONS CONTAINED IN THE COMPLAINT....................... 2

ARGUMENT.................................................................................................................. 9

I.   YALE'S MOTION TO DISMISS IS FATALLY DEFECTIVE............................................ 9

A.  The Applicable Legal Standards ................................................................. 10

B.  Dongguk Properly Pleaded The Claim For Negligence ...................................... 12

C.  Dongguk Properly Pleaded The Claim For Reckless and Wanton Conduct ........................ 20

D.  Dongguk Has Properly Pleaded The Breach of Implied Contract Claim .............................. 22

E.  Dongguk Has Properly Pleaded Its Defamation Claim ........................................ 24

II.  YALE'S EXTRA-COMPLAINT DOCUMENTS CANNOT BE CONSIDERED BY
     THE COURT ........................................................................................................ 29

A.  The Applicable Legal Standard ............................................................................. 30

B.  The Newspaper Articles Were Not Relied Upon By Dongguk For Their Truth ................... 33

C.  The Court Cannot Consider The Korean Judgment................................................. 36

D.  Even If The Court Could Consider Yale's "Extra-Complaint" Documents, It Would
    Still have To Deny Yale's Motion To Dismiss ...................................................... 38

CONCLUSION................................................................................................................ 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aldrich v. Randolph Central Sch. District*, 963 F.2d 520 (2d Cir.), *cert. denied*, 506 U.S. 695 (1992)..................................................................................................33, 34

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................10

*Boyd v. Nationwide Mutual Insurance Co.*, 208 F.3d 406 (2d. Cir. 2000)........................28

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ........................31

*Burke v. APT Foundation*, 509 F. Supp. 2d 169, 172 (D. Conn. 2007).............................10

*Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206 (S.D.N.Y. 2007) ......................................................................................................................35

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ..............................31, 32, 33

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) .................................10

*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ...................30, 33

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir 1989) ...................................................................35

*DeRay v. Larson*, 2004 U.S. Dist. LEXIS 19642 (D. Conn. Sept. 29, 2004), *aff'd*, *DeRay v. Otis Elevator Co.*, 153 Fed. App'x 19 (2d Cir. 2005)..................................31

*Doe v. Norwich Roman Catholic Diocesan Corp.*, 268 F. Supp. 2d 139 (D. Conn. 2003) ............................................................................................................19

*Dougherty v. Town of North Hempstead Board of Zoning*, 282 F.3d 83 (2d Cir. 2002) .............................................................................................................28

*Erickson v. Pardus*, _ U.S._, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ......................11

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ....................................................32

*Gerrity v. R. J. Reynolds Tobacco Co.*, 399 F. Supp. 87 (D. Conn. 2005)........................11

*Global v. Hasty*, 490 F. 3d 143, 157 (2d Cir. 2007) .........................................................11

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1980)............................................................35

i

*Gorman v. Consolidated Edison Corp.*, 488 F.3d 586 (2d Cir. 2007), *cert. denied*, 2008 U.S. LEXIS 4864 (June 9, 2008) ........................................................................10

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) ....................................................................................27

*Henschke v. New York Hospital-Cornell Medical Center*, 821 F. Supp. 166 (S.D.N.Y. 1993) ..........................................................................................................32

*Holmes v. Gaynor*, 313 F. Supp. 345 (S.D.N.Y. 2004) ..........................................35

*I. Meyer Pincus and Associate v. Oppenheimer & Co., Inc.*, 936 F.2d 759 (2d Cir. 1991) ..................................................................................................................30

*International Star Class Yacht Racing v. Tommy Hilfiger*, 146 F.3d 66 (2d Cir. 1998) ..................................................................................................................37

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ........................................................10

*Jackson v. Jimino*, 506 F. Supp. 2d 105 (N.D.N.Y. 2007) ..............................34, 35

*Kaya v. City of New London*, No. 05-cv-1436 (JCH), 2008 U.S. Dist. LEXIS 5478 (D. Conn. Jan. 24, 2008) ....................................................................................35

*LG Deflice, Inc. v. Fireman's Insurance Co.*, 41 F. Supp. 2d 152 (D. Conn. 1998) .........22

*Lyddy v. Civil Bridgport*, No. 3:06CV1420 (AHN), 2007 U.S. Dist. LEXIS 66920 (D. Conn. Sept. 11, 2007) ....................................................................................10

*Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314 (D. Conn. 2008) ............................11

*Morgan v. Lantz*, No. 3:05CV1659 (MRK)(WIG), 2007 U.S. Dist. LEXIS 49961 (D. Conn. Jul. 10, 2007) ....................................................................................11

*Morron v. City of Middletown*, 464 F. Supp. 2d 111 (D. Conn. 2006) ................24, 28

*Newman & Schwartz v. Asplundh Tree Export Co., Inc.*, 102 F.3d 660 (2d Cir. 1996) ..................................................................................................................31

*Nora Beverages, Inc. v. The Perrier Group of America, Inc.*, 269 F.3d 114 (2d Cir. 2001) ..................................................................................................................33

*Pouliot v. Paul Arpin Van Lines, Inc.*, 367 F. Supp. 2d 267 (D. Conn. 2005) .................21

*Raskin v. The Wyatt Company*, 125 F.3d 55 (2d Cir. 1997) ..............................33

*Rogues v. Bayer Corp.*, Case No. 3:02-cv-1778 (MRK), 2004 U.S. Dist. LEXIS 17026 (D. Conn. Aug. 25, 2004) ........................................................28, 29

*St. Amant v. Thompson*, 390 U.S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)..............27

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122, S. Ct. 992, 152 L. Ed. 2d 1 (2002).............................................................................................11

*United States v. International Longshoremen's Association*, 518 F. Supp. 422 (E.D.N.Y. 2007).................................................................................35

*Vincent v. Essent Healthcare of Conn.*, 2006 U.S. Dist. LEXIS 71816 (D. Conn. Sep. 28. 2006) .........................................................................31

*Wartsila NSD North America, Inc. v. Hill International, Inc.*, 342 F. Supp. 2d 267 (D.N.J. 2004)..............................................................................17

*Woodford v. Community Action Agency, Greene County*, 239 F.3d 517 (2d Cir. 2001) ......................................................................................11

### STATE CASES

*Abdelsayed v. Narumanchi*, 39 Conn. App. 778 (1995) ....................................................28

*Arnott v. Standard Association*, 57 Conn. 86 (1888)....................................................26, 27

*Beler v. Milford Board Of Education*, CV054002886S, 2005 Conn. Super. LEXIS 1932 (Conn. Super. June 23, 2005)................................................................29

*Borsoi v. Sparico*, 141 Conn. 366 (1954) ......................................................................13

*Brigheti v. New Britain Shirt Corp.*, 167 Conn. 403 (1947)................................................22

*Carey v. Woodruff*, 89 Conn. 304 (1915)........................................................................26

*Carolina Casualty v. Gregory Boulevard*, 2000 WL 350284 (Conn. Super. Mar. 21, 2000) ......................................................................................16

*Clevecon, Inc. v. Northeast Ohio Regional Sewer District*, 90 Ohio App. 3d 215 (1993)..........................................................................................16

*Coburn v. Lenox Homes, Inc.*, 173 Conn. 567 (1977) ......................................................15

*Coburn v. Lenoxx Homes, Inc.*, 186 Conn. 370 (1982) ....................................................12

*Coner v. Chittenden et al.*, 116 Conn. 78 (1932)..............................................................21

*Craig v. Driscoll*, 64 Conn. App. 699 (2002) ......................................................21

*Craig v. Driscoll*, 262 Conn. 312 (2003) ..........................................................21

*Darien Asphalt Paving, Inc. v. Town of Newtown*, cv 9804878, 1998 Conn. Super.
  LEXIS 3496 (Dec. 3, 1998) ...............................................................15, 17

*DeVillegas v. Quality Roofing, Inc.*, cv 92-02941905, 1993 Conn. Super. LEXIS
  3185 (Nov. 30, 1993) .............................................................................16

*Doe v. Manheimer*, 212 Conn. 748 (1989) .....................................................18, 19

*Doe v. Yale University*, 252 Conn. 641 (2000) .................................................17

*Emerick v. Kuhn*, cv 94-0460869S, 1996 Conn. Super. LEXIS 1251 (May 7,
  1966) ...................................................................................................23

*Fine v. Advance Realty Co.*, 4 Conn. Super. 264, 265 (1936) ...........................22

*Frillici v. Town of Westport*, 264 Conn. 266 (2003)........................................20

*Holbrook v. Canazza*, 204 Conn. 336 (1987) .................................................28

*Integrated Security Solutions, LLC v. Security Technology Systems, LLC*, cv
  4001811, 2007 Conn. Super. LEXIS 2397 (Super. Conn. Sept. 10, 2007) ...........25, 27

*Jacobson Electronic Co. v. Rome Fastener Corp.*, 156 Conn. 55 (1968) .........................22

*Kowal v. Hofher*, 181 Conn. 355 (1980).......................................................20

*L.F. Pace & Sons, Inc. v. The Travelers Indemnity Co.*, 9 Conn. App. 30 (1986)...........22

*Levesque Builders v. Hoerle*, 49 Conn. App. 751 (1998).................................23

*Mix v. Woodward*, 12 Conn. 262 (1837).......................................................26

*Pisel v. Stamford Hospital*, 180 Conn. 314 (1980).......................................13, 14

*Real Estate Listing Service, Inc. v. Connecticut Real Estate Commission*, 179
  Conn. 128 (1979) ..................................................................................24

*Reiner & Reiner v. Conn. Natural Gas Corp.*, cv 95-0551260, 1995 Conn. Super.
  LEXIS 3470 (Dec. 12, 1995) ..................................................................16

*Sheiman v. Lafayette Bank & Trust Co.*, 4 Conn. App. 39 (1985) ...................21

*Ventresca v. Kissner*, 105 Conn. 533 (1926) ..........................................................26

*Waters v. Autuori*, 236 Conn. 820 (1996)..........................................................16, 17

## STATUTES

FED. R. CIV. P. 8 ..........................................................................................2, 11

FED. R. CIV. P. 9 ..........................................................................................2, 12

FED. R. CIV. P. 10(c) ..............................................................................2, 30, 35

FED. R. CIV. P. 12(b)......................................................................11, 31, 32, 35

FED. R. CIV. P. 12(d)............................................................................................2

FED. R. CIV. P. 56 ...................................................................................2, 32

FED. R. EVID. 201(b).....................................................................................37

FED. R. EVID. 802 .........................................................................................35

## MISCELLANEOUS

2-5 *Corbin on Contracts* § 5.27 ......................................................................24

Dan B. Dobbs, The Law of Torts (2001) ..........................................................26

Wright, Fitzgerald, Ankerman, *Connecticut Law of Torts*, 3d Ed.................13, 15, 18, 26

Plaintiff Dongguk University ("Dongguk") submits this Memorandum of Law in opposition to the motion of defendant Yale University ("Yale") to dismiss each of the claims set forth in the complaint.

## PRELIMINARY STATEMENT

As this Court is well aware, it is settled-law that in determining the sufficiency of a complaint, a court must review the four corners of the complaint to determine whether a claim for relief has been stated. In an effort to deflect attention from the allegations contained in the complaint in this action (the "Complaint"), [1] Yale has attached a series of inadmissible documents to its Memorandum of Law in Support of Motion to Dismiss ("Yale's Brief") in order to convince the Court that Yale, like Dongguk, was a victim and that if anyone is to blame, it is Dongguk not Yale.

Based upon these inadmissible documents and a few cherry-picked allegations taken from the Complaint, Yale concocts a story as to why Dongguk cannot possibly recover on any of its claims for relief. [2] Not surprisingly, in concocting its story, Yale has intentionally ignored virtually every allegation regarding its own wrongful conduct.

While Yale would like the Court to reach the merits of this dispute based only upon these inadmissible documents, the Court's role at this stage of the proceeding is limited to determining whether the Complaint sets forth legally cognizable claims for relief. As discussed below, in order to grant Yale's motion, this Court would have to ignore the provisions contained as in

---

[1] A copy of the Complaint is annexed to the Affidavit of Jin Yung Bae ("Bae Affidavit") as Exhibit A.

[2] While Yale's sensational story of sex and politics makes interesting reading, it is neither accurate nor a defense to Yale's conduct. Try as it may, Yale cannot dispute the series of communications exchanged between it and Dongguk nor can it dispute what it publicly stated to the Korean press.

Rules 8, 9, 10(c), 12(d) and 56(e) of the Federal Rules of Civil Procedure ("F.R.C.P.") as well as the Supreme Court and Second Circuit decisions interpreting them.

Yale's desire to avoid addressing the core allegations contained in the Complaint regarding its own wrongful conduct is perfectly understandable. As discussed below in Point I, *infra*, a review of *all* of the Complaint allegations in light of the applicable case law must result in a determination that Dongguk has stated claims for negligence, reckless and wanton conduct, defamation and breach of implied contract.

In order to overcome Dongguk's well pleaded Complaint, Yale relies heavily on the inadmissible documents attached to its Brief. As discussed below in Point II, *infra*, this Court cannot consider the extra-complaint documents appended to Yale's Motion to Dismiss because they are outside of the four corners of the Complaint. Moreover, even if the extra-complaint documents could theoretically be considered, the Court cannot rely upon them because they consist of inadmissible hearsay. Finally, even if the extra-complaint documents were to be admissible, Yale's Motion to Dismiss would still have to be denied because the documents raise disputed issues of material fact.

## SUMMARY OF THE ALLEGATIONS
## CONTAINED IN THE COMPLAINT

Beginning at page 2 of its Brief in support of its Motion to Dismiss, Yale spends six pages purportedly summarizing the allegations contained in Dongguk's thirty-page Complaint. Since Yale's summary intentionally omits any discussion of critical allegations in the Complaint and since many of those allegations go to the heart of Dongguk's claims, Dongguk will briefly reiterate them here.

Yale has long been aware that unscrupulous individuals will falsify their academic records in order to claim that they have received graduate or post-graduate degrees from Yale.

2

(Complaint, ¶ 23.)  In this regard, Yale receives numerous inquiries from academic institutions

seeking to verify whether individuals had actually received academic degrees from Yale.

(Complaint, ¶ 25.)  Similarly, Yale routinely contacts other academic institutions to verify the

academic credentials of individuals who are seeking faculty positions at Yale and it relies upon

the information that it receives.  (Complaint, ¶¶ 28-29.)  Recognizing the importance of

providing accurate information to inquiring academic institutions, Yale has developed and

implemented protocols regarding the verification of Ph.D.'s and other degrees claimed to have

been awarded by Yale.  (Complaint, ¶¶ 25-26.)

     Dongguk is one of the most important academic institutions in Korea and has developed a

stellar reputation for the quality of its education in its one hundred years of existence.

(Complaint, ¶ 6.)  Dongguk was founded in 1906 by the Jogye Order, a Buddhist monastic order

and is one of the most prestigious Buddhist-affiliated universities in the world.  (Complaint, ¶ 8.)

The Jogye Order, which was established in 1354, is the largest and one of the most influential

Buddhist Orders in Korea.  (Complaint, ¶ 9.)

     In August 2005, Jeong Ah Shin ("Shin"), a rising star in the Korean art world, applied to

Dongguk for a faculty position in Dongguk's art history department and provided Dongguk with

a number of documents including a letter dated May 27, 2005, which was signed by "Pamela

Schirmeistr [sic]," an Associate Dean in Yale's Graduate School of Arts and Sciences

("Schirmeister").  (Complaint, ¶¶ 30-42, 47-48, 51-52.)  The May 27, 2005 letter (the

"Certification Letter") certified that Shin had been awarded a Ph.D. by Yale.  (Complaint, ¶ 51.)

     In early September 2005, within a few days after Dongguk decided to hire Shin, Dongguk

received information that raised questions regarding the accuracy of Shin's statement that she

had received a Ph.D. from Yale.  (Complaint, ¶ 59.)  Before permitting Shin to teach and in order

3

to verify the fact that Shin had received a Ph.D. from Yale, on September 6, 2005, Dongguk sent

a registered letter dated September 5, 2005 (the "September 5 Registered Letter") to Yale

together with a copy of the Certification Letter provided by Shin.  (Complaint, ¶ 60.)

> The September 5 Registered Letter states in pertinent part:
>
> > *I would like to confirm whether you can verify the contents of the enclosed letter issued by your University for Ms. Jeong-Ah Shin.*
> >
> > *Since this is being done as part of internal procedure for employing a faculty member at Dongguk University,* your verification will be kept confidential.  It would be very kind of you to send us the information we have requested as soon as possible.  (Italics supplied.)  (Complaint, ¶ 61.)

The September 5 Registered Letter was received by Schirmeister, the Associate Dean who had

supposedly signed the Certification Letter on behalf of Yale.  (Complaint, ¶ 62.)

On September 22, 2005, Schirmeister, on behalf of Yale, sent Dongguk a three-page fax

(the "September 22 Fax") which stated in pertinent part:

> > *As requested I am confirming that the attached letter* [i.e. the Certification Letter] *was issued by the Yale Graduate School and signed by me.*
> > (Italics supplied.)  (Complaint, ¶¶ 63-64.)

Relying on the September 22 Fax sent by Schirmeister that attested to the fact that Shin had

received a Ph.D. from Yale, Dongguk concluded that Shin had received a Ph.D. from Yale as she

had represented and that the rumor was therefore baseless.  (Complaint, ¶ 65.)  Shin was

permitted to begin teaching classes at Dongguk for the spring semester of 2006 and she

continued to teach at Dongguk until 2007.  (Complaint, ¶ 66.)

In June 2007, Dongguk received a document that raised a question as to whether Shin had

written the dissertation ("Shin's Dissertation") that was the basis for her Ph.D.  (Complaint,

¶ 67.)  In an effort to determine the truth, Dongguk contacted Yale and asked whether it had a

copy of Shin's dissertation (Complaint ¶ 68.)  Yale responded by stating not only did it not have

a record of Shin's Dissertation, but according to Yale's records, "Jeong Ah Shin did not receive a Ph.D. in our department at Yale University." (Complaint, ¶¶ 69, 72.)

In June 2007, the rumors regarding the authenticity of Shin's Dissertation reached the Korean press and by late June 2007, several Korean newspapers began writing articles questioning whether Shin had written her dissertation and whether she had in fact obtained a Ph.D. from Yale. (Complaint, ¶ 73.) In response to the newspaper articles questioning Shin's academic credentials, on July 2, 2007, Dongguk held a press conference defending Dongguk's decision to hire Shin, explaining that in September 2005, Dongguk had taken steps to verify Shin's Ph.D. and stating that in response to its inquiry, Yale sent the September 22 Fax to Dongguk which confirmed the fact that Shin had obtained a Ph.D. from Yale. (Complaint, ¶ 74.)

Nevertheless, on July 6, 2007, Dongguk sent an email directly to Schirmeister and a letter to Yale's President asking them to explain the contradiction between Schirmeister's September 22 Fax that confirmed that Shin had received a Ph.D. from Yale and the June 2007 communications from Yale stating that Shin had not received a Ph.D. from Yale. (Complaint, ¶ 77.) Schirmeister never responded to this email. (Complaint, ¶ 78.) On July 10, 2007, an attorney in Yale's Legal Department wrote a letter on behalf of Yale's President to Dongguk which stated that the September 22 Fax "is not authentic" and that Yale had no "knowledge currently regarding the creation or issuance" of the September 22 Fax. (Complaint, ¶¶ 79, 82.)

At the time when this letter was written, Yale was fully aware that the Korean press had questioned Dongguk's employment of Shin and was aware that Dongguk had informed the Korean press that it had relied on the September 22 Fax attesting to Shin's Ph.D. (Complaint ¶ 84.) Nevertheless, Yale continued to assert that the September 22 fax was a forgery. (Complaint, ¶ 84.) By July 10, 2007, Yale was also aware of the importance of providing

truthful, accurate and complete information to the Korean press regarding the communications
between Dongguk and Schirmeister, on behalf of Yale, about Shin. (Complaint, ¶¶ 85-86.)

As set forth in the Complaint, instead of acknowledging that the September 22 Fax was
authentic, beginning on July 10, 2007, Yale embarked on a campaign designed to distance itself
from any responsibility regarding Shin by denying any knowledge of Dongguk's efforts to verify
Shin's Ph.D. (Complaint, ¶ 87.) On that day, Yale informed the Korean press that it had never
sent Dongguk the September 22 Fax that Shin had received a Ph.D. from Yale. (Complaint
¶ 112.)

As specifically set forth in the Complaint, following its July 10, 2007 interview with the
Korean press, Yale, in a series of press interviews as well as in emails and press releases
disseminated to the Korean media, made numerous knowingly false statements regarding
Dongguk's efforts to verify Shin's Ph.D. Many of these false statements are detailed in
paragraphs 89-97, 108-112, 122, and 143-144 of the Complaint. Among other things, Yale told
the Korean press that it had never received the September 5 Registered Letter from Dongguk
seeking to verify Shin's Ph.D. (Complaint, ¶ ¶ 107, 109-12.) As a consequence of Yale's
statements, which were published in the Korean press, numerous inaccurate articles were written
by the Korean press about Dongguk's supposed failure to verify Shin's credentials. (Complaint
¶ 115.)

At the time that the inaccurate newspaper articles were being published, Dongguk was in
continued contact with Yale in its effort to prove to Yale's Legal Department that Schirmeister
had received the September 5 Registered Letter and that the September 22 Fax attesting to Shin's
Ph.D. had actually been sent by Yale to Dongguk. (Complaint, ¶¶ 98, 101, 130, 132, 134, 135,

136.) By September 12, 2007, in its effort to prove that the September 5 Registered Letter had

been received by Yale, Dongguk had provided Yale's Legal Department with:

(a)      a copy of the U.S. Postal Service's Track & Confirm Receipt stating that the September 5 Registered Letter had been received by "M Moore YCM;"

(b)      a website link to Yale's Central Mailroom which established that Yale's mailroom was staffed by, among others, Michael Moore;

(c)      a copy of the mailing label that was put on the package that contained the September 5 Registered Letter; and

(d)      the Yale fax telephone number that was on the September 22 Fax. (Complaint ¶¶ 137-38.)

The Complaint asserts that having received this information, Yale should have been able to

determine that the September 5 Registered Letter had been received by Yale and that the

September 22 Fax had been sent by Yale to Dongguk. (Complaint ¶ 139.)

Rather than correct its false statements and admit the truth, Yale made numerous public

statements in which it continued to deny that it had received the September 5 Registered Letter

and it continued to maintain that the September 22 Fax was a forgery. In fact, on September 21,

2007, Yale issued an "Official Statement" stating, *inter alia*, that all documents supporting

Shin's claim were forgeries and therefore "are fake." (Complaint ¶ 143.) Yale's "Official

Statement" was reported in an article published by a prominent Korean newspaper on September

23, 2007. (Complaint ¶ 144.)

As a result of Yale's continued public statements denying any involvement in the Shin

matter, a group of monks belonging to the Jogye Order issued a formal statement publicly calling

for the dismissal of Dongguk's Board of Directors. (Complaint, ¶ 125.) In addition, Dongguk's

Professors Association issued a number of formal statements demanding the resignation of

Dongguk's President and Vice President as well as the resignation of it's Board of Directors.

(Complaint ¶ 145.) All of these formal statements were reported in the Korean press.
(Complaint ¶ 145.)

Based upon Yale's continued public statements that the September 5 Registered Letter and the September 22 Fax were forgeries, Korean prosecutors, who were investigating Shin, began to focus their attention on Dongguk's supposed failure to verify Shin's Ph.D credentials. (Complaint ¶ 146.) As a result, numerous Korean newspapers and other media outlets informed the Korean population-at-large of the Korean prosecutors' investigation of Dongguk's purported role in the Shin matter. (Complaint ¶ 147.)

As set forth in the Complaint, based upon Yale's false statements to the Korean media, the Korean media and the Korean population-at-large concluded that Dongguk was dishonest and incompetent and that Dongguk's role in the Shin scandal had tarnished the reputation of Korea as a country. (Complaint ¶ 164.) As a result, KMAC, a prominent Korean consumer service consulting organization, notified Dongguk that because of Dongguk's reported role in the Shin scandal, it would not be receiving KMAC's prestigious 2007 Customer Satisfaction Management Grand Award. (Complaint ¶¶ 166-67.)

The Complaint further asserts that as a direct result of the publication of the false statements made by Yale about Dongguk, the amount of money received from Dongguk's alumni and from corporate donors decreased. (Complaint ¶ 168.) In addition, the number of student applications for admission to Dongguk decreased and the amount of government grants made to Dongguk decreased. (Complaint ¶ 169.) The Complaint also alleges that Dongguk was notified by the Korean government that it would not be added to the list of academic institutions permitted to open a "U.S. style" law school. (Complaint ¶ 172.)

8

# Memorandum –
# Part 2

On October 11, 2007, Shin was arrested by the Korean prosecutors and she was accused of fabricating a doctorate degree and other documents from Yale. (Complaint ¶ 148.) In connection with the then-upcoming criminal trial of Shin, in or around November 2007, the Korean prosecutors issued a document subpoena to Yale in an effort to obtain copies of Yale's records that might be related to the Shin matter. (Complaint ¶ 149.) As a result of this document subpoena, Yale finally admitted that it had received the September 5 Registered Letter and that the September 22 Fax attesting to Shin's Ph.D. was authentic. (Complaint ¶ 150.)

Based upon these and other fact allegations contained in the Complaint, Dongguk has asserted four claims for relief: negligence, reckless and wanton misconduct, breach of implied contract and defamation. In pleading these claims, Dongguk was cognizant of Connecticut law and it has pleaded all of the elements necessary for each claim.

## ARGUMENT

### I.   YALE'S MOTION TO DISMISS IS FATALLY DEFECTIVE

Beginning at page 8 of its Brief, Yale discusses the legal sufficiency of the claims asserted in the Complaint. A review of each of the arguments that have been made demonstrates that they are inextricably intertwined with supposed facts taken from the newspaper articles and the judgment attached to Yale's Brief. As discussed in Point II, these extra-complaint documents cannot be considered by this Court in determining Yale's Motion to Dismiss. In addition to improperly relying on extra-complaint documents, Yale has compounded its errors by relying on the wrong legal standard, misapplying cases and ignoring controlling precedents.

When the supposed facts contained in the newspaper articles and the judgment are stripped away from Yale's arguments, each of Yale's arguments quickly collapses like a house of cards. As set forth below, a review of the Complaint allegations coupled with the relevant

legal authorities must result in the conclusion that all of Dongguk's claims are well-pleaded and

that they set forth legally cognizable claims for relief.

### A.   The Applicable Legal Standards

As recently stated in *Lyddy v. Civil Bridgeport Board of Education*,[3] No. 3:06CV1420

(AHN), 2007 U.S. Dist. LEXIS 66920, at *1 (D. Conn. Sept. 11, 2007):

> The function of a Rule 12(b)(6) motion to dismiss is "merely to
> assess the legal feasibility of the complaint, not to assay the weight
> of the evidence which might be offered in support thereof." *When
> considering a motion to dismiss, the court must accept the facts
> alleged in the complaint as true, draw all reasonable inferences
> from those facts in the light most favorable to the plaintiff, and
> construe the complaint liberally. The district court may dismiss a
> claim only if the plaintiff's factual allegations are not sufficient "to
> state a claim to relief that is plausible on its face*." (Emphasis
> supplied.) (Citations omitted.)

*See also Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007) (The "Court

must accept as true all allegations in the complaint and draw all reasonable inferences in favor of

the non-moving party") *cert. denied*, 2008 U.S. LEXIS 4864 (June 9, 2008); *Burke v. APT

Foundation*, 509 F. Supp. 2d 169, 172 (D. Conn. 2007).

As stated in the landmark case of *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2

L. Ed. 2d 80 (1957), "the Federal Rules do not require a claimant to set out in detail the facts

upon which he bases his claim." Rather, as stated by the Supreme Court, "all the rules require is

a 'short plain statement of the claim' that will be give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests." *Id.* This principle has recently been

---

[3] The standard that Yale must meet has not been modified by the Supreme Court decision of *Bell Atl.
Corp. v. Twombly*, ___U.S. ___, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007). As explained by the Second
Circuit in *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), "we believe the [Supreme] Court is not
requiring a heightened standard of heightened fact pleading, but is instead requiring a flexible
'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations ... to
render the claim *plausible*." (Italics in original.) A review of the Complaint in this action shows that it
is replete with factual allegations that make Dongguk's claims "plausible."

reiterated by the Supreme Court in *Erickson v. Pardus,* _ U.S._, 127 S. Ct. 2197, 2200, 167 L.

Ed. 2d 1081 (2007) in which the Supreme Court stated:

> Federal Rule of Civil Procedure 8(a)(2) requires only a "short and
> plain statement of the claim showing that the pleader is entitled to
> relief." Specific facts are not necessary; the statement need only
> " 'give the defendant fair notice of what the ... claim is and the
> grounds upon which it rests.' "

This principle has been faithfully followed by the Second Circuit and the courts in the District of

Connecticut (*see, e.g., Iqbal v. Hasty,* 490 F.3d 143, 157 (2d Cir. 2007); *Morgan v. Lantz,* No.

3:05CV1659 (MRK)(WIG), 2007 U.S. Dist. Lexis 49961, at *2 (D. Conn. Jul. 10, 2007); *Modis,*

*Inc. v. Bardelli,* 531 F. Supp. 2d 314, 318 (D. Conn. 2008) ("The Complaint must contain the

grounds upon which the claim rests through allegations sufficient 'to raise a right to relief above

the speculative level.'")

Moreover, as explained in *Gerrity v. R. J. Reynolds Tobacco Co.,* 399 F. Supp. 87, 91

(D. Conn. 2005) "[t]here is no requirement that to survive a Rule 12(b)(6) motion to dismiss a

plaintiff must allege in his/her complaint each specific element of the claim, so long as the

elements may reasonably be inferred from the allegations in the complaint." Indeed, as pointed

out in *Woodford v. Community Action Agency, Greene County,* 239 F.3d 517, 526 (2d Cir.

2001), a "plaintiff is not required to prove his case at this pleading stage" - - rather, "[t]he

pleading of evidence should be avoided."

In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122, Sup. Ct. 992, 998, 152 L. Ed. 2d

1 (2002), the Supreme Court emphatically stated that "Rule 8(a)'s simplified standard applies to

all civil actions, with limited exceptions." In *Swierkiewicz,* the Supreme Court went to state,

citing F.R.C.P. 8(e)(1) and 8(f), that "[g]iven the Federal Rules' simplified standard for pleading,

'[a] Court may dismiss a complaint only if it is clear that no relief could be granted under any set

of facts that could be proved consistent with the allegations.'" *Id.*

11

The "limited exceptions" referred to by the Supreme Court in the *Swierkiewicz* case are found in F.R.C.P. 9(b)'s heightened pleading requirements F.R.C.P. 9(b). *Id.* While the F.R.C.P. 9(b) pleading requirements have minimal application to this case, as discussed in Point I, E below, Dongguk has met these requirements.

**B.  Dongguk Properly Pleaded The Claim For Negligence**

In order to state a claim for negligence, the complaint must show that "the actor owed a duty of care to the victim, which was breached by the actor's failure to meet the standard of care arising therefrom and that the breach was the proximate cause of actual harm suffered by the victim." *Coburn v. Lenoxx Homes, Inc.*, 186 Conn. 370, 372 (1982). Dongguk's Complaint properly alleges facts that must be pleaded to assert a negligence claim.

Among other things, Dongguk asserts that, as a direct result of Yale's negligent failure to exercise its duty of care in verifying Shin's purported Ph.D. from Yale, Dongguk relied on Yale's verification and concluded that Shin's degree was authentic. (Complaint ¶ 65.) Dongguk also asserts that Yale compounded its negligence when it failed to provide accurate information to Dongguk and to the Korean media regarding the September 5 Registered Letter and the September 22 Fax of Dongguk. Based on Yale's false statements, the Korean public believed that Dongguk had improperly hired Shin, had never contacted Yale and had lied in order to cover up its inaction by relying on a forged document. (Complaint ¶¶ 83, 87-88, 94-97, 105, 110-12, 116, 122, 160, 164.)

In addition, Dongguk asserts that it suffered damages that were proximately caused by Yale's negligence. As a direct result of the publication of inaccurate statements made by Yale, Dongguk was publicly humiliated as being dishonest and incompetent, and its reputation was destroyed. (Complaint ¶¶ 157, 160, 164-65.) Dongguk also suffered a decrease in the amount of donations and government grants that it had previously been receiving and student applications

12

for admission went down. (Complaint ¶¶ 168-69.) Dongguk was also denied a prestigious

award as well as permission to open a U.S. style law school. (Complaint ¶¶ 166-67, 172.)

Further, Dongguk was forced to expend money and time defending itself against the claim that it

had improperly hired Shin without verifying her Ph.D. (Complaint ¶¶ 170-71.) Therefore, the

facts asserted by Dongguk in the Complaint are sufficient to show all elements of its negligence

claims.

Yale argues that the claim for negligence must be dismissed because Yale did not owe

any duty to Dongguk. (Yale's Motion to Dismiss Br., p. 8.) Yale is wrong as a matter of law.

Under Connecticut law, the ultimate test of the existence of a duty of care is found "in the

foreseeability that harm may result if [the duty] is not exercised." *Borsoi v. Sparico*, 141 Conn.

366, 369 (1954) ("duty to exercise a reasonable care arises whenever the activities of two

persons come so in conjunction that the failure to exercise that care by one is liable to cause

injury to the other."). In determining whether there is duty of care, the question to be asked is,

"would the ordinary man, in the defendant's position, knowing what it [sic] knew or should have

known, anticipate that harm of the general nature of that suffered by the plaintiff was likely to

result unless reasonable care was taken[?]" *Pisel v. Stamford Hospital,* 180 Conn. 314, 332

(1980); *see also* Wright, Fitzgerald, Ankerman, *Connecticut Law of Torts*, 3d. Ed., p. 45.

In this case, the answer is "yes." As set forth in the Complaint, Yale has long been aware

that unscrupulous individuals may falsify their academic records and that academic institutions,

like Dongguk, rely on Yale's verification that their faculty candidates have in fact been awarded

degrees from Yale. (Complaint ¶¶ 23-25, 193.) Therefore, Yale should have foreseen that if it

did not exercise the requisite degree of care in verifying Shin's purported Ph.D. from Yale,

Dongguk would nonetheless rely on Yale's verification and that it would hire Shin as a faculty member because it believed that she had received a Ph.D. from Yale.

Yale further argues that it did not owe any duty of care to Dongguk because it could not have foreseen that Dongguk's hundred-year reputation would be destroyed if Yale incorrectly verified Shin's purported degree in 2005. (Yale Motion to Dismiss Br., p. 12). Yale incorrectly states the test for a duty of care. As the court in *Pisel* pointed out, "it is *the general harm* that must be foreseen, not the particular injury." *Pisel*, 180 Conn. at 332 (emphasis supplied). Yale certainly could have foreseen at the time of its verification of Shin's purported degree in 2005 that Dongguk's reliance on inaccurate information provided by Yale would likely result in some type of general harm to Dongguk.

Moreover, Yale's negligent act is not limited to the inaccurate statements contained in the September 22 Fax. When Dongguk and the Korean press contacted Yale in June 2007 to again inquire about Shin, Yale was fully aware of the Korean media's interest in Dongguk's employment of Shin and Shin's false educational background. (Complaint ¶¶ 73, 84.) Yale was fully aware of Dongguk's statement to the media that in employing Shin, it had relied on the September 22 Fax attesting to Shin's Ph.D. (Complaint ¶¶ 74, 84.) At the time that Yale publicly denied both sending the September 22, Fax and receiving the September 5 Registered Letter, Yale knew or should have known that by providing inaccurate information regarding its communications with Dongguk about Shin, Dongguk would suffer adverse consequences.

Yale next argues that even assuming that there was a duty of care, the duty of care was gratuitous and that in the absence of privity of contract, Connecticut law does *not* recognize a gratuitous duty of care when the injury is solely based upon economic loss. (Yale's Motion to

14

Dismiss Br., p. 9.) Yale knows that this is not the law.[4] In fact, Connecticut treatises and its

Courts have routinely upheld negligence claims that resulted in economic injury where there is

no privity of contract.

As stated in Wright, Fitzgerald, Ankerman, *Connecticut Law of Torts*, 3d. Ed., p. 54:

> Thus the more recent cases indicate that while a gratuitous actor
> may have no legal duty to assist someone, yet when he has
> undertaken to render assistance he must follow through with the
> undertaking in a reasonable and prudent manner . . . As Professor
> Leon Green stated in a letter to the Connecticut Bar Journal in
> 1950, *in cases of gratuitous undertakings, the common law has
> always imposed liability on the undertaker for the consequence of
> his negligence under the doctrine of affirmative conduct.*

> In case of gratuitous undertakings, the common law has always
> imposed liability on the undertaker for the consequences of his
> negligence under the doctrine of affirmative conduct. (Italics
> supplied.)

Under Connecticut law, the issue is not whether an aggrieved party can recover for non-physical

injury without privity of contract.

Connecticut courts have held on numerous occasions that physical harm is not required in

recovering based on a negligence claim even when plaintiff is not in a relationship of privity with

the defendant so long as the harm suffered by the plaintiff was foreseeable. As stated in *Darien

Asphalt Paving, Inc. v. Town of Newtown et al*, CV 9804878, 1998 Conn. Super. LEXIS 3496, at

*10 (Dec. 3, 1998), "the touchstone for recovery by a plaintiff is not a privity relationship with

the tortfeasor, but rather whether the injury was foreseeable."

In *Coburn v. Lenox Homes, Inc.*, 173 Conn. 567, 574 (1977), in upholding a negligence

cause of action where the plaintiff home buyer sought recovery from a contractor with whom the

---

[4] Indeed, Yale acknowledges in its Brief that its position that physical harm is required for a negligence
claim based on the defendant's voluntary assumption of duty has not been universally adopted by all
Connecticut courts. (Yale's Motion to Dismiss Br., p. 9, n. 8.)

plaintiff was not in privity, the court stated that "the requirement of privity should only be

applicable to actions growing out of contract theory and should be irrelevant to tort actions." *See*

*also Carolina Casualty v. Gregory Boulevard*, 2000 WL 350284 (Conn. Super. Mar. 21, 2000) at

*2 ("[A] majority of [Connecticut] jurisdictions have held that the absence of privity of contract

is not a bar to negligence actions by construction professionals against one another for economic

losses where reliance by the plaintiff was reasonably foreseeable ... *This court will follow the*

*majority of jurisdictions and hold that lack of privity where economic loss is claimed does not*

*constitute a bar to a negligence action*"). (Emphasis supplied.)

In *Reiner & Reiner v. Conn. Natural Gas Corp.*, cv 95-0551260, 1995 Conn. Super.

LEXIS 3470, at *3-5 (Dec. 12, 1995), the plaintiff alleged that the defendant gas company had

negligently caused a gas leak when it failed to provide accurate maps of the gas lines to a

construction company installing a sewer system near the plaintiffs' businesses. Rejecting the

defendant's claim that no cause of action existed because the plaintiff could neither show

contractual privity with the defendant nor personal injury or property damage from the incident,

the court held that "although the plaintiffs have failed to allege the requisite privity of contract,

they have successfully alleged direct damages…The plaintiffs' economic losses are not too

remote to be chargeable to the defendant." *Id.* at **4-5.

The two main cases relied upon by Yale for its nature of the injury argument are

*DeVillegas v. Quality Roofing*, Inc., cv 92-02941905, 1993 Conn. Super. LEXIS 3185 (Nov. 30,

1993) and *Waters v. Autuori*, 236 Conn. 820 (1996). [5] The defendants in both *DeVillegas* and

---

[5] Yale also relies on cases from outside of Connecticut to argue that the law recognizes no gratuitous duty
to exercise reasonable care to prevent economic harm. (Yale's Motion to Dismiss Br., pp. 10-11.)
These out-of-state cases are not dispositive in determining a duty of care under Connecticut law.
Indeed, contrary to Yale's argument, numerous courts outside of Connecticut have upheld the principle
that gratuitous actors owe a duty to the person they are assisting regardless of whether the nature of the
harm is physical or economic. *See Clevecon, Inc. v. Northeast Ohio Regional Sewer District*, 90 Ohio

*Waters*, could not state a claim for negligence because in each case, the defendant did not have a relationship or direct contact with the plaintiff. [6]

In fact, in *Darien* the court distinguished the cases relied upon by *DeVillegas*, explaining that in those cases, "the concept of privity was utilized to measure the remoteness of the competing parties' interests to determine whether the injured party's loss was foreseeable." *Darien*, 1998 Conn. Super. LEXIS 3496, at *8. The *Darien* court's explanation is in accordance with the court's decision in *Waters*, which held that a plaintiff's reliance on financial reports prepared by a third party that was in compliance with the defendant organization's standards was too remote to provide "a nexus" between the parties that was "sufficient to impose a duty of care." *Waters*, 236 Conn. at 836.

Yale next argues that as a matter of public policy, it should not be responsible for the harm suffered by Dongguk because "there is no duty to protect a third person from the conduct of another." (Yale's Motion to Dismiss Br., pp. 13-14.) At the outset, the duty at issue in this case is not, as Yale claims, a duty to *protect* another person. Rather, it is the duty to "follow through the undertaking" regardless of whether the person has undertaken the task voluntarily

---

App.3d 215, 220-221 (1993) (holding that, where there is a nexus in substitute for a contractual privity, liability for economic loss exists for a negligence claim); *Wartsila NSD North America, Inc. v. Hill Int'l, Inc.*, 342 F.Supp.2d 267, 285 (D.N.J. 2004) (denying the defendant's summary judgment motion and holding that a duty of care may be found in a case involving economic harm as long as "such damages were reasonably to be anticipated in view of defendant's capacity to have foreseen that the particular plaintiff … is demonstrably within the risk created by the defendant's negligence.") (Citations omitted.)

[6] The only other Connecticut case relied on by Yale with regard to the physical harm requirement is *Doe v. Yale University*, 252 Conn. 641 (2000). However, the court's decision in that case was narrowly limited to the rejection of an educational malpractice claim, which is not the claim asserted in this case. *Id.* at 663 ("When the claimed result is an inadequate education, there is no viable claim because we are unwilling to recognize such a legal duty as a matter of public policy. When, however, the result is physical harm, as in the present case, we *are* willing to recognize the claim…") (Citation omitted.)

"in a reasonable and prudent manner." Wright, Fitzgerald, Ankerman, *Connecticut Law of Torts*, 3d Ed., p. 54.

In fact, public policy favors a finding of a duty on the part of Yale. In order to prevent individuals from falsifying or fabricating their credentials, society has a substantial interest in encouraging universities such as Yale to verify the academic degrees in order to avoid charlatans from claiming they have degrees from prestigious institutions in important academic fields. Even Yale recognizes the importance of the verification of academic credentials and it has established protocols to do exactly that.

Thus, the imposition of a duty with regard to the verification of academic credentials is particularly appropriate. Moreover, the imposition of this duty does not create a difficult burden. Academic institutions such as Yale need only refer to their own records in order to ascertain whether a particular individual has received the degree he or she claims to have been awarded. In short, for public policy reasons, it is appropriate to hold Yale to a reasonable care when it responds to inquiries for verification of degrees.

Finally, Yale argues that Dongguk's negligence claim cannot be sustained because Yale's negligence was neither the cause in fact nor the proximate cause of the injury to Dongguk. (Yale's Motion to Dismiss Br., pp. 16-22.) This argument raises issues of fact and cannot be determined on a motion to dismiss.[7] As stated by the court in *Doe v. Manheimer*, 212 Conn. 748, 757 (1989):

---

[7] In fact, Yale's proximate cause argument is based on a misreading of the Complaint. In arguing that Yale's negligence was not the proximate cause of Dongguk's injury because Dongguk supposedly failed to verify Shin's Ph.D. prior to the date of hiring, Yale mischaracterizes the facts set forth in Dongguk's Complaint. While it is true that Shin was hired before Dongguk contacted Yale, Yale neglects to state that (i) the Complaint alleges that within a few days after the formal hiring, Dongguk learned of the rumors, (ii) it immediately contacted Yale in order to verify Shin's Ph.D (Complaint ¶¶ 58-60.) and (iii) that based upon Yale's verification of Shin's Ph.D, Dongguk permitted Shin to teach classes at Dongguk. (Complaint ¶¶ 65-66.)

18

> *Conclusions of proximate cause are to be drawn by the jury and
> not by the court.* It becomes a conclusion of law only when the
> mind of a fair and reasonable man could reach only one
> conclusion; if there is room for a reasonable disagreement the
> question is one to be determined by the trier of fact. (Emphasis
> supplied.) (Citations omitted.)

*See also, Doe v. Norwich Roman Catholic Diocesan Corp.*, 268 F. Supp. 2d 139, 147 (D. Conn.

2003).

Dongguk has properly pleaded that the harm it suffered was legally caused by Yale's

negligent acts. The test for a cause in fact is whether "the injury [would] have occurred were it

not for the actor's conduct." *Manheimer*, 212 Conn. at 757. Dongguk properly pleaded that,

"but for" the inaccurate information provided by Yale to Dongguk in 2005, Dongguk would not

have gone forward with Shin's employment. (Complaint ¶¶ 65, 154.) Dongguk further asserted

sufficient facts showing that if not for a series of false and negligently made statements uttered

by Yale to the Korean media in 2007, Dongguk would not have been vilified in the Korean press,

which resulted in direct injury to Dongguk. (Complaint ¶¶ 115, 119, 124-26, 145-47, 154-157.)

Proximate cause is defined as "an actual cause that is a *substantial* factor in the resulting

harm." *Id.* (emphasis supplied.) Dongguk has asserted that in reliance upon the information

provided to it by Yale, Dongguk properly concluded that Shin had received a Ph.D. from Yale.

(Complaint ¶¶ 65, 154.) Dongguk further asserted that the criticism of Dongguk by the media

and the Korean population at large for its *supposed* failure to verify Shin's Ph.D. as well as the

other damages suffered by it were based upon and arose out of Yale's inaccurate statements that

it had never received Dongguk's September 5 Registered Letter and that Yale's September 22

Fax was a fake and a forgery. (Complaint ¶¶ 115, 119, 124-26, 145-47, 154, 157, 164.)

### C. **Dongguk Properly Pleaded The Claim For Reckless and Wanton Conduct**

Dongguk has also asserted sufficient facts to state a claim of reckless and wanton conduct. In order to recover for reckless and wanton conduct, a plaintiff must show that defendant's act indicates "a reckless disregard of the just rights or safety of others or of the consequences of action." *Kowal v. Hofher*, 181 Conn. 355, 362 (1980). Reckless or wanton conduct may be seen as a kind of "aggravated negligence" that "involv[es] an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Frillici v. Town of Westport*, 264 Conn. 266, 278 (2003). A defendant's alleged conduct must be "more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention." *Id.*

Among other things, Dongguk asserted that since Yale possessed all relevant information and since it had access to individuals with personal knowledge, Yale should easily have been able to determine that it had received the September 5 Registered Letter and that it sent the September 22 Fax. In fact, all Yale had to do was to consult its own records and inquire of Schirmeister as to whether she had signed and sent the September 22 Fax. Even if Yale had not done that simple task, based upon the written evidence provided to Yale by Dongguk, it still should have known that it had received Dongguk's September 5 Registered Letter and that it sent the September 22 Fax.

Even after it had received written evidence from Dongguk demonstrating its errors, Yale refused to acknowledge its errors. Rather, a Yale representative stated on Korean television that Yale had never received an inquiry from Dongguk and that it had never sent the September 22 Fax. (Complaint ¶¶ 120-23.) Thereafter, Dongguk provided Yale with more written evidence that Dongguk had sent the September 5 Registered Letter and Yale had sent the September 22

Fax. Yet, Yale still refused to correct its false statements and instead issued an "Official

Statement" repeating them.

Under Connecticut law whether Yale's conduct was reckless is "a question of fact to be

determined by the trier of fact." *Pouliot v. Paul Arpin Van Lines, Inc.*, 367 F.Supp.2d 267, 275

(D. Conn. 2005); *Coner v. Chittenden*, 116 Conn. 78, 81 (1932); In *Craig v. Driscoll*, 64 Conn.

App. 699, 721-22 (2002), the court held that:

> *Whether defendant's conduct constituted heedless and reckless*
> *disregard of the plaintiffs' rights was a question of fact for the jury*
> whose verdict, based upon conflicting evidence, will not be
> disturbed unless reasoning minds could reasonably have reached
> such conclusion...Whether the evidence will support a reckless
> cause of action is not to be decided here. (Emphasis supplied.)

As stated by the Connecticut Supreme Court in *Craig v. Driscoll*, 262 Conn. 312, 343 (2003):

> Although there is a difference between negligence and a reckless
> disregard of the rights or safety of others, a complaint is not
> deficient so long as it utilizes language explicit enough to inform
> the court and opposing counsel that both negligence and reckless
> misconduct are being asserted. (Citation omitted.)

Thus, Yale's contention that it did act recklessly cannot be resolved on its Motion to Dismiss.

In addition, Yale's argument is based upon an incorrect statement of law. Citing *Sheiman*

*v. Lafayette Bank & Trust Co.*, 4 Conn. App. 39 (1985), Yale argues that Dongguk has not

shown recklessness because it has not alleged that Schirmeister *knew* that the September 22 Fax

was untrue or that Yale's other representatives *knew* that their 2007 statements were untrue.

(Yale's Motion to Dismiss Br., p. 22.) However, the "consciousness" of the defendant that the

court referred to in *Sheiman* was a consciousness with respect to "the *consequence* of [the

defendant's] acts." *Id.* at 45.

Thus, the test is not whether the Complaint explicitly alleges that Yale's representatives

actually knew for a fact that their statements were untrue at the time they made such statements.

Rather, the test is whether the Complaint contains sufficient allegations to show that Yale knew

or should have known of the substantial risk or of adverse consequences to Dongguk that could

be caused by Yale's representatives' failure to exercise a duty of care in making such statements.

Among other things, the Complaint properly alleges that prior to the time Yale issued its

"Official Statement" to the press, it had been made aware by Dongguk that the Korean

Prosecutors were interested in Dongguk's role in the Shin affair and that it was important for

Yale to acknowledge that both the September 5 Registered Letter had been received by Yale and

the September 22 Fax had been sent by Yale. (Complaint, ¶¶ 139-41.)  The Complaint further

alleges that rather than correct its misstatements, Yale made a conscious choice and issued its

"Official Statement" reiterating its contention that it had not been contacted by Dongguk and that

the September 22 Fax was a forgery. (Complaint ¶¶ 143-44.)  Thus, Dongguk has properly

pleaded the elements of a reckless and wanton claim.

### D. **Dongguk Has Properly Pleaded The Breach of Implied Contract Claim**

Dongguk properly alleged each and every element of its claim for breach of implied

contract. "An implied contract is an agreement between the parties which is not expressed in

words but which is inferred from the acts and the conduct of the parties." *Brighenti v. New*

*Britain Shirt Corp.*, 167 Conn. 403, 406 (1947).  Like conduct, custom and usage can be used to

show that an implied contract exists when the subject matter is not a matter of common

knowledge. *Fine v. Advance Realty Co.*, 4 Conn. Super. 264, 265 (1936); *Jacobson Electronic*

*Co. v. Rome Fastener Corp.*, 156 Conn. 55, 60 (1968); *LG Deflice, Inc. v. Fireman's Insurance*

*Co.*, 41 F. Supp. 2d 152, 161 (D. Conn. 1998); *L.F. Pace & Sons, Inc. v. The Travelers Indemnity*

*Co.*, 9 Conn. App. 30, 38 (1986).

Dongguk has alleged that having long been aware that unscrupulous individuals may

falsify their academic records, Yale has a significant interest in preventing individuals from

falsely claiming that they have received degrees from Yale as well as an interest in ascertaining

that Yale's faculty members have actually received degrees from the academic institutions they

claim to have received them from. (Complaint ¶¶ 23-24, 27.) As a consequence, Dongguk has

alleged that there is a well-established custom among academic institutions to request

verification of degrees purportedly awarded to their faculty candidates or to other individuals

applying for a position within the institutions. (Complaint ¶¶ 24-25, 28-29.)

Thus, Dongguk has alleged that there was an understanding (*i.e.* a *quid pro quo*) between

Yale and other academic institutions that they would rely on each other in determining whether

to hire the individuals about whom they have inquired. (Complaint ¶¶ 26, 29, 193.) Dongguk

further alleges that in furtherance of this understanding, Yale had developed certain protocols for

verifying degrees claimed to have been awarded by Yale. (Complaint ¶¶ 25-26.) Dongguk also

alleges that by establishing these protocols, Yale has agreed to be bound by such protocols.

(Complaint ¶ 192.) Finally, Dongguk has alleged that based upon their dealings with each other,

Yale and Dongguk entered into an implied contract, which was breached by Yale's incorrect

confirmation that Shin had been awarded a Ph.D. by Yale. (Complaint ¶¶ 194-95.)

Yale argues that the claim for breach of implied contract should be dismissed because

Yale did not agree to undertake any express contractual commitment to Dongguk and because

Dongguk has not alleged any words or actions from which an agreement may be inferred.

(Yale's Motion to Dismiss Br., p. 27.) The existence of an implied contract cannot be

determined on this Motion to Dismiss because whether a contract exists is a question of fact for

the jury. *Levesque Builders v. Hoerle*, 49 Conn. App. 751, 754 (1998).

As stated in *Emerick v. Kuhn*, cv 94-0460869S, 1996 Conn. Super. LEXIS 1251, at *6

(May 7, 1966):

23

> Whether or not certain policies and manuals cited by the plaintiff
> constitute a contract between the parties is a question of fact for the jury.
> *Whether or not there was a meeting of the minds to establish a contract is*
> *a question of fact for the jury. This finding extends to all contract claims.*
> (Emphasis supplied.)

Thus, whether an implied contract exists is a fact issue that must be determined by the jury.

Yale further argues that there was no consideration for Yale in the dealings between Yale

and Dongguk and that therefore the claim for implied contract should be dismissed.  (Yale's

Motion to Dismiss Br., p. 28.)  As stated in 2-5 *Corbin on Contracts* § 5.27:

> Promises are discovered by "implication," either for the purpose of
> enforcing the implied promise itself, or for the purpose of finding
> consideration for another promise that is sought to be
> enforced...*an implied promise is not prevented from being*
> *consideration by the fact that it is implied from conduct or from*
> *words that are not in express promissory form.*  (Emphasis
> supplied.)

Dongguk has asserted sufficient facts to show that Yale was provided with the consideration for

the implied contract.  Connecticut courts have consistently held that "mutual promises, which

confer benefits and corresponding detriments on the respective parties, are sufficient

consideration to support a bilateral contract."  *See, e.g., Real Estate Listing Service, Inc. v.*

*Connecticut Real Estate Comm.*, 179 Conn. 128, 135 (1979).

Here, Dongguk has pleaded that the parties had promised to each other that upon a

request of one party, the other party will verify and provide accurate information as to whether

the purported degrees were actually awarded by it or not.  Such mutual promises constitute

sufficient consideration to support the implied contract claim asserted here.

### E.  Dongguk Has Properly Pleaded Its Defamation Claim

As stated in *Morron v. City of Middletown*, 464 F. Supp. 2d. 111, 117 (D. Conn. 2006),

"Under Connecticut law, [libel] is actionable per se if it charges improper conduct or lack of skill

or integrity in one's profession or business and is of such a nature that it is calculated to cause

# Memorandum –
# Part 3

injury to one in his profession or business." To establish a prima facie case of defamation, a plaintiff must plead that: (i) the defendant published a defamatory statement; (ii) the defamatory statement identified the plaintiff to a third person; (iii) the defamatory statement was published to a third person; and (iv) the plaintiff's reputation suffered injury as a result of the statement. *Integrated Security Solutions, LLC v. Security Technology Systems, LLC*, CV 4001811, 2007 Conn. Super. LEXIS 2397, at *4-5 (Super. Conn. Sept. 10, 2007). Dongguk has properly pleaded all of these elements.

Dongguk has pleaded that on July 10, 12, 17, and 18 of 2007 as well as on August 4, 2007 and on September 21, 2007, Yale maliciously told various Korean newspapers and/or broadcast media that (a) it had never received the September 5 Registered Letter; (b) it had never informed Dongguk that Shin had been awarded a Ph.D. from Yale; and (c) the September 22 Fax was "fake" and a "forgery." (Complaint, ¶¶.94-97, 108, 107-08, 109-12, 122-23, 143, 198.) Dongguk has also pleaded that the Korean media and the population-at-large understood Yale's statements to mean that (i) Dongguk improperly hired Shin without verifying her credentials; (ii) Dongguk had lied when it said that it had contacted Yale about Shin's Ph.D., and (iii) Dongguk had tried to cover up its misconduct by reliance on a forged document, *i.e.* the September 22 Fax. (Complaint, ¶¶ 115-16, 160.)

Dongguk has also pleaded that Yale's defamatory statements were widely published in Korea and inflicted significant injury to Dongguk's reputation. (Complaint ¶¶ 95-97, 104-06, 108-16, 120-23, 144, 198.) Thus, the Complaint alleges that as a direct result of Yale's defamatory statements, Dongguk was perceived as being dishonest and incompetent, and that its reputation was tarnished. (Complaint ¶¶ 115-16, 119, 157, 164, 201-02.) Dongguk further alleges that as a consequence it suffered substantial damages, including but not limited to a

25

decrease in the amount of donations, government grants and student applications for admission, the loss of a prestigious award and the failure to obtain permission to open a U.S. style law school. (Complaint ¶¶ 166, 172.)

According to Yale, the defamation claim must be dismissed because the statements quoted in the Complaint cannot be reasonably interpreted as referring to Dongguk or being defamatory or malicious. (Yale's Motion to Dismiss Br., p. 30.) This argument is meritless because it is well-settled that whether certain words or sentences carry a defamatory meaning is a question of fact for the jury. *Carey v. Woodruff*, 89 Conn. 304, 309 (1915); *Arnott v. The Standard Association*, 57 Conn. 86, 93 (1888); *Ventresca v. Kissner*, 105 Conn. 533, 535 (1926).

Where the alleged defamatory words may seem innocuous on their face, they may nevertheless give rise to a defamatory innuendo because of extrinsic facts. Wright, Fizgerald, Ankerman, *Connecticut Law of Torts*, 3d Ed., p. 415. *See also* Dobbs, *The Law of Torts*, p. 1132 (2001) (explaining that, for questions of meaning, the courts take into account the literary context as well as the social context). Even where a statement made by a defendant does not mention a defamed party on its face, it has long been settled that Connecticut courts allow extrinsic facts to show that the statement refers to the plaintiff. *Mix v. Woodward*, 12 Conn. 262, 287 (1837) ("We suppose it to be well settled, that where the person is so ambiguously described, that a resort to extrinsic facts is necessary to ascertain his identity; there the libel and all attending circumstances, are to be submitted to the jury; and that the plaintiff is at liberty to prove the averment, 'that the libel was published of and concerning him'").

In short, in determining the meaning of the words at issue in a defamation case, the words are "to be understood in the sense which hearers of common and reasonable understanding would ascribe to them." *Ventresca*, 105 Conn. at 535. What matters in determining the meaning

of the particular words is the common understanding by listeners, not the actual intention of the author. *Arnott*, 57 Conn. at 93.

In essence, by stating that the September 5 Registered Letter had never been received by Yale, that the September 22 Fax was never sent to Dongguk and that both documents were fakes and forgeries, Yale was publicly calling Dongguk a liar. By imputing dishonesty and incompetence to Dongguk, Yale's statements damaged Dongguk's reputation and resulted in severe consequences, including financial harm and a criminal investigation. Yale's statements were therefore defamatory in their nature. *See Integrated Security Solutions*, 2007 Conn. Super. LEXIS 2397, at *4 ("A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him").

Yale also asserts that Dongguk has not pleaded that Yale made the statements alleged in the Complaint with actual malice. (Yale's Motion to Dismiss Br., p. 33.)  A review of the Complaint reveals that Dongguk has, in fact, pleaded facts that would permit a jury to conclude that Yale's statements were made with malice.  Moreover, as specifically stated in the Complaint, Dongguk has asserted that all of the defamatory statements were "maliciously" made to the Korean media. (Complaint ¶ 198.)

There is a difference between proving malice and pleading malice.  As stated by the Supreme Court in *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2685, 105 L. Ed. 2d 562 (1989), in proving malice, a public figure must at a minimum demonstrate that the statement was made "with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *See also St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1986), ("...evidence of either deliberate

27

falsification or reckless publication 'despite the publisher's awareness of probable falsity' [is] essential to recovery by public officials in defamation actions.") As more recently stated, in *Morron*, at 118, " 'Actual Malice' occurs when a statement is made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"

However, in order to plead malice, it is sufficient for a plaintiff "to generally aver malice as to a defendant's state of mind." *Boyd v. Nationwide Mut. Insur. Co.*, 208 F.3d 406, 410 (2d Cir. 2000) *See also, Dougherty v. Town of North Hemstead Bd. of Zoning*, 282 F 3d 83, 91 (2d Cir. 2002). Connecticut courts have held that a complaint which alleges that statements were made maliciously was sufficient to withstand defendant's motion to dismiss. For example, in denying the defendant's motion to dismiss, the *Morron* court stated:

> Considering the standard set forth in [*Times v. Sullivan,* 376 U.S. 254 (1964)], the court finds that the plaintiffs have sufficiently alleged actual malice. In the Complaint, they asserted that "Thornton's ... false statements were *made maliciously, intentionally, willfully, wantonly, and/or with reckless disregard of the truth*...Whether this assertion is ultimately tenable will be a matter for discovery. 464 F. Supp. 2d at 118. (Italics supplied.)

Dongguk has not only satisfied this standard, it has pleaded the facts it needs to prove malice.

However, the issue of malice cannot be determined on Yale's Motion to Dismiss. As the court noted in *Morron*, whether a defendant made statements with actual malice is a question of fact for the jury. *Id.   See also Abdelsayed v. Narumanchi,* 39 Conn., App. 778, 780 (1995); *Holbrook v. Canazza*, 204 Conn. 336, (1987).

Neither of the two cases cited by Yale, *Beler v. Milford Bd. Of Educ.,* CV054002886S, 2005 Conn. Super. LEXIS 1932, at *4 (Conn. Super. June 23, 2005), and *Rogues v. Bayer Corp.*, Case No. 3:02-cv-1778 (MRK), 2004 U.S. Dist. LEXIS 17026, at *35 (D. Conn. Aug. 25, 2004), are to the contrary. Indeed, both cases are distinguishable on their facts.

28

In *Beler*, the plaintiff simply did not allege actual malice at all. 2004 U.S. Dist. LEXIS 17026, at *4 ("The complaint fails to allege this essential element . . . There are simply no facts alleged from which it can be implied that the statements were made with actual malice.") Here, not only did Dongguk properly plead that Yale's statements were maliciously made, it asserted sufficient facts to show that at the time Yale made such statements, it knew or should have known that their statements were inaccurate.

*Rogues* involved the issue of whether the defendant abused its qualified privilege in making a defamatory statement, which is not an issue here. *Id.* Moreover, when it received the complaints, the defendant in *Rogue "promptly investigated"* the notes containing the alleged defamatory statements. Based upon this fact, the court concluded that the defendant had not acted maliciously. *Id.*

In this case, there is no qualified privilege and Yale did not promptly investigate the matter. Indeed, Yale ignored all of the evidence that Dongguk provided to it in July, August and September of 2007, which should have enabled Yale to determine that it had received the September 5 Registered Letter and that the September 22 Fax were authentic. (Complaint ¶¶ 130-31, 133, 135, 137.) Instead, Yale issued its "Official Statement" reiterating its earlier statements that all documents supporting Shin's claims were forgeries and therefore are "fake." (Complaint ¶ 143.) Thus, Yale's behavior is far different from that of the defendant in *Rogues*.

## II. YALE'S EXTRA-COMPLAINT DOCUMENTS CANNOT BE CONSIDERED BY THE COURT

Rather than confine its review to the allegations contained in the Complaint, Yale's recitation of Dongguk's claims is based in large part on a series of English language translations of newspaper articles and a Judgment entered in the Seoul Western District Court ("Judgment"). Indeed, Yale spends more pages discussing the newspaper articles and the Judgment than it does

29

the allegations contained in the Complaint.  These newspaper articles and the Judgment, together with Yale's misdescription of the allegations contained in the Complaint, then become the centerpiece of Yale's legal arguments.  (*See, e.g.*, Yale's Motion to Dismiss Br., pp. 15, 18, 20, 21, 31, 32 and 33.)

In an effort to convince the Court that these "extra-complaint" documents should be considered in determining the Motion to Dismiss, Yale argues that (i) the Court can consider the newspaper articles because they were relied upon by Dongguk and (ii) the Court can take judicial notice of the Judgment.  Yale is wrong in both points.  As discussed below, these documents cannot be considered by the Court because they were not "relied" on by Dongguk and they constitute inadmissible hearsay.

### A.   The Applicable Legal Standard

The Second Circuit has held that in extremely limited circumstances, F.R.C.P. 10(c)[8] permits a reviewing court to review documents outside of the pleading if the moving party can demonstrate that the documents were relied upon by the plaintiff and were integral to the claims set forth in the complaint.  For example in *I. Meyer Pincus and Assoc. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991), the Second Circuit held that in determining the sufficiency of a securities fraud claim based upon a prospectus, it was proper for a district court to review the terms of a prospectus even though it was not attached to the complaint because the prospectus was integral to the complaint.  *See also, Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (court permitted the district court to review stock purchase agreement, offering memorandum and warrant that were not attached to complaint since plaintiff's securities fraud claims arose out of these documents).

---

[8] F.R.C.P. 10(c) provides that a "statement in a pleading may be adopted by reference elsewhere in the same pleading or any other pleading or motion."

Notwithstanding this limited exception, the Second Circuit has continually stressed that it is improper to consider "extra-complaint information in the motion to dismiss." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993); *See also, Newman & Schwartz v. Asplundh Tree Export Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) (district court reversed for considering "extra-complaint" information going to the merits of the complaint); *DeRay v. Larson*, 2004 U.S. Dist LEXIS 19642, at *6 (D. Conn. Sept. 29, 2004), *aff'd, DeRay v. Otis Elevator Co.*, 153 Fed. Appx. 19 (2d Cir. 2005); *Vincent v. Essent Healthcare of Conn.*, 2006 U.S. Dist. LEXIS 71816, at *1 (D. Conn. Sep. 28. 2006).

As observed by this Second Circuit in *Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 153 (2d Cir. 2002), its rules regarding consideration of extra-complaint documents "has been misinterpreted on occasion . . . ." In *Chambers*, the Second Circuit emphasized that extra-complaint documents can only be considered "where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* The Second Circuit also stated that "mere notice or possession is not enough." *Id.* The Second Circuit noted that while it may have been proper for the district court to review contracts whose interpretation was requested by the plaintiff, the district court committed reversible error by reviewing other documents. *Chambers, supra* at 154.

In reversing the district court, the Second Circuit went on to state that "once the District Court was presented with matters outside the pleadings, Rule 12(b) afforded two options."[9] As

---

[9] F.R.C.P. 12(b)(6) provides in pertinent part:

> . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

explained by the Second Circuit, the district court "could have excluded the extrinsic documents"

or if it chose to consider the extra-complaint documents, it "was obligated to convert the motion

[to dismiss] to one for summary judgment and *give the parties an opportunity to conduct*

*appropriate discovery* and submit the additional supporting material contemplated by Rule 56."

[10] *Id.* (Emphasis supplied.)

      As stated in *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000), the Second

Circuit takes this conversion process very seriously. In *Friedl*, the Second Circuit reversed a

district court for considering extra-complaint documents in determining a motion to dismiss. In

so doing, the Second Circuit stated:

> [W]hen matters outside the pleadings are presented in response to a
> 12(b)(6) motion," a district court must either "exclude the
> additional material and decide the motion on the complaint alone"
> or "convert the motion to one for summary judgment under
> Fed.R.Civ.P. 56 and afford all parties the opportunity to present
> supporting material." *This conversion requirement is strictly
> enforced whenever there is a "legitimate possibility" that the
> district court relied on material outside the complaint in ruling on
> the motion. Thus, a district court errs when it consider[s]*
> affidavits and exhibits submitted by defendants, or *relies on factual
> allegations contained in legal briefs or memoranda... Vacatur is
> required even where the court's ruling simply "mak[es] a
> connection not established by the complaint alone" or contains an
> "unexplained reference" that "raises the possibility that it
> improperly relied on matters outside the pleading in granting the
> defendant's Rule 12(b) motion.* (Citations omitted) (Emphasis
> supplied.)

*See also, Henschke v. New York Hospital-Cornell Medical Center*, 821 F. Supp. 166, 169

(S.D.N.Y. 1993).

      If the motion to dismiss is converted to a summary judgment motion, then all of the

provisions of F.R.C.P. 56 apply to the motion. Thus, the extra-complaint documents must be

---

[10] It must be noted that in contrast to the holding in *Chambers*, Yale wants this Court to consider the extra-complaint documents while at the same time stay discovery.

examined to determine whether they contain admissible evidence before they can be considered by the court. *See, e.g, Raskin v. The Wyatt Company,* 125 F.3d 55, 66 (2d Cir. 1997) (". . . only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment"); *Nora Beverages, Inc. v. The Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir. 2001) ("It is appropriate for a district court ruling on summary judgment to consider only admissible evidence").

Finally, even assuming that the extra-complaint documents are admissible, they must then be examined to determine whether they raise genuine issues of material fact. Summary judgment must be denied if there is a dispute regarding material fact or "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) *cert. denied,* 506 U.S. 695 (1992). In deciding a summary judgment motion, the court must resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523.

### B. The Newspaper Articles Were Not Relied Upon By Dongguk For Their Truth

According to footnote 2 on page 3 of Yale's Brief in support of its Motion to Dismiss (and repeated in footnotes 3, 4, 5, 11 and 12), the Court can properly consider the statements made in the newspaper articles attached to Yale's Brief because Dongguk "relied" on them in its pleading, *i.e.* the Complaint. In so arguing, Yale misunderstands and misapplies the reliance rule.

In *Chambers, Oppenheimer,* and *Cortec,* the Second Circuit permitted the district courts to review relevant prospectuses and contracts in connection with the plaintiffs' fraud and breach of contract claims because the prospectuses and contracts were, on their face, dispositive of the plaintiffs' claims. As detailed in the Complaint, Dongguk does not rely on the truth of any of the

33

newspaper articles attached to Yale's Brief in Support of its Motion to Dismiss and their content is not dispositive of Dongguk's claims. [11]

In contrast to Dongguk's position that the newspaper articles are false, Yale has attached the newspaper articles to its Brief because Yale wants the Court to accept the contents of those newspaper articles as truthful fact. [12]  In this regard, the Court need only refer to pages 2 through 7 of Yale's Brief which contains Yale's version of the facts and which are substantially based on the newspaper articles and the Judgment attached to Yale's Brief.

There is an important distinction between submitting newspaper statements for the truth of the statement contained therein and referring to them because they contain defamatory matters. As stated in *Jackson v. Jimino*, 506 F. Supp. 2d 105, 113 (N.D.N.Y. 2007), newspaper articles are only admissible when the articles are "submitted not for the truth of the matter but for the fact that the statements did occur and were published."

---

[11] Indeed, even Yale itself has refused to be bound by their content, the Court need only refer to the section entitled "The Facts Omitted from the Complaint" which is contained in the Brief submitted by Yale in support of its Motion to Stay Discovery (pp. 6-11).  That section is based entirely on a series of newspaper articles attached to that Brief, a number of which are also appended to Yale's Brief in support of its Motion to Dismiss.  Notwithstanding Yale's contention that these newspaper articles contain "Facts," Yale states in footnote 1 of its Motion to Stay Discovery Brief:

> Yale takes its description of the factual background from Dongguk's Complaint and *from contemporaneous news accounts*, both of which *Yale reserves the right to contest as the facts come to light if discovery ensues*.  (Emphasis supplied.)

Thus, Yale wants to have it both ways.  It wants this Court to accept as "fact" statements contained in the newspaper articles even though Yale wants to be able to challenge their accuracy at a later date.

[12] Remarkably, at page 6 of its Reply Memorandum of Law submitted in support of the Motion to Stay Discovery (Bae Affidavit, Ex. B), Yale now contends that it did not attach the newspaper articles for their truth, but rather "for the fact of their publication..."  Yale then proceeds to state that its "arguments in support of the motion to dismiss do not depend on the truths of any of the matters stated in the articles."  *Id.*  If this is so, Yale offers no explanation as to why the newspaper articles have been attached to Yale's Brief in the first place.  In point of fact, despite Yale's newest position, the fact remains that many of Yale's legal arguments are based upon the information contained the newspaper articles.  (*See* Yale's Motion to Dismiss Br., pp 18, 20, 21, 31, 32, and 33.)

34

As pointed out in the *Jackson* case, it is settled law that the contents of newspaper articles are hearsay under Federal Rule of Evidence ("F.R.E.") 802 and that consequently they cannot be relied upon to support or defeat a summary judgment motion.  506 F. Supp. 2d at 113.  *See also Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 217 (S.D.N.Y. 2007) ("Newspaper articles offered for the truth of the matter asserted are inadmissible hearsay"); *Kaya v. City of New London*, No. 05-cv-1436 (JCH), 2008 U.S. Dist. LEXIS 5478, at *25 (D. Conn. Jan. 24, 2008) (Newspaper articles "are inadmissible hearsay . . . and thus cannot be considered on summary judgment"); *Holmes v. Gaynor*, 313 F. Supp. 345, 358 N.1 (S.D.N.Y. 2004).  ("The newspaper article . . . is hearsay and inadmissible for proving the truth of the matters asserted therein.")

Yale attempts to circumvent this evidentiary rule by asserting that because Dongguk referenced the defamatory articles in its Complaint, they were therefore relied upon by Dongguk. There is nothing in F.R.C.P. 10(c) or in any Second Circuit decision that permits a party to attach inadmissible hearsay documents to a brief in support of a Motion to Dismiss and then have those documents be considered by the Court as if they contained unassailable fact.  As stated by the Second Circuit in *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir 1989), in reversing a district court for relying on extra-complaint documents, "limited quotation does not constitute incorporation by reference."  *See also, Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1980) (reversible error to consider documents that "were to some extent quoted" in determining F.R.C.P. 12(b)(6) motion).

In *United States v. International Longshoremen's Ass'n.*, 518 F. Supp. 422, 452 (E.D.N.Y. 2007), the court held that it was improper for the court to consider a newspaper article

appended to the defendant's motion papers in determining a F.R.C.P. 12(b)(6) motion. As stated by the court:

> The problem with the ILA's argument is that it did not submit the Daily News article as mere "background," but rather for the purpose of challenging the factual accuracy of the Amended Complaint's allegations regarding the ongoing influence of organized crime on the Waterfront. ILA Exhibit A falls within none of the categories of documents outside the complaint that may be considered in a 12(b)(6) motion identified by the Second circuit in *Bright,* and the Court therefore shall not consider it in ruling on the ILA's 12(b)(6) motion.

Simply put, the supposed fact statements contained in the newspaper articles that are appended to Yale's Brief cannot be considered by the Court in determining Yale's Motion to Dismiss.

### C. The Court Cannot Consider The Korean Judgment

There is no doubt that Yale seeks to have the Court accept the truth of certain facts purportedly decided by the Korean judge who signed the Judgment. And like the newspaper articles, the Judgment is inadmissible hearsay. Even more egregious is that in Yale's Brief, it asserts that the Korean judge made findings that he did not make and then relies on these supposed findings in making its legal arguments.

In footnote 6 of its Brief, Yale argues that the Court can rely on the Judgment because it can "take judicial notice of the indictments and convictions" of Shin and Yang Kyun Byeon ("Byeon"). In the same footnote, Yale also acknowledges that judicial notice does not extend to the truth of "the matters asserted in the other litigation." However, having correctly stated the rule, Yale proceeds to ignore it.

In several places in its Brief, Yale, relying on the Judgment, asserts that Shin had an affair with a former high-level government official and that Shin was hired by Dongguk at Byeon's request in exchange for a promise from Byeon that Dongguk would benefit financially. According to Yale, in the Judgment, the Korean judge "found that Dongguk hired Shin at

Byeon's urging because he had told Dongguk's then-President Hong that hiring Shin 'will be a great help to Dongguk University financially.'" In explaining why Dongguk's negligence claim should be dismissed at pages 15 and 18 of its Brief, Yale proceeds to repeat this statement as if the statement is an established fact.

While a court can take judicial notice of a conviction or an indictment, it cannot accept as true the underlying facts involved in that criminal matter. As stated in F.R.E. 201(b), courts can only take judicial notice of facts outside the trial record that are "not subject to reasonable dispute." In interpreting this evidentiary rule, the Second Circuit has stated in *Int'l Star Class Yacht Racing v. Tommy Hilfiger*, 146 F.3d 66, 70 (2d Cir. 1998):

> Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b).

The Second Circuit went on to state:

> Facts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b); they are not usually common knowledge, nor are they derived from an unimpeachable source. *Id.*

Thus, even had Yale's Brief accurately referred to the Judgment, the Judgment would be inadmissible to prove the truth of the facts purportedly contained in it. Accordingly, those supposed facts cannot be considered by the Court.[13]

---

[13] In fact, much of the Judgment is of questionable relevance despite Yale's efforts to tie Dongguk to it. For example, at pages 6 and 7 of its Brief in Support of its Motion to Dismiss, Yale points out that criminal charges were brought against Byeon and Yong Taek Lim ("Lim"), a Buddhist Monk and the Chairman of Dongguk's University Foundation's Board of Directors, because Lim had improperly requested and received a state subsidy for a Buddhist temple. Not only does this event have nothing to do with Dongguk, the Judgment states at page 12 that Lim and Byeon did not even meet until February 2006, months after the exchange of the September 2005 documents between Yale and Dongguk regarding Shin's Ph.D.

But Yale makes it much worse. A review of the Judgment reveals that the supposed finding attributed to the Korean judge (*i.e.* "that Dongguk hired Shin at Byeon's urging because he had told Dongguk's then-President Hong that 'hiring Shin' will be a great help to Dongguk University financially") was not a judicial finding at all. Rather, the information comes from the portion of the Judgment entitled "Indicted Facts," which are the facts alleged to support the charge that Shin and Byeon had bribed Dongguk. As is made clear at page 43 of the Judgment, the Korean court actually acquitted Shin and Byeon on its charge containing these "Indicted Facts." Thus, no findings of fact were ever made on this point.

### D. Even If The Court Could Consider Yale's "Extra-Complaint" Documents, It Would Still have To Deny Yale's Motion To Dismiss

Even assuming *arguendo* that the Court could properly consider Yale's "extra complaint" documents, the Court would nonetheless have to deny Yale's Motion to Dismiss because these extra-complaint documents are not dispositive of any of the claims asserted in the Complaint. Rather, at best, they demonstrate the existence of multiple issues of disputed material fact.

Indeed, Yale's Brief is replete with disputed issues of material fact. Among these material issues of fact are:

- Whether "Dongguk seeks to shift the blame for its own inadequate efforts onto Yale, which had nothing to do with the impostor's fraud or Dongguk's foolhardy decision to hire her." (Yale's Motion to Dismiss Br., p. 1.)

- Was Yale "itself the victim of the same fraud since Shin falsely claimed to have earned a Yale Ph.D."?[14] (Yale's Motion to Dismiss Br., p. 1.)

- Is there "a satisfactory explanation why [Dongguk] University requested the verification only to Yale University but not to the University of Kansas . . ."? (Yale's Motion to Dismiss Br., p. 5.)

---

[14] It is difficult to understand how Yale can seriously contend that Yale was a "victim" of Shin's fraud in September 2005 when it verified Shin's degree since in June 2007, Yale had no trouble determining that Shin had not received a Ph.D. from Yale.

38

- Was Dongguk "deceived by the lies of Shin" or had it "actively protected and covered up Shin for some reason"? (Yale's Motion to Dismiss Br., p. 6.)

- Did Dongguk hire "Shin at Byeon's urging because he told Dongguk's then-President Hong that hiring Shin 'will be a great help to Dongguk University finically'"? (Yale's Motion to Dismiss Br., p. 7.)

- Could Yale "have foreseen that the authenticity of the September 22, 2005 fax could cause harm of the nature alleged by Dongguk"? (Yale's Motion to Dismiss Br., p. 13.)

- Is it true that "but for Shin's fraud, Schirmeister would not have sent the September 22, 2005 fax, and Carney and Reinstein would not have made the 2007 statements"? (Yale's Motion to Dismiss Br., p. 14.)

- Was Dongguk "either complicit in, or willfully ignorant of, Shin's fraud"? (Yale's Motion to Dismiss Br., p. 14.)

- Is it true that "Yale was not a cause in fact of any harm to Dongguk"? (Yale's Motion to Dismiss Br., p. 16.)

- Could Dongguk's "alleged injuries . . . have occurred regardless of Yale's alleged negligence"? (Yale's Motion to Dismiss Br., p. 17.)

- Would Dongguk have "employed Shin regardless of Yale's actions . . ."? (Yale's Motion to Dismiss Br., p. 17.)

- Was Dongguk have been "forced to spend money 'defending itself against the claim that it had acted improperly because it had supposedly failed to verify Shin's Ph.D.'"? (Yale's Motion to Dismiss Br., p. 18.)

- Would Dongguk have suffered all of the harm that it has alleged "even if Yale had never questioned the authenticity of the September 22, 2005 fax . . ."? (Yale's Motion to Dismiss Br., p. 19.)

- What role did "the crimes of Shin, Byeon, and Lim," have in connection with the hiring of Shin? (Yale's Motion to Dismiss Br., p. 21.)

- Did "the risk of harm to Dongguk exist prior to, and independently of, any of Yale's actions"? (Yale's Motion to Dismiss Br., p. 21.)

- Did Dongguk's "alleged harm . . . have occurred regardless of anything that Yale did"? (Yale's Motion to Dismiss Br., p. 22.)

- Can an agreement between Dongguk and Yale be inferred by Yale's "words or actions"? (Yale's Motion to Dismiss Br., p. 28.)

- Was there a "meeting of the minds" between Yale and Dongguk?  (Yale's Motion to Dismiss Br., p. 28.)

- Did Yale make "defamatory statements about Dongguk"?  (Yale's Motion to Dismiss Br., p. 29.)

- Can the statements attributed to Yale in the newspaper articles referred to in the Complaint be "reasonably interpreted" as to being defamatory to Dongguk?  (Yale's Motion to Dismiss Br., pp. 30-33.)

Ironically, the vast majority of these fact issues arise from the statements made in the newspaper articles and the Judgment.

In short, even assuming that these materials could be considered by the Court, they do not establish that Yale will prevail on any of these fact issues let alone all of them.  There is simply no basis in the record before the Court that would support the granting of summary judgment to Yale dismissing all of the claims asserted in the Complaint.

### CONCLUSION

For all the above reasons, Yale's Motion to Dismiss should be denied in its entirety.

MCDERMOTT WILL & EMERY LLP

By: _____
    Robert A. Weiner
    340 Madison Avenue
    New York, New York  10173-1922
    (212) 547-5400
    *Attorneys for Plaintiff Dongguk University*

Of Counsel:

Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz P.C.
350 Orange Street
New Haven, Connecticut  06511
(203) 772-3100