# EXHIBIT 79

1

1

2                    UNITED STATES DISTRICT COURT

3                   FOR THE DISTRICT OF CONNECTICUT

4    - - - - - - - - - - - - - - - x
                                   :
5    DONGGUK UNIVERSITY            :   No. 3:08CV441(RNC)
                                   :
6                     Plaintiff,   :
                                   :
7              vs                  :
                                   :
8    YALE UNIVERSITY               :
                                   :   HARTFORD, CONNECTICUT
9                     Defendant.   :   JANUARY 30, 2009
                                   :
10   - - - - - - - - - - - - - - - x

11                       MOTIONS HEARING

12       BEFORE:

13          HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

14   APPEARANCES:

15       FOR THE PLAINTIFF:

16          MCDERMOTT WILL & EMERY
                  50 Rockefeller Plaza
17                340 Madison Avenue
                  New York, New York 10173-4613
18          BY:   ROBERT A. WEINER, ESQ.
                  JEAN BAE, ESQ.
19
         FOR THE DEFENDANT:
20
            DAY PITNEY LLP
21                242 Trumbull Street
                  Hartford, Connecticut 06103-1212
22          BY:   FELIX J. SPRINGER, ESQ.
                  HOWARD FETNER, ESQ.
23
         ALSO PRESENT:  AUDREY LU
24

25                              Darlene A. Warner, RDR-CRR
                                Official Court Reporter

1

2                              10:00 A.M.

3

4              THE COURT:  Good morning.  Would you please

5    state your appearances.

6              MR. WEINER:  Robert Weiner, McDermott, Will &

7    Emery, for the plaintiff.  Jean Bae is a colleague.  And I

8    have a young associate who has not attended an oral

9    argument before but I'd ask she sit at counsel table if

10   it's okay with Your Honor.

11             THE COURT:  Welcome.

12             MR. SPRINGER:  Felix Springer of Day Pitney on

13   behalf of Yale University along with --

14             MR. FETNER:  Howard Fetner, also on behalf of

15   Day Pitney, Your Honor.

16             THE COURT:  Good morning.

17             We're here for argument on the pending motions.

18   I've read your papers, and I'll be glad to hear whatever

19   additional presentations you would like to make.

20             Mr. Springer?

21             MR. SPRINGER:  Thank you, Your Honor.  Good

22   morning.

23             This is, as you've seen from the papers, isn't

24   your garden variety tort claim.  And what I thought might

25   be most helpful to the Court is if in fact I focused on

1   the key issues that I think divide the parties.  And what

2   I thought I would do is first focus on the issue of

3   whether the news articles may be considered on a motion to

4   dismiss without turning it into a motion for summary

5   judgment.  I think that's one of perhaps the key issues --

6   the key overarching issue that divides the parties.  It's

7   certainly one that Dongguk spends a good deal of its

8   papers on.

9           I then thought I would move backward through the

10  complaint and talk about the key issues that divide the

11  parties and point out the degree to which Dongguk doesn't

12  engage with its allegations and how important it is in

13  this matter to focus on the allegations and the reasonable

14  inferences drawn from them.

15          Contrary to Dongguk's papers, we don't disagree

16  with the standard on a motion to dismiss.  But in this

17  over 200 paragraph complaint, there are a wealth of

18  allegations, and it is particularly easy to confuse some

19  of the documents and what is said about them and the

20  context in which it is said.  So I wanted to walk through

21  and, you know, with Your Honor's indulgence, I would do

22  that.  I will try to be as brief as possible, nonetheless,

23  I think I have to spend some time with some specific

24  focus.

25          Yale maintains that the Court -- this Court can

1    and should consider the news articles on the motion to

2    dismiss.  Dongguk argues, in essence, that such

3    consideration turns the motion to dismiss into a motion

4    for summary judgment and that there are numerous issues of

5    fact that arise as a consequence.  They put a lot of eggs

6    in that basket.

7           But I think the Second Circuit law is fairly

8    clear here, Your Honor, that if the articles are relied on

9    and if they are integral to Dongguk's complaint, then this

10   Court may consider them and may consider them on a motion

11   to dismiss.

12          And in fact, Dongguk's complaint does rely on

13   the news articles.  The recklessness and defamation claims

14   are explicitly based on what is said in the news articles,

15   and the news articles are used to frame the other claims

16   as well.

17          And I want to point out right at the outset,

18   although I'll say something more about this, Yale does not

19   rely on the news articles for their truth.  It's

20   irrelevant to our arguments whether the statements

21   reported in the news articles are true.  We use the news

22   articles for the same reason that Dongguk does, namely to

23   what is reported out there.

24          And if you look at both the Chambers case and

25   the other case involving misrepresentation about financial

1    matters -- and I'll get to the name of that shortly --

2    both of them use the articles in the same way. And that

3    case, by the way, is Pincus v. Oppenheimer where it was

4    alleged that the statements included in the prospectus at

5    issue in that case constituted the defendant's alleged

6    securities fraud.

7           Your Honor, I think even the pleading standard

8    for defamation shows why these news articles are integral.

9    Plaintiff must plead the actual words spoken. They must

10   plead what the defamatory statements were that were made

11   concerning the plaintiff, when they were made and to whom

12   they might have been made.

13          It is that standard that points out why the

14   articles are integral to the complaint. Dongguk was

15   required to plead the contents of those articles in order

16   to state a claim for defamation. What could be more

17   integral to a defamation claim than the defendant's

18   allegedly defamatory statement?

19          Again, Your Honor, I think we discussed the

20   cases fairly carefully in our briefs, Chambers v. Times

21   Warner, the Cortec case, the Pincus one that I've just

22   referred to, Oppenheimer, and the United States v.

23   International Longshoreman's Association.

24          I want to pause just a bit on the last case

25   because it's cited by the plaintiffs. But the plaintiff

1    only cites half of it and only refers to what is not

2    relied on because -- rather than what is relied on. They

3    say that a news article that was used to try to -- for the

4    truth to contradict the allegations couldn't be used, and

5    we agree with that. That's not what's at issue here. But

6    the Longshoreman's case also indicated that the

7    constitution and the code of ethics that were relied upon

8    could be considered in those cases.

9            Let me just -- so we're very clear or I'm very

10   clear about how Yale used those articles -- it used them

11   to show that the Korean media would have criticized

12   Dongguk regardless of Yale's alleged negligence, in other

13   words, for what was reported and to show that Yale's

14   alleged statements could not reasonably be considered

15   defamatory.

16           Again, if you look at those cases, those

17   articles, the complaint doesn't rely on them for the

18   truth. Plaintiffs don't have to rely on the news articles

19   for the truth. That's what the case law says. That's

20   what the Pincus and the Cortec case holds as well as

21   Chambers.

22           In arguing that it has not relied on the news

23   articles for their truth, as Dongguk does at its

24   memorandum at the end, 33 to 36, Dongguk attacks the

25   strong end. We have not again cited those articles for

1    their truth.  And again you need not rely on, as a

2    plaintiff, those articles for that.

3          It also cites pages of our brief and claims that

4    we -- that many of Yale's legal arguments are based on the

5    information contained in the newspaper articles.

6          Your Honor, as we maintain in our reply brief at

7    page 9, none of those pages, nor any other portion of

8    Yale's brief, rely on the truth of the statements

9    contained in any of the articles.

10         And by the way, Dongguk has not identified any

11   way in which any of Yale's argument depend on the truth of

12   the statements in any extra complaint document.

13         And I might just in passing as a last point just

14   mention the Korean a judgment.  Similarly, we don't rely

15   on any facts underlying that judgment.  We simply rely on

16   the fact that it was made for a brief, if you will, point

17   about public policy in our brief.

18         So if those articles are relied on as they

19   should, then we need to go to the complaint itself.  And

20   what I want to point out is that consistently and

21   repeatedly in the opposition, their opposition and in

22   their arguments, they refuse to engage with their own

23   allegations.  It's true of every cause of action.

24         And I want to start with defamation because it

25   affords the best -- well, there are other good examples,

1    but among them significantly, it wrongly summarizes the

2    allegations, and I'll get to that in the opposition on 27.

3    And it also concludes that it has pleaded facts that would

4    permit a jury to conclude Yale's statements were made with

5    malice.

6        Remember our argument, Your Honor, is -- and

7    I'll walk through these -- is that there are five

8    statements that Yale made that are being relied on for the

9    defamation claim and we also maintain there is no malice.

10   I'd like, if I could, because it becomes important to the

11   argument, to go over Exhibits B and C with Your Honor.  If

12   you have them handy.  Otherwise I have copies of them.

13        THE COURT:  I have them.

14        MR. WEINER:  I would appreciate a copy.

15        MR. SPRINGER:  Sure.

16        MR. WEINER:  Thank you.

17        MR. SPRINGER:  I mention these, Your Honor,

18   because I think it behooves all of us to pay careful

19   attention to these documents.  They are confused in the

20   complaint, they are confused in the brief.  And the

21   context in which they're mentioned and how they're

22   mentioned by Yale in its alleged statements I think show

23   that there are no cause of action.

24        No question Yale made mistakes here, and the

25   point is we're not arguing, you know, the issue of breach

1   here.  We're arguing no duty and we're arguing no

2   defamation, et cetera.

3          So if you look at the first document, B, that is

4   the certification letter, okay?  And this is signed by Pam

5   Shirmeister on Yale heading.  It is repeatedly referred to

6   as the certification letter but sometimes referred to as a

7   fax.  And it again has Yale University stationery.

8          If you look at C, that contains -- and that is

9   dated May 27th, 2005 -- that contains a three-page

10  document and it is -- the first document is Professor

11  Shirmeister's fax transmittal sheet.  "As requested, I am

12  confirming that the attached letter was issued by Yale

13  graduate school and signed by me."

14         The next is the certification letter.

15         And the third is the letter of inquiry dated

16  September 5th by Dongguk.

17         And I point out why it is important because it

18  is, if you look for instance at paragraphs 97 -- 94

19  through 97 of the complaint, and particularly 95, 94 says

20  that Reinstein informed the reporters that the fax was

21  forged.  But if you look at 95, it is very clear that

22  Reinstein is referring to in fact the certification letter

23  that was forged and it is not the September 22nd fax that

24  was forged.  That is, her fax without a signature but

25  rather it is the certification letter.  This document is

1    in a different format from Yale's University academic

2    record verification, and it is a forged document.

3         By the way, there is no controversy that it is a

4    forged document and that Shirmeister made a mistake in

5    sending the -- you know, taken in by the fraud -- made a

6    mistake in sending the September 22nd fax.

7         But I point this out because it becomes

8    important as to what is reported. For instance, if you

9    look at Exhibit F, which is where all of this occurs, the

10   newspaper conflates those too, where she says the document

11   has a different form than that of Yale University's

12   official certificate. The document is fake. And it is

13   not the September 22nd document in that context that is

14   fake.

15        Now, Yale -- and I point that out because there

16   is yet another, if you will, confusion. Others might

17   claim it's a misrepresentation. But if you look at the

18   plaintiff's brief in opposition at page 8, it says at the

19   top first full paragraph, based upon Yale's continued

20   public statements, that the September 5th registered

21   letter and the September 22nd fax were forgeries. There

22   has not been any statement in the allegation whatsoever

23   that the September 5th registered letter was a forgery,

24   Your Honor. The only two statements that Yale has made is

25   that it was not received. This is based on the knowledge

1   that they had that it was not received.  And this becomes

2   important as we'll see for the defamation claim.

3           And it is true that the September 22nd fax in a

4   couple of statements were said to be a fake, but those

5   statements where it was said to be a fake are always in

6   the context of Shin's fraud.  And that's why we maintain

7   any of the statements related to Yale's saying it hadn't

8   received the September 5th letter from Dongguk or that the

9   September 22nd fax was a fake, have -- don't at all

10  besmirch, if you will, or even implicate whatsoever

11  Dongguk or its reputation.

12          So if we could, Your Honor, look for instance --

13  and we do deal with these allegations.  If you would

14  look -- or you don't need to look, I'm sorry -- at page 30

15  of our brief, our initial brief, we point out all of the

16  statements that were made.  And again there are only two

17  statements that essentially are being relied on that the

18  certification letter was not -- I'm sorry, the

19  certification letter was not received and that the

20  September 22nd fax was a fake.  But not that Dongguk, you

21  know, didn't receive it.

22          And that becomes important because if you look

23  at our argument, Reinstein's acknowledgment is that the

24  September 22nd, 2005 fax may have been faxed from Yale

25  University, and that's at the complaint at 105 and our

1    brief at 32.  The point being that the inference to be

2    drawn is it is very much contrary to any inference that

3    Dongguk had forged the fax, but it also bolsters what

4    Dongguk was saying, that it received the fax.

5          So what we have here is Yale not contradicting,

6    look you're saying you received it based on what we know,

7    you know, it could have been sent to you.  We believe at

8    this point it's a fake.  We believe at this point it's a

9    fake.  And so if you look at these statements, what they

10   essentially do is make those statements, but they never

11   implicate Dongguk.  And I think that becomes clear.

12         And what is interesting again is that Dongguk

13   never engages with those allegations or those paragraphs

14   of the complaint.  All of those statements again are made

15   in the context of Shin's forgery and her fraud, not any

16   statement of forgery or fraud or misdealing by Dongguk.

17         To counter Yale's statements, what Dongguk says

18   in its opposition at 27 is, in essence, by stating that

19   the September 5th letter had never been received by Yale

20   and that the September 22nd fax was never sent to Dongguk

21   and that both documents were fakes and forgery, Dongguk

22   was -- Yale was calling Dongguk a liar, publicly.

23         Again, there is no allegation that that

24   September 5th letter, that is Dongguk's letter of inquiry,

25   was a fake or forgery.  We point that out in our footnote

1     in our reply.  And secondly, there's no allegation that

2     the September 22nd fax was not sent, only that it was not

3     prepared by Yale as the complaint says at 105.

4          And what's key here is not only are the facts

5     misrepresented, but by not bothering to explain how Yale's

6     alleged statements could be interpreted as calling Dongguk

7     a liar, that's the only way that Dongguk can claim that

8     the allegations are sufficient to state a claim of

9     defamation.  Looked at I think with all reasonable

10    inferences, nothing implicates Dongguk and certainly

11    nothing defames them.

12         Your Honor, Dongguk tries the same strategy, if

13    you will, with regard to the issue of malice.  There's a

14    bald assertion in the brief on page 27 without citation to

15    anything in the complaint that Yale's statements were made

16    maliciously.  But because there's no citation in the

17    allegation, there's no inference that could reasonably be

18    drawn that Yale made any statements about Dongguk with

19    knowledge that they were false or with a reckless

20    disregard of the truth.  There are summary conclusory

21    remarks in the brief that this is malice, but there's

22    nothing that is relied on in the complaint.

23         What we do in our brief, to the contrary, is

24    address the allegations that Dongguk made that show a lack

25    of malice.  And those are prompt investigation,

1   correspondence from Yale back and forth with Dongguk that

2   seeks the truth or attempts to find out what's happened

3   here, prompt acknowledgment of its mistake once it was

4   discovered.  And again, Yale made mistakes here and the

5   issue is, you know, was a cause of action stated in any

6   regard in any of these four claims.  And it promptly

7   acknowledged that and then it apologized.  All of those

8   are indicia of a lack of malice.  I'll -- and again,

9   dealing with the complaint you get there.

10          The contract claim is another example, I

11  believe, Your Honor, where Dongguk refuses to engage with

12  its own allegations and seeks to mask their insufficiency

13  by mischaracterizing them.

14          Dongguk claims that it alleged that there was an

15  understanding between Yale and other academic institutions

16  that they would rely on each other in determining whether

17  to hire the individuals about which they inquired.  There

18  are three paragraphs cited by Dongguk, this time 26, 29

19  and 193 of the complaint.  Those paragraphs contain no

20  such allegation of understanding between Yale and other

21  academic institutions.  No reasonable inference can be

22  drawn of that.  They're just simply not there.  More

23  importantly, Your Honor, there are no allegations of an

24  understanding between Yale and Dongguk.

25          If you remember, we make two arguments with

1    regard to contract, essentially there's no meeting of the

2    minds, there's no understanding between the two and

3    there's no custom that is alleged as Dongguk would

4    maintain from which a contract can be inferred, and

5    there's no consideration.

6         To say, as Dongguk repeatedly does, that whether

7    a contract exists is a question of fact, it is to miss the

8    point and it's to miss the threshold inquiry.  It's a

9    question for this Court as a matter of law as to whether

10   Dongguk has alleged the existence of a contract.

11        The issue of consideration, again, I believe

12   shows Dongguk refusing to engage with the allegations of

13   its own complaint.  It argues, and here it is at the

14   opposition at 24, that mutual promises may be sufficient

15   consideration, but there is no allegation that Dongguk

16   made any promise to Yale.  There just isn't.  There's no

17   basis for the claim of mutual promises.  It may be a

18   correct statement of law, but there's nowhere in the

19   complaint does that occur.

20        And again, without citing its complaint, Dongguk

21   argues that Dongguk has pled that the parties had promised

22   to each other that upon request of one party the other

23   party will verify and provide accurate information as to

24   whether the reported degrees were actually awarded by it

25   or not.  Again, there is no such allegation and the lack

1       of citation on page 27 makes clear that this is, you know,

2       I think just a mask for the transparent insufficiencies of

3       the complaint.

4               Your Honor, I'm going to now just briefly

5       address the reckless and wanton conduct claim.

6               Here there's I think a lack of engagement with

7       the essential element of that cause of action.  And it

8       does require a conscious choice of a course of action.

9       And what Dongguk puts forth is only a negligence standard,

10      a should have known standard.  And it misunderstands the

11      legal standard by saying it need not allege that

12      Shirmeister, Carney and Reinstein knew that their

13      statements were untrue.  Unless they knew that their

14      statements were untrue or recklessly disregarded that,

15      there can be no conscious choice of a course of action.

16      There can be, according to the, you know, Sheiman and the

17      Connecticut Appellate Court, no claim for reckless and

18      wanton conduct.

19              Again, they claim that it is a question of fact

20      to be determined by the trier of fact.  Again they put the

21      cart before the horse.  The issue is whether they have

22      alleged reckless and wanton conduct, and that's a question

23      for this Court and it's a question of law.

24              I should point out with regard to the reckless

25      and wanton conduct claim, that they have not even

1    addressed Yale's argument that it cannot state a claim for

2    reckless and wanton conduct because Yale's alleged actions

3    entailed no risk of physical harm to Dongguk.  And Dongguk

4    does not deny that every case to recognize a claim for

5    reckless and wanton conduct has involved a risk of

6    physical danger.  And indeed each case that Dongguk cites

7    in its opposition brief at 20 to 22 involves physical

8    danger.

9            Finally, Your Honor, I would turn to negligence.

10   And we make, if you will, five arguments with regard to

11   negligence and three as to why there is no duty, and two

12   why -- one why there's no causation in fact and why there

13   is no proximate cause here.

14           Our first argument is that Yale had no duty to

15   prevent Dongguk's pure economic harm.  And as we point out

16   in a footnote and as we try to be candid with the Court,

17   no Connecticut appellate court has addressed that issue

18   directly.  However, we would maintain if one looks at both

19   the Restatement at Prosser, Restatement Sections 323 and

20   324A, Prosser, you look at the Waters, the Supreme Court

21   case in Waters, you look at the Doe v. Yale case, all of

22   those, you know, indicate -- granted they may not hold --

23   certainly indicate that in Connecticut, which follows a

24   great many other states in this regard, that in the

25   absence of physical harm, there cannot be -- there's no

1   duty to prevent purely economic alleged loss here.  And,

2   Your Honor, I will tell you that I, you know, read these

3   cases in an attempt to discern what the rationale was.

4          I think if you look at the other states' cases

5   and what's going on here, I think the cases want to draw a

6   line between tort and contract.  And some of the cases

7   basically say, if you wanted to, you know, as it were,

8   protect your economic expectancy, you should have entered

9   into a contract.  We are not going to blur the line, we

10  are going to make a distinction here, certainly where

11  things are gratuitous.

12         The other reason I think is if you look here,

13  what's at issue are statements.  And plaintiff -- and

14  plaintiffs typically have other causes of action for

15  statements.  And in fact, this plaintiff has chosen one of

16  those other causes of action, which is defamation.  They

17  could not plead negligent misrepresentation here because

18  they couldn't fulfill the -- those -- the elements of that

19  claim which requires a business interest.  It's applicable

20  mostly unfortunately to people like me in the legal

21  profession and accountants and such.

22         But the point being, I think there is a

23  rationale for this.  And I think the real weight of

24  authority in this regard indicates that there should not

25  be a duty for purely economic alleged loss here.

1             Your Honor, then if I could turn to the

2    foreseeability argument.

3             THE COURT:  Mr. Springer, let me interrupt you

4    at this point just briefly.

5             Once Yale undertook to respond to the letter of

6    inquiry, did it have any duty at all?

7             MR. SPRINGER:  We maintain that it did not, both

8    for the reasons I've just mentioned, but also because of,

9    in this instance, because of foreseeability issues, Your

10   Honor, and because of public policy.

11            THE COURT:  Did it have a duty to act honestly?

12            MR. SPRINGER:  It did act honestly based on the

13   knowledge that it had, Your Honor.

14            THE COURT:  But you don't concede that it had a

15   duty to do even that?

16            MR. SPRINGER:  I don't think there is any

17   allegation here that there was a dishonest action.  And

18   when you ask do I not concede, I'm rapidly going through

19   my brain to recognize what the implications may be.

20            I think, Your Honor, if it did not act honestly,

21   there would be a fraud claim available here, perhaps.  And

22   there is no basis for that fraud claim.

23            THE COURT:  So if an academic institution

24   inquires of Yale, it can reasonably expect that Yale will

25   act honestly?

1          MR. SPRINGER:  Because they would have a fraud

2    claim.  But it can't be a guarantee of accuracy.  And

3    that's one of the public policy arguments I want to make.

4          We're looking at a large research institution,

5    Your Honor, where if you had that standard as the

6    plaintiff wants to impose, and I think it's paragraph 174,

7    that it has to respond accurately here.

8          Looking over with many schools, 50 years of

9    records, receiving vague inquiries.  Did Jane Doe graduate

10   from Yale?  Can you provide us more information?  I'm not

11   sure.  Names that change, names that are inaccurately

12   given, all of that, it does, I think, you know, respond

13   honestly, but I don't think there's any allegation nor can

14   there be that it, based it on the knowledge it had at the

15   time, the standard that the plaintiff wants to impose and

16   the damages it wants to impose, make this, you know, a

17   case where if a duty is found by this Court, I think it

18   would be contrary to public policy.  And one of the

19   reasons is to impose a 50 million-dollar, as it were,

20   penalty for making a mistake would basically have, you

21   know, as Mr. Weiner said in the argument on the motion to

22   stay, look, if they'd ignored it, there wouldn't be a

23   problem here.  You want people to respond, you want them

24   to respond with the knowledge they have and honestly.  But

25   they may make mistakes.

1           Here, to punish that and to hold out that

2    punishment, one, the threat of that liability is so

3    enormous, two, I don't think a university could, given the

4    fact that we're dealing with human beings, design a system

5    so foolproof that you could prevent a mistake.  And

6    furthermore, the cost of seeking to design a system would

7    be enormous.

8           So that's why I'm saying public policy for

9    innocent mistake -- and we maintain it is an innocent

10   mistake -- and if you will based on the knowledge, and an

11   honest mistake.  We're not saying that dishonesty should

12   not be, you know, dealt with.  But there's no allegation

13   nor can there be of that.

14          And also I guess when you said honest, you know,

15   Your Honor, all is, I recognize it's a bald statement.  I

16   recognize you're dealing and trying to understand the

17   implications of any law that you may fashion here, but

18   again it's all contextual for me and I'm referring back to

19   the complaint.

20          Let me then, if I could -- and I hope I've

21   answered your question.

22          THE COURT:  Let me ask you to stay with me for a

23   moment longer.

24          MR. SPRINGER:  Sure.

25          THE COURT:  You state that of course it's

1    socially desirable for a university to be able to respond

2    to a request for verification.  You state that because

3    it's socially desirable, we need to be very careful not to

4    create a chilling effect.

5         I take it you agree that what is socially

6    desirable is that the university not only respond, but

7    that it exercise some degree of care in responding?

8         MR. SPRINGER:  Your Honor, I think we are at the

9    point where we can talk about making an honest response,

10   and my concern is that the camel's nose get under the tent

11   here, that there will be a chilling effect and some degree

12   of care of course is in the eye of the beholder.  Dongguk

13   may say some degree of care is to ensure that the response

14   is accurate.

15        THE COURT:  All necessary and appropriate steps

16   to ensure that it's accurate.

17        MR. SPRINGER:  Well, you know, again that may,

18   you know, what are all -- that may -- people may differ

19   about that particularly with a large university where

20   someone gets relied on that you have a reasonable basis

21   for relying.  So I don't think you can be as prescriptive

22   as that, because I worry that that becomes a slippery

23   slope for a standard here and I don't think you are -- I

24   don't think -- I think the chilling effect you worry about

25   will occur particularly if we -- if Yale is subject to

1    $50 million in damages.

2            THE COURT:  In the area of negligent

3    misrepresentation, under the restatement of torts, the

4    principles that have been developed aim to confine

5    potential liability for the misinformation --

6            MR. SPRINGER:  They do.

7            THE COURT:  -- to that transaction.  And you

8    mention that here the plaintiff could not plead a cause of

9    action for negligent misrepresentation.  Whether that's

10   true or not, looking at this limitation on liability, if

11   you will, could something like that be fashioned to

12   address the situation here?  Namely, a situation in which

13   it is socially desirable that a response be provided, it

14   is socially desirable that a response be made not

15   willy-nilly but after the exercise of some appropriate

16   degree of care without exposing the supplier of the

17   information to the kind of vast liability that the

18   plaintiff would seek to impose upon Yale in this case.  Is

19   there a way to follow the guidance provided by the law in

20   the area of negligent misrepresentation to achieve that

21   end?

22           MR. SPRINGER:  I don't think so, Your Honor, and

23   I will tell you why.

24           You're talking about Section 552 of the

25   Restatement which -- B of the Restatement.  And what

1    becomes important is the elements of a negligent

2    misrepresentation claim.  And I don't think you can import

3    because of those elements that Restatement to 323 and

4    324A, which I think are applicable here and which set the

5    standard and don't provide the guidance, in part because

6    one of the elements of the negligent misrepresentation

7    claim is -- and this is why I said it applies to lawyers

8    and accountants -- one who in the course of his business,

9    profession or employment or in any other transaction in

10   which he has a pecuniary interest.  And I think that

11   supplies false information.  And I think that because of

12   the nature of that cause of action and because of the

13   pecuniary interest and because it's in the business

14   profession or employment, you know, or with a pecuniary

15   interest.

16        That's not true here.  There is no pecuniary

17   interest.  There is a gratuitous undertaking by Yale.  And

18   I think what fits are the -- essentially the strictures

19   that are in 323 and 324A.

20        THE COURT:  Just supposing that we can get past

21   the elements of negligent misrepresentation claim and

22   consider that rule that limits liability for providing

23   incorrect information, focusing on that, is there a way to

24   import such a limitation into the situation we have here?

25        MR. SPRINGER:  I don't think so without a

1   slippery slope.  I really do not.  I think that's why we

2   have the economic loss.  That's why we talk about privity.

3   That's why we talk -- and I don't think there is here.  I

4   think it's an either/or, as it were, game.

5           THE COURT:  In this situation, Yale knew or

6   should have known from the contents of the letter of

7   inquiry that the university was considering hiring this

8   person.  And in that context, Yale responded as it did.

9           Let's take a hypothetical case.  Let's say that

10  the inquiring party was the University of Kansas and this

11  person is being hired for a particular position on the

12  faculty and that information is disclosed and the

13  verification proves to be inaccurate.  In the meantime,

14  the person has been given an opportunity to teach and it

15  comes to light that the person is in fact not a graduate

16  of Yale and the person is terminated.  That's it.  There's

17  no publicity.  It's just as simple as that.

18           In that circumstance, generally speaking, what

19  would be the harm to the University of Kansas that might

20  warrant some recovery from Yale?

21           MR. SPRINGER:  I don't know that there

22  necessarily is any harm to Kansas from someone who, you

23  know, has falsified the degree and works and then is

24  terminated.  I don't know that there necessarily is any

25  harm.  I'm thinking of lawyers who get hired who don't,

1  you know, have the credentials they say or, you know,

2  we -- and then we --

3          THE COURT:  What about that?

4          First off, I trust that in your research you

5  find no case on point, that is, no case in which an

6  academic institution responding to this type of inquiry,

7  provides incorrect information and winds up getting sued

8  for pecuniary harm?

9          MR. SPRINGER:  We have not, Your Honor.

10         THE COURT:  No case?

11         MR. SPRINGER:  No case, Your Honor.

12         THE COURT:  And you mention attorneys.  What

13 about cases involving employers who are contacted for

14 verification of prior employment and respond with

15 incorrect information and wind up getting sued?  Any cases

16 like that?

17         MR. SPRINGER:  There may be some, but what has

18 happened, there is -- the advice that goes out is, don't

19 respond to the request unless you get a release.  And that

20 is fairly uniform advice in the employment bar these days,

21 because you don't know what may be claimed with regard to

22 that, and it's a tricky issue as you might gather.  So

23 there's -- I don't think there's guidance there.

24         The other thing I would mention, is in your

25 example, one of the issues here is again that this was

1    fraud.  The certification letter had her signature, it had
2    Yale's letterhead and I don't think there was any question
3    taken in by that.  But the point being Yale -- and we
4    argue this in our brief -- as a matter of public policy --
5    I just want to briefly get back to the foreseeability --
6    as a matter of public policy is not, you know, to protect
7    Dongguk from Shin's fraud.  And it is literally Shin's
8    fraud throughout all of this.  Because without Shin's
9    fraud, none of this occurs.  None of this occurs.  And,
10   you know, it is repeated frauds, a stack of, you know,
11   fraudulent documents that Yale is privy to and that we
12   cite in I believe it's Footnote 8 of our brief, our main
13   brief.
14            THE COURT:  Would the case be different if -- I
15   hope I didn't interrupt you there.
16            MR. SPRINGER:  No, no, no.
17            THE COURT:  Would the case be different if in
18   the letter of inquiry, the university stated, "We have
19   reason to suspect that this person is not a graduate of
20   Yale"?
21            MR. SPRINGER:  It might be, Your Honor.  The
22   issue then would be, you know -- it might, although I'm,
23   you know, I'm trying -- certainly it would be a different
24   case and there might be a different argument to be made if
25   other -- and as we point out as a public policy matter,

28

1    Dongguk could have made it easier on Yale.  It had other

2    information.  It had other documents, you know.  And, you

3    know, in part it's the fraud that it was put before

4    Shirmeister.

5         One of the issues there is I suppose -- I'm

6    worried again about a slippery slope.  Certainly not our

7    case.  And if it had been done, maybe there's another

8    argument to be made here, but, you know, I don't know that

9    it imposes a duty.  I can't see it necessarily imposing a

10   duty without more.  And I don't know what the more

11   necessarily is.  And we may talk about that.

12        THE COURT:  I'm wondering if a party in the

13   shoes of the university submitting this letter of inquiry

14   is obliged to disclose the information in order for law to

15   protect whatever expectancy it might have, and that's why

16   I ask.

17        MR. SPRINGER:  Well, one --

18        THE COURT:  If you know or reasonably suspect

19   that the person you're dealing with is a con artist and

20   you submit a request to Yale without telling Yale, what is

21   your reasonable expectancy as a matter of law?  That you

22   can hold Yale fully responsible for whatever might flow

23   from an incorrect verification?

24        MR. SPRINGER:  That's what we argue as a matter

25   of public policy, Your Honor, in our brief, that Yale, you

1  know -- Dongguk had more information.  It certainly had

2  enough information to be very suspicious of Shin and, you

3  know, according to the allegations in the complaint and

4  what's in the newspapers, it did not and --

5          THE COURT:  I mean, realistically, and here

6  we're getting a bit far afield, but realistically, if in

7  the letter of inquiry, Yale was informed that the

8  university was concerned about the legitimacy of this

9  claim and it was a matter of extreme importance because

10  this applicant, in fact this recent hire, had a very high

11  profile and the university did not want to be embarrassed

12  because the damage to its reputation given the nature of

13  the culture could be extremely significant, what would

14  Yale have done?  Realistically.

15          MR. SPRINGER:  Realistically, I think it is

16  realistic to believe that Shirmeister would not have been

17  taken in by the fraud and fooled by that.

18          THE COURT:  Would she have responded?

19          MR. SPRINGER:  Your Honor, I think that when you

20  say responded --

21          THE COURT:  Would she treat that as just another

22  day at the office in the ordinary course of business,

23  we'll just send something back?

24          MR. SPRINGER:  No, I don't think so.  I mean, I

25  think she would have -- it's my belief -- when you say

1    realistically -- I don't think she would have made the
2    mistake she did.
3            THE COURT:  I think that's probably right.  I
4    mean logically that sounds right.
5            MR. SPRINGER:  Yeah.
6            THE COURT:  So in that context, what should the
7    rule be?
8            MR. SPRINGER:  Well --
9            THE COURT:  You want to encourage universities
10   to provide verification, we want them to act with an
11   appropriate degree of care in the circumstances, but we
12   don't want to expose them to liability that would chill
13   this process.
14           What circumstance or set of circumstances could
15   give rise to that kind of liability?
16           You've got a con artist who was bent on doing
17   who knows what, but if the university hiring this con
18   artist receives misinformation from Yale, it will trust
19   that the person is not a con artist and we go from there.
20   It seems to me as a matter of public policy, if you were
21   crafting rules or protocols, you would certainly focus on
22   the obligation of the requesting party to tell Yale what
23   it knows.
24           I mean, the requesting party is asking Yale to
25   do this gratis, like it's just another day at the office,

1  nothing special, with no disclosure of the particulars

2  which would be significant to a reasonable person in

3  Yale's position.

4           MR. SPRINGER:  I think that's right.

5           THE COURT:  By the way, does Yale have

6  protocols?

7           MR. SPRINGER:  They do, Your Honor.  We haven't

8  done discovery and we haven't -- you're asking me, and it

9  does have protocols.

10          I will simply say again that Shirmeister was

11  taken in by the fraud, and it is my -- and maybe I should

12  state it's my belief that this was, you know, as you look

13  at this, it had her signature.  And if you look at what

14  she responded to it, that she was fooled by the forgery

15  and simply acknowledged that it was hers, there's a

16  little -- there's not an exact meeting of what was asked

17  for here.  So that's why I say that she was fooled by the

18  forgery.

19          Without getting further and, you know, I think

20  one possibility, let me put it that way, is that it was

21  not taken as a request for verification because of the

22  forgery.  Did you sign -- here's your signature, Yale

23  letterhead.  You know, get us a response.  Yeah, this is

24  mine.  You know?

25          And again, it is -- with the forgery and the

1   fraud here, Yale is put in a difficult position.  And we

2   maintain, as we do in our brief, that, you know, that for

3   public policy reasons, it should not be in a position to

4   protect Dongguk, particularly as we also argue Dongguk was

5   in a position to protect itself better than it did with

6   regard to the inquiry it made of Yale, that it made it

7   difficult.

8           Two brief points, Your Honor, if you would, and

9   I'm happy to answer further questions.  It is to say the

10  least, as I said, not your garden variety tort claim.

11          In any event, just two questions.  On

12  foreseeability here, it is harm of the -- it is -- and I

13  probably should, you know, look at it, because Dongguk

14  conflates the standard about foreseeability.

15          What is true here is that Yale could not foresee

16  the harm of the general type that occurred, namely this

17  devastating effect on Dongguk's reputation.  Remember, the

18  only harm is reputation.  All of the rest flow from that.

19  Because the law school doesn't get authorized, the award

20  doesn't get made because of the reputation.  But neither

21  Shirmeister, as we point out, nor Carney, nor Reinstein,

22  nor is alleged -- you know, could foresee that harm.

23  Dongguk talks about -- you know, reverses it.  It's in

24  their brief, and it's in part because I don't want to

25  spend that much more time and I think it is in the brief,

1    as you will see.

2           And lastly on causation, Your Honor, we would

3    maintain that the harm would have occurred anywhere.  As

4    you rightly point out, and I noted, she had been hired

5    anyway, there would have been criticism for that.  The

6    Shingate incident with the trial and the convictions of

7    the, you know, the Chairman of the Board of Trustees and

8    the government minister and Shin herself, all, you know,

9    were focused on the hiring before Yale got in.

10           And so if you look at the news articles -- and

11   again what was reported not for the truth but what was

12   reported -- it all focuses on that and those.  So that the

13   harm we maintain was not either caused in fact or

14   proximately caused by Yale.

15           Thank you.

16           THE COURT:  Thank you.

17           MR. WEINER:  Your Honor, I actually would like

18   to address some of the comments and questions that you

19   raise.  But I want to just focus you in June of 2007.

20           And when Your Honor is concerned, and rightfully

21   so, with what is the impact, the chilling effect in terms

22   of verification, that's not really what this case is just

23   about.  This case is about what happened in June and July

24   and August of 2007.  If Yale had simply said when the

25   Korean press first raised the issue with them, yes, we

1   made a mistake.  We sent by mistake -- and they knew at

2   this point that she did not have a Ph.D..  We made a

3   mistake when we verified the Ph.D., this case wouldn't be

4   here.

5            My client simply said when we made our --

6   decided to hire Ms. Shin when we made this inquiry from

7   Yale and received this inquiry saying that she had, we

8   went forward.  If Yale had said at the time in June or

9   July of 2007, yes, that is true, they did speak to us.  In

10  fact we have now learned that we made a mistake at that

11  time, we wouldn't then have suffered the damages.

12            What happened is that that --

13            THE COURT:  You're not withdrawing Count One,

14  are you?

15            MR. WEINER:  No.  Remember, all our counts cover

16  Yale's mistakes, not just the mistakes regarding 2005.

17            THE COURT:  In all seriousness -- and this was a

18  question that I wanted to ask you -- looking at your case

19  in full, comparing and contrasting your claim based on

20  Ms. Shirmeister's response in September of 2005 with the

21  events that occurred later, I gather you view the

22  Shirmeister part of the case as relatively unimportant.

23            MR. WEINER:  No.  It's a predicate act.

24            You can look at this case on a variety of

25  negligence or reckless acts and then ultimately defamatory

1    acts and we did not allege fraud because we did not have

2    sufficient information to allege fraud then.  Maybe

3    discovery will point that out.  If it does, I will come

4    back to you and say I would like an amendment.  But

5    essentially I think she was at the very least reckless.

6    And let me just briefly --

7            THE COURT:  You -- and I don't want to interrupt

8    and prevent you from even getting started -- but you said

9    that if Yale had acknowledged its mistake, we wouldn't be

10   here.  So that's --

11           MR. WEINER:  I said if Yale had acknowledged its

12   mistake publicly that in fact Dongguk had gone to them,

13   that Dongguk had received a fax from Yale which verified,

14   although mistakenly, verified Ms. Shin as having gotten a

15   Ph.D. from Yale, my client would have -- that's what

16   happened.  That's what they were telling the press.  But

17   when Yale comes in and says none of that is true --

18           THE COURT:  So --

19           MR. WEINER:  They never contacted us, we never

20   told them she had a Ph.D., then my client becomes a

21   subject of a potential criminal and a criminal

22   prosecution.  Then it's vilified in the press for having

23   lied about why it hired Ms. Shin in the first place.

24           So this is a series of serious mistakes.  Not

25   just at the very beginning.  These mistakes continued.

1           THE COURT:  So if I were to raise the

2     possibility of certifying this case to the Connecticut

3     Supreme Court for advice, indeed for controlling law on

4     whether you have a negligence claim against Yale based on

5     what Ms. Shirmeister did, you would say, I take it, please

6     don't do that because that's really not why we're here?

7           MR. WEINER:  No.  I would say there are a number

8     of negligence acts in this case, not just what

9     Ms. Shirmeister did.

10          THE COURT:  But that's sort of -- well, it

11    happened first in time.

12          MR. WEINER:  It happened first in time.

13          THE COURT:  At this stage of the case, it's the

14    tail on the dog.  Don't send the case to the Connecticut

15    Supreme Court to address the tail.  Let's keep the case

16    here and look at the dog.  The dog being what happened

17    when they failed to acknowledge their error.  That's what

18    this case is really about.  Is that --

19          MR. WEINER:  In essence that's correct

20    because -- when Your Honor raised for example what kind of

21    damages would Dongguk have suffered for simply having

22    received misinformation from Yale, I would have told you

23    probably not a lot because maybe they could recover for

24    the wages they paid her, maybe they could find some other

25    type of damages they may have suffered.  But the real

1    damage occurs in beginning in June and July when Yale
2    says, we don't know what you're talking about, we never
3    contacted you, we never told you she had a Ph.D. from
4    Yale, in fact, we never received any letter from you in
5    the first place.

6        So while I believe this is -- you know, what
7    Shirmeister did or didn't do was obviously very important
8    to some of our claims. The core of this case occurs as to
9    what happened and why did Yale say in June and July and
10   August and September, particularly in the face of having
11   received information from my client saying, you know, I
12   think you're making a mistake here, could you please tell
13   the Korean press and the prosecutors, by the way, that in
14   fact you did get an inquiry from us and you sent back to
15   us a fax. Even if in the face of being told we were
16   facing criminal prosecution, Yale continued to deny and
17   claimed that it had never received the communication from
18   my client and it had never sent any communication back.
19   And that's the core of this case. It's the core takes
20   place in 2007, not 2005. That's the predicate.

21       I'm not withdrawing my claims that it impacts
22   that. But if you're trying to truly analyze this case,
23   the damages flow from the acts that occurred in 2007.

24       If Yale had simply said, you know what, we made
25   a mistake, then, before all the press, before they went on

1   TV, before they issued press releases, before they issued

2   official statements denying everything, then I suspect we

3   wouldn't be here.  But that's what they did.  And it's

4   undisputable.

5         We have the press releases.  We have the 60

6   Minutes type of television presentation that they made.

7   We have their official statements.  All of which they

8   deny, stating that the letter that they sent was a

9   forgery, the fax was a forgery.  I disagree with my

10  adversary as to that, as to what the newspapers said.  And

11  they also deny having received any inquiry from my client.

12        What makes it reckless, which takes it to the

13  next step, is my client kept sending them additional

14  information saying, we think you're wrong, here's the fax

15  number, here's the person in the mail room who received

16  our inquiry.  And in the face of this continuing

17  information that we sent to them, they continued to issue

18  false statements to the press.

19        So when you analyze this case, that's what I

20  think you have to look at.

21        Now, in terms of protection in terms of public

22  policy, the fact of the matter is that's why we have Good

23  Samaritan laws.  I'm not suggesting -- I happen to agree

24  with Mr. Springer that there is no limitation.  I don't

25  think we'd prove a lot of damages if we were just relying

1   on Shirmeister's mistake.  So I don't think there's a

2   specter of huge damages on that.  But there is huge

3   damages that run from the negligent or reckless

4   misstatements that were made in 2007 or defamatory

5   statements that were made in 2007, and we believe we have

6   pleaded them correctly under Connecticut law.

7          Now, I would like to briefly address some of the

8   points that Mr. Springer did make.

9          He started off his argument by referring Your

10  Honor to Chambers v. Time Warner, Inc. 282 F.3d 147 as a

11  seminal case as to when you can rely on documents outside

12  of the pleadings, the actual complaint documents.  And

13  that's actually a case I agree you should read.  Because

14  in that case, the Second Circuit took pains to distinguish

15  as to when you can do that and when you cannot do that.

16         And essentially what the Second Circuit has said

17  is that under Rule 10(c), a Court can consider extra

18  complaint documents if they are dispositive of the claims

19  before it.  For example, the cases that Mr. Springer

20  referred you to were cases involving contract disputes or

21  securities claims where the prospectus on the contract, on

22  the face of those documents, were dispositive of the

23  plaintiff's claim.  And under those very narrow

24  circumstances, the district court is permitted to use and

25  rely on those documents.  However, in Chambers, the Second

1  Circuit went on to state that's a very narrow exception,

2  and our rule on this has been in many respects

3  misinterpreted by district courts so we're going to say it

4  again.

5          And I believe, Your Honor, if we go to page --

6  let me get that page for you -- pages 153 and 154, it

7  explains why you have this narrow exception. And then it

8  goes on to state, "Once the district court was presented

9  with matters outside the pleadings, Rule 12(b)" -- not

10  10(c) -- "Rule 12(b) afforded two options." You can

11  exclude the documents and not consider them and rule on

12  the motion to dismiss, or if you're going to consider

13  them, then you must turn it into a summary judgment

14  motion, you must give the adversary notice of that fact

15  and treat it as a summary judgment motion. Which is why

16  we argued, Your Honor, that essentially by relying on

17  newspaper articles -- this is what I heard Mr. Springer

18  say -- those are not the type of dispositive documents

19  that dispose of this case. They simply quite frankly

20  raise issues of fact.

21          Neither side is endorsing them as having truth

22  to the statements. We're saying they're defamatory.

23  They're saying they're not even relying on the truth.

24          Beyond that --

25          THE COURT: What strikes me -- more accurately,

1    what struck me at first blush when I looked at the

2    pleadings, is how different this is from what the rules

3    contemplate.  I don't want to waste your time, but it

4    might be helpful to explain a bit more what has been in my

5    mind so that you can understand my perspective.

6           In the appendix of forms that accompanies the

7    West version of the civil rules, there is a form complaint

8    in negligence and it is a notice of pleading, it's a

9    barebones document, it is literally a couple of

10   paragraphs.  On X date the defendant negligently ran his

11   vehicle against the plaintiff causing damage, period.  The

12   forms are there to illustrate what a notice pleading is

13   supposed to look like.

14          It seems to me that an awful lot of thought and

15   careful writing went into the preparation of this 30-page

16   complaint which tells the story in great detail.  Without

17   implying any criticism of that approach, I hope you can

18   understand why, to my eye, it reads like a press release

19   that one would issue to the Korean press to explain the

20   whole saga from the Plaintiff's point of view.  It's not a

21   notice pleading for purposes of litigation.  It's a

22   statement to the world for purposes of perhaps mitigating

23   the harm that has been done to the plaintiff.  But that's

24   not what I'm here for.  That's where it begins.

25          And Mr. Springer on behalf of Yale decides,

1  well, they've told their side of the story, now I'll make

2  a motion to dismiss and we'll tell ours.

3            MR. WEINER:  That's perfectly fine.

4            THE COURT:  And here I am, a guy who's supposed

5  to get a notice of pleading that's not more than a few

6  pages long, and if I get a motion to dismiss it's supposed

7  to be because the complaint itself contains a

8  self-defeating allegation which, if credited, destroys the

9  purported cause of action or omits in some glaring way an

10 essential statement of an element of a claim.

11            MR. WEINER:  Well, Your Honor --

12            THE COURT:  I'm not supposed to be calling upon

13 you to prove your case and I'm not supposed to be asking

14 Mr. Springer to disprove your case.  That's not what we're

15 supposed to be doing.  But here we are.

16            MR. WEINER:  That's correct, Your Honor.  I

17 think the only thing that Mr. Springer says, I didn't add

18 to my complaint, that somehow we didn't add the term

19 "malicious" or we didn't use it correctly.

20            THE COURT:  It's in there though.

21            MR. WEINER:  It's in paragraph 198.

22            THE COURT:  Right.

23            MR. WEINER:  So the complaint does tell our

24 position, that is true, Your Honor.  But under Bell v.

25 Twombly, there is a standard that suggests that you need

1    to be -- even though the courts have gone since then --
2    since then they've come back and said notice of pleadings
3    still exists, but there clearly is some question in an
4    adversary's mind as to how much to put in.

5            And when you're dealing with a defamatory case,
6    although there is negligence and reckless disregard and
7    reply contract claims, you need to tell very specifically
8    in terms of what your defamation is and it has to be a
9    context to it.  So I think that we have fulfilled that
10   obligation.

11           And, Your Honor, the fact of the matter is, this
12   is not a summary judgment motion.  If it had been a
13   summary judgment motion, I would have been happy to
14   respond with affidavits and documents that will
15   substantiate my client's case.  In particular the e-mails
16   exchanged and the other documents that are involved here.

17           What I think Mr. Springer has done is raised, as
18   you said, the other side.  He says there are a lot of
19   arguments that we have here that have to be resolved.
20   This is not a slam dunk for the plaintiff.  Let me tell
21   you what those arguments are.

22           So he has effectively -- if you feel that we've
23   told our side, he's effectively told his side.  But this
24   is not a motion for summary judgment, this is a motion on
25   the sufficiency of the pleadings.  I believe that we have

44

1    sufficiently stated in our brief that we have met every

2    pleading requirement, every element that is necessary to

3    sustain a cause of action on each of the claims that we've

4    asserted.  And I think that's what we're about to do in

5    this stage.

6            If Your Honor would like to convert it to a

7    summary judgment motion, we would do it.

8            THE COURT:  I already have far too many of

9    those, thank you.

10           MR. WEINER:  So just a few points, Your Honor.

11           So I believe I covered the malice point.

12           I believe all of the -- the vast majority of

13   Mr. Springer's arguments were based upon factual

14   contentions as to how he read the newspaper articles or

15   how he views the facts.  Those are the facts that will

16   have to be resolved either at a future summary judgment

17   motion, if discovery shows one side or the other has no

18   bases for them, or at a trial.

19           The statement of the law, let me just briefly

20   discuss this negligence issue.

21           The only Connecticut case that we have found

22   that says that you need physical harm, is the latest case

23   which came down in 1993, DeVillegas v. Quality Roofing and

24   that's a Superior Court case that came down in 1993.

25           Subsequent to that particular case, two other

1     Connecticut cases, Reiner & Reiner, which came down in

2     1995, and those are cited in my brief as well, and Darien

3     Asphalt.  And both of those subsequent cases stated very

4     clearly that Connecticut does not have this economic

5     loss -- this doctrine that prevents a party from recovery

6     unless there's physical injury.

7              So I think the law is -- goes both ways in

8     Connecticut, but the more recent cases go the way that we

9     suggest that they should go.

10             We also cited out of state cases.

11             THE COURT:  Generally speaking, Connecticut

12    Supreme Court embraces the Restatement, and the

13    Restatement incorporates the economic loss rule, does it

14    not?

15             MR. WEINER:  Depends on what you look at.

16             The Connecticut Law of Torts I don't believe

17    does.  And the Second Circuit, by the way, has -- and I

18    don't have the cite in front of me, but there's a Second

19    Circuit case that has actually said that Connecticut is

20    unsettled on this point and they did not send it off to

21    the Connecticut court to find out.  But the Reiner case --

22             THE COURT:  Do you think I should send it to the

23    Connecticut court?

24             MR. WEINER:  I don't know if it will change the

25    nature of this case if you do that, Your Honor.  I think

1    the discovery is going to be exactly the same.  I think

2    everything's going to be exactly the same.  We can find

3    out.

4            But at the end of the day, one of the things I

5    was going to get to in terms of the motion to stay, is

6    that all of the claims that are before you arise out of

7    the same basic set of facts.  So even if you knocked out

8    this particular claim or that particular claim, it's not

9    going to dispose of the case in terms of discovery.  You

10   might shorten discovery.

11           I'm happy for you to send it off to the

12   Connecticut Supreme Court for determination, but I would

13   urge that we continue the case with discovery and move

14   forward on that.

15           The case was filed I believe last April.  We

16   have not had any discovery at all.  And for purposes of

17   ultimate disposition of negligence claims, certainly that

18   would be beneficial to note, but I don't think that will

19   dispose of the defamation claims.

20           The reckless claims may go with the negligence

21   claims, so that's a possibility.

22           THE COURT:  That was a question I wanted to ask

23   you.  If the negligence claim went out of the case, would

24   the reckless and wanton misconduct claim follow?

25           MR. WEINER:  If you ingraft that limitation,

1    possibly.  But the Sheiman case, that was a case where

2    someone sued for both negligence and reckless disregard

3    where a bank negotiated a check that didn't have a proper

4    endorsement and as a result of that negotiation of the

5    check the plaintiffs lost a lot of money.  Person who

6    received the money was long gone apparently.  So they sued

7    the bank for negligence and for reckless disregard.  And

8    the Court there -- and I believe that was an appellate

9    decision, by the way.

10        The Court there did not say, oh, by the way,

11   there's no physical injury here, therefore you don't have

12   either a negligence claim or a reckless disregard claim.

13   They actually found for the defendant on the question of

14   duty.  There was no duty established.

15        So I would think that the Connecticut courts

16   recognize that you could have reckless disregard and

17   negligence and that is at the appellate level without any

18   physical harm.

19        But again, I think if you want to present both

20   of those issues to the Connecticut court, I could

21   understand why you would feel that way since there is --

22   the lower court on the negligence side cases go in two

23   directions.  But I think it will come out that there is no

24   limitation on physical liability, and it makes a lot of

25   sense.  People can commit negligence in a variety of ways

48

1    that do not have economic consequences, just property

2    damage or physical damage.

3           Reiner & Reiner was a perfect example.  Court

4    there -- somebody was in an office building, had rented a

5    lot of space, and next door a contractor was working,

6    caused a gas leak that made -- the building had to be

7    vacated, and the person who was -- the office owner, the

8    person owning the business, sued for negligence saying,

9    hey, I had to pay all my people, I lost all this business

10   because of your negligence impacted my ability to conduct

11   my business.  In Reiner the court said, absolutely

12   appropriate to have negligence in this action here.  The

13   fact you did not suffer property damage, you did not

14   suffer physical damage doesn't, in our view, mean that the

15   person who caused the gas leak should not be held

16   responsible, and they held that person responsible.

17          So I think that the better reasoned decisions is

18   that there is no limitation of property damage or on

19   personal injury.

20          THE COURT:  It seems that these limitations have

21   been crafted to limit what might otherwise be excessive

22   liability.

23          MR. WEINER:  I don't know -- I don't think I've

24   seen anything that would suggest that.  I think the law

25   evolved and law has continued to evolve.  At least the

1    initial cases would involve personal injury or property

2    damage.  But as cases were brought involving simply

3    economic harm, the courts said, well, there are situations

4    where someone can do a negligent act and cause economic

5    harm.  Reiner was one.  And the court said, no problem,

6    saying they were liable.

7            THE COURT:  It makes sense in principle, but

8    what about the concern evident here that liability can

9    become unmoored from the underlying misstep?

10           I mean, putting aside your defamation claims,

11   because we're not talking about those at the moment,

12   Ms. Shirmeister doesn't look closely enough, she's too

13   busy, too distracted, she's got a funeral to go to, who

14   knows, and the next thing you know, Yale's facing a

15   50 million-dollar lawsuit.

16           MR. WEINER:  Not just because of what

17   Shirmeister did, Your Honor.  If it was limited to that,

18   then the damages wouldn't be $50 million.

19           But under negligence law, thin skull.  Ever

20   since I've been in law school, if you commit a negligent

21   act and someone has a thin skull, you have substantial

22   liability.  But our liability flows, really in terms of

23   damages, damages really flow from what happened in 2007.

24   And when you begin to actively -- and this was an active

25   role by Yale, this wasn't just passive -- issue press

1   releases that are wrong, make these statements that are

2   wrong, give press interviews that are wrong, issue

3   official statements that are wrong, then you may have

4   substantial liability.  This wasn't just the innocent

5   mistake by someone who didn't have reason to investigate

6   it.

7           By that time, Your Honor, they had reason to

8   investigate, and by that time, we were providing them with

9   information saying you were wrong so please correct what

10  you said, and they didn't and wouldn't.

11          THE COURT:  Well, from a pragmatic point of

12  view, which I believe is a legitimate way of thinking

13  about any case, particularly given the command of Rule 1,

14  we're supposed to try to bring about a just, speedy and

15  inexpensive resolution of the case, I question the wisdom

16  of spending a lot of time, effort and money litigating the

17  negligence and implied contract claims, which really seem

18  to be addressed to Ms. Shirmeister's response, if the core

19  of the case is the defamation claim and the claim for

20  reckless and wanton disregard of the plaintiff's

21  interests.

22          MR. WEINER:  The reason why you cannot so simply

23  separate out the negligence claim -- maybe you can in an

24  implied contract claim, because the implied contract claim

25  is really just more focused in what happened in 2005.

1          THE COURT:  It only refers to that, it doesn't

2     refer to anything else.

3          MR. WEINER:  That's correct.

4          .  2007, the acts that occurred could be

5     defamatory, jury can find them to be negligent and not

6     defamatory.  Those were mistakes.  Now, whether they were

7     mistakes that rose to the level of being defamatory will

8     be something for the jury to determine.  As to whether

9     they were simply limited to negligence as to what occurred

10    in 2007, is simply a jury issue, and the same thing with

11    reckless disregard.

12         So 2005 encompasses both implied contract as

13    well as negligence as well as perhaps reckless disregard.

14    The reckless disregard and negligence claims continue into

15    2007 on a continuing basis between July -- June or July

16    through September.

17         THE COURT:  Okay.  While we're on the subject of

18    implied contract -- and I'm going to need to give our

19    reporter a break -- but while we're on the topic of

20    implied contract, your complaint alleges that Yale has

21    established protocols and by virtue of that fact has

22    agreed to be bound by them.

23         Can you clarify what you mean by that?

24         MR. WEINER:  It is our understanding from

25    articles at Yale, it was quoted in the Yale -- the daily

1    news -- I don't know what the local paper is, is that they

2    have protocols, they were not followed in this case, and

3    as a result they were revisiting their protocols and

4    determining what to do.

5         In my view, having looked at the cases, that

6    creates -- the fact that you have protocols that you

7    undertake, you know, to follow those protocols and

8    universities share this information back and forth, in our

9    view that creates an implied contract between the parties

10   that, you know, we will send you inquiries and we expect

11   you to provide us accurate information and you send us

12   inquiries and we will send you accurate information, is an

13   implied contract.

14        THE COURT:  Prior to this case there were no

15   dealings between these two universities as far as we know.

16        MR. WEINER:  As far as we know, that's correct.

17        THE COURT:  When you say in the complaint,

18   "Based on their dealings with one another, Yale and

19   plaintiff entered into an implied contract," what dealings

20   are you referring to?

21        MR. WEINER:  I'm referring to the fact once we

22   made an inquiry knowing full well that universities like

23   Yale -- even though we hadn't done one why with Yale --

24   have protocols, that those protocols would be followed, we

25   would get accurate information.  That's why we exchange

1    information with one another.

2            And just to digress for a moment, Your Honor,

3    because you were discussing about Ms. Shin and being

4    someone who is a scam artist or whatever.  I think if you

5    look back at the complaint in paragraphs 30 to 42, you

6    will see impeccable credentials from this woman.  She was

7    a major curator -- curator of several major museums, she

8    had put on hundreds of well-regarded exhibitions, she was

9    featured in the Korean Art Press.  She had taught at other

10   universities in Korea.  So we're not talking about someone

11   who was just a fly by night.

12           And what occurred in September, as we said, was

13   an unfounded rumor that came in a couple days after

14   saying, we don't think she has a Ph.D. from Yale.  Not

15   that any of the other credentials were at all wrong.  And

16   it was at that point my client sends a letter saying,

17   Could you please verify it?  I don't think that's

18   inappropriate under the circumstances and I'm not sure

19   there's an obligation or should be an obligation as to

20   say, Oh, by the way we heard an unfounded rumor, so please

21   verify it.  But that I think is something ultimately a

22   jury would have to determine as to whether we were acting

23   reasonably in terms of our conduct.

24           THE COURT:  Perhaps.

25           So dealing with the implied contract claim, it's

1   your position that the allegation that Yale has protocols

2   is sufficient to support the existence of an implied

3   contract once a another academic institution calls and

4   inquires?

5           MR. WEINER:  Yes.  That the two universities are

6   forming an implied contract whereby Yale will fulfill --

7   follow its protocols and provide accurate information.

8           THE COURT:  Does this implied contract include a

9   provision whereby the person requesting the information

10  will tell Yale what it knows that causes it to make the

11  inquiry?

12          MR. WEINER:  I don't know -- and this could be

13  one of the things we can certainly look into -- but I

14  don't believe that universities will provide information

15  for the very reason that Mr. Springer said.  "We think

16  that so and so is a fake," I think creates its own issues.

17          They didn't think she was a fake.  They actually

18  thought this was going to be nothing -- this was just an

19  unfounded rumor, they'd get their verification from Yale

20  and move forward.  This wasn't as if we believed there was

21  a real problem here.

22          So the answer to your question, Your Honor,

23  would be no unless you have some real hard evidence that

24  you think that someone was fabricating their degree.  We

25  didn't have any reason to believe that this would come

1   back with anything other than, yes, she got a Ph.D. from

2   Yale, based upon the information that was already in the

3   public record.

4           THE COURT:  If I had an application from

5   somebody who purported to be a Yale graduate and I called

6   for verification and they incorrectly responded that, yes,

7   this person is a Yale graduate, would that violate an

8   implied contract?

9           MR. WEINER:  If you just called and you didn't

10  go through the -- ask for a verification.

11          THE COURT:  I'd do what the university did

12  except it's me, I am not the university, I'm not an

13  academic university.  I'm a perspective employer in a

14  different field.

15          MR. WEINER:  Possibly.  I think it would depend

16  somewhat on the circumstances.

17          But one of the reasons why people ask for

18  references -- I mean to say for verification -- is they

19  can have significant impact.

20          You suggested, you know, the University of

21  Kansas analogy, but supposing I wanted to know whether

22  someone had received a medical degree from Yale because I

23  was going to put someone to work in a hospital.

24          THE COURT:  As a brain surgeon.

25          MR. WEINER:  To me those verifications are

1    significant and there needs to be some consequences.  And

2    I don't think, you know -- talking about liability and

3    whether they should be shielded from liability, I think

4    will depend on the circumstances.

5              THE COURT:  There's no case law involving a

6    similar situation?  People seek references and

7    verification from others continually and this is the first

8    time?

9              MR. WEINER:  I actually think there are cases in

10   the employment field where there are defamation cases and

11   other cases.  We didn't research those cases for purposes

12   of this particular motion because we viewed it as a motion

13   on the pleadings and whether we met the standards.  But I

14   believe, Your Honor, when you raise that question, yes,

15   there are cases.

16             I'm not an employment lawyer, but I'm aware of

17   them with dealing with my firm, we are very careful about

18   what we say about former employees because we know we can

19   get sued if we give wrong information.  And the reason

20   why, as Mr. Springer said to you, what people do is they

21   don't say anything because then they won't get sued if

22   they're wrong.  But in fact here Yale did so.

23             But as I said earlier, the core of my case isn't

24   just that.  It goes into 2007.

25             THE COURT:  This is my point.  I think that the

1   claims that you make based on Ms. Shirmeister's incorrect

2   response distracts attention from what you regard as the

3   core of your case because they entail all of these

4   uncertainties and raise all of these questions,

5   uncertainties under the law and questions about public

6   policy.

7           If that's really not what the case is about, why

8   should we immerse ourselves in them?  What do you gain?

9           MR. WEINER:  Well, I need the facts for sure.  I

10  got no question about that.  And at trial, if we come to

11  the point where what claims do I want to press, I'll make

12  that decision.

13          But I'll tell you something else, Your Honor,

14  and we didn't put it to the pleadings, but we have heard

15  that Ms. Shin was working with someone within Yale to get

16  this done.  I don't have proof of it.  I didn't plead it.

17  It will certainly be the subject of discovery.  And it may

18  well be that Ms. Shirmeister was not simply the innocent

19  person who made the mistake.

20          And one of the things that is really sort of

21  interesting in this case is that she sort of disappeared

22  from the scene.  In June, when we heard contrary

23  information from Yale's librarian that in fact Shin did

24  not receive a degree from Yale, my client contacted

25  Ms. Shirmeister, tried to reach her, to have her explain

1    how it was that she had sent this fax.  Ms. Shirmeister

2    never responded.

3            If you look at -- and then it became interesting

4    to us --

5            THE COURT:  She learned not to respond.

6            MR. WEINER:  She learned not to respond.

7            And how is it that Yale said in early July that

8    Shirmeister never sent the letter?  It was a fake?  Did

9    she tell that to Yale?  So we don't know what

10   Ms. Shirmeister's role was.

11           It shouldn't have been very difficult for Yale

12   to figure out that Shirmeister sent the fax.  All it had

13   to do was to ask her.

14           So yes, Your Honor, it may be a sideshow.  I

15   just don't know enough yet.  I haven't had the opportunity

16   to take discovery.

17           THE COURT:  All right.  Why don't we take a

18   short break and I'll go through my notes and see if

19   there's anything more that I'd like to ask while I have

20   you here.  And why don't we say we'll come back in 20

21   minutes?  Is that all right?

22           MR. WEINER:  Thank you, that's fine, Your Honor.

23               (Whereupon, a recess followed)

24           THE COURT:  Mr. Weiner?

25           MR. WEINER:  Yes.

1           THE COURT:  We took a recess while you were at

2    the podium.  I wanted to follow up with you on the

3    defamation claim.

4           The motion to dismiss that claim makes two basic

5    points:  First, that the statements cannot reasonably be

6    interpreted as defamatory of the plaintiff; and second,

7    that the plaintiff is a public figure and we don't see

8    allegations to support a finding of actual malice.

9           Dealing with the first point.  In the memorandum

10   submitted by Yale in support of a motion, we see at

11   page 29 the section entitled, "Yale Made No Defamatory

12   Statements About Dongguk."

13          Going over to the next page, page 30, Yale sets

14   out what it describes as the statements underlying the

15   defamation claim.  It then proceeds to look at each of

16   these, and for reasons given, urges me to find that none

17   is defamatory.  I'd like to give you a chance to comment

18   on each of these.

19          But first let me ask:  Are we in agreement that

20   these are indeed the statements underlying the claim?

21          MR. WEINER:  No, we are not.

22          The statements that are quoted -- and I'd rather

23   go through the complaint than Yale's characterization of

24   them.  But if you look throughout the complaint, I suggest

25   we look at, I guess for example, paragraph 95, paragraph

1   97, paragraph --

2            MR. SPRINGER:   I'm sorry, I didn't hear the

3   first one.

4            MR. WEINER:   95, 97 and -- 96, 97, 110, 112,

5   111, the official statement, which is 143.   Those are just

6   my quick reading of the complaint, Your Honor, but let me

7   just go to the core of the argument.

8            Core of the argument is that on their face

9   they're not defamatory and I would disagree with that, but

10  that's a jury question.   However, under Mix v. Woodward,

11  which is a longstanding Connecticut case, and cases that

12  follow it, this is called liable or defamation by

13  extrinsic fact.   And what they're saying is Dongguk is not

14  necessarily mentioned by name, therefore how could it be

15  defamatory.   And by extrinsic fact, and this is a

16  longstanding liable doctrine, that if someone had reason

17  to know who you were referring to when you say, "I never

18  received that from him" -- and they know who "him" is --

19  that's enough.   And it's a determination of the jury then

20  to determine whether in fact the "him" can reasonably be

21  identified as us.

22           But the interesting thing is that if you read

23  the articles that Mr. Springer has attached to his

24  pleadings, they all make very clear they're talking about

25  Dongguk.   Just not -- I didn't quote the entire article.

 1   But if you read the articles themselves in their entirety,
 2   you're going to see they're talking about Dongguk.  So as
 3   a matter of law, it's not a basis to dismiss, and as a
 4   matter of fact, he's actually provided to Your Honor the
 5   entire articles which provide the detail.

 6            Now going to your second question, which I
 7   believe was whether we had asserted enough for malice.

 8            As we cited to Your Honor, there are two cases,
 9   both Connecticut, one is Morron at 464 F. Supp. 2d 111,
10   and the other is Dougherty at 282 F.3d 83, and in each of
11   those cases, and going back to Your Honor's statement to
12   me about notice pleading, that is sufficient to meet the
13   malice requirement by simply putting into the complaint
14   that the statements, the alleged defamatory statements
15   were made maliciously, which we did.

16            Now, having said that, the complaint goes on in
17   detail, in our view, to provide what we believe was
18   reckless that would satisfy the malice standard, in
19   particular the actions that occurred through the summer
20   and September of 2007 in which Yale was making these
21   statements at the very time it knew or had reason to
22   know -- and I would say knew -- that the statements were
23   false because of the information that my clients had
24   provided to them regarding the proof that had been
25   received by Yale, fax number and all that stuff.

1     So not only have we pleaded malice in a way

2   that's appropriate, but we've also provided you with the

3   evidentiary detail, which we didn't have to do but we did

4   it anyway.

5     THE COURT:  Okay.  Let me detain you and ask you

6   to go through this while it's fresh in my mind.  I would

7   be interested to have your thoughts, of course.

8     In the section of the memorandum in support of

9   the motion to dismiss that I referred to earlier starting

10   at pages 29 and continuing on to page 30, we see what Yale

11   offers in support of its argument that the claim should be

12   dismissed.

13     Focusing on page 30, Yale lists the statement by

14   Reinstein that the certification letter had been formed.

15   With regard to this, Yale argues that this refers to the

16   certification letter, not the fax, and Yale continues,

17   "Even if Yale said that the fax was a forgery, this would

18   not defame Dongguk."

19     MR. WEINER:  You look at paragraph 111, Your

20   Honor, just for an example, and also paragraph 110, which

21   by the way I don't believe is specifically referred to on

22   page 30, on July 19th, it quotes Reinstein, this is a

23   Korean publication, paragraph 110, "Dongguk University

24   said it mailed a letter for inquiry, so we looked into it,

25   but we never received the letter."  That I think is pretty

 1  explicit.  And if you read the next paragraph, it

 2  basically says the same thing.

 3          So we did an plea and the complaint does contain

 4  the defamatory language and it does refer to Dongguk.  And

 5  I think what Yale has provided to you, Your Honor, is an

 6  interpretation in basically trying to draw inferences of

 7  fact from the words, which is really the province of the

 8  jury.

 9          THE COURT:  Please be patient as I review these

10  documents.

11          Are you suggesting that one can reasonably

12  interpret the statements set out in these paragraphs of

13  the complaint as referring to the letter of inquiry as

14  distinct from the certification letter?

15          MR. WEINER:  Yes.  I mean, it says, but -- I

16  just read it into the record -- mailed a letter for

17  inquiry for academic letters, so we looked into it but we

18  never received the letter.

19          THE COURT:  So that's a reference to what we

20  will refer to as the letter of inquiry?

21          MR. WEINER:  Correct.

22          THE COURT:  As distinct from the certification

23  letter?

24          MR. WEINER:  That's correct, Your Honor.

25          THE COURT:  Okay.  And so one could interpret

1    these statements to mean that Dongguk did not send the

2    letter of inquiry?

3              MR. WEINER:  And it lied when it said it did.

4              THE COURT:  All right.  Going back to the

5    memorandum in support of the motion to dismiss, at page

6    30, the first Reinstein statement referred to cites

7    paragraphs 95 to 97 of the complaint, a July 13, 2007

8    article.

9              MR. WEINER:  Your Honor, if you look at

10   paragraph 95, in the complaint itself, Reinstein is quoted

11   as saying, Professor Shirmeister, whose signature's

12   included in the letter, is presently away, but

13   verification with her assistant professor confirmed that

14   Professor Shirmeister never signed such a letter.  That's

15   referring to Shirmeister's fax, not to the earlier

16   certification.

17             THE COURT:  Right, right.

18             And this is --

19             MR. WEINER:  Again a lie that we said we had

20   received a letter from Yale saying signed by Shirmeister.

21             THE COURT:  Yale's point seems to be that this

22   is not reasonably susceptible to the defamatory

23   construction because it doesn't suggest that Dongguk

24   forged anything or even that Dongguk is lying about what

25   it did or did not receive but rather simply means that

1    somebody, presumably Shin, forged it.

2               MR. WEINER:  That may be their theory, but the

3    words don't say that, Your Honor.  And the context of

4    this, as we said in the complaint, when Dongguk was called

5    to task by the media and explained that it had sent a

6    letter of inquiry and received one back from Yale which

7    said that Ms. Shin had received her Ph.D., and then they

8    contact Yale to verify whether what we said was true,

9    which is what happened at that point, and Yale says, no,

10   we never received an inquiry and we never sent the letter,

11   that basically calls my client a liar publicly, and that's

12   defamation by extrinsic fact -- if it's not clear they are

13   referring to us, the articles are clear they were

14   referring to us.  You're essentially calling my client a

15   liar, and that's defamatory.

16              THE COURT:  So your point is while possibly a

17   jury could construe this as Yale has construed it, that's

18   not what matters at this stage?

19              MR. WEINER:  That's not what we're here for.

20   And I would say to Your Honor, as I said earlier, even if

21   these were not defamatory, at a minimum, in our view they

22   were reckless or negligent.  That's why all three of those

23   claims are present.

24              THE COURT:  Understood.

25              Continuing, the next statement on page 30 in

1    Yale's memorandum references paragraph 105 of the

2    complaint.

3              The news article at issue in --

4              MR. WEINER:  There clearly, yeah, this is what

5    the quoted language says, we refer to the September 22nd

6    fax and the certification letter, and they followed by,

7    quote, faxed from Yale University.  Faxed from Yale

8    University.  Certification letter, as I understand, was

9    not -- the original Ph.D. letter was not faxed, as I

10   understand it.  But what we said what we received was

11   faxed.  And then it goes on to quote, "They were all fake

12   documents that were not prepared by Yale University." It

13   incorporates everything.  And if they want to argue that

14   that was only referring to the first document, I would say

15   that the word "all" would encompass more than the first.

16   So, again, defamatory.

17             THE COURT:  So the documents, plural, referred

18   to as fake, include the letter of inquiry?

19             MR. WEINER:  I'm not sure I would argue that

20   necessarily.  I would have to do some discovery of that.

21   Certainly included the fax coming back.

22             THE COURT:  Your point would be that a jury

23   could reasonably construe this statement to mean that

24   Dongguk itself fabricated one or more documents?

25             MR. WEINER:  No, no.  I'm saying that when you

1    read the context of this in the chronology that these

2    things occur, is that my client was continually being

3    called a liar by Yale. And as these things were coming,

4    as Reinstein was makes these statements, in the background

5    we were sending Yale information, said, by the way, you're

6    not right, please correct it. And they continued to make

7    these statements. And they continued to say they never

8    received our letter and that what we did receive from Yale

9    was not by Yale. It's calling us liars on a regular

10   consistent basis even though they had evidence to the

11   contrary.

12           Your Honor, I think there was one more in that

13   group that I'd like to briefly address. That's the last

14   bullet point on page 30, 143.

15           THE COURT:  Yes.

16           MR. WEINER:  I'd like to focus Your Honor first

17   on paragraph 140 in the complaint. And paragraph 140

18   you'll see that in the September 12th e-mail, we advise

19   Yale of the fact that the Korean prosecutors were now

20   actively looking at my client for having been a

21   participant in this and having covered it up and having

22   somehow lied about having contacted Yale. So it's a

23   little more urgent here.

24           If you go back to 137, by this time my client

25   had provided the mailroom information, the fax number, the

1   website, the mailing label, all to Yale.  And what do they
2   do?  And that's when we get to the paragraph that
3   Mr. Springer was referring to.  Let me get that paragraph
4   again, page 30.
5            THE COURT:  143.
6            MR. WEINER:  143.  That's when Yale, despite all
7   this evidence, issues an official statement saying all the
8   documents were forged.  And again, going back -- or fake.
9   Excuse me, forgeries and are fake.  And I don't have the
10   article, the official statement in front of me, but again
11   making very clear to the world that we lied.  And that's
12   why we believe we have a defamation claim as well as the
13   other claims that we're asserting.
14            THE COURT:  Let me see if I have anything
15   further for you.
16                 (Pause)
17            THE COURT:  I think I'm all set.  Thank you.
18            MR. WEINER:  Thank you, Your Honor.
19            THE COURT:  Mr. Springer, I'll give you the last
20   word for today anyway.
21            MR. SPRINGER:  Thank you, Your Honor.  I will
22   try to be brief.
23            Your Honor, there was discussion of two stories
24   being told.  As I'm sure you well know, this would not
25   have been our complete story.  We really have responded to

69

1    their story based on their allegations and documents.

2    We've got more of a story to tell, and it is because we

3    think that's -- what they have said really has, you know,

4    been insufficient for all the reasons we've mentioned and

5    I won't belabor them, I just didn't want you to think that

6    we had gotten our story out there.

7              THE COURT:  There's more to this story?

8              MR. SPRINGER:  There is a lot more to this

9    story.

10             But as you point out, and I think it is -- there

11   are no claims in this regard.  We have researched them.

12   There are no universities suing universities over this.

13   The employment context is different for those.  And

14   Mr. Weiner's right, as you know I am an employment lawyer,

15   and there are those suits and that's why I mention

16   employers sometimes do what I said, obtain release before

17   providing information.

18             THE COURT:  Let me ask you for your help on

19   that.

20             I realize we're talking about academic

21   institutions, but we're also talking about employment.

22             A new employer having recently hired this person

23   contacts someone else to verify that the person's

24   representation about her qualifications is correct.  In

25   the employment context when you have just regular everyday

1   business entities as opposed to academic institutions,

2   does the Good Samaritan rule apply?

3           MR. SPRINGER:  Well, because there is fear that

4   it doesn't, it's why people don't respond.  It's precisely

5   because of that chilling effect now, that you obtain

6   releases, you don't talk and, you know, you are leery of

7   doing it.  If there's any wisdom, it does have a chilling

8   effect because there has been talk about those lawsuits

9   and some do exist.

10          THE COURT:  And the upshot of that I guess is a

11  net loss to the public interest.

12          MR. SPRINGER:  I think that's right.  I think

13  that's right.  But people like me, counsel, employers all

14  the time are not to take the risk without an ironclad

15  release about providing information, even to your good

16  buddy who's in the industry because you never know what

17  that person hears and that person says.  It's just being

18  cautious.

19          THE COURT:  Thank you.

20          MR. SPRINGER:  Sure.

21          I wanted to pick up just briefly on Mr. Weiner's

22  point about Dongguk and it's in response to your question

23  not having an obligation to tell what it knew about

24  hearing the rumor which is said to be unfounded but turned

25  out to be founded and that, you know, that Dongguk should

1    have no obligation despite having all the interest here.

2              And I think going back to your point, I think

3    there -- if Yale is to have an obligation, Dongguk

4    certainly should have an obligation in the first instance

5    to provide what it knows.  And as we point out, there's a

6    public policy reason for not, you know, going forward with

7    the negligence claim.  I think it's just a troubling

8    statement to hear that Dongguk should have no obligation

9    under these circumstances.

10             Mr. Weiner talked about the statements and said

11   that we had provided the newspaper articles.  With regard

12   to the core of this complaint, as he repeatedly mentioned,

13   I believe, the June, the July, the August, September,

14   actions.  If that's the core the complaint, then I don't

15   see how those newspaper articles aren't integral.

16             We would argue that Chambers doesn't require

17   dispositive, that you know, the documents be dispositive.

18   But even if it does require that they be dispositive, that

19   would be fine here because those articles do contain the

20   defamatory statements and are dispositive.  That's where

21   they come from and, you know, even as we looked, and I

22   think we, as, you know, cite all those articles.  So I

23   just -- one, it's integral and, two, it -- if need be,

24   it's dispositive.

25             I want to say again, and I'm always leery

1   about -- I want to be careful about how I say this --

2   Mr. Weiner repeatedly mentioned that Yale accused Dongguk

3   in essence of lying with its statements.  I think if -- I

4   think if you look at the statements -- and again all the

5   ones Mr. Weiner cited are ones that we cited on page 30

6   and then explained.  I think if you engage with those

7   statements, engage with -- and I won't walk through them,

8   although I'm happy to.  You've been awfully kind and

9   generous to provide us all this time, Your Honor.  I think

10   if you look at those, I don't think you can reasonably

11   infer that they're defamatory.  Even the last statement on

12   paragraph 143, if you look at the newspaper article, which

13   is Exhibit U, it doesn't even mention Dongguk.  It doesn't

14   even mention Dongguk.  And so, you know, where it cites

15   it.

16          Yale was very careful to deal with the issue of

17   what it was faced with, which was a great deal of a great

18   many documents that were fraudulent.  And yes, it made a

19   mistake, but it didn't attribute the fakery or the forgery

20   to Dongguk nor can it be reasonably inferred.  And I think

21   if you look at all that, it's there.

22          And just a couple of more brief points.

23          On the motion to stay, and it was just mentioned

24   briefly, there are three prongs, as you know.  One is the

25   burden of discovery which I think is -- there's no dispute

1    it will be enormous.  I will tell you just because it's

2    ironic, Mr. Fetner received an e-mail indicating that the

3    Korean Supreme Court had ruled that Ms. Shin now needs to

4    stand trial on the claim of forgery which had been

5    dismissed on a technicality.  So we have a hundred

6    thousand Korean documents already from that criminal

7    proceeding.  We are now going to have more documents.  The

8    burden, you know, that we laid out in our papers, you

9    know, in some ways are extraordinary here and, you know,

10   we laid out some of them but, you know, there's going to

11   be difficulties at every step of the way.

12            And Mr. Weiner has not indicated -- it's been 10

13   months, but there's been no prejudice.  And I think we've

14   made some substantial arguments with regard to the

15   viability of these claims.  And for those reasons, I think

16   the motion to stay should be granted at this point.

17            And one last thing about -- Mr. Weiner

18   speculated about a third party.  It's obviously not in the

19   complaint.  I note that I have trouble remembering what I

20   did last week.  There may be an issue of memory here with

21   regard to Ms. Shirmeister over two years and it's all

22   speculation at this point.  We want to focus on the story

23   they told and the documents that they made integral to the

24   complaint.

25            And I think, Your Honor, if those allegations

 1    are engaged with, I think our arguments have some force

 2    and I believe persuasive again.  Thank you for your time

 3    and attention.

 4              THE COURT:  Thank you.

 5              MR. WEINER:  Your Honor, there just maybe,

 6    may --

 7              THE COURT:  Yes.

 8              MR. WEINER:  In essence, the motion to stay in

 9    some ways has been granted since this case was filed in

10    April or so.

11              THE COURT:  I apologize for that.  I referred

12    the case to the magistrate judge.

13              MR. WEINER:  And then there was a disclosure and

14    that caused an issue, but that motion was actually argued

15    in August and we hadn't gotten a decision on that.

16              I do believe that there will be a number of

17    discovery issues that will require either another

18    magistrate or Your Honor's time.  For example, issue of

19    Ms. Shin's criminal trial.

20              This case really doesn't -- we all know what

21    Ms. Shin did.  Really the issue from our perspective --

22    I'm not sure why all this discovery is part of this case,

23    other than to frighten the Court as to how much discovery

24    has to be done -- is the jury will determine whether the

25    statements were made negligently, recklessly or

     1     defamatorily.  It's not that complicated.  It's not that

     2     big discovery case.  Yes, there are facts that involve

     3     Ms. Shin.  She was originally the person that caused all

     4     this.  But the notion that we have to get into her

     5     criminal trial as to whether or not she forged the

     6     document, we all accept it.  The document was forged.  We

     7     don't need to go down that road.

     8              So I think the specter -- and I would

     9     stipulate -- the specter of this huge amount of discovery

    10     that needs to be done in Korea I think has been overstated

    11     and I do think it would be appropriate to have a

    12     conference, at least a conference.  At least let's get

    13     moving on a discovery plan or something.  Because this

    14     case has sat.

    15              THE COURT:  My thought would be to convene a

    16     telephone conference next week at which time I would give

    17     you a ruling on the pending motions and we would see where

    18     we stand and go from there.  But I don't want to keep you

    19     waiting any longer for a ruling on the motion to dismiss.

    20     Accordingly, if you're free toward the end of next week,

    21     Thursday or Friday?

    22              MR. SPRINGER:  Those are the two days I'm taking

    23     a short vacation, Your Honor.

    24              THE COURT:  Vacation?

    25              MR. SPRINGER:  It's the first in a long time.

1    It's five days only.

2            THE COURT:  What's happened to the standards at

3    Day Pitney?

4            MR. SPRINGER:  I apologize, Your Honor.  It's,

5    you know, it is spousal request.

6            MR. WEINER:  Your Honor, I never have a problem

7    with another lawyer's vacation.  So if you want to push it

8    into the week after that, that's certainly fine.

9            THE COURT:  All right.  Are you around on

10   Wednesday, by any chance?

11           MR. WEINER:  That's Wednesday the 13th?

12           THE COURT:  No, no.

13           MR. SPRINGER:  Wednesday, the 4th.

14           THE COURT:  Next Wednesday.

15           MR. SPRINGER:  I am in New Jersey preparing a

16   witness for a deposition but I could certainly break free.

17   It just would be inconvenient.  That's the --

18           THE COURT:  Are you planning to be there all

19   day?

20           MR. SPRINGER:  I am.  Part of the juggling act.

21   If there were a way, I, you know -- if you want to -- it

22   is an all day session that is planned.  But I can

23   interrupt or -- if you want.

24           MR. WEINER:  I'm available.

25           THE COURT:  You're available more or less any

1    time Wednesday?

2         MR. WEINER:  Other than 12:30 lunch that I have

3    and a very early MRI which is going to be 7:30, which I

4    don't think the Court would be calling, I'm fine.

5         THE COURT:  You eat lunch, you go on vacation.

6    What am I doing wrong?

7         MR. WEINER:  This is what the legal profession

8    has come to.

9         THE COURT:  Well, we'll get back to you this

10   afternoon and see if we can set something up for

11   Wednesday.  If not, then we'll go to the following week.

12        MR. WEINER:  Okay.  I will be driving back to

13   New York City, so I expect to be back 3:30, 4:00.  So your

14   chambers can contact me, or let me give you a cell phone

15   number:  917-690-1488.

16        THE COURT:  Would you please repeat that.

17        MR. WEINER:  917-690-1488.

18        THE COURT:  Thank you.  We'll set up a time for

19   that telephone conference.  Until then, thank you very

20   much.

21             (Proceedings adjourned at 12:50 p.m.)

22

23

24

25

1

2

3                           C E R T I F I C A T E

4

5                      In Re: DONGGUK  vs. YALE

6

7

8              I, Darlene A. Warner, RDR-CRR, Official Court

9    Reporter for the United States District Court for the

10   District of Connecticut, do hereby certify that the

11   foregoing pages are a true and accurate transcription of

12   my shorthand notes taken in the aforementioned matter to

13   the best of my skill and ability.

14

15

16

17
                     /s/_____
18
                        DARLENE A. WARNER, RDR-CRR
19                        Official Court Reporter
                          450 Main Street, Room #223
20                        Hartford, Connecticut 06103
                              (860) 547-0580
21

22

23

24

25

# EXHIBIT 80

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DONGGUK UNIVERSITY,

          Plaintiff,

   v.

YALE UNIVERSITY,

          Defendant.

Civil Action No. 3:08-CV-00441-RNC

**PLAINTIFF DONGGUK UNIVERSITY'S SECOND SUPPLEMENTAL ANSWERS AND
OBJECTIONS TO DEFENDANT YALE UNIVERSITY'S FIRST SET OF
INTERROGATORIES**

      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff Dongguk

University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and

Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby responds to defendant Yale University's

("Yale") First Set of Interrogatories (the "Interrogatories") as follows:

**RESERVATION OF RIGHTS**

      1.    Dongguk's answers and objections are made without in any way waiving or

intending to waive, but on the contrary preserving and intending to preserve all questions as to

their competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose

of the answers or subject matter thereof, in any subsequent proceeding or the trial of this or any

other action.

      2.    Dongguk preserves the right to object on any ground to the use of said answers, or

the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

      3.    Dongguk reserves the right to supplement or amend these answers in light of facts

or information that may be discovered or brought to light after submission of these answers.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk states that the following individuals interviewed Shin in 2005:

- President Hong

- Byung Shik Kim, former Vice-President

- Young Ho Lee, former Chairman of Jeonggak Won (Dongguk's Buddhist Center)

- Yoon Kil Seo, former Dean of the Graduate School

- Yoo

The individuals listed above should be contacted only through counsel for Dongguk at McDermott Will & Emery LLP.

**SUPPLEMENTAL ANSWER:**

Subject to and without waiving the General Objections, Dongguk respectfully refers Yale to its Supplemental Answer to Interrogatory No. 3 and Second Supplemental Answer to Interrogatory No. 5 for the addresses of the individuals indentified in this Interrogatory.

**INTERROGATORY 23**

Identify all newspaper articles or other media reports that criticized or vilified Dongguk University or harmed Dongguk University's reputation, including the medium of each article or other report, the title of each article or other report, the date each article or other report was first published, and the name of the publication containing each article or other report.

## OBJECTIONS AND ANSWER:

Dongguk specifically objects to this Interrogatory on the ground that it is overly broad and unduly burdensome. Subject to and without waiving the foregoing specific objection and the General Objections, Dongguk will identify non-privileged, non-confidential documents that are responsive to this Interrogatory at the time of production. Upon execution of the confidentiality stipulation, Dongguk will further identify bates numbers of all non-privileged, confidential documents, if any, that are responsive to this Interrogatory.

## SUPPLEMENTAL ANSWER:

Subject to and without waiving the foregoing specific objections and General Objections, Dongguk states that the following newspaper articles and other media reports criticized Dongguk or harmed its reputation:

| Medium | Title | Date Published | Name of Publication |
|---|---|---|---|
| Web Article | Debate over Dongguk's Faculty Hiring Process | 6/30/2007 | Bowonsa |
| Web article | Biennale Art Director Accused of Phony Credentials | 7/12/2007 | Chosunilbo |
| Web article | Biennale Director sacked for Academic Forgery | 7/12/2007 | Korea Times |
| Web article | Art luminary forged her academic credentials | 7/12/2007 | JoongAng |
| Web Article | Falsified Academic Degree…Fabricated Dissertation… Serious Moral Hazard in Culture Industry | 7/12/2007 | Herald Business |
| Web article | The Fake Doctor Scandal for the Cinderella of the Art World | 7/12/2007 | Chosunilbo |
| Web Article | Suspicions about Jeong Ah Shin's Falsified Academic Degree Officially Suggested When Hiring in 2005 | 7/13/2007 | Yonhap News |
| Print Article | Dongguk University's "Weird" Faculty Hiring | 7/13/2007 | Chosun Ilbo |
| Web article | Art world shocked over curator's forged degrees | 7/13/2007 | The Korea Herald |
| Web article | Mystery behind hiring of shamed art professor | 7/13/2007 | JoongAng |
| Web article | The talented Ms Shin | 7/13/2007 | The Independent |

| Web article | Stroke of luck, raw talent fueled Shin's ascent | 7/14/2007 | JoongAng |
|---|---|---|---|
| Print Article | Hiring Process of Shin "Full of Questions" | 7/14/2007 | Chosun Ilbo |
| Web article | Biennale Curator's Degree Revealed a Forgery | 7/14/2007 | Chosunilbo |
| Web Article | Dongguk Univ. to Fire Prof Who Forged Her Degrees | 7/14/2007 | KBS World News |
| Web Article | Would Dongguk's Internal Investigation Closely Examine "Academic Forgery" | 7/16/2007 | Yonhap News |
| Web article | Yale University Won't Probe Source of Shin's False Certificate | 7/16/2007 | Dong-A Ilbo |
| Web article | Dongguk failed to check records of discredited art professor | 7/16/2007 | The Hankyoreh |
| Web article | The Rise and Fall of a Korean Success Story | 7/17/2007 | Asia Sentinel |
| Print Article | Dongguk "Did Not Send A Request to Kansas" | 7/18/2007 | Donga Ilbo |
| Print Article | "Fake Dr." Shin Disappeared in Manhattan "I will Stay for One Month to Avoid the Passing Rain" | 7/18/2007 | JoongAng Ilbo |
| Print Article | Dongguk Top Management Suspicious of "Covering Shin" | 7/18/2007 | Chosun Ilbo |
| Web article | University of Kansas Has No Record of Verification of Shin's Diplomas | 7/18/2007 | Korea Times |
| Web Article | "Growing Suspicion" Dongguk University being deceived or protected | 7/18/2007 | Hankook Ilbo |
| Web Article | Dongguk Remained Silent After Receiving Confirmation of Shin's Fake Degree A Few Months Ago | 7/19/2007 | Yonhap News |
| Web article | Snowball of Lies | 7/20/2007 | news.naver.com |
| Web Article | Dongguk University 'Shin Investigation "Nothing Discovered" | 7/20/2007 | Yonhap News |
| Web article | Fake Diplomas | 7/20/2007 | Korea Times |
| Web article | Dongguk University Fires Bogus Professor | 7/20/2007 | Korea Times |
| Print Article | Shin's "Fake Doctoral Degree" Evidence Dongguk Might Have Kept Silent Since This April | 7/20/2007 | Chosun Ilbo |
| Print Article | After Shallow Investigation, "There Was No Absurdity" | 7/21/2007 | Donga Ilbo |
| Web article | Former university president takes the heat on art fraud | 7/21/2007 | JoongAng |
| Web article | Fake Diplomas Emphasis Must Shift from Academia to Meritocracy | 7/21/2007 | Korea Times |
| Web article | Dongguk U. Sacks Bogus Prof. Shin Jeong-Ah | 8/3/2007 | Korea Times |
| Web article | Suspicions Grow Over Shin's Diploma Forgery | 8/27/2007 | Korea Times |
| Web article | Growing Suspicions | 8/27/2007 | Korea Times |

- 24 -

| Web article | Clearing up a Scandal | 8/30/2007 | news.naver.com |
|---|---|---|---|
| Web article | GNP accuses Biennale of endorsing Shin | 8/30/2007 | news.naver.com |
| Web article | Factional Feud Deepens in Buddhist Groups | 9/3/2007 | Korea Times |
| Web article | Korea battles resume fakers | 9/5/2007 | Yale Daily News |
| Web article | Monk urges Dongguk Directors to Resign | 9/6/2007 | Korea Times |
| Web article | Ex-professor's home and office raided in probe on degree forgery | 9/8/2007 | news.naver.com |
| Web article | Lie After Lie | 9/11/2007 | Korea Times |
| Web article | Dongguk Professors Call for Resignation of Directors | 9/16/2007 | Korea Times |
| Web article | Probe Triggers Backlash from Buddhists | 9/22/2007 | Korea Times |
| Web article | Yale University Rejects Shin's Fake Ph.D. Claim | 9/23/2007 | Dong-A Ilbo |
| Web Article | Did Not Verify Academic Degree When Hiring | 10/4/2007 | Yonhap News |
| Web article | Korean professor accused of forging Yale art degree | 10/16/2007 | Yale Daily News |
| Web article | Dongguk board chairman to resign | 10/17/2007 | JoongAng |
| Web article | Brief:  Art history professor charged with forgery of doctorate indicted by authorities | 11/1/2007 | Yale Daily News |
| Web article | Byeon, Shin Deny Charges in 1st Trial | 11/12/2007 | Korea Times |
| Web article | A Very Good Step | 12/7/2007 | news.naver.com |
| Web article | Deception Sums Up Year of 2007 | 12/23/2007 | Korea Times |
| Web article | Fax on ex-art professor's Yale doctorate degree found to be genuine | 12/28/2007 | Yonhap News |
| Web article | Dongguk v. Yale | 9/24/2008 | Korea Times |
| Web article | Poison Ivy:  Cleaning up a Korean Art Conspiracy | N/A | ArtAsiaPacific Magazine |
| Blog | Forged Credentials and Korean Employment Law | N/A | Korean Law Blog |
| Web article | Cancelling Chosun Ilbo Subscriptions | N/A | The Hankyoreh |
| Web article | DGU sues Yale | N/A | Dongguk-In |

**INTERROGATORY 24**

Identify all documents that you contend contain false statements that Yale University made concerning Dongguk University.

**OBJECTIONS AND ANSWER:**

Dongguk specifically objects to this Interrogatory on the ground that it is overly broad and unduly burdensome. Subject to and without waiving the foregoing specific objection and the General Objections, Dongguk will identify non-privileged, non-confidential documents that are responsive to this Interrogatory at the time of production. Upon execution of the confidentiality stipulation, Dongguk will further identify bates numbers of all non-privileged, confidential documents, if any, that are responsive to this Interrogatory.

**SUPPLEMENTAL ANSWER:**

Subject to and without waiving the foregoing specific objections and General Objections, Dongguk states the following documents contain false statements that Yale made concerning Dongguk:

| Date | Type | Description | Name of Publication (if any) |
|------|------|-------------|------------------------------|
| 7/9/2007 | Letter | Letter from E. Barnaby to Gwangju Biennale Foundation | |
| 7/9/2007 | E-mail | E-mail from G. Reinstein to Director General of the National Museum of Korea | |
| 7/10/2007 | E-mail | E-mail from G. Reinstein to Chosun Ilbo reporter | |
| 7/10/2007 | Letter | Letter from S. Carney to E. Cho | |
| 7/12/2007 | Web article | Biennale Art Director Accused of Phony Credentials | Chosunilbo |
| 7/12/2007 | Web Article | "Cannot be..." Art Industry "Shin Shock" | Munhwa Ilbo |
| 7/12/2007 | Web article | The Fake Doctor Scandal for the Cinderella of the Art World | Chosunilbo |
| 7/13/2007 | Print Article | Jeong Ah Shin Mystery "Fax Dongguk Received from Yale" Also Fake | Chosun Ilbo |
| 7/13/2007 | Web | Dongguk Ignored All the "Shin Suspicions" | Segye |

| | Article | | |
|---|---|---|---|
| 7/13/2007 | Web Article | Did Dongguk Know Shin's Diplomas Were Fake | Munhwa Ilbo |
| 7/13/2007 | Web Article | Jeong Ah Shin "Fax from Yale" Also Fake.  Yale Answers "Different Form"...Possibly Fabricated Domestically | Herald Business |
| 7/13/2007 | Web Article | "Jeong Ah Shin Mystery" Fax Regarding Degree Also Fabricated | Herald Business |
| 7/13/2007 | Web Article | Diploma Confirmation Fax Dongguk Received from Yale is Also Fake | CBS Nocut News |
| 7/14/2007 | Web article | Biennale Curator's Degree Revealed a Forgery | Chosunilbo |
| 7/14/2007 | Print Article | "Document Dongguk Received from Yale at the Time of Hiring is Fake" | Donga Ilbo |
| 7/15/2007 | E-mail | E-mail from S. Carney to E. Cho | |
| 7/16/2007 | Web Article | "Fake Dr." Jeong Ah Shin, Review of Investigation Request" | MBC |
| 7/16/2007 | Print Article | Yale Will Not Investigate "Shin Falsified Fax" | Donga Ilbo |
| 7/16/2007 | Print Article | Yale University Fax Mystery | JoongAng I |
| 7/16/2007 | Print Article | Jeong Ah Shin Hiding After Returning to Korea | Chosun Ilbo |
| 7/16/2007 | Web Article | Who Sent the "Falsified Confirmation Fax" of Doctorol Degree | Joins |
| 7/16/2007 | E-mail | E-mail from Chosun Ilbo reporter to P. Schirmeister | |
| 7/17/2007 | Web article | The Rise and Fall of a Korean Success Story | Asia Sentinel |
| 7/17/2007 | E-mail | E-mail from G. Reinstein to H. Klasky | |
| 7/17/2007 | E-mail | E-mail from P. Schirmeister to J. Bulter and R. Sleight | |
| 7/18/2007 | Web Article | "Increasing Suspicions" Dongguk, Deceived or Protected.  Dongguk, Did Not Verify Academic Degrees of Shin | Hankook Ilbo |
| 7/18/2007 | Web Article | Jeong Ah Shin. Solve "Degree Verifying Fax From Yale" Mystery | CBS Nocut News |
| 7/19/2007 | Print Article | "Shin Incident" Yale "Did Not Receive Dongguk's Request for Shin's Academic Degree Verification" | Chosun Ilbo |
| 7/19/2007 | Web Article | Yale Considering A Legal Action Against Shin | Maeil Business Newspaper |
| 7/19/2007 | E-mail | E-mail from G. Reinstein to The Hankyoreh reporter | |
| 7/20/2007 | Web Article | "Shin's Academic Forgery" Dongguk Internal Investigation Committee Q&As | Yonhap News |
| 7/20/2007 | Web Article | "Shin's Academic Forgery" Dongguk Internal Investigation Committee Q&As | Donga Ilbo |
| 7/20/2007 | Web Article | Dongguk Will Dismiss and Accuse Shin | Hankook Ilbo |
| 7/20/2007 | E-mail | E-mail from G. Reinstein to The Hankyoreh reporter | |
| 7/21/2007 | Web Article | Fake Dr.' Shin Dismissed...Request for Investigation | Joins |

| 8/4/2007 | TV Interview | Munhwa Broadcasting Corporation interview | MBC |
|---|---|---|---|
| 8/20/2007 | Web Article | [World] (1) Amplifying Suspicions About Shin's Falsified Degrees | MBC |
| 9/4/2007 | Web Article | Did Shin Send the Fax | MBC |
| 9/4/2007 | E-mail | E-mail from G. Reinstein to Yale Daily News reporter | |
| 9/5/2007 | Web article | Korea battles resume fakers | Yale Daily News |
| 9/19/2007 | Web article | Yale University Embarrassed by Shin's Claim | Dong-A Ilbo |
| 9/21/2007 | Statement | Official Statement by Yale University (and all copies distributed to Korean media) | |
| 9/23/2007 | Web article | Yale University Rejects Shin's Fake Ph.D. Claim | Dong-A Ilbo |
| 10/16/2007 | Web article | Korean professor accused of forging Yale art degree | Yale Daily News |
| 11/1/2007 | Web article | Brief: Art history professor charged with forgery of doctorate indicted by authorities | Yale Daily News |
| 12/28/2007 | Web article | Following scandal with Korean professor, University revises degree-verification procedure | Yale Daily News |
| 12/29/2007 | Statement | Public Statement by Yale University | |
| 1/3/2008 | Web article | Yale to be more careful about verifying graduate degrees | boston.com |
| 1/3/2008 | Web article | Yale raises bar on credentials | New Haven Register |
| 1/3/2008 | Web article | Yale to be more careful about verifying graduate degrees | The AP |
| 1/14/2008 | Web article | Yale revamps degree-verification procedure | Yale Daily News |
| 1/31/2008 | Letter | Letter from S. Carney to E. Cho | |
| 2/4/2008 | Web article | Yale to be sued over Shin case | Yale Daily News |

Dated: October 30, 2009

MCDERMOTT WILL & EMERY LLP

By: _Robert A. Weiner_

   Robert A. Weiner
   Audrey Lu
  340 Madison Avenue
  New York, New York 10173-1922
  (212) 547-5400
  *Attorneys for Plaintiff Dongguk University*

Of Counsel:
Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz, P.C.
350 Orange Street
New Haven, Connecticut 06511
(203) 951-3720

## VERIFICATION

I, _Jin-Soo Han_, hereby certify that I have reviewed the above Interrogatories and responses thereto and that they are true and accurate to the best of my knowledge and belief.

Name: Jin-Soo Han
Title: Vice president

Subscribed and sworn to before me this _27_ day of _October_, 2009.

NOTARY PUBLIC   Young Kyoo Kong

# EXHIBIT 81

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DONGGUK UNIVERSITY,

          Plaintiff,

    v.

YALE UNIVERSITY,

          Defendant.

Civil Action No. 3:08-CV-00441-TLM

## PLAINTIFF DONGGUK UNIVERSITY'S REVISED FOURTH SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANT YALE UNIVERSITY'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff Dongguk University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby responds to defendant Yale University's ("Yale") First Set of Interrogatories (the "Interrogatories") as follows:

### RESERVATION OF RIGHTS

1.    Dongguk's answers and objections are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve all questions as to their competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the answers or subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

2.    Dongguk preserves the right to object on any ground to the use of said answers, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

3.    Dongguk reserves the right to supplement or amend these answers in light of facts or information that may be discovered or brought to light after submission of these answers.

Civil Procedure and the Local Rules of the Court.  Dongguk will comply with the Federal Rules of Civil Procedure and the Court's Local Rules.

## SPECIFIC OBJECTIONS AND REVISED SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY 26

Identify the total amount, in Korean won, of all government grants that Dongguk University received in each year since 1998.

### OBJECTIONS AND ANSWER:

Subject to and without waiving the General Objections, Dongguk states as follows:

Two of the research project applications submitted for the Humanities Korea Support Grants ("HK Grants") were rejected in the fall semester of 2007.  The first project was titled "East Asian Buddhism—Interchange, Consilience and Synergy," initiated by Dongguk's Korea Buddhist Research Institute.  The second project was titled "Discovery and Creation of Cultural Identity of Korean Nation in the Age of Globalization," initiated by Dongguk's Cultural Research Center.  Had they been selected, each of the projects would have received 8,000,000,000 won.

The result was surprising especially in view of Dongguk's superior qualifications compared to other applicants.  As a Buddhist academic institution with over 100 years of history, Dongguk is one of the leaders in the field of Buddhist studies.  The Korea Buddhist Research Institute was established in 1962 and is known for its active involvement in academic research and the quality of its articles that have been published over the last 45 years.  Its journal, Buddhist Bulletin, was selected as one of the leading journals in the field by Korea Research Foundation, the government institution that in fact initiated and awarded the HK Grants in 2007. The Korea Buddhist Research Institute is the only Buddhist research institutes in Korea that have

- 3 -

held over ten international symposiums since 2002.  In comparison, the Buddhist Culture

Research Center of Geumgang University, who was the recipient of the HK Grants, is still in the

early stage of development.  It was established in 2003 and had published only one issue of

journal at the time of application.  In view of the facts above, it is hard to imagine that Dongguk

would have suffered the same loss without the impact of the Shin incident.

The following chart summarizes the amount of government grants awarded to Dongguk

for each calendar year, reflecting the loss of the grants mentioned above in 2007.

*Unit: 10,000,000 won (rounding off to the unit amount)

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amount of Government Grants | 31 | 68 | 77 | 86 | 98 | 95 | 97 | 162 | 179 | 187 | 250 |

< Government Grants Received in Each Calendar Year>

**REVISED SUPPLEMENTAL ANSWER:**

Subject to and without waiving the General Objections, Dongguk states as follows:

*Unit: 100,000,000 won (rounding off to the unit amount)

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amount of Government Grants | 31 | 68 | 77 | 86 | 98 | 95 | 97 | 162 | 179 | 187 | 250 | 506 |

< Government Grants Received in Each Calendar Year>

**INTERROGATORY 28**

Identify the total number of student applicants who were offered admission to Dongguk

University for each year since 1998 and the total number who accepted Dongguk University's

offers of admission to its undergraduate and graduate programs for each year since 1998.

**OBJECTIONS AND ANSWER:**

Subject to and without waiving the General Objections, Dongguk states as follows:

The chart below summarizes the number of admission offers to Dongguk's undergraduate programs and the number of students who accepted such offers for each year from 1999 until 2008: Dongguk has no information responsive to this Interrogatory for the year 1998.

| Application Year | Number of Admission Offers | Number of Students Who Accepted Offers |
|---|---|---|
| 1999 | 3,781 | 2,965 |
| 2000 | 3,611 | 2,944 |
| 2001 | 3,720 | 2,919 |
| 2002 | 3,803 | 2,944 |
| 2003 | 3,738 | 2,941 |
| 2004 | 3,690 | 2,937 |
| 2005 | 3,588 | 2,868 |
| 2006 | 3,568 | 2,829 |
| 2007 | 3,915 | 2,692 |
| 2008 | 3,458 | 2,720 |

<Number of Admission Offers to Undergraduate Programs>

Dongguk states that it has no information concerning the number of students who were offered admission to its graduate program for each year. Dongguk further states that it has no information on the number of students who accepted or rejected the offers for its graduate program for each year.

**REVISED SUPPLEMENTAL ANSWER:**

Subject to and without waiving the General Objections, Dongguk states as follows:

| Application Year | Number of Admission Offers | Number of Students Who Accepted Offers | Number of Students Who Rejected Offers |
|---|---|---|---|
| 1999 | 3,781 | 2,965 | 816 |
| 2000 | 3,611 | 2,944 | 667 |
| 2001 | 3,720 | 2,919 | 801 |
| 2002 | 3,803 | 2,944 | 859 |
| 2003 | 3,738 | 2,941 | 797 |
| 2004 | 3,690 | 2,937 | 753 |
| 2005 | 3,588 | 2,868 | 720 |
| 2006 | 3,568 | 2,829 | 739 |
| 2007 | 3,645 | 2,692 | 953 |
| 2008 | 3,458 | 2,720 | 738 |
| 2009 | 3,388 | 2,687 | 701 |

<Number of Admission Offers to Undergraduate Programs>

**VERIFICATION**

I, _Jin-Soo Han_, hereby certify that I have reviewed the above

Interrogatories and supplemental responses thereto and that they are true and accurate to the best

of my knowledge and belief.

Name: _Jin Soo Han_
Title: _Chairperson, Committee for Judicial Affairs_

Subscribed and sworn to before me this _1st_ day of _March_, 2011.

NOTARY PUBLIC   Yong Seok Ahn

# EXHIBIT 82

[DONGGUK0265339]

Supplemental Information Regarding the Yale Lawsuit

<Attachment sent after scanning>


Q. When was the application made for the Humanities Korea Project?
A. August 24, 2007 [See attachment □]
   → Buddhist Cultural Research Institute: Agenda – Exchange, Consilience and Mutual Benefit in East Asian Buddhism

   Cultural Studies Institute: Agenda – Creation and innovation in Korean folk culture in the age of globalization


Q. When did selection occur for the Humanities Korea Project?
A. Stage 1 selection (28 humanities institutes or groups): September 20, 2007 [See attachment □]
Final selection (16 humanities institutes or groups): November 14, 2007 [See attachment □]
※ We were eliminated in stage 1

Q. Application for Humanities Korea Project submitted to the Ministry of Education, Science and Technology?
A. 2 copies of application attached [see attachment □]


Q. Were there other colleges that applied under the topic of Buddhism?
A. 69 colleges/universities, and a total of 153 institutes/groups (102 in humanities, 51 in foreign studies) applied for the project, but the details of the topics applied for are not made public → among the selected institutes/groups, the only Buddhist one is the Geumgang Center for Buddhist Studies at Geumgang University [see attachment □]

Q. What order of Buddhism is Geumgang University?
A. Cheontae Order [see Geumgang University website (http://www.ggu.ac.kr)]

Q. What did Geumgang University achieve through the Humanities Korea Project in 2007?
A. From the time of selection for the project in 2007 to now, 3 international conferences & 2 international seminars have been held (cannot confirm outcomes by year) → cannot confirm other outcomes such as articles published or research contracts [see Geumgang Center for Buddhist Studies website (http://gcbs.geumgang.ac.kr/)]


Confidential

DONGGUK0265339

[DONGGUK0265340]

Q. Have any researchers been let go (due to elimination from this project) from among those employed by the Buddhist Cultural Research Institute at the time of the Humanities Korea Project application?
A. It is not permitted to include a list of researchers in the Humanities Korea Project application [see project application, attachment □] → difficult to illustrate a connection between the researchers employed at that time and the Humanities Korea Project

Q. Have there been other cases of elimination from projects, similarly to the case of the Humanities Korea Project, due to the Jeong-Ah Shin incident?
A. Although it cannot be said with certainty that the reason for elimination was the Jeong-Ah Shin incident, there have been the following large national government projects:

| Date of project application | Supporting agency [Project name] | Person in charge of research | Proposal name | Total project costs (thousand won) |
|---|---|---|---|---|
| 5/25/2007 | Ministry of Knowledge Economy [Project to Improve Expertise in New Renewable Energy Sources] | | Bioenergy Core Technologies Research Center | 10,513,500 |
| 7/31/2007 | Ministry of Education, Science and Technology (Science Foundation) [Project to Support Superior Research Centers] | | Wave energy bioactivation technology research center | 4,800,000 |
| 8/24/2007 | Ministry of Education, Science and Technology (Korea Research Foundation) [Humanities Korea Project] | | [Buddhist Cultural Research Institute] Exchange, Consilience and Mutual Benefit in East Asian Buddhism | 8,000,000 |
| 8/24/2007 | Ministry of Education, Science and Technology (Korea Research Foundation) [Humanities Korea Project] | | [Cultural Studies Institute] Creation and innovation in Korean folk culture in the age of globalization | 8,000,000 |
| 10/26/2007 | Ministry of Education, Science and Technology (Korea Research Foundation) | | [North Korean Studies Institute] Seeking New Paradigms and Insight on 60 Years of North Korea Research | 2,068,956 |
| 10/26/2007 | Ministry of Education, Science and Technology (Korea Research Foundation) | | [Industrial Technology Institute] Developing integrated crisis management systems | 4,500,000 |

DONGGUK0265340

# 예일대 소송 관련 자료 보완

## 〈별첨은 스캔 후 송부〉

Q. 인문한국지원사업 신청시점이 언제인가?

A. 2007년 8월 24일 [별첨① 참조]

→ 불교문화연구원 : Agenda – 동아시아 불교, 교류와 통섭 그리고 상생

　문화학술원 : Agenda – 지구화시대 한민족 문화정체성의 발견과 창출


Q. 인문한국지원사업 선정시점은 언제인가?

A. 1단계 선정(인문분야 28개 연구소(단)) : 2007년 9월 20일 [별첨③ 참조]

　최종 선정(인문분야 16개 연구소(단)) : 2007년 11월 14일 [별첨③ 참조]

　※ 우리 대학은 1단계 심사에서 탈락


Q. 교육과학기술부에 제출한 인문한국지원사업 신청서?

A. 신청서 2부 별첨 [별첨② 참조]


Q. 당시 불교를 주제로 신청한 다른 대학이 있었나?

A. 69개 대학(교) 총 153개(인문분야 102개, 해외지역분야 51개) 연구소(단)가 사업을 신청하

　였으나 신청 주제에 대한 상세 내역은 공개하지 않음 → 선정된 연구소(단) 중에는 불교

　는 금강대학교 불교문화연구소 1개 뿐임 [별첨③ 참조]


Q. 금강대학교의 불교 종파가 무엇인가?

A. 천태종 [금강대학교 홈페이지(http://www.ggu.ac.kr/)에서 참조]


Q. 인문한국지원사업을 통한 금강대학교의 2007년 성과가 무엇인가?

A. 2007년 사업선정 이후 현재까지 국제학술대회 3회 개최 및 국제학술세미나 2회 개최(연도

　별 실적 확인 불가능) → 이 외 논문게재 및 연구비 수주 등의 실적은 확인 불가능  [금강

　대학교 불교문화연구소(http://gcbs.geumgang.ac.kr/)홈페이지에서 참조]

CONFIDENTIAL

DONGGUK0265339

Q. 인문한국지원사업 신청 당시 불교문화연구원의 연구원 중 (해당 사업의 탈락으로 인해) 현재 퇴직한 연구원이 있는가?

A. 인문한국지원사업 신청서에는 연구원 명단을 기재하지 않도록 되어있음 [별첨② 사업신청서 참조] → 당시 소속 연구원과 인문한국지원사업의 연관성을 설명하기 어려움


Q. 인문한국지원사업의 경우처럼 신청아 사건으로 인해 탈락한 다른 사업이 있는가?

A. 사업의 탈락 사유가 명확하게 신청아 사건이라고 할 수는 없겠지만, 당시 탈락한 대형 국책사업에는 다음과 같은 사업들이 있음

| 사업신청일 | 지원기관<br>[사업명] | 연 구<br>책임자 | 과 제 명 | 총사업비<br>규모(천원) |
|---|---|---|---|---|
| 2007.05.25 | 지식경제부<br>[신재생에너지인력양성사업] | | 바이오에너지 핵심기술연구센터 | 10,513,500 |
| 2007.07.31 | 교육과학기술부(과학재단)<br>[우수연구센터지원사업] | | 파동에너지 생체활성화기술연구센터 | 4,800,000 |
| 2007.08.24 | 교육과학기술부(학술진흥재단)<br>[인문한국지원사업] | redacted based on | [불교문화연구원] 동아시아 불교, 교류와 통섭 그리고 상생 | 8,000,000 |
| 2007.08.24 | 교육과학기술부(학술진흥재단)<br>[인문한국지원사업] | | [문화학술원] 지구화시대 한민족 문화정체성의 발견과 창출 | 8,000,000 |
| 2007.10.26 | 교육과학기술부(학술진흥재단)<br>[중점연구소지원사업] | | [북한학연구소] 북한연구 60년의 성찰과 새로운 패러다임의 모색 | 2,068,956 |
| 2007.10.26 | 교육과학기술부(학술진흥재단)<br>[중점연구소지원사업] | | [산업기술연구원] 위기통합관리시스템 개발 | 4,500,000 |

CONFIDENTIAL

# CERTIFICATE OF TRANSLATION

I, Samuel Henderson hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0265339-40 from the Korean language into the English language.

I further certify that translation of DONGGUK0265339-40 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

**Samuel Henderson**
**Professional Translator**

Subscribed and sworn to before me on _____27th_____ day of _July_, _2011_ (year)

(Signature of Notary)

Official Seal
LAKETRA N. WILLIAMS
Resident of Lake County, IN
My commission expires
September 4, 2016

(Notary Stamp)

# EXHIBIT 83

# FILED UNDER SEAL

# EXHIBIT 84

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)

------------------------------x

DONGGUK UNIVERSITY,                    :

       Plaintiff,                      :

  -versus-                             :       VOLUME I

YALE UNIVERSITY,                       :

       Defendant.                      :

------------------------------x


      Rule 30(b)(6) Deposition of BYOUNG

GEON JEON, taken pursuant to the Federal Rules of

Civil Procedure, at the Law Offices of Day

Pitney, LLP, 1 Audubon Street, New Haven,

Connecticut, before James A. Martone, LSR #248,

and Notary Public, in and for the State of

Connecticut, on August 9, 2010, at 10:03 a.m.

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 18

1    A.  That's correct.
2    Q.  Mr. Jeon, does the book that is sitting
3  in front of you contain the documents that you
4  reviewed in preparation for this deposition?
5         MR. WEINER:  All the documents?
6         MR. FETNER:  I just want to know
7  generally what's in there.
8         MR. WEINER:  The answer is no, it
9  does not.
10   A.  Which documents are you referring to?
11   Q.  Okay.  Let me start it this way.  Have
12  you reviewed those documents in that book in
13  preparing for the deposition?
14   A.  Yes.
15   Q.  When did you review those documents?
16   A.  Now something, I was reminded by one of
17  the documents that I have to correct something.
18  I reviewed documents which explains how documents
19  are supposed to be retained in the United States.
20  The documents that I reviewed were related to
21  this case.  And I reviewed the file that I have
22  in front of me in Korea before I came to the
23  United States.
24   Q.  Who compiled the documents in the book
25  sitting in front of you?

Page 19

1    A.  Audrey Lu, the attorney at MWE.
2         MR. FETNER:  We don't need to do
3  it now, Bob, I assume you have no objection to us
4  making a copy of that binder at some point?
5         MR. WEINER:  No objection.
6    Q.  Mr. Jeon, did you meet with any
7  attorneys in preparing for this deposition?
8    A.  Yes.
9    Q.  Who did you meet with?
10   A.  In Young Lee at MWE.  I N Y O N G.  In
11  Young Lee.
12        MR. WEINER:  O U N G.
13   A.  And Audrey Lu, at MWE.
14   Q.  On how many occasions did you meet with
15  them?
16   A.  I met with In Young Lee once.  And met
17  with Audrey Lu twice.
18   Q.  When did you meet with Mr. Lee?
19   A.  Last Monday.
20   Q.  For approximately how long did you meet
21  with him?
22   A.  About two to three hours.
23   Q.  When did you meet with Ms. Lu?
24   A.  Last Wednesday and last Thursday.
25   Q.  And for approximately how long on each

Page 20

1  day did you meet with her?
2    A.  Seven to eight hours a day.
3    Q.  Mr. Jeon, what claim does Dongguk make
4  in this lawsuit relating to student applications?
5    A.  In order to explain that, in order to
6  explain that I would have to explain to you when
7  the -- when high school graduation takes place,
8  and when the college starts.
9    Q.  Please explain whatever you need to to
10  answer the question.
11   A.  High school students graduate in
12  February in Korea.  And then they start college
13  in March.  And college takes applications
14  starting from September to February.
15        And the time period the colleges
16  take in applications are according to the
17  government guidelines.  And December is the most
18  important month for applications of students.
19  Because most number of students apply in
20  December.
21   Q.  And colleges select students according
22  to college exam, it's similar to SAT in the
23  United States.  And the entire nation is
24  interested in college entrance in Korea.  And the
25  number of applicants are published through

Page 21

1  different medias, such as newspapers and TVs,
2  programs.
3         And Dongguk University is
4  insisting that due to Yale's wrongful answers,
5  Dongguk has received national criticism.  And due
6  to that, number of applicants were reduced in
7  December.
8    Q.  Of what year or years?
9    A.  2007 and 2008.
10   Q.  Is that Dongguk's entire claim relating
11  to student applications?
12   A.  Not only the number of applicants, but
13  also the school does not think the quality of
14  students has reached its formal level before this
15  incident.
16   Q.  Is that Dongguk's entire claim relating
17  to student applications?
18   A.  Yes.
19   Q.  So Dongguk does not claim that the
20  number of student applications was reduced in
21  months other than December?
22   A.  Well, there was an overall reduction in
23  2007.  However, starting from 2008, the number of
24  applicants increased.  It's been getting better.
25   Q.  Mr. Jeon, my question was does Dongguk

6  (Pages 18 to 21)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 22

1    claim in this lawsuit that the number of student
2    applications it received in months other than
3    December was decreased because of any action on
4    Yale's part?
5        A.   Well, that is the principal complaint.
6    December.
7        Q.   My question is about months other than
8    December.
9        A.   We don't take applicants starting from
10   September to February continuously.  As I
11   mentioned before, we have to follow the
12   government guideline.  And so we receive
13   applications in December once.  And then we take
14   in applications once or twice before that
15   December application.
16            So I was saying for 2007, the
17   overall application was reduced.  And in 2008, I
18   would say there were more reduction in the number
19   of students who applied in December than any
20   other month.
21       Q.   My question is, does Dongguk claim that
22   the number of applications was reduced in months
23   on the than December?
24       A.   Yes, in 2007.
25       Q.   In what months?

Page 23

1        A.   I don't remember.  I would have to look
2    at documents.
3        Q.   Do you have any documents with you that
4    would help answer that question?
5        A.   Yes.
6        Q.   You're free to review them.
7        A.   Okay.
8        Q.   What months in 2007 does Dongguk claim
9    it received fewer applications because of Yale?
10       A.   Just December.
11       Q.   Is the same true for subsequent years?
12       A.   Yes.
13       Q.   Mr. Jeon, you said earlier that
14   December is the most important month for student
15   applications.
16       A.   Yes.
17       Q.   Why is that?
18       A.   Applications taken in before December
19   rely, are based on student's grades and their
20   essays and their interests and talents.  However,
21   for December applicants, they are selected based
22   on their college math test scores.
23            THE INTERPRETER:  May the
24   interpreter correct something please?
25            MR. FETNER:  Sure.

Page 24

1        A.   It's not actually the math test.  It's
2    called Korean SAT.
3        A.   Now traditionally Korean universities
4    have selected their students based on student's
5    SAT scores.  And depending on the SAT scores of
6    students, students decide what college they can
7    go to.
8            And high schools usually have
9    information on what colleges the students enter
10   according to their level.  And the quality of
11   colleges depend on the students who enter their
12   schools, because they are picked based on their
13   SAT scores.  There are no objective standard
14   which can, which allows the comparison of
15   students before December.
16            So depending on the applications
17   received in December, college ranking is decided.
18   Therefore, it is the most important month for
19   college applications.
20       Q.   Does the number of applications that a
21   college receives in December determine its
22   ranking or the quality of the applications?
23       A.   Generally colleges popular by new
24   students, that college has more chance to select
25   better students.  Just like in United States, Ivy

Page 25

1    Leagues, more applicants, and they're able to
2    pick better students.
3        Q.   Okay. Mr. Jeon, my question was about
4    the college rankings that you mentioned a moment
5    ago.  My specific question was, are those
6    rankings based on the numbers of applications
7    that colleges receive or are they based on the
8    SAT scores of the applicants to each college?
9        A.   I would say it depends on the both
10   criteria.  Well, the number of students
11   application are published through media.  And so
12   the colleges have more chances or opportunities
13   to pick better students.
14       Q.   Is that your complete answer?
15       A.   Yes.
16       Q.   When you talk about college rankings,
17   is there a particular organization that performs
18   the rankings you're describing?
19       A.   No.
20       Q.   So what are you referring to?
21       A.   I'm talking about how the school is
22   perceived in the — school's perceived generally
23   among public, and what type of jobs the graduates
24   have.  And according to those, people have ideas
25   which is a good college and which is not.

7  (Pages 22 to 25)

DONGGUK v. YALE UNIVERSITY

Page 38

1  seen the faculty criticism.
2        MR. FETNER: Bob, I understand
3  your position, I'd just like him to answer the
4  question I've asked.
5        MR. WEINER: Okay.
6     A.  Well, I have to say it's an obvious
7  fact, but I can't think of any ways to explain to
8  you why that is so.
9     Q.  How does Dongguk know that public
10  perceptions relating to the Shin incident caused
11  the decrease in the number of December
12  applications?
13     A.  Because there's no other reason for the
14  reduction of the number of applicants. Because
15  this case was the only thing, and therefore, this
16  is the only reason that we can think of.
17     Q.  Is that Dongguk's entire explanation?
18        MR. WEINER: No, it's not because
19  he's -- but we went through this, so it's his
20  entire explanation.
21        MR. FETNER: Well, he's testifying
22  on behalf of Dongguk.
23        MR. WEINER: Right, as have other
24  witnesses.
25     Q.  My question was, is that Dongguk's

Page 39

1  entire explanation?
2        MR. WEINER: And I'm going to
3  object to the form, for the reasons I stated.
4  But you can answer.
5     A.  That's the best answer I can give you.
6     Q.  My question is, is it the entire
7  answer?
8        MR. WEINER: That's his entire
9  answer. Okay. Let's move on.
10        MR. FETNER: That's not what he
11  had said.
12        MR. WEINER: It's the best answer
13  he can give you is what he said.
14     Q.  Is that the entire answer?
15        MR. WEINER: Do you have anything
16  else to add?
17     A.  No.
18        MR. WEINER: Okay.
19     Q.  So is that the entire answer?
20     A.  Yes.
21     Q.  What factors does Dongguk examine in
22  determining whether to offer admission to student
23  applicants?
24     A.  Are you talking about the December
25  applications?

Page 40

1     Q.  Well, I was asking about all
2  applications, but if the factors are different in
3  December, then yes, December.
4        MR. WEINER: I think they're
5  actually different within December.
6     Q.  Okay. So yeah, what factors does
7  Dongguk look at in determining whether to offer
8  admission to December applicants?
9     A.  Well, I -- there are two categories.
10  One category relies on the college SAT scores,
11  100 percent. And the other category relies on
12  the student high school grade, and the college
13  SAT scores.
14        I would say 97 to 98 percent on
15  the SAT exam, and 2 or 3 percent on the high
16  school grades.
17     Q.  Are those the only factors that Dongguk
18  looks at for December applicants?
19     A.  Yes.
20     Q.  What factors does Dongguk examine in
21  determining whether to offer admission to
22  applicants in other months?
23     A.  Well, there are various factors and
24  included are such as high school grades, essays,
25  and interviews. And then any awards the student

Page 41

1  might have received.
2        Well, I have to say there are a
3  number of different categories that we consider
4  new applicants, I mean new students. And each
5  category looks at different criteria.
6     Q.  Do you mean there are different
7  categories of students?
8     A.  Well, the college has different
9  categories set up. For instance, there might be
10  one category where the college will pick students
11  based on their rewards received, and another
12  category might pick students based upon the
13  student's grades and essays. So students review
14  these categories, and they pick one category
15  which would be most beneficial to them, in
16  getting into a college.
17     Q.  Are the students who apply for
18  admission in December, are they higher quality
19  than the students who apply in other months?
20     A.  Yes. Generally.
21     Q.  How does Dongguk know that?
22     A.  Because some students apply before
23  December or who enter school before December,
24  doesn't necessarily have to take SATs.
25  Therefore, the students who apply before December

11 (Pages 38 to 41)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

**Page 46**

1    MS. KIM:  Higher scores.
2         MR. WEINER:  Could we have that
3    corrected then.
4         A.  It just means the students who have
5    higher SAT scores have rejected the admission.
6         MR. FETNER:  Let's take a very
7    short break just so the videographer can change
8    the tape.
9         THE VIDEOGRAPHER:  Off the record,
10   12:19.
11        (Recess taken)
12        THE VIDEOGRAPHER:  On the record,
13   12:21.
14        Q.  Mr. Jeon, when you testified just
15   before the break about the numbers of students
16   who rejected Dongguk's offers of admission, were
17   you referring to students who applied for
18   admission in December?
19        A.  Yes.
20        Q.  Does Dongguk claim in this lawsuit that
21   students who applied for admission in months
22   other than December rejected Dongguk's offers of
23   admission in increased numbers?
24        A.  Now with regards to students who apply
25   in other months, this procedure that I just

**Page 47**

1    explained to you does not apply.  It is not
2    required by the government.
3         Q.  Apart from whether that particular
4    procedure applies, I'm asking generally.
5         A.  I don't know.
6         Q.  Does Dongguk have any information about
7    the reasons that students who are offered
8    admission rejected those offers?
9         A.  No.
10        Q.  In what year or years does Dongguk
11   claim in this lawsuit that increased numbers of
12   students rejected its offers of admission?
13        A.  2007.
14        Q.  Only 2007?
15        A.  Yes.
16        Q.  Does Dongguk know if other Korean
17   universities saw similar trends in the number of
18   December applications as Dongguk in 2007 and
19   2008?
20        A.  No.
21        Q.  Does Dongguk have any information about
22   whether other Korean universities saw similar
23   trends with respect to the number of students who
24   rejected offers of admission in 2007?
25        A.  No.

**Page 48**

1         Q.  What claim does Dongguk make in this
2    lawsuit relating to job fairs or other recruiting
3    events?
4         THE INTERPRETER:  May the
5    interpreter ask the attorney to repeat the
6    question please.
7         Q.  What claim does Dongguk make in this
8    lawsuit relating to job fairs or other recruiting
9    events?
10        A.  First the number of companies who
11   participate in the recruiting event sponsored by
12   Dongguk University has decreased.  And top one
13   hundred companies in Korea, well, number of top
14   one hundred companies in Korea who attend
15   recruiting event have decreased.  And therefore,
16   it lowers the possibilities of getting good jobs
17   for students.
18        Q.  Is that Dongguk's entire claim relating
19   to job fairs or other recruiting events?
20        MR. WEINER:  Just so it's clear,
21   it's not a claim, it's a reflection of reputation
22   damages.  I think we explained that in our damage
23   analysis.
24        MR. FETNER:  How ever it's
25   characterized, I just want to understand what it

**Page 49**

1    is.
2         MR. WEINER:  Okay.
3         A.  Yes.
4         Q.  When you say that the number of
5    companies who participate has decreased, are you
6    referring to a particular year or years?
7         A.  Well, the job fair was established in
8    2007, so there are no other materials to compare
9    the job fair with regard to other recruiting
10   events.  The number of businesses participating
11   in the event in 2007 and 2008 was lower than
12   2006, second semester.  And the number of one
13   hundred top Korean companies participating in
14   this event has been decreasing since 2007 to
15   2009, when compared to the number in 2006.
16        Q.  With respect to the top one hundred
17   companies, what event are you referring to?  Is
18   it the job fair or some other recruiting event?
19        A.  Job fairs and recruiting events.
20        Q.  Other than the job fair, what
21   recruiting events does Dongguk hold?
22        A.  I'd like to explain in detail about the
23   recruiting events.  When you say recruiting
24   events, it refers to companies coming to our
25   school, and promoting, and those companies

13  (Pages 46 to 49)

DONGGUK v. YALE UNIVERSITY                                    August 9, 2010

Page 54

1  list, has the number of the top one hundred
2  companies that participated in Dongguk's job
3  fairs or other recruiting events increased or
4  decreased since 2007?
5      A.  Decreased.
6      Q.  How about from 2006 to 2007?
7      A.  Does it include 2007?
8      Q.  My question is, did that number of the
9  top one hundred companies that participate in
10  Dongguk's events decrease from 2006 to 2007?
11      A.  Are you talking about all the companies
12  that attended these event or are you just talking
13  about the top one hundred companies?
14      Q.  I'm talking about the top one hundred
15  companies.
16      A.  It increased, in up until 2006, end of
17  2006, and then it decreased in 2007.
18      Q.  Now I'd like to ask the same question
19  about all companies.  Not just the top one
20  hundred companies.
21      A.  Probably increased because the job fair
22  was established starting from 2007.
23      Q.  And how about since 2007?
24      A.  Well, it increased because of the newly
25  established job fair.

Page 55

1      Q.  I'm asking has that, the number of
2  total corporations that participated in Dongguk's
3  events increased from 2007 to 2008, and from 2008
4  to 2009?
5      A.  Yes, the overall number increased.
6  However, the top one hundred companies, the
7  number of top one hundred companies decreased.
8  Therefore, the companies, well, the quality of
9  companies that attend these events have gone
10  down.
11      Q.  How many of the top one hundred
12  companies participated in Dongguk's job fairs or
13  other recruiting events in 2007?
14      A.  I just -- well, I told you about the
15  ratio of companies that participated in these
16  events.  One hundred top companies compared to
17  the other companies.  However, I have to look
18  through my documents in order to know what that
19  ratio is.
20      Q.  Mr. Jeon, I wasn't asking you about a
21  ratio.  I was simply asking how many of the top
22  one hundred companies participated in 2007?
23      A.  I do not know the numbers, but I can
24  tell you after I look through my documents and
25  find out.

Page 56

1      Q.  If there are documents that would help
2  you answer, then please look at them.
3      A.  I don't have any documents relating to
4  that.
5      Q.  When you testified earlier about the
6  top one hundred companies that participated in
7  Dongguk's events, were you referring to the
8  number of top one hundred companies that
9  participated, or the ratio of the top one hundred
10  companies that participated to the total number
11  of participants?
12      A.  I was talking about the ratio.
13      Q.  Okay.  I didn't ask about the ratio.
14  Regardless of that ratio, did the total number of
15  ton one hundred companies that participate in
16  Dongguk's job fairs or other recruiting events
17  increase or decrease from 2006 to 2007?
18      A.  Well, I have to look at other documents
19  in order to give you an answer.
20      Q.  Would the same be true for 2007 to
21  2008?
22      A.  Yes.
23      Q.  And 2009?
24      A.  Yes.
25      Q.  Does Dongguk keep track of the numbers

Page 57

1  of its students who get jobs through these job
2  fairs or other recruiting events?
3      A.  About the number, how many get jobs
4  through these events you mean?
5      Q.  Yes.
6      A.  No.  A lot of students attend these
7  events.  Therefore, we cannot determine who
8  participates in these events.
9      Q.  Does Dongguk keep track of the number
10  of students who participate in the job fairs or
11  other recruiting events?
12      A.  Well, general ballpark.
13      Q.  Has that number increased or decreased
14  since 2006 and each year subsequent?
15      A.  Well, I don't have an answer to that
16  now.  I don't have any documents to look at.
17      Q.  But does Dongguk maintain documents
18  with that information?
19      A.  Yes.
20      Q.  Does Dongguk know why corporations that
21  did not participate in its job fairs chose not to
22  participate?
23      A.  Well, only one company told the school
24  the reason.  It's called NHN.  It's a major
25  company.  It could be compared to Google in the

15  (Pages 54 to 57)

DONGGUK v. YALE UNIVERSITY                                          August 9, 2010

Page 58

1    United States. And NHN stated that the company
2    was going to participate in the event. During
3    the playing stages. However, after the Jeong Ah
4    Shin's case was known to the public because of
5    the media reported, with regard to the Dongguk
6    University's hiring of professors, NHN notified
7    the school that it will not participate.
8        Q. Which particular job fair are you
9    referring to?
10       A. It was a job fair.
11       Q. My question is, when was that job fair
12   to be held?
13       A. 2007, September job fair. Initially
14   NHN was going to participate. But then later
15   decided not to.
16       Q. You said that NHN wrote to Dongguk,
17   saying that they would no longer participate?
18       A. Well, it wasn't a letter. It was
19   communicated to the school. And that was
20   reported in the college, in a college newspaper
21   in Korea.
22           THE INTERPRETER: May the
23   interpreter ask Mr. Jeon to clarify something
24   please?
25           MR. FETNER: Sure.

Page 59

1        A. Well, it's a newspaper which reports on
2    the events of different schools, different
3    colleges.
4        Q. When did NHN notify Dongguk that it was
5    not going to participate in the September, 2007
6    job fair?
7        A. I do not know the exact date.
8        Q. Do you know approximately?
9        A. I'm certain it was in September of
10   2007.
11       Q. It was in September?
12       A. Yes.
13       Q. And just so I'm clear, did NHN contact
14   Dongguk in writing?
15       A. No. It was communicated by a
16   representative or a person.
17       Q. A phone call?
18       A. Yes.
19       Q. Who received that phone call?
20       A. Hae Duk Kim. H A E  D U K  K I M. Job
21   support team employee.
22       Q. And who made that phone call from NHN?
23       A. I don't know.
24       Q. And as completely as you can tell me,
25   what was said in that phone call?

Page 60

1        A. I heard that NHN thought it was
2    inappropriate to attend this job fair due to
3    Jeong Ah Shin's crisis being repeatedly reported
4    by the media.
5        Q. Is there anything more you can tell me
6    about that phone call?
7        A. No.
8        Q. How did you learn that?
9        A. Mr. Hae Duk Kim told me. And it was
10   also reported in the college newspaper.
11           MR. FETNER: Unless you object,
12   this seems like a good place for a lunch break.
13           MR. WEINER: That's fine.
14           THE VIDEOGRAPHER: Off the record,
15   1:04.
16       (Lunch Recess)
17           THE VIDEOGRAPHER: On the record,
18   2:07.
19       Q. Mr. Jeon, I just want to go back and
20   clarify one point, in light of a comment you made
21   earlier. Is Dongguk claiming in this lawsuit
22   that the number of top one hundred companies that
23   participated in its job fairs and other
24   recruiting events decreased or is it only
25   claiming that the ratio of the top one hundred

Page 61

1    companies to the total number of participating
2    companies decreased?
3            MR. WEINER: Or both?
4        Q. Or both? Yes. I just want to know
5    what the claim is.
6        A. One thing I'm certain of is that the
7    ratio has decreased. I'm guessing the number
8    also decreased because of the decrease in the
9    ratio. However, I need to look into my documents
10   to give you the exact answer.
11       Q. Do you have those documents here?
12       A. No. Not with me.
13       Q. Do you have any information today about
14   whether the number of top one hundred companies
15   participating in Dongguk's events decreased?
16       A. Yes.
17       Q. What is that information?
18       A. Well, I have a list of the companies
19   that participated in these events and I also have
20   the list of one hundred, top one hundred
21   companies that participated in these events. And
22   the list was provided by the job support team and
23   I have to go back to my hotel and -- in order to
24   look for it.
25       Q. Since you're going to be testifying on

16  (Pages 58 to 61)

DONGGUK v. YALE UNIVERSITY                                    August 9, 2010



Page 62

1    Wednesday, please expect me to ask the same
2    question on Wednesday.  And please also bring
3    those lists to the deposition on Wednesday.
4       A.  Okay.
5       Q.  Did the percentage of Dongguk students
6    who obtained jobs decrease from 2006 to 2007?
7       A.  As far as I know, slightly.
8       Q.  What was that percentage in 2006?  And
9    what was it in 2007?
10      A.  I will give you that answer on
11   Wednesday as well.
12      Q.  Do you have documents that contain that
13   information?
14      A.  I would have to contact the school in
15   Korea.
16      Q.  Do you have information about those
17   percentages for 2008 and 2009?
18      A.  Well, I don't have them with me, so --
19      Q.  Does Dongguk have any information about
20   the reasons that any companies other than NHN
21   chose not to participate in its job fairs or
22   other recruiting events?
23           MR. WEINER:  You mean direct
24   communication?
25      Q.  Well, the question for now is any

Page 63

1    information at all?
2       A.  No.  Just NHN.
3       Q.  Did NHN participate in any of Dongguk's
4    job fairs or any other recruiting events after
5    2007?
6       A.  No.
7       Q.  Does Dongguk invite companies other
8    than the top one hundred companies to participate
9    in its job fairs?
10      A.  Yes.
11      Q.  How many companies does Dongguk invite
12   to participate in each of its job fairs?
13      A.  I do not know the exact number.
14      Q.  Approximately how many?
15      A.  Between 200 to 300.
16      Q.  What is the significance of the ratio
17   that you mentioned earlier?
18      A.  Well, it is an indication of the number
19   of top one hundred companies participating in
20   either job fairs or recruiting events in
21   comparison to all other companies.  And the
22   decrease in percentage, of the percentage means
23   that less and less companies that are included be
24   one hundred top companies attend our events.  It
25   is also significant because it decreases the

Page 64

1    chances for Dongguk graduates to secure good
2    jobs.
3       Q.  I'm not asking about the significance
4    of the number of top one hundred companies that
5    participate.  I'm asking about the significance
6    of the ratio of top one hundred companies to
7    total number of companies that participate.
8       A.  Well, don't they mean the same?  Number
9    of companies that participate and then the number
10   of companies that belong to top one hundred
11   companies and the decrease in the ratio.  I'll
12   say the reduction in ratio means the same thing
13   as the reduction in the number of one hundred
14   companies.
15      Q.  Well, if the number of the top one
16   hundred companies that participate in the job
17   fairs stays the same, but the number of other
18   companies that participate increases, wouldn't
19   the ratio decrease?
20      A.  Yes.
21      Q.  Why is that bad?
22      A.  Well, I would have to look at the
23   numbers and then I will, then I can answer that
24   question.
25      Q.  I'm not asking about particular

Page 65

1    numbers.
2       A.  I do not have any information in front
3    of me which can tell me how many one hundred
4    companies, how many of the top one hundred
5    companies participated and -- so I would have to
6    look at that information.
7       Q.  Apart from the number of companies that
8    participated in any particular year, I'm trying
9    to understand the significance of the ratios at
10   all.  I answered that way because I thought the
11   number of reduction causes the reduction in
12   ratio.  So I would have to look at accurate
13   numbers in order to answer your question.
14      Q.  And those numbers are on the list that
15   you have in your hotel room?
16      A.  Yes.
17      Q.  We'll revisit that on Wednesday.
18      A.  Yes.
19      Q.  What claim does Dongguk make in this
20   lawsuit relating to government grants?
21      A.  First the government grant Dongguk
22   University has received had decreased.  When
23   compared to the entire government grant.
24      Q.  Can you explain that?  I don't
25   understand.

17  (Pages 62 to 65)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 70

1  A. Yes. That's correct. But Dongguk
2  University's Buddhism research teams were
3  established in 1962. And has produced many
4  research materials. And sponsored academic
5  conferences.
6         THE INTERPRETER: May I interpreter
7  ask Mr. Jeon to clarify, please.
8  A. And the Korea Research Foundation lists
9  a journal produced by Dongguk University research
10 team as a famous journal, and it is actually
11 recorded. As a famous journal. So it is very
12 unusual that Keum Kang University was picked to
13 do this project, because when you compare Dongguk
14 University and Keum Kang University's
15 achievements, it was very unusual.
16    Q. Who awarded the grant that you're
17 referring to, that is the Humanities Korea grant?
18    A. Educational department.
19    Q. The Ministry of Education?
20    A. Yes. Ministry of Education. And it is
21 managed by Korea Research Foundation.
22    Q. Is the Korea Research Foundation part
23 of the Ministry of Education?
24    A. It's a public agency.
25    Q. But is it part of the Ministry of

Page 71

1  Education or is it independent of the Ministry of
2  Education?
3  A. Well, it's not a part of government.
4  However, that organization is affiliated with the
5  government.
6  Q. Why did the Ministry of Education award
7  the Humanities Korea grants to Keum Kang
8  University?
9  A. I don't know. But however, when you
10 compare these two universities, Dongguk
11 University was more capable of doing this type of
12 research. So with regard to the fact Keum Kang
13 University being selected to do this project is a
14 mystery to Dongguk University too.
15    Q. How many universities applied for these
16 grants?
17    A. I believe two.
18    Q. So there was a particular grant that
19 was limited to the study of Buddhism?
20    A. Well, the government received
21 applications from various universities with
22 regard to the study of humanities. However,
23 the -- for the study of Buddhism, the grant was
24 given to the Keum Kang University.
25    Q. How many applications did the Ministry

Page 72

1  of Education receive?
2  A. I would say about 60 universities and
3  there were about 80 subjects for research.
4  Q. Did the government announce in advance
5  that it was definitely going to fund a research
6  project relating to Buddhism?
7  A. Well, the government did not limit it
8  to the Buddhism, study of Buddhism.
9  Q. That wasn't my question. Couldn't the
10 government have chosen not to fund either
11 Dongguk's project or Keum Kang University's
12 project?
13    A. Yes, that's correct. However, the
14 research project about the study of Buddhism was
15 selected.
16    Q. What was the subject of Keum Kang
17 University's research proposal?
18    A. I don't know. Dongguk University does
19 not know.
20    Q. Does Dongguk University have any
21 information about Keum Kang University's
22 proposal?
23    A. Well, if I look for it, I believe I may
24 be able to find about the subject.
25    Q. As with the other areas we discussed

Page 73

1  earlier, Mr. Jeon, please review whatever
2  information you have on that subject, so that I
3  can ask you about that on Wednesday. What was
4  the subject of Dongguk's research proposal
5  relating to Buddhism?
6  A. Comparison studies of Buddhism in Pan
7  Asia. Asian countries.
8  Q. What faculty member or members
9  submitted that proposal for Dongguk?
10    A. She's a professor, Mun Sung Kang.
11 M U N  S U N G  K A N G.
12    Q. What is she a professor of?
13    A. Buddhism.
14    Q. What is the name of her department?
15    A. Study of Buddhism.
16    Q. Is she the only Dongguk faculty member
17 who was responsible for that application?
18    A. No.
19    Q. Who else?
20    A. I do not remember any names. It was a
21 research team comprised of about 20 people.
22    Q. What professor or professors were
23 responsible for Keum Kang University's
24 application?
25    A. I do not have any information on that.

19  (Pages 70 to 73)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

**Page 74**

1    Q.  Did the Ministry of Education provide
2  Dongguk with any information about the reason it
3  denied Dongguk's application?
4    A.  No.  Because research teams are
5  selected based on the team's proposed plans, and
6  the team's capabilities.  If the government rely
7  on any other criteria, then it is wrong, it is
8  prohibited.
9    Q.  Okay.  My question was did the
10  government tell Dongguk why it rejected Dongguk's
11  proposal?
12    A.  I said no, and then I gave you an
13  explanation as to why.
14    Q.  Does Dongguk have any reason to believe
15  that the government relied on any improper
16  criteria in rejecting its application?
17    A.  Yes.
18    Q.  Tell me all information that Dongguk
19  has about that.
20    A.  The selection process began on about
21  October or November of 2007.  And this is the
22  time when Dongguk University was being criticized
23  because of Jeong Ah Shin, Shin Jeong Ah-Gate.
24        And at this time when Dongguk
25  University made an application to do other type

**Page 75**

1  of studies, research projects, the government
2  actually asked for the research team members who
3  were going to be involved in those projects.  And
4  also the education backgrounds of the people who
5  were going to be heading those projects.
6    Q.  What projects are you referring to?
7        THE INTERPRETER:  Could the
8  interpreter reask that question please?
9        MR. FETNER:  Sure.
10    A.  One subject is identity of Pan Asian
11  culture, which was presented by Jong Yun Hwang,
12  J O N G  Y U N  H W A N G, a professor.
13    Q.  I want to be sure that I understand
14  your testimony, Mr. Jeon.  I asked you if Dongguk
15  had any reason to believe that the government
16  relied on any improper criteria in rejecting
17  Dongguk's applications for grants in 2007.
18    A.  Well, I don't have any information
19  about that.
20    Q.  Did I misunderstand your testimony?
21    A.  Which testimony?  The question -- was
22  your question asking about if I knew any other
23  reasons, any other criteria that the government
24  used for selecting schools to give grants to?
25    Q.  Well, the immediate question was

**Page 76**

1  whether Dongguk has any information to suggest
2  that the government relied on any improper
3  criteria in denying Dongguk's grant applications
4  in 2007?
5        MR. WEINER:  He said he has no
6  information.
7        MR. FETNER:  I just want to be
8  clear that he was answering to my question.
9        MR. WEINER:  He's correct.
10  There's no information.
11        THE INTERPRETER:  Could you repeat
12  the last question?
13    Q.  Does Dongguk have any information to
14  suggest that the Korean government relied on any
15  improper criteria in denying Dongguk's grant
16  applications in 2007?
17    A.  No.
18    Q.  Mr. Jeon, you testified earlier that
19  the ratio of grant funding that Dongguk received
20  to the total available amount of grant funding
21  decreased beginning in 2007.
22    A.  Yes.
23    Q.  Were you referring to the total amount
24  of grants that the Korean government awards each
25  year?

**Page 77**

1    A.  Yes.
2    Q.  How much money in grants did the Korean
3  government award in 2007?
4    A.  I would have to look for documents and
5  then I will let you know.
6    Q.  Do you have documents that contain that
7  information?
8    A.  Yes.
9    Q.  Other than to the grants you've already
10  described for which Dongguk applied in 2007, are
11  there any other particular grants for which
12  Dongguk applied and it did not receive that are
13  part of its claims in this lawsuit?
14    A.  There are two mentioned in this lawsuit
15  and then there are others.
16    Q.  What are the others?
17    A.  For instance, Dongguk University
18  applied for a grant with regard to biowave energy
19  project which was headed by a professor whose
20  name is Jung Keuk Park. J U N G  K E U K
21  P A R K.  That was also rejected.
22    Q.  When?
23    A.  Around September or October of 2007.
24    Q.  Does Dongguk claim that that grant
25  application was rejected because of the Shin

20  (Pages 74 to 77)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 82

1  before?
2     A. Yes.
3     Q. When did you see this document?
4     A. On or about May or June of 2009.
5     Q. Do you know when this document was
6  created?
7     A. I would say probably at the same time.
8     Q. Who created it?
9     A. Manager of R&D team, her name is Yoo
10 Jin.
11        THE INTERPRETER: I have to
12 correct it. It's Jin Yoo.  J I N,
13 Last name Y O O.
14    Q. Why was this document created?
15    A. Her -- the preparation of -- as a
16 preparation for this litigation.
17    Q. Mr. Jeon, the table on the second page
18 of the document lists six grant proposals.  Do
19 you see that?
20    A. Yes.
21    Q. Does Dongguk claim that all of those
22 proposals were rejected because of the Shin
23 incident?
24    A. Not all.
25    Q. Which ones does it claim were rejected

Page 83

1  because of the Shin incident?
2     A. The five except for the first one.
3     Q. All except for the first one?
4     A. Yes.
5     Q. Why does Dongguk believe the first
6  proposal was rejected?
7        THE INTERPRETER: Could the
8  interpreter ask the attorney to repeat that
9  question please.
10    Q. Why does Dongguk believe the first
11 proposal was rejected?
12       THE INTERPRETER: What was the
13 question before?  Because the question doesn't
14 seem to make sense.  With regard to the --
15    Q. The previous question, I had asked him
16 which of the grant proposals listed on this page
17 does Dongguk believe were rejected because of the
18 Shin incident.
19    A. I don't know.
20    Q. Why does Dongguk believe that it was
21 not because of the Shin incident?
22    A. Because of the reasons that I stated
23 before. I stated that with regard to the
24 Buddhism studies, Dongguk University is the
25 leading research institute.

Page 84

1     Q. Mr. Jeon, my question was about the
2  first grant proposal listed on the second page of
3  this document.  The May 25th, 2007 application.
4        THE INTERPRETER: Was the question
5  why was it rejected or was wasn't it rejected?
6     Q. Well, my first question for you is, why
7  does Dongguk believe that proposal was rejected?
8     A. I have to guess that when compared to
9  other --
10       MR. WEINER: Don't guess.
11    A. I do not know.
12    Q. Dongguk has no information about the
13 reasons that that proposal was rejected?
14       MR. WEINER: Before you answer,
15 he's not here to talk about ones that we're not
16 claiming.
17    A. I don't know.
18    Q. Okay. How about the second
19 application?  The one dated July 31st, 2007.
20 What information does Dongguk have about the
21 reasons that proposal was rejected?
22    A. This was headed by Jung Keuk Park.  And
23 he didn't get a grant for this subject in 2007.
24 However, he got the grant for the same subject in
25 2009.

Page 85

1     Q. The grant that he received in 2009, was
2  for the same proposal that was rejected in 2007?
3     A. Yes.
4     Q. How much money did Dongguk receive in
5  connection with this 2009 grant?
6        MS. KIM: Around five million.
7     A. Around five million U.S. dollars.
8     Q. What information does Dongguk have to
9  believe that the July 31st, 2007 application was
10 rejected because of the Shin incident?
11    A. Because he was able to receive funding
12 for the same subject in 2009.  And that proves
13 this research subject was worthy of getting the
14 research grant.  So it's questionable why this
15 proposal did not receive grant in 2007.
16 Therefore, it only leads to one conclusion, that
17 it was due to Shin Jeong Ah-Gate.
18    Q. Does Dongguk have any other reasons for
19 believing that?
20    A. No.
21    Q. Turning to the third application listed
22 in this table, the first one that's dated August
23 24th, 2007.  What information does Dongguk have
24 for believing that application was rejected
25 because of the Shin indent?

22  (Pages 82 to 85)

DONGGUK v. YALE UNIVERSITY                                    August 9, 2010

Page 86

1    A.  This is also related to Buddhism.  I
2  said previously that Keum Kang University had
3  received funding for the same subject and I also
4  said when you compare the Dongguk University with
5  Keum Kang University, Keum Kang University was a
6  much more capable of -- Dongguk University was
7  much more capable of conducting this study.
8    Q.  Are there any other reasons that
9  Dongguk has for believing that the first August
10  24th, 2007 application was rejected because of
11  the Shin incident?
12    A.  No.
13    Q.  Was this grant proposal ever funded at
14  a later date?
15    A.  No.
16    Q.  In order to carry out this grant, had
17  it been successful, what expenses would Dongguk
18  have had to incur?
19    A.  First research team has to be set up.
20  And then the team, and then the team has to come
21  up with a research plan application.  And money
22  for meals and also for overtime work, working
23  night shift.  And application documents have to
24  be compiled into a book in order to be presented.
25  Those things.

Page 87

1    Q.  What would Dongguk have had to do after
2  receiving the grant in order to comply with its
3  terms?
4    A.  After receiving a grant, 20 percent of
5  the grant is actually paid to the university, so
6  the 20 percent becomes the school property.
7  School assets.  And then the rest is used to
8  conduct studies.  And then the rest, which is 80
9  percent, is spent on paying for the research team
10  members and also purchasing research equipment,
11  et cetera.  If the research term is more than one
12  year, then the school has to submit a research
13  report to the government.
14    Q.  Was the research term of this grant
15  proposal more than one year?
16    A.  Ten year.
17    Q.  Would the school have had to submit a
18  report to the government each year?
19    A.  Yes.
20    Q.  What does such a report consist of?
21    A.  People who are involved in the research
22  and what was researched for that particular year.
23  And how the money was spent for that particular
24  year.
25    Q.  What happened to the 20 percent of the

Page 88

1  grant funding that is not used to conduct
2  research?
3    A.  It becomes a part of school budget, so
4  school uses it.
5    Q.  What does the school use it for?
6    A.  Well, it varies.  Wherever the school
7  sees the need.
8    Q.  Does the government impose any
9  requirements for how the funding associated with
10  each grant is spent?
11    A.  Are you talking about the 20 percent or
12  the 80 percent?
13    Q.  I'm just asking generally if the
14  government imposes any such requirements?
15    A.  Yes.
16    Q.  What are those requirements?
17    A.  Paying for the research team.  And
18  purchasing research equipment.  Transportation,
19  money for the transportation to and from academic
20  conferences.  Papers and other stationeries that
21  are needed for the study.  Those are what I
22  remember.
23    Q.  Does the government impose any
24  limitations on how the 20 percent of the funding
25  that's not used to conduct research may be spent?

Page 89

1    A.  No.
2    Q.  So the university can spend it how ever
3  it wants?
4    A.  Yes.
5    Q.  Doesn't have to be related to the
6  research at all?
7    A.  That's correct.
8    Q.  Let's turn to the next application
9  listed in the second page of Exhibit 1.  This is
10  the second application dated August 24th, 2007.
11  Was that proposal ever funded?
12    A.  Well, prior to this time, yes, but not
13  after this date.
14    Q.  You mean similar research was funded
15  earlier?
16    A.  A few years prior to this time, yes.
17    Q.  And I'm asking if this particular
18  proposal was funded at any time on or after
19  August 24th, 2007?
20    A.  No.
21    Q.  What information does Dongguk have for
22  believing that this proposal was rejected because
23  of the Shin incident?
24    A.  I'm basing it upon the fact that the
25  professor Jong Yun Hwang was able to receive a

23  (Pages 86 to 89)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 90

1   smaller amount of grant prior to this time, and
2   he was able to complete the research
3   successfully.
4          And the money was granted from the
5   same agency. And Mr. Hwang was going to study
6   the same subject in-depth, and he thought since
7   he received a grant prior to that time, he was
8   going to get a grant.
9      Q.  Does Dongguk have any other reasons for
10  believing that this proposal was rejected because
11  of the Shin incident?
12     A.  No.
13     Q.  Would the same expenses that you
14  described for the other August 24th, 2007 grant
15  have applied to this grant as well?
16     A.  Yes.
17     Q.  And the same division between 80
18  percent used to fund research and 20 percent used
19  for other purposes?
20     A.  Yes.
21     Q.  And the same requirement for an annual
22  report to the government?
23     A.  Yes.
24     Q.  How many years would this grant have
25  covered?

Page 91

1      A.  Ten years.
2      Q.  Okay. Let's turn to the next grant.
3   On the second page of Exhibit 1, which is the
4   first one dated August -- excuse me, October
5   26th, 2007. Was this particular grant proposal
6   ever funded?
7      A.  You mean prior to this time or --
8      Q.  No. I mean at any time after this
9   application was rejected, was this particular
10  proposal funded?
11     A.  I don't have any information about
12  that.
13     Q.  Does Dongguk believe that this
14  particular grant was rejected because of the Shin
15  incident?
16     A.  Yes.
17     Q.  What information does Dongguk have for
18  that belief?
19         THE INTERPRETER: May the
20  interpreter ask Mr. Jeon to clarify.
21     A.  Dongguk University is the first
22  university in Korea to establish a North Korean
23  study course. And therefore, when there is an
24  issue with regard to North Korea, the Dongguk
25  University professors are called to give their

Page 92

1   opinions and interviews.
2          There are a few universities who
3   have, which have North Korea related studies,
4   however, Dongguk University is leading university
5   in that subject.
6      Q.  Does Dongguk have any other reasons for
7   believing that this grant proposal was rejected
8   because of the Shin incident?
9      A.  No.
10     Q.  What university was awarded this grant?
11     A.  Well, your question actually does not
12  apply to -- I cannot say which college received a
13  funding for this subject because with regard to
14  this application, the grant would have been given
15  to the research team, and not for the subject.
16         MS. KIM:  Research center.
17     A.  I would like to correct, it's a
18  research institute.
19     Q.  What research institute received the
20  grant that Dongguk applied for on October 26th,
21  2007?
22     A.  I don't know.
23     Q.  Does Dongguk have any information about
24  the research proposal that succeeded over
25  Dongguk's October 26th, 2007 application?

Page 93

1      A.  No.
2      Q.  Would the same expenses and
3   administrative requirements that you described
4   earlier have applied to this grant, if Dongguk
5   had received it?
6      A.  Yes.
7      Q.  How many years would this grant have
8   covered?
9      A.  I don't remember.
10     Q.  What information does Dongguk have for
11  believing that the last grant application listed
12  on page 2 also dated October 26th, 2007, was
13  rejected because of the Shin incident?
14     A.  I don't have detailed information with
15  regard to this study.
16     Q.  Well, let me back up a second. Does
17  Dongguk believe that that application was
18  rejected because of the Shin incident?
19     A.  Yes.
20     Q.  Why?
21     A.  Because of the timing. During this
22  time Dongguk University was being criticized
23  because of the Shin Jeong Ah-Gate. And during
24  this time Dongguk University was being
25  scrutinized and the government was verifying the

24  (Pages 90 to 93)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 98

1  grant proposals were rejected because of the Shin
2  incident?
3      A.  There may be other, may be other ones.
4  However, it's difficult to list all of them
5  because they're smaller.
6      Q.  Are there any that you could identify?
7      A.  No.
8      Q.  What efforts has Dongguk made to
9  mitigate the damages that it seeks to recover in
10 this lawsuit?
11     A.  Dongguk University has changed its UI,
12 its university identity.
13     Q.  What does university identity refer to?
14     A.  University logos.  After Shin Jeong
15 Ah-Gate, Dongguk University has changed its logo.
16     Q.  Does university identity include
17 anything else?
18     A.  University had put an ad in the paper
19 that the university, image of the university has
20 changed and it's refreshed, and it had, and the
21 school just had let the public know that the
22 school had changed its identity.
23     Q.  When did Dongguk do that?
24     A.  Decision was made in 2007, September,
25 and the school decided to change its UI.

Page 99

1  However, it was confirmed in 2008.
2      Q.  When you say it was confirmed in 2008,
3  what does that mean?
4      A.  A number of different logos were
5  presented between 2007 and 2008, because the
6  decision to change UI was made in 2007.  However,
7  the logo was selected in 2008.
8      Q.  Approximately when in 2008 was it
9  selected?
10     A.  I don't remember the exact date.
11 However, I believe it was in the beginning of
12 2008.
13     Q.  Who made the decision to change
14 Dongguk's UI?
15     A.  The president of the school.
16     Q.  Other than the new logo and the
17 newspaper advertisements, what else does the
18 change of UI consist of?
19     A.  Selecting an independent professional
20 agency, to come up with different ideas.  And
21 collecting opinions from alumnis, professors and
22 employees, with regard to a logo.
23         And then the top management team
24 of the school decides on which logo to use.  And
25 if the logo is selected, then it has to be

Page 100

1  registered for its brand name.  And it's notified
2  to the public.
3      Q.  Who are the members of the top
4  management team that decided which logo to use?
5      A.  The president of the school, YoungKyo
6  Oh.  The vice president of the school, Jin Soo
7  Han.  J I N  S O O  H A N.
8      Q.  Anybody else?
9      A.  No.  These two people have the
10 authority to make decisions with record to the
11 logos.
12     Q.  When did Dongguk first consider
13 changing its UI?
14     A.  Probably in September or October of
15 2007.
16     Q.  Do you know?
17     A.  I have some documents, reference
18 materials at my hotel.
19     Q.  Other than changing the UI, what else
20 has Dongguk done to mitigate the damages that it
21 claims in this lawsuit?
22     A.  Dongguk University made promotional
23 brochures or PR brochures and sent them to
24 different companies in Korea.  And also produced
25 a promotional individual yes, sir.  And put it up

Page 101

1  on the Internet so it was, public can come and
2  access it on the Internet.
3          MS. KIM:  School's website.
4      A.  School's website.  And that video was
5  used at different high schools for high school
6  students and their teachers to view when, during
7  recruiting events or, it's an admission
8  recruiting event.
9          And the school has hired a PR firm
10 to plan a future promotion to promote our school.
11 And one of the main reasons for hiring a PR firm
12 was to let the public know that Dongguk
13 University had not done anything wrong with
14 regard to Shin Jeong Ah-Gate.  And in 2010,
15 Dongguk University started to advertise in
16 different subways in order to raise its brand
17 name value.
18     Q.  When did Dongguk hire the PR firm?
19     A.  In 2009.
20     Q.  What month?
21     A.  I do not remember.
22     Q.  Do you remember what part of the year?
23     A.  As far as I can remember, probably in
24 the fall of 2009.
25     Q.  When did Dongguk produce the

26  (Pages 98 to 101)

DONGGUK v. YALE UNIVERSITY

August 9, 2010

Page 102

1  promotional videos that you mentioned?
2      A.  I believe it was in 2009.
3      Q.  When in 2009?
4      A.  I do not remember.
5      Q.  Approximately?
6      A.  The beginning of 2009.
7      Q.  When did Dongguk create the PR
8  brochures that you mentioned?
9      A.  2007, 2008 and 2009.
10     Q.  How many different brochures did
11 Dongguk create?
12     A.  As far as I can remember, one or two.
13 They're produced by our PR department and sent
14 out to various companies.
15     Q.  When did Dongguk send the brochures to
16 the companies?
17     A.  When the brochures are ready, but I do
18 not know the exact dates.
19     Q.  When did Dongguk first send the
20 brochures?  Approximately?
21     A.  Around December of 2007.  Maybe.
22     Q.  Did Dongguk send brochures only to
23 businesses?
24     A.  No.  To alumnis too.  And to other
25 people who had given money to the school.

Page 103

1      Q.  What did the brochures say?
2      A.  Well, it's promotional, so it states
3  the history of the school.  And what kind of
4  reforms the school is making at that time.  And
5  how the school plans to educate its students.
6  And it lists improvements.
7      Q.  When did Dongguk first place newspaper
8  ads relating to its new UI?
9      A.  In the beginning of 2008.
10     Q.  Why did Dongguk decide to change its
11 UI?
12     A.  Because of the criticism the school
13 received due to Shin Jeong Ah-Gate.  The school
14 wanted to send out a message saying that the
15 school wanted to start over with a new heart.
16     Q.  Are there any other reasons the school
17 changed its UI?
18     A.  No.
19     Q.  Is there a particular department or
20 committee that was responsible for the UI change?
21     A.  Yes.  PR department.
22     Q.  Whose idea was it to consider changing
23 the UI in the first place?
24     A.  The president of the school.
25     Q.  President Oh?

Page 104

1      A.  Yes.
2      Q.  Did President Oh assign the PR
3  department to begin the process of changing the
4  UI?
5      A.  Yes.
6      Q.  What were his instructions?
7      A.  Well, I do not know.  The president
8  would know better.
9      Q.  What did the PR department do?  How did
10 it begin the process --
11         MR. WEINER:  Of --
12     Q.  Of looking into changing the UI?
13     A.  The PR office submits a plan for the
14 change to the president of the school.  And then
15 select an outside independent agency.
16     Q.  What does that agency do?
17     A.  And then they present different ideas
18 which may best suit the image of the school.  And
19 then those ideas are presented to different
20 professors and employees.  And alumnis and
21 students and their opinions are collected.
22         And then based on all those
23 elements, the president of the school decides on
24 the final design.  I mentioned about the top
25 management officers.

Page 105

1      Q.  Who was the outside agency who was
2  involved in the UI change?
3      A.  I don't have that information with me
4  now.
5         MR. WEINER:  Do you need the name?
6  We'll get it.
7         MR. FETNER:  Sure.
8         MR. WEINER:  Okay.
9         MR. FETNER:  It's just about five
10 o'clock, this is a natural breaking point for me.
11 Why don't we adjourn for the day and pick up on
12 Wednesday.
13         MR. WEINER:  Okay.
14         THE VIDEOGRAPHER:  Off the record,
15 4:56.
16
17
18
19
20
21
22
23
24
25

27  (Pages 102 to 105)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)

------------------------------x

DONGGUK UNIVERSITY,                   :

      Plaintiff,                      :

  -versus-                            :        VOLUME II

YALE UNIVERSITY,                      :

      Defendant.                      :

------------------------------x


       Continued Rule 30(b)(6) Deposition

of BYOUNG GEON JEON, taken pursuant to the

Federal Rules of Civil Procedure, at the Law

Offices of Day Pitney, LLP, 1 Audubon Street, New

Haven, Connecticut, before James A. Martone, LSR

#248, and Notary Public, in and for the State of

Connecticut, on August 11, 2010, at 10:00 a.m.

DONGGUK v. YALE UNIVERSITY

August 11, 2010

## Page 120

1   increased much more, however, there were more
2   companies that were not top one hundred
3   companies.
4       Q.   Why is that bad?
5       A.   It's same in the United States.  You
6   know, students want to be employed at a, at top
7   companies, such as Google.  And Korean students
8   have the same set of mind.
9           Top ten companies, if I could list
10  them, there are probably Samsung Electronics,
11  Hyundai Automobiles, LG Electronics.  Et cetera.
12  Students want to be employed at those companies.
13      Q.   Why did the number of top one hundred
14  companies participating in Dongguk's job fairs
15  and other recruiting events decrease from 2008 to
16  2009?
17      A.   I don't know the reason.
18      Q.   Does Dongguk have any information about
19  that?
20      A.   No.
21      Q.   Why did the number of top one hundred
22  companies participating in Dongguk's job fairs
23  and other recruiting events stay the same from
24  2007 to 2008?
25      A.   I don't know.

## Page 121

1       Q.   Does Dongguk have any information about
2   that?
3       A.   No.
4       Q.   Mr. Jeon, I'd like you to look now at
5   the second table on the first page of Exhibit 3.
6       A.   Yes.
7       Q.   I asked you on Monday if the percentage
8   of Dongguk students who obtained jobs had
9   increased or decreased from 2006 to 2007.  Are
10  you now able to answer that question?
11      A.   Yes.
12      Q.   What is the answer?
13      A.   Increased.  However, the number
14  reflected under 2007 represents the percentage of
15  students who acquired a job in the February of
16  2007.  So 2007 -- therefore, it represents the
17  percentage for the students who graduated before
18  Shin Jeong Ah-Gate became public.
19      Q.   How about 2008?  What does the number
20  for 2008 represent?
21      A.   It represents the percentage of
22  students who acquired jobs after the Shin Jeong
23  Ah-Gate became public.  The graduates of -- and
24  the students who graduated in the February of
25  2008.

## Page 122

1       Q.   And how did that number change from
2   2007 to 2008?
3       A.   The rate decreased.
4       Q.   By how much?
5       A.   .4 percent.
6       Q.   Why?
7       A.   Well, the news was reported in the
8   newspapers.
9       Q.   What news was reported in the
10  newspapers?
11      A.   Well, I'll explain.  In the fall of
12  2007, in order for students to get jobs, they go
13  and have interviews at various companies.  And
14  many companies asked the students about Shin
15  Jeong Ah-Gate.
16          And the students were worried that
17  Shin Jeong Ah-Gate may negatively influence their
18  chances of getting jobs.  And also the companies,
19  since Dongguk University was under harsh
20  criticism.  I'm guessing they were concerned
21  about hiring student graduates of Dongguk
22  University.
23      Q.   Who was concerned?
24      A.   The companies.
25      Q.   Which companies?

## Page 123

1       A.   Well, the names of the companies were
2   not listed in any newspapers, so I don't know.
3       Q.   You said that you were guessing that
4   companies were concerned about the Shin incident.
5   Do you know?
6       A.   You know, it was reported on
7   newspapers.  And that's my opinion based upon the
8   articles that I read.
9       Q.   Is it based on anything else?
10      A.   No.
11      Q.   If the companies were so concerned
12  about the Shin incident, why did they continue to
13  participate in Dongguk's job fairs?
14      A.   Because our school asked them to.
15      Q.   Why did they continue to hire Dongguk
16  students?
17      A.   Well, the ratio of students who were
18  acquiring jobs went down actually.
19      Q.   You're talking about the .4 percent
20  change from 2007 to 2008?
21      A.   No.  When you see the trend, the number
22  has been increasing since 2005.  However, in
23  2008, it decreased.
24      Q.   Why did that number decrease in 2009?
25      A.   My opinion is that it's still affecting

5  (Pages 120 to 123)

DONGGUK v. YALE UNIVERSITY                                    August 11, 2010

---

**Page 124**

1  the numbers, that event.
2      Q.  So your testimony is that more
3  companies chose not to hire Dongguk students
4  because of the Shin incident in 2009 than in
5  2008?
6      A.  Yes.
7      Q.  What is that based on?
8      A.  Because there is no other issue which
9  can negatively affect these numbers.
10     Q.  Is it possible that the state of the
11 economy made it harder for students to find jobs
12 in 2008 and 2009?
13     A.  Well, Dongguk University does not have
14 any information on that.
15     Q.  Did students at other Korean
16 universities have a harder time finding jobs in
17 2008 and 2009?
18     A.  There's no information on that either.
19     Q.  Dongguk has no information about that?
20     A.  That's correct.
21     Q.  Did Korea's overall employment rate
22 decrease in 2008 and 2009?
23     A.  I don't know.
24          MR. FETNER:  Mark this.
25          (Defendant's Exhibit 4 marked

---

**Page 125**

1      For identification)
2      Q.  Mr. Jeon, I'm showing you what's been
3  marked Exhibit 4.  On Monday, I asked your if
4  Dongguk had any information about the research
5  proposal submitted by Kum Kang University
6  relating to the study of Buddhism in 2007.
7      A.  Yes.
8      Q.  At the time you told me you had no
9  information about that.
10     A.  Yes.
11     Q.  Does the document labeled Exhibit 4,
12 respond to my question?
13     A.  Yes.
14     Q.  Unfortunately, since we just received
15 this document last night, I have not been able to
16 have it translated.  Can you summarize the
17 document for me?
18          (Pause in the Proceedings)
19     A.  Humanities Korea project.  Our
20 school -- Kum Kang University, has been picked to
21 carry on a project and that project is called
22 Humanities Korea Project.  It is sponsored by
23 Korean Research Foundation.  About eight million
24 dollars will be given in ten year period.
25          And the subject of study

---

**Page 126**

1  develpment of -- development, change, and
2  application of culture through ancient Buddhist
3  language and ancient literature.  Participants,
4  person in charge, Jeon Ah Kim.
5      Q.  Mr. Jeon, I'm not asking you to read
6  the entire document.  I'm just asking generally
7  what the document says.
8      A.  It explains about the HK Project, which
9  the Kum Kang University has won.  It states the
10 subject and the people who will be participating
11 in this project.  And it also states the name of
12 the organization that will be participating and,
13 and the amount of grant.
14          THE INTERPRETER:  May the
15 interpreter correct something please.  Sorry, I
16 don't have to correct.
17     A.  And it also states the terms of the
18 research.
19     Q.  What was the amount of the grant?
20     A.  Initially it was set at approximately
21 eight million.  But when you go down, the actual
22 amount that was given was almost 8.6 million.
23     Q.  Million or billion?
24     A.  Million.
25     Q.  Of what unit?

---

**Page 127**

1          THE INTERPRETER:  I'm sorry, it's
2  dollars.
3      Q.  The grant would have been awarded in
4  Korean won, wouldn't it?
5      A.  In Korean won, it's 8.6 billion wons.
6      Q.  Who prepared this document?
7      A.  Well, I copied it from Kum Kang
8  University's home page.
9      Q.  When did you do that?
10     A.  Yesterday.  Oh, no, Monday night.
11     Q.  Other than what's in this document,
12 does Dongguk have any information about Kum
13 Kang's 2007 Research proposal?
14     A.  No.
15     Q.  Mr. Jeon, you testified on Monday, that
16 Dongguk submitted two separate research proposals
17 relating to Buddhism in 2007.  Do you recall
18 that?  Do you have Exhibit 1 available?
19          MS. KIM:  It was in his binder.
20     Q.  Well, I've got another copy of it.
21     A.  There's only one in 2007.  Did I say
22 there were two?
23     Q.  Perhaps I was unclear.  When you
24 testified on Monday, that Dongguk applied for a
25 grant that was awarded to Kum Kang University,

---

6  (Pages  124 to 127)

DONGGUK v. YALE UNIVERSITY

August 11, 2010



**Page 128**

1  which Dongguk application were you referring to?
2      A.  The third one from the top.
3      Q.  How about the fourth one from the top?
4      A.  No.  The fourth one from the top has
5  nothing to do with Kum Kang University project.
6      Q.  Okay.  To whom was that grant awarded?
7      A.  I do not know.  Because the grant was
8  given to various schools.
9      Q.  That one grant was given to various
10  schools?
11      A.  It states -- it is stated here 16.
12      Q.  Does Dongguk have any information about
13  why those 16 schools received that grant?
14      A.  No.
15      Q.  Mr. Jeon, I asked you on Monday whether
16  there were any grants other than those listed in
17  Exhibit 1 that Dongguk claims it did not receive
18  because of the Shin incident.
19      A.  Yes.
20      Q.  You testified that there were a few
21  more but you could not remember what they were.
22      A.  Yes.
23      Q.  Do you have any information about those
24  grants now?
25      A.  Well, I called Korea.  And I received

**Page 129**

1  an answer saying that with regard to smaller
2  grants, if the school gets rejected, then all the
3  applications are discarded.  Therefore, I was not
4  able to get any detailed information about that.
5      Q.  Do you have any information about any
6  grants other than those listed in Exhibit 1, that
7  Dongguk claims it did not receive because of the
8  Shin incident?
9      A.  No.
10      Q.  Mr. Jeon, on Monday, I asked you if
11  Dongguk had ever been rejected for any grants it
12  had applied for relating to Buddhist studies
13  before 2007.
14      A.  Okay.
15      Q.  You did not have any pertinent
16  information then.
17      A.  Okay.
18      Q.  Do you have any now?
19      A.  No.  But however, I do know that
20  Dongguk University has received total of 8.7
21  billion wons as research fund since 2003 until
22  present time.  I would say 2003 to 2009.
23      Q.  A total of 8.7 billion for that entire
24  period?
25      A.  Yes.

**Page 130**

1      Q.  With respect to my question though,
2  about whether Dongguk had been rejected for any
3  Buddhism related grants that it had applied for
4  before 2007, do you have any information?
5      A.  I don't have any information on that.
6      Q.  Do you have any information relating to
7  whether Dongguk had been rejected from its
8  applications for other grants prior to 2007?
9      A.  Maybe, but however, I do not have any
10  detailed information.
11      Q.  Mr. Jeon, I asked you on Monday when
12  Dongguk first considered changing its UI.
13      A.  Yes.
14      Q.  Your answer was probably in September
15  or October of 2007.
16      A.  Yes.
17      Q.  Do you now know certainly when Dongguk
18  first considered changing its UI?
19      A.  September of 2007.
20      Q.  Was it at a particular date in September?
21      A.  I don't know the exact date.
22      Q.  How do you know that it was September?
23      A.  Because PR office started a process to
24  hire an outside agency and that was in September.
25      Q.  When did the PR office hire the outside

**Page 131**

1  agency?
2      A.  I do not know.
3      Q.  Mr. Jeon, I asked you on Monday when
4  Dongguk hired a PR firm in connection with its
5  brand rehabilitation efforts.  You testified
6  there are a number of PR firms.  There's one
7  responsible for publishing a book, and then
8  there's another one responsible for creating a
9  new UI.  Which agency are you talking about?
10          You testified that there's a PR
11  firm that Dongguk hired in 2009, but you couldn't
12  remember what month.
13      A.  Yes.
14      Q.  Do you now know what month Dongguk
15  hired that PR firm?
16      A.  September of 2009.
17      Q.  What is the name of that PR firm?
18      A.  It was an English name.  Something that
19  sounded like Plushman Hillary.  Something like
20  that.
21      Q.  Mr. Jeon, I asked you on Monday about
22  what efforts Dongguk had made to mitigate its
23  damages.  You mentioned Dongguk's changing its
24  UI, preparing PR brochures, producing promotional
25  videos.  Hiring a PR firm.  And placing

7  (Pages 128 to 131)

Page 132

1 advertisements. Other than those activities, did
2 Dongguk do anything else to mitigate its damages
3 relating to this lawsuit?
4 A. Yes.
5 Q. What else did Dongguk do?
6 A. The list that I gave you were actually
7 main activities carried out by our PR office.
8 And there's an employment support team and our
9 employment support team actually invites HR
10 managers from various companies and create a
11 group, and created a forum.
12       And the school promoted itself to
13 these people. And prepared cultural events for
14 them to experience, such as plays or cultural
15 events. And starting from 2010, the school
16 started a subway advertisement and then admission
17 office hired about ten admission evaluators, to
18 promote our school by getting in contact with
19 more high school students and their parents.
20 Q. Has Dongguk done anything else to
21 mitigate its damages associated with this
22 lawsuit?
23 A. Well, Mr. Oh had initiated a number of
24 reforms at the school in order to restore the
25 school's good name. Well, anyway, the activities

Page 133

1 that he initiated may not be solely directed to
2 improving our reputation, however, he did
3 initiate number of activities. And that was
4 reported to the public by Korean media.
5       One example I can give you is
6 there was a student survey evaluating teachers.
7 That was the first time in Korea and that was
8 reported to the public.
9 Q. What reforms did President Oh initiate
10 to restore Dongguk's good name?
11       THE INTERPRETER: May the
12 interpreter ask the attorney to repeat the
13 question.
14 Q. What reforms did President Oh initiate
15 to restore Dongguk's good name?
16 A. Well, what I meant to say was that he
17 didn't initiate reforms to restore our
18 reputation. It's just that he initiated number
19 of reforms and that in turn restored our
20 reputation.
21 Q. What reforms are you --
22       MR. WEINER: Can we just take a
23 few minute break?
24       MR. FETNER: Sure.
25       THE VIDEOGRAPHER: Off the record,

Page 134

1 11:09.
2       (Recess taken)
3       THE VIDEOGRAPHER: On the record,
4 11:21.
5 Q. Mr. Jeon, before the break, you had
6 described or at least mentioned reforms that
7 President Oh initiated that helped restore
8 Dongguk's good name. What reforms were you
9 referring to?
10 A. I gave you one example before. Our
11 school is the first one to try the student
12 grading system. Students would evaluate teachers
13 and that result was open to public. It was
14 published.
15       Well, I have to correct something.
16 Our school was not the first to evaluate teachers
17 by students. Our school was the first to make it
18 known to public.
19 Q. What other reforms were you referring
20 to?
21       THE INTERPRETER: May the
22 interpreter ask Mr. Jeon to clarify something
23 please.
24 A. And he also established an evaluating
25 system where you look at the number of students

Page 135

1 attending a certain department, and this system
2 allowed the school to see the popularity of that
3 department or if that department was necessary,
4 and then it also sees the employment rate, rates
5 of students who graduate from that department,
6 and based upon that result, the system allowed
7 either to add more students to the department or
8 decrease the number of students.
9       In Korea, professors who would
10 like to keep their department, departments
11 unchanged, they like to keep the number of
12 students and they like to maintain that
13 department as it was before. And therefore, when
14 we first came up with this type of system and it
15 was announced, it was a hot issue and it was
16 reported widely in Korea.
17 Q. When did Dongguk first come up with
18 that system?
19 A. It started in 2008.
20 Q. When in 2008?
21 A. Well, the system was set in place in
22 May of 2008, and it went into effect in 2009,
23 when it was setting the number of students for
24 certain departments.
25 Q. When did the reform relating to

8 (Pages 132 to 135)

DONGGUK v. YALE UNIVERSITY

August 11, 2010

Page 136

1  students evaluating professors go into effect?
2      A.  It's been there for a long, long time.
3  But making it known public was something unusual.
4  It was never done before.
5      Q.  When was it made public?
6      A.  The results of second semester of 2007
7  was made public in February of 2008.
8      Q.  Was that the first time Dongguk made
9  such results public?
10     A.  Yes.
11     Q.  How did Dongguk make those results
12 public?
13     A.  It was in our home page, so anyone who
14 enters our home page was able to view the
15 results.  And they were able to refer to this
16 report when students were choosing their classes
17 the following semester.
18     Q.  Other than the items you've just
19 described, are there any other reforms that
20 President Oh initiated that had the effect of
21 restoring Dongguk's good name??
22     A.  Well, there is a result evaluation
23 system, which evaluates each department and each
24 college.  And the result is reflected in
25 promotions.  And it is applied to future budgets

Page 137

1  for each department and each college.
2          Under Korean law, each college has
3  to evaluate themselves.  And Dongguk University
4  was leading university which, Dongguk University
5  already was doing result evaluations and other
6  schools came to Dongguk University to learn our
7  system.
8      Q.  Are there any other reforms?
9      A.  Those are what I remember.  And any
10 other you'll probably have to ask Mr. Oh.
11     Q.  Other than what you've told me, did
12 Dongguk make any other efforts to mitigate its
13 damages relating to this lawsuit?
14     A.  Well, in 2007, KMSC Consulting Agency
15 rated our school as, as an excellent school for
16 customer satisfaction.  However, this agency sent
17 the school a letter saying that it was not able
18 to grant the award to us in 2007 due to Shin
19 Jeong Ah crisis.
20          We tried to receive this award in
21 2008 and 2009 again.  And we were selected for
22 customer satisfaction award.  There's another
23 award.  And our school also won a grand prize for
24 quality management.  This is awarded by the
25 president of South Korea.  We received it in

Page 138

1  2009.  And we were one of the only two
2  universities who received this award.
3      Q.  Mr. Jeon, my question was other than
4  what you've already told me, has Dongguk made any
5  other efforts to mitigate its damages in
6  connection with this lawsuit?  Did Dongguk do
7  anything else to mitigate its damages?
8      A.  In order to draw in more donations, the
9  school started a new campaign in 2008, which the
10 school was not able to do in 2007 due to Shin
11 Jeong Ah-Gate.
12     Q.  What campaign are you referring to?
13     A.  It's called Dongguk President Members.
14 Well, Dongguk created a community of alumni who
15 are either business owners or who are successful.
16     Q.  How much money did the Dongguk
17 President Members campaign raise?
18     A.  I don't have that information.
19     Q.  How much money did that campaign
20 attempt to raise?
21     A.  I do not have that information either.
22     Q.  Is there anything else that Dongguk has
23 done to mitigate its damages?
24     A.  Nothing.  I don't remember anything
25 else now.

Page 139

1      Q.  Why was Dongguk denied approval to open
2  a U.S. style law school?
3          THE INTERPRETER:  May the
4  interpreter ask the attorney to repeat the
5  question please.
6      Q.  Why was Dongguk denied approval to open
7  a U.S. style law school?
8      A.  Dongguk University was not able to be
9  approved as a law school due to Shin Jeong
10 Ah-Gate, and the effect that it had on the
11 school's reputation.
12     Q.  How does Dongguk know that?
13     A.  I am basing that information on the
14 analysis report on law school evaluation by Hyn
15 Gik, H Y N  G I K University.  This result was
16 announced at the symposium held by Korean Law
17 School Professors Association.  And the Korean
18 media also reported on it too.
19     Q.  Is it based on anything else?
20     A.  No.
21     Q.  What did the report by Hyn Gik
22 University state?
23     A.  In granting a law school to -- a school
24 has to meet two criterias.  One is quantitative
25 and one is quality.  And Dongguk University

9 (Pages 136 to 139)

DONGGUK v. YALE UNIVERSITY

August 11, 2010

### Page 140

1    scored high in quantitative evaluation, however,
2    it scored low in quality. And the difference
3    between these two scores were prominent, and in
4    other scores when you see other scores, if --
5    other schools, usually the schools who score high
6    in quantity, scored high in quality also.
7         However, our school was different,
8    and it what unusual, and therefore, according to
9    Hyn Gik University's report, our school's being
10   unable to receive the approval depended on --
11        THE INTERPRETER: May the
12   interpreter correct something please.
13   A.  If Dongguk University had received --
14   if the Dongguk University had scored high in
15   quality as it did in quantity, then it would be
16   one of the top ten universities. When compared
17   to other universities.
18   Q.  Why did Dongguk receive a low
19   qualitative score?
20   A.  Because of Shin Jeong Ah-Gate, it has
21   been under great criticism from the public, and
22   there was a negative impression that.
23        THE INTERPRETER: May the
24   interpreter actually ask Mr. Jeon to clarify
25   something please.

### Page 141

1    A.  And it negatively affected against
2    Dongguk University to be approved for a law
3    school which can produce judges, attorneys and
4    prosecutors.
5    Q.  Who scored the quantitative and
6    qualitative scores that you referred to earlier?
7    A.  The Legal Education Committee under the
8    Ministry of Education.
9    Q.  Did that committee tell Dongguk that it
10   was influenced by the Shin incident?
11   A.  No. But well, telling us that we are
12   not being given, we are not being approved
13   because of Shin Jeong Ah-Gate will be tantamount
14   to admitting that their evaluation system is
15   wrong.
16   Q.  Why is that?
17   A.  This committee is not supposed to be
18   swayed by any political inclinations, but telling
19   us that would be just like admitting the fact
20   that the committee has given us a lower
21   quantitative score in order to disqualify us.
22   Q.  What did the committee say?
23   A.  About why Dongguk was not approved for
24   a law school.
25   A.  It did not offer any reasons. It just

### Page 142

1    sent a letter saying that it cannot give the
2    approval. It just said not approved.
3    Q.  When the committee met to discuss which
4    universities would be approved to open law
5    schools, did it discuss the Shin incident?
6    A.  Well, the committee held 15 meetings.
7    And 13 meeting minutes were made public.
8    However, two of the most important meetings,
9    their content was not disclosed.
10   Q.  Mr. Jeon, do you remember my question?
11   A.  Yes.
12   Q.  What is the answer?
13   A.  Well, with regard to your last
14   question, I -- no, I don't know.
15   Q.  Does Dongguk have any information that
16   the Legal Education Committee discussed the Shin
17   incident at all?
18   A.  No.
19   Q.  Who were the members of the Legal
20   Education Committee?
21   A.  There are 13 members. I do not know
22   their names.
23   Q.  Do you know their titles or positions?
24   A.  I do know there are about four law
25   school professors. One or more attorneys.

### Page 143

1    Prosecutors. And social organization
2    representatives.
3    Q.  How do you know that those people were
4    influenced by the Shin incident at all?
5    A.  Like I stated before, our school has
6    received a high quantitative score, which scores
7    professors' achievements and the number of
8    professors and equipment and facilities.
9    However, our qualitative score was low, which
10   reflects the purpose of the school.
11   Q.  How did -- strike that. Is there any
12   other information that Dongguk has to suggest
13   that the members of the Legal Education Committee
14   were influenced by the Shin incident?
15   A.  Well, there's the Joong Ang Daily
16   newspaper, J O O N G  A N G, which is one of the
17   three largest newspapers in Korea. It made a
18   report saying that the reason Dongguk University
19   did not, was not approved for its law school was
20   probably due to Shin Jeong Ah-Gate.
21   Q.  How would Joong Ang Daily know that?
22   A.  I don't know.
23   Q.  What information was this report based
24   on?
25   A.  Well, I have I don't have any

10  (Pages 140 to 143)

DONGGUK v. YALE UNIVERSITY

August 11, 2010

Page 152

1  this point and I'm trying to explain to you why
2  those two things are related.
3        I'm saying because of the
4  achievement, there was no reason for us to score
5  low in qualitative evaluation.
6    Q.  I asked you what factors the Legal
7  Education Committee considered in awarding
8  qualitative scores.  You listed several items.
9  But you didn't mention a university's historical
10 achievement in legal education.
11   A.  Yes.
12   Q.  So my question is, what does your
13 testimony about Dongguk's history of educating
14 lawyers have to do with its qualitative score by
15 the Legal Education Committee?
16   A.  What I'm saying is that it proves that
17 our school's purpose for education was excellent.
18   Q.  Is that your complete answer?
19   A.  And our school had excellent
20 curriculum.  Therefore, there was no reason for
21 us to receive low qualitative scores, because
22 those were the factors that is considered for
23 qualitative score evaluation.
24   Q.  You told me you couldn't even identify
25 all of the factors that the education committee

Page 153

1  considered in awarding qualitative scores.
2    A.  Yes.
3    Q.  So how do you know the committee's
4  reason for awarding the scores that it did?
5        THE INTERPRETER:  May the
6  interpreter --
7    Q.  How do you know the committee's reason
8  for awarding the score that it did?
9        MR. WEINER:  I'm going to object
10 to the form of that.
11   A.  Well, I have no way of proving it.
12       MR. FETNER:  Mark this.
13       (Defendant's Exhibit 5 marked
14 For identification.)
15   Q.  This is Exhibit 5.  Mr. Jeon, I'm
16 showing you what's been marked Exhibit 5.  Have
17 you seen this document before?
18   A.  Yes.
19   Q.  Did you read it in preparing for your
20 deposition?
21   A.  Yes.
22   Q.  Had you seen it previously?
23   A.  You mean before today?
24   Q.  I mean before you were preparing for
25 the deposition?

Page 154

1    A.  Yes.
2    Q.  Were you involved in preparing this
3  document?
4    A.  Well, I did provide a number of
5  documents in order to prepare this document.
6    Q.  Mr. Jeon, I'd like you to turn to page
7  6 of the document.  I understand that the
8  document is in English.  And I expect you to get
9  whatever help you need from the interpreter.  Do
10 you understand?
11   A.  Okay.  Yes.
12   Q.  Item number 1 on page 6, titled "Loss
13 of Revenue."  Do you see that?
14   A.  Yes.
15   Q.  The first item underneath that heading
16 mentions a loss of annual earning revenue minus
17 expenses of 1.35 billion won.
18   A.  Yes.
19   Q.  What is that number based on?
20   A.  In our application, we stated we would
21 take 80 applicants for our law school.  And it's
22 a three-year law school, and so when you figure
23 those two numbers, it's 240 people.  And we
24 calculated revenues from their tuition.  Minus
25 payrolls for professors.

Page 155

1        And also administrators.  And then
2  scholarships.  And other expenses for
3  stationeries.
4    Q.  How much tuition would Dongguk have
5  charged the law students?
6    A.  As far as I can remember, the entire
7  amount for the tuition was about 4.5 billion
8  wons.  But I do not know how much the individual
9  tuition was.
10   Q.  What does the 4.5 billion figure figure
11 refer to?
12   A.  240 students attending the law school.
13 Times their tuitions.
14       MR. WEINER:  So you can divide and
15 get the tuition amount.
16       MR. FETNER:  I understand.  I just
17 want to know what the number represented.
18       MR. WEINER:  Okay.
19   Q.  Did Dongguk expect the law school to
20 operate at a profit?
21   A.  Yes.
22   Q.  Does the rest of Dongguk University
23 operate at a profit?
24   A.  Yes.  In most departments, yes.
25   Q.  Does Dongguk's medical school operate

13  (Pages 152 to 155)

DONGGUK v. YALE UNIVERSITY

August 11, 2010

Page 168

1   Q.  Are there any other academics
2   departments that have space in that building?
3       A.  Right now, yes.  However, they were
4   supposed to move out when we were, we get
5   approved for a law school.
6       Q.  What other departments are located in
7   the law school building?
8       A.  Other departments professors are using
9   some of the rooms as a research room.
10      Q.  What departments?
11      A.  Buddhism Studies.  Korean language.  I
12  guess those are it.  I don't remember anything
13  else.
14      Q.  Are the classrooms in the law
15  department building being used?
16      A.  Currently our School of Law, the
17  undergraduates are using that room.  However,
18  well, there are a lot of empty spaces because
19  government requirement for U.S. style law school
20  and the existing Korean School of Law are
21  different.  So there are a lot of empty spaces
22  that are being unused.
23      Q.  What spaces are empty?
24      A.  Like the room that I explained to you,
25  where a young mother can breastfeed.  And then

Page 169

1   children's playroom.  Consultation rooms.  And et
2   cetera.
3       Q.  Well, what else are you referring to?
4       A.  That's all I remember.
5       Q.  Have the rooms you just listed been
6   empty since the reconstruction was complete?
7       A.  Yes.
8       Q.  Are there professors' offices in the
9   law building?
10      A.  Is that different than the research
11  room?
12      Q.  I'm asking you.  I don't know.  What do
13  you mean by research room?
14      A.  Well, they're the same.  However, in
15  Korea, each professor receives a room for them to
16  do research.  But I believe they are the same
17  thing.
18      Q.  Have those rooms been used?
19      A.  Yes, it's been -- it's being used by
20  the law professors that we hired for the expected
21  law school, and then the existing School of Law
22  professors, and the rest is being used by other
23  departments, like the ones that I mentioned to
24  you from Buddhist Studies.
25      Q.  Are the moot courtrooms being used?

Page 170

1       A.  It's being used as a classroom.
2       Q.  Is there only one moot courtroom or are
3   there more than one?
4       A.  Just one.
5       Q.  Has it been used as a classroom since
6   the reconstruction was complete?
7       A.  Yes.
8       Q.  What is the name of the law department
9   building?
10      A.  It's called Bub Hak Kwan.  B U B  H A K
11  K W A N.
12      Q.  Does that name mean something?
13      A.  Just a law school.
14      Q.  The building has no other name?
15      A.  No.  Currently that's the only name
16  that's being used.
17      Q.  Is there a library in the law building?
18      A.  Yes.  A legal library.
19      Q.  Has that been used since the
20  reconstruction was complete?
21      A.  Yes.
22      Q.  Does the 7.737 billion won figure
23  indicated at the bottom of page 6 represent the
24  complete cost of the reconstruction of the law
25  department building?

Page 171

1       A.  Yes.
2       Q.  Why did Dongguk reconstruct the law
3   department building?
4       A.  Because the Dongguk University was sure
5   that it was going to be approved for the law
6   school.
7       Q.  Not for any other reason?
8       A.  No.
9       Q.  How could Dongguk be sure that it would
10  be approved for a law school?
11      A.  I stated before that Dongguk University
12  ranked 15th with regard to people who passed bar
13  exams.  And it has produced a Supreme Court judge
14  and a Constitutional law judge.  And the School
15  of Law has been established for more than 50
16  years.  And when you consider these factors, it
17  was obvious for us to be approved.
18      Q.  Is there any other basis for Dongguk's
19  being sure that it would be approved for a law
20  school?
21      A.  You know, just the general consensus
22  among public, Dongguk University is known as an
23  excellent university.  Therefore, Dongguk
24  University was sure that it was going to be
25  approved.

17 (Pages 168 to 171)

DONGGUK v. YALE UNIVERSITY

August 11, 2010

---

Page 176

1  entirety of those two buildings?
2      A.  Yes.
3      Q.  What did Dongguk do to construct a law
4  school dormitory?  What did Dongguk do to
5  construct a law school dormitory?
6      A.  Dongguk University has changed windows
7  in those apartment complexes and purchased beds
8  and bookcases.  And renovated the heating and
9  air-conditioning system.
10      Q.  Have the buildings that Dongguk
11  purchased to use as a law school dormitory been
12  used for anything?
13      A.  Some are empty.  Some are being used
14  now.
15      Q.  What are they being used for?
16      A.  They're being used, used for staff
17  members who are overnight guests, and also for
18  guests coming from oversees.
19      Q.  Are any of them used as dormitories for
20  students?
21      A.  Yes.
22      Q.  Approximately what percentage of these
23  buildings have been used?
24      A.  I don't know.
25      Q.  Could you give me any approximation?

---

Page 177

1      A.  I have no information about that.
2      Q.  Has Dongguk made any effort to rent or
3  sell the portions of these buildings that it does
4  not use?
5      A.  No.  Because those two buildings are
6  within the premises of Dongguk University.
7      Q.  From whom did Dongguk purchase those
8  buildings?
9      A.  Just average citizens.
10      Q.  So why couldn't Dongguk sell the
11  buildings to average citizens?
12      A.  I would like to explain to you about
13  the Korean laws relating to the education in
14  Korea.
15      Q.  Does it answer my question?
16      A.  Well, it will help you to understand.
17      Q.  Okay.  I'd like to know why Dongguk
18  hasn't made any effort to sell or rent the
19  portions of the buildings that it does not use?
20      A.  Now the apartment that the school had
21  purchased becomes a property that is to be used
22  for education purpose.  And it's tax-free.  And
23  if we decide to sell, then we have to purchase
24  another property that is going to be used for
25  education purpose only.

---

Page 178

1          And then we have for get an
2  approval from the Ministry of Education that this
3  property, this education use property has to be
4  made --
5          THE INTERPRETER:  May I ask
6  Mr. Jeon to clarify something, please.
7      A.  Our school has to get an approval from
8  the Ministry of Education about changing this
9  education purpose property into a profit making
10  profit.  And since we have to go through such an
11  approval process and we have to purchase another
12  property, therefore, we cannot sell the
13  apartments that are not being used.
14      Q.  If Dongguk has no use for this
15  building, why would it have to purchase another
16  building when it sells this one?
17      A.  Because we have to go through the
18  process that I just explained to you.  Therefore,
19  that's why even though some of them are not being
20  used, it's not being sold.
21      Q.  Mr. Jeon, my question is, why would
22  Dongguk have to go through that process?
23      A.  Because it's required by the
24  government.
25      Q.  The government requires universities

---

Page 179

1  that sell real estate to purchase other real
2  estate immediately afterwards?
3      A.  Yes, another one has to be bought.
4      Q.  Korean universities can never sell real
5  estate without purchasing other real estate?
6      A.  With regard to the education assets or
7  properties.
8          MS. KIM:  Education purpose
9  property.
10      A.  Education purpose properties.  But for
11  profit properties, you can sell.
12      Q.  So just so I understand your testimony,
13  any time a Korean university sells real estate
14  that it uses for educational purposes, it must
15  purchase other real estate?
16      A.  Yes.
17      Q.  Did Dongguk consider that when it
18  purchased these buildings?
19      A.  No.  I told you before, Dongguk
20  University thought for sure it was going to be
21  approved for the law school.
22      Q.  Has Dongguk made any effort to use the
23  portions of these buildings that are not being
24  used?
25      A.  Yes.  That's why it was used for the

---

19  (Pages 176 to 179)

DONGGUK v. YALE UNIVERSITY                                        August 11, 2010

Page 180

1    staff members and outside guests.
2        Q.  Does Dongguk have any plans to use the
3    unused portions of these buildings in the future?
4        A.  I don't know what the future plan is.
5        Q.  Of the 6.283 billion won indicated in
6    item 3, how much of that was used to purchase the
7    real estate?
8        A.  Well, except for the registration cost,
9    the rest was the price to purchase the property.
10       Q.  You said part of it was used for things
11   like windows, beds, bookcases, and heating and
12   air-conditioning.
13       A.  I don't know.
14       Q.  How many faculty members did Dongguk
15   hire specifically for the proposed U.S. style law
16   school?
17       A.  22.
18       Q.  You referred to 30 faculty members
19   earlier.  Who were the additional eight faculty
20   members?
21       A.  The existing professors, who taught at
22   our law school.  School of Law.
23       Q.  When did Dongguk hire the 22 faculty
24   members for the U.S. style law school?
25       A.  Starting from 2004 up until 2007.

Page 181

1        Q.  Have those faculty members been
2    teaching classes at Dongguk?
3        A.  What is the time period that you're
4    talking about?
5        Q.  At any time?
6        A.  Initially our school, our School of Law
7    was being managed by eight law professors.  And
8    then 22 new professors were added, and we
9    couldn't just pay them.  So they were teaching
10   basic courses and other undergraduate courses for
11   our School of Law, but new courses had to be set
12   up for these professors.
13       Q.  Have all 22 of the newly hired faculty
14   members taught classes at Dongguk?
15       A.  Close to all.
16       Q.  How many of them?
17       A.  I have to say all.
18       Q.  Have the newly hired faculty members
19   taught classes in Dongguk's graduate law school?
20       A.  Yes, some.
21       Q.  How many of them?
22       A.  Two or three.
23       Q.  Have the 22 newly hired faculty members
24   conducted academic research at Dongguk?
25       A.  I don't know.

Page 182

1        Q.  Have they published any academic
2    papers?
3        A.  I'm guessing some did and some did not.
4        Q.  Do you know?
5        A.  I don't.
6        Q.  Have these newly hired faculty members
7    performed any other services while employed by
8    Dongguk?
9        A.  What exactly are you talking about when
10   you talk about services?
11       Q.  Have they done anything else?
12       A.  Such as?
13       Q.  That's my question for you, Mr. Jeon.
14   As employees of Dongguk, have they done anything
15   else other than teach classes and perform
16   academic research?
17       A.  No.
18       Q.  Are there other services that Dongguk
19   faculty members typically provide that these
20   faculty members did not?
21       A.  No.
22       Q.  Why hasn't Dongguk fired the 22 faculty
23   members it hired for it's U.S. style law school?
24       A.  In Korea, once the professors are
25   hired, it's almost impossible to fire them.

Page 183

1        Q.  Did Dongguk consider that before hiring
2    all those professors?
3        A.  Well, the school was certain that it
4    was going to be approved for a law school.
5        Q.  Turning to item 5, at the top of page
6    7.  What does the administrative expense relating
7    to application and evaluation refer to?
8        A.  It's the expenses spent for filing
9    applications, such as overnight shift, publishing
10   and designing materials.  And brochures and then
11   per diem, and with regard to evaluation mentioned
12   here, Law Education Committee members came to
13   Dongguk University to evaluate our school.
14           Therefore, we had to create an
15   evaluation room according the their requirements.
16   And we had to furnish that room.  And cost of
17   labor.  Transportation cost for Legal Education
18   Committee members.  Money for their meals.  It's
19   the entire money that was spent for the
20   application process.
21       Q.  When did Dongguk spend that money?
22       A.  Some were spent before 2007.  However,
23   it was mainly spent between October to December
24   of 2007.
25       Q.  When did Dongguk submit its application

20  (Pages 180 to 183)

DONGGUK v. YALE UNIVERSITY                                    August 11, 2010

Page 184

1   for approval to open a U.S. style law school?
2        A.  November 30th, 2007.
3        Q.  Turning to the examples item, Mr. Jeon,
4   which is subsection B.  What does the amount
5   expended during lawsuit represent?  That is what
6   did Dongguk spend the money on?
7            THE INTERPRETER:  Which
8   subsection?
9        Q.  Immediately below number 5.
10       A.  B.
11       Q.  Immediately below subsection 5 is a B.
12       A.  Oh, sorry.
13       Q.  My question is what did Dongguk spend
14   that money on?
15       A.  For attorneys.
16       Q.  Anything else?
17       A.  Fees and costs for the courts.
18       Q.  Didn't the Dongguk University
19   Foundation file the lawsuit regarding the law
20   school selection?
21       A.  Yes.
22           THE INTERPRETER:  Could -- the
23   attorney repeat the question please.
24       Q.  My question was didn't the Dongguk
25   University Foundation file the lawsuit regarding

Page 185

1   the law school selection?
2        A.  Yes.
3        Q.  So why did Dongguk University pay the
4   lawyers and court fees?
5        A.  Well, I have to explain to you about
6   Korea.  Well, only private citizens or
7   corporations can file suits.  Dongguk University
8   is not a corporation.  Therefore, it cannot file
9   a complaint.  The plaintiff in this lawsuit is
10  Dongguk University, as a corporation.  However,
11  Dongguk University has been delegated to hire the
12  attorneys.  And pay the monies.
13       Q.  Who is the plaintiff -- strike.  Who
14  was the plaintiff in the lawsuit regarding the
15  law school selection?
16       A.  Chairman of the Dongguk University
17  Foundation.
18           MR. FETNER:  Let's take a very
19  short break, just so the videographer can change
20  the tape.
21           THE VIDEOGRAPHER:  Off the record,
22  3:11.
23       (Recess taken)
24           THE VIDEOGRAPHER:  On the record,
25  3:14.

Page 186

1        Q.  What arguments did the Dongguk
2   University Foundation make in the lawsuit
3   regarding the refusal to permit Dongguk to open a
4   law school?
5        A.  Dongguk University is claiming that the
6   rejection was a wrong decision.
7        Q.  Why?  That is what were Dongguk's
8   reasons as stated in the lawsuit?
9        A.  Because there's a big difference
10  between the quantitative evaluation score and the
11  qualitative evaluation score.  For our school.
12           THE INTERPRETER:  May the
13  interpreter ask Mr. Jeon to clarify something,
14  please.
15       A.  We're claiming that the Legal Education
16  Committee members made the determination on their
17  own unilaterally.
18       Q.  Was that not permitted?
19       A.  That the Legal Education Committee
20  members did not score based on standard scoring.
21  They gave scores on their own discretion.
22       Q.  Did Dongguk claim anything else in the
23  lawsuit?
24       A.  Yes.
25       Q.  What?

Page 187

1        A.  15 schools were chosen and the 14th
2   school was rejected.  And Kang Won University
3   which scored 19th highest was selected instead of
4   Dongguk University.
5            I mentioned to you before, that
6   some of the Legal Education Committee members
7   were law school professors.  The law does not
8   allow anyone to be involved in this scoring
9   process who has interest in the outcome of the
10  scoring.  Some of the committee's members
11  violated this law because the school they worked
12  for also applied for law school approvals.
13       Q.  Did Dongguk make any other arguments in
14  the law suit?
15       A.  That's what I can remember.
16       Q.  Did Dongguk make any arguments relating
17  to the Shin incident?
18       A.  No.
19       Q.  Why not?
20       A.  I have to think, clear myself.  The
21  fact that we received quite, two different scores
22  in quantitative and qualitative evaluation is an
23  evidence that it is related to Shin Jeong
24  Ah-Gate.
25       Q.  Mr. Jeon, my question was why didn't

                        21  (Pages 184 to 187)

DONGGUK v. YALE UNIVERSITY

August 11, 2010

Page 188

1  Dongguk make any arguments in the lawsuit about
2  the Shin incident?
3       MR. WEINER:  Are you talking about
4  a Complaint or a lawsuit?
5       MR. FETNER:  The damages analysis,
6  which is the document we're working from, refers
7  to a lawsuit.
8       MR. WEINER:  I understand, but is
9  he referring to the Complaint or the lawsuit?
10      MR. FETNER:  I don't know what
11  he's referring to, but I'm referring to the
12  lawsuit.
13     A.  I don't know.
14     Q.  Mr. Jeon, could you turn to page 3 of
15  the same document.  I'm going to ask you some
16  questions about the section of this document
17  relating the donations.  As with the previous
18  section, if you need any help, following the
19  document, please ask the interpreter to help you.
20     A.  Yes.
21     Q.  What was President Oh's goal of raising
22  100 million dollars in donations based on?
23     A.  2006 was 100th anniversary of Dongguk
24  University.  There was a group of people who were
25  passionate about developing Dongguk University.

Page 189

1  Mr. Oh had connections to political and business
2  circles.  And based upon those factors, this
3  number was calculated by Mr. Oh.
4      Q.  Didn't President Oh become the
5  president of Dongguk in 2007?
6      A.  He was elected in December of 2006, and
7  he started to work in March of 2007.
8      Q.  So hadn't Dongguk already celebrated
9  its 100th anniversary before he became president?
10     A.  Yes.
11     Q.  So I don't understand how he could have
12  raised money in connection with that 100th
13  anniversary.
14     A.  The 100th year celebration does not end
15  in just one day.  You know, it will develop as
16  the year goes by, 100th year, 101th year, 102
17  year.
18     Q.  Did Dongguk raise money in celebration
19  of its 100th anniversary in 2006?
20     A.  No.  Not on that day.
21     Q.  Well, I'm not asking about a day, I'm
22  asking about the entire year of 2006.
23     A.  Yes.
24     Q.  And you're saying that President Oh
25  raised money in commemoration of Dongguk's 101st

Page 190

1  year anniversary in 2007?
2      A.  No.  He just took 100th year
3  anniversary as an opportunity to raise money for
4  the school.
5      Q.  In 2007?
6      A.  Yes.
7      Q.  Mr. Jeon, I'd like you to look at the
8  table towards the bottom of page 3.
9      A.  Yes.
10     Q.  Does that table represent President
11  Oh's fund-raising goals over the course of his
12  presidential term?
13     A.  Yes.
14     Q.  And the line beneath that represents
15  the amount of money that Dongguk received in
16  furtherance of those goals?
17     A.  Yes.  However, included in these
18  numbers are some money that was promised before
19  that year.
20     Q.  My understanding is that this table is
21  meant to represent what portion of President Oh's
22  goals have been received in donations.  Is that
23  correct?
24     A.  Yes.  However, you have to consider the
25  fact that the number that is shown here under

Page 191

1  amount received, some of the money that are added
2  in this figure may be the ones that were promised
3  in previous years.
4      Q.  And presumably some of the money
5  promised in these years would be received in
6  subsequent years, correct?
7      A.  Yes.  They can make, people can make
8  promises to give in a lump sum or in smaller
9  amounts each year.
10     Q.  How much of President Oh's goal amounts
11  was pledged to Dongguk in each of these years?
12         THE INTERPRETER:  May the
13  interpreter ask the attorney to repeat the
14  question please.
15     Q.  How much of President Oh's goal amounts
16  was pledged to Dongguk in each of these years?
17     A.  It's in the examples page.
18     Q.  Well, I'm asking about the total
19  amount.  The total amount of President Oh's
20  goals.
21     A.  You are asking about the pledged
22  amount.  This is the amount received.
23     Q.  Correct.  I'm asking how much was
24  pledged in each of those years.
25     A.  I have to see the examples page.

22  (Pages 188 to 191)

# EXHIBIT 85

# FILED UNDER SEAL

# EXHIBIT 86

# FILED UNDER SEAL

# EXHIBIT 87

DONGGUK v. YALE

October 27, 2010

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)

------------------------------x

DONGGUK UNIVERSITY,                  :

       Plaintiff,               :

   -versus-                        :   CONTAINS

YALE UNIVERSITY,                     :   CONFIDENTIAL

       Defendant.               :   INFORMATION

------------------------------x


       30(b)(6)Deposition of SUN IN LEE, taken

pursuant to the Federal Rules of Civil Procedure,

at the Law Offices of Day Pitney, LLP, 1 Audubon

Street, New Haven, Connecticut, before James A.

Martone, LSR #248, and Notary Public, in and for

the State of Connecticut, on October 27, 2010, at

10:08 a.m.

DONGGUK v. YALE                                                    October 27, 2010

Page 86

1       A.  I believe it was a part of centennial
2    celebration event in 2006.  No, no.  According to
3    my recollection, it started at the time of the
4    centennial celebration in 2006.
5       Q.  And when did that campaign end or has
6    it ended?
7       A.  It became -- it was discontinued when I
8    joined the university in 2008, because of the
9    negative feelings by the alumni for the school.
10   So I interrupted this campaign.
11      Q.  I have the same questions for the next
12   campaign.  The Tuition Donation For Dongguk
13   Juniors.
14      A.  The same answer for this.
15      Q.  Also began in 2006 and ended in 2008?
16      A.  Yes.
17      Q.  And the same question again for the
18   Come Together with 108 Project?
19      A.  No.  This campaign started in 2007.
20      Q.  And when did it end?
21      A.  The pledges were obtained in, during
22   that year.  And the amount shown here reflects
23   the amount that we actually received from the
24   pledges made that year.  During the campaign.
25   Come Together with 108 Project.

Page 87

1       Q.  Does Dongguk know why the people who
2    made pledges for those campaigns did not all
3    fulfill those pledges?
4       A.  I cannot tell you about all different
5    cases.  I can explain to you about the portion of
6    the reasons.  I'm sorry, I have just forgotten
7    the original question.
8       Q.  The question is, does Dongguk know the
9    reason that people who made pledges to those
10   campaigns did not all fulfill those pledges?
11      A.  It's difficult for me to tell you the
12   reasons for everyone, but I can tell you about
13   the -- some of their reasons.  Reasons for some
14   of them.  Again, I'm saying I cannot tell you the
15   reasons for everyone not keeping their pledges,
16   but I can tell you the reasons about for some of
17   them.
18      Q.  Please tell me the reasons for whatever
19   people you can tell me.
20      A.  In case with Jin Moon Kim, J I N space
21   M O O N space Kim, he pledged that he would make
22   1 billion won.  1 billion won for 2007 in either
23   March or April of that year.
24         Once the Shin -- once Shin Jeong
25   Ah scandal broke out, he canceled his pledge.  He

Page 88

1    took back the pledge paper.  When I arrived at
2    the school in 2008, they were telling me about
3    this.  So I had to try very, very hard to change
4    his mind back to original pledge and I received
5    .1 billion won pledge from him.  By the end of
6    2008, I received as a result, 50 thousand dollars
7    from him.  Approximately 50 million won in Korean
8    denomination, or currency.  Remaining half was to
9    be paid according to him step by step.
10      Q.  Did Mr. Kim tell you -- or strike that.
11   Was Mr. Kim's 1 billion won pledge made in
12   connection with one of these particular
13   campaigns?
14      A.  No.
15         THE INTERPRETER:  Repeating the
16   question.  Would you repeat the question again?
17      Q.  Well, sure.  My question was, was Mr.
18   Kim's 1 billion won pledge made in connection
19   with any of the three campaigns listed on page 4
20   in that chart?
21      A.  Not to my recollection, because since
22   President Oh joined the school, he met with many
23   important individuals to urge them to make
24   donations to the school.  The pledge made by Jin
25   Moon Kim was the result of President Oh's effort.

Page 89

1           When Shin Jeong Ah scandal broke
2    out, he became extremely indignant.  He sent a
3    letter that he is withdrawing his pledge to the
4    school.  And then he took the pledge paper
5    itself, and he ripped it up while our employees
6    were watching.
7       Q.  With respect to each of the three
8    campaigns identified in the chart on page 4, that
9    is the Buddhist Youth Leaders Education Fund, The
10   Tuition Donation For Dongguk Juniors, and The
11   Come Together with 108 Project, does Dongguk know
12   the reasons that donors who made pledges did not
13   fulfill them?
14      A.  After I joined the university, in June
15   of 2008, I believe it was around October of that
16   year, I made reminder calls to remind them of
17   their pledges.  As a result, many people actually
18   paid.  Yet some of them responded by saying not
19   to call them again, and some I wasn't even able
20   to reach by phone call.  So by this year, I
21   stopped making an effort to collect from the
22   previous year's pledges.
23      Q.  Mr. Lee, my question was does Dongguk
24   know the reason that the people who made pledges
25   for those three campaigns didn't fulfill them?

23  (Pages 86 to 89)

DONGGUK v. YALE

October 27, 2010

Page 90

```
 1      A.  As I answered to your previous
 2   question, I would not know the reasons for
 3   everyone not keeping their pledges, but I know
 4   about some of them.
 5      Q.  Okay.
 6      A.  And I explained the -- and I explained
 7   the current situation.
 8      Q.  The only person you've identified as
 9   having specifically not fulfilled a pledge is Jin
10   Moon Kim.  My question is about people who made
11   pledges in connection with these three particular
12   campaigns.
13      A.  There's nothing I can think of right
14   now.
15      Q.  If you look at the bottom of page 4,
16   there's a reference to the 100th Year Anniversary
17   Development Fund Campaign.  And you'll see at the
18   top of the next page a chart identifying amounts
19   that were pledged and received in connection with
20   that campaign.
21      A.  Yes.
22      Q.  I have the same question for this
23   campaign as I did for the previous ones.  Does
24   Dongguk know the reasons that people who made
25   pledges did not fulfill them?
```

Page 91

```
 1      A.  I know about one case.  It involves Oh
 2   Hyun Kim, O H space H Y U N space O H -- last
 3   name Kim.  K I M.  Not Oh.
 4      Q.  What do you know about Mr. Kim's
 5   reasons for not fulfilling a pledge?
 6      A.  During the 100th year anniversary
 7   campaign, he pledged -- he pledged 500 million
 8   won.  And he pledged that to be paid during the
 9   years 2007 and 2008.  When Shin Jeong Ah scandal
10   broke out, he became extremely indignant, and he
11   withdrew his pledge.
12      Q.  Did he say why he was withdrawing his
13   pledge?
14      A.  I heard the reason from himself.
15      Q.  What did he say?
16      A.  I am very close to him currently.  He
17   said although he made the pledge in 2006, when
18   Shin Jeong Ah scandal broke out, he started
19   feeling very poorly, negatively about the school.
20   And that he was withdrawing his pledge.  And he
21   said all this while he was smiling to me.
22      Q.  When did he say that?
23      A.  I think it was around May of 2009.
24      Q.  Did he send any letter or any other
25   document indicating the withdrawal of his pledge
```

Page 92

```
 1   in 2007?
 2      A.  He's not a type of person who to write
 3   a formal withdrawal letter.  His major was to
 4   begin with physical education, and he had a hot
 5   temper.
 6      Q.  Other than Oh Hyun Kim, does Dongguk
 7   know the reasons why any of the other pledges for
 8   the 100th year anniversary campaign were not
 9   fulfilled?
10      A.  I have to think about it.  Right now I
11   can't come up with any other cases.
12         MR. FETNER:  We're a few minutes
13   past 5:00.  Why don't we break for the day and
14   pick up in the morning.
15         THE VIDEOGRAPHER:  Off the record,
16   5:05.
17
18
19
20
21
22
23
24
25
```

Page 93

```
 1      I,_____,have read the
 2   foregoing transcript of the testimony given at my
 3   deposition on,_____, and it is true
 4   and accurate to the best of my knowledge and
 5   belief as originally transcribed and/or with the
 6   changes as noted on the attached errata sheet.
 7
 8
 9
10   SUN IN LEE
11
12      SUBSCRIBED AND SWORN TO BEFORE ME,
13   the undersigned authority, on this
14   the_____ day of_____, 2008.
15
16
17
18   NOTARY PUBLIC
19
20   My commission expires:
21
22
23
24
25
```

24  (Pages 90 to 93)

DONGGUK v. YALE UNIVERSITY

October 28, 2010

Page 94

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)

-------------------------------x

DONGGUK UNIVERSITY,                    :

        Plaintiff,              :    VOLUME II

    -versus-                           :

YALE UNIVERSITY,                       :

        Defendant.              :

-------------------------------x


    Continued 30(b)(6)Deposition of SUN IN LEE,

taken pursuant to the Federal Rules of Civil

Procedure, at the Law Offices of Day Pitney, LLP,

1 Audubon Street, New Haven, Connecticut, before

James A. Martone, LSR #248, and Notary Public, in

and for the State of Connecticut, on October 28,

2010, at 9:17 a.m.

DONGGUK v. YALE UNIVERSITY                                     October 28, 2010

Page 95

1      A P P E A R A N C E S :
2      For the Plaintiff:
3      McDERMOTT, WILL & EMERY, LLP
4      340 Madison Avenue
5      New York, New York  10173-1922
6      BY: AUDREY LU, ESQ.
7         (212) 547-5408
8
9      For the Defendant:
10     DAY PITNEY, LLP
11     242 Trumbull Street
12     Hartford, Connecticut 06103
13     BY: HOWARD FETNER, ESQ.
14     AND: FELIX J. SPRINGER, ESQ.
15        (860) 275-0100)
16
17     A L S O   P R E S E N T :
18     Robert Brown, Videographer
       Geomatrix Productions
19
       Arien Greene, Interpreter
20
21
22
23
24
25

Page 96

1              WITNESS INDEX
2                      PAGE
3      Continued Direct Examination by Mr. Fetner   98
4      Cross Examination by Ms. Lu        186
5      Redirect Examination by Mr. Fetner     192
6              EXHIBIT INDEX
7      DEFENDANT     DESCRIPTION       PAGE
8      3 Statement of Confirmation       109
9      4 Statement of Confirmation       117
10     5 Verification Statement       141
11     6 Statement of Confirmation       148
12     7 Shinsung Pharmaceutical Company Letter   162
13     8 List Of Contribution and Covenants For
14        Development Funds        176
15     9 Letter dated March 30, 2009      184
16     10 Handwritten document prepared by witness 191
17
18
19
20
21
22
23
24
25

Page 97

1
2
3
4
5
6
7
8
9
10     ARIEN GREENE, Interpreter, having been previously
11     first duly sworn interpret the testimony of the
12     witness:
13     SUN IN LEE
14     Dongguk University
15     Seoul, Korea
16     Called as a witness, having been previously first
17     duly sworn by James A. Martone, a Notary Public
18     in and for the State of Connecticut, was
19     examined and testified as follows:
20              THE VIDEOOGRAPHER: On the record
21     9:17.
22              MR. FETNER: This is the rule
23     30(b)(6) Deposition of Dongguk University,
24     designating Sun In Lee as the deponent.  Recorded
25     on October 28th, 2010, in New Haven, Connecticut.

Page 98

1           This deposition is being taken in
2      the case of Dongguk University versus Yale
3      University.  And was noticed by the defendant.
4           The videotape operator is Bob
5      Brown, of Geomatrix Productions, 270 Amity Road,
6      New Haven, Connecticut.
7           This is a continuation, so the
8      same stipulations are in place.  I am Howard Fetner
9      interpreter have been sworn.  I am Howard Fetner
10     of Day Pitney, for Yale University.
11              MR. SPRINGER: Felix Springer, Day
12     Pitney, for Yale University.
13              MS. LU: Audrey Lu, of McDermott,
14     Will & Emery, for Plaintiff, Dongguk University.
15              MS. PARK: Michelle Park,
16     translator by Dongguk University.
17              THE INTERPRETER: Arien Greene,
18     interpreter.
19     CONTINUED DIRECT EXAMINATION BY MR. FETNER:
20     Q. Mr. Lee, do you understand that you are
21     still testifying on behalf of Dongguk University?
22     A. Yes.
23     Q. Does Dongguk keep any documentary
24     record of pledges and donations?
25     A. Yes.

2  (Pages  95  to  98)



Page 99

1    Q.  How does Dongguk record pledges?
2    A.  First we maintain pledge letters
3  themselves, and then we also enter that
4  information into a computer.
5    Q.  Does Dongguk send a letter or any
6  correspondence to a donor making a pledge in
7  order to confirm the pledge?
8    A.  Before myself, I don't know what the
9  practice was.  But since I started working, I
10  make phone calls to appreciate and show our
11  gratitude to the people who pledged.  During
12  those phone calls, we confirm their pledges and
13  also remind them of the details of their pledges.
14    Q.  Does Dongguk make any other sort of
15  record of pledges?
16    A.  Nothing else I can recall at the
17  moment.
18    Q.  What does Dongguk do to record
19  donations?
20    A.  The same with that.  We also enter that
21  information into a computer.
22    Q.  Does Dongguk keep individual files on
23  particular donors?
24    A.  We haven't had that kind of cases.  We
25  do not maintain individual files.

Page 100

1    Q.  Does Dongguk send letters or any other
2  sort of writing to either -- or to thank donors
3  for their donations?
4    THE INTERPRETER:  Any other --
5    Q.  Does Dongguk send letters or any other
6  sort of writing to thank donors for their
7  donations?
8    A.  Yes.
9    Q.  Mr. Lee, do you still have Exhibit 2 in
10  front of you?
11    A.  Yes.
12    Q.  Please turn to page 4 of that document.
13  And I show you the document only as a reference
14  for the particular campaigns I'm asking you
15  about.  With respect to the Buddhist Youth
16  Leaders Education Fund Campaign, was there a
17  particular fund-raising goal for that campaign?
18    A.  We don't usually set up any particular
19  goal for campaigns.  What I'm saying that we do
20  not set any goal, I meant in terms of monetary
21  amounts.  Our goal is to raise as much as we
22  could.
23    Q.  Is the same true for all of Dongguk's
24  fund-raising campaigns?
25    A.  Although we have yearly target goal

Page 101

1  amounts, but it is difficult for setting a goal
2  for individual campaigns.
3    Let me give you an example.  Right
4  now we are trying to build a pharmaceutical
5  college, meaning new building for the school.
6  And the cost was approximately 20 billion won.
7  In that case, however, we do not set a goal of 20
8  billion when we run our campaign to fund that
9  project.
10    Q.  Does Dongguk ever set a fund-raising
11  goal for a particular fund-raising campaign?
12    A.  Not as far as I could recall.
13    Q.  Please turn to page 5 of the same
14  document.  In the first paragraph, beneath the
15  chart at the top of the page, there's a reference
16  to a "Dongguk President Members Campaign."
17    A.  Yes.
18    Q.  The document states "As a result of the
19  extremely negative response from its alumni,
20  Dongguk was forced to cancel the campaign
21  entirely."  Referring to the Dongguk President
22  Members Campaign.  What did that response from
23  the alumni consist of?
24    THE INTERPRETER:  What did --
25    Q.  What did that response from the alumni

Page 102

1  consist of?
2    A.  The distrust that was implanted in them
3  due to Shin Jeong Ah scandal, and feeling of
4  betrayal, and disappointment.  And those are the
5  kind of, of feelings they seem to have felt.
6    Q.  How do you know that?
7    A.  When I was told that the campaign was
8  going to stop, I heard about the reason from our
9  staff.  But if you look at it, this campaign was
10  carried out in 2007.  When the staff members
11  called the alumni, what they were asking in turn
12  is what the school was doing.  They didn't
13  understand what was going on with the school.
14  With the Shin Jeong Ah related scandal.
15    Q.  Who didn't understand what was going on
16  with the school?
17    A.  Alumni members.  They were saying
18  because of Shin Jeong Ah scandal, they don't even
19  want to look at the school.  They didn't want to
20  attend any events held by the school they said.
21  According to our staff, that was what they heard
22  from the alumni they spoke to.
23    Q.  Can you tell me the names of any alumni
24  who said that?
25    A.  I wasn't told as to who those

3  (Pages 99 to 102)

## Page 103

1 individuals were at the time. Yet I, myself,
2 heard about the same stories from the alumni
3 since I started working for the school.
4          And if you ask me the names of
5 those people, I can give you their names. Yoon
6 Soep Choi. Y O O N space S E O P space C H O I.
7 Jae Kwon Lee, J A E space K W O N space Lee.
8 Those are the people I — whose name I remember
9 right now.
10     Q. Are those people just so I understand,
11 the people you just named, are they alumni who
12 responded negatively to the Dongguk President
13 Members Campaign in August, 2007?
14     A. As I stated before, I was not at the
15 school at that time, so I was not told about the
16 names of those individuals. I spoke to these two
17 people after I started working for the school.
18 And they expressed a lot of discontent they felt
19 about the school.
20     Q. Did either of them say anything about
21 the Dongguk President Members Campaign?
22     A. Mr. Lee was one of the members of the
23 Dongguk President Members.
24     MS. Park: I think he said
25 candidate of the members.

## Page 104

1     A. I would say candidate.
2          THE INTERPRETER: Two different
3 things. Interpreter was told two different
4 things.
5          MS. PARK: Oh, you were told two
6 different things.
7          THE INTERPRETER: He was
8 correcting himself. He said in other words, he's
9 a member of this President -- Dongguk President
10 Members. So I decided adopt his conclusion.
11     Q. What -- what was Mr. Lee's connection
12 to the Dongguk President Members Campaign?
13     A. Let me tell you about the Dongguk
14 President Members group. They are the people who
15 are the owners or CEOs of corporations. If I am
16 to describe this group in a different way, then
17 they are the potential donors, who have had, who
18 have capacity to make contributions. In case
19 with Jae Kwon Lee, since he is a business owner,
20 and at the same time he's an alumnus, so he
21 belongs to that group.
22     Q. What I still don't understand is did
23 Mr. Lee say anything to you about the Dongguk
24 President Members Campaign?
25     A. Despite the massive situation and, and

## Page 105

1 the trouble the university was in, due to Shin
2 Jeong Ah scandal, he said he received a phone
3 call that said they were organizing a, such group
4 as, campaign as Dongguk President Members
5 Campaign, and asking for assistance. So he said
6 he -- he approached the person whom he spoke to.
7 And I heard about this from him either in
8 September or October of 2008.
9     Q. When was the Dongguk President Members
10 Campaign canceled?
11     A. According to what I know, it was
12 canceled two weeks approximately after the
13 campaign started in August, 2007.
14     Q. Who made the decision to cancel it?
15     A. My predecessor. And — it's not and,
16 but after the decision he reported it to the
17 President.
18     Q. If you look at the next paragraph of
19 page 5, Mr. Lee, there's a discussion of
20 something called "The Tuition Donation Campaign."
21 Is that the same campaign that's referred to as
22 the Tuition Donation For Dongguk Juniors Campaign
23 on page 4, or is that a different campaign?
24     A. Different.
25     Q. Was there any fund-raising goal set for

## Page 106

1 the tuition donation campaign that's discussed on
2 page 5?
3     A. Not as far as I know.
4     Q. Does Dongguk know why pledges made in
5 connection with the tuition donation campaign
6 were not fulfilled?
7     A. Would you repeat the question?
8     Q. Does Dongguk know why pledges made in
9 connection with the tuition donation campaign
10 were not fulfilled?
11     A. Yes.
12     Q. Why?
13     A. By the time arrived -- I arrived at the
14 school in 2008, there were no pledges. When we
15 tried to get pledges, the reaction from the
16 people was that they were not going to make any
17 further pledges, and due to Shin Jeong Ah
18 scandal.
19          Even before I arrived, there
20 hadn't been any pledges in 2008, during the first
21 half of 2008. So I stopped the effort to get
22 pledges. Yet in September and October we sent
23 out reminder calls and eventually we were able to
24 collect certain amounts.
25          We also ran a reminder campaign in

DONGGUK v. YALE UNIVERSITY

October 28, 2010



Page 107

1  2009. After running that reminder campaign, in
2  2009, I realized that we were not getting
3  anywhere, and the response was not good. By 2010
4  I had completely stopped, even reminder campaign
5  was stopped.
6      Q. Mr. Lee, my question was not why were
7  additional pledges not made, my question was why
8  did people who made pledges not fulfill them?
9      A. When we ran that reminder campaign, we
10 were told that we should run the school in an
11 appropriate manner, and that they were so
12 dissatisfied, they would no longer give any money
13 to the school.
14     Q. Who said that?
15     A. Those people who had made pledges.
16     Q. Who?
17     A. The campaign was run by my staff, and
18 they did not tell me the individual's names.
19     Q. How many people said that?
20     A. My staff team leader reported to me
21 that it was going to be useless and that it
22 wasn't going to work. Without any hesitation, I
23 accepted his recommendation because I had already
24 heard about enough complaints and dissatisfaction
25 for the school through such individuals as Yoon

Page 108

1  Soep Choi or Jae Kwon Lee. So I did not doubt
2  the -- my staff's stories.
3      Q. Mr. Lee, do you know any more than
4  you've already told me about people's reasons for
5  not fulfilling pledges that were made in
6  connection with the tuition donation campaign?
7      A. Nothing I can think of at the moment.
8      Q. I'm not sure if I asked you this
9  yesterday, but with respect to the 100th
10 anniversary campaign that's discussed in the
11 chart at the top of page 5, does Dongguk know the
12 reasons that people who made pledges in
13 connection with that campaign did not fulfill
14 them?
15     A. I believe that question was posed
16 yesterday, and I also believe I had given you
17 sufficient answer to that question.
18     Q. Please remind me what the answer was.
19     A. If that's the case, then would you
20 repeat that question again.
21     Q. Does Dongguk know the reasons that
22 people who made pledges in connection with the
23 100th anniversary campaign did not fulfill them?
24     A. Yesterday I gave you an example of Oh
25 Hyun Kim. O H space H Y U N space Kim. During

Page 109

1  that campaign, he promised half billion won and
2  he was planning to pay for the pledges during the
3  years 2007 and 2008.
4          When Shin Jeong Ah scandal broke
5  out, he became extremely disappointed, he
6  canceled his pledge. And I believe this was the
7  same answer I gave to you yesterday.
8      Q. It is, and I guess my question is for
9  people other than Mr. Kim, does Dongguk know the
10 reasons that people who did not fulfill pledges?
11     A. Nothing else I can recollect for the
12 moment.
13          MR. FETNER: Mark this.
14          (Defendant's Exhibit 3 marked
15 For identification.)
16     Q. Mr. Lee, I'm showing you what's been
17 marked Exhibit 3. It consists of a Korean
18 document and an English translation. I would
19 like you to focus on the Korean document, but
20 you're certainly welcome to look at the English
21 as well if you'd like. Have you seen this
22 document before?
23     A. Yes, I have.
24     Q. What is this document? I'm asking only
25 about the Korean.

Page 110

1      A. Let me point out some typographical
2  error.
3          MS. LU: Mr. Lee, Howie just wants
4  you to look at the first page.
5      Q. My question only pertains to the Korean
6  page.
7      A. I'm sorry. Statement of Confirmation.
8      Q. Who created this document?
9      A. Chairman Jin Sik Choi.
10     Q. Did Mr. Choi draft this document
11 himself?
12     A. Yes.
13     Q. The date above his signature is May
14 20th, 2010.
15     A. Yes.
16     Q. Is that when he drafted the document?
17     A. Yes.
18     Q. How did he come to draft the document
19 at that time?
20     A. Sometime after I started working for
21 the university in June of 2008, I had gradually
22 become quite close to some of the individuals,
23 and as such, that I was able to share some
24 in-depth stories and sentiment with them. So one
25 day I heard from Mr. Choi, that he had pledged 5

5 (Pages 107 to 110)

DONGGUK v. YALE UNIVERSITY

Page 111

1  billion won, with, with the President Oh, yet he
2  decided not to keep that pledge. Instead, he
3  said he decided to establish a scholarship fund.
4      When she said he set up a
5  scholarship fund, that was for his own
6  corporation. As the school was preparing for the
7  lawsuit, in May of this year, in other words, we
8  were to compile the material for the cases of
9  broken or unrealized pledge cases. There was a,
10  some kind of consensus that we should prepare
11  actual anecdotes, so as I -- since I remembered
12  hearing from Mr. Choi of his sentiment, I asked
13  him to write up his, his story.
14      Q.  When did you hear from Mr. Choi about
15  his decision not to donate 5 billion won to
16  Dongguk?
17      A.  It was either in May or April of 2009,
18  during the time when we were playing golf
19  together, that he had decided not to carry out,
20  fulfill his pledge.
21          MS. LU:  Can I just have that
22  answer back. The question and the answer.
23          MR. FETNER:  He's not done.
24          MS. LU:  There's more?
25      A.  I don't know when he made that

Page 112

1  decision, but that's when I heard about that from
2  him. Actually, he was just lightly commenting on
3  something that had happened previously.
4      Q.  Did Mr. Choi ever make a pledge in the
5  amount of 5 billion won?
6      A.  In his case, he is the kind of person
7  who does not make the pledges and then pay later.
8  He would give the pledge, he would be actually
9  giving the money. Let me explain to you again.
10      What I meant by what I said was
11  that he is not a kind of person who write down in
12  paper that he is pledging something. He would
13  give the verbal pledge. And then he would
14  immediately fulfill that promise.
15      For example, let me give you an
16  actual anecdote with him. It was in 2009, he
17  gave .2 billion won to the school. In that case,
18  I heard that promise along with President Hong.
19  As he was making the promise, in November, he
20  paid actual amount during that month.
21      Another example about him is when
22  I tried very hard to collect pledges and money
23  for the development fund in 2008, I received his
24  promise of .1 billion won through phone
25  conversation. Within one month, he gave the

Page 113

1  money. As he promised.
2      At this point I would like to give
3  you an insight into Korean culture. Culturally,
4  individuals who give large sums do not make
5  pre-written pledges.
6      Q.  Did Mr. Choi make a pledge in the
7  amount of 5 billion won?
8      A.  Yes, he made that promise to the
9  President.
10      Q.  Did he make that promise in writing?
11      A.  I explained to you, he doesn't make
12  that kind of pledges in written form, in other
13  words.
14      Q.  I'm asking in this particular case, did
15  he put it in writing?
16      A.  No, he did not.
17      Q.  Did Dongguk create any document to
18  reflect that pledge?
19      A.  No. Not as far as I know.
20      Q.  You said that Mr. Choi verbally told
21  President Oh that he would donate 5 billion won?
22      A.  Yes.
23      Q.  Did he say what the purpose of that
24  donation was?
25      A.  I believe there was a certain

Page 114

1  understanding about the need for the fund. At
2  the time school was engaged in intensive
3  renovations, and at the same time they also was
4  planning to build an international center and I
5  believe that was where the money was going to go
6  to.
7      Actually, it's not that I thought,
8  but that I was told that was the case from
9  President Oh. And also I heard that from Mr.
10  Choi.
11      Q.  When did Mr. Choi tell President Oh
12  that he planned to donate 5 billion won?
13      A.  I heard from President Oh either in
14  April or May of — I'm going to repeat. Since he
15  arrived at the school in February, on the 25th in
16  particular of 2007, President Oh had met with
17  many alumni members and during the course of his
18  effort of raising development fund, he met with
19  Mr. Choi, either in April or May. He was given
20  the promise of 5 billion won from Mr. Choi.
21      Q.  When did Mr. Choi plan to donate the
22  money?
23      A.  According to what I heard, it was
24  during the month -- during the years 2007 and
25  2008.

6  (Pages 111 to 114)

DONGGUK v. YALE UNIVERSITY                                    October 28, 2010

Page 119

1    yet due to Shin Jeong Ah scandal, he said he
2    canceled that plan.
3            I heard about it from Mr. Park
4    himself, and also through President Oh. This
5    story came out during our golf game, and which
6    was attended by Mr. Oh, Mr. Park, and myself, and
7    another individual. Because of that memory, I --
8    so I requested Mr. Park to generate this kind of
9    paper for the litigation.
10   Q.  When was the golf game that you just
11   mentioned?
12   A.  Most of this kind of occasions took
13   place during the months March and May -- March
14   and April of 2008.
15   Q.  So it was before you were working at
16   Dongguk?
17          MS. PARK:  I thought he said
18   2009.
19   A.  It was incorrect. I was saying March
20   or April of 2009. Not 8.
21   Q.  When did Mr. Park make a plan to donate
22   4.5 billion won to Dongguk?
23   A.  When President Oh came to the school,
24   and he announced 108 Project, the mood at the
25   school was really high. So that kind of

Page 120

1    conversation took place during the months of
2    April and May of 2007.
3    Q.  Did Mr. Park make a pledge to donate
4    4.5 billion won?
5    A.  He promised President Oh that he would
6    pay for the project that was going to cost
7    approximately 4.5 billion to 5 billion won. And
8    that refers to the renovation project of the main
9    building.
10   Q.  Did Mr. Park make that promise in
11   writing?
12   A.  Yes. He did.
13          MS. PARK:  I think he asked in
14   writing.
15   Q.  Yes, the question is did Mr. Park make
16   that promise in writing?
17   A.  As I explained to you before,
18   customarily in Korea, big donors do not make
19   written pledges. And thus, Mr. Park did not make
20   a written pledge.
21   Q.  Did Dongguk create any written record
22   of Mr. Park's promise?
23   A.  Probably not.
24   Q.  Did Dongguk send any correspondence to
25   Mr. Park regarding his promise?

Page 121

1    A.  No.
2    Q.  Did Mister --
3    A.  Before myself, there wasn't any such
4    system as to sending out confirmation letters,
5    and send out letter of appreciation after the
6    actual donation. I am the one who introduced
7    that kind of system.
8    Q.  Did Dongguk issue a press release
9    announcing Mr. Park's promise?
10   A.  No. Because people like him do not
11   want to be known about their promises. They do
12   not want the public to know about these.
13   Q.  Did Dongguk issue a press release
14   announcing an anonymous promise?
15   A.  Even that kind of release was not
16   allowed.
17   Q.  Not allowed by whom?
18   A.  Precisely speaking, people like Mr.
19   Park, would not like us to announce their
20   promises without disclosing their names.
21   Q.  I'm not asking about people like Mr.
22   Park, I'm asking about Mr. Park in particular.
23   Did he ask Dongguk not to announce the promise?
24   A.  I don't know about this particular
25   case.

Page 122

1    Q.  Other than President Oh, did anyone
2    else from Dongguk discuss this potential donation
3    with Mr. Park?
4    A.  Not in this case, only the President Oh
5    and myself.
6    Q.  Did President Oh discuss this potential
7    donation with Mr. Park on more than one occasion?
8    A.  They get together often.
9    Q.  When did Mr. Park decide not to donate
10   4.5 billion won to Dongguk?
11   A.  I believe it was after Shin Jeong Ah
12   scandal.
13   Q.  I'm asking when. Can you tell me what
14   year? What month?
15   A.  Would you repeat the entire question
16   again?
17   Q.  Sure. My question is when did Mr. Park
18   decide not to donate 4.5 billion won to Dongguk?
19   A.  To my knowledge it was after Shin Jeong
20   Ah scandal.
21   Q.  In what year?
22   A.  2007.
23   Q.  In what month?
24   A.  Since Shin Jeong Ah scandal broke out
25   in July, it was probably November or December.

8  (Pages 119 to 122)

DONGGUK v. YALE UNIVERSITY

October 28, 2010

**Page 131**

1  Q.  Does Dongguk have any documents
2  reflecting either Mr. Park's plan to donate 4.5
3  billion won, or his decision not to donate 4.5
4  billion won?
5  A.  This is it.  (Indicating)
6  Q.  Turn back, if you would, to Exhibit 3.
7  No, Mr. Choi's statement.  Did you tell Mr. Choi
8  the purpose for which his statement would be
9  used?
10  THE INTERPRETER:  Repeating the
11  same question.
12  A.  As I answered to your question about
13  Chairman Park, I told him the same kind of things
14  to Mr. Choi.
15  Q.  You told him that the statement would
16  be used for the lawsuit?
17  A.  Yes.
18  Q.  Did you tell him what information to
19  include in the statement?
20  A.  I requested that he write about the
21  fact that he had pledged 5 billion won to the
22  school initially, but he gave up on the idea
23  after Shin Jeong Ah scandal.  Instead he
24  established a foundation of his own company.  And
25  I asked him to write about it.  I like to be more

**Page 132**

1  precise.  I asked him by saying that he had told
2  me certain things, and that I would like him to
3  write about it.
4  Q.  Did anyone from Dongguk assist Mr. Choi
5  in drafting the statement?
6  A.  No.
7  Q.  Did anyone from Dongguk edit the
8  statement in any way?
9  A.  No.
10  Q.  Did anyone from Dongguk other than
11  yourself talk to Mr. Choi about the statement?
12  A.  No, and there's something that I would
13  like to ask you to pay attention to.  No one
14  would add or delete or edit the statements
15  written by such important individuals as these
16  two people after they signed the paper.  Let me
17  correct the first version.  I would like to say
18  neither Mr. Choi nor Mr. Park would ever put down
19  their signatures on the statements that's either
20  modified or altered by other people.
21  MR. FETNER:  Let's take a break.
22  THE VIDEOGRAPHER:  Off the record,
23  11:32.
24  (Recess taken).
25  THE VIDEOGRAPHER:  On the record,

**Page 133**

1  11:40.
2  Q.  Mr. Lee, were you familiar with the
3  financial condition of Mr. Choi's corporation in
4  2007?
5  A.  You are referring to Jin Sik Choi,
6  right?
7  Q.  Yes.
8  A.  Nothing in detail.  What's clear to me
9  is that he was going to give 5 billion won and
10  instead he used that fund to create his company's
11  foundation.
12  Q.  Has that foundation donated money to
13  Dongguk?
14  A.  No, no, no.  His initial intention was
15  that he was going to donate 5 billion to Dongguk.
16  Instead, he created the scholarship fund with
17  that fund.  That's the fact.
18  Q.  My question is, has the fund that Mr.
19  Choi created donated money to Dongguk?
20  A.  Would you repeat the question?
21  Q.  Has the fund that Mr. Choi created
22  donated money to Dongguk?
23  A.  Yes.  Considerable sum was donated to
24  the school by that foundation.
25  Q.  How much money was donated to Dongguk

**Page 134**

1  by that foundation?
2  A.  I can give you the exact amount in the
3  afternoon, but I believe that foundation gave
4  approximately 20 million won annually.  Let me
5  take a look at the document here.  From his
6  scholarship fund, we received 32 million won, on
7  February 27th, 2009.  Additional 36 million won
8  on September 15th, and the, another donation on
9  March 9th, 2010, in the amount of 42 million won.
10  Q.  Do you know if Mr. Choi's foundation
11  has made donations to other academic
12  institutions?
13  A.  According to what I heard, although I
14  cannot be certain, his scholarship fund has been
15  giving out to many other schools.
16  Q.  Mr. Lee, have you told me everything
17  that you know about your communications with Mr.
18  Choi with respect to donations to Dongguk?
19  A.  In general, I have frequent
20  get-togethers with him, and during those
21  get-togethers, I've been requesting for
22  contributions.
23  Q.  What has been his response?
24  A.  He did not have good feelings for the
25  school when I first started working.  Actually,

11  (Pages 131 to 134)

Page 139

1  what does that mean?
2      A.  What he means here by process of making
3  the donation, meaning procedures for the
4  contribution, in particular he is saying, means
5  he was reviewing as to how to deliver the fund.
6  That means it's either by having a certain kind
7  of ceremony where he would present a check to
8  President Oh, and have the photo taken, and then
9  announce that contribution.  Or whether or not he
10  was simply going to have the fund be transferred
11  into the school's account.
12          I'm sorry it came out to be so
13  complicated, but that's what it meant.  But I
14  must tell you strictly speaking, there is no way
15  for me to know what he meant when he used this
16  word procedures.  Because what I previously
17  stated is general way, general ways the school
18  receives funds from donors.
19    . Q.  Did anyone from Dongguk discuss with
20  Mr. Choi whether he would be making the donation
21  in either of the two ways you described?
22      A.  Around that time, it was President Oh
23  that he spoke to.
24      Q.  Did they discuss that?
25      A.  According to this confirmation

Page 140

1  statement, that was the case I think.
2      Q.  Do you know which way he planned to
3  donate the money?
4      A.  I don't know that.  He had been using
5  direct transfer to our account when he was giving
6  100 million, 150 million won. 200, and 200
7  million won.  When such a large donations as
8  this, these are involved, in general we hold the
9  ceremony to receive the funds.  But in his case,
10  he had been sending the monies through the
11  transfer only.
12      Q.  Has Dongguk ever received a donation as
13  large as 5 billion won?
14      A.  Yes.
15      Q.  How many such donations has Dongguk
16  received?
17      A.  Last year we received a donation from
18  an individual in the value of 11.3 billion won,
19  and the value, and it was in the form of museum,
20  and the value of that total donation was
21  approximately 11.3 billion won.
22      Q.  Other than that donation, has Dongguk
23  received any other donations as large as 5
24  billion won?
25      A.  There's an occasion where Mr. Oh

Page 141

1  arranged that, and we received actual donation of
2  2 billion won in 2008.  It was achieved by
3  President Oh personally.
4      Q.  Has Dongguk received any other
5  donations as large as 5 billion won?
6      A.  Other than what I told you a few
7  minutes ago, there's nothing else I can recall
8  right now.
9          MR. FETNER:  Mark this.
10          (Defendant's Exhibit 5 marked
11          For identification.)
12      Q.  Mr. Lee, who made the two billion won
13  donation that you mentioned a few moments ago?
14      A.  It was by Yi Hae Lang Play Group
15  Foundation.  Y I space H A E space L A N G.
16      Q.  Who made the 11.3 billion won donation
17  that you mentioned a few moments ago?
18      A.  Ju Pil Kim, J U space P I L space Kim.
19      Q.  Turning to what's been marked
20  Exhibit 5, have you seen this document before?
21      A.  Yes.
22      Q.  When did you first see this document?
23      A.  Last May.
24      Q.  Who drafted this document?
25      A.  I don't know.  Kang Hyun Jung must have

Page 142

1  drafted this.
2      Q.  Do you know if anyone from Dongguk
3  assisted in drafting this document?
4      A.  No.
5      Q.  Did you have any communications with
6  Mr. Kang about this document?
7      A.  No.
8      Q.  How did he come to draft it?
9      A.  Vice-president Jin Soo Han must know
10  about this.  Because Vice-President, Mr. Han,
11  studied at the same university, University of
12  Indiana.  I don't know whether actually it was
13  the very same university or the universities in
14  the State.
15          For that reason Mr. Han and Ms.
16  Kang were well acquainted people.  And it
17  happened that Ms. Kang's company renovated one of
18  the school buildings in 2004.
19          I asked Mr. Han about Ms. Kang, as
20  I was leaving for the U.S.  He said, he had
21  suggested that she should make contributions to
22  the school to improve the institution because he
23  has been trying very hard since his arrival in
24  2007, to turn the university to an excellent
25  school.

13  (Pages 139 to 142)

DONGGUK v. YALE UNIVERSITY                                      October 28, 2010



Page 143

1        At that time he said she pledged 1
2   billion won.
3       Q.  When did she make that pledge?
4       A.  It was after Mr. Oh joined the
5   university. It was probably April or May of
6   2007.
7       Q.  Is there any document reflecting that
8   pledge?
9       A.  Nothing other than what you have here
10  in the form of confirmation statement.
11      Q.  Did Dongguk issue a press release
12  announcing the pledge?
13      A.  No.
14      Q.  To whom did Ms. Kang say she would
15  donate 1 billion won?
16      A.  To -- she promised to the
17  Vice-President Jin Soo Han.
18      Q.  Is Ms. Kang an alumna of Dongguk?
19      A.  No.
20      Q.  Did she say why she would be donating 1
21  billion won to Dongguk?
22      A.  You are not asking me how we were told
23  from her.
24      Q.  Yes, I am asking you what she said.
25  About why she would be donating the money.

Page 144

1       A.  According to what I heard from the
2   Vice-President, Jin Soo Han, Ms. Kang said she
3   understood that Mr. Oh had been trying very hard
4   to improve the school since he joined the
5   university. So she would like to encourage and
6   join in his effort and thus, she was planning to
7   give approximately 1 billion won. And I heard
8   this story from Mr. Han.
9       Q.  Was she planning to give the money for
10  any particular purpose?
11      A.  What I stated shortly before was all I
12  was told about this. In other words, she was
13  going to give the money to the school in order to
14  encourage and join in President Oh's effort to
15  develop and improve the school.
16      Q.  Was the 1 billion won to be donated
17  personally or by her company?
18      A.  In my opinion, it was in her company's
19  name.
20      Q.  When did Ms. Kang tell Dongguk that she
21  wouldn't be donating 1 billion won?
22      A.  After Shin Jeong Ah scandal broke out.
23      Q.  Can you be any more specific than that?
24      A.  I was not with the school at the time.
25  On top of that, I never had an occasion to ask

Page 145

1   Mr. Han about the details. I do not know exactly
2   when it was. And the way I look at it, it was
3   probably after Shin Jeong Ah scandal broke out.
4   In December. Of 2007.
5       Q.  Did she send any sort of writing to
6   Dongguk announcing the cancellation of the
7   donation?
8       A.  No.
9       Q.  Did Dongguk create any document
10  reflecting the cancellation of the donation?
11      A.  No, and there's something else I'd like
12  to tell you. After Shin Jeong Ah scandal broke
13  out in July, during the months July, August,
14  September, especially considering that the
15  President Oh's office was searched by the
16  prosecutor's office, no one at the school had the
17  mind to follow up on this kind of matter.
18          The entire administration of the
19  university was paralyzed at that time. Because
20  of that kind of situation, no one was in the
21  frame of mind to generate paperwork in connection
22  with these kind of matters.
23      Q.  After the initial conversation between
24  Ms. Kang and Vice-President Han, that you
25  described, did anyone from Dongguk attempt to

Page 146

1   collect the 1 billion won donation from her?
2       A.  It was Vice-President, Mr. Han, mainly
3   that followed up on this. If he did. As for me,
4   I met with her either in March or April of this
5   year.
6       Q.  In 2007, what did Vice-President Han do
7   to attempt to collect this donation?
8       A.  I have not been told by Vice-President
9   Mr. Han in detail about this. But in general, in
10  order to collect 10 billion won --
11          MS. LU: 1 billion.
12          MR. FETNER: 1 billion.
13      A.  1 billion won, it requires at least 10
14  meetings.
15      Q.  How many meetings did he have?
16      A.  I don't have detailed knowledge of
17  this, but let's say this initial conversation
18  took place during the second half of 2007. They
19  should have met at least four or five times. But
20  in reality, I don't think he was able to have a
21  meeting with Ms. Kang. Due to Shin Jeong Ah
22  scandal.
23      Q.  Did President Oh ever meet with Ms.
24  Kang regarding her potential donation?
25      A.  Probably. But no more than once or

                                    14 (Pages 143 to 146)

DONGGUK v. YALE UNIVERSITY

October 28, 2010



Page 147

1  twice. Although I don't have the detailed
2  knowledge of this. What I'm saying is I'm pretty
3  certain that he met with Ms. Kang during the
4  course of his initial effort to meet with all the
5  possible potential donors after he first joined
6  the university. I'm sure he met Ms. Kang. But
7  speaking of the actual promises of donation was
8  between Mr. Han and Ms. Kang. According to what
9  I was told.
10     Q.  Do you know that President Oh actually
11  met with Ms. Kang?
12     A.  I have never had a chance to confirm
13  that. Before I came here.
14     Q.  When did you speak to Ms. Kang about a
15  potential donation to Dongguk?
16     A.  I met her once in probably April of
17  this year.
18     Q.  Not previously?
19     A.  No. The contacts with this person had
20  been through Vice-President, Mr. Han. Mainly.
21     Q.  Do you know if the financial condition
22  of Ms. Kang's company plays any role in her
23  decision not to donate the 1 billion won to
24  Dongguk?
25     A.  Before coming here, I had a chance to

Page 148

1  take a look at the finance of Ms. Kang's company
2  briefly. Her business had been steadily
3  generating profits. But the size of the profits,
4  approximately 5 billion won annually, as I
5  recall. But it's not the precise number.
6     Q.  Does that approximate number apply to
7  2007?
8     A.  Yes.
9     Q.  Did anyone from Dongguk tell Ms. Kang
10  the purpose which this statement would be used?
11     A.  When I told Mr. Han that I was
12  preparing for the lawsuit and compiling this kind
13  of statement, Mr. Han initiated by saying that
14  there was an incident with Ms. Kang, where she
15  pledged and then withdrew her pledge due to Shin
16  Jeong Ah scandal, and that he can ask for
17  statement, which would contain the stories that
18  had been discussed here today.
19     Q.  Did Mr. Han tell Ms. Kang that the
20  statement would be used in Dongguk's lawsuit?
21     A.  I believe so.
22     Q.  Did Mr. Han tell Ms. Kang any more than
23  that about what the statement should say?
24     A.  Culturally, it's not a correct behavior
25  to request anything more than that to a potential

Page 149

1  donor, than what was already requested of because
2  it's rather impolite and unethical, considered to
3  be.
4         MR. FETNER:  Mark this.
5         (Defendant'S Exhibit 6 marked
6       For identification)
7     Q.  Mr. Lee, I'm showing you what's been
8  marked Exhibit 6. Have you seen this document
9  before?
10     A.  Yes.
11     Q.  When did you first see it?
12     A.  Last May.
13     Q.  Who drafted this statement?
14     A.  Probably Mr. Kim himself.
15     Q.  Do you know if Mr. Kim drafted this
16  statement?
17     A.  Well, he put it down and that was
18  handed to me.
19     Q.  Did you talk to Mr. Kim about this
20  statement?
21     A.  I had heard his story where he had made
22  a pledge to donate money to the school, and then
23  because of Shin Jeong Ah scandal, he canceled his
24  pledge. That was something that I had known
25  about.

Page 150

1         So as I was collecting the
2  confirmation statements, I called Chairman, Mr.
3  Kim, and asked prepare a statement based on the
4  facts.
5     Q.  What did you say to Mr. Kim about the
6  statement?
7     A.  I told him that this was going to be
8  used in connection with the litigation against
9  Yale University.
10     Q.  Did you say anything else to Mr. Kim
11  about the statement?
12     A.  I don't think there was anything else
13  to discuss.
14     Q.  Did anyone from Dongguk assist in
15  drafting this statement?
16     A.  No.
17     Q.  When did Mr. Kim make a pledge to
18  donate 500 million won to Dongguk?
19     A.  I believe it was in 2006, because it
20  appears here.
21     Q.  Do you know when in 2006?
22     A.  If my recollection is correct, and it
23  is correct, what I heard was that it was around
24  September. Of 2006.
25     Q.  Is there any document reflecting Mr.

15  (Pages 147 to 150)

DONGGUK v. YALE UNIVERSITY                                                October 28, 2010

Page 151

1   Kim's pledge?
2       A.  I believe so.  I think I heard from our
3   staff that there's a pledge letter in this case
4   somewhere.
5       Q.  Mr. Kim sent a letter to Dongguk
6   anouncing the pledge?
7       A.  Yes.
8       Q.  When did he do that?
9       A.  I think I told you it was September of
10  2006.  But I could be wrong.
11      Q.  Did Dongguk create any record to
12  confirm the pledge?
13      A.  I don't know.  As I stated before, at
14  that time there wasn't a certain system set to
15  practice at that time.  It was only after I
16  started working the system where the pledges were
17  confirmed in written form and then sent letters
18  of appreciation for the pledge or the letters of
19  appreciation for actual donation are sent out.
20  And that's why I answered that I do not know for
21  your previous question.
22      Q.  Did anyone from Dongguk write to thank
23  Mr. Kim for his pledge?
24      A.  For the reasons I gave to you
25  previously, I don't know.

Page 152

1       Q.  Did anyone from Dongguk meet with Mr.
2   Kim to discuss his pledge?
3       A.  I heard a story that he had pledged and
4   then canceled the pledge in May -- in March of
5   2009.  After I heard that story, whenever I got
6   together with him, I urged him very, very
7   informally, like "Why don't you give us the
8   money" or something to that effect.
9       Q.  Other than yourself, did anyone from
10  Dongguk meet with Mr. Kim to discuss the pledge?
11      A.  Yes.  The President and Vice-President.
12      Q.  When?
13      A.  See him once in a while.  Recently they
14  were having once every other month golf games.
15      Q.  You're referring to President Oh and
16  Vice-President Han?
17      A.  President Oh and Vice-President Mr. Han
18  and myself.  And Chairman Oh Hyun Kim play golf
19  every month.  I like to make it very clear when I
20  say we got together to play golf every other
21  month, that does not necessarily mean that you
22  play the game as a four person group.
23          There were approximately 20 people
24  and thus, a team could, team members could vary.
25  In other words, not necessarily President Oh and

Page 153

1   Vice-President Han would attend these once every
2   other month games.  Sometimes they would miss.
3       Q.  Did President Oh discuss the potential
4   500 million won donation with Mr. Kim in 2007?
5           THE INTERPRETER:  Would you repeat
6   the question?  I'm sorry.
7       Q.  Sure.  Did President Oh discuss the
8   potential 500 million won donation with Mr. Kim
9   in 2007?
10      A.  I assume so, naturally, but I never
11  heard anything about it in particular.
12      Q.  Did anyone else from Dongguk discuss
13  this donation with Mr. Kim in 2007?
14      A.  I don't know.  I never asked anyone
15  about it.
16      Q.  When did Mr. Kim decide not to donate
17  500 million won to Dongguk?
18      A.  It was when the school was defamed and
19  considered an unethical institution and then
20  there were rampant newspaper articles about it
21  due to Shin Jeong Ah scandal, and for that reason
22  he canceled.
23      Q.  My question was when?  Could you tell
24  me a month and a year?
25      A.  I have not heard about that but I did

Page 154

1   know it was due to Shin Jeong Ah scandal.  No,
2   no.  Although I have not heard exactly when it
3   was, but I heard from Chairman Oh Hyun Kim that
4   he was canceling because of Shin Jeong Ah
5   scandal.
6       Q.  When did you hear that from him?
7       A.  My knowledge of this in general is
8   around, coming from the -- coming from my
9   encounters with these people in March, in or
10  about March of 2009.
11      Q.  Did Mr. Kim send any document to
12  Dongguk announcing the cancellation of his
13  pledge?
14      A.  I think I explained to you yesterday
15  that Oh Hyun Kim is not the kind of individual
16  who would send a written letter about that kind
17  of matter.
18      Q.  So he didn't send a letter?
19      A.  Correct.
20      Q.  Did Dongguk create any record of the
21  cancellation of his pledge?
22      A.  I don't know.
23      Q.  Was Mr. Kim planning to donate the 500
24  million won personally or was it to come from his
25  business?

16  (Pages 151 to 154)

Page 159

1  months or the -- the following months. Depends
2  on one's own situation. One can make the
3  decision.
4      Q.  And why did Mr. Kim make that decision?
5      A.  I would not know. My understanding is
6  that he made a decision based on his own personal
7  schedule.
8      Q.  Mr. Lee, you mentioned this morning
9  that Dongguk had received a donation of 11.3
10 billion won in 2009. And a separate donation of
11 2 billion won in 2008. Other than those
12 donations, has Dongguk received any other
13 donations valued at 1 billion won or larger?
14     A.  1 billion won from one individual and
15 300 million won from another and I remember
16 receiving 1.5, 1 billion 500 million won from
17 Jogye Order. 1.5 billion. I don't recall every
18 pledge, but those are what I can recall right
19 now.
20     Q.  You mentioned a 1 billion won donation.
21 When did Dongguk receive that donation?
22     A.  How much?
23         MS. PARK:  1 billion.
24     Q.  You mentioned a 1 billion won donation.
25     A.  One person in 2008, it was from Bong

Page 160

1  Kwan Lee. B O N G space K W A N space Lee. As I
2  recall.
3      Q.  When did Dongguk receive the 300
4  million won donation that you mentioned?
5      A.  Either in February or March of 2009.
6      Q.  Who made that donation?
7      A.  There was a request from himself not to
8  disclose his name. It happened to be a lady.
9  That was not the condition for the donation, yet
10 there was a request.
11         MS. PARK:  I think it's different.
12     A.  I'm sorry, I meant to say it was the
13 condition for the donation.
14     Q.  When did Dongguk receive the 1.5
15 billion won donation that you mentioned?
16     A.  I hope you are not trying to test my
17 memory. I'm not sure but it was either August or
18 September of 2009. I regret that my memory is
19 not that good, and thus, I cannot remember each
20 case.
21         MS. LU:  Howie, if you want to
22 make a request for him to check it with his
23 office, these dates and amounts.
24         MR. FETNER:  We can deal with that
25 afterwards. For now this is certainly sufficient

Page 161

1  information.
2      Q.  Who made the 1.5 billion won donation?
3      A.  Jogye Order.
4      Q.  Other than the donations you've
5  mentioned, has Dongguk received any other
6  donations of 1 billion won or more?
7      A.  As I recall, there has been steady
8  donations by the Alumni Association of Oriental
9  Medicine Department. In the amount of .1 to .2
10 billion won annually. Up to -- from 2002 to
11 2009, and all together, so far they have donated
12 2 billion won.
13     Q.  Are you aware of any other donations
14 that Dongguk has received --
15     A.  Nothing else I can recall right now.
16     Q.  So the record is clear, the witness
17 answered before I finished asking the question.
18 What I was asking is are you aware of any other
19 donations that Dongguk has received of at least 1
20 billion won?
21     A.  Nothing else I recall right now.
22     Q.  Are you aware of any other donations
23 Dongguk has received of at least 500 million won?
24     A.  I'm sorry, right now, nothing. I'm not
25 able to think clearly. I'm just explaining to

Page 162

1  you that I'm almost, my memory is almost
2  paralyzed right now.
3      Q.  Would you like to take a break?
4         MS. LU:  I think he's just saying
5  you're testing his memory very deeply and these
6  aren't numbers that he has at the reach of his
7  fingertips. So if you want to make a request as
8  to these types of numbers, we can do that for
9  you.
10        MR. FETNER:  Okay. Well, we can,
11 like I said, we can deal with other requests
12 later. Within the context of the deposition, I
13 just want to be clear, are you comfortable to
14 continue testifying?
15     A.  Let's try.
16        MS. LU:  I think Howie is saying,
17 do your best with these numbers and dates. But
18 we understand that you may not remember
19 everything.
20        MR. FETNER:  Mark this.
21        (Defendant's Exhibit 7 marked
22        For identification.)
23     Q.  Mr. Lee, I'm showing you what's been
24 marked Exhibit 7. Have you seen this document
25 before?

18  (Pages 159 to 162)

DONGGUK v. YALE UNIVERSITY

October 28, 2010



Page 163

1    A.  Yes.
2    Q.  When did you first see it?
3    A.  Last May.
4    Q.  In what context did you see this
5  document?
6    A.  In the process of compiling and
7  preparing the documents in connection with the
8  lawsuit against Yale.  When we discussed amongst
9  us with our staff, what cases were there where we
10 failed to collect donations from the pledges that
11 had been made due to Shin Jeong Ah scandal.  One
12 of the staff members told me that there was such
13 a letter like this, and then he showed this
14 document to me.
15   Q.  During the conversation with the staff
16 members that you just mentioned, were any other
17 donors mentioned?
18   A.  Oh Hyun Kim, Jin Sik Choi.  And those
19 individuals.
20   Q.  Anybody else?
21   A.  There were no other individuals were
22 mentioned.  But it was brought up that many
23 people refused to fulfill their pledges when we
24 made reminder calls.
25   Q.  Turning to Exhibit 7, do you know who

Page 164

1  drafted this document?
2    A.  I don't know.  But my understanding is
3  that it's the Chairman Jin Moon Kim.  Can I take
4  a break?
5        MR. FETNER:  Yes.
6        THE VIDEOGRAPHER:  Off the record
7  2:33.
8        (Recess taken)
9        THE VIDEOGRAPHER:  On the record,
10 2:40
11   Q.  Did Jin Moon Kim make his pledge to
12 donate 1 billion won in writing?
13   A.  Yes.  I was told so.
14   Q.  And is that the same sort of form that
15 you mentioned with respect to the other Mr. Kim?
16   A.  According to what I was told, he
17 filled out the form but after Shin Jeong Ah
18 scandal, in December of 2007, he got -- he came
19 to the school and got all excited and he took the
20 pledge letter back, pledge form back and then
21 ripped it up in front of the staff.
22        MS. PARK:  I think it was
23 outraged.
24        THE INTERPRETER:  I would adopt
25 that.  He was outraged instead of being all

Page 165

1  excited.
2    Q.  When did Mr. Kim rip up the pledge
3  form?
4    A.  In December, that's what I was told.
5  Of 2007.
6    Q.  Other than the pledge form that Mr. Kim
7  ripped up, does Dongguk have any other written
8  record of Mr. Kim's pledge?
9    A.  This is the one.
10   Q.  So other than this document, Exhibit 7,
11 Dongguk has no other written record of Mr. Kim's
12 pledge?
13   A.  In my opinion, there is none.  Other
14 than this.
15   Q.  Did anyone from Dongguk meet with Mr.
16 Kim in 2007, concerning his pledge?
17   A.  Probably President Oh.  Because I heard
18 that the pledge form was ripped up while the
19 staff members were looking, they must have met
20 him as well.
21   Q.  Do you actually know of any meetings
22 that Mr. Kim had with anyone from Dongguk in
23 2007?
24   A.  Other than the staff who witnessed the
25 scene where he ripped up the pledge form, I don't

Page 166

1  know any other individuals.
2    Q.  After Mr. Kim made his billion won
3  pledge, what did Dongguk do to attempt to collect
4  that money?
5    A.  According to his pledge, he would pay
6  and fulfill the pledges in 2008 and 2009.  For
7  that reason, President was the one who had
8  managed the relationship.  And this is my
9  feeling, that the school must have taken a --
10       MS. PARK:  Laid back.
11   A.  -- a laid back attitude in their effort
12 to collect money from him.  Because he said the
13 money would be paid in 2008 and 2009.
14   Q.  After Mr. Kim sent the letter saying
15 that he was canceling his pledge, did Dongguk
16 attempt to change his mind?
17   A.  I don't know.  But as from common
18 sense, who would expect or who would try to
19 collect money from him in 2007, after he ripped
20 up his own pledge form and walked out?  In his
21 outrage.
22   Q.  Since Mr. Kim ripped up the pledge
23 form, has anyone from Dongguk had any
24 communications with him?
25   A.  I don't know about any effort before my

19 (Pages 163 to 166)

DONGGUK v. YALE UNIVERSITY

October 28, 2010

Page 171

1  discussed in the context of these statements, Mr.
2  Choi, Mr. Park, Ms. Kang, Mr. Kim, and Mr. Kim,
3  did they attend the meeting earlier this year,
4  with alumni leaders that you testified about
5  yesterday?
6       A.  Yes.  I'm sure about one of them.  But
7  I'm not certain about the second individual.  I'm
8  certain about Oh Hyun Kim being there.  I'm not
9  sure about Jin Moon Kim.
10      Q.  What about the others?
11      A.  The rest are not leading members of
12 alumni group.  Speaking of these five
13 individuals, they were the people who were very
14 much interested in the school and, and with an
15 intention to help the school with the effort to
16 improve.  And on the other hand, the meeting that
17 took place this spring, it's been a kind of
18 gathering for the leaders who had negative
19 feelings of the school.  So it was not a kind of
20 event these five individuals would be attending.
21          MS. PARK:  Attending or welcomed?
22      A.  Attending.
23      Q.  Does Dongguk have a list of the people
24 who attended that meeting earlier this year?
25      A.  Probably, yes.

Page 172

1       Q.  Other than the five people whose
2  statements we've looked at, did Dongguk ask any
3  other alumni or potential donors to prepare
4  similar statements?
5       A.  No.  Because none of us, myself,
6  Vice-President, and our staff members heard
7  about, other cases of cancellation of pledges.
8  So these five individuals were the -- whose name
9  I was able to come up with.
10      Q.  This may be what you just said but I
11 want the record to be clear.  Other than the five
12 individuals whose statements we looked at, is
13 Dongguk aware of anybody else who canceled
14 pledges or chose not to donate to Dongguk because
15 of the Shin scandal?
16      A.  When we made reminder calls, many,
17 there were many such individuals.  But among the
18 people who made pledges and then went back on
19 their pledges and told us about their change of
20 mind, these five individuals were the people
21 whose name I could recall now.  Not now, at that
22 time.
23      Q.  Today, could you tell me the names of
24 any other people who canceled pledges or chose
25 not to donate to Dongguk because of the Shin

Page 173

1  scandal?
2       A.  No.
3       Q.  Let's turn back to Exhibit 2, which is
4  the damages analysis.  In particular, I'd like
5  you to turn to page 4 of that document.  And I'd
6  like you to look in particular at the chart at
7  the top of that page.
8           The chart lists three types of
9  donors.  Alumni, corporate and others.  My
10 question is, what does the "others" category
11 refer to.
12      A.  Others written here includes Buddhists
13 and Jogye Order, and temple.  Buddhist temples.
14 And such organizations as the scholarship
15 foundations.
16      Q.  If you'll look at the bottom line of
17 the chart, it says the total amount of received
18 donations, which is the total, it appears that
19 Dongguk's total amount of received donations
20 increased in 2006, and again in 2007.  Do you
21 know the causes of those increases?
22      A.  According to our analysis, despite the
23 tremendous damage caused by Shin Jeong Ah
24 scandal, due to the effort, tremendous effort by
25 newly installed President Oh, and the result of

Page 174

1  his effort were reflected in these total amounts.
2           As I explained to you yesterday,
3  had there not been Shin Jeong Ah scandal, I
4  believe that we would have raised 15 billion to
5  20 billion won in 2007.  And I also believe by
6  2008 we would have raised 20 billion won.  And in
7  2009, we would have raised 30 billion won.
8       Q.  To what do you attribute the
9  significant increase in Dongguk's total received
10 donations in 2008?
11      A.  I would attribute that to the effort by
12 President Oh.
13      Q.  Were you at all responsible for that?
14      A.  I would attribute 10 percent to 15
15 percent to the effort of myself and our staff.
16      Q.  To what do you attribute the increase
17 in Dongguk's total received donations in 2009?
18          THE INTERPRETER:  Would you
19 repeat?
20      Q.  The question is, to what do you
21 attribute the increase in the total received
22 donations in 2009?
23      A.  Also due to Mr. Oh's effort.
24      Q.  What does President Oh do that is
25 different from his predecessor in terms of

21 (Pages 171 to 174)

# EXHIBIT 88

[DONGGUK0381478]

Written Verification

Name: Oh Hyun Kim
DOB: REDACTED
Work & Position: CEO, Bokyung Investments Inc.

I, the individual named above, have been operating business activities since I graduated from Dongguk University in 1980, and recently established Dasan SD Industrial Development Inc. (Haisung 2 Bldg. 9th floor, 942-10 Daichi-dong, Kangnam-ku, Seoul) and Bokyung Invest Inc. (total revenue in 2009: 9.4 billion won) and have managed them. I have always been grateful to and proud of my alma mater Dongguk University.

While I have been thinking about my interests in and contributions to the School as one of its alumni businessmen, I made a commitment in 2006 to make a contribution for the funding of Dongguk University advancement (for the School's 100th anniversary) in the amount of 500 million won over a period of 2 years.

Further, my alma mater Dongguk University appointed as its president Young Kyo Oh, who was formerly the minister of Public Administration and Security, in February 2007, which made a fellow alumnus have great expectations for advancement of the School. Appointment of such a capable CEO-type person as its president was itself sufficient to make me expect a great deal of change and advancement for the School.

However, as the news that Jeong Ah Shin and the School were unethically involved continued to hit the press in July 2007, I began to feel disappointment and even a sense of betrayal, which eventually led me to withdraw my commitment for making a contribution of 500 million won. At the time, I was so embarrassed about the fact that I was an alumnus of Dongguk University that I had no interest in the School whatsoever.

Nevertheless, I came to find out recently that the School had not made any intentional mistakes regarding the Jeong Ah Shin incident, so I hope that the damage and psychological scars that not only the School but also its alumni have suffered will be healed as soon as possible.

I certify that the above is true and accurate.

May 24, 2010

[Signature]
Bokyung Investments Inc.
Oh Hyun Kim

# 확 인 서

성    명: 김 오 현

생년월일:        REDACTED

근무처 및 직위: (주)보경인베스트 회장

상기 본인은 1980년에 동국대학교를 졸업한 이후 기업활동을 영위해 왔고, 최근에는 (주)다산에스디산업개발(서울시 강남구 대치동 942-10 해성 2빌딩 9층) 및 (주)보경인베스트(2009년 기준 총매출액 94억원) 등을 설립하여 운영하고 있으며, 나의 모교인 동국대학교에 대하여 항상 감사하고 자랑스럽게 생각해 왔습니다.

동문 기업인으로서 평소 학교에 대한 관심과 기여를 생각해 오던 중 2006년에는 동국대학교 건학 100주년을 맞아 5억원 규모의 동국대학교 발전기금을 2개년에 걸쳐 납부키로 약정하였습니다.

그리고 2007년 2월에는 모교 동국대학교가 행정자치부 장관을 역임한 현 오영교 총장을 영입함으로써, 동문의 한사람으로서 학교 발전에 대한 기대가 부풀었습니다. 역량있는 CEO형 외부인사인 오영교 총장의 부임 자체만으로도 학교의 많은 변화와 발전을 기대하기에 충분하였습니다.

그러나 2007년 7월 신정아와 학교가 부도덕하게 연루되었다는 소식이 연일 언론에 대서특필되므로써 실망을 넘어 배신감을 느꼈으며 당초 계획한 5억원의 기부를 하지 않기로 결정하였습니다. 당시 본인은 동국대학교 동문이라는 사실을 무척 부끄럽게 생각하고 학교에 대한 관심조차 두지 않았습니다.

그럼에도 불구하고 최근 신정아 사태에 학교의 고의적인 실수가 없었음을 듣게 되었으며, 신정아 사태로 인해 학교는 물론 동문들이 받았던 피해와 정신적 상처가 하루빨리 회복되기를 바랍니다.

위 내용이 사실과 다름없음을 확인합니다.

2010년 5월 24일

(주)보경인베스트
김 오 현

DONGGUK0381478

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0381478 from the Korean language into the English language.

I further certify that translation of DONGGUK0381478 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Kwang Park
**Professional Translator**

Subscribed and sworn to before me on ____27____ day of July , 2011 (year)

(Signature of Notary)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Notary Stamp)

# EXHIBIT 89

UNITED STATES DISTRICT COURT
DISTRICT OF C0NNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DONGGUK UNIVERSITY,                           :        No. 3:08-CV-00441 (TLM)
                                              :
            Plaintiff,                        :
                                              :
     v.                                       :
                                              :
YALE UNIVERSITY,                              :
                                              :
            Defendant.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### PLAINTIFF DONGGUK UNIVERSITY OBJECTIONS AND RESPONSES TO DEFENDANT YALE UNIVERSITY'S FOURTH SET OF REQUESTS FOR PRODUCTION

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff Dongguk University ("Dongguk"), by and through its attorneys, McDermott, Will & Emery LLP and Jacobs, Grudberg, Belt, Dow & Katz, P.C., hereby responds to defendant Yale University's ("Yale") First Set of Requests for Production (the "Document Requests") as follows:

### RESERVATION OF RIGHTS

1.      Dongguk's responses and objections are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve all questions as to their competency, authenticity, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the responses or subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

2.      Dongguk preserves the right to object on any ground to the use of said responses, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

**OBJECTIONS AND RESPONSE:**

Subject to and without waiving the General Objections, Dongguk states that all documents identified in Interrogatory 4 of Yale's Fourth Set of Interrogatories to Dongguk have already been produced to Yale in prior productions.  Dongguk has no other documents responsive to this Document Request.

**DOCUMENT REQUEST NO. 4**

All applications, resumes, or other documents that Dongguk received from any individuals seeking the position for which Dongguk hired Jeong Ah Shin on September 1, 2005.

**OBJECTIONS AND RESPONSE:**

Dongguk specifically objects to this Document Request on the ground that it is based upon a misstatement of fact.  No other individuals were considered for the position for which Jeong Ah Shin ("Shin") was hired because Shin was hired as part of Dongguk's 2005 special hiring process.  Subject to and without waiving the foregoing specific and General Objections, Dongguk states that it does not have any documents responsive to this Document Request.

**DOCUMENT REQUEST NO. 5**

All documents concerning any donations that Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim made, pledged, or proposed to make to Dongguk.

**OBJECTIONS AND RESPONSE:**

Subject to and without waiving the General Objections, Dongguk states that all documents concerning any donations that Jin Sik Choi, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim made, pledged, or proposed to make to Dongguk have already been produced to Yale in prior productions.

**DOCUMENT REQUEST NO. 6**

All documents concerning Dongguk's solicitation of donations from Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim.

**OBJECTIONS AND RESPONSE:**

Subject to and without waiving the foregoing General Objections, Dongguk states that all documents concerning Dongguk's solicitation of donations from Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim have already been produced to Yale in prior productions.

**DOCUMENT REQUEST NO. 7**

All documents concerning any correspondence or other communications between Dongguk and Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim.

**OBJECTIONS AND RESPONSE:**

Dongguk specifically objects to this Document Request to the extent that it seeks the production of documents that are not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Dongguk specifically objects to this Document Request to the extent that it is overly broad and unduly burdensome in that it requires "any correspondence or other communications between Dongguk and Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim." Subject to and without waiving the foregoing specific objections and the General Objections, Dongguk states that all documents responsive to this Document Request have already been produced to Yale in prior productions.

**DOCUMENT REQUEST NO. 8**

To the extent not otherwise requested, all documents concerning Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim.

**OBJECTIONS AND RESPONSE:**

Dongguk specifically objects to this Document Request to the extent that it seeks the production of documents that are not reasonably calculated to lead to the discovery of admissible evidence.  Additionally, Dongguk specifically objects to this Document Request to the extent that it is overly broad and unduly burdensome in that it requires "all documents concerning Jin Sik Cho, Joon Hyung Park, Hyun Jung Kang, Oh Hyun Kim, or Jin Moon Kim."  Subject to and without waiving the foregoing specific objection and the General Objections, Dongguk states that all documents responsive to this Document Request have already been produced to Yale in prior productions.

**DOCUMENT REQUEST NO. 9**

From 2007 to the present, all documents concerning any individual's, corporation's, or other entity's decision not to donate money to Dongguk, including but not limited to all documents concerning any individual's, corporation's, or other entity's reasons for not donating money to Dongguk.

**OBJECTIONS AND RESPONSE:**

Dongguk specifically objects to this Document Request to the extent the phrase "decision not to donate money" is vague and ambiguous.  Subject to and without waiving the foregoing specific objection and General Objections, Dongguk states that it does not have any documents responsive to this Document Request.

**DOCUMENT REQUEST NO. 10**

Any minutes or transcript of the October 10, 2007 meeting of the Dongguk University Foundation Board of Directors.

**OBJECTIONS AND RESPONSE:**

Subject to and without waving the General Objections, Dongguk states that it has previously produced documents concerning Dongguk's ranking among Korean universities in prior productions. Dongguk intends to produce any additional responsive, non-privileged documents and it will identify the bates numbers of such documents at the time of production.

Dated: November 3, 2010

McDERMOTT WILL & EMERY LLP

By: _____
Robert A. Weiner
Audrey Lu
340 Madison Avenue
New York, New York 10173-1922
(212) 547-5400
*Attorneys for Plaintiff Dongguk University*

Of Counsel:
Ira Grudberg
Jacobs, Grudberg, Belt, Dow & Katz, P.C.
350 Orange Street
New Haven, Connecticut 06511
(203) 951-3720

-11-

# EXHIBIT 90

# Fetner, Howard

| | |
|---|---|
| **From:** | Lu, Audrey [AuLu@mwe.com] |
| **Sent:** | Tuesday, October 26, 2010 2:07 PM |
| **To:** | Fetner, Howard |
| **Subject:** | RE: Dongguk v. Yale |

Howie-

The affidavits and the chart produced are the only responsive documents.

**From:** Fetner, Howard [mailto:hfetner@daypitney.com]
**Sent:** Monday, October 25, 2010 4:59 PM
**To:** Lu, Audrey
**Subject:** Dongguk v. Yale

Audrey,

You agreed to provide Dongguk's responses to Requests 5-9 of Yale's Fourth Set of Requests for Production prior to this Wednesday and Thursday's Rule 30(b)(6) deposition concerning donations. You've indicated that all of Dongguk's responsive documents to Requests 5-9 have been produced, but we still have not received Dongguk's responses to those Requests (including identifying responsive documents by Bates numbers). Other than the documents numbered DONGGUK0381465 and DONGGUK0381478-82, are there any documents responsive to Requests 5-9? If so, please identify them by Bates number no later than tomorrow. Thank you.

Howie

Howard Fetner
Attorney at Law
Day Pitney LLP
One Audubon Street, 6th Floor | New Haven CT 06511
| t (203) 752 5012 | f (203) 752 5001 | c (203) 232 7125
hfetner@daypitney.com     www.daypitney.com

*********************************************************************************
IRS Circular 230 Notice: Any tax advice provided herein (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed on any taxpayer.
*********************************************************************************

This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely for the use of the addressee(s) named above. Any disclosure, distribution, copying or use of the information by others is strictly prohibited. If you have received this message in error, please notify the sender by immediate reply and delete the original message. Thank you.

This message contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended solely the use of the addressee(s) named above. Any disclosure, distribution, copyin information by others is strictly prohibited. If you have received this messa notify the sender by immediate reply and delete the original message. Thank y

**********************************************************************************************

IRS Circular 230 Disclosure: To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

---

This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
**********************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

7/29/2011

# EXHIBIT 91

[DONGGUK0381479]

 Shinsung Pharmaceutical Co., Ltd.

Shinsung Bldg. 4th floor, 398-8 Jungan-1-dong, Dongdaimun-ku, Seoul ☎ 02-3407-2500 / Fax
02-2245-5076

<u>Respectfully submitted to the President, Dongguk University</u>
Subject: Request for cancellation of school advancement fund contribution
Name: Jin Moon Kim, President of Shinsung Pharmaceutical Co., Ltd.
DOB: REDACED

    1. I, as the individual named above and an alumnus entrepreneur, have been thinking
about my interest in and contribution to the School, and when my alma mater Dongguk
University appointed the current president Young Kyo Oh, who was a former minister of Public
Administration and Security, in February this year, I became very hopeful as an alumnus about
advancement of the School. Because appointment of Young Kyo Cho, who was an outsider but
known to be a capable CEO-type person, as president itself was sufficient to expect a great deal
of change and advancement for the School, I decided to contribute a total of 1 billion won of
development funds over the period of '08 to '09, and signed a memorandum of commitment last
April.

    2. However, as the news that Jeong Ah Shin and the School had been unethically
involved continued to hit the press every day in July this year, I felt disappointed and even felt a
sense of betrayal and began to think that it is a very embarrassing fact that I am a graduate of
Dongguk University.

    3. Thus, I withdraw my commitment for the donation signed last April and request that
said commitment be invalidated.

Dec. 5, 2007

                             [signature]
                             Jin Moon Kim
                             Shinsung Pharmaceutical Co., Ltd.

新星藥品株式會社

서울시 동대문구 장안1동 398-8 신성빌딩 4층 ☎ 02-3407-2500 / Fax 02-2245-5076

동국대학교 총장 귀하

제 목: 학교 발전기금 납부계획 취소 요청

성 명: 김 진 문, 신성약품(주) 대표

생년월일:     REDACTED

1. 상기 본인은 동문 기업인으로서 평소 학교에 대한 관심과 기여를 생각해 오던 중 금년 2월 모교 동국대학교가 행정자치부 장관을 역임한 현 오영교 총장을 영입함으로써, 동문의 한사람으로서 학교 발전에 대한 기대가 부풀었습니다. 역량있는 CEO형 외부인사인 오영교 총장의 부임 자체안으로도 학교의 많은 변화와 발전을 기대하기에 충분하였기 때문에 본인은 '08~'09년에 걸쳐 총 10억원의 발전기금을 학교에 납부키로 하고 지난 4월에 약정서를 체결하였습니다.

2. 그러나 금년 7월 신정아와 학교가 부도덕하게 연루되었다는 소식이 연일 언론에 대서특필됨으로써 실망을 넘어 배신감을 느끼고 있으며, 동국대학교 동문이라는 사실을 무척 부끄럽게 생각하고 있습니다.

3. 이에 지난 4월에 체결한 기부 약정을 포기하오니 동 약정사실이 없었던 것으로 하여 주시기 바랍니다.

2007년 12월 5일

金 鎭 文

신성약품(주) 김진문

DONGGUK0381479

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0381479 from the Korean language into the English language.

I further certify that translation of DONGGUK0381479 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_Kwang Park_
**Kwang Park**
**Professional Translator**

Subscribed and sworn to before me on ___27___ day of _July_ , _2011_ (year)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Signature of Notary)                              (Notary Stamp)

# EXHIBIT 92

[DONGGUK0381480]

 **SIMPAC HDS**          Written Verification

Name: Jin Sik Choi
DOB: REDACTED
Work & Position: CEO, SIMPAC Inc.

    I, the individual named above, am a graduate of the Trade Department of Dongguk University (admitted in March 1977, graduated in February 1983) and an entrepreneur who manages SIMPAC Inc., a metal forming machinery manufacturer (in 2009, total assets: 177 billion won, revenue: 122.5 billion won, net profit for the year: 13.7 billion won), SIMPAC ANC Inc., an alloy producer (in 2009, total assets: 163.6 billion won, revenue: 119.2 billion won, net profit for the year: 9 billion won), SIMPAC ENG Inc., a steel plate processor and distributor (in 2009, total assets: 29.1 billion won, revenue: 34.4 billion won, net profit for the year: 7.1 billion won), and the holding company of SIMPAC GROUP, SIMPAC Holdings Inc. (in 2009, total assets: 74.2 billion, revenue: 15.6 billion, net profit for the year: 14 billion won).

    As an alumnus entrepreneur of Dongguk University, I sympathized with the vision and development strategy, "108 Project," presented by president Young Kyo Oh of the University upon his inauguration in February 2007, and planned a donation of 5 billion won. While I was reviewing the procedure for donating 5 billion won and the detailed plan for utilizing the donation amount, I came to face the embarrassing incident related to Jeong Ah Shin (hereinafter, Jeong Ah Shin case) in July 2007, so have reversed my intention to donate.

    As an alumnus entrepreneur, I became greatly disappointed and distrust the president and management staff and the School as a result of the 'Jeong Ah Shin case,' so I decided to establish a separate scholarship foundation rather than donating directly to the School. Furthermore, I have utilized the 5 billion won that I had planned to donate to Dongguk University to establish and have been operating the "Piljung Scholarship Foundation," whose basic assets amount to 5 billion won.

    It is frustrating to witness that the social controversy, the plummeting status of my alma mater and distrust by alumni, all of which was caused by the 'Jeong Ah Shin case,' have not been restored. I sincerely wish that the damage and disgrace suffered by my dear Dongguk University will disappear quickly and completely. If so, confidence in and contributions to the School by its alumni will increase and advancement of the School will speed up.

    I verify that the foregoing is true and accurate.

May 20, 2010

[Signature]<br>Jin Sik Choi

**SIMPAC HDS**

# 확 인 서

성 명 : 최진식
생년월일 :　　REDACTED
근무처 및 직위 : ㈜SIMPAC 회장

상기 본인은 동국대학교 무역학과 동문 (1977년 3월 입학, 1983년 2월 졸업)으로서 금속 성형기계 제조업체인 SIMPAC GROUP 내 ㈜SIMPAC (2009년 자산총계 1,770억원, 매출액 1,225억원, 당기순이익 137억원), 합금철 생산업체인 ㈜SIMPAC ANC (2009년 자산총계 1,636억원, 매출액 1,192억원, 당기순이익 90억), 철판 가공, 유통업체인 ㈜ SIMPAC ENG (2009년 자산총계 291억, 매출액 344억, 당기순이익 71억)와 그룹 지주 회사인 ㈜심팩홀딩스 (2009년 자산총계 742억, 매출액 156억, 당기순이익 140억)를 경영하는 기업가입니다.

동국대학교 동문 기업가로서 본인은 모교 오영교 총장이 2007년 2월 취임시 제시한 동국대학교 비전과 발전전략 '10B프로젝트'에 공감하고, 이의 원활한 실천과 모교 발전에 기여하고자 50억원의 기부를 계획하였습니다. 기부금 50억원 납부 절차와 기부금 세부 활용방안에 대해 검토하던 중 2007년 7월 신정아와 관련한 당혹스런 사태 (이하, 신정아 건)를 접하고 당초 계획한 기부 의사를 철회하였습니다.

동문 기업가로서 본인은 '신정아 건'의 발생으로 인해 총장 이하 경영진 및 모교에 대한 실망과 불신이 높아져, 학교로의 직접적인 기부보다는 별도의 장학재단을 설립하기로 하고 동국대학교에 기부키로 계획하였던 상기 50억원을 활용하여 기본재산 50억원의 "필경장학재단"을 설립하고 운영하고 있습니다.

'신정아 건'으로 인한 사회적 파장, 낮아진 모교의 위상 및 동문들의 불신이 여전히 회복되지 못하고 있음은 안타까운 일입니다. 저는 사랑스러운 동국대학교가 '신정아 건'으로 입은 피해와 불명예가 조속하게 완전히 해소되기를 간절히 바랍니다. 그럴 경우, 동문들의 학교에 대한 자부심과 기여도가 높아지고 학교발전을 앞당기게 될 것입니다.

위 내용이 사실과 다름없음을 확인합니다.

2010년  5월 20일

최 진 식

**DONGGUK0381480**

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0381480 from the Korean language into the English language.

I further certify that translation of DONGGUK0381480 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

_Kwang Park_
**Kwang Park**
**Professional Translator**

Subscribed and sworn to before me on ___27___ day of _July_ , _2011_ (year)

_Frances Fuentes_

(Signature of Notary)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Notary Stamp)

# EXHIBIT 93

[DONGGUK0381481]

**Affidavit**
Name: Jun-Hyeong Park
Date of birth: REDACTED
Place and position of employment: Silla Co., Ltd., Chairman of the Board

I, the person named above, after graduating from the economics department of Dongguk University in 1963, founded Silla Co., Ltd. in 1967 and since then have been actively engaged in the enterprises of deep-sea fishing and the import/export business.

Through approximately 40 years of corporate activity, at the end of 2009 Silla Co., Ltd. had grown into a company with capital amounting to 382.4 billion won, sales of 234.0 billion won, and an annual net profit of 31.2 billion won.

As the Chairman of the Board of Silla Co., Ltd., I have always been interested in the development of my alma mater, and in particular, upon meeting the newly-appointed President Young-Kyo Oh in March 2007, I was deeply impressed to hear of his development plans and vision for Dongguk University.

Subsequently, when I had made plans to contribute a half-billion won to the development fund to provide funding for my alma mater, I learned of the rumored "Jeong-Ah Shin incident" in July 2007.

At the time, this came as a very great shock to me, and in great disappointment, I did not feel any expectation for my alma mater's development or any need to contribute, and I abandoned my intention to contribute.

I hope that Dongguk University will swiftly recover its image that has been tarnished by the "Jeong-Ah Shin" incident, and I confirm the above facts.

May 28, 2010
[signature]
Jun-Hyeong Park, Chairman of the Board, Silla Co., Ltd.



# 확 인 서

성     명: 박준형
생년월일;      REDACTED
근무처 및 직위: 신라교역(주) 회장

상기 본인은 동국대학교 경계학과를 1963년 졸업 한 후, 1967년 신라교역주
식회사 설립하여 원양어업과 수출입업을 중심으로 기업 활동을 해오고 있습
니다.

40여년의 기업 활동을 통해 신라교역(주)는 2009년 말 기준으로 자산규모
3824억 원, 매출액 2340억 원, 당기순이익 312억 원대의 기업으로 성장하였
습니다.

신라교역(주)의 회장으로서 모교 발전에 관심을 늘 가져왔고, 특히 2007년 3
월 모교 총장으로 취임한 오영교 총장을 만나면서 동국대학교의 비전과 발
전계획 등을 전해 듣고 깊은 인상을 받았습니다.

이후 모교 발전을 위한 재원을 위해 45억 원의 발전기금을 기부하기로 계획
하던 중 2007년 7월 "신정아 사건" 소식을 들었습니다.

당시에 본인은 매우 큰 충격을 받았고, 깊은 실망감에 모교 발전에 대한 기
대감은 물론 기부 실행의 필요성을 더 이상 느끼지 못해 기부 의사를 철회
하였습니다.

동국대학교가 "신정아 사건"을 통해 실추된 위상을 조속히 회복하기를 바라
면서, 위 사실을 확인합니다.

2010년 5월 28 일

신라교역(주) 회장 박 준 형

DONGGUK0381481

## CERTIFICATE OF TRANSLATION

**I, Samuel Henderson, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0381481 from the Korean language into the English language.**

**I further certify that translation of DONGGUK0381481 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.**

Samuel Henderson
Professional Translator

Subscribed and sworn to before me on _27th_ day of _July_, _2011_ (year)

(Signature of Notary)

Official Seal
LAKETRA N. WILLIAMS
Resident of Lake County, IN
My commission expires
September 4, 2016
(Notary Stamp)

# EXHIBIT 94

[DONGGUK0381482]
Ultra
**Affidavit**
Name: Hyeon-Jeong Kang

Ultra Construction, of which I, the above-named, am the CEO, received a contract in 2004 for the remodeling of the Dongguk University library and successfully completed the project; we subsequently maintained a positive relationship with Dongguk University. During that period, in early 2007, I was considering a donation for the development of Dongguk University, in the amount of 1.0 billion won.

However, in the summer of 2007, the case of Jeong-Ah Shin, which arose between Dongguk University and Yale University, shocked the entire Republic of Korea, and due to the negative press regarding Dongguk University, I anticipated there would be a risk of damage to our corporate image, and gave up the thought of contributing.

I hope that Dongguk University swiftly recovers the public trust.

The above is a truthful statement of the facts.

May 31, 2010
[signature]
Hyeon-Jeong Kang

# ultra

## 확　인　서

성　　　명 : 강현정


상기 본인이 대표이사로 있는 울트라건설은 2004년 동국대학교의 도서관 리
모델링 공사를 수주받아 성공적으로 완공하였으며, 동국대학교와 우호적인
관계를 유지하고 있었습니다. 그러던 중 상기 본인은 2007년 초에 동국대학
교의 발전을 위해 10억 정도 기부를 고려하고 있었습니다.

그러나 2007년 여름에 동국대학교와 예일대학교 간에 발생한 신정아 사건이
대한민국 전체를 떠들썩하게 하였고 동국대학교에 대한 부정적인 여론으로
인한 회사 이미지 하락 등 위험이 예상되어 기부하려는 생각을 접었습니다.

상기 본인은 동국대학교가 조속히 사회의 신뢰를 회복하길 기원합니다.

위 내용은 사실과 다름이 없습니다.


2010년 5월 31일


강 현 정

DONGGUK0381482

# CERTIFICATE OF TRANSLATION

I, Samuel Henderson, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0381482 from the Korean language into the English language.

I further certify that translation of DONGGUK0381482 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

Samuel Henderson
Professional Translator

Subscribed and sworn to before me on _27th_ day of _July_, _2011_ (year)

(Signature of Notary)

Official Seal
LAKETRA N. WILLIAMS
Resident of Lake County, IN
My commission expires
September (Notary Stamp)
NOTARY PUBLIC (SEAL) INDIANA