# EXHIBIT 95

[DONGGUK0378590]

## Complaint

| | | |
|---|---|---|
| Plaintiff | School | Corporation Dongguk University |
| | | 26 Pil-dong, 3-ga, Jung-gu, Seoul |

Representative Yong Taik Im, Chairman

Attorney of the above plaintiff: Dongsuwon Law Corporation

Responsible Attorney: Sung Bae Namkung, Chol Hwan Wee, Yo Hum Lee

Sungjun Bldg. #406

83-23 Wonchun-dong, Yongtonggu, Suwon-si

[TEL: 031-211-5723, FAX: 031-211-5726]

| | |
|---|---|
| Defendant | Minister of Education, Science and Technology |
| | 55 Sejong-no. Chongno-gu, Seoul |

Action of cancellation request for disposition of preliminary approval rejection

### Intent of request

1. The disposition that Defendant has rejected preliminary approval on a law school with respect to Plaintiff on 2/4/2008 shall be cancelled.
2. Defendant shall be responsible for the expenses of litigation.
   Judgment as in the above is requested.

[Repeated footer:]

| | | | |
|---|---|---|---|
| 83-23 Wonchun-dong, Yongtonggu, Suwon-si Sungjun Bldg. #406 | Notary Public | Dongsuwon Law Corporation | Tel: (031) 211-5723 ~ 4 Fax: (031) 211-5726 |

[DONGGUK0378591]

Cause of Request

1.    Progress of this case disposition

   A. Plaintiff

   The plaintiff represents the first Buddhist order-founded university of the Daehan
   Empire, which was established by pioneers of the Buddhism circle as the central
   educational institute for new age education in 1906.
   The plaintiff has cultivated numerous talents in the legal profession, including
   supreme court justices and judges for the Constitutional Court, and contributed to
   national development since its department of law was newly established in 1949
   (Exhibit Kap No. 1).
   In the meantime, as social demands for legal services of high quality that would meet
   with varied expectations and desires of people have increased, the act concerning
   installation and operation of the law school was established as part of judicial reform
   on 7/27/2007. As such, the plaintiff invested, according to all bases including the
   above act, enforcement ordinance, and approval standards, approximately 20 billion
   won for the expenses required for new construction and renovation of such facilities
   including an exclusive law school library, newly appointed over 20 professors
   including six that had Korean lawyer qualifications and completed hands-on training,
   organized approximately 30 billion won of scholarship funds, and strived to organize
   the education curricula in which the Culture and Industry Act was chosen as a
   specification area to reinforce versatility, specialization and specification so that
   teachers, facilities and curricula required by the act above might be faithfully
   furnished.
   Further, the plaintiff submitted, based on the above Act, an application for
   preliminary approval for establishment of a law school to the defendant on
   11/30/2007 (Exhibit Kap No. 2).

[DONGGUK0378592]

### B. Defendant

The defendant is the person with the authority who may determine approval if there is an application for approval of installation of a law school, taking the validity of the educational goals and curricula, satisfaction of the installation standards, etc., of the plaintiff into account according to the Act concerning Installation and Operation of a Law School (the Act concerning Installation and Operation of a Law School Article 6) and made an official announcement of 25 universities in Seoul, capital and provincial regions as those with preliminary approval through each press agency on 2/4/2008.

2.   Regarding related laws and ordinances

The basic law of this case disposition is the Act concerning Installation and Operation of a Law School, and its key provisions are listed below:

Act concerning Installation and Operation of a Law School

Article 4    (Installation Principle)        A founder/operator of a university (Refers to the state in case of a national university, a local government in case of a public university, and a school corporation in case of a private university, respectively. Hereinafter, the same applies.) may install and operate a law school whose primary objective deals with education and research on legal theories and practices required to cultivate legal professionals.

Article 6    (Standards for Approval of an Installation)    ① The Minister of Education, Science and Technology may, if there is a request for approval for installation of a law school according to Article 5 Clause 2, consider the validity of the educational goals and curricula intended to achieve the educational vision according to Article 2, satisfaction of the installation standards, etc., into account and approve.

[DONGGUK0378593]

② Any detailed standards required concerning approval of the installation in Clause 1 shall be prescribed by the minister of Education, Science and Technology.

Article 10 (Installation and Function of Law Education Committee)    The law education committee shall be placed under the minister of Education, Science and Technology in order to review each of the following concerning a law school.

1. Details concerning approval for the installation of a law school (including the details concerning installation of a law school that is established in a national university.)

2. Details concerning approval of abolishment of and changes in a law school (including details concerning abolishment of and changes in a law school established in a national university.)

3. Details concerning the quota of an individual law school.

4. Details concerning detailed standards for approval for the installation of a law school.

5. Other details that the minister of Education, Science and Education adds concerning cultivation of legal professionals and law education of a law school.

Article 11 (Organization of Law Education Committee)         ① The law education committed shall consist of 13 members, including one chairperson.

② The chairperson shall be appointed from among the members, according to Clause 3, by the minister of Education, Science and Technology.

③ The members shall be appointed by the minister of Education, Science and Technology from those to which the following apply:

1. Law school professor or associate professor, 4 persons.

2. A judge with at least 10 years of experience who is recommended by the commissioner of National Court Administration, 1 person.

[DONGGUK0378594]

3. A prosecutor with at least 10 years of experience who is recommended by the minister of Justice, 1 person.

4. An attorney with at least 10 years of experience who is recommended by the chairman of the Korean Bar Association, 2 persons.

5. A government official who has at least 10 years of experience in education administration, 1 person.

6. A person with academic knowledge and reputation (excluding those who hold the title of full-time instructor of law or higher and have lawyer qualifications), 4 persons.

Article 13 (Reasons for Exclusion as a Law Education Committee Member)  The member shall not become involved in the review concerned if any of the following apply to him/her:

1. The instance in which the principal or his/her spouse is employed in the University targeted for review or the school corporation that installs and operates such university.

2. The instance in which the principal or his/her spouse has a kinship relation, according to the 'Civil Code' Article 777, with a person to which any of the following apply:

A. President of the university under a review.

B. Teacher in the law department, undergraduate law school or law school of the university under review.

C. Officer of the school corporation for the university under review.

3. Illegal nature of this case disposition

A. Illegal nature of organization of the law school committee

(1) The Act concerning installation and operation of a law school prescribes

[DONGGUK0378595]

installation of the law education committee consisting of 13 persons as its review agency in order to promote appropriateness of installation approval and quota determination (Article 10). As such, the defendant appointed 13 persons as members of the law education committee and designated In Nyung Shin from among them as the chairperson [Exhibit Kap No. 3].

(2) The law education committee has the authority to review the details concerning approval for the installation of a law school, its quota allocation, and details concerning detailed standards of such installation approval.

(3) On the other hand, in order to promote appropriateness and fairness of the review process above, the reasons for exclusion of a member of the law education committee are prescribed in Article 13 of the Act concerning Installation and Operation of a Law School. Thus the reasons for exclusion of a member of the law education committee are prescribed such that a person for whom it is found that "the instance in which the principal or his/her spouse is employed in the University targeted for review or the school corporation that installs and operates such university" and "the instance in which the principal or his/her spouse has a kinship relation, according to the 'Civil Code' Article 777, with a person who is the president of the university under review, a teacher in the law department, undergraduate law school or law school of the university under review, or an officer of the school corporation for the university under review" shall not be involved in such a review.

(4) Nevertheless, the defendant committed such an illegal act that may not be comprehended in which he appointed professor In Nyung Shin as its chairperson who currently holds office in the School of Law in Ewha Women's University, which applied for approval for establishment of a law school, and appointed as its members professor Hyo Shin Kim, who currently holds office in the School of Law in Kyungbuk National University, professor Byung Seok Jung, who currently holds office in the School of Law in Chonnam National University, and professor In Sop Han, who currently holds office in the School of Law in Seoul National University.

[DONGGUK0378596]

Under the situation that public interest in the approval for establishment of a law school has greatly increased and the relations of interests among applying universities are in sharp confrontation, this act of appointing the person who held office in the university under review cannot possibly be ignored.

Basically, the reasons for exclusion refer to reasons by which a person who is in a special relation with respect to a specific incident is prohibited from performing duties concerning the incident. This represents the system in which a party is prohibited from performing duties based on the reason of a special relation out of concern for fair performance of his/her duties, whether he/she has performed his/her duties fairly or not.

Therefore, it is evident that all the acts of review performed by the members above after they had been appointed for the law education committee are illegal acts in violation of the reasons for exclusion based on the following aspects:

B. Illegal nature of installation approval based on willful selection method

(1) The dependant stated through the notice of request for approval for installation of a law school (Notice No. 2007-120) according to the Act above on 10/30/2007 that the selection method regarding the approved university should be based on the following:

Following

[DONGGUK0378597]

o   The purpose shall be the cultivation of excellent legal professionals and selection shall be made taking regional balances into consideration.

o   The entire nation shall be established as 5 major regions based on the units of the High Court jurisdiction, and excellent universities selected for installation approval within each region.

| High Count Location | Region |
|---|---|
| Seoul | Seoul, Kyunggi, Inchun, Kangwon |
| Taijon | Taijon, Chungnam, Chungbuk |
| Taigu | Taigu, Kyungbuk |
| Pusan | Pusan, Kyungnam, Ulsan |
| Kwangju | Kwangju, Chonnam, Chonbuk, Cheju |

o   While regional balances may be taken into account in selecting the universities with installation approval within each region, any university that is judged to be inappropriate for installation and operation of a law school based on a review shall not be selected.

o   A law school (including the admission quota of individual graduate school) shall be approved for installation by the minister of Education, Science and Technology upon the review by the law education committee.

(2)   On the other hand, according to the results of the review of the Seoul region to which the plaintiff belonged, disclosed on 1/15/2008, 15 universities out of 24 applicant universities in the Seoul region were selected, but 13 universities ranked 1 to 13, the 15th ranking (Inha Univ.) and the 19th ranking (Kangwon National Univ.) were selected in terms of rankings, which represents the results according to the so-called principle of regional

[DONGGUK0378598]

balance, in which the universities located in Kyunggi Province, Kangwon Province and Inchun Metropolitan City were preferentially selected for the Seoul region, and the universities were allocated to the universities located in Seoul according to the quota.

(3) However, regarding the method for selecting approved universities announced by the defendant, its principle is such that the entire nation shall be established as 5 major regions based on the units of the High Court jurisdiction, with excellent universities selected as those with installation approval within each region, and a supplementary and exceptional selection method seems to be presented, wherein "While regional balances may be taken into account in selecting the universities with installation approval within each region, any university that is judged to be inappropriate for installation and operation of a law school based on a review shall not be selected."

(4) Then, the method of selection for preliminary approval in the Seoul region discloses its appropriateness afterward regarding evaluation of each review item, and the fact according to the announcement made by the defendant that the "14th ranking university" was omitted from the 15 universities selected, with the 15th ranking and 19th ranking universities being selected, would be in violation of the law in that it lacks a reason even based on the selection method above, so the principle criteria are ignored according to the supplementary and exceptional criteria of regional balance.

(5) Furthermore, if the regional balances within the regions are taken into consideration, the disposition of the defendant that the criterion of "no selection in case of lacking capabilities" was ignored and the 19th ranking university was preferentially selected according to the criteria of regional balances above would clearly exceed its discretion, and so becomes illegal.

[DONGGUK0378599]

C. Unjust nature of evaluation of each evaluation item on the application for installation approval.

Regarding the unjust nature of the evaluation concerning each evaluation item (educational goals, admission screening, curriculum, teachers, students, educational facilities, finances, related degree programs, university competitiveness and social obligations) on the application for approval for installation of a law school submitted by the plaintiff, statements will be made as soon as field survey reports prepared by the field survey team on the plaintiff and its competitors within the same region of Inha University and Kangwon National University, the written opinion prepared by each member of the law education committee, rating tables, and any other documentary evidence prepared during the review process are secured.

4. Conclusion

Therefore, this case disposition is thought to have not only violated the provisions of the Act concerning Installation and Operation of a Law School, but also exceeded or abused the scope of discretionary rights so as to be illegal, so that this litigation has been instituted to seek its cancellation.

Method of Proof

1. Exhibit Kap No. 1    Certified copy of corporate registration ledger

[DONGGUK0378600]

| | |
|---|---|
| 1. Exhibit Kap No. 2 | Application for approval for installation of a law school |
| 1. Exhibit Kap No. 3 | List of members of the law education committee and their affiliations |
| 1. 1 to 8 of Exhibit Kap No. 4 | Each newspaper article |
| 1. Exhibit Kap No. 5 | Study of installation approval review criteria in the field of curriculum for law schools (Korea Research Foundation) |
| 1. Exhibit Kap No. 6 | Criteria of review of approval for installation of a law school (Ministry of Education, Science, and Technology) |
| 1. Exhibit Kap No. 7 | Notice of request for approval for installation of a law school |

## Appendix

| | |
|---|---|
| 1. Complaint duplicate | 1 each. |
| 1. Documentary evidence above | 2 each. |
| 1. Service payment notice | 1 each. |
| 1. Litigation power of attorney | 1 each. |
| 1. Responsible attorney designation form | 1 each. |

Feb. 2008
Attorney of the above Plaintiff
Dongsuwon Law Corporation
Responsible Attorney:  Sung Bae Namkung,
Chol Hwan Wee, Yo Hum Lee

Seoul Administrative Court                                    Respectfully Submitted

[DONGGUK0378601]

Litigation Power of Attorney

| Case | Preliminary approval rejection disposition cancellation |
|---|---|
| Party | (Plaintiff) School Corporation Dongguk University<br>(Defendant) Minister of Education, Science and Technology |

Regarding the case above, the appointee indicated below is appointed as attorney and the following authority is awarded.

| Appointee | Dongsuwon Law Corporation<br>Sungjun Bldg. #406, 83-23 Wonchun-dong, Yongtonggu, Suwon-si<br>TEL: (031)211-5723          FAX: (031)211-5726 |
|---|---|
| Details of Authorization | (1) Any litigation acts and any acts related to the above case and concerning payment collection from the defendant.  (2) Institution of counterclaims and appearance.  (3) Reconciliation on the trial and outside the trial.  (4) Cancellation of action.  (5) Surrender and acceptance of claim.  (6) Appointment of sub-agent.  (7) Receipt of object.  (8) Payment of deposit and return request for and receipt of deposit and interest.  (9) Security interest exercise, best application, security cancellation application and agreement to said application, receipt of the original of security cancellation decision, and surrender of the appeal right regarding said cancellation decision.  (10) Institution or cancellation of appeal.  (11) Application for litigation cost settlement and its appearance.  (12) Opposition to ancillary attachments and provisional dispositions and said cancellation application and appearance regarding the above.  (13) Exercise of rights and best application.  (14) Application for lawsuit institution order.  (15) Property list application and its appearance.  (16) Dividend receipt.  (17) Any and all acts concerning complaint. |

The above litigation shall be delegated.

2008

Delegator (Plaintiff)   Yonng Taik Im, Representative Director
School Corporation Dongguk University
26 Pil-dong, 3-ga, Jung-gu, Seoul
[seal]

[DONGGUK0378602]

Responsible Attorney Designation Form

| Case | Preliminary approval rejection disposition cancellation |
|---|---|
| Party | (Plaintiff) School Corporation Dongguk University<br>(Defendant) Minister of Education, Science and Technology |

Concerning the above case, its attorney is Dongsuwon Law Corporation and designates its responsible attorneys as follows in accordance with the Korea Attorney Article 40 Clause 1.

| Responsible Attorney | Sung Bae Namkung, Chol Hwan Wee, Yo Hum Lee |
|---|---|

Feb. 2008

Dongsuwon Law Corporation

Sungjun Bldg. #406, 83-23 Wonchun-dong, Yongtonggu, Suwon-si
TEL: (031)211-5723          FAX: (031)211-5726

Seoul Central District Court                          Respectfully Submitted

Dongsuwon Law Corporation

Sungjun Bldg. #406, 83-23 Wonchun-dong, Yongtonggu, Suwon-si
TEL: (031)211-5723          FAX: (031)211-5726

[DONGGUK0378603]

Certificate of Filing

Plaintiff: School Corporation Dongguk University
Defendant: Minister of Education, Science and Technology

Regarding the case of preliminary approval rejection disposition cancellation request between the above parties, it is respectfully requested to certify that the plaintiff has filed the above case as number 2008GuHap7311 on 2/20/2008.  [seal]

The above is certified.
2/20/2008
Seoul Administrative Court
Jong Yeon Lee, Court Clerk
[seal]

2/20/2008
Attorney for the above plaintiff
Dongsuwon Law Corporation
Responsible Attorneys: Sung Bae Namkung, Chol Hwan Wee
[seals]

[Stamp:]
Filed
No.
02/20/2008
Seoul Administrative Court
Main Filing Office

Seoul Administrative Court                    Respectfully Submitted

2 - 3

# 소            장

원    고    학교법인  동국대학교

서울특별시  중구  필동3가  26

대표자  이사장  임 용 택

위  원고의  소송대리인  동수원종합  법무법인

담당변호사  남궁성배,  위철환,  이요흠

수원시  영통구  원천동  83의  23  승전빌딩  406호

[전화 031-211-5723,    FAX 031-211-5726]


피    고    교육인적자원부장관

서울  종로구  세종로  55


**예비인가거부처분 취소청구의 소**


### 청 구 취 지

1. 피고가  2008.  2.  4.  원고에  대하여  법학전문대학원  예비인가를  거부한

   처분은  이를  취소한다.

2. 소송비용은  피고의  부담으로  한다.


라는  판결을  구합니다.


수원시 영통구 원천동 83-23
(승전빌딩 406호)       공증  동수원종합법무법인       대표전화 : (031) 211-5723~4
                      인가                        팩    스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378590

# 청 구 원 인

## 1. 이 사건 처분의 경위

### 가. 원고

원고는 1906년 불교계의 선각자들이 신교육을 위한 중앙교육기관으로서 명진학교를 설립한 대한제국 최초의 불교 종립대학입니다.

원고는 1949년 법학과를 신설한 이래 대법관, 헌법재판소 재판관등 수많은 법조인재를 양성하여 국가발전에 기여하여 왔습니다(갑제1호증).

그런데 국민의 다양한 기대와 요청에 부응하는 양질의 법률서비스에 대한 사회적 수요가 높아지자 사법개혁의 일환으로 2007. 7. 27. 법학전문대학원설치·운영에 관한 법률이 제정되게 되었습니다. 이에 원고는 위 법, 시행령, 인가기준등의 모든 근거에 따라서 법학관과 법학전문도서관 등의 시설물 신·개축 비용으로 약200억을 투자하고, 6명의 국내의 변호사자격소지실무교육을 포함한 20여명의 교수를 신규로 임용하고, 약 300억원의 장학금을 조성하였으며, 문화산업법을 특성화 영역으로 선정하여 다양화·전문화·특성화를 제고하는 교육과정을 심혈을 기울여 편성하는 등 위 법률이 요구하는 교원·시설 및 교육과정을 충실히 갖추었습니다.

그리고 원고는 2007. 11. 30. 위 법률에 근거하여 피고에게 법학전문대학원설립 예비인가 신청서를 제출하였습니다(갑제2호증).

수원시 영통구 원천동 83-23
(승전빌딩 406호)
공증
인가 동수원종합법무법인
대표전화 : (031) 211-5723~4
팩    스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378591

나. 피고

피고는 법학전문대학원의 설치인가 신청이 있는 경우에 법학전문대학원설치·운영에 관한 법률에 따라 원고의 교육목표 및 교육과정의 타당성과 설치기준의 충족 여부 등을 고려하여 그 인가여부를 결정할 수 있는 권한을 가진 자로써(법학전문대학원설치·운영에 관한 법률 제6조) 2008. 2. 4. 서울·수도권 및 지방을 합하여 25개의 대학을 예비인가대학으로 각 언론기관을 통하여 공식발표를 하였습니다.


## 2. 관련법령에 관하여

이 사건 처분의 근거법률인 법학전문대학원설치·운영에 관한 법률의 중요 조항은 다음과 같습니다.


법학전문대학원 설치·운영에 관한 법률

제4조 (설치주체) 대학의 설립·경영자(국립대학의 경우에는 국가, 공립대학의 경우에는 지방자치단체, 사립대학의 경우에는 학교법인을 말한다. 이하 같다)는 법조인의 양성에 필요한 전문적인 법률이론 및 실무에 관한 교육 및 연구를 주된 목적으로 하는 법학전문대학원을 설치·운영할 수 있다.

제6조 (설치인가의 기준) ① 교육인적자원부장관은 제5조 제2항에 따른 법학전문대학원의 설치인가에 대한 신청이 있는 경우에는 제2조에 따른 교육이념을 달성하기 위한 교육목표 및 교육과정의 타당성과 설치기준의 충족

CONFIDENTIAL

DONGGUK0378592

여부 등을 고려하여 인가할 수 있다.

② 제1항의 설치인가에 관하여 필요한 세부기준은 교육인적자원부장관이 정한다.

제10조 (법학교육위원회의 설치 및 기능) 법학전문대학원에 관한 다음 각 호의 사항을 심의하기 위하여 교육인적자원부장관 소속으로 법학교육위원회를 둔다.

　　1. 법학전문대학원의 설치인가에 관한 사항(국립대학에 두는 법학전문대학원의 설치에 관한 사항을 포함한다)

　　2. 법학전문대학원의 폐지 및 변경인가에 관한 사항(국립대학에 두는 법학전문대학원의 폐지 및 변경에 관한 사항을 포함한다)

　　3. 개별 법학전문대학원의 정원에 관한 사항

　　4. 법학전문대학원 설치인가의 세부기준에 관한 사항

　　5. 그 밖에 법조인의 양성 및 법학전문대학원의 법학교육에 관하여 교육인적자원부장관이 부의하는 사항

제11조 (법학교육위원회의 구성) ① 법학교육위원회는 위원장 1인을 포함한 13인의 위원으로 구성한다.

② 위원장은 제3항에 따른 위원 중에서 교육인적자원부장관이 임명한다.

③ 위원은 다음 각 호에 해당하는 자 중에서 교육인적자원부장관이 위촉한다.

　　1. 법학교수 또는 부교수 4인

　　2. 10년 이상의 경력을 가진 판사로서 법원행정처장의 추천을 받은 자 1인

수원시 영통구 원천동 83-23
(승건빌딩 406호)
공증인가 동수원종합법무법인
대표전화 : (031) 211-5723~4
팩　　스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378593

3. 10년 이상의 경력을 가진 검사로서 법무부장관의 추천을 받은 자 1
인

4. 10년 이상의 경력을 가진 변호사로서 대한변호사협회장의 추천을 받
은 자 2인

5. 10년 이상 교육행정에 종사한 공무원 1인

6. 학식과 덕망이 있는 자(법학을 가르치는 전임강사 이상의 직에 있는
자 및 변호사 자격을 가진 자를 제외한다) 4인

제13조 (법학교육위원회 위원의 제척사유) 위원은 다음 각 호의 어느 하나
에 해당하는 경우에는 당해 심의에 관여하지 못한다.

1. 본인 또는 그 배우자가 심의대상인 대학 또는 대학을 설치·경영하는
학교법인에 재직하고 있는 경우

2. 본인 또는 그 배우자가 다음 각 목의 어느 하나에 해당하는 자와
「민법」 제777조의 친족관계에 있는 경우

가. 심의대상인 대학의 장

나. 심의대상인 대학의 법학과·법학부 또는 법학전문대학원의 교원

다. 심의대상인 대학의 학교법인의 임원

## 3. 이 사건 처분의 위법성

### 가. 법학교육위원회 구성의 위법성

(1) 법학전문대학원 설치·운영에 관한 법률은 법학전문대학원의 설

---

CONFIDENTIAL

DONGGUK0378594

치인가 및 정원결정에 있어서의 타당성을 기하기 위하여 그 심

의기관으로 13인으로 구성된 법학교육위원회를 설치하도록 하고

있습니다(제10조). 이에 피고는 13인을 법학교육위원으로 위촉하

고, 그 중 신인령을 위원장으로 임명하였습니다(갑제3호증).

(2) 법학교육위원회는 법학전문대학원의 설치인가에 관한 사항, 정원

배정, 설치인가의 세부기준에 관한 사항을 심의할 권한을 가집

니다.

(3) 한편 위 심의과정의 타당성 및 공정성을 기하기 위하여 법학전문

대학원설치 · 운영에 관한 법률은 제13조에서 법학교육위원회 위

원의 제척사유를 규정하고 있습니다. 그리하여 "본인 또는 그

배우자가 심의대상인 대학 또는 대학을 설치·경영하는 학교법인

에 재직하고 있는 경우" 및 "본인 또는 그 배우자가 심의대상인

대학의 장, 심의대상인 대학의 법학과·법학부 또는 법학전문대학

원의 교원, 심의대상인 대학의 학교법인의 임원에 해당하는 자

와 「민법」 제777조의 친족관계에 있는 경우"에는 당해 심의에

관여하지 못하도록 법학교육위원회 위원의 제척사유를 규정하고

있습니다.

(4) 그런데도 피고는 법학전문대학원 설립인가를 신청한 이화여자대

학교 법과대학에 재직하고 있는 신인령 교수를 위원장으로, 경

북대학교 법과대학에 재직하고 있는 김효신 교수, 전남대학교

법과대학에 재직하고 있는 전병석 교수, 서울대학교 법과대학에

재직하고 있는 한인섭 교수를 위원으로 각 임명하는 납득할 수

CONFIDENTIAL

DONGGUK0378595

없는 위법한 행위를 하였습니다. 법학전문대학원 설립인가에 대한 사회적 관심이 집중되고 신청대학들의 이해관계가 첨예하게 대립되어 있는 상황에서 위와 같이 심의의 대상인 대학에 재직하고 있는 자를 위원으로 임명한 행위는 도저히 묵과할 수 없는 처사입니다.

원래 제척사유란 어떤 자가 구체적인 사건과 관련하여 특수한 관계에 있는 경우에 법률상 당연히 그 사건에 관한 직무수행을 행할 수 없게 하는 사유를 말합니다. 이는 당사자가 실제로 직무수행을 공정하게 행하였는지 여부와 상관없이 직무수행을 불공정하게 할 우려가 있는 특수한 관계성만을 이유로 하여 직무수행을 금지하는 제도입니다.

따라서 위 위원들이 법학교육위원으로 위촉된 뒤에 수행한 모든 심의행위는 다음에서 보는 바와 같은 점에 비추어 제척사유를 위반한 위법한 행위임이 분명합니다.


나. 자의적 선정방법에 의한 설치인가의 위법성


(1) 피고는 2007. 10. 30. 위 법률에 따라 법학전문대학원 설치인가 신청공고(공고 2007-120호)를 통하여 인가대학에 대한 선정방법을 다음과 같은 방법에 의한다고 하였다.


다          음

CONFIDENTIAL

DONGGUK0378596

O 우수한 법조인 양성을 목적으로 하고 지역간 균형을 고려하여 선정한다.

O 전국을 고등법원 관할 구역을 단위로 5대 권역으로 설정하고 각 권역

내에서 우수한 대학을 설치인가 대학으로 선정한다.

| 고등법원 소재지 | 지역 |
|---|---|
| 서울 | 서울, 경기, 인천, 강원 |
| 대전 | 대전, 충남, 충북 |
| 대구 | 대구, 경북 |
| 부산 | 부산, 경남, 울산 |
| 광주 | 광주, 전남, 전북, 제주 |

O 각 권역내 설치인가 대학 선정시 지역간 균형을 고려할 수 있으나, 심사

결과 법학전문대학원을 설치·운영하기에 부적법하다고 판단되는 경우에

는 선정하지 아니한다.

O 법학전문대학원(개별 대학원의 입학정원 포함)은 법학교육위원회의 심의

를 거쳐 교육인적자원부장관이 설치인가 한다.

(2) 한편 원고가 속한 서울권역에 대한 심의결과가 2008. 1. 15. 공개

되었는바 이에 따르면 서울권역 24개 신청 대학 중 15개 대학이

선정 되었으나 그 순위는 1위에서 13위까지의 13개 대학과 15위

(인하대), 19위(강원대)의 대학이 선정되었고 이는 이른바 지역

CONFIDENTIAL

DONGGUK0378597

간 균형 원칙에 따라 서울권에서 경기도, 강원도, 인천광역시에 우선적으로 그 소재 대학을 선정하고 서울 소재 대학에 대학을 정원수에 따라 배정한 결과라는 것입니다.

(3) 그러나 피고가 발표한 인가대학 선정방법은 지역간 균형을 위하여 전국을 고등법원 관할구역을 단위로 한 5대 권역으로 설정하고 각 권역에서 우수한 대학으로 선정하는 것이 원칙이고 "다만 각 권역내 설치인가 대학선정시 지역간 균형을 고려할 수 있으나, 심사결과 법학전문대학원을 설치, 운영하기에 부적합하다고 판단되는 경우에는 선정하지 아니한다"는 보충적, 예외적 선정방법이 제시되어 있다고 할 것입니다.

(4) 그렇다면 서울권역에 있어서 예비인가에 대한 선정방법은 심사항목별 평가에 대하여 추후 그 적정성에 대하여서는 밝히고 피고의 발표내용에 의하더라도 선정된 15개 대학에는 "14위 대학"이 탈락되고 이에 비하여 15위 대학과 19위 대학이 선정 되었음은 위 선정방법에 의하더라도 합리성을 결여한 나머지 지역균형이라는 보충적이고 예외적 기준에 따라 원칙기준을 저버리는 위법이 있다고 할 것입니다.

(5) 더구나 위 권역별내에서 지역균형을 고려하더라도 "그 능력이 떨어진다면 선정하지 않겠다"는 기준을 저버리고 19위 대학을 위

수원시 영통구 원천동 83-23
(승전빌딩 406호)

공증
인가 동수원종합법무법인

대표전화 : (031) 211-5723~4
팩    스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378598

지역균형이라는 기준에 따라 우선적으로 선정한 피고의 처분은 명백히 재량을 벗어난 위법한 것이라 할 것입니다.

다. 설치인가신청서상의 각 평가항목에 대한 평가의 부당성

원고가 제출한 법학전문대학원 설치인가신청서의 각 평가대상 항목(교육목표, 입학전형, 교육과정, 교원, 학생, 교육시설, 재정, 관련학위과정, 대학경쟁력 및 사회적 책무성)에 대한 평가의 부당성에 대하여는, 원고 및 같은 권역내의 경원자(競願者)인 소외 인하대학교, 강원대학교에 대한 현지조사단의 현지조사보고서, 법학교육위원들의 각 의견서, 평정표 기타 심의과정에서 작성된 일체의 증거서류가 확보되는 대로 차후에 진술하도록 하겠습니다.

4. 결론

따라서 이 사건 처분은 법학전문대학원 설치·운영에 관한 법률의 규정을 위반하였을 뿐만 아니라, 아울러 재량권의 범위를 일탈 내지 남용하여 위법하다고 할 것이므로 그 취소를 구하기 위하여 이 사건 소를 제기하기에 이른 것입니다.

## 입 증 방 법

1. 갑제1호증        법인등기부등본

---

수원시 영통구 원천동 83-23        공증 동수원종합법무법인        대표전화 : (031) 211-5723~4
(승전빌딩 406호)        인가                          팩    스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378599

1. 갑제2호증          법학전문대학원 설치인가신청서

1. 갑제3호증          법학교육위원회 명단 및 소속

1. 갑제4호증의 1 내지 8     각 신문기사

1. 갑제5호증          법학전문대학원의  교육과정  분야  설치

                   인가심사기준  연구(학술진흥재단)

1. 갑제6호증          법학전문대학원 설치인가 심사기준

                   (교육인적자원부)

1. 갑제7호증          법학전문대학원 설치인가 신청공고

첨 부 서 류

1. 소장부본                    1 통

1. 위 입증서류                  각 2 통

1. 송달료납부서                  1 통

1. 소송위임장                   1 통

1. 담당변호사지정서               1 통

2008.     2.

위 원고의 소송대리인

동수원종합 법무법인

담당변호사 남궁성배,    위철환,    이요흠

서울행정법원                              귀중

---

CONFIDENTIAL

DONGGUK0378600



# 소 송 위 임 장

| 사 건 | 예비인가거부처분취소 |
|---|---|
| 당사자 | (원 고) 학교법인 동국대학교<br>(피 고) 교육인적자원부장관 |

위 사건에 관하여 다음 표시 수임인을 소송대리인으로 선임하고, 다음 표시 권한을 수여합니다.

| 수임인 | **동수원종합 법무법인**<br>수원시 영통구 원천동 83-3 승전빌딩 406호<br>전        화 : (031)211-5723    FAX : (031)211-5726 |
|---|---|
| 수권사항 | (1) 일체의 소송행위와 위 사건과 관련된 집행 및 피고로부터의 대금수령에 관한 일체의 행위 (2) 반소의 제기 및 응소 (3) 재판상 및 재판외의 화해 (4) 소의 취하 (5) 청구의 포기 및 인낙 (6) 복대리인 선임 (7) 목적물의 수령 (8) 공탁물의 납부, 공탁물 및 이자의 반환청구와 수령 (9) 담보권 행사, 최고신청, 담보취소신청, 동신청에 대한 동의, 담보취소결정정본의 수령, 동취소결정에 대한 항고권 포기 (10) 항소 및 상고의 제기 또는 취하 (11) 소송비용확정신청 및 이에 대한 응소 (12) 가압류, 가처분 결정에 대한 이의 동 취소시청 및 이에 대한 응소 (13) 권리행사 최고신청 (14) 제소명령 신청 (15) 재산명시신청 및 이에 대한 응소 (16) 배당금수령 (17) 고소에 관한 일체의 행위 |

위 소송을 위임함.

2008.

위임인   (원고) 학교법인 동국대학교
서울 중구 필동 3가 26
대표자 이사장 임 용 택



수원시 영통구 원천동 83-23
(승전빌딩 406호)

공증
인가 **동수원종합법무법인**

대표전화 : (031) 211-5723~4
팩    스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378601

# 담 당 변 호 사 지 정 서

| 사 건 | 예비인가거부처분취소 |
|---|---|
| 당 사 자 | (원 고) 학교법인 동국대학교<br>(피 고) 교육인적자원부장관 |

위 사건에 관하여 변호인은 **동수원종합 법무법인**으로서 변호사법 제40조 제1항에 의거하여 그 업무를 담당할 변호사를 다음과 같이 지정합니다.

| 담당변호사 | 남궁성배, 위철환, 이요흠 |
|---|---|

2008. 2. .

**동수원종합 법무법인**

수원시 영통구 원천동 83-23 승전빌딩 406호
전화(031)211-5723   FAX : (031)211-5726

서울중앙지방법원                                       귀중

**동수원종합 법무법인**

수원시 영통구 원천동 83-23 승전빌딩 406호
전화(031)211-5723,  FAX : (031)211-5726

CONFIDENTIAL

DONGGUK0378602

# 접수증명원

원 고  학교법인 동국대학교

피 고  교육인적자원부장관

위 당사자 간 예비인가거부처분취소 청구사건에 관하여 원고는 2008.

2. 20. 2008구합 *1711* 호 로 위 사건을 접수하였음을 증명하여 주시기 바랍

니다.

위 증명합니다.
2007 년 2월 20일
서 울 행 정 법 원
법원주사 이 종 연



2008.  2.  20.

위 원고의 소송대리인

동수원종합 법무법인

담당변호사  남궁성배,  위철환,



서울행정법원                                      귀중

수원시 영통구 원천동 83-23     공증  동수원종합법무법인     대표전화 : (031) 211-5723~4
(승전빌딩 406호)              인가                              팩    스 : (031) 211-5726

CONFIDENTIAL

DONGGUK0378603

# CERTIFICATE OF TRANSLATION

I, Kwang Park, hereby certify that I am competent in both the Korean and English languages and that I translated DONGGUK0378590-603 from the Korean language into the English language.

I further certify that translation of DONGGUK0378590-603 from the Korean language into the English language is accurate and correct to the best of my knowledge and proficiency.

**Kwang Park**
**Professional Translator**

Subscribed and sworn to before me on ___27th___ day of _July_ , _2011_ (year)

FRANCES FUENTES
COMM #1849867
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires May 18, 2013

(Signature of Notary)                          (Notary Stamp)

# EXHIBIT 96

# FILED UNDER SEAL

# EXHIBIT 97

# McDermott
# Will&Emery

Boston  Brussels  Chicago  Düsseldorf  Houston  London  Los Angeles  Miami  Milan
Munich  New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Audrey Lu
Associate
aulu@mwe.com
+1 212 547 5361

January 8, 2010

**VIA E-MAIL AND REGULAR MAIL**

Howard Fetner, Esq.
Day Pitney LLP
1 Audubon Street
New Haven, Connecticut  06511

Re:    Dongguk University v. Yale University, No. 3:03-CV-00441 (RNC)

Dear Howie:

I write in response to your December 22, 2009 letter concerning Dongguk's Answers to Yale's Second Set of Interrogatories.

First, enclosed please find Dongguk's Supplemental Answers to Yale's Second Set of Interrogatories.

**Interrogatory 1**

As we stated in our December 14, 2009 letter, we believe we have fully responded to this Interrogatory by providing the information which it requests.

**Interrogatory 4**

The Committee has not provided any other reasons as to why Dongguk was not permitted open a law school.

Additionally, upon further review, we believe our initial Interrogatory answer was complete. However, because we previously agreed to provide you with additional information, that information is below.

The factors upon which the Legal Education Committee relied to determine the quantitative and qualitative scores are attached hereto as Exhibit A.

The universities that were initially grouped in the Seoul Metropolitan District were:  Seoul National University, Yonsei University, Sungkyunkwan University, Korea University, Ihwa Women's University, Hanyang University, Kyunghee University, the University of Seoul, Chung-Ang Unviersity, Hankuk University of Foreign Studies, Sogang University, Konkuk

Howard Fetner, Esq.
January 8, 2010
Page 2

University, Ajou University, Dongguk University, Inha University, Kookmin University, Hongik University, Dankook University, Kangwon University, Sookmyung Women's University, Soongsil University, Myungji University, Sungshin Women's University, and Kyonggi University.

The quantitative and qualitative scores and rankings Dongguk previously provided in its Interrogatory answers were based upon public information the Ministry of Education released early in the selection process and analysis of those scores by various third parties. The information below is based upon information made directly available to Dongguk by the Ministry of Education after the conclusion of the selection process. Thus, based upon information provided by the Ministry of Education, the quantitative, qualitative and total scores, and rankings of the universities in the Seoul Metropolitan District prior to the sub-division were as follows:

| UNIVERSITY | Ranking (prior to division) | Total Score | Quantitative Score | Qualitative Score |
|---|---|---|---|---|
| Seoul National University | 1 | 934.6 | 599.3 | 335.3 |
| Yonsei University | 2 | 904.3 | 588.4 | 315.9 |
| Sungkyunkwan University | 3 | 896.5 | 595 | 301.5 |
| Korea University | 4 | 892.5 | 581 | 311.5 |
| Ihwa Women's University | 5 | 888.7 | 586 | 302.7 |
| Hanyang University | 6 | 879.7 | 589.3 | 290.4 |
| Kyunghee University | 7 | 869.1 | 576.3 | 292.8 |
| University of Seoul | 8 | 864 | 588.5 | 275.5 |
| Chung-Ang University | 9 | 863.1 | 578.9 | 284.2 |
| Hankuk University of Foreign Studies | 10 | 861.4 | 568.1 | 293.3 |

Howard Fetner, Esq.
January 8, 2010
Page 3

| | | | | |
|---|---|---|---|---|
| Sogang University | 11 | 860.5 | 577.7 | 282.8 |
| Konkuk University | 12 | 857.8 | 582.2 | 275.6 |
| Ajou University | 13 | 848.5 | 558.9 | 289.6 |
| Dongguk University | 14 | 834.9 | 553.2 | 281.7 |
| Inha University | 15 | 834.2 | 578.7 | 255.5 |
| Kookmin University | 16 | 824.8 | 564.3 | 260.5 |
| Hongik University | 17 | 820.3 | 561.4 | 258.9 |
| Dankook University | 18 | 801.1 | 550.6 | 250.5 |
| Kangwon University | 19 | 800 | 544.1 | 255.9 |
| Sookmyung Women's University | 20 | 793.8 | 543.8 | 250 |
| Soongsil University | 21 | 773.3 | 539.9 | 233.4 |
| Myungji University | 22 | 730.4 | 521.8 | 208.6 |
| Sungshin Women's University | 23 | 690.4 | 502.8 | 187.6 |
| Kyonggi University | 24 | 677.8 | 480.1 | 197.7 |

After the sub-division, the universities were grouped according to the following districts:

- In the Seoul District:  Seoul National University, Yonsei University, Sungkyunkwan University, Korea University, Ihwa Women's University, Hanyang University, Kyunghee University, the University of Seoul, Chung-Ang Unviersity, Hankuk University of Foreign Studies, Sogang University, Konkuk University, Dongguk University, Kookmin University, Hongik University, Dankook University, Sookmyung Women's University, Soongsil University, Myungji University, Sungshin Women's University

- In the Kyonggi District:  Ajou University, Kyonggi University

Howard Fetner, Esq.
January 8, 2010
Page 4

- In the Incheon District:  Inha University

- In the Kangwon District:  Kangwon University

The following fifteen (15) universities were permitted to open "U.S. style" law schools:  Seoul National University, Yonsei University, Sungkyunkwan University, Korea University, Ihwa Women's University, Hanyang University, Kyunghee University, the University of Seoul, Chung-Ang Unviersity, Hankuk University of Foreign Studies, Sogang University, Konkuk University, Ajou University, Inha University, and Kangwon University.


Sincerely yours,

Audrey Lu

Enclosures

cc:    Felix J. Springer, Esq.
       Robert Weiner, Esq.
       Ira Grudberg, Esq.

NYK 1268647-2.081817.0011

EXHIBIT A

로스쿨 평가항목

| Evaluation Category | Evaluation Sub-Category | Evaluation Item | Allocated Scores | Quantitative/Qualitative |
|---|---|---|---|---|
| 1. Purpose of Education (40 points) | 1.1 Propriety of the Educational Purpose (20) | 1.1.1 Are the legal education purpose, university objectives and educational purpose systematic/concrete? | 5 | Qualitative Evaluation |
| | | 1.1.2 Is the law school's educational purpose sufficiently concrete and practical to produce desirable legal professionals? | 5 | Qualitative Evaluation |
| | | 1.1.3 Does the educational purpose reflect the educational and legal demand of the university body as well as the (local) society? | 5 | Qualitative Evaluation |
| | | 1.1.4 Does the university pay attention to the educational resources as well as environments in order to accomplish its educational purpose and objectives. | 5 | Qualitative Evaluation |
| | 1.2 Existence of Infrastructure to Realize the Educational Purpose (10) | 1.2.1 Do a concrete strategy and implementation system exist in order to accomplish the educational purpose of the law school? | 4 | Qualitative Evaluation |
| | | 1.2.2 Does the university have a self-evaluation system for its law | 3 | Qualitative Evaluation |
| | | 1.2.3 How do the law school's implementation system, development plan and evaluation system relate to the university body and (local) | 3 | Qualitative Evaluation |
| | 1.3 Purpose and Strategy for Specialization (10) | 1.3.1 Is the specialization strategy concrete, and can it be properly established and implemented? | 4 | Quantitative Evaluation |
| | | 1.3.2 Are the specialization plan and purpose properly reflected in the research process and re-education process? | 3 | Qualitative Evaluation |
| | | 1.3.3 Does the university have a proper way to evaluate whether the specialization plan is actually being carried out and to correct any problems that are later discovered? | 3 | Qualitative Evaluation |

로스쿨 평가항목

| 2. Student Admission (60 Points) | 2.1. Student Admission Plan (to determine whether someone will be admitted or not) | 2.1.1 Does the admission plan satisfy all the requirements of the law concerning law school? | P/F | Quantitative Evaluation |
|---|---|---|---|---|
| | 2.2. Consideration of social minorities (20) | 2.2.1 Does the university categorize "social minorities" (for the purpose of special admission) in a fair and reasonable manner? | 10 | Qualitative Evaluation |
| | | 2.2.2 What is the ratio of special admission program offered to social minorities? | 10 | Quantitative Evaluation |
| | 2.3 Quota allocation for people who did not previously receive legal education (10) | 2.3.1 Does the university maintain a quota that is equal to or above 1/3 of its total number of admission for people who did not previously receive legal education? | P/F | Quantitative Evaluation |
| | 2.4 Quota allocation for people from other universities | 2.4.1 Does the university maintain a quota that is equal to or above 1/3 of its total number of admission for people who graduated other universities? | P/F | Quantitative Evaluation |
| | 2.5 Fairness of the admission plan (20) 2.6 Reflection of the educational purpose and specialization | 2.5.1 Is the university's law school student admission plan fair and proper? | 20 | Qualitative Evaluation |
| | | 2.6.1 Does the admission plan properly reflect the educational purpose and the specialization objectives? | 10 | Qualitative Evaluation |
| | objectives in the student admission plan (10) | | | |
| | 2.7 Variety of the admission plan (10) | 2.7.1 Does the admission plan offer diverse/various options for applicants? | 10 | Qualitative Evaluation |

로스쿨 평가항목

| | | | |
|---|---|---|---|
| 3.1 Systematization of the Education Process (15) | 3.1.1 Does the education process properly reflect the law school's educational purpose and objectives? | 15 | Qualitative Evaluation |
| 3.2 Systematization of the Core Courses | 3.2.1 Are the core courses systematically planned out? | 15 | Quantitative Evaluation |
| 3.3 Required Credits for Graduation | 3.3.1 Does the law school require more than 90 credits for graduation? | P/F | Quantitative Evaluation |
| 3.4. Clinical Courses | 3.4.1 Are there five clinical courses assigned to students? Are there actual clinical courses offered in the curriculum for the students? | P/F | Quantitative Evaluation |
| 3.5 Propriety of Core Courses (20) | 3.5.1 Are the core classes appropriately assigned within the 35-credit | 10 | Quantitative Evaluation |
| | 3.5.2 Propriety of the law school's selection of core courses | 10 | Qualitative Evaluation |
| 3.6 Propriety of Elective Courses (50) | 3.6.1 Number of elective courses for the particular major | 20 | Quantitative Evaluation |
| | 3.6.2 Do elective courses offer comprehensive education that combines theoretical education and practical education? | 10 | Quantitative Evaluation |
| | 3.6.3 Are the courses pertaining to each major up to date, reflecting the latest development in the legal field with regard to factors such as domestic and foreign demand? | 10 | Quantitative Evaluation |
| | 3.6.4. Establishment and operation of the foreign language courses | 10 | Quantitative Evaluation |
| 3.7 Education Process Operation System (35) | 3.7.1 Independence of the educational process | 5 | Qualitative Evaluation |
| | 3.7.2 Did the university establish an internal organization in order to evaluate the law school education process? | 5 | Quantitative Evaluation |
| | 3.7.3 Contents and operation of the education method improvement program | 10 | Qualitative Evaluation |
| | 3.7.4 Reasonableness of the course evaluation plan | 10 | Qualitative Evaluation |
| | 3.7.5 Does the school policy allow students who received an undergraduate law degree to carry over their credits equal to or below 15 in law school? | 5 | Qualitative Evaluation |
| 3.8 Propriety of Faculty Assignment (60) | 3.8.1 Are faculty members teaching courses that suit their capabilities? | 50 | Quantitative Evaluation |
| | 3.8.2 Do faculty members assigned to teach their courses in a foreign language have the capacity to teach in that language? | 10 | Qualitative Evaluation |

포스콜 평가항목

| | | | Points | Evaluation |
|---|---|---|---|---|
| 3. Education Process (345 Points) | 3.9 Propriety of Course Syllabus (30) | 3.9.1 Contents and application of the course syllabuses | 10 | Qualitative Evaluation |
| | | 3.9.2 Fairness of the student grading system | 5 | Qualitative |
| | | 3.9.3 Substantiality of course management | 5 | Qualitative |
| | | 3.9.4 Diversity and creativity of teaching method | 10 | Qualitative |
| | 3.10 Strict Management of University Affairs | 3.10.1. Is there a system in place to manage university affairs in a strict and proper manner? | 20 | Qualitative Evaluation |
| | 3.11 Propriety of Clinical Courses (30) | 3.11.1 The number of organizations that participate in the clinical | 5 | Quantitative |
| | | 3.11.2 The propriety of clinical course curriculum | 5 | Qualitative |
| | | 3.11.3 Does cooperating organizations sufficiently encompass the clinical students for their work? | 10 | Quantitative Evaluation |
| | | 3.11.4 Is the clinical course well-structured and planned out? | 10 | Qualitative Evaluation |
| | 3.12. Joint Education Program with Foreign Educational Institutions (10) | 3.12.1 Past experience in operating a joint education program with foreign educational institutions | 5 | Quantitative Evaluation |
| | | 3.12.2 Propriety of the legal education and clinical program offered by foreign educational institutions | 5 | Qualitative Evaluation |
| | 3.13 Propriety of the Specialization Program | 3.13.1 Does the university assign more than 30 credits of its elective courses to the specialization area? | 5 | Qualitative Evaluation |
| | | 3.13.2 Whether the courses offered in the specialization area correspond to the specialization education it is supposed to provide? | 5 | Qualitative Evaluation |
| | | 3.13.3 Does the university have capacity to implement the specialization program? | 5 | Qualitative Evaluation |
| | | 3.13.4 Whether the specialization program properly relates to/support the students' career after graduation | 5 | Qualitative Evaluation |
| | 3.14 Resources and management | 3.14.1 Organization of the research institute and effectiveness of its management | 5 | Qualitative Evaluation |
| | Finance for Research Institutes (15) | 3.14.2 Number of paid researchers | 3 | Quantitative Evaluation |
| | | 3.14.3 Number of staff members and RAs dedicated to the research institute | 2 | Quantitative Evaluation |
| | | 3.14.4 Amount of annual operation budget | 5 | Quantitative Evaluation |
| | 3.15 Accomplishment of Research Institutes (20) | 3.15.1 The frequency and size of the academic conference events over the last three years | 5 | Quantitative Evaluation |
| | | 3.15.2 The number of academic journals issued over the last three years | 5 | Quantitative |
| | | 3.15.3 The number of research projects over the last three years | 5 | Quantitative |
| | | 3.15.4 The total amount of the research project funds over the last three years | 5 | Quantitative |
| | 3.16 Specialization of Research Institutes | 3.16.1 Plan to issue academic journals concerning specialization area of the research institute | 5 | Qualitative Evaluation |

로스쿨 평가항목

| | | | | |
|---|---|---|---|---|
| 4. Faculty (195 Points) | 4.1 Number of Faculty Members Dedicated to the Law School | 4.1.1 Does the law school have at minimum twenty tenured faculty members? | P/F | Quantitative Evaluation |
| | | 4.1.2 Plan to add more tenured faculty members by the time the university receives permission not open a law school? | P/F | Quantitative Evaluation |
| | 4.2 Ratio of Professor to Students | 4.2.1 The ratio of the number of students per each professor by the year law school is completed | 30 | Quantitative Evaluation |
| | 4.3 Number of Faculty Members with Legal Practice | 4.3.1 Did the law school secure the required number of faculty members with legal practice experience? | P/F | Quantitative Evaluation |
| | 4.4 Ratio of Faculty members with practical experience | 4.4.1 The ratio of faculty members with practical experience (including both legal and non-legal experience) | 20 | Quantitative Evaluation |
| | 4.5 Diversity of the Faculty Body (20) | 4.5.1 The ratio of faculty members from other universities to all newly hired faculty members (based on the 3-year future hiring plan) | 10 | Quantitative Evaluation |
| | | 4.5.2 The ratio of women faculty members to all faculty members (based on the past records and the 3-year hiring plan in the future) | 10 | Quantitative Evaluation |
| | 4.6 The Ratio of Faculty Members with Ph.D. Degrees | 4.6.1 The ratio of faculty members who obtained Ph.D. to all tenured faculty members | 10 | Quantitative Evaluation |
| | 4.7 Academic accomplishment of tenured faculty members (50) | 4.7.1 Academic accomplishment of tenured faculty members | 50 | Quantitative Evaluation |
| | 4.8 Education experience of tenured faculty members | 4.8.1 Education experience of tenured faculty members | 20 | Quantitative Evaluation |
| | 4.9 Lecture workload of faculty members (20) | 4.9.1 Hours of lectures assigned to each faculty member | 25 | Quantitative Evaluation |
| | 4.10 Ratio of paid TAs (20) | 4.10.1 Ratio of paid Taps per each faculty member | 20 | Quantitative Evaluation |

로스쿨 평가항목

| | | | | |
|---|---|---|---|---|
| 5. Students (125 Points) | 5.1 Student Advisement (10) | 5.1.1. Plan to require advising professor to spend certain number of hours to advise students assigned to him/her | 5 | Qualitative Evaluation |
| | | 5.1.2. Propriety of the advising professor's plan to support and counsel his/her advisees | 3 | Qualitative Evaluation |
| | | 5.1.3. Variety of choices for students in choosing their advisors based on their opinions and future career plans | 2 | Qualitative Evaluation |
| | 5.2 Student Support Center (10) | 5.2.1 Plan to establish a student support center specializing in career and employment counseling | 3 | Qualitative Evaluation |
| | | 5.2.2 Plan to secure sufficient human resources for the student support center | 3 | Qualitative Evaluation |
| | | 5.2.3 Variety and propriety of the support programs offered to the students | 4 | Qualitative Evaluation |
| | 5.3 Student Benefits (13) | 5.3.1 Plan to provide spaces and financial support for students' academic and political activities | 5 | Qualitative Evaluation |
| | | 5.3.2 Educational support programs and facilities for students with disabilities | 4 | Qualitative Evaluation |
| | | 5.3.3 Plan to provide rest areas and daycare center for women students | 4 | Qualitative Evaluation |
| | 5.4 Academic Support (12) | 5.4.1 Plan to establish an academic support center dedicated to the law school | 5 | Qualitative Evaluation |
| | | 5.4.2 Did the university establish a program to survey students' needs and wants and reflect their opinions in the academic affairs? | 4 | Qualitative Evaluation |
| | | 5.4.3 Did the university establish a program to survey students' satisfaction level and reflect their opinions in the academic affairs? | 3 | Qualitative Evaluation |
| | 5.5 Scholarship (55) | 5.5.1 The ratio of students who will receive scholarship or grants to the law school student body | 30 | Quantitative Evaluation |
| | | 5.5.2 The consideration given to social minorities in choosing scholarship/grant recipients and the ratio of social minorities to the students who receive scholarship or grants | 25 | Quantitative Evaluation |
| | 5.6 Ratio of Legal Practitioners (25) | 5.6.1 The number of students who passed the bar exam over the last five years | 15 | Quantitative Evaluation |
| | | 5.6.2 The number of students who passed the bar exam among those with undergraduate law degrees over the last five years | 10 | Quantitative Evaluation |

로스쿨 평가항목

| Category | Subitem | Question | Points | Type |
|---|---|---|---|---|
| 6. Education Facilities (102 Points) | 6.1 Independent Space Provided to the Law School (6) | 6.1.1 Did the law school secure independent space that is dedicated as its own ? | 3 | Qualitative Evaluation |
| | | 6.1.2 Is the space of the law school building properly laid out with proper relations to the functions it is supposed to serve? | 3 | Qualitative Evaluation |
| | 6.2 Essential Facilities (3) | 6.2.1 Did the law school properly secure essential facilities and common space? | 3 | Quantitative Evaluation |
| | 6.3 Law School Library | 6.3.1 Does the law school have a library specialized in legal texts? | P/F | Quantitative Evaluation |
| | 6.4 Number of Seats for Students in Law Library | 6.4.1 Did the law school secure seats for at minimum 70% of the entire student body in its library? | 7 | Qualitative Evaluation |
| | 6.5 Books Concerning Law (45) | 6.5.1 Does the law school library have a proper number of books on legal topics? | 15 | Quantitative Evaluation |
| | | 6.5.2 Does the law school library have a plan to secure more books on legal topics in the future? | 10 | Quantitative Evaluation |
| | | 6.5.3 The content and quality of the books available in the library | 10 | Qualitative Evaluation / Evaluation |
| | | 6.5.4 How many legal journals are available in the library? (includes electronic journals) | 5 | Quantitative Evaluation |
| | | 6.5.5 Substance of the books available in the library | 5 | Qualitative Evaluation |
| | 6.6 Librarian Specialized in Legal Text (6) | 6.6.1 Did the law library secure a librarian with a first grade librarian license? | 3 | Quantitative Evaluation |
| | | 6.6.2 Did the law library secure sufficient number of employees to support its function? | 3 | Quantitative Evaluation |
| | 6.7 Mock Courtroom (5) | 6.7.1 Is the space of the mock courtroom properly allocated for legal practice training? | 3 | Qualitative Evaluation |
| | | 6.7.2 Is the size of the mock courtroom sufficiently large to support participation of its students? | 2 | Quantitative Evaluation |
| | 6.8 Computer Lab(5) | 6.8.1 Does the law school have proper computer facilities and space to support students' research? | 5 | Quantitative Evaluation |
| | 6.9 Legal Database (10) | 6.9.1 The number of Web-DB available in the law library | 5 | Quantitative Evaluation |
| | | 6.9.2 The variety of Web-DB available in the law library | 5 | Quantitative Evaluation |
| | 6.10. Large-scale Lecture Room (5) | 6.10.1 Does the law school have at least one large-scale lecture room? | 5 | Quantitative Evaluation |
| | 6.11 Dormitory (10) | 6.11.1 Does the law school have its own dormitories for the students (at least one room per two students)? | 10 | Quantitative Evaluation |

로스쿨 평가항목

| Category | Criteria | Sub-criteria | Points | Evaluation |
|---|---|---|---|---|
| 7. Finance (55 Points) | 7.1 Propriety of financial support provided to students (12) | 7.1.1 Propriety of financial supports provided to its students over the last three years | 12 | Quantitative Evaluation |
| | 7.2 Working environment for faculty members of [faculty members] | 7.2.1 Propriety of the working environment for the entire university | 15 | Quantitative Evaluation |
| | 7.3 Propriety of the university's accounting practice (15) | 7.3.1 Ratio of tuition to the operation revenue | 4 | Quantitative Evaluation |
| | | 7.3.2 Ratio of the external funds to the operation revenue | 4 | Quantitative Evaluation |
| | 7.4 Plan to financially support the resources for law (8) | 7.4.1 Does the university have an appropriate and stable plan to secure financial resources necessary for law school? | 10 | Qualitative Evaluation / Quantitative |
| | 7.5 Resource Allocation Plan for Law School (10) | 7.5.1 Does the university have a proper plan to allocate its financial resources for law school? | 10 | Quantitative Evaluation |
| 8. Affiliated Degrees (30 Points) | 8.1 Elimination of Undergraduate Law Degree | 8.1.1 Does the university plan to eliminate its undergraduate law degree? | P/F | Quantitative Evaluation |
| | 8.2 Affiliated Degrees (10) | 8.2.1 Propriety of the university's plan to establish and implement the doctorate degree program or research scholarship program in its law school | 3 | Qualitative Evaluation |
| | | 8.2.2 Propriety of the university's plan to secure faculty and staff dedicated to the doctorate degree program or research scholarship | 3 | Qualitative Evaluation |
| | | 8.2.3 Did the university secure appropriate facilities and space for students who attend its doctorate degree program or research | 2 | Qualitative Evaluation |
| | | 8.2.4 Do the degree or research programs appropriately reflect the law school's educational purpose and specialization plan? | 2 | Qualitative Evaluation |
| | 8.3 Plan to implement the "temporary law department" (20) | 8.3.1 Did the law school or the university that will open a law school secure human and material resources to manage the education of students in the existing undergraduate law department that will be eliminated in the future (hereinafter "temporary law department")? | 5 | Qualitative Evaluation |
| | | 8.3.2 Propriety of university administration and educational process management for existing law students | 5 | Qualitative Evaluation |
| | | 8.3.3 Propriety of the university's plan to manage the demand of law education for undergraduate students after the existing law department is eliminated | 5 | Qualitative Evaluation |

로스쿨 평가항목

| | | |
|---|---|---|
| 8.3.4. Ratio of scholarship provided to students of "temporary law department" | 5 | Quantitative Evaluation |

로스쿨 평가항목

| | | | |
|---|---|---|---|
| 9. Competitiveness and Social Responsibility of the University (48 Points) | 9.1. Accomplishment in Restructuring and Improvement (10) | 9.1.1 The extent of accomplishment in the university restructuring and improvement | 5 | Quantitative Evaluation |
| | | 9.1.2 Did the university succeed in combining or eliminating similar or redundant majors? | 5 | Qualitative Evaluation |
| | 9.2. Accomplishment in Specialization (10) | 9.2.1 Selection of areas of specialization | 10 | Qualitative Evaluation |
| | | 9.3.1 Does the university's mid-term and long-term development plan sufficiently reflect its globalization goal? | 3 | Qualitative Evaluation |
| | 9.3. Globalization of the Education (10) | 9.3.2 Does the university have the appropriate structure for its internal organization that specializes in globalization? Does the university have the appropriate number of employees dedicated to the | 2 | Qualitative Evaluation |
| | | 9.3.3 The extent of globalization in the university's research | 3 | Qualitative Evaluation |
| | | 9.3.4 The extent of globalization in the university's education | 2 | Qualitative Evaluation |
| | 9.4. Research Ethics (10) | 9.4.1 The university's policy concerning research ethics | 5 | Qualitative Evaluation |
| | | 9.4.2 The efforts made by university to apply its policy concerning research ethics | 5 | Qualitative Evaluation |
| | 9.5. Social responsibility concerning | 9.5.1 Any sanction against the university with regard to its administrative and financial operation concerning student admission over the last three years | 4 | Quantitative Evaluation |
| | improvement of high school education (8) | 9.5.2 Ratio of social minorities in the student body | 4 | Quantitative Evaluation |

# EXHIBIT 98

# FILED UNDER SEAL

# EXHIBIT 99

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
DONGGUK UNIVERSITY              :   No. 3:08CV441(RNC)
                                :
                 Plaintiff,     :
                                :
        vs                      :
                                :
YALE UNIVERSITY                 :
                                :   HARTFORD, CONNECTICUT
                 Defendant.     :   March 30, 2009
                                :
- - - - - - - - - - - - - - - - x

TELEPHONE CONFERENCE

BEFORE:

     HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

APPEARANCES:

   FOR THE PLAINTIFF:

          MCDERMOTT WILL & EMERY
               50 Rockefeller Plaza
               340 Madison Avenue
               New York, New York 10173-4613
          BY:  ROBERT A. WEINER, ESQ.
               JEAN BAE, ESQ.

          JACOBS GRUDBERG BELT DOW & KATZ
               350 Orange Street
               P.O. Box 606
               New Haven, Conneticut 06503-0606
          BY:  IRA B. GRUDBERG, ESQ.

   FOR THE DEFENDANT:

          DAY PITNEY LLP
               242 Trumbull Street
               Hartford, Connecticut 06103-1212
          BY:  FELIX J. SPRINGER, ESQ.
               HOWARD FETNER, ESQ.

                              Darlene A. Warner, RDR-CRR
                              Official Court Reporter

1                          2:30 P.M.

2              THE COURT:  Hello.

3              MR. SPRINGER:  Hello, Your Honor.

4              MR. GRUDBERG:  Hi, Judge.  Ira.

5              MR. WEINER:  Good afternoon, Your Honor, Robert

6     Weiner.

7              THE COURT:  Good afternoon.  Did everybody get a

8     chance to identify themselves for the record?

9              MR. SPRINGER:  I don't think I did, Your Honor.

10    Felix Springer, and with me is Howard Fetner for Yale

11    University.

12             MR. WEINER:  Robert Weiner, McDermott, Will &

13    Emery.  I'm here with Audrey -- excuse me -- Jane Bae for

14    Dongguk.

15             MR. GRUDBERG:  Ira Grudberg also for Dongguk

16    University.

17             THE COURT:  Thank you very much.  We set up this

18    telephone call to discuss the dispute you're having with

19    regard to the plaintiff's disclosure of its computations

20    of claim damages.  I've read your correspondence,

21    including its attachments.  Where does the matter stand at

22    the moment?

23             Mr. Springer?

24             MR. SPRINGER:  I think you have our last letter

25    which I believe was sent to you Thursday.  We have had no

1    further correspondence.  And all we have at this point,

2    Your Honor, is the initial disclosures or are the initial

3    disclosures, I suppose.

4              THE COURT:  Okay, all right.

5              Mr. Weiner, do you have any suggestions as to

6    how we might be able to resolve this problem?

7              MR. WEINER:  First of all, Your Honor, I think

8    that the disclosures are detailed, and I'd like to go

9    through them for the record.

10             Mr. Springer complained in his last letter to

11   you, he has no idea from reading his disclosures as to how

12   we came up with $50 million worth of damages.  And if you

13   look at the disclosures, at pages 11 and 12, we explain

14   the losses in detail:  $16 million for the first year.  At

15   page 10, we explain that we lost $8 million of grants in

16   the first year.  At page 14, we explain that we incurred

17   $18 million in expenses in constructing a new law school

18   and everything that goes along with that.  And that law

19   school did not come into fruition because of the

20   situation.  And then we explained that there was probably

21   $5 million per year of lost revenues that would have been

22   received from the law school.

23             So just taking those hard damages, which are

24   expenses and revenues, we are somewhere over $40 million.

25             But we also explained in detail in our

1    disclosures that the university suffered intangible

2    damages in the form of loss of reputation, and we gave

3    examples as to how that occurred.  University --

4    corporations not coming to the university job fair, fall

5    off in applications, diminution in quality of students who

6    were applying.  And we explained that those are intangible

7    damages which are not easily calculated and which will

8    require expert testimony in terms of valuing that.

9          And then we also explained there's another

10   category of damages for which we will also need expert

11   testimony, which is brand rehabilitation damages.  Where a

12   corporation suffers a reputational damage, they have to

13   undergo certain expenses in terms of marketing and

14   promotion in order to restore their reputation.  And

15   again, that will be the subject of expert testimony.

16         And we also explained, Your Honor, that -- if

17   you read the request for production of documents and the

18   interrogatories that Yale has served, certainly beginning

19   on page 17 and that's attached to my letter -- there are

20   multiple document requests and interrogatories which were

21   based upon these disclosures.  So we think we have

22   provided what we can provide.  And quite frankly, Your

23   Honor, we had no further information beyond what we put in

24   there.

25         This is going to be an ongoing process.  We will

1    be able to supplement as we obtain our expert testimony

2    and reports and we will certainly supplement as we get

3    additional information on an ongoing basis in terms of

4    loss of revenues or grants, things of that nature.  But I

5    don't have any further information, the client doesn't

6    have any further information, and we put that together

7    initially at the request of Magistrate Martinez who in

8    asking that the parties come together and try and resolve

9    the case, wanted us to be as complete as we could possibly

10   be so that she understood the magnitude of the damages as

11   of that time, which is, you know, maybe six months ago.

12   Things have not dramatically changed.

13          So I'm not sure where we go from our end.  We

14   think we have complied.

15          THE COURT:  Mr. Springer?

16          MR. SPRINGER:  Thank you, Your Honor.  Let me

17   start at the end.

18          Although there are numbers there, there are no

19   computations of damages.  And I'll go back through it, but

20   I think it helps that Mr. Weiner has gone specifically

21   through.  And the last he mentioned was brand

22   rehabilitation damages.

23          What we have here is a statement that there will

24   be brand rehabilitation damages, which are the moneys that

25   Dungguk will need to expend to rehabilitate its brand name

1    and will have to engage in a series of public relations

2    and marketing activities to rehabilitate its brand name.

3    As we said in our correspondence, we want to know what

4    damages they can compute to date with regard to that.  If

5    it is zero, Your Honor, we ought to know that at this

6    point.  All we are asking for here is what they've

7    expended.  That information is in Dongguk's hands.

8    Presumably they have receipts, they have canceled checks.

9    And if they have expended nothing in the 18 months since

10   Yale noted that it made a mistake back in November of

11   2007, we ought to know that as well.  We ought to know

12   that one because Rule 26(a) requires them to do so at this

13   time.

14           And they have been, you know -- at the time they

15   filed this complaint over a year ago, they could have

16   reasonably expected to provide this information because

17   they claimed $50 million in damages in that complaint.

18   And so -- and furthermore -- you know -- so if they've got

19   zero, if they've expended nothing, if they have done

20   nothing with regard to a series of public relations and

21   marketing activities -- quite frankly, we are puzzled by

22   the need to retain an expert to determine the amount of

23   damages in this category because it's going to be a series

24   of expenditures that they have made.  We see nothing of

25   that.  And, you know, if they're going to spend some stuff

1   in the future, monies in the future, that's fine.  All we

2   want, as we've said in our papers, and all Rule 26

3   requires, and we agree, that they tell us what damages

4   they've incurred to date.

5          THE COURT:  All right, all right, I think that

6   clear enough.

7          Mr. Weiner, can you tell us?

8          MR. WEINER:  They have not engaged in a brand

9   rehabilitation program as of now because it requires

10  engaging a person who's expert in having to do that.  And

11  which is as I've said to Mr. Springer since we met in

12  August, this is something that we are in the process --

13  and quite frankly met and continuing to meet with people,

14  and we will select someone -- but it is not something we

15  have spent to date.  It is something that will be a future

16  expense.

17         And the type of detail that Mr. Springer is

18  talking about -- and we have now researched this pretty

19  thoroughly -- there is no case law that supports

20  Mr. Springer's position that essentially we have to

21  provide the actual receipts and things of that nature.

22         Rule 26 is there to -- for Mr. Springer to

23  understand the categories of our damages, not for us to

24  have all of our proof of our damages in that disclosure.

25  And not only -- we actually have some lower court cases

1    that we could provide to Your Honor on that. But we have

2    in hand as much detail as we now know, and we will

3    continue to supplement that. I have nothing further to

4    provide to him.

5              THE COURT: Okay, so Mr. Springer --

6              MR. SPRINGER: Your Honor, if I just might --

7    all we're asking for is what Rule 26(a) requires, which is

8    a computation of each category of damages and the making

9    available for inspection, as copying, the documents or

10   other evidentiary material, unless privileged or protected

11   from disclosure, on which each computation is based. And

12   that's all we're asking for, Your Honor. What it

13   requires.

14             The reason there's no case law is people comply

15   with this. I've never had a problem with this in the

16   hundreds, if not more, cases in federal court.

17             The other thing I want to point out is, contrary

18   to what Mr. Weiner said here, the expert here is not being

19   retained according to the initial disclosure statement

20   with regard to determining what it needs to do to

21   rehabilitate its image. Its basically, as it said in the

22   disclosure, is in the process of retaining an expert to

23   determine the amount of damages in this category. And

24   again, I don't see what that could be except adding

25   invoices. If that's -- and there's no expert that's

1    needed for that.

2            That's contrary to what Mr. Weiner just said

3    about the need to retain an expert to determine how to

4    rehabilitate now 18 months after Yale has issued its

5    apology in essence.

6            MR. GRUDBERG:  If the Court please, you know,

7    the expert needn't be the same person.  If you have to get

8    somebody to tell you what the best way is in Korea to

9    rehabilitate the name of Dongguk, which has, we believe,

10   has been trashed here, that's not necessarily someone

11   who's going to testify as to what it costs and how much it

12   should cost and so forth.  They could be two different

13   people that Bob is talking about.

14           MR. SPRINGER:  My point, Ira, is what the

15   initial disclosure said and what we're entitled to.  We

16   understand the other point that's being made.

17           MR. GRUDBERG:  Well, we've told them that

18   nothing has been put out on that because we're not ready

19   to waddle around in the water crazily until someone tells

20   us how best to go about this, as I understand what

21   Mr. Weiner said.

22           MR. WEINER:  That's exactly right, Your Honor.

23   We -- if I had further information, which is pretty

24   detailed --

25           MR. SPRINGER:  That's fine --

1          MR. WEINER:  May I finish, Felix?

2          If I had additional information to give to

3    Mr. Springer, I would give it to him.  I'm not holding

4    anything back.  I've given him as much as I can in terms

5    of the revenues, loss revenues, incurred expenses, loss

6    donations.  And the documents that he has requested are

7    the ones we're going to provide to him.

8          He's asking me for Yale to say something that I

9    can't say.  I don't know what the rehabilitation plan will

10   encompass nor do we know at the moment what its cost will

11   be.  It's one of the things we've engaged our experts

12   about.

13         THE COURT:  Mr. Springer, I think we have an

14   answer with regard to brand rehabilitation damages.

15         MR. SPRINGER:  Fair enough.  I understand it to

16   be zero.

17         THE COURT:  Right.

18         MR. WEINER:  It's not a zero.  It's not yet

19   calculated.

20         THE COURT:  It's zero as of today.

21         MR. WEINER:  It's not yet calculated as of today

22   because we don't -- we're not in a position to calculate

23   it because we need someone to tell us how to go about

24   doing it.

25         THE COURT:  Right.  To be clear, based on your

1   understanding, Mr. Weiner, the plaintiff has thus far

2   incurred zero expense with regard to brand rehabilitation.

3   You expect that once you have an expert, there will be

4   expenses incurred for brand rehabilitation, but as of

5   today, the actual amount incurred is zero.

6          MR. WEINER:  As far as I understand, that's

7   correct, Your Honor.  The only exception is I think we

8   placed one ad at one point in time, but I don't know the

9   cost of that.

10          THE COURT:  Okay.

11          MR. WEINER:  They brought that ad to us when we

12   met with the magistrate.

13          THE COURT:  Mr. Springer, where would you like

14   to turn now?

15          MR. SPRINGER:  I might as well start at the

16   beginning, Your Honor, with regard to these categories.

17   Injury relating to students' perception of Dongguk

18   University.

19          THE COURT:  All right.

20          MR. SPRINGER:  Your Honor, my difficulty is

21   there is a statement here -- all of these.  There's a

22   decrease in the number of student applications for the

23   graduate and undergraduate programs as a result of the

24   Shin incident.  There's a decrease in the Dongguk

25   University, satisfaction with Dongguk University.  Those

1    two, there is no computation in damages, and I'm at a loss

2    to see what further information Mr. Weiner would need to

3    be able to tell us tell us at this point what those --

4    what's the computation of damages is and, in essence,

5    documents that support that or tell us how they arrived at

6    that.  We have the information.  I'm at a loss to --

7    there's certainly no computation here.

8            MR. WEINER:  I'm not sure what Mr. Springer

9    would expect me to do.  These are reputational damages and

10   this is part of the defamation claim.  It's not the kind

11   of loss profit analysis or loss of revenues or increased

12   expenses.  This is a jury -- a jury should have to

13   determine based upon these facts what it determines the

14   reputation value to be.  I could put any number on it, but

15   it's not a computation.  It's not anything I can come up

16   with a fixed dollar amount.  It's totally in the province

17   of a jury in a defamation per se case, which this is, and

18   I don't think there's any law out there -- it's totally in

19   the jury's domain.

20           THE COURT:  What would you ask the jury to do

21   with regard to the decrease in the number of student

22   applications depicted on page 8?

23           MR. WEINER:  One of the things, we were asked to

24   give categories.  We would ask a jury to put a dollar

25   value on the diminution of -- on the diminution of

1   reputation.  This goes to the overall reputation of the

2   university.

3           We are trying to show how the reputation of the

4   university has been negatively impacted and there are

5   indicia that show that.  One is loss of application.  Two

6   is a lower quality student.  These are the intangible

7   aspects of a reputational damage case.

8           I could put any number on it but it's not a

9   calculation in the traditional way, and I'm not sure what

10  more we can do.  It's -- ultimately -- that's why we

11  started the case the way we did.  It could be one dollar,

12  it could be a million dollars, it can be $10 million, but

13  it's not that kind of calculation.

14          THE COURT:  Do you propose to offer evidence

15  that would allow a jury to make a reasoned determination

16  as opposed to a speculative guess with regard to the

17  relationship between the defamation and the decrease in

18  the number of applicants?

19          MR. WEINER:  I think that is evidence.  The fact

20  that we can establish that there has been an adverse

21  impact on the faculty, an adverse impact on the students

22  that would apply on the student body, that is evidence

23  that the jury can consider in determining that their

24  reputation has been diminished.  And once they have made

25  that determination, then they will take those factors into

1    consideration in reaching a number.

2         But getting beyond that, we do expect to have

3    evidence that will go into reputational damages.  And I

4    understand there are, in the trademark area or any of

5    these areas, that there are intangible damages that need

6    to be calculated.  Again, the subject of expert testimony.

7         THE COURT:  So dealing just with decline in the

8    number of applications, you report a drop of approximately

9    4,000 between 2006 and 2008.  Your position today, as I

10   understand it, is that a jury could reasonably find that

11   some number of those are attributable to the defamation.

12   And were a jury to make that finding, what would you

13   expect the jury to do?  How much would each one be worth?

14        Let's say you -- let's say the jury concluded

15   that a thousand people who would have applied, but for the

16   defamation did not apply?  What would that be worth?

17        MR. WEINER:  I would expect that the jury, in

18   terms of its deliberation, to make that determination

19   based upon its view of -- I mean, I can't -- I'm not

20   trying my case right now.  I have no discovery.  So what I

21   would expect it to do, is make the determination that the

22   reputation of the university has been diminished, and

23   then, like in any case where you have intangible damages,

24   I would expect the jury to come up with a number they

25   believe was appropriate to award to the person whose

1    reputation was diminished.

2           MR. GRUDBERG:  Such as a usual defamation case,

3    it's very, very difficult to put a number, a hard number

4    to a jury.

5           The plaintiff stands up and says as much as it

6    can say about the indicia that would show that the

7    reputation has been diminished, like a very significant

8    lowering of number of applicants.  Hopefully we'll be able

9    to determine or we'll be able to show that because of the

10   diminution in applicants, the overall student body isn't

11   as good as it would have been, which impacts on the

12   school.

13          You've got the figures on faculty, acceptances

14   and non-acceptances.  And it just seems to me that if

15   you've got a university that -- in Korean terms, we think

16   we can show was flying pretty high and all of a sudden

17   it's hurting -- spent a bunch of money on a law school,

18   which it can't open now, that overall the number is up to

19   a jury.  Bob or I can stand up and say we think it's worth

20   10,000,000.  Felix can stand up and say we don't think

21   it's worth anything.  But reputation damage typically

22   is -- and the hurt imposed to a reputation, is something

23   that really is a jury's camp.

24          We can stand up and say numbers that the Court

25   or the jury may think is silly or they may not.  But it

1    just seems to me that it's not the kind of thing that is

2    subject to the kind of calculation in a narrow sense that

3    Mr. Springer's talking about as far as 26(a).

4               MR. SPRINGER:  Your Honor, if I may?

5               THE COURT:  Sure.

6               MR. SPRINGER:  I didn't know who I was

7    interrupting, I hope it wasn't you.

8               MR. GRUDBERG:  It was me.

9               THE COURT:  No, no, go right ahead.

10              MR. SPRINGER:  The issue I think, as Your Honor

11   is indicating, is this is a strange case and here

12   reputation damages arguably have practical consequences.

13   And what we're looking at is presumably the damages

14   calculations and what is being set forth here.  And what

15   Mr. Weiner and Mr. Grudberg are talking about is that the

16   reputation damages in these categories have had practical

17   consequences.  And I think your questions, Your Honor, are

18   exactly the right ones.  You know, if there is a practical

19   consequence here, how are you calculating the damages?

20              For instance, you know, does the loss of a --

21   what's the cost of a loss of student?  Arguably in C, the

22   decrease with Dongguk University's student satisfaction,

23   the practical consequence of that was to bring additional

24   revenue into the school because these students had to take

25   an additional course, which is exactly why we think for

1      these practical consequences we ought to get computations.

2                  THE COURT:  It seems to me that to the extent

3      the damages are subject to a reasonable computation, the

4      plaintiff needs to provide one.  If the plaintiff --

5                  MR. WEINER:  Your Honor, I think we have.

6                  THE COURT:  Mr. Weiner, if the plaintiff's

7      position is, look, they really are not subject to that

8      kind of computation, then the plaintiff should say so.

9                  As I listen to the statements that have been

10     made today, I recognize that there is some truth to what

11     you have said to some degree, these damages are not

12     subject to calculation in the way that special damages

13     typically are calculated.  I think that we might be able

14     to advance the case if you were to think about it that way

15     and provide Mr. Springer with a clearer understanding of

16     how you see it.

17                 MR. WEINER:  Your Honor, I think we did exactly

18     that.  Maybe we should go directly to the disclosures.

19                 THE COURT:  Well, okay.

20                 MR. WEINER:  Okay?  I mean, I would like to walk

21     you through it then.

22                 THE COURT:  Let me see if I can help.

23                 In this part of your disclosure -- and I'm

24     referring to page 8 -- you point out that you've

25     experienced a decline in applications and I'm wondering --

1    MR. WEINER:  Just so you understand our thinking

2    on this, Your Honor, the first -- pages 8 and 9 and the

3    first half of 10, go to the reputational damages that we

4    were just talking about.

5              THE COURT:  Right.

6              MR. WEINER:  Then when you go to the next

7    element on page 4 -- Number 4 on 10, where Mr. Springer

8    asks for the practical impact, where it actually comes

9    into actual dollars, where we can determine, then we talk

10   about it.  We talk about the loss of grants, corporations,

11   donations, sponsorships and individual donations, and we

12   spell out the dollar amounts.

13             THE COURT:  Right.

14             MR. WEINER:  And then if you go through there,

15   we actually show there were $20 million promised and

16   $5 million received.  And we have the actual numbers for

17   Mr. Springer.

18             THE COURT:  Right.

19             MR. WEINER:  It continues into page 12, and we

20   were very specific about the campaigns that were involved.

21   And then you get to page 13, which talks about the law

22   school in very specific terms, about the losses that were

23   incurred and the loss revenues that were resulted from the

24   fact that we can't open a law school.

25             And then we move on to the intangible damages in

1    terms of brand rehabilitation.

2              THE COURT:  Okay.

3              MR. WEINER:  I think we have provided, again,

4    what we can provide.

5              THE COURT:  So --

6              MR. WEINER:  We gave it to them.

7              THE COURT:  Are you saying, in other words, that

8    for those items that appear on pages 8, 9, and 10, under

9    Numbers 1, 2 and 3, you do not believe that they are

10   subject to the kind of computation that you provide for

11   Items 4 and 5.

12             MR. WEINER:  That's what I'm saying, Your Honor.

13             THE COURT:  Mr. Springer?

14             MR. SPRINGER:  Well, this is my difficulty with

15   that, Your Honor:  With regard to our -- are we then

16   saying that when I think of practical consequence, I look

17   at the decrease in student applications?

18             And let's just assume, as we must for this

19   exercise, that they're claiming all of this is

20   attributable to Yale, and we then look -- and I want to

21   know what profit they make on each additional student

22   here.

23             For instance, if the class size went down to

24   2,727, how many fewer faculty did they higher in fact as a

25   result of this?  May it have been more profitable for the

1    university to operate?  Or, you know, did they -- I don't

2    know what they did in relationship to this decreased size.

3          Similarly, you know, the increase in the

4    students who rejected the offer of admission, leaving

5    aside all the causation arguments, you know, what

6    practical effect did that have?  Did it have any effect on

7    enrollment?  Couldn't we get back to A?

8          Similarly, I want discovery with regard to C

9    and, you know, what practical effect?  But what I'm

10   hearing is the presentation at trial will say, you know,

11   in essence this is, you know, injury to reputation and

12   this is one of the fallouts and we really can't provide

13   any computation or any guidance for you and we will leave

14   it in the realm of speculation because that's where we see

15   it, Your Honor.  And, you know, if I can come up with

16   these suggestions, and I'll go through the numbers, by the

17   way, for 4 and 5 because I think we're a long way from a

18   damage computation on those even though there are numbers

19   set forth.  But here we're essentially being told the jury

20   can speculate.  And by the way, Mr. Springer, you're

21   discovery may well be irrelevant to all of this.

22          MR. GRUDBERG:  That's not what we're saying at

23   all, Judge.

24          MR. SPRINGER:  Then why not provide computations

25   along those lines or show us where the practical

1   consequences play out?  And not leave it in the realm of

2   speculation?

3            MR. GRUDBERG:  The 26(a) doesn't end discovery,

4   it sort of begins it.  You put something out there, the

5   things that Mr. Springer is talking about, we want to know

6   what the profit is per student, we want to know this, that

7   and the other, he's entitled to depose people, he's

8   entitled to get documents, all of those things.  But 26(a)

9   is not supposed to be a volume of a zillion pages.  And

10  just because he thinks he would calculate damages somewhat

11  differently than Mr. Weiner has, he's entitled.  But he's

12  entitled to get discovery and so forth.

13           But we just started this.  I don't think that's

14  what 26(a) is about.  We put in a calculation, of the

15  things we feel we can't calculate --

16           MR. SPRINGER:  That's not a calculation, Ira.

17           MR. GRUDBERG:  Well, in terms of the numbers of

18  Mr. Weiner throughout the writing of the $40 million, it's

19  a calculation.  It's an addition.  And it points out they

20  had 21,000,000 in pledges and they had 5,000,000 in change

21  in computer payments.  Now, you know, whatever else may

22  have happened to Dongguk, he can look into that.  But it

23  is a calculation.

24           We added two or three numbers and came up to

25  $40 million.  And to say that, just guessing -- unless the

1    feeling is going to be just because Dongguk is an

2    institution, it can't have general damages to its

3    reputation, which may not be fully shown in the various

4    smaller piles of money we thought that we had, that we

5    otherwise would have had.  We believe Dongguk is not

6    entitled because it's a corporation, because it's an

7    entity to general damages.  General damages are just that.

8    Who knows what pain and suffering are worth.  It's up to

9    what a jury tells us it's worth.  There will be testimony

10   concerning it, and however compelling or winning it is,

11   we'll see in front of a jury, if it comes to that.

12          But it just seems to me that just because we

13   can't put a number on general damages, reputation damages,

14   would mean that no libel action could ever go to a jury on

15   general damages.  And we know that's not the law.

16          MR. SPRINGER:  Your Honor, if I may, one thing

17   you said, Ira, you said that Mr. Weiner and I may

18   calculate damages differently.  The difficulty here is

19   there is no computation or calculation of any damages and

20   we are left in the dark and we are left to think that all

21   that is going to occur is speculation.  There is no

22   calculation or computation with regard to 1, 2, or 3, and

23   I would maintain with regard to 4 and 5 as well.

24          THE COURT:  Would you please tell me why you

25   view 4 and 5 that way so we can better understand the

1    dispute with regard to those items?

2              MR. SPRINGER:  Sure, Your Honor.  Let me start

3    with 5 because it's easier, and we can go to 4.

4              We'll start also with the back, which is D, if

5    we could.  This is on page 14.

6              THE COURT:  Yes.

7              MR. SPRINGER:  The damages in this category

8    include the following:  Reconstruction of the law

9    department building, okay?  And it says $8.7 million.  Are

10   we to understand -- that's a number that is put out there,

11   okay?  And if we're being told that's the damages, then

12   we're to assume that this building has no other use,

13   cannot be resold, has no value at all; that the

14   reconstruction has no -- similarly for the new

15   construction of the law library and mock court, 2.4, that

16   these have no value whatsoever without a law school.  And

17   similarly for the purchase of real estate and construction

18   of a law school dormitory, that these have no value

19   whatsoever.

20             What we understand is this is an expense that

21   has been laid out, but to call it damages is to tell us

22   that these have no value, can't be sold, there is no

23   utility for Dongguk.  That is my difficulty with the

24   numbers.

25             THE COURT:  Okay.

1      MR. SPRINGER: And the newly hired law school

2   faculty members and the salaries provided them, are they

3   not teaching anything else? Have they not taught anything

4   else? You know, is this -- is that what we are being

5   told? And that's why we want a calculation.

6      If we're being told these are the damages and

7   that's what it is, that's fine, but just to have a number

8   doesn't tell us the damage calculation.

9      Similarly, if you go back now to loss of annual

10   earnings, that presumably is a calculation that in essence

11   there are expenses and there are revenues related to that

12   and there would be documents that we would be able to see

13   beginning in 2008, so presumably it occurred last year and

14   presumably the law school they claim would have opened in

15   2008. You know, something I have difficulty with.

16      The loss of annual government grants,

17   3.5 million. Are we saying that there are no expenses

18   whatsoever related to any of these? If that's so, that's

19   fine, but typically, you know, Your Honor -- and I serve

20   on lots of non-profits and deal with lots of educational

21   institutions -- grants come with requirements and

22   expenses. So it is not, you know, a simple matter of, you

23   know, them losing these. And if they're telling us these

24   are essentially gifts to which, you know, are being given

25   to Dongguk, that's not what it says. It says grants.

1          Then loss of projected annual donation which

2    would come from law school alumnae.  So we are finding out

3    that every year, starting before they have graduated

4    maybe, because we're asking for it now, we're going to get

5    $2,000 from each graduate.  The first class, even if it

6    opened in '08, presumably if it's a U.S. style is three

7    years, is, you know, going to start in 2011.

8          I raised funds for three educational

9    institutions.  You know, Your Honor, maybe Harvard because

10   of its grants gets 2,000 a year, but that's a different

11   story.

12         Let them estimate what they will, but that's my

13   difficulty.  We have a number here that is not a damage

14   calculation, it's a number thrown out, as you were, for an

15   item without taking into account what the value is to

16   Dongguk.  If there's nothing that's fine.

17         And similarly, then, with regard to these, what

18   expenses are associated with an item.  That's Number 5.

19         You know, I'm happy to go to Number 4 and talk

20   about the same matter there.

21              THE COURT:  Let's stick with Number 5.

22              MR. WEINER:  May I respond, Your Honor?

23              THE COURT:  Yes, please.

24              MR. WEINER:  First of all, this isn't what

25   Rule 26 requires.  Mr. Springer is raising his problems

1    with the damages that we have going forward. He thinks

2    we've overstated them. That's his prerogative. These are

3    the damages we believe were appropriate. We put them in

4    there for that reason.

5         Now, we've -- also it was attached, Your Honor,

6    to my letter, from Mr. Springer's document request. And

7    if you look, beginning at page 17 of that request, for the

8    next five or six pages, and then further on in his

9    request, he has sought the very type of detail he is now

10   saying that a party must provide in a Rule 26(a)

11   disclosure. There's no authority for that.

12        We have complied with this rule as far as we can

13   do. If he wants to argue at trial that our damages are

14   overstated because we didn't take into account certain

15   expenses or certain uses for a building that might be used

16   for some other reason, he has asked for that in discovery,

17   but it's not my obligation to agree with him that my

18   damages should be discounted under his theories.

19        THE COURT: Let's see if we can figure out how

20   best to proceed from here.

21        MR. WEINER: Why can't we go to the discovery

22   requests and provide him with the discovery he's seeking?

23   This is not a matter where he doesn't know what he's

24   looking for. He knows very well what he's looking for.

25   We have to provide him with that detail. He's already

1   asked for that.

2            THE COURT:   Let's just talk this through a

3   little bit more and maybe it will wind up benefiting all

4   concerned.

5            Focusing on part five, taking each point in the

6   order in which the points were made, I gather, Mr. Weiner,

7   that with regard to the $8.7 million claimed for

8   reconstruction of the law department building, what we see

9   is a number, 8.7 million.  That, as far as you know, is

10  the cost to reconstruct the building?

11           MR. WEINER:   Correct.

12           THE COURT:   And similarly, the 2.4 million for

13  the new construction of a law library and mock court is

14  the number that you have received from your client and it

15  reflects just that, the cost to build this library and

16  mock court?

17           MR. WEINER:   Right.

18           THE COURT:   So stepping back from this, am I

19  right, you have prepared this document in conjunction with

20  a settlement conference?

21           MR. WEINER:   The initial -- yes.  The initial

22  request from Magistrate Martinez in anticipation of the

23  settlement conference was for us to spell out as best we

24  could the basis for our damages.

25           THE COURT:   This was its intended purpose at the

1    time you pulled these figures together, which is a

2    distinctly different purpose from the one Mr. Springer has

3    in mind, which is satisfying the requirements of Rule 26

4    insofar as it calls upon you to provide a computation of

5    each category along with documents and other evidentiary

6    material on which each computation is based.

7            MR. WEINER:  I don't see there being any

8    difference, Your Honor.  In fact, I would say Rule 26 is

9    less demanding than Judge -- Magistrate Judge Martinez's

10   order.

11           THE COURT:  Okay, well, let's think practically

12   about this situation.

13           Mr. Springer, hopefully you have a better

14   understanding with regard to exactly what you're looking

15   at, and on that assumption, would you be content to seek

16   the type of detail that you believe should have been

17   included but was not through the discovery process and in

18   that way, you know, expect to receive the detail that you

19   have not yet been given?

20           MR. SPRINGER:  The difficulty I have with that,

21   Your Honor, is that I hear what you're saying and, you

22   know, I don't want to create more work for all of us than

23   is needed, but the difficulty I have here is that

24   Rule 26(a)(1)(A)(iii) provides for, as you've read and

25   I've read now, copies of the documents or other

1    evidentiary material upon which these computations are

2    based.  We will now know in advance to that what --

3    assuming we have heard that these are the damages now

4    claimed, we will now get those documents in response to

5    that.

6            What I am concerned about, Your Honor, is the

7    answers to the requests for production or even

8    interrogatories may not yield the same information.  I

9    fear we may get objections.  We will be derailed.  And

10   this is a clear path to that than what ought to be

11   provided.

12           Presumably this was done with the 8.7 million

13   and the 2.4.  We ought to get this information so that,

14   you know, we don't have to worry about future fights, we

15   don't have to worry about whether the interrogatories map

16   this exactly.  If we have a dispute in the future, we can

17   refer, as often we do, to the responses to initial

18   disclosures.

19           And that's my concern, Your Honor, that by not

20   honoring this, I'm left with, you know, having now to

21   speculate as to what necessarily would have been produced

22   here.  And whether they map exactly, whether I have

23   everything and it creates a lot more work and quite

24   frankly a lot more anxiety than it would to get responses

25   to these -- to these initial disclosures to which again we

1    believe we're entitled, particularly if these are now the

2    claimed damages, it's kind of easy to set forth what the

3    documents are.  Presumably they looked at some documents

4    to come up with these numbers and we can get them.

5         MR. WEINER:  Your Honor, I don't understand what

6    Mr. Springer is saying.  The rules, the advisors' notes to

7    the rules, Moore's on federal procedure and any Court that

8    has construed these rules has made it very clear that the

9    burden on the plaintiff to provide these types of

10   disclosures is in the detail.  We gave more detail than

11   those rules even require.  And beyond that, it was for the

12   other side to have an opportunity so they had -- they can

13   frame their discovery requests, so they know what to look

14   for in discovery.

15        It is not a substitute for discovery, and that's

16   exactly what Mr. Springer just said to you.  He said, we

17   can't rely on and trust discovery so we want this all done

18   today.  That's not what's appropriate under this rule.

19   The rule is set forth so that Mr. Springer understands my

20   categories of damages, which he does; he understands how

21   I've calculated my damages, to the extent he can; he also

22   understands that there are intangible reputational damages

23   that I can't calculate at the moment.  He has therefore

24   now served his discovery request.  Is he now going to

25   withdraw them because they're no longer necessary?  I

1    doubt that.

2            He has -- and we've provided them to you, Your

3    Honor -- he has category after category after category of

4    document requests based upon our disclosures and

5    interrogatories based upon our disclosures.  It is not my

6    burden at this point in the proceeding to take into

7    account all of the arguments that he has made as to why my

8    client's damages should be discounted.

9            He has enough -- we'll argue that to the jury

10   when the time comes -- but we believe that when we say

11   that we spent $8.7 million on a building, we're entitled

12   to be compensated for it, when we say we spent

13   $2.4 million on a library, we're entitled to it.  We've

14   complied with our burden.

15           THE COURT:  Mr. Weiner, you may want to repeat

16   the last part of your statement because the reporter

17   couldn't keep up with you.

18           MR. WEINER:  I'm sorry, when we gave the

19   categories and we were very specific with the amounts, 8.7

20   for the new building, 2.4 for the building and mock court,

21   6.3 for the law school dormitory as well as the other

22   specific elements, they were put in there because they

23   were specific computations of damages which we believe our

24   client has suffered.

25           Mr. Springer understandably has arguments why

1   those numbers should be discounted, but I have fulfilled

2   my burden in complying with Rule 26(a) by providing him

3   with the categories and our computations.  That's why we

4   now have discovery, he will see whether he's correct that

5   these were used for other purposes or could be used for

6   other purposes and that those damages should be

7   diminished, assuming that we win on liability.

8            But in terms of where we are at this point, it

9   seems to me we should move on to the discovery phase which

10  he's already served.

11           THE COURT:  All right.  May reaction to all of

12  this is as follows:  I hark back to the discussion we had

13  about how to try to tackle this very unusual case in a way

14  that would hopefully promote the goal of achieving a

15  prompt, reasonable, inexpensive disposition, to the extent

16  those goals can be achieved.

17           Right now our focus is not on damages but on

18  liability.  Damages are in the picture because we hope

19  that you can have a meaningful settlement conference at

20  the end of this initial phase.  But the main focus is on

21  liability.

22           It is conceivable that the plaintiff will

23  encounter great difficulty trying to impose any liability

24  on Yale, but whatever the case may be, the objective is to

25  enable all of us to get a better handle on that as soon as

1   possible so that people don't spend a lot of time and

2   effort and money needlessly.

3           With that in mind, I don't think the plaintiff

4   should be ordered to produce additional work product

5   reflecting the details that one can at least arguably

6   contend are called for by Rule 26(a)(1)(A)(iii).

7           Mr. Springer, I would leave it to you to follow

8   up with your discovery requests in this context and

9   request another conference if you think that the

10  information you received through discovery is insufficient

11  to enable you to prepare adequately for a meaningful

12  settlement conference, because of course I want to do what

13  I can to lay the groundwork for a meaningful settlement

14  conference.

15          If the case settles, fine, if it doesn't settle,

16  then I guess we will be confronting potentially thorny and

17  even frustratingly complicated questions about damages.

18  Where one draws the line between sufficient evidence to

19  support a reasonable estimate by a jury on the one hand,

20  and on the other, impermissible speculation and folded

21  into that would be issues relating to causation, as you

22  mentioned.

23          So rather than enter the order that you request,

24  I'm going to leave you to the discovery process given the

25  particular concerns we have in this case and our

1   particular objectives in this first phase.

2          I think we know that with regard to Items 1, 2

3   and 3, there is no computation available and I don't see a

4   need to insist on having one done, particularly if it

5   diverts attention from the main event here in this phase,

6   which is liability.

7          With regard to Items 4 and 5, I recognize that

8   these numbers raise lots of questions and I expect that

9   you will be able to get answers to those questions, if not

10  through formal discovery, then perhaps informally.  But

11  certainly you do have legitimate questions as you have

12  demonstrated in your statement regarding 5.

13         While I have you all on the phone, perhaps it

14  would be helpful, Mr. Springer, if you expressed your

15  thoughts on Item 4.

16         MR. SPRINGER:  Well, they're similar, Your Honor

17  to Item 5.

18         What we have here is we have two sets of

19  numbers.  We have a total approximate donation amount that

20  has been promised and then a total approximate donation

21  amount that was actually received.

22         THE COURT:  Right.

23         MR. SPRINGER:  We have a difference of

24  $15.6 million.  They are saying that, you know -- one of

25  the immediate questions is:  What is the typical yield on

1    these sorts of pledges?  Do they always get 100 percent?

2    And why do they think 100 percent is warranted here?

3            We -- there are the same kinds of questions.

4    There is absolutely no discounting, and we suspect that

5    some of the donors to get out of their pledges would have

6    indicated something like personal issues.  That's been my

7    experience.  A loss in the stock market, a business

8    reversal, all sorts of reasons come into play.  But they,

9    like their estimates in Number 5, are basically saying

10   that there is no discounting for the hosts of reasons that

11   occurs here.  And that's their calculation.  We understand

12   that now that this is their calculation of damages.

13           They've indicated on the next page 3, categories

14   of donations and what was the target amount, and then the

15   amount promised.

16           So one -- those are essentially the questions

17   that, to my mind Your Honor, fall in the same category as

18   we had with the real estate, if you will.  Why is there no

19   discounting in these circumstances?  And if you're

20   claiming 100 percent, that's fine.

21           And all attributable to Yale?

22           THE COURT:  That appears to be the case.

23           MR. SPRINGER:  That's what I'm understanding,

24   Your Honor.  That's fine.

25           THE COURT:  All right.  It seems to me that if

1    we are going to have a meaningful settlement conference

2    and if the plaintiff is going to claim these figures as

3    the basis for its demand, then at some point in advance of

4    that conference, the plaintiff should provide us with the

5    information that Mr. Springer has requested.  Perhaps the

6    plaintiff doesn't need to provide all of the detail that

7    one could dream up in a set of interrogatories or

8    deposition questions for an expert witness, but the

9    plaintiff does have an obligation to prove causation.  The

10   plaintiff does have an obligation to mitigate damages.

11           I think the plaintiff would be serving the

12   interest of all concerned, including the plaintiff, if

13   further information were provided.

14           MR. GRUDBERG:  It's possible also, Judge, that

15   further information could go the other way from the way

16   Mr. Springer is trying to push it.  The fact is, you don't

17   often spend $40 million to go to law school on dorms and a

18   library and so on and so forth without borrowing money.

19   If you didn't borrow money, if you had the money to put

20   up, the loss of the use of the money, and the fact is that

21   if they knew they weren't going to have a law school right

22   away, they probably wouldn't have built it.

23           MR. SPRINGER:  But Ira that's precisely the kind

24   of calculation we're entitled to.  If you're borrowing the

25   money and you're paying interest on it, that's exactly

1    what should happen.  Don't speculate and tell me that.  It
2    should be in 26(a).
3                MR. GRUDBERG:  It shouldn't be in 26(a).  You
4    ask for it in your discovery for God's sakes.  I've never
5    seen a 26(a) as complete as the one Bob put together on
6    this one in my almost 50 years of practicing law.  And as
7    he says, you ask for it and you get it.
8                But I'm just pointing out that at this stage of
9    the game if you figure in interest problems and so forth,
10   the number may be higher rather than lower, that's all.
11               MR. WEINER:  Your Honor, we're happy to provide
12   Mr. Springer with the backup documents that support every
13   number that we put into our disclosures.  But again
14   Mr. Springer continues to argue why these numbers should
15   be discounted.  That's his prerogative.
16               Just so we're clear, while he's taking issue
17   that we may be attributing 100 percent to Yale, he's also
18   attributing 0 percent to Yale.  Maybe there's a middle
19   ground out there that we can reach when it comes to trying
20   to resolve this case, but this is not just a one-way
21   street.
22               THE COURT:  Well, we don't have a jury here.  We
23   have a difficult case to contend with, and to try to
24   resolve.  I think Mr. Springer has made some good points.
25   They seem to me to be fair and reasonable.  If the

1   plaintiff believes in good faith that it can claim every

2   dime it cost to build the law school, okay.  If the claim

3   is that the facility is essentially useless, okay.  But

4   that doesn't sound fair and reasonable to me and I doubt

5   that's going to be the plaintiff's position.

6        Similarly, Mr. Springer points out that the

7   plaintiff can't realistically maintain that Yale is

8   responsible for every single lost donation to the last

9   penny, and clearly such a claim would be absurd.  Let's

10  speak frankly.  That would be ridiculous.  I don't think

11  the plaintiff intends to be ridiculous.  So further

12  information along that line is clearly in order.

13       While, you know, we can accept for today the

14  reality that Items 1 through 3 are advanced simply to

15  sensitize Yale to the practical consequences that one can

16  discern in these numbers, a decline in population, decline

17  in student body, increased dissatisfaction among the

18  student body, et cetera, you know, you don't have anything

19  you can offer today that would be in the nature of a

20  calculation of damages.  But still to be clear, the

21  numbers are put out there simply to sensitize Yale, not to

22  suggest that at some point in time the plaintiff is going

23  to try to hold Yale responsible for each and every student

24  who decided not to go to this university, et cetera.

25       I mean, I think, speaking plainly, that's what's

1    going on.  That's not the end of the world, but please, I

2    hope that we will be able to have a surer, more realistic,

3    more balanced statement of damages in advance of the hoped

4    for settlement conference that's going to come along in a

5    matter of months.

6          So I would urge the plaintiff to take these

7    matters into account.  I do think that it's a whole lot

8    more effective for lawyers to exchange views and

9    information in a conference than it is through the

10   formality of written discovery requests and responses.  I

11   would hope that you would take advantage of the time we

12   have to engage in that sort of back and forth off the

13   record in advance of the settlement conference, and I

14   volunteer to be available to help facilitate that if you

15   wanted to have that kind of an exchange with me.

16          MR. WEINER:  Your Honor, we would appreciate any

17   efforts that you can make.  I do think that both sides

18   have served their first wave of the document requests,

19   interrogatories and notices to admit and that will help

20   the parties, I would presume, to reach an accommodation,

21   if we can.

22          And in terms of Dongguk's calculation, as I'm

23   sure Your Honor is aware, often as cases progress, both

24   sides' view of damages will change.  The defendants often

25   go up and the plaintiffs often go down, but there needs to

1    be a flow of information in order to get there.

2                    MR. SPRINGER:  We would agree with that.

3                    THE COURT:  I think we all understand what you

4    have just said, and I know that you're all very

5    experienced and very capable.  I know that you have the

6    emotional intelligence, not just the legal acumen and

7    experience, to put yourself in the other person's

8    position, and I hope you will do that, because to me, you

9    know, that's what separates the really good lawyers from

10   the rest and that's what promotes fair, just and speedy

11   resolutions of cases, especially difficult cases.  So I

12   hope that you will use your resources to make progress in

13   the weeks and months ahead.

14                   On that note, I will let you go and wish you

15   luck and remind you that I'm here if you need me.

16                   MR. SPRINGER:  We appreciate that very much,

17   Your Honor.  It's why we came to you this time, and I

18   think this conference has been beneficial.  I would hope

19   Mr. Weiner feels the same way.

20                   MR. WEINER:  We do, Your Honor.

21                   THE COURT:  All right, good.

22                   MR. GRUDBERG:  Thanks, Judge.

23                   THE COURT:  You're most welcome.

24                        (Proceedings adjourned at 2:40 p.m. p.m.)

25

41

C E R T I F I C A T E

In Re: DONGGUK UNIV.  Vs. YALE UNIV.


       I, Darlene A. Warner, RDR-CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




             /s/_____

                 DARLENE A. WARNER, RDR-CRR
                   Official Court Reporter
                 450 Main Street, Room #223
                  Hartford, Connecticut 06103
                    (860) 547-0580

# EXHIBIT 100

# FILED UNDER SEAL

# EXHIBIT 101

# FILED UNDER SEAL

# EXHIBIT 102

# FILED UNDER SEAL

# EXHIBIT 103

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

CIVIL ACTION 3:08-CV-00441 (RNC)

------------------------------x

DONGGUK UNIVERSITY,                 :

      Plaintiff,                   :

  -versus-                         :      VOLUME I

YALE UNIVERSITY,                    :

      Defendant.                   :

------------------------------x


    Deposition of YOUNG KYO OH, taken

pursuant to the Federal Rules of Civil Procedure,

at the Law Offices of Day Pitney, LLP, 1 Audubon

Street, New Haven, Connecticut, before James A.

Martone, LSR #248, and Notary Public, in and for

the State of Connecticut, on September 15, 2010,

at 10:15 a.m.

DONGGUK v. YALE UNIVERSITY

September 15, 2010

Page 66

1  enlarge it much.  You know what, why don't we
2  take a very short break so we can try and do
3  that.
4          THE VIDEOGRAPHER:  Off the record,
5  3:09.
6          MR. FETNER:  Mark this as 3A.
7          (Defendant's Exhibit 3A marked
8  For identification.)
9          THE VIDEOGRAPHER:  On the record,
10  3:21.
11     Q.  As I look at this, it looks like we
12  inadvertently included an extra page, or maybe I
13  have these in the wrong order.
14          MR. WEINER:  No, I think what
15  happened is it took the bottom from the top.
16          MR. FETNER:  The last page is on
17  the front, is that it?
18          MR. WEINER:  Yeah.  You'll notice
19  they were cut in half.  I looked at that.  I
20  don't think it's a problem though.
21          MR. FETNER:  The first page should
22  really be the fourth page it looks like.
23          MR. WEINER:  Yeah.
24     Q.  Mr. Oh, I'd like to you turn to what is
25  the second page of the enlarged document.

Page 67

1  Probably the first page of the smaller document.
2          MR. WEINER:  You may want to ask
3  the witness to put it in the right order.  He
4  could probably figure it out.
5          MR. FETNER:  Okay.
6     A.  Second page.
7          MR. WEINER:  Can we do this?
8  Could we mark on the exhibit physically what the
9  order of the pages ought to be so we know?
10          MR. FETNER:  Yeah, absolutely.
11  I'd like the record to be correct.
12          MR. WEINER:  Madam interpreter,
13  could you just ask the witness to, with a pen,
14  indicate which pages the document should be in
15  order, so that page 1 may be in the exhibit page
16  2, so we know, we have some way of determining
17  the order of the document.
18          THE INTERPRETER:  Would you like
19  number -- him to write down the correct numbers
20  with the correct corresponding page numbers from
21  the original document?
22          MR. WEINER:  Yes.
23          MR. FETNER:  Yes, exactly.
24     A.  Yes.
25     Q.  Mr. Oh, what is the 108 Project?

Page 68

1     A.  It refers to the long term project of
2  the school.
3     Q.  Is that something that you initiated?
4     A.  Yes.
5     Q.  What is the significance of the number
6  108?
7     A.  Various meanings.  The number 108 in
8  Buddhism represents the number of difficulties
9  that's discussed in Buddhism when it says that
10  there are difficulties we have to overcome.  They
11  say there are 108 difficulties to overcome.  It's
12  rather symbolic, because the number 108 is, has
13  certain significance in Buddhism.
14     Q.  Were there actually 108 projects as
15  part of your plan to reform Dongguk?
16     A.  We created 108 tasks.
17     Q.  Did you actually implement each of
18  those 108 tasks?
19     A.  As of when?
20     Q.  As of today, have you done that?
21          MR. CHO:  Objection.  Implement,
22  he used the word implement, right?  Implement
23  here means in a kind way proposed.
24     Q.  Have you performed the tasks?
25          THE INTERPRETER:  That's the

Page 69

1  meaning.
2     A.  Ever since I became the President, the
3  movement to carry out those tasks has been
4  continuing.  These tasks are related to the basic
5  direction.  Depends on the task.  Certain tasks
6  can be completed in one year.  Certain tasks
7  would take many years.
8     Q.  When you became President of Dongguk in
9  March, 2007, did you believe that Dongguk's image
10  needed to be transformed from domestic to
11  international?
12     A.  Yes.
13     Q.  Also in March, 2007, did you believe
14  that Dongguk's image needed to be transformed
15  from traditional to forward looking?
16     A.  Yes.
17     Q.  Also in March, 2007, did you believe
18  that Dongguk's image needed to be transformed
19  from conservative to progressive?
20          THE INTERPRETER:  From
21  conservative to --
22          MR. FETNER:  Progressive.
23     A.  Not in every aspect, but because I have
24  the feeling that the word "progressive" is not
25  precise, I would say innovative and flexible, and

18  (Pages 66 to 69)

DONGGUK v. YALE UNIVERSITY

September 15, 2010

Page 70

1  the attitude where one would, one can change if
2  necessary. And I thought the school has to be
3  taken into that direction.
4      Q.  When did Dongguk's UI renewal project
5  begin?
6      A.  I don't recall precisely when it was,
7  but I do recall at a policy committee meeting was
8  held around August.
9      Q.  Was that meeting the start of the UI
10  renewal project?
11     A.  After each department forms searching
12  for independent tasks and those ideas would be
13  reviewed and discussed at the --
14          MR. CHO: Policy committee
15  meeting.
16     A.  Policy committee meeting. So you can
17  say the beginning of that plan was around that
18  time.
19     Q.  I'd like you to look at what I think is
20  the second page of the enlarged version of this.
21     A.  Yes.
22     Q.  Does item number 1 at the top of that
23  page indicate that Holistic UI Development was
24  selected as the 17th project of the 108 Project
25  in March, 2007?

Page 71

1          THE INTERPRETER: I think we are
2  looking at the wrong page.
3      Q.  It's the first page of Exhibit 3, which
4  is the smaller version. I think it's the second
5  page of the larger version.
6          MS. LU: It is the second page.
7      A.  Yes.
8          THE INTERPRETER: We still haven't
9  located the portion, corresponding portion.
10  Could you show me the --
11     Q.  That's what I'm asking about.
12         MS. LU: Why don't you ask the
13  question again.
14         MR. FETNER: Sure.
15     Q.  Mr. Oh, my question is, whether the
16  portion of the document that I've just indicated
17  states that in March, 2007, Holistic UI
18  Development was selected as the 17th project of
19  the 108 projects?
20         MR. WEINER: Maybe the easiest
21  thing to do, could I ask the interpreter, I'd
22  like to ask the interpreter really what you're
23  asking is if the English translation is accurate.
24         MR. FETNER: It's much easier.
25         MS. LU: She's translating back

Page 72

1  and forth.
2          MR. WEINER: The real question is,
3  is the translation --
4          THE INTERPRETER: I'm going to
5  translate your question based on yours.
6          MR. FETNER: Sure, but I mean Bob
7  is right, what I'm getting at here is is, the
8  English translation in the document an accurate
9  translation of the Korean?
10         MR. WEINER: He can't answer that.
11         MR. FETNER: I understand that.
12  That's why I've asked him the question.
13         MR. WEINER: So I'm asking the
14  interpreter to look at it.
15         (Pause in the Proceedings)
16         MR. WEINER: Is it an actual
17  accurate translation? That's what we're asking.
18         THE INTERPRETER: I don't see that
19  portion. I don't see background.
20         MR. WEINER: So that's the --
21  English is lot more extensive than Korean.
22         MR. WEINER: Could you translate
23  the Korean.
24         THE INTERPRETER: Yes.
25  Background. Number 1.

Page 73

1          MR. WEINER: Just read the Korean.
2  Forget the English. Don't even look at the
3  English. Just read as you were.
4          THE INTERPRETER: Right.
5      Q.  All -- just so it's clear, all I'm
6  interested in now is number 1, and then the three
7  lines of the Korean text underneath it.
8          THE INTERPRETER: Right.
9          MR. WEINER: That's what she's
10  gonna read.
11         THE INTERPRETER: At the point
12  when Dongguk University's image should be
13  transformed from domestic to international and
14  from conservative to future -- futuristic, and
15  from conservative to progressive image, has been
16  I started with Dongguk's image should be -- has
17  been the consensus of inside and outside of
18  school.
19         At this point -- UI renewal of at
20  that time holistic UI renewal has been selected
21  as the 17th task of the 108 Projects. That's
22  what's written.
23     Q.  I see in the Korean, the number 2007.
24  Followed by the number 3.
25         THE INTERPRETER: Yes. Oh, and it

19 (Pages 70 to 73)

# EXHIBIT 104

# FILED UNDER SEAL