# EXHIBIT  C

1            UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF CONNECTICUT

3                     --oOo--

4   DONGGUK UNIVERSITY,

5          Plaintiff,

6     vs.
                           No. 3:08-CV- 00441-TLM
7   YALE UNIVERSITY,

8          Defendant.

9

10

                    Deposition of
11
                  ITAMAR SIMONSON
12
           WEDNESDAY, SEPTEMBER 21, 2011
13

14   Reported by:
     KIMBERLEE SCHROEDER, CSR, RPR, CCRR
15   License No. 11414

16

17

18

19

20

21

22

23

24

25

Itamar Simonson                                              9/21/2011

1
2
3
4
5
6          BE IT REMEMBERED that on Wednesday,
7  September 21, 2011, commencing at the hour of 9:28 a.m.,
8  at the Law Offices of McDermott, Will & Emery, 275
9  Middlefield Road, Menlo Park, California, before me,
10  KIMBERLEE SCHROEDER, a Certified Shorthand Reporter in
11  and for the State of California, duly authorized to
12  administer oaths pursuant to Section 30(c) of the
13  Federal Rules of Civil Procedure, personally appeared
14          ITAMAR SIMONSON
15  called as a witness herein on behalf of Plaintiff, who,
16  having been duly sworn, was thereupon examined as
17  hereinafter set forth.
18
19
20
21
22
23
24
25

1              APPEARANCES
2  For the Plaintiff:
3     MCDERMOTT, WILL & EMERY
        By:  ROBERT WEINER, ESQ.
4            AUDREY LU, ESQ.
             Attorneys at Law
5      340 Madison Avenue
       New York, New York 10173
6      Ph:  212-547-5361
       E-mail:  Rowe@mwe.com
7               Aulu@mwe.com
8  For the Defendant:
9     DAY PITNEY, LLP
        By:  HOWARD FETNER, ESQ.
10            Attorney at Law
       One Audubon Street
11     New Haven, Connecticut 06511
       Ph:  203-752-5012
12     E-mail:  Hfetner@daypitney.com
13    DAY PITNEY, LLP
        By:  Felix J. Springer, Esq.
14            Attorney at Law
       242 Trumbull Street
15     Hartford, Connecticut 06103-1212
       Ph:  860-275 0184
16     E-mail:  Fjspringer@daypitney.com
17  Also Present:
18  MATTHEW KWAN, Videographer
19
20
21
22
23
24
25

1              ITAMAR SIMONSON
2          THE VIDEOGRAPHER:  Good morning, ladies and
3  gentlemen.  My name is Matthew Kwan, your videographer.
4  I represent Toby Feldman, Inc. located at One Penn
5  Plaza, New York, New York 10119.  Today's date is
6  September 21st, 2011, and the time on the monitor is
7  9:34.
8          This is the start of disk labeled No. 1 of the
9  videotaped deposition of Itamar Simonson in the matter
10  of Dongguk University vs. Yale University in the U.S.
11  District Court, District of Connecticut, Case No.
12  3:08-CV-00441 TLM, taking place at McDermott, Will &
13  Emery, 275 Middlefield Road, Menlo Park, California.
14  This is taken on behalf of the plaintiff.
15          Counsel, will you please identify yourself
16  starting with the questioning attorney.
17          MR. WEINER:  Robert Weiner, McDermott, Will &
18  Emery for Dongguk University.
19          MS. LU:  Audrey Lu for McDermott, Will & Emery,
20  Dongguk University.
21          MR. SPRINGER:  Felix Springer for Yale
22  University.
23          MR. WEINER:  Howard Fetner, Day Pitney, also
24  for Yale University.
25          THE VIDEOGRAPHER:  Your Court Reporter today is

1              ITAMAR SIMONSON
2  Kim Schroeder from Toby Feldman.
3          Will the Court Reporter please swear in the
4  witness?
5              ITAMAR SIMONSON,
6  after being first duly sworn, was examined and testified
7  as follows:
8          THE VIDEOGRAPHER:  You may now proceed.
9              EXAMINATION
10  BY MR. WEINER:
11      Q.  Dr. Simonson, will you state for the record
12  both your business and home address?
13      A.  My business and home address is 1561 Newlands,
14  N-e-w-l-a-n-d-s, Avenue, Burlingame, California 94010.
15      Q.  Now, is English your native language?
16      A.  I grew up speaking Hebrew, but I've been here
17  approximately 30 years.  So I'm not sure how you count
18  that.
19      Q.  If there is any difficulty in understanding any
20  of the questions that I ask, would you please let me
21  know?
22      A.  I will.
23      Q.  How many depositions have you actually been a
24  witness in?
25      A.  Approximately 90.

Itamar Simonson                                                    9/21/2011

Page 6

ITAMAR SIMONSON
1   ITAMAR SIMONSON
2   Q. Over what period of time?
3   A. Probably since 1992.
4   Q. And of the approximately 90 depositions that
5   you have been a witness, how many of them have been as
6   an expert witness?
7   A. All.
8   Q. So you are familiar with the procedures?
9   A. I believe so.
10  Q. Let me show you what we've marked as Simonson
11  Exhibit 1. And Audrey, you should just note when you
12  make this, make Itamar Simonson.
13              (Plaintiff's Exhibit No. 1 was
14              marked for identification.)
15  MR. WEINER: Q. Okay. Is Simonson Exhibit 1 a
16  report you authored in connection with this case?
17  A. Yes.
18  Q. And the date of that report is what?
19  A. June 29th, 2011.
20  Q. The Videographer informed us he's getting
21  interference. Do you have a sense of where it's from?
22  THE VIDEOGRAPHER: Not at the moment. Can we
23  go off the record?
24  MR. WEINER: Sure. Let's go off the record.
25  THE VIDEOGRAPHER: We are now going off the

Page 7

ITAMAR SIMONSON
1   ITAMAR SIMONSON
2   record. The time is 9:38.
3   THE VIDEOGRAPHER: I'm sorry.
4   (Recess taken: 9:37 a.m. - 9:39 a.m.)
5   THE VIDEOGRAPHER: We are now going back on the
6   record. The time is 9:39.
7   MR. WEINER: Q. Dr. Simonson, I'm going to
8   show you three exhibits which are marked as Simonson
9   Exhibits 2, 3 and 4, with Simonson 2 being the retention
10  agreement and Exhibits 3 and 4 the invoices that you
11  sent in connection with this case.
12              (Plaintiff's Exhibit Nos. 2, 3
13              and 4 were marked for
14              identification.)
15  MR. WEINER: Q. Am I correct you were retained
16  on April 20th, 2011?
17  A. Appears to be.
18  Q. And what were you asked to do?
19  A. To evaluate the survey of Dr. Jacoby.
20  Q. And with whom did you meet in connection with
21  your retention?
22  A. With whom did I meet?
23  Q. Yes. Did you meet with anyone?
24  A. Yes.
25  Q. Okay. With whom did you meet?

Page 8

ITAMAR SIMONSON
1   ITAMAR SIMONSON
2   A. I met with Mr. Fetner and Mr. Springer.
3   Q. And was this on or before April 20th, 2011?
4   A. I believe it was shortly after.
5   Q. Could you explain to me the sequence of events
6   then which related to your retention?
7   A. It's been awhile now, but as far as I recall, I
8   first received a copy of Dr. Jacoby's report. I
9   evaluated it and formed an initial opinion. I thought
10  that it suffered from serious flaws.
11  Q. We'll get to the flaws that you perceive, but
12  I'm trying to find out your retention.
13  A. I informed two attorneys --
14  MR. FETNER: Dr. Simonson, I just want to
15  interrupt for a second because your communications with
16  Yale's counsel are not within the scope of discovery.
17  So --
18  MR. WEINER: You mean the substance of them;
19  not the existence of them?
20  MR. FETNER: Well, the fact of a conversation
21  is fine. The fact of a communication is fine. I just
22  want to caution you not to discuss the substance of any
23  communications.
24  THE WITNESS: Okay.
25  So just to proceed, we then met, I believe,

Page 9

ITAMAR SIMONSON
1   ITAMAR SIMONSON
2   sometime before the end of April. They came to my
3   office at the university. And then I proceeded to
4   review the various documents and evaluate the survey.
5   MR. WEINER: Q. Okay. You said you received a
6   copy of Dr. Jacoby's report. Just get it out of the
7   blue, or did someone call you beforehand?
8   A. I'm sure someone called me beforehand.
9   Q. Who was that?
10  A. One of those two attorneys. I do not recall
11  who it was.
12  Q. And they then sent you a copy of Dr. Jacoby's
13  report; is that correct?
14  A. Yes.
15  Q. Which you, as I understand it, reviewed
16  preliminarily; is that correct?
17  A. Yes.
18  Q. And then you entered into this retention
19  agreement. Was that at your office on or about
20  April 20th, 2011?
21  A. I do not recall. Probably not. Probably it
22  was done by e-mail, but I'm not sure.
23  Q. Okay. Let's take a look at the Exhibits 3 and
24  4. I'm sorry. 3 and 4.
25  MR. FETNER: Just to be clear, Bob, there are a

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson                                              9/21/2011

| | |
|---|---|
| Page 10 | Page 12 |

**Page 10**

ITAMAR SIMONSON

1
2  bunch of documents stapled together. Can you tell me
3  specifically what is 3 and what is 4?
4      MR. WEINER: Sure. As I understand, Exhibit 3
5  is dated June 11th, 2011. It's an invoice which has
6  attached to it two pages of handwritten notations.
7      MR. FETNER: Okay. And you understand that the
8  invoice didn't actually have those notations attached to
9  it independently of your assembling them for purposes of
10 this deposition?
11     MR. WEINER: I don't understand that, and we
12 can certainly find that out.
13     MR. FETNER: Okay. But you consider those
14 three pages all to be what you call Exhibit 3?
15     MR. WEINER: Yes.
16     MR. FETNER: That's what I want to know.
17     MR. WEINER: Exhibit 4 would be similarly an
18 invoice with a second page.
19     Q. But since Mr. Fetner has raised the question,
20 would you look at Exhibit 3, and tell me what the first
21 page represents?
22     A. This is an invoice that I sent.
23     Q. And what is the second and third pages? What
24 are the second and third pages?
25     A. I was asked to produce the record that I had of

**Page 11**

ITAMAR SIMONSON

1
2  the hours spent by day on this matter.
3      Q. Okay. And the -- I guess what is confusing to
4  me, and maybe the best way to do this is for you to
5  explain. You have two invoices; am I correct? One is
6  June 11th and the other is July 3rd.
7      A. Correct.
8      Q. And the first invoice covers 83.5 hours and the
9  second is another 76.5 hours; is that correct?
10     A. Yes.
11     Q. And looking at the handwritten documents which
12 are the hours that you maintained, are those all the
13 hours that you spent? Do they reflect all the hours
14 that you spent on this matter up until the point of your
15 second invoice?
16     A. No. It appears to be more than that. I
17 usually issue invoices by month. In this case, the
18 first month covered April and May which means that it
19 would go up to the end of May.
20     Q. Okay. So let's focus on the second page on the
21 top of the third page of Exhibit 3. The work that was
22 done in April and May -- and I'm having some difficulty
23 reading your handwriting -- consisted of what?
24     A. You want me to go line by line?
25     Q. Hopefully not. So if you can first tell me

**Page 12**

ITAMAR SIMONSON

1
2  what the general categories were of the work you did.
3      A. Evaluate the report and survey and its
4  findings, and review materials.
5      Q. Okay. And then to the right of that, there are
6  hours spent; is that correct?
7      A. Yes.
8      Q. And then further down, you have something
9  called "consultant." Is that what that word is for the
10 May 4th entry?
11     A. "Consultation."
12     Q. "Consultation." And then there are a bunch of
13 entries beneath that with parenthesis. What does that
14 mean?
15     A. I'm trying to remember what it represented at
16 the time. I think it probably was my evaluation of the
17 survey and possibly communicating my opinions to the
18 attorneys. And I should note that the consultation part
19 might have accounted for, you know, 30 minutes in a day.
20 And most of the time that you see here pertains to the
21 many documents that I reviewed.
22     Q. Let's see if I can understand that better.
23     Beginning on April 26th, you began to review
24 materials; is that correct?
25     A. Right.

**Page 13**

ITAMAR SIMONSON

1
2      Q. Okay. And then you continued to review
3  materials on the 27th, 28th, 29th, 30th and May 1st; is
4  that right?
5      A. Right.
6      Q. But then on May 4th, it just says,
7  "Consultation plus." You're doing consultation plus
8  still reviewing materials on the 4th through the 10th?
9      A. Correct. In fact, it continues all the way
10 till almost the end of may.
11     Q. On the 12th, you have something called, "Review
12 documents"; is that right?
13     A. Yes. That's the same.
14     Q. When you use the word "materials" and
15 "documents," it's the same?
16     A. Correct.
17     Q. And then it says the 16th is survey materials.
18     A. That would refer to some specific survey
19 materials that I received regarding Dr. Jacoby's survey.
20     Q. What did you do on the 18th?
21     A. So, again, that has "review materials."
22     Q. Yes. And what else?
23     A. I can't read the first two letters. The second
24 one is something to do with deposition. I cannot
25 recall -- the first part of Dr. Jacoby's happened at

4 (Pages 10 to 13)

Itamar Simonson                                                     9/21/2011

Page 14

ITAMAR SIMONSON
1
2  that point, and maybe I received the transcript. I'm
3  not sure.
4      Q. And then further down on the 23rd, you have
5  parenthesis mark plus "plan." Is that the word?
6      A. Yes.
7      Q. What happened then?
8      A. I planned the report.
9      Q. By May 23rd, you had begun planning your
10  report; is that correct?
11      A. Yes.
12      Q. Based upon the materials that you had reviewed;
13  is that correct?
14      A. That's correct.
15      Q. And you continued to plan your report until the
16  25th; is that correct?
17      A. Plus review documents, yes.
18      Q. Well, okay.
19         And then on the 26th, you began to prepare an
20  outline of your report?
21      A. Correct.
22      Q. And you were still reviewing documents?
23      A. Correct.
24      Q. And then beginning on the 27th, what does it
25  say?

Page 15

ITAMAR SIMONSON
1
2      A. Review documents.
3      Q. Okay. And then what happens on the 28th?
4      A. Planned the report and review documents.
5      Q. So you were still reviewing documents at the
6  very same time that you were planning your report as
7  opposed to reviewing documents and then planning your
8  report?
9      A. That's correct. I continued to review
10  documents.
11      Q. Okay. And then beginning the 31st, you just
12  began writing your report; is that correct?
13      A. That's correct.
14      Q. And that continued through June 18th; is that
15  right?
16      A. Yes.
17      Q. Okay. And that's the report that we marked as
18  Exhibit 1; is that right?
19      A. That's correct.
20      Q. And then what happened on June 20th?
21      A. Well, let's go to -- let's go to the second
22  page of Exhibit 4.
23      Q. Right.
24      A. And read from there. I continued to work on
25  the report. I continued to review documents. I don't

Page 16

ITAMAR SIMONSON
1
2  recall exactly what documents these were on each date,
3  but I continued to receive documents.
4      Q. Where does it say that, that you continued to
5  receive documents after May 31st?
6      A. If you look on the second page of Exhibit 4 --
7      Q. Yes.
8      A. -- you see the word "docs."
9      Q. Where?
10      A. On June 20th.
11      Q. Yes.
12      A. Then you see it again on June 23rd. And I
13  think June 24 there's a review of articles which I guess
14  you can call that review of documents. And on June 25,
15  you see both the report and review articles. June 26th
16  is report. June 28 is report.
17      Q. Okay. So June 20th has -- reads what? It says
18  something "call plus documents"?
19      A. Where do you read that?
20      A. I'm reading it on the second page of Exhibit 4
21  you just referenced me to. For the June 20th entry,
22  what does it say?
23      A. "Call re docs," which means phone call related
24  to documents.
25      Q. Okay. It doesn't mean you reviewed documents.

Page 17

ITAMAR SIMONSON
1
2  It means you made a phone call regarding the documents;
3  is that correct?
4      A. Yes, although it's likely statement I also
5  reviewed documents.
6      Q. But that's not what it says?
7      A. It's not what it says. You're right.
8      Q. Then on the 23rd, which is the next reference
9  to documents; right? For the 21st and 22nd of June,
10  simply says, "Report"?
11      A. Right.
12      Q. And 23rd says, "Report plus docs." That's four
13  and a half hours; is that right?
14      A. Yes.
15      Q. I believe you told me that your report was
16  completed on June 29th?
17      A. Yes.
18      Q. Okay. So you were reviewing articles up to the
19  very last day of your report, completing your report; is
20  that right?
21      A. Almost, yes.
22      Q. All right. Let's return to your report itself,
23  and I would like to ask you a few questions about your
24  background. In article 3, by the way, how many reports
25  have you authored in your career, expert reports?

5 (Pages 14 to 17)

Page 18

ITAMAR SIMONSON
1
2     A. It would be very hard for me to estimate.
3     Q. Approximately.
4     A. Perhaps hundreds, but I couldn't tell you
5  exactly.
6     Q. Okay.
7     A. I assume you're referring to expert reports as
8  opposed to academic research.
9     Q. Reports used in court proceedings or
10 arbitration proceedings.
11    A. Yes. That's what I answered.
12    Q. Okay. According to Exhibit 1, which is your
13 report, your field of expertise includes consumer
14 behavior. Can you tell me what consumer behavior is?
15    A. Has to do with all aspects of the behavior of
16 consumers.
17    Q. Well, would you give us a little more detail?
18    A. Consumer's attitudes, consumer's perceptions,
19 consumer memory, consumer decision-making, social
20 influences on consumers. Many other things.
21    Q. When you say "social influences on consumers,"
22 what is that?
23    A. For example, word of mouth.
24    Q. Would it be fair to say essentially why
25 consumers do what they do?

Page 19

ITAMAR SIMONSON
1
2     A. That's too narrow, I would say. It's also why
3  they think what they think, and why they perceive what
4  they perceive, and why they remember what they remember,
5  and so on.
6     Q. And in connection with that, you have become
7  expert in the -- I think you put it as social influences
8  on consumers. Is there anything other than word of
9  mouth that comes under that category?
10    A. Reference groups. There's issues related to
11 being in the majority versus the minority. Nowadays,
12 people talk a great deal about social media.
13    Q. Now, what is word of mouth?
14    A. Exposure to words of others.
15    Q. When you say "words of others," are those oral
16 words or written words?
17    A. All of the above.
18    Q. And are those words of others available through
19 the broadcast media?
20    A. They might be.
21    Q. Internet?
22    A. Sure.
23    Q. Press?
24    A. Yes.
25    Q. Have you heard the term "trusted source"?

Page 20

ITAMAR SIMONSON
1
2     A. Yes.
3     Q. What is a trusted source?
4     A. I presume you don't want me to just say a
5  source that is trusted.
6     Q. You can say that, and I'll ask you the
7  follow-up question.
8     A. I mean, that would be just a source that is
9  characterized as trusted.
10    Q. Well, in the context of consumer behavior, what
11 significance, if any, is a trusted source?
12    A. Well, you would think that trusted sources have
13 more influence than suspect sources.
14    Q. Why is that?
15    A. Because they're trusted. They're more
16 credible.
17    Q. How does one determine who or what is a trusted
18 source?
19    A. There have been many studies on that question.
20 It could relate to just your personal familiarity with
21 the person and that person's prior record. It could be
22 that person's qualifications.
23    Q. Does a trusted source have to be an individual?
24    A. No, not necessarily.
25    Q. For example, could the New York Times be a

Page 21

ITAMAR SIMONSON
1
2  trusted source?
3     A. It could.
4     Q. Could Consumer Reports be a trusted source?
5     A. Yes.
6     Q. And why is that?
7     A. If you believe that Consumer Reports issues
8  reliable evaluations of products, for example, then you
9  may come to trust it.
10    Q. Now, you are a professor at Stanford
11 University; correct?
12    A. Yes.
13    Q. Could Stanford University be considered a
14 trusted source?
15    A. Yes.
16    Q. How about Yale University?
17    A. Yes.
18    Q. Now, continuing on to the second line of
19 paragraph 3 where it talks about human judgment and
20 decision-making, is that separate and apart from
21 consumer behavior?
22    A. Yes. That's more specific in some ways and
23 more general in other ways. So here it's not limited to
24 consumers. It's anything to do with human judgment and
25 decision-making.

One Penn Plaza, NYC                        Toby Feldman, Inc.                          (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        (800) 246.4950

Itamar Simonson                                    9/21/2011

Page 22

1                    ITAMAR SIMONSON
2       Q.  M-hm.  Okay.  And then you have something
3   called the competitive context.  What is the competitive
4   context?
5       A.  Other alternatives that the relevant consumers
6   might consider.
7       Q.  Could you give me some concrete explanation of
8   what you're talking about?
9       A.  Well, thinking about universities, and you have
10  the brightest students, and you think where, which
11  universities are they considering.  And they may be
12  considering Stanford and Yale and Harvard and Princeton
13  and some other universities.  So that you may be seeing
14  as the competitive set.
15      Q.  Okay.  Let's pick up on that.
16          So in your view, universities can compete with
17  one another for students; is that correct?
18      A.  Yes.
19      Q.  Can they compete with one another for faculty?
20      A.  Yes.
21      Q.  Can they compete with one another for
22  government grants or private industry grants?
23      A.  Yes.
24      Q.  Can they compete with one another for money in
25  terms of donations?

Page 23

1                    ITAMAR SIMONSON
2       A.  Yes.
3       Q.  And are there -- well, strike that.
4          Then you go into something called marketing
5   activities such as promotions, advertising on consumers
6   purchasing behavior and buying decisions.
7          What do you cover in that topic?
8       A.  Well, the sentence started earlier.  So much of
9   my research is focused on the effects of, among other
10  things, marketing activities, such as advertising
11  promotions on consumer behavior and buying decisions.
12      Q.  Okay.  Now, let's turn to page 2 of your report
13  and paragraph 5 which talks about some of the areas that
14  you teach; is that correct?
15      A.  Yes.
16      Q.  Among other things, you teach a doctoral course
17  that has something to do with influences on purchase
18  decisions; is that correct?
19      A.  Yes.
20      Q.  Another doctoral course that talks about
21  factors that affect people's judgments and choices?
22      A.  Correct.
23      Q.  Can you tell me -- and if you want me to break
24  it into two, I will.  But can you tell me what types of
25  things influence purchase decisions and persuasion and

Page 24

1                    ITAMAR SIMONSON
2   factors that affect people's judgments and choices?
3       A.  It would take me weeks to give you a complete
4   answer.  I assume that's not what you have in mind.
5       Q.  No, it's not.  So how would you best answer
6   that in the time we have available, and I don't want to
7   cut your answer off.
8       A.  Well, a wide range of factors such as your
9   prior preferences, habits, loyalties.  It could be
10  social aspects, such as your family, your reference
11  group, your friends.  It could be the importance weights
12  of different attributes.  It could be activities of the
13  marketers, such as advertising and promotions, pricing,
14  where you can find a product.
15          And various other things.
16      Q.  Could it be word of mouth?
17      A.  Yeah.  Sure.
18      Q.  And could it be cultural influences?
19      A.  It could.
20      Q.  Have you done any studies in connection with
21  cultural influences?
22      A.  I have.
23      Q.  Can you tell me about that?
24      A.  I can think of specifically two articles that
25  come to mind.  One article was published in

Page 25

1                    ITAMAR SIMONSON
2   collaboration with an ex-doctoral student who is now
3   teaching at the University of Sydney.  And it looked at
4   the effect of explaining choices on the kinds of choices
5   that consumers in different cultures make.
6          So for example, in an earlier study, I showed
7   with another ex-student that when you are asked to give
8   reasons for your decisions, you're actually less likely
9   to compromise, to choose a middle option.
10          What we did in this cross-cultural study was to
11  look at the effect of asking to explain choices.  We did
12  it in Hong Kong, in the U.S., in Japan.  We did it among
13  Asian Americans here at San Jose University.  And what
14  we found was that when there is no need to explain the
15  choices, then all consumers in all cultures were less
16  likely to compromise.
17          However, once you need to provide reasons,
18  people in what we call collectivist cultures, such as
19  the Eastern cultures, like Japan or China, they are more
20  likely to compromise.  Whereas in the U.S., what we call
21  individualistic cultures, the effect is, as I said, the
22  opposite.
23          And we conducted a follow-up study, and we
24  looked at Chinese proverbs and compared that to American
25  proverbs.  And we noticed in Chinese proverbs, there is

7 (Pages 22 to 25)

Itamar Simonson                                                    9/21/2011

Page 26

ITAMAR SIMONSON
1
2  a preference to rules that favor compromise.
3      Whereas in the U.S., it's usually the other
4  way. Like you find things like nice guys finish last
5  kind of thing, which is clearly not consistent with
6  compromising.
7      There's another article that we follow up with
8  the same two authors where we looked at the effect of
9  language. As you may know, in Hong Kong, many of the
10 people speak both English and Chinese. I think it's
11 Cantonese, if I'm not wrong.
12     And we wanted to see whether the language in
13 which the questionnaire appears affects their
14 preferences. And I do not recall all the details, but
15 we did find that it does make a difference.
16     Q. I just want to go back to what you said was a
17 collectivist culture.
18     A. Right.
19     Q. Can you tell me a little more about what that
20 is?
21     A. Well, it has to do with the importance of the
22 family, for example. That is, it's the honor of the
23 family, trying to protect the family. So there's work
24 indicating that people in collectivist cultures would be
25 very cooperative within their family or among their

Page 27

ITAMAR SIMONSON
1
2  closest friends, much more so than you find in
3  individualistic or Western societies.
4      Q. Is there a basis to the collectivist culture
5  that you're aware of?
6      A. What do you mean "basis"?
7      Q. Where does it stem from in your judgment or
8  your research?
9      A. You know, that's a very old literature. It's
10 been going on for decades. I wouldn't say that, even
11 though I published in that area, I wouldn't consider
12 myself a major contributor to that literature.
13     Q. Okay. And when you talk about Eastern culture,
14 are you talking about -- you mentioned Japan. You
15 mentioned Hong Kong. China, Korea, for example?
16     A. Yeah, correct.
17     Q. Do you have those documents?
18     Let me show you what we have marked -- they're
19 a little out of order, which is okay. This will be
20 Simonson 6, which is a memo and some related material to
21 a course that you teach.
22     MR. FETNER: Do you have copies of that.
23     MR. WEINER: No.
24          (Plaintiff's Exhibit No. 6 was
25          marked for identification.)

Page 28

ITAMAR SIMONSON
1
2      MR. WEINER: Q. Could you tell us really what
3  this document is?
4      A. This is just a syllabus that I used a year and
5  a half ago when I taught that MBA class.
6      Q. Okay. I would like to reference you to
7  Simonson Bates No. 2350, I assume you understand what a
8  Bates stamp number is. And that is a problem or a
9  discussion, series of questions that you gave to your
10 students; is that correct?
11     A. Yes.
12     Q. Can you tell us what you were attempting to
13 have your students focus on in connection with this case
14 study?
15     A. It's been awhile, and I taught this particular
16 case only once. After teaching it, I didn't
17 particularly like it. But if I recall correctly, this
18 is a case of a vodka brand that was a tremendous success
19 in Russia, the homeland of vodka. And then the
20 billionaire who started this brand decided to introduce
21 it into the U.S. market and other markets.
22     And given the competitive conditions in the
23 vodka market in the U.S. were so different than in
24 Russia, the product has not done well, and we analyzed
25 the differences between the two markets, why it did not

Page 29

ITAMAR SIMONSON
1
2  do well and what it would have taken in terms of, for
3  example, advertising to have a chance to compete in the
4  U.S. market, which is -- which is very competitive.
5      Q. In connection with this case study, in your
6  view, were there any cultural differences, for example,
7  between Russia and the U.S., in connection with the
8  marketing campaign?
9      A. I don't think culture was a big part of it,
10 even though I usually in the course try to include at
11 least one case that has some cross-cultural component --
12 I'm talking about the MBA course -- I don't know if
13 that's the one that I used for that purpose.
14     But I think it was more an issue of the
15 differences between the vodka market in Russia and in
16 the U.S. I mean, they may have Grey Goose and Belvedere
17 and those brands and Absolut there, but they are fairly
18 weak brands there; whereas, they're doing very well
19 here.
20     So introducing yet another prestigious vodka
21 brand in the U.S. takes a lot of money with unknown
22 prospects of success.
23     Q. So you did mention that typically with your MBA
24 course, you try and include one case study with
25 cross-cultural components. What did you mean by that?

8 (Pages 26 to 29)

Itamar Simonson                                          9/21/2011

Page 30

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2        A. I just want to introduce my students to the
3    importance of looking at cross-cultural differences and
4    their implications.
5        Q. And why is that important?
6        A. Well, they are being trained to be managers in
7    a global economy, and that's just an important component
8    of their education.
9        Q. That there are differences in culture that
10   affect perceptions in consumer behavior?
11       A. That could play a role.
12       (Plaintiff's Exhibit No. 5 was
13       marked for identification.)
14       MR. WEINER: Q. Okay. Let me show you
15   Simonson Exhibit 5 and ask you if this is the article
16   that you were referring to earlier. That is the one.
17       And first, I would like to address your
18   attention to page 175, which begins with a references.
19       Do you see that on the bottom right-hand
20   column?
21       A. Yes.
22       Q. Then you list in the remainder of the article,
23   a number of references; am I correct?
24       A. Yes.
25       Q. And did any of those references talk about

Page 31

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    cultural differences?
3        A. Probably.
4        Q. Okay. For example, let's turn to page 176.
5    The article by C-h-i-u, Chiu, Morris, Hong, Menon.
6    Perhaps it's easier for you to go down the list and let
7    me know if you talked about cultural differences. I
8    made some notes, but you'll be a better source than I
9    am.
10       A. Probably many. Maybe even most of the articles
11   that you see here have something to do with
12   cross-cultural differences or similarities.
13       Q. Okay. Now, going back to page 158 and the
14   bottom left-hand column, you refer to something, "To
15   investigate this dynamic view of cultural influence on
16   decision-making," what is cultural influence on
17   decision-making?
18       A. The notion in this case, and that's the
19   reference to "dynamic," is that in a place such as
20   Hong Kong, many of the consumers have what you may call
21   dual -- they're bicultural, which means if you show them
22   McDonald's and American football and Coke, you put them
23   in a Western state of mind. That's their Western
24   culture.
25       If you show them Chinese symbols, dragon and

Page 32

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    various other Chinese symbols, you can place them in
3    their Chinese cultured state of mind. I think that was
4    a big part of this research.
5        Q. Okay. And turning to page 159, do you see the
6    paragraph that begins with the word "second." And then
7    it continues as -- actually, the first full paragraph on
8    that page, "In consumer research, Han and Shavitt found
9    advertising appeals emphasizing personal benefits have
10   more influence on decisions of consumers in the United
11   States" -- "in the United States than in Korea, whereas
12   advertisements emphasizing family or in-group benefits
13   have more influence in Korea."
14       What were you trying to convey when you used
15   that sentence?
16       A. Just what it says. As I said earlier, that in
17   the cultures, such as Korean, Chinese and so on, the
18   Eastern cultures, the family or in-group is very
19   important. More so -- obviously, these are very broad
20   generalizations. There are a lot of differences.
21       But as a general rule, it's more important in
22   Eastern cultures, including Korea, than it is in Western
23   cultures such as the U.S. or Western Europe.
24       Q. Am I correct later in the article, you go on to
25   explain why that is so?

Page 33

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2        A. I believe so. It's been awhile since I read
3    this article.
4        Q. Let's see if I can help you out.
5        Can you go to 161. You see in the column on
6    the right-hand side, it's about ten lines down, "By way
7    of contrast. Buddhist teaching about the same human
8    dilemma centers on the notion of the middle way," and it
9    continues on from there.
10       A. Yes.
11       Q. You refer to Confucius. Can you tell me what
12   you were -- why you've added that language to this
13   article?
14       A. No, I really do not recall. And I should
15   confess that within our team, I was the decision-making
16   expert whereas Michael Morris, he specializes in
17   cross-cultural differences.
18       As I said, I wrote this article, and I teach
19   about cross-cultural differences. As I recall
20   correctly, he's the one who contributed that, and he's
21   more of an expert in that. So I really do not recall.
22       Q. Okay. Let's go further down to that page.
23       After there's this extended discussion of
24   Buddhism and Eastern culture, it goes on to state, the
25   article does, "This key difference in the principles of

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS     (800) 246.4950

Itamar Simonson                                                    9/21/2011

Page 34

ITAMAR SIMONSON
1
2  Western versus Chinese traditions of logic and ethics
3  have been suggested by a number of scholars," and it
4  cites some scholars.
5        What are the ethical differences between
6  Western culture and Eastern culture?
7        MR. FETNER: Can you read that question back,
8  please?
9        (Record read: "What are the ethical
10       differences between Western culture and Eastern
11       culture?")
12       MR. FETNER: Object to the form.
13       MR. WEINER: Q. I'll tell you what: Is there
14  a difference in your view between Eastern culture and
15  Chinese traditional?
16       A. No. If I recall correctly, we did not make
17  that distinction even though there's been more research
18  on China than on other Eastern cultures.
19       Q. Going back to my question, in your view, is
20  there an ethical difference between Western culture as
21  you've used that term and Eastern culture as you've used
22  that term?
23       THE WITNESS: Sitting here --
24       MR. FETNER: Objection. You can answer.
25       THE WITNESS: Sitting here, it's what you can

Page 35

ITAMAR SIMONSON
1
2  read in the paragraph just before that.
3        MR. WEINER: Q. Okay. Let me show you an
4  excerpt from a book by an individual by the name of
5  David Aaker, A-a-k-e-r. Do you know who he is?
6        A. I do.
7        Q. Can you tell us who he is?
8        A. Well, he was my colleague at the University of
9  California, Berkeley for six years. He's a well-known
10  branding expert; published a number of books. He's now
11  emeritus from U.C. Berkeley. He lives in -- actually, I
12  shouldn't go there. But yeah, I know him well.
13       Q. I take it you have respect for his work?
14       A. I do respect his work. Doesn't mean that I
15  would agree with everything that he has said. But I
16  generally respect his contribution to the branding
17  literature.
18       Q. And I haven't yet asked you whether you agree
19  with everything he said. I was just generally getting
20  your sense of who he is and whether you consider him an
21  expert in the field, and I take it you do?
22       A. I do.
23       Q. So let me show you what's been marked as
24  Simonson Exhibit 7. The excerpt we pulled from the
25  book, Building Strong Brands.

Page 36

ITAMAR SIMONSON
1
2        (Plaintiff's Exhibit No. 7 was
3        marked for identification.)
4        MR. WEINER: Q. By the way, I take it you're
5  familiar with that book.
6        A. Yes.
7        Q. I take it you're also familiar with the
8  Managing Brand Equity book that he's authored?
9        A. Yes.
10       Q. Have you read them both?
11       A. I don't know if I have read every page, but I
12  believe I have both of them.
13       Q. Would you look at the first page in the
14  excerpt, which is page 11, right under, "Image
15  obsession" --
16       A. 111.
17       Q. 111, where it talks about "Japanese firms care
18  intensely about how people view them." And then it goes
19  on to state, "Their highest priorities are
20  innovativeness, being successful and social
21  responsibility, that is, being good corporate citizens."
22       Do you know what that refers to?
23       MR. FETNER: You left out being sensitive to
24  the --
25       MR. WEINER: "And being sensitive to the

Page 37

ITAMAR SIMONSON
1
2  environment."
3        THE WITNESS: What do you mean "what does it
4  refer to"?
5        MR. WEINER: Q. Being good corporate citizens,
6  do you have any sense of w hat that refers to?
7        A. I presume we can ask him. I hesitate to
8  interpret what he had in mind. But I would think it has
9  something to do with contribution to society.
10       Q. Do you know if in Eastern cultures, among other
11  things, the ethics of a corporation or institution is
12  important?
13       A. I assume that in virtually every country in the
14  world it is important.
15       Q. Do you know if in an Eastern country, it is
16  more important than say in a Western country?
17       A. That, I don't know.
18       Q. Okay. Let's go back to you r report. And I
19  want to get to paragraph 6. And there's something
20  called branding -- building brand equity.
21       Can you tell me what building brand equity is
22  or what brand equity is?
23       A. Well, given that you just now talked about
24  David Aaker, his conception of brand equity has four
25  components. I should say that different people have

10 (Pages 34 to 37)

Page 38

ITAMAR SIMONSON
1
2    different ways of defining it.  But just to stay with
3    what he used in his first book, he was saying that brand
4    equity includes brand awareness, brand quality or
5    perceived quality, brand loyalty, and brand
6    associations.
7          Building favorable associations, building
8    awareness, building loyalty, building perceived quality
9    would be building brand equity.
10         Q.  Let me show you what we have marked as an
11   excerpt from a book by Kotler and Keller called
12   Marketing Management as Simonson Exhibit 8.
13               (Plaintiff's Exhibit No. 8 was
14               marked for identification.)
15         MR. WEINER:  Q.  If you look at the excerpts,
16   it starts with the so-called Aaker model.
17         Is that what you just referred to.
18         A.  Let me make sure that's the one they are
19   referring to.  Where do you see that?
20         Q.  On the first page of the excerpt, "Aaker model,
21   Former U.C. Berkeley marketing professor David Akker
22   views brand equity as the brand awareness, brand loyalty
23   and brand associations that combine to add to or
24   subtract from the value provided by a product or
25   service."

Page 39

ITAMAR SIMONSON
1
2          Is that what you were just referring to?
3          A.  Yes.
4          Q.  Then on the next page, there's something called
5    "Brand building blocks."  Do you see that?  It's like a
6    little pyramid?
7          A.  Yes.
8          Q.  There are various factors that go into that.
9          Do you agree with those factors?
10         A.  I would say I wouldn't agree or disagree.
11   There are so many ways to structure this that any single
12   one of them is -- has some degree of arbitrariness in
13   it.  So I think it's perhaps generally okay.  But I
14   don't know if that's the one that I would endorse.  In
15   fact, I have not endorsed it.
16         Q.  Okay.  Going back to the second page of the
17   document about things that combine to add or to subtract
18   with respect to a brand, what can negatively affect a
19   brand?
20         A.  Many different things.  Poor quality,
21   disappointing consumers which would lead to customer
22   dissatisfaction.
23         Q.  Anything else you can think of?
24         A.  Flaws in the product.  I guess I already said
25   that.

Page 40

ITAMAR SIMONSON
1
2          Q.  How about rumors?
3          A.  Rumors could.
4          Q.  Are you familiar -- you may not be, but are you
5    familiar with Corona beer?
6          A.  I've seen many of their ads.
7          Q.  Do you know if there was a rumor several years
8    ago that Mexican workers were urinating in the beer when
9    it was being made that impacted the sale of that brand?
10         A.  I do not recall that one.
11         Q.  Okay.  But you would agree with me that a
12   negative rumor could negatively impact a brand; am I
13   correct?
14         A.  I agree.
15         Q.  How about media reports?  If they're negative,
16   can they negatively impact a brand?
17         A.  They could.
18         Q.  And do you recall the 60 Minutes television
19   broadcast involving the Audi 5000 and the acceleration
20   of that car?
21         A.  I do.
22         Q.  What do you recall about that?
23         A.  If I recall correctly, they were talking about
24   what you just said, problems with sudden acceleration
25   which I think later they discovered was simply due to

Page 41

ITAMAR SIMONSON
1
2    the fact that some drivers were pressing on the gas
3    instead of the brakes, and there might have been some
4    design issue there that the two pedals were slightly
5    closer than they should have been.  I'm not obviously an
6    expert in that.
7          Q.  Do you recall whether that broadcast had a
8    negative impact on the sale of that particular
9    automobile?
10         A.  If I recall correctly, it did.
11         Q.  Do you recall news reports about the Firestone
12   tires having an inappropriate rate of blow-outs?
13         A.  Kind of rings a bell.  I do not recall.  Might
14   have been a long time ago.
15         Q.  In your experience, in terms of building or
16   subtracting from brand equity, you have come across
17   examples where there have been media reports that turn
18   out to be wrong that impact a brand; am I correct?
19         A.  That's possible, yes.
20         Q.  Is it more than possible?  In fact, that has
21   happened?
22         A.  That's correct.
23         Q.  Are you familiar with the Suzuki Samurai and
24   the Consumer Reports issue that said it had a tendency
25   to turn on its side?  Are you aware of that?

11 (Pages 38 to 41)

Page 42

ITAMAR SIMONSON

2  A. I vaguely recall something, but not any detail.

3  Q. Well, in the courses that you teach, do you
4  talk about building brand equity or the negative aspects
5  of brand equity?

6  A. I do. I have not used those examples.

7  Q. What do you use as examples?

8  A. I used -- I use primarily case studies. I
9  assign often readings to the students which cover such
10  topics, and in the context of a case study, we may
11  discuss such issues.

12  Q. Can you give me specific examples of the case
13  studies?

14  A. Well, we talked about the vodka case. That has
15  something to do with branding and what are the brand
16  associations of this Russian standard product in Russia
17  as opposed to the U.S.

18  Q. Let me see if I can go precisely to my
19  question.

20      Do you teach your students about negative word
21  of mouth caused by rumors or media reports?

22  A. I don't recall covering that specifically.

23  Q. Do you know if that's a topic that's written
24  about in the literature in your field?

25  A. Yeah. There's been some research on that

Page 43

ITAMAR SIMONSON

2  topic.

3  Q. Do you recall what that research shows?

4  A. I guess one topic that I vaguely recall had to
5  do with the impact of trying to refute rumors. For
6  example, many years ago, there was a rumor that McDonald
7  hamburgers contained worms. And someone did an
8  experiment, if I recall correctly, about 30, 40 years
9  ago, examining whether refuting that rumor had the
10  effect of making it worse or better. I vaguely recall
11  they actually found out it was counterproductive to try
12  and refute it.

13  Q. Let me show you what we have marked as
14  Simonson's Exhibit 10, which is an excerpt from a book
15  called Consumer Behavior, Buying, Having, and Being,
16  Sixth Edition by Michael Solomon.

17      (Plaintiff's Exhibit No. 10 was
18      marked for identification.)

19  MR. WEINER: Q. Are you familiar with this
20  book?

21  A. I've seen it, yes.

22  Q. I would like you to look at page 379.

23      Do you see where in the third full paragraph it
24  talks about word of mouth?

25  A. Yes.

Page 44

ITAMAR SIMONSON

2  Q. "Word of mouth is a product information
3  transmitted by individuals" -- "to individuals."

4      And it goes on to state that, "Word of mouth
5  tends to be more reliable and trustworthy than
6  recommendations we get through formal marketing
7  channels."

8      Do you agree with that?

9  A. I think it's too general. There are many
10  exceptions.

11  Q. You think that's too general?

12  A. Right.

13  Q. Page 380. "The influence of others' opinions
14  is at times even more powerful than one's own
15  perceptions."

16      Do you agree with that statement?

17  A. It's a possibility.

18  Q. By the way, who is Michael Solomon?

19  A. I think he's a professor somewhere. Maybe
20  Rutgers.

21  Q. Do you consider him to be an expert in the
22  field?

23  A. I haven't seen many publications by him, but
24  he's been publishing this textbook for many years. I
25  don't know what edition this is.

Page 45

ITAMAR SIMONSON

2  Q. Sixth edition?

3  A. Sixth edition. But he's had this book for a
4  long time.

5  Q. Have you used it in your classes?

6  A. I have not.

7  Q. Then it goes on to page 381, where it talks
8  about, "Negative word of mouth and the power of rumors."

9      Do you see that?

10  A. I do.

11  Q. I would like you to turn for a moment to the
12  next page. And you see the last paragraph, "A rumor,
13  even if it has no basis in fact, can be a very dangerous
14  thing." Do you agree with that?

15  A. Yes.

16  Q. Further up that page, "The consumer is likely
17  to pay more attention to negative information than
18  positive information."

19  MR. FETNER: Where?

20  MR. WEINER: "Especially when she's considering
21  a new product or service, the consumer is likely to pay
22  more attention to negative information than positive
23  information and to relate news of this experience to
24  others."

25  Q. Do you agree with that?

Itamar Simonson                                                    9/21/2011

---

Page 46

ITAMAR SIMONSON

1
2      A.  Well, you often see that reference.  I think
3  that I looked into that once, and I think I had trouble
4  finding a reliable source on which this generalization
5  was based.
6      But I would say as a general rule, negative
7  aspects tend to receive more weight than positive
8  aspects.
9      MR. WEINER:  Q.  Let me show you -- let's do
10  this one.
11      Let me show you Simonson Exhibit 11, which is
12  an excerpt in The Handbook of Industrial and
13  Organizational Psychology.
14          (Plaintiff's Exhibit No. 11 was
15          marked for identification.)
16      MR. WEINER:  Q.  That's written, I believe, by
17  Dr. Jacoby; am I correct?
18      A.  It appears to be.
19      Q.  Have you read this chapter, Chapter 24, prior
20  to today?
21      A.  No.
22      Q.  I want to ask you a couple questions.
23      I would like you to turn to page 1035, where it
24  talks about word-of-mouth processes and informal
25  communication.  You see that?

---

Page 47

ITAMAR SIMONSON

1
2      A.  I do.
3      Q.  First of all, do you agree with Dr. Jacoby that
4  the distinguishing characteristics of word-of-mouth
5  advertising and that which differentiates it from
6  personal selling is that the sources perceived by the
7  receiver to be independent of the manufacturer
8  advertiser and/or seller.
9      Do you agree with that?
10      A.  Does he define here word-of-mouth advertising?
11      Q.  I think he does -- well, I think if you go
12  further up the page, he does.
13      A.  (Reviewing document.)  I see.
14      I would disagree with it.  Obviously, it
15  relates to a situation that might have applied in the
16  '60s, which probably I didn't see where it was
17  published.  Probably sometime in the '60s.
18      But in any case, I don't think that is correct
19  because as he defines it here, word-of-mouth advertising
20  is just advertising, and consumers have learned that if
21  they see a couple of consumers, presumed consumers
22  talking to each other, one person says, "Ah, this is a
23  great product," consumers have figured out that this is
24  just another way of advertising a product, and it's not
25  more credible than any other ads.

---

Page 48

ITAMAR SIMONSON

1
2      Q.  But word of mouth, if I understand you
3  correctly, you're saying that if it's perceived to be
4  the extension of a manufacturer of the product, it's not
5  considered to be independent?  Is that what you're
6  saying?
7      A.  Word-of-mouth advertising?
8      Q.  Yes, word-of-mouth advertising.
9      A.  Yeah.  Just, advertising.  In fact, you could
10  argue that personal selling, if you have a face-to-face
11  interaction with a salesperson, you may develop trust
12  with that person much more so than with an ad say on TV.
13      Q.  Okay.  Would you -- I think what you told me
14  earlier was that word of mouth, if it comes from an
15  independent source, has greater credibility; is that
16  correct?
17      A.  In many cases, it would.  Let's say if you told
18  me, "I saw this movie, and I thought it was great," as
19  opposed to the marketer of the movie saying it is great,
20  I think I probably will take your word for it before
21  I'll trust a promoter.
22      Q.  Let me -- this one.  Let me show you what we've
23  marked as Simonson Exhibit 12, which is an article
24  entitled, "The Influence of Source Credibility on
25  Communication Effectiveness."

---

Page 49

ITAMAR SIMONSON

1
2          (Plaintiff's Exhibit No. 12 was
3          marked for identification.)
4      MR. WEINER:  Q.  Are you familiar with this?
5      A.  I think I've seen it cited.  I don't think I've
6  ever read it.
7      Q.  Do you know who Carl Hovland and Dr. Weiss are?
8      A.  I've seen him cited a great deal, I believe.
9  He, at one time, I don't know if the '50s, he was
10  regarded as an authority in that field.
11      Q.  What field?
12      A.  Persuasion, social psychology perhaps.
13      Q.  Do you consider him to be an expert in
14  anything?
15      A.  I presume he was an expert.  At least my
16  understanding is that he published several influential
17  articles on issue of communication.
18      Q.  Is this one of them?
19      A.  I couldn't tell you.
20      Q.  Okay.  This one.
21      Let me show you Simonson Exhibit 13.
22          (Plaintiff's Exhibit No. 13 was
23          marked for identification.)
24      THE WITNESS:  (Reviewing document.)
25      MR. WEINER:  Q.  Exhibit 13 is an article

---

13 (Pages 46 to 49)

Itamar Simonson                                                    9/21/2011

Page 50

ITAMAR SIMONSON
1
2  entitled, "The Effects of Negative Publicity and Company
3  Reaction on Consumer Attitudes," by Celso, C-e-l-s-o,
4  de Matos D-e M-a-t-o-s and Ricardo Veiga, V-e-i-g-a.
5        Are you familiar with these individuals?
6     A. No.
7     Q. Are you familiar with the article?
8     A. No.
9     Q. Are you familiar with the effect of negative
10 publicity on companies?
11    A. What does that mean?  What do you mean by that?
12 You mean in the context of this article?
13    Q. In general.
14    A. In general, I thought we already talked about
15 it.
16    Q. I just want to make sure.
17    A. I said yeah, it could happen.
18    Q. Okay.  I would like you to turn to page 4.  Do
19 you know who Skrowronski and Carlston are?
20    A. I think I saw those names before.
21    Q. Well, what do you know about them?
22    A. Nothing.
23    Q. According to page 4 of this article, it states,
24 "The literature also indicates that the degree of
25 relevance perceived in the negative news tends to be

Page 51

ITAMAR SIMONSON
1
2  greater when the news refers to moral aspects such as
3  company values."
4        Do you agree with that?
5     A. I don't know what they mean by that.  We
6  probably will need to look at the actual article, and
7  see what --
8     Q. So you can't determine what moral aspects are
9  as opposed to company values; right?
10    A. No.  As used by those two individuals, no.
11    Q. Okay.  Let's turn to page 22, see if this
12 helps.  "Skwrowronski and Carlston suggest that negative
13 information linked to moral aspects, e.g. company
14 values, is perceived as more important than compared
15 with negative information related to aspects of company
16 ability, e.g. product attributes."
17       Does that help you out?
18    A. No.
19    Q. Okay.  Let me show you Exhibit 9, which is an
20 article that appeared in the Wall Street Journal.  It's
21 entitled, "Yale Safeguards Its Top Spot," and it's dated
22 April 24th, 2008.
23       (Plaintiff's Exhibit No. 9 was
24       marked for identification.)
25 MR. WEINER:  Q. And earlier in the deposition,

Page 52

ITAMAR SIMONSON
1
2  you had mentioned how universities compete with one
3  another.
4        In your view, do universities have a brand?
5     A. Yes.
6     Q. Could you tell me what you mean by that, what
7  kind of a brand?
8     A. Well, as we discussed earlier, using Dave
9  Aaker's model, they're associated with a certain level
10 of awareness, loyalty, perceived quality and various
11 associations.
12    Q. And in your judgment, can that brand be
13 negatively impacted by certain things?
14    A. It could.
15    Q. Could it be negatively impacted by rumors?
16    A. I don't know which rumors.
17    Q. Any rumors?
18    A. Any.
19    Q. I'm not asking you specifically about a rumor.
20 In general, can a university's brand be impacted by a
21 rumor?
22    A. It's conceivable.
23    Q. Can a university's brand be impacted by a false
24 media report?
25    A. It's possible.

Page 53

ITAMAR SIMONSON
1
2     Q. Could it be negatively impacted by word of
3  mouth?
4     A. It's possible.
5     Q. Could it be negatively impacted depending on
6  the culture of the country in which the university is
7  located?
8     A. I'm not sure I understand what you mean by
9  that.
10    Q. The impact of a rumor or a negative article,
11 could that vary from country to country depending on the
12 culture of the country where the university is located?
13    A. I can't think of any specific examples.  Maybe
14 it's possible.
15       MR. WEINER:  Why don't we take our first break?
16       THE VIDEOGRAPHER:  We are now going off the
17 record.  The time is 10:45.
18       (Recess taken:  10:45 a.m. - 10:59 a.m.)
19       THE VIDEOGRAPHER:  We are now going back on the
20 record.  The time is 10:59.
21       MR. WEINER:  Q.  Going back to Simonson
22 Exhibit 1, I would like focus on paragraph 11, page 3,
23 continues on to page 4.
24       In that paragraph, you state that in connection
25 with preparation of this report, the report you're

14 (Pages 50 to 53)

Itamar Simonson                                    9/21/2011

Page 54

ITAMAR SIMONSON
1      ITAMAR SIMONSON
2  looking at, you reviewed a number of documents which are
3  listed on Exhibit C. Let's turn to Exhibit C.
4      Among the documents that you reviewed were some
5  interrogatory answers and objections; is that correct?
6      A. Yes.
7      Q. How did you select the interrogatory answers
8  and objections that you wanted to review as compared to
9  others that might have been answered in the cases?
10      A. Well, I asked the attorneys for any information
11  pertaining to what actually happened during the relevant
12  periods, specifically in 2008 which is the time when
13  Dr. Jacoby's survey was conducted, I wanted to know what
14  happened in that period as compared to before the Shin
15  incidents.
16      Q. Okay. And --
17      A. And they provided those documents.
18      Q. Do you know if they provided you with all the
19  answers to interrogatories that were provided by Dongguk
20  in this case?
21      A. I don't know.
22      Q. How did you select the depositions you reviewed
23  of which there were four; am I correct?
24      A. Yes. I believe these were, again, depositions
25  that pertained to what actually happened as seen by

Page 55

ITAMAR SIMONSON
1      ITAMAR SIMONSON
2  people from Dongguk University. Again, for the same
3  purpose of allowing me to compare Dr. Jacoby's findings
4  with what actually happened.
5      Q. Do you know if these were all the depositions
6  given by Dongguk individuals in this case?
7      A. I do not know.
8      Q. But it's your understanding that it is?
9      A. Probably not.
10      Q. Well, then how -- what was the distinguishing
11  factor between the ones you reviewed and the ones you
12  didn't review?
13      A. If I recall correctly, these depositions were
14  related to the alleged damages. But I don't know if
15  that's -- these are all of the depositions related to
16  the alleged damages.
17      Q. Did you ask that question?
18      A. I do not recall asking that.
19      Q. So as you sit here today, you do not know
20  whether the four witnesses whose depositions you
21  reviewed is the totality of deposition testimony on the,
22  as you put it, alleged damages; is that correct?
23      A. That is correct. I do not know. And as a
24  matter of fact, I found those depositions not that
25  informative.

Page 56

ITAMAR SIMONSON
1      ITAMAR SIMONSON
2      Q. Similarly, it's -- you do not know whether you
3  have reviewed all the interrogatory answers that bear on
4  Dongguk's view of the facts in the case; is that
5  correct?
6      MR. FETNER: Object to form.
7      MR. WEINER: I'll rephrase that.
8      Q. You said you reviewed certain interrogatory
9  answers that were provided to you by counsel; is that
10  correct?
11      A. Correct. Those that relate to what happened
12  during the relevant period with respect to the various
13  measures that I looked at such as number of applicants,
14  donations and so on.
15      Q. Okay. What about regarding false statements
16  that were contained in articles that were published in
17  Korea? Did you seek to obtain that information?
18      A. I received those 58 articles that I believe
19  were identified by Dongguk counsel.
20      Q. As what?
21      A. As those that demonstrate the harm caused to
22  Dongguk as a result of so-called Yale's misstatements.
23      Q. Okay. And how did you -- what was the inquiry
24  that you made to obtain those articles?
25      A. I just asked for articles.

Page 57

ITAMAR SIMONSON
1      ITAMAR SIMONSON
2      Q. Okay.
3      A. I don't remember exactly where they were
4  mentioned, but articles that were relied upon as a basis
5  for the claim that Yale's alleged misstatements caused
6  harm to Dongguk.
7      Q. Now, you also attached certain court cases,
8  opinions in cases; is that correct?
9      A. Yes.
10      Q. In fact, I think there were three, Kargo
11  Global, Beneficial Corp and Simon Property; correct?
12      A. Yes.
13      Q. How did you select those as compared to others?
14      A. Those are three, if I recall correctly, I cited
15  in my report.
16      Q. Why did you cite those three as compared to
17  others?
18      A. Because I thought they illustrated the points
19  that I was making.
20      Q. Okay. And in those -- of the three cases, how
21  many of those cases were you involved personally?
22      A. Two out of the three.
23      Q. Simon Property and Kargo?
24      A. Yes.
25      Q. And then you also select certain articles,

15 (Pages 54 to 57)

Itamar Simonson                                                    9/21/2011

Page 58

ITAMAR SIMONSON
1
2    research articles; am I correct?
3        A. Yes.
4        Q. How did you come to select those articles?
5        A. Again, these are articles or books that I'm
6    familiar with, and I thought they were relevant
7    references to the points that I was making.
8        Q. And you also reference McCarthy on trademarks;
9    is that correct?
10       A. I did.
11       Q. Of those materials, how many have you cited in
12   prior reports that you have issued?
13       A. Many times, I would think.
14       Q. Let's go back to paragraph 8 of your report.
15       You state in paragraph 8 that you have
16   conducted, supervised or evaluated well over a thousand
17   marketing surveys including many related to consumer
18   behavior and information processing, trademark
19   brandings, marketing strategy and advertising-related
20   issues.
21       Is that correct?
22       A. Yes.
23       Q. Of the well over 1,000 -- by the way, what is
24   well over 1,000?  It can be 10,000.  It can be 12,000.
25   It can be 1,100.

Page 59

ITAMAR SIMONSON
1
2        A. It's hard for me to put a number.  That's why I
3    said well over a thousand.  I would say probably more
4    than 3,000, but I can't tell you more than that.
5        Q. And of the ones that you have supervised and
6    over what period of years was this?
7        A. Well, since my PhD program.  And that, by the
8    way, includes primarily academic studies.
9        Q. Okay.
10       A. So it starts from 1985 or so.
11       Q. Let's see if I can narrow that down and narrow
12   it down to surveys in which you have been involved as an
13   expert witness either in an arbitration or a court
14   proceeding.  Okay.
15       What would the over 1,000 marketing surveys be
16   reduced to?
17       A. Perhaps over 200.
18       Q. Okay.  And the over 200, would it also include
19   the same topics, consumer behavior, information
20   processing, trademark branding and marketing strategies
21   and advertising-related issues?
22       A. Well, I probably wouldn't describe those in
23   those terms even though I would think there are studies
24   on each of these topics that were conducted in the
25   context of litigation, but in the context of litigation,

Page 60

ITAMAR SIMONSON
1
2    I probably conducted relatively more on issues related
3    to trademarks, false advertising, consumer information,
4    processing surveys, survey research, and other topics
5    such as branding, advertising.  It probably would be
6    more concentrated in certain areas.
7        Q. Have you ever been involved in a case that had
8    as a central issue a defamation claim prior to today,
9    prior to this case?
10       A. I do not remember.  Probably, but I can't
11   remember.
12       Q. "Probably" doesn't help me.
13       Do you have a recollection of any case in which
14   you were involved as an expert that involved defamation
15   as you sit here today?
16       A. Nothing specific that I recall.  I believe that
17   I have, but I just do not recall most of the cases in
18   which I've been involved.
19       Q. As you sit here today, would it be fair to
20   state you cannot recall any case in which you were
21   involved with a claim based upon defamation other than
22   the case that we are litigating today; is that fair?
23       A. I would hesitate to say it like that.  I would
24   say I think that I was involved in such cases; I just
25   cannot recall any specific case as we sit here now.

Page 61

ITAMAR SIMONSON
1
2        Q. Well, what would you need to do to refresh your
3    memory?
4        A. I don't think there's anything I can do.
5        Q. I take it you do not have a survey that you
6    prepared in connection with the defamation case; is that
7    correct?
8        A. That is correct.
9        Q. And you do not have a --
10       A. At least I do not -- yeah, currently I do have
11   any such survey.
12       Q. And you do not have an expert report in which,
13   that you wrote, in connection with a defamation case; is
14   that correct?
15       A. Yes.
16       Q. Have you ever conducted a survey in connection
17   with a defamation case?
18       A. Again --
19       Q. Do you have a recollection?
20       A. I think that I have.  I don't remember anything
21   specific.
22       Q. Well, why don't you give me what you recall
23   generally?
24       A. I just recall addressing that issue with a
25   survey.

16 (Pages 58 to 61)

Itamar Simonson                                              9/21/2011

Page 62

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    Q.  That you did or that you critiqued?
3    A.  That I did, but again, I don't have a specific
4  recollection of what it -- specific case it might have
5  been.
6    Q.  And you don't even know whether in fact you
7  even did such a survey?
8    A.  I believe I did.
9    Q.  When you say you believe, that's different from
10 saying I did.
11   A.  Let me just -- just to complete my answer -- in
12 the context of dilution, there is aspects of dilution
13 called tarnishment, which is an important source of
14 dilution.  And I've conducted several dilution surveys
15 that involve both so-called tarnishment and blurring.
16   Q.  Were those trademark cases?
17   A.  Yes.
18   Q.  Okay.
19   A.  I guess I don't know.  Some people make
20 distinctions between dilution and trademark.  But it's
21 related.
22   Q.  And they were trademark claims asserted in
23 those cases?
24   A.  Issues of dilution, tarnishment, yes.
25   Q.  Did those cases involve the Lanham Act, for

Page 63

1    ITAMAR SIMONSON
2  example?
3    A.  I don't recall.
4    Q.  Of the 200 surveys or so that you said you were
5  involved with in connection with litigation, how many
6  were ones that you conducted as compared to as evaluated
7  or supervised?
8    A.  No.  I was talking about conducting.
9    Q.  Okay.  So you conducted four litigation, 200
10 surveys?
11   A.  As I said, I don't know the exact number, but I
12 would think that it's probably over 200.
13   Q.  Okay.  And you are aware that we have asked
14 that you produce in connection with this deposition
15 surveys that you have previously prepared; you're aware
16 of that?
17   A.  I'm aware of that.
18   Q.  And you're aware that you only produced three?
19   A.  I don't remember the number.  I thought it was
20 more than three, but if you tell me that it was three,
21 it might have been three.
22   Q.  Do you know where the other 197 are?
23   A.  As far as I know, gone.  Maybe they're in
24 someone's offices.
25   Q.  When you prepare a survey, do you maintain a

Page 64

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2  record of what you've done?
3    A.  For some period when I need it.
4    Q.  What period of time do you maintain your
5  records?
6    A.  I don't have a particular period.  Let's say
7  the case settles, I don't need it anymore, I often soon
8  after will discard it.  Or if I switch computers, I
9  definitely am motivated to clean my computer and get rid
10 of things that clog my or clutter my computer.
11   Q.  And how many surveys have you supervised in
12 connection with litigation?
13   A.  Well, in the context of litigation, there's no
14 distinction.  I design the survey, so I would call it
15 conducted.  Supervise, it's more in the academic context
16 where the student is given an assignment, is given some
17 directions on how to conduct the study, what questions
18 to investigate, and then the student really implements
19 the survey and even designs the questionnaires.
20       In the context of litigation, I'm the one
21 conducting -- the survey, of course, I'm not the one
22 interviewing respondents, but I conduct the survey.
23   Q.  Well, when you say you conduct the survey, that
24 means you go out and you retain under your supervision a
25 company that actually does the survey; is that right?

Page 65

1    ITAMAR SIMONSON
2    A.  Exactly.
3    Q.  And in your experience, have you used telephone
4  surveys?
5    A.  A few times.  Usually I don't.
6    Q.  Is there anything wrong with using a telephone
7  survey?
8    A.  I think they have certain limitations.  And
9  they are becoming, as a matter of fact, they are
10 becoming less and less commonly used.
11   Q.  Were you involved in a case that had a claim
12 against Allianz Insurance Company?
13   A.  Yes.
14   Q.  Did you do a survey in that case?
15   A.  I did.
16   Q.  Was it a telephone survey?
17   A.  It was what we call a phone-mail-phone
18 methodology.
19   Q.  When you say phone-mail-phone, let me see if I
20 got it right.  The questioner under your supervision
21 would call someone; is that correct?
22   A.  Yes.
23   Q.  And if you want to find out if the person
24 wanted to participate in a survey; is that correct?
25   A.  Yes.

17 (Pages 62 to 65)

Itamar Simonson                                                    9/21/2011

Page 66

ITAMAR SIMONSON
1
2      Q. If the person said yes, then certain forms or
3   written materials were then mailed to the person; is
4   that right?
5      A. Exactly, FedExed.
6      Q. And then after the receipt of those materials,
7   a survey was done by telephone; is that correct?
8      A. That is correct.
9         And that's really one of the limitations of
10  phone surveys is that you cannot show anything. In a
11  normal phone survey, you cannot show any stimulus which
12  in many cases is a limitation. So that's why in that
13  case, we went through the trouble of first getting them
14  to agree to participate. Then sending them materials,
15  the specific brochure that they had evaluated when they
16  purchased this annuity, and then after they received it,
17  we could ask them to review again the same brochure and
18  ask them the questions.
19     Q. We'll get into this later, but you had
20  knowledge based upon the survey that you conducted the
21  people to whom you sent the brochures had actually
22  reviewed them before?
23     A. These were class members.
24     Q. I understand they were class members.
25        Did you have knowledge that they actually

Page 67

ITAMAR SIMONSON
1
2   reviewed the surveys at an earlier point in time?
3      A. Well, they bought the products.
4      Q. I understand they bought the products. I
5   didn't ask you that question. I'm simply asking you did
6   you have knowledge as to the people you sent these
7   brochures to that they had actually read them prior to
8   the time?
9      A. I was not obviously present when they purchased
10  the annuity. However, normally when people invest say a
11  hundred thousand dollars in an annuity, based on my
12  expertise in consumer behavior, I would say that they
13  tend to read the terms of that annuity.
14     Q. So you made an assumption?
15     A. Of course, based on my expertise in consumer
16  behavior.
17     Q. And you never sought to find out?
18     A. I beg your pardon?
19     Q. You never sought to find that out whether your
20  assumption was correct?
21     A. Obviously I was not there when they purchased
22  the product.
23     Q. No question was asked. But we'll get there.
24        Let's go back to what you call stimuli, and one
25  of the advantages is to provide written materials that

Page 68

ITAMAR SIMONSON
1
2   stimulate something. What do you have in mind? I'm
3   trying to understand the concept.
4      MR. FETNER: Object to form. You can answer.
5      THE WITNESS: In that case, it was the
6   brochure.
7      MR. WEINER: Q. I understand. You said one of
8   the disadvantages of a telephone survey is that you
9   don't have the ability to stimulate. Stimulate what?
10     A. I didn't say --
11     MR. FETNER: Objection.
12     MR. WEINER: Q. Why don't you tell me what you
13  said.
14     A. I said stimuli.
15     Q. What is stimuli?
16     A. Doesn't have much to do with stimulate as far
17  as English goes.
18     Q. What is stimuli as far as you use that term?
19     A. For example, TV commercial is stimulus. Print
20  ad is stimulus. Brochure is a stimulus. Anything that
21  you present visually to someone.
22     Q. If you were to present it orally, is that a
23  stimulus?
24     A. It's oral stimulus.
25     Q. Does that create demand characteristics in your

Page 69

ITAMAR SIMONSON
1
2   view?
3      A. No. Just to be clear, it depends on each case.
4   There might be situations where it's okay to use phone
5   interviewing. So it's not something you can say it
6   creates or does not create. It depends on each case.
7      Q. Okay. So each case sort of is own set of
8   factors; is that correct?
9      A. Yeah. There is a specific situation in each
10  case.
11     Q. I would like you to go to page 9. It's
12  paragraph 21, that's entitled, "A brief review of some
13  basic survey principles."
14        And before we do that, let me ask you some more
15  questions about some of your experience. How many
16  surveys have you critiqued?
17     A. In the context of litigation?
18     Q. Yes.
19     A. I do not remember.
20     Q. Approximately?
21     A. Over a hundred.
22     Q. Okay. And you list in Exhibit B cases that you
23  have been an expert in in the last four years; is that
24  right?
25     A. That's correct.

18 (Pages 66 to 69)

Itamar Simonson                                      9/21/2011

Page 70

ITAMAR SIMONSON
1
2     Q. I believe there's a total of 50 cases; is that
3  correct?
4     A. Yes.
5     Q. Of those 50, do you recall how many you were
6  the author of a survey as opposed to someone who
7  critiqued the survey?
8     A. What about cases where I did both?
9     Q. Or you did both.
10     A. So do you want me to count in my head and let
11  you know?
12     Q. You know what, let's do it this way. Let's go
13  down the group. You can tell me if it was one or the
14  other or both?
15     A. No. 1 was an evaluation of a survey. No. 2, I
16  don't remember if there was a survey there or if it was
17  just an opinion pertaining to commonality of a class.
18     Q. Let me make this as quick as we can. If it
19  wasn't either evaluating or critiquing, we'll just move
20  on to the next one. Okay?
21     A. Sure. No. 3 is the one I -- we just talked
22  about where I conducted a survey. No. 4, I evaluated a
23  survey. No. 5, I conducted a survey and evaluated a
24  survey. Same in No. 6. Same in No. 7. No. 8, I don't
25  think there were surveys there.

Page 71

ITAMAR SIMONSON
1
2     No. 9, I conducted a survey. I don't remember
3  if I evaluated a survey. Not sure. No. 10, I conducted
4  a survey. No. 11, I evaluated a survey. No. 12, I
5  conducted a four surveys and evaluated I think two. In
6  No. 13, I evaluated a survey.
7     No. 14, I conducted a survey. In No. 15, I
8  evaluated a survey. In No. 16, I conducted a survey and
9  evaluated a survey. No. 17, I conducted a survey. In
10  No. 18, I evaluated a survey. Skipping No. 19, there
11  are no surveys. No. 20, I evaluated a survey. No. 21,
12  I conducted a survey. No. 22, I conducted a survey and
13  evaluated a survey.
14     No. 23, I evaluated a survey. In No. 24, there
15  were no surveys. In No. 25, I evaluated a survey. In
16  No. 26, I evaluated a survey. No. 27, there were no
17  surveys. No. 28, I conducted three surveys and
18  evaluated one I think or maybe two. No. 29, I evaluated
19  different iterations. I ended up evaluating two.
20     In No. 30, there were no surveys. No. 31,
21  there were no surveys. No. 32, I evaluated three
22  surveys. In No. 33, I conducted a survey.
23     No. 34, I don't think there were surveys. At
24  least I was not involved in surveys. No. 35, I don't
25  think -- there were no surveys there I believe. No. 36,

Page 72

ITAMAR SIMONSON
1
2  I evaluated a survey. No. 37, I evaluated a survey.
3     Skipping 38 and 39. In No. 40, I conducted a
4  survey and evaluated two, again, in different
5  iterations.
6     In No. 41, I conducted a survey and evaluated a
7  survey. Skipping 42 and 43. 44, I evaluated a survey.
8  45, I believe I evaluated a survey. 46, I evaluated a
9  survey. 47, I conducted a survey and maybe also
10  evaluated a survey.
11     48, I evaluated a survey. 49, I evaluated a
12  survey. And 50, I evaluated surveys.
13     Q. Now, when there is an underscore on one of the
14  parties, I take it that's the party who retained you;
15  correct?
16     A. Correct.
17     MR. WEINER: Which one is this?
18     MR. FETNER: Doesn't inspire confidence.
19     MR. WEINER: Couldn't tell from the materials
20  we received.
21     MS. LU: We only had partial materials to go
22  from.
23     MR. WEINER: Let's deal with this one then.
24  Okay. This is what?
25     MS. LU: This is 14.

Page 73

ITAMAR SIMONSON
1
2     (Plaintiff's Exhibit No. 14 was
3     marked for identification.)
4     MR. WEINER: Q. Dr. Simonson, you're aware
5  that we had been attempting to obtain copies of reports
6  that you have issued in other cases and surveys that you
7  have authored in other cases; is that correct?
8     A. Yes.
9     Q. We have been partially successful in that
10  effort and have obtained through subpoenas various
11  reports that you have authored. And we have prepared a
12  chart to reflect what we have discovered in those
13  reports.
14     A. M-hm.
15     Q. And feel free to correct this in any way that
16  you think is appropriate.
17     So let me show you Simonson Exhibit 14.
18     Now, what I would like you to do is
19  cross-reference this with Exhibit B, so I can see what
20  I'm missing.
21     MS. LU: Okay.
22     MR. WEINER: Q. Of the cases where we have
23  obtained reports, we have a case name, a type of case,
24  and then we have some of the criticisms that you have
25  asserted when critiquing the surveys prepared by others.

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson                                                    9/21/2011

Page 74

ITAMAR SIMONSON

1
2       Do you understand what we did in this document?
3    A. Yes.
4       MR. FETNER: Just so I'm clear, Bob, I just
5    want to understand what you're representing this to be.
6    Is this a list of Dr. Simonson's reports that you've
7    obtained in which he's evaluating another expert's
8    survey?
9       MR. WEINER: Yes.
10      MR. FETNER: Not involving surveys that
11   Dr. Simonson has himself conducted?
12      MR. WEINER: No. These are not any surveys
13   that he has conducted. It's simply based upon the
14   reports which are, as I said earlier, does not include
15   all of the reports which he authored in the last four
16   years, and we would be certainly happy to receive
17   additional reports if someone wants to make them
18   available to us.
19      Q. First of all, the types of cases that are
20   listed, what is a genericness case?
21      A. This is a question of whether a particular term
22   is generic.
23      Q. Is that a trademark case?
24      A. Yes.
25      Q. And just going through exhibit B, once again

Page 75

ITAMAR SIMONSON

1
2    very quickly, can you tell me which cases were not
3    trademark cases? You don't want have to go through them
4    one by one. Just as you peruse it, tell me which ones
5    are not.
6       MR. FETNER: I just want to be clear. Doctor,
7    you're looking at Exhibit 14.
8       MR. WEINER: Go to Exhibit B.
9       MR. FETNER: I think the question is Exhibit B
10   to your report.
11      THE WITNESS: I'm sorry.
12      MR. WEINER: Q. Go to Exhibit B of your
13   report.
14      A. Were not?
15      Q. Were not.
16      A. No. 2, No. 3 -- where do you put false
17   advertising?
18      Q. Trademark.
19      A. Trademark.
20      No. 8; No. 10; No. 25; No. 27; No. 31; No. 33;
21   No. 35; No. 36, I believe; No. 39; No. 42; No. 43 -- I'm
22   not sure how to classify No. 46. I think I should
23   include 46. 47. That's it.
24      Q. Okay. So let's just go back. In No. 2, you
25   neither evaluated nor did a survey; right?

Page 76

ITAMAR SIMONSON

1
2    A. I believe so. I'm trying to remember if there
3    was a survey in that case. I'm not sure.
4       Q. Earlier when you went through it, you said
5    there was neither.
6       A. I think I said I was not sure. There might
7    have been.
8       Q. Three was a fraud case?
9       A. Three was a fraud case. I don't remember how
10   it was classified.
11      Q. Okay. Eight, where you neither authored or
12   evaluated a survey I'll skip. What kind of case was 10?
13      A. It had to do with something that's known in
14   California as Proposition 65.
15      Q. Proposition 65 is what?
16      A. It has to do with the proper warning or
17   information provided to consumers.
18      Q. Okay. Then we go on to 25. What was that?
19      A. That was a patent case.
20      Q. Patent case. Okay. Intellectual property
21   case?
22      A. Yes.
23      Q. Do you understand that trademarks are
24   intellectual property as well?
25      A. I believe so. I mean, I'm not a lawyer.

Page 77

ITAMAR SIMONSON

1
2       Q. But you cite legal cases and certainly testify
3    enough.
4       A. At times, yes.
5       Q. 27, you authored -- you neither authored, nor
6    critiqued or report. I'll skip that. I'll skip 31.
7    Let's move on to 33. What was that?
8       A. That was another patent case, I believe, yes.
9       Q. I'll skip 35. You didn't author a report there
10   or critique one. 36?
11      A. 36 had to do with a dispute between Bank of
12   America and L.L. Bean concerning their credit card
13   program, something to do with whether after L.L. Bean
14   stopped distributing to its customers Bank of America
15   card, whether Bank of America tried unfairly to
16   influence L.L. Bean customers to switch to another card,
17   something along those lines.
18      Q. Was it unfair competition case; do you know?
19      A. I do not recall.
20      Q. I'll skip 39, also a situation where you
21   neither authored or critiqued. Same thing with 42, 43.
22      That brings us to 46. What is 46?
23      A. What did you say about 43?
24      Q. 42 or 43, you neither authored or critiqued the
25   survey?

One Penn Plaza, NYC                     Toby Feldman, Inc.                (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson                                              9/21/2011

Page 78

ITAMAR SIMONSON

1  A.  If that's what I said, I was wrong.
2  A.  If that's what I said, I was wrong.
3  Q.  Okay.
4  A.  I did evaluate one or two surveys.
5  Q.  In which one?  43?
6  A.  Yes.
7  Q.  Okay.  What did that case involve?
8  A.  It involved gift cards.  Something to do with
9  the credit left on the gift card, I believe.
10  Q.  Okay.  And then we get to 46.  What does that
11  case involve?
12  A.  That had to do with whether slices of fruit in
13  a plastic container were perceived by consumers as fresh
14  or not fresh.
15  Q.  And 47, patent case?
16  A.  Yes.
17  Q.  Okay.  Thank you.
18        Going back to Exhibit 14, which lists some of
19  the criticisms that you have made in cases in which you
20  have critiqued surveys, would it be fair to state one of
21  the common criticisms that you make is a failure to
22  approximate market conditions?
23  A.  I've made -- I've criticized quite a few
24  surveys for that reason.
25  Q.  And another is incorrect or no control or no

Page 79

ITAMAR SIMONSON

1
2  filter?
3  A.  It's possible -- yes.  I would say that issues
4  related to control often are discussed.
5  Q.  That's typically a criticism that you make; is
6  that correct?
7  A.  In many cases, yes.
8  Q.  By the way, would it be true that where you
9  have lodged these criticisms, courts have not always
10  accepted your view?
11        MR. FETNER:  Object to form.
12        THE WITNESS:  With respect to control?
13        MR. WEINER:  Q.  Yes.
14  A.  I can think of one case, and I don't keep up
15  with all the court decisions.  I can think of one case
16  related to Cohiba Cigars in which the court disagreed, I
17  think, with my criticism of a survey that did not
18  include any control, and I said that control was an
19  essential component.
20        The court did not accept that position.  If I
21  recall correctly, the Court said in the original
22  Eveready, it's one word, case, there was no control.  Of
23  course, that original survey was conducted I think in
24  the mid '70s, and litigation surveys have become more
25  sophisticated.

Page 80

ITAMAR SIMONSON

1
2        I don't think today there is any dispute about
3  controls or the need for controls.  But the court in
4  that case disagreed with my opinion.  As an aside, not
5  for that reason, I believe the Court's decision was
6  subsequently reversed.
7  Q.  On that point?
8  A.  No, not on that point.  Although I think that
9  the Second Circuit said there was no need to revisit
10  those issues because I believe that they found there was
11  cause for reversal due to something related to the Cuban
12  embargo.
13  Q.  So the Second Circuit didn't reverse the
14  judge's finding on the issue of control; correct?
15  A.  I don't think they even discussed it.
16  Q.  That means they didn't reverse it?
17        MR. FETNER:  Objection?
18        THE WITNESS:  They reversed the Court's --
19        MR. WEINER:  Q.  Let me just, so we're clear.
20  I have five minutes left on the tape.  They were
21  reversed on other grounds?
22  A.  Yes.
23  Q.  Another common criticism that you assert is
24  demand effects and question order bias; isn't that
25  right?

Page 81

ITAMAR SIMONSON

1
2  A.  Yes.
3  Q.  And finally, you also commonly assert leading
4  or biased or relevant questions; is that correct?
5  A.  Yeah.  That appears in many cases.
6        MR. WEINER:  Why don't we take a quick break
7  while you change the tape?
8        THE VIDEOGRAPHER:  This now marks the ending of
9  tape labeled 1 in the deposition of Itamar Simonson.
10  The time on the monitor is 11:38.
11        (Recess taken:  11:39 a.m. - 11:43 a.m.)
12        THE VIDEOGRAPHER:  This now marks the beginning
13  of tape labeled No. 2 of the videotaped deposition of
14  Itamar Simonson.  We're now going back on the record.
15  The time is 11:43.
16        MR. WEINER:  Q.  Dr. Simonson, I would like to
17  refer you to paragraph 21 on page 9 where you refer to
18  certain standards that you claim are not arbitrary what
19  are the standards you're talking about.
20        MR. FETNER:  Object to form.
21        THE WITNESS:  It's very broad.  I taught a
22  whole doctoral course on such standards.  I teach, for
23  example, next Thursday, I'm starting to teach a course
24  on consumer decision-making.  And I'll talk about
25  research standards and with the students evaluate how

21 (Pages 78 to 81)

Page 82

ITAMAR SIMONSON
1
2  particular articles or studies implemented them.
3      So it's really too broad to provide you an
4  answer. I mean, it's something that appears in many
5  sources. It's something that I've learned. It's
6  something that I've researched. So there are many
7  diverse sources that add up to those accepted standards.
8      MR. WEINER: Q. The first sentence of
9  paragraph 21 says, "The methodology of a survey must
10  follow certain standards."
11      Can you identify them for me?
12      A. Well, as I said, it's too broad. Do you have
13  any particular question?
14      Q. Yeah, I do. What are the certain standards
15  that you refer to?
16      A. It should not be biased. The purpose of a
17  survey is to capture, if I may just complete --
18      Q. Let's be clear on the question. I'm not asking
19  you for the purpose. You were referring to specific
20  standards. I would like you to list them for me.
21      A. May I just answer your questions?
22      Q. Yes, if you answer it.
23      A. Yeah. I'll do the best that I can starting
24  with whatever sentence I think is helpful.
25      Q. Okay.

Page 83

ITAMAR SIMONSON
1
2      A. If I may.
3      The purpose of a survey is to capture certain
4  reality to allow us to learn from the study about the
5  relevant real world. Therefore, the survey
6  implementation and the standards that it follows should
7  be such that they allow us to learn from the study about
8  the reality that we are interested in. After all, we
9  just don't -- we do not care only about those study
10  participants; we are trying to generalize from the study
11  with respect to reality.
12      The standards are designed to allow us to do
13  exactly that. Now if you want to do, to know some
14  specific standards, you should not use leading
15  questions, because leading questions.
16      Q. Leading questions, okay. All right.
17      A. If I could just --
18      Q. I have to write a note. One is leading
19  questions. Continue.
20      A. Can I continue?
21      Q. Yes, yes. I just want to --
22      A. Thank you.
23      So it should not be leading questions. And let
24  me explain why. Because leading questions is something
25  that happens in a survey. It affects the responses, and

Page 84

ITAMAR SIMONSON
1
2  therefore, it makes it harder for us to generalize from
3  such a flawed survey to the reality we are interested
4  in.
5      The survey should not suggest particular
6  answers. It should try to find out what the, if you
7  will, natural opinions, perceptions, views, preferences,
8  and so on, of the relevant consumers or respondents are.
9      The survey should test what is at issue. In
10  other words, to the extent that the survey has a
11  particular objective, it should be designed in such a
12  way that would allow you to test or to achieve
13  potentially those objectives. The question should be
14  properly worded.
15      Order effects, question order effects, that is,
16  should be avoided. In the context of litigation, we
17  usually also require that validation be conducted. I'm
18  sure I skipped many other standards, but if you like to
19  ask me some specific questions.
20      Q. I'm asking what you are referring to in
21  paragraph 21.
22      A. I just illustrated several of those.
23      Q. I'm not looking for the several. I'm looking
24  for the entirety.
25      A. Well, you can open any survey handbook or any

Page 85

ITAMAR SIMONSON
1
2  market research textbook, and you'll find dozens of
3  standards. I don't think it would be reasonable for me
4  to sit here and to try to at the spur of the moment tell
5  you everything.
6      Q. Sir, this is your report. Your report states,
7  "A survey must follow certain standards," and goes on to
8  state, "That these standards are not arbitrary. They
9  have been developed by survey experts based upon a great
10  deal of experience."
11      And I'm trying to get you to tell me what these
12  nonarbitrary standards are. You have listed four:
13  Leading questions, test questions what is at issue,
14  questions which need to be properly worded relating to
15  order effects, and validation.
16      Anything else?
17      MR. FETNER: Bob, you're mischaracterizing the
18  witness's testimony. He's answered the question several
19  times.
20      MR. WEINER: You can object all you want. I'll
21  give you a continuing objection.
22      Q. Is there anything else?
23      A. I think you misunderstanding, excuse me, with
24  all due respect, the sentence that you just read. This
25  is a general statement. It didn't say here are the

Itamar Simonson                                               9/21/2011

Page 86

ITAMAR SIMONSON
1
2   standards that need to be followed. What it says is
3   there are standards, and a survey should follow them.
4   That's all it says.
5        There's nothing here that says here are all the
6   standards; therefore, I don't see where you find in this
7   sentence reference to a particular set of standards. I
8   think I later in this review, I refer to some specific
9   standards, or I'll be happy to talk about those.
10       Q. We'll get to that.
11       Who are the survey experts that you're
12   referring to in paragraph 21?
13       A. Thousands of researchers. There's some
14   specific sources I'm happy to refer you to. But I don't
15   think that I can single out a couple of people and say,
16   "These are the authorities."
17       Q. Well, why don't you tell me who you were
18   referring to when you used the term "survey experts," if
19   you can identify any of them?
20       A. I'm a survey expert. There are thousands of
21   survey experts.
22       Q. Why don't you tell me who you were referring to
23   when you used this sentence?
24       A. The community of researchers and it is
25   reflected also in specific sources. I'm happy to give

Page 87

ITAMAR SIMONSON
1
2   you some examples if you would like.
3        Q. I want you to give me as many as you can that
4   is the basis for the sentence that, "These standards are
5   not arbitrary. They have been developed by survey
6   experts based on a great deal of experience and a
7   careful examination of different methodological
8   options."
9        Who were you referring to when you wrote that
10   sentence?
11       MR. FETNER: Objection.
12       THE WITNESS: I think I just answered that.
13       MR. WEINER: Q. Thousands of people?
14       A. It is the community. You say there are
15   principles of psychology, who are you referring to?
16   Well, there are thousands of researchers who have
17   created the field of psychology just as there are
18   thousands of people who engage in research and surveys
19   and that community produced those principles.
20       Now, if you want me to refer to a couple of
21   illustrations of books, I'm happy to do so.
22       Q. Why don't you do that?
23       A. So, in the context of litigation, I noticed
24   that many people like to cite the chapter by Shari --
25   that's S-h-a-r-i -- Diamond, which I think is called

Page 88

ITAMAR SIMONSON
1
2   "Survey Research." And it's published by the Center For
3   Judicial -- something.
4        Q. Okay. Anything else?
5        A. As I said, any market research textbook. For
6   example, I happen to have on my shelf at home, a market
7   research book by Burn, B-u-r-n, and Bush. I don't -- I
8   think it's Bush. I'm not sure.
9        So I mean, you can take any market research
10   textbook. There is something called The Survey Research
11   Handbook. One of the author's name is Alreck,
12   A-l-r-e-c-k.
13       Q. Anything else? It's an open-ended question.
14       A. I think there are some that I cited here. For
15   example, an old book by Schuman and Presser from 1981.
16       Q. Is that a book on surveys?
17       A. I think it's a book about questions.
18       Q. Questions. Okay. Anything else?
19       A. I think I cited, for example, a chapter by
20   Dr. Krosnick, K-r-o-s-n-i-k (sic). It's called Survey
21   Research, I believe.
22       Q. Okay.
23       A. I believe I have an old volume called Handbook
24   of Market Research. I haven't looked at it in 30 years,
25   but I know it exists and talks about various aspects of

Page 89

ITAMAR SIMONSON
1
2   market research, including various research techniques
3   including surveys.
4        Q. The fact that something was published 30 years
5   ago, does that in your view make it less or more
6   authoritative?
7        A. It's hard to generalize. There's some good old
8   articles. But by and large, I would say probably less
9   because over time, we learn more things about the
10   limitations and advantages of different techniques.
11       Q. Anything else?
12       A. As I said, any market research textbook, any
13   survey book, lots and lots of articles that I've
14   reviewed over the years in journals.
15       Q. Let's go back to what you mentioned. You
16   mentioned Shari Diamond's book?
17       A. It's a chapter.
18       Q. A chapter. Do you agree with statements she
19   makes in her chapter?
20       MR. FETNER: Objection. Are you referring to
21   particular statements, Bob?
22       MR. WEINER: I'm talking to him about the
23   chapter, not any particular statement.
24       Q. Do you agree with what she says?
25       MR. FETNER: Objection.

23 (Pages 86 to 89)

Itamar Simonson                                                     9/21/2011

Page 90

ITAMAR SIMONSON

1
2      THE WITNESS:  There are many things I agree.  I
3  don't know if I agree with everything she says.
4      MR. WEINER:  Q.  What about Burn and Bush?  Do
5  you agree with everything they say.
6      A.  Probably not.  I mean, I don't know.  I haven't
7  carefully reviewed that book recently.  I don't think
8  you'll find any book where I would say I agree with
9  every word they say.
10     Q.  That would be true with respect to Alrek's
11  book, you probably don't agree with everything he says
12  either?
13     A.  That's probably true.  I believe that's a she.
14     Q.  She.  How about Schuman and Presser?
15     A.  Same.
16     Q.  And Krosnick?
17     A.  I would tend to trust him a little more because
18  it's more recent.  I do know him.  But again, I haven't
19  reviewed any word.  I'm sure there will be some things
20  there that I may disagree with.
21     Q.  Okay.  Turn to page 10, paragraph 23.
22         You have been previously critical of Dr. Jacoby
23  in other cases; is that correct?
24     A.  Yes.
25     Q.  When did you first meet Dr. Jacoby?

Page 91

ITAMAR SIMONSON

1
2      A.  I do not remember.  Probably would be many
3  years ago.  Maybe early '90s.  I really do not remember.
4      Q.  When you discuss your being critical with
5  Dr. Jacoby in the context of litigation, you have a
6  footnote, is that correct, to a case Kargo Global?
7      A.  Yes.
8      Q.  Can I have that case?  That's my next exhibit.
9         Let me show you Simonson Exhibit 15.
10        (Plaintiff's Exhibit No. 15 was
11        marked for identification.)
12     MR. WEINER:  Q.  Is that the case you're
13  referring to, Kargo Global vs. Advance Magazine
14  Publishers?
15     A.  Yes.
16     Q.  In that particular case, the Court accepted
17  your criticisms of the survey and survey report that
18  Dr. Jacoby had authored?
19     A.  I believe so.
20     Q.  Okay.  And one of your principal criticisms was
21  that the survey was done in such a way that it did not
22  approximate market conditions; is that right?
23     A.  It was one of my criticisms, yes.
24     Q.  And did the court, by the way, adopt all of
25  your criticisms or just a couple?

Page 92

ITAMAR SIMONSON

1
2      A.  I do not recall.
3      Q.  And in your experience and you've testified
4  many times, have courts always accepted your surveys and
5  your criticisms?
6      A.  I can think of one case they did not accept my
7  survey.
8      Q.  Which was that?
9      A.  It was High Voltage vs. Coca-Cola.
10     Q.  Can you think of any others?
11     A.  That's where they did not accept my survey?
12     Q.  M-hm.
13     A.  I cannot think of any other case.  I'm not sure
14  what you mean.  There was one case in Oregon has to do
15  with I think it's called Newport Pacific vs. something.
16        In that case, I did both a confusion survey and
17  a dilution survey.  If I recall correctly, the confusion
18  survey demonstrated 14 percent confusion.  I don't think
19  the court had any comments on the survey, but thought
20  that 14 percent was below threshold.
21     Q.  Okay.  Can I have this case?
22     A.  And I also did their dilution survey.  And I
23  think that one of the minor aspects of that survey had
24  to do with the degree of recognition of those Moe's,
25  M-o-e, apostrophe s, restaurants, along the Oregon

Page 93

ITAMAR SIMONSON

1
2  shore, whether they were well-recognized or famous in
3  Oregon.
4         I mean, in hindsight, I discovered there was a
5  need for them to be famous nationwide, which clearly
6  they were not.  It ended up being irrelevant.
7      Q.  Let me show you what we've marked as Simonson
8  Exhibit 16, which is a case involving Conopco, Inc.
9  doing business as Calvin Klein vs. Cosmair, Inc., Polo
10  Ralph Lauren Corp and PRL USA Holdings, Inc.
11        (Plaintiff's Exhibit No. 16 was
12        marked for identification.)
13     THE WITNESS:  You're confusing me with another
14  Simonson.
15     MR. WEINER:  Q.  This is a different -- this is
16  a different Simonson?
17     A.  This is Dr. Alex Simonson.  I think at that
18  time he used to call himself Alexander Simonson.  In
19  fact I recall -- even though it was many years ago, I
20  recall that case because I sent a letter to the Court, I
21  forgot his name, Sprezzo or something like that, and I
22  said, "Could you do me a favor," because many people
23  made that mistake, "Could you do me a favor and just add
24  the first name?"
25        And I believe that the clerk eventually took

24 (Pages 90 to 93)

Page 94

ITAMAR SIMONSON
1
2  care of that, and the correction was made. And I'm no
3  longer guilty for criticisms of Alex Simonson who is
4  still active.
5      Q. How about the Champagne Louis Roederer vs.
6  J. Garcia Carrion?
7      A. What about it? That is me.
8      Q. That was your case?
9      A. That is my case.
10     Q. Were your criticisms accepted in that case?
11     A. Well, I do not know. I think it was a mixed --
12  I don't remember exactly how it ended up. Maybe you can
13  show me --
14     Q. I will, but I'm actually going to get into that
15  a little later. I wanted to know if that was a case in
16  which Courts have opined on your work product?
17     A. I vaguely recall they did, even though actually
18  that case was more recent. Maybe I should remember.
19         But I think the Court might have accepted some
20  of my criticism, but not all. If I recall correctly,
21  that Court ended up accepting my position that what the
22  survey issued actually showed -- I could be wrong on
23  this, but I think what the Court ended up saying, it was
24  the -- the confusion was less than ten percent.
25         Maybe seven percent or so, which I think some

Page 95

ITAMAR SIMONSON
1
2  Courts would regard or have regarded as in significant.
3  But in any case, I think that the Court perhaps did not
4  accept everything.
5      Q. Okay. We're going to get to that case in some
6  detail later. You'll have an opportunity to take a look
7  at it.
8         In 23, paragraph 23, you also then say you're
9  going to cite in order to demonstrate the strength of
10  your conclusions in your report from an article that
11  Dr. Jacoby wrote in connection with a Federal Trade
12  Commission Proceeding; is that correct?
13     MR. FETNER: Object to form.
14     THE WITNESS: Yes.
15     MR. WEINER: Q. Okay. Let me show you that
16  article.
17         What's my next exhibit number.
18     MS. LU: 18.
19     MR. SPRINGER: Is there a 17?
20     MS. LU: No.
21     MR. FETNER: I didn't get a 17.
22     MR. WEINER: You didn't give them the Roederer
23  case? We'll get to it later. You can give it to them.
24  Doesn't matter.
25  /////

Page 96

ITAMAR SIMONSON
1
2         (Plaintiff's Exhibit Nos. 17 and
3          18 were marked for
4          identification.)
5      MR. WEINER: Q. Let me show you Exhibit 18.
6      I want to understand the context in which this
7  article was written. And if you look at paragraph 25 of
8  your report, you quote from the article, and it talks
9  about -- the quote is, "Probably the single source of
10  conflict in a copy-test research for litigation is
11  whether individuals questions" -- "whether individual
12  questions are properly drafted to elicit rather than
13  suggest responses."
14         Do you see that?
15     MR. FETNER: Can you tell me what paragraph?
16     MR. WEINER: Paragraph 25.
17     Q. What is a copy-test research case?
18     A. Test of a copy of a particular ad.
19     Q. And is there a standard methodology to be
20  followed in your view in connection with designing a
21  survey for a copy test research case?
22     A. There are many different methodologies for
23  conducting copy test, and the same general principles
24  would apply to all of those methodologies as they would
25  to any other survey.

Page 97

ITAMAR SIMONSON
1
2      Q. Well, for example, is it required in a
3  copy-test research survey that there be open-ended
4  questions before closed-ended questions?
5      A. Normally, yes.
6      Q. When you say "normally," does that mean there
7  are exceptions?
8      A. I've never conducted a copy test or false
9  advertising study that did not start with open-ended
10  questions, and in most cases, it exclusively relied on
11  open-ended questions.
12     Q. Okay. Let's talk about what this article is
13  about.
14         Is it your understanding that in connection
15  with this FTC proceeding that the FTC brought against
16  Kraft that Dr. Jacoby was the expert witness for Kraft?
17     A. Yes.
18     Q. And the FTC had had retained another individual
19  by the name of Stewart to act as its expert; is that
20  correct?
21     A. Yes.
22     Q. Do you know what Mr. Stewart's full name is?
23     A. David.
24     Q. David Stewart. And is it your understanding
25  that that case went to an administrative law judge for

25 (Pages 94 to 97)

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Page 98

ITAMAR SIMONSON

1
2  disposition?
3      A. That, I don't know.
4      Q. What happened in that case?  You're citing this
5  article.
6      A. No.  It makes no difference whatsoever what the
7  specific way in which it was administered.  What I'm
8  looking at are the specific principles that Dr. Jacoby
9  alluded to or highlighted in this article.
10      Those surveys -- those principles, I should
11  say, are not unique to this context or that context.
12  For example, what you just read from my report, the
13  notion that questions should not be suggestive has
14  nothing to do with whether it was FTC or not FTC,
15  whether there was administrative judge or not
16  administrative judge.
17      This is a general principle, and that's what
18  really I was focusing on, and there was really no need
19  for me to figure out all the background of that
20  particular case.
21      Q. Well, the title of the article, "Consumer
22  Research in FTC vs. Kraft," paren, "1991," colon, "A
23  Case of Heads We Win, Tales You Lose."
24      Isn't Dr. Jacoby's article a criticism of the
25  specific survey that Mr. Stewart had authored in that

Page 99

ITAMAR SIMONSON

1
2  case?
3      A. But he relies on --
4      Q. Is that correct?  Just answer the question I'm
5  asking.
6      A. If I may --
7      Q. No.  Could you please answer the question I'm
8  asking you?  If you don't understand it, tell me.
9      A. No.  I understand it, and I'm happy to --
10      Q. Is that what Dr. Jacoby was doing?  He was
11  commenting on the FTC's reliance and the administrative
12  law judge's acceptance of a survey that had been
13  authored by Mr. Stewart; isn't that correct?
14      A. May I answer the question?
15      Q. That's the question I'm asking.  It's a yes or
16  no.
17      A. Can I just answer the question?
18      Q. Could you answer the question yes or no?
19      I'll have it reread?
20      MR. FETNER:  Allow the witness to answer the
21  question.
22      MR. WEINER:  Q. Would you explain to me why
23  you can't answer it yes or no?
24      A. No.  I answer it the way to the best of my
25  ability.

Page 100

ITAMAR SIMONSON

1
2      Q. Okay.
3      A. The specific issue had to do with this dispute
4  between Kraft and the FTC.  The principles on which
5  Dr. Jacoby relied are general and not unique to that
6  case.  These are the principles that I was citing.
7      I mean, that's really what's important here.
8  Whether he applied it to this case or that case, that's
9  really not relevant.
10      Q. What Dr. Jacoby did in this article was
11  critique the FTC's and Kraft surveys, the one he
12  authored and the one Mr. Stewart authored; isn't that
13  correct?
14      A. Dr. Jacoby relied on general principles.  For
15  example, he never said it acquiescence bias and the need
16  for open-ended questions or the need to avoid suggestive
17  questions was unique to that case.  Therefore, the
18  principles on which he relied are general.  He, in this
19  particular article, he applied them to that particular
20  case.
21      MR. WEINER:  I'm going to move to strike the
22  answer as nonresponsive.
23      Could you read my question back, please?
24      (Record read:  "What Dr. Jacoby did in this
25      article was critique the FTC's and Kraft surveys,

Page 101

ITAMAR SIMONSON

1
2      the one he authored and the one Mr. Stewart
3      authored; isn't that correct?")
4      THE WITNESS:  You want me to repeat my answer?
5      MR. WEINER:  Q. No.  Can you answer yes or no?
6      MR. FETNER:  Objection.  Asked and answered.
7      MR. WEINER:  Q. If you can't answer yes or no,
8  just tell me.
9      A. No.  I'll answer the question.  You asked me a
10  question --
11      Q. Can you answer that question yes or no?
12      MR. FETNER:  He's already answered the
13  question.
14      THE WITNESS:  I already answered the questions.
15      MR. WEINER:  Q. Okay.  I'll move on.
16      In fact, Dr. Jacoby criticizes the FTC survey
17  for the principles that you just articulated; isn't that
18  correct?  He raised a number of principles why he said
19  the FTC survey was inadequate.
20      A. Exactly.  He relied on those principles that I
21  rely on.  We are in agreement.  In fact, I agree with
22  most of the principles that he relied on in this
23  article.
24      Q. But the administrative law judge didn't agree;
25  isn't that correct?

26 (Pages 98 to 101)

Page 102

ITAMAR SIMONSON

1
2    A. The administrative law judge -- again, I don't
3    know the details of what the administrative law person
4    decided or not decided. It's really --
5    Q. Excuse me.
6    A. It didn't really matter because --
7        MR. WEINER: Can we just go off the record.
8        THE VIDEOGRAPHER: We are now going off the
9    record. The time is 12:10.
10       (Recess taken: 12:10 p.m. - 12:11 p.m.)
11       THE VIDEOGRAPHER: We are now going back on the
12   record. The time is 12:11.
13       THE WITNESS: I did not see any evidence that
14   the administrative law judge disagreed with the
15   principles. He might have disagreed with the manner in
16   which they applied to that particular case.
17       MR. WEINER: Q. Let's go up to the very
18   beginning of the article where it states, "The author's
19   review of the principal surveys offered as evidence in
20   FTC vs. Kraft, Inc. The authors explain that the FTC's
21   survey is flawed in universe definition, question
22   wording, experimental design and analyses and argue that
23   through Kraft's survey employed generally recognized and
24   accepted science practices, especially as applied in
25   surveys conducted for litigation matters."

Page 103

ITAMAR SIMONSON

1
2        Isn't it true that this was a contested
3    proceeding, and the FTC was able to convince a judge
4    that despite the criticisms that Dr. Jacoby had with the
5    survey that the FTC survey was a valid survey, even
6    though it didn't follow any of the principles that
7    Dr. Jacoby talks about in this article?
8        A. I've seen no evidence in the article or
9    anywhere else that the court -- the judge disagreed with
10   the principles.
11       Q. What did the judge do in this case?
12       A. I don't know.
13       Q. You don't know?
14       A. I believe that they supported the FTC, but I
15   don't know the specifics.
16       Q. Well, how about looking at page 3 where it
17   talks about the administrative law judge ruling. The
18   ALJ, the administrative law judge, accepted Stewart's
19   survey. Isn't that correct?
20       A. Yes.
21       Q. And the administrative law judge ultimately
22   ruled in favor of the FTC; isn't that correct?
23       A. It's my understanding.
24       Q. And Dr. Jacoby was very upset and wrote this
25   article because he thought that survey should not have

Page 104

ITAMAR SIMONSON

1
2    been accepted; correct?
3        MR. FETNER: Objection.
4        THE WITNESS: I don't know. It appears that's
5    the case based on this article.
6        MR. WEINER: Q. And he then explains why in
7    this article he thinks that the administrative law judge
8    should not have accepted the survey; is that correct?
9        A. It appears to be, yes.
10       Q. But at the end of the day, despite Dr. Jacoby's
11   view of what it should or should not have done, the
12   judge disagreed?
13       MR. FETNER: Objection.
14       MR. WEINER: Q. Correct?
15       A. Yes. I didn't see any disagreement about the
16   principles on which Dr. Jacoby relies. I have trouble
17   understanding what the decision tells us.
18       Q. Let's go on to page 11.
19       MR. FETNER: Page 11 of the report.
20       MR. WEINER: Q. Yes. Page 11 of the report.
21       And there, beginning paragraph 26, you refer to
22   Professor McCarthy, and McCarthy on Trademarks; is that
23   correct?
24       A. Yes.
25       MR. WEINER: Can I have these two documents?

Page 105

ITAMAR SIMONSON

1
2        (Plaintiff's Exhibit No. 19 was
3        marked for identification.)
4        MR. WEINER: Q. Let me show you Exhibits 19
5    and 20. You have to put Simonson.
6        Am I correct that McCarthy is the author of
7    McCarthy on Trademarks and Unfair Competition?
8        A. Yes.
9        Q. And his treatise focuses on the law involving
10   trademark and unfair competition?
11       A. Yes.
12       Q. And among other things, he does talk about
13   surveys, but it is in the context of trademarks and
14   unfair competition; isn't that correct?
15       A. Yes, even though some of the principals are
16   applicable to other types of surveys.
17       Q. And I gave to you Exhibit 19 which is the
18   preface to the Fourth Edition where he makes very clear
19   that the purpose of his treatise is to find and
20   understand trademark and unfair competition law; is that
21   right?
22       A. Yes.
23       Q. Now, you in paragraph 26, refer to something
24   that I believe you talk about as a leading question.
25       Do you see that?

Itamar Simonson                                                          9/21/2011

Page 106

ITAMAR SIMONSON
1
2      A.  Yes.
3      Q.  How would you define leading question?
4      A.  A question that leads to a particular response,
5    suggests a particular response or makes one's response
6    more likely.
7      Q.  As opposed to a different response; right?
8      A.  Right.
9      Q.  If you look at page 364 of Exhibit 20, there is
10   a reference to secondary meaning questions.  Do you see
11   that?
12     A.  Page 364.
13     Q.  Yeah.  It would be 32-364.  Do you see it?
14     A.  I do.  Where's that.
15     Q.  Professor McCarthy states, "Survey questions
16   should not be slanted or leading so as to lead the
17   respondent to a desired response."
18         Do you agree with that definition?
19     A.  Yeah.  That would be one way to define it.
20         MR. FETNER:  I didn't get a chance to object to
21   the form of the question.
22         MR. WEINER:  Okay.
23     Q.  In paragraph 26, you refer to an example; is
24   that correct?
25     A.  Yes.

Page 107

ITAMAR SIMONSON
1
2      Q.  And you refer to a case called Beneficial Corp.
3    vs. Beneficial Capital Corp; is that right?
4      A.  Yes.
5      Q.  Can you explain to me how the question which
6    you quote in 26 is a leading question?
7      A.  It suggests a possibility of a business
8    connection between Beneficial Corp. and Beneficial
9    Finance System Companies even though it's possible that
10   this possible connection would not have occurred to the
11   respondents without that question.
12     Q.  So let's just get the question on the record.
13         Question in that case was:  Do you think that
14   there may or may not be a business connection between
15   Beneficial Corp. and the Beneficial Finance System
16   Companies.  And your view or let's put it this way:  You
17   agree with the Court that that question suggested that
18   there was a relationship?
19     A.  Yes.
20     Q.  Do you know --
21     A.  In other words, that question -- I don't know
22   what's the background of this case, I should note.  But
23   to the extent that in reality, those two corporations
24   would not be simultaneously evaluated, and then someone
25   just presented to a respondent to say are these two

Page 108

ITAMAR SIMONSON
1
2    connected, I would, I would regard that as leading.
3      Q.  Do you know if Professor McCarthy agrees with
4    you?
5      A.  I believe he does.
6         MR. WEINER:  Can I have this?  This will be
7    what?
8              (Plaintiff's Exhibit No. 21 was
9              marked for identification.)
10        MR. WEINER:  Q.  Let me show you what we've
11   marked as Simonson Exhibit 21, which is from an earlier
12   edition of McCarthy.
13        And I would like to refer you to the second
14   page where it states, "Authors opinion."  "In my view,
15   it is not improperly leading to present the respondent
16   with a fair and accurate representation of the
17   contesting marks and ask in a neutral manner if the
18   respondent thinks there is or there is not some
19   connection," and goes on from there.
20        Doesn't Professor McCarthy actually disagree
21   with this Court's decision?
22     A.  No.  I didn't see any reference to this
23   particular case.  I don't know.  Each case has its own
24   unique circumstances, and it's conceivable that --
25     Q.  Start from the beginning where he's talking

Page 109

ITAMAR SIMONSON
1
2    about Beneficial Capital Corp. and the Beneficial
3    Finance.  He's talking about the very question that I
4    just read into record right on page 1 of this particular
5    excerpt.
6         MR. FETNER:  When you say "start at the
7    beginning," what are you referring to?  The beginning
8    where?
9         MR. WEINER:  Right under section 32-172.
10     Q.  For example, the question:  "Do you think that
11   there may or may not be a business connection between
12   Beneficial Capital Corp. and the Beneficial Finance
13   System Companies was rejected as a leading question?"
14        And then doesn't Professor McCarthy go on to
15   explain why he disagrees with that conclusion?
16        MR. FETNER:  Objection.
17        THE WITNESS:  I don't think so.  We probably
18   need to have Professor McCarthy come here and explain
19   whether that was, what he was referring to.  Maybe
20   there's some situations where that could be appropriate.
21        I don't know what questions were asked before
22   that.  I don't know how those products are encountered
23   in reality.  I mean, there are all kinds of specific
24   questions that we need to address.  And I don't read his
25   opinion here as referring specifically to disagreement

28 (Pages 106 to 109)

Page 110

ITAMAR SIMONSON
1   
2   with this particular question and this particular
3   survey.
4        MR. WEINER:  Q.  Going on to the third page of
5   that document where it states, quote, "If the respondent
6   is given a fair opportunity to say yes, no or I don't
7   know" --
8        MR. FETNER:  Where on the page are you reading?
9        MR. WEINER:  I would say it's about the top
10  half.  It's the third -- I think the third sentence
11  down.
12       MR. FETNER:  Okay.
13       MR. WEINER:  You see it?
14       MR. FETNER:  Yeah.
15       MR. WEINER:  Okay.  Quote, "If the respondent
16  is given a fair opportunity to say yes, no or I don't
17  know, I fail to see how such a question is so improperly
18  leading that responses should be discounted or ignored.
19  Responses to such questions should be given their fair
20  weight and considered along with other evidence in the
21  case," close quote.
22       Q.  Do you agree with that?
23       A.  I think if you read the sentence before that,
24  he refers specifically to genericness and confusion.
25  Not to anything else.  So apparently he decided it was

Page 111

ITAMAR SIMONSON
1   
2   important to limit it to genericness and confusion.
3        Q.  Well --
4        A.  And there might be some situations where he's
5   right.  There might be other situations where he's not
6   right.  As you pointed out, I don't think that he would
7   represent it himself as a survey expert.  He had the
8   good sense of citing me.  And I guess citing Dr. Jacoby.
9        But in any case, he's not a survey expert, but
10  doesn't mean that I disagree with him on everything.
11       Q.  I simply asked you whether -- by the way, when
12  you say this is limited to questions about genericness,
13  descriptiveness, et cetera, et cetera, that's what the
14  Beneficial case was all about, whether there was
15  relationship between the two cases; right?
16       MR. FETNER:  Objection.
17       THE WITNESS:  Right.  Each case has its own
18  unique characteristics.  I mean, it's well accepted that
19  you need to have, for example, open-ended questions in
20  confusion studies.  I cannot think of a single case
21  where there were no open-ended questions --
22       MR. WEINER:  Q.  In confusion studies?
23       A.  In confusion surveys.
24       Q.  By the way, is the case we're presently
25  litigating a confusion case?

Page 112

ITAMAR SIMONSON
1   
2        A.  No, not at all.
3        Q.  Now, you mentioned that you have been cited by
4   Dr. McCarthy; is that correct?  Or Professor McCarthy,
5   excuse me.
6        A.  I believe a couple of times.  And I think
7   Dr. Jacoby, I noticed, makes a point of saying, "I've
8   been cited the most."
9        Q.  Is he correct?
10       A.  You know, I didn't count.
11       Q.  I did.
12       A.  I trust that you did.
13       Q.  You were cited twice, and Dr. Jacoby has been
14  cited -- I didn't write this down -- one, two, three,
15  four, five, six, seven, eight, nine times.
16       A.  Well --
17       MR. FETNER:  Is that a question?
18       MR. WEINER:  Yes.
19       Q.  Do you have any reason to disbelieve what I
20  just told you?
21       A.  No.  I trust your counting.
22       Q.  Okay.  Can I have this?
23            (Plaintiff's Exhibit No. 22 was
24            marked for identification.)
25       MR. WEINER:  Q.  Let me show you Simonson

Page 113

ITAMAR SIMONSON
1   
2   Exhibit 22.
3        Is this the Simonson -- excuse me -- is this is
4   Diamond chapter you were referring to?
5        A.  Did you say a particular page?
6        Q.  No.  Is this the chapter when you referred to
7   Diamond?
8        A.  It is.
9        Q.  Okay.  Now, on page 12, you quote Dr. Jacoby in
10  his article where Dr. Jacoby states -- this is toward
11  the middle of the page -- "At the very least, Q1 should
12  have been proceeded by an open-ended filter question."
13       Do you see that?
14       A.  Yes.
15       Q.  Now, is it your view -- first of all, what is
16  an open-ended filter question?
17       A.  I'm not sure exactly how he -- what he meant by
18  that because the question that he asks, I would classify
19  more as an open-ended question.  But I guess you can
20  also call it -- refer to it as a filter question.
21       In essence, he's suggesting, and as far as I
22  can tell correctly, is that you don't want to suggest to
23  respondent any particular ad or any particular content,
24  but instead, you want to find out what they think.  For
25  example, what ads do you remember?  What products were

29 (Pages 110 to 113)

Itamar Simonson                                                    9/21/2011

Page 114

ITAMAR SIMONSON
1
2    remembered in these ads, or you know, have you ever
3    heard about any incidents involving any university in
4    Korea, you know, open-ended question that does not lead
5    them in a particular direction but instead tries to find
6    out what they know, remember and think.
7        Q.  Would you look at Diamond page 274?  You see
8    the definition of open-ended question.  "Open-ended
9    question, a question that requires a respondent to
10   formulate his or her own response."
11       Do you agree with that definition?
12       A.  Probably wouldn't be the one that I would use,
13   but I can see ways where it would fit what I mean by
14   open-ended question.
15       Q.  What's the definition you would use?
16       A.  It's a question that does not present a set of
17   response options and instead invites the respondent to
18   answer the question any way he or she desires.
19       Q.  Okay.  Let's look at page 273.  Tell me if you
20   agree with the definition of close-ended question which
21   is, "A question that provides the respondents with a
22   list of choices and asks the respondents to choose from
23   among them."
24       Do you agree with that?
25       A.  Yeah.

Page 115

ITAMAR SIMONSON
1
2        Q.  Now, in your view, are all close-ended
3    questions leading?
4        A.  I hesitate to make such a sweeping
5    generalization.  I would say most close-ended questions
6    have a leading component which means that to the extent
7    that it is determined that they have to be used, there
8    should be appropriate controls such as to account for
9    the leading nature of or the likely leading nature of
10   such questions.
11       Q.  Are you aware of any surveys that only use
12   closed-ended questions?
13       A.  Any surveys?
14       Q.  Yeah.  Any types of surveys?
15       A.  Could be.  I mean, yeah, that's possible.  For
16   example, if you are conducting a survey about consumer
17   preferences and you asked them to indicate their choices
18   among toothpaste, toothbrushes, lots of other products,
19   and you don't care about the reasons they have for
20   making those choices, it's possible that you would just
21   ask them to choose among options.
22       Q.  So there is no rule that says every survey must
23   begin with an open-ended question?
24       A.  Not every single survey, you're right.
25       Q.  And in fact, if you look at page 251 of

Page 116

ITAMAR SIMONSON
1
2    Diamond, she makes a statement when she's talking about
3    whether surveys use open-ended or closed-ended
4    questions, she states, "The questions that make up a
5    survey instrument may be open-ended, closed-ended or a
6    combination of both."
7        Do you agree with that?
8        A.  I agree, yeah.  If you're talking about the
9    entire universe of surveys, I agree with that.
10       Q.  Would you agree there are different reasons to
11   ask open-ended and closed-ended questions?
12       A.  I guess it really depends on each situation.
13   But I would say if you're looking for a general
14   statement, that may be true.
15       Q.  On the next page, she goes on to state that and
16   this is the third line, "The response alternatives in a
17   closed-ended question may remind respondents of options
18   that they would not otherwise consider which simply do
19   not come to mind as easily."
20       Do you agree with that statement?
21       A.  Yes.
22       Q.  That's one of the advantages of closed-ended
23   questions; is that right?
24       A.  No.
25       Q.  You don't think that's an advantage?

Page 117

ITAMAR SIMONSON
1
2        A.  I don't think it's a general advantage.  In
3    many cases, it's a disadvantage.  In other words, to the
4    extent that they would not have thought about it, that
5    means in reality, they would not have thought about it.
6    And what it means is that the closed-ended questions
7    really led them to think of something they would not
8    have normally thought about.  That's a flaw.
9        Q.  That's a flaw.
10       Let's look at footnote 91 where she says, "In
11   addition, there is evidence that respondents answering
12   open-ended questions may be less likely to report some
13   information that they would reveal in a response to a
14   closed-ended question when that information seems
15   self-evident or irrelevant."
16       Isn't she saying one of the ways to establish
17   something more concretely is to ask closed-ended
18   questions?
19       A.  I don't know exactly what Dr. Diamond means by
20   that.  And I would be surprised if I found out that she
21   is saying that closed-ended questions should be used in
22   order to elicit certain responses that respondents would
23   not have thought about them in reality.
24       Q.  Let's see if I can understand the differences
25   in what you're saying.  Let's assume I want to take a

30 (Pages 114 to 117)

Page 118

ITAMAR SIMONSON

1
2  survey of the students in your class to find out if they
3  have ever seen the movie Casablanca.  Okay.
4       I take it you're familiar with the movie
5  Casablanca?
6       A. Yes.
7       Q. Now, one of the things I could do is I could
8  start off with a question which is, "What movies have
9  you seen?"  Right?
10      A. Yes.
11      Q. That would be an open-ended question?
12      A. Right.
13      Q. But you might not tell me or your students
14  might not tell me they saw Casablanca.  They may list a
15  lot of movies, but not Casablanca; correct?
16      A. That's right.
17      Q. I may not get the right information by asking
18  an open-ended question; correct?
19      A. That is correct.
20      Q. So I can instead say, "Did you ever see the
21  movie Casablanca?"  Calls for a yes or no; that would be
22  a closed-ended question?
23      A. Right.  Completely -- if I may just complete my
24  answer.  Completely irrelevant.  If you think about
25  movies, I think you're absolutely right.  Because there

Page 119

ITAMAR SIMONSON

1
2  are thousands of thousands of movies, it would make no
3  sense to use a closed-ended question.
4       Q. You mean an open-ended question?
5       A. You're right.  Open-ended question.  There's no
6  way many people would mention Casablanca.  So instead
7  what you need to do is have close-ended questions with
8  proper controls where, for example, you include names of
9  movies that do not exist, such as, "Have you seen the
10  movie Marrakech?"  Let's assume there is -- Marrakech,
11  let's assume there is no such movie.
12      So in other words, you include what we call
13  phantom names as controls to make sure that you don't
14  get noise.  Okay.
15      Now, if on the other hand, let's assume, just
16  as a hypothetical or not a hypothetical, that we are
17  dealing here with scandals involving faculty in a Korean
18  university.  I would like to assume that there aren't as
19  many scandals involving Korean university as there are
20  movies.
21      Therefore, there's absolutely no similarity
22  between the situation with movies as there is with
23  scandals involving university in Korea.  Zero
24  similarity.  It's completely irrelevant.
25      But coming back to the issue of movies, I

Page 120

ITAMAR SIMONSON

1
2  completely agree with you.  It can be done.  It's
3  called -- you may start with unaided awareness, which is
4  what you refer to as open-ended question here.  But that
5  would be ineffective, I agree.  You start with
6  closed-ended question with proper controls.
7       Q. We're not talking controls at the moment.
8  We're talking about whether a survey must start with an
9  open-ended question.  I take it you would agree with me
10 it depends?
11      A. In the case of movies, it should not.
12      Q. It can be lots of different things.  It depends
13 on the circumstances.  There is no general rule that
14 says in order to a conduct a survey, I must first have
15 an open-ended question; is that correct?
16      A. I wouldn't characterize it like that.
17      Q. How would you characterize it?
18      A. I would say there are particular conditions
19 that determine whether you should start with open-ended
20 questions or not.  In the case of movie, you should not.
21 In the case of -- in the case of scandals involving
22 Korean university, you should.
23      Q. Which is your opinion?  But there's no black
24 letter law that says scandals in Korean universities
25 require open-ended questions?

Page 121

ITAMAR SIMONSON

1
2       A. No.  There is a rule that would say to the
3  extent that you have a finite, a small set and you're
4  not sure that whether your respondents are aware of the
5  particular incident that you're interested in, you have
6  to not assume that they know.  You have to use
7  open-ended questions to find out.
8       In other words, it's not random.  It's not as
9  if like you say, well, you know, it can go this way; it
10 can go that way; anything goes.  Not at all.
11      Based on the facts of the case, that determines
12 whether you should start with open-ended questions.
13      Q. Okay.  So it depends on the facts of the case.
14 That's what you just said?
15      A. It depends on the facts of the case and the
16 particular conditions, yes.  And once you know that, you
17 can determine how the question should be asked.
18      Q. Now, in your experience, do experts disagree as
19 to when open-ended questions need to be asked first?
20      A. I've not encountered -- in matters like that,
21 I've not encountered disagreements.  For example, in
22 issues of false advertising studies, such as you show
23 people a commercial and you want to test what messages
24 you are communicated, such --
25      Q. Can I have the --

31 (Pages 118 to 121)

Itamar Simonson                                                9/21/2011

Page 122

ITAMAR SIMONSON

1
2    A. -- such surveys should begin with open-ended
3  questions. I'm not familiar with experts who would
4  disagree with that.
5    Q. By the way, in your Allianz case, did you begin
6  with open-ended questions?
7    A. If you have the questionnaire here.
8    Q. I do. And I'll get to it. What's your
9  recollection?
10   A. I have a vague recollection of asking them what
11  was -- what factors were important --
12   Q. I'm talking -- I'm asking whether you began the
13  survey with open-ended questions followed by close-ended
14  questions?
15   MR. FETNER: I think it would be helpful if you
16  actually showed him --
17   MR. WEINER: I can test his recollection. Then
18  I'll show him the survey.
19   THE WITNESS: I don't recall all the details of
20  that case. If you show me, then I'll be happy to
21  answer.
22   In that case, the issue was very concrete, very
23  specific about whether they took away certain message
24  from the name cash bonus annuity.
25   MR. WEINER: Q. Let's go back to my survey of

Page 123

ITAMAR SIMONSON

1
2  your students about the movie Casablanca.
3    If I asked them the close-ended questions,
4  putting aside filters and putting aside control
5  questions, simply did you see the movie Casablanca, is
6  that a leading question?
7    A. That's not a leading question. That's a proper
8  question, assuming you have proper controls.
9    Q. Okay. There's nothing wrong with asking a
10  close-ended questions, per se?
11   A. Yeah. There are situations where they are
12  appropriate.
13   Q. Okay. And supposing the answer is, "You know,
14  I don't remember," that's what your students tell me,
15  would it be proper for me then to say, "Well, the movie
16  Casablanca involved a guy named Rick who owned a bar in
17  Morocco during World War II, does that refresh whether
18  you saw the movie Casablanca?"
19   A. Completely inappropriate.
20   Q. Why?
21   A. Because the person told you, "I don't
22  remember." You stop right there. You do not try to
23  induce positive response by giving them clues that may,
24  A, suggest they're supposed to remember, B, may get them
25  confused with something else. They told you, "I don't

Page 124

ITAMAR SIMONSON

1
2  remember." You just accept their response, and you stop
3  right there.
4    Q. All right. So instead of that, what I do is
5  when I ask them whether they saw Casablanca, I give them
6  a copy of a advertisement, you know, those big movie
7  advertisements and say, "Here." Is that proper?
8    A. And you do that for your controls as well?
9    Q. Well, we'll talk about what a control group is
10  in a second. We'll get there. I want to find out if
11  your students saw the movie.
12   A. I would just ask them about the name. They
13  would recognize it -- if they recognize it or remember
14  it, they would remember it based on the name, not based
15  on something that was taped or posted on movie theaters.
16  I don't understand what that would tell them.
17   Q. Didn't you tell me earlier in this deposition
18  that there was something called stimuli, and there was
19  nothing improper about using stimuli? Didn't you tell
20  me that?
21   MR. FETNER: Objection.
22   THE WITNESS: I don't remember. Can we look --
23  go back to my testimony? I think you're taking
24  something out of context. There are many cases where
25  stimuli is useful. Others where they are not.

Page 125

ITAMAR SIMONSON

1
2   MR. WEINER: Q. You don't think that using
3  stimuli might be useful to find out whether your
4  students saw the movie Casablanca?
5    A. Not in that case. The name is sufficient.
6    Q. How do you know?
7    A. Because the name is famous. To the extent that
8  --
9    Q. It may be famous to you and me, but it may not
10  be famous to a 20-year-old?
11   A. In which case the 20-year-old would say, "Well,
12  I don't know if I saw Casablanca, but once I saw the
13  poster or something with Casablanca, now that triggers
14  my memory," that simply -- I can see no reason for doing
15  so.
16   MR. WEINER: Okay. Why don't we take our lunch
17  break. What time do you think you guys need?
18   MR. FETNER: Well, that will depend on how far
19  we need to go to find lunch.
20   THE VIDEOGRAPHER: We are now going off the
21  record. The time is 12:43.
22   (Whereupon, the lunch recess was taken at 12:43
23  p.m. to reconvene at 1:30 p.m.)
24   ---oOo---
25  /////

32 (Pages 122 to 125)

Itamar Simonson                                                    9/21/2011

Page 126

1          ITAMAR SIMONSON
2          AFTERNOON SESSION
3          (Time noted: 1:31 p.m.)
4          THE VIDEOGRAPHER:  We are now going back on the
5    record.  The time is 1:31.
6          MR. WEINER:  Q.  Dr. Simonson, we had been
7    talking about closed-ended and open-ended questions
8    before the lunch break.  We also we were talking about
9    Shari Diamond's – Shari Diamond's article, which is
10   Exhibit 22.
11         Would you find Exhibit 22?
12         A.  Yes.
13         Q.  Okay.  Would you turn to page 253?
14         A.  (Complying.)
15         Q.  You see where she states, beginning at the last
16   paragraph before the subheading D, "Although many Courts
17   prefer open-ended questions on the grounds they tend to
18   be less leading, the value of any open-ended or
19   closed-ended question depends on the information it is
20   intended to elicit."
21         Do you agree with that?
22         A.  I wouldn't phrase it like that.  I would say
23   that the use of one question type or another depends on
24   what you're trying to measure.
25         Q.  Okay.  Then she goes on to state, "Open-ended

Page 127

1          ITAMAR SIMONSON
2    questions are more appropriate when the survey is
3    attempting to gauge what comes first to a respondent's
4    mind."
5          Do you agree with that?
6          A.  No.
7          Q.  And then she continues with, "Closed-ended
8    questions are more suitable for assessing choices" --
9          A.  I mean, let me correct.
10         They're also suitable when you are trying to
11   assess what comes to mind.  But their usefulness goes
12   much beyond that.
13         Q.  She then goes on to state, "Closed-ended
14   questions are more suitable for assessing choices
15   between well-identified options or obtaining ratings on
16   a clear set of alternatives."
17         Do you agree with that?
18         A.  Again, I wouldn't phrase it like that.  As I
19   said earlier, if what you're trying to do is get
20   people's preferences among three options, then, yeah,
21   that might be suitable.  Like, you know, toaster 1,
22   toaster 2 and toaster 3, then it's okay to just ask for
23   people's choices.
24         Q.  Or, "Did you see Casablanca?"  Option 1 is yes;
25   Option 2 is no.

Page 128

1          ITAMAR SIMONSON
2          A.  I would not even ask the question -- that's not
3    the way it would normally be asked.
4          What you would do is give a list of names, and
5    you'd say, "Which, if any, of the following names is the
6    name of a movie that you saw?"
7          Q.  Are you saying it's improper to ask a question,
8    "Did you see the movie Casablanca?"
9          A.  I think if that's the only question, I would
10   find some problem with that.
11         Q.  If I wanted to -- we were talking about
12   Casablanca.  Let's change it a little bit.
13         Are you familiar with the advertising that
14   occurred a number of years ago involving a character
15   called Mr. Clean?
16         A.  Yes.
17         Q.  Okay.  And I want to find out who -- whether
18   your students ever saw any Mr. Clean advertisements.  If
19   I recall correctly, that was a TV commercial that aired
20   for a number of years.
21         Do you remember those commercials?
22         A.  I don't know if it was limited to TV
23   commercials.  I think it was kind of a symbol of a
24   particular brand that right now escapes me.
25         Q.  Well, I want to find out if your students saw

Page 129

1          ITAMAR SIMONSON
2    the television commercials that involved Mr. Clean;
3    that's what I want to find out; that's what I want to
4    test.
5          Is it your view that -- the first question I
6    have to ask your students is:  Can you tell me all the
7    advertisements you've seen?
8          A.  No, that would be like the --
9          Q.  That would be like the movies --
10         A.  -- the movies that we discussed earlier.
11   Obviously, there are thousands and thousands of
12   commercials.
13         Q.  So what is the open-ended question that you
14   would precede, if any, when my question is:  Did you see
15   Mr. Clean?  And I can talk about whether I need to put
16   other choices in the closed-ended question, but what's
17   the open-ended question that you would use?
18         A.  I'm not sure exactly.  I need to think about it
19   exactly how you would do that.  I'm not even sure I
20   would use the term "Mr. Clean."
21         Q.  Well, that's what I want to find out.
22         A.  I'm not sure I understand.
23         Q.  I want to find out if your students saw the
24   commercials involving Mr. Clean --
25         A.  Right.

33 (Pages 126 to 129)

Itamar Simonson                                                    9/21/2011

Page 130

ITAMAR SIMONSON
1
2    Q. -- the character that was created for those
3  advertisements?
4    A. Right. But when you watch a commercial, it's
5  not like a name of a movie. It's a certain character
6  that appears in certain commercials. So it's not the
7  title of the commercial as "Mr. Clean." Mr. Clean is a
8  component of this commercial.
9        So, therefore, I don't think in that particular
10  example that I would use the term "Mr. Clean." But --
11    Q. What would you use?
12    A. I may show them a series of commercials,
13  including the one that you're talking about, and for
14  each one, ask them whether they've seen that commercial
15  before.
16        Again, some of those commercials would be what
17  I would call control commercials; in other words,
18  commercials that were not -- were never shown.
19    Q. But we're not talking about control. That's a
20  different issue.
21        I'm talking about open-ended questions.
22        What open-ended question would you precede my
23  question that focuses on whether your students saw a
24  commercial involving Mr. Clean?
25    MR. FETNER: Objection. I think the witness

Page 131

ITAMAR SIMONSON
1
2  has already answered that question --
3    MR. WEINER: You have your objection.
4    Q. Can I have the answer? What's the open-ended
5  question?
6    A. I didn't say that I would start with open-ended
7  question in that particular case. It's completely
8  different. So, yeah, I don't think I would.
9    Q. So when you state on page 14, quote, "Indeed,
10  open-ended questions and non-leading questions are just
11  as critical for our ability to derive reliable
12  conclusions based on a survey regarding a TV commercial
13  as they are with respect to our ability to rely on the
14  survey conducted by Dr. Jacoby in this case," close
15  quote, what are you referring to?
16    A. To the standard communication survey involving
17  TV commercials; in other words, what are the message --
18  the messages, I should say, communicated by the
19  commercial. This is the standard communication survey
20  involving commercials.
21        I cannot recall a single case in which a survey
22  was conducted to find out whether people had been
23  exposed to a particular commercial.
24        I guess, actually, let me correct that. Maybe
25  sometimes is it at issue. I've never been involved in

Page 132

ITAMAR SIMONSON
1
2  something like that, and that's certainly not what I was
3  referring to. I was referring to the standard
4  communication survey.
5    Q. Okay. Let's go back to paragraph 29, on
6  page 13.
7    MR. FETNER: 13.
8    MR. WEINER: Page 13, paragraph 29.
9    Q. What was the purpose for your quoting
10  Dr. Jacoby's article in paragraph 29?
11    A. That was his opinion about the virtue of
12  open-ended questions and the problems with close-ended
13  questions.
14    Q. You understood when you reviewed that paragraph
15  that Dr. Jacoby was talking about the use or
16  desirability of using closed-ended questions; is that
17  what you understood?
18    A. Yeah, he talks about -- if you look at the
19  sentence starts with "However," "However, closer
20  analysis reveals considerable support for demand
21  characteristics and threats to validity that make it
22  impossible to conclude that there was any deception
23  whatsoever."
24    Q. Okay. And what about the sentence before,
25  what's that referring to?

Page 133

ITAMAR SIMONSON
1
2    A. "It is argued that close-ended data revealed
3  deception."
4    Q. Is that what Dr. Jacoby said in his article?
5    A. I just read from his article.
6    Q. You just read what you have in your report.
7        I'm asking, is that what was said in his
8  article?
9    A. Are you saying my quote is not --
10    Q. That's exactly what I'm saying.
11    A. -- is not taken from his article?
12    Q. Let's take a look.
13        You have Exhibit 18?
14    A. I do.
15    Q. Let's look at page 7.
16        Now, isn't it true that Dr. Jacoby was not
17  talking about a general rule? What he was talking about
18  was the closed-end data that was contained as a result
19  of the survey by the FTC?
20    A. Give me just a minute here to refresh my
21  recollection of this article.
22    Q. Sure.
23    A. (Reviewing document.) Where did you read on
24  page 7?
25    Q. Start with your quote. The section that you

34 (Pages 130 to 133)

Itamar Simonson                                                    9/21/2011

Page 134

ITAMAR SIMONSON

1
2  quoted immediately comes after the subtitle of this
3  particular section of the article, which is entitled,
4  quote, "Were the data properly analyzed," question mark;
5  correct?
6       A. Yes.
7       Q. And then Dr. Jacoby goes on to discuss the data
8  that was elicited through the survey, through
9  Mr. Stewart's survey; isn't that correct?
10      A. (Reviewing document.)  Okay.  Could you repeat
11 the question, then, again?
12      MR. WEINER:  Could you read it back?
13      (Record read:  "And then Dr. Jacoby goes on to
14      discuss the data that was elicited through the
15      survey, through Mr. Stewart's survey; isn't that
16      correct?")
17      THE WITNESS:  Okay, I'm reading here, and I see
18 that he said exactly -- I mean, not the same -- the same
19 words, but moreover, the message that he's communicating
20 is exactly what I'm saying in my report.
21      And let me explain.
22      MR. WEINER:  Q.  Sure.
23      A. You see, if you look in the first paragraph
24 here, under the heading, okay, the sentence that starts
25 with, "Examination of...."  Do you see that?

Page 135

ITAMAR SIMONSON

1
2       "Examination of the raw data that's in
3  reference to the open-ended questions...."
4       Q. Yes.
5       A. You see that?
6       "...reveals the reason for this omission, not a
7  single," italicized, "verbatim response to any
8  open-ended question evidenced these themes.  The lack of
9  any evidence of likely deception in the open-ended
10 response is telling."
11      In other words, what Dr. Jacoby is telling you
12 is that open-ended questions are critical, and examining
13 the answers to open-ended questions is critical and is,
14 to use his term, telling.
15      Therefore, you need to include -- and I think
16 there's no ambiguity based on what he wrote.  And also
17 if you go back when he talks about question 11, there's
18 absolutely no ambiguity about the fact that Dr. Jacoby
19 correctly highlights the importance of open-ended
20 questions.  I don't think there's any ambiguity about
21 that.
22      Q. Let's go back.
23      In paragraph 29 of your report, you quote the
24 first sentence that appears under "Were the data
25 properly analyzed?"  Is that correct?

Page 136

ITAMAR SIMONSON

1
2       A. Yes.
3       Q. Then you eliminate the rest of that paragraph.
4       A. Exactly what I just read --
5       Q. You didn't just read the rest of the paragraph.
6       A. That's correct, I skipped, yes.
7       Q. You skipped.
8       And among the things that you skipped was the
9  sentence, for example, "Although Stewart's 1987
10 open-ended questions were capable of revealing instances
11 of the alleged deception, the coding scheme for
12 tabulating responses to these questions contain no such
13 capabilities."
14      So he was criticizing that; wasn't he?
15      A. Exactly what I just said.
16      Q. That's fine.  No, no, no --
17      A. Can I just answer --
18      Q. You just answered the question.
19      A. No, I did not.  If I may complete my answer.
20      Q. Go ahead.  Go ahead.
21      A. That's exactly the point.  I guess the only
22 argument I can see here that your question suggests is
23 that I did not cite all of the sentences in this article
24 written by Dr. Jacoby highlighting the importance of
25 asking open-ended questions and then analyzing properly,

Page 137

ITAMAR SIMONSON

1
2  and such an analysis is telling.
3       That's exactly -- now, you, I guess, say, well,
4  you know, why didn't you cite that?  Well, that would
5  just bolster the observation that I made.  For the sake
6  of brevity, in order not to copy the entire article, I
7  did not include the rest of the paragraph.
8       Q. You are attempting to take Dr. Jacoby's
9  criticism of a survey, both its open-ended and
10 close-ended aspects in a copy testing case and applying
11 it more universally; isn't that correct?
12      MR. FETNER:  Objection.
13      THE WITNESS:  No.  I rely on the principles
14 that Dr. Jacoby relies on, and these are the same
15 principles that I apply routinely, and he has applied in
16 many cases.
17      So, in other words --
18      MR. WEINER:  Q.  What are the principles, sir?
19      MR. FETNER:  Please let him answer the
20 question.
21      THE WITNESS:  I said the importance in such
22 surveys asking open-ended questions, analyzing them
23 properly, not asking leading questions, asking filter
24 questions, all of the things that he's talking about
25 right here.

One Penn Plaza, NYC                    Toby Feldman, Inc.                     (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS     (800) 246.4950

Page 138

ITAMAR SIMONSON

1
2   MR. WEINER:  Q.  In analyzing a copy testing
3   survey; correct?  Correct?
4       A.  No.
5       Q.  No?  He's not?  He's not doing that?
6       A.  He is criticizing, but he's talking about
7   general principles, because --
8       Q.  Sir --
9       A.  -- if I may just complete -- you don't allow me
10  to complete my answer, if I may.
11      Q.  Go ahead.
12      A.  Obviously, 99.9 percent of the readers of this
13  article are not familiar with the details of the case.
14      Q.  Did you do a survey to establish that?
15      A.  I did not do a survey, but there is no reason
16  why they would be.
17      Okay.  Now --
18      Q.  The article talks about it.
19      MR. FETNER:  Bob, please stop cutting the
20  witness off --
21      MR. WEINER:  He's just volunteering
22  information.  I would like -- there's no question that's
23  on the record, so I'm --
24      MR. FETNER:  I believe your last words to the
25  witness were, "Please continue."

Page 139

ITAMAR SIMONSON

1
2       MR. WEINER:  Q.  Go ahead.  Go ahead.
3   Continue.
4       A.  In other words, what he's doing here, he's
5   explaining what principles should have guided the judge,
6   which Dr. Jacoby believed were not followed.  These are
7   general principles.
8       Obviously, the specifics of this copy test,
9   they don't matter.  Maybe they mattered in the process
10  of that litigation.  But he published it in a general
11  purpose article -- journal, which means that he was
12  trying to teach people about how surveys need to be
13  conducted.
14      MR. WEINER:  Q.  That's what you understand
15  that this reason that this article was published was to
16  teach people about the way the surveys are to be
17  conducted, even though the article is entitled, quote,
18  "Consumer Research in FTC Versus Kraft, a Case Heads You
19  Win, Tails You Lose," is that what you're telling me?
20      A.  That's exactly what I'm telling you.
21      Q.  Okay.
22      A.  And let me explain to you.  I'm sitting on nine
23  editorial boards, okay?
24      Q.  M-hm.
25      A.  And I published in this particular journal --

Page 140

ITAMAR SIMONSON

1
2   in fact, an article that I published here received the
3   award for the best article published during a period of
4   three years.  I know this -- this journal.
5       The journal would not publish something that's
6   limited in its relevance to only one particular case.
7   The journal is publishing something that's the criteria
8   that I'm using as a reviewer.  Only things that are of
9   general interest that could educate a broad segment of
10  researchers.
11      Q.  Why did you leave out the word "the" in the
12  second part of your quote?  "It is argued," you have it
13  in your report, "that closed-end data reveals
14  deception," when the actual quote says, "the closed-end
15  data reveals deception."
16      Wasn't Dr. Jacoby referring to the closed-end
17  data that was revealed in that case, not a general rule?
18      A.  I'm not sure how to answer the question.  Are
19  you saying that I noticed the word "the" and I said,
20  okay, let's see if I can misquote and mislead?  I
21  mean --
22      Q.  You did misquote.
23      A.  Okay, if you say that I misquote --
24      Q.  Did you not misquote?  It's not an accurate
25  quote.

Page 141

ITAMAR SIMONSON

1
2       A.  Apparently, I omitted the word "the," and if we
3   go word by word, we may find some other typos that I
4   included.  It always happens.
5       Q.  Now, wasn't this article an actual response to
6   another article that Mr. Stewart had done earlier?
7       A.  I thought that both articles were published in
8   the same issue.  If I recall correctly, I may have
9   missed the beginning of this, but Dr. Jacoby published
10  his article.  The next article was an article by
11  Stewart.  And I think if I recall correctly, there might
12  have been another article, but I don't remember.
13      Q.  Would it be fair to say that over time,
14  closed-ended questions have become increasingly popular?
15      A.  No, on the contrary, if you read Dr. Krosnick's
16  more recent review, he concluded based on a great deal
17  of research that concerns that had a reason initially,
18  in the old days, about open-ended questions have
19  diminished, and it's become clearer and clearer that in
20  many cases, closed-ended questions are biasing
21  respondents.
22      Q.  Let me show you Krosnick.
23      This is the article that you referred to in
24  your report; is that correct?
25      A.  That is correct.

36 (Pages 138 to 141)

Itamar Simonson                                    9/21/2011

Page 142

ITAMAR SIMONSON
1
2        (Plaintiff's Exhibit No. 24 was
3        marked for identification.)
4        MR. WEINER:  Q.  That's Exhibit 24.  Let's turn
5  to page 543.
6        A.  544?
7        Q.  543.
8        Open-ended versus closed questions.  You see
9  where it says at the end of that paragraph, "Over time,
10 closed-ended questions have become increasing popular,
11 whereas open-ended questions have been asked less
12 frequently"?
13       A.  That's citing something from 1987 --
14       Q.  Yes.
15       A.  -- so that would be 24 years ago.
16       Q.  I understand.
17       A.  So, yes --
18       Q.  As of that time, was that true?
19       A.  During that period, but now that we have
20 accumulated evidence indicating that -- the magnitude of
21 flaws of closed-ended questions, we used them only when
22 necessary.
23       Q.  But this is the research you cited.
24       A.  Yeah, that's right.
25       Q.  And at the time that this article was written,

Page 143

ITAMAR SIMONSON
1
2  which I assume you cited it because you accepted it, it
3  states that over time, closed-ended questions have
4  become increasingly popular as of the time this article
5  was written; is that correct?
6        A.  That's incorrect.  The Krosnick article was
7  published in 1999.
8        Q.  Okay.  You think he's stopping at 1987, when he
9  publishes something in 1999?
10       A.  I'm not aware, and I think it's highly unlikely
11 that he conducted any study to -- subsequent to 1987 or
12 subsequent to what Mr. -- Dr. Smith said in '87 to find
13 out the trend.
14       Q.  Now, essentially, what Dr. Krosnick was saying
15 is that open-ended questions aren't as bad as people
16 thought; isn't that correct?  That's what he goes on to
17 prove?
18       MR. FETNER:  Objection.
19       THE WITNESS:  No --
20       MR. WEINER:  Q.  Let's turn to 544, where he
21 states, "Thus, open-ended questions seem to be more
22 viable research tools than seem to be the case."
23       Isn't that the core of what he was saying;
24 they're not as bad as what people thought they were?
25       A.  No, what he's saying, at the time -- if you go

Page 144

ITAMAR SIMONSON
1
2  back to, say, the Schuman and Presser book, they said,
3  well, there are advantages to closed-ended questions;
4  there are advantages to open-ended questions; each one
5  also has some disadvantages.
6        What Dr. Krosnick is saying is that, in fact,
7  turns out that those limitations of open-ended questions
8  have become -- have turned out to be less significant.
9        So on balance, now it's clear that whenever
10 possible and appropriate, open-ended questions should be
11 preferred.
12       Q.  But you've already told me that there are
13 surveys that you don't need to use open-ended questions.
14       A.  There are certain surveys you have to look.
15 But let's be clear, it's not anything goes.  It's not
16 like, well, it's just a matter of judgment.  No, it's
17 not a matter of judgment.  It's a matter of principle of
18 what you're trying to find out.
19       For example, in the present matter, to the
20 extent that Dr. Jacoby was interested in what people
21 knew, if anything, about the Shin incident, any
22 conceivable involvement they might have known about with
23 Yale, any information they had, any beliefs they held,
24 they should have asked open-ended questions instead of
25 planting certain responses in their mind.

Page 145

ITAMAR SIMONSON
1
2        Q.  Okay.  Let's see if I can understand through an
3  example.
4        A former governor of California was Arnold
5  Schwarzenegger.  I'm sure you're familiar with him.
6        A.  Not personally, but I know of him.
7        Q.  You know, "familiar" being you know who he is.
8        And I take it that you became aware of the fact
9  through the press in California that Mr. Schwarzenegger
10 fathered a love child with a housekeeper?
11       A.  I heard that.
12       Q.  Okay.  Now, are you saying if I want to find
13 out whether that event caused people's view of
14 Mr. Schwarzenegger's reputation to change, that's what I
15 want to find out, find out if the Court Reporter in this
16 office or the Videographer thought less of
17 Mr. Schwarzenegger as a result of that event, now, I
18 could design a survey that says, "Are you aware of this
19 incident?  And has this incident caused you to change
20 your view of Mr. Schwarzenegger?"
21       But you would tell me that that wouldn't be
22 proper; correct?
23       A.  I don't know if I would start with that
24 question.  But I agree with you that people in
25 California, many of them would be aware of this

37 (Pages 142 to 145)

Page 146

## ITAMAR SIMONSON

1  ITAMAR SIMONSON
2  particular affair.
3         However, suppose the following: Suppose that
4  in addition to fathering a child with the housekeeper,
5  Schwarzenegger also neglected his kids, or maybe he did
6  a poor job of acting in Terminator or something, okay?
7         Now, I would not say, "Have you or haven't you
8  heard about Schwarzenegger neglecting his kids?"
9         Oh, unless they say, "No, I don't know," you
10 say, "Don't you remember that's the case where Maria was
11 waiting for him at some place, and he promised he would
12 show up, and he didn't show up?" That would be
13 definitely improper.
14        You see, the love child, that was major
15 headlines. There were no other components speaking of
16 love childs. There was no -- also an affair involving
17 Shin and the aide to the president. There was no trial
18 involved relating to all those other issues.
19        In other words, with all due respect to
20 Schwarzenegger affair, it's completely different.
21     Q. Well, do you remember reading an article about
22 how Schwarzenegger was accused of womanizing in
23 connection with the movies that he made? You never saw
24 those articles in California?
25     A. I saw it during the elections, yeah, I do

Page 147

## ITAMAR SIMONSON

1  ITAMAR SIMONSON
2  remember.
3     Q. You remember that.
4         So when I ask, I want to know a really simple
5  question, which is: Did the fathering of the love child
6  cause you to change your view of Arnold Schwarzenegger?
7  That's what I want to find out. Are you saying to me I
8  now have to find out from the people I'm asking, the
9  Court Reporter in this room, the Videographer in this
10 room, as to, did you read those other articles about
11 womanizing way back when and filter that out or
12 something? Is that what you are saying?
13     A. No. What I'm saying is that in that particular
14 case, you would ask the respondents, "What's your
15 opinion of Schwarzenegger?"
16        And let's say that someone says on a 10-point
17 scale, it's a 5. Okay. "What causes you to give him a
18 5 instead of a 10?" Okay. "What do you know about
19 Schwarzenegger?"
20     Q. You're asking open-ended questions?
21     A. Exactly.
22     Q. I want to find out not whether they thought the
23 womanizing caused the problem, or he beat his children.
24 I want to focus on, "Did this love child cause you to
25 change your opinion?"

Page 148

## ITAMAR SIMONSON

1  ITAMAR SIMONSON
2         So you're telling me if I was to design a
3  survey that simply said, "Okay, are you familiar with
4  this event? And I want to know whether it caused a
5  change in your view of Schwarzenegger," in your expert
6  opinion, that would be improper?
7     A. That would be a problem, not as significant as
8  in the case of Dr. Jacoby's survey. That would be a
9  problem because by creating what we call focalism, in
10 other words, you only focus their attention on one
11 thing, you're creating what is known as impact bias.
12 You are magnifying the real impact of that incident by
13 calling the respondent's attention to that.
14        To the extent that this incident had an effect,
15 and it may very well be the case that it did, in that
16 case, respondents will tell you about it. Just tell me,
17 what do you think about Schwarzenegger? What has
18 affected -- what events, if any, have affected your
19 evaluation of Schwarzenegger? People will tell you, "I
20 heard about this, and he betrayed his wife," and so on.
21     Q. Do you think it would be improper to have a
22 follow-up question as, you know, if your testimony that --
23 "Well, do you think that having a love child with your
24 housekeeper brought shame on Maria Shriver," do you
25 think that would be an inappropriate question?

Page 149

## ITAMAR SIMONSON

1  ITAMAR SIMONSON
2     A. I would not ask it that way.
3     Q. Okay.
4     A. I would ask it --
5     Q. That's fine. I got your answer.
6         And how about if I was to say, "Did it bring
7  shame on the State of California because he was
8  Governor?"
9     A. I would not ask that either.
10    Q. Okay. How would you ask it?
11        MR. FETNER: Objection.
12        THE WITNESS: Well, what's the purpose of the
13 study?
14        MR. WEINER: Q. I want to find out whether
15 people think his actions brought some kind of
16 reputational diminishment to the State of California as
17 Governor.
18     A. Sure. So I'll ask people about their
19 evaluations of the State of California. I may even ask
20 them what causes them to have that evaluation. I may
21 even go as far as to suggest that to opine whether or
22 not the government had any impact and then ask them what
23 about the government impacted their evaluation of the
24 State.
25     Q. Now, you also in your report talk about

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson                                                    9/21/2011

Page 150

ITAMAR SIMONSON
1
2  something you refer to as demand characteristics; is
3  that correct?
4      A. Right.
5      Q. What are demand characteristics?
6      A. Situation where the questions or procedure
7  suggests or provide cues to the respondents what the
8  expected answer is.
9      Q. And how many surveys have you designed to have
10 no demand characteristics?
11     A. I try to do it every time.
12     Q. I didn't ask you whether you tried to.
13         How many actually have no demand
14 characteristics?
15     A. I'm not aware of any studies I've done that
16 suffered from demand characteristics. It's possible
17 that someone would disagree.
18         I mean, for example, when you're submitting an
19 article to a journal, you have reviewers in a refereed
20 journal, and in some cases, they say, well, this
21 question or this study suffers from demand
22 characteristics.
23         MR. WEINER: What number is this?
24     Q. Let me show you Exhibit 25.
25         (Plaintiff's Exhibit No. 25 was

Page 151

ITAMAR SIMONSON
1
2         marked for identification.)
3         MR. WEINER: Q. Is -- this is an article
4  entitled "On the Social Psychology of the Psychological
5  Experiment: With Particular Reference to Demand
6  Characteristics and Their Implications," by Martin Orne
7  of the Harvard Medical School.
8         Is this one of the articles that you cited to
9  me?
10     A. I believe so.
11     Q. And it's one of the articles on which you rely;
12 is that correct?
13     A. Yeah. I think he was the first one who
14 introduced the term. That was, I think, back in 1964.
15     Q. Okay. Would you look at page 779?
16     A. (Complying.)
17     Q. And I want to know if you agree with the
18 statement that Dr. Orne makes. It's in the first full
19 paragraph of the second column. Quote, "It should be
20 clear that demand characteristics cannot be eliminated
21 from experiments. All experiments will have demand
22 characteristics, and these will always have some
23 effect," close quote.
24         Do you agree with that?
25     A. I don't think that by itself is meaningful.

Page 152

ITAMAR SIMONSON
1
2  You can say that anyone who participates in a survey or
3  a study, there might be some slight demand
4  characteristics there.
5         However, it's not a black-and-white kind of
6  thing. The question is magnitude. If simply someone
7  participated in a study, that is not what we refer to as
8  demand characteristics.
9         Demand characteristics are cases -- or occur in
10 studies where there's something much stronger than
11 something as basic or minimal as impact such as
12 participating in a study.
13     Q. Let's go on to page 780.
14         And do you see where he states --
15     A. Which page?
16     Q. Next page.
17         The third full paragraph, quote, "As we have
18 pointed out, it is futile to imagine an experiment that
19 could be created without demand characteristics," close
20 quote?
21         Do you agree with that statement?
22     A. I don't think as I use the term "demand
23 characteristics" and as it is used today in the
24 literature, I don't think that the kind of demand
25 characteristics that he refers to when he talks about

Page 153

ITAMAR SIMONSON
1
2  they're always present would qualify.
3         And let me be clear: In other words, he may be
4  right in the sense that there is a tiny bit of demand in
5  any laboratory study or experiment. But that's not
6  something we are concerned about. We are concerned
7  about demand characteristics where they have measurable
8  significant effect on the responses.
9      Q. Well, can you tell me where in Exhibit C in any
10 of the articles that you cite as the support for your
11 conclusions there is a discussion of the demand
12 characteristics other than what we just see in
13 Dr. Orne's article?
14     A. I teach --
15     Q. I'm sorry. I'm talking about in what you
16 cited.
17     A. No, but as I said, I teach demand
18 characteristics. I talk about it about a couple of
19 times a week. When I evaluate articles as a journal
20 referee, I talk about that often.
21     Q. That's not the question I asked you.
22         I asked you --
23     A. I didn't cite other sources because that's
24 something that I do all the time. This article, I
25 think, is worth being cited because that's the original

39 (Pages 150 to 153)

Itamar Simonson                                              9/21/2011

Page 154

ITAMAR SIMONSON
1  ITAMAR SIMONSON
2  article published back in 1964.
3        Since then, we've learned a great deal about
4  demand characteristics. This is what I teach. This is
5  how I evaluate articles and studies. And that's what I
6  was referring to.
7        But I think this article, you know, is
8  important because it was the first one in this area.
9    Q. In fact, it's the only article you cite.
10   A. I believe you're right.
11        MR. FETNER: Objection.
12        MR. WEINER: Q. Okay. And that's cited on
13  page 14, footnote 9, which is a footnote contained in
14  paragraph 30; is that correct?
15   A. If you say so, I'll believe that.
16   Q. Okay. I also cite a case called Simon
17  Property; is that correct?
18   A. Yes.
19   Q. Is that a case you were involved in?
20   A. I was.
21   Q. And did you make a criticism in that case that
22  the survey involved demand characteristics?
23   A. It was awhile back, but I think I did, yeah. I
24  think that was back in '99.
25        (Plaintiff's Exhibit No. 26 was

Page 155

1  ITAMAR SIMONSON
2        marked for identification.)
3        MR. WEINER: Q. Let me show you Exhibit 26.
4  Is that the case that you cited?
5   A. (Reviewing document.) It is.
6   Q. Okay. And you -- I would like to draw your
7  attention to page 14.
8        This is a case that you cite in paragraph 30 as
9  well; is that right?
10   A. The Beneficial one?
11   Q. No, I'm talking about Simon Property, footnote
12  10, paragraph 30.
13        Do you have the report there?
14   A. Yes. That's the Simon Property case that I
15  cited, yes.
16   Q. Page 14.
17        "The courts have also recognized" --
18   A. Did I cite page 14, do you say?
19   Q. Well, why don't you go to page 14?
20        MR. FETNER: You mean page 14 of his report
21  or --
22        MR. WEINER: Page 14 of his report.
23        MR. FETNER: Okay. I misunderstood, too.
24        THE WITNESS: I see.
25        MR. WEINER: Page 14, paragraph 30, you say,

Page 156

1  ITAMAR SIMONSON
2  "The courts have also recognized the significance of the
3  demand effects, and such problems have contributed to
4  the rejection of surveys," close quote.
5        Do you know of any court that has rejected a
6  survey based solely on the effect of the demand or
7  demand effects?
8   A. Not solely, but it was highlighted in a number
9  of decisions.
10   Q. The one you cite -- and let's go to page 14 of
11  the decision.
12   A. (Complying.)
13   Q. First of all, there's a reference to the Squirt
14  Co. format. S-q-u-i-r-t, capital C-o.
15        Do you know what the Squirt Co. format is?
16   A. Yes.
17   Q. What is it?
18   A. Well, in that case, it refers to a survey
19  methods involving sequential presentation of marks.
20   Q. And the Court says, "To some extent, these
21  potential demand effects are inherent in the Squirt Co.
22  format."
23        Do you agree with that, that it's inherent in
24  the format?
25   A. Yes.

Page 157

1  ITAMAR SIMONSON
2   Q. And the Squirt Co. format is one of two
3  well-recognized formats in the trademark area; isn't
4  that correct? The other being Eveready?
5   A. No, it's more than that. And Squirt's could be
6  done in many different ways.
7   Q. Do you agree that there is a potential demand
8  effect inherent in that particular format?
9   A. No. It depends on -- the way they did it, in
10  other words, the way the other side proposed to do it?
11   Q. That's not what the Court says. It says, "To
12  some extent, these potential demand effects are inherent
13  in" --
14        MR. FETNER: Bob, please stop cutting him off,
15  please.
16        THE REPORTER: Counsel, I didn't get your
17  question because when you interrupt each other --
18        MR. WEINER: Q. The Court says, quote, "To
19  some extent, these potential demand effects are inherent
20  in the Squirt Co. format," closed quote.
21        It's not talking about what lawyers did in this
22  case. It's talking about the format in general; isn't
23  that correct?
24        MR. FETNER: You didn't read the second half.
25        MR. WEINER: Q. "...in which the interviewer

40 (Pages 154 to 157)

Itamar Simonson                                                    9/21/2011

Page 158

1               ITAMAR SIMONSON
2   is instructed to ask the question, raising the issue
3   about a possible relationship or affiliation between the
4   two marks or entities."
5       A. Yeah, I think in that case, there is. Depends
6   how you do it, depends on the case, but in the context
7   of that case, it is true.
8           Moreover, as you can see from the beginning of
9   the section about demand effects on page 13, he was
10  talking about this particular case. He said, "There is
11  a third significant problem with SPG's proposed home
12  page survey. The survey's questions implicitly suggest
13  to the respondent the possibility of a business
14  connection between the SPG and mySimon home pages that
15  the respondent may not have made in his or her own
16  citing from my report."
17      Q. Let's be clear about what I was asking.
18          First, I'm asking is whether you understood the
19  judge to be saying that inherent in any Squirt Co.
20  format, there is the potential of a demand effect?
21      A. I understood that to mean the Squirt format as
22  he understood it in the context of that case. I don't
23  know --
24      Q. I'm going to read --
25      A. If I may just finish.

Page 159

1               ITAMAR SIMONSON
2       Q. Yeah, continue.
3       A. I doubt that the judge, who, obviously, has a
4   lot of other things he needs to know as the judge, I'm
5   not sure if he was familiar with the many variants of
6   Squirt and when they are or are not appropriate.
7       Q. So it's clear in the record as to whether this
8   is merely the judge commenting on the plaintiff's action
9   in this case or the defendant's actions in this case or
10  more generally on the Squirt Co. Method, I will read the
11  paragraph: Quote, "To some extent, these potential
12  demand effects are inherent in the Squirt Co. format in
13  which the interviewer is instructed to ask a question
14  that raises the issue about a possible relationship or
15  affiliation between the two marks or entities," period.
16          "However, SPG is trying to state the Squirt Co.
17  format a step farther than any other Court has taken it
18  by introducing an additional possible answer. This
19  Court does not necessarily view this problem as so
20  serious by itself as to require exclusion of the home
21  page survey, but it adds to the other reasons for
22  excluding the survey."
23          So am I correct -- close quote. So am I
24  correct that the Court says inherent in any Squirt Co.
25  survey is a demand problem, but even here, where the

Page 160

1               ITAMAR SIMONSON
2   party took it even further, that standing alone was not
3   sufficient to exclude the survey?
4       A. I thought --
5           MR. FETNER: Objection.
6           THE WITNESS: I thought I already answered
7   that.
8           I said as he understood Squirt format, as he
9   describes it here, that's what he was referring to.
10          MR. WEINER: What's my next exhibit?
11              (Plaintiff's Exhibit No. 27 was
12              marked for identification.)
13          MR. WEINER: Q. I'm going to show you
14  Exhibit 27.
15          Are you familiar with Schuman and Presser?
16      A. I've reviewed this book at some point.
17      Q. Do you agree with their conclusions?
18          MR. FETNER: Objection.
19          THE WITNESS: I said earlier, there are some
20  things I agree with and others I don't. It's a fairly
21  sizable book.
22          MR. WEINER: Q. Okay. Well, do you understand
23  that, among other things, Schuman and Presser were
24  attempting to determine whether there were presumed
25  advantages to open-ended questions?

Page 161

1               ITAMAR SIMONSON
2       A. I'm not sure I understand the question.
3       Q. Do you understand that, among other things,
4   Schuman and Presser were trying to determine whether, in
5   fact, that certain presumed advantages to open-ended
6   questions were justified?
7           MR. FETNER: Objection.
8           THE WITNESS: I didn't think about it in those
9   terms. I know they have some opinions about open-ended
10  and closed-ended questions and when each is appropriate
11  and so on.
12          MR. WEINER: Q. Well --
13      A. I think Dr. Krosnick might have even cited to
14  their concerns about different types of questions in his
15  more recent review from 1999.
16      Q. Would you look at page 110?
17      A. (Complying.)
18      Q. You see paragraph No. 4?
19          Would you read that and tell us what you
20  understood that paragraph to be saying?
21          MR. FETNER: Do you want him to read it to
22  himself?
23          MR. WEINER: Yes.
24          THE WITNESS: (Reviewing document.) I think
25  probably -- do you have the entire book here, because

41 (Pages 158 to 161)

Itamar Simonson                                        9/21/2011

Page 162

ITAMAR SIMONSON
1    ITAMAR SIMONSON
2    they conducted some specific tests of different
3    principles in very different contexts.  I believe they
4    were interested in attitudes, attitude measurements, if
5    I recall correctly.  Nothing to do with what we're
6    dealing with here.
7         So, therefore, I don't think that their
8    discussion here is particularly relevant.  But I think
9    they're saying here that in the particular study they
10   conducted, they didn't find the problem of social
11   desirability be a significant problem.
12        MR. WEINER:  Q.  Well, actually, they start
13   paragraph 4 by saying, quote, "It is often assumed that
14   closed-ended questions bias respondents by presenting
15   attractive alternatives that they would not have thought
16   of themselves if the problem was social desirability."
17        And would it be fair to state that they have
18   concluded, that is, Presser and Schuman have concluded
19   that assumption was not true?
20        A.  In a very different context.  For example, you
21   just read the word "attractive," which tells you how
22   irrelevant it is.
23        For example, in the present case, we're not
24   dealing with anything that has to do with
25   attractiveness.  It's really completely irrelevant.

Page 163

ITAMAR SIMONSON
1    ITAMAR SIMONSON
2    Those studies that they base their book on are
3    completely irrelevant to the issues in this case.
4         Q.  Could you tell me, sir, since you do cite
5    Schuman and Presser in your list of publications that
6    you relied upon, precisely where in that book I need to
7    look to see what you relied upon?
8         A.  You know, I don't remember.  I know that they
9    do talk about question order effects, if I recall
10   correctly.  But sitting here now, I don't remember if
11   that was the issue that I cited them for.
12        Q.  So you cited them for some things you agree
13   with, and there are other things you didn't agree with?
14        A.  Yeah, that's quite possible.
15        Q.  Are Schuman and Presser among those experts to
16   whom you were referring earlier regarding the proper
17   survey standards?
18        A.  I think in 1991, I think their book was
19   definitely worthwhile and led to further investigation,
20   so I think that was a good book at that time.
21        Q.  Do you know who Terence Shimp, Eva Hyatt and
22   David Snyder are?
23        A.  I know Terry Shimp.
24        Are you referring to their demand effect
25   article?

Page 164

ITAMAR SIMONSON
1    ITAMAR SIMONSON
2         Q.  Yes.
3         A.  Okay.
4         Q.  What do you know about that article?
5         A.  I haven't looked at it in a long, long time.
6         Q.  Well, did you once read it?
7         A.  I think I probably did, at least the abstract.
8         Q.  Do you recall whether you agreed with it?
9         A.  I don't remember what's in the article.
10        Q.  Do you know if it talks about demand effects
11   and closed-ended questions?
12        A.  I do not recall.
13        Q.  Okay.  And who are -- who is Terry Shimp?
14        A.  He's emeritus professor.  We used to be on the
15   faculty of University of South Carolina.
16        Q.  Is he someone you respect as an expert in the
17   field?
18        A.  Yeah.  I don't know if he's expert in surveys,
19   but in general, in the area of consumer behavior, he's
20   someone I respect.
21        Q.  Okay.  What is a control group?
22        A.  A control group is often used to estimate the
23   level of noise or error that is resulting from, say,
24   certain biases of the survey from guessing, all sources
25   of noise.

Page 165

ITAMAR SIMONSON
1    ITAMAR SIMONSON
2         Q.  Well, when -- the use of a group, is that a
3    separate set of people who are asked questions?
4         A.  Yes.
5         Q.  And how does that get set up, if you can
6    explain it to me?
7         A.  Well, if you're using a control group, let me
8    give you an example.  I did a study in an advertising
9    dispute involving AT&T and Verizon.  And Verizon said
10   that the fact that AT&T commercials used the terms --
11   the term "more bars in more places" implies to
12   consumers -- implies to consumers that the AT&T network
13   is more efficient.  Whereas AT&T said, "No, all it means
14   is coverage; we have broader coverage."
15        So I conducted a survey on behalf of AT&T using
16   commercials, AT&T commercials.  In a test group, we
17   tested the original commercial.  In the control group,
18   we omitted the sentence or the slogan "more bars in more
19   places."  Then both groups were asked the same questions
20   about the takeaways from the commercial and some other
21   questions.
22        MR. WEINER:  Okay.  I think our tape is about
23   to run out.  Why don't we take a short break, ten-minute
24   break so we can change the tape?
25        THE VIDEOGRAPHER:  This now marks the ending of

42 (Pages 162 to 165)

Itamar Simonson                                                    9/21/2011

Page 166

ITAMAR SIMONSON
1
2  tape labeled No. 2 in the videotaped deposition of
3  Itamar Simonson. We're now going off the record. The
4  time is 2:22.
5       (Recess taken: 2:22 p.m. - 2:32 p.m.)
6       THE VIDEOGRAPHER: This now marks the beginning
7  of tape labeled No. 3 of the videotaped deposition of
8  Itamar Simonson. We're now going back on the record.
9  The time is 2:32.
10      MR. WEINER: Q. Could you pull out Exhibit 22,
11 which is the Shari Diamond chapter? And if you would,
12 could you turn first to page 273?
13      A. 273?
14      Q. Yes.
15      A. (Complying.)
16      Q. You see that she defines a filter question as a
17 question asked of respondents to screen out those who do
18 not have an opinion on the issue under investigation
19 before asking them the question properly? Do you see
20 that?
21      A. I do.
22      Q. Do you agree with that definition?
23      A. Yeah, I think that's one way to define it.
24      Q. If you turn to the next page, 275, it defines
25 quasi-filter question as a question that offers a,

Page 167

ITAMAR SIMONSON
1
2  quote, "don't know," closed quote, or, quote, "no
3  opinion," closed quote, option to respondents as part of
4  a set of responsible alternatives used to screen out
5  respondents who may not have an opinion on the issue
6  under investigation.
7       Do you see that?
8       A. I do.
9       Q. Do you agree with that?
10      A. Yeah.
11      Q. Now, have you used quasi-filter questions?
12      A. Sometimes.
13      Q. And have you used filter questions?
14      A. Yes.
15      Q. And under what circumstances do you use
16 quasi-filter as opposed to filter questions?
17      A. Well, in some cases, say, like confusion
18 surveys, I may ask, the two marks are put out by the
19 same company, the two marks are put out by different
20 companies, or you have no opinion or don't know? So
21 that will be a quasi-filter question where you
22 explicitly state the "no opinion" or "don't know"
23 response option.
24      Q. Do you ever instruct respondents prior to
25 asking any closed-ended questions that they have the

Page 168

ITAMAR SIMONSON
1
2  option of saying they don't know?
3       A. I always do that at the beginning of a survey,
4  but that would not be a quasi-filter question.
5       Q. Okay. Now, turning to page -- get my page
6  back.
7       249.
8       A. Are we talking about my report, or which --
9       Q. If your report has 249, we're going to be here
10 a long time.
11      A. No, you're right. You're right.
12      (Complying.) Okay.
13      Q. You see where the heading of this topic is,
14 "Were filter questions provided to reduce guessing?"
15      Is the purpose of the filter question to reduce
16 guessing?
17      A. I think it goes beyond that. But I think
18 guessing the part of that.
19      Q. What does it go beyond to include?
20      A. Well, to the extent that the response options
21 suggested one of the presented options is the correct
22 answer, then it has a leading component to it,
23 especially if one of the response options appears to be
24 the correct answer.
25      Q. When you say something appears to be the

Page 169

ITAMAR SIMONSON
1
2  correct answer, how does one determine whether something
3  appears to be the correct answer?
4       A. It depends on each survey and each context.
5       Q. Give me an example.
6       A. "Have you heard that Schwarzenegger abuses
7  women, does not abuse women, has never abused women, or
8  don't you know?"
9       Q. What's the correct answer?
10      A. The correct answer is, yeah, he has abused
11 women.
12      Q. How do you discern the correct answer is he has
13 abused women from what you have posed?
14      A. Because I've heard vaguely, even though --
15 let's assume that I'm a respondent who has heard some
16 negative things about Schwarzenegger and women, and the
17 fact that you phrased a question in such a way suggests
18 to me that, yeah, this is probably what I'm supposed to
19 know.
20      Q. So I ask you the question as -- let's put it
21 this way: Has your opinion of Schwarzenegger changed as
22 a result of your knowledge that he fathered a love
23 child? What's the correct answer?
24      A. So what are the response options? Yes or no?
25      Q. Yes or no. What is the correct answer?

43 (Pages 166 to 169)

Itamar Simonson                                                9/21/2011

Page 170

ITAMAR SIMONSON
1
2      MR. FETNER: Object to the form.
3      THE WITNESS: I don't know. I have to think
4  about that particular one.
5      MR. WEINER: Q. What would you need to think
6  about?
7      A. I'm not sure. I'm sitting here in a
8  deposition, and you're asking me to tell you whether it
9  does or it doesn't, so I'm not sure I can give you an
10 answer.
11     Q. Well, you're aware of the love child incident;
12 right?
13     A. Yes.
14     Q. I'm now asking you the question as part of this
15 deposition.
16     Has your opinion of Schwarzenegger changed as a
17 result of your knowledge of that incident? What's the
18 correct answer?
19     MR. FETNER: Objection.
20     THE WITNESS: Given what I know about people's
21 ability to answer such a question, I would tell you I
22 don't know because I know that I cannot know the answer
23 to such a question because I do not know what affects my
24 opinion.
25     However, if you ask me that question, I said

Page 171

ITAMAR SIMONSON
1
2  well, yeah, I know about it. That's a bad thing. So it
3  probably suggests to me that I should have changed my
4  opinion of Schwarzenegger. So I think you could say
5  that it does have a leading component.
6      MR. WEINER: Q. So your -- as I understand
7  what you just told me, when I want to find out what you
8  thought about it, whether it changed your opinion, by
9  asking you the question, it has a leading component and
10 it's leading to a correct answer, but you don't know
11 what answer I'm looking for, I may be his first cousin,
12 for all you know. So maybe I'm looking for the answer
13 it didn't change. How do you know what the answer is?
14     MR. FETNER: Objection.
15     THE WITNESS: I'm not sure I understand.
16 What's the question?
17     MR. WEINER: Q. You're saying that the
18 question leads someone to give the correct answer. And
19 I'm trying to understand how you determine what the
20 correct answer is.
21     A. Well --
22     MR. FETNER: Objection.
23     You can answer. I'm sorry.
24     THE WITNESS: Here, we're sitting in a
25 deposition, you know, with all due respect to

Page 172

ITAMAR SIMONSON
1
2  Schwarzenegger, I would like a little more time and
3  maybe some empirical research to figure out what -- how
4  people interpret that question.
5      In the case of Dr. Jacoby's surveys, I did
6  spend time to analyze his survey and results and came to
7  certain conclusions. So if you ask me right now about
8  Schwarzenegger, I'm not sure.
9      MR. WEINER: Q. About a week ago, I got a call
10 from a survey company in New York wanting to know
11 whether I thought Mayor Bloomberg was doing a good job,
12 and they asked me that exact question.
13     In your view, by asking me that question, I was
14 being programmed, so to speak, to say yes or no?
15     MR. FETNER: Objection.
16     THE WITNESS: Again, I haven't thought about
17 it. No, I wouldn't think so. That seems like a
18 legitimate question to me.
19     MR. WEINER: Q. It was a closed-ended
20 question: Do you think Mayor Bloomberg's doing a good
21 job?
22     A. Yeah, I think --
23     Q. Is there a demand characteristic to that?
24     A. I cannot think of any, but, you know, give me
25 more time. I have to think about it. It's certainly

Page 173

ITAMAR SIMONSON
1
2  not something that jumps at me.
3      Q. Okay. Now, looking back at page 249,
4  Dr. Diamond provides three ways in which filter
5  questions can be asked; am I correct?
6      A. I don't know.
7      Q. Why don't you read Section 249, 250, if you'd
8  like, up through 251, if you want. My focus is really
9  on 249 and 250.
10     A. (Reviewing document.)
11     Q. She offers three ways in which filter questions
12 can be asked. Do you agree with her? There's a full
13 filter, there's a quasi-filter, and there's asking the
14 question directly.
15     A. Yes.
16     Q. Are there any other ways?
17     A. In the context of what she's discussing here,
18 I'm saying no. I mean, there are all kinds of other
19 types of questions and other types of surveys where that
20 would not be applicable.
21     Q. All right. Can you tell me what order effect
22 is?
23     A. Order effects come in two areas. One has to do
24 with so-called question order effects. That's the
25 effect of answering one question or being asked a

44 (Pages 170 to 173)

Itamar Simonson                                                    9/21/2011

Page 174

ITAMAR SIMONSON

1 particular question on answers to subsequent questions.
2     There's also response option order effect. In
3 other words, let's say there are five response
4 categories in a closed-ended question, and the order in
5 which people evaluate the response options could affect
6 the answers.
7     Q. Just so I understand, I can have a series of
8 questions, let's call them question 1 through 10, okay,
9 that are all different questions.
10    A. Right.
11    Q. And I can also have question 5, which has the
12 answer of A, B, C, or D, okay. So I want to make sure I
13 understand what you are telling me.
14    So one of the things I can do is with respect
15 to question 5 is put a different order for A, B, C and
16 D. Sometimes A will go first; sometimes B will go
17 first. That's one type of order effect; is that
18 correct?
19    A. Correct.
20    Q. The other type is for questions 1 through 10, I
21 can put question 1 where question 5 was or whatever; is
22 that correct?
23    A. Yes.
24    Q. How typically do you with respect to a seriatim
25

Page 175

ITAMAR SIMONSON

1 of questions change the order of questions, not the
2 responses?
3     A. Well, it's really hard to generalize; it
4 depends on each survey. To the extent that I'm
5 concerned that there might be order effects, but I'm not
6 sure if there will or will not be, what I may do is have
7 different versions.
8     Some respondents are asked questions in this
9 order; other respondents are asked the same questions in
10 a different order. Then I compare the answers of the
11 two groups.
12    If I find no differences, I can pool all of
13 them together. If I find differences, then I can just
14 focus on the answers to the initial questions which I
15 know were not influenced by order.
16    Q. Just going back to Dr. Diamond's manual,
17 Exhibit 2, why don't you turn to 274, and let me know if
18 you agree with her definition of order effect.
19    MR. FETNER: Objection.
20    THE WITNESS: (Reviewing document.) I don't
21 think it's a good definition because it mixes the two
22 types of order effects.
23    MR. WEINER: Q. Okay.
24    A. If I understand it correctly.
25

Page 176

ITAMAR SIMONSON

1     Q. What way would you change her definition?
2     A. Well, I would define, as I just did, question
3 order effects one way and response item order effects in
4 a different way.
5     Q. Turn to 254 of the same exhibit.
6     A. (Complying.)
7     Q. Do you see where she says under Topic E, "What
8 approach was used to avoid or measure potential order or
9 context efforts -- effects?" Excuse me. She says in
10 the second sentence, "Thus, although asking a general
11 question before a more specific question on the same
12 topic is unlikely to affect the response to the specific
13 question, reversing the order of the questions may
14 influence responses to the general question."
15    Do you agree with that?
16    A. Again, it's very hard to generalize, but I
17 would change that to say that, starting with non-leading
18 or general, open-ended questions at the beginning, then
19 getting into more focused open-ended questions and maybe
20 even closed-ended questions is the proper order.
21    Q. Are you done?
22    A. Yes.
23    Q. She's not talking specifically about
24 closed-ended or open-ended questions. She's talking
25

Page 177

ITAMAR SIMONSON

1 about general questions as opposed to specific
2 questions; is that correct?
3     A. I don't know what exactly she means by that and
4 how it applies to any particular situation.
5     Q. Okay. Turn to page 255, the next page.
6     A. (Complying.)
7     Q. Do you see where she states, quote, "In
8 telephone surveys, respondents are more likely to choose
9 the last choice offered," close quote?
10    Do you agree with that?
11    A. It depends on how many response options you are
12 talking about. So let's say if you have ten response
13 options, I think that sounds right. If you're talking
14 about two, that's probably not true.
15    Q. Okay. Then she goes on to state, "Although
16 these effects are typically small, no general formula is
17 available that can adjust values to correct for order
18 effects because the size and even the direction of the
19 order effects may depend on the nature of the questions
20 being asked and the choices being offered."
21    Do you agree with that?
22    A. It's hard to generalize. I think that, in
23 general -- and I hesitate to say "in general" because it
24 varies from one case to another -- I would be more
25

45 (Pages 174 to 177)

Itamar Simonson                                    9/21/2011

Page 178

ITAMAR SIMONSON
1  concerned about question order effects than about
2  response item order effects.
3      Q. Let's go back to control --
4      MR. WEINER: Can I have -- what exhibit will
5  this be?
6      (Plaintiff's Exhibit No. 28 was
7      marked for identification.)
8      MR. WEINER: Q. Let me show you Simonson
9  Exhibit 28, which is, I believe, a case you referred me
10 to earlier, which is Empresa Cubana.
11     And do we have the right Simonson this time?
12     A. You do, yes. I do remember a long decision,
13 which I did not read carefully.
14     Q. Now, at the bottom of 441, the Court in the
15 last paragraph on that page is referring to you.
16     Am I correct?
17     A. Yes.
18     Q. The Court says, quote, "Simonson argues that
19 a" -- quote within the quote, "Simonson argues that a,
20 quote, 'a survey designed to eliminate the
21 likelihood'" --
22     A. "To estimate."
23     Q. -- "'estimate the likelihood of confusion must
24 include a proper control.' This categorical statement

Page 179

ITAMAR SIMONSON
1  is made after citing to what Simonson states is the most
2  common type of survey, the Eveready format, after the
3  case in which the survey was named."
4      The Court goes on to state, "The study in that
5  seminal case, however, did not contain a control."
6      Now, then the Court goes on and says, "The
7  purpose of control is to determine what extent or ports
8  of confusion, in fact, reflect guessing or survey bias."
9      Do you agree with that?
10     MR. FETNER: Object to form.
11     THE WITNESS: In general, I do agree with that,
12 yes.
13     MR. WEINER: Q. "It is difficult to determine
14 from Simonson criticism exactly how the control could
15 have been helpfully employed in the 2000 survey."
16     That was a survey that was performed in that
17 case; is that right?
18     A. Yes.
19     Q. Now, just so I understand, in connection with
20 the survey that was done in this case by Dr. Jacoby,
21 what is the control group that you believe should have
22 been used?
23     MR. FETNER: Objection.
24     THE WITNESS: I thought I made it clear that I

Page 180

ITAMAR SIMONSON
1  was talking about control questions.
2      MR. WEINER: Q. So we would agree, then, that
3  we don't need to worry about a control group; correct?
4      MR. FETNER: Objection.
5      THE WITNESS: That is correct, even though you
6  can have a separate group that's only asked about some
7  other university, but I think there probably should have
8  been a way to ask the same respondents about perhaps
9  different universities, about different possible events,
10 as I explained earlier, by rotating the order to make
11 sure that we don't experience any order effects.
12     MR. WEINER: Q. Well, the purpose of a control
13 is to eliminate guessing or survey bias; is that right?
14     A. Yes.
15     Q. So what is the control question that you would
16 have used precisely?
17     MR. FETNER: Objection.
18     THE WITNESS: Well, I don't know if I can give
19 you the precise answer. I think in my report, I
20 illustrated the types of control -- straightforward
21 control questions that Dr. Jacoby could have used, such
22 as asking about other universities, same questions --
23     MR. WEINER: Q. When you say --
24     MR. FETNER: Please allow the witness to

Page 181

ITAMAR SIMONSON
1  finish.
2      MR. WEINER: Q. I didn't know if you had
3  finished. I thought you were. Okay, other
4  universities?
5      A. No, I did not finish.
6      Asking about other universities or asking about
7  other events that did not happen.
8      Q. Well, give me a question.
9      A. Sure. The same questions that you asked, just
10 changing the name Shin to some other name, changing the
11 name of the university from Dongguk to Yonsei or Korea
12 University.
13     In other words, asking the same questions about
14 a whole different university and finding out how many
15 people said they have heard about it, for example.
16     Q. And that would have done what?
17     A. That would have provided estimate of some of
18 the bias created by Dr. Jacoby's questions.
19     Q. Can you explain to me how?
20     A. Yes. Because to the extent that respondents
21 assume that the information provided to them about that
22 Shin incident -- so let's say that I'm conducting the
23 same survey and asking respondents about Yonsei, and I'm
24 saying, "Have you heard about the Shin incident that

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson                                          9/21/2011

Page 182

ITAMAR SIMONSON

1    took place at Yonsei University?"  And someone says, "I
2    don't know."
3        I say, "Well, don't you remember that's the
4    incident in which Dr. Shin -- whatever Dr. Jacoby said,
5    you know, giving the full description of presumably what
6    happened, some people say, "Yeah, no, I remember that,"
7    even though they couldn't because it never happened.
8        That would give you an estimate of the degree
9    to which Dr. Jacoby's questions created answers.
10       Q.  So just going back to your Schwarzenegger
11   example.  When I asked the Court Reporter whether her
12   view of Governor Schwarzenegger changed as a result of
13   the love child, I should have a control question that
14   says with Governor Christie of New Jersey and ask her
15   whether her view of Governor Christie of New Jersey has
16   changed as a result of a -- fathering a love child; is
17   that what you're saying?
18       A.  For example, I'm not sure if Christie would be
19   as relevant to the Court Reporter, as familiar to the
20   Court Reporter as Schwarzenegger, but I think in
21   principal, the answer is yes.
22       Q.  So I should -- let's make it even a little
23   closer.  I should ask her about Jerry Brown.
24       Has your opinion of Jerry Brown --

Page 183

ITAMAR SIMONSON

1        A.  How old is he?  I'm not sure.  You need
2    something plausible, not to insult old people.
3        Q.  I didn't realize they couldn't father a child,
4    but that's neither here nor there.  That's what you're
5    talking about.
6        You're saying the control here should be -- now
7    I'm talking about, let's say President Obama.  I want to
8    know whether his recent position on taxing millionaires
9    has caused people to have a lesser opinion of him --
10       A.  Could be.  I mean --
11       Q.  I just want to understand your concept of your
12   view when you use the word "control."
13       So you're saying to me I should ask whether
14   Bush, George Bush -- I mean, is that what you're saying
15   to me?  I have to have some kind of analogous question
16   in the survey?
17       A.  That's one type of control that I talked about.
18   But, yeah, you want something plausible.
19       For example, I think a proper control here
20   might be, have you ever heard about -- and I would not
21   ask those questions, of course, regardless, even if
22   there were a good control, but putting that aside, have
23   you heard about the love child of Charlie Sheen?  Okay?
24   That seems applause.

Page 184

ITAMAR SIMONSON

1        I'm not aware of any.  And just the other day,
2    watched his roasting on Comedy Central, which was
3    reasonably funny, but he fits the stereotype like
4    Schwarzenegger, that he's someone who is fully capable
5    of fathering a love child.
6        Q.  Right.
7        A.  So I think that would be -- that would be a
8    proper control with respect to the identity of the
9    university.
10       Q.  Now, is your criticism that the survey that
11   Dr. Jacoby prepared contained no controls, or you don't
12   think the controls that were in it were sufficient?
13       A.  No, there were no controls at all.
14       Q.  Okay.  All right.  And by the way, are controls
15   typically used in trademark cases?
16       A.  Yes.
17       Q.  Okay.  Can you tell me what controls that you
18   have in non-trademark cases in which you performed
19   surveys?
20       A.  Which particular survey are you talking about?
21       Q.  Any one that you prepared.
22       MR. FETNER:  You're asking him about every
23   survey he's ever prepared?
24       MR. WEINER:  If he can tell me.  I don't know

Page 185

ITAMAR SIMONSON

1    what he prepared.  I'm askin g --
2        THE WITNESS:  Pick any survey on the list that
3    I -- hopefully I can still remember and where I
4    conducted a survey and ask me if I remember what the
5    control was.
6        MR. WEINER:  Q.  I'm going to start, when
7    should the control questions be asked?
8        MR. FETNER:  Object to form.
9        MR. WEINER:  Q.  What part?  Beginning of the
10   survey?  End of the survey.
11       A.  Well, it depends.  I mean, if you think that
12   there will be contamination or order effect, then you
13   may do it in a separate gr oup.
14       If you don't think there will be question order
15   effect, then you can do it within the same group.
16       Q.  What should the control question consist of?
17       A.  I thought we already talked about one type of
18   control question.
19       Q.  Should it be as close as possibl e to the
20   subject at hand?
21       A.  Yeah.  Generally speaking, yes.
22       Q.  Now, let me ask you about -- can I have -- let
23   me show you Exhibit 17.
24       Are you familiar with the Roederer case?

47 (Pages 182 to 185)

Page 186

1       ITAMAR SIMONSON
2       A. Yes.
3       Q. Is that a case in which you argued that there
4   was no control?
5       A. No, if I recall correctly, there was a control
6   in that case.
7       Q. Well, what did you argue?
8       A. What's that?
9       Q. What did you argue in that case?
10      MR. FETNER: Object to form.
11      MR. WEINER: Q. About control?
12      A. I do not recall.
13      Q. Look at page 99.
14      A. (Reviewing document.)
15      Q. Does that refresh your recollection as to
16  whether you made an argument in that case about the lack
17  of a control or even a control group?
18      MR. FETNER: Are you looking at a particular
19  part of the page?
20      MR. WEINER: Yeah, under 50, "Rather than
21  disagreeing with the appropriateness if this comparison,
22  defendant's expert, Dr. Simonson, testified that a
23  control should be as similar to that junior mark in this
24  case."
25      Q. Tell me what you were arguing in that case;

Page 187

1       ITAMAR SIMONSON
2   what was the nature of your report?
3       A. I just don't remember the details. There was a
4   control. I think that I thought that Cristalino was
5   improperly control. If I recall correctly, there was
6   another product there in the lineup. I think something
7   called Willm, W-i-l-l-m, I could be wrong, which should
8   have produced about zero confusion; yet because of the
9   leading nature of the methodology, produced, if I recall
10  correctly, high presumed confusion.
11      Q. You concluded in that case there was a leading
12  method in the methodology; is that correct?
13      A. I think that was one of my conclusions, yes.
14      Q. The Court rejected that conclusion; did it not?
15      A. Can you point me to --
16      Q. Well, did the Court grant the preliminary
17  injunction that was being sought?
18      A. No, I think that the Court accepted some
19  things, apparently, and did not others.
20      Q. Can you point to where the Court says that she
21  did not disagree?
22      Q. 52, let's go to 52. It's on page 1.
23      "Defendants also contend that the sequential
24  survey methodology employed by the Kaplan survey created
25  demand effects because it did not replicate market

Page 188

1       ITAMAR SIMONSON
2   conditions."
3       When you say "created demand effects," it's
4   leading; correct?
5       MR. FETNER: Objection.
6       THE WITNESS: Demand effects is demand effects.
7       MR. WEINER: Q. I understand. But you were
8   criticizing the survey as leading someone to a
9   conclusion; am I correct?
10      MR. FETNER: Objection.
11      THE WITNESS: I thought I said what I said. I
12  obviously don't remember exactly my report. But that's
13  what it says here, so I assume it's accurate.
14      MR. WEINER: Q. And the Court then goes on to
15  state, "The Kaplan survey consisted" -- now, did the
16  Court accept this conclusion?
17      MR. FETNER: What conclusion?
18      MR. WEINER: That the survey created demand
19  effects.
20      THE WITNESS: I don't see -- maybe you can
21  point me --
22      MR. WEINER: Q. Well, you were in the case; I
23  wasn't.
24      A. I know, but it looks like you've reviewed this
25  decision more recently than I have.

Page 189

1       ITAMAR SIMONSON
2       Q. "The Court concludes that the sequential survey
3   methodology was not entirely inappropriate."
4       A. It's not entirely inappropriate. Okay. So
5   what's the question?
6       Q. My question was: Did the Court accept your
7   conclusion that the survey was fatally flawed?
8       MR. FETNER: Objection.
9       THE WITNESS: Well, it accepted it in part and
10  reduced the estimate, if I recall correctly, from about
11  25 percent to about 7 percent.
12      So I think that the Court, if you look at the
13  numbers, accepted my concerns, or 75 percent of them, if
14  you want to put a number on that.
15      Q. Which party were you representing in this case?
16      A. The defendant.
17      Q. And if you go to the conclusion, who won?
18      A. I think both sides claim to have won, and I
19  think if I recall correctly from the press, to some
20  degree, neither one did.
21      Q. Well, what were you asked to opine on in that
22  case in terms of trademark infringement?
23      A. The survey of Dr. Kaplan.
24      Q. And would it be fair to say that in that case,
25  the Court found there was no trademark infringement --

48 (Pages 186 to 189)

Itamar Simonson                                                9/21/2011

Page 190

1              ITAMAR SIMONSON
2   there was a trademark infringement based upon the survey
3   that the plaintiff had provided to the Court?
4       A. Where do you read that?
5       Q. The conclusion, page 105, "Find in favor of
6   Roederer in its trademarks infringement and unfair
7   competition claims."
8       A. Where do you see that --
9       Q. Page 105 --
10      A. I see. But where do you see it's based on the
11  survey?
12      Q. Well, now I'm about to ask you, wasn't the
13  survey that was done by Professor Kaplan in support of
14  the trademark claims, trademark infringement claims?
15      A. No. As you may know, in matters of trademark
16  infringement, there are, I think, about ten factors. I
17  believe in the Second Circuit, they refer to them as the
18  Polaroid factors, whereas in the Ninth Circuit, they're
19  known as the Sleekcraft factors.
20      So there are about ten factors, like proximity
21  of the brand, channels of distribution, similarity of
22  the marks, lots of factors, survey is just one of them.
23      Q. Okay. Let's go back to page 88.
24      Roederer obtained Dr. Leon D. Kaplan to
25  provide -- to do a survey to determine whether there was

Page 191

1              ITAMAR SIMONSON
2   likelihood of confusion; is that correct?
3       A. Page 80. Where --
4       Q. 88.
5       A. 88.
6       Q. Yeah, likelihood of confusion survey.
7       That's what the survey was done for, to
8   determine whether there was a likelihood of confusion;
9   correct?
10      A. Yes.
11      Q. And that was the trademark infringement claim;
12  isn't that correct?
13      A. Yes.
14      Q. Okay. And that's why that survey was done by
15  Dr. Kaplan; right?
16      A. Yes.
17      Q. You were then retained to rebut that survey; am
18  I right?
19      A. To evaluate it, yes.
20      Q. To evaluate it. And that's at page 89, where
21  it states, "Defendants retained Dr. Itamar Simonson, a
22  professor of marketing at Stanford, who has conducted
23  numerous mall interceptor surveys"; correct?
24      A. Yes.
25      Q. You issued a report, debunking -- my word --

Page 192

1              ITAMAR SIMONSON
2   the survey results that were determined by Dr. Kaplan;
3   isn't that correct?
4       A. Yes.
5       Q. And the Court did not accept your criticisms
6   and concluded that there was, in fact, an infringement
7   based upon the information provided by Dr. Kaplan's
8   survey; isn't that correct?
9       MR. FETNER: Objection.
10      THE WITNESS: I already answered that question.
11  As the Court said, she did not find my evaluation
12  entirely correct. And considering all the manufacturers
13  that she took into consideration here, she reached her
14  decision.
15      MR. WEINER: Q. Well, why don't you show me
16  what all these other factors are?
17      A. Sure.
18      Starting on page 78, talking about the labels,
19  the container, the marks, the meaning of the marks --
20      Q. That's all the facts; right?
21      A. No, that's her analysis. Marketing and trade
22  channels, now I'm on page 83, she's going through the
23  standard analysis of likelihood of confusion.
24      Page 86, recognition, advertising and
25  promotion.

Page 193

1              ITAMAR SIMONSON
2       In other words, she went through a large number
3   of factors which led her to her decision.
4       Q. Sir, up until page 89, would you agree with me
5   she lays out the facts of the case, and beginning on 89,
6   she talks about the legal aspects of the case?
7       A. No.
8       Q. No?
9       A. I do not.
10      Q. Okay. So when she starts at page 74 with a
11  section called, "Nonconfidential findings of fact,"
12  that's not what she was doing, finding the facts? And
13  that continues up through 89, the very areas you were
14  just referring me to.
15      A. No, that's her analysis of the facts of the
16  case.
17      Q. And then beginning --
18      A. That she perceived to be relevant to forming
19  her opinion.
20      Q. And then beginning at 89, she finds, starts
21  with, "Nonconfidential conclusions of law"; is that
22  correct? Am I correct?
23      A. Yes.
24      Q. And in that discussion of the nonconfidential
25  of law, she discusses your survey -- I'm sorry -- your

49 (Pages 190 to 193)

Page 194

ITAMAR SIMONSON

1
2  critique of Dr. Kaplan's survey and whether it was
3  sufficient to prove that there was no trademark -- that
4  your criticisms were such that the survey that
5  Dr. Kaplan did was unreliable?
6      A. With all due respect, I think you're misreading
7  the decision.
8          If you look, for example, on page 91 --
9      Q. Yes.
10     A. -- you see the strength of Roederer's, spelled
11 R-o-e-d-e-r-e-r, apostrophe s, trademarks, you see that,
12 that's not a survey.  That's her assessment of the
13 strength of those trademarks, commercial strength.
14 That's page 93.  Do you see that?
15         Competitive proximity.  Do you see that?
16 That's on page 94.
17         Similarity of the marks.  Do you see that?
18 That's on page 95.
19         Intent, do you see that?  That's on page 96.
20     Q. Yep.  Now, let's get to where she discusses the
21 surveys, or where you just ignore them.
22         Beginning on page 97 --
23     MR. FETNER:  Objection.
24     MR. WEINER:  Q. -- right before you stopped,
25 she starts with a factor that has to be considered

Page 195

ITAMAR SIMONSON

1
2  actual confusion.  Am I correct?
3      A. Yes.
4      Q. And one of the elements that someone has to
5  prove in order to prove a trademark infringement is
6  actual confusion; isn't that correct?
7      A. I'm not a lawyer, But I believe you.
8      MR. FETNER:  Objection.
9      MR. WEINER:  Q. You don't know that?
10     A. I believe it's incorrect.
11     Q. Oh, so when she discusses actual confusion,
12 that's just an element she made up for purposes of this
13 case?
14     MR. FETNER:  Objection.
15     THE WITNESS:  No, but I'm saying, this is a
16 factor.  It doesn't mean -- if you'll just allow me to
17 finish my answer.
18     MR. WEINER:  Q. Yeah.
19     A. In fact, there's an article published showing
20 that most likelihood of confusion surveys do not include
21 any survey.  There is no evidence of actual confusion
22 nor survey nor marketplace confusion.  Just a fact.
23     Q. Okay.
24     A. So in other words, it's one of the factors.  If
25 you have a survey, you consider it.  If you don't have a

Page 196

ITAMAR SIMONSON

1
2  survey, you have all those other factors.
3      Q. In this case, which you are saying that I have
4  mis-described, beginning on page 97, she lists an area
5  that she now has to determine to determine whether or
6  not this was an infringement.  This was a trial.  And
7  she talks about actual confusion; correct?
8      MR. FETNER:  Objection.
9      MR. WEINER:  Q. Bottom of page 97, first
10 column.
11     A. Yeah, that's one of the factors --
12     Q. Sir, I'm just focusing on that, not any other
13 factor, just this factor, okay?
14         Then she discusses she needs to look at the
15 survey evidence to determine whether there was actual
16 confusion; correct?
17     A. Yeah.  Survey No. 8, or whatever it was, yeah,
18 that was one of the factors she considered.
19     Q. Right.  And what she did at that point is she
20 looked at Dr. Kaplan's survey to determine whether that
21 survey was sufficient to show actual confusion.  That's
22 what the plaintiffs put in for purposes of proving that;
23 isn't that correct?
24     A. That's part of the evidence.
25     Q. They held up the survey and said, here's the

Page 197

ITAMAR SIMONSON

1
2  evidence I have of actual confusion, a survey that
3  Dr. Kaplan did; right?
4      MR. FETNER:  Objection.
5      THE WITNESS:  That's part of the evidence.
6      MR. WEINER:  Q. I know it's part of the
7  evidence.
8          And then the defendant said, the party that
9  retained you, they said, "No, no, no, no, Court.  You
10 can't rely on that survey because it's flawed."  Maybe
11 you even used the term "fatally flawed."  But you said
12 You can't rely on that survey.  That was the purpose of
13 your report; correct?
14     MR. FETNER:  Objection.
15     THE WITNESS:  Yes, that's right.
16     MR. WEINER:  Q. And you launched a number of
17 criticisms in that case?
18     A. Yes.
19     Q. You talked about --
20     A. In fact, can I have that earlier
21 exhibit where -- the one that talks about the survey of
22 the different arguments, criticisms.
23     Q. I'll tell you exactly what you said.
24         You said in the Roederer case that there was a
25 failure to proximate market conditions.  That was

Itamar Simonson                                                    9/21/2011

Page 198

ITAMAR SIMONSON
1
2   rejected by the Court; correct?
3       MR. FETNER: Objection.
4       MR. WEINER: Q. You don't recall?
5       A. I don't recall. I think she did mention that
6   there are some stores where the two products are in
7   proximity.
8       Q. And you also said that there were no -- the
9   incorrect controls, no filters in that case; isn't that
10  correct?
11      A. I think I said there was improper control --
12      Q. Oh, improper control.
13      A. Yes.
14      Q. And that was rejected as well.
15      A. No, that was not -- show me where it was
16  rejected.
17      Q. Let me ask you a question: You said show me
18  where it's rejected. Can you tell me why the judge
19  granted the injunction based upon the survey and the
20  actual confusion if your criticisms were valid?
21      MR. FETNER: Objection.
22      THE WITNESS: I think I already explained it a
23  number of times.
24      There are a number of factors here starting on
25  page 91. All those factors that she took into

Page 199

ITAMAR SIMONSON
1
2   consideration, survey was one of them. And if you look
3   at the survey, she had a number of criticisms of that
4   survey; so therefore, her decision was based on various
5   factors.
6       And, in fact, I think what she required them to
7   do, I don't remember the details, the injunction was
8   quite limited. I think they needed -- if I recall
9   correctly, they needed to put the name of the company a
10  little closer to the brand name or something like that,
11  which I think they were pretty pleased with.
12      MR. WEINER: Q. So as far as you were
13  concerned that on the infringement claim, your side won?
14      MR. FETNER: Objection.
15      THE WITNESS: No, if I recall correctly, that
16  was one of those cases where both sides claim to have
17  won. I'm not the judge or the jury, and so it's not my
18  role to declare winners or losers. I just did what I
19  was asked to do.
20      MR. WEINER: Q. Sir, I'm asking on the
21  infringement claim, the claim which you were retained to
22  rebut the survey on the other side, is it your testimony
23  that your side won the infringement claim and that your
24  criticisms were accepted?
25      MR. FETNER: Objection.

Page 200

ITAMAR SIMONSON
1
2       THE WITNESS: I think we already --
3       MR. WEINER: Q. Just yes or no, sir.
4       Could I have the question back? And I would
5   like an answer, "yes" or "no."
6       Can you read it back?
7       (Record read: "Sir, I'm asking on the
8   infringement claim, a claim which you were retained
9   to rebut the survey on the other side, is it your
10  testimony that your side won the infringement claim
11  and that your criticisms were accepted?")
12      THE WITNESS: It's not my role to assess the
13  meaning of the Court's decision. So therefore, what I'm
14  telling you is from what I've heard is that both sides
15  claim to have won and the changes requested by the Court
16  from the defendant were perceived as minimal and they
17  thought that for all practical purposes, they came up
18  ahead, or came out ahead in that case.
19      It appears from the decision which you showed
20  me that the Court considered the various factors that go
21  into assessments of trademark infringement, which she
22  did, she accepted many of my opinions about the survey,
23  but not all.
24      MR. WEINER: Q. So when the Court says, quote,
25  "The Court finds in favor of Roederer on its trademark

Page 201

ITAMAR SIMONSON
1
2   infringement claim," you are unable to tell me whether
3   Roederer won that claim or not?
4       MR. FETNER: Objection. He's answered that
5   several times.
6       THE WITNESS: Do you have a separate order,
7   because I know that the specifics of the decision were
8   very concrete in terms of what she asked them to do?
9       And besides, as I said, it's not my job or
10  expertise to opine on the implications of the Court's
11  decision. She relied to a significant degree on my
12  opinions about the survey.
13      For example, one point that you did not mention
14  is that I said that Dr. Kaplan was surveying the wrong
15  universe. She accepted that position as a result
16  instead of relying on the estimate that he provided.
17  She cut it by I think something like 75 percent, which
18  was very substantial.
19      MR. WEINER: Q. Substantial in what respect?
20      A. 75 percent is substantial.
21      Q. Well, it didn't change her view that there was
22  an infringement; did it?
23      MR. FETNER: Objection.
24      THE WITNESS: I think we can continue that
25  discussion.

51 (Pages 198 to 201)

Itamar Simonson                                                9/21/2011

---

Page 202

ITAMAR SIMONSON

1
2       MR. WEINER:  Q.  Well, let's move on.
3           Let's take a look at another source that you
4   cite, Simonson Exhibit 29, which is an article,
5   "Experimental Design and Selection of Controls and
6   Trademark in Deceptive Advertising Surveys."
7               (Plaintiff's Exhibit No. 29 was
8               marked for identification.)
9       MR. WEINER:  Q.  Why did you cite this article
10  in your report?
11      MR. FETNER:  Objection.
12      THE WITNESS:  Can you remind me, I forget,
13  where was it that I cited it?
14      MR. WEINER:  Q.  Well, it's your report.
15      A.  I know.
16      Q.  If you take a look at -- well, actually, I
17  don't know if you cite it.  You reviewed it -- excuse
18  me.
19          Why did you review it?  It's listed on your
20  list of materials on Exhibit C.
21      A.  Just as I reviewed Dr. Jacoby's 1995 article, I
22  was evaluating his report in this case and survey and
23  thought that the fact that he wrote an article about
24  experimental controls, selection of controls might have
25  some relevance, so I just quickly reviewed that article.

---

Page 203

ITAMAR SIMONSON

1
2       Q.  So you didn't rely on it?
3       A.  I don't think that I relied on that.
4       Q.  And you accept -- if you look at page 903.
5       A.  What's that?
6       Q.  Page 903 of the exhibit.
7           Do you agree with the statement that, quote,
8   "Not all trademark, trade dress, or advertising surveys
9   demand the use of the controls," close quote?
10      A.  Where do you read that?  Oh, I see, the top
11  sentence.
12      Q.  Yep.
13      A.  (Reviewing document.)  I can see there might be
14  some atypical cases where you do not need a control,
15  like the case where he refers to famous, fame or, say,
16  level of awareness.
17          Although, actually, I take it back.  If you use
18  aided awareness questions, you do need to include a
19  control.  If you're just using unaided awareness, you do
20  not need a control.
21              (Plaintiff's Exhibit No. 30 was
22              marked for identification.)
23      MR. WEINER:  Q.  Okay.  Let me show you
24  Simonson Exhibit 30, which is the survey that Dr. Jacoby
25  prepared.  And also show you Simonson Exhibit 23, which

---

Page 204

ITAMAR SIMONSON

1
2   is a survey which you prepared.
3               (Plaintiff's Exhibit No. 23 was
4               marked for identification.)
5       THE WITNESS:  Okay.
6       MR. WEINER:  Q.  I would like you to look also
7   at your report, paragraph 48 on page 24.
8       A.  Could you repeat that?
9       Q.  Sure.
10          Look at paragraph 48, on page 24.
11      A.  Okay.
12          (Reviewing document.)  Okay.
13      Q.  First of all, you state in the first sentence
14  in that paragraph, "There is no point in conducting a
15  survey that merely provides the respondents the answers
16  desired by the party on whose behalf the survey is
17  conducted and ask them if they agree with those
18  statements," close quote.
19          Looking at Dr. Jacoby's survey, can you tell me
20  where he asks the respondents if they agreed with
21  certain statements?
22      A.  That includes any question that's "yes" or "no"
23  question.
24      Q.  Tell me which questions you're referring to.
25      A.  All of the questions, sir --

---

Page 205

ITAMAR SIMONSON

1
2       Q.  Why don't you go through them one by one.
3       A.  Is a "yes" or "no" question.
4       Q.  "Yes" or "no" question?
5       A.  Yes.
6       Q.  Let's go through them one by one.
7       A.  Sure.
8       Q.  Question No. 1 states, "This interview" --
9   actually, before we do that, let me just go back to
10  paragraph 13B.
11      A.  13B of what?
12      Q.  13A of page 5 of your report.
13      A.  Okay.
14      Q.  Okay.  Paragraph 13A states that the survey
15  consisted primarily of blatantly biased and leading
16  closed-ended questions which provided respondents with
17  the correct answers that were supportive of Dongguk
18  University's allegations; is that correct?
19      A.  Yes.
20      Q.  Now, as we go through each question, I want you
21  to explain to me how the question provided the
22  respondents with the correct answers supportive of
23  Dongguk University's allegations, okay?
24      A.  Okay.
25      Q.  Question by question.

---

52 (Pages 202 to 205)

Itamar Simonson                                             9/21/2011

Page 206

ITAMAR SIMONSON
1
2     A. And that would apply starting from Question 2C.
3     Q. Well, we're going to start with 1.
4     A. Sure.
5     Q. Okay. And number two, I would like you to tell
6  me whether it is your understanding that the survey
7  taker conveyed to the respondents on whose behalf the
8  survey was being conducted. Was it a blind survey, or
9  was there information provided to the respondents as to
10  who the author of the survey was?
11     A. No, of course, they didn't say, "This is a
12  survey done for Dongguk University. Could you please
13  give me the answers that I'm looking for?"
14     Q. Right.
15     A. No, they did not say that, if that's how you're
16  interpreting what I said.
17     Q. Right. Nor did they say, "This is a survey
18  conducted for Yale University."
19     A. That's right.
20     Q. It could have been conducted on behalf of
21  either university; is that correct?
22     A. Right.
23     Q. There's nothing in the question that says this
24  is for Dongguk or for Yale; am I right?
25     A. It did not say that.

Page 207

ITAMAR SIMONSON
1
2     Q. Okay. So let's start with Question 1.
3        First of all, is Question 1 a filter question?
4     A. I think it's a screening question.
5     Q. Screening question. "This interview will take
6  approximately ten minutes. If you feel that you do not
7  know the answer or cannot answer any questions, there is
8  no need to guess. If you say 'I don't know' or 'I
9  cannot recall,' I will move on to the next question.
10  Are you ready?"
11        Is there anything wrong with that question, in
12  your opinion?
13     A. Could you repeat that, please?
14     Q. Is there anything wrong with that question, in
15  your opinion?
16     A. No. With that instruction, you mean?
17     Q. Yes.
18     A. No.
19     Q. In fact, if you go to Allianz survey, page 3 of
20  the actual questionnaire, that's about the fifth page,
21  sixth page in, you see what you're doing there. It's
22  Question AA.
23     A. Yes.
24     Q. You ask, "Do you have the Priority Mail package
25  we sent you?" And the answer is, "Yes, no, don't know,

Page 208

ITAMAR SIMONSON
1
2  refused."
3        Is that a closed-ended questions?
4     A. Sure. It's not a survey question --
5     Q. I just asked you --
6     A. -- of course --
7     Q. It's a closed-ended question --
8     A. It is a closed-ended question.
9     Q. -- to find out if they received a package?
10     A. Yes.
11     Q. Now, the purpose of -- maybe we should at this
12  point, tell me a little bit about the Allianz case.
13  What was the issue that you were trying to establish?
14     A. Well --
15        MR. FETNER: Objection.
16        THE WITNESS: Allianz was selling to those
17  people, many of them elderly, an annuity that was called
18  "Cash Bonus Annuity," which allegedly created the
19  perception that people who buy that annuity will receive
20  cash bonus.
21        The purpose of the survey was to determine
22  whether they understood the real terms of the annuity
23  and whether they realized that, in fact, in order to get
24  the so-called cash bonus annuity, they would have to
25  wait something like 11 years or receive installments

Page 209

ITAMAR SIMONSON
1
2  over an 11-year period.
3        MR. WEINER: Q. Now, one of the things you
4  could have done in your Allianz survey before you sent
5  or had someone read the brochure was ask an open-ended
6  question, as do you recall reading any brochures or
7  other documents regarding an annuity, which you
8  purchased?
9     A. No, I could not have done that.
10     Q. You could not have done that?
11     A. No, of course not, because then the other side,
12  Allianz would come back and say, well, you are now
13  sending them something that they reviewed two,
14  three years ago, and right now, they don't remember any
15  of that.
16        So therefore, the conservative thing for me to
17  do was to give them the brochure. And we were very
18  careful to give them the exact brochure that they
19  reviewed, to give them that brochure and ask them to
20  review it again --
21     Q. Sir --
22        MR. FETNER: Just let him answer the question.
23        MR. WEINER: Q. Go ahead.
24     A. If after they just reviewed the brochure again,
25  they still are confused about what they are buying, that

53 (Pages 206 to 209)

Page 210

```
1              ITAMAR SIMONSON
2    will be very conservative test of what --
3         Q. When you say conservative --
4         A. -- from the perspective of the plaintiffs, that
5    was very conservative. That was as helpful to Allianz
6    as possible.
7         Q. Sir, you were trying to establish on behalf of
8    this class whether someone was misled by a brochure;
9    correct? That's one of the things you were trying to
10   establish; am I right?
11        A. Just whether, yes.
12        THE REPORTER: What was that?
13        THE WITNESS: Whether.
14        MR. WEINER: Q. But you never asked any of the
15   recipients of this brochure, before we show you this, do
16   you recall whether you actually read a brochure?
17        A. Of course --
18        Q. You didn't ask that. I'm not asking for your
19   explanation, sir.
20        A. Of course not, because --
21        Q. I'm not asking for your explanation, sir.
22        MR. FETNER: Please quit cutting off the
23   witness.
24        THE WITNESS: If I can just --
25        MR. WEINER: Q. No, you can't. When I ask you
```

Page 211

```
1              ITAMAR SIMONSON
2    the next question to explain, you can. Right now I'm
3    asking --
4         A. If I may just --
5         Q. No, you may not --
6         MR. FETNER: Bob, the witness is trying to
7    answer the question --
8         MR. WEINER: I asked him a "yes" or "no"
9    question.
10        MR. FETNER: In your mind, it's a "yes" or "no"
11   question. That doesn't mean that's his answer.
12        MR. WEINER: Yes, it is his answer, or he can't
13   answer it yes or no?
14        MR. FETNER: If he can't, let him give the
15   answer --
16        MR. WEINER: Q. Can you not answer the
17   question yes or no?
18        A. Of course not --
19        Q. So you did not ask the question of whether
20   before you gave anything to anybody whether they, in
21   fact, recalled, one, receiving the brochure; correct?
22        A. Of course not --
23        Q. That's fine. You did not ask -- excuse me,
24   sir. When I want an explanation, I'll ask for it.
25             And you did not ask the question of, if you
```

Page 212

```
1              ITAMAR SIMONSON
2    received a brochure, did you read it? You never asked
3    that question either; is that correct? Yes or no? Yes
4    or no?
5         A. Can I just --
6         Q. No, you may not, sir. Sir, you may not.
7         MR. FETNER: Bob, you have to give him the
8    opportunity to answer the question --
9         MR. WEINER: No, no, no. You can't -- you want
10   to bring it out on cross, bring it out on cross.
11        Q. Answer "yes" or "no." You did not ask that
12   question; correct?
13        A. Of course not. And the reason --
14        Q. I'm not asking you, sir --
15        A. The reason was --
16        THE REPORTER: Counsel, wait. I'm not writing.
17   So, whoever talks the loudest is whoever I'm getting.
18        MR. WEINER: And if we need to get rulings from
19   a judge, we will. I'm entitled to ask the questions in
20   the order that I want. And if you want to bring
21   something out on cross, you can.
22        Q. Right now, I'm simply asking about what you did
23   or what you didn't do. If you want to find out why or
24   why you didn't do it, I will ask. Do you understand
25   that? Do you understand that?
```

Page 213

```
1              ITAMAR SIMONSON
2         A. I already answered. Of course not for the
3    reasons that I provided.
4         Q. Fine.
5         MR. FETNER: Can we take a break, Bob?
6         MR. WEINER: No, I want to go back -- no, we're
7    not taking a break. We're going into this area, and I'm
8    going to try and do it without the witness volunteering
9    answers to questions I haven't asked.
10        MR. FETNER: The witness is trying to answer
11   the questions you're asking. I'm requesting a break
12   only because I think when the atmosphere gets heated
13   like this, I think it makes it harder to be productive.
14   And I think we all might benefit from five minutes to
15   cool off.
16        MR. WEINER: Howie, I think we can continue.
17   I'll simply ask that you didn't do that.
18        Q. Now, let's go back to what you did in Allianz.
19             What you did in Allianz -- I think we covered
20   this briefly this morning -- is before you asked any
21   questions, you sent a brochure to the people that you
22   were going to ask questions of; isn't that correct?
23        A. Yes.
24        Q. Okay. And then the first thing that is done
25   after the survey begins, which is, again, on page 3 and
```

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        (800) 246.4950

Itamar Simonson                                                    9/21/2011

Page 214

                    ITAMAR SIMONSON
1
2   going on to page 4, you ask -- or your survey takers are
3   asked to instruct the people who received the brochures
4   to carefully review the documents that had been sent to
5   them; is that correct?
6       A. Yes.
7       Q. And then to let them -- let the survey
8   questioner know when that person was finished reviewing
9   the brochure; correct?
10      A. Yes.
11      Q. And then the survey questioner instructs the
12  recipient that he would like or she would like to ask a
13  few questions, and that the recipient is to feel free to
14  look at the documents that have been provided to the
15  recipient at any time.
16      MR. FETNER: Objection.
17      MR. WEINER: Q. Is that what -- what's the
18  basis of your objection?
19      MR. FETNER: It's to the form of your question.
20      MR. WEINER: Fine. I'll read what the survey
21  says.
22      Q. The survey says, "Now I would like to ask you a
23  few questions. Please feel free to look at the
24  documents at any time."
25      Do you see that?

Page 215

                    ITAMAR SIMONSON
1
2       A. Yes.
3       Q. Is that the instruction that was told to the
4   people who were being interviewed?
5       A. Of course.
6       Q. And is there an open-ended question there?
7       A. Of course. The first question, the survey
8   question is open-ended.
9       Q. Which one?
10      A. (Reviewing document.) If you look at where it
11  says Question 1.
12      Q. Yes.
13      A. On page 5 of the survey.
14      Q. Yes.
15      A. "When you decided to buy the annuity" --
16      Q. Where are you?
17      A. Let's see. "When you decide" -- page 5,
18  Question 1. Are we looking at the same thing?
19      Q. I don't know. I'm looking -- "I would like to
20  ask you a few questions. Please feel free to look at
21  the documents."
22      A. I think you're confusing the screener with the
23  actual survey.
24      Q. Okay. Let's deal with the screener first.
25  Let's look at the screener first.

Page 216

                    ITAMAR SIMONSON
1
2       A. So --
3       MR. FETNER: He's answering your previous
4   question.
5       THE WITNESS: So are you interested in the
6   screener -- I said the actual main questioner started
7   with an open-ended question. That's Question 1 that
8   appears on page 5.
9       MR. WEINER: Q. Where are the questions that
10  appear on page 4?
11      A. (Reviewing document.) These are screening
12  questions.
13      Q. When you say "screening questions," "Have you
14  owned or do you own the annuity described in these
15  documents" --
16      A. Yeah. That's a screening question.
17      Q. -- that's a screener question?
18      Okay. Is that a closed-ended question?
19      A. Of course. Screening questions are always --
20  or usually they're closed-ended questions.
21      Q. And the next one is close-ended as well; is
22  that correct?
23      A. That's correct. Screening questions are
24  closed-ended questions.
25      Q. Okay.

Page 217

                    ITAMAR SIMONSON
1
2       A. So now let's go to the first survey question.
3       Q. Okay.
4       A. "Suppose you were considering buying the
5   annuity described in those documents."
6       Q. Yes.
7       A. I think there was more than one document.
8       "What features or advantages of this annuity,
9   if any, would be important in your decision?"
10      Q. Why was it necessary to show the survey
11  participants the brochure instead of asking Question 1
12  as the way that you did it?
13      A. Because the same reason I just explained to
14  you, because then the response of Allianz, which would
15  be quite reasonable, would be well, at the time they
16  understood, but because they forgot -- but by now, they
17  forgot what the brochure was about; so therefore, they
18  can't remember.
19      So I decided to be conservative from the point
20  of view of the plaintiff. I said, well, let's give you
21  the specific brochure that you have evaluated. Read it
22  again. I give you every opportunity to understand it
23  properly.
24      Q. But you never established that they, in fact,
25  had reviewed the brochure. You keep saying, I gave them

                                          55 (Pages 214 to 217)

Itamar Simonson                                                          9/21/2011

Page 218

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2  the one that they reviewed.  But not one of your
3  questions elicited that; isn't that correct?
4     A.  There was no need for that because it was the
5  practice of Allianz and its agents to give these
6  brochures to their prospective customers.
7     Q.  But that was their instruction but not
8  necessarily their practice; isn't that correct?
9     MR. FETNER:  Objection.
10    THE WITNESS:  No.  And I think, as I said, it
11 was conservative.  There was no, really no downside to
12 it.
13    Because let's say in reality 1 in 100 did not
14 actually review the brochure when they made the
15 decision, "Well, now I've been very conservative," I
16 said, "Okay, you didn't review it then.  Here, review it
17 now."
18    To the extent that Allianz was claiming that
19 its brochures were not misleading, well, let's give
20 those brochures opportunity to speak for themselves to
21 make everything clear.
22    MR. WEINER:  Q.  So you are providing the
23 respondents with something they may not have looked at
24 at the time that they made their decision to purchase;
25 correct?

Page 219

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2     A.  It's extremely unlikely they did not look at
3  them.
4     Q.  But you don't know because you never tested for
5  it.
6     A.  No, there was no need because that was the
7  practice testified by Allianz agents and Allianz
8  representatives.
9     Q.  But you don't know -- the fact that you can
10 give a brochure to someone doesn't mean the person
11 reviewed it; correct?
12    A.  The fact that Allianz's practice was to provide
13 those brochures was more reliable than asking people to
14 remember three, five years later whether they reviewed
15 it or not.  Maybe they don't remember exactly whether
16 they reviewed it or not.  Therefore, asking that
17 question at that point was not -- would not have been
18 helpful.
19    Instead, I said, let's be conservative.  Let's
20 give them the opportunity to review the brochure now.
21    Q.  You keep using the term, "Let's be
22 conservative.  Let's be conservative."
23    The fact of the matter is, what you were doing
24 is providing a stimuli to the people who were
25 responding; isn't that correct?

Page 220

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2     MR. FETNER:  Objection.
3     THE WITNESS:  Well, the brochure explained the
4  product at issue, of course.
5     MR. WEINER:  Q.  And you're asking them to
6  review that brochure very carefully in answering these
7  questions.  And if someone reviews a brochure very
8  carefully, whether they reviewed it three years before
9  or not, it would be fairly easy for them to now come up
10 with something that would suggest that they had been
11 misled; isn't that correct?
12    MR. FETNER:  Objection.
13    THE WITNESS:  I guess we miscommunicated.
14    MR. WEINER:  Q.  I guess so.
15    A.  Are you saying that company such as Allianz,
16 one of the biggest companies in the world, is creating
17 brochures that if someone reads it -- read those
18 brochures very carefully, then they are misled; whereas
19 people who don't read them at all are not misled?  Isn't
20 that what you're asking?
21    Q.  No, that's not what I'm saying, sir.  I think
22 you're misinterpreting what I'm saying.
23    What I'm saying is, if you're trying to find
24 out if someone was misled three years ago, in the first
25 instance, wouldn't you want to find out what they

Page 221

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2  remember?  Now, you could find out what they remember
3  and then decide whether you want to refresh their memory
4  by showing them the brochure.  But that's not what you
5  did.
6     MR. FETNER:  Objection.
7     MR. WEINER:  Q.  Correct?  What you did was,
8  I'm going to assume, I'm going to assume that they got
9  the brochure, and then I'm going to ask questions by
10 showing them the brochure now; isn't that right?
11    MR. FETNER:  Objection.
12    THE WITNESS:  No.  It's not right.  And I think
13 I already explained it a number of times why the
14 methodology that I used was the most appropriate and
15 conservative and to the extent that they were misled,
16 even though they just read the brochure carefully, it
17 indicates that the brochure itself was misleading the
18 consumers.
19    MR. WEINER:  Q.  Was your survey at Allianz
20 ever used by anyone else in a different case, a state
21 case?
22    A.  Yes.
23    Q.  What happened in that case?
24    A.  I was not involved.  It was conducted in
25 another class action against Allianz by someone else who

56 (Pages 218 to 221)

Page 222

ITAMAR SIMONSON

1
2 used to be my student and is now a marketing professor
3 at Columbia University. I think that's the later
4 litigation in which Dr. Jacoby was involved.
5    Q. And in that case, was the survey thrown out?
6    A. Not that I'm aware of, but I didn't keep up.
7    Q. Okay. Let's go to Dr. Jacoby's statement.
8 Let's start with Question 1A.
9       What do you understand the purpose of
10 Question 1A to be?
11    A. Find out whether the respondents had heard of
12 Dongguk or Dongguk University.
13    Q. For what purpose?
14    A. Find out whether they heard about Dongguk
15 University.
16    Q. Do you know whether Dr. Jacoby inserted into
17 Question 1A a false fact -- or why don't I rephrase
18 that.
19       Do you know why Dr. Jacoby added the university
20 Woojang University to Question 1A?
21    A. I think that's an example of the control that
22 he used for the purpose -- specific purpose of awareness
23 of Dongguk University. That's it.
24    Q. So he used a control?
25    A. No, he did not use a control for the survey.

Page 223

ITAMAR SIMONSON

1
2 As part of his screening, he included a control for the
3 specific purpose of awareness of Dongguk University,
4 nothing else. There was really no control in his
5 survey.
6    Q. The survey consists of Question 1A and other
7 questions; is that correct?
8    A. I beg your pardon?
9    Q. The survey includes not only Question 1A, but
10 other questions; is that correct?
11    A. Yes.
12    Q. And Question 1A is a control question; is it
13 not?
14    A. No, not at all. It's not a control question.
15 It's a control question for 1A as it relates to Dongguk
16 University, nothing else.
17    Q. Okay. That's your opinion; correct?
18       MR. FETNER: Objection.
19       MR. WEINER: Q. That's your opinion.
20    A. It is my opinion, yes.
21    Q. And do you understand that Dr. Jacoby has a
22 different opinion on that?
23       MR. FETNER: Objection.
24       MR. WEINER: Q. You don't know? Did you not
25 read his deposition?

Page 224

ITAMAR SIMONSON

1
2    A. I think that he referred to this question and
3 the other question about the MBA program as questions
4 that were presumably designed to weed out naysayers, a
5 concept that I never encountered before.
6    Q. Right. The one of the purposes of the control
7 is to avoid guessing; isn't that correct?
8       MR. FETNER: Objection.
9       THE WITNESS: Yes.
10       MR. WEINER: Q. Okay. That's what I'm asking.
11    A. Yes.
12    Q. Okay. And does Question 2 have a control,
13 whether it's, in your view, as part of a screening
14 process or not?
15    A. I don't know if you want to call it, again, a
16 control. I guess you can call it control.
17       This Question 2B is not a control, even for the
18 other parts of Question 2.
19    Q. Okay. Tell me about Question 2A?
20       What is your problem with Question 2A?
21       MR. FETNER: Objection.
22       THE WITNESS: I don't particularly have a
23 problem with Question 2A --
24       MR. FETNER: Are you referring to -- just to be
25 clear. There are two Question 2As. Which one are you

Page 225

ITAMAR SIMONSON

1
2 on?
3       MR. WEINER: Not the Question 2 with no A, B or
4 C. The one that's at the bottom of page 3.
5       THE WITNESS: Oh, I see. I thought you were
6 talking about Question 2, Part A.
7       MR. WEINER: Q. No.
8       THE WITNESS: Oh, you're talking about the
9 other one.
10       MR. WEINER: Yes.
11       THE WITNESS: (Reviewing document.)
12       MR. WEINER: Q. What's the problem with that?
13    A. What's the problem with Question 2A?
14    Q. Yes.
15    A. Well, it's a blatantly leading question that
16 I've seen in awhile.
17    Q. How is it blatantly leading, sir?
18    A. It just tells them what they're supposed to
19 remember instead of asking them about it.
20    Q. Well, let's see what it says.
21       It says, "The Shin Jung incident refers to the
22 incident where Dongguk University employed Shin Jung Ah
23 as a professor after Dongguk University believed Shin
24 Jung Ah made false claims in a forged document showing
25 that she received a doctorate degree from Yale

57 (Pages 222 to 225)

Page 226

ITAMAR SIMONSON
1
2   University in the United States.
3        "Have you heard or read anything at all about
4   this incident?"
5        What is leading and biased about that?
6        And what is the correct answer, by the way?
7        MR. FETNER:  Objection.
8        THE WITNESS:  I don't see what part of the
9   question is not leading.
10       MR. WEINER:  Q.  Well, I understand, but why
11  don't you tell me in your words.
12       A.  Everything, every word, the entire question is
13  leading.  First, it was asked of people who said "no" or
14  "don't know," so these people who said "no" to
15  Question 2, Part C, should have just been let go and not
16  continued with the survey.
17       Putting that aside, then he goes on to those
18  people who said, "No, I don't know, I don't remember,"
19  and he tells them all of those details about what they
20  were supposed to remember.
21       Suppose that they didn't know much about it.
22  Maybe they heard vaguely the name Shin.  They don't know
23  anything.  He just told them what they're supposed to
24  remember.
25       That's the most blatantly leading question I've

Page 227

ITAMAR SIMONSON
1
2   encountered in awhile.
3        Q.  That's different from providing brochures to
4   the people that you were asking about as to whether they
5   relied on information they received three years ago, you
6   find that to be a different context?
7        A.  Has absolutely nothing to do with it.  If you
8   want to find out whether a brochure of a company is
9   misleading and you give to respondent that brochure,
10  there's nothing leading about that.  That's the brochure
11  that the company chose to use for its marketing --
12       Q.  Sir --
13       A.  If I can just complete my answer.
14       Q.  Sure.
15       A.  On the other hand, this is not a statement
16  taken from brochure put out by Yale, or even Dongguk
17  University.  It is just something that the plaintiff in
18  this case indicates, this is what the purpose of the
19  survey was, and he just tells them what they're supposed
20  to remember.  It's just ridiculously leading.
21       Q.  It tells them what they're supposed to
22  remember.  I read you the question, and then I'll read
23  you the answers, and I'll put it in context.  So again,
24  I'm trying to understand what you're saying to me, sir.
25       "The Shin Jung Ah incident refers to the

Page 228

ITAMAR SIMONSON
1
2   incident where Dongguk University employed Shin Jung Ah
3   as a professor after Dongguk University believed Shin
4   Jung Ah's false claims on a forged document showing she
5   received a doctorate degree from Yale University in the
6   United States.
7        "Have you seen or heard or read anything at all
8   about this incident?"
9        The question is, "Does not remember, does
10  remember."
11       What exactly is it that leads to the answer
12  whether the person does or does not remember?
13       MR. FETNER:  Objection.
14       THE WITNESS:  Everything -- the entire
15  question -- let's take an assumption.  I'm a person in
16  Korea.  I heard about Shin and that she was working at
17  Dongguk University.
18       MR. WEINER:  Q.  Okay.
19       A.  I know nothing else about this.  But I do know
20  that there was a Professor Shin working in the art
21  department of Dongguk University.
22       Q.  Right.  The question --
23       A.  I don't know anything else.  I don't know about
24  the forgery.  I don't know this business about Yale.  I
25  don't know anything.

Page 229

ITAMAR SIMONSON
1
2        Q.  Right.
3        A.  Now you just read me an entire statement that
4   includes multiple components.  I don't know anything of
5   that.
6        Now you're asking me --
7        Q.  Have you seen, heard or read anything?  You can
8   say yes, no, or I don't know.
9        A.  But what if I've heard the name Shin, but I've
10  not seen any of the others, what's the right answer?
11       Q.  I'm asking you what's the right answer?
12       A.  The answer is, well, if you ask me that
13  question, it must be right.
14       Q.  Where do you get that from, if you ask me the
15  question, it must be right?
16       Let's go back to Schwarzenegger.  I ask you,
17  have you heard about the Schwarzenegger incident and
18  where she fathered a love child?  You can tell me yes,
19  no or I don't know.
20       Have you led you to the conclusion that the
21  answer is yes?
22       A.  There's really no comparison between the two.
23  But if you like, suppose you said, have you heard about
24  the Schwarzenegger love child and how he met with the
25  this woman who worked there and, in fact, his wife Maria

One Penn Plaza, NYC                    Toby Feldman, Inc.                (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS     (800) 246.4950

Itamar Simonson                                         9/21/2011

Page 230

ITAMAR SIMONSON
1
2  gave a present to this woman when the child was born and
3  later they would celebrate the birthday of the child
4  every year, do you remember that?  That would be --
5      Q.  What's the correct answer to that?
6      A.  The answer to that in that particular case, it
7  would be yes, but you do not ask those questions because
8  you just provided all kinds of details that the
9  respondents, you know, was unaware of.
10     Q.  Why do you say the respondent was unaware?  The
11 question asks simply, do you know about the incident
12 where Shin -- where Dongguk believed Shin's false claims
13 and there was a forged document regarding Yale?  You
14 find that suggests an answer, the answer is yes?  Is
15 that what you're saying?
16     MR. FETNER:  Objection.
17     THE WITNESS:  Yes --
18     MR. WEINER:  Q.  This question leads to that
19 answer?
20     A.  Yes.  It leads to the answer yes, and it
21 provides specific details that were never tested that we
22 have no idea whether respondents knew anything of that
23 or what portions they did.
24        Whereas the obvious approach would have been to
25 ask an open-ended question, which is, you know, ask

Page 231

ITAMAR SIMONSON
1
2  about different universities, what have you heard, any
3  particular incidents, and slowly ask more directed,
4  open-ended questions to find out what they know or do
5  not know about the Shin incident.
6      Q.  I understand that you would like to have an
7  open-ended question, but I'm trying to understand why
8  you consider the question so blatantly biased that it
9  leads the respondent to an answer that I do remember --
10     MR. FETNER:  Objection.
11     MR. WEINER:  Q.  -- as opposed to I don't
12 remember or the answer is I don't know.
13     MR. FETNER:  Objection.  He's answered that
14 several times.
15     MR. WEINER:  Well, the fact that -- I'm sorry,
16 Howie.  I'm having difficulty understanding the concept.
17     Q.  If I ask you whether you remember the
18 Schwarzenegger love child, I don't quite understand how
19 that leads the respondent to the answer that is the
20 correct answer.
21        And by the way, how does the respondent know
22 what the correct answer is here?
23     MR. FETNER:  Objection.
24     THE WITNESS:  Let's put Schwarzenegger aside --
25     MR. WEINER:  Q.  No, let's not put

Page 232

ITAMAR SIMONSON
1
2  Schwarzenegger aside --
3      A.  Do you want me to answer about this question or
4  about Schwarzenegger?
5      Q.  I'm trying to understand the difference.
6      A.  What's that?
7      Q.  I don't understand the difference.  So why
8  don't you explain it to me?
9      MR. FETNER:  The difference between what and
10 what?
11     MR. WEINER:  The Schwarzenegger situation and
12 the Shin situation.
13     THE WITNESS:  Okay.  Let's stay with this
14 question.
15     MR. WEINER:  Q.  Sure.
16     A.  If you ask Schwarzenegger, "Are you aware of
17 the love child or not," that may be like asking about
18 the Shin incident or not.  Okay.  That may be
19 equivalent.
20        But that's not what he did here.  These are
21 people who said, "No, I don't know," or "No, I've not
22 heard about it," or "I don't know."
23        Now they said, "Well, there was the Shin
24 incident.  It's an incident where Dongguk University
25 employed Shin Jung Ah as a professor after Dongguk

Page 233

ITAMAR SIMONSON
1
2  University believed Shin" -- I'm not going to -- for the
3  sake of the Court Reporter, I'm not going to read the
4  rest of the question.
5         All of these details, this is the most
6  blatantly leading question I've seen in awhile.  Now,
7  you may not be a survey expert, but I would be surprised
8  if someone with survey experience like Dr. Jacoby would
9  not recognize that this is a blatantly leading question.
10        Now, I understand he had his reasons for not
11 asking open-ended questions, which I disagree with.  But
12 I think this is clearly a blatantly leading question.
13     Q.  I had asked you about the definition of a
14 leading question earlier, and you said that a leading
15 question is a question that leads the respondent to a
16 desired response.
17        Just show me how this question leads the
18 respondent to the desired response.
19        First of all, tell me how the respondent is
20 going to know what the desired response is, and then
21 tell me how one gets to the other.
22     MR. FETNER:  Objection.
23     THE WITNESS:  I already addressed it, but let
24 me try one more time.
25        Remember these are respondents who said, "No,

One Penn Plaza, NYC                Toby Feldman, Inc.              (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    (800) 246.4950

Itamar Simonson                                                    9/21/2011

Page 234

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2   I've not heard about the Shin incident," as it was
3   defined in Part C of Question 2, which already included
4   somewhat detailed explanation. They said, "No, I've not
5   heard about it."
6         So now that person has said, "No, I've not
7   heard about it," here's all of those details that
8   suggests to that person that, "Well, how come you don't
9   know all of those details? I'm just telling you all the
10  things you should remember."
11        And you, as a survey taker, should ask
12  yourself, this person just told you a second ago they've
13  not heard about the Shin incident, and now are you
14  suggesting that they remember even more details about
15  the case? I mean, it's just ridiculously leading.
16        Moreover, that question appeared earlier in the
17  survey and contaminated the rest of the survey.
18        MR. WEINER: Q. Didn't you tell me that a
19  closed-ended question can be used to cause someone to
20  remember something?
21     A. I don't remember saying that.
22     Q. Didn't Shari Diamond say that? Didn't we talk
23  about it earlier?
24     A. Yeah. It's possible in some context that it
25  can do that. I don't remember exactly what I said and

Page 235

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2   what you asked.
3      Q. Closed-ended questions are -- let's see if I
4   can find it.
5         "Responsible alternatives in a closed-ended
6   question may remind respondents of options they would
7   not have otherwise considered."
8         Let me ask you a question: Is an oral stimuli
9   which you referred to earlier this morning essentially
10  what was done here?
11        MR. FETNER: Objection.
12        THE WITNESS: I'm not sure I understand the
13  question.
14        MR. WEINER: Q. You told me earlier this
15  morning that one could use oral stimuli to provide
16  information to a respondent that would help the
17  respondent remember something.
18        MR. FETNER: Objection.
19        MR. WEINER: Q. Do you recall that?
20     A. I think you misunderstood.
21     Q. Oh, really? What do you mean?
22     A. Stimuli would be something like a commercial,
23  like a brochure. Providing information about facts --
24     Q. Is this factually incorrect?
25     A. It may be correct, but that's not the point.

Page 236

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2   Providing information about facts that you should find
3   out whether the respondents remember or knows those
4   details or not instead of feeding them the facts that
5   they're expected to remember. I mean, this has nothing
6   to do with stimulate.
7      Q. Is there anything factually incorrect with
8   Question 2A?
9      A. May be accurate. But if the only point of the
10  survey was to establish that people can repeat facts
11  given to them, there was really know need for the
12  survey, if that's what you're suggesting.
13     Q. This is repeating what they were given to them
14  when it asks whether you remember or not?
15     A. Well, they just told you --
16        MR. FETNER: Objection.
17        THE WITNESS: We continue this discussion.
18        But they just told you they don't remember
19  anything about the Shin incident, so now you're going to
20  give them more detail, and suddenly they remember the
21  more specific details. I mean, this is just ridiculous.
22        MR. WEINER: Q. This doesn't refresh your
23  memory? There's something wrong with refreshing
24  someone's memory?
25        MR. FETNER: Objection.

Page 237

ITAMAR SIMONSON
1     ITAMAR SIMONSON
2         THE WITNESS: If someone told you he doesn't
3   remember this incident at all, now suddenly he would
4   remember more specific details and that will refresh his
5   or her memory?
6         MR. WEINER: Q. You don't think that happens
7   all the time with closed-ended questions?
8      A. No. That's not how you design surveys. It's
9   leading.
10     Q. Okay. Let's go on to Question 3.
11        Is Question 3 leading, leading to a correct
12  response?
13        "Some people may have learned about the Shin
14  Jung Ah incident through conversations with other
15  people, and other people may have learned about the Shin
16  Jung Ah incident through reports on TV, the radio,
17  newspapers, magazine, the internet or media.
18        "Trying to remember the best you can, is your
19  knowledge about the Shin Jung Ah purely from what you
20  came to know through conversations with other people or
21  some -- or did some of what you know also come from
22  reports you saw, heard or read in media from sources
23  such as TV or radio?"
24        What's the correct response?
25        MR. FETNER: Objection.

One Penn Plaza, NYC                    Toby Feldman, Inc.              (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    (800) 246.4950

Page 238

ITAMAR SIMONSON
1
2      THE WITNESS:  Yeah, that's leading.
3      MR. WEINER:  Q.  What's the correct response?
4      MR. FETNER:  The correct response to what?
5      MR. WEINER:  Q.  According to your report, the
6  questions were designed to lead to a correct response.
7      A.  Yes.
8      Q.  What you said in paragraph 13A, "Your blatantly
9  biased and leading, closed-ended questions which
10  provided respondents with the correct answers."
11      So what's the correct answer to that question?
12      A.  There is some that came through media reports.
13      Q.  How does that response -- why is that the
14  correct response as opposed to being the accurate
15  response?
16      A.  Because if you look at the wording of the
17  question and the wording of the response options, I
18  think it suggests to you what the right answer is.
19      For example, if you look at response Option 1.
20      Q.  Yes.
21      A.  Which reads, "Came to know of it purely through
22  conversations with other people," that language suggests
23  that we're dealing here with a situation where, even if
24  you heard about it 99 percent from conversation, but not
25  100 percent from conversation, you should reject that

Page 239

ITAMAR SIMONSON
1
2  response option because of the word "purely."
3      It doesn't ask, "Where did you hear about it,
4  or to what extent did you hear about it from
5  conversation with other people or through the media?"
6  It just refers to purely.  So it sounds like anything
7  less than 100 percent should lead the respondent to
8  reject response Option 1 and go with response Option 1.
9      Q.  Do you think it matters in this case whether
10  the people who learned of the Shin incident learned it
11  from their neighbors or through -- directly through
12  media reports?
13      MR. FETNER:  Objection.
14      THE WITNESS:  That, I don't know.  The question
15  was asked.  You asked me if it was leading, it is.
16      MR. WEINER:  Q.  Let's go on to paragraph 4A.
17      "In the process of employing Shin Jung Ah as a
18  professor, which of the following do you think Dongguk
19  University did?"
20      Answer 1 is, "Contacted Yale University to
21  verify whether Shin Jung Ah received a doctorate
22  degree"; two, "Did not contact Yale University to verify
23  whether Shin Jung Ah received a doctorate degree";
24  three, "Have no thoughts about this" -- actually, three
25  and four you don't have to read.

Page 240

ITAMAR SIMONSON
1
2      So either they contacted or did not contact and
3  the person can say they don't know.
4      What's the correct response?
5      MR. FETNER:  Objection.
6      THE WITNESS:  I don't know what the correct
7  answer -- the correct answer.  But the question is
8  leading for I think obvious reasons.  I'm happy to
9  explain.  In other words --
10      MR. WEINER:  Q.  Okay.  Go ahead.  Explain.
11      A.  Let's say that I'm Korean consumer.
12      Q.  Yes.
13      A.  I don't know anything about all this business
14  about whether Dongguk contacted Yale, did not contact
15  Yale.
16      Q.  Yes.
17      A.  Not that something I ever heard about.
18      Q.  Okay.
19      A.  So now I'm asked to choose between these two
20  options.  Now, okay, I'm faced with a dilemma of which I
21  really do not know much.
22      Now, recall that in Question 2, I think it was,
23  we were told about the forgery incident, and we're given
24  all those details.  Forgery is a bad thing.
25      Now, you would think that a university's

Page 241

ITAMAR SIMONSON
1
2  involved in forgery such as Dongguk did not do anything
3  right.  In other words, for example, it did not contact
4  Yale to verify whether Shin received her doctorate
5  degree.  Doesn't mean that every single respondent would
6  choose that answer, but it leads a significant
7  percentage to give that answer.
8      Q.  Are you done with your answer?
9      A.  Yes.
10      Q.  I'm trying to understand.
11      The question says, "Do you believe Dongguk
12  contacted Yale, did not contact Yale as to verify?"  Has
13  nothing to do with -- has nothing to do with the
14  forgery, simply whether they verified the degree or not.
15      What's the correct answer here?  I don't
16  understand.
17      MR. FETNER:  Objection.
18      THE WITNESS:  I thought I just answered it.
19      MR. WEINER:  Q.  Well, I don't see how you go
20  from -- the question is yes or no, essentially; right?
21  You contacted them, or you didn't contact them.  That's
22  what the question asks.
23      A.  Yes.
24      MR. FETNER:  Objection.
25      MR. WEINER:  Q.  How do you conclude that is a

Page 242

ITAMAR SIMONSON

1
2  leading question?
3      A.  Okay.  Do you want me to repeat?  I just said
4  that many of those respondents really might have had no
5  idea about all this business about whether they
6  contacted Yale or did not contact Yale.  Maybe they
7  heard something about Shin.  Maybe they heard about the
8  love affair.  Maybe they heard about the fact that she
9  forgered her degrees at the University of Kansas and at
10  Yale.  Maybe they heard that.
11      But they don't know anything about all this
12  business about contacting Yale.  So now they have to
13  choose between two response options.  They're on the
14  phone.  They're probably not getting compensated.  They
15  just want to get done with that survey --
16      Q.  Are you guessing all this?
17      A.  No.  I've conducted many surveys.
18      Q.  In Korea?
19      A.  And listened to many interviews.
20      Q.  In Korea?
21      A.  I beg your pardon?
22      Q.  In Korea?  How many surveys?
23      A.  I've conducted some surveys in Korea.
24      Q.  So by asking whether you contacted or did not
25  contact, person says, "You know what, I'm just going to

Page 243

ITAMAR SIMONSON

1
2  guess and say they contacted or did not contact"; right?
3      A.  I didn't say.  That's one of the problems with
4  this leading question without having any open-ended
5  questions to find out who, if any of those respondents,
6  had any prior knowledge about all the issues related to
7  this litigation.
8      Q.  So your conclusion is based upon question 2A
9  that infected, i-n-f-e-c-t-e-d, all the other questions;
10  is that correct?
11      A.  No.  I think -- I thought I already explained
12  it a few times.  I said that's one of the problems.  I
13  think I explained some of the other questions.  I think
14  it comes back to one of the key problems that I think is
15  important to keep emphasizing is the importance of
16  starting with open-ended questions and then asking the
17  specific questions only of those people who have
18  demonstrated that they have any knowledge about this
19  issue that's the center of this litigation.
20      Q.  I understand that you think this should have
21  been open-ended questions, but you are concluding that
22  this particular question standing alone was a biased,
23  leading question when it asks whether someone did or
24  didn't do something.
25      And what I'm trying to understand since

Page 244

ITAMAR SIMONSON

1
2  closed-ended questions are not inherently improper,
3  which you've told me, they are only improper when they
4  lead to a conclusion.  What is it about this question
5  standing alone which leads to a conclusion?
6      MR. FETNER:  Objection.
7      THE WITNESS:  Where did I say that closed-ended
8  questions are not leading?  There might be some
9  closed-ended questions in some studies that are not
10  leading.  In many cases, they're strongly leading, and I
11  think I was very clear about that.
12      But coming back to this issue, I think you
13  cannot look at this question standing alone.  As I said,
14  you are asking questions of people who probably have no
15  information about the Shin incident.  And therefore, it
16  was so essential to begin with open-ended questions and
17  ask the key questions only of those people who
18  demonstrated they're familiar with the issues in this
19  case.  I think I emphasized enough.
20      In addition, I pointed to the order effect that
21  was present here.
22      Q.  Let's not keep leaping around to different
23  criticisms.  Let's go backing to page 52 of Diamond and
24  make sure I understood your prior testimony.
25      MR. FETNER:  Which page?

Page 245

ITAMAR SIMONSON

1
2      MR. WEINER:  Page 52.
3      Q.  I thought I asked you about this earlier.
4  "Thus the wording of a question, open-ended or
5  closed-ended questions can be leading."
6      Are you now telling me that every closed-ended
7  questions in your view is a leading question?
8      MR. FETNER:  Objection.
9      THE WITNESS:  No.  I find it funny the way you
10  are mischaracterizing what I said.  I'm not saying that
11  every closed-ended questions question is leading.  As I
12  said, if the only thing you are testing is, for example,
13  do I prefer this bottle of water or a cup of coffee,
14  that's all you care about, you can just ask me that, "Do
15  you prefer A or B?"  You don't need open-ended questions
16  for that.
17      But there are many, many cases such as the case
18  at issue here where you must have open-ended questions
19  upfront, and the closed-ended questions relied upon by
20  Dr. Jacoby were blatantly leading and turned the survey
21  into, in my opinion, a meaningless exercise with
22  predictable results.
23      Q.  You keep going back to other factors.  I'm
24  asking about a particular question.  Not whether you
25  think this should have been a proceeding open-ended

Page 246

ITAMAR SIMONSON
1
2  questions.
3        Let's go to page 253. I think I asked you
4  about this too, that quote, "Closed-ended questions are
5  more suitable for assessing choices between
6  well-identified options." Is that correct?
7     A. As I said, it depends --
8     Q. Is that correct?
9     A. No, it's not correct.
10    Q. It's not correct?
11    A. No, no. Let me just be clear. In some cases,
12 it is correct just as a said now in choices between
13 water and coffee. There are many other cases where it's
14 incorrect.
15    Q. Doesn't question 4A offer the respondent two
16 well-identified options?
17    A. No.
18    Q. No?
19    A. Two leading questions that propose answers that
20 respondents may very well have no opinion of or any
21 knowledge of before the survey.
22    Q. But if a closed-ended question can properly
23 test -- provide respondents -- I'll rephrase that.
24       If closed-ended questions are suitable for
25 assessing choices for -- between well-identified

Page 247

ITAMAR SIMONSON
1
2  options, isn't that exactly what 4A does when it asks
3  whether the respondents believe that Dongguk either
4  contacted or did not contact Yale?
5     MR. FETNER: Objection.
6     MR. WEINER: Q. Those are the two
7  well-identified options; isn't that correct?
8     A. That is a fatally flawed question for the
9  reasons that I already explained. This may be two
10 options. Let's say, you know, "Where would you like to
11 go tomorrow? Would you like to go to -- I don't know --
12 a particular neighborhood, or would you like to go to
13 another country?" One answer is much more likely than
14 the other.
15       Moreover, the response options contain
16 information that the respondents never showed or were
17 never asked about to show that they understood or were
18 familiar with. Therefore, these two response options
19 are leading, contain information that was produced by
20 the survey, and as a result, the entire survey based on
21 this question and the remaining questions produces or
22 produced results that tell us nothing about the Korean
23 population in general.
24    Q. So you don't agree that question 4A --
25 actually, I'll rephrase that.

Page 248

ITAMAR SIMONSON
1
2        So in your view, when one says either you
3  contacted or did not contact Yale University, does not
4  provide two well-identified options; is that correct?
5     MR. FETNER: Objection.
6     THE WITNESS: In the context of this survey,
7  that's correct.
8     MR. WEINER: Q. Let's go to 4B. 4B says, "Do
9  you think your belief Dongguk University did not contact
10 Yale University to verify whether Shin Jung Ah received
11 a doctorate degree has affected or changed your view,
12 affected or changed your view of Dongguk University?"
13       Okay. What's wrong with that question?
14    A. All the flaws that I talked about already. In
15 addition, this question --
16    Q. I'm just focusing on the question, not whether
17 it's preceded by anything else you're saying this is a
18 blatantly leading question. I'm going to simply ask
19 someone whether their view has been changed?
20    MR. FETNER: Objection. Please allow the
21 witness to answer.
22    MR. WEINER: Okay.
23    THE WITNESS: You just led them to say they did
24 not contact; they did something bad. That's question
25 4A. Now, after making it very salient in their head

Page 249

ITAMAR SIMONSON
1
2  that the University did something bad, you're asking did
3  it affect you? Two problems here.
4     MR. WEINER: Q. How does 4A --
5     MR. FETNER: Stop interrupting the witness.
6     MR. WEINER: Q. Go ahead.
7     A. Two problems. A, you focus their attention on
8  something, and you made it very salient, and as a
9  result, you're grossly inflating any conceivable
10 influence that they would have.
11       Second, it's well-established that people could
12 not tell you whether something like that affected their
13 perceptions a year or two earlier.
14    Q. Where does it say did something bad? Can you
15 tell me what you mean?
16    A. I think being involved in degree forgery and
17 then not contacting Yale.
18    Q. Who is involved in degree forgery?
19    A. The University.
20    Q. How?
21    A. They hired a professor that forged her degrees.
22    Q. So how does that mean that Dongguk did
23 something bad?
24    MR. FETNER: Objection.
25    THE WITNESS: Well, I think that University

One Penn Plaza, NYC                     Toby Feldman, Inc.                      (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS     (800) 246.4950

Itamar Simonson                                           9/21/2011

Page 250

ITAMAR SIMONSON
1
2  that evidently did such a poor job of screening faculty
3  hires.
4        MR. WEINER: Q. Is that what happened here?
5     A. What's that?
6        MR. FETNER: Please allow him to finish.
7        MR. WEINER: Q. Go ahead.
8     A. Well, I've never encountered -- this goes
9  beyond the Jacoby survey, I've never encountered a case
10  where a university hired someone without checking their
11  credentials, their work, without talking to their
12  advisor. I've just never encountered anything like
13  that.
14        Certainly in the U.S. and I know something
15  about Korean universities, this seems very strange.
16  From what I read in some of those articles, apparently
17  that raised some red flags also in Korea.
18     Q. So you believed the articles that you read?
19        MR. FETNER: Objection.
20        THE WITNESS: To the effect that they point to
21  those concerns that were raised, yes.
22        MR. WEINER: Q. Do you know if those articles
23  are accurate?
24     A. I don't know if they're accurate --
25        MR. FETNER: Objection.

Page 251

ITAMAR SIMONSON
1
2        THE WITNESS: -- in every respect. All they
3  say is that those concerns were raised.
4        MR. WEINER: Q. I understand. What is
5  Stanford University's criteria when it hires faculty?
6  Does it seek to verify degrees?
7        MR. FETNER: Objection.
8        THE WITNESS: Of course we get the list of
9  grades. We invite the person to give a lecture. We
10  talk to the advisor. We talk to other people who know
11  that person. We read the articles published by that
12  person.
13        We take hiring decisions very carefully.
14        MR. WEINER: Q. And you think that writing
15  Yale University and asking whether someone received a
16  degree from Yale does not reflect a checking of
17  credentials?
18        MR. FETNER: Objection.
19        THE WITNESS: Of course not. They got a faxed
20  response from someone. That's what they did. That's
21  what confirmed to them that the person got a degree from
22  Yale. After, if I recall correctly, suspicions had
23  already been raised, and the only thing they did was
24  send a letter from Yale and got a faxed response. And
25  that's --

Page 252

ITAMAR SIMONSON
1
2        MR. WEINER: Q. You don't think that's
3  appropriate; send a registered letter and get a
4  response?
5        MR. FETNER: Objection.
6        MR. WEINER: That's not appropriate.
7        THE WITNESS: My role here was to evaluate the
8  survey. But if you ask me, yeah, I think that's very
9  inappropriate.
10        MR. WEINER: Q. What does Yale do to verify
11  degrees?
12     A. Exactly what Stanford does.
13     Q. Seeks verification from other universities?
14     A. Yeah. They talk to advisors.
15     Q. Not what I asked you, sir.
16        Does it seek a verification of a degree from
17  another university?
18        MR. FETNER: Objection.
19        MR. WEINER: Q. Or do you not know?
20     A. That I don't know. But they have --
21     Q. That's fine. You don't know the answer.
22        Do you know what Berkeley does?
23        MR. FETNER: Objection.
24        THE WITNESS: I believe, actually, I was hired
25  by Berkeley. I was on the faculty of Berkeley for six

Page 253

ITAMAR SIMONSON
1
2  years.
3        MR. WEINER: Q. Right. Did they verify your
4  degree?
5     A. I believe they did.
6     Q. But you don't know?
7     A. I'm pretty sure they did.
8     Q. Okay. What's the standard in Korea?
9     A. I know --
10        MR. FETNER: Objection.
11        THE WITNESS: -- my student was hired by the --
12  by Korea University.
13        MR. WEINER: Q. Okay.
14     A. And the people who hired her in the marketing
15  department of Korea University had lengthy discussions
16  with me about her and about her record and what I
17  thought about her and about our joint work that we
18  published.
19        So I think they did their homework, as far as I
20  can tell, no different than American universities.
21     Q. Continuing, do you understand what the basis of
22  this case is as to whether Dongguk made an accurate
23  statement -- I'll rephrase that.
24        What's your understanding of this case?
25        MR. FETNER: Objection.

64 (Pages 250 to 253)

Itamar Simonson                                                    9/21/2011

Page 254

ITAMAR SIMONSON

1        ITAMAR SIMONSON
2        THE WITNESS: As far as -- I mean, I read the
3    complaint. And as far as I recall, it had to do with
4    the alleged harm caused by the alleged so-called Yale
5    misstatements to Dongguk University.
6        MR. WEINER: Q.  Did Yale in your view make any
7    misstatements?
8        A. Yeah, evidently someone -- again, I don't have
9    enough information. From what I could tell, it appears
10   that someone somewhere sent a confirmation that in
11   hindsight turned out to be incorrect.
12       Q. Going to question 4B, can you tell me what the
13   correct answer to question 4B is? And the question
14   is --
15       MR. FETNER: Objection.
16       MR. WEINER: Q.  -- "Do you think your belief
17   that Dongguk University did not contact Yale to verify
18   whether Shin Jung Ah received a doctorate degree has
19   affected or changed your view of Dongguk University," is
20   it yes or no?
21       A. Yes.
22       Q. And then the question 5A, "Which of the
23   following do you think Dongguk University did? Dongguk
24   University did not tell the truth to the public because
25   of the attempt to contact Yale University to verify" --

Page 255

ITAMAR SIMONSON

1        ITAMAR SIMONSON
2    let me read that again.
3        "Which of the following do you think Dongguk
4    University did? Dongguk told the truth to the public
5    about the attempt to contact Yale University to verify
6    whether Yale University awarded Shin Jung Ah a doctorate
7    degree. Dongguk did not tell the truth to the public
8    about the attempt to contact Yale University to verify
9    whether Yale University awarded Shin Jung Ah a doctorate
10   degree," what's the correct answer?
11       MR. FETNER: Objection.
12       THE WITNESS: Did not tell the truth.
13       MR. WEINER: Q.  And what leads --
14       A. Again, doesn't mean that most would choose that
15   response. But enough people would.
16       Q. Based upon what in the question?
17       A. I think it's, again, based on the series of
18   questions and the information provided to respondents.
19   I don't know if there's a point in me repeating for each
20   question what I just said --
21       Q. So there's nothing in the question itself
22   standing alone. That's what I'm asking. I'm not asking
23   about what they might have done, question order. What
24   in the question causes the question to be answered one
25   way or the other way?

Page 256

ITAMAR SIMONSON

1        ITAMAR SIMONSON
2        MR. FETNER: Objection. The questions don't
3    stand alone. They're all part of the same
4    questionnaire.
5        MR. WEINER: Excuse me, Howie. I think we had
6    defined a leading question as a question -- and I'll get
7    it for you exactly in a minute -- that leaves a
8    respondent to a desired response. That is the question
9    itself standing alone leads to a desired response.
10       MR. FETNER: Objection.
11       MR. WEINER: Q.  Tell me what it is that
12   question that leads to a desired response?
13       A. You cannot isolate one question and assume that
14   respondents ignored everything that you asked them just
15   a couple of seconds earlier. You look at a series of
16   questions, the information provided, the context of
17   cert, that's how you do it.
18       That's what makes this question leading.
19       Q. So there's nothing in the question itself;
20   correct?
21       A. No.
22       Q. It's the way it was ordered?
23       A. No. That's not true.
24       Q. Then what is --
25       A. Because the question is part of a series of

Page 257

ITAMAR SIMONSON

1        ITAMAR SIMONSON
2    questions.
3        Q. I'm not talking about series. I'm talking
4    about each individual question.
5        You made a number of statements that all these
6    questions are blatant and leading. I'm trying to find
7    out aside from order effect, aside from open-ended
8    versus closed-ended, what in the question leads to a
9    response. Tell me in 5a what leads to a response.
10       MR. FETNER: Objection.
11       THE WITNESS: One problem we may be having here
12   is you, I assume, are an expert on the law and not an
13   expert on surveys where I'm a survey expert.
14       Therefore, I think you assume you can look at
15   each question and say forget about all the other
16   questions, all the other information. Obviously you
17   cannot do that. When I'm saying a question is leading,
18   I'm referring to the context of the question, which
19   question will -- was asked earlier.
20       I'll be happy to give you an example, and there
21   are numerous examples like that. I'm happy to give you
22   an example of how one question affects the other, if you
23   would like.
24       MR. WEINER: Q.  That's what I'm trying to
25   isolate, Dr. Simonson.

65 (Pages 254 to 257)

Itamar Simonson                                          9/21/2011

Page 258

ITAMAR SIMONSON

1
2    So you are not saying as you sit here today
3    that if I was to take each question individually, that
4    they are individually by themselves leading and come to
5    a response?  It's the way in which they were put
6    together seriatim; is that correct?
7        A.  No.  I'm saying all of the questions are
8    leading as evaluated in the context of the survey.
9        Q.  When you say "all of the questions are
10   leading," that's in the aggregate; is that correct?
11       A.  Each question is leading when considered in the
12   context of the survey.
13       Q.  I'm asking you -- you understand what I mean by
14   the term "aggregate"?
15       A.  I know what the term "aggregate" means.
16       Q.  Fine.  So let's distinguish between an
17   individual question.  If I was simply to take a question
18   I just read to you with the choices that are available,
19   are you saying that those individual questions are by
20   themselves without reference to anything else leading?
21   Yes or no?
22       A.  No.  It's not a yes or no.
23       Q.  Without reference to any other question,
24   without reference to ordering, without reference to
25   open-ended, I'm trying to get you to focus on the

Page 259

ITAMAR SIMONSON

1
2    individual questions themselves.  Can you not answer
3    that question?
4        A.  I can.  All the questions are leading, given
5    the context in which they're embedded.
6        Q.  Let's try and get a straight answer to my
7    question.  I'm not asking you the way they're embedded.
8    I'm not asking you the way that they're ordered.  I'm
9    not asking you in the way they have been put together.
10   I'm asking you singularly, standing alone, without
11   reference to anything else in the survey, are you saying
12   that each individual question standing alone without
13   reference to anything else is leading and leads the
14   respondent to a desired result?
15       A.  I thought I already answered that a number of
16   times.
17       Q.  No.  You keep trying to duck it.  Try and
18   answer that question.
19           Can I have the question read back?
20       A.  What you're asking me to do is say, "Please,
21   give an answer that makes no sense and violates
22   everything we know about the conduct of surveys.  Could
23   you please do that?"  No, I cannot do that.
24       Q.  Sir what, you're telling me as I think I
25   understand your testimony is that the survey as a whole

Page 260

ITAMAR SIMONSON

1
2    when you look at the way the questions are ordered, it
3    doesn't have an open-ended questions in the beginning,
4    doesn't in your view have filters or controls, that the
5    survey therefore in your opinion is fatally flawed.  I
6    get it.  I understand that.
7        But that's not what I'm asking you.  What I'm
8    asking you is whether each individual question standing
9    alone creates a desired response and is therefore
10   leading.  But you're not answering that question, and
11   you're obfuscating your answer by saying, "Well, there
12   are survey principles."
13       See if I can get an answer to the question.
14   Are you saying each question standing alone without
15   reference to any of your other criticisms leads to a
16   desired response?
17       MR. FETNER:  Objection.  This question has been
18   asked and answered many times.  Go ahead and answer it
19   again.
20       THE WITNESS:  I already answered it a number of
21   times.  Each of the questions are leading when
22   considered in the context of the survey that they were
23   asked.
24       MR. WEINER:  Okay.  We have to break for the
25   tape.  We'll come back.

Page 261

ITAMAR SIMONSON

1
2        THE VIDEOGRAPHER:  This now marks the ending of
3    tape labeled No. 3 of the videotaped deposition of
4    Itamar Simonson.  We're now going off the record.  The
5    time is 4:25.
6        (Recess taken:  4:25 p.m. - 4:37 p.m.)
7        THE COURT:  This now marks the beginning of
8    tape labeled No. 4 of the videotaped deposition of
9    Itamar Simonson.  We are now going back on the record.
10   The time is 4:37.
11       MR. WEINER:  Q.  Dr. Simonson, one of your
12   criticisms of the survey regards the survey or lack of
13   validation; am I correct?
14       A.  Yes.
15       Q.  Typically, how are telephone surveys validated?
16       A.  The way I do it is I have a separate research
17   firm that contacts the respondents.  In the case of
18   phone surveys, I use significantly lower validation rate
19   than I do in the context of mall intercept surveys.
20       In the case of mall intercept surveys, I try to
21   validate a hundred percent of the interviews.  In the
22   case of phone surveys, I think I do something like
23   20 percent.
24       Q.  Would it be fair to say that typically with
25   respect to phone surveys, at least in the U.S.,

66 (Pages 258 to 261)

Itamar Simonson                                          9/21/2011

Page 262

ITAMAR SIMONSON
1
2  validation is done when a supervisor listens to a sample
3  of interviews that each interviewer does?
4      A. That's not what I would recall -- that exists,
5  and I assume that's the case, but I wouldn't call that
6  survey validation. Although, I agree -- maybe you
7  didn't ask that, but I think I said in a report, among
8  all the flaws of the Jacoby survey, I considered that a
9  very minor one.
10     Q. Another flaw you consider very minor is not
11 informing the survey recipients about a lawsuit?
12     A. That's correct.
13     Q. Why is that a flaw?
14     A. Well, to the extent that the lawsuit itself
15 received a great deal of publicity, it's possible that
16 respondents know what the survey is about, and that
17 might somehow affect their answers.
18     Q. How?
19     A. It's hard to predict, but if I'm involved in a
20 high -- you know, a high-profile case, and I conduct the
21 survey, I try to test for that. And then later, that
22 allows you to the extent that many people have heard
23 about it, I try to compare those who have, and those who
24 have not to see if there is any difference.
25     Q. How would the knowledge of an existence of a

Page 263

ITAMAR SIMONSON
1
2  lawsuit cause someone to change their opinion?
3      MR. FETNER: Objection.
4      THE WITNESS: Well, it's sometimes hard to
5  predict. I was involved a few years back in a case
6  related to Splenda, which was a fairly high-profile
7  case.
8          And I was concerned that respondents had heard
9  that the makers of Splenda were accused of representing
10 Splenda as being natural or more natural than other
11 sweeteners, which in reality it is not. Suppose I'm a
12 respondent, and I know what the survey is about, or I
13 think I know what the survey is about. That may cause
14 me to say certain things about whether Splenda contains
15 sugar or does not contain sugar.
16         But again, this is a minor issue.
17     MR. WEINER: Q. All right. Let's now turn to
18 paragraph 69 of your report. That's the beginning of
19 what you call other causes that potentially negatively
20 impact Dongguk's reputation.
21         You continue and get to paragraph 71 where you
22 say, "Thus, there is no doubt" -- I'm sorry. "There is,
23 thus, no doubt that many aspects of the Shin scandal
24 aren't related to Yale or key contributors to any
25 negative publicity surrounding Dongguk University."

Page 264

ITAMAR SIMONSON
1
2      What did you do to test for that conclusion?
3      A. I did not test specifically for anything. But
4  looking at the data, the articles, reading, for example,
5  about the trial that received, I believe, a great deal
6  of attention. And what was discussed according to the
7  news reports, during that trial, it certainly appears
8  that this was a big part of this whole Shin affair.
9      Q. I'll give you a couple of exhibits we put
10 together for you. The first one has yellow.
11         (Plaintiff's Exhibit Nos. 31 and
12         32 was marked for
13         identification.)
14     MR. WEINER: Q. Now, I'm going to show you
15 Exhibits 31 and 32 and tell you that they consist of
16 articles which you cited in your report as well as some
17 other articles that we added. And that the yellow tabs
18 are the tabs I'm going to ask you about as well as the
19 orange tabs.
20         But we can start with the orange tabs. The
21 orange tabs are the ones that you cited in paragraphs 69
22 through 72. So actually, let's start with the yellow.
23         When do you understand that the alleged
24 negative articles came to be published? Do you recall?
25 Do you have any understanding?

Page 265

ITAMAR SIMONSON
1
2      A. Which negative articles are you referring to?
3      Q. Articles in which Yale says that it never
4  contacted -- that Dongguk never sent the fax to Dongguk,
5  and Dongguk never sent the letter.
6      MR. FETNER: Objection.
7      THE WITNESS: I thought that started sometime
8  in late June of 2007.
9      MR. WEINER: Q. Okay.
10     A. I think it coincided with her appointment to a
11 prestigious role as a director of some art event.
12     Q. Going back to what we had discussed earlier
13 this morning about the impact of negative media reports
14 and word of mouth and trusted source, I would like you
15 to just sort of thumb through and let's go to yellow tab
16 to yellow tab in Exhibit 31.
17     A. The first one?
18     Q. Yeah. The first one, which is July 12th, I
19 believe.
20     A. Yes.
21     Q. You see where it says, "Allegations of possible
22 influence-peddling in Shin's appointment."
23         Do you think that --
24     A. Where's that?
25     Q. It's in the second to last paragraph.

67 (Pages 262 to 265)

Itamar Simonson                                              9/21/2011

Page 266

ITAMAR SIMONSON
1
2      A.  I see.
3      Q.  Do you think the statement about "allegations
4  of possible influence-peddling" is a positive or
5  negative statement about an entity?
6      A.  Negative.
7      Q.  Okay.  And do you think that that may have
8  contributed to someone's reputation, brand reputation
9  being negatively impacted?
10     MR. FETNER:  Objection.  Are you referring to
11  Dongguk's reputation?
12     MR. WEINER:  Sure.
13     THE WITNESS:  It might have.  I didn't test it.
14  It might have.
15     MR. WEINER:  Q.  Okay.  Let's go to the next
16  tab, which is I believe an article dated July 13th.
17     Do you see that?
18     A.  I do.
19     Q.  It has underneath it, Reinstein Exhibit 10, the
20  headline being "The Fax from Yale University to Dongguk
21  University is also forged."
22     A.  Wait.  Where is that?
23     Q.  The headline right on top.
24     A.  Oh.
25     Q.  Do you think a headline like that has a

Page 267

ITAMAR SIMONSON
1
2  positive or negative influence on the reputation of
3  Dongguk?
4      MR. FETNER:  Objection.
5      THE WITNESS:  It could have.
6      MR. WEINER:  Q.  Could have negative?
7      A.  Could have negative effect.  Of course, it's
8  hard to say, you know, what else was in the article and
9  what other things were mentioned.  So it's hard to know
10  how -- what kind of effect it has.  Standing alone if
11  you asked me about that, I would say it could have
12  negative effects.
13     Q.  It says, "The fax that Dongguk University has
14  been claiming to have received from Yale University is
15  then said to be false or forged"; is that correct?
16  That's what the article leads into; am I right?
17     MR. FETNER:  Objection?
18     THE WITNESS:  Is that the beginning of article?
19     MR. WEINER:  Q.  Right.  "Jeong Ah Shin
20  mystery," right beneath that first column.  You see
21  that?
22     A.  I do.
23     Q.  Okay.  And then continuing with the next one,
24  also July 12th, where it refers to Gila Reinstein of
25  Yale University.

Page 268

ITAMAR SIMONSON
1
2      A.  Where is that?
3      MR. FETNER:  Where are you looking?
4      MR. WEINER:  It's Bates stamped Yale 753.
5      MR. FETNER:  Which paragraph?
6      MR. WEINER:  There's the second paragraph that
7  refers to Gila Reinstein.
8      Q.  Do you know if Ms. Reinstein, who Ms. Reinstein
9  is?
10     A.  I think I read it at some point.  It says that
11  she was the Office of Public Affairs.
12     Q.  Okay.  Let's go on to the next article which is
13  also dated July 13th, is dated July 13th.
14     You see the statement that it says, "The Board
15  didn't verify Shin's degree for incomprehensible
16  reasons."  Do you know if that's accurate?
17     MR. FETNER:  Which paragraph?
18     MR. WEINER:  Headline, "Allegations of Shin
19  Jeong-ah's degree fabrication had surfaced since 2005
20  during her appointment, but the school and the Board
21  didn't verify for incomprehensible reasons."
22     Q.  Do you think that's a statement that might have
23  caused a negative impact on Dongguk's reputation?
24     MR. FETNER:  Objection.
25     THE WITNESS:  Lot of other things.  It's hard

Page 269

ITAMAR SIMONSON
1
2  standing alone it could have negative effect.
3      MR. WEINER:  Q.  This led to charges that
4  Dongguk knew of the allegations already, yet they were
5  negligent in verifying the degree or they were trying to
6  cover it up."  You think that might be negative?
7      A.  It could be negative, and I guess, yeah.  I'll
8  leave it for someone else to decide whether that happens
9  to be appropriate.
10     Q.  Okay.  Let's go to the next article that I
11  tabbed, July 13th, also 2007.  "The allegations
12  surrounding Shin's appointment process is growing.  Some
13  suggested the possibility of corruption among the
14  school's Board."
15     A.  Wait.  Where are you reading?
16     Q.  First paragraph.  Is that negative?
17     MR. FETNER:  Objection.
18     THE WITNESS:  Yes.  I mean, I don't see what --
19  I'm not sure I understand the relevance.  If you asked
20  me specifically about that, those allegations, yeah,
21  they could be -- any corruption is negative.
22     MR. WEINER:  Q.  Right.
23     A.  I mean, if you look at the headline, it seems
24  to emphasize something else.
25     Q.  July 14th, 2007, next one with tabs, if you go

68 (Pages 266 to 269)

Itamar Simonson                                                      9/21/2011

Page 270

ITAMAR SIMONSON
1
2   to the second page of the article, "There are
3   allegations that despite the repeated resurgery he knows
4   of Shin's degree fabrication problem, Dongguk either
5   ignored them or tried to hide them."
6        You think that's accurate?  I mean, do you
7   think that causes a negative view of Dongguk?
8        MR. FETNER:  Objection.
9        THE WITNESS:  Are you asking me if it's
10  accurate?
11       MR. WEINER:  Q.  No.  I'm asking you whether
12  that would cause a negative impact in your view?
13       A.  Any allegation against someone of any type
14  could have negative component.  Obviously it depends
15  which specific aspects are highlighted and to what
16  degree.  So for example, if people talk about lots of
17  other things, then you can look at what, if any, was the
18  contribution of one element of that.
19       Q.  I'll skip to -- in the interest of time, let's
20  go to July 18th, 2007, and that's Simonson 1684.
21       You find that?
22       A.  What's the Bates?
23       Q.  July 18th, 2007.
24       MR. FETNER:  1684 is the Bates.
25       MR. WEINER:  1684 is the Bates stamp.  It has a

Page 271

ITAMAR SIMONSON
1
2   yellow tab.
3        A.  Okay.  Okay.  Let me take a look at this one.
4        Q.  You see where it states, "It was reported on
5   the 17th during September 2005, while hiring Shin
6   Jeong-ah, Dongguk did not verify Shin's bachelor's and
7   master's degrees."
8        A.  Where is that here?
9        Q.  Did, in fact, Dongguk verify Shin's PhD?
10       MR. FETNER:  Objection.
11       THE WITNESS:  I don't know if you want to call
12  it -- they sent a letter and received a fax.
13       MR. WEINER:  Q.  Which Yale at this point was
14  contending was a forged document; is that correct?
15       MR. FETNER:  Objection.
16       THE WITNESS:  I don't know at what time.
17       MR. WEINER:  Q.  Let's move to the first orange
18  tab, which I think is in that book.
19       In your view, what significance --
20       A.  The one about University of Kansas?
21       Q.  Yes.  What significance does that article have?
22       MR. FETNER:  Objection.
23       MR. WEINER:  Q.  This is one you referred to in
24  your report, first one.
25       A.  It could be -- that's another issue related to

Page 272

ITAMAR SIMONSON
1
2   Shin, and I believe it was later determined that there
3   was no attempt whatsoever to verify her degrees from
4   University of Kansas.
5        Q.  Correct.  That's what it was determined.
6   What's the significance of that?
7        MR. FETNER:  Objection.
8        THE WITNESS:  Just another thing that allegedly
9   Dongguk University did improperly.
10       MR. WEINER:  Q.  Why was that improper?
11       A.  Because, as I discussed earlier, you normally
12  ask for proof that someone had diplomas or that received
13  the degrees that she claimed to have received.
14       Q.  The degree that they tried to verify was her
15  PhD degree; is that correct?
16       A.  I think you were referring to the letter.
17       Q.  It was a letter seeking verification of her PhD
18  degree from Yale?
19       A.  From Yale, right, not from University of
20  Kansas.
21       Q.  No.  That's what they sought in September of
22  2005; right?
23       A.  Right.  What's the question?
24       Q.  Why, therefore, was it somehow improper that it
25  didn't contact Kansas to find out whether Shin received

Page 273

ITAMAR SIMONSON
1
2   a PhD degree from Yale?
3        MR. FETNER:  Objection.
4        THE WITNESS:  I'm not sure I understand.
5        MR. WEINER:  Q.  I'll rephrase if you don't
6   understand.
7        Am I correct as you understand the facts of
8   this case that in September of 2005, Dongguk sent a
9   registered letter to Yale seeking verification and
10  received back a response saying that she did receive a
11  response from Yale saying she had received a PhD from
12  Yale?
13       MR. FETNER:  Objection.
14       MR. WEINER:  Q.  That you understand.
15       A.  Right.
16       Q.  Why was it then improper that Dongguk did not
17  seek to find out any information about Kansas?
18       A.  Because it tells you something about their
19  superficial hiring process which contributed to hiring
20  someone who really did not have the degrees that she
21  claimed to have completed.
22       Q.  Sir, no one cared, am I correct, about Kansas?
23  They cared about whether there was a degree from Yale;
24  am I correct?
25       MR. FETNER:  Objection.

69 (Pages 270 to 273)

Page 274

ITAMAR SIMONSON
1
2     THE WITNESS: I didn't conduct a survey. I
3  think I recall correctly from those various articles,
4  people talked, in many cases, about degree forgery or
5  the fact that a professor was hired due to influence
6  from higher levels, and despite the objections of the
7  department and the love affair, various other issues.
8     So I think that the fact that the university
9  did not apparently bother to verify her degrees,
10  undergraduate and master's degree from University of
11  Kansas, is another indication of superficial hiring
12  process.
13     MR. WEINER: Q. Do you understand that there
14  is a contention in this case that Shin ever claimed she
15  had a master's degree from Kansas?
16     MR. FETNER: Objection.
17     THE WITNESS: I could be wrong. I thought she
18  received two degrees from Kansas. If you're telling me
19  it was only one.
20     MR. WEINER: Q. It was only one.
21     MR. FETNER: No. She claimed to have received
22  two degrees from Kansas University. In fact, you just
23  read a reference to that in the previous article.
24     MR. WEINER: Q. Let's continue with going to
25  the July 19th, 2007.

Page 275

ITAMAR SIMONSON
1
2     A. Is that in yellow?
3     Q. That's in yellow. It has a picture of
4  Reinstein. It's a few more in. That's it.
5     Do you think where it says, "Yale University
6  says Dongguk University's official letter for inquiry of
7  academic records were never received," do you think that
8  would have an impact on Dongguk's reputation?
9     MR. FETNER: Objection.
10     THE WITNESS: I think I already answered that.
11  It really depends on all the other facts of the case,
12  but yeah. If many people read that and only that, it
13  could have negative effect.
14     MR. WEINER: Q. Would you agree Yale would be
15  a trusted source?
16     MR. FETNER: Objection.
17     THE WITNESS: I haven't checked Yale's image in
18  Korea.
19     MR. WEINER: Q. Do you have any reason to
20  believe it's not a trusted source?
21     A. I have no reason to believe either way.
22     Q. When it says, "Did Dongguk University really
23  send the mail?" Do you see that in the first column?
24  And the Yale University spokesman says, "We never
25  received the letter." Do you think that would have a

Page 276

ITAMAR SIMONSON
1
2  negative impact on Dongguk's reputation --
3     MR. FETNER: Objection.
4     MR. WEINER: Q. -- as having lied?
5     MR. FETNER: Objection.
6     THE WITNESS: Again, I think I already answered
7  that question a number of times. To the extent many
8  people read it and that's the only thing they read and
9  that's what affected their perceptions, it could.
10     MR. WEINER: Q. Let's go to the next tab.
11  "Fake doctorate degree, why no admission?" The last
12  column on the right. "Dongguk University's claiming to
13  have forwarded an academic record verification request
14  to Yale University. Did you receive it?" The answer
15  is, "I looked for it repeatedly in the department of art
16  history and the graduate school with no success."
17     A. Where are you reading?
18     Q. Last column on the right stating that the
19  letters was not received. Another indication again of
20  adverse impact on Dongguk's reputation?
21     MR. FETNER: Objection.
22     THE WITNESS: Again, it could. And I don't
23  know how many people read it as opposed to reading what
24  was said in the headline.
25     MR. WEINER: Q. Okay.

Page 277

ITAMAR SIMONSON
1
2     A. But the president, some reference to the
3  president here.
4     Q. All right. So I want go through all the ones
5  we tabbed in yellow. Now I want to focus on the ones
6  you tabbed that you referred to in your report. And
7  those are identified in paragraphs 69, 70 and 71. We
8  covered one of them.
9     I would like you to now go to Exhibit 32 where
10  the others are. One is dated September 12th, 2007,
11  Bates stamped 210. Do you see that?
12     A. Right.
13     Q. Okay. What was the purpose of referring to
14  this particular document?
15     A. It referred to the other important aspects of
16  the Shin incident.
17     Q. What aspect was that?
18     A. Her -- how Shin exploited relations with Roh's,
19  which I believe was the president's former aide. That's
20  what it says in the document.
21     Q. What about this information that negatively
22  impacts Dongguk?
23     MR. FETNER: Objection.
24     THE WITNESS: The fact that the -- if I recall
25  correctly, the president of the university was I'm

70 (Pages 274 to 277)

Page 278

ITAMAR SIMONSON
1
2  not -- I don't know if they use the term blackmailed.
3       MR. WEINER:  Q.  Can you show me where in the
4  article you are referring?
5       A.  There was a series of articles.
6       Q.  This is the one you identified.  Tell me where
7  in this article there is anything negative about
8  Dongguk?
9       MR. FETNER:  Objection.  This is one of many.
10       MR. WEINER:  Not many.  There are about eight.
11  Let's go through each one.
12       Q.  What is it about this article in your view is a
13  negative regarding Dongguk?
14       MR. FETNER:  Objection.
15       THE WITNESS:  This one focuses on the person
16  who did the influencing.
17       MR. WEINER:  Q.  Where?
18       A.  If I understand correctly.  That's the aide
19  that, if I understand correctly, tried to influence --
20  I don't know if the hiring or keeping Shin --
21       Q.  M-hm.
22       A.  -- at the university.
23       Q.  Okay.  In fact, is that true that someone tried
24  to improperly influence Dongguk?
25       MR. FETNER:  Objection.

Page 279

ITAMAR SIMONSON
1
2       THE WITNESS:  I'm not expert on those details,
3  but that's my impression, yes.
4       MR. WEINER:  Q.  That it was true?
5       A.  That there was an influence on I believe the
6  president or at least the ex-president of Dongguk
7  University said that he was pressed, and so I think
8  there was that aspect.  There were also all those
9  accusations, if I recall correctly, the fact that she
10  had help from higher levels at the university, and
11  apparently was hired despite the strong opposition from
12  the department.  And I believe I read somewhere that
13  even after she was hired, she was not allowed to teach
14  anything.
15       Q.  Why don't you just tell me about the articles
16  that you focused on.
17       A.  I thought you just asked me a question, and I'm
18  answering this question.
19       Q.  I am.  What is it in this article that in your
20  view creates the negative impact on Dongguk --
21       MR. FETNER:  Objection.
22       MR. WEINER:  Q.  -- that you think that
23  Dr. Jacoby should have somehow referenced?
24       A.  Of course.
25       Q.  What is it in the article?

Page 280

ITAMAR SIMONSON
1
2       A.  If I can just answer the question --
3       Q.  Yeah.
4       A.  -- that would be helpful.
5       Q.  Okay.
6       A.  When you have a university that's apparently
7  was influenced by corruption, that is a negative thing.
8  And this is one article.  There are a series of articles
9  that I believe in the headlines in connection with
10  that trial.
11       So I think this was if you look at all the
12  articles, at least those that I reviewed, many of them,
13  that clearly was a big part of any negative associations
14  created with respect to Dongguk University.
15       Q.  So do I understand you correctly that in your
16  understanding of the events, that the reason that Shin
17  was hired was a result of corruption?
18       MR. FETNER:  Objection.
19       THE WITNESS:  No.
20       MR. FETNER:  I think you're mischaracterizing
21  his testimony.
22       MR. WEINER:  Q.  That's what I'm trying to find
23  out.  You answered the question.
24       Is it your view that the reason that Dongguk --
25  that Ms. Shin was hired had nothing to do with the fact

Page 281

ITAMAR SIMONSON
1
2  that Yale had verified her degree?
3       MR. FETNER:  Objection.
4       THE WITNESS:  Obviously I'm not in a position.
5  I was not there.  I can read the articles, and it
6  appears from articles that I reviewed that people
7  accused or associated what happened with Shin at Dongguk
8  University with her relationship with that presidential
9  aide.
10       MR. WEINER:  Q.  But you state her relationship
11  with the presidential aide, what does that have to do
12  with anything?
13       A.  Well, because --
14       MR. FETNER:  Asked and answered that question.
15       THE WITNESS:  -- tried to influence the
16  university.
17       MR. WEINER:  Q.  That's what people wrote?
18       A.  Yes.
19       Q.  And that's because people did not believe that
20  Dongguk had ever contacted Yale?
21       MR. FETNER:  Objection.  Are you testifying
22  now, Bob?
23       MR. WEINER:  Q.  Isn't that correct?
24       MR. FETNER:  No.
25       THE WITNESS:  I've seen no evidence whatsoever

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson                                                    9/21/2011

Page 282

ITAMAR SIMONSON
1
2    to support that.
3        MR. WEINER: Q. Okay. "There is no doubt many
4    aspects of the Shin scandal unrelated to Yale were key
5    contributors to any negative publicity surrounding
6    Dongguk University." And is it your understanding that
7    the articles were written about Shin and her love affair
8    were unrelated to Yale or Yale's statement to the press
9    that had never verified Dongguk -- verified Shin's
10   credentials or received a letter from Dongguk?
11       MR. FETNER: Objection.
12       THE WITNESS: Those articles, as far as I can
13   tell, did not mention Yale. In fact, one thing that
14   struck me as I was trying to understand why Dr. Jacoby's
15   results were so disconnected from what happened in
16   reality, I looked back on those articles, those 58
17   articles that I think you identified.
18       And I noticed that while there are some
19   exceptions, by and large, this issue about Yale
20   confirming, not confirming, correcting, denying, that
21   played, as far as I could tell, a limited role. It does
22   not appear that was a big part of it.
23       Whereas, there are a lot of other things that
24   obviously Shin was apparently a great fascination for
25   many of the people, talking about her meteoric rise,

Page 283

ITAMAR SIMONSON
1
2    Cinderella story, et cetera.
3        And there were various other aspects of this
4    person there on the Board that was fired and criticized.
5    There are a lot of other elements that the press talked
6    about.
7        MR. WEINER: Q. Right.
8        A. So, therefore, I did not see any direct link
9    with some exceptions to this Yale denial. Yeah, it was
10   mentioned as you just pointed to. Yeah, it was
11   mentioned.
12       Q. And your conclusions were based solely on those
13   58 articles?
14       MR. FETNER: What conclusions?
15       MR. WEINER: That he just testified to.
16       THE WITNESS: As I said, those 58 articles I
17   understand --
18       MR. WEINER: Q. Can I finish my question?
19       A. Sure.
20       Q. They were solely based upon the 58 articles
21   that you read and now are telling us about based upon
22   your personal view of those articles; is that correct?
23       MR. FETNER: Objection.
24       MR. WEINER: Q. You didn't do any studies; you
25   didn't review all the deposition testimony; you didn't

Page 284

ITAMAR SIMONSON
1
2    review all the articles. Is that correct?
3        MR. FETNER: Objection.
4        MR. WEINER: Q. You only reviewed a few?
5        A. I reviewed those 58 I understand that the
6    plaintiff identified.
7        Q. Just so we're clear on the record, I should
8    make that statement today. We actually, in preparation
9    of your deposition, learned that there had been an error
10   in compiling certain articles which we have now since
11   corrected.
12       But you did not ask to review all of the
13   articles that Dongguk was claiming contained false
14   statements?
15       MR. FETNER: Objection. Objection. And before
16   you answer that, I just want to respond. We did receive
17   a letter from you a couple of days ago trying to
18   supplement interrogatory responses.
19       MR. WEINER: We're required to.
20       MR. FETNER: We'll deal separately outside of
21   the context of this deposition whether that's proper or
22   admissible. Let's deal with that separately.
23       MR. WEINER: As I understand your instructions
24   in your interrogatories, we are to supplement and
25   correct as appropriate, which is what we did.

Page 285

ITAMAR SIMONSON
1
2        MR. FETNER: I think you misunderstood those
3    instructions. Like I said, we can deal with those
4    separately.
5        MR. WEINER: Yes, we can.
6        Q. So your conclusions you have reached about all
7    of these other aspects of the Shin scandal are simply
8    based upon the limited materials that you reviewed in
9    connection with this case; is that correct?
10       MR. FETNER: Objection.
11       THE WITNESS: The 58 articles that you
12   identified as well as other articles that I reviewed.
13       MR. WEINER: Q. Okay. Let's continue with the
14   ones that you specifically identified.
15       A. Okay.
16       Q. Next one is dated September 12th, 2007. Is
17   that one of the ones you identified? "Shin Jeong-ah's
18   Life Full of Mystery."
19       A. Right.
20       Q. And that, in your view, had a negative impact
21   on Dongguk's reputation?
22       MR. FETNER: Objection.
23       THE WITNESS: I said there are many other
24   aspects to the Shin scandal that should have been taken
25   into consideration because they could have negatively

72 (Pages 282 to 285)

Itamar Simonson                                                      9/21/2011

Page 286

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    affected perceptions of Dongguk, and therefore,
3    Dr. Jacoby in designing a survey should have accounted
4    for those other factors.
5         MR. WEINER: Q. And the other one, just to
6    walk through them so it's clear on the record that you
7    identified, was an article dated September 13th, 2007,
8    referring to Dongguk University President Oh's lies.
9         Do you know what those lies were?
10        A. What are you referring to?
11        Q. It's the next orange tab. Do you know what
12   those lies were?
13        A. Can I just refresh my recollection --
14        Q. Sure.
15        A. -- of this article. (Reviewing document.)
16        Here, the next paragraph tells us what they
17   are.
18        Q. And what are they?
19        A. "Through press conferences and others,
20   President Oh," O-h, "and other Dongguk officials have
21   asserted that there were no favors or external influence
22   in processing Shin's appointment, but prosecutors who
23   had been investigating this matter stated on the 12th
24   that," quote, "former Blue House policy secretary," not
25   going to read his complicated name, "had recommended

Page 287

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    Shin Jeong-ah for the professor position during 2005."
3         Q. Okay.
4         A. That's what I was referring to.
5         Q. And what is the lie?
6         A. I beg your pardon?
7         Q. What was the lie?
8         MR. FETNER: Objection. That's asked and
9    answered.
10        THE WITNESS: That's what they said.
11        MR. WEINER: Q. I understand. What you read,
12   what was the lie that was revealed? Are you saying the
13   lie was the statement by President Oh that there was no
14   favors or external influence?
15        A. That's what it appears from this article.
16        Q. Oh. And the fact that someone recommended
17   someone for a position in your view is an external
18   influence?
19        A. It's not my position to start arguing with this
20   article. I mean, that's what the article said. You
21   asked me about it. That's what it says.
22        Q. Okay. And it's your view that because there
23   were references to the so-called affair between Shin and
24   a government official that somehow Dr. Jacoby should
25   have some way factored that into his survey; is that

Page 288

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    correct?
3         MR. FETNER: Objection?
4         THE WITNESS: Of course. Of course.
5         MR. WEINER: Q. And for what purpose?
6         A. Let's say that respondents were thinking about
7    that love affair and had no knowledge of the Yale
8    confirmation, denial and so on.
9         And that's one reason why you need to start the
10   survey with open-ended questions. Say, "Have you heard
11   about the Shin scandal?" "Yes. I've heard about it."
12   "What have you heard about it?" "Anything else?"
13   "Anything else?" So we get from the respondent
14   everything they knew about the Shin scandal.
15        Let's say respondents tell you that they knew
16   about the love affair, they never mentioned Yale or
17   Yale's confirmation, denial and so on, nothing, that
18   will be very important and would inform us about the
19   aspects of the Shin scandal that were of most relevance.
20        MR. WEINER: Q. I understand the words you're
21   saying. I don't understand it in the context the
22   questions that were asked in the survey. The survey
23   wants to know whether people believed that Dongguk
24   contacted Yale or not.
25        So what is the relationship between whether

Page 289

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2    someone knows about an affair between Shin and a
3    government official and the core of the survey which was
4    to find out if Dongguk contacted Yale?
5         MR. FETNER: Objection.
6         THE WITNESS: I think I already explained that,
7    but let me try again.
8         MR. WEINER: Q. Go ahead.
9         A. As I said, we want to know to the extent that
10   any harm was caused to Dongguk University, which I
11   understand is something that was at issue, that
12   Dr. Jacoby was trying to gather information about, we
13   would like to find out what contributed to that harm.
14        Okay. Now, suppose that the open-ended
15   questions that you asked inform you that the only thing
16   people remember about the Shin scandal has to do with
17   the love affair, and they know nothing, don't even think
18   about the PhD diploma being denied, confirmed or not
19   confirmed by Yale University. That will be very
20   important.
21        It will tell us that really what drove or
22   underlied any possible harm to Dongguk University was
23   something else as opposed to the Yale issue.
24        Q. It may be interesting to you, Dr. Simonson, but
25   this survey asked only the following, whether people

73 (Pages 286 to 289)

Itamar Simonson                                    9/21/2011

Page 290

ITAMAR SIMONSON
1    believe that Dongguk contacted or did not contact Yale
2    University, believed whether Dongguk received or did not
3    receive verification.  And then it wants to know based
4    upon that, whether people's opinion about Dongguk
5    changed.  It was altered:  It went up; it went down.
6        As I understand what you're saying is somehow
7    we need to know what people also knew about a sexual
8    relationship between Shin and some government official.
9    That's not what the survey is focused on; is it?
10       MR. FETNER:  Objection.
11       THE WITNESS:  I think I already explained.  I'm
12   happy to do it one more time.  As I said, and I will not
13   repeat all my concerns about this entire survey and the
14   fact that it didn't measure anything about Yale.
15       The question is what people really knew about
16   this Shin scandal.  Moreover, as a side point, as you
17   recall from Dr. Jacoby's survey, he told respondent at
18   some point, I don't remember after which question, he
19   said, "From now on, please answer the questions based on
20   everything you know about Dongguk University."
21       He never said, "Well, I don't want -- I want
22   you to ignore everything that you might know about any
23   love affair or anything unrelated to the PhD diploma,
24   confirmation."  He asked them to rely on everything they
25

Page 291

ITAMAR SIMONSON
1    knew about Dongguk University or the Shin incident,
2    which may very well have included all those other
3    things.
4        Q.  Again, survey is very clear.  It says, "Do you
5    think your belief that Dongguk University did not tell
6    the truth about their effort to contact Yale University
7    in order to verify whether Shin Jeong-ah received a
8    doctorate degree from Yale University has affected or
9    changed your view of Dongguk University."  Very
10   straightforward question.
11       It's asking whether someone believes that
12   Dongguk lied when it said it had contacted Yale
13   University.  And the survey wants to know whether that
14   impacted their view.  What, again, has that to do with
15   all these other things you think are so important like
16   whether she had an affair with the government official?
17       MR. FETNER:  Objection.
18       THE WITNESS:  I'm not going to repeat all the
19   reasons why that question and the questions that
20   preceded it and came after it were meaningless and
21   unreliable.
22       But again, whenever you evaluate a conclusion
23   especially with respect to cause and effect, you must
24   examine other possible causes.  Otherwise, there is no
25

Page 292

ITAMAR SIMONSON
1    way for you to establish any cause and effect link.  In
2    this case, the allegations point to very concrete cause
3    with respect to the alleged harm, specifically it was
4    Yale's denial or whatever.  The fact that they sent this
5    fax and later they denied it, that specifically
6    allegedly was what caused the harm to Dongguk
7    University.  Very concretely.
8        This cause, as we know, was never tested.
9    Moreover, Dr. Jacoby completely ignored other causes.
10       MR. WEINER:  Q.  Going back to my
11   Schwarzenegger example, in your view if I designed my
12   survey to find out whether his fathering a love child
13   caused someone to think less or more of him, then it is
14   essential for me to establish from all the survey
15   participants whether they were aware of his supposedly
16   womanizing or sexually harassing actresses when he was a
17   movie star.
18       Is that what you're saying?  Am I correct?
19       A.  No.  I said earlier the Schwarzenegger example
20   is quite different.  I don't think the Schwarzenegger
21   analogy informs us about anything relevant to this case.
22       Q.  Are you familiar with the incident involving
23   Kahn-Strauss who's the French minister who was arrested
24   for rape, and later the charges were dropped?
25

Page 293

ITAMAR SIMONSON
1    A.  Yes.
2        Q.  Now, if I want to find out whether someone's
3    view of him changed as a result of the media reports
4    about that incident, is it your view I first must ask
5    the participants of the survey whether they're aware
6    that he's being sued in France by a woman reporter for
7    sexual harassment?
8        MR. FETNER:  Objection.
9        THE WITNESS:  I'm not sure I understand the
10   question.  If I'm interested in, what you call him,
11   DSK's perception, and he was a prominent politician in
12   France, I guess the to-be prime minister, probably there
13   have been many studies before about his image.
14       So we can conduct -- we have data about his
15   image before this affair and his image today.  We can
16   conduct a new study in France or U.S., wherever is
17   relevant, and find out what people think about it and
18   then ask them to explain, and see what they mention,
19   whether they mention this reporter thing from 2002 or
20   whenever that happened or whether they mentioned the
21   maid, the hotel maid.
22       Q.  I'm simply asking whether someone's view of
23   Strauss-Kahn changed as a result of his arrest in
24   New York.  And if I understand you correctly, any time
25

74 (Pages 290 to 293)

Page 294

ITAMAR SIMONSON
1
2  you do a survey about anything like this that involves
3  reputation, in your view is essential, required that the
4  survey must ask the individuals being questioned what
5  they know about the person in other contexts; am I
6  correct?
7       MR. FETNER:  Objection.
8       THE WITNESS:  I think I just answered it.
9       MR. WEINER:  Q.  Yes or no?  I'm asking for yes
10 or no.
11     A.  Maybe I was not clear.  No, the answer is you
12 conduct a whole different survey for that.  You find out
13 what people think about DSK, and you find out why they
14 think so.  Whatever they say, they say.
15     If they mention just the hotel maid, so be it.
16 That will tell us something.  If they also mention this
17 reporter, that will tell us as well.  We let the
18 respondents tell us what they think and what influence
19 them.
20     Q.  If I was to ask someone about whether their
21 view of Martha Stewart's reputation changed after she
22 was convicted of violating security laws, again, in your
23 view, the survey participants would have to be asked
24 about what they knew about Martha Stewart and whether
25 her reputation was and all those things that occurred

Page 295

ITAMAR SIMONSON
1
2  before; is that right?
3       A.  Again, I'm not going to design a survey as we
4  sit here.  In general, you do not single out one thing
5  because that guarantees that it will be inflated, I
6  think consistent with my earlier answers.
7       Q.  And that's how opinion surveys are done in your
8  understanding and expert opinion?
9       A.  I don't know what opinion surveys specifically
10 you are referring.
11     Q.  Opinion surveys generally?
12     A.  If you ask people to rate different people,
13 yeah, you can do that.  I'm not sure --
14     Q.  What do you understand an opinion survey to be?
15     A.  There are all kinds of opinion surveys.
16     Q.  Why don't you tell me what "all kinds" are?
17     A.  What's that?
18     Q.  What are they?  What are opinion surveys?
19     A.  Surveys of opinions.
20     Q.  And how does one design one?
21     A.  It depends what the purpose of each survey.
22     Q.  Find it whether someone's reputation has been,
23 find out whether someone's view of an individual or an
24 entity has changed as a result of an event.  That's the
25 opinion survey I want to do.

Page 296

ITAMAR SIMONSON
1
2       A.  Sure.  Ideally you do a before and after.  You
3  ask people about their opinions of that person who
4  without -- before this event happened, and after it
5  happened, and you find out to what degree it influenced
6  that person's perceptions.
7       Q.  Is that standard?
8       A.  Yes.
9       Q.  Okay.  And where do I find that?  What
10 literature do I have to look to find that?
11     A.  If I can recall correctly, it's even mentioned
12 in Dr. Jacoby's article about experimental controls.  He
13 talks about different kind of designs.  If I recall
14 correctly, and I haven't looked at this article in
15 awhile, I think he talks about before and after design.
16     MR. WEINER:  Why don't we take a short break to
17 use the men's room?
18     THE VIDEOGRAPHER:  We are now going off the
19 record.  The time is 5:23.
20     (Recess taken:  5:23 p.m. - 5:32 p.m.)
21     THE VIDEOGRAPHER:  We are now going back on the
22 record.  The time is 5:32.
23     MR. WEINER:  Q.  Could you turn to page 21 of
24 your report, paragraph 44?  You see in the second
25 sentence of that paragraph, "Putting aside any

Page 297

ITAMAR SIMONSON
1
2  methodological issues, one does not expect a survey
3  report to declare certain conclusions even though those
4  conclusions were not tested as part of the survey."
5       Can you tell me what you mean by that?
6       A.  Which part is not clear?  I mean, it strikes me
7  as very clear.  But all --
8       Q.  Are you saying in reaching a conclusion, it's
9  important that the person reaching the conclusion have
10 tested for that conclusion?
11     A.  Yeah.  You could say that.  In other words, you
12 cannot declare a conclusion say, "Well, the survey found
13 that because of Yale's misstatements, Dongguk's
14 reputation has been harmed."  Okay.
15     Now, if you did not even test the effect of
16 Yale's misstatements on Dongguk's reputation, then you
17 cannot reach conclusions on that topic.
18     Q.  So when you state in paragraph 71, quote,
19 "There is no doubt that many aspects of the Shin scandal
20 are related to Yale were key contributors to any
21 negative publicity surrounding Dongguk University,"
22 close quote, you did not test that conclusion by a
23 survey or anything else?
24     A.  I did not conduct any surveys in this case.
25     Q.  You simply just reached that conclusion from

75 (Pages 294 to 297)

Page 298

ITAMAR SIMONSON
1
2  reaching, as you said earlier -- reading as you said
3  earlier some articles that you have been provided with;
4  is that correct?
5      MR. FETNER: Objection.
6      THE WITNESS: I said these are aspects that
7  could have very well contributed to any negative
8  publicity surrounding the university. For example, it's
9  probably fairly uncommon for any university in Korea or
10 elsewhere to be involved in a high profile trial.
11     MR. WEINER: Q. Your sentence doesn't say
12 these may have contributed. It says, "There is thus no
13 doubt." You weren't saying this is a possibility. This
14 is a conclusion that you have actually reached without
15 having done a necessary survey or anything else?
16     MR. FETNER: Objection.
17     THE WITNESS: I did not conduct a survey. I
18 reached that conclusion based on the high-profile trial.
19 But I guess you could say that trials like that happen
20 often with respect to universities in Korea, and maybe
21 it's not a big deal, in which case I could change the
22 words to may.
23     But it seems pretty unusual, at least in the
24 U.S., you don't -- I cannot recall such a case or such a
25 trial with comparable issues involving universities.

Page 299

ITAMAR SIMONSON
1
2      MR. WEINER: Q. And your view is all these
3  other factors may well have impacted Dongguk
4  University's reputation had nothing to do with Yale; is
5  that correct?
6      MR. FETNER: Objection.
7      THE WITNESS: I don't know nothing to do. They
8  were not related to Yale, right.
9      MR. WEINER: Could I have this?
10     THE WITNESS: At least I've not seen evidence
11 that they were.
12         (Plaintiff's Exhibit No. 33 was
13         marked for identification.)
14     MR. WEINER: Q. Let me show you Simonson
15 Exhibit 33. It's an e-mail chain from a reporter with
16 the Chosun Ilbo, and ask you whether this is one of the
17 documents that you reviewed in connection with your
18 report?
19     A. Can I review it?
20     Q. Yes, please review it.
21     A. Does it start reverse order?
22     Q. Yes.
23     A. (Reviewing document.)
24        Could you repeat the question, please?
25     Q. Did you review this document in connection with

Page 300

ITAMAR SIMONSON
1
2  your report?
3      A. I might have, if it's listed in Exhibit C.
4      Q. It's not listed in Exhibit C.
5      A. I do not recall reading it. I reviewed many
6  documents. I cannot tell you with certainty.
7      Q. Did you ask for documents that refer to Yale's
8  so-called apology?
9      MR. FETNER: Objection.
10     MR. WEINER: Q. You refer to the apology in
11 the context of your report? Do you recall that?
12     A. I think I've said it from Dr. Jacoby's report.
13     Q. Do you know whether there was in fact an
14 apology?
15     A. I didn't consider that to be particularly
16 important when evaluating Dr. Jacoby's survey or its
17 results.
18     Q. And do you consider Simonson Exhibit 32
19 something that would have been helpful to you in --
20     MS. LU: 33.
21     MR. WEINER: Q. 33. Excuse me. In doing your
22 critique?
23     A. You mean, I did not? Is that --
24     Q. You did not do it. Do you think that's
25 something that would have been helpful to you?

Page 301

ITAMAR SIMONSON
1
2      A. No. I don't see how it would be.
3      Q. Okay. You also at the bottom of page 21 refer
4  to some articles regarding Dongguk that appeared in
5  2005; is that correct?
6      A. Right.
7      Q. What was the purpose for referring to those
8  articles?
9      A. Just to point that there might have been other
10 events that contributed to negative perceptions of
11 Dongguk University that had nothing to do with Shin.
12     Q. That would have had what impact on the survey
13 as far as you're concerned?
14     MR. FETNER: Objection.
15     THE WITNESS: If I recall correctly, Dr. Jacoby
16 testified during his deposition that he believed that
17 until the Shin incident, Dongguk had -- I don't remember
18 the word that he used -- excellent or very good
19 reputation. And to the extent that the public in Korea
20 had some concerns about Dongguk even before the Shin
21 incident, that certainly would be another factor that he
22 should have considered in designing his survey.
23         (Plaintiff's Exhibit Nos. 34 was
24         marked for identification.)
25     MR. WEINER: Q. Let me show you in reverse

76 (Pages 298 to 301)

Itamar Simonson                                          9/21/2011

Page 302

ITAMAR SIMONSON

1    ITAMAR SIMONSON
2  order Exhibits 36, 35 and 34 and ask you if these are
3  the three articles you referenced in your report.
4       A. (Reviewing document.) It looks like these are
5  the ones. I didn't memorize every word.
6       Q. Let's start with Exhibit 36. First of all,
7  there are a number of translation notes that appear; is
8  that correct?
9       A. Right.
10       Q. Do you know if this article is actually about
11  Dongguk University or the Dongguk Foundation?
12       A. I'm looking at the heading, the headline. It
13  says, "Suspicion of corruption at Dongguk University."
14       Q. Right. And then look at the footnotes 3 and 4.
15       A. Right.
16       Q. Which is referring to the Foundation.
17       A. The Dongguk University Educational Foundation,
18  yes.
19       Q. What is that?
20       A. I'm not familiar with that.
21       Q. Do you know if Dongguk University actually was
22  the entity that's being referred to in this article as
23  opposed to the Dongguk Foundation?
24       MR. FETNER: Objection.
25       THE WITNESS: You know, I don't know the

Page 303

1    ITAMAR SIMONSON
2  details of those other events.
3       MR. WEINER: Q. Well, would you agree with me
4  that this is a translation that seems to be somewhat
5  imperfect in that the translator has a number of notes
6  saying that they couldn't tell certain information?
7       MR. FETNER: Objection.
8       THE WITNESS: I couldn't tell you if it's
9  imperfect. I'm -- I'm certainly in no position to do
10  that. I notice in the translated version, Dongguk is
11  mentioned. Furthermore, you would think that the
12  educational foundation of a university is linked to that
13  university.
14       MR. WEINER: Q. Do you know -- do you
15  understand the Catholic Archdiocese -- I'll rephrase
16  that.
17       Do you have any idea what the relationship is
18  between Dongguk University and Dongguk Foundation?
19       A. No.
20       MR. FETNER: Objection.
21       MR. WEINER: Q. As you sit here today, you
22  can't even really tell me whether this situation
23  involving Pil-dong Hospital involved the university as
24  opposed to foundation; correct?
25       MR. FETNER: Objection.

Page 304

1    ITAMAR SIMONSON
2       THE WITNESS: The point I was making is that it
3  appears that there were other negative associations with
4  Dongguk University. I didn't investigate the specifics
5  of each --
6       MR. WEINER: Q. Okay.
7       A. -- press story.
8       Q. So that was a press story that appeared in
9  April of 2005. By the way, do you know how many
10  newspapers this story appeared in?
11       A. I have no idea.
12       Q. Do you have any idea if it was more than one?
13       A. I do not know.
14       Q. Do you know if it was one of the major news
15  stories of 2005?
16       A. I do not know.
17       Q. Do you know what happened to this so-called
18  investigation?
19       A. No.
20       Q. Let's go on to the next one, which is dated I
21  think April 25th, 2005. Tell me what this involves.
22  I'm sorry. April -- October 19th, 2005.
23       Do you know what this involves?
24       MR. FETNER: This is Exhibit 36?
25       MR. WEINER: Yes.

Page 305

1    ITAMAR SIMONSON
2       THE WITNESS: You mean 34 now?
3       MR. WEINER: I think it's 36 was the first one.
4       MR. FETNER: I guess I misnumbered them.
5       MR. WEINER: This should be 35, actually.
6       THE WITNESS: It says 34 here on my copy.
7       MR. WEINER: It should be -- I don't know.
8  What did you do?
9       THE WITNESS: I have 36 here.
10       MR. WEINER: That's fine. We've got it
11  straightened out. Let me show you 34 and 35.
12       Can you tell me what that incident that you
13  refer to involved?
14       A. (Reviewing document.) Says that the president
15  of Dongguk University was at a loss of words; that it
16  was apparently his statement, and he expressed his
17  concern that both alumni and overall status of their
18  alma mater would suffer greatly, and it goes on.
19       Q. All right. What did it involve?
20       A. I do not remember.
21       Q. Let's go to article Exhibit 35, which is the
22  two-page exhibit.
23       Do you notice in Exhibit 34 there's a reference
24  to Professor Kang Jeong-gu?
25       A. Yes. Yes, I do.

77 (Pages 302 to 305)

Itamar Simonson                                    9/21/2011

Page 306

ITAMAR SIMONSON
1
2     Q. And did the so-called Kang Jeong-gu scandal
3  involve the fact that a professor that happened to be
4  teaching at Dongguk was indicted for disseminating
5  materials in March of 2004?
6     A. Yes. I see some materials.
7     Q. And there were some issues regarding the Korean
8  national security law?
9     A. That's correct.
10    Q. And what this professor did is argue that among
11 other things, the United States -- South Korea was under
12 the neocolonial rule of the United States?
13    A. Yes. Looks like it.
14    Q. That's what this so-called 2005 incident was
15 about?
16    A. Yes.
17    Q. How is that a negative on Dongguk, that a
18 particular professor happened to do something that got
19 himself in trouble?
20    MR. FETNER: Objection.
21    THE WITNESS: So you have here a professor who
22 violated the national security of the country, that
23 strikes me as fairly negative thing. I don't know how
24 it stacks against the faculty who is forgering her
25 degree. But seems to me a professor who is violating

Page 307

ITAMAR SIMONSON
1
2  the law going against apparently what he was accused of,
3  going against the security of the country, it strikes me
4  as pretty serious.
5     MR. WEINER: Q. That was about the professor?
6     A. The professor who was a professor who was hired
7  and apparently employed by Dongguk University.
8     Q. So it's your view that anyone who teaches at
9  Stanford University who gets into trouble, that's a
10 black eye for Stanford?
11    MR. FETNER: Objection.
12    THE WITNESS: It could. It could have -- a
13 faculty professor -- I'm sorry. If a faculty is accused
14 of a crime, that could. I'm not saying. It depends on
15 each circumstances to what extent it reflects on the
16 entire university, but it could have some negative
17 effect.
18    MR. WEINER: Q. And the same would be true if
19 someone at Berkeley -- if some professor was taking a
20 position, for example, that was considered racist, that
21 would impact the university as a whole?
22    MR. FETNER: Objection.
23    THE WITNESS: I don't know. I'll need to
24 conduct a study about that. It's really hard to
25 generalize.

Page 308

ITAMAR SIMONSON
1
2     MR. WEINER: Q. In order to find out the
3  impact of articles, you would have to conduct a survey?
4     MR. FETNER: Objection.
5     THE WITNESS: I would say if you have a
6  collection of article that talks about various other
7  apparently important aspects of scandal, I think --
8  which leads to a high-profile trial, that strikes me as
9  something that's very likely to have significant impact.
10    MR. WEINER: Q. Was there a trial?
11    A. I believe there was a trial, yes.
12    Q. Of whom?
13    A. I remember that the ex-president was
14 testifying.
15    Q. As a witness?
16    A. Might have been as a witness. And I think Shin
17 I think was tried. I forget who else.
18    Q. Let's go on to page 33 of your report.
19 Actually, let's move on to 39. It's probably easier.
20    Beginning on page 37, just to get a context,
21 you reached certain conclusions regarding what you
22 considered to be the lack of impact, a lack of evidence
23 of an impact on Dongguk reputation; correct?
24    MR. FETNER: Objection.
25    THE WITNESS: Right. In other words, what I

Page 309

ITAMAR SIMONSON
1
2  looked at is whether there was evidence in the
3  marketplace that -- about actual behavior of relevant
4  constituencies such as donors and applicants and the
5  government and so on during the time that Dr. Jacoby
6  conducted a survey, that is, in 2008, whether there was
7  indeed evidence that the University's reputation has
8  been harmed and that affected the university.
9     MR. WEINER: Q. In paragraph 81, you conclude
10 that there was no evidence that Dongguk's donations were
11 impacted by anything that occurred as a result of the
12 Shin situation; is that right?
13    MR. FETNER: Objection.
14    THE WITNESS: Right.
15    MR. WEINER: Q. How did you reach that
16 conclusion?
17    A. I relied on the responses to interrogatories.
18    Q. Okay. Which interrogatories did you rely on?
19    A. Those that you, in other words, that
20 plaintiff's counsel apparently filed.
21    Q. And which ones?
22    A. I don't remember specifics. But I received
23 quite a few of those initial and supplementary.
24    Q. What number is this?
25    MS. LU: 37.

78 (Pages 306 to 309)

Page 310

ITAMAR SIMONSON

1   (Plaintiff's Exhibit No. 37 was
2   marked for identification.)
3   MR. WEINER: Q.  Let me show you Exhibit 37,
4   and ask you if that's the set of interrogatories that
5   you relied upon?
6   A.  I believe that's one of them, yes.
7   Q.  Any others?
8   A.  Yeah.  There were several others.
9   Q.  That refer to donations?
10  A.  Oh, I don't remember.
11  Q.  Right now, focusing on paragraph 81 of your
12  report.
13  A.  Okay.
14  Q.  Now, tell me how you came to your conclusion
15  that there was no impact on donations?
16  MR. FETNER: Did you say paragraph 81?
17  MR. WEINER: 82, excuse me.
18  THE WITNESS: (Reviewing document.)
19  MR. WEINER: Q.  82 is -- 82?  You're right.
20  82.  I believe you have in the middle of your chart
21  donations pledged and donations received; is that
22  correct?
23  A.  Right.
24  Q.  Where does that come from?

Page 311

ITAMAR SIMONSON

1   A.  Let me try to refresh my recollection.
2   Was that the only interrogatory that I
3   received?
4   MR. WEINER: Q.  As far as I know.  That deals
5   with donations.
6   A.  I'm looking at page 15 where it says, "Total
7   for pledged."
8   Q.  Yep.
9   A.  You see under '06, it says 834?
10  Q.  Yep.
11  A.  And under '08, it says 1622?
12  Q.  Yes.
13  A.  Okay.  So that's pledged.  You see at the
14  bottom where it says total, 065922, and '08 --
15  Q.  Right.
16  A.  1017.
17  Q.  Am I correct what you did is you looked at the
18  numbers for '06 and '08, put them in this chart, and
19  concluded that there was no negative impact on
20  donations?
21  MR. FETNER: Objection.
22  THE WITNESS: What I did, just to be clear, I
23  said let's look at '06 which is before.
24  MR. WEINER: Right.

Page 312

ITAMAR SIMONSON

1   THE WITNESS: The scandal and then look at '08,
2   which is the time that Dr. Jacoby conducted his survey.
3   Now, his survey presumably captured people's
4   perceptions in '08.  So therefore, I thought that was
5   the appropriate year.
6   MR. WEINER: Q.  And you didn't bother to look
7   at '07; am I correct?
8   MR. FETNER: Objection.
9   THE WITNESS: That's correct because that's
10  when -- I thought comparing before and after, that's how
11  you do it.
12  MR. WEINER: Q.  Now, you reviewed deposition
13  testimony in this case; did you not?
14  A.  I did.
15  Q.  And did you review the deposition testimony of
16  someone who testified about donations?
17  A.  At some point, I did.
18  Q.  Was that a Mr. Ly?
19  A.  Might have been.
20  Q.  What do you recall Mr. Lee saying in his
21  deposition about the diminution if any in donations or
22  the impact of donations?
23  MR. FETNER: Objection.
24  THE WITNESS: I don't recall specifically, if

Page 313

ITAMAR SIMONSON

1   you can show me.
2   (Plaintiff's Exhibit Nos. 38 and
3   39 marked for identification.)
4   MR. WEINER: Q.  Sure.  Let me show you
5   Exhibits 38 and 39 and ask you whether you reviewed the
6   testimony that's contained in those exhibits?
7   A.  I believe I did.  Are they listed in my
8   Exhibit C?
9   Q.  Did you review that material?
10  A.  I believe so.  Are these listed by Exhibit C?
11  Q.  Yes.
12  A.  Okay.  So I reviewed them.
13  Q.  Okay.  Do you recall Mr. Lee discussing
14  individuals who canceled their donations?
15  A.  He might have -- I don't have a specific
16  recollection.  My understanding is that it's routine and
17  now looking at this page 15 we just talked about, it
18  seems every year there's a difference between pledged
19  and received.  So it seems that it's not all that
20  unusual that there is a gap between the two.
21  Q.  Well, were you aware that -- I believe it was
22  referenced in Mr. Lee's deposition that Dongguk has
23  received statements from individuals saying that as a
24  result of the Shin scandal and their belief that Dongguk

Itamar Simonson                                              9/21/2011

Page 314

ITAMAR SIMONSON
1   had done something wrong, they canceled their donations
2   in the amount of millions of dollars?
3       MR. FETNER: Objection.
4       THE WITNESS: Yeah. I'm not in a position to
5   testify as to the accuracy or lack thereof of what
6   Mr. Lee testified to or what. I don't know if that's
7   hearsay or not. I'm not an attorney. But what he said
8   that people told him I think what we can do is look at
9   the numbers.
10      Q. Sir, I just asked you a question.
11      A. I don't know what Mr. Lee -- to what extent
12  Mr. Lee accurately represented what happened, whether
13  the people he said he talked to indeed said what he said
14  they said and so on. I'm in no position to opine on
15  that. All I can do is just look at the numbers.
16      Q. Well, you can also look at the actual
17  statements these individuals gave. So let me give them
18  to you. They're Exhibits 40 through 44.
19      A. Okay.
20              (Plaintiff's Exhibit Nos. 40,
21              41, 42, 43 and 44 were marked
22              for identification.)
23      MR. WEINER: Q. Let me tell you if you were
24  shown or received any of these statements while you were

Page 315

ITAMAR SIMONSON
1   reaching your conclusions that there was no negative
2   impact.
3       MR. FETNER: Objection.
4       THE WITNESS: I was not -- I'm in no position
5   to evaluate those kind of letters. I mean, these people
6   were apparently sufficiently trusting and willing to
7   help Dongguk University to prepare or to sign at least
8   those statements. Apparently they --
9       MR. WEINER: Q. Are you suggesting that
10  these --
11      MR. FETNER: Bob, please don't interrupt him --
12      THE WITNESS: Apparently they've not lost all
13  trust of Dongguk because otherwise they would refuse to
14  sign those statements. I have no idea. I don't know
15  these people.
16      All I can do is look at the numbers, '06, '08.
17  According to Dr. Jacoby's survey results, we should have
18  seen a sharp decline. We did not see sharp decline.
19  That's all I'm saying.
20      I don't know all those things Mr. Lee said
21  this; these people signed those statements. I'm really
22  in no position to opine on their significance.
23      MR. WEINER: Q. Dr. Simonson, you are reaching
24  a conclusion based upon numbers that are contained in an

Page 316

ITAMAR SIMONSON
1   interrogatory answer. First of all, were you aware that
2   when the hundredth anniversary was of Dongguk
3   University?
4       A. No.
5       Q. Do you know if that had an impact on the
6   likelihood of people providing additional donations?
7       MR. FETNER: Objection.
8       MR. WEINER: Q. Yes or no?
9       A. No.
10      Q. And you have reached the conclusion simply that
11  because between 2006 and 2008, there was an increase in
12  pledged amount that there was therefore no impact; is
13  that right?
14      MR. FETNER: Objection.
15      THE WITNESS: All I'm saying --
16      MR. WEINER: Q. Is that right?
17      A. Can I just answer the question?
18      Q. Sure.
19      A. All I'm saying is, if you look at the numbers,
20  what actually was the donations actually pledged and
21  received, and you compared that to Dr. Jacoby's survey
22  results, there is no connection between the two.
23      Based on his conclusions, the reputation of the
24  university has been devastated because specifically of

Page 317

ITAMAR SIMONSON
1   Yale's so-called misstatements. In reality, we see an
2   increase. That's all I can look at.
3       Q. Well, let's take a look at Exhibit 40. Just
4   bear with me. Where Mr. Sik, S-i-k, states, "As a
5   businessman and Dongguk alumnist, I agree with the
6   vision and advancement strategy President Oh Young-kyo
7   presented in 108 projects."
8       He goes on to state, "I planned a donation of
9   5 billion won. While reviewing the procedures of the
10  contribution and detailed application for the funds, I
11  heard of the embarrassing incident related to Shin Jung
12  Ah in July of 2007 and decided to withdraw the plan to
13  make the donation."
14      He then goes on to state he donated 5 billion
15  won to some other organization. In your view, this is
16  not evidence that the incident involving Shin had a
17  direct impact on donations?
18      MR. FETNER: Objection.
19      THE WITNESS: I'm in no position to know -- to
20  conclude much based on this particular statement. I'm
21  also looking to see whether he indicated that he was
22  particularly disappointed by the fact that Dongguk
23  claimed to have checked with Yale, and Yale denied it.
24      MR. WEINER: Q. In July of 2007, is that what

One Penn Plaza, NYC                      Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS     (800) 246.4950

Page 318

ITAMAR SIMONSON

1  that occurred?
2
3      A.  No.  I'm just trying to figure if he mentioned
4  that as a factor or perhaps he was referring to other
5  aspects of the Shin scandal.  I'm -- I tell you, really,
6  I cannot form any conclusions based on these statements.
7  The only thing I can do is compare Dr. Jacoby's survey
8  conclusions with what happened in reality based on the
9  numbers.
10     Q.  Let's continue with the next one, Exhibit 41,
11  where the individual states that in March of 2007, he
12  met with President Oh to discuss a donation and then
13  goes on to state, "After the meeting, I made a plan to
14  donate 4.5 billion won to the development funds for
15  advancement of my alma mater.  It was then during
16  July of 2007 that I heard about the Shin Jeong-ah
17  incident.  At the time, I was immensely shocked, felt
18  deeply disappointed, and lost any expectations for the
19  school's advancement.  Feeling no further need to make
20  any contribution, I withdrew my intention to donate."
21     You think that's evidence of the impact?
22     MR. FETNER:  Objection.
23     THE WITNESS:  I really, I couldn't tell you
24  really.  I mean, we can read all of these.  I don't know
25  really what to make of these and to what extent it

Page 319

ITAMAR SIMONSON

1
2  informs us about Yale's alleged role.
3      MR. WEINER:  Q.  Exhibit 42, where the
4  individual states that in the early part of 2007, he was
5  considering a 1 billion dollar won contribution to
6  Dongguk University.  And goes on to state, quote,
7  "However, during the summer of 2007, Shin Jeong-ah
8  incident which arose between Dongguk and Yale University
9  shook the entire Korea.  Due to negative media reports
10  on Dongguk, we anticipated danger to the company such as
11  deterioration of company image; therefore, we decided
12  not to donate."
13     Evidence of an impact?
14     MR. FETNER:  Objection.
15     THE WITNESS:  I think I already answered that.
16     MR. WEINER:  Q.  Okay.  Going on to Exhibit 43,
17  where the individual states that in July of 2007, the
18  school made headlines every day that it was involved
19  with Shin Jeong-ah in an unethical way which caused that
20  individual not to contribute 500 million won.
21     By the way, was there any articles in July of
22  2007 or even the summer of 2007 that involved a love
23  affair between Shin and a government official?
24     MR. FETNER:  Objection.
25     THE WITNESS:  I don't remember.  That might

Page 320

ITAMAR SIMONSON

1
2  have started a little later.  Maybe in September.
3      MR. WEINER:  Q.  Were there any articles in
4  July or summer of 2007 that involved a trial?
5      A.  When were these statements filed?
6      Q.  I'm sorry?
7      A.  When were these statements completed?
8      Q.  These statements were completed prior to the
9  time you did your report.
10     A.  I see.  Where it says here May 24, 2010, that's
11  inaccurate?
12     Q.  No, no.  The time you did your report was I
13  believe in June of 2011; is that correct?
14     A.  No.  I'm asking those statements by those
15  people --
16     Q.  When were they signed?
17     A.  Yes.
18     Q.  Those dates.
19     A.  In those dates?
20     Q.  Yes.
21     A.  Okay.  So in other words --
22     Q.  They existed prior to the time that you drew
23  your conclusions regarding the lack of an impact?
24     MR. FETNER:  Objection.
25     THE WITNESS:  Do you have, by the way -- I

Page 321

ITAMAR SIMONSON

1
2  guess that's really not my area of expertise.  But do
3  you have a letter from these people in July of 2007
4  saying announcing their decisions, or were that
5  something that they announced only later --
6      MR. WEINER:  Q.  I believe if you read the
7  deposition testimony, you'll get all the answers that
8  you need.
9      And by the way, you had that deposition
10  testimony available to you when you did your report.
11     MR. FETNER:  Objection.
12     MR. WEINER:  Q.  Let's go on to the last one.
13  I'm sure you're not trying to be an advocate for Yale or
14  being a lawyer for Yale here.
15     MR. FETNER:  Objection.
16     MR. WEINER:  Q.  Which talks about an
17  individual whose with Shinsung Pharmaceutical where he
18  states during July of this year, that is 2007, which he
19  decided not to donate a billion won.
20     So as you sit here today, your view is I want
21  you to ignore these five exhibits and simply look at the
22  numbers that are set forth in the interrogatories;
23  correct?
24     MR. FETNER:  Objection.
25     THE WITNESS:  As a researcher, what I learned

One Penn Plaza, NYC                    Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        (800) 246.4950

Itamar Simonson                                                                          9/21/2011

Page 322

ITAMAR SIMONSON
1
2   to do is not rely on anecdotes, which is a small number,
3   and look at the overall numbers, which is what I did.
4        If you look at the overall numbers, I come to
5   the conclusion that Dr. Jacoby's survey conclusions
6   appear inconsistent with what happened in reality.
7        MR. WEINER:  Q.  Okay.  Let's talk about the
8   grants, university grants.
9        It's your conclusion that there is no impact on
10  university grants; is that correct?
11       A.  Yes.
12       Q.  Okay.  And how do you reach that conclusion?
13       A.  Same way.  Just looking at the interrogatories.
14       Q.  Just looking at the interrogatories.  Which
15  interrogatories?
16       A.  I do not recall which one it was.
17       Q.  Do you know if there -- how did you reach your
18  conclusions because grants increased from 179 million
19  won to 250 million won; therefore, there could not have
20  been an impact.  Is that my understanding of your
21  conclusion?
22       MR. FETNER:  Objection.
23       THE WITNESS:  I think you would expect -- based
24  on the survey conclusions, you would have expect decline
25  in grants.  If I recall correctly, Dr. Jacoby even

Page 323

ITAMAR SIMONSON
1
2   testified to that during his deposition.
3        MR. WEINER:  Q.  Do you know whether the amount
4   of grants that the Korean government was giving out
5   between 2006 and 2008 increased in terms of dollar
6   amounts or won amount?
7        A.  I do not know.
8        Q.  Do you know if the proportion of grants that
9   Dongguk received in 2006 was equal to, less than or more
10  than the grants they received in 2008?
11       A.  Could you repeat that?
12       Q.  Sure.  Do you know what percentage of grants
13  that were available in 2006 Dongguk received; 8 percent,
14  10 percent, 20 percent?
15       A.  I still don't know.
16       Q.  I'll see if I can make it a little clearer.
17  In 2006, is it your understanding that Dongguk
18  received a 179 million won in grants?
19       MR. FETNER:  Objection.
20       THE WITNESS:  I believe so yes.
21       MR. WEINER:  Q.  That's what you have in
22  paragraph 82.
23       MR. FETNER:  It says 179, 100 million won.
24  It's actually a different unit.
25       MR. WEINER:  Excuse me?

Page 324

ITAMAR SIMONSON
1
2        MR. FETNER:  It's a different unit.  It's not
3   179 million won.
4        MR. WEINER:  179, 100 million won.
5        MR. FETNER:  Essentially.
6        THE WITNESS:  Yeah.
7        MR. WEINER:  Q.  Do you know what percentage of
8   the overall grants that were available that that
9   represented; 8 percent, 10 percent, 20 percent,
10  2 percent?
11       A.  Grants to all universities?
12       Q.  Yes, to all universities.
13       A.  I don't know.
14       Q.  And you say that in 2008, it received 200, 100
15  million won in grants?
16       MR. FETNER:  250.
17       MR. WEINER:  Q.  250, 100 million won; correct?
18       A.  Right.
19       Q.  Do you know what percentage that represented of
20  all grants?
21       A.  No.
22       Q.  Do you know if in fact the percentage between
23  2006 and 2008 increased or decreased?
24       A.  I don't know that.
25       Q.  So the only reason that you have concluded that

Page 325

ITAMAR SIMONSON
1
2   there was no damage is because the number went from 179
3   to 250; is that correct?
4        MR. FETNER:  Objection.
5        THE WITNESS:  What I'm saying is if you look at
6   Dr. Jacoby's survey conclusions, there should have been
7   sharp decline.  That did not happen.
8        MR. WEINER:  Q.  Well --
9        A.  I'm in no position here to speculate about how
10  the number would have been different had something else
11  had happened or not happened.  I don't think any one of
12  us, including I would think people who work for Dongguk
13  University, could reliably speculate about how much
14  money they would have received.  I mean, we all are
15  susceptible to wishful thinking.
16       MR. FETNER:  Bob, according to my watch, we're
17  now at seven hours.  If you say you have a few more
18  minutes, I'm not going to make an issue of it.
19       MR. WEINER:  I would certainly think less than
20  30, as few as 15.
21       MR. FETNER:  Okay.
22            (Plaintiff's Exhibit Nos. 45 and
23             46 was marked for
24             identification.)
25       MR. WEINER:  Q.  Let me show you Exhibits 45

82 (Pages 322 to 325)

Itamar Simonson                                                    9/21/2011

<table>
<tr><td>

Page 326

ITAMAR SIMONSON

1
2  and 46.  Is that the deposition testimony you read in
3  connection with the grants that Dongguk is claiming it
4  lost as a result of the Shin incident?
5      A.  Right.
6      Q.  What is your understanding as to the grants it
7  claims it lost?
8      A.  I don't recall the details, but I understand
9  that they thought they would have received more, and
10 they didn't.
11     Q.  When you say "received more," were they talking
12 about in general or specific grants that they were
13 actually in the process of applying for?
14     A.  Well, there's some specific things.  I vaguely
15 recall something to do with some Buddhist project or
16 program.
17     Q.  And what did you do to test whether Dongguk's
18 belief that it would have received two grants in
19 Buddhist studies that it did not receive but for the
20 Shin incident was an accurate conclusion?
21     A.  I don't think I could test it nor could they.
22     Q.  So the only reason that you concluded, again,
23 that there is no impact is simply saying, "Well, your
24 grant numbers went up in 2008 as compared to 2006"?
25     MR. FETNER:  Objection.

</td><td>

Page 328

ITAMAR SIMONSON

1
2  improvement?
3      A.  In absolute terms, it's an improvement.
4      Q.  That's an improvement?
5      A.  Yes.
6      Q.  So that in 2006, assume I get 20 percent of all
7  grant money.  And in 2008, I get 5 percent of all grant
8  money.  In your view, that's an improvement?
9      MR. FETNER:  Objection.
10     THE WITNESS:  That doesn't sound like an
11 improvement if that's what you tell me happened; it went
12 from 20 to 5.  I don't know what other institution,
13 research institution or universities have participated
14 or were applying for this program or department.
15     So in other words, I don't think that I can or
16 anyone one of us, including Dongguk University, which is
17 clearly in a position where they could dream about the
18 moon and the stars and saying, "Oh, if only for that.
19 If only there was no Shin incident, we would have done
20 wonderfully."
21     MR. WEINER:  Q.  That's not the question I
22 asked you, sir.  The question I asked you is whether
23 assuming there was a diminution in the percentage of
24 overall grants they received whether in your view that's
25 an improvement.

</td></tr>
<tr><td>

Page 327

ITAMAR SIMONSON

1
2      THE WITNESS:  What I'm saying is that we can
3  all speculate about what would have happened and assume
4  that, "If only that did not happen, we would have
5  received this or that," that's sheer speculation.
6      MR. WEINER:  Q.  What did you do to test it?
7      A.  Of course the only thing that can be done,
8  which is to compare the actual numbers.
9      Q.  What did you do to test it?
10     MR. FETNER:  Test what?
11     MR. WEINER:  Q.  Test your conclusion?
12     A.  I looked at the numbers.
13     Q.  You did arithmetic?
14     A.  Yes.
15     Q.  You didn't do anything other than look at
16 arithmetic and simply because a number was higher in
17 2008 than it was in 2006, your view is therefore no
18 impact?
19     MR. FETNER:  Objection.
20     MR. WEINER:  Q.  Right?
21     A.  My conclusion based on that and that's the only
22 conclusion you can derive, the numbers indicate an
23 improvement.  Not deterioration.
24     Q.  If in fact their proportion of grant money
25 actually decreased between 2006 and 2008, is that an

</td><td>

Page 329

ITAMAR SIMONSON

1
2      MR. FETNER:  Objection.
3      MR. WEINER:  Q.  The answer is yes or no.
4      A.  The answer is, as I said, if it went from
5  20 percent to 5 percent, doesn't sound like an
6  improvement.
7      Q.  What about 20 to 15?
8      A.  I can't tell.  That fact is --
9      Q.  So you can't tell whether there was
10 improvement?
11     A.  Sure I can tell.  I can tell according to the
12 conclusions of Dr. Jacoby, there should have been a
13 sharp decline because the reputation of the university
14 has been harmed irreparably.
15     Q.  What happened in 2007?
16     A.  Can I just complete my answer?
17     MR. WEINER:  Q.  Sure.
18     THE WITNESS:  In fact, if we look at the
19 numbers, they increased.  The only thing we can look at
20 is the actual numbers in the relevant currency.  That's
21 the only thing we can do.  Everything else strikes me as
22 speculation, and I cannot do that.
23     MR. WEINER:  Q.  When you say you looked at
24 numbers, you only looked at two numbers?
25     MR. FETNER:  Objection.

</td></tr>
</table>

83 (Pages 326 to 329)

Itamar Simonson                                                    9/21/2011

Page 330

ITAMAR SIMONSON
1
2    MR. WEINER: Q. You didn't look at the overall
3 percentage of grant money?
4    MR. FETNER: Objection.
5    THE WITNESS: Yeah. I looked at actual number,
6 2006 and 2008.
7    MR. WEINER: Q. Listen to my question. You
8 didn't find out whether they had increased or decreased
9 their share of grant money?
10    MR. FETNER: Objection.
11    THE WITNESS: No. Of course I did not. As I
12 indicated, Dr. Jacoby testified that you would see
13 decline. Decline means the number would go down. The
14 number did not go down. It went up.
15    MR. WEINER: Q. Decline can mean my percentage
16 of grant money went down; could it not?
17    A. I don't recall Dr. Jacoby referring to --
18    Q. I'm not asking about Dr. Jacoby. I'm asking
19 about whether decline can mean that my percentage of
20 overall grants increased?
21    MR. FETNER: Objection.
22    THE WITNESS: I don't know. I looked at the
23 actual numbers.
24    MR. WEINER: Q. I'm asking you a question.
25    Could decline mean that my overall percentage

Page 331

ITAMAR SIMONSON
1
2 of grants that were available decreased?
3    MR. FETNER: Objection.
4    THE WITNESS: I think that -- I mean, you can
5 look at it different ways. If you got -- let's say you
6 got 50 percent increase, others got even greater
7 increase. So what?
8    Q. That's a decline?
9    A. No. That's not a decline. That's 50 percent
10 increase. That means you can hire more faculty. You
11 can open more departments. You can meet more students.
12 That's a positive thing.
13    Q. Yeah, yeah. You also reached some conclusions
14 regarding the percentage of student jobs. By the way,
15 that changed between 2006, '07 and '08. You only talk
16 about 2006 and 2008. You never talk about 2007.
17    A. I don't remember -- 2007. As I said, I looked
18 at the year before the scandal and the year that
19 Dr. Jacoby conducted his survey.
20    Q. How about the year in which the scandal
21 occurred?
22    A. I didn't look at that.
23    Q. You didn't look at that?
24    A. Right.
25    Q. And tell me about the companies that came on

Page 332

ITAMAR SIMONSON
1
2 campus. Was there an increase or decrease between 2006
3 and 2007?
4    A. I don't remember what happened in 2007. I see
5 that from 2006, it went -- to 2008, it went from 37 to
6 75. That's a pretty high percentage increase.
7    Q. What happened in 2007? Did it go down between
8 2007 and 2008?
9    A. I do not recall.
10    Q. Did they start new job fairs in 2007 that
11 didn't exist in 2006?
12    A. I do not recall. As I said, I looked at the
13 numbers for 2006.
14    Q. You didn't look at the numbers?
15    A. For 2008.
16    Q. You never sought to go behind the numbers to
17 find out what the cause of the numbers would be?
18    MR. FETNER: Objection.
19    THE WITNESS: That would be speculation.
20    MR. WEINER: Q. Why is that speculation?
21    A. It's a speculation to say, well, what might
22 have caused may be -- can you just --
23    Q. You didn't hear my question.
24    A. Can I just --
25    Q. My question is: Did you go find out whether in

Page 333

ITAMAR SIMONSON
1
2 2007 there was a different kind of job fair that was
3 started --
4    MR. FETNER: That was not your question.
5    MR. WEINER: Q. Did you do anything to find
6 out what the hiring process was in terms of job fairs?
7    A. Of course --
8    Q. Between 2006 and 2007?
9    A. Of course not. Of course not. Because I don't
10 know what's the -- how this program was implemented,
11 what effect it had or did not have. All of that would
12 require me to speculate, which I did not want to do.
13    The only thing I could do is look at the actual
14 numbers. That tells you about the actual preferences
15 and behavior of, in this case, the companies.
16    Q. When you say cause you to speculate, are you
17 saying by reviewing the actual deposition testimony when
18 witnesses testified under oath about what occurred
19 between 2006, 2007 and 2008, that would cause you to
20 speculate?
21    MR. FETNER: Objection.
22    THE WITNESS: Yeah. These people, they didn't
23 know. They speculated. They said they thought this
24 would have had certain effects or they're thinking about
25 this counter factual world that would have existed but

84 (Pages 330 to 333)

Itamar Simonson                                                    9/21/2011

Page 334

1                ITAMAR SIMONSON
2  for the Shin incident. Whereas, in reality, I cannot
3  rely on that.
4        MR. WEINER: Q. That's not what they testified
5  to; was it? What they testified to was what their job
6  fairs were in 2006, 2007, and 2008, who came and for
7  what reason.
8        MR. FETNER: Objection.
9        MR. WEINER: Q. It wasn't what would have
10 occurred but if the Shin --
11       MR. FETNER: Is there testimony you want to
12 show the witness?
13       MR. WEINER: Q. I'm telling you that's what
14 they testified to.
15       MR. FETNER: Objection.
16       THE WITNESS: I'm not sure what relevance that
17 would be. I just looked at the numbers how many
18 companies participated in recruiting events in 2006 and
19 2008.
20       MR. WEINER: Q. Let's talk about the top 100
21 companies. Top 100 companies in Korea participate
22 greater or less than between 2006 and 2008?
23       MR. FETNER: Objection.
24       THE WITNESS: I do not recall.
25       MR. WEINER: Q. You think that's significant?

Page 335

1                ITAMAR SIMONSON
2        A. I don't know how --
3        Q. You don't think it's important in terms of
4  hiring whether your top companies come to your campus or
5  not?
6        A. I couldn't tell. It depends what the students
7  are interested in, how many positions they have. There
8  are many factors.
9        Q. What did you do to determine whether the
10 companies that came in 2006 were the same quality as the
11 companies that came in 2008 or --
12       MR. FETNER: Objection.
13       THE WITNESS: I'm in no position to compare the
14 quality, whatever that means, of the companies.
15       MR. WEINER: Q. You don't understand what that
16 means?
17       A. No.
18       Q. You don't think at Stanford University that
19 it's better to have Goldman Sachs come to campus than
20 some small money firm that no one has ever heard of?
21 You don't think that makes a difference to your
22 students?
23       MR. FETNER: Objection.
24       THE WITNESS: No. Many students don't like to
25 work for Goldman Sachs. They would rather work for a

Page 336

1                ITAMAR SIMONSON
2  small company where the culture is different. Many of
3  them go to small startups that you have never heard
4  about. They don't like to work for Goldman Sachs or
5  McKenzie or any of the larger companies.
6        MR. WEINER: Q. I can only talk about law.
7        You don't think it's important to law students
8  whether the top law firms in New York, California,
9  Illinois come to campus as opposed to small firms in
10 Deerfield, Illinois or in small cities? You don't think
11 that makes a difference to your law students?
12       MR. FETNER: Objection.
13       THE WITNESS: You're going beyond my area of
14 expertise. I don't know what law students prefer.
15       MR. WEINER: Q. How about business students?
16 How about the marketing students that come to your
17 class? You don't think they prefer certain types of
18 employers over others?
19       MR. FETNER: Objection.
20       THE WITNESS: Depends on their preferences.
21       MR. WEINER: Q. What do you think?
22       A. Some are looking for small tech companies.
23 Each student has his or her own preference.
24       Q. So from your expert opinion, based upon the
25 fact that you teach PhD programs, in your judgment, the

Page 337

1                ITAMAR SIMONSON
2  vast majority of students that you teach prefer to go to
3  small startup companies as compared with major
4  well-established companies; is that correct?
5        A. Did I just say that?
6        Q. That's I'm asking you. Is that correct?
7        A. No. As I said, different students have
8  different preferences.
9        Q. Now, let's talk about the number of
10 undergraduate applications.
11       What did you do to determine whether the
12 quality of the students was different between 2006 and
13 2008?
14       MR. FETNER: Objection.
15       THE WITNESS: I tested them individually and
16 figured out they are the same quality.
17       MR. WEINER: Q. How did you do that?
18       A. No, I'm joking.
19       Q. I know you are.
20       A. What I meant to say is how can I test something
21 like that? Of course I cannot.
22       Q. But someone else can?
23       A. Again, I'm repeating myself. But the only
24 thing I can do is look at the numbers, the numbers that
25 you provided in your interrogatory responses.

One Penn Plaza, NYC                 Toby Feldman, Inc.                    (212) 244.3990
email@tobyfeldman.com     NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Page 338

ITAMAR SIMONSON
1
2  Q. But there was testimony about the quality of
3  the students; wasn't there?
4  A. I believe there was.
5  Q. But you ignored that testimony?
6  MR. FETNER: Objection.
7  THE WITNESS: As I said, I looked at the
8  numbers. I was trying not to look -- I couldn't rely on
9  in this case subjective measures that someone says,
10 "Well, I think they're higher quality, lower quality.
11 They came in December. They came in November,"
12 something like that. I couldn't rely on that because
13 I --
14 MR. WEINER: Q. You think the witnesses
15 rely --
16 MR. FETNER: Please stop interrupting the
17 witness.
18 THE WITNESS: I said I looked at the numbers.
19 MR. WEINER: Q. I understand. The witness
20 testified about quality based upon SAT scores. Is that
21 subjective or objective?
22 MR. FETNER: Objection.
23 THE WITNESS: SAT is objective.
24 MR. WEINER: Q. And there was testimony that
25 the quality in terms of SAT scores was less; isn't that

Page 339

ITAMAR SIMONSON
1
2  correct?
3  MR. FETNER: Objection. Do you want to show
4  him that testimony?
5  THE WITNESS: Yeah. That would be good for me
6  to see it.
7  MR. WEINER: Q. Unfortunately, I don't have
8  that with me. I'll be happy to get it.
9  Was there a difference in your view there was
10 no evidence that was provided as to quality differences?
11 MR. FETNER: Objection.
12 THE WITNESS: I don't recall specific. As I
13 said, I know I'm repeating myself. What I could do
14 really is rely on the actual numbers for 2006, 2008,
15 that's what I did.
16 MR. WEINER: Okay. Why don't we take a
17 few-minute break, and we will decide how much more if
18 any we have.
19 MR. FETNER: We're now 15 minutes over seven
20 hours. So I'm hoping we're just about done.
21 MR. WEINER: Well --
22 THE VIDEOGRAPHER: We are now going off the
23 record. The time is 6:26.
24 (Recess taken: 6:26 p.m. - 6:35 p.m.)
25 THE VIDEOGRAPHER: We are going back on the

Page 340

ITAMAR SIMONSON
1
2  record. The time is 6:36.
3  MR. WEINER: We have no further questions.
4  MR. FETNER: I have no questions.
5  MR. WEINER: We have concluded the deposition.
6  Dr. Jacoby says to say hello.
7  THE WITNESS: Yes, please send my regards to
8  him.
9  THE VIDEOGRAPHER: This now concludes the
10 videotaped deposition of Itamar Simonson on
11 September 21st, 2011. We are now going off the record.
12 The time is 6:36.
13 THE REPORTER: Counsel, your copy order will be
14 e-mailed to me?
15 MR. SPRINGER: Yes. Thank you.
16 (The deposition adjourned at 6:36 p.m.)
17 --oOo--
18
19
20
21
22
23
24
25

Page 341

ACKNOWLEDGEMENT
1
2
3  STATE OF CALIFORNIA )
                      :ss
4  COUNTY OF SAN MATEO )
5
6  I, ITAMAR SIMONSON, hereby certify,
7  I have read the transcript of my testimony
8  taken under oath in my deposition of September 21, 2011;
9  that the transcript is a true, complete
10 and correct record of what was asked, answered
11 and said during this deposition, and that the answers on
12 the record as given by me are true and correct.
13
14 _____
15           ITAMAR SIMONSON
16
17
18
19
20
21
22
23
24
25

One Penn Plaza, NYC                  Toby Feldman, Inc.              (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    (800) 246.4950

Page 342

```
 1           REPORTER'S CERTIFICATE
 2
 3       I, KIMBERLEE SCHROEDER, CSR 11414, duly
 4   authorized to administer oaths pursuant to Section 30(c)
 5   of the Federal Rules of Civil Procedure, hereby certify
 6   that the witness in the foregoing deposition was by me
 7   duly sworn to testify the truth, the whole truth and
 8   nothing but the truth in the within-entitled cause; that
 9   said deposition was taken at the time and place therein
10   stated; that the testimony of the said witness was
11   reported by me and thereafter transcribed by me.
12       I further certify that I am not of counsel or
13   attorney for either or any of the parties to said cause
14   of action, nor in any way interested in the outcome of
15   the cause named in said cause of action.
16
17       IN WITNESS WHEREOF, I have hereunto set my
18   hand this 4th day of October, 2011.
19
20
21       KIMBERLEE SCHROEDER, CSR, RPR, CCRR
         License No. 11414
22
23
24
25
```

Page 343

```
 1                I N D E X
 2   DEPOSITION OF ITAMAR SIMONSON
 3   EXAMINATION                             PAGE
 4   BY MR. WEINER                             5
 5            ---oOo---
 6              EXHIBITS
 7   PLAINTIFF'S EXHIBITS                    PAGE
 8    1   Rebuttal Expert Report of Dr. Itamar    6
         Simonson
 9
      2   Letter dated April 20, 2011 from Felix  7
10        Springer to Itamar Simonson
11    3   Letter dated June 11, 2011 from Itamar  7
          Simonson to Felix Springer
12
      4   Letter dated July 3, 2011 from Itamar   7
13        Simonson to Felix Springer
14    5   Article entitled, "Reasons asCarriers of  30
          Culture:  Dynamic versus Dispositional
15        Models of Cultural Influence on
          Decision-Making"
16
      6   Article entitled, "Reasons as Carriers of  27
17        Culture:  Dynamic versus Dispositional
          Models of Cultural Influence on Decision
18        Making"
19    7   Excerpt from book, "Building Strong    36
          Brands," by David Aaker
20
      8   Excerpt from book "Marketing Management"  38
21        by Philip Kotler and Kevin Keller
22    9   Article entitled, "Yale Safeguards Its   51
          Top Spot"
23
     10   Excerpt from book, "Consumer Behavior,   43
24        Buying, Having, and Being," Sixth Edition
          by Michael Solomon
25
```

Page 344

```
 1              EXHIBITS
 2   PLAINTIFF'S EXHIBITS                    PAGE
 3   11   Excerpt of book entitled, "The Handbook   46
         of Industrial and Organizational
 4       Psychology," by Jacob Jacoby
 5   12   Article, "the Influence of Source      49
         Credibility on Communication
 6       Effectiveness," by Carl Hovland and
         Walter Weiss
 7
     13   Article entitled, "The Effects of      49
 8       Negative Publicity and Company Reaction
         on Consumer Attitudes," by Celso de Matos
 9       and Ricardo Velga
10   14   Matrix                                 73
11   15   LexisNexis printout of Kargo Global Inc.  91
         V. Advance Magazine Publishers
12
     16   LexisNexis printout, Conopco, Inc. doing  93
13       business as Calvin Klein v.s. Cosmair,
         Inc., Polo Ralph Lauren Corp and PRL USA
14       Holdings, Inc.
15   17   LexisNexis printout, Champagne Louis   96
16       Roederer v. J. Garcia Carrion
17   18   Article, "Consumer Research in FTC versus  96
         Kraft (1991): A Case of Heads We Win,
18       Tails You Lose?"
19   19   Excerpt of "McCarthy on Trademarks"   105
20   20   Article entitled, "Preface to Fourth   105
         Edition"
21
     21   Excerpt from "McCarthy on Trademarks"  108
22
     22   Article entitled, "Reference Guide on  112
23       Survey Research," by Shari Diamond
24   23   Financial Products Study - Phone Invite  204
25
```

Page 345

```
 1              EXHIBITS
 2   PLAINTIFF'S EXHIBITS                    PAGE
 3   24   Survey Research                     142
 4   25   Article entitled, "On the Social     150
         Psychology of the Psychological
 5       Experiment:  With Particular Reference to
         Demand Characteristics and Their
 6       Implications," by Martin Orne
 7   26   LexisNexis printout, Simon Property  154
         Group, L.P. v. MySimon, Inc.
 8
     27   Excerpt from "Questions & Answers in  160
 9       Attitude Surveys," by Howard Schuman and
         Stanley Presser
10
     28   LexisNexis printout, Empresa Cubana Del  178
11       Tabaco v. Culbro Corporation and General
         Cigar Co., Inc.
12
     29   Article entitled, "Experimental Design  202
13       and Selection of Controls and Trademark
         in Deceptive Advertising Surveys."
14
     30   Survey on University Image 2008 November  203
15       26th
16   31   Multi-page document                  264
17   32   Multi-page document                  264
18   33   E-mail chain, the last in time dated  299
         December 27, 2007 from Helaine Klasky to
19       Jon Butler and Dorothy  Robinson
20   34   Article entitled, "Naver News"       301
21   35   Article entitled, "Naver News"       301
22   36   Article entitled, "Naver News"       301
23   37   Plaintiff Dongguk University's Fourth  310
         Supplemental Answers and Objections to
24       Defendant Yale University's First Set of
         Interrogatories
25
```

One Penn Plaza, NYC                    Toby Feldman, Inc.              (212) 244.3990
email@tobyfeldman.com        NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS   (800) 246.4950

Page 346

```
 1                EXHI8ITS
 2   PLAINTIFF'S EXHIBITS                    PAGE
 3   38   Deposition transcript of Sun In Lee      313
 4   39   Continued deposition transcript of Sun In   313
          Lee
 5
     40   Statement of Confirmation, Choi Jin Sik    314
 6
     41   Statement of Confirmation, Park Joon       314
 7        Hyung
 8   42   Verification 5tatement, Kang Hyun-jung    314
 9   43   Statement of Confirmation, Kim Oh Hyun    314
10   44   Request to Cancel Contribution Plan to     314
          the School's Development Funds, Kim Jin
11        Moon
12   45   Deposition transcript of Byoung Geon Jeon   325
13   46   Continued deposition transcript of Byoung   325
          Geon Jeon
14
15            ---oOo---
16
17
18
19
20
21
22
23
24
25
```

One Penn Plaza, NYC                  Toby Feldman, Inc.               (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      (800) 246.4950

Itamar Simonson

9/21/2011

Page 1

| A | | | | |
|---|---|---|---|---|
| AA 207:22 | 250:23,24 253:22 | adjourned 340:16 | affair 146:2,16,20 | 262:6 275:14 |
| Aaker 35:5 37:24 | 268:16 270:6,10 | adjust 177:18 | 242:8 264:8 274:7 | 303:3 317:6 |
| 38:16,20 343:19 | 326:20 | administer 2:12 | 282:7 287:23 | agreed 164:8 |
| Aaker's 52:9 | accurately 314:13 | 342:4 | 288:7,16 289:2,17 | 204:20 |
| ability 51:16 68:9 | accusations 279:9 | administered 98:7 | 290:24 291:17 | agreement 7:10 |
| 99:25 131:11,13 | accused 146:22 | administrative | 293:16 319:23 | 9:19 101:21 |
| 170:21 | 263:9 281:7 307:2 | 97:25 98:15,16 | Affairs 268:11 | agrees 108:3 |
| able 103:3 | 307:13 | 99:11 101:24 | affect 23:21 24:2 | Ah 47:22 225:22,24 |
| Absolut 29:17 | achieve 84:12 | 102:2,3,14 103:17 | 30:10 39:18 174:6 | 227:25 228:2 |
| absolute 328:3 | acquiescence | 103:18,21 104:7 | 176:13 249:3 | 232:25 237:14,16 |
| absolutely 118:25 | 100:15 | admissible 284:22 | 262:17 | 237:19 239:17,21 |
| 119:21 135:18 | act 62:25 97:19 | admission 276:11 | affiliation 158:3 | 239:23 248:10 |
| 227:7 | acting 146:6 | adopt 91:24 | 159:15 | 254:18 255:6,9 |
| abstract 164:7 | action 159:8 | ads 40:6 47:25 | AFTERNOON | 267:19 317:13 |
| abuse 169:7 | 221:25 342:14,15 | 113:25 114:2 | 126:2 | ahead 136:20,20 |
| abused 169:7,10,13 | actions 149:15 | Advance 91:13 | agents 218:5 219:7 | 138:11 139:2,2 |
| abuses 169:6 | 159:9 | 344:11 | aggregate 258:10 | 200:18,18 209:23 |
| academic 18:8 59:8 | active 94:4 | advancement | 258:14,15 | 240:10 249:6 |
| 64:15 275:7 | activities 23:5,10 | 317:7 318:15,19 | ago 28:5 40:8 41:14 | 250:7 260:18 |
| 276:13 | 24:12 | advantage 116:25 | 43:6,9 89:5 91:3 | 289:8 |
| acceleration 40:19 | actresses 292:17 | 117:2 | 93:19 128:14 | Ah's 228:4 |
| 40:24 | actual 51:6 140:14 | advantages 67:25 | 142:15 172:9 | aide 146:17 277:19 |
| accept 79:20 92:6 | 141:5 195:2,6,11 | 89:10 116:22 | 209:14 220:24 | 278:18 281:9,11 |
| 92:11 95:4 124:2 | 195:21 196:7,15 | 144:3,4 160:25 | 227:5 234:12 | aided 203:18 |
| 188:16 189:6 | 196:21 197:2 | 161:5 217:8 | 284:17 | aired 128:19 |
| 192:5 203:4 | 198:20 207:20 | adverse 276:20 | agree 35:15,18 39:9 | Akker 38:21 |
| acceptance 99:12 | 215:23 216:6 | advertisement | 39:10 40:11,14 | Alex 93:17 94:3 |
| accepted 79:10 | 309:3 314:17 | 124:6 | 44:8,16 45:14,25 | Alexander 93:18 |
| 82:7 91:16 92:4 | 327:8 329:20 | advertisements | 47:3,9 51:4 66:14 | ALJ 103:18 |
| 94:10,19 102:24 | 330:5,23 333:13 | 32:12 124:7 | 89:18,24 90:2,3,5 | allegation 270:13 |
| 103:18 104:2,8 | 333:14,17 339:14 | 128:18 129:7 | 90:8,11 101:21,24 | allegations 205:18 |
| 111:18 143:2 | ad 48:12 68:20 | 130:3 | 106:18 107:17 | 205:23 265:21 |
| 187:18 189:9,13 | 96:18 113:23 | advertiser 47:8 | 110:22 114:11,20 | 266:3 268:18 |
| 199:24 200:11,22 | add 38:23 39:17 | advertising 23:5,10 | 114:24 116:7,8,9 | 269:4,11,20 270:3 |
| 201:15 | 82:7 93:23 | 24:13 29:3 32:9 | 116:10,20 120:2,5 | 292:3 |
| accepting 94:21 | added 33:12 | 47:5,10,19,20,24 | 120:9 126:21 | alleged 55:14,16,22 |
| account 115:8 | 222:19 264:17 | 48:7,8,9 60:3,5 | 127:5,17 145:24 | 57:5 136:11 254:4 |
| accounted 12:19 | addition 117:11 | 75:17 97:9 121:22 | 151:17,24 152:21 | 254:4 264:23 |
| 286:3 | 146:4 244:20 | 128:13 165:8 | 156:23 157:7 | 292:4 319:2 |
| accumulated | 248:15 | 192:24 202:6 | 160:17,20 163:12 | allegedly 208:17 |
| 142:20 | additional 74:17 | 203:8 345:13 | 163:13 166:22 | 272:8 292:7 |
| accuracy 314:6 | 159:18 316:7 | advertising-relat... | 167:9 173:12 | Allianz 65:12 122:5 |
| accurate 108:16 | address 5:12,13 | 58:19 59:21 | 175:19 176:16 | 207:19 208:12,16 |
| 140:24 188:13 | 30:17 109:24 | advisor 250:12 | 177:11,22 179:10 | 209:4,12 210:5 |
| 236:9 238:14 | addressed 233:23 | 251:10 | 179:12 180:3 | 213:18,19 217:14 |
| | addressing 61:24 | advisors 252:14 | 193:4 203:7 | 218:5,18 219:7,7 |
| | adds 159:21 | advocate 321:13 | 204:17 247:24 | 220:15 221:19,25 |

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

(212) 244.3990
(800) 246.4950

| | | | | |
|---|---|---|---|---|
| Allianz's 219:12 | 67:10,11,13 | 101:6,12,14 131:2 | 301:4 304:8,10 | 304:21,22 343:9 |
| allow 83:4,7,12 | 122:24 208:17,18 | 136:18 160:6 | appears 7:17 11:16 | arbitrariness 39:12 |
| 84:12 99:20 138:9 | 208:19,22,24 | 192:10 201:4 | 26:13 46:18 81:5 | arbitrary 81:18 |
| 180:25 195:16 | 209:7 215:15 | 213:2 231:13 | 82:4 104:4,9 | 85:8 87:5 |
| 248:20 250:6 | 216:14 217:5,8 | 241:18 255:24 | 130:6 135:24 | arbitration 18:10 |
| allowed 279:13 | answer 24:4,5,7 | 259:15 260:18,20 | 168:23,25 169:3 | 59:13 |
| allowing 55:3 | 34:24 62:11 68:4 | 275:10 276:6 | 200:19 216:8 | Archdiocese |
| allows 262:22 | 82:4,21,22 99:4,7 | 280:23 281:14 | 254:9 264:7 281:6 | 303:15 |
| alluded 98:9 | 99:14,17,18,20,23 | 287:9 294:8 | 287:15 304:3 | area 27:11 154:8 |
| alma 305:18 | 99:24 100:22 | 319:15 341:10 | applause 183:25 | 157:3 164:19 |
| 318:15 | 101:4,5,7,9,11 | answering 117:11 | applicable 105:16 | 196:4 213:7 321:2 |
| Alreck 88:11 | 114:18 118:24 | 173:25 216:3 | 173:20 | 336:13 |
| Alrek's 90:10 | 122:21 123:13 | 220:6 260:10 | applicants 56:13 | areas 23:13 60:6 |
| altered 290:6 | 131:4 136:17,19 | 279:18 | 309:4 | 173:23 193:13 |
| alternatives 22:5 | 137:19 138:10 | answers 54:5,7,19 | application 317:11 | argue 48:10 102:22 |
| 116:16 127:16 | 140:18 149:5 | 56:3,9 84:6 | applications | 186:7,9 306:10 |
| 162:15 167:4 | 150:8 159:18 | 135:13 174:2,7 | 337:10 | argued 133:2 |
| 235:5 | 168:22,24 169:2,3 | 175:11,15 182:10 | applied 47:15 | 140:12 186:3 |
| alumni 305:17 | 169:9,10,12,23,25 | 204:15 205:17,22 | 100:8,19 102:16 | argues 178:19,20 |
| alumnist 317:6 | 170:10,18,21,22 | 206:13 213:9 | 102:24 137:15 | arguing 186:25 |
| ambiguity 135:16 | 171:10,11,12,13 | 227:23 238:10 | applies 177:5 | 287:19 |
| 135:18,20 | 171:18,20,23 | 246:19 262:17 | apply 96:24 137:15 | argument 136:22 |
| America 77:12,14 | 174:13 180:20 | 295:6 321:7 | 206:2 | 186:16 |
| 77:15 | 182:22 195:17 | 341:11 345:8,23 | applying 137:10 | arguments 197:22 |
| American 25:24 | 200:5 207:7,7,25 | anticipated 319:10 | 326:13 328:14 | arithmetic 327:13 |
| 31:22 253:20 | 209:22 211:7,11 | anybody 211:20 | appointment | 327:16 |
| Americans 25:13 | 211:12,13,15,16 | anymore 64:7 | 265:10,22 268:20 | Aruold 145:4 147:6 |
| amount 314:3 | 212:8,11 213:10 | apart 21:20 | 269:12 286:22 | arose 319:8 |
| 316:13 323:3,6 | 226:6 227:13 | apology 300:8,10 | approach 176:9 | arrest 293:24 |
| amounts 323:6 | 228:11 229:10,11 | 300:14 | 230:24 | arrested 292:24 |
| analogous 183:16 | 229:12,21 230:5,6 | apostrophe 92:25 | appropriate 73:16 | art 228:20 265:11 |
| analogy 292:22 | 230:14,14,19,20 | 194:11 | 109:20 115:8 | 276:15 |
| analyses 102:22 | 231:9,12,19,20,22 | apparently 110:25 | 123:12 127:2 | article 17:24 24:25 |
| analysis 132:20 | 232:3 238:11,18 | 141:2 187:19 | 144:10 159:6 | 26:7 30:15,22 |
| 137:2 192:21,23 | 239:20 240:7,7 | 250:16 274:9 | 161:10 221:14 | 31:5 32:24 33:3 |
| 193:15 | 241:6,7,8,15 | 279:11 280:6 | 252:3,6 269:9 | 33:13,18,25 48:23 |
| analyze 172:6 | 247:13 248:21 | 282:24 305:16 | 284:25 312:6 | 49:25 50:7,12,23 |
| analyzed 28:24 | 252:21 254:13 | 307:2,7 308:7 | appropriateness | 51:6,20 53:10 |
| 134:4 135:25 | 255:10 259:2,6,18 | 309:20 315:7,9,13 | 186:21 | 95:10,16 96:7,8 |
| analyzing 136:25 | 259:21 260:11,13 | appeals 32:9 | approximate 78:22 | 97:12 98:5,9,21 |
| 137:22 138:2 | 260:18 276:14 | appear 216:10 | 91:22 | 98:24 100:10,19 |
| and/or 47:8 | 280:2 284:16 | 282:22 302:7 | approximately | 100:25 101:23 |
| anecdotes 322:2 | 290:20 294:11 | 322:6 | 5:17,25 6:4 18:3 | 102:18 103:7,8,25 |
| anniversary 316:3 | 316:2,18 329:3,4 | APPEARANCES | 69:20 207:6 | 104:5,7 113:10 |
| announced 321:5 | 329:16 | 3:1 | April 7:16 8:3 9:2 | 126:9 132:10 |
| announcing 321:4 | answered 18:11 | appeared 2:13 | 9:20 11:18,22 | 133:4,5,8,11,21 |
| annuity 66:16 | 54:9 85:18 87:12 | 51:20 234:16 | 12:23 51:22 304:9 | 134:3 136:23 |

137:6 138:13,18
139:11,15,17
140:2,3 141:5,6
141:10,10,10,12
141:23 142:25
143:4,6 146:21
150:19 151:3
153:13,24 154:2,7
154:9 163:25
164:4,9 195:19
202:4,9,21,23,25
266:16 267:8,16
267:18 268:12
269:10 270:2
271:21 274:23
278:4,7,12 279:19
279:25 280:8
286:7,15 287:15
287:20,20 296:12
296:14 302:10,22
305:21 308:6
343:14,16,22
344:5,7,17,20,22
345:4,12,20,21,22
**articles** 16:13,15
17:18 24:24 31:10
49:17 56:16,18,24
56:25 57:4,25
58:2,4,5 82:2 89:8
89:13 141:7
146:24 147:10
151:8,11 153:10
153:19 154:5
250:16,18,22
251:11 264:4,16
264:17,24 265:2,3
274:3 278:5
279:15 280:8,12
281:5,6 282:7,12
282:16,17 283:13
283:16,20,22
284:2,10,13
285:11,12 298:3
301:4,8 302:3
308:3 319:21
320:3
**articulated** 101:17

**asCarriers** 343:14
**Asian** 25:13
**aside** 80:4 123:4,4
183:23 226:17
231:24 232:2
257:7,7 296:25
**asked** 7:18 10:25
25:7 35:18 54:10
56:25 63:13 67:23
101:6,9 109:21
111:11 115:17
121:17,19 123:3
128:3 142:11
144:24 153:21,22
165:3,19 166:17
172:12 173:5,12
173:25 175:9,10
177:21 180:7
181:10 182:12
185:8 189:21
199:19 201:8
208:5 210:14
211:8 212:2 213:9
213:20 214:3
226:13 233:13
235:2 239:15,15
240:19 245:3
246:3 247:17
252:15 256:14
257:19 260:18,23
267:11 269:19
279:17 281:14
287:8,21 288:22
289:15,25 290:25
294:23 314:11
328:22,22 341:10
**asking** 25:11 52:19
55:18 67:5 82:18
84:20 99:5,8,15
118:17 122:10,12
123:9 133:7
136:25 137:22,23
137:23 147:8,20
158:17,18 166:19
167:25 170:8,14
171:9 172:13
173:13 176:11

180:23 181:7,7,14
181:24 184:23
185:2 199:20
200:7 210:18,21
211:3 212:14,22
213:11 217:11
219:13,16 220:5
220:20 224:10
225:19 227:4
229:6,11 232:17
233:11 242:24
243:16 244:14
245:24 249:2
251:15 255:22,22
258:13 259:7,8,9
259:10,20 260:7,8
270:9,11 291:12
293:23 294:9
320:14 330:18,18
330:24 337:6
**asks** 113:18 114:22
204:20 230:11
236:14 241:22
243:23 247:2
**aspect** 277:17
279:8
**aspects** 18:15 24:10
42:4 46:7,8 51:2,8
51:13,15 62:12
88:25 92:23
137:10 193:6
263:23 270:15
277:15 282:4
283:3 285:7,24
288:19 297:19
298:6 308:7 318:5
**assembling** 10:9
**assert** 80:23 81:3
**asserted** 62:22
73:25 286:21
**assess** 127:11
200:12
**assessing** 127:8,14
246:5,25
**assessment** 194:12
**assessments** 200:21
**assign** 42:9

**assignment** 64:16
**associated** 52:9
281:7
**associations** 38:6,7
38:23 42:16 52:11
280:13 304:3
**assume** 18:7 24:4
28:7 37:13 117:25
119:10,11,15,18
121:6 143:2
169:15 181:22
188:13 221:8,8
256:13 257:12,14
262:5 327:3 328:6
**assumed** 162:13
**assuming** 123:8
328:23
**assumption** 67:14
67:20 162:19
228:15
**atmosphere** 213:12
**attached** 10:6,8
57:7
**attempt** 254:25
255:5,8 272:3
**attempting** 28:12
73:5 127:3 137:8
160:24
**attention** 30:18
45:17,22 148:10
148:13 155:7
249:7 264:6
**attitude** 162:4
345:9
**attitudes** 18:18
50:3 162:4 344:8
**attorney** 3:10,14
4:16 314:8 342:13
**attorneys** 3:4 8:13
9:10 12:18 54:10
**attractive** 162:15
162:21
**attractiveness**
162:25
**attributes** 24:12
51:16
**atypical** 203:14

**AT&T** 165:9,10,12
165:13,15,16
**Audi** 40:19
**Audrey** 3:4 4:19
6:11
**Audubon** 3:10
**Aulu@mwe.com**
3:7
**author** 70:6 77:9
105:6 206:10
**authored** 6:16
17:25 36:8 73:7
73:11 74:15 76:11
77:5,5,21,24
91:18 98:25 99:13
100:12,12 101:2,3
**authoritative** 89:6
**authorities** 86:16
**authority** 49:10
**authorized** 2:11
342:4
**authors** 26:8
102:20 108:14
**author's** 88:11
102:18
**automobile** 41:9
**available** 19:18
24:6 74:18 177:18
258:18 321:10
323:13 324:8
331:2
**Avenue** 3:5 5:14
**avoid** 100:16 176:9
224:7
**avoided** 84:16
**award** 140:3
**awarded** 255:6,9
**aware** 27:5 41:25
63:13,15,17,18
73:4 115:11 121:4
143:10 145:8,18
145:25 150:15
170:11 184:2
222:6 232:16
292:16 293:6
313:22 316:2
**awareness** 38:4,8

Itamar Simonson                                                      9/21/2011

38:22 52:10 120:3
203:16,18,19
222:22 223:3
**awhile** 8:7 28:15
33:2 154:23
225:16 227:2
233:6 296:15
**A-a-k-e-r** 35:5
**A-l-r-e-c-k** 88:12
**a.m** 2:7 7:4,4 53:18
53:18 81:11,11

—————————

**B**
**B** 69:22 73:19
74:25 75:8,9,12
123:24 174:13,16
174:17 225:3
245:15
**bachelor's** 271:6
**back** 7:5 26:16
31:13 34:7,19
37:18 39:16 53:19
53:21 58:14 67:24
75:24 78:18 81:14
89:15 100:23
102:11 119:25
122:25 124:23
126:4 132:5
134:12 135:17,22
144:2 147:11
151:14 154:2,23
154:24 166:8
168:6 173:3
175:17 178:4
182:11 190:23
200:4,6 203:17
205:9 209:12
213:6,18 229:16
243:14 244:12
245:23 259:19
260:25 261:9
263:5 265:12
273:10 282:16
292:11 296:21
339:25
**background** 17:24
98:19 107:22

**backing** 244:23
**bad** 143:15,24
171:2 240:24
248:24 249:2,14
249:23
**balance** 144:9
**Bank** 77:11,14,15
**bar** 123:16
**bars** 165:11,18
**base** 163:2
**based** 14:12 46:5
60:21 66:20 67:11
67:15 74:13 85:9
87:6 104:5 121:11
124:14,14 131:12
135:16 141:16
156:6 190:2,10
192:7 198:19
199:4 243:8
247:20 255:16,17
283:12,20,21
285:8 290:4,20
298:18 315:25
316:24 317:21
318:6,8 322:23
327:21 336:24
338:20
**basic** 69:13 152:11
**basis** 27:4,6 45:13
57:4 87:4 214:18
253:21
**Bates** 28:7,8 268:4
270:22,24,25
277:11
**Bean** 77:12,13,16
**bear** 56:3 317:5
**beat** 147:23
**becoming** 65:9,10
**beer** 40:5,8
**beg** 67:18 223:8
242:21 287:6
**began** 12:23 14:19
15:12 122:12
**beginning** 12:23
14:24 15:11 81:12
102:18 104:21
108:25 109:7,7

126:15 141:9
158:8 166:6 168:3
176:19 185:10
193:5,17,20
194:22 196:4
260:3 261:7
263:18 267:18
308:20
**begins** 30:18 32:6
213:25
**begun** 14:9
**behalf** 2:15 4:14
165:15 204:16
206:7,20 210:7
**behavior** 18:14,14
18:15 20:10 21:21
23:6,11 30:10
43:15 58:18 59:19
67:12,16 164:19
309:3 333:15
343:23
**belief** 248:9 254:16
291:6 313:25
326:18
**beliefs** 144:23
**believe** 6:9 8:4,25
17:15 21:7 33:2
36:12 46:16 49:8
54:24 56:18 60:16
62:8,9 70:2 71:25
72:8 75:21 76:2
76:25 77:8 78:9
80:5,10 88:21,23
90:13 91:19 93:25
103:14 105:24
108:5 112:6
138:24 151:10
154:10,15 162:3
178:10 179:22
190:17 195:7,10
241:11 247:3
252:24 253:5
264:5 265:19
266:16 272:2
275:20,21 277:19
279:5,12 280:9
281:19 290:2

308:11 310:7,21
313:8,11,22
320:13 321:6
323:20 338:4
**believed** 139:6
148:22 225:23
228:3 230:12
233:2 250:18
288:23 290:3
301:16
**believes** 291:12
**bell** 41:13
**Belvedere** 29:16
**beneath** 12:13
267:20
**Beneficial** 57:11
107:2,3,8,8,15,15
109:2,2,12,12
111:14 155:10
**benefit** 213:14
**benefits** 32:9,12
**Berkeley** 35:9,11
38:21 252:22,25
252:25 307:19
**best** 11:4 24:5
82:23 99:24 140:3
237:18
**betrayed** 148:20
**better** 12:22 31:8
43:10 335:19
**beyond** 127:12
168:17,19 250:9
336:13
**bias** 80:24 100:15
148:11 162:14
179:9 180:14
181:19
**biased** 81:4 82:16
205:15 226:5
231:8 238:9
243:22
**biases** 164:24
**biassing** 141:20
**bicultural** 31:21
**big** 29:9 32:4 124:6
264:8 280:13
282:22 298:21

**biggest** 220:16
**billion** 317:10,15
318:14 319:5
321:19
**billionaire** 28:20
**birthday** 230:3
**bit** 128:12 153:4
208:12
**black** 120:23
307:10
**blackmailed** 278:2
**black-and-white**
152:5
**blatant** 257:6
**blatantly** 205:15
225:15,17 226:25
231:8 233:6,9,12
238:8 245:20
248:18
**blind** 206:8
**blocks** 39:5
**Bloomberg** 172:11
**Bloomberg's**
172:20
**blow-outs** 41:12
**blue** 9:7 286:24
**blurring** 62:15
**Board** 268:14,20
269:14 283:4
**boards** 139:23
**Bob** 9:25 74:4
85:17 89:21
138:19 157:14
211:6 212:7 213:5
281:22 315:12
325:16
**bolster** 137:5
**bonus** 122:24
208:18,20,24
**book** 35:4,25 36:5
36:8 38:3,11
43:14,20 45:3
88:7,15,16,17
89:13,16 90:7,8
90:11 144:2
160:16,21 161:25
163:2,6,18,20

271:18 343:19,20
343:23 344:3
**books** 35:10 58:5
87:21
**born** 230:2
**bother** 274:9 312:7
**bottle** 245:13
**bottom** 30:19 31:14
178:15 196:9
225:4 301:3
311:15
**bought** 67:3,4
**brakes** 41:3
**brand** 28:18,20
29:21 36:8 37:20
37:21,22,24 38:3
38:4,4,5,5,9,22,22
38:22,23 39:5,18
39:19 40:9,12,16
41:16,18 42:4,5
42:15 52:4,7,12
52:20,23 128:24
190:21 199:10
266:8
**branding** 35:10,16
37:20 42:15 59:20
60:5
**brandings** 58:19
**brands** 29:17,18
35:25 343:19
**break** 23:23 53:15
81:6 125:17 126:8
165:23,24 213:5,7
213:11 260:24
296:16 339:17
**brevity** 137:6
**brief** 69:12
**briefly** 213:20
**brightest** 22:10
**bring** 149:6 212:10
212:10,20
**brings** 77:22
**broad** 32:19 81:21
82:3,12 140:9
**broadcast** 19:19
40:19 41:7
**broader** 165:14

**brochure** 66:15,17
68:6,20 209:5,17
209:18,19,24
210:8,15,16
211:21 212:2
213:21 214:9
217:11,17,21,25
218:14 219:10,20
220:3,6,7 221:4,9
221:10,16,17
227:8,9,10,16
235:23
**brochures** 66:21
67:7 209:6 214:3
218:6,19,20
219:13 220:17,18
227:3
**brought** 97:15
148:24 149:15
**Brown** 182:24,25
**Buddhism** 33:24
**Buddhist** 33:7
326:15,19
**building** 35:25
37:20,21 38:7,7,8
38:8,9 39:5 41:15
42:4 343:19
**bunch** 10:2 12:12
**Burlingame** 5:14
**Burn** 88:7 90:4
**Bush** 88:7,8 90:4
183:15,15
**business** 5:12,13
93:9 107:7,14
109:11 158:13
228:24 240:13
242:5,12 336:15
344:13
**businessman** 317:6
**Butler** 345:19
**buy** 208:19 215:15
**buying** 23:6,11
43:15 209:25
217:4 343:24
**Byoung** 346:12,13
**B-u-r-n** 88:7

**C**

**C** 54:3,3 153:9
174:13,16 202:20
225:4 226:15
234:3 300:3,4
313:9,11 341:1
**California** 2:9,11
4:13 5:14 35:9
76:14 145:4,9,25
146:24 149:7,16
149:19 336:8
341:3
**call** 9:7 10:14 16:14
16:18,23,23 17:2
25:18,20 31:20
64:14 65:17,21
67:24 93:18
113:20 119:12
130:17 148:9
172:9 174:9
224:15,16 262:5
263:19 271:11
293:11
**called** 2:15 9:8 12:9
13:11 22:3 23:4
37:20 38:11 39:4
43:15 62:13 87:25
88:10,20,23 92:15
107:2 120:3
124:18 128:15
154:16 187:7
193:11 208:17
**calling** 148:13
**Calls** 118:21
**Calvin** 93:9 344:13
**campaign** 29:8
**campus** 332:2
335:4,19 336:9
**Cancel** 346:10
**canceled** 313:15
314:2
**Cantonese** 26:11
**capabilities** 136:13
**capable** 136:10
184:5
**capital** 107:3 109:2

109:12 156:14
**capture** 82:17 83:3
**captured** 312:4
**car** 40:20
**card** 77:12,15,16
78:9
**cards** 78:8
**care** 36:17 83:9
94:2 115:19
245:14
**cared** 273:22,23
**career** 17:25
**careful** 87:7 209:18
**carefully** 90:7
178:14 214:4
220:6,8,18 221:16
251:13
**Carl** 49:7 344:6
**Carlston** 50:19
51:12
**Carolina** 164:15
**Carriers** 343:16
**Carrion** 94:6
344:16
**Casablanca** 118:3
118:5,14,15,21
119:6 123:2,5,16
123:18 124:5
125:4,12,13
127:24 128:8,12
**case** 4:11 6:16 7:11
11:17 28:13,16,18
29:5,11,24 31:18
42:8,10,12,14
47:18 54:20 55:6
56:4 60:7,9,13,20
60:22,25 61:6,13
61:17 62:4 64:7
65:11,14 66:13
68:5 69:3,6,7,10
73:23,23 74:20,23
76:3,8,9,12,19,20
76:21 77:8,18
78:7,11,15 79:14
79:15,22 80:4
91:6,8,12,16 92:6
92:13,14,16,21

93:8,20 94:8,9,10
94:15,18 95:3,5
95:23 96:17,21
97:25 98:4,20,23
99:2 100:6,8,8,17
100:20 102:16
103:11 104:5
107:2,13,22
108:23,23 110:21
111:9,14,17,20,24
111:25 120:11,20
120:21,21 121:11
121:13,15 122:5
122:20,22 125:5
125:11 131:7,14
131:21 137:10
138:13 139:18
140:6,17 143:22
146:10 147:14
148:8,15,16
154:16,19,21
155:4,8,14 156:18
157:22 158:5,6,7
158:10,22 159:9,9
162:23 163:3
172:5 177:25
178:10 179:4,6,18
179:21 185:25
186:3,6,9,16,24
186:25 187:11
188:22 189:15,22
189:24 193:5,6,16
195:13 196:3
197:17,24 198:9
200:18 202:22
203:15 208:12
221:20,21,23
222:5 227:18
230:6 234:15
239:9 244:19
245:17 250:9
253:22,24 261:17
261:20,22 262:5
262:20 263:5,7
273:8 274:14
275:11 285:9
292:3,22 297:24

| | | | | |
|---|---|---|---|---|
| 298:21,24 312:14 | center 88:2 243:19 | 295:24 331:15 | 26:10 31:25 32:2 | citizens 36:21 37:5 |
| 333:15 338:9 | centers 33:8 | changes 200:15 | 32:3,17 34:2,15 | Civil 2:13 342:5 |
| 344:17 | central 60:8 184:3 | changing 181:11 | Chiu 31:5 | claim 57:5 60:8,21 |
| cases 48:17 54:9 | cert 256:17 | 181:11 | Choi 346:5 | 65:11 81:18 |
| 57:7,8,20,21 | certain 52:9,13 | channels 44:7 | choice 177:10 | 189:18 191:11 |
| 60:17,24 62:16,23 | 56:8 57:7,25 60:6 | 190:21 192:22 | choices 23:21 24:2 | 199:13,16,21,21 |
| 62:25 66:12 69:22 | 65:8 66:2 81:18 | chapter 46:19,19 | 25:4,4,11,15 | 199:23 200:8,8,10 |
| 70:2,8 73:6,7,22 | 82:10,14 83:3 | 87:24 88:19 89:17 | 114:22 115:17,20 | 200:15 201:2,3 |
| 74:19 75:2,3 77:2 | 85:7 117:22 | 89:18,19,23 113:4 | 127:8,14,23 | claimed 272:13 |
| 78:19 79:7 81:5 | 122:23 130:5,6 | 113:6 166:11 | 129:16 177:21 | 273:21 274:14,21 |
| 90:23 97:10 | 144:14,25 161:5 | character 128:14 | 246:5,12,25 | 317:24 |
| 111:15 117:3 | 164:24 172:7 | 130:2,5 | 258:18 | claiming 218:18 |
| 124:24 137:16 | 204:21 263:14 | characteristic | choose 25:9 114:22 | 267:14 276:12 |
| 141:20 150:20 | 284:10 297:3 | 172:23 | 115:21 177:9 | 284:13 326:3 |
| 152:9 167:17 | 303:6 308:21 | characteristics | 240:19 241:6 | claims 62:22 190:7 |
| 184:16,19 199:16 | 333:24 336:17 | 47:4 68:25 111:18 | 242:13 255:14 | 190:14,14 225:24 |
| 203:14 244:10 | certainly 10:12 | 132:21 150:2,5,10 | chose 227:11 | 228:4 230:12 |
| 245:17 246:11,13 | 74:16 77:2 132:2 | 150:14,16,22 | Chosun 299:16 | 326:7 |
| 274:4 | 172:25 250:14 | 151:6,20,22 152:4 | Christie 182:15,16 | class 28:5 66:23,24 |
| cash 122:24 208:18 | 264:7 301:21 | 152:8,9,19,23,25 | 182:19 | 70:17 118:2 210:8 |
| 208:20,24 | 303:9 325:19 | 153:7,12,18 154:4 | Cigar 345:11 | 221:25 336:17 |
| categorical 178:25 | certainty 300:6 | 154:22 345:5 | Cigars 79:16 | classes 45:5 |
| categories 12:2 | CERTIFICATE | characterize | Cinderella 283:2 | classified 76:10 |
| 174:5 | 342:1 | 120:16,17 | Circuit 80:9,13 | classify 75:22 |
| category 19:9 | Certified 2:10 | characterized 20:9 | 190:17,18 | 113:18 |
| Catholic 303:15 | certify 341:6 342:5 | charges 269:3 | circumstances | clean 64:9 128:15 |
| cause 80:11 147:6 | 342:12 | 292:25 | 108:24 120:13 | 128:18 129:2,15 |
| 147:24 234:19 | cetera 111:13,13 | Charlie 183:24 | 167:15 307:15 | 129:20,24 130:7,7 |
| 263:2,13 270:12 | 283:2 | chart 73:12 310:21 | cite 57:16 77:2 | 130:10,24 |
| 291:24 292:2,3,9 | chain 299:15 | 311:19 | 87:24 95:9 136:23 | clear 9:25 69:3 |
| 332:17 333:16,19 | 345:18 | checked 275:17 | 137:4 153:10,23 | 74:4 75:6 80:19 |
| 342:8,13,15,15 | Champagne 94:5 | 317:24 | 154:9,16 155:8,18 | 82:18 105:18 |
| caused 42:21 56:21 | 344:15 | checking 250:10 | 156:10 163:4 | 127:16 144:9,15 |
| 57:5 145:13,19 | chance 29:3 106:20 | 251:16 | 202:4,9,17 | 151:20 153:3 |
| 147:23 148:4 | change 81:7 128:12 | child 145:10 146:4 | cited 49:5,8 57:14 | 158:17 159:7 |
| 183:10 254:4 | 145:14,19 147:6 | 146:14 147:5,24 | 58:11 88:14,19 | 179:25 218:21 |
| 268:23 289:10 | 147:25 148:5 | 148:23 169:23 | 112:3,8,13,14 | 224:25 244:11 |
| 292:7,14 319:19 | 165:24 171:13 | 170:11 182:14,17 | 142:23 143:2 | 246:11 284:7 |
| 332:22 | 175:2 176:2,18 | 183:4,24 184:6 | 151:8 153:16,25 | 286:6 291:5 |
| causes 147:17 | 201:21 263:2 | 229:18,24 230:2,3 | 154:12 155:4,15 | 294:11 297:6,7 |
| 149:20 255:24 | 298:21 | 231:18 232:17 | 161:13 163:11,12 | 311:23 |
| 263:19 270:7 | changed 169:21 | 292:13 | 202:13 264:16,21 | clearer 141:19,19 |
| 291:25 292:10 | 170:16 171:3,8 | children 147:23 | cites 34:4 | 323:16 |
| caution 8:22 | 182:13,17 248:11 | childs 146:16 | cities 336:10 | clearly 26:5 93:5 |
| CCRR 1:14 342:21 | 248:12,19 254:19 | China 25:19 27:15 | citing 98:4 100:6 | 233:12 280:13 |
| celebrate 230:3 | 290:6 291:10 | 34:18 | 111:8,8 142:13 | 328:17 |
| Celso 50:3 344:8 | 293:4,24 294:21 | Chinese 25:24,25 | 158:16 179:2 | clerk 93:25 |

Itamar Simonson                                                    9/21/2011

clog 64:10
close 110:21 131:14
  151:23 152:19
  156:4 159:23
  177:10 185:20
  203:9 204:18
  297:22
closed 142:8
  157:20 167:2,3
closed-end 133:18
  140:13,14,16
closed-ended 97:4
  115:12 116:3,5,11
  116:17,22 117:6
  117:14,17,21
  118:22 119:3
  120:6 126:7,19
  127:7,13 129:16
  132:16 141:14,20
  142:10,21 143:3
  144:3 161:10
  162:14 164:11
  167:25 172:19
  174:5 176:21,25
  205:16 208:3,7,8
  216:18,20,24
  234:19 235:3,5
  237:7 238:9 244:2
  244:7,9 245:5,6
  245:11,19 246:4
  246:22,24 257:8
closer 41:5 132:19
  182:24 199:10
closest 27:2
close-ended 114:20
  115:2,5 119:7
  122:13 123:3,10
  132:12 133:2
  137:10 216:21
clues 123:23
clutter 64:10
Coca-Cola 92:9
coding 136:11
coffee 245:13
  246:13
Cohiba 79:16
coincided 265:10

Coke 31:22
collaboration 25:2
colleague 35:8
collection 308:6
collectivist 25:18
  26:17,24 27:4
colon 98:22
Columbia 222:3
column 30:20
  31:14 33:5 151:19
  196:10 267:20
  275:23 276:12,18
combination 116:6
combine 38:23
  39:17
come 21:9 24:25
  41:16 58:4 109:18
  116:19 173:23
  209:12 220:9
  234:8 237:21
  258:4 260:25
  310:25 322:4
  335:4,19 336:9,16
Comedy 184:3
comes 19:9 48:14
  127:3,11 134:2
  243:14
coming 119:25
  244:12
commencing 2:7
commenting 99:11
  159:8
comments 92:19
commercial 68:19
  121:23 128:19
  130:4,7,8,14,24
  131:12,19,23
  165:17,20 194:13
  235:22
commercials
  128:21,23 129:2
  129:12,24 130:6
  130:12,16,17,18
  131:17,20 165:10
  165:16,16
Commission 95:12
common 78:21

80:23 179:3
commonality 70:17
commonly 65:10
  81:3
communicated
  121:24 131:18
communicating
  12:17 134:19
communication
  8:21 46:25 48:25
  49:17 131:16,19
  132:4 344:5
communications
  8:15,23
community 86:24
  87:14,19
companies 50:10
  107:9,16 109:13
  167:20 220:16
  331:25 333:15
  334:18,21,21
  335:4,10,11,14
  336:5,22 337:3,4
company 50:2 51:3
  51:9,13,15 64:25
  65:12 167:19
  172:10 199:9
  220:15 227:8,11
  319:10,11 336:2
  344:8
comparable 298:25
compare 55:3
  175:11 262:23
  318:7 327:8
  335:13
compared 25:24
  51:14 54:8,14
  57:13,16 63:6
  316:22 326:24
  337:3
comparing 312:11
comparison 186:21
  229:22
compensated
  242:14
compete 22:16,19
  22:21,24 29:3

52:2
competition 77:18
  105:7,10,14,20
  190:7
competitive 22:3,3
  22:14 28:22 29:4
  194:15
compiling 284:10
complaint 254:3
complete 24:3
  62:11 82:17
  118:23 136:19
  138:9,10 227:13
  329:16 341:9
completed 17:16
  273:21 320:7,8
completely 118:23
  118:24 119:24
  120:2 123:19
  131:7 146:20
  162:25 163:3
  292:10
completing 17:19
completing 17:16
complicated
  286:25
Complying 126:14
  151:16 156:12
  161:17 166:15
  168:12 176:7
  177:7
component 29:11
  30:7 79:19 115:6
  130:8 168:22
  171:5,9 270:14
components 29:25
  37:25 146:15
  229:4
compromise 25:9
  25:16,20 26:2
compromising 26:6
computer 64:9,10
computers 64:8
conceivable 52:22
  108:24 144:22
  249:9
concentrated 60:6
concept 68:3

183:12 224:5
  231:16
conception 37:24
concern 305:17
concerned 153:6,6
  175:6 178:2
  199:13 263:8
  301:13
concerning 77:12
concerns 141:17
  161:14 189:13
  250:21 251:3
  290:14 301:20
conclude 132:22
  241:25 309:9
  317:21
concluded 141:16
  162:18,18 187:11
  192:6 311:20
  324:25 326:22
  340:5
concludes 189:2
  340:9
concluding 243:21
conclusion 109:15
  187:14 188:9,16
  188:17 189:7,17
  190:5 229:20
  243:8 244:4,5
  264:2 291:23
  297:8,9,10,12,22
  297:25 298:14,18
  309:16 310:15
  315:25 316:11
  322:5,9,12,21
  326:20 327:11,21
  327:22
conclusions 95:10
  131:12 153:11
  160:17 172:7
  187:13 193:21
  283:12,14 285:6
  297:3,4,17 308:21
  315:2 316:24
  318:6,8 320:23
  322:5,18,24 325:6
  329:12 331:13

Itamar Simonson                                          9/21/2011

Page 8

concrete 22:7
   122:22 201:8
   292:3
concretely 117:17
   292:8
conditions 28:22
   78:22 91:22
   120:18 121:16
   188:2 197:25
conduct 64:17,22
   64:23 120:14
   259:22 262:20
   274:2 293:15,17
   294:12 297:24
   298:17 307:24
   308:3
conducted 25:23
   54:13 58:16 59:24
   60:2 61:16 62:14
   63:6,9 64:15
   66:20 70:22,23
   71:2,3,5,7,8,9,12
   71:12,17,22 72:3
   72:6,9 74:11,13
   79:23 84:17 97:8
   102:25 131:14,22
   139:13,17 143:11
   162:2,10 165:15
   185:5 191:22
   204:17 206:8,18
   206:20 221:24
   242:17,23 309:6
   312:3 331:19
conducting 63:8
   64:21 96:23
   115:16 181:23
   204:14
conferences 286:19
confess 33:15
confidence 72:18
confirmation
   254:10 288:8,17
   290:25 346:5,6,9
confirmed 251:21
   289:18,19
confirming 282:20
   282:20

conflict 96:10
Confucius 33:11
confused 123:25
   209:25
confusing 11:3
   93:13 215:22
confusion 92:16,17
   92:18 94:24
   110:24 111:2,20
   111:22,23,25
   167:17 178:24
   179:9 187:8,10
   191:2,6,8 192:23
   195:2,6,11,20,21
   195:22 196:7,16
   196:21 197:2
   198:20
connected 108:2
Connecticut 1:2
   3:11,15 4:11
connection 6:16
   7:11,20 19:6
   24:20 28:13 29:5
   29:7 53:24 61:6
   61:13,16 63:5,14
   64:12 95:11 96:20
   97:14 107:8,10,14
   108:19 109:11
   146:23 158:14
   179:20 280:9
   285:9 299:17,25
   316:23 326:3
Conopco 93:8
   344:12
conservative
   209:16 210:2,3,5
   217:19 218:11,15
   219:19,22,22
   221:15
consider 10:13
   22:6 27:11 35:20
   44:21 49:13
   116:18 195:25
   231:8 262:10
   300:15,18
considerable
   132:20

consideration
   192:13 199:2
   285:25
considered 21:13
   48:5 110:20
   194:25 196:18
   200:20 235:7
   258:11 260:22
   262:8 301:22
   307:20 308:22
considering 22:11
   22:12 45:20
   192:12 217:4
   319:5
consist 185:17
   264:15
consisted 11:23
   188:15 205:15
consistent 26:5
   295:6
consists 223:6
constituencies
   309:4
consultant 12:9
consultation 12:11
   12:12,18 13:7,7
consumer 18:13,14
   18:19,19 20:10
   21:4,7,21 23:11
   30:10 32:8 41:24
   43:15 45:16,21
   50:3 58:17 59:19
   60:3 67:12,15
   81:24 98:21
   115:16 139:18
   164:19 240:11
   343:23 344:8,17
consumers 18:16
   18:20,21,25 19:8
   21:24 22:5 23:5
   25:5,15 31:20
   32:10 39:21 47:20
   47:21,21,23 76:17
   78:13 84:8 165:12
   165:12 221:18
consumer's 18:18
   18:18

contact 239:22
   240:2,14 241:3,12
   241:21 242:6,25
   243:2 247:4 248:3
   248:9,24 254:17
   254:25 255:5,8
   272:25 290:2
   291:7
contacted 239:20
   240:2,14 241:12
   241:21 242:6,24
   243:2 247:4 248:3
   265:4 281:20
   288:24 289:4
   290:2 291:13
contacting 242:12
   249:17
contacts 261:17
contain 136:12
   179:6 247:15,19
   263:15
contained 43:7
   56:16 133:18
   154:13 184:12
   284:13 313:7
   315:25
container 78:13
   192:19
contains 263:14
contaminated
   234:17
contamination
   185:13
contend 187:23
contending 271:14
content 113:23
contention 274:14
contested 103:2
contesting 108:17
context 20:10 22:3
   22:4 42:10 50:12
   59:25,25 62:12
   64:13,15,20 69:17
   84:16 87:23 91:5
   96:6 98:11,11
   105:13 124:24
   158:6,22 162:20

   169:4 173:17
   176:10 227:6,23
   234:24 248:6
   256:16 257:18
   258:8,12 259:5
   260:22 261:19
   284:21 288:21
   300:11 308:20
contexts 162:3
   294:5
continue 83:19,20
   138:25 139:3
   159:2 201:24
   213:16 236:17
   263:21 274:24
   285:13 318:10
continued 13:2
   14:15 15:9,14,24
   15:25 16:3,4
   226:16 346:4,13
continues 13:9 32:7
   33:9 53:23 127:7
   193:13
continuing 21:18
   85:21 253:21
   267:23
contrary 141:15
contrast 33:7
contribute 319:20
contributed 33:20
   156:3 266:8
   273:19 289:13
   298:7,12 301:10
contribution 35:16
   37:9 270:18
   317:11 318:20
   319:5 346:10
contributor 27:12
contributors
   263:24 282:5
   297:20
control 78:25 79:4
   79:12,18,18,22
   80:14 123:4 124:9
   130:17,19 164:21
   164:22 165:7,17
   178:4,25 179:6,8

Itamar Simonson                                                                 9/21/2011

179:15,22 180:2,4
180:13,16,21,22
182:14 183:7,13
183:18,20,23
184:9 185:6,8,17
185:19 186:4,5,11
186:17,17,23
187:4,5 198:11,12
203:14,19,20
222:21,24,25
223:2,4,12,14,15
224:6,12,16,16,17
**controls** 80:3,3
115:8 119:8,13
120:6,7 123:8
124:8 184:12,13
184:14,15,18
198:9 202:5,24,24
203:9 260:4
296:12 345:13
**conversation** 8:20
238:24,25 239:5
**conversations**
237:14,20 238:22
**convey** 32:14
**conveyed** 206:7
**convicted** 294:22
**convince** 103:3
**cool** 213:15
**cooperative** 26:25
**copies** 27:22 73:5
**copy** 8:8 9:6,12
96:18,21,23 97:8
124:6 137:6,10
138:2 139:8 305:6
340:13
**copy-test** 96:10,17
97:3
**core** 143:23 289:3
**Corona** 40:5
**Corp** 57:11 93:10
107:2,3,8,15
109:2,12 344:13
**corporate** 36:21
37:5
**corporation** 37:11
345:11

**corporations**
107:23
**correct** 7:15 9:13
9:16 11:5,7,9 12:6
12:24 13:9,16
14:10,13,14,16,21
14:23 15:9,12,13
15:19 17:3 21:11
22:17 23:14,18,22
27:16 28:10 30:23
32:24 40:13 41:18
41:22 46:17 47:18
48:16 54:5,23
55:22,23 56:5,10
56:11 57:8,11
58:2,9,21 61:7,8
61:14 65:21,24
66:7,8 67:20 69:8
69:25 70:3 72:15
72:16 73:7,15
79:6 80:14 81:4
90:23 91:6 95:12
97:20 99:4,13
100:13 101:3,18
101:25 103:19,22
104:2,8,14,23
105:6,14 106:24
112:4,9 118:15,18
118:19 120:15
127:9 131:24
134:5,9,16 135:25
136:6 137:11
138:3,3 141:24,25
143:5,16 145:22
150:3 151:12
154:14,17 157:4
157:23 159:23,24
168:21,24 169:2,3
169:9,10,12,23,25
170:18 171:10,18
171:20 173:5
174:19,20,23
177:3,18 178:17
180:4,6 187:12
188:4,9 191:2,9
191:12,23 192:3,8
192:12 193:22,22

195:2,6 196:7,16
196:23 197:13
198:2,10 205:17
205:18,22 206:21
210:9 211:21
212:3,12 213:22
214:5,9 216:22,23
218:3,8,25 219:11
219:25 220:11
221:7 223:7,10,17
224:7 226:6 230:5
231:20,22 235:25
237:11,24 238:3,4
238:6,10,11,14
240:4,6,7 241:15
243:10 246:6,8,9
246:10,12 247:7
248:4,7 254:13
255:10 256:20
258:6,10 261:13
262:12 267:15
271:14 272:5,15
273:7,22,24
281:23 283:22
284:2,25 285:9
288:2 292:19
294:6 298:4 299:5
301:5 302:8
303:24 306:9
308:23 310:23
311:18 312:8,10
320:13 321:23
322:10 324:17
325:3 337:4,6
339:2 341:10,12
**corrected** 284:11
**correcting** 282:20
**correction** 94:2
**correctly** 28:17
33:20 34:16 40:23
41:10 43:8 48:3
55:13 57:14 79:21
92:17 94:20
113:22 128:19
135:19 141:8,11
162:5 163:10
175:25 186:5

187:5,10 189:10
189:19 199:9,15
251:22 274:3
277:25 278:18,19
279:9 280:15
293:25 296:11,14
301:15 322:25
**corruption** 269:13
269:21 280:7,17
302:13
**Cosmair** 93:9
344:13
**counsel** 4:15 8:16
56:9,19 157:16
212:16 309:20
340:13 342:12
**count** 5:17 70:10
112:10
**counter** 333:25
**counterproductive**
43:11
**counting** 112:21
**country** 37:13,15
37:16 53:6,11,11
53:12 247:13
306:22 307:3
**COUNTY** 341:4
**couple** 46:22 47:21
86:15 87:20 91:25
112:6 153:18
256:15 264:9
284:17
**course** 23:16,20
27:21 29:10,12,24
64:21 67:15 79:23
81:22,23 183:22
206:11 208:6
209:11 210:17,20
211:18,22 212:13
213:2 215:5,7
216:19 220:4
251:8,19 267:7
279:24 288:4,4
327:7 330:11
333:7,9,9 337:21
**courses** 21:7
**court** 1:1 4:11,25

5:3 18:9 57:7
59:13 79:15,16,20
79:21 80:3 91:16
91:24 92:19 93:20
94:19,21,23 95:3
103:9 107:17
145:15 147:9
156:5,20 157:11
157:18 159:17,19
159:24 178:15,19
179:5,7 182:12,20
182:21 187:14,16
187:18,20 188:14
188:16 189:2,6,12
189:25 190:3
192:5,11 197:9
198:2 200:15,20
200:24,25 233:3
261:7
**conrts** 79:9 92:4
94:16 95:2 126:16
155:17 156:2
**Court's** 80:5,18
108:21 200:13
201:10
**cousin** 171:11
**cover** 23:7 42:9
269:6
**coverage** 165:14,14
**covered** 11:18
213:19 277:8
**covering** 42:22
**covers** 11:8
**create** 68:25 69:6
**created** 87:17
130:2 152:19
181:19 182:10
187:24 188:3,18
208:18 280:14
**creates** 69:6 260:9
279:20
**creating** 148:9,11
220:16
**credentials** 250:11
251:17 282:10
**credibility** 48:15
48:24 344:5

Itamar Simonson                                          9/21/2011

Page 10

credible 20:16
  47:25
credit 77:12 78:9
crime 307:14
Cristalino 187:4
criteria 140:7
  251:5
critical 90:22 91:4
  131:11 135:12,13
criticism 79:5,17
  80:23 94:20 98:24
  137:9 154:21
  179:15 184:11
criticisms 73:24
  78:19,21 79:9
  91:17,20,23,25
  92:5 94:3,10
  103:4 192:5 194:4
  197:17,22 198:20
  199:3,24 200:11
  244:23 260:15
  261:12
criticized 78:23
  283:4
criticizes 101:16
criticizing 136:14
  138:6 188:8
critique 77:10
  100:11,25 194:2
  300:22
critiqued 62:2
  69:16 70:7 77:6
  77:21,24 78:20
critiquing 70:19
  73:25
cross 212:10,10,21
cross-cultural
  25:10 29:11,25
  30:3 31:12 33:17
  33:19
cross-reference
  73:19
CSR 1:14 342:3,21
Cuban 80:11
Cubana 178:11
  345:10
cues 150:7

Culbro 345:11
cultural 24:18,21
  29:6 31:2,7,15,16
  343:15,17
culture 26:17 27:4
  27:13 29:9 30:9
  31:24 33:24 34:6
  34:6,10,11,14,20
  34:21 53:6,12
  336:2 343:14,17
cultured 32:3
cultures 25:5,15,18
  25:19,21 26:24
  32:17,18,22,23
  34:18 37:10
cup 245:13
currency 329:20
currently 61:10
customer 39:21
customers 77:14,16
  218:6
cut 24:7 201:17
cutting 138:19
  157:14 210:22
C-e-l-s-o 50:3
C-h-i-u 31:5
C-o 156:14

_____

**D**

D 126:16 174:13,17
  190:24 341:1
  343:1
damage 325:2
damages 55:14,16
  55:22
danger 319:10
dangerous 45:13
data 133:2,18
  134:4,7,14 135:2
  135:24 140:13,15
  140:17 264:4
  293:15
date 4:5 6:18 16:2
dated 10:5 51:21
  266:16 268:13,13
  277:10 285:16
  286:7 304:20

343:9,11,12
  345:18
dates 320:18,19
Dave 52:8
David 35:5 37:24
  38:21 97:23,24
  163:22 343:19
day 3:9,13 4:23
  11:2 12:19 17:19
  104:10 184:2
  319:18 342:18
days 141:18 284:17
de 50:4 344:8
deal 19:12 49:8
  72:23 85:10 87:6
  141:16 154:3
  215:24 262:15
  264:5 284:20,22
  285:3 298:21
dealing 119:17
  162:6,24 238:23
deals 311:5
debunking 191:25
decades 27:10
December 338:11
  345:18
deception 132:22
  133:3 135:9
  136:11 140:14,15
Deceptive 202:6
  345:13
decide 215:17
  221:3 269:8
  339:17
decided 28:20
  102:4,4 110:25
  215:15 217:19
  317:13 319:11
  321:19
decision 80:5
  104:17 108:21
  156:11 178:13
  188:25 192:14
  193:3 194:7 199:4
  200:13,19 201:7
  201:11 217:9
  218:15,24 343:17

decisions 23:6,11
  23:18,25 25:8
  32:10 79:15 156:9
  251:13 321:4
decision-making
  18:19 21:20,25
  31:16,17 33:15
  81:24 343:15
declare 199:18
  297:3,12
decline 315:19,19
  322:24 325:7
  329:13 330:13,13
  330:15,19,25
  331:8,9
decrease 332:2
decreased 324:23
  327:25 330:8
  331:2
deeply 318:18
Deerfield 336:10
defamation 60:8,14
  60:21 61:6,13,17
defendant 1:8 3:8
  189:16 197:8
  200:16 345:24
Defendants 187:23
  191:21
defendant's 159:9
  186:22
define 47:10 106:3
  106:19 166:23
  176:3
defined 234:3
  256:6
defines 47:19
  166:16,24
defining 38:2
definitely 64:9
  146:13 163:19
definition 102:21
  106:18 114:8,11
  114:15,20 166:22
  175:19,22 176:2
  233:13
degree 39:12 50:24
  92:24 182:9

189:20 201:11
  225:25 228:5
  239:22,23 241:5
  241:14 248:11
  249:16,18 251:16
  251:21 252:16
  253:4 254:18
  255:7,10 268:15
  268:19 269:5
  270:4,16 272:14
  272:15,18 273:2
  273:23 274:4,10
  274:15 276:11
  281:2 291:9 296:5
  306:25
degrees 242:9
  249:21 251:6
  252:11 271:7
  272:3,13 273:20
  274:9,18,22
Del 345:10
demand 68:25
  80:24 132:20
  150:2,5,10,13,16
  150:21 151:5,20
  151:21 152:3,8,9
  152:19,22,24
  153:4,7,11,17
  154:4,22 156:3,6
  156:7,21 157:7,12
  157:19 158:9,20
  159:12,25 163:24
  164:10 172:23
  187:25 188:3,6,6
  188:18 203:9
  345:5
demonstrate 56:21
  95:9
demonstrated
  92:18 243:18
  244:18
denial 283:9 288:8
  288:17 292:5
denied 289:18
  292:6 317:24
denying 282:20
department 228:21

253:15 274:7
276:15 279:12
328:14
**departments**
331:11
**depend** 125:18
177:20
**depending** 53:5,11
**depends** 69:3,6
116:12 120:10,12
121:13,15 126:19
126:23 157:9
158:5,6 169:4
175:5 177:12
185:12 246:7
270:14 275:11
295:21 307:14
335:6 336:20
**deposition** 1:10 4:9
10:10 13:24 51:25
55:21 63:14 81:9
81:13 124:17
166:2,7 170:8,15
171:25 223:25
261:3,8 283:25
284:9,21 301:16
312:13,16,22
313:23 321:7,9
323:2 326:2
333:17 340:5,10
340:16 341:8,11
342:6,9 343:2
346:3,4,12,13
**depositions** 5:23
6:4 54:22,24 55:5
55:13,15,20,24
**derive** 131:11
327:22
**describe** 59:22
**described** 216:14
217:5
**describes** 160;9
**description** 182:6
**descriptiveness**
111:13
**design** 41:4 64:14
102:22 145:18

148:2 202:5 237:8
295:3,20 296:15
345:12
**designed** 83:12
84:11 150:9
178:21 224:4
238:6 292:12
**designing** 96:20
286:3 301:22
**designs** 64:19
296:13
**desirability** 132:16
162:11,16
**desired** 106:17
204:16 233:16,18
233:20 256:8,9,12
259:14 260:9,16
**desires** 114:18
**despite** 103:4
104:10 270:3
274:6 279:11
**detail** 18:17 42:2
95:6 236:20
**detailed** 234:4
317:11
**details** 26:14 102:3
122:19 138:13
187:3 199:7
226:19 230:8,21
233:5 234:7,9,14
236:4,21 237:4
240:24 279:2
303:2 326:8
**deterioration**
319:11 327:23
**determine** 20:17
51:8 120:19
121:17 160:24
161:4 169:2
171:19 179:8,14
190:25 191:8
196:5,5,15,20
208:21 335:9
337:11
**determined** 115:7
192:2 272:2,5
**determines** 121:11

**devastated** 316:25
**develop** 48:11
**developed** 85:9
87:5
**development**
318:14 346:10
**Diamond** 87:25
113:4,7 114:7
116:2 117:19
166:11 173:4
234:22 244:23
344:23
**Diamond's** 89:16
126:9,9 175:17
**difference** 26:15
33:25 34:14,20
98:6 232:5,7,9
262:24 313:19
335:21 336:11
339:9
**differences** 28:25
29:6,15 30:3,9
31:2,7,12 32:20
33:17,19 34:5,10
117:24 175:13,14
339:10
**different** 24:12
25:5 28:23 37:25
38:2 39:20 62:9
71:19 72:4 87:7
89:10 93:15,16
96:22 106:7
116:10 120:12
130:20 131:8
146:20 157:6
161:14 162:2,3,20
167:19 174:10,16
175:8,11 176:5
180:10,10 181:15
197:22 221:20
223:22 227:3,6
231:2 244:22
253:20 292:21
294:12 295:12
296:13 323:24
324:2 325:10
331:5 333:2 336:2

337:7,8,12
**differentiates** 47:5
**difficult** 179:14
**difficulty** 5:19
11:22 231:16
**dilemma** 33:8
240:20
**dilution** 62:12,12
62:14,14,20,24
92:17,22
**diminished** 141:19
**diminishment**
149:16
**diminution** 312:22
328:23
**diploma** 289:18
290:24
**diplomas** 272:12
**direct** 283:8 317:18
**directed** 231:3
**direction** 114:5
177:19
**directions** 64:17
**directly** 173:14
239:11
**director** 265:11
**disadvantage** 117:3
**disadvantages** 68:8
144:5
**disagree** 39:10
47:14 90:20
108:20 111:10
121:18 122:4
150:17 187:21
233:11
**disagreed** 79:16
80:4 102:14,15
103:9 104:12
**disagreeing** 186:21
**disagreement**
104:15 109:25
**disagreements**
121:21
**disagrees** 109:15
**disappointed**
317:23 318:18
**disappointing**

39:21
**disbelieve** 112:19
**discard** 64:8
**discern** 169:12
**disconnected**
282:15
**discounted** 110:18
**discovered** 40:25
73:12 93:4
**discovery** 8:16
**discuss** 8:22 42:11
91:4 134:7,14
318:12
**discussed** 52:8 79:4
80:15 129:10
264:6 265:12
272:11
**discusses** 193:25
194:20 195:11
196:14
**discussing** 173:17
313:14
**discussion** 28:9
33:23 153:11
162:8 193:24
201:25 236:17
**discussions** 253:15
**disk** 4:8
**disposition** 98:2
**Dispositional**
343:14,17
**dispute** 77:11 80:2
100:3 165:9
**dissatisfaction**
39:22
**disseminating**
306:4
**distinction** 34:17
64:14
**distinctions** 62:20
**distinguish** 258:16
**distinguishing** 47:4
55:10
**distributing** 77:14
**distribution** 190:21
**District** 1:1,2 4:11
4:11

Itamar Simonson                                                      9/21/2011

**diverse** 82:7
**docs** 16:8,23 17:12
**Doctor** 75:6
**doctoral** 23:16,20
  81:22
**doctorate** 225:25
  228:5 239:21,23
  241:4 248:11
  254:18 255:6,9
  276:11 291:9
**document** 28:3
  39:17 47:13 49:24
  74:2 110:5 133:23
  134:10 155:5
  161:24 173:10
  175:21 186:14
  203:13 204:12
  215:10 216:11
  217:7 225:11,24
  228:4 230:13
  271:14 277:14
  286:15 299:23,25
  302:4 305:14
  310:19 345:16,17
**documents** 9:4
  10:2 11:11 12:21
  13:12,15 14:17,22
  15:2,4,5,7,10,25
  16:2,3,5,14,18,24
  16:25 17:2,5,9
  27:17 54:2,4,17
  104:25 209:7
  214:4,14,24
  215:21 216:15
  217:5 299:17
  300:6,7
**doing** 13:7 29:18
  93:9 99:10 125:14
  138:5 139:4
  172:11,20 193:12
  207:21 219:23
  300:21 344:12
**dollar** 319:5 323:5
**dollars** 67:11 314:3
**donate** 318:14,20
  319:12 321:19
**donated** 317:15

**donation** 317:9,14
  318:12
**donations** 22:25
  56:14 309:10
  310:10,16,22,22
  311:6,21 312:17
  312:22,23 313:15
  314:2 316:7,21
  317:18
**Dongguk** 1:4 4:10
  4:18,20 54:19
  55:2,6 56:19,22
  57:6 181:12
  205:17,23 206:12
  206:24 222:12,12
  222:14,23 223:3
  223:15 225:22,23
  227:16 228:2,3,17
  228:21 230:12
  232:24,25 239:18
  240:14 241:2,11
  247:3 248:9,12
  249:22 253:22
  254:5,17,19,23,23
  255:3,4,7 263:25
  265:4,4,5 266:20
  267:3,13 269:4
  270:4,7 271:6,9
  272:9 273:8,16
  275:6,22 276:12
  277:22 278:8,13
  278:24 279:6,20
  280:14,24 281:7
  281:20 282:6,9,10
  284:13 286:2,8,20
  288:23 289:4,10
  289:22 290:2,3,5
  290:21 291:2,6,10
  291:13 292:7
  297:21 299:3
  301:4,11,17,20
  302:11,11,13,17
  302:21,23 303:10
  303:18,18 304:4
  305:15 306:4,17
  307:7 308:23
  313:23,25 315:8

**315**:14 316:3
  317:6,23 319:6,8
  319:10 323:9,13
  323:17 325:12
  326:3 328:16
  345:23
**Dongguk's** 56:4
  263:20 266:11
  268:23 275:8
  276:2,20 285:21
  326:17
**donors** 309:4
**Dorothy** 345:19
**doubt** 159:3 263:22
  263:23 282:3
  297:19 298:13
**downside** 218:11
**dozens** 85:2
**Dr** 5:11 7:7,19 8:8
  8:14 9:6,12 13:19
  13:25 46:17 47:3
  49:7 54:13 55:3
  73:4 74:6,11
  81:16 88:20 90:22
  90:25 91:5,18
  93:17 95:11 97:16
  98:8,24 99:10
  100:5,10,14,24
  101:16 103:4,7,24
  104:10,16 111:8
  112:4,7,13 113:9
  113:10 117:19
  126:6 131:14
  132:10,15 133:4
  133:16 134:7,13
  135:11,18 136:24
  137:8,14 139:6
  140:16 141:9,15
  143:12,14 144:6
  144:20 148:8
  151:18 153:13
  161:13 172:5
  173:4 175:17
  179:21 180:22
  181:19 182:5,5,10
  184:12 186:22

**189**:23 190:24
  191:15,21 192:2,7
  194:2,5 196:20
  197:3 201:14
  202:21 203:24
  204:19 222:4,7,16
  222:19 223:21
  233:8 245:20
  257:25 261:11
  279:23 282:14
  286:3 287:24
  289:12,24 290:18
  292:10 296:12
  300:12,16 301:15
  309:5 312:3
  315:18,24 316:22
  318:7 322:5,25
  325:6 329:12
  330:12,17,18
  331:19 340:6
  343:8
**drafted** 96:12
**dragon** 31:25
**draw** 155:6
**dream** 328:17
**dress** 203:8
**drew** 320:22
**drivers** 41:2
**dropped** 292:25
**drove** 289:21
**DSK** 294:13
**DSK's** 293:12
**dual** 31:21
**duck** 259:17
**due** 40:25 80:11
  85:24 146:19
  171:25 194:6
  274:5 319:9
**duly** 2:11,16 5:6
  342:3,7
**dynamic** 31:15,19
  343:14,17
**D-e** 50:4

—————————
**E**
—————————
**E** 176:8 341:1,1,1
  343:1

**earlier** 23:8 25:6
  30:16 32:16 48:14
  51:25 52:8 67:2
  74:14 76:4 108:11
  124:17 127:19
  129:10 141:6
  160:19 163:16
  178:11 180:11
  197:20 233:14
  234:16,23 235:9
  235:14 245:3
  249:13 256:15
  257:19 265:12
  272:11 292:20
  295:6 298:2,3
**early** 91:3 319:4
**easier** 31:6 308:19
**easily** 116:19
**Eastern** 25:19
  27:13 32:18,22
  33:24 34:6,10,14
  34:18,21 37:10,15
**easy** 220:9
**economy** 30:7
**edition** 43:16 44:25
  45:2,3 105:18
  108:12 343:24
  344:20
**editorial** 139:23
**educate** 140:9
**education** 30:8
**educational** 302:17
  303:12
**effect** 25:4,11,21
  26:8 43:10 50:9
  148:14 151:23
  153:8 156:6 157:8
  158:20 163:24
  173:21,25 174:3
  174:18 175:19
  185:13,16 244:20
  250:20 257:7
  267:7,10 269:2
  275:13 291:24
  292:2 297:15
  307:17 333:11
**Effectiveness** 48:25

344:6
effects 23:9 50:2
    80:24 84:15,15
    85:15 156:3,7,21
    157:12,19 158:9
    159:12 163:9
    164:10 173:23,24
    175:6,23 176:4,4
    176:10 177:17,19
    177:20 178:2,3
    180:12 187:25
    188:3,6,6,19
    267:12 333:24
    344:7
efficient 165:13
effort 73:10 291:7
efforts 176:10
eight 76:11 112:15
    278:10
either 59:13 70:19
    90:12 149:9
    206:21 212:3
    240:2 247:3 248:2
    270:4 275:21
    342:13
elderly 208:17
elections 146:25
element 195:12
    270:18
elements 195:4
    283:5
elicit 96:12 117:22
    126:20
elicited 134:8,14
    218:3
eliminate 136:3
    178:21 180:14
eliminated 151:20
embargo 80:12
embarrassing
    317:12
embedded 259:5,7
emeritus 35:11
    164:14
Emery 2:8 3:3 4:13
    4:18,19
emphasize 269:24

emphasized 244:19
emphasizing 32:9
    32:12 243:15
empirical 172:3
employed 102:23
    179:16 187:24
    225:22 228:2
    232:25 307:7
employers 336:18
employing 239:17
Empresa 178:11
    345:10
encountered
    109:22 121:20,21
    224:5 227:2 250:8
    250:9,12
ended 71:19 93:6
    94:12,21,23
endorse 39:14
endorsed 39:15
engage 87:18
English 5:15 26:10
    68:17
entered 9:18
entire 116:9 137:6
    161:25 226:12
    228:14 229:3
    247:20 290:14
    307:16 319:9
entirely 189:3,4
    192:12
entirety 84:24
entities 158:4
    159:15
entitled 48:24 50:2
    51:21 69:12 134:3
    139:17 151:4
    212:19 343:14,16
    343:22 344:3,7,20
    344:22 345:4,12
    345:20,21,22
entity 266:5 295:24
    302:22
entries 12:13
entry 12:10 16:21
environment 37:2
equal 323:9

equity 36:8 37:20
    37:21,22,24 38:4
    38:9,22 41:16
    42:4,5
equivalent 232:19
error 164:23 284:9
escapes 128:24
especially 45:20
    102:24 168:23
    291:24
Esq 3:3,4,9,13
essence 113:21
essential 79:19
    244:16 292:15
    294:3
essentially 18:24
    143:14 235:9
    241:20 324:5
establish 117:16
    138:14 208:13
    210:7,10 236:10
    292:2,15
established 217:24
estimate 18:2
    164:22 178:23,24
    181:18 182:9
    189:10 201:16
et 111:13,13 283:2
ethical 34:5,9,20
ethics 34:2 37:11
Europe 32:23
Eva 163:21
evaluate 7:19 9:4
    12:3 78:4 81:25
    153:19 154:5
    174:6 191:19,20
    252:7 291:23
    315:6
evaluated 8:9
    58:16 63:6 66:15
    70:22,23 71:3,4,5
    71:6,8,9,10,11,13
    71:14,15,16,18,18
    71:21 72:2,2,4,6,7
    72:8,8,10,11,11
    72:12 75:25 76:12
    107:24 217:21

258:8
evaluating 70:19
    71:19 74:7 202:22
    300:16
evaluation 12:16
    70:15 148:19
    149:20,23 192:11
evaluations 21:8
    149:19
event 145:13,17
    148:4 265:11
    295:24 296:4
events 8:5 148:18
    180:10 181:8
    280:16 301:10
    303:2 334:18
eventually 93:25
Eveready 79:22
    157:4 179:3
evidence 102:13,19
    103:8 110:20
    117:11 135:9
    142:20 195:21
    196:15,24 197:2,5
    197:7 281:25
    299:10 308:22
    309:2,7,10 317:17
    318:21 319:13
    339:10
evidenced 135:8
evidently 250:2
    254:8
exact 63:11 172:12
    209:18
exactly 16:2 18:5
    57:3 65:2 66:5
    83:13 94:12
    101:20 113:17
    117:19 129:18,19
    133:10 134:18,20
    136:4,15,21 137:3
    139:20 147:21
    177:4 179:15
    188:12 197:23
    219:15 228:11
    234:25 247:2
    252:12 256:7

examination 5:9
    87:7 134:25 135:2
    343:3
examine 291:25
examined 2:16 5:6
examining 43:9
    135:12
example 18:23
    20:25 21:8 25:6
    26:22 27:15 29:3
    29:6 31:4 43:6
    63:2 68:19 81:23
    88:6,15,19 97:2
    98:12 100:15
    106:23 109:10
    111:19 113:25
    115:16 119:8
    121:21 130:10
    136:9 144:19
    145:3 150:18
    162:20,23 165:8
    169:5 181:16
    182:12,19 183:20
    194:8 201:13
    222:21 238:19
    241:3 245:12
    257:20,22 264:4
    270:16 292:12,20
    298:8 307:20
examples 41:17
    42:6,7,12 53:13
    87:2 257:21
excellent 301:18
exceptions 44:10
    97:7 282:19 283:9
excerpt 35:4,24
    36:14 38:11,20
    43:14 46:12 109:5
    343:19,20,23
    344:3,19,21 345:8
excerpts 38:15
exclude 160:3
excluding 159:22
exclusion 159:20
exclusively 97:10
excuse 85:23 102:5
    112:5 113:3

176:10 202:17
211:23 256:5
300:21 310:18
323:25
**exercise** 245:21
**exhibit** 6:11,13,15
7:12 10:4,14,17
10:20 11:21 15:18
15:22 16:6,20
18:12 27:24 30:12
30:15 35:24 36:2
38:12,13 43:14,17
46:11,14 48:23
49:2,21,22,25
51:19,23 53:22
54:3,3 69:22 73:2
73:17,19 74:25
75:7,8,9,12 78:18
91:8,9,10 93:8,11
95:17 96:2,5
105:2,17 106:9
108:8,11 112:23
113:2 126:10,11
133:13 142:2,4
150:24,25 153:9
154:25 155:3
160:10,11,14
166:10 175:18
176:6 178:5,7,10
185:24 197:21
202:4,7,20 203:6
203:21,24,25
204:3 264:11
265:16 266:19
277:9 299:12,15
300:3,4,18 301:23
302:6 304:24
305:21,22,23
310:2,4 313:3,9
313:11 314:21
317:4 318:10
319:3,16 325:22
**exhibits** 7:8,9,10
9:23 105:4 264:9
264:15 302:2
313:6,7 314:19
321:21 325:25

343:6,7 344:1,2
345:1,2 346:1,2
**exist** 119:9 332:11
**existed** 320:22
333:25
**existence** 8:19
262:25
**exists** 88:25 262:4
**expect** 297:2
322:23,24
**expectations**
318:18
**expected** 150:8
236:5
**experience** 41:15
45:23 65:3 69:15
85:10 87:6 92:3
121:18 180:12
233:8
**experiment** 43:8
151:5 152:18
153:5 345:5
**experimental**
102:22 202:5,24
296:12 345:12
**experiments**
151:21,21
**expert** 6:6 17:25
18:7 19:7 33:16
33:21 35:10,21
41:6 44:21 49:13
49:15 59:13 60:14
61:12 69:23 86:20
97:16,19 111:7,9
148:5 164:16,18
186:22 233:7
257:12,13,13
279:2 295:8
336:24 343:8
**expertise** 18:13
67:12,15 201:10
321:2 336:14
**experts** 85:9 86:11
86:18,21 87:6
121:18 122:3
163:15
**expert's** 74:7

**explain** 8:5 11:5
25:11,14 32:25
83:24 99:22
102:20 107:5
109:15,18 134:21
139:22 165:6
181:20 205:21
211:2 232:8 240:9
240:10 293:19
**explained** 180:11
198:22 217:13
220:3 221:13
243:11,13 247:9
289:6 290:12
**explaining** 25:4
139:5
**explains** 104:6
**explanation** 22:7
210:19,21 211:24
234:4
**explicitly** 167:22
**exploited** 277:18
**exposed** 131:23
**Exposure** 19:14
**expressed** 305:16
**extended** 33:23
**extension** 48:4
**extent** 84:10
107:23 115:6
117:4 121:3 125:7
144:20 148:14
156:20 157:12,19
159:11 168:20
175:5 179:8
181:21 218:18
221:15 239:4
262:14,22 276:7
289:9 301:19
307:15 314:12
318:25
**external** 286:21
287:14,17
**extremely** 219:2
**ex-doctoral** 25:2
**ex-president** 279:6
308:13
**ex-student** 25:7

**eye** 307:10
**e-mail** 3:6,12,16
9:22 299:15
345:18
**e-mailed** 340:14
**e.g** 51:13,16

---
**F**

**fabrication** 268:19
270:4
**faced** 240:20
**face-to-face** 48:10
**fact** 8:20,21 13:9
39:15 41:2,20
45:13 48:9 55:24
57:10 62:6 65:9
89:4 93:19 101:16
101:21 115:25
135:18 140:2
144:6 145:8 154:9
161:5 165:10
169:17 179:9
192:6 193:11
195:19,22 197:20
199:6 202:23
207:19 208:23
211:21 217:24
219:9,12,23
222:17 229:25
231:15 242:8
271:9 274:5,8,22
277:24 278:23
279:9 280:25
282:13 287:16
290:15 292:5
300:13 306:3
317:23 324:22
327:24 329:8,18
336:25
**factor** 55:11 194:25
195:16 196:13,13
301:21 318:4
**factored** 287:25
**factors** 23:21 24:2
24:8 39:8,9 69:8
122:11 190:16,18
190:19,20,22

192:16 193:3
195:24 196:2,11
196:18 198:24,25
199:5 200:20
245:23 286:4
299:3 335:8
**facts** 56:4 121:11
121:13,15 192:20
193:5,12,15
235:23 236:2,4,10
273:7 275:11
**factual** 333:25
**factually** 235:24
236:7
**faculty** 22:19
119:17 164:15
250:2 251:5
252:25 306:24
307:13,13 331:10
**fail** 110:17
**failure** 78:21
197:25
**fair** 18:24 60:19,22
78:20 108:16
110:6,16,19
141:13 162:17
189:24 261:24
333:2
**fairly** 29:17 160:20
220:9 263:6 298:9
306:23
**fairs** 332:10 333:6
334:6
**Fake** 276:11
**false** 52:23 56:15
60:3 75:16 97:8
121:22 222:17
225:24 228:4
230:12 267:15
284:13
**fame** 203:15
**familiar** 6:8 36:5,7
40:4,5 41:23
43:19 49:4 50:5,7
50:9 58:6 118:4
122:3 128:13
138:13 145:5,7

Itamar Simonson                                                      9/21/2011

| | | | | |
|---|---|---|---|---|
| 148:3 159:5 | **Felix** 3:13 4:21 | 228:13 230:16 | 324:2,5,16 325:4 | 145:15 147:7,8,22 |
| 160:15 182:20 | 343:9,11,13 | 231:10,13,23 | 325:16,21 326:25 | 149:14 162:10 |
| 185:25 244:18 | **felt** 318:17 | 232:9 233:22 | 327:10,19 328:9 | 171:7 175:13,14 |
| 247:18 292:23 | **Fetner** 3:9 4:23 8:2 | 235:11,18 236:16 | 329:2,25 330:4,10 | 190:5 192:11 |
| 302:20 | 8:14,20 9:25 10:7 | 236:25 237:25 | 330:21 331:3 | 208:9 212:23 |
| **familiarity** 20:20 | 10:13,16,19 27:22 | 238:4 239:13 | 332:18 333:4,21 | 220:23,25 221:2 |
| **family** 24:10 26:22 | 34:7,12,24 36:23 | 240:5 241:17,24 | 334:8,11,15,23 | 222:11,14 227:6,8 |
| 26:23,23,25 32:12 | 45:19 56:6 68:4 | 244:6,25 245:8 | 335:12,23 336:12 | 230:14 231:4 |
| 32:18 | 68:11 72:18 74:4 | 247:5 248:5,20 | 336:19 337:14 | 235:4 236:2 243:5 |
| **famous** 93:2,5 | 74:10 75:6,9 | 249:5,24 250:6,19 | 338:6,16,22 339:3 | 245:9 257:6 |
| 125:7,9,10 203:15 | 79:11 80:17 81:20 | 250:25 251:7,18 | 339:11,19 340:4 | 270:21 272:25 |
| **far** 8:7 63:23 68:16 | 85:17 87:11 89:20 | 252:5,18,23 | **few-minute** 339:17 | 273:17 280:22 |
| 68:18 113:21 | 89:25 95:13,21 | 253:10,25 254:15 | **field** 18:13 35:21 | 289:4,13 292:13 |
| 125:18 149:21 | 96:15 99:20 101:6 | 255:11 256:2,10 | 42:24 44:22 49:10 | 293:3,18 294:12 |
| 199:12 253:19 | 101:12 104:3,13 | 257:10 260:17 | 49:11 87:17 | 294:13 295:22,23 |
| 254:2,3 282:12,21 | 104:19 106:20 | 263:3 265:6 | 164:17 | 296:5,9,10 308:2 |
| 301:13 311:5 | 109:6,16 110:8,12 | 266:10 267:4,17 | **fifth** 207:20 | 330:8 332:17,25 |
| **farther** 159:17 | 110:14 111:16 | 268:3,5,17,24 | **figure** 98:19 172:3 | 333:5 |
| **fascination** 282:24 | 112:17 122:15 | 269:17 270:8,24 | 318:3 | **finding** 46:4 80:14 |
| **fatally** 189:7 | 124:21 125:18 | 271:10,15,22 | **figured** 47:23 | 181:15 193:12 |
| 197:11 247:8 | 130:25 132:7 | 272:7 273:3,13,25 | 337:16 | **findings** 12:4 55:3 |
| 260:5 | 137:12,19 138:19 | 274:16,21 275:9 | **filed** 309:20 320:5 | 193:11 |
| **father** 183:4 | 138:24 143:18 | 275:16 276:3,5,21 | **filter** 79:2 113:12 | **finds** 193:20 |
| **fathered** 145:10 | 149:11 154:11 | 277:23 278:9,14 | 113:16,20 137:23 | 200:25 |
| 169:22 229:18 | 155:20,23 157:14 | 278:25 279:21 | 147:11 166:16 | **fine** 8:21,21 136:16 |
| **fathering** 146:4 | 157:24 160:5,18 | 280:18,20 281:3 | 167:13,16 168:14 | 149:5 211:23 |
| 147:5 182:17 | 161:7,21 170:2,19 | 281:14,21,24 | 168:15 173:4,11 | 213:4 214:20 |
| 184:6 292:13 | 171:14,22 172:15 | 282:11 283:14,23 | 173:13 207:3 | 252:21 258:16 |
| **favor** 26:2 93:22,23 | 175:20 179:11,24 | 284:3,15,20 285:2 | **filters** 123:4 198:9 | 305:10 |
| 103:22 190:5 | 180:5,18,25 | 285:10,22 287:8 | 260:4 | **finish** 26:4 158:25 |
| 200:25 | 184:23 185:9 | 288:3 289:5 | **finally** 81:3 | 181:2,6 195:17 |
| **favorable** 38:7 | 186:10,18 188:5 | 290:11 291:18 | **Finance** 107:9,15 | 250:6 283:18 |
| **favors** 286:21 | 188:10,17 189:8 | 293:9 294:7 298:5 | 109:3,12 | **finished** 181:4 |
| 287:14 | 192:9 194:23 | 298:16 299:6 | **Financial** 344:24 | 214:8 |
| **fax** 265:4 266:20 | 195:8,14 196:8 | 300:9 301:14 | **find** 8:12 10:12 | **finite** 121:3 |
| 267:13 271:12 | 197:4,14 198:3,21 | 302:24 303:7,21 | 24:14 26:4,15 | **fired** 283:4 |
| 292:6 | 199:14,25 201:4 | 303:25 304:24 | 27:2 65:23 67:17 | **Firestone** 41:11 |
| **faxed** 251:19,24 | 201:23 202:11 | 305:4 306:20 | 67:19 84:6 85:2 | **firm** 261:17 335:20 |
| **features** 217:8 | 208:15 209:22 | 307:11,22 308:4 | 86:6 90:8 105:19 | **firms** 36:17 336:8,9 |
| **Federal** 2:13 95:11 | 210:22 211:6,10 | 308:24 309:13 | 113:24 114:5 | **first** 5:6 8:8 10:20 |
| 342:5 | 211:14 212:7 | 310:17 311:22 | 118:2 121:7 | 11:8,18,25 13:23 |
| **FedExed** 66:5 | 213:5,10 214:16 | 312:9,24 314:4 | 124:10 125:3,19 | 13:25 30:17 32:7 |
| **feeding** 236:4 | 214:19 216:3 | 315:4,12 316:8,15 | 126:11 128:10,17 | 36:13 38:3,20 |
| **feel** 73:15 207:6 | 218:9 220:2,12 | 317:19 318:22 | 128:25 129:3,21 | 47:3 53:15 66:13 |
| 214:13,23 215:20 | 221:6,11 223:18 | 319:14,24 320:24 | 129:23 131:22 | 74:19 82:8 90:25 |
| **Feeling** 318:10 | 223:23 224:8,21 | 321:11,15,24 | 141:3 143:12 | 93:24 113:15 |
| **Feldman** 4:4 5:2 | 224:24 226:7 | 322:22 323:19,23 | 144:18 145:12,15 | 120:14 121:19 |

127:3 129:5
134:23 135:24
151:13,18 154:8
156:13 158:18
166:12 171:11
174:17,18 196:9
204:13,13 207:3
213:24 215:7,24
215:25 217:2
220:24 226:13
233:19 264:10
265:17,18 267:20
269:16 271:17,24
275:23 293:5
302:6 305:3 316:2
345:24
**fit** 114:13
**fits** 184:4
**five** 80:20 112:15
174:4 213:14
219:14 321:21
**Fjspringer@day...**
3:16
**flags** 250:17
**flaw** 117:8,9 262:10
262:13
**flawed** 84:3 102:21
189:7 197:10,11
247:8 260:5
**flaws** 8:10,11 39:24
142:21 248:14
262:8
**focalism** 148:9
**focus** 11:20 28:13
53:22 147:24
148:10 173:8
175:15 249:7
258:25 277:5
**focused** 23:9
176:20 279:16
290:10
**focuses** 105:9
130:23 278:15
**focusing** 98:18
196:12 248:16
310:12
**follow** 26:7 82:10

85:7 86:3 103:6
**followed** 86:2
96:20 122:13
139:6
**following** 128:5
146:3 239:18
254:23 255:3
289:25
**follows** 5:7 83:6
**follow-up** 20:7
25:23 148:22
**football** 31:22
**footnote** 91:6
117:10 154:13,13
155:11
**footnotes** 302:14
**foregoing** 342:6
**forged** 225:24
228:4 230:13
249:21 266:21
267:15 271:14
**forgered** 242:9
**forgering** 306:24
**forgery** 228:24
240:23,24 241:2
241:14 249:16,18
274:4
**forget** 202:12
257:15 308:17
**forgot** 93:21
217:16,17
**form** 34:12 56:6
68:4 79:11 81:20
95:13 106:21
170:2 179:11
185:9 186:10
214:19 318:6
**formal** 44:6
**format** 156:14,15
156:22,24 157:2,8
157:20,22 158:20
158:21 159:12,17
160:8 179:3
**formats** 157:3
**formed** 8:9
**former** 38:21 145:4
277:19 286:24

**forming** 193:18
**forms** 66:2
**formula** 177:17
**formulate** 114:10
**forth** 2:17 321:22
**forwarded** 276:13
**found** 25:14 32:8
43:11 55:24 80:10
117:20 189:25
297:12
**foundation** 302:11
302:16,17,23
303:12,18,24
**four** 17:12 37:24
54:23 55:20 63:9
69:23 71:5 74:15
85:12 112:15
239:25
**Fourth** 105:18
344:20 345:23
**France** 293:7,13,17
**fraud** 76:8,9
**free** 73:15 214:13
214:23 215:20
**French** 292:24
**frequently** 142:12
**fresh** 78:13,14
**friends** 24:11 27:2
**fruit** 78:12
**FTC** 97:15,15,18
98:14,14,22 100:4
101:16,19 102:20
103:3,5,14,22
133:19 139:18
344:17
**FTC's** 99:11
100:11,25 102:20
**full** 32:7 43:23
97:22 151:18
152:17 173:12
182:6 285:18
**fully** 184:5
**funds** 317:11
318:14 346:10
**funny** 184:4 245:9
**further** 12:8 14:4
33:22 45:16 47:12

160:2 163:19
318:19 340:3
342:12
**Furthermore**
303:11
**futile** 152:18

_____

### G

**G** 341:1
**gap** 313:21
**Garcia** 94:6 344:16
**gas** 41:2
**gather** 289:12
**gauge** 127:3
**general** 12:2 21:23
32:21 44:9,11
46:6 50:13,14
52:20 85:25 96:23
98:17 100:5,14,18
116:13 117:2
120:13 133:17
138:7 139:7,10
140:9,17 157:22
164:19 176:11,15
176:19 177:2,17
177:24,24 179:12
247:23 295:4
326:12 345:11
**generalization** 46:4
115:5
**generalizations**
32:20
**generalize** 83:10
84:2 89:7 175:4
176:17 177:23
307:25
**generally** 35:16,19
39:13 61:23
102:23 159:10
185:22 295:11
**generic** 74:22
**genericness** 74:20
110:24 111:2,12
**gentlemen** 4:3
**Geon** 346:12,13
**George** 183:15
**getting** 6:20 35:19

66:13 176:20
212:17 242:14
**gift** 78:8,9
**Gila** 267:24 268:7
**give** 18:17 22:7
24:3 25:7 42:12
61:22 85:21 86:25
87:3 95:22,23
124:5 128:4
133:20 147:17
165:8 169:5 170:9
171:18 172:24
180:19 181:9
182:9 206:13
209:17,18,19
211:14 212:7
217:20,22 218:5
218:19 219:10,20
227:9 236:20
241:7 251:9
257:20,21 259:21
264:9 314:18
**given** 28:22 37:23
55:6 64:16,16
110:6,16,19
170:20 236:11,13
240:23 259:4
341:12
**giving** 123:23
182:6 323:4
**global** 30:7 57:11
91:6,13 344:11
**go** 6:23,24 11:19,24
15:21,21 23:4
26:16 31:6 32:24
33:5,22 35:12
37:18 39:8 42:18
47:11 58:14 64:24
67:24 69:11 70:12
72:21 75:3,8,12
75:24 76:18 89:15
102:7,17 104:18
109:14 121:9,10
122:25 124:23
125:19 132:5
135:17,22 136:20
136:20 138:11

| | | | | |
|---|---|---|---|---|
| 139:2,2 141:3 | 160:13 166:3,8 | **great** 19:12 47:23 | **hamburgers** 43:7 | **Hartford** 3:15 |
| 143:25 149:21 | 168:9 175:17 | 48:18,19 49:8 | **Han** 32:8 | **Harvard** 22:12 |
| 152:13 155:19 | 182:11 185:7 | 85:9 87:6 141:16 | **hand** 119:15 | 151:7 |
| 156:10 168:19 | 192:22 206:3 | 154:3 262:15 | 185:21 227:15 | **Haven** 3:11 |
| 174:17,17 178:4 | 213:7,8,22 214:2 | 264:5 282:24 | 342:18 | **head** 70:10 248:25 |
| 187:22 189:17 | 221:8,8,9 233:2,3 | **greater** 48:15 51:2 | **handbook** 46:12 | **heading** 134:24 |
| 190:23 200:20 | 233:20 236:19 | 331:6 334:22 | 84:25 88:11,23 | 168:13 302:12 |
| 205:2,6,9,20 | 242:25 245:23 | **greatly** 305:18 | 344:3 | **headline** 266:20,23 |
| 207:19 209:23 | 248:18 254:12 | **grew** 5:16 | **handwriting** 11:23 | 266:25 268:18 |
| 213:6,18 217:2 | 261:4,9 264:14,18 | **Grey** 29:16 | **handwritten** 10:6 | 269:23 276:24 |
| 222:7 226:15 | 265:12 274:24 | **grossly** 249:9 | 11:11 | 277:20 302:12 |
| 229:16 237:10 | 286:25 291:19 | **grounds** 80:21 | **happen** 50:17 88:6 | **headlines** 146:15 |
| 239:8,16 240:10 | 292:11 295:3 | 126:17 | 181:8 298:19 | 280:9 319:18 |
| 241:19 244:23 | 296:18,21 307:2,3 | **group** 24:11 70:13 | 325:7 327:4 | **Heads** 98:23 |
| 246:3 247:11,11 | 319:16 325:18 | 124:9 164:21,22 | **happened** 13:25 | 139:18 344:17 |
| 247:12 248:8 | 336:13 339:22,25 | 165:2,7,16,17 | 14:7 15:20 41:21 | **hear** 239:3,4 |
| 249:6 250:7 | 340:11 | 179:22 180:4,7 | 54:11,14,25 55:4 | 332:23 |
| 260:18 265:15 | **Goldman** 335:19 | 185:14,16 186:17 | 56:11 98:4 182:7 | **heard** 19:25 114:3 |
| 266:15 268:12 | 335:25 336:4 | 345:7 | 182:8 221:23 | 145:11 146:8 |
| 269:10,25 270:20 | **good** 4:2 36:21 37:5 | **groups** 19:10 | 250:4 281:7 | 148:20 169:6,14 |
| 276:10 277:4,9 | 89:7 111:8 163:20 | 165:19 175:12 | 282:15 293:21 | 169:15 181:16,25 |
| 278:11 289:8 | 172:11,20 175:22 | **growing** 269:12 | 296:4,5 304:17 | 183:21,24 200:14 |
| 304:20 305:21 | 183:23 301:18 | **guarantees** 295:5 | 306:3,18 314:13 | 222:11,14 226:3 |
| 308:18 321:12 | 339:5 | **guess** 11:3 16:13 | 318:8 322:6 | 226:22 228:7,16 |
| 330:13,14 332:7 | **Goose** 29:16 | 39:24 43:4 62:19 | 325:11,11 327:3 | 229:7,9,17,23 |
| 332:16,25 336:3 | **government** 22:22 | 111:8 113:19 | 328:11 329:15 | 231:2 232:22 |
| 337:2 | 149:22,23 287:24 | 116:12 131:24 | 332:4,7 | 234:2,5,7,13 |
| **goes** 33:24 36:18 | 289:3 290:9 | 136:21 137:3 | **happens** 15:3 83:25 | 237:22 238:24 |
| 44:4 45:7 68:17 | 291:17 309:5 | 207:8 220:13,14 | 141:4 237:6 269:8 | 240:17 242:7,7,8 |
| 85:7 108:19 | 319:23 323:4 | 224:16 243:2 | **happy** 74:16 86:9 | 242:10 262:22 |
| 116:15 121:10 | **governor** 145:4 | 269:7 293:13 | 86:14,25 87:21 | 263:8 288:10,11 |
| 126:25 127:11,13 | 149:8,17 182:13 | 298:19 305:4 | 99:9 122:20 240:8 | 288:12 317:12 |
| 134:7,13 143:16 | 182:15,16 | 321:2 | 257:20,21 290:13 | 318:16 335:20 |
| 144:15 168:17 | **grades** 251:9 | **guessing** 164:24 | 339:8 | 336:3 |
| 177:16 179:5,7 | **graduate** 276:16 | 168:14,16,18 | **harassing** 292:17 | **hearsay** 314:8 |
| 188:14 226:17 | **grant** 187:16 | 179:9 180:14 | **harassment** 293:8 | **heated** 213:12 |
| 250:8 305:18 | 326:24 327:24 | 224:7 242:16 | **hard** 18:2 59:2 89:7 | **Hebrew** 5:16 |
| 317:9,15 318:13 | 328:7,7 330:3,9 | **Guide** 344:22 | 175:4 176:17 | **Helaine** 345:18 |
| 319:6 | 330:16 | **guided** 139:5 | 177:23 262:19 | **held** 144:23 196:25 |
| **going** 6:25 7:5,7 | **granted** 198:19 | **guilty** 94:3 | 263:4 267:8,9 | **hello** 340:6 |
| 27:10 31:13 34:19 | **grants** 22:22,22 | **guy** 123:16 | 268:25 307:24 | **help** 33:4 51:17 |
| 39:16 53:16,19,21 | 322:8,8,10,18,25 | **guys** 26:4 125:17 | **harder** 84:2 213:13 | 60:12 235:16 |
| 74:25 78:18 81:14 | 323:4,8,10,12,18 | | **harm** 56:21 57:6 | 279:10 315:8 |
| 94:14 95:5,9 | 324:8,11,15,20 | **H** | 254:4 289:10,13 | **helpful** 82:24 |
| 100:21 102:8,11 | 326:3,6,12,18 | **habits** 24:9 | 289:22 292:4,7 | 122:15 210:5 |
| 110:4 125:20 | 328:24 330:20 | **half** 17:13 28:5 | **harmed** 297:14 | 219:18 280:4 |
| 126:4 158:24 | 331:2 | 110:10 157:24 | 309:8 329:14 | 300:19,25 |

helpfully 179:16
helps 51:12
hereinafter 2:17
hereunto 342:17
hesitate 37:7 60:23
    115:4 177:24
Hfetner@daypit...
    3:12
hide 270:5
high 92:9 187:10
    262:20 298:10
    332:6
higher 274:6
    279:10 327:16
    338:10
highest 36:19
highlighted 98:9
    156:8 270:15
highlighting
    136:24
highlights 135:19
highly 143:10
high-profile 262:20
    263:6 298:18
    308:8
hindsight 93:4
    254:11
hire 331:10
hired 249:21
    250:10 252:24
    253:11,14 274:5
    279:11,13 280:17
    280:25 307:6
hires 250:3 251:5
hiring 251:13
    271:5 273:19,19
    274:11 278:20
    333:6 335:4
history 276:16
Holdings 93:10
    344:14
home 5:12,13 88:6
    158:11,14 159:20
homeland 28:19
homework 253:19
Hong 25:12 26:9
    27:15 31:5,20

honor 26:22
hopefully 11:25
    185:4
hoping 339:20
Hospital 303:23
hotel 293:22
    294:15
hour 2:7
hours 11:2,8,9,12
    11:13,13 12:6
    17:13 325:17
    339:20
House 286:24
housekeeper
    145:10 146:4
    148:24
Hovland 49:7
    344:6
Howard 3:9 4:23
    345:9
Howie 213:16
    231:16 256:5
human 21:19,24
    33:7
hundred 67:11
    69:21 261:21
hundreds 18:4
hundredth 316:3
Hyatt 163:21
hypothetical
    119:16,16
Hyun 346:9
Hyung 346:7
Hyun-jung 346:8

_____I_____

idea 230:22 242:5
    303:17 304:11,12
    315:15
Ideally 296:2
identification 6:14
    7:14 27:25 30:13
    36:3 38:14 43:18
    46:15 49:3,23
    51:24 73:3 91:11
    93:12 96:4 105:3
    108:9 112:24

142:3 151:2 155:2
    160:12 178:8
    202:8 203:22
    204:4 264:13
    299:13 301:24
    310:3 313:4
    314:23 325:24
identified 56:19
    277:7 278:6
    282:17 284:6
    285:12,14,17
    286:7
identify 4:15 82:11
    86:19
identity 184:9
ignore 194:21
    290:23 321:21
ignored 110:18
    256:14 270:5
    292:10 338:5
II 123:17
Ilbo 299:16
Illinois 336:9,10
illustrated 57:18
    84:22 180:21
illustrations 87:21
image 36:14 275:17
    293:14,16,16
    319:11 345:14
imagine 152:18
immediately 134:2
immensely 318:17
impact 40:12,16
    41:8,18 43:5
    53:10 148:11,12
    149:22 152:11
    263:20 265:13
    268:23 270:12
    275:8 276:2,20
    279:20 285:20
    301:12 307:21
    308:3,9,22,23
    310:16 311:20
    312:23 315:3
    316:6,13 317:18
    318:21 319:13
    320:23 322:9,20

326:23 327:18
impacted 40:9
    52:13,15,20,23
    53:2,5 149:23
    266:9 291:15
    299:3 309:11
impacts 277:22
imperfect 303:5,9
implementation
    83:6
implemented 82:2
    333:10
implements 64:18
implications 30:4
    151:6 201:10
    345:6
implicitly 158:12
implies 165:11,12
importance 24:11
    26:21 30:3 135:19
    136:24 137:21
    243:15
important 30:5,7
    32:19,21 37:12,14
    37:16 51:14 62:13
    100:7 111:2
    122:11 154:8
    217:9 243:15
    277:15 288:18
    289:20 291:16
    297:9 300:16
    308:7 335:3 336:7
impossible 132:22
impression 279:3
improper 124:19
    128:7 146:13
    148:6,21 198:11
    198:12 244:2,3
    272:10,24 273:16
improperly 108:15
    110:17 187:5
    272:9 278:24
improvement
    327:23 328:2,3,4
    328:8,11,25 329:6
    329:10
inaccurate 320:11

inadequate 101:19
inappropriate
    41:12 123:19
    148:25 189:3,4
    252:9
incident 121:5
    144:21 145:19,19
    148:12,14 170:11
    170:17 181:23,25
    182:5 225:21,22
    226:4 227:25
    228:2,8 229:17
    230:11 231:5
    232:18,24,24
    234:2,13 236:19
    237:3,14,16
    239:10 240:23
    244:15 277:16
    291:2 292:23
    293:5 301:17,21
    305:12 306:14
    317:12,17 318:17
    319:8 326:4,20
    328:19 334:2
incidents 54:15
    114:3 231:3
include 29:10,24
    59:18 74:14 75:23
    79:18 119:8,12
    135:15 137:7
    168:19 178:25
    195:20 203:18
included 141:4
    223:2 234:3 291:3
includes 18:13 38:4
    59:8 204:22 223:9
    229:4
including 32:22
    58:17 89:2,3
    130:13 325:12
    328:16
incomprehensible
    268:15,21
inconsistent 322:6
incorrect 78:25
    143:6 195:10
    198:9 235:24

236:7 246:14
254:11
**increase** 316:12
317:3 331:6,7,10
332:2,6
**increased** 322:18
323:5 324:23
329:19 330:8,20
**increasing** 142:10
**increasingly**
141:14 143:4
**independent** 47:7
48:5,15
**independently** 10:9
**indicate** 115:17
327:22
**indicated** 317:22
330:12
**indicates** 50:24
221:17 227:18
**indicating** 26:24
142:20
**indication** 274:11
276:19
**indicted** 306:4
**individual** 20:23
35:4 96:11 97:18
257:4 258:17,19
259:2,12 260:8
295:23 318:11
319:4,17,20
321:17
**individualistic**
25:21 27:3
**individually** 258:3
258:4 337:15
**individuals** 44:3,3
50:5 51:10 55:6
96:11 294:4
313:15,24 314:18
**induce** 123:23
**Industrial** 46:12
344:3
**industry** 22:22
**ineffective** 120:5
**infected** 243:9
**inflated** 295:5

**inflating** 249:9
**influence** 20:13
23:25 31:15,16
32:10,13 44:13
48:24 77:16
176:15 249:10
267:2 274:5
278:19,24 279:5
281:15 286:21
287:14,18 294:18
343:15,17 344:5
**influenced** 175:16
280:7 296:5
**influences** 18:20,21
19:7 23:17 24:18
24:21
**influence-peddling**
265:22 266:4
**influencing** 278:16
**influential** 49:16
**inform** 288:18
289:15
**informal** 46:24
**information** 44:2
45:17,18,22,23
51:13,15 54:10
56:17 58:18 59:19
60:3 76:17 117:13
117:14 118:17
126:19 138:22
144:23 181:22
192:7 206:9 227:5
235:16,23 236:2
244:15 247:16,19
254:9 255:18
256:16 257:16
273:17 277:21
289:12 303:6
**informative** 55:25
**informed** 6:20 8:13
**informing** 262:11
**informs** 292:22
319:2
**infringement**
189:22,25 190:2,6
190:14,16 191:11
192:6 195:5 196:6

199:13,21,23
200:8,10,21 201:2
201:22
**inherent** 156:21,23
157:8,12,19
158:19 159:12,24
**inherently** 244:2
**initial** 8:9 175:15
309:23
**initially** 141:17
**injunction** 187:17
198:19 199:7
**innovativeness**
36:20
**inquiry** 56:23
275:6
**inserted** 222:16
**insignificant** 95:2
**inspire** 72:18
**installments**
208:25
**instance** 220:25
**instances** 136:10
**institution** 37:11
328:12,13
**instruct** 167:24
214:3
**instructed** 158:2
159:13
**instruction** 207:16
215:3 218:7
**instructions** 284:23
285:3
**instructs** 214:11
**instrument** 116:5
**insult** 183:3
**Insurance** 65:12
**intellectual** 76:20
76:24
**intended** 126:20
**intensely** 36:18
**Intent** 194:19
**intention** 318:20
**interaction** 48:11
**intercept** 261:19,20
**interceptor** 191:23
**interest** 140:9

270:19
**interested** 83:8
84:3 121:5 144:20
162:4 216:5
293:11 335:7
342:14
**interesting** 289:24
**interference** 6:21
**internet** 19:21
237:17
**interpret** 37:8
172:4
**interpreting**
206:16
**interrogatories**
54:19 284:24
309:17,18 310:5
321:22 322:13,14
322:15 345:24
**interrogatory** 54:5
54:7 56:3,8
284:18 311:3
316:2 337:25
**interrupt** 8:15
157:17 315:12
**interrupting** 249:5
338:16
**interview** 205:8
207:5
**interviewed** 215:4
**interviewer** 157:25
159:13 262:3
**interviewing** 64:22
69:5
**interviews** 242:19
261:21 262:3
**introduce** 28:20
30:2
**introduced** 151:14
**introducing** 29:20
159:18
**invest** 67:10
**investigate** 31:15
64:18 304:4
**investigating**
286:23
**investigation**

163:19 166:18
167:6 304:18
**invite** 251:9 344:24
**invites** 114:17
**invoice** 10:5,8,18
10:22 11:8,15
**invoices** 7:10 11:5
11:17
**involve** 62:15,25
78:7,11 305:19
306:3
**involved** 57:21
59:12 60:7,14,14
60:18,21,24 63:5
65:11 71:24 78:8
123:16 129:2
131:25 146:18
154:19,22 221:24
222:4 241:2
249:16,18 262:19
263:5 298:10
303:23 305:13
319:18,22 320:4
**involvement**
144:22
**involves** 294:2
304:21,23
**involving** 40:19
74:10 93:8 105:9
114:3 119:17,19
119:23 120:21
128:14 129:24
130:24 131:16,20
146:16 156:19
165:9 292:23
298:25 303:23
317:17
**in-group** 32:12,18
**irrelevant** 93:6
117:15 118:24
119:24 162:22,25
163:3
**irreparably** 329:14
**isolate** 256:13
257:25
**issue** 11:17 29:14
41:4,24 49:17

Itamar Simonson

9/21/2011

Page 20

| | | | | |
|---|---|---|---|---|
| 60:8 61:24 80:14 | 74:1 75:1 76:1 | 211:1 212:1 213:1 | **iterations** 71:19 | **Japan** 25:12,19 |
| 84:9 85:13 100:3 | 77:1 78:1 79:1 | 214:1 215:1 216:1 | 72:5 | 27:14 |
| 119:25 122:22 | 80:1 81:1,9,14 | 217:1 218:1 219:1 | **i-n-f-e-c-t-e-d** | **Japanese** 36:17 |
| 130:20 131:25 | 82:1 83:1 84:1 | 220:1 221:1 222:1 | 243:9 | **Jeon** 346:12,13 |
| 141:8 158:2 | 85:1 86:1 87:1 | 223:1 224:1 225:1 | | **Jeong** 267:19 |
| 159:14 163:11 | 88:1 89:1 90:1 | 226:1 227:1 228:1 | **─── J ───** | **Jeong-ah** 271:6 |
| 166:18 167:5 | 91:1 92:1 93:1 | 229:1 230:1 231:1 | **J** 3:13 94:6 344:16 | 287:2 291:8 |
| 208:13 220:4 | 94:1 95:1 96:1 | 232:1 233:1 234:1 | **Jacob** 344:4 | 318:16 319:7,19 |
| 243:19 244:12 | 97:1 98:1 99:1 | 235:1 236:1 237:1 | **Jacoby** 7:19 46:17 | **Jeong-ah's** 268:19 |
| 245:18 263:16 | 100:1 101:1 102:1 | 238:1 239:1 240:1 | 47:3 90:22,25 | 285:17 |
| 271:25 282:19 | 103:1 104:1 105:1 | 241:1 242:1 243:1 | 91:5,18 95:11 | **Jeong-gu** 305:24 |
| 289:11,23 325:18 | 106:1 107:1 108:1 | 244:1 245:1 246:1 | 97:16 98:8 99:10 | 306:2 |
| **issued** 58:12 73:6 | 109:1 110:1 111:1 | 247:1 248:1 249:1 | 100:5,10,14,24 | **Jerry** 182:24,25 |
| 94:22 191:25 | 112:1 113:1 114:1 | 250:1 251:1 252:1 | 101:16 103:4,7,24 | **Jersey** 182:15,16 |
| **issues** 19:10 21:7 | 115:1 116:1 117:1 | 253:1 254:1 255:1 | 104:16 111:8 | **Jin** 346:5,10 |
| 42:11 58:20 59:21 | 118:1 119:1 120:1 | 256:1 257:1 258:1 | 112:7,13 113:9,10 | **job** 146:6 172:11 |
| 60:2 62:24 79:3 | 121:1 122:1 123:1 | 259:1 260:1 261:1 | 131:14 132:15 | 172:21 201:9 |
| 80:10 121:22 | 124:1 125:1 126:1 | 261:4,9 262:1 | 133:4,16 134:7,13 | 250:2 332:10 |
| 146:18 163:3 | 127:1 128:1 129:1 | 263:1 264:1 265:1 | 135:11,18 136:24 | 333:2,6 334:5 |
| 243:6 244:18 | 130:1 131:1 132:1 | 266:1 267:1 268:1 | 137:14 139:6 | **jobs** 331:14 |
| 274:7 297:2 | 133:1 134:1 135:1 | 269:1 270:1 271:1 | 140:16 141:9 | **joint** 253:17 |
| 298:25 306:7 | 136:1 137:1 138:1 | 272:1 273:1 274:1 | 144:20 179:21 | **joking** 337:18 |
| **italicized** 135:7 | 139:1 140:1 141:1 | 275:1 276:1 277:1 | 180:22 182:5 | **Jon** 345:19 |
| **Itamar** 1:11 2:14 | 142:1 143:1 144:1 | 278:1 279:1 280:1 | 184:12 203:24 | **Joon** 346:6 |
| 4:1,9 5:1,5 6:1,12 | 145:1 146:1 147:1 | 281:1 282:1 283:1 | 222:4,16,19 | **Jose** 25:13 |
| 7:1 8:1 9:1 10:1 | 148:1 149:1 150:1 | 284:1 285:1 286:1 | 223:21 233:8 | **journal** 51:20 |
| 11:1 12:1 13:1 | 151:1 152:1 153:1 | 287:1 288:1 289:1 | 245:20 250:9 | 139:11,25 140:4,5 |
| 14:1 15:1 16:1 | 154:1 155:1 156:1 | 290:1 291:1 292:1 | 262:8 279:23 | 140:7 150:19,20 |
| 17:1 18:1 19:1 | 157:1 158:1 159:1 | 293:1 294:1 295:1 | 286:3 287:24 | 153:19 |
| 20:1 21:1 22:1 | 160:1 161:1 162:1 | 296:1 297:1 298:1 | 289:12 292:10 | **journals** 89:14 |
| 23:1 24:1 25:1 | 163:1 164:1 165:1 | 299:1 300:1 301:1 | 301:15 309:5 | **judge** 97:25 98:15 |
| 26:1 27:1 28:1 | 166:1,3,8 167:1 | 302:1 303:1 304:1 | 312:3 322:25 | 98:16 101:24 |
| 29:1 30:1 31:1 | 168:1 169:1 170:1 | 305:1 306:1 307:1 | 329:12 330:12,17 | 102:2,14 103:3,9 |
| 32:1 33:1 34:1 | 171:1 172:1 173:1 | 308:1 309:1 310:1 | 330:18 331:19 | 103:11,17,18,21 |
| 35:1 36:1 37:1 | 174:1 175:1 176:1 | 311:1 312:1 313:1 | 340:6 344:4 | 104:7,12 139:5 |
| 38:1 39:1 40:1 | 177:1 178:1 179:1 | 314:1 315:1 316:1 | **Jacoby's** 8:8 9:6,12 | 158:19 159:3,4,8 |
| 41:1 42:1 43:1 | 180:1 181:1 182:1 | 317:1 318:1 319:1 | 13:19,25 54:13 | 198:18 199:17 |
| 44:1 45:1 46:1 | 183:1 184:1 185:1 | 320:1 321:1 322:1 | 55:3 98:24 104:10 | 212:19 |
| 47:1 48:1 49:1 | 186:1 187:1 188:1 | 323:1 324:1 325:1 | 132:10 137:8 | **judge's** 80:14 99:12 |
| 50:1 51:1 52:1 | 189:1 190:1 191:1 | 326:1 327:1 328:1 | 148:8 172:5 | **judgment** 21:19,24 |
| 53:1 54:1 55:1 | 191:21 192:1 | 329:1 330:1 331:1 | 181:19 182:10 | 27:7 52:12 144:16 |
| 56:1 57:1 58:1 | 193:1 194:1 195:1 | 332:1 333:1 334:1 | 202:21 204:19 | 144:17 336:25 |
| 59:1 60:1 61:1 | 196:1 197:1 198:1 | 335:1 336:1 337:1 | 222:7 282:14 | **judgments** 23:21 |
| 62:1 63:1 64:1 | 199:1 200:1 201:1 | 338:1 339:1 340:1 | 290:18 296:12 | 24:2 |
| 65:1 66:1 67:1 | 202:1 203:1 204:1 | 340:10 341:6,15 | 300:12,16 315:18 | **Judicial** 88:3 |
| 68:1 69:1 70:1 | 205:1 206:1 207:1 | 343:2,8,10,11,12 | 316:22 318:7 | **July** 11:6 265:18 |
| 71:1 72:1 73:1 | 208:1 209:1 210:1 | **item** 176:4 178:3 | 322:5 325:6 | 266:16 267:24 |

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
(212) 244.3990
(800) 246.4950

| | | | | |
|---|---|---|---|---|
| 268:13,13 269:11 | keeping 278:20 | 110:7,17 112:10 | 271:16 276:23 | 306:7 323:4 |
| 269:25 270:20,23 | Keller 38:11 | 114:2,4,6 117:19 | 278:2,20 286:9,11 | Kotler 38:11 |
| 274:25 317:13,25 | 343:21 | 121:6,9,16 123:13 | 288:23 289:9,17 | 343:21 |
| 318:16 319:17,21 | Kevin 343:21 | 124:6 125:6,12 | 290:4,8,21,23 | Kraft 97:16,16 |
| 320:4 321:3,18 | key 33:25 243:14 | 127:21 128:22 | 291:14 292:9 | 98:22 100:4,11,25 |
| 343:12 | 244:17 263:24 | 137:4 140:4 145:6 | 294:5 295:9 299:7 | 102:20 139:18 |
| jumps 173:2 | 282:4 297:20 | 145:7,7,23 146:9 | 300:13 302:10,21 | 344:17 |
| June 6:19 10:5 11:6 | kids 146:5,8 | 147:4,18 148:4,22 | 302:25,25 303:14 | Kraft's 102:23 |
| 15:14,20 16:10,12 | Kim 5:2 346:9,10 | 151:17 154:7 | 304:9,13,14,16,17 | Krosnick 88:20 |
| 16:13,14,15,16,17 | KIMBERLEE | 156:5,15 158:23 | 304:23 305:7 | 90:16 141:22 |
| 16:21 17:9,16 | 1:14 2:10 342:3 | 159:4 161:9 163:8 | 306:23 307:23 | 143:6,14 144:6 |
| 265:8 320:13 | 342:21 | 163:8,21,23 164:4 | 311:5 314:7,12 | 161:13 |
| 343:11 | kind 26:5 41:13 | 164:10,18 167:2 | 315:15,21 316:6 | Krosnick's 141:15 |
| Jung 225:21,22,24 | 52:7 76:12 128:23 | 167:20,22 168:2 | 317:20 318:24 | Kwan 3:18 4:3 |
| 227:25 228:2,4 | 149:15 152:5,24 | 169:8,19 170:3,20 | 322:17 323:3,7,8 | K-r-o-s-n-i-k 88:20 |
| 232:25 237:14,16 | 183:16 267:10 | 170:22,22,22,23 | 323:12,15 324:7 | |
| 237:19 239:17,21 | 296:13 315:6 | 171:2,10,12,13,25 | 324:13,19,22,24 | **L** |
| 239:23 248:10 | 333:2 | 172:10,24 173:6 | 328:12 330:22 | L 341:1 |
| 254:18 255:6,9 | kinds 25:4 109:23 | 175:16,18 177:4 | 333:10,23 335:2 | labeled 4:8 81:9,13 |
| 317:12 | 173:18 230:8 | 180:19 181:3 | 336:14 337:19 | 166:2,7 261:3,8 |
| junior 186:23 | 295:15,16 | 182:3,6 183:9 | 339:13 | labels 192:18 |
| jury 199:17 | Klasky 345:18 | 184:25 188:24 | knowledge 66:20 | laboratory 153:5 |
| justified 161:6 | Klein 93:9 344:13 | 190:15 195:9 | 66:25 67:6 169:22 | lack 135:8 186:16 |
| | knew 144:21 | 197:6 201:7 | 170:17 237:19 | 261:12 308:22,22 |
| **K** | 230:22 269:4 | 202:15,17 207:7,8 | 243:6,18 246:21 | 314:6 320:23 |
| K 341:1 | 288:14,15 290:8 | 207:25 214:8 | 262:25 288:7 | ladies 4:2 |
| Kahn-Strauss | 290:16 291:2 | 215:19 219:4,9 | known 76:13 | language 5:15 26:9 |
| 292:14 | 294:24 | 222:16,19 223:24 | 144:22 148:11 | 26:12 33:12 |
| Kang 305:24 306:2 | know 5:21 10:16 | 224:15 226:14,18 | 190:19 | 238:22 |
| 346:8 | 12:19 26:9 27:9 | 226:21,22 228:19 | knows 236:3 270:3 | Lanham 62:25 |
| Kansas 242:9 | 29:12 31:7 35:5 | 228:19,23,23,24 | 289:2 | large 89:8 193:2 |
| 271:20 272:4,20 | 35:12 36:11,22 | 228:25 229:4,8,19 | Kong 25:12 26:9 | 282:19 |
| 272:25 273:17,22 | 37:10,15,17 39:14 | 230:9,11,25 231:4 | 27:15 31:20 | larger 336:5 |
| 274:11,15,18,22 | 40:7 42:23 44:25 | 231:5,12,21 | Korea 27:15 32:11 | late 265:8 |
| Kaplan 187:24 | 49:7,9 50:19,21 | 232:21,22 233:20 | 32:13,22 56:17 | launched 197:16 |
| 188:15 189:23 | 51:5 52:16 54:13 | 234:9 236:11 | 114:4 119:23 | Lauren 93:10 |
| 190:13,24 191:15 | 54:18,21 55:5,7 | 237:20,21 238:21 | 181:12 228:16 | 344:13 |
| 192:2 194:5 197:3 | 55:14,19,23 56:2 | 239:14 240:3,6,13 | 242:18,20,22,23 | law 2:8 3:4,10,14 |
| 201:14 | 62:6,19 63:11,22 | 240:21 242:11,25 | 250:17 253:8,12 | 97:25 99:12 |
| Kaplan's 192:7 | 63:23 70:11,12 | 247:10,11 250:14 | 253:15 275:18 | 101:24 102:2,3,14 |
| 194:2 196:20 | 77:18 83:13 88:25 | 250:22,24 251:10 | 298:9,20 301:19 | 103:17,18,21 |
| Kargo 57:10,23 | 90:3,6,18 94:11 | 252:19,20,21,22 | 306:11 319:9 | 104:7 105:9,20 |
| 91:6,13 344:11 | 94:15 97:22 98:3 | 253:6,9 255:19 | 334:21 | 120:24 193:21,25 |
| keep 79:14 217:25 | 102:3 103:12,13 | 258:15 259:22 | Korean 32:17 | 257:12 306:8 |
| 219:21 222:6 | 103:15 104:4 | 262:16,20 263:12 | 119:17,19 120:22 | 307:2 336:6,7,8 |
| 243:15 244:22 | 107:20,21 108:3 | 263:13 267:8,9 | 120:24 240:11 | 336:11,14 |
| 245:23 259:17 | 108:23 109:21,22 | 268:8,16 271:11 | 247:22 250:15 | laws 294:22 |

lawsuit 262:11,14 263:2
lawyer 76:25 195:7 321:14
lawyers 157:21
lays 193:5
lead 39:21 106:16 114:4 238:6 239:7 244:4
leading 81:3 83:14 83:15,16,18,23,24 85:13 105:24 106:3,16 107:6 108:2,15 109:13 110:18 115:3,6,9 115:9 123:6,7 126:18 137:23 168:22 171:5,9,10 187:9,11 188:4,8 205:15 225:15,17 226:5,9,13,25 227:10,20 233:6,9 233:12,14,14 234:15 237:9,11 237:11 238:2,9 239:15 240:8 242:2 243:4,23 244:8,10,10 245:5 245:7,11,20 246:19 247:19 248:18 256:6,18 257:6,17 258:4,8 258:10,11,20 259:4,13 260:10 260:21
leads 106:4 171:18 228:11 230:18,20 231:9,19 233:15 233:17 241:6 244:5 255:13 256:9,12 257:8,9 259:13 260:15 267:16 308:8
leaping 244:22
learn 83:4,7 89:9
learned 47:20 82:5 154:3 237:13,15

239:10,10 284:9 321:25
leave 140:11 269:8
leaves 256:7
lecture 251:9
led 117:7 163:19 193:3 229:20 248:23 269:3
Lee 312:21 313:14 314:7,12,13 315:21 346:3,4
Lee's 313:23
left 36:23 78:9 80:20
left-hand 31:14
legal 77:2 193:6
legitimate 172:18
lengthy 253:15
Leon 190:24
lesser 183:10
letter 93:20 120:24 251:24 252:3 265:5 271:12 272:16,17 273:9 275:6,25 282:10 284:17 321:3 343:9,11,12
letters 13:23 276:19 315:6
let's 6:24 9:23 11:20 12:22 15:21 15:21 17:22 22:15 23:12 31:4 33:4 33:22 37:18 46:9 48:17 51:11 54:3 58:14 59:11 64:6 67:24 70:12,12 72:23 75:24 77:7 82:18 89:15 97:12 102:17 104:18 107:12,16 114:19 117:10,24,25 119:10,11,15 122:25 128:12 132:5 133:12,15 135:22 140:20 142:4 143:20

144:15 145:2
147:16 152:13
156:10 158:17
169:15,20 174:4,9
177:13 178:4
181:23 182:23
183:8 187:22
190:23 194:20
202:2,3 205:6
207:2 213:18
215:17,24,25
217:2,20 218:13
218:19 219:19,19
219:21,22 222:7,8
225:20 228:15
229:16 231:24,25
232:13 235:3
237:10 239:16
240:11 244:22,23
246:3 247:10
248:8 258:16
259:6 263:17
264:22 265:15
266:15 268:12
269:10 270:19
271:17 274:24
276:10 278:11
284:22 285:13
288:6,15 302:16
304:20 305:21
308:18,19 311:24
317:4 318:10
321:12 322:7
331:5 334:20
337:9
level 52:9 164:23 203:16
levels 274:6 279:10
LexisNexis 344:11 344:12,15 345:7 345:10
License 1:15 342:21
lie 287:5,7,12,13
lied 276:4 291:13
lies 286:8,9,12
Life 285:18

likelihood 178:22 178:24 191:2,6,8 192:23 195:20 316:7
limit 111:2
limitation 66:12
limitations 65:8 66:9 89:10 144:7
limited 21:23 111:12 128:22 140:6 199:8 282:21 285:8
line 11:24,24 21:18 116:16
lines 33:6 77:17
lineup 187:6
link 283:8 292:2
linked 51:13 303:12
list 30:22 31:6 69:22 74:6 82:20 114:22 118:14 128:4 163:5 185:3 202:20 251:8
listed 54:3 74:20 85:12 202:19 300:3,4 313:8,11
Listen 330:7
listened 242:19
listens 262:2
lists 78:18 196:4
literature 27:9,12 35:17 42:24 50:24 152:24 296:10
litigating 60:22 111:25
litigation 59:25,25 63:5,9 64:12,13 64:20 69:17 79:24 84:16 87:23 91:5 96:10 102:25 139:10 222:4 243:7,19
little 18:17 26:19 27:19 39:6 90:17 94:15 128:12 172:2 182:23

199:10 208:12 320:2 323:16
lives 35:11
LLP 3:9,13
located 4:4 53:7,12
lodged 79:9
logic 34:2
long 41:14 45:4 164:5,5 168:10 178:13
longer 94:3
look 9:23 10:20 16:6 25:11 36:13 38:15 43:22 51:6 95:6 96:7 106:9 114:7,19 115:25 117:10 124:22 132:18 133:12,15 134:23 144:14 151:15 161:16 163:7 186:13 189:12 194:8 196:14 199:2 202:3,16 203:4 204:6,10 214:14 214:23 215:10,20 215:25 219:2 238:16,19 244:13 256:15 257:14 260:2 269:23 270:17 271:3 280:11 296:10 302:14 311:24 312:2,7 314:9,16 314:17 315:17 316:20 317:3,4 321:21 322:3,4 325:5 327:15 329:18,19 330:2 331:5,22,23 332:14 333:13 337:24 338:8
looked 25:3,24 26:8 46:3 56:13 88:24 164:5 196:20 218:23 276:15 282:16 296:14

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

(212) 244.3990
(800) 246.4950

Itamar Simonson                                             9/21/2011

| | | | | |
|---|---|---|---|---|
| 309:2 311:18 | loyalty 38:5,8,22 | manufacturer 47:7 | 165:25 166:6 | 16:25 20:8 27:6 |
| 327:12 329:23,24 | 52:10 | 48:4 | 167:18,19 190:22 | 29:16,25 35:14 |
| 330:5,22 331:17 | Lu 3:4 4:19,19 | manufacturers | 192:19,19 194:17 | 37:3 50:11,11,12 |
| 332:12 334:17 | 72:21,25 73:21 | 192:12 | 261:2,7 | 51:5 52:6 53:8 |
| 338:7,18 | 95:18,20 300:20 | March 306:5 | Marrakech 119:10 | 76:25 82:4 88:9 |
| looking 11:11 30:3 | 309:25 | 318:11 | 119:10 | 90:6 92:14 93:4 |
| 54:2 75:7 84:23 | lunch 125:16,19,22 | Maria 146:10 | Martha 294:21,24 | 97:6 100:7 109:23 |
| 84:23 98:8 103:16 | 126:8 | 148:24 229:25 | Martin 151:6 345:6 | 111:10,18 114:13 |
| 116:13 171:11,12 | Ly 312:19 | mark 14:5 134:4 | master's 271:7 | 115:15 119:4 |
| 173:3 186:18 | L.L 77:12,13,16 | 186:23 | 274:10,15 | 127:9 134:18 |
| 204:19 206:13 | L.P 345:7 | marked 6:10,14 7:8 | MATEO 341:4 | 140:21 150:18 |
| 215:18,19 264:4 | | 7:13 15:17 27:18 | mater 305:18 | 155:20 158:21 |
| 268:3 302:12 | **M** | 27:25 30:13 35:23 | 318:15 | 173:18 183:11,15 |
| 311:7 313:18 | M 341:1 | 36:3 38:10,14 | material 27:20 | 185:12 195:16 |
| 317:22 322:13,14 | Madison 3:5 | 43:13,18 46:15 | 313:10 | 207:16 211:11 |
| 336:22 | magazine 91:13 | 48:23 49:3,23 | materials 12:4,24 | 219:10 234:15 |
| looks 188:24 302:4 | 237:17 344:11 | 51:24 73:3 91:11 | 13:3,8,14,17,19 | 235:21 236:5,21 |
| 306:13 | magnifying 148:12 | 93:7,12 96:3 | 13:21 14:12 58:11 | 241:5 249:15,22 |
| Lose 98:23 139:19 | magnitude 142:20 | 105:3 108:9,11 | 66:3,6,14 67:25 | 254:2 255:14 |
| 344:18 | 152:6 | 112:24 142:3 | 72:19,21 202:20 | 258:13 269:18,23 |
| losers 199:18 | maid 293:22,22 | 151:2 155:2 | 285:8 306:5,6 | 270:6 287:20 |
| loss 305:15 | 294:15 | 160:12 178:8 | Matos 50:4 344:8 | 297:5,6 300:23 |
| lost 315:13 318:18 | mail 207:24 275:23 | 202:8 203:22 | Matrix 344:10 | 305:2 315:6 |
| 326:4,7 | mailed 66:3 | 204:4 264:12 | matter 4:9 11:2,14 | 318:24 325:14 |
| lot 29:21 32:20 | main 216:6 | 299:13 301:24 | 55:24 65:9 95:24 | 330:15,19,25 |
| 118:15 159:4 | maintain 63:25 | 310:3 313:4 | 102:6 139:9 | 331:4 |
| 268:25 282:23 | 64:4 | 314:22 325:23 | 144:16,17,17,19 | meaning 106:10 |
| 283:5 | maintained 11:12 | market 28:21,23 | 219:23 286:23 | 192:19 200:13 |
| lots 89:13,13 | major 27:12 | 29:4,15 78:22 | mattered 139:9 | meaningful 151:25 |
| 115:18 120:12 | 146:14 304:14 | 85:2 88:5,6,9,24 | matters 102:25 | meaningless |
| 190:22 270:16 | 337:3 | 89:2,12 91:22 | 121:20 190:15 | 245:21 291:21 |
| loudest 212:17 | majority 19:11 | 187:25 197:25 | 239:9 | means 11:18 16:23 |
| Louis 94:5 344:15 | 337:2 | marketer 48:19 | Matthew 3:18 4:3 | 17:2 31:21 64:24 |
| love 145:10 146:14 | makers 263:9 | marketers 24:13 | Mayor 172:11,20 | 80:16 115:6 117:5 |
| 146:16 147:5,24 | making 43:10 | marketing 23:4,10 | MBA 28:5 29:12,23 | 117:6,19 139:11 |
| 148:23 169:22 | 57:19 58:7 115:20 | 29:8 38:12,21 | 224:3 | 165:13 177:4 |
| 170:11 182:14,17 | 248:25 304:2 | 44:6 58:17,19 | McCarthy 58:8 | 258:15 330:13 |
| 183:24 184:6 | 343:18 | 59:15,20 191:22 | 104:22,22 105:6,7 | 331:10 335:14,16 |
| 229:18,24 231:18 | mall 191:23 261:19 | 192:21 222:2 | 106:15 108:3,12 | meant 113:17 |
| 232:17 242:8 | 261:20 | 227:11 253:14 | 108:20 109:14,18 | 337:20 |
| 274:7 282:7 288:7 | Management 38:12 | 336:16 343:20 | 112:4,4 344:19,21 | measurable 153:7 |
| 288:16 289:17 | 343:20 | marketplace | McDermott 2:8 3:3 | measure 126:24 |
| 290:24 292:13 | managers 30:6 | 195:22 309:3 | 4:12,17,19 | 176:9 290:15 |
| 319:22 | Managing 36:8 | markets 28:21,25 | McDonald 43:6 | measurements |
| lower 261:18 | manner 102:15 | marks 81:8,12 | McDonald's 31:22 | 162:4 |
| 338:10 | 108:17 | 108:17 116:9 | McKenzie 336:5 | measures 56:13 |
| loyalties 24:9 | manual 175:17 | 158:4 159:15 | mean 8:18 12:14 | 338:9 |

| | | | | |
|---|---|---|---|---|
| **media** 19:12,19 40:15 41:17 42:21 52:24 237:17,22 238:12 239:5,12 265:13 293:4 319:9 | 82:9 96:19 187:9 187:12,24 189:3 221:14 **methods** 156:19 **Mexican** 40:8 **Michael** 33:16 43:16 44:18 343:24 | 220:11,18,19,24 221:15 **misnumbered** 305:4 **misquote** 140:20 140:22,23,24 **misreading** 194:6 **missed** 141:9 | 48:2,14 53:3 265:14 **move** 70:19 77:7 100:21 101:15 202:2 207:9 271:17 308:19 **movie** 48:18,19 118:3,4,21 119:10 | **national** 306:8,22 **nationwide** 93:5 **native** 5:15 **natural** 84:7 263:10,10 **nature** 115:9,9 177:20 187:2,9 **Naver** 345:20,21,22 |
| **Medical** 151:7 **meet** 7:20,22,23,25 90:25 331:11 **meeting** 318:13 **members** 66:23,24 **memo** 27:20 **memorize** 302:5 **memory** 18:19 61:3 125:14 221:3 236:23,24 237:5 **Menlo** 2:9 4:13 **Menon** 31:5 **mention** 29:23 119:6 198:5 201:13 282:13 293:19,20 294:15 294:16 **mentioned** 27:14 27:15 52:2 57:4 89:15,16 112:3 267:9 283:10,11 288:16 293:21 296:11 303:11 318:3 | **mid** 79:24 **middle** 25:9 33:8 113:11 310:21 **Middlefield** 2:9 4:13 **million** 319:20 322:18,19 323:18 323:23 324:3,4,15 324:17 **millionaires** 183:9 **millions** 314:3 **mind** 24:4,25 31:23 32:3 37:8 68:2 116:19 127:4,11 144:25 211:10 **minimal** 152:11 200:16 **minister** 292:24 293:13 **minor** 92:23 262:9 262:10 263:16 **minority** 19:11 | **missing** 73:20 **misstatements** 56:22 57:5 254:5 254:7 297:13,16 317:2 **mistake** 93:23 **misunderstanding** 85:23 **misunderstood** 155:23 235:20 285:2 **mis-described** 196:4 **mixed** 94:11 **mixes** 175:22 **model** 38:16,20 52:9 **Models** 343:15,17 **Moe's** 92:24 **moment** 6:22 45:11 85:4 120:7 **money** 22:24 29:21 | 119:2,9,20,22,25 120:11 129:9,10 146:23 **multiple** 229:4 **Multi-page** 345:16 345:17 **mySimon** 158:14 345:7 **mystery** 267:20 285:18 **M-a-t-o-s** 50:4 **M-hm** 22:2 73:14 92:12 139:24 278:21 **M-o-e** 92:25 | **naysayers** 224:4 **necessarily** 20:24 159:19 218:8 **necessary** 142:22 217:10 298:15 **need** 25:14,17 51:6 61:2 64:3,7 80:3,9 85:14 86:2 93:5 98:18 100:15,16 109:18,24 111:19 119:7 121:19 125:17,19 129:15 129:18 135:15 139:12 144:13 163:6 170:5 180:4 183:2 203:14,18 203:20 207:8 212:18 218:4 219:6 236:11 245:15 288:9 290:8 307:23 318:19 321:8 |
| **men's** 296:17 **merely** 159:8 204:15 **message** 122:23 131:17 134:19 **messages** 121:23 131:18 **met** 8:2,25 229:24 318:12 **meteoric** 282:25 **method** 159:10 187:12 **methodological** 87:7 297:2 **methodologies** 96:22,24 **methodology** 65:18 | **minute** 133:20 256:7 **minutes** 12:19 40:18 80:20 207:6 213:14 325:18 339:19 **mischaracterizing** 85:17 245:10 280:20 **miscommunicated** 220:13 **misinterpreting** 220:22 **mislead** 140:20 **misleading** 218:19 221:17 227:9 **misled** 210:8 | 325:14 327:24 328:7,8 330:3,9 330:16 335:20 **monitor** 4:6 81:10 **month** 11:17,18 **moon** 328:18 346:11 **moral** 51:2,8,13 **morning** 4:2 213:20 235:9,15 265:13 **Morocco** 123:17 **Morris** 31:5 33:16 **motivated** 64:9 **mouth** 18:23 19:9 19:13 24:16 42:21 43:24 44:2,4 45:8 | — **N** — **N** 341:1,1 343:1 **name** 4:3 35:4 73:23 88:11 93:21 93:24 97:19,22 122:24 124:12,14 125:5,7 128:6 130:5 181:11,11 181:12 199:9,10 226:22 229:9 286:25 **named** 123:16 179:4 342:15 **names** 50:20 119:8 119:13 128:4,5 **narrow** 19:2 59:11 59:11 | **needed** 199:8,9 **needs** 159:4 196:14 **negative** 40:12,15 41:8 42:4,20 45:8 45:17,22 46:6 50:2,9,25 51:12 51:15 53:10 169:16 263:25 264:24 265:2,13 266:5,6 267:2,6,7 267:12 268:23 269:2,6,7,16,21 270:7,12,14 275:13 276:2 278:7,13 279:20 280:7,13 282:5 285:20 297:21 |

Itamar Simonson                                        9/21/2011

298:7 301:10
304:3 306:17,23
307:16 311:20
315:2 319:9 344:8
**negatively** 39:18
40:12,16 52:13,15
53:2,5 263:19
266:9 277:21
285:25
**neglected** 146:5
**neglecting** 146:8
**negligent** 269:5
**neighborhood**
247:12
**neighbors** 239:11
**neither** 75:25 76:5
76:11 77:5,21,24
183:5 189:20
**neocolonial** 306:12
**network** 165:12
**neutral** 108:17
**never** 67:17,19
97:8 100:15
130:18 131:25
146:23 169:7
182:8 210:14
212:2 217:24
219:4 224:5
230:21 247:16,17
250:8,9,12 265:3
265:4,5 275:7,24
282:9 288:16
290:22 292:9
331:16 332:16
336:3
**new** 3:5,5,11 4:5,5
20:25 45:21
172:10 182:15,16
293:17,25 332:10
336:8
**Newlands** 5:13
**Newport** 92:15
**news** 41:11 45:23
50:25 51:2 264:7
304:14 345:20,21
345:22
**newspapers** 237:17

304:10
**nice** 26:4
**nine** 112:15 139:22
**Ninth** 190:18
**noise** 119:14
164:23,25
**nonarbitrary** 85:12
**nonconfidential**
193:11,21,24
**nonresponsive**
100:22
**non-leading** 131:10
176:18
**non-trademark**
184:19
**normal** 66:11
**normally** 67:10
97:5,6 117:8
128:3 272:11
**Nos** 7:12 96:2
264:11 301:23
313:3 314:21
325:22
**notations** 10:6,8
**note** 6:11 12:18
83:18 107:22
**noted** 126:3
**notes** 31:8 302:7
303:5
**notice** 303:10
305:23
**noticed** 25:25
87:23 112:7
140:19 282:18
**notion** 31:18 33:8
98:13
**November** 338:11
345:14
**Nowadays** 19:11
**number** 28:8 30:23
34:3 35:10 54:2
56:13 59:2 63:11
63:19 95:17
101:18 128:14,20
150:23 156:8
189:14 193:2
197:16 198:23,24

199:3 206:5
221:13 257:5
259:15 260:20
276:7 302:7 303:5
309:24 322:2
325:2,10 327:16
330:5,13,14 337:9
**numbers** 189:13
311:19 314:10,16
315:17,25 316:20
318:9 321:22
322:3,4 326:24
327:8,12,22
329:19,20,24,24
330:23 332:13,14
332:16,17 333:14
334:17 337:24,24
338:8,18 339:14
**numerous** 191:23
257:21
**N-e-w-l-a-n-d-s**
5:14

_____

**O**

**O** 341:1
**oath** 333:18 341:8
**oaths** 2:12 342:4
**Obama** 183:8
**obfuscating** 260:11
**object** 34:12 56:6
68:4 79:11 81:20
85:20 95:13
106:20 170:2
179:11 185:9
186:10
**objection** 34:24
68:11 80:17 85:21
87:11 89:20,25
101:6 104:3,13
109:16 111:16
124:21 130:25
131:3 137:12
143:18 149:11
154:11 160:5,18
161:7 170:19
171:14,22 172:15
175:20 179:24

180:5,18 188:5,10
189:8 192:9
194:23 195:8,14
196:8 197:4,14
198:3,21 199:14
199:25 201:4,23
202:11 208:15
214:16,18 218:9
220:2,12 221:6,11
223:18,23 224:8
224:21 226:7
228:13 230:16
231:10,13,23
233:22 235:11,18
236:16,25 237:25
239:13 240:5
241:17,24 244:6
245:8 247:5 248:5
248:20 249:24
250:19,25 251:7
251:18 252:5,18
252:23 253:10,25
254:15 255:11
256:2,10 257:10
260:17 263:3
265:6 266:10
267:4,17 268:24
269:17 270:8
271:10,15,22
272:7 273:3,13,25
274:16 275:9,16
276:3,5,21 277:23
278:9,14,25
279:21 280:18
281:3,21 282:11
283:23 284:3,15
284:15 285:10,22
287:8 288:3 289:5
290:11 291:18
293:9 294:7 298:5
298:16 299:6
300:9 301:14
302:24 303:7,20
303:25 306:20
307:11,22 308:4
308:24 309:13
311:22 312:9,24

314:4 315:4 316:8
316:15 317:19
318:22 319:14,24
320:24 321:11,15
321:24 322:22
323:19 325:4
326:25 327:19
328:9 329:2,25
330:4,10,21 331:3
332:18 333:21
334:8,15,23
335:12,23 336:12
336:19 337:14
338:6,22 339:3,11
**objections** 54:5,8
274:6 345:23
**objective** 84:11
338:21,23
**objectives** 84:13
**observation** 137:5
**obsession** 36:15
**obtain** 56:17,24
73:5
**obtained** 73:10,23
74:7 190:24
**obtaining** 127:15
**obvious** 230:24
240:8
**obviously** 32:19
41:5 47:14 67:9
67:21 129:11
138:12 139:8
159:3 188:12
257:16 270:14
281:4 282:24
**occur** 152:9
**occurred** 107:10
128:14 294:25
309:11 318:2
331:21 333:18
334:10
**October** 304:22
342:18
**offer** 246:15
**offered** 102:19
177:10,21
**offers** 166:25

| | | | | |
|---|---|---|---|---|
| 173:11 | 132:5,24 134:10 | 183:3 | **opined** 94:16 | 247:2,7,10,15,18 |
| **office** 9:3,19 145:16 | 134:17,24 138:17 | **omission** 135:6 | **opinion** 8:9 70:17 | 248:4 |
| 268:11 | 139:21,23 140:20 | **omitted** 141:2 | 80:4 108:14 | **oral** 19:15 68:24 |
| **offices** 2:8 63:24 | 140:23 143:8 | 165:18 | 109:25 120:23 | 235:8,15 |
| **official** 275:6 | 145:2,12 146:6 | **once** 25:17 28:16 | 132:11 147:15,25 | **orally** 68:22 |
| 287:24 289:3 | 147:17,18 148:3 | 46:3 74:25 121:16 | 148:6 166:18 | **orange** 264:19,20 |
| 290:9 291:17 | 149:3,10 151:15 | 125:12 164:6 | 167:3,5,20,22 | 264:21 271:17 |
| 319:23 | 154:12,16 155:6 | **ones** 55:11,11 59:5 | 169:21 170:16,24 | 286:11 |
| **officials** 286:20 | 155:23 160:22 | 63:6 75:4 264:21 | 171:4,8 182:25 | **order** 27:19 80:24 |
| **Oh** 146:9 195:11 | 164:3,13,21 | 277:4,5 285:14,17 | 183:10 193:19 | 84:15,15 85:15 |
| 198:12 203:10 | 165:22 168:5,12 | 302:5 309:21 | 207:12,15 223:17 | 95:9 117:22 |
| 225:5,8 235:21 | 173:3 174:9,13 | **one's** 44:14 106:5 | 223:19,20,22 | 120:14 137:6 |
| 266:24 286:20 | 175:24 177:6,16 | **oOo** 125:24 343:5 | 245:21 246:20 | 163:9 173:21,23 |
| 287:13,16 310:11 | 181:4 183:24 | 346:15 | 260:5 263:2 290:5 | 173:24 174:3,5,16 |
| 317:7 318:12 | 184:15,18 189:4 | **open** 84:25 331:11 | 295:7,8,9,11,14 | 174:18 175:2,6,10 |
| 328:18 346:9 | 190:23 191:14 | **open-ended** 88:13 | 295:15,18,25 | 175:11,16,19,23 |
| **Oh's** 286:8 | 193:10 195:23 | 97:3,9,11 100:16 | 336:24 | 176:4,4,9,14,21 |
| **okay** 6:15 7:25 8:24 | 196:13 203:23 | 111:19,21 113:12 | **opinions** 12:17 | 177:18,20 178:2,3 |
| 9:5,23 10:7,13 | 204:5,11,12 | 113:16,19 114:4,8 | 44:13 57:8 84:7 | 180:11,12 185:13 |
| 11:3,20 12:5 13:2 | 205:13,14,23,24 | 114:8,14 115:23 | 161:9 200:22 | 185:15 195:5 |
| 14:18 15:3,11,17 | 206:5 207:2 | 116:3,5,11 117:12 | 201:12 295:19 | 201:6 208:23 |
| 16:17,25 17:18 | 213:24 215:24 | 118:11,18 119:4,5 | 296:3 | 212:20 244:20 |
| 18:6,12 22:2,15 | 216:18,25 217:3,6 | 120:4,9,15,19,25 | **opportunity** 95:6 | 255:23 257:7 |
| 23:12 27:13,19 | 218:16 222:7 | 121:7,12,19 122:2 | 110:6,16 212:8 | 291:8 299:21 |
| 28:6 30:14 31:4 | 223:17 224:10,12 | 122:6,13 126:7,17 | 217:22 218:20 | 302:2 308:2 |
| 31:13 32:5 33:22 | 224:19 225:7 | 126:18,25 129:13 | 219:20 | 340:13 |
| 35:3 37:18 39:13 | 228:18 232:13,18 | 129:17 130:21,22 | **opposed** 15:7 18:8 | **ordered** 256:22 |
| 39:16 40:11 48:13 | 237:10 240:10,18 | 131:4,6,10 132:12 | 42:17 48:19 51:9 | 259:8 260:2 |
| 49:20 50:18 51:11 | 240:20 242:3 | 135:3,8,9,12,13 | 70:6 106:7 167:16 | **ordering** 258:24 |
| 51:19 54:16 56:15 | 248:13,22 253:8 | 135:19 136:10,25 | 177:2 231:11 | **Oregon** 92:14,25 |
| 56:23 57:2,20 | 253:13 260:24 | 137:9,22 141:18 | 238:14 276:23 | 93:3 |
| 59:9,14,18 62:18 | 265:9 266:7,15 | 142:8,11 143:15 | 289:23 302:23 | **organization** |
| 63:9,13 69:4,7,22 | 267:23 268:12 | 143:21 144:4,7,10 | 303:24 336:9 | 317:16 |
| 70:20 72:24 73:21 | 269:10 271:3,3 | 144:13,24 147:20 | **opposite** 25:22 | **Organizational** |
| 75:24 76:11,18,20 | 276:25 277:13 | 160:25 161:5,9 | **opposition** 279:11 | 46:13 344:3 |
| 78:3,7,10,17 | 278:23 280:5 | 176:19,20,25 | **option** 25:9 127:24 | **original** 79:21,23 |
| 82:25 83:16 88:4 | 282:3 285:13,15 | 209:5 215:6,8 | 127:25 167:3,23 | 153:25 165:17 |
| 88:18,22 90:21 | 287:3,22 289:14 | 216:7 230:25 | 168:2 174:3 | **Orne** 151:6,18 |
| 91:20 92:21 95:5 | 296:9 297:14 | 231:4,7 233:11 | 238:19 239:2,8,8 | 345:6 |
| 95:15 97:12 100:2 | 301:3 304:6 | 243:4,16,21 | **options** 87:8 | **Orne's** 153:13 |
| 101:15 106:22 | 309:18 310:14 | 244:16 245:4,15 | 114:17 115:21 | **outcome** 342:14 |
| 110:12,15 112:22 | 311:14 313:13,14 | 245:18,25 257:7 | 116:17 127:15,20 | **outline** 14:20 |
| 113:9 114:19 | 314:20 319:16 | 258:25 260:3 | 168:20,21,23 | **outside** 284:20 |
| 118:3 119:14 | 320:21 322:7,12 | 288:10 289:14 | 169:24 174:6 | **overall** 305:17 |
| 121:13 123:9,13 | 325:21 339:16 | **opine** 149:21 | 177:12,14 235:6 | 322:3,4 324:8 |
| 125:16 126:13,25 | **old** 27:9 88:15,23 | 189:21 201:10 | 238:17 240:20 | 328:24 330:2,20 |
| 127:22 128:17 | 89:7 141:18 183:2 | 314:15 315:23 | 242:13 246:6,16 | 330:25 |

Itamar Simonson                                                  9/21/2011

**owned** 123:16
216:14
**O-h** 286:20
**o0o** 1:3 340:17

―――――――
**P**

**Pacific** 92:15
**package** 207:24
208:9
**page** 10:18,21
11:20,21 15:22
16:6,20 23:12
30:18 31:4,13
32:5,8 33:22
36:11,13,14 38:20
39:4,16 43:22
44:13 45:7,12,16
46:23 47:12 50:18
50:23 51:11 53:22
53:23 69:11 81:17
90:21 103:16
104:18,19,20
106:9,12 108:14
109:4 110:4,8
113:5,9,11 114:7
114:19 115:25
116:15 126:13
131:9 132:6,8
133:15,24 142:5
151:15 152:13,15
152:16 154:13
155:7,16,18,19,20
155:22,25 156:10
158:9,12 159:21
161:16 166:12,24
168:5,5 173:3
177:6,6 178:16
186:13,19 187:22
190:5,9,23 191:3
191:20 192:18,22
192:24 193:4,10
194:8,14,16,18,19
194:22 196:4,9
198:25 203:4,6
204:7,10 205:12
207:19,20,21
213:25 214:2

215:13,17 216:8
216:10 225:4
244:23,25 245:2
246:3 270:2
296:23 301:3
308:18,20 311:7
313:18 343:3,7
344:2 345:2 346:2
**pages** 10:6,14,23
10:24 158:14
**paragraph** 21:19
23:13 32:6,7 35:2
37:19 43:23 45:12
53:22,24 58:14,15
69:12 81:17 82:9
84:21 86:12 90:21
95:8 96:7,15,16
104:21 105:23
106:23 126:16
132:5,8,10,14
134:23 135:23
136:3,5 137:7
142:9 151:19
152:17 154:14
155:8,12,25
159:11 161:18,20
162:13 178:16
204:7,10,14
205:10,14 238:8
239:16 263:18,21
265:25 268:5,6,17
269:16 286:16
296:24,25 297:18
309:9 310:12,17
323:22
**paragraphs** 264:21
277:7
**pardon** 67:18
223:8 242:21
287:6
**paren** 98:22
**parenthesis** 12:13
14:5
**Park** 2:9 4:13
346:6
**part** 12:18 13:25
29:9 32:4 140:12

167:3 168:18
170:14 185:10
186:19 189:9
196:24 197:5,6
223:2 224:13
225:6 226:8,15
234:3 256:3,25
264:8 280:13
282:22 297:4,6
319:4
**partial** 72:21
**partially** 73:9
**participants** 83:10
217:11 292:16
293:6 294:23
**participate** 65:24
66:14 334:21
**participated** 152:7
328:13 334:18
**participates** 152:2
**participating**
152:12
**particular** 28:15
41:8 64:6 74:21
82:2,13 84:5,11
86:7 89:21,23
91:16 96:18 98:20
100:19,19 102:16
106:4,5 108:23
109:4 110:2,2
113:5,23,23 114:5
120:18 121:5,16
128:24 130:9
131:7,23 134:3
139:25 140:6
146:2 147:13
151:5 157:8
158:10 162:9
170:4 174:2 177:5
184:21 186:18
230:6 231:3
243:22 245:24
247:12 277:14
306:18 317:21
345:5
**particularly** 28:17
162:8 224:22

300:15 317:23
**parties** 72:14
342:13
**parts** 224:18
**party** 72:14 160:2
189:15 197:8
204:16
**patent** 76:19,20
77:8 78:15
**pay** 45:17,21
**pedals** 41:4
**Penn** 4:4
**people** 19:12 25:18
26:10,24 36:18
37:25 55:2 62:19
66:21 67:6,10
86:15 87:13,18,24
93:22 119:6
121:23 131:22
139:12,16 143:15
143:24 144:20
145:24 147:8
148:19 149:15,18
165:3 172:4 174:6
181:16 182:7
183:3,10 208:17
208:19 213:21
214:3 215:4
219:13,24 220:19
226:13,14,18
227:4 232:21
236:10 237:13,15
237:15,20 238:22
239:5,10 243:17
244:14,17 249:11
251:10 253:14
255:15 262:22
270:16 274:4
275:12 276:8,23
281:6,17,19
282:25 288:23
289:16,25 290:8
290:16 293:18
294:13 295:12,12
296:3 314:9,14
315:6,16,22 316:7
320:15 321:3

325:12 333:22
**people's** 23:21 24:2
127:20,23 145:13
170:20 290:5
312:4
**perceive** 8:11 19:3
19:4
**perceived** 38:5,8
47:6 48:3 50:25
51:14 52:10 78:13
193:18 200:16
**percent** 92:18,20
94:24,25 138:12
189:11,11,13
201:17,20 238:24
238:25 239:7
261:21,23 323:13
323:14,14 324:9,9
324:9,10 328:6,7
329:5,5 331:6,9
**percentage** 241:7
323:12 324:7,19
324:22 328:23
330:3,15,19,25
331:14 332:6
**perception** 208:19
293:12
**perceptions** 18:18
30:10 44:15 84:7
249:13 276:9
286:2 296:6
301:10 312:5
**performed** 179:17
184:19
**period** 6:2 54:14
56:12 59:6 64:3,4
64:6 140:3 142:19
159:15 209:2
**periods** 54:12
**person** 20:21 47:22
48:12 65:23 66:2
66:3 102:3 123:21
214:8 219:10
228:12,15 234:6,8
234:12 240:3
242:25 251:9,11
251:12,21 278:15

283:4 294:5 296:3 297:9
**personal** 20:20 32:9 47:6 48:10 283:22
**personally** 2:13 57:21 145:6
**person's** 20:21,22 296:6
**perspective** 210:4
**persuasion** 23:25 49:12
**pertained** 54:25
**pertaining** 54:11 70:17
**pertains** 12:20
**peruse** 75:4
**Ph** 3:6,11,15
**phantom** 119:13
**Pharmaceutical** 321:17
**PhD** 59:7 271:9 272:15,17 273:2 273:11 289:18 290:24 336:25
**Philip** 343:21
**phone** 16:23 17:2 66:10,11 69:4 242:14 261:18,22 261:25 344:24
**phone-mail-phone** 65:17,19
**phrase** 126:22 127:18
**phrased** 169:17
**pick** 22:15 185:3
**picture** 275:3
**Pil-dong** 303:23
**Pitney** 3:9,13 4:23
**place** 4:12 31:19 32:2 146:11 182:2 342:9
**places** 165:11,19
**plaintiff** 1:5 2:15 3:2 4:14 190:3 217:20 227:17 284:6 345:23

**plaintiffs** 196:22 210:4
**plaintiff's** 6:13 7:12 27:24 30:12 36:2 38:13 43:17 46:14 49:2,22 51:23 73:2 91:10 93:11 96:2 105:2 108:8 112:23 142:2 150:25 154:25 159:8 160:11 178:7 202:7 203:21 204:3 264:11 299:12 301:23 309:20 310:2 313:3 314:21 325:22 343:7 344:2 345:2 346:2
**plan** 14:5,15 317:13 318:13 346:10
**planned** 14:8 15:4 317:9
**planning** 14:9 15:6 15:7
**planting** 144:25
**plastic** 78:13
**plausible** 183:3,19
**play** 30:11
**played** 282:21
**Plaza** 4:5
**please** 4:15 5:3,20 34:8 99:7 100:23 137:19 138:19,25 157:14,15 180:25 206:12 207:13 210:22 214:23 215:20 248:20 250:6 259:20,23 290:20 299:20,24 315:12 338:16 340:7
**pleased** 199:11
**pledged** 310:22 311:8,14 313:19 316:13,21

**plus** 13:7,7 14:5,17 16:18 17:12
**point** 11:14 14:2 67:2 80:7,8 112:7 136:21 160:16 187:15,20 188:21 196:19 201:13 204:14 208:12 217:19 219:17 235:25 236:9 250:20 255:19 268:10 271:13 290:17,19 292:3 301:9 304:2 312:18
**pointed** 111:6 152:18 244:20 283:10
**points** 57:18 58:7
**Polaroid** 190:18
**policy** 286:24
**politician** 293:12
**Polo** 93:9 344:13
**pool** 175:13
**poor** 39:20 146:6 250:2
**popular** 141:14 142:10 143:4
**population** 247:23
**portions** 230:23
**ports** 179:8
**posed** 169:13
**position** 79:20 94:21 183:9 201:15 281:4 287:2,17,19 303:9 307:20 314:5,15 315:5,23 317:20 325:9 328:17 335:13
**positions** 335:7
**positive** 45:18,22 46:7 123:23 266:4 267:2 331:12
**possibility** 44:17 107:7 158:13 269:13 298:13

**possible** 41:19,20 52:25 53:4,14 79:3 107:9,10 115:15,20 144:10 150:16 158:3 159:14,18 163:14 180:10 185:20 210:6 234:24 262:15 265:21 266:4 289:22 291:25
**possibly** 12:17
**posted** 124:15
**poster** 125:13
**potential** 156:21 157:7,12,19 158:20 159:11 176:9
**potentially** 84:13 263:19
**power** 45:8
**powerful** 44:14
**practical** 200:17
**practice** 218:5,8 219:7,12
**practices** 102:24
**precede** 129:14 130:22
**preceded** 248:17 291:21
**precise** 180:20
**precisely** 42:18 163:6 180:17
**predict** 262:19 263:5
**predictable** 245:22
**preface** 105:18 344:20
**prefer** 126:17 245:13,15 336:14 336:17 337:2
**preference** 26:2 336:23
**preferences** 24:9 26:14 84:7 115:17 127:20 333:14 336:20 337:8

**preferred** 144:11
**preliminarily** 9:16
**preliminary** 187:16
**preparation** 53:25 284:8
**prepare** 14:19 63:25 315:8
**prepared** 61:6 63:15 73:11,25 184:12,22,24 185:2 203:25 204:2
**present** 3:17 67:9 68:21,22 108:15 114:16 144:19 153:2 162:23 230:2 244:21
**presentation** 156:19
**presented** 107:25 168:21 317:8
**presenting** 162:14
**presently** 111:24
**president** 146:17 183:8 277:2,3,25 279:6 286:8,20 287:13 305:14 317:7 318:12
**presidential** 281:8 281:11
**president's** 277:19
**press** 19:23 145:9 189:19 282:8 283:5 286:19 304:7,8
**pressed** 279:7
**Presser** 88:15 90:14 144:2 160:15,23 161:4 162:18 163:5,15 345:9
**pressing** 41:2
**prestigious** 29:20 265:11
**presumably** 182:6 224:4 312:4
**presume** 20:4 37:7

Itamar Simonson                                    9/21/2011

49:15
presumed 47:21
  160:24 161:5
  187:10
pretty 199:11
  253:7 298:23
  307:4 332:6
previous 216:3
  274:23
previously 63:15
  90:22
pricing 24:13
primarily 42:8
  59:8 205:15
prime 293:13
Princeton 22:12
principal 91:20
  102:19 182:22
principals 105:15
principle 98:17
  144:17
principles 33:25
  69:13 87:15,19
  96:23 98:8,10
  100:4,6,14,18
  101:17,18,20,22
  102:15 103:6,10
  104:16 137:13,15
  137:18 138:7
  139:5,7 162:3
  260:12
Print 68:19
printout 344:11,12
  344:15 345:7,10
prior 20:21 24:9
  46:19 58:12 60:8
  60:9 67:7 167:24
  243:6 244:24
  320:8,22
priorities 36:19
Priority 207:24
private 22:22
PRL 93:10 344:13
probably 6:3 9:21
  9:21 12:16 31:3
  31:10 47:16,17
  48:20 51:6 55:9

59:3,22 60:2,5,10
  60:12 63:12 89:8
  90:6,11,13 91:2
  96:9 109:17
  114:12 161:25
  164:7 169:18
  171:3 177:15
  180:8 242:14
  244:14 293:13
  298:9 308:19
problem 28:8
  128:10 147:23
  148:7,9 158:11
  159:19,25 162:10
  162:11,16 224:20
  224:23 225:12,13
  257:11 270:4
problems 40:24
  132:12 156:3
  243:3,12,14 249:3
  249:7
procedure 2:13
  150:6 342:5
procedures 6:8
  317:10
proceed 5:8 8:25
proceeded 9:3
  113:12
proceeding 59:14
  95:12 97:15 103:3
  245:25
proceedings 18:9
  18:10
process 139:9
  224:14 239:17
  269:12 273:19
  274:12 326:13
  333:6
processes 46:24
processing 58:18
  59:20 60:4 286:22
produce 10:25
  63:14
produced 63:18
  87:19 187:8,9
  247:19,22
produces 247:21

product 24:14
  28:24 38:24 39:24
  42:16 44:2 45:21
  47:23,24 48:4
  51:16 67:22 94:16
  187:6 220:4
productive 213:13
products 21:8 67:3
  67:4 109:22
  113:25 115:18
  198:6 344:24
professor 21:10
  38:21 44:19
  104:22 106:15
  108:3,20 109:14
  109:18 112:4
  164:14 190:13
  191:22 222:2
  225:23 228:3,20
  232:25 239:18
  249:21 274:5
  287:2 305:24
  306:3,10,18,21,25
  307:5,6,6,13,19
profile 298:10
program 59:7
  77:13 224:3
  326:16 328:14
  333:10
programmed
  172:14
programs 336:25
project 326:15
projects 317:8
prominent 293:12
promised 146:11
promoter 48:21
promotion 192:25
promotions 23:5
  23:11 24:13
proof 272:12
proper 76:16 119:8
  120:6 123:7,8,15
  124:7 145:22
  163:16 176:21
  178:25 183:20
  184:9 284:21

properly 84:14
  85:14 96:12 134:4
  135:25 136:25
  137:23 166:19
  217:23 246:22
property 57:11,23
  76:20,24 154:17
  155:11,14 345:7
proportion 323:8
  327:24
propose 246:19
proposed 157:10
  158:11
Proposition 76:14
  76:15
prosecutors 286:22
prospective 218:6
prospects 29:22
protect 26:23
prove 143:17 194:3
  195:5,5
proverbs 25:24,25
  25:25
provide 25:17
  67:25 82:3 150:7
  190:25 219:12
  235:15 246:23
  248:4
provided 38:24
  54:17,18,19 56:9
  76:17 168:14
  181:18,22 190:3
  192:7 201:16
  205:16,21 206:9
  213:3 214:14
  230:8 238:10
  255:18 256:16
  298:3 337:25
  339:10
provides 114:21
  173:4 204:15
  230:21
providing 218:22
  219:24 227:3
  235:23 236:2
  316:7
proving 196:22

proximate 197:25
proximity 190:20
  194:15 198:7
Psychological
  151:4 345:4
psychology 46:13
  49:12 87:15,17
  151:4 344:4 345:4
public 254:24
  255:4,7 268:11
  301:19
publications 44:23
  163:5
publicity 50:2,10
  262:15 263:25
  282:5 297:21
  298:8 344:8
publish 140:5
published 24:25
  27:11 35:10 47:17
  49:16 56:16 88:2
  89:4 139:10,15,25
  140:2,3 141:7,9
  143:7 154:2
  195:19 251:11
  253:18 264:24
Publishers 91:14
  344:11
publishes 143:9
publishing 44:24
  140:7
pull 166:10
pulled 35:24
purchase 23:17,25
  218:24
purchased 66:16
  67:9,21 209:8
purchasing 23:6
purely 237:19
  238:21 239:2,6
purpose 29:13 55:3
  82:16,19 83:3
  105:19 132:9
  139:11 149:12
  168:15 179:8
  180:13 197:12
  208:11,21 222:9

Itamar Simonson                                              9/21/2011

| | | | | |
|---|---|---|---|---|
| 222:13,22,22 | 84:13,15 85:18 | 200:4 204:22,23 | 279:17,18 280:2 | 158:12 160:25 |
| 223:3 227:18 | 88:13 99:4,7,14 | 205:3,4,8,20,21 | 280:23 281:14 | 161:6,10,14 |
| 277:13 288:5 | 99:15,17,18,21 | 205:25,25 206:2 | 283:18 290:16,19 | 162:14 164:11 |
| 295:21 301:7 | 100:23 101:9,10 | 206:23 207:2,3,3 | 291:11,20 293:11 | 165:3,19,21 |
| **purposes** 10:9 | 101:11,13 102:21 | 207:4,5,9,11,14 | 299:24 314:11 | 167:11,13,16,25 |
| 195:12 196:22 | 105:24 106:3,4,21 | 207:22 208:4,7,8 | 316:18 328:21,22 | 168:14 173:5,11 |
| 200:17 224:6 | 107:5,6,11,12,13 | 209:6,22 211:2,7 | 330:7,24 332:23 | 173:19 174:2,9,10 |
| **pursuant** 2:12 | 107:17,21 109:3 | 211:9,11,17,19,25 | 332:25 333:4 | 174:21 175:2,2,9 |
| 342:4 | 109:10,13 110:2 | 212:3,8,12 214:19 | **questioned** 294:4 | 175:10,15 176:14 |
| **put** 19:7 31:22 | 110:17 112:17 | 215:6,7,8,11,18 | **questioner** 65:20 | 176:19,20,21,25 |
| 55:22 59:2 75:16 | 113:12,16,18,19 | 216:4,7,7,16,17 | 214:8,11 216:6 | 177:2,3,20 180:2 |
| 105:5 107:16 | 113:20 114:4,8,9 | 216:18 217:2,11 | **questioning** 4:16 | 180:22,23 181:10 |
| 129:15 167:18,19 | 114:9,14,16,18,20 | 219:17 222:8,10 | **questionnaire** | 181:14,19 182:10 |
| 169:20 174:16,22 | 114:21 115:23 | 222:17,20 223:6,9 | 26:13 122:17 | 183:22 185:8 |
| 189:14 196:22 | 116:17 117:14 | 223:12,12,14,15 | 207:20 256:4 | 203:18 204:24,25 |
| 199:9 227:16,23 | 118:8,11,18,22 | 224:2,3,12,17,18 | **questionnaires** | 205:16 207:7 |
| 231:24,25 258:5 | 119:3,4,5 120:4,6 | 224:19,20,23,25 | 64:19 | 208:3 212:19 |
| 259:9 264:9 | 120:9,15 121:17 | 225:3,6,13,15 | **questions** 5:20 | 213:9,11,21,22 |
| 311:19 | 123:6,7,8 126:19 | 226:9,12,15,25 | 17:23 28:9 46:22 | 214:13,23 215:20 |
| **putting** 123:4,4 | 126:23 128:2,7,9 | 227:22 228:9,15 | 64:17 66:18 69:15 | 216:9,12,13,19,20 |
| 183:23 226:17 | 129:5,13,14,16,17 | 228:22 229:13,15 | 81:4 82:21 83:15 | 216:23,24 218:3 |
| 296:25 | 130:22,23 131:2,5 | 230:11,18,25 | 83:15,16,19,23,24 | 220:7 221:9 223:7 |
| **pyramid** 39:6 | 131:7 134:4,11 | 231:7,8 232:3,14 | 84:19 85:13,13,14 | 223:10 224:3 |
| **p.m** 102:10,10 | 135:8,17 136:18 | 233:4,6,9,12,14 | 88:17,18 96:11,12 | 230:7 231:4 |
| 125:23,23 126:3 | 136:22 137:20 | 233:15,15,17 | 97:4,4,10,11 | 233:11 235:3 |
| 166:5,5 261:6,6 | 138:22 140:18 | 234:3,16,19 235:6 | 98:13 100:16,17 | 237:7 238:6,9 |
| 296:20,20 339:24 | 145:24 147:5 | 235:8,13 236:8 | 101:14 106:10,15 | 243:5,9,13,16,17 |
| 339:24 340:16 | 148:22,25 150:21 | 237:10,11 238:11 | 109:21,24 110:19 | 243:21 244:2,8,9 |
| | 152:6 153:21 | 238:17 239:14 | 111:12,19,21 | 244:14,16,17 |
| ———————— | 157:17 158:2 | 240:7,22 241:11 | 115:3,5,10,12 | 245:5,7,11,15,18 |
| **Q** | 159:13 161:2 | 241:20,22 242:2 | 116:4,4,11,23 | 245:19 246:2,4,19 |
| **qualifications** | 163:9 166:16,17 | 243:4,8,22,23 | 117:6,12,18,21 | 246:24 247:21 |
| 20:22 | 166:19,25,25 | 244:4,13 245:4,7 | 119:7 120:20,25 | 255:18 256:2,16 |
| **qualify** 153:2 | 167:21 168:4,15 | 245:11,24 246:15 | 121:7,12,19 122:3 | 257:2,6,16 258:7 |
| **quality** 38:4,5,8 | 169:17,20 170:14 | 246:22 247:8,21 | 122:6,13,14 123:3 | 258:9,19 259:2,4 |
| 39:20 52:10 | 170:21,23,25 | 247:24 248:13,15 | 123:5,10 126:7,17 | 260:2,3,21 288:10 |
| 335:10,14 337:12 | 171:9,16,18 172:4 | 248:16,18,24 | 127:2,8,14 130:21 | 288:22 289:15 |
| 337:16 338:2,10 | 172:12,13,18,20 | 254:12,13,13,22 | 131:10,10 132:12 | 290:20 291:20 |
| 338:10,20,25 | 173:14,24,25 | 255:16,20,21,23 | 132:13,16 135:3 | 340:3,4 345:8 |
| 339:10 | 174:2,5,9,12,16 | 255:24,24 256:6,6 | 135:12,13,20 | **quick** 70:18 81:6 |
| **quasi-filter** 166:25 | 174:22,22 176:3 | 256:8,12,13,18,19 | 136:10,12,25 | **quickly** 75:2 |
| 167:11,16,21 | 176:12,12,14,15 | 256:25 257:4,8,15 | 137:22,23,24 | 202:25 |
| 168:4 173:13 | 178:2 180:16 | 257:17,18,19,22 | 141:14,18,20 | **quit** 210:22 |
| **question** 10:19 | 181:9 182:14 | 258:3,11,17,17,23 | 142:8,10,11,21 | **quite** 78:23 163:14 |
| 20:7,19 34:7,19 | 183:16 185:15,17 | 259:3,7,12,18,19 | 143:3,15,21 144:3 | 199:8 217:15 |
| 42:19 55:17 67:5 | 185:19 189:5,6 | 260:8,10,13,14,17 | 144:4,7,10,13,24 | 231:18 292:21 |
| 67:23 74:21 75:9 | 192:10 198:17 | 272:23 276:7 | 147:20 150:6 | 309:23 |
| 80:24 82:13,18 | | | | |

**quote** 96:8,9 107:6
110:5,15,21 113:9
131:9,15 133:9,25
134:4 135:23
139:17 140:12,14
140:25 151:19,23
152:17,20 156:4
157:18,20 159:11
159:23 162:13
167:2,2,2,3 177:8
177:10 178:19,20
178:20,21 200:24
203:7,9 204:18
246:4 286:24
297:18,22 319:6
**quoted** 134:2
**quoting** 132:9
**Q1** 113:11

___

**R**

**racist** 307:20
**radio** 237:16,23
**raised** 10:19
101:18 250:17,21
251:3,23
**raises** 159:14
**raising** 158:2
**Ralph** 93:10
344:13
**random** 121:8
**range** 24:8
**rape** 292:25
**rate** 41:12 261:18
295:12
**ratings** 127:15
**raw** 135:2
**reach** 297:17
309:15 322:12,17
**reached** 192:13
285:6 297:25
298:14,18 308:21
316:11 331:13
**reaching** 297:8,9
298:2 315:2,24
**Reaction** 50:3
344:8
**read** 13:23 15:24

16:19 33:2 34:7,9
35:2 36:10,11
46:19 49:6 67:7
67:13 85:24 98:12
100:23,24 109:4
109:24 110:23
133:5,6,23 134:12
134:13 136:4,5
141:15 147:10
157:24 158:24
159:10 161:19,21
162:21 164:6
173:7 178:14
190:4 200:6,7
203:10 209:5
210:16 212:2
214:20 217:21
220:17,19 221:16
223:25 226:3
227:22,22 228:7
229:3,7 233:3
237:22 239:25
250:16,18 251:11
254:2 255:2
258:18 259:19
268:10 274:23
275:12 276:8,8,23
279:12 281:5
283:21 286:25
287:11 318:24
321:6 326:2 341:7
**readers** 138:12
**reading** 11:23
16:20 110:8
134:17 146:21
209:6 264:4
269:15 276:17,23
298:2 300:5
**readings** 42:9
**reads** 16:17 220:17
238:21
**ready** 207:10
**real** 83:5 148:12
208:22
**reality** 83:4,8,11
84:3 107:23
109:23 117:5,23

218:13 263:11
282:16 317:2
318:8 322:6 334:2
**realize** 183:4
**realized** 208:23
**really** 28:2 33:14
33:21 64:18 66:9
82:3 91:3 98:18
98:18 100:7,9
102:4,6 116:12
117:7 147:4
162:25 173:8
175:4 218:11
223:4 229:22
235:21 236:11
240:21 242:4
273:20 275:11,22
289:21 290:16
303:22 307:24
315:22 318:5,23
318:24,25 321:2
339:14
**reason** 78:24 80:5
112:19 125:14
135:6 138:15
139:15 141:17
212:13,15 217:13
275:19,21 280:16
280:24 288:9
324:25 326:22
334:7
**reasonable** 85:3
217:15
**reasonably** 184:4
**reasons** 25:8,17
115:19 116:10
159:21 213:3
233:10 240:8
247:9 268:16,21
291:20 343:14,16
**rebut** 191:17
199:22 200:9
**Rebuttal** 343:8
**recall** 8:7 9:10,21
13:25 16:2 26:14
28:17 33:14,19,21
34:16 40:10,18,22

40:23 41:7,10,11
41:13 42:2,22
43:3,4,8,10 55:13
55:18 57:14 60:16
60:17,20,25 61:22
61:24 63:3 70:5
77:19 79:21 92:2
92:17 93:19,20
94:17,20 122:19
128:19 131:21
141:8,11 162:5
163:9 164:8,12
186:5,12 187:5,9
189:10,19 198:4,5
199:8,15 207:9
209:6 210:16
235:19 240:22
251:22 254:3
262:4 264:24
274:3 277:24
279:9 290:18
296:11,13 298:24
300:5,11 301:15
312:21,25 313:14
322:16,25 326:8
326:15 330:17
332:9,12 334:24
339:12
**recalled** 211:21
**receipt** 66:6
**receive** 16:3,5 46:7
74:16 208:19,25
273:10 276:14
284:16 290:4
326:19
**received** 8:8 9:5
13:19 14:2 56:18
66:16 72:20 140:2
208:9 212:2 214:3
225:25 227:5
228:5 239:21,23
241:4 248:10
251:15 254:18
262:15 264:5
267:14 271:12
272:12,13,25
273:10,11 274:18

274:21 275:7,25
276:19 282:10
290:3 291:8
309:22 310:22
311:4 313:20,24
314:25 316:22
323:9,10,13,18
324:14 325:14
326:9,11,18 327:5
328:24
**receiver** 47:7
**receiving** 211:21
**recess** 7:4 53:18
81:11 102:10
125:22 166:5
261:6 296:20
339:24
**recipient** 214:12,13
214:15
**recipients** 210:15
262:11
**recognition** 92:24
192:24
**recognize** 124:13
124:13 233:9
**recognized** 102:23
155:17 156:2
**recollection** 60:13
61:19 62:4 122:9
122:10,17 133:21
186:15 286:13
311:2 313:17
**recommendations**
44:6
**recommended**
286:25 287:16
**reconvene** 125:23
**record** 5:11 6:23,24
7:2,6 10:25 20:21
34:9 53:17,20
64:2 81:14 100:24
102:7,9,12 107:12
109:4 125:21
126:5 134:13
138:23 159:7
166:3,8 200:7
253:16 261:4,9

276:13 284:7
286:6 296:19,22
339:23 340:2,11
341:10,12
**records** 64:5 275:7
**recruiting** 334:18
**red** 250:17
**reduce** 168:14,15
**reduced** 59:16
189:10
**refer** 13:18 31:14
33:11 37:4 81:17
81:17 82:15 86:8
86:14 87:20
104:21 105:23
106:23 107:2
108:13 113:20
120:4 150:2 152:7
190:17 300:7,10
301:3 305:13
310:10
**referee** 153:20
**refereed** 150:19
**reference** 17:8
19:10 24:10 28:6
31:19 46:2 58:8
86:7 106:10
108:22 135:3
151:5 156:13
258:20,23,24,24
259:11,13 260:15
274:23 277:2
305:23 344:22
345:5
**referenced** 16:21
279:23 302:3
313:23
**references** 30:18
30:23,25 58:7
287:23
**referred** 38:17
113:6 141:23
178:10 224:2
235:9 271:23
277:6,15 302:22
**referring** 18:7
30:16 38:19 39:2

82:19 84:20 86:12
86:18,22 87:9,15
89:20 91:13 109:7
109:19,25 113:4
131:15 132:3,3,25
140:16 154:6
160:9 163:16,24
178:16 193:14
204:24 224:24
257:18 265:2
266:10 272:16
277:13 278:4
286:8,10 287:4
295:10 301:7
302:16 318:4
330:17
**refers** 36:22 37:6
51:2 110:24
152:25 156:18
203:15 225:21
227:25 239:6
267:24 268:7
**reflect** 11:13 73:12
179:9 251:16
**reflected** 86:25
**reflects** 307:15
**refresh** 61:2 123:17
133:20 186:15
221:3 236:22
237:4 286:13
311:2
**refreshing** 236:23
**refuse** 315:14
**refused** 208:2
**refute** 43:5,12
**refuting** 43:9
**regard** 95:2 108:2
**regarded** 49:10
95:2
**regarding** 13:19
17:2 56:15 131:12
163:16 209:7
230:13 278:13
301:4 306:7
308:21 320:23
331:14
**regardless** 183:22

**regards** 261:12
340:7
**registered** 252:3
273:9
**Reinstein** 266:19
267:24 268:7,8,8
275:4
**reject** 238:25 239:8
**rejected** 109:13
156:5 187:14
198:2,14,16,18
**rejection** 156:4
**relate** 20:20 45:23
56:11
**related** 8:6 16:23
19:10 27:20 51:15
55:14,15 58:17
60:2 62:21 79:4
79:16 80:11 243:6
263:6,24 271:25
297:20 299:8
317:12
**relates** 47:15
223:15
**relating** 85:14
146:18
**relations** 277:18
**relationship** 107:18
111:15 158:3
159:14 281:8,10
288:25 290:9
303:17
**relatively** 60:2
**relevance** 50:25
140:6 202:25
269:19 288:19
334:16
**relevant** 22:5 54:11
56:12 58:6 81:4
83:5 84:8 100:9
162:8 182:20
193:18 292:22
293:18 309:3
329:20
**reliable** 21:8 44:5
46:4 131:11
219:13

**reliably** 325:13
**reliance** 99:11
**relied** 57:4 97:10
100:5,14,18
101:20,22 163:6,7
201:11 203:3
227:5 245:19
309:17 310:6
**relies** 99:3 104:16
137:14
**rely** 101:21 131:13
137:13 151:11
197:10,12 203:2
290:25 309:18
322:2 334:3 338:8
338:12,15 339:14
**relying** 201:16
**remainder** 30:22
**remaining** 247:21
**remember** 12:15
19:4,4 57:3 60:10
60:11 61:20 63:19
69:19 70:16 71:2
76:2,9 91:2,3
94:12,18 113:25
114:6 123:14,22
123:24 124:2,13
124:14,22 128:21
141:12 146:10,21
147:2,3 163:8,10
164:9 178:13
182:4,7 185:4,5
187:3 188:12
199:7 209:14
217:18 219:14,15
221:2,2 225:19
226:18,20,24
227:20,22 228:9
228:10,12 230:4
231:9,12,17
233:25 234:10,14
234:20,21,25
235:17 236:3,5,14
236:18,20 237:3,4
237:18 289:16
290:19 301:17
305:20 308:13

309:22 310:11
319:25 331:17
332:4
**remembered** 2:6
114:2
**remind** 116:17
202:12 235:6
**repeat** 101:4
134:10 204:8
207:13 236:10
242:3 290:14
291:19 299:24
323:11
**repeated** 270:3
**repeatedly** 276:15
**repeating** 236:13
255:19 337:23
339:13
**rephrase** 56:7
222:17 246:23
247:25 253:23
273:5 303:15
**replicate** 187:25
**report** 6:16,18 8:8
9:6,13 12:3 14:8
14:10,15,20 15:4
15:6,8,12,17,25
16:15,16,16 17:10
17:12,15,19,19,22
18:13 23:12 37:18
52:24 53:25,25
57:15 58:14 61:12
75:10,13 77:6,9
85:6,6 91:17
95:10 96:8 98:12
104:19,20 117:12
133:6 134:20
135:23 140:13
141:24 149:25
155:13,20,22
158:16 168:8,9
180:20 187:2
188:12 191:25
197:13 202:10,14
202:22 204:7
205:12 238:5
262:7 263:18

Itamar Simonson                                                    9/21/2011

264:16 271:24
277:6 296:24
297:3 299:18
300:2,11,12 302:3
308:18 310:13
320:9,12 321:10
343:8
**reported** 1:14
271:4 342:11
**reporter** 2:10 4:25
5:3 145:15 147:9
157:16 182:12,20
182:21 210:12
212:16 233:3
293:7,20 294:17
299:15 340:13
**REPORTER'S**
342:1
**reports** 17:24,25
18:7,9 21:4,7
40:15 41:11,17,24
42:21 58:12 73:5
73:11,13,23 74:6
74:14,15,17
237:16,22 238:12
239:12 264:7
265:13 293:4
319:9
**represent** 4:4 111:7
**representation**
108:16
**representatives**
219:8
**represented** 12:15
314:13 324:9,19
**representing** 74:5
189:15 263:9
**represents** 10:21
**reputation** 145:14
263:20 266:8,8,11
267:2 268:23
275:8 276:2,20
285:21 294:3,21
294:25 295:22
297:14,16 299:4
301:19 308:23
309:7 316:24

329:13
**reputational**
149:16
**request** 276:13
346:10
**requested** 200:15
**requesting** 213:11
**require** 84:17
120:25 159:20
333:12
**required** 97:2
199:6 284:19
294:3
**requires** 114:9
**reread** 99:19
**research** 18:8 23:9
27:8 32:4,8 34:17
42:25 43:3 58:2
60:4 81:25 85:2
87:18 88:2,5,7,9
88:10,21,24 89:2
89:2,12 96:10,17
96:21 97:3 98:22
139:18 141:17
142:23 143:22
172:3 261:16
328:13 344:17,23
345:3
**researched** 82:6
**researcher** 321:25
**researchers** 86:13
86:24 87:16
140:10
**respect** 35:13,14,16
39:18 56:12 79:12
83:11 85:24 90:10
131:13 146:19
164:16,20 171:25
174:15,25 184:9
194:6 201:19
251:2 261:25
280:14 291:24
292:4 298:20
**respond** 284:16
**respondent** 106:17
107:25 108:15,18
110:5,15 113:23

114:9,17 158:13
158:15 169:15
227:9 230:10
231:9,19,21
233:15,18,19
235:16,17 239:7
241:5 246:15
256:8 259:14
263:12 288:13
290:18
**respondents** 64:22
84:8 107:11
114:21,22 116:17
117:11,22 121:4
141:21 147:14
148:16 150:7
162:14 166:17
167:3,5,24 175:9
175:10 177:9
180:9 181:21,24
204:15,20 205:16
205:22 206:7,9
218:23 222:11
230:9,22 233:25
235:6 236:3
238:10 242:4
243:5 246:20,23
247:3,16 255:18
256:14 261:17
262:16 263:8
288:6,15 294:18
**respondent's** 127:3
148:13
**responding** 219:25
**response** 106:4,5,5
106:7,17 114:10
114:17 116:16
117:13 123:23
124:2 135:7,10
141:5 167:23
168:20,23 169:24
174:3,4,6 176:4
176:13 177:12,13
178:3 217:14
233:16,18,20
237:12,24 238:3,4
238:6,13,14,15,17

238:19 239:2,8,8
240:4 242:13
247:15,18 251:20
251:24 252:4
255:15 256:8,9,12
257:9,9 258:5
260:9,16 273:10
273:11
**responses** 83:25
96:13 110:18,19
117:22 136:12
144:25 153:8
175:3 176:15
284:18 309:17
337:25
**responsibility**
36:21
**responsible** 167:4
235:5
**rest** 136:3,5 137:7
233:4 234:17
**restaurants** 92:25
**result** 56:22 133:18
145:17 169:22
170:17 182:13,17
201:15 247:20
249:9 259:14
280:17 293:4,24
295:24 309:11
313:25 326:4
**resulting** 164:23
**results** 172:6 192:2
245:22 247:22
282:15 300:17
315:18 316:23
**resurgery** 270:3
**retain** 64:24
**retained** 7:15 72:14
97:18 191:17,21
197:9 199:21
200:8
**retention** 7:9,21
8:6,12 9:18
**return** 17:22
**reveal** 117:13
**revealed** 133:2
140:17 287:12

**revealing** 136:10
**reveals** 132:20
135:6 140:13,15
**reversal** 80:11
**reverse** 80:13,16
299:21 301:25
**reversed** 80:6,18
80:21
**reversing** 176:14
**review** 9:4 12:4,23
13:2,11,21 14:17
15:2,4,9,25 16:13
16:14,15 54:8
55:12 66:17 69:12
86:8 102:19
141:16 161:15
202:19 209:20
214:4 218:14,16
218:16 219:20
220:6 283:25
284:2,12 299:19
299:20,25 312:16
313:10
**reviewed** 9:15
12:21 14:12 16:25
17:5 54:2,4,22
55:11,21 56:3,8
66:22 67:2 89:14
90:7,19 132:14
160:16 188:24
202:17,21,25
209:13,19,24
217:25 218:2
219:11,14,16
220:8 280:12
281:6 284:4,5
285:8,12 299:17
300:5 312:13
313:6,13
**reviewer** 140:8
**reviewers** 150:19
**reviewing** 13:8
14:22 15:5,7
17:18 47:13 49:24
133:23 134:10
155:5 161:24
173:10 175:21

Itamar Simonson                                    9/21/2011

| | | | | |
|---|---|---|---|---|
| 186:14 203:13 | 228:22 229:2,10 | 115:22 120:13 | 117:25 128:7 | 275:22,24 277:20 |
| 204:12 214:8 | 229:11,13,15 | 121:2 133:17 | 133:9,10 134:20 | 287:21 291:5 |
| 215:10 216:11 | 238:18 241:3,20 | 140:17 306:12 | 140:19 143:14,23 | 298:12 302:13 |
| 225:11 286:15 | 243:2 253:3 | **ruled** 103:22 | 143:25 144:6 | 305:6,14 311:7,10 |
| 299:23 302:4 | 263:17 266:23 | **rules** 2:13 26:2 | 145:12 147:7,12 | 311:12,15 320:10 |
| 305:14 310:19 | 267:16,19,20 | 342:5 | 147:13 158:19 | 323:23 338:9 |
| 317:10 333:17 | 269:22 272:19,22 | **ruling** 103:17 | 161:20 162:9,13 | 340:6 |
| **reviews** 220:7 | 272:23 273:15 | **rulings** 212:18 | 168:2 171:17 | **scale** 147:17 |
| **revisit** 80:9 | 276:12,18 277:4 | **rumor** 40:7,12 43:6 | 173:18 181:25 | **scandal** 263:23 |
| **Ricardo** 50:4 344:9 | 277:12 283:7 | 43:9 45:12 52:19 | 182:18 183:7,14 | 282:4 285:7,24 |
| **Rick** 123:16 | 285:19 295:2 | 52:21 53:10 | 183:15 195:15 | 288:11,14,19 |
| **rid** 64:9 | 299:8 301:6 302:9 | **rumors** 40:2,3 | 196:3 217:25 | 289:16 290:17 |
| **ridiculous** 236:21 | 302:14,15 305:19 | 42:21 43:5 45:8 | 220:15,21,22,23 | 297:19 306:2 |
| **ridiculously** 227:20 | 308:25 309:12,14 | 52:15,16,17 | 227:24 230:15 | 308:7 312:2 |
| 234:15 | 310:12,20,24 | **run** 165:23 | 234:21 245:10 | 313:25 318:5 |
| **right** 12:5,25 13:4 | 311:16,25 316:14 | **Russia** 28:19,24 | 248:17 257:17 | 331:18,20 |
| 13:5,12 15:15,18 | 316:17 324:18 | 29:7,15 42:16 | 258:2,7,19 259:11 | **scandals** 119:17,19 |
| 15:23 17:7,9,11 | 326:5 327:20 | **Russian** 42:16 | 260:11,14 273:10 | 119:23 120:21,24 |
| 17:13,20,22 26:18 | 331:24 | **Rutgers** 44:20 | 273:11 287:12 | **scheme** 136:11 |
| 36:14 44:12 51:9 | **right-hand** 30:19 | **R-o-e-d-e-r-e-r** | 288:21 290:7 | **scholars** 34:3,4 |
| 64:25 65:20 66:4 | 33:6 | 194:11 | 292:19 297:8 | **school** 151:7 |
| 69:24 75:25 80:25 | **rings** 41:13 | | 298:13 303:6 | 268:20 276:16 |
| 83:16 91:22 | **rise** 282:25 | ——————— | 307:14 312:21 | 319:18 |
| 105:21 106:7,8 | **Road** 2:9 4:13 | **S** | 313:24 315:20 | **school's** 269:14 |
| 107:3 109:4,9 | **roasting** 184:3 | **s** 92:25 194:11 | 316:16,20 321:4 | 318:19 346:10 |
| 111:5,6,15,17 | **Robert** 3:3 4:17 | **Sachs** 335:19,25 | 325:5 326:23 | **Schroeder** 1:14 |
| 115:24 116:23 | **Robinson** 345:19 | 336:4 | 327:2 328:18 | 2:10 5:2 342:3,21 |
| 118:9,12,16,17,23 | **Roederer** 94:5 | **Safeguards** 51:21 | 333:17 | **Schuman** 88:15 |
| 118:25 119:5 | 95:22 185:25 | 343:22 | **says** 13:6,17 16:17 | 90:14 144:2 |
| 123:22 124:3,4 | 190:6,24 197:24 | **sake** 137:5 233:3 | 17:6,7,10,12 | 160:15,23 161:4 |
| 128:24 129:25 | 200:25 201:3 | **sale** 40:9 41:8 | 32:16 47:22 82:9 | 162:18 163:5,15 |
| 130:4 137:25 | 344:16 | **salesperson** 48:11 | 86:2,4,5 89:24 | 345:9 |
| 142:24 150:4 | **Roederer's** 194:10 | **salient** 248:25 | 90:3,11 115:22 | **Schwarzenegger** |
| 153:4 154:10 | **Roh's** 277:18 | 249:8 | 117:10 120:14,24 | 145:5,9,17,20 |
| 155:9 168:11,11 | **role** 30:11 199:18 | **sample** 262:2 | 140:14 142:9 | 146:5,8,20,22 |
| 170:12 172:7 | 200:12 252:7 | **Samurai** 41:23 | 145:18 147:16 | 147:6,15,19 148:5 |
| 173:21 174:11 | 265:11 282:21 | **San** 25:13 341:4 | 156:20 157:11,11 | 148:17,19 169:6 |
| 177:14 178:12 | 319:2 | **SAT** 338:20,23,25 | 157:18 159:24 | 169:16,21 170:16 |
| 179:18 180:14 | **room** 147:9,10 | **saw** 48:18 50:20 | 176:8,10 178:19 | 171:4 172:2,8 |
| 184:7,15 191:15 | 296:17 | 118:14 123:18 | 179:7 182:2,15 | 182:11,13,21 |
| 191:18 192:20 | **rotating** 180:11 | 124:5,11 125:4,12 | 187:20 188:13 | 184:5 229:16,17 |
| 194:24 196:19 | **routine** 313:17 | 125:12 128:6,18 | 200:24 206:23 | 229:24 231:18,24 |
| 197:3,15 206:14 | **routinely** 137:15 | 128:25 129:23 | 214:21,22 215:11 | 232:2,4,11,16 |
| 206:17,19,22,24 | **Rowe@mwe.com** | 130:23 146:23,25 | 225:20,21 241:11 | 292:12,20,21 |
| 209:14 210:10 | 3:6 | 237:22 | 242:25 248:2,8 | **Schwarzenegger's** |
| 211:2 212:22 | **RPR** 1:14 342:21 | **saying** 38:3 48:3,6 | 265:3,21 267:13 | 145:14 |
| 221:10,12 224:6 | **rule** 32:21 46:6 | 48:19 62:10 94:23 | 268:10,14 275:5,6 | **science** 102:24 |
| | | 112:7 117:16,21 | | |

scope 8:16
scores 338:20,25
screen 166:17
  167:4
screener 215:22,24
  215:25 216:6,17
screening 207:4,5
  216:11,13,16,19
  216:23 223:2
  224:13 250:2
se 123:10
second 8:15 10:18
  10:23,24 11:9,15
  11:20 13:23 15:21
  16:6,20 21:18
  32:6 39:16 80:9
  80:13 108:13
  124:10 140:12
  151:19 157:24
  176:11 190:17
  234:12 249:11
  265:25 268:6
  270:2 296:24
secondary 106:10
seconds 256:15
secretary 286:24
section 2:12 109:9
  133:25 134:3
  158:9 173:7
  193:11 342:4
security 294:22
  306:8,22 307:3
see 12:20,22 16:8
  16:12,15 26:12
  30:19 31:11 32:5
  33:4,5 38:19 39:5
  42:18 43:23 45:9
  45:12 46:2,25
  47:13,16,21 51:7
  51:11 59:11 65:19
  73:19 86:6 96:14
  102:13 104:15
  105:25 106:10,13
  108:22 110:13,17
  113:13 114:7,13
  117:24 118:20
  123:5 125:14

126:15 127:24
128:8 129:14
134:17,23,25
135:5 136:22
140:20 142:8
145:2 146:14
152:14 153:12
155:24 158:8
161:18 163:7
166:16,19 167:7
168:13 176:8
177:8 188:20
190:8,10,10
194:10,11,14,15
194:17,19 203:10
203:13 207:21
214:25 215:17
225:5,20 226:8
235:3 241:19
260:13 262:24
265:21 266:2,17
267:20 268:14
269:18 271:4
275:23 277:11
283:8 293:19
296:24 301:2
306:6 311:10,14
315:19 317:2,22
320:10 323:16
330:12 332:4
339:6
seeing 22:13
seek 56:17 251:6
252:16 273:17
seeking 272:17
273:9
Seeks 252:13
seen 40:6 43:21
44:23 49:5,8
54:25 103:8 118:3
118:9 119:9 129:7
130:14 225:16
228:7 229:7,10
233:6 281:25
299:10 315:19
segment 140:9
select 54:7,22 57:13

57:25 58:4
selection 202:5,24
345:13
self-evident 117:15
seller 47:8
selling 47:6 48:10
208:16
seminal 179:6
send 251:24 252:3
275:23 340:7
sending 66:14
209:13
sense 6:21 35:20
37:6 111:8 119:3
153:4 259:21
sensitive 36:23,25
sent 7:11 9:12
10:22 66:21 67:6
93:20 207:25
209:4 213:21
214:4 254:10
265:4,5 271:12
273:8 292:5
sentence 23:8
32:15 82:8,24
85:24 86:7,23
87:4,10 110:10,23
132:19,24 134:24
135:24 136:9
165:18 176:11
203:11 204:13
296:25 298:11
sentences 136:23
separate 21:20
165:3 180:7
185:14 201:6
261:16
separately 284:20
284:22 285:4
September 1:12
2:7 4:6 271:5
272:21 273:8
277:10 285:16
286:7 320:2
340:11 341:8
sequence 8:5
sequential 156:19

187:23 189:2
seriatim 174:25
258:6
series 28:9 130:12
174:8 255:17
256:15,25 257:3
278:5 280:8
serious 8:10 159:20
307:4
service 38:25 45:21
SESSION 126:2
set 2:17 22:14 69:7
86:7 114:16 121:3
127:16 165:3,5
167:4 310:5
321:22 342:17
345:24
settles 64:7
seven 94:25 112:15
325:17 339:19
sexual 290:8 293:8
sexually 292:17
shame 148:24
149:7
share 330:9
Shari 87:24 89:16
126:9,9 166:11
234:22 344:23
sharp 315:19,19
325:7 329:13
Shavitt 32:8
Sheen 183:24
sheer 327:5
shelf 88:6
Shimp 163:21,23
164:13
Shin 54:14 144:21
146:17 181:11,23
181:25 182:5
225:21,22,23
226:22 227:25
228:2,3,16,20
229:9 230:12
231:5 232:12,18
232:23,25 233:2
234:2,13 236:19
237:13,15,19

239:10,17,21,23
241:4 242:7
244:15 248:10
254:18 255:6,9
263:23 264:8
267:19 268:18
271:5 272:2,25
274:14 277:16,18
278:20 280:16,25
281:7 282:4,7,24
285:7,17,24 287:2
287:23 288:11,14
288:19 289:2,16
290:9,17 291:2,8
297:19 301:11,17
301:20 308:16
309:12 313:25
317:12,17 318:5
318:16 319:7,19
319:23 326:4,20
328:19 334:2,10
Shinsung 321:17
Shin's 230:12
265:22 268:15
269:12 270:4
271:6,9 282:9
286:22
shocked 318:17
shook 319:9
shore 93:2
short 165:23
296:16
Shorthand 2:10
shortly 8:4
show 6:10 7:8
27:18 30:14 31:21
31:25 35:3,23
38:10 43:13 46:9
46:11 48:22 49:21
51:19 66:10,11
73:17 91:9 93:7
94:13 95:15 96:5
105:4 108:10
112:25 121:22
122:18,20 130:12
141:22 146:12,12
150:24 155:3

Itamar Simonson

9/21/2011

| | | | | |
|---|---|---|---|---|
| 160:13 178:9 | **similarly** 10:17 | 112:25 113:1,3 | 238:1 239:1 240:1 | 152:6 212:22 |
| 185:24 192:15 | 56:2 | 114:1 115:1 116:1 | 241:1 242:1 243:1 | 213:17 230:11 |
| 196:21 198:15,17 | **Simon** 57:11,23 | 117:1 118:1 119:1 | 244:1 245:1 246:1 | 241:14 248:18 |
| 203:23,25 210:15 | 154:16 155:11,14 | 120:1 121:1 122:1 | 247:1 248:1 249:1 | 258:17 285:7 |
| 217:10 233:17 | 345:7 | 123:1 124:1 125:1 | 250:1 251:1 252:1 | 293:23 297:25 |
| 247:17 264:14 | **Simonson** 1:11 | 126:1,6 127:1 | 253:1 254:1 255:1 | 316:11 321:21 |
| 278:3 299:14 | 2:14 4:1,9 5:1,5 | 128:1 129:1 130:1 | 256:1 257:1,25 | 326:23 327:16 |
| 301:25 305:11 | 5:11 6:1,10,12,15 | 131:1 132:1 133:1 | 258:1 259:1 260:1 | **simultaneously** |
| 310:4 313:2,5 | 7:1,7,8,9 8:1,14 | 134:1 135:1 136:1 | 261:1,4,9,11 | 107:24 |
| 325:25 334:12 | 9:1 10:1 11:1 | 137:1 138:1 139:1 | 262:1 263:1 264:1 | **single** 39:11 86:15 |
| 339:3 | 12:1 13:1 14:1 | 140:1 141:1 142:1 | 265:1 266:1 267:1 | 96:9 111:20 |
| **showed** 25:6 94:22 | 15:1 16:1 17:1 | 143:1 144:1 145:1 | 268:1 269:1 270:1 | 115:24 131:21 |
| 122:16 200:19 | 18:1 19:1 20:1 | 146:1 147:1 148:1 | 270:20 271:1 | 135:7 241:5 295:4 |
| 247:16 | 21:1 22:1 23:1 | 149:1 150:1 151:1 | 272:1 273:1 274:1 | **singularly** 259:10 |
| **showing** 195:19 | 24:1 25:1 26:1 | 152:1 153:1 154:1 | 275:1 276:1 277:1 | **sir** 85:6 137:18 |
| 221:4,10 225:24 | 27:1,20 28:1,7 | 155:1 156:1 157:1 | 278:1 279:1 280:1 | 138:8 163:4 193:4 |
| 228:4 | 29:1 30:1,15 31:1 | 158:1 159:1 160:1 | 281:1 282:1 283:1 | 196:12 199:20 |
| **shown** 130:18 | 32:1 33:1 34:1 | 161:1 162:1 163:1 | 284:1 285:1 286:1 | 200:3,7 204:25 |
| 314:25 | 35:1,24 36:1 37:1 | 164:1 165:1 166:1 | 287:1 288:1 289:1 | 209:21 210:7,19 |
| **shows** 43:3 | 38:1,12 39:1 40:1 | 166:3,8 167:1 | 289:24 290:1 | 210:21 211:24 |
| **Shriver** 148:24 | 41:1 42:1 43:1 | 168:1 169:1 170:1 | 291:1 292:1 293:1 | 212:6,6,14 220:21 |
| **sic** 88:20 | 44:1 45:1 46:1,11 | 171:1 172:1 173:1 | 294:1 295:1 296:1 | 225:17 227:12,24 |
| **side** 33:6 41:25 | 47:1 48:1,23 49:1 | 174:1 175:1 176:1 | 297:1 298:1 299:1 | 252:15 259:24 |
| 157:10 199:13,22 | 49:21 50:1 51:1 | 177:1 178:1,9,12 | 299:14 300:1,18 | 273:22 314:11 |
| 199:23 200:9,10 | 52:1 53:1,21 54:1 | 178:19,20 179:1,2 | 301:1 302:1 303:1 | 328:22 |
| 209:11 290:17 | 55:1 56:1 57:1 | 179:15 180:1 | 304:1 305:1 306:1 | **sit** 55:19 60:15,19 |
| **sides** 189:18 199:16 | 58:1 59:1 60:1 | 181:1 182:1 183:1 | 307:1 308:1 309:1 | 60:25 85:4 258:2 |
| 200:14 | 61:1 62:1 63:1 | 184:1 185:1 186:1 | 310:1 311:1 312:1 | 295:4 303:21 |
| **sign** 315:8,15 | 64:1 65:1 66:1 | 186:22 187:1 | 313:1 314:1 315:1 | 321:20 |
| **signed** 315:22 | 67:1 68:1 69:1 | 188:1 189:1 190:1 | 315:24 316:1 | **sitting** 34:23,25 |
| 320:16 | 70:1 71:1 72:1 | 191:1,21 192:1 | 317:1 318:1 319:1 | 139:22 163:10 |
| **significance** 20:11 | 73:1,4,17 74:1,11 | 193:1 194:1 195:1 | 320:1 321:1 322:1 | 170:7 171:24 |
| 156:2 271:19,21 | 75:1 76:1 77:1 | 196:1 197:1 198:1 | 323:1 324:1 325:1 | **situation** 47:15 |
| 272:6 315:23 | 78:1 79:1 80:1 | 199:1 200:1 201:1 | 326:1 327:1 328:1 | 69:9 77:20 116:12 |
| **significant** 144:8 | 81:1,9,14,16 82:1 | 202:1,4 203:1,24 | 329:1 330:1 331:1 | 119:22 150:6 |
| 148:7 153:8 | 83:1 84:1 85:1 | 203:25 204:1 | 332:1 333:1 334:1 | 177:5 232:11,12 |
| 158:11 162:11 | 86:1 87:1 88:1 | 205:1 206:1 207:1 | 335:1 336:1 337:1 | 238:23 303:22 |
| 201:11 241:6 | 89:1 90:1 91:1,9 | 208:1 209:1 210:1 | 338:1 339:1 340:1 | 309:12 |
| 308:9 334:25 | 92:1 93:1,7,14,16 | 211:1 212:1 213:1 | 340:10 341:6,15 | **situations** 69:4 |
| **significantly** | 93:17,18 94:1,3 | 214:1 215:1 216:1 | 343:2,8,10,11,13 | 109:20 111:4,5 |
| 261:18 | 95:1 96:1 97:1 | 217:1 218:1 219:1 | **Simonson's** 43:14 | 123:11 |
| **Sik** 317:5 346:5 | 98:1 99:1 100:1 | 220:1 221:1 222:1 | 74:6 | **six** 35:9 112:15 |
| **similar** 186:23 | 101:1 102:1 103:1 | 223:1 224:1 225:1 | **simple** 147:4 | 252:25 |
| **similarities** 31:12 | 104:1 105:1,5 | 226:1 227:1 228:1 | **simply** 17:10 40:25 | **sixth** 43:16 45:2,3 |
| **similarity** 119:21 | 106:1 107:1 108:1 | 229:1 230:1 231:1 | 67:5 74:13 111:11 | 207:21 343:24 |
| 119:24 190:21 | 108:11 109:1 | 232:1 233:1 234:1 | 116:18 123:5 | **sizable** 160:21 |
| 194:17 | 110:1 111:1 112:1 | 235:1 236:1 237:1 | 125:14 148:3 | **size** 177:19 |

| | | | | |
|---|---|---|---|---|
| skip 76:12 77:6,6,9 | sought 67:17,19 | 54:12 109:25 | 253:8 296:7 | 36:19 44:4 53:24 |
| 77:20 270:19 | 187:17 272:21 | 110:24 176:24 | standards 81:18,19 | 58:15 60:20 78:20 |
| skipped 84:18 | 332:16 | 264:3 269:20 | 81:22,25 82:7,10 | 85:8 116:15 |
| 136:6,7,8 | sound 328:10 329:5 | 285:14 292:4,6 | 82:14,20 83:6,12 | 126:25 127:13 |
| Skipping 71:10 | sounds 177:14 | 295:9 312:25 | 83:14 84:18 85:3 | 131:9 149:7,16,19 |
| 72:3,7 | 239:6 | 316:25 | 85:7,8,12 86:2,3,6 | 149:24 159:16 |
| Skrowronski 50:19 | source 19:25 20:3,5 | specifics 103:15 | 86:7,9 87:4 | 162:17 167:22 |
| Skwrowronski | 20:8,11,18,23 | 139:8 201:7 304:4 | 163:17 | 177:16 179:5 |
| 51:12 | 21:2,4,14 31:8 | 309:22 | standing 160:2 | 188:15 204:13 |
| slanted 106:16 | 46:4 48:15,24 | speculate 325:9,13 | 243:22 244:5,13 | 221:20 281:10 |
| Sleekcraft 190:19 | 62:13 96:9 202:3 | 327:3 333:12,16 | 255:22 256:9 | 297:18 317:9,15 |
| slices 78:12 | 265:14 275:15,20 | 333:20 | 259:10,12 260:8 | 318:13 319:6 |
| slight 152:3 | 344:5 | speculated 333:23 | 260:14 267:10 | 341:3 |
| slightly 41:4 | sources 20:12,13 | speculation 327:5 | 269:2 | stated 286:23 |
| slogan 165:18 | 47:6 82:5,7 86:14 | 329:22 332:19,20 | Stanford 21:10,13 | 342:10 |
| slowly 231:3 | 86:25 153:23 | 332:21 | 22:12 191:22 | statement 17:4 |
| small 121:3 177:17 | 164:24 237:22 | spelled 194:10 | 251:5 252:12 | 44:16 85:25 89:23 |
| 322:2 335:20 | South 164:15 | spend 172:6 | 307:9,10 335:18 | 116:2,14,20 |
| 336:2,3,9,10,22 | 306:11 | spent 11:2,13,14 | Stanley 345:9 | 151:18 152:21 |
| 337:3 | so-called 38:16 | 12:6 | stapled 10:2 | 178:25 203:7 |
| Smith 143:12 | 56:22 62:15 | SPG 158:14 159:16 | star 292:18 | 222:7 227:15 |
| Snyder 163:22 | 173:24 208:24 | SPG's 158:11 | stars 328:18 | 229:3 253:23 |
| social 18:19,21 | 254:4 287:23 | Splenda 263:6,9,10 | start 4:8 97:9 | 266:3,5 268:14,22 |
| 19:7,12 24:10 | 300:8 304:17 | 263:14 | 108:25 109:6 | 282:8 284:8 |
| 36:20 49:12 151:4 | 306:2,14 317:2 | spokesman 275:24 | 118:8 120:3,5,8 | 287:13 305:16 |
| 162:10,16 345:4 | speak 26:10 172:14 | Spot 51:21 343:22 | 120:19 121:12 | 317:21 346:5,6,8 |
| societies 27:3 | 218:20 | Sprezzo 93:21 | 131:6 133:25 | 346:9 |
| society 37:9 | speaking 5:16 | Springer 3:13 4:21 | 145:23 162:12 | statements 56:15 |
| solely 156:6,8 | 146:15 185:22 | 4:21 8:2 95:19 | 185:7 206:3 207:2 | 89:18,21 204:18 |
| 283:12,20 | specializes 33:16 | 340:15 343:10,11 | 222:8 264:20,22 | 204:21 257:5 |
| Solomon 43:16 | specific 13:18 | 343:13 | 287:19 288:9 | 284:14 313:24 |
| 44:18 343:24 | 21:22 42:12 53:13 | spur 85:4 | 299:21 302:6 | 314:18,25 315:9 |
| someone's 63:24 | 60:16,25 61:21 | Squirt 156:13,15 | 332:10 | 315:15,22 318:6 |
| 236:24 266:8 | 62:3,4 66:15 69:9 | 156:21 157:2,20 | started 23:8 28:20 | 320:5,7,8,14 |
| 293:3,23 295:22 | 82:19 83:14 84:19 | 158:19,21 159:6 | 216:6 265:7 320:2 | states 1:1 32:11,11 |
| 295:23 | 86:8,14,25 98:7,8 | 159:10,12,16,24 | 333:3 | 50:23 85:6 102:18 |
| somewhat 234:4 | 98:25 100:3 | 160:8 | starting 4:16 81:23 | 106:15 108:14 |
| 303:4 | 109:23 122:23 | Squirt's 157:5 | 82:23 176:18 | 110:5 113:10 |
| soon 64:7 | 162:2 176:12,13 | ss 341:3 | 192:18 198:24 | 116:4 126:15 |
| sophisticated 79:25 | 177:2 217:21 | stacks 306:24 | 206:2 243:16 | 143:3,21 152:14 |
| sorry 7:3 9:24 | 222:22 223:3 | stamp 28:8 270:25 | starts 38:16 59:10 | 177:8 179:2 |
| 75:11 153:15 | 230:21 236:21 | stamped 268:4 | 132:19 134:24 | 191:21 205:8,14 |
| 171:23 193:25 | 237:4 243:17 | 277:11 | 193:10,20 194:25 | 226:2 228:6 271:4 |
| 231:15 263:22 | 270:15 313:16 | stand 256:3 | startup 337:3 | 306:11,12 317:5 |
| 304:22 307:13 | 326:12,14 339:12 | standard 42:16 | startups 336:3 | 318:11 319:4,17 |
| 320:6 | specifically 10:3 | 96:19 131:16,19 | state 2:11 5:11 | 321:18 |
| sort 69:7 265:15 | 24:24 42:22 52:19 | 132:3 192:23 | 31:23 32:3 33:24 | stating 276:18 |

Itamar Simonson                                    9/21/2011

status 305:17
stay 38:2 232:13
stem 27:7
step 159:17
stereotype 184:4
Stewart 97:19,24
  98:25 99:13
  100:12 101:2
  141:6,11 294:24
Stewart's 97:22
  103:18 134:9,15
  136:9 294:21
stimulate 68:2,9,9
  68:16 236:6
stimuli 67:24 68:14
  68:15,18 124:18
  124:19,25 125:3
  219:24 235:8,15
  235:22
stimulus 66:11
  68:19,20,20,23,24
stop 123:22 124:2
  138:19 157:14
  249:5 338:16
stopped 77:14
  194:24
stopping 143:8
stores 198:6
stories 304:15
story 283:2 304:7,8
  304:10
straight 259:6
straightened
  305:11
straightforward
  180:21 291:11
strange 250:15
strategies 59:20
strategy 58:19
  317:7
Strauss-Kahn
  293:24
Street 3:10,14
  51:20
strength 95:9
  194:10,13,13
strike 23:3 100:21

strikes 297:6
  306:23 307:3
  308:8 329:21
strong 35:25
  279:11 343:19
stronger 152:10
strongly 244:10
struck 282:14
structure 39:11
student 25:2 64:16
  64:18 222:2
  253:11 331:14
  336:23
students 22:10,17
  28:10,13 30:2
  42:9,20 81:25
  118:2,13 123:2,14
  124:11 125:4
  128:18,25 129:6
  129:23 130:23
  331:11 335:6,22
  335:24 336:7,11
  336:14,15,16
  337:2,7,12 338:3
studies 20:19 24:20
  42:8,13 59:8,23
  82:2 111:20,22
  121:22 150:15
  152:10 154:5
  163:2 244:9
  283:24 293:14
  326:19
study 25:6,10,23
  28:14 29:5,24
  42:10 64:17 83:4
  83:7,9,10 97:9
  143:11 149:13
  150:21 152:3,7,12
  153:5 162:9 165:8
  179:5 293:17
  307:24 344:24
subheading 126:16
subject 185:21
subjective 338:9,21
submitting 150:18
subpoenas 73:10
subsequent 143:11

143:12 174:2
subsequently 80:6
substance 8:18,22
substantial 201:18
  201:19,20
subtitle 134:2
subtract 38:24
  39:17
subtracting 41:16
success 28:18 29:22
  276:16
successful 36:20
  73:9
sudden 40:24
suddenly 236:20
  237:3
sued 293:7
suffer 305:18
suffered 8:10
  150:16
suffers 150:21
sufficient 125:5
  160:3 184:13
  194:3 196:21
sufficiently 315:7
sugar 263:15,15
suggest 51:12 84:5
  96:13 113:22
  123:24 149:21
  158:12 220:10
suggested 34:3
  107:17 168:21
  269:13
suggesting 113:21
  234:14 236:12
  315:10
suggestive 98:13
  100:16
suggests 106:5
  107:7 136:22
  150:7 169:17
  171:3 230:14
  234:8 238:18,22
suitable 127:8,10
  127:14,21 246:5
  246:24
summer 319:7,22

320:4
Sun 346:3,4
superficial 273:19
  274:11
Supervise 64:15
supervised 58:16
  59:5 63:7 64:11
supervision 64:24
  65:20
supervisor 262:2
supplement 284:18
  284:24
Supplemental
  345:23
supplementary
  309:23
support 132:20
  153:10 190:13
  282:2
supported 103:14
supportive 205:17
  205:22
suppose 146:3,3
  217:4 226:21
  229:23 263:11
  289:14
supposed 123:24
  169:18 225:18
  226:20,23 227:19
  227:21
supposedly 292:16
supposing 123:13
sure 5:17 6:24 9:8
  9:22 10:4 14:3
  19:22 24:17 38:18
  50:16 53:8 70:21
  71:3 75:22 76:3,6
  84:18 88:8 90:19
  92:13 113:17
  119:13 121:4
  129:18,19,22
  133:22 134:22
  140:18 145:5
  149:18 159:5
  161:2 170:7,9
  171:15 172:8
  174:13 175:7

180:12 181:10
  182:19 183:2
  192:17 204:9
  205:7 206:4 208:4
  227:14 232:15
  235:12 244:24
  253:7 266:12
  269:19 273:4
  283:19 286:14
  293:10 295:13
  296:2 313:5
  316:19 321:13
  323:12 329:11,17
  334:16
surfaced 268:19
surprised 117:20
  233:7
surrounding
  263:25 269:12
  282:5 297:21
  298:8
survey 7:19 9:4
  12:3,17 13:17,18
  13:19 54:13 60:4
  61:5,11,16,25
  62:7 63:25 64:14
  64:19,21,22,23,25
  65:7,14,16,24
  66:7,11,20 68:8
  69:13 70:6,7,15
  70:16,22,23,23,24
  71:2,3,4,4,6,7,8,8
  71:9,9,10,11,13
  71:12,13,14,15,16
  71:22 72:2,2,4,6,7
  72:7,8,9,9,10,11
  72:12 74:8 75:25
  76:3,12 77:25
  79:17,23 82:9,17
  83:3,5,25 84:3,5,9
  84:10,25 85:7,9
  86:3,11,18,20,21
  87:5 88:2,10,20
  89:13 91:17,17,21
  92:7,11,16,17,18
  92:19,22,23 94:22
  96:21,25 97:3

98:25 99:12
101:16,19 102:21
102:23 103:5,5,5
103:19,25 104:8
106:15 110:3
111:7,9 115:16,22
115:24 116:5
118:2 120:8,14
122:13,18,25
127:2 131:12,14
131:16,19,21
132:4 133:19
134:8,9,15,15
137:9 138:3,14,15
145:18 148:3,8
152:2 154:22
156:6,18 158:12
159:21,22,25
160:3 163:17
164:24 165:15
168:3 169:4 172:6
172:10 175:5
178:21 179:3,4,9
179:16,17,21
180:14 181:24
183:17 184:11,21
184:24 185:3,5,11
185:11 187:24,24
188:8,15,18 189:2
189:7,23 190:2,11
190:13,22,25
191:6,7,14,17
192:2,8 193:25
194:2,4,12 195:21
195:22,25 196:2
196:15,17,20,21
196:25 197:2,10
197:12,21 198:19
199:2,3,4,22
200:9,22 201:12
202:22 203:24
204:2,15,16,19
205:14 206:6,8,8
206:10,12,17
207:19 208:4,21
209:4 213:25
214:2,7,11,20,22

215:7,13,23 217:2
217:10 221:19
222:5,25 223:5,6
223:9 226:16
227:19 233:7,8
234:11,17,17
236:10,12 242:15
245:20 246:21
247:20,20 248:6
250:9 252:8
257:13 258:8,12
259:11,25 260:5
260:12,22 261:12
261:12 262:6,8,11
262:16,21 263:12
263:13 274:2
286:3 287:25
288:10,22,22
289:3,25 290:10
290:14,18 291:5
291:14 292:13,15
293:6 294:2,4,12
294:23 295:3,14
295:21,25 297:2,4
297:12,23 298:15
298:17 300:16
301:12,22 308:3
309:6 312:3,4
315:18 316:22
318:7 322:5,24
325:6 331:19
344:23 345:3,14
**surveying** 201:14
**surveys** 58:17
  59:12,15 60:4
  62:14 63:4,10,15
  64:11 65:4 66:10
  67:2 69:16 70:25
  71:5,11,15,17,17
  71:20,21,22,23,24
  71:25 72:12 73:6
  73:25 74:10,12
  78:4,20,24 79:24
  87:18 88:16 89:3
  92:4 98:10 100:11
  100:25 102:19,25
  105:13,16 111:23

115:11,13,14
116:3,9 122:2
137:22 139:12,16
144:13,14 150:9
156:4 164:18
167:18 172:5
173:19 177:9
184:20 191:23
194:21 195:20
202:6 203:8 237:8
242:17,22,23
257:13 259:22
261:15,18,19,20
261:22,25 295:7,9
295:11,15,18,19
297:24 345:9,13
**survey's** 158:12
**susceptible** 325:15
**suspect** 20:13
**Suspicion** 302:13
**suspicions** 251:22
**Suzuki** 41:23
**swear** 5:3
**sweeping** 115:4
**sweeteners** 263:11
**switch** 64:8 77:16
**sworn** 2:16 5:6
  342:7
**Sydney** 25:3
**syllabus** 28:4
**symbol** 128:23
**symbols** 31:25 32:2
**System** 107:9,15
  109:13
**S-h-a-r-i** 87:25
**S-i-k** 317:5
**S-q-u-i-r-t** 156:14

_____

**T**

**T** 341:1
**tab** 265:15,16
  266:16 271:2,18
  276:10 286:11
**Tabaco** 345:11
**tabbed** 269:11
  277:5,6
**tabs** 264:17,18,19

264:20,21 269:25
**tabulating** 136:12
**Tails** 139:19
  344:18
**take** 9:23 24:3
  35:13,21 36:4,7
  48:20 53:15 61:5
  72:14 81:6 88:9
  95:6 117:25 118:4
  120:9 125:16
  133:12 137:8
  145:8 165:23
  202:3,16 203:17
  207:5 213:5
  228:15 251:13
  258:3,17 271:3
  296:16 317:4
  339:16
**takeaways** 165:20
**taken** 4:14 7:4 29:2
  53:18 81:11
  102:10 125:22
  133:11 159:17
  166:5 227:16
  261:6 285:24
  296:20 339:24
  341:8 342:9
**taker** 206:7 234:11
**takers** 214:2
**takes** 29:21
**Tales** 98:23
**talk** 19:12 27:13
  30:25 42:4 81:24
  86:9 97:12 105:12
  105:24 124:9
  129:15 149:25
  153:18,20 163:9
  234:22 251:10,10
  252:14 270:16
  322:7 331:15,16
  334:20 336:6
  337:9
**talked** 31:7 37:23
  42:14 50:14 70:21
  183:18 185:18
  197:19 248:14
  274:4 283:5

313:18 314:14
**talking** 22:8 27:14
  29:12 40:23 47:22
  63:8 81:19 89:22
  108:25 109:3
  116:2,8 120:7,8
  122:12 126:7,8
  128:11 130:13,19
  130:21 132:15
  133:17,17 137:24
  138:6 153:15
  155:11 157:21,22
  158:10 168:8
  176:24,25 177:13
  177:14 180:2
  183:6,8 184:21
  192:18 225:6,8
  250:11 257:3,3
  282:25 326:11
**talks** 21:19 23:13
  23:20 36:17 43:24
  45:7 46:24 88:25
  96:8 103:7,17
  132:18 135:17
  138:18 152:25
  164:10 193:6
  196:7 197:21
  212:17 296:13,15
  308:6 321:16
**tape** 80:20 81:7,9
  81:13 165:22,24
  166:2,7 260:25
  261:3,8
**taped** 124:15
**tarnishment** 62:13
  62:15,24
**taught** 28:5,15
  81:21
**taxing** 183:9
**teach** 23:14,16
  27:21 33:18 42:3
  42:20 81:22,23
  139:12,16 153:14
  153:17 154:4
  279:13 336:25
  337:2
**teaches** 307:8

| | | | | |
|---|---|---|---|---|
| **teaching** 25:3 | 329:8,9,11,11 | 297:15,22 326:17 | 306:23 318:7 | 113:24 114:6 |
| 28:16 33:7 306:4 | 331:25 335:6 | 326:21 327:6,9,10 | 327:7 329:19,21 | 116:25 117:2,7 |
| **team** 33:15 | **telling** 135:10,11 | 327:11 337:20 | 331:12 333:13 | 118:24,25 122:15 |
| **tech** 336:22 | 135:14 137:2 | **tested** 165:17 219:4 | 337:24 | 124:23 125:2,17 |
| **techniques** 89:2,10 | 139:19,20 148:2 | 230:21 292:9 | **things** 18:20 23:10 | 128:9,23 129:18 |
| **telephone** 65:3,6,16 | 174:14 200:14 | 297:4,10 337:15 | 23:16,25 24:15 | 130:9,25 131:8 |
| 66:7 68:8 177:9 | 234:9 245:6 | **testified** 5:6 92:3 | 26:4 37:11 39:17 | 135:15,20 141:11 |
| 261:15 | 259:24 274:18 | 186:22 219:7 | 39:20 52:13 64:10 | 143:8,10 148:17 |
| **television** 40:18 | 283:21 334:13 | 283:15 301:16 | 89:9 90:2,19 | 148:21,23,25 |
| 129:2 | **tells** 104:17 162:21 | 312:17 314:7 | 105:12 118:7 | 149:15 151:13,14 |
| **tell** 10:2,20 11:25 | 225:18 226:19 | 323:2 330:12 | 120:12 136:8 | 151:25 152:22,24 |
| 18:4,14 23:23,24 | 227:19,21 273:18 | 333:18 334:4,5,14 | 137:24 140:8 | 153:25 154:7,23 |
| 24:23 26:19 28:2 | 286:16 333:14 | 338:20 | 159:4 160:20,23 | 154:24 158:5 |
| 28:12 33:11 34:13 | **ten** 33:6 94:24 | **testify** 77:2 314:6 | 161:3 163:12,13 | 161:8,13,24 162:7 |
| 35:7 37:21 49:19 | 177:13 190:16,20 | 342:7 | 169:16 174:15 | 162:8 163:18,18 |
| 52:6 59:4 63:20 | 207:6 | **testifying** 281:21 | 187:19 209:3 | 163:20 164:7 |
| 68:12 70:13 72:19 | **tend** 46:7 67:13 | 308:14 | 210:9 234:10 | 165:22 166:23 |
| 75:2,4 85:4,11 | 90:17 126:17 | **testimony** 55:21 | 263:14 267:9 | 168:17,17 170:3,5 |
| 86:17,22 96:15 | **tendency** 41:24 | 85:18 124:23 | 268:25 270:17 | 171:4 172:17,20 |
| 99:8 101:8 113:22 | **tends** 44:5 50:25 | 199:22 200:10 | 282:23 291:4,16 | 172:22,24,25 |
| 114:19 118:13,14 | **ten-minute** 165:23 | 244:24 259:25 | 294:25 306:11 | 175:22 177:14,23 |
| 123:14 124:16,17 | **Terence** 163:21 | 280:21 283:25 | 315:21 326:14 | 180:8,20 182:21 |
| 124:19 129:6 | **term** 19:25 34:21 | 312:14,16 313:7 | **think** 12:16 16:13 | 183:20 184:8,13 |
| 145:21 148:16,16 | 34:22 68:18 74:21 | 321:7,10 326:2 | 19:3,3,7 20:12 | 185:12,15 187:4,6 |
| 148:19 153:9 | 86:18 129:20 | 333:17 334:11 | 22:10 24:24 26:10 | 187:13,18 189:12 |
| 161:19 163:4 | 130:10 135:14 | 338:2,5,24 339:4 | 29:9,14 32:3 37:8 | 189:18,19 190:16 |
| 170:8,21 173:21 | 151:14 152:22 | 341:7 342:10 | 39:13,23 40:25 | 194:6 198:5,11,22 |
| 184:18,25 186:25 | 165:11 197:11 | **testing** 137:10 | 44:9,11,19 46:2,3 | 199:6,8,11 200:2 |
| 197:23 198:18 | 219:21 258:14,15 | 138:2 245:12 | 47:11,11,18 48:13 | 201:17,24 203:3 |
| 201:2 204:19,24 | 278:2 | **tests** 162:2 | 48:20 49:5,5 | 207:4 213:12,13 |
| 206:5 208:12 | **Terminator** 146:6 | **textbook** 44:24 | 50:20 53:13 57:10 | 213:14,16,19 |
| 224:19 226:11 | **terms** 22:25 29:2 | 85:2 88:5,10 | 58:13 59:23 60:24 | 215:22 217:7 |
| 229:18 233:19,21 | 41:15 59:23 67:13 | 89:12 | 61:4,20 63:12 | 218:10 220:21 |
| 234:18 247:22 | 161:9 165:10 | **Thank** 78:17 83:22 | 65:8 70:25 71:5 | 221:12 222:3,21 |
| 249:12,15 253:20 | 189:22 201:8 | 340:15 | 71:18,23,25 73:16 | 224:2 233:12 |
| 254:9,12,24 255:7 | 208:22 323:5 | **theaters** 124:15 | 75:9,22 76:6 | 235:20 237:6 |
| 255:12 256:11 | 328:3 333:6 335:3 | **themes** 135:8 | 79:14,15,17,23 | 238:18 239:9,18 |
| 257:9 264:15 | 338:25 | **thereof** 314:6 | 80:2,8,15 82:24 | 240:8,22,25 |
| 278:6 279:15 | **Terry** 163:23 | **thing** 26:5 45:14 | 85:3,23 86:8,15 | 243:11,13,13,14 |
| 282:13,21 288:15 | 164:13 | 77:21 148:11 | 87:12,25 88:8,14 | 243:20 244:11,12 |
| 289:21 291:6 | **test** 84:9,12 85:13 | 152:6 171:2 | 88:17,19 90:7 | 244:19 245:25 |
| 294:16,17,18 | 96:18,21,23 97:8 | 209:16 213:24 | 92:6,10,13,15,18 | 246:3 248:9 |
| 295:16 297:5 | 121:23 122:17 | 215:18 240:24 | 92:23 93:17 94:11 | 249:16,25 251:14 |
| 300:6 303:6,8,22 | 129:4 139:8 | 245:12 251:23 | 94:19,23,25 95:3 | 252:2,8 253:19 |
| 304:21 305:12 | 165:16 210:2 | 272:8 276:8 280:7 | 107:13 109:10,17 | 254:16,23 255:3 |
| 310:15 314:24 | 246:23 262:21 | 282:13 289:15 | 110:10,23 111:6 | 255:17 256:5 |
| 318:5,23 328:11 | 264:2,3 266:13 | 293:20 295:4 | 111:20 112:6 | 257:14 259:24 |

261:22 262:7
263:13 265:10,23
266:3,7,25 268:10
268:22 269:6
270:6,7 271:18
272:16 274:3,8
275:5,7,10,25
276:6 279:7,22
280:11,20 282:17
285:2 289:6,17
290:12 291:6,16
292:14,21 293:18
294:8,13,14,18
295:6 296:15
300:12,24 303:11
304:21 305:3
308:7,16,17 314:9
318:21 319:15
322:23 325:11,12
325:19 326:21
328:15 331:4
334:25 335:3,18
335:21 336:7,10
336:17,21 338:10
338:14
**thinking** 22:9
288:6 325:15
333:24
**thinks** 104:7
108:18
**third** 10:23,24
11:21 43:23 110:4
110:10,10 116:16
152:17 158:11
**thought** 8:9 48:18
50:14 57:18 58:6
63:19 92:19
103:25 117:4,5,8
117:23 141:7
143:16,24 145:16
147:22 160:4,6
162:15 171:8
172:11,16 179:25
181:4 185:18
187:4 188:11
200:17 202:23
225:5 241:18

243:11 245:3
253:17 259:15
265:7 274:17
279:17 312:5,11
326:9 333:23
**thoughts** 239:24
**thousand** 58:16
59:3 67:11
**thousands** 86:13,20
87:13,16,18 119:2
119:2 129:11,11
**threats** 132:21
**three** 7:8 10:14
57:10,14,16,20,22
63:18,20,20,21
71:17,21 76:8,9
112:14 127:20
140:4 173:4,11
209:14 219:14
220:8,24 227:5
239:24,24 302:3
**threshold** 92:20
**thrown** 222:5
**thumb** 265:15
**Thursday** 81:23
**till** 13:10
**time** 4:6 6:2 7:2,6
12:16,20 15:6
24:6 41:14 45:4
49:9 53:17,20
54:12 64:4 67:2,8
81:10,15 89:9
93:18 102:9,12
125:17,21 126:3,5
141:13 142:9,18
142:25 143:3,4,25
150:11 153:24
163:20 164:5
166:4,9 168:10
172:2,6,25 178:12
214:15,24 217:15
218:24 233:24
237:7 261:5,10
270:19 271:16
290:13 293:25
296:19,22 309:5
312:3 318:17

320:9,12,22
339:23 340:2,12
342:9 345:18
**times** 20:25 44:14
58:13 65:5 77:4
85:19 92:4 112:6
112:15 153:19
198:23 201:5
221:13 231:14
243:12 259:16
260:18,21 276:7
**tiny** 153:4
**tires** 41:12
**title** 98:21 130:7
**TLM** 4:12
**toaster** 127:21,22
127:22
**Toby** 4:4 5:2
**today** 4:25 46:20
55:19 60:8,15,19
60:22 80:2 152:23
258:2 284:8
293:16 303:21
321:20
**Today's** 4:5
**told** 17:15 48:13,17
112:20 123:21,25
144:12 171:7
215:3 226:23
234:12 235:14
236:15,18 237:2
240:23 244:3
255:4 290:18
314:9
**tomorrow** 247:11
**tools** 143:22
**toothbrushes**
115:18
**toothpaste** 115:18
**top** 11:21 51:21
110:9 203:10
266:23 334:20,21
335:4 336:8
343:22
**topic** 23:7 42:23
43:2,4 168:13
176:8,13 297:17

**topics** 42:10 59:19
59:24 60:4
**total** 70:2 311:7,15
**totality** 55:21
**to-be** 293:13
**trade** 95:11 192:21
203:8
**trademark** 58:18
59:20 62:16,20,22
74:23 75:3,18,19
105:10,20 157:3
184:16 189:22,25
190:2,14,14,15
191:11 194:3
195:5 200:21,25
202:6 203:8
345:13
**trademarks** 58:8
60:3 76:23 104:22
105:7,13 190:6
194:11,13 344:19
344:21
**traditional** 34:15
**traditions** 34:2
**trained** 30:6
**transcribed** 342:11
**transcript** 14:2
341:7,9 346:3,4
346:12,13
**translated** 303:10
**translation** 302:7
303:4
**translator** 303:5
**transmitted** 44:3
**treatise** 105:9,19
**tremendous** 28:18
**trend** 143:13
**trial** 146:17 196:6
264:5,7 280:10
298:10,18,25
308:8,10,11 320:4
**trials** 298:19
**tried** 77:15 150:12
270:5 272:14
278:19,23 281:15
308:17
**tries** 114:5

**triggers** 125:13
**trouble** 46:3 66:13
104:16 306:19
307:9
**true** 79:8 90:10,13
103:2 116:14
133:16 142:18
158:7 162:19
177:15 256:23
278:23 279:4
307:18 341:9,12
**Trumbull** 3:14
**trust** 21:9 48:11,21
90:17 112:12,21
315:14
**trusted** 19:25 20:3
20:5,9,11,12,15
20:17,23 21:2,4
21:14 265:14
275:15,20
**trusting** 315:7
**trustworthy** 44:5
**truth** 254:24 255:4
255:7,12 291:7
342:7,7,8
**try** 29:10,24 43:11
84:6 85:4 123:22
150:11 213:8
233:24 259:6,17
261:20 262:21,23
289:7 311:2
**trying** 8:12 12:15
26:23 32:14 43:5
68:3 76:2 83:10
85:11 126:24
127:10,19 139:12
144:18 159:16
161:4 171:19
208:13 210:7,9
211:6 213:10
220:23 227:24
231:7 232:5
237:18 241:10
243:25 257:6,24
258:25 259:17
269:5 280:22
282:14 284:17

Itamar Simonson

9/21/2011

| | | | | |
|---|---|---|---|---|
| 289:12 318:3 | 175:23 180:21 | 287:11 288:20,21 | 4:24 9:3 21:11,13 | 23     205:18,23 |
| 321:13 338:8 | 336:17 | 289:11 290:7 | 21:16 25:3,13 | 251:5 275:6 |
| **turn** 23:12 31:4 | **typically** 29:23 | 293:10,25 295:14 | 35:8 53:6,12 55:2 | 276:12 299:4 |
| 41:17,25 45:11 | 79:5 174:25 | 303:15 326:8 | 114:3 119:18,19 | 309:7 345:23,24 |
| 46:23 50:18 51:11 | 177:17 184:16 | 335:15 338:19 | 119:23 120:22 | **unknown** 29:21 |
| 54:3 90:21 126:13 | 261:15,24 | **understanding** | 164:15 180:8 | **unrelated** 282:4,8 |
| 142:4 143:20 | **typos** 141:3 | 5:19 49:16 55:8 | 181:12,13,15 | 290:24 |
| 166:12,24 175:18 | | 97:14,24 103:23 | 182:2 184:10 | **unreliable** 194:5 |
| 176:6 177:6 | _____ | 104:17 206:6 | 206:12,18,21 | 291:22 |
| 263:17 296:23 | **U** | 231:16 253:24 | 222:3,12,15,19,20 | **unusual** 298:23 |
| **turned** 144:8 | **ultimately** 103:21 | 264:25 280:16 | 222:23 223:3,16 | 313:21 |
| 245:20 254:11 | **unable** 201:2 | 282:6 295:8 | 225:22,23 226:2 | **upfront** 245:19 |
| **turning** 32:5 168:5 | **unaided** 120:3 | 313:17 322:20 | 227:17 228:2,3,5 | **upset** 103:24 |
| **turns** 144:7 | 203:19 | 323:17 326:6 | 228:17,21 232:24 | **urinating** 40:8 |
| **TV** 48:12 68:19 | **unaware** 230:9,10 | **understood** 132:14 | 233:2 239:19,20 | **USA** 93:10 344:13 |
| 128:19,22 131:12 | **uncommon** 298:9 | 132:17 158:18,21 | 239:22 240:25 | **use** 13:14 42:7,8 |
| 131:17 237:16,23 | **undergraduate** | 158:22 160:8 | 242:9 248:3,9,10 | 68:18 69:4 83:14 |
| **twice** 112:13 | 274:10 337:10 | 161:20 208:22 | 248:12 249:2,19 | 114:12,15 115:11 |
| **two** 8:13 9:10 10:6 | **underlied** 289:22 | 217:16 244:24 | 249:25 250:10 | 116:3 119:3 121:6 |
| 11:5 13:23 23:24 | **underneath** 266:19 | 247:17 | 251:15 252:17 | 126:23 129:17,20 |
| 24:24 26:8 28:25 | **underscore** 72:13 | **unethical** 319:19 | 253:12,15 254:5 | 130:10,11 132:15 |
| 41:4 51:10 57:22 | **understand** 9:15 | **unfair** 77:18 105:7 | 254:17,19,23,24 | 135:14 144:13 |
| 71:5,18,19 72:4 | 10:4,7,11 12:22 | 105:10,14,20 | 254:25 255:4,5,6 | 152:22 165:2 |
| 78:4 104:25 | 28:7 48:2 53:8 | 190:6 | 255:8,9 263:25 | 167:15 183:13 |
| 107:23,25 111:15 | 66:24 67:4 68:3,7 | **unfairly** 77:15 | 266:20,21 267:13 | 203:9,17 222:25 |
| 112:14 157:2 | 74:2,5 76:23 96:6 | **Unfortunately** | 267:14,25 271:20 | 227:11 235:15 |
| 158:4 159:15 | 99:8,9 105:20 | 339:7 | 272:4,9,19 274:8 | 261:18 278:2 |
| 167:18,19 173:23 | 117:24 124:16 | **unique** 98:11 100:5 | 274:10,22 275:5 | 296:17 |
| 175:12,22 177:15 | 129:22 139:14 | 100:17 108:24 | 275:22,24 276:14 | **useful** 124:25 125:3 |
| 198:6 206:5 | 142:16 145:2 | 111:18 | 277:25 278:22 | **usefulness** 127:11 |
| 209:13 224:25 | 160:22 161:2,3 | **unit** 323:24 324:2 | 279:7,10 280:6,14 | **usually** 11:17 26:3 |
| 229:22 239:22 | 171:6,15,19 174:8 | **United** 1:1 32:10 | 281:8,16 282:6 | 29:10 65:5 84:17 |
| 240:19 242:13 | 174:14 175:25 | 32:11 226:2 228:6 | 286:8 289:10,19 | 216:20 |
| 246:15,19 247:6,9 | 179:20 183:12 | 306:11,12 | 289:22 290:3,21 | **U.C** 35:11 38:21 |
| 247:18 248:4 | 188:7 212:24,25 | **universally** 137:11 | 291:2,6,7,9,10,14 | **U.S** 4:10 25:12,20 |
| 249:3,7,13 274:18 | 217:22 222:9 | **universe** 102:21 | 292:8 297:21 | 26:3 28:21,23 |
| 274:22 313:21 | 223:21 226:10 | 116:9 201:15 | 298:8,9 301:11 | 29:4,7,16,21 |
| 316:23 326:18 | 227:24 231:6,7,18 | **universities** 22:9 | 302:11,13,17,21 | 32:23 42:17 |
| 329:24 | 232:5,7 233:10 | 22:11,13,16 52:2 | 303:12,13,18,23 | 250:14 261:25 |
| **two-page** 305:22 | 235:12 241:10,16 | 52:4 120:24 | 304:4 305:15 | 293:17 298:24 |
| **type** 73:23 126:23 | 243:20,25 251:4 | 180:10,23 181:5,7 | 307:7,9,16,21 | |
| 174:18,21 179:3 | 253:21 258:13 | 231:2 250:15 | 309:8 315:8 316:4 | _____ |
| 183:18 185:18 | 259:25 260:6 | 252:13 253:20 | 316:25 319:6,8 | **V** |
| 270:13 | 264:23 269:19 | 298:20,25 324:11 | 322:8,10 325:13 | **v** 344:11,16 345:7 |
| **types** 23:24 74:19 | 273:4,6,7,14 | 324:12 328:13 | 328:16 329:13 | 345:11 |
| 105:16 115:14 | 274:13 278:18,19 | **university** 1:4,7 | 335:18 345:14 | **vague** 122:10 |
| 161:14 173:19,19 | 280:15 282:14 | 4:10,10,18,20,22 | **university's** 52:20 | **vaguely** 42:2 43:4 |
| | 283:17 284:5,23 | | | 43:10 94:17 |

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

(212) 244.3990
(800) 246.4950

169:14 226:22
326:14
valid 103:5 198:20
validate 261:21
validated 261:15
validation 84:17
  85:15 261:13,18
  262:2,6
validity 132:21
value 38:24 126:18
values 51:3,9,14
  177:18
variants 159:5
varies 177:25
various 9:4 24:15
  32:2 39:8 52:10
  56:12 73:10 88:25
  89:2 199:4 200:20
  274:3,7 283:3
  308:6
vary 53:11
vast 337:2
Veiga 50:4 344:9
verbatim 135:7
verification 252:13
  252:16 272:17
  273:9 276:13
  290:4 346:8
verified 241:14
  281:2 282:9,9
verify 239:21,22
  241:4,12 248:10
  251:6 252:10
  253:3 254:17,25
  255:5,8 268:15,21
  271:6,9 272:3,14
  274:9 291:8
verifying 269:5
Verizon 165:9,9
version 303:10
versions 175:8
versus 19:11 34:2
  139:18 142:8
  257:8 343:14,17
  344:17
viable 143:22
videographer 3:18

4:2,3,25 5:8 6:20
  6:22,25 7:3,5
  53:16,19 81:8,12
  102:8,11 125:20
  126:4 145:16
  147:9 165:25
  166:6 261:2
  296:18,21 339:22
  339:25 340:9
videotaped 4:9
  81:13 166:2,7
  261:3,8 340:10
view 22:16 29:6
  31:15 34:14,19
  36:18 52:4 56:4
  69:2 79:10 89:5
  96:20 104:11
  107:16 108:14
  113:15 115:2
  129:5 145:13,20
  147:6 148:5
  159:19 172:13
  182:13,16 183:13
  201:21 217:20
  224:13 245:7
  248:2,11,12,19
  254:6,19 260:4
  270:7,12 271:19
  278:12 279:20
  280:24 283:22
  285:20 287:17,22
  291:10,15 292:12
  293:4,5,23 294:3
  294:21,23 295:23
  299:2 307:8
  317:16 321:20
  327:17 328:8,24
  339:9
views 38:22 84:7
violated 306:22
violates 259:21
violating 294:22
  306:25
virtually 37:13
virtue 132:11
vision 317:7
visually 68:21

vodka 28:18,19,23
  29:15,20 42:14
Voltage 92:9
volume 88:23
volunteering
  138:21 213:8
vs 1:6 4:10 91:13
  92:9,15 93:9 94:5
  98:22 102:20
  107:3 344:13
V-e-i-g-a 50:4
_____
            W
W 341:1
wait 208:25 212:16
  266:22 269:15
waiting 146:11
walk 286:6
Wall 51:20
Walter 344:6
want 8:14,22 10:16
  11:24 20:4 23:23
  24:6 26:16 30:2
  37:19 46:22 50:16
  65:23 70:10 74:5
  75:3,6 83:13,21
  85:20 87:3,20
  96:6 101:4 113:22
  113:24 117:25
  121:23 124:10
  128:17,25 129:3,3
  129:21,23 145:12
  145:15 147:4,7,22
  147:24 148:4
  149:14 151:17
  161:21 171:7
  173:8 174:13
  183:8,12,19
  189:14 205:20
  211:24 212:9,20
  212:20,23 213:6
  220:25 221:3
  224:15 227:8
  232:3 242:3,15
  271:11 277:4,5
  284:16 289:5
  290:22,22 293:3

295:25 321:20
  333:12 334:11
  339:3
wanted 26:12 54:8
  54:13 65:24 94:15
  128:11
wanting 172:10
wants 74:17 288:23
  290:4 291:14
War 123:17
warning 76:16
wasn't 70:19
  136:14 140:16
  141:5 188:23
  190:12 334:9
  338:3
watch 130:4 325:16
watched 184:3
water 245:13
  246:13
way 11:4 13:9
  17:24 26:4 33:6,8
  36:4 44:18 47:24
  58:23 59:8 70:12
  73:15 79:8 84:12
  91:21,24 98:7
  99:24 106:19
  107:16 111:11,24
  114:18 119:6
  121:9,10 122:5
  128:3 139:16
  147:11 149:2
  157:9,10 166:23
  169:17,21 176:2,4
  176:5 180:9
  184:15 217:12
  226:6 231:21
  245:9 255:25,25
  256:22 258:5
  259:7,8,9 260:2
  261:16 275:21
  287:25 292:2
  304:9 319:19,21
  320:25 321:9
  322:13 331:14
  342:14
ways 21:22,23 38:2

39:11 114:13
  117:16 157:6
  173:4,11,16 331:5
weak 29:18
Wednesday 1:12
  2:6
weed 224:4
week 153:19 172:9
weeks 24:3
weight 46:7 110:20
weights 24:11
Weiner 3:3 4:17,17
  4:23 5:10 6:15,24
  7:7,15 8:18 9:5
  10:4,11,15,17
  27:23 28:2 30:14
  34:13 35:3 36:4
  36:25 37:5 38:15
  43:19 45:20 46:9
  46:16 49:4,25
  51:25 53:15,21
  56:7 68:7,12
  72:17,19,23 73:3
  73:22 74:9,12
  75:8,12 79:13
  80:19 81:6,16
  82:8 85:20 87:13
  89:22 90:4 91:12
  93:15 95:15,22
  96:5,16 99:22
  100:21 101:5,7,15
  102:7,17 104:6,14
  104:20,25 105:4
  106:22 108:6,10
  109:9 110:4,9,13
  110:15 111:22
  112:18,25 122:17
  122:25 125:2,16
  126:6 131:3 132:8
  134:12,22 137:18
  138:2,21 139:2,14
  142:4 143:20
  149:14 150:23
  151:3 154:12
  155:3,22,25
  157:18,25 160:10
  160:13,22 161:12

Itamar Simonson                                                                9/21/2011

| | | | | |
|---|---|---|---|---|
| 161:23 162:12 | 275:19 276:4,10 | **went** 66:13 76:4 | 59:13 68:5 75:11 | 276:6,22 277:24 |
| 165:22 166:10 | 276:25 278:3,10 | 97:25 193:2 290:6 | 79:12 80:18 81:21 | 278:15 279:2 |
| 170:5 171:6,17 | 278:17 279:4,22 | 290:6 325:2 | 87:12 90:2 93:13 | 280:19 281:4,15 |
| 172:9,19 175:24 | 280:22 281:10,17 | 326:24 328:11 | 95:14 97:16 99:20 | 281:25 282:12 |
| 178:5,9 179:14 | 281:23 282:3 | 329:4 330:14,16 | 101:4,14 102:13 | 283:16 285:11,23 |
| 180:3,13,24 181:3 | 283:7,15,18,24 | 332:5,5 | 104:4 109:17 | 287:10 288:4 |
| 184:25 185:7,10 | 284:4,19,23 285:5 | **weren't** 298:13 | 111:17 122:19 | 289:6 290:12 |
| 186:11,20 188:7 | 285:13 286:5 | **Western** 27:3 | 124:22 130:25 | 291:19 293:10 |
| 188:14,18,22 | 287:11 288:5,20 | 31:23,23 32:22,23 | 134:17 137:13,21 | 294:8 298:6,17 |
| 192:15 194:24 | 289:8 292:11 | 34:2,6,10,20 | 138:20,25 143:19 | 299:7,10 301:15 |
| 195:9,18 196:9 | 294:9 296:16,23 | 37:16 | 149:12 155:24 | 302:25 303:8 |
| 197:6,16,20 198:4 | 298:11 299:2,9,14 | **we'll** 8:11 66:19 | 160:6,19 161:8,24 | 304:2 305:2,6,9 |
| 199:12,20 200:3 | 300:10,21 301:25 | 67:23 70:19 86:10 | 170:3,20 171:15 | 306:21 307:12,23 |
| 200:24 201:19 | 303:3,14,21 304:6 | 95:23 124:9,10 | 171:24 172:16 | 308:5,15,16,25 |
| 202:2,9,14 203:23 | 304:25 305:3,5,7 | 260:25 284:20 | 175:21 179:12,25 | 309:14 310:19 |
| 204:6 209:3,23 | 305:10 307:5,18 | **we're** 80:19 81:14 | 180:6,19,25 185:3 | 311:23 312:2,10 |
| 210:14,25 211:8 | 308:2,10 309:9,15 | 95:5 111:24 120:7 | 188:6,11,20 189:9 | 312:25 314:5 |
| 211:12,16 212:9 | 310:4,18,20 311:5 | 120:8 130:19 | 192:10 195:15 | 315:5,13 316:16 |
| 212:18 213:6,16 | 311:25 312:7,13 | 162:5,23 166:3,8 | 197:5,15 198:22 | 317:20 318:23 |
| 214:17,20 216:9 | 313:5 314:24 | 168:9 171:24 | 199:15 200:2,12 | 319:15,25 320:25 |
| 218:22 220:5,14 | 315:10,24 316:9 | 206:3 213:6,7 | 201:6,24 202:12 | 321:25 322:23 |
| 221:7,19 223:19 | 316:17 317:25 | 238:23 240:23 | 204:5 208:16 | 323:20 324:6 |
| 223:24 224:10 | 319:3,16 320:3 | 261:4 284:7,19 | 210:13,23,24 | 325:5 327:2 |
| 225:3,7,10,12 | 321:6,12,16 322:7 | 325:16 339:19,20 | 211:6 213:8,10 | 328:10 329:18 |
| 226:10 228:18 | 323:3,21,25 324:4 | **we've** 6:10 48:22 | 216:5 218:10 | 330:5,11,22 331:4 |
| 230:18 231:11,15 | 324:7,17 325:8,19 | 93:7 108:10 154:3 | 220:3,13 221:12 | 332:19 333:22 |
| 231:25 232:11,15 | 325:25 327:6,11 | 305:10 | 224:9,22 225:5,8 | 334:12,16,24 |
| 234:18 235:14,19 | 327:20 328:21 | **whatsoever** 98:6 | 225:11 226:8 | 335:13,24 336:13 |
| 236:22 237:6 | 329:3,17,23 330:2 | 132:23 272:3 | 228:14 230:17 | 336:20 337:15 |
| 238:3,5 239:16 | 330:7,15,24 | 281:25 | 231:24 232:13 | 338:7,17,18,19,23 |
| 240:10 241:19,25 | 332:20 333:5 | **WHEREOF** | 233:23 235:12 | 339:5,12 340:7 |
| 245:2 247:6 248:8 | 334:4,9,13,20,25 | 342:17 | 236:17 237:2 | 342:6,10,17 |
| 248:22 249:4,6 | 335:15 336:6,15 | **wide** 24:8 | 238:2 239:14 | **witnesses** 55:20 |
| 250:4,7,22 251:4 | 336:21 337:17 | **wife** 148:20 229:25 | 240:6 241:18 | 333:18 338:14 |
| 251:14 252:2,6,10 | 338:14,19,24 | **willing** 315:7 | 244:7 245:9 248:6 | **witness's** 85:18 |
| 252:19 253:3,13 | 339:7,16,21 340:3 | **Willm** 187:7 | 248:21,23 249:5 | **woman** 229:25 |
| 254:6,16 255:13 | 340:5 343:4 | **Win** 98:23 139:19 | 249:25 250:20 | 230:2 293:7 |
| 256:5,11 257:24 | **Weiss** 49:7 344:6 | 344:17 | 251:2,8,19 252:7 | **womanizing** |
| 260:24 261:11 | **well-established** | **winners** 199:18 | 252:24 253:11 | 146:22 147:11,23 |
| 263:17 264:14 | 249:11 337:4 | **wishful** 325:15 | 254:2 255:12 | 292:17 |
| 265:9 266:12,15 | **well-identified** | **withdraw** 317:13 | 257:11 260:20 | **women** 169:7,7,7 |
| 267:6,19 268:4,6 | 127:15 246:6,16 | **withdrew** 318:20 | 263:4 265:7 | 169:11,13,16 |
| 268:18 269:3,22 | 246:25 247:7 | **within-entitled** | 266:13 267:5,18 | **won** 189:17,18 |
| 270:11,25 271:13 | 248:4 | 342:8 | 268:25 269:18 | 199:13,17,23 |
| 271:17,23 272:10 | **well-known** 35:9 | **witness** 2:15 5:4,24 | 270:9 271:11,16 | 200:10,15 201:3 |
| 273:5,14 274:13 | **well-recognized** | 6:5,6 8:24 34:23 | 272:8 273:4 274:2 | 317:10,16 318:14 |
| 274:20,24 275:14 | 93:2 157:3 | 34:25 37:3 49:24 | 274:17 275:10,17 | 319:5,20 321:19 |

322:19,19 323:6
323:18,23 324:3,4
324:15,17
**wonderfully**
328:20
**Woojang** 222:20
**word** 12:9 13:14
  14:5 16:8 18:23
  19:8,13 24:16
  32:6 42:20 43:24
  44:2,4 45:8 48:2
  48:14,20 53:2
  79:22 90:9,19
  140:11,19 141:2,3
  141:3 162:21
  183:13 191:25
  226:12 239:2
  265:14 301:18
  302:5
**worded** 84:14
  85:14
**wording** 102:22
  238:16,17 245:4
**words** 19:14,15,16
  19:16,18 84:10
  107:21 117:3
  119:12 121:8
  130:17 131:17
  134:19 135:11
  137:17 138:24
  139:4 146:19
  148:10 153:3
  157:10 174:4
  181:14 193:2
  195:24 226:11
  240:9 241:3
  288:20 297:11
  298:22 305:15
  308:25 309:19
  320:21 328:15
**word-of-mouth**
  46:24 47:4,10,19
  48:7,8
**work** 11:21 12:2
  15:24 26:23 35:13
  35:14 94:16
  250:11 253:17

325:12 335:25,25
  336:4
**worked** 229:25
**workers** 40:8
**working** 228:16,20
**world** 37:14 83:5
  123:17 220:16
  333:25
**worms** 43:7
**worry** 180:4
**worse** 43:10
**worth** 153:25
**worthwhile** 163:19
**wouldn't** 27:10,11
  39:10 59:22
  114:12 120:16
  126:22 127:18
  145:21 172:17
  220:25 262:5
**write** 83:18 112:14
**writing** 15:12
  212:16 251:14
**written** 19:16
  42:23 46:16 66:3
  67:25 96:7 136:24
  142:25 143:5
  282:7
**wrong** 26:11 41:18
  65:6 78:2 94:22
  123:9 187:7
  201:14 207:11,14
  236:23 248:13
  274:17 314:2
**wrote** 33:18 61:13
  87:9 95:11 103:24
  135:16 202:23
  281:17
**W-i-l-l-m** 187:7

---
**X**
---
**X** 343:1

---
**Y**
---
**Yale** 1:7 4:10,21,24
  21:16 22:12 51:21
  144:23 206:18,24
  225:25 227:16

228:5,24 230:13
  239:20,22 240:14
  240:15 241:4,12
  241:12 242:6,6,10
  242:12 247:4
  248:3,10 249:17
  251:15,16,22,24
  252:10 254:4,6,17
  254:25 255:5,6,8
  255:9 263:24
  265:3 266:20
  267:14,25 268:4
  271:13 272:18,19
  273:2,9,11,12,23
  275:5,14,24
  276:14 281:2,20
  282:4,8,13,19
  283:9 288:7,16,24
  289:4,19,23 290:2
  290:15 291:7,9,13
  297:20 299:4,8
  317:24,24 319:8
  321:13,14 343:22
  345:24
**Yale's** 8:16 56:22
  57:5 275:17 282:8
  288:17 292:5
  297:13,16 300:7
  317:2 319:2
**yeah** 24:17 27:16
  35:12 42:25 48:9
  50:17 61:10 69:9
  81:5 82:14,23
  106:13,19 110:14
  114:25 115:14,15
  116:8 123:11
  127:20 131:8
  132:18 142:24
  146:25 151:13
  154:23 158:5
  159:2 163:14
  164:18 166:23
  167:10 169:10,18
  171:2 172:22
  182:7 183:19
  185:22 186:20
  191:6 195:18

196:11,17,17
  216:16 234:24
  238:2 252:8,14
  254:8 265:18
  269:7,20 275:12
  280:3 283:9,10
  295:13 297:11
  310:9 314:5 324:6
  330:5 331:13,13
  333:22 339:5
**year** 28:4 230:4
  249:13 312:6
  313:19 321:18
  331:18,18,20
**years** 5:17 35:9
  40:7 43:6,8 44:24
  59:6 69:23 74:16
  88:24 89:4,14
  91:3 93:19 128:14
  128:20 140:4
  142:15 208:25
  209:14 219:14
  220:8,24 227:5
  253:2 263:5
**yellow** 264:10,17
  264:22 265:15,16
  271:2 275:2,3
  277:5
**Yep** 194:20 203:12
  311:9,11
**Yonsei** 181:12,24
  182:2
**York** 3:5,5 4:5,5
  20:25 172:10
  293:25 336:8
**Young-kyo** 317:7

---
**Z**
---
**zero** 119:23 187:8

---
**0**
---
**0184** 3:15
**06** 311:10,19,24
  315:17
**06103-1212** 3:15
**06511** 3:11
**065922** 311:15

**07** 312:8 331:15
**08** 311:12,15,19
  312:2,5 315:17
  331:15

---
**1**
---
**1** 4:8 6:11,13,15
  15:18 18:12 53:22
  70:15 81:9 109:4
  127:21,24 174:9
  174:21,22 187:22
  205:8 206:3 207:2
  207:3 215:11,18
  216:7 217:11
  218:13 238:19
  239:8,8,20 319:5
  343:8
**1A** 222:8,10,17,20
  223:6,9,12,15
**1st** 13:3
**1,000** 58:23,24
  59:15
**1,100** 58:25
**1:30** 125:23
**1:31** 126:3,5
**10** 43:14,17 71:3
  75:20 76:12 90:21
  147:18 155:12
  174:9,21 266:19
  323:14 324:9
  343:23
**10th** 13:8
**10,000** 58:24
**10-point** 147:16
**10:45** 53:17,18
**10:59** 53:18,20
**100** 218:13 238:25
  239:7 323:23
  324:4,14,17
  334:20,21
**10119** 4:5
**1017** 311:17
**10173** 3:5
**1035** 46:23
**105** 190:5,9 344:19
  344:20
**108** 317:8 344:21

Itamar Simonson                                              9/21/2011

| | | | | |
|---|---|---|---|---|
| **11** 36:14 46:11,14 | **154** 345:7 | 224:12,18 225:3,6 | 321:3,18 329:15 | **24** 16:13 46:19 |
| 53:22 71:4 104:18 | **1561** 5:13 | 226:15 234:3 | 331:16,17 332:3,4 | 71:14 142:2,4,15 |
| 104:19,20 135:17 | **158** 31:13 | 240:22 324:10 | 332:7,8,10 333:2 | 204:7,10 320:10 |
| 208:25 343:11 | **159** 32:5 | 343:9 | 333:8,19 334:6 | 345:3 |
| 344:3 | **16** 71:8 93:8,11 | **2A** 224:19,20,23 | 345:18 | **24th** 51:22 |
| **11th** 10:5 11:6 | 344:12 | 225:13 236:8 | **2008** 51:22 54:12 | **242** 3:14 |
| **11-year** 209:2 | **16th** 13:17 | 243:8 | 309:6 316:12 | **249** 168:7,9 173:3,7 |
| **11:38** 81:10 | **160** 345:8 | **2As** 224:25 | 323:5,10 324:14 | 173:9 |
| **11:39** 81:11 | **161** 33:5 | **2B** 224:17 | 324:23 326:24 | **25** 16:14 71:15 |
| **11:43** 81:11,15 | **1622** 311:12 | **2C** 206:2 | 327:17,25 328:7 | 75:20 76:18 96:7 |
| **110** 161:16 | **1684** 270:20,24,25 | **2:22** 166:4,5 | 330:6 331:16 | 96:16 150:24,25 |
| **111** 36:16,17 | **17** 71:9 95:19,21 | **2:32** 166:5,9 | 332:5,8,15 333:19 | 189:11 345:4 |
| **112** 344:22 | 96:2 185:24 | **20** 71:11 105:5 | 334:6,19,22 | **25th** 14:16 304:21 |
| **1141** 1:15 342:3 | 344:15 | 106:9 261:23 | 335:11 337:13 | **250** 173:7,9 322:19 |
| 342:21 | **17th** 271:5 | 323:14 324:9 | 339:14 345:14 | 324:16,17 325:3 |
| **12** 48:23 49:2 71:4 | **175** 30:18 | 328:6,12 329:5,7 | **2010** 320:10 | **251** 115:25 173:8 |
| 113:9 344:5 | **176** 31:4 | 343:9 344:20 | **2011** 1:12 2:7 4:6 | **253** 126:13 246:3 |
| **12th** 13:11 265:18 | **178** 345:10 | **20th** 7:16 8:3 9:20 | 6:19 7:16 8:3 | **254** 176:6 |
| 267:24 277:10 | **179** 322:18 323:18 | 15:20 16:10,17,21 | 9:20 10:5 320:13 | **255** 177:6 |
| 285:16 286:23 | 323:23 324:3,4 | **20-year-old** 125:10 | 340:11 341:8 | **26** 71:16 104:21 |
| **12,000** 58:24 | 325:2 | 125:11 | 342:18 343:9,11 | 105:23 106:23 |
| **12:10** 102:9,10 | **18** 71:10 95:18 96:3 | **200** 59:17,18 63:4,9 | 343:12 | 107:6 154:25 |
| **12:11** 102:10,12 | 96:5 133:13 | 63:12 324:14 | **202** 345:12 | 155:3 345:7 |
| **12:43** 125:21,22 | 344:17 | **2000** 179:16 | **203** 345:14 | **26th** 12:23 14:19 |
| **13** 49:21,22,25 71:6 | **18th** 13:20 15:14 | **2002** 293:20 | **203-752-5012** 3:11 | 16:15 345:15 |
| 132:6,7,8 158:9 | 270:20,23 | **2004** 306:5 | **204** 344:24 | **264** 345:16,17 |
| 344:7 | **19** 71:10 105:2,4,17 | **2005** 268:19 271:5 | **21** 1:12 2:7 69:12 | **27** 71:16 75:20 77:5 |
| **13A** 205:12,14 | 344:19 | 272:22 273:8 | 71:11 81:17 82:9 | 160:11,14 343:16 |
| 238:8 | **19th** 274:25 304:22 | 287:2 301:5 304:9 | 84:21 86:12 108:8 | 345:8,18 |
| **13B** 205:10,11 | **1964** 151:14 154:2 | 304:15,21,22 | 108:11 296:23 | **27th** 13:3 14:24 |
| **13th** 266:16 268:13 | **197** 63:22 | 306:14 | 301:3 341:8 | **273** 114:19 166:12 |
| 268:13 269:11 | **1981** 88:15 | **2006** 316:12 323:5 | 344:21 | 166:13 |
| 286:7 | **1985** 59:10 | 323:9,13,17 | **21st** 4:6 17:9 | **274** 114:7 175:18 |
| **14** 71:7 72:25 73:2 | **1987** 136:9 142:13 | 324:23 326:24 | 340:11 | **275** 2:8 4:13 166:24 |
| 73:17 75:7 78:18 | 143:8,11 | 327:17,25 328:6 | **210** 277:11 | **28** 16:16 71:17 |
| 92:18,20 131:9 | **1991** 98:22 163:18 | 330:6 331:15,16 | **212-547-5361** 3:6 | 178:7,10 345:10 |
| 154:13 155:7,16 | 344:17 | 332:2,5,11,13 | **22** 51:11 71:12 | **28th** 13:3 15:3 |
| 155:18,19,20,22 | **1992** 6:3 | 333:8,19 334:6,18 | 112:23 113:2 | **29** 71:18 132:5,8,10 |
| 155:25 156:10 | **1995** 202:21 | 334:22 335:10 | 126:10,11 166:10 | 135:23 202:4,7 |
| 344:10 | **1999** 143:7,9 | 337:12 339:14 | 344:22 | 345:12 |
| **14th** 269:25 | 161:15 | **2007** 265:8 269:11 | **22nd** 17:9 | **29th** 6:19 13:3 |
| **142** 345:3 | | 269:25 270:20,23 | **23** 71:14 90:21 95:8 | 17:16 |
| **15** 71:7 91:9,10 | **——— 2 ———** | 274:25 277:10 | 95:8 203:25 204:3 | **299** 345:18 |
| 311:7 313:18 | **2** 7:9,9,12 23:12 | 285:16 286:7 | 344:24 | |
| 325:20 329:7 | 70:15 75:16,24 | 317:13,25 318:11 | **23rd** 14:4,9 16:12 | **——— 3 ———** |
| 339:19 344:11 | 81:13 127:22,25 | 318:16 319:4,7,17 | 17:8,12 | **3** 7:9,10,12 9:23,24 |
| **150** 345:4 | 166:2 175:18 | 319:22,22 320:4 | **2350** 28:7 | 10:3,4,14,20 |

Itamar Simonson                                                                                              9/21/2011

11:21 17:24 21:19
53:22 70:21 75:16
103:16 127:22
166:7 207:19
213:25 225:4
237:10,11 261:3
302:14 343:11,12
**3rd** 11:6
**3,000** 59:4
**3:08-CV-00441**
4:12
**3:08-CV-00441-...**
1:6
**30** 5:17 12:19 43:8
71:20 88:24 89:4
154:14 155:8,12
155:25 203:21,24
325:20 343:14
345:14
**30th** 13:3
**30(c)** 2:12 342:4
**301** 345:20,21,22
**31** 71:20 75:20 77:6
264:11,15 265:16
345:16
**31st** 15:11 16:5
**310** 345:23
**313** 346:3,4
**314** 346:5,6,8,9,10
**32** 71:21 264:12,15
277:9 300:18
345:17
**32-172** 109:9
**32-364** 106:13
**325** 346:12,13
**33** 71:22 75:20 77:7
299:12,15 300:20
300:21 308:18
345:18
**34** 71:23 301:23
302:2 305:2,6,11
305:23 345:20
**340** 3:5
**35** 71:24 75:21 77:9
302:2 305:5,11,21
345:21
**36** 71:25 75:21

77:10,11 302:2,6
304:24 305:3,9
343:19 345:22
**364** 106:9,12
**37** 72:2 308:20
309:25 310:2,4
332:5 345:23
**379** 43:22
**38** 72:3 313:3,6
343:20 346:3
**380** 44:13
**381** 45:7
**39** 72:3 75:21 77:20
308:19 313:4,6
346:4

_____
**4**
**4** 7:9,10,13 9:24,24
10:3,17 15:22
16:6,20 50:18,23
53:23 70:22
161:18 162:13
214:2 216:10
261:8 302:14
343:12
**4A** 239:16 246:15
247:2,24 248:25
249:4
**4B** 248:8,8 254:12
254:13
**4th** 12:10 13:6,8
342:18
**4.5** 318:14
**4:25** 261:5,6
**4:37** 261:6,10
**40** 43:8 72:3 314:19
314:21 317:4
346:5
**41** 72:6 314:22
318:10 346:6
**42** 72:7 75:21 77:21
77:24 314:22
319:3 346:8
**43** 72:7 75:21 77:21
77:23,24 78:5
314:22 319:16
343:23 346:9

**44** 72:7 296:24
314:19,22 346:10
**441** 178:15
**45** 72:8 325:22,25
346:12
**46** 72:8 75:22,23
77:22,22 78:10
325:23 326:2
344:3 346:13
**47** 72:9 75:23 78:15
**48** 72:11 204:7,10
**49** 72:11 344:5,7

_____
**5**
**5** 23:13 30:12,15
70:23 147:17,18
174:12,16,22
205:12 215:13,17
216:8 317:10,15
328:7,12 329:5
343:4,14
**5a** 254:22 257:9
**5:23** 296:19,20
**5:32** 296:20,22
**50** 70:2,5 72:12
186:20 331:6,9
**50s** 49:9
**500** 319:20
**5000** 40:19
**51** 343:22
**52** 187:22,22
244:23 245:2
**543** 142:5,7
**544** 142:6 143:20
**58** 56:18 282:16
283:13,16,20
284:5 285:11

_____
**6**
**6** 27:20,24 37:19
70:24 343:8,16
**6:26** 339:23,24
**6:35** 339:24
**6:36** 340:2,12,16
**60** 40:18
**60s** 47:16,17
**65** 76:14,15

**69** 263:18 264:21
277:7

_____
**7**
**7** 35:24 36:2 70:24
133:15,24 189:11
343:9,11,12,19
**70** 277:7
**70s** 79:24
**71** 263:21 277:7
297:18
**72** 264:22
**73** 344:10
**74** 193:10
**75** 189:13 201:17
201:20 332:6
**753** 268:4
**76.5** 11:9
**779** 151:15
**78** 192:18
**780** 152:13

_____
**8**
**8** 38:12,13 58:14,15
70:24 75:20
196:17 323:13
324:9 343:20
**80** 191:3
**81** 309:9 310:12,17
**82** 310:18,20,20,21
323:22
**83** 192:22
**83.5** 11:8
**834** 311:10
**86** 192:24
**860-275** 3:15
**87** 143:12
**88** 190:23 191:4,5
**89** 191:20 193:4,5
193:13,20

_____
**9**
**9** 51:19,23 69:11
71:2 81:17 154:13
343:22
**9:28** 2:7
**9:34** 4:7

**9:37** 7:4
**9:38** 7:2
**9:39** 7:4,6
**90** 5:25 6:4
**90s** 91:3
**903** 203:4,6
**91** 117:10 194:8
198:25 344:11
**93** 194:14 344:12
**94** 194:16
**94010** 5:14
**95** 194:18
**96** 194:19 344:15
344:17
**97** 194:22 196:4,9
**99** 154:24 186:13
238:24
**99.9** 138:12