UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

DONGGUK UNIVERSITY,            .   Case No. 3:08-CV-00441
                               .   (TLM)
              Plaintiff,        .
                               .   Bridgeport, Connecticut
     v.                        .   December 20, 2011
                               .
YALE UNIVERSITY,               .
                               .
              Defendant.       .
. . . . . . . . . . . . . . .   .

                        MOTION HEARING
         BEFORE THE HONORABLE HOLLY B. FITZSIMMONS,
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      McDermott, Will & Emery LLP
                        By:  ROBERT A. WEINER, ESQ.
                        50 Rockefeller Plaza
                        340 Madison Avenue
                        New York, NY 10173

                        Ira B. Grudberg, LLC
                        By:  IRA B. GRUDBERG, ESQ.
                        350 Orange Street
                        P.O. box 606
                        New Haven, CT 06503

For the Defendants:     Day Pitney, LLP
                        By:  HOWARD FETNER, ESQ.
                             FELIX J. SPRINGER, ESQ.
                        242 Trumbull Street
                        Hartford, CT 06103

Electronic Court
Recorder Operator:      MS. SANDI BALDWIN

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

```
1              (Proceedings commenced at 2:31 p.m.)

2                   THE COURT:  Good afternoon.

3                   COUNSEL:  Good afternoon, Your Honor.

4                   THE COURT:  I apologize for keeping you all

5       waiting.

6                   This is Civil Case Number 08-CV-441, Dongguk

7       University v. Yale University, a matter that's assigned

8       to Judge Melancon.

9                   So if counsel will appear for the record,

10      please, then we'll proceed with the motions to preclude

11      the expert testimony of Dr. Kim and Dr. Jacoby.

12                  MR. WEINER:  Robert Weiner, McDermott Will &

13      Emery.  I'm with Andrea Allegrat (phonetic), who's one

14      of my associates.

15                  MR. GRUDBERG:  Ira Grudberg.

16                  THE COURT:  Good afternoon to all of you.

17                  MR. FETNER:  Howard Fetner, Day Pitney, for

18      Yale University.

19                  MR. SPRINGER:  Felix Springer, Your Honor, of

20      Day Pitney, for Yale University.

21                  THE COURT:  And good afternoon to both of

22      you.

23                  So, Mr. Fetner or Mr. Springer, who is going

24      to go first?

25                  MR. FETNER:  I will, Your Honor, and before I
```

1    begin, does the Court have a preference as to which of

2    the two motions is argued first?

3              THE COURT:  I don't.

4              MR. FETNER:  Okay.

5              I do think, and counsel for Dongguk agrees,

6    that it does make sense to argue the two separately.

7              THE COURT:  I think that makes a lot of

8    sense, as well.

9              MR. FETNER:  Okay.

10             Well, I'll begin then, with the motion to

11   exclude the testimony of Dr. Kim.

12             Would the Court prefer if I stand at the

13   podium?

14             THE COURT:  Wherever you're most comfortable,

15   as --

16             MR. FETNER:  Okay.

17             THE COURT:  -- as long as you speak into a

18   mic.

19             MR. FETNER:  Sure.

20             Well, I will do my best not to rehash any of

21   the material discussed in either of the two memoranda

22   that we've submitted in connection with this motion.

23             In short, to boil it down as concisely as

24   possible, Dr. Kim's proposed testimony really consists

25   primarily of two components.  First is her assumptions

1    that the statements and allegations of Dongguk and its

2    attorneys are correct; and the second is for

3    generalizations or stereotypes about Korean people that

4    apparently led her to conclude not only that the

5    particular allegations that Dongguk and its attorneys

6    have made are correct, but that various notions of

7    Korean culture inform or determine the cause of the

8    various allegations that she's assumed to be correct,

9    and is our position, Your Honor, that neither is a

10   permissible basis for expert testimony, and both merit

11   the complete exclusion of Dr. Kim's proposed testimony

12   under both Rule 702 and Rule 4 (phonetic).

13          I think it's best to begin with a very brief

14   explanation of just what it is that Dr. Kim proposes to

15   testify to, and the simplest place to begin with that,

16   I think, is the very end; that is, Dr. Kim's

17   conclusion.

18          THE COURT:  Uh-huh.

19          MR. FETNER:  In the final paragraph of her

20   report, Dr. Kim says:

21          "In light of the above, it is my opinion that

22          Yale's false statements regarding Dongguk

23          resulted in significant and concrete material

24          damage to Dongguk's reputation."

25          In order to reach that conclusion, as it

1    explained, in part, in the report and, in part, further

2    elucidated during Dr. Kim's deposition, Dr. Kim first,

3    as I said, made a number of assumptions; that is, she

4    assumed that the statements told to her by Dongguk's

5    attorneys were correct.

6           Yale representative made false statements

7    about Dongguk.  Those statements were published in the

8    Korean media.  As a result, members of the Korean media

9    believed statements published by Yale representative.

10   As a result, the Korean public believed what the media

11   told them.  As a result, both the media and the public

12   believed that Dongguk was a "inept and lying

13   institution", I think is the phrase that Dr. Kim used.

14          Furthermore, Dr. Kim offers the opinion that

15   as a result of all of that, Dongguk was caused to lose

16   donations, grants, recruiting opportunities for

17   students, permission to open a personal (inaudible),

18   and its reputation suffered.

19          The first problem with Dr. Kim's conclusion

20   is there's no evidence for nearly any of it.  Apart

21   from the issue of what statements were made by Yale

22   representatives, which is an issue that Dr. Kim herself

23   has acknowledged she doesn't know anything about, there

24   is no evidence any statements published by any Yale

25   representatives were believed by members of the Korean

1    media.  There's no evidence showing that the Korean

2    media accused Dongguk of any sort of lying or

3    wrongdoing, either as a result of any statements made

4    by Yale representatives, or even in connection with the

5    issues discussed by any Yale representatives.

6              There's no evidence showing what any members

7    of the Korean public believed as a result of any

8    statements made by any Yale representatives.

9              There is no evidence that any Yale statements

10   or any news coverage relating to any Yale statements

11   caused anyone to rescind any donations to Dongguk,

12   caused anyone to deny any grants to Dongguk, caused the

13   government to deny permission to open a school to

14   Dongguk, caused any companies not to participate in any

15   recruiting events for Dongguk or for Dongguk students.

16   There is simply no evidence at all.

17             Instead, what there is, is the allegations

18   Dongguk makes in its Complaint, and the assumptions

19   that Dongguk's attorneys hold Dr. Kim to assume as true

20   in a memorandum.

21             A wealth of case law makes clear that an

22   expert witness may not simply accept a one-sided view

23   of the facts as dictated by a party or its attorneys,

24   assume them to be true, and offer those assumptions as

25   conclusions.  We've cited a number of cases in our

1   memoranda that exclude expert testimony simply because

2   the expert has done just what I just described, and

3   that really gets to what's at the heart of really any

4   review of any proposed expert testimony, and that is

5   the principles and methodology that the expert used in

6   reaching her conclusion, entirely apart from whether

7   the conclusions are correct.  The fact that there is no

8   evidence that supports them doesn't simply mean that

9   the conclusions are false, it means Dr. Kim used an

10  improper methodology.  She didn't review facts.  She

11  didn't review admissible evidence or even hearsay

12  evidence to determine that certain conclusions are

13  warranted.  She accepted them.  She accepted them

14  essentially on faith.

15          In her deposition, Dr. Kim testified that her

16  job in this case is to try to determine whether or not

17  Dongguk being accused of forgery, falsification, lying

18  or whatever, had an impact on Dongguk's reputation.

19          As I've already mentioned, Dongguk was not

20  accused of any of those things, certainly not by anyone

21  connected with Yale, and certainly not in any of the

22  media coverage connected to any issues relating to

23  Yale.  As a result, the premise is simply false, and

24  it's not clear what reliable conclusions Dr. Kim could

25  possibly reach based on a premise that is simply false.

1          As I said a moment ago, the key to the

2     admissibility of any expert testimony are the

3     principles and methods that the expert employees, and

4     this is where Dr. Kim once again reveals the lack of

5     any proper foundation for her testimony.

6          She has essentially acknowledged, through her

7     deposition testimony, that her conclusions are based on

8     generalizations or stereotypes, and we've identified a

9     number of instances throughout Dr. Kim's proposed

10    testimony, both in her report and in her deposition

11    transcript, where she makes generalizations about what

12    Korean people think, what Korean people believe, how

13    Korean people operate, and how they make decisions.

14          It's our position that that is simply an

15    improper method for any expert to employ, regardless of

16    the conclusions that follow from it, and I think the

17    fact that Dr. Kim applies those generalizations, to

18    then go ahead and offer specific conclusions about what

19    particular people apparently did in this case, because

20    they are Korean and they think the way Korean people

21    think, or believe the things Korean people believe

22    makes her testimony even more clearly improper.

23          THE COURT:  Do you think, Mr. Fetner, that

24    the subject of Korean culture and perhaps the

25    differences between certain aspects of Korean culture

1    and aspects of American culture is a proper subject for

2    expert testimony?

3            MR. FETNER:  It may be in an appropriate case

4    and if it is addressed in an appropriate way.

5            I think it's significant that both Dr. Kim, in

6    her declaration that she submitted in connection with

7    the instant motion, and Dongguk, in its memorandum

8    opposing the instant motion, both treat Yale's motion

9    as one to exclude all testimony from all cultural

10   experts on all subjects in all cases.  That's not the

11   case.

12           Experts may very well be able to testify about

13   cultural issues, but they can't do so simply by

14   stereotyping an entire nationality or culture, and

15   saying, "Korean people think in this way, therefore,

16   it's my opinion that people who chose not to recruit

17   Dongguk students must have thought in that way, and

18   must have made that choice because they think in that

19   way."

20           It's essentially three improper opinions:

21           One, Korean people think a certain way;

22           two, particular people about whom Dr. Kim

23   admits she knows nothing think in that way; and

24           three, the fact that those particular people

25   think in that way explains particular choices they've

1   made in this case.

2          So, apart from whether some cultural expert

3   testimony could be admissible in some cases, the

4   particular testimony we're talking about here is not,

5   and I do want to make very clear, there may very well

6   be some case where some cultural expert may have

7   relevant testimony, may have reliable testimony.  This

8   is not such a case.

9          I also think the fact that there is no

10  evidence supporting all the points I discussed earlier

11  makes very clear that Dr. Kim's testimony doesn't serve

12  the purpose of somehow explaining fact evidence in a

13  way that makes it clear to a jury who wouldn't be able

14  to understand the fact evidence without the proper

15  cultural context.  There is no fact evidence for Dr.

16  Kim to explain, and she doesn't even purport to explain

17  it.

18         For example, this is not a case in which the

19  Korean government issued some sort of decision saying,

20  "We hereby decide to reject Dongguk's application for

21  certain research grants because we read a certain

22  newspaper article and we believe the statements of

23  Yale's representative, and we think as a result of that

24  statement, that Dongguk must be lying, and we don't

25  award grants to lying institutions", in which, if that

1    were the case, perhaps, I won't concede that it is the

2    case, but perhaps an expert might be able to explain,

3    "Well, why is it that a Korean government agency would

4    believe an American university over a Korean

5    university.

6            Theoretically, there would at least be an

7    opportunity.  That is something to be explained.  It's

8    a moot point here because there is no such evidence to

9    be explained, and Dr. Kim made very clear, she doesn't

10   actually know, in terms of the particular facts that

11   would be explained.

12           I think it's significant that Dr. Kim

13   discusses in her declaration, a particular source that

14   she describes as a gentleman named L. Robert Kohls who,

15   she says, put it best in talking about stereotyping,

16   when he said the following, and I'll quote a bit from

17   the -- Dr. Kim's quotation of this particular source.

18           She says:

19           "Stereotyping can lead to false

20           generalizations and judgments when we confuse

21           our stereotypes with the individuals we are

22           dealing with face-to-face.  Thus, it is

23           important to not allow the comparisons,

24           contrasts and generalizations we make

25           regarding values and behaviors, to lead us to

1           stereotype either Americans or Koreans."

2           While most of the Koreans, excuse me, "While

3           most of the Americans and Koreans you meet

4           will reflect many or most of the values and

5           behaviors described in this chapter, other

6           individuals may deviate significantly."

7      Dr. Kim made no effort to determine whether

8  any of the particular individuals involved in this case

9  deviate significantly from any of the generalizations

10 she talks about regarding Korean people.  She simply

11 assumes that none of them do.

12      And I think it's important to note that while

13 there are cases that have admitted cultural expert

14 testimony for some purposes, we have not seen one

15 single case admitting any cultural expert testimony

16 along the lines of what Dr. Kim is proposing to testify

17 to here; that is, an expert testifying about

18 stereotypical traits or behaviors that a nationality,

19 or culture, or any sort of subgroup holds, and further

20 testifying, based on those stereotypes, that particular

21 people must have taken particular actions or made

22 particular decisions simply because they're members of

23 that nationality or cultural subgroup.

24      I do want to make very clear that Dr. Kim has

25 admitted her opinions are, in fact, based on

1  stereotypes.  She doesn't use the word "Stereotypes",

2  but she's made very clear that that is, in fact, what

3  her opinions are based on.

4        To use just one example, Dr. Kim offers the

5  opinion that what she describes as two facets of Korean

6  culture explain or caused particular individuals to

7  rescind donations to Dongguk that they had pledged to

8  make.

9        Those two alleged facets of Korean culture

10  are, number one, the connection between an individual's

11  reputation and the reputation of a group to which the

12  individual belongs; and two, the -- what she -- she

13  calls it "Neo-colonial mentality" for which Korean

14  people consider American institutions, and in

15  particular, she says elite educational institutions

16  like Yale, exalted entities.

17        She says those two facets of Korean culture

18  caused the particular people who allegedly rescinded

19  donations to Dongguk, to make the decision to rescind

20  those donations.

21        Dr. Kim was asked, in her deposition, to

22  explain that opinion; that is, "What is the basis for

23  it?  What is the basis on which she concluded not

24  simply that Koreans generally hold certain beliefs, or

25  that particular people rescinded donations, but what's

1    the basis for her opinion that those general beliefs

2    that Koreans supposedly hold, caused these particular

3    individuals to rescind these particular donations.

4            Here is her complete testimony on that

5    subject:

6            Question:  And is it your opinion that the

7            intertwining of individual reputations with

8            collective reputations, and the Korean

9            public's trust of Yale caused individuals to

10           rescind donations to Dongguk?  Is that what

11           you're saying here?

12       Answer:  Yes.

13       Question:  What is that opinion based on?

14       Answer:  That opinion as based on the two

15           things that I keep saying over and over

16           again.  One is that the reputation that the

17           individual is connected to can taint the

18           collectivity, or a particular instant or

19           action can color the collectivity, and that,

20           in the sort of neo-colonial mentality that

21           still exists in Korea, Yale is considered,

22           you know, an exulted entity.  So if someone

23           from Yale says something official from Yale,

24           officially identified from Yale, then people

25           would tend to believe that that's true."

1            In other words, the reasoning is circular.

2    Her opinion that the stereotype explains the behavior

3    is simply that the stereotype explains behavior.

4            When Dr. Kim was asked, similarly, to explain

5    the basis for her opinion about the cause of the Korean

6    public's alleged negative perception of Dongguk, she

7    gave essentially the same answer, simply restating the

8    same two generalizations.

9            Once again, I think it's important to note the

10   absence of fact evidence, not simply because it shows

11   Dr. Kim's opinions to be incorrect, and not simply

12   because it shows that there's simply nothing for Dr.

13   Kim to explain through her opinions, but because it is

14   another basis for (unintelligible) in its own right;

15   that is, as authority we've cited in our memoranda

16   indicate, expert opinion may not serve the purpose of

17   substituting for absent fact evidence.

18           In the absence of fact evidence showing that

19   particular people believed the statements of Yale's

20   representative, or particular people interpreted the

21   statements of Yale's representative to somehow be

22   critical of Dongguk, or people concluded from those

23   statements, that Dongguk must be lying, or people

24   concluded from those statements that Dongguk doesn't

25   merit particular donations or grants (unintelligible)

1   law school, and the other things that Dongguk alleges,

2   Dongguk presents Dr. Kim to say, "Well, in my opinion

3   people believed those statements and they thought

4   Dongguk was lying, and they caused them not to give

5   Dongguk donations and grants, and permission to open a

6   law school, and all the rest, and that's simply not a

7   proper role for expert testimony.

8           THE COURT:  So are you saying that if there

9   were a witness called by the Plaintiff who testified

10  that he had rescinded a donation to Dongguk because

11  having heard the Yale explanation of what happened, it

12  concluded that they weren't worthy of it, or that there

13  was -- it violated some Korean principle, then at that

14  stage you think that it might be appropriate for an

15  expert in Korean culture to assist the jury by

16  explaining why that might be the response of someone in

17  Korean culture, when it might not have been the

18  response of someone who is in American culture?

19          MR. FETNER:  In theory, yes.  In this case,

20  no, because Dr. Kim herself has admitted that there is

21  no relevant difference between Korean culture and

22  American culture in that circumstance.

23          When she was asked in her deposition, about

24  that very example; that is, "What is there about Korean

25  culture to explain?", or how does she know what Koreans

1  who rescind donations to Dongguk must have thought, she

2  said, "Well, you know, I have no doubt that it's true.

3  I have no doubt that Koreans did rescind donations to

4  Dongguk as a result of this scandal."  And when she was

5  asked the obvious follow-up question, how does she know

6  that, she said, "Because the same thing happens here."

7  Donors to the University of California, Berkeley, where

8  she teaches, she says, have also rescinded donations

9  because of events that they're unhappy with, she says,

10  because of events that tarnished Berkeley's reputation.

11  She has no doubt the same thing would happen at

12  Dongguk.

13       Apart from Dr. Kim's particular admission on

14  that specific issue, I think it points to something

15  more general, which is, there's nothing unique about

16  Korean culture that explains any of these issues.

17       It -- I don't think there's any question a

18  Connecticut jury can understand that if someone

19  believed an entity's reputation had been tarnished, if

20  someone believed an entity was immoral, inept, lying,

21  dishonest, they might not want to donate large sums of

22  money to that institution.  I don't think expert

23  testimony is needed to explain that.

24       The general stereotypes and generalizations

25  about Korean culture that Dr. Kim makes are, I think,

1    inadmissible for yet another reason, as well, which we

2    also discussed in our briefs, and that is they're not

3    relevant.  Whether Korean people generally, or a

4    majority of Korean people, or particular Korean people

5    with whom Dr. Kim is familiar, think in a certain way,

6    subscribe to certain beliefs, have a certain world view

7    based on these facets of Korean culture that she

8    describes, whether any of those things is true is

9    simply irrelevant to any issue in this case, which is,

10   whether particular people took particular actions

11   because those people held particular views, and I think

12   it's not simply irrelevant, but misleading and

13   potentially prejudicial.  Not prejudicial, as Dongguk

14   would frame it, because it's somehow bad for Yale.

15   It's prejudicial because it invites a jury to make a

16   decision on an improper basis, not that particular

17   people believed Yale's statements, or particular people

18   thought less of Dongguk, or particular people thought

19   Yale had defamed Dongguk, but particular people,

20   "They're Korean and that's just what Korean people do."

21   That's not a proper basis for a verdict.

22          As I indicated before, Your Honor, this is not

23   any sort of attack on cultural expertise.  It's not any

24   sort of attack on the field of Korean Studies, I think,

25   as Dongguk also frames it at one point.  It is simply a

1    motion to exclude a particular set of opinions that are

2    based on two things.  One, an assumption that the

3    statements of Dongguk's attorneys are correct; and two,

4    a generalization that particular Korean people must

5    have taken particular actions, both because they

6    subscribe to particular stereotypes, and because those

7    particular stereotypes somehow motivated their actions,

8    and we think that's an improper basis for any expert

9    testimony, and certainly the testimony that's been

10   offered by Dr. Kim here.

11         THE COURT:  Do you take issue though, with

12   Dr. Kim's qualifications as an expert in the field of

13   Korean culture?

14         MR. FETNER:  We haven't moved to exclude Dr.

15   Kim on that basis, and not having made that argument in

16   our briefs, I'm not going to ask the Court to exclude

17   her on that basis now.

18         Since you've raised the question, I do think

19   her credentials are wanting.  She admitted in her

20   deposition that Korean Studies is not her field.

21         If you review her CV, it's very clear, she's

22   -- her education as in literature, and I believe not

23   even Korean Literature, I think it's English

24   Literature, and her Ph.D. is in Education.

25         The field of her study, the classes she

1    teach, the publications she creates relate to what she
2    described at one point as, I think, Asian-American or
3    Korean-American Studies, at one point Korean Diaspora
4    Studies.
5           I am not suggesting that Korean-American
6    people, or the Korean diaspora has a different cultural
7    background than Korean people, or that the principles
8    described in Dr. Kim's report are somehow not within
9    her field of knowledge.  As I said, we haven't moved to
10   exclude her on that basis, but I do think the ways in
11   which Dongguk has used Dr. Kim's background,
12   essentially as a crutch; that is, if you look,
13   throughout Dongguk's opposition brief, rather than
14   pointing to particular methods that Dr. Kim employed,
15   the argument goes something like this: "Well, Dr. Kim
16   has been studying Korean Studies for 40 years, so
17   clearly her opinions are meritorious on this subject."
18          I think it's a red herring in any event.  As
19   I said, we haven't moved on that basis, simply just --
20   that's not a sufficient basis for admitting expert
21   testimony, even if the relevant experience were apt in
22   that way, but the reality is, if you look through her
23   list of publications, they deal with Korean-American,
24   (inaudible) with Korean disparage (phonetic), but
25   again, I don't -- I think that's a red herring because

1    the bigger issue is whatever her background is, she
2    simply hasn't employed, in any reliable methodology,
3    and she hasn't applied it reliably, to the facts of the
4    case.
5                   Are there any other questions?
6                   THE COURT:  Not now.  Thank you.
7                   MR. FETNER:  Thank you, Your Honor.
8                   MR. WEINER:  Good afternoon, Your Honor.
9                   THE COURT:  Good afternoon.
10                  MR. WEINER:  It would be easier for my
11   argument if I could just provide you, I know you have
12   them, but I (unintelligible) easier, a copy of
13   Professor Kim's declaration and her expert report,
14   (inaudible) had them about (inaudible).
15                  It's not an accident that in making its
16   motion, Yale neglected to provide the Court with a copy
17   of the expert report, because having listened to Mr.
18   Fetner and his quote of the last paragraph in the
19   expert report, I think it appears, Your Honor, on
20   page --
21                  THE COURT:  Paragraph 99.
22                  MR. FETNER:  Yes.  Let me just get that, my
23   copy.  There it is.  Bear with me.
24                  Page -- Actually, paragraph 99, as you said,
25   at page 20.

1          So let's talk about the first 19 pages which

2    Yale neglects to mention, and I've heard the Defendant

3    say that all that Dr. Kim did was simply repeat what

4    the lawyers fed to her.

5          So if we go back, Your Honor, to page 5, and

6    that begins at paragraph 19, let's be very clear what

7    it is that Dr. Kim reviewed.

8          Clearly, she reviewed the Complaint -- the

9    proposed Amended Complaint.

10          Importantly, she reviewed Dr. Jacoby's

11    report, and his survey, and his conclusions, and what

12    that report revealed.

13          She did review a chronology of events that we

14    prepared for her, which is the basis -- seems to be the

15    crux of Yale's motion.

16          More than that, if you go to Exhibit D, Your

17    Honor, she reviewed multiple, and there's a list of, I

18    don't know, maybe a hundred, or 50 documents that she

19    reviewed that have been produced both by Yale and by

20    Dongguk.

21          She reviewed the deposition testimony of the

22    three Korean fact witnesses.

23          She reviewed the English and Korean

24    newspapers and websites which are listed in Exhibit E,

25    and those, again, are many, many, many.  I didn't count

1    them up, but they seem to be three pages worth, single

2    spaced.

3            She reviewed a DVD of Gila Reinstein's TV

4    appearance in Korea.

5            She reviewed the various statements that the

6    Dongguk faculty had issued during the course of this

7    matter, and they cover the period, I think, in October,

8    November and December of 2007.

9            She reviewed a letter from a Korean rating

10   organization that denied the customer service award as

11   a result of the Kim affair.

12           She reviewed the affidavits and the

13   translations of the donors who Mr. Fetner referred to,

14   who said very clearly, in those declarations, that they

15   were not giving money because of the (unintelligible)

16   affair.

17           And she reviewed the damage analysis that we

18   provided.

19           So this was not a report that was simply

20   based upon what the lawyers said and, quite frankly,

21   there is nothing in this report that is at all

22   accurately incorrect.  So let's talk about the report.

23           Beginning at page 6 and 7 she gives an

24   overview of her report, and then more specifically, at

25   page 18 through page 19, after the bottom of 18, top of

19, she discusses solely Korean culture.  She discusses

collectivism.  She discusses Confucianism, she

discusses the very nature of Eastern culture, and

particularly Korean culture that differs from American

culture, and there's nothing unique about that, in the

sense that she didn't make this up.  These are the very

kinds of differences that have been pointed out by

scholars elsewhere.

          In her declaration, Your Honor, she provides

Your Honor with a list of other scholarly works that

make the same points.  In fact, she attached a copy of

Dr. Simonson, their survey expert, who wrote an article

discussing the differences between Eastern culture and

Western culture when it comes to consumer behavior, and

if you were to look at the 20 or 30 resources that Dr.

Simonson references in his article, they make similar

points.

          The fact of the matter is there is a

fundamental difference between Eastern culture and

Western culture, and her role as an expert witness is

to explain to the jury what those differences are and

how they impact this particular situation.

          Now, her conclusions, as Mr. Fetner refers to

them, actually begin toward the middle of page 19, and

if Your Honor would turn to that page, so we're looking

1    at page -- at paragraph 96.  Okay.

2           First, in paragraph 96 she says:

3                "As explained earlier, if the Korean public

4                believed that Dongguk is inept and lying

5                institution."

6           And that, of course, is referencing the

7    results of the Jacoby survey, and then she goes on to

8    explain how that could be.

9           Then she refers to, in paragraph 7, which is

10   the -- I think the paragraph that Mr. Fetner may have

11   been referring to, which talks about the donors, well,

12   the donors are very clear about what they did and why

13   they did it, and she's simply explaining, from a

14   cultural aspect, why that makes sense.

15          And then in paragraph 98 she says:

16               "It's not surprising, as shown by the survey,

17               that there was a negative perception."

18          There is nothing in this report that would

19   justify it being struck, which is probably why Yale

20   didn't move to strike it.  What Yale moved to do is

21   say, "Oh, no, no, no.  Forget the report.  She can't

22   testify, and the reason she can't testify is because

23   when we asked her questions at her depositions, we

24   didn't like those answers.  We didn't think that they

25   were answers that were appropriate, or answers that she

1    believed.

2            And quite frankly, Your Honor, that's what

3    the cross-examination process is about.  If Yale

4    believes that Dr. Kim has somehow overstated her

5    conclusion, is wrong in her opinions, that's why they

6    bring it out through advocacy, but there's no basis in

7    the law, at this juncture, to simply state, "Nope,

8    can't testify.  Nope, can't put it in your report.  You

9    can't be there."

10           It's simply that, you know, that's -- that

11   would be the role of the trial judge at the time, if he

12   thinks those objections or those questions are proper.

13           THE COURT:  Putting the cart before the horse

14   a little bit now, given her reliance on the results of

15   the survey, if the Defendants are successful in their

16   motion to strike the survey, does that undermine the

17   admissibility of the testimony from Dr. Kim?

18           MR. WEINER:  No, because the focus of her

19   testimony is culture and explaining the difference

20   between Western culture and Eastern culture.

21           Might it affect some of her ultimate

22   conclusions?  Sure.  It might affect some of her

23   ultimate conclusions, but it doesn't affect the body of

24   what she would be talking about, just to explain to the

25   jury the difference between Eastern culture and Western

1    culture.

2           So, it may well be that that conclusion is

3    (unintelligible).  I can't talk about that because that

4    evidence has been struck, so on direct, I mean, I

5    wouldn't be able to go there, but we -- certainly

6    doesn't prevent us from putting her on for the purpose

7    of explaining what Eastern culture is, and that's, you

8    know, the crux of what she will be testifying to.

9           Now, the last thing I heard was her

10   qualifications.  This is the first we heard of it, was

11   today.  So this was addressed in her declaration.  This

12   is not someone who was a English Literature or

13   something like that.  If you go to page 5, she makes --

14   Beginning at page 18 of her declaration, she makes it

15   very clear that her opinions are based on her four

16   decades of experience studying Eastern Asian culture.

17   She mentions that when she had her Fulbright in Korea

18   she was doing field interviews on social

19   (unintelligible) and cultural practices in South Korea.

20          The documents that she attaches to her

21   declaration support her qualifications.  I don't think

22   that that's a -- an issue here, and this whole notion

23   that somehow the fact that we -- that a cultural

24   witness is improper in this case is absurd.  If any

25   case deserves or needs a cultural witness, it's this

1    one.

2         We're talking about the impact of statements

3    that were made in Korea, and how culturally a

4    population would respond to them, and in the various

5    materials that she refers to and annexes to her

6    declaration, others having nothing to do with this case

7    have made the same basic points, the points about face,

8    the points about reputation, the points about

9    collectivism, the concept of shame, and how that

10   permeates Korean society, and how that impacts how

11   individuals look at entities, how entities deal with

12   individuals.  All that are critically important in

13   determining and assessing ultimately, the reputation

14   damages that, if the jury finds there's liability, they

15   will have to consider.

16        So, Your Honor, I will end with the -- I

17   guess the statement that there is nothing in this

18   report, nothing in her qualifications that would

19   prevent her from testifying.  As to whether there are

20   some questions down the road, or some areas that we

21   would need to cut back on, that will be determined by

22   decision on another motion, perhaps on the summary

23   judgment motion.  That doesn't justify the striking,

24   wholesale, of her as a witness -- as an expert witness

25   in this case.

1          THE COURT:  The -- I wanted to ask you, Mr.

2     Weiner, about the conclusion that paragraph 99

3     (inaudible).

4          Assuming, for purposes of the argument, that

5     Dr. Kim is qualified as an expert in Korean culture,

6     and would be helpful to the jury in understanding

7     things like the concept of shame in Korean culture, and

8     how that might differ from American culture, the

9     conclusion, the opinion that's in paragraph 99, what

10    support is there for that opinion, in her report or in

11    her declaration?

12         MR. WEINER:  Well, I sort of go back to where

13    you were at trial, okay?  Expert witness in this case

14    is going to appear after the testimony of the fact

15    witnesses, and fact -- I anticipate the fact witnesses

16    will testify, as they have, or at least consistently

17    with their declarations, consistently with their

18    deposition testimony, consistently with the affidavits

19    of others who did not testify at their deposition, and

20    I think it's fair to ask, at that point, any expert

21    witness, in this case it will be Dr. Kim, "Were you

22    aware of the testimony of A, B, C and D, blah, blah,

23    blah, blah?  Are you aware of the statements that Yale

24    made in the press because (unintelligible)?  Are you

25    aware that those statements were not true?"  In your

opinion, do you -- Is it your opinion that -- "In your

opinion, did those statements have any consequences,

based upon your knowledge of Korean culture and your

hearing of the factual testimony?", and she could say

"Yes", and I -- we could simply ask her, "What is your

opinion?"

There's nothing wrong with that.  Witnesses

opine all the time based upon their ultimate

conclusion, whether it's the ultimate conclusion going

on in the case.

So now, at that time the Court can say, "Wait

a second.  There is no basis for those -- for that --

the various assumptions you've made.  I'm going to

abstain an objection that they will undoubtedly make,

but you cannot now, I should respectfully submit, say,

"Oh, no, she can't opine on that."  She will be able to

opine as any expert witness can opine on the evidence

based upon -- even on assumptions, if there is

sufficient facts in the record.

So happens here among the documents that she

read were the news reports, the very, very news reports

that we're relying on to provide liability.  She's read

the deposition testimony.  She read the declarations

and, I think, therefore, it was actually appropriate

for her -- for her to conclude here,  based upon the

1    materials that were provided to her, that there was

2    material (unintelligible).

3              THE COURT:  But would it be -- I'm just

4    trying to understand the scope of the opinion that you

5    think might be elicited from her.

6              It sounds to me as though, assuming that all

7    of your underlying evidence comes in as you hope and

8    expect, that then you're not asking that she explain

9    why it would be that the witnesses who testified that

10   they did thus and so, did that.

11             MR. FETNER:  No, I --

12             THE COURT:  You want to be -- You want them

13   -- You want her to testify that the -- You want to make

14   -- You want her to make a causation opinion; that is,

15   that the statements caused the damages that the

16   witnesses testify about.

17             MR. FETNER:  Not really.  What I was -- I'm

18   asking her to comment on is that the impact of a

19   statement that brings shame to your community in Korea

20   has far greater reputational consequences than does a

21   similar statement had it occurred in the United States

22   because of the cultural differences, that once you are

23   singled -- I mean (unintelligible), once an entity or

24   individual is singled out for having done something

25   wrong, the concept of shame emanates to people who are

1    affiliated with that person, and the only way I can --

2    Perhaps I can give Your Honor an example.

3           The first Korean case that I ever had

4    involved a Korean trading company that was sued by J.

5    Crew, and that company had the license for J. Crew in

6    Korea and did not meet J. Crew's -- if you ever go into

7    a J. Crew store, they all look the same.  They've very

8    standard ways of doing it.

9           In Korea you can't do that because they don't

10   have the space (unintelligible) so he authorized the

11   company not to follow the standards and there was a

12   great success, they sold a lot of (unintelligible), but

13   J. Crew was very upset and they sued for breach of

14   contract.

15          We prevailed on behalf of the Korean entity

16   but the guy that we -- authorized this was fired.  He

17   was fired because he brought this lawsuit down on

18   (inaudible).  He brought shame to the company.  It's a

19   different world, and reputation is very significant,

20   far more than we deal with on a day-to-day basis.

21          So one, we submit that she's entitled to

22   discuss -- explain the differences; and two, to comment

23   on them, that when you have these kinds of statements

24   that are made, where the press is essentially saying or

25   quoting Yale as having said something which isn't true,

1    and we have other evidence, of course, but

2    (unintelligible) those factors occur, that she can

3    opine that that's going to have significant adverse

4    consequences.  I don't think there's anything wrong

5    with that.

6              THE COURT:  All right.

7              But you would agree that that's not what she

8    says in paragraph 99.  Her opinion, as formulated in

9    paragraph 99, is quite different.

10             MR. FETNER:  No.  No.  She didn't say that in

11   99.  I mean, she -- that -- it was the last paragraph

12   in her declaration, but in terms of general subject

13   matter, so that we're clear, my expectation is she's

14   going to discuss, generally, the -- we couldn't discuss

15   the evidence that was in the record because there was

16   no record to, you know, put it in, but that's where I

17   anticipated her going.

18             I do not explain -- I -- The jury is going to

19   have to reach its own conclusions, hearing what, you

20   know, (unintelligible) says about this, as to what the

21   ultimate damage is, assuming they come out on

22   liability, assuming we get there.  The jury doesn't

23   deny out -- doesn't grant the -- Yale's motion.

24             THE COURT:  Yes.  All right.  Thank you.

25             MR. FETNER:  Okay.

1          Mr. Fetner?  You don't have to speak again,

2     but I thought you might want to.

3          MR. FETNER:  I -- Thank you, Your Honor.  I

4     do appreciate the opportunity.  I will do my best to be

5     brief.

6          I think it's worth noting, Mr. Weiner has

7     referred several times to the fact that Dr. Kim

8     identifies, in connection with the instant motion, her

9     declaration, other sources and other scholars who have

10    provided similar opinions, or described similar notions

11    of Korean culture.

12         I want to reiterate, as we've said in our

13    memoranda, whether Dr. Kim's opinions are correct is

14    really beside the point.  At issue here is the

15    methodology that she applied in reaching them, and she

16    didn't look to those other scholars in reaching her

17    opinions here.  She didn't identify them in her report.

18    She didn't identify when she was asked in her

19    deposition, so I -- it's simply not relevant.

20         I think Your Honor's question to Mr. Weiner

21    about whether the survey, that I know we'll be

22    discussing in a couple of moments, undermines Dr. Kim's

23    testimony.  It hits the nail on the head in one key

24    way.  In looking through the particular paragraphs of

25    Dr. Kim's report, Mr. Weiner stopped on paragraph 96,

1   which he said explicitly references the survey's
2   results, and the same is true a couple of paragraphs
3   later, in paragraph 98, where Dr. Kim purports to be
4   explaining why people in Korea had some negative
5   opinion of Dongguk.  Obviously, if those opinions are
6   based on the fact that a survey found that people in
7   Korea had a negative opinion of Dongguk, well, then the
8   lack of a survey to base it on means there's nothing
9   left for her to explain, and nothing for her to
10  extrapolate on.
11          I think, once again, it's worth
12  (unintelligible) dealing with just the issue of the
13  survey, but more generally, there's nothing for Dr. Kim
14  to be explaining here.
15          Mr. Weiner referred to fact witnesses, and he
16  says he envisions at trial, that (unintelligible) fact
17  witnesses will testify, and that Dr. Kim will offer
18  opinions that put those fact witnesses' testimony in
19  the cultural context, or explain them in light of
20  Korean culture, and he said (unintelligible) through
21  that in her report, or in her declaration, or in her
22  deposition testimony because, well, there's no trial
23  record yet, for her to explain.
24          Of course, Mr. Weiner also said that he
25  expects fact witnesses at trial to testify in

1  accordance with their depositions and their

2  declarations and their affidavits, so if that is, in

3  fact, the trial testimony that's envisioned for Dr.

4  Kim, obviously that should have been what she did in

5  her report, based on the same fact witnesses who should

6  supposedly be explaining at trial.

7          Moreover, the fact that she hasn't done that

8  in her report would, independently of all the other

9  reasons, preclude her from all the sudden launching

10 into a line of testimony at trial, in any event.

11         Mr. Weiner said at one point that Dr. Kim

12 would explain the impact of a statement that brings

13 shame to your community, and that that impact is

14 somehow greater in Korean culture than in American

15 culture.

16         It's worth reiterating again, that there is

17 simply no evidence of any statements made by anyone

18 connected to Yale brought shame on anyone.  So once

19 again, I hate to be a broken record, but the same

20 explanation applies in pretty much every context here.

21 There is nothing for her to explain.  It is, as I think

22 Your Honor was pointing out in focusing on paragraph

23 (unintelligible) of Dr. Kim's report, it's not the

24 explanation of fact evidence, it's the replacement of

25 fact evidence.

1          I also think it's worth pointing out that

2   just as was the case in Dongguk's memorandum, Mr.

3   Weiner's presentation here didn't actually mention, in

4   any aspects or -- differences between Korean and

5   American culture.  His explanation, Dr. Kim would bring

6   that would somehow explain any fact evidence, or

7   explain, really, any issue in the case, and I think

8   it's -- it should be clear by now that there's none.

9          In the absence of any questions, I've got

10  nothing more.

11          THE COURT:  Thank you.

12          Anything else, Mr. Weiner?

13          MR. WEINER:  I don't think so.

14          THE COURT:  Okay.  Thank you.

15          Now why don't we go on to Dr. Jacoby's report

16  and (inaudible).

17          MR. FETNER:  Just a moment, Your Honor,

18  I'm --

19          THE COURT:  Certainly, whatever time you

20  need.

21      (Pause.)

22          THE COURT:  Your Honor, Dr. Jacoby's

23  testimony is of a somewhat different form from Dr.

24  Kim's testimony.  Dr. Kim's testimony, as we've been

25  discussing, involves a somewhat amorphous field,

1   something that's in some ways difficult to wrap your

2   hands around.  That is much less the case with Dr.

3   Jacoby's proposed testimony.

4           Dr. Jacoby would testify as a survey expert

5   based on a survey that he prepared and that was

6   implemented in Korea, based on his instructions and

7   purportedly the results of that survey.

8           Survey science is not arbitrary.  There are

9   rules for the proper design and implementation of

10  surveys.  Dr. Jacoby has contributed to literature,

11  both academically and as an expert witness in

12  litigation.  He's written academic articles, written

13  numerous expert reports.  He's offered many

14  depositions, trial testimony, affidavits, declarations.

15  We've identified a number of them in connection with

16  the motion to include his testimony, simply because

17  it's a way of demonstrating both that there are rules

18  and Dr. Jacoby knows what those rules are, and that he

19  hasn't followed them here, and I think it's worth

20  starting with what really is far and away the biggest

21  issue with Dr. Jacoby's proposed testimony.

22          There are a number of flaws.  We discussed

23  many of them in our briefs, but far and away the most

24  (unintelligible) here is Dr. Jacoby would offer

25  opinions and conclusions that he never even tested in a

1    survey.

2         He says, at one point in his declaration that

3    he submitted in connection with this motion that,

4    "Well, I could have concluded that Yale's statements

5    caused some harm to Dongguk, even without conducting a

6    survey."  I think that's telling in one sense, but

7    apart from that, he's not testifying as some sort of

8    mind reader.  He's testifying as a survey expert.  So

9    what conclusions he believes he might, or could, or

10   should have reached in the absence of a survey really

11   are irrelevant.  What's relevant is what did he do in

12   the survey, what does it show, and what opinions and

13   conclusions can permissibly be drawn from it.

14        I think it should be apparent by now, as

15   Dongguk doesn't dispute Dr. Jacoby himself, and hasn't

16   disputed, the survey asked no questions about any

17   statements made by Yale.  It didn't ask respondents if

18   they heard of any Yale statements, didn't ask them if

19   they remembered any Yale statements, didn't ask them if

20   they knew the content of any Yale statements, didn't

21   ask them if they read any news coverage that quoted any

22   Yale statements, didn't ask them if they believed any

23   Yale statements, didn't address any Yale statements in

24   any way.

25        Also, in defining the (unintelligible)

1    incident in connection with two of the early questions,

2    the survey didn't mention even that Yale had made

3    statements, apart from their content, didn't even

4    inform respondents that they -- that such statements

5    existed.  I'm not suggesting that would have been

6    proper, I'm simply saying there is no way to know, as

7    Dr. Jacoby conceded in his deposition, whether

8    respondents even knew Yale had made any statements.

9           Nevertheless, Dr. Jacoby offers conclusions

10   that Yale's statements somehow caused all of the

11   results that the survey did find.

12          It's also worth noting that apart from the

13   survey's failure to ask any questions about Yale's

14   statements, it also didn't ask any questions about

15   causality in general; that is, the survey didn't say,

16   in response to each question, "Do you believe Dongguk

17   did or did not tell the truth."  Follow up question,

18   "Why do you believe that?"  There were no questions of

19   any kind -- of that kind in any (unintelligible) to any

20   of the survey's questions, so there's simply no way to

21   know what people were thinking, why they thought the

22   things they said, because the survey never asked.

23          And having failed to ask those questions in

24   the survey, Dr. Jacoby should not be permitted to come

25   into court and testify as a survey expert, about what

1    he imagines the survey would have found if he had

2    actually asked those questions.

3              Dr. Jacoby acknowledged in his deposition, as

4    I said, that he doesn't know if any respondents were

5    actually aware of any statements made by Gila Reinstein

6    to the Korean media.  Apart from that, I think it's

7    worth putting just a bit of context around that fact.

8              The survey was conducted in the very end of

9    November and beginning of December 2008.  Gila

10   Reinstein made a number of statements to the Korean

11   media in mid July 2007.  Then there was a later

12   statement in September of 2007 that was discussed in

13   one newspaper article, and apart from Yale's correction

14   and apology a couple of months later, that's basically

15   it.

16             So what Dr. Jacoby apparently would testify

17   to is that somehow, without having asked a question to

18   even determine it, he knows that all these people in

19   Korea who responded to the survey at the very end of

20   2008 both were familiar with and remembered and

21   remained familiar with a handful of statements that

22   were made about a year and a half earlier, and not only

23   were they familiar with them, but he's certain that

24   those statements were so significant in these peoples'

25   minds, that they're the only thing that conceivably

1    could have led them to answer the questions as they

2    did.

3           Again, apart from the survey's failure to ask

4    that question, it simply doesn't make sense, but the

5    failure to ask alone is reason to exclude Dr. Jacoby's

6    testimony because he would be testifying as a survey

7    expert.

8           In the absence of any reason to believe, or

9    basis for concluding that the respondents to the survey

10   were both aware of and motivated by Gila Reinstein's

11   statements of 2007, Dr. Jacoby says, "Well, I can

12   nevertheless conclude that those statements caused the

13   beliefs that are expressed for two reasons.  One is

14   Dongguk's reputation was spotless before the Shin

15   incident; and number two, no other events of any kind

16   that occurred in connection with the Shin incident or

17   over the succeeding year and a half, could have

18   influenced the beliefs that are expressed in connection

19   with the survey.

20          Now, Doctor Jacoby's belief of those two

21   things apparently is based on the representations of

22   Dongguk's counsel.   Apart from -- As we discussed in

23   connection with Dr. Kim's proposed testimony, apart

24   from even whether that's a permissible basis for ever

25   reaching such a conclusion, it's certainly not a

1    permissible basis for reaching a conclusion based on a

2    survey that never even addressed those issues.

3           Doctor Jacoby acknowledged in his deposition,

4    that he was not even aware of a number of issues that

5    were reported, and actually widely reported in the

6    Korean media in connection with the Shin incident, and

7    we discussed them in the brief and I don't want to

8    rehash the details here, but suffice it to say in the

9    absence of survey questions, I'd ask respondents if

10   they were aware of those incidents, or found that -- if

11   they were thinking of those incidents, or found that if

12   those incidents colored their views, there's simply no

13   way for Dr. Jacoby to know, and it is not the case that

14   the survey somehow excluded that anyway, by instructing

15   the respondents to answer questions based solely on the

16   narrow definition of the Shin incident that's provided

17   in the survey.  To the contrary, the survey actually

18   instructed the respondents to answer questions based on

19   everything they remember seeing, hearing and reading

20   about the Shin incident.

21          When the respondents were asked Question 6,

22   upon which Dr. Jacoby's ultimate conclusion purportedly

23   is based, the question is -- was not about what

24   respondents think of Dongguk's supposed failure to send

25   a verification letter to Yale, the question was Dongguk

1    University's actions in the Shin incident.

2           In the absence of any question, and in the

3    presence of instruction to consider everything that was

4    seen, heard and read in connection with the Shin

5    incident, it's simply impossible for a survey expert to

6    conclude that all of those people were thinking only of

7    statements that Dr. Jacoby acknowledges he doesn't even

8    know if they were aware of in the first place.

9           I want to spend just a moment to respond to

10   Dongguk's apparent explanation that Dr. Jacoby made

11   respondents aware of Yale in the context of the Shin

12   incident.

13          I'm not quite sure, as we say it in the

14   brief, what Dongguk means by that, but all of -- that

15   the survey respondents were told about Yale, in the

16   context of the Shin incident, is that Yale is the

17   University from which Shin falsely claimed to have

18   received a degree.  That obviously does not mean the

19   respondents know that Yale also had a representative

20   make various statements to the Korean media, or that

21   the media reported those statements, or that those

22   statements differed in some ways from statements made

23   by Dongguk, or that the people remembered those

24   statements a year-and-a-half later, or that those

25   statements influenced their views on a number of

1    issues.  It simply means that respondents heard that

2    Shin claimed to have a degree from Yale.  It obviously

3    doesn't permit Dr. Jacoby to draw any conclusions about

4    the causality of any Yale statements.

5            I want to spend just a moment to discuss the

6    role of control groups and control questions, because I

7    think there's a bit of confusion being sown by Dr.

8    Jacoby and Dongguk's memorandum.

9            The point of a control group or a control

10   question is to eliminate noise, essentially eliminate,

11   as Dr. Jacoby said in his deposition, other plausible

12   causes of survey results.

13           In an absence of control questions, a survey

14   (unintelligible) doesn't know why respondents are

15   giving the answers they're giving.  Dr. Jacoby has

16   acknowledged this.  He's acknowledged this in academic

17   writing.  He's acknowledged it in connection with

18   litigation.  He's criticized adverse survey experts who

19   purport to draw causal conclusions without using

20   control groups or control questions.  He's done it, as

21   we said our brief, in cases that had nothing to do with

22   the Lanham Act or trademark law.

23           Obviously, it should be very clear that the

24   use of controls has nothing to do with trademark law.

25           Pharmaceutical companies use controls to

1    determine their -- the cause of drug reactions, nothing

2    to do with trademark law, it's simply a way to rule out

3    other plausible explanations for the reactions.

4            The acknowledgment in Dongguk's memorandum,

5    that Dr. Jacoby's survey here is an opinion survey and

6    not an experimental design is significant.  It's huge,

7    in fact, because as Dr. Jacoby himself has said an

8    opinion survey doesn't tell you anything about

9    causation.  It might tell you what people think, but it

10   doesn't tell you why they think it, doesn't tell you

11   what caused them to think it, and those are his

12   conclusions here.  His conclusions are only relevant to

13   this case because of the causal aspect of them, and

14   he's essentially acknowledged, he has acknowledged that

15   the sort of survey he's done here doesn't permit that.

16           Dongguk clearly says he did not use

17   experimental design.  As we point out in the reply

18   memorandum, Dr. Jacoby has criticized other experts and

19   said, "Look, without experimental design you can't draw

20   any causal conclusions."  That's a whole point.

21           Dongguk argues that Jacoby's -- Dr. Jacoby's

22   survey did, in fact, use control questions, and it's

23   worth pausing a moment to not just take that at face

24   value, but actually look at those two questions.

25           One of those questions asks respondents if

1    they've heard of a series of universities.  Several of

2    them are actual universities and one is fictional.

3          It is -- As we say in the memorandum, I think

4    it is conceivable that they use (unintelligible), and

5    that such a question could serve as a control question

6    in connection with the respondent's awareness of

7    universities, not in connection with anything else, of

8    course, because all it tells you is how reliable are

9    the responses to that question.

10         The other control question that Dongguk

11   asserts was used, asked respondents if they were aware

12   of a fictional joint MBA program.  They don't explain,

13   and it is far from clear to me, what purpose they think

14   that serves.  A control question is not simply

15   something you put a checkmark next to and say, "Right.

16   We've used what we call a 'Control question' because

17   it's got a fictional component, therefore we've

18   discharged our duty."  A control question actually has

19   to be used in connection with the particular test

20   questions that are used in the survey in order to rule

21   out other plausible causes of the answers to the survey

22   questions.

23         There's no question in Dr. Jacoby's survey

24   whose answers could be explained, or whose potential

25   causes could be ruled out in any way because of

1   whatever respondents said in response to a question

2   about their awareness of a fictional joint degree

3   program.  Whether respondents said they were or were

4   not aware of a fictional joint degree program says

5   nothing about the accuracy, or the cause, I guess, of

6   the respondent's answers to questions about their

7   awareness of the Shin incident, thoughts about whether

8   Dongguk told the truth.  It's simply irrelevant.

9           And again, it's worth reiterating a

10  particular point that we do make in the brief.  It is

11  -- Survey noise is present all the time.  It's

12  impossible to eliminate.  In every survey there are

13  some questions and some respondents who will -- which

14  will involve either, you know, a leading component to a

15  question, or a respondent's confused, or a respondent

16  is guessing, or a respondent has some prior notion

17  before even entering into the survey, that might color

18  something.  You don't know.  That's why you have to use

19  the control questions, to find out.

20          And again, as Dr. Jacoby has acknowledged,

21  noise is present all the time.  You can't simply

22  eliminate it.  You have to quantify it and then

23  discount it from your survey responses, and that wasn't

24  done here.

25          Regarding the survey's leading questions, I

1    don't want to dwell too long on the particular survey

2    language.  As we've explained in the memoranda, Dr.

3    Jacoby has -- himself has defined a leading question as

4    "A 'Yes' or 'No' question that provides only the

5    affirmative, and no response options," and that, as

6    we've said in our brief, to a "T" describes a number of

7    the questions in Dr. Jacoby's own survey, but -- and

8    there are Dongguk and Dr. Jacoby's arguments about

9    rotating response options is relevant to a point, only

10   to a very limited point, and that is, while it's

11   possible for the order in which response options are

12   presented to influence a survey's responses, that's not

13   the only way in which a survey question can be leading.

14   It's simply one small component of it and, of course,

15   as I think we've pointed out already, only a few of the

16   survey questions had response options and rotated those

17   response options.  So it's no real response to the

18   substance of this issue anyway.

19          Beyond the particular language of each

20   question on its own terms, it's important to look at

21   the survey questions in the context of the entire

22   survey because these questions weren't asked in a

23   vacuum, and they weren't thrown at each individual

24   respondent, you know, separately.  They were actually

25   asked in sequence, of all the respondents, and as Dr.

1    Jacoby acknowledged in his deposition, survey

2    practitioners spend lots of hours putting together

3    surveys, and part of what they do is making sure they

4    get the order of the questions right.  He acknowledged

5    that that's an important component of designing a

6    survey.

7              Dr. Jacoby's conclusions here are at least

8    purportedly based on the responses to Question 6, which

9    asked respondents, "How has your view of Dongguk

10   University changed as a result of Dongguk University's

11   actions in the Shin incident?", and respondents

12   presumably say either (unintelligible) "It has gotten

13   worse" or "It's gotten better."

14             By the time respondents were asked that

15   question, they had been told first, Question 2.c., that

16   there was a degree forgery incident at Dongguk

17   University.

18             They had also been told, in Question 2.a.,

19   that Dongguk had employed a professor who made false

20   claims, and who had submitted a forged document to

21   Dongguk.

22             They had been asked questions about whether

23   Dongguk failed to verify that professor's degree, and

24   whether Dongguk had told the truth or had not told the

25   truth to the public.

1           Then they're asked, "How has your view

2    changed?  Has it become more positive or more

3    negative?"  Unsurprisingly, in the context of that

4    survey, after all that was told and asked of those

5    respondents, 324 people said their view had become more

6    negative, and 11 said their view had become more

7    positive, and it is obviously inexplicable as to how,

8    based on all of that, 11 people could have said their

9    view had become more positive, except to believe that

10   they really didn't understand what was going on, they

11   were guessing.

12           And, in fact, I think perhaps even more

13   amazing, is that 59 people, after saying that their

14   view of Dongguk had changed as a result of these

15   issues, said they didn't know if it had become more

16   positive or more negative, and Dr. Jacoby acknowledged,

17   obviously he had to, those are the only two options.

18   There's no third way for views to change.  They simply

19   didn't know.

20           Dongguk's response, or explanation of

21   Question 6, they say, "Well, the response options were

22   rotated."  Obviously, rotating more positive, more

23   negative, in response to that question, does not

24   address the fundamentally leading nature of the entire

25   survey.  It simply fails to add yet one more

1    potentially biasing component to an already biased

2    survey.

3            As I hope we've made clear in the

4    memorandum, Dr. Jacoby's testimony would not assist the

5    jury here, and I think that's very important because

6    looking at the survey, you have to ask yourself, "What

7    is the survey trying to accomplish?  What is its role?"

8    And all that this -- What Dr. Jacoby says the survey

9    were unable (phonetic) to testify to is Korean people

10    have negative views of Dongguk.

11            The Korean people have negative views of

12    Dungguk because Yale made false statements to the

13    Korean media, and I can draw that conclusion because

14    Dungguk's reputation was unblemished before the

15    incident, and nothing else related to this incident

16    could have affected Dungguk's reputation in connection

17    with this survey in any way.

18            Those are four pretty significant issues in

19    this case that Dr. Jacoby would just dismiss with the

20    wave of a hand and instruct the jury to simply

21    essentially take his word for it, even though these

22    issues weren't even tested in this survey.  It's hard

23    to say how a survey expert could assist the jury in

24    understanding issues that his survey never even tested.

25            As we say in the brief, this is not a case

1    where one can look at a couple of survey flaws and say,

2    "Well, the survey is not perfect but we'll let a jury

3    discount them."

4          The fact that Dr. Jacoby didn't even ask the

5    relevant questions in the survey, to get answers that

6    would inform his supposed opinions here, means the

7    survey and the testimony need to be excluded in their

8    entirety because they're simply -- as we say in the

9    reply memorandum, with respect to the ultimate

10   conclusions that are being offered here, there really

11   is no survey to evaluate.

12         If there are no questions, I have nothing

13   more.

14         THE COURT:  Actually, I do have a question.

15         You didn't really address, in your papers,

16   the Schering factors.

17         Is that because you think that they don't

18   apply here or, if not, what's your sense of how they do

19   apply?

20         MR. FETNER:  Sure.  Well, it's a -- maybe a

21   three-part answer.

22         The first part is, as I just said at the very

23   conclusion of my argument, it doesn't make sense to

24   dwell on whether a survey that was conducted in a

25   certain way meets particular factors if the conclusion

that's being offered from that survey has no basis in
the survey at all.  The way in which the survey was
conducted is essentially irrelevant to that conclusion,
but an even more significant point is that's not the
only flaw with Dr. Jacoby's survey or conclusions.

Schering itself involved an issue that's
completely unrelated to the instant motion and to this
case.  It involved the Court's analysis of a hearsay
objection, and I think the particular issue was the
circumstances under which scientifically conducted
surveys may be admitted into evidence over a hearsay
objection.

There's no hearsay objection and I -- There's
no hearsay objection in the bulk of surveys, certainly
not at this point in time, because they're routinely
offered into evidence and they're routinely evaluated
and, as we say in the memorandum, they're often, in
fact, excluded altogether from evidence, based on a
number of the same objections that we've made, based on
the absence of controls or control questions, or even
based on the inadequacy of controls or control
questions that are used, based on the leading and
biased nature of a survey and, in an extremely rare
occasion, I think, based on a survey's failure to even
test the relevant issue.  So, I don't think Schering is

1    -- Well, it's certainly not controlling in that sense.

2         I -- It is relevant in the sense that we

3    don't dispute that the factors that are discussed in

4    that case are relevant, but that's not -- it's -- maybe

5    the best way to look at it is as a floor rather than a

6    ceiling.

7         Certainly, there are certain minimum --

8    minimal criteria that surveys need to meet, and those

9    are among them, but those don't automatically warrant

10   the admission of a survey.  It might just as

11   (unintelligible), overcome a hearsay objection, which

12   isn't even made here, so it's not really determinative.

13        And, I mean, I don't want to belabor it.

14   There certainly are a number of particular issues with

15   the way the survey was conducted, the way it was

16   designed, the way the data were reported.  We allude to

17   this in our initial memorandum, that are inadequate, as

18   well.

19        The headline issues here are so obvious and so

20   fundamental that it's not worth dwelling on those

21   because it would only distract from the fact that this

22   -- there is no relevant survey to inform the

23   conclusions that are being offered, regardless of how

24   it was conducted.

25        THE COURT:  Okay.  Thank you.

1          MR. FETNER:  Thank you, Your Honor.

2          THE COURT:  Mr. Weiner?

3          MR. WEINER:  Your Honor, Mr. Fetner's

4    argument is probably argument he ought to make at the

5    end of the case, but not for Daubert motion.

6          When he says it's so obvious that this survey

7    should be disregarded, what he's really saying is, "I

8    don't have any survey authorities that support my

9    position because all the authorities that Dr. Simonson

10   cited, we were able to show Your Honor actually

11   supported Dr. Jacoby's survey.

12         THE COURT:  But don't you think that the

13   survey is fundamentally flawed from the get-go because

14   it doesn't address the specific causation question of

15   what caused whenever attitudes the Korean people have?

16         MR. WEINER:  No, because there's a public --

17   it is simply what it says it is.  It is a survey

18   designed to find out whether people changed their view

19   of Dungguk as a result of the publicity that occurred,

20   did they believe that Dungguk lied about the fact that

21   it said it had sent an inquiry to Korea.  That goes to

22   the reputation.

23         This survey was designed to find out what

24   people's views were as a result of what they heard in

25   the media.

1          To give you an example, let's assume, and I'm

2   sure you remember, Your Honor, back in, I think it was

3   about maybe 20 years ago or so, when Audi 5000, there

4   was a 60 Minutes program on the acceleration problem of

5   the Audi 5000, and people stopped buying that car in

6   droves.  Their reputation was damaged.

7          The purpose of the survey was to find out

8   whether there was a change in perception as a result of

9   what was reported in the media during the Shin

10  incident, and that's what these survey questions were

11  designed to find out, and that's what they did find

12  out, that there was a change in perception, and the

13  only way you can find out through a survey is to ask,

14  did you -- "Is there a change in your perception?"

15         For example, we just asked this at Dr.

16  Simonson's deposition.  If I wanted to find out whether

17  Governor Schwarzenegger's reputation was changed as a

18  result of the reports that he had a child -- a love

19  child with another woman, asking that question is

20  appropriate, has your -- in your view, has your -- "Do

21  you think less or more of Governor Schwarzenegger as a

22  result of the fact that he had a love child?"

23         THE COURT:  But that's not the question that

24  the survey asked here.  I mean, --

25         MR. WEINER:  The survey --

1          THE COURT:  -- it seems to me the analogous

2     question would be, "Do you think more or less of

3     Dongguk University because Yale said that they lied

4     about making an inquiry concerning Ms. Shin's Ph.D?

5          MR. WEINER:  No, because we were not asking

6     about -- First of all, we -- if we were to ask that,

7     that would have been objectionable, that Yale lied.

8     They would have been all over us for saying that Yale

9     lied, or mischaracterizing the evidence.  We couldn't

10    ask that kind of a question.

11         THE COURT:  Okay.  I understand that.

12         MR. WEINER:  Okay.  So no less --

13         THE COURT:  But --

14         MR. WEINER:  So no less -- But let's take a

15    look at the questions.  I think that -- Your Honor has

16    to look through them.

17       (Pause.)

18         MR. WEINER:  Start with 2.a.

19         THE COURT:  Okay.

20         MR. WEINER:  2.a. is what Dr. Simonson

21    acknowledged is a stimulus.  Nothing wrong with it.

22    It's simply to put a context.

23         3.b. -- Question 3 is to tell people, you

24    know, "This is how you may have heard of it."

25         Now we get to the core:

1              "In the process of employing Shin Jeong-Ah as

2              a professor, which of the following do you

3              think Dongguk did?  They contacted Yale.  Did

4              not contact Yale."

5         What's wrong with that question?

6              "Have no opinion."

7         THE COURT  Well, there's nothing wrong with

8    -- there may be nothing wrong with the question, but of

9    what help is that to the jury in this case?

10        MR. WEINER:  Because if you go on, Question

11   b., if you think that Dongguk did not -- Question --

12   did not contact -- has, or wait.

13             "Do you think your belief that Dongguk

14             University did not contact Yale University to

15             verify whether Shin Jeong-Ah received" a

16             corporate -- "a doctorate degree has affected

17             or changed your view of Dongguk University?"

18        The media reports were Yale said Dongguk

19   never contacted Yale University.

20        Now, this question is asking, "If you believe

21   that, if you believe that, has that changed your view

22   of Dongguk?"  Nothing wrong with that question either.

23        Now, I don't have to ask, or the survey

24   didn't have to ask, "How did you come to believe that

25   Dongguk didn't contact Yale University?", because the

 1   media was out there.  There's no dispute about that.

 2   It was, you know, one of the largest stories in Korea.

 3            We have already established, in the earlier

 4   questions, that they had heard, and if they said they

 5   didn't heard -- had not heard of the incident, those

 6   people were counted in anyway, as part of the

 7   denominator.

 8            THE COURT:  But wasn't the failure to contact

 9   Yale a part of the Korean prosecutor's investigation of

10   Dongguk?

11            MR. WEINER:  No.  In fact, the Korean

12   prosecutors were the ones who told Dongguk that Yale

13   had received the documents.

14            THE COURT:  Well, I know that eventually

15   happened, after the --

16            MR. WEINER:  No, the --

17            THE COURT:  -- the prosecutor --

18            MR. WEINER:  -- the prosecution, which

19   switched a little bit, the initial prosecution was

20   Shin.

21            THE COURT:  Right.

22            MR. WEINER:  Then it -- there was these

23   stories about Shin and her lover, and the issue was

24   whether Dongguk had received grants that it should not

25   otherwise have received, nothing about contacting Yale

1    or not contacting Yale.

2            THE COURT:  I thought, I don't remember where

3    I read this, but I thought that I read --

4        (Pause.)

5            THE COURT:  Yes.  In -- This is on page 8 of

6    a Dr. Jacoby's report.

7            MR. WEINER:  Yes.

8            THE COURT:  He says:

9            "In or about early August 2007, the Seoul

10               Western District Prosecution Office commenced

11               a criminal investigation," at cetera.

12           "Among other things, the prosecutors were

13               interested in whether Dongguk University had

14               verified Shin's Ph.D., as it had claimed."

15           MR. WEINER:  Yes, but that wasn't a public --

16    That was not public.

17           THE COURT:  Okay.  I mean, he doesn't say

18    that.

19           MR. WEINER:  Yes.  That wasn't reported in

20    the press, and if that had come up in the press, by the

21    way, it would've been as a result of Yale's public

22    statements that it hadn't, hadn't received a

23    communication.

24           THE COURT:  But who's going to say that?  I

25    mean, how are you going to establish that as a

1   (inaudible).

2           MR. WEINER:  I'm not trying to establish

3   anything other than from a reputational point of view,

4   again, this all goes to reputation, that as a result of

5   the press reports which we have the evidence of, that

6   Yale was claiming that it never received a

7   communication from Dongguk.  People became aware that.

8   Doesn't matter whether they read it directly or they

9   heard it from their neighbor or their parent, but they

10  heard it, and as a result of that -- and then we have

11  -- That's called "Negative word of mouth."  As a result

12  of that, that caused them to change their view of

13  Dongguk.  That's what the survey asked for.

14          THE COURT:  But the survey never mentions the

15  statement made by Yale.  The survey only talks about

16  the incident as described in the opening question.

17          MR. WEINER:  Right.

18          THE COURT:  So what opinion is it that you

19  expect Dr. Jacoby to offer?

20          MR. WEINER:  To say that as a result of

21  people's awareness of the Dongguk incident, which was

22  reported in the press, and the articles were published,

23  because people said they heard about it, that that

24  caused them to change their opinion of Dongguk as to

25  whether it was telling the truth when it said it had

1    sent Yale a letter seeking to verify Shin's Ph.D.

2              THE COURT:  I don't understand how you get

3    from the first part of that sentence to the second part

4    of that sentence when no one ever was asked.

5              I mean, the predicate question for number

6    3 --

7              MR. WEINER:  Yes.

8              THE COURT:  -- was:

9              "Some people may have learned about the

10             incident through conversations, and other

11             people may have learned through reports on

12             TV, the radio, in newspapers, magazines, on

13             the Internet or other media."  Do you -- Did

14             the -- "Did your knowledge of the incident

15             come purely from what you know through

16             conversations, or did some of it come from

17             reports that you saw or heard?"

18             MR. WEINER:  But can --

19             THE COURT:  And some people said that it came

20   from reports that they saw or heard, but the answer was

21   -- the instruction as to the succeeding questions was:

22             "Answer the remaining questions based on

23             everything you remember seeing, hearing and

24             reading about the incident."

25             MR. WEINER:  Right, and the question --

1          THE COURT:  And I don't understand how, with

2    that broad an intro, factually, there could be a

3    conclusion that anything Yale did caused any of this.

4          MR. WEINER:  This isn't a causation.  This is

5    not a causation --

6          THE COURT:  But if it's not about causation,

7    what use is it to the jury?

8          MR. WEINER:  Because it's about impact on

9    reputation.  I mean, it -- this --

10         THE COURT:  But it has to be the impact of

11   what they did.

12         MR. WEINER:  Oh, let me -- Maybe -- Let me

13   see if I can -- If you look at Question 2.a., the

14   incident is whether -- where Dungguk University

15   imported Shin Jeong-Ah as a professor after Dongguk

16   University believed Shin Jeong-Ah's false claims and a

17   false -- forged document showing she received a

18   doctorate degree from Yale University in the United

19   States.  So that's -- We have defined the incident.

20          Then we're saying, in the core of it, "Do you

21   think you believe that Dongguk contacted Yale or not?",

22   in that context?  The media reports were out there.

23   I'm not sure, Your Honor, how you would have us or have

24   Dr. Jacoby, in that particular case, design the survey.

25   The media reports are there, where we -- he has said,

1    "Here is the incident", and we're talking at Dongguk

2    here.  "Is it your view that Dongguk lied or didn't

3    lie?"  As it -- Is it your view, as a result of this,

4    that your view of their reputation has gone up or gone

5    down?  It doesn't say, "Do you believe that Yale lied."

6    We're not asking anybody to conclude whether Yale lied,

7    or whatever, simply, "What is your view of the

8    reputation of Dongguk as a result of the incident?"

9            A fact has occurred.  They could not put into

10   the question, by the way, you know, Yale misled, or

11   Yale falsely stated, or Yale incorrectly stated.  That

12   would have been an improper question.

13           THE COURT:  But you could -- Couldn't you

14   have asked, "Were you influenced by any statement by

15   Yale University?"

16           MR. WEINER:  That was -- Those were their

17   published statements.  Those were the incident -- That

18   was what the incident was.  It was the panoply of

19   articles that occurred between July and August,

20   actually through -- even into September, about what

21   Dongguk did or didn't do.

22           THE COURT:  But that's not what it says.

23   What it says is, "Everything you heard and know and

24   read about this incident", --

25           MR. WEINER:  Right.

1          THE COURT:  -- and that can't just be about

2    Yale.

3          MR. WEINER:  Well, then that -- If that's the

4    position that Yale is going to argue, that will go into

5    the weight of those conclusions.  If they can say,

6    "Look, you can't tell from these responses whether the

7    people who were responding were taking into

8    consideration other extraneous factors," that's going

9    to go to the weight, it's not going to go to its

10   admissibility, but there is no way a survey can get

11   designed the way Your Honor would suggest we design it,

12   which is, you know, assume Yale -- essentially, we have

13   to go and say that.  Assume Yale misstated the facts.

14   How would you have an introductory question?

15         THE COURT:  Well, even if you -- I mean, it

16   doesn't matter, for purposes of this problem, whether

17   Yale accurately stated it or inaccurately stated it.

18   What's important for, I think, for your case, is that

19   it was a Yale statement that caused the effect on the

20   Korean public, not something else, and so -- I mean,

21   and then, you know, as part of the case, your proof

22   that the statement was false, and then you have the

23   evidence that the false statement caused a particular

24   affect which damaged you, but it seems to me that in

25   this case you can't get from Point A to Point B because

you don't have any evidence in the survey, that what Yale said was the cause of the change in the public's perception of Dongguk.

MR. WEINER:  Well, my answer would be, "There's nothing else that would've caused it."  What else would have caused it?  If it -- You know, asking whether they thought -- Remember the question, "Do you believe that Dongguk communicated with Yale?"  That's the question.

Other than Yale's statement, what else would have caused that?  That's the core (unintelligible). "Do you believe that Dongguk communicated with Yale?" It can only be -- An opinion can only come from -- based upon Yale's statements.

THE COURT:  But, I mean, if what you're focused on is the belief that Dongguk did not contact Yale is the -- is sort of the root of the problem, only 18 percent of the people said that affected their opinion.

MR. WEINER:  That's a lot of people, 18 percent.

THE COURT:  But all of them didn't -- It wasn't negative for all of them.

MR. WEINER:  Well, I don't have the statistics right in front of me.  I believe it's more

1    than 18 but --

2              THE COURT:  All right.  I'm --

3              MR. WEINER:  -- (unintelligible) --

4              THE COURT:  -- looking at page 22.

5              MR. WEINER:  -- we're talking about -- but

6    we're talking about the question.

7              THE COURT:  Yes, I'm talking about --

8              MR. WEINER:  Okay, but --

9              THE COURT:  -- page 22.

10             MR. WEINER:  --  we're talking about the

11   question itself.  The question -- The core question is,

12   "Do you believe that Dongguk contacted Yale?"  The only

13   way that someone would say "No" is because Yale said

14   "No", in order for you to have a belief.

15             And then it asked, "If you believe that, that

16   Dongguk didn't contact Yale," --

17             THE COURT:  Right.

18             MR. WEINER:  -- "did that cause you to have a

19   better or worse opinion of Dongguk?", and that's the

20   reputational damage, and (unintelligible) result, "Did

21   you believe that brought shame?", but the core question

22   of whether they contacted Yale can only be based upon a

23   communication with Yale, and nothing else.

24             THE COURT:  And that's the one where 25

25   percent of the people, approximately, said no, they

1    didn't believe it, right?

2         MR. WEINER:  Yes.  That's a lot of people.

3    You know, two percent's not a lot, maybe.  Or even

4    that, I would say, is a lot, but 25 -- a quarter of the

5    population -- of the adult population is quite

6    significant, and the only source for that -- for

7    someone to have an opinion on that is based upon their

8    knowledge of what Yale said.

9         THE COURT:  And not what the prosecutor said?

10   Not what --

11        MR. WEINER:  Prosecutor --

12        THE COURT:  -- the press said?

13        MR. WEINER:  -- didn't say anything about

14   this.  We're talking about Yale -- We're talking about

15   what -- whether Dongguk told the truth when it said it

16   contacted Yale.  The prosecutor has never accused

17   Dongguk of not telling the truth, and even had it

18   accused Dongguk of not telling the truth, it would've

19   been an absolute, what's the word I'm looking for, it

20   would have been as a result of Yale's statements,

21   wouldn't exonerate Yale, it would just further damage,

22   as a result of Yale's statement, assuming that was

23   publicly out there.

24        It all emanates back from what Yale said.  It

25   can only be that.  It's a very focused question.

1       (Pause.)

2              THE COURT:  What conclusion, then, do you

3       want the jury to draw from this evidence, assuming that

4       Dr. Jacoby is --

5              MR. WEINER:  That people --

6              THE COURT:  -- allowed to give it?

7              MR. WEINER:  -- changed their view of

8       Dongguk.  They thought it was a lying institution, that

9       it was lying to the public, it was lying to it's

10      faculty, and lying to everyone.

11             THE COURT:  And therefore?

12             MR. WEINER:  That causes damage to your

13      reputation, particularly when you're a Buddhist

14      institution known as the premier Buddhist institution

15      in the world.  Those are reputational damages.

16             THE COURT:  So you're not, at this point,

17      talking about the causation of the specific economic

18      damages that --

19             MR. WEINER:  No.  The economic damages stand

20      separate and apart.

21             THE COURT:  Okay.

22         (Pause.)

23             THE COURT:  And what about the three

24      subgroups?

25             MR. WEINER:  Which three subgroups?

1           THE COURT:  The three subgroups that Dr.

2    Jacoby identifies as more important, in his survey.

3           MR. WEINER:  Well, --

4           THE COURT:  The people who were thinking

5    about going to graduate school.  The people who were --

6           MR. WEINER:  Well, there are --

7           THE COURT:  -- discussing --

8           MR. WEINER:  Yes, you can look -- We surveyed

9    the adult population but I --

10          THE COURT:  Right.

11          MR. WEINER:  -- we also broke it down --

12          THE COURT:  Uh-huh.

13          MR. WEINER:  -- by geography, age, things of

14   that nature, and you can say, or argue, or conclude

15   that if you're thinking of applying to colleges, that

16   it may have more significance to those people than to

17   others, and I think that he was referring to that, you

18   know, as someone who's, you know, 68 years old and not

19   sending any children to college is not -- you know,

20   there's not going to be alumni, there -- may be less

21   important, but I don't think that's a significant focus

22   of the -- for purposes of where we are today.

23          THE COURT:  I didn't mean to interrupt you,

24   Mr. Weiner, but I had another question.  Maybe this is

25   not the right time to ask it --

1              MR. WEINER:  You're not going to

2      (unintelligible) respond to the questions, then I'll

3      pick up whatever is left.

4              THE COURT:  About the apology, the lack of

5      effect of the apology, how --

6              MR. WEINER:  Yes.  He explains that, and what

7      he says is what -- The survey was taken after Yale had

8      issued its so-called apology, which we all discuss or

9      debate whether that was an apology or not, but it was

10     publicized, and after the original Complaint was filed,

11     and had that apology had a significant effect, in his

12     view, you wouldn't gotten 25 percent, or whatever

13     numbers you got here.  It could have been one percent.

14             So he drew the conclusion that the apology

15     did not have the effect that maybe Yale would have

16     liked it to have had.

17             You still -- You know, this survey was taken

18     after that incident and after the lawsuit was brought,

19     which basically explained what we believed had

20     happened, which was exculpatory, but you still got a

21     very, very significant proportion of people saying

22     "Dongguk, you're lying."

23         (Pause.)

24             THE COURT:  So it's Dr. -- In your view, it's

25     Dr. Jacoby's -- The important opinion that you would

1    expect Dr. Jacoby to offer at trial is that -- the

2    specific survey question about believing or not

3    believing that Dongguk contacted Yale?

4              MR. WEINER:  That Dongguk lied when it said

5    it had contacted Yale.  People concluded that it had

6    lied, and that as a result of concluding it had lied,

7    it thought less of the University, in significant

8    numbers.

9              Remember, the survey questions says you can

10   have no opinion.

11             THE COURT:  Uh-huh.

12             MR. WEINER:  And it doesn't -- It doesn't say

13   you have to say "Yes" or "No."  You can have no

14   opinion.

15             THE COURT:  Okay.

16             And there were a significant number of --

17             MR. WEINER:  Yes.

18             THE COURT:  -- people that didn't have an

19   opinion.

20             MR. WEINER:  Right.

21        (Pause.)

22             THE COURT:  And the conclusion that's in the

23   report, that there was not only an affect, but it was a

24   substantial long-lasting harmful affect, what's that

25   based on?

1              MR. WEINER:  I think that that -- I think he

2    explained it, that if you had this many people after

3    the apologies, at the time the survey was taken, which

4    was after the lawsuit was brought, still believing what

5    it believed, that's substantial and long-lasting.

6              THE COURT:  And again, that's based purely on

7    that one question?

8              MR. WEINER:  On -- By the -- Not just the

9    one, but --

10             THE COURT:  On the 20 -- On the 25 percent?

11             MR. WEINER:  As it develops throughout the

12   rest of the survey, yes.  I mean, I have -- I'd go

13   back, you know, look specifically at how he came to his

14   numbers, but it emanates from that, yes.

15             THE COURT:  Well, because it seemed to me

16   when I read the survey questions, that the other

17   questions having to do with Dongguk's reputation, the

18   problem with them was that they were broader.  They

19   talked about the incident, and they didn't limit it

20   only to information that would have been attributable

21   to Yale.

22             When you think about --

23             MR. WEINER:  Yes, you -- I understand what

24   you're saying, Your Honor.  You could argue that, and I

25   think that goes to the weight.  Certainly doesn't go to

1    the admissibility, as to whether those questions pick

2    up what Mr. Fetner would refer to as "Noise", but that

3    would not go to the admissibility of it.

4            THE COURT:  Well, why wouldn't it go to

5    admissibility if there's no causation question?  I

6    mean, you know, --

7            MR. WEINER:  Because I would -- Your Honor, I

8    would actually argue that these questions are an actual

9    follow up of people who thought they lied.

10           I mean, you're saying that somehow this

11   brings into -- other individuals.  I'm saying it

12   doesn't, but if you're going to argue that, then it's

13   going to go to the weight.

14           To me, if you conclude that someone has lied,

15   you have now concluded that -- or you think worse of

16   them, and then the next question is, "And by the way,

17   do you think this has brought shame on your country?"

18   It's a flow.  They're not -- They didn't open up a new

19   area, it's followed one to the other.

20           THE COURT:  But the question, for example,

21   Question 6, was, "How has your view of Dongguk

22   University changed after coming to know about the Shin

23   Jeong-Ah incident?", not after concluding that they

24   lied.

25           MR. WEINER:  I understand what it says.

1          THE COURT:  I mean, there's a lot about this

2     incident that --

3          MR. WEINER:  I understand --

4          THE COURT:  -- that would be --

5          MR. WEINER:  -- Your Honor, I understand what

6     that says and, as I said, I would disagree with Your

7     Honor, but assuming that that's an imperfect question,

8     the law is that goes to its weight, not to its

9     admissibility.

10         The Schering factors, despite Mr. Fetner's

11    efforts to pooh-pooh them, apply here.  They apply to

12    every survey in the Second Circuit, and then by the

13    way, as Your Honor, I'm sure, knows, the Second Circuit

14    standards aren't unique.  These are the standards that

15    are applied around the country, and the only issue

16    under the Schering standards that we have, is whether

17    these questions are leading, and while we could argue

18    the scope, what we're not arguing about is whether

19    they're leading.  These are not leading questions.

20    They're not telling someone how to answer a question,

21    under anyone's definition.

22         So in terms of the Schering factors and, you

23    know, in order to exclude the survey and -- you --

24    there has to be a showing that we haven't met the

25    Schering factors.  We've met the Schering factors.

1    Everything else is going to go to the weight, including

2    control which, by the way, is a bogus argument which

3    I'd like to just address very quickly.

4           At his deposition I asked Professor Simonson

5    who, as I pointed out in our brief, Your Honor, never

6    makes the light of day, whether there is a control that

7    was necessary here, and he testified that there is no

8    control group that's appropriate in this kind of

9    survey, and that's at pages 179 and 180 of his

10   deposition, and that's because you can't have a control

11   group in this kind of a survey.

12          Mr. Fetner argues that you can, but if you

13   think about it, what he's -- what Yale said in its

14   brief is that he should have found another 1200 people,

15   or whatever it was, who never heard of the Shin

16   incident, and that would have been your control group.

17          Okay, and then what do you ask them?  There

18   is no --  There is nothing you can ask them.  If it

19   never heard the Shin incident, there's nothing left.

20   That's why control groups are inappropriate.  That's

21   why Dr. Simonson agreed that control groups are

22   inappropriate here.  They don't make sense here.  They

23   only make sense in consumer confusion cases, when

24   you're trying to isolate, or the consumers are confused

25   by the alleged infringing mark or activity from those

1    consumers, who know nothing about it, and even the case

2    that they cited in their reply brief, which I think is

3    Hernandez v. Attention, LLC, which was a class action

4    notice case, the standard they apply, because the issue

5    in that case was whether there was consumer confusion

6    in the class notice, the Court says:

7            "The Seventh Circuit has repeatedly mentioned

8            consumer survey evidence, like that used in

9            trademark cases, as an appropriate method of

10           showing the particular collection letter is

11           confusing to the unsophisticated consumer."

12           Controls do not apply to this case.  They do

13   not comply to public opinion surveys, just don't, but

14   even if they did, the courts have also made very clear,

15   and we cited them in our brief, they go to the weight,

16   not to admissibility.

17           There is no case that Mr. Fetner has cited,

18   that a lack of control has caused a survey to be

19   rejected because it's not one of the Schering

20   standards, and as to control questions, we disagree.

21   We believe there are control questions.  We have cited

22   the sources the -- in the authorities, whether it's

23   Diamond or others, that say the questions that were

24   asked are legitimate control questions, but then again,

25   that also goes to the weight, not to admissibility.

1          As to other questions that -- For example,

2    Your Honor, said, "Well, you could have asked this" or

3    Mr. Fetner said, "You could have asked that," courts

4    have said, goes to the weight.

5          Could you have designed your survey

6    differently?  Perhaps, but that goes to the weight.  We

7    believe, strongly believe that this survey complies

8    with the Schering standards, that there is nothing

9    inherently wrong about it, that it stands on its own,

10   and we believe that, you know, looking at that one

11   question, Your Honor, so we could maybe disagree with

12   Question 6, but this -- the core of questions from

13   which everything is -- else emanates is based upon what

14   Yale said or didn't say, can (phonetic) be no other

15   source.

16          Thank you, Your Honor, unless you have any

17   other questions.

18          THE COURT:  Not yet.  Thank you.

19          MR. FETNER:  May I reply, Your Honor?

20          THE COURT:  Of course.

21          MR. FETNER:  I guess I'd like to begin where

22   Mr. Weiner began, which is his description of the

23   survey that we're talking about here is -- he says, "It

24   was designed to find out peoples' views as a result of

25   what they heard in the media."

1          The survey doesn't include any questions that

2     ask people either on the one hand, "What do you think

3     as a result of what you read in the media?", or, on the

4     other hand, "Okay, you've told me your views.  What

5     caused you to have those views?", and I think that

6     really is the beginning and end of that issue.

7          If you want to find out what people think as

8     a result of what they've heard in the media, you can

9     ask them what they think of what they've heard in the

10    media.

11         I also think it's worth pointing out that Dr.

12    Jacoby himself disagrees.  When he was asked in his

13    deposition, if the survey was designed to determine

14    causation, he said it was not designed with causation

15    in mind.

16         Of course, if Mr. Weiner is contending that

17    the questions that were included in the survey somehow

18    elucidate what the respondents think about what they

19    read in the media, even that says nothing about Yale.

20         For one thing, as I said, it doesn't actually

21    ask people to have these views as a result of what they

22    read in the media, but even more significantly, even if

23    one accepts that premise, there's no basis in the

24    survey itself.  People may have read many, many, many

25    things in the media that have no connection whatsoever

1    to Yale.

2          Mr. Weiner apparently has the notion that,

3    "Well, even if people think the things that are

4    expressed in the survey because they read some news

5    coverage about a prosecutorial investigation, and even

6    if they believed those things because they read some

7    news article that reported what a prosecutor said,

8    well, it's still Yale's fault because the prosecutor

9    only said it because Yale said it."  How Mr. Weiner is

10   able to read a prosecutor's mind is entirely beyond me.

11         Obviously, a prosecutor conducting an

12   investigation could believe many things for many

13   reasons, and there is no reason whatsoever, certainly

14   not in the context of a survey that asked no questions

15   on the subject, to conclude that a prosecutor

16   (inaudible) believes whatever he believes because Yale

17   said so.

18         Mr. Weiner said several things that require

19   either correction or clarification.

20         One thing he said is Question 2.a. in the

21   survey, he said, is a stimulus, which Dr. Simonson

22   agreed is -- there's nothing wrong with.  There are

23   actually two different questions in the survey that are

24   labeled 2.a.  I'm assuming Mr. Weiner was talking about

25   the one that's actually of some substance, and that is

1   the one that gives the more detailed definition of the

2   Shin incident, and then asks respondents if they're

3   aware of it.

4          Dr. Simonson certainly did not say anything

5   of the kind.  He said, "Yes, it is appropriate to use

6   stimuli in surveys," but that doesn't mean it's

7   appropriate to define an incident in a leading way, and

8   then ask people, including, or actually, only people

9   who have already said that they're not aware of an

10  incident, "Hey, now are you aware of it?"

11         Regardless, Mr. Weiner also seems to confuse

12  what a stimulus is.  A "stimulus" is something that's

13  presented to a survey population in order to gauge the

14  reaction to it.  For example, in consumer confusion

15  surveys you'd -- the survey population would be shown a

16  product, or an advertisement, or a promotional message,

17  and then -- and be asked questions about it.  What do

18  you think about this?  Why do you think it", et cetera.

19  Nothing like that was done here.

20         If Mr. Weiner wants to contend that the use

21  of some stimulus would have been proper here, he'd be

22  talking about a different survey.

23         For example, if Dr. Jacoby had taken some

24  news articles and asked respondents to read them, and

25  said, "Okay, now that you've read this article I'm

going to ask you a series of questions about what you

think as a result of having read that article", whether

that would have been appropriate is beside the point

because it wasn't done here.

          And I think Mr. Weiner's points about, "Well,

Yale criticizes the survey.  Maybe it could have done

this.  Maybe it could have done that," all of that is

really beside the point.  We're not saying Dr. Jacoby,

you know, could have done more.  What we're saying is

what he's done isn't adequate to support the

conclusions he's offering.  Whether some other survey

could support them is irrelevant.  I suppose it's

possible, though it seems extremely unlikely here, that

there are some subjects that are beyond the capacity of

surveys to answer.  That doesn't mean you just do a

grossly inadequate survey, and say, "Hey, it's all we

could do."  It means you've got no survey to explain

your position, and again, whether that's the case here

is irrelevant, but I don't really see why it would be

the case.

          Mr. Weiner -- I'm a little confused on this

question of the role of the prosecutorial

investigation.  I heard Mr. Weiner say that Dongguk's

supposed failure to contact Yale was not part of the

Korean prosecutor's investigation of Dongguk, and

1    furthermore, nothing about that investigation was

2    reported in the Korean media anyway.

3            Suffice to say Dongguk is at the opposite on

4    both of those points, in its summary judgment

5    opposition memorandum.  I don't imagine the Court has a

6    copy in front of it, but just to read the very first

7    part of it, it's on page 37 of that memorandum, Dongguk

8    writes:

9            "In seeking to downplay Dongguk's non-

10           economic damages, Yale makes a series of

11           specious assertions.  For example, Yale

12           claims that the Korean prosecutor's

13           investigation of Dongguk had nothing to do

14           with Yale's statements about Shin."

15           That is false.  I don't -- There's no

16   evidence cited at the end of that sentence, and I --

17   obviously, there's no reason to believe that, but I

18   think it's rather significant that we're now hearing

19   Mr. Weiner say literally the complete opposite of that.

20           MR. WEINER:  Your Honor, I said there was no

21   public prosecution statements about Yale contacting.  I

22   didn't say that we do not view this --

23           THE COURT:  I understood what you said.

24           MR. WEINER:  Okay.

25           MR. FETNER:  The record will reflect what Mr.

1    Weiner said.

2         Mr. Weiner also said something very strange,

3    which is, "The survey is not about causation, it's

4    about the impact on Dongguk's reputation."  I don't

5    know what that distinction is meant to explain because

6    what we're talking about here, in any litigation, is

7    not whether some inexplicable force somehow harmed

8    Dongguk's reputation, it's whether the impact on

9    Dongguk's reputation was caused by Yale, because if it

10   wasn't, it's got nothing to do with this case.  So

11   simply saying it's (unintelligible) impact on Dongguk's

12   reputation is just another way of saying it's about

13   whether Yale's statements had some impact on Dongguk's

14   reputation.

15        THE COURT:  I thought what Mr. Weiner was

16   saying was that he -- that because of this specific

17   question about believing whether Dongguk had to lie or

18   not because a significant number of people, 25 percent,

19   said they believed that Yale had -- that Dongguk had

20   lied, and they could only believe that if they had read

21   and believed the Yale statements because there was no

22   other basis on which anyone could have concluded that

23   Dongguk lied, then that would show that Dongguk's

24   reputation had been damaged by Yale, which was apart

25   from the question of whether Dongguk suffered any

economic damages because of the damage to its

reputation, right?

          MR. WEINER:  Correct.

          THE COURT:  Okay.

          MR. FETNER:  Okay, and I would love to

address that point, Your Honor, because it's on my list

anyway.

          Essentially, what I think you're describing

is Mr. Weiner's statement that there's nothing else

that could have caused respondents to express the

views in the survey, except Gila Reinstein's statements

to the Korean media in July of 2007, that Yale had no

record of either sending a fax or receiving a letter

from Dongguk.

          Here are a number of possibilities.  What

about guessing?  What about confusion?  What about

other awareness of other Dongguk acts, such as news

articles that say Dongguk lied about verifying Ms.

Shin's degrees from the University of Kansas, new

articles saying Dongguk's president lied about the

absence of external influence on Dongguk's hiring

issue, or say the criminal conviction of the chairman

of Dongguk's board of directors?  The list goes on.

          The notion that the only reason a person, in

responding to a survey in December of 2008, could say

1    Dongguk didn't tell the truth is because Yale made a

2    statement a year and a half earlier is preposterous.

3            For purposes of analyzing the survey, the

4    most significant, in fact, I'd say the only significant

5    point is that the question wasn't asked.  If Dongguk is

6    so certain that every one of those respondents who said

7    their view of Dongguk became more negative believed

8    that that became more negative because they believed

9    Yale's statements, all they had to do was ask.

10           And Mr. Weiner is performing mental

11   gymnastics here (unintelligible) they couldn't have

12   been at -- shown a Yale statement.  They couldn't have

13   been told there was a Yale statement.  A Yale statement

14   couldn't have been described to them.  They couldn't

15   have been divided up into separate test and control

16   groups.

17           I have no idea why any of those things would

18   be the case, but it doesn't matter.  The only question

19   that needed to be asked was, "Why do you believe that?"

20           According to Mr. Weiner, one hundred percent

21   of the respondents who said, I think Dongguk's opinion

22   became -- "My opinion became more negative", also would

23   have said, "Because Yale said so."

24           "Why do you think Dongguk lied?  Because Yale

25   said so.  Why do you think Dongguk failed to contact --

1    or Dongguk failed to contact Yale?  Because Yale said

2    so."

3            Again, we don't need to perform any sort of

4    mathematical analysis to figure out what percentage of

5    people would have responded to that question in one --

6    in what way.  What matters, for purposes of the

7    admissibility of Dr. Jacoby's testimony, is the

8    question wasn't asked.  The question wasn't asked, I

9    suspect, because a hundred percent of the people would

10   not have said it was because of Yale.

11           Regardless, a survey expert cannot neglect to

12   ask the key question at the heart of his supposed

13   opinion, and then claim, "Well, if I had asked it they

14   all would have given the answer that would have

15   supported my opinion and, by the way, my client's

16   position (phonetic) in the lawsuit anyway."

17           And if you look at Dr. Jacoby's expert

18   report, the question is right there on the very cover

19   page, "To what" -- This is the title of his report: "To

20   what extent has Dongguk University's reputation been

21   damaged by Yale University's actions in the Jeong-Ah

22   Shin degree forgery incident?"

23           No questions were asked about Yale

24   University's actions in the Jung-Ah Shin degree forgery

25   incident, and if that is really the question that Dr.

1    Jacoby wanted to form opinions on and testify about, he

2    should have asked some question that would have

3    informed it.

4            Another really significant point here, about

5    this notion that nothing else could have caused

6    respondents to respond the way they did, is the concept

7    that's really noise.  The reference manual on survey

8    research, McCarthy on Trademarks, which Dongguk cites

9    in the (unintelligible) brief, both of which Dr. Jacoby

10   repeatedly relies on in his expert testimony, both make

11   very clear, noise is present in any survey.  It's

12   present in every survey.  It's present in every measure

13   of public opinion or popular opinion because human

14   beings are not perfect.  It's not some indictment of

15   the people who design the surveys, or the respondents

16   who participate, it's simply a recognition that they

17   are human, but again, we're not here to try and

18   determine, on some post hoc basis, what percentage of

19   the responses are noise and what percentage reflect

20   genuine belief about Dongguk's reputation as a result

21   of the issues of the Jeong-Ah Shin incident because the

22   questions weren't asked.  Without a control group or

23   control questions, you simply don't know.

24           Mr. Weiner contends no control group would

25   have been possible here.  I don't think that's the

1    case.  It doesn't matter.  Again, as I said before,

2    first of all, he doesn't explain why control questions

3    weren't used.  As we explained in the brief, there's no

4    reason they couldn't be, of course.  You don't need a

5    separate universe.  You don't need people with

6    different knowledge or background or experience.  The

7    same exact people.  Ask all the same questions.  You

8    just add the control questions to them.

9            So, of course, there's no reason they

10   couldn't have been.  In fact, Dongguk claims that they

11   were used in connection with the awareness question at

12   the beginning.  So, of course they could have been, but

13   again, what matters is not what percentage would have

14   been shown to be noise.  We have no idea.

15           The point is we don't know because the

16   question wasn't asked, and if it's not asked, Dr.

17   Jacoby can't claim to know what it would have been.  If

18   you want to express an opinion about that, you have to

19   actually test it in a survey.

20           One specific point here, I think, really

21   bears mentioning.  Noise, as we discussed in the

22   memorandum, basically refers to anything that could

23   cloud the survey responses.  Among those things are

24   just simple confusion of the respondents.

25           In an open-ended survey, it's very clear what

respondents think because you haven't told them
anything.  You simply say, "What do you think?", and
they tell you.

        With closed-ended questions like this, it's
less clear.  If you ask people, "What do you think
Dongguk did?  Did they write to Yale or did they not
write to Yale?"  Mr. Weiner says the only reason a
person could possibly have for saying they didn't write
to Yale is they remembered reading a news article a
year and a half earlier, in which a Yale spokesperson
is quoted saying, "We didn't get a letter from
Dongguk."  That's preposterous.

        When you're asked a closed-ended question
with two choices, you may answer it simply by guessing.
It's the nature of any closed-ended question.  The
answers are presented to the respondents.  They may
guess and, in fact, the actual results of the Jacoby
survey indicate that that is precisely what many, many
of these respondents (inaudible).

        Respondents were asked these two substantive
questions about the Shin incident, right?  First they
were asked, "Which do you think Dongguk did, did they
contact Yale or did they not contact Yale?"  Then they
were asked, "What do you think Dongguk did, did they
tell the truth about the contacting Yale or did they

1   not tell the truth about the contacting Yale?"

2          We've looked through the survey data.  A

3   total of 301 respondents said, "We think Dongguk" did

4   tell the truth, excuse me, "did contact Yale to verify

5   Jeong-Ah Shin's degree."  Well, if you're actually

6   thinking about the issues that are being discussed

7   here, there's no rational way, there's no conceivable

8   way that a person aware of what's being questioned here

9   would think Dongguk both did contact Yale and didn't

10  tell the truth to the public about it.  That person

11  would have to believe Dongguk actually did take the

12  effort to write to Yale, verify Jeong-Ah Shin's degree,

13  and yet when they're asked about the issue by the media

14  two years later, they lied and said, "Oh, no, we were

15  negligent.  We didn't verify that degree."

16         Obviously, that's ridiculous and Dr. Jacoby

17  doesn't claim that anyone really thought that, because

18  it would make no sense.

19         Nevertheless, of the 301 people who said they

20  believed Dongguk did contact Yale, a clear majority of

21  them also said they think Dongguk didn't tell the truth

22  about contacting Yale.  158 of those 301 people said,

23  "Yeah, we think Dongguk wrote to Yale, but we also

24  think they lied about it."  There's zero way to make

25  sense of those numbers.

1          When Dr. Jacoby was asked about that in his

2    deposition, he didn't even try to make sense of it

3    because, of course, there is no sense to come from

4    nonsense.  What he said is, "Well, you're assuming that

5    people are rational."

6          You asked, Your Honor, about the three

7    subgroups that Dr. Jacoby described as particularly

8    significant.  We don't see any basis for the conclusion

9    that they're particularly significant, but the thing

10   that's most striking about it is if Dr. Jacoby believes

11   that people planning to apply to college or graduate

12   school in the next five years are not only relevant,

13   but especially significant, why didn't he ask the

14   people who are likely to do that?  The survey universe

15   excluded all people under 18 years of age.

16         I asked him if he had any reason to believe

17   that in Korea, unlike the United States, the people,

18   say from 13 to 17, are not likely to apply to college

19   in the next five years and, of course, he said "No."

20   Well, of course they are.

21         So it's impossible to believe either that the

22   group he surveyed is particularly significant, but more

23   significantly, that he even surveyed a representative

24   sample of that group to get any meaningful data to rely

25   on in any event.

1          Again, the notion that Dr. Jacoby, you know,

2    couldn't have asked, or couldn't have found a way to

3    find out what caused peoples' beliefs is, forget about

4    the obvious answer and just use the same basic control

5    questions that Dr. Jacoby routinely criticizes other

6    experts for either not using, or not using properly,

7    all he had to do was say, "Why do you think that?"

8          Now, when he was asked that question in his

9    deposition, Dr. Jacoby said, "Well, that would have

10   involved translating the answers into English."  I

11   don't understand -- First of all, I don't know why that

12   would be the case, since the organization that

13   implemented the survey is Korean.  In any event, then

14   that's what you do.  It's the same explanation of -- I

15   had a moment ago.  If there's no control group, and if

16   somehow there are no control questions, if there's no

17   proper methodology that you can use to find the results

18   that you need to find, then you don't do anything.

19   That's not a reason to cut corners.

20         And needless to say, as I'm sure Your Honor

21   is painstakingly aware by now, many, many, many

22   documents have been translated from Korean to English

23   in this case.  Responses to the survey obviously could

24   have been translated, as well, if that's what we needed

25   to actually inform the opinions that Dr. Jacoby wants

1    to offer.

2          And finally, I just want to respond to Mr.

3    Weiner's notion that objections to the lack of a

4    control group or control question somehow go to the

5    weight of a survey, not its admissibility.

6          Dongguk hasn't actually cited any authority

7    in its memorandum for that position, and we're not

8    aware of any authority.  In fact, if you look at pages

9    22 to 23 of our initial memorandum, we cite, it looks

10   like eight to ten cases that actually do exclude

11   surveys entirely because they fail to include control

12   groups or control questions.

13         The notion that the Schering case somehow

14   means that survey can find causal conclusions without

15   using controls is not only wrong on its face, but would

16   come as news to the many second -- judges in the Second

17   Circuit who have, in fact, excluded surveys for that

18   very reason, since the Schering case was decided, a

19   number of which are cited in our brief.

20         Nor, as Mr. Weiner said, do I think the law

21   is any different in any other circuit; that is, if you

22   want to reach a causal conclusion you need to use

23   controls.

24         And the same is true with the issue of noise.

25   It's really the other half of the same coin, noise is

1    always present.  You can't simply say it goes to it's

2    weight because there's nothing to weigh.  We have no

3    idea what the noise is here because it was never

4    tested.

5              I have nothing further, unless the Court has

6    anymore questions.

7              THE COURT:  Would you agree that if there

8    were an adequate foundation to show that the only way

9    that a respondent could form an opinion about whether

10   or not Dongguk had lied about contacting Yale was

11   Yale's statements, so putting aside that as an issue,

12   would -- do you agree that a 25 percent response rate

13   of "Yes" on that question is a significant response

14   rate?

15             MR. FETNER:  Well, I mean, I think issues of

16   significance are really irrelevant here.  I mean, you

17   know, because it -- I think it's significant or not

18   significant to an issue that's entirely irrelevant.  I

19   can't simply say, "Let's ignore the fact that the

20   relevant question was never asked, and assume this

21   question is somehow relevant to the case."  I can't

22   ignore that and, you know, I don't think significance

23   is really an issue that would merit exclusion, in any

24   event.

25             We're not saying, "Only X percent of people

1    said this, therefore, it doesn't go, you know, it

2    shouldn't go to a jury."  Frankly, if zero percent of

3    the people said, you know, "We have negative thoughts

4    of Dongguk", we wouldn't think that would be a basis

5    for exclusion either.

6              So I don't really think that that, on it's

7    own, would be grounds for exclusion, and we haven't

8    argued that.

9              THE COURT:  Thank you.

10             Mr. Weiner?

11             MR. WEINER:  Just very quickly.

12             As to the age of the respondents, I believe

13   it is against the law to survey anyone under the age of

14   18, which is why no one was surveyed under 18.

15             THE COURT:  Right, but this definition of

16   people as likely to apply in the next five years --

17             MR. WEINER:  Or -- Well, you're dealing with

18   the adult population with, I mean, that's -- but I --

19   as I read it.  I just went back and took a look at it.

20             THE COURT:  Okay.

21             MR. WEINER:  This notion of control and

22   Schering, the cases that Mr. Fetner refers to

23   throughout his brief and the reply brief, are cases

24   where the surveys were admitted into evidence.  There

25   was testimony from the experts and at the end of the

1   case, typically they were bench hearings or injunction

2   motions, a court concluded that they rejected the

3   survey evidence that was admitted or ready.

4           We're here on a <u>Daubert</u> motion to prevent the

5   admissibility of those materials.

6           And third, just to go back to this notion of

7   somehow, and picking up where I had left off, you know,

8   these are focused questions.  This wasn't about the

9   general reputation of Dongguk, this was about the

10  impact on reputation as a result of Yale, you know,

11  sending something to Yale or not, and for Mr. Fetner to

12  say, "Well, people could have had in their minds, the

13  Kansas incident," that -- you know, no one can ever

14  figure out what's in someone's mind, I think any survey

15  person will tell you, but the -- that's irrelevant.

16          The fact there's -- No one in their right

17  mind is going to respond when they have a choice, "I

18  don't know" or "I have an opinion."

19          I'm thinking of Kansas, but I'm going to do

20  something here on Yale.  I'm sorry, Your Honor.

21          We believe that the survey is narrowly drawn

22  on that point, and all the questions that follow from

23  that are focused.  They're not focused more generally

24  on the reputation, whether they had a good reputation

25  or a bad reputation.  You could, in fact, have a bad

reputation made worse.  That's what we were designing

the survey to find out.  We believe it appropriate to

have done it that way, and it meets the standard of

Schering.  I know that Mr. Fetner would like us not to

apply that standard, but it meets that standard.

Everything else he's argued to you in his

reply, are arguments that go to the weight, and that

simple, Your Honor.

MR. FETNER:  May I have just one minute, Your

Honor?

THE COURT:  Sure.

MR. FETNER:  Mr. Weiner actually raised a

point that I had neglected to mention earlier, so I'm

glad he did.

He said the cases that we've cited in our

briefs involve surveys that were admitted into evidence

at bench hearings, and then were the subject of Daubert

considerations afterwards.

I think, well, it's not entirely true, and if

you actually read the parenthetical quotations in our

brief, you'll see the THOIP case says that because the

survey failed to use an adequate control, it is

"inadmissible."

If you look at the Simon Property case, says

-- the Court says the absence of adequate controls is,

1    "An independent reason for excluding the results of the

2    survey."

3         I can go on, but the point is, of course, if

4    a Court is conducting a bench hearing and it needs to

5    conduct a Daubert hearing on the admissibility of an

6    expert witness, it will just conduct them

7    simultaneously, and then rule on the admissibility of

8    the survey evidence afterwards.  It's not going to

9    bring the parties into court, have one essentially

10   mini-trial on the Daubert hearing, then make a decision

11   on that, and then call the parties into court at a

12   later date to have the rest of the hearing.  The court

13   can do it all at once.

14         You can't do that in a jury trial.  The Court

15   has to make a ruling as to the admissibility of the

16   survey evidence before the trial, because otherwise the

17   Court has no idea what conclusions the jury is going to

18   draw from it.

19         And the other point, as Mr. Weiner says, no

20   one can ever figure out what's in someone's mind.  I

21   think that's a telling place, or telling point on which

22   to end because that is apparently what Dr. Jacoby is

23   trying to do here, and I completely agree with Mr.

24   Weiner, he cannot do that.

25         Thank you, Your Honor.

1        THE COURT:  (Inaudible.)

2        MR. WEINER:  My last point, Your Honor.  I

3   get calls from survey companies all the time, public

4   opinion surveys, and I don't recall it ever being said,

5   "And what's in your mind?"  They'll say, "Do you like

6   president so-and-so?  Do you support his policy?  Do

7   you not support his policy?  I mean, you know, "Will

8   you do things like that?"

9        I'm sorry, this is a public opinion survey.

10   It meets all the criteria that is meant to be met.

11   There is nothing in their papers, nothing in their

12   papers or nothing that occurred today that says that

13   this public opinion survey was done inappropriately.

14        THE COURT:  Thank you all very much.

15        MR. FETNER:  Thank you, Your Honor.

16        MR. WEINER:  Thank you, Your Honor.

17        THE COURT:  And happy holidays to you.

18        MR. FETNER:  Happy holidays to you.

19     (Proceedings concluded at 4:38 p.m.)

20

21

22

23

24

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


/s/_____           January 5, 2012
STEPHEN C. BOWLES