UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------------X
Dongguk University,

                                    Plaintiff,         **RULING ON MOTION FOR**
                                                       **SUMMARY JUDGMENT**
              -against-                                 Case No. 08-cv-0441 (TLM)

Yale University,

                                    Defendant
-------------------------------------------------------------X

**TUCKER L. MELANÇON, Senior United States District Judge:**

Before the Court is defendant Yale University's Motion for Summary Judgment [Rec. Doc. 249], plaintiff Dongguk University's Memorandum in Opposition thereto [Rec. Doc. 265], defendant's Reply Memorandum [Rec. Doc. 286] in further support of its Motion, and plaintiff's Amended Memorandum in Opposition to the Motion [Rec. Doc. 298]. Yale moves for summary judgment on all of Dongguk's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, Yale's Motion will be **GRANTED IN PART** and **DENIED IN PART**.

Dongguk alleges that Yale's false statements harmed its reputation, resulting in substantial economic and non-economic damages. Dongguk asserts claims of reckless and wanton conduct, defamation, and negligence against Yale under Connecticut state law.

**I. Background**

**A. Dongguk's Hiring of Jeong Ah Shin in 2005**

Plaintiff Dongguk University is a private university in Seoul, Korea. Compl. ¶ 1. Defendant Yale University is a private university in New Haven, Connecticut. Answer ¶ 2. On August 5, 2005, Jeong Ah Shin applied for a faculty position as an art history professor at Dongguk. Pl.'s Rule

1

56(a)2 Stmt. ¶¶ 1-2; Pl. Ex. 9 at Bates Stamp Number 0259809.  In applying for a position at Dongguk, Shin submitted no diplomas, no academic transcripts, and no copies of her dissertation (her only purported academic publication).  Pl.'s Rule 56(a)2 Stmt. ¶ 2.  Dongguk hired Shin on September 1, 2005 and appointed her to a three-year term as an assistant professor in the Fine Arts History Department of Dongguk's Graduate School.  Pl.'s Rule 56(a)2 Stmt. ¶ 1; Def. Ex. 3 at Bates Stamp Number 358383.

Among the materials Shin submitted to Dongguk in her application was a document on Yale letterhead (the "Certification Document").  Pl.'s Rule 56(a)2 Stmt. ¶ 5.  The Certification Document purported to certify that Shin had received a Ph.D from Yale in art history in May 2005, and further purported to have been signed by Yale Associate Dean Pamela Schirmeister.  Pl.'s Rule 56(a)2 Stmt. ¶ 8; Def. Ex. 12 at Bates Stamp Number 358387.  Four days after Dongguk hired Shin, on September 5, 2005 it sent a letter to Yale (the "Inquiry Letter"), with the Certification Document enclosed, seeking to verify the contents of the Certification Document.  Pl.'s Rule 56(a)2 Stmt. ¶ 6; Def. Ex. 11 at Bates Stamp Number 358385.  Schirmeister responded to the Inquiry Letter on behalf of Yale via fax (the "Schirmeister Fax") dated September 22, 2005 that stated: "As requested I am confirming that the attached letter [the Certification Document] was issued by the Yale Graduate School and signed by me."  Pl.'s Rule 56(a)2 Stmt. ¶ 7; Def. Ex. 12 at Bates Stamp Number 358389.

In fact, Shin never attended Yale.  Pl.'s Rule 56(a)2 Stmt. ¶ 9.  The Certification Document was a forgery that contained exact reproductions of Yale's letterhead and Schirmeister's signature. Pl.'s Rule 56(a)2 Stmt. ¶ 8. On the Certification Document, Schirmeister's printed name below her forged signature was misspelled as "Schirmeistr," as was the word "Century" in the phrase "MAJOR: History of Art (Twentieth Centry Art)."  Def. Ex. 12 at Bates Stamp Number 358387; Pl.

2

Ex. 154, S. Carney Dep., February 2, 2010, at 31.  Schirmeister testified in her deposition taken on

January 28, 2010 that she did not remember sending the Schirmeister Fax.  *See* Def. Ex. 14, P.

Schirmeister Dep. at 30-31.  Schirmeister stated in a January 1, 2008 email to Jon Butler, Dean of

Yale's Graduate School of Arts and Sciences, that she supposed the "mistake" occurred because

"amidst the general chaos of the start of the semester I did not read the [Certification Document]

carefully . . . ." *See* Pl. Ex. 25 at Bates Stamp Number 7215.

### B. Yale's Statements to Dongguk and the Media in 2007

Dongguk alleges that on June 4, 2007, it received information suggesting Shin had

plagiarized her dissertation.  Compl. ¶ 67.  On June 7, 2007, Euiyon Cho, the Director of Dongguk's

Office of Management and Supervision, emailed an inquiry to Yale librarian Cynthia Ostroff, who

responded that same day that Yale had no record of Shin's dissertation.  Pl.'s Rule 56(a)2 Stmt. ¶

13; Def. Ex. 16 at Bates Stamp Number 260220-22.  On June 10, 2007, Cho emailed an inquiry to

Susan Emerson, the graduate registrar of Yale's Art History Department, who responded to Cho on

June 11, 2007 that Shin had not received a Ph.D from Yale.  Pl.'s Rule 56(a)2 Stmt. ¶ 14.  Dongguk

has produced email correspondence showing that a Korean media outlet made a similar inquiry of

Emerson on June 12, 2007.  *See* Pl. Ex. 32 at Bates Stamp Number 50-51.[1]

On June 11, 2007, Emerson forwarded Cho's inquiry to Christine Mehring, the Yale art

history professor whom Shin had identified to Dongguk as her dissertation advisor.  Pl.'s Rule 56(a)2

Stmt. ¶ 15.  On June 13, 2007, Professor Mehring emailed Cho that she had not been Shin's

dissertation advisor and that she did not know Shin.  Pl.'s Rule 56(a)2 Stmt. ¶ 16.  On June 25, 2007

---

[1] From the record before the Court, it cannot be ascertained whether Yale responded to
the media inquiry.

Shin tendered her resignation to Dongguk and the Korean media began to report that she had lied about having obtained a Ph.D from Yale.  Pl.'s Rule 56(a)2 Stmt. ¶ 18-19;  Def. Ex. 21 at 1.

On July 5, 2007, Dongguk's then-president Youngkyo Oh wrote a letter to Yale president Richard Levin seeking an explanation of the conflicting representations made by Schirmeister in 2005 and Emerson and Professor Mehring in 2007.  Pl.'s Rule 56(a)2 Stmt. ¶ 20; Def. Ex. 22 at Bates Stamp Number 357917.  President Oh's letter enclosed a copy of the Certification Document, the Schirmeister Fax, and a Yale diploma bearing Shin's name (the "Diploma").  *See* Def. Ex. 22 at Bates Stamp Number 357917.  In a July 10, 2007 letter response to President Oh, Yale's Deputy General Counsel Susan Carney correctly stated that Shin never attended Yale, that the Certification Document and Diploma enclosed with Oh's letter were inauthentic, and that, therefore, the representations made by Emerson and Professor Mehring were correct.  Pl.'s Rule 56(a)2 Stmt. ¶ 21; Def. Ex. 23 at Bates Stamp Number 0277523. However, Carney incorrectly stated that the Schirmeister Fax enclosed with Oh's letter was inauthentic. Pl.'s Rule 56(a)2 Stmt. ¶ 21.

Dongguk has produced an email from Carney to Assistant Dean Edward Barnaby and President Levin's Assistant Nina Glickson, dated July 10, 2007, the day Carney wrote her letter response to Oh.  In the email, Carney stated: "I remain concern[ed] about the apparent fax lines on the document transmittal sheets, and the apparent receipt within the Dean's office of the 2005 inquiry. (But maybe that is false, too)." Pl. Ex. 66 at Bates Stamp Number 8469.  Dongguk has produced an email dated July 10, 2007 from Hongnam Kim, a representative of The National Museum of Korea, to Gila Reinstein, the Associate Director of Yale's Public Affairs Office.  In the email, Kim notes that the "fax number of [the] Associate Dean's office [] is clearly printed on top of the transmitted pages." Pl. Ex. 62 at Bates Stamp Number 361; Pl. Ex. 63 at Bates Stamp Number

4

7390.  That same day, Reinstein forwarded Kim's email to Carney.  Pl. Ex. 63 at Bates Stamp

Number 7390.  Dongguk has also produced a July 11, 2007 email from Carney to Glickson in which

Carney stated: "Ed Barnaby and I were troubled about the fax line at the top of some of the purported

Yale correspondence, although it's pretty easy to make up fake documents including such lines these

days.  Also, I had not seen the 2005 inquiry sent by fax to the Dean's office before; that, too, is

troubling." Pl. Ex. 70 at Bates Stamp Number 7375.

On July 15, 2007, Cho emailed Carney asking her how she had concluded in her letter to

President Oh that the Schirmeister Fax was inauthentic.  Answer ¶ 99; Def. Ex. 120 at Bates Stamp

Number 0262861.  Carney replied via email on July 16, 2011 that "investigators" were examining

the Schirmeister Fax and would be "making further inquiries."  Answer ¶ 100; Def. Ex. 121 at Bates

Stamp Number 0262865.

Yale referred the ensuing media inquiries regarding Shin to its Office of Public Affairs. Pl.'s

Rule 56(a)2 Stmt. ¶ 25.  Reinstein made statements to the various media outlets on behalf of Yale

on July 10, July 12, July 19, July 20, August 4, September 4, and September 21, 2007. Def. Ex. 27,

28, 30, 31, 32, 132, 133, 135, 136, 137; Pl. Ex. 87.  In her statements, Reinstein correctly told the

media that Shin had not received a degree from Yale and that the Certification Document and

Diploma were "not authentic" and "fake," Def. Ex. 27 at Bates Stamp Number 488; Def. Ex. 28 at

Bates Stamp Number 493; Def. Ex. 30 at Bates Stamp Number 4737, but incorrectly told the media

that the Schirmeister Fax was also "fake" and "false" and that Yale "never received" the Inquiry

Letter.  Def. Ex. 30 at Bates Stamp Number 4737; Def. Ex. 31 at 21; Def. Ex. 32 at Bates Stamp

Number 708; Def. Ex. 132 at Bates Stamp Number 500; Def. Ex. 133 at Bates Stamp Number 513;

Def. Ex. 135 at Bates Stamp Number 567; Def.'s Rule 56(a)1 Stmt. ¶ 26.  In contrast, Dongguk

released the results of its internal investigation on July 20, 2007 that concluded Dongguk had in fact sent the Inquiry Letter to Yale, received the Schirmeister Fax from Yale in response, and relied on the Schirmeister Fax as verification of Shin's purported credentials, i.e., that she had received a Ph.D. from Yale in art history. Def. Ex. 20 at 5-6.

Both parties have produced numerous media articles that show Reinstein's incorrect statements were widely reported in Korea. *See*, *e.g.*, Def. Ex. 145; Pl. Ex. 73. So too, however, were other aspects of the so-called "Shin scandal." Dongguk concedes that, in the Summer and Fall of 2007, the media reported that: all of Shin's three purported academic degrees (one from Yale and two from the University of Kansas) were fraudulent; Dongguk had failed to verify Shin's purported degrees from the University of Kansas; Shin had an affair with Yang Kyun Byeon, a senior official in the Korean government; Byeon had recommended Shin to President Oh; Byeon had pressured Dongguk Board Member Monk Jang Yoon to cover up Shin's fraud; and Byeon had illegally arranged for a government payment to the private temple of the Dongguk Board Chairman Yong Taek Lim. Pl.'s Rule 56(a)2 Stmt. ¶ 30-33, 35, 36; Def. Ex. 45 at 1; Def. Ex. 35 at Bates Stamp Number 64. Dongguk further admits that "Shin's relationship with Byeon and their corruption became a national scandal in Korea." Pl.'s Rule 56(a)2 Stmt. ¶ 38.

On August 31, 2007, Cho advised Carney via email that Dongguk had located the United States Postal Service tracking record of the Inquiry Letter. Answer ¶ 130; Def. Ex. 124 at Bates Stamp Number 262907. Cho attached a copy of the tracking record to his email, which showed that Dongguk's "item" was delivered on September 20, 2005 in New Haven, Connecticut, and was signed for by "M MOORE YCM." Answer ¶ 130; Def. Ex. 124 at Bates Stamp Number 262909. Cho stated in his email that he "hope[d] this new evidence will help your investigators to find out

to whom the [Inquiry Letter] was delivered." Answer ¶ 131; Def. Ex. 124 at Bates Stamp Number 262907.  That same day, Carney responded to Cho's email via email stating that the tracking record "does not support the conclusion that any package from Dongguk University was ever delivered to Dean Schirmeister," and that "'YCM' is not an acronym related to the Graduate School Dean's Office, where Dean Schirmeister works." Answer ¶ 132; Def. Ex. 125 at Bates Stamp Number 262915-16.  Cho replied in turn the same day via email, asserting that "YCM" stood for "Yale Central Mailroom." Answer ¶ 133; Def. Ex. 126 at Bates Stamp Number 262929-30.  On September 1, 2007 via email, Carney asked Cho to provide the "mailing label" of the package and a "copy of the actual receipt" from the United States Postal Service.  Answer ¶ 134; Def. Ex. 126 at Bates Stamp Number 262929.  Cho's September 3, 2007 email response included a copy of the mailing label, which was in Korean.  Answer ¶ 135; Def. Ex. 126 at Bates Stamp Number 262934.  Carney replied via email on September 4, 2007 that the mailing label was in Korean and requested an English copy of the mailing label, which Cho was unable to provide.   Answer ¶ 136; Def. Ex. 127 at Bates Stamp Number 262940.

Michael Madera, the Manager of the Yale Central Mailroom, stated in his deposition taken on August 23, 2010 that if the Yale Central Mailroom had been provided with the information in the tracking record, it could have located the item to which it referred. *See* Pl. Ex. 159, Madera Dep. at 8, 37.

### C.  Yale Discovers its Mistakes

In connection with the Korean prosecutor's investigation of Shin, Yale received a subpoena on October 17, 2007 seeking information and documents relating to Shin.  Pl.'s Rule 56(a)2 Stmt. ¶ 40.  In gathering the information and documents requested by the subpoena, Yale Associate

General Counsel Harold Rose learned on October 18, 2007 that Yale had in fact received the Inquiry Letter in 2005.  Pl.'s Rule 56(a)2 Stmt. ¶ 41; *see* Pl. Ex. 125, Def. Second Interrogatory Response 1(b).  That day, Rose contacted Schirmeister, who in turn asked her assistant, Alicia Grendziszewski, to search Schirmeister's files for "anything related to Dongguk University or Jeong Ah Shin." Pl. Ex. 125,  Def. Second Interrogatory Response 1(b); Grendziszewski Dep. at 30.  Grendziszewski found the Inquiry Letter and a copy of the Schirmeister Fax in Schirmeister's "miscellaneous" file. Pl.'s Rule 56(a)2 Stmt. ¶ 42; Grendziszewski Dep. at 32-33.

On November 29, 2007, Carney sent a letter, via email and regular mail, to President Oh correcting the inaccurate statement in her July 10, 2007 letter that the Schirmeister Fax was fake. Pl.'s Rule 56(a)2 Stmt. ¶ 44; Def. Ex. 24 at Bates Stamp Number 277532.   On December 27, 2007, Dongguk informed the Korean media during a press conference that it had received a letter from Yale acknowledging that the Schirmeister Fax was authentic.  Pl.'s Rule 56(a)2 Stmt. ¶ 46.  On December 28, 2007, Cho responded, via email and regular mail, to Carney's November 29 letter, stating for the first time that  Dongguk had received "a lot of harsh criticism from the public" and that Yale had "ruined" its reputation.  Pl.'s Rule 56(a)2 Stmt. ¶ 47; Def. Ex. 53 at Bates Stamp Number 378534.  On December 29, 2007, Yale issued a press release stating that the Schirmeister Fax was genuine but erroneous. Pl.'s Rule 56(a)2 Stmt. ¶ 48.

### D. Relief Sought by Dongguk

Dongguk initiated this litigation on March 24, 2008, alleging claims of (1) reckless and wanton conduct, (2) defamation, and (3) negligence under Connecticut state law.  Compl. ¶¶ 173-

190; 197-204.[2]  Based on its damages analysis submitted pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Dongguk seeks compensatory damages for (1) lost government grants, (2) lost donations, (3) the Korean government's denial of its application to open a law school (in particular, the resulting lost revenue and the write-offs of outlaid expenditures), (4) brand rehabilitation costs, (5) denial of a customer satisfaction award, (6) the commencement of a criminal investigation of Dongguk regarding its role in the Shin scandal, (7) decreased student applications, (8) increased student rejection of admission offers, (9) decreased student satisfaction, (10) decreased faculty applications, (11) decreased faculty satisfaction, and (12) decreased employment opportunities for its students. Def. Ex. 74.  Dongguk also seeks punitive damages under its reckless and wanton conduct and defamation claims.  Compl. ¶ 204(2), (4).

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the record reflects that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Such a determination is to be made "after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor."  *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact.  When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As to

---

[2] Dongguk also alleged a claim of breach of implied contract, Compl. ¶ 196, which it voluntarily withdrew on January 26, 2011 [Rec. Doc. 208].

issues which the nonmoving party has the burden of proof at trial, the moving party must satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim, and if the moving party succeeds the burden shifts to the non-moving party to show that there is a genuine issue for trial. *Id.* at 322-23.

Once the burden shifts to the non-moving party, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Id.* at 324. The non-moving party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970).

There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If no issue of fact is presented and if the movant is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

### III. Reckless and Wanton Conduct

Dongguk alleges a claim of "reckless and wanton conduct" against Yale. To prevail on a claim of reckless and wanton conduct under Connecticut state law, the plaintiff must show that the defendant knew or had reason to know that his conduct created an "unreasonable risk of *bodily harm*" to the plaintiff. *Craig v. Driscoll*, 781 A.2d 440, 454 (Conn. App. Ct. 2001) (emphasis added) (internal quotations omitted); *see* Restatement (Second), Torts § 500 (1965) ("The actor's conduct

10

is in reckless disregard of the safety of another if . . . his conduct creates an unreasonable risk of *physical harm* to another . . .") (emphasis added).  As Dongguk's complaint does not allege, nor does the record before the Court tend to establish, that Yale's alleged conduct created a risk of bodily harm to any agent or employee of Dongguk, Yale's motion for summary judgment on Dongguk's reckless and wanton conduct claim must be granted.

## IV. Defamation

### A. The Elements of Dongguk's Defamation Claim

To establish a prima facie case of defamation under Connecticut state law, the plaintiff must demonstrate that (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement.  *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28 (2009).

As to the first element, a "defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Gambardella*, 291 Conn. at 627 (internal quotation marks omitted).  To determine whether a statement is defamatory, "the words [are] to be interpreted according to the common understanding, and not at all by the intent of the author."  *Arnott v. Standard Ass'n*,  17 A. 361, 362 (Conn. 1888).  It is for the Court to decide whether the defendant's statements were capable of bearing a defamatory meaning, and it is for the jury to decide if the defendant's statements were, in fact, so understood by its recipients.  Restatement (Second), Torts § 614 (1977);  *Parkes v. HSBC Holdings PLC*, No. 93-CV-0129233, 1997 WL 433817 (Conn. Super. Ct. Jul. 24, 1997).

11

Based on the record before the Court, while Reinstein never expressly denounced as lies Dongguk's public assertions that Dongguk had sent the Inquiry Letter and that Yale had replied with the Schirmeister Fax, when the Korean media, *see, e.g.*, Def. Ex. 28, and the Yale Daily News, *see* Def. Ex. 30, made inquiry of Reinstein about Dongguk's assertions, she consistently responded that Yale "never received" the Inquiry letter and that the Schirmeister Fax was "false" and "fake." Def. Ex. 30 at Bates Stamp Number 4737; Def. Ex. 31 at 21; Def. Ex. 32 at Bates Stamp Number 708; Def. Ex. 132 at Bates Stamp Number 500; Def. Ex. 133 at Bates Stamp Number 513; Def. Ex. 135 at Bates Stamp Number 567; Def. Rule 56(a)1 Stmt. ¶ 26.   The Court concludes that Yale's public statements could be understood as an implicit accusation that Dongguk was lying about the background check it performed on Shin.  Further, a reasonable jury could conclude that Yale's public statements were, in fact, so understood in Korea.  Indeed, at least two Korean news outlets opined that this was a possible explanation of the contradictory statements issued by Yale and Dongguk. *See* Def. Ex. 157 at Bates Stamp Number 771-72 ("[The Schirmeister Fax] which purportedly confirmed the doctorate degree of Shin was proved fraudulent, so it is [] questionable whether [Dongguk] had requested the verification of academic records to Yale University . . . . Therefore, there is suspicion that [Dongguk] was not deceived by the lies of Shin, but may have actively participated and covered up Shin for some reason."); *see also* Pl. Ex. 83 ("Did Dongguk really send the [Inquiry Letter]?").[3]  Thus, there is a genuine issue of material fact as to whether Yale's statements were defamatory that must be decided by a jury.

---

[3] Yale incorrectly argues that these statements are inadmissible hearsay.  In the present context, the media's statements are being offered to prove that Reinstein's statements were interpreted as an accusation of dishonesty. Thus, the media's statements are not being offered to prove the truth of the matters asserted, i.e., that Dongguk did not conduct a background check on Shin and that Dongguk sought to cover up a fraud. *See* Fed. R. Evid. 801(c).

To establish the second element of its defamation claim–that Yale's statements identified Dongguk–Dongguk must show that "the recipient of the defamatory communication under[stood] it as intended to refer to the plaintiff." Restatement (Second), Torts § 564 cmt. a (1977).  For the reasons set forth above, a reasonable jury could conclude that Yale had in effect called Dongguk a purveyor of untruth, a liar, thus "identifying" Dongguk. This is so even though Yale never specifically mentioned "Dongguk" in any of its public statements. *See Kirch v. Liberty Media Corp*., 449 F.3d 388, 399 (2d Cir. 2006) (noting that "[t]here are indeed cases . . . where a statement was held to be 'of and concerning' the plaintiff even though . . . not naming the plaintiff, could have been understood by a reasonable reader as being, in substance, actually *about* him or her") (emphasis in original); *see also Mix v. Woodward*, 12 Conn. 262 (1837) ("We suppose it to be well settled, that where the person is so ambiguously described, that a resort to extrinsic facts is necessary to ascertain his identity; there the libel and all attending circumstances, are to be submitted to the jury; and that the plaintiff is at liberty to prove the averment, 'that the libel was published of and concerning him,' in the same manner, and by the same kind of evidence, as he might prove any other fact in the case.").  A genuine issue of material fact exists as to whether Yale's statements identified Dongguk, which must be resolved by a jury.

There is no dispute as to the third element of Dongguk's defamation claim as Yale admits it published the allegedly defamatory statements to a third person. Def.'s Rule 56(a)1 Stmt. ¶ 25-26.

Dongguk has produced evidence that supports the fourth element of a defamation claim–an injury to its reputation.  Four Dongguk alumni have declared, in substance, that they were embarrassed to be associated with their alma matter when the media reported on Dongguk's "lies" and "unethical behavior" regarding its verification of Shin's Yale degree.  *See* Joon Hyung Park

Decl. ¶¶ 7-10 ("My big pride of being a graduate of the one of the [sic] oldest universities fell to the ground."); *see also* Jin Shik Choi Decl. ¶¶ 6-8, 11 (noting his "disappointment and embarrassment of [his] alma mater"); Jin Moon Kim Decl. ¶¶ 7-8 ("I was ashamed of the fact that I was an alumnus of Dongguk University."); Oh Hyun Kim Decl. ¶¶ 7-9 ("I became more and more ashamed of being an alumnus of Dongguk University."). Moreover, as set forth below in the Court's discussion of causation, the media coverage itself constitutes further evidence from which a reasonable jury could conclude that Dongguk's reputation was injured.[4]

**B. Causation**

To prevail on a defamation claim a plaintiff must, as with any tort, establish a causal connection between the defendant's conduct and the plaintiff's alleged injury. *See QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 357 (2001). "With respect to the element of causation, a plaintiff must establish that the defendant's conduct legally caused the injuries, that is, that the conduct both caused the injury in fact and proximately caused the injury . . . ." *Archambault v. Soneco/Northeastern, Inc.*, 287 Conn. 20, 32 (2008) (internal quotation marks omitted). "The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. The test of proximate cause is whether the defendant's conduct is a substantial factor in producing the plaintiff's injury." *Id*. at 32-33 (internal quotation marks omitted). The issue of causation is a question of fact. *See Burton v. City of Stamford*, 971 A.2d 739, 765-66 (Conn. App. Ct. 2009).

---

[4] Yale has moved *in limine* to exclude "for all purposes" the testimony of Dongguk's expert witnesses Jacob Jacoby and Elaine Haikyung Kim [Rec. Docs. 288 and 291], thereby implicitly moving the Court to disregard Jacoby's and Kim's expert reports, Pl. Ex. 170, 171, in its resolution of Yale's motion for summary judgment. Jacoby and Kim intend to testify that Yale's false statements harmed Dongguk's reputation. Dongguk has produced other evidence of a reputational injury sufficient to withstand summary judgment, thus it was not necessary for the Court to consider Jacoby's or Kim's expert reports in resolving the motion.

Dongguk has produced direct evidence of a causal link between Yale's false statements to the media and Dongguk's alleged injury to its reputation. Four Dongguk alumni and one Dongguk "affiliate" stated in declarations that they pledged substantial donations to Dongguk, but canceled those pledges when the media reported Dongguk's "lies" and "unethical behavior" regarding its verification of Shin's Yale degree. *See* Jin Shik Choi Decl. ¶¶ 5-10; *see also* Joon Hyung Park Decl. ¶¶ 7-12; Jim  Moon Kim Decl. ¶¶ 6-10; Oh Hyun Kim Decl. ¶¶ 5-10; Hyun Jung Kang ¶¶ 5-9.

Additionally, the media articles in the record constitute ample circumstantial evidence that links Yale's false statements to Dongguk's alleged injury.  There are one-hundred and two distinct media articles attached as exhibits to the parties' summary judgment papers that report on some part of the Shin scandal. *See* Def. Ex. 21, 35-49, 58, 59, 61-67, 69-72, 131, 138-140, 141-151, 154-172, 175-181, 182, 184-186; *see also* Pl. Ex. 72-75, 82-84, 87, 91, 92, 102-107, 109-114, 122, 124, 133, 134, 142, 143.  In reviewing these exhibits the Court, as it must, "constru[es] the evidence in the light most favorable to the nonmoving party and [draws] all reasonable inferences in its favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).  From the Court's review of these exhibits it concludes that, of the one-hundred and two articles that reported on the Shin scandal, thirty-one of them could be read, in varying degrees, as implying that Dongguk had been less than candid about the background check it performed on Shin. *See* Def. Ex. 21, 37, 40, 62, 66, 67, 69, 71, 131, 141, 143, 144, 149, 154, 155, 157, 158, 164, 166, 172, 176, 178; *see also* Pl. Ex. 72-75, 82, 83, 84, 87, 122.[5]  Thus, although Dongguk's and Yale's contradictory public statements regarding Shin were

---

[5] In an October 27, 2008 response to Yale's interrogatory request during discovery, Dongguk identified fifty-nine media articles that allegedly harmed its reputation (Yale incorrectly asserts that Dongguk identified fifty-eight such articles).  Def. Ex. 73.  Yale urges the Court to disregard eight media articles that Dongguk did not identify in its interrogatory response as having harmed its reputation, i.e., Def. Ex. 66, 67, 69, 71; Pl. Ex. 73, 74, 83, 84.  Notably, Yale

but one component of a larger scandal covered by the media, a reasonable jury could conclude those contradictory statements were the cause in fact and a proximate cause of Dongguk's alleged injury to its reputation.  *Archambault,* 287 Conn. at 32-33.

### C.  Actual Malice

Based on its own assertion, Dongguk is a public figure.  *See* Compl. ¶ 6 ("Plaintiff Dongguk University is one of the most important academic institutions in Korea . . . ."); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974) (noting that a public figure is one who has achieved "general fame or notoriety in the community, and pervasive involvement in the affairs of society"). Thus, to prevail on its defamation claim Dongguk must prove that Yale published its statements with actual malice–that is, with knowledge that the statements were false or with a reckless disregard of whether or not they were false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). A speaker acts with reckless disregard of the falsity of his statement if he "entertained serious doubts as to the truth"of his statement, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), *quoted in Chandok v. Klessig, 632 F.3d 803, 813 (2d Cir. 2011)*, or if he possessed a "high degree of awareness of [his statement's] probable falsity." *Garrison v. Louisiana*,  379 U.S. 64, 74 (1964).

Actual malice must be proven by clear and convincing evidence. *Celle v. Filipino Reporter*

---

does not contend that Dongguk failed to exchange the eight articles during discovery it now urges the Court to disregard. As Yale does not dispute the authenticity of the eight articles, the Court will not exclude those articles.  In any event, exclusion of the eight articles would not affect the ultimate result of the Court's ruling on defendant's motion, as the affidavits of the Dongguk alumni and a Dongguk "affiliate" alone constitute competent summary judgment evidence of causation sufficient to withstand defendant's motion for summary judgment on the issue. "Given that there must be a trial either way, it makes sense for the fact-finder to have at its disposal all relevant testimony and documents, including [those that contradict prior interrogatory responses] . . . ." *See Competitive Tech., Inc. v. Marcovitch*, No. 07-CV-1327, 2009 WL 928647, at *7 (D. Conn. Apr. 6, 2009) (Dorsey, J.).

*Enter. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000).  Clear and convincing evidence is evidence of such

a nature "indicating that the thing to be proved is highly probable or reasonably certain." *Ragbir v.*

*Holder*,  389 Fed. Appx. 80, 84-85 (2d Cir. 2010) (citation omitted).

Preliminarily, the parties dispute whose state of mind is relevant to the actual-malice inquiry.

Yale asserts that only Reinstein's state of mind is relevant, as she is the agent of Yale who published

the allegedly defamatory statements.  Dongguk asserts that Yale, as a corporate entity, is charged

with the knowledge of all its agents, and thus the culpability of Reinstein's statements must be

judged against that collective knowledge.

When the Supreme Court confronted this issue in *Sullivan*, it held that "the state of mind

required for actual malice [has] to be brought home to the persons in the [defendant's] organization

having responsibility for the publication of the advertisement." 376 U.S. at 287.  The lower courts

have not interpreted this holding as narrowly as Yale suggests or as broadly as Dongguk would have

this Court do. In *Flotech, Inc. v. E.I. Du Pont de Nemours & Co.*, 814 F.2d 775 (1st Cir. 1987), the

court's actual- malice inquiry examined the mental states of the two corporate employees "with the

primary roles" in issuing a defamatory press release.  *Id*. at 781.  One of these employees had

conducted the fact investigation that informed the contents of the press release, and the other made

the decision on behalf of the company to publish the press release.  *Id*. at 781-82.  In *Speer v.*

*Ottaway Newspapers, Inc.*, 828 F.2d 475 (8th Cir. 1987), the court's actual-malice inquiry examined

whether the employee of the defendant had offered "input in suggesting the topic for the

[defamatory] editorial, [made] recommendations regarding the editorial's content, [wrote or

reviewed] the editorial before publication, or [decided] whether the editorial would be published."

 *Id*. at 477.

17

The Court concludes that Dongguk may be able to satisfy the actual malice requirement at trial by proving the requisite mental state of any Yale employee who the jury finds (1) published an allegedly defamatory statement, (2) authored an allegedly defamatory statement, (3) offered input as to the contents of an allegedly defamatory statement, or (4) approved an allegedly defamatory statement prior to its publication.

Based on the record before the Court, a reasonable jury could conclude that Carney approved and/or offered input as to Reinstein's statements to the media prior to their publication. *See* Pl. Ex. 77, 80.[6]   The Court also concludes that a reasonable jury could find, by clear and convincing evidence, that Carney's statements in emails to other Yale employees establish that she "entertained serious doubts as to the truth" of Reinstein's statements, which could satisfy Dongguk's burden of proving actual malice, *St. Amant,* 390 U.S. at 731, *quoted in Chandok,* 632 F.3d at 813. *See* Pl. Ex. 66 at Bates Stamp Number 8469 (email dated July 10, 2007 from Carney to Glickson and Barnaby in which Carney expresses her concern regarding the appearance of Yale's fax number on the Shirmeister Fax and Yale's apparent receipt of the Inquiry Letter in 2005); *see also* Ex. 70 at Bates Stamp 7375 (substantially similar email from Carney to Glickson dated July 11, 2007); *supra* Section I.B.

---

[6] Plaintiff's exhibit 77 is a July 17, 2007 email to Reinstein from Helaine Klasky, Yale's Associate Vice President and Director of Public Affairs, in which Klasky instructs Reinstein to use the language "cleared by the GC's office" to respond to media inquiries.  Plaintiff's exhibit 80 is a table of the details of multiple emails, e.g., the sender, recipient(s), date, and the general subject matter of the emails.  The table shows Carney sent Reinstein two emails on July 11, 2007 in which Carney provided "[l]egal advice concerning Dongguk University and Jeon Ah Shin."  The table also shows that Carney and Reinstein exchanged a series of emails on July 20, 2007 in which Carney and Reinstein discussed "[l]egal advice concerning communications with media" and "[l]egal advice concerning media enquiries concerning Jeong Ah Shin."

### D. Defamation Damages

Having concluded there is a genuine issue of material fact as to each element of Dongguk's defamation claim precluding summary judgment, the Court turns to the damages available under that claim in the event of a plaintiff's verdict.

Connecticut law limits the type of damages recoverable under a defamation claim depending on the nature of the defamatory statements. If a defendant's statements are defamatory per quod, the plaintiff may only recover the "actual damages" he sustained–that is, damages that "are of a material and, generally, of a pecuniary nature." *Urban v. Hartford Gas Co.,* 139 Conn. 301, 308 (1952). By contrast, if a defendant's statements are defamatory per se the plaintiff may recover both actual damages and "general damages"–that is, non-pecuniary damages that compensate the plaintiff's intangible loss of standing in the community. *DeVito v. Schwartz*, 784 A.2d 376, 381 (Conn. App. Ct. 2001). A statement is defamatory per se only if its defamatory meaning is "apparent on the face of the statement," whereas a statement is defamatory per quod if its defamatory meaning is understood through innuendo or implication. *Mercer v. Cosley*, 955 A.2d 550, 560 n.9 (Conn. App. Ct. 2008). Whether a publication is defamatory per se or per quod is a question of law to be decided by the Court. *Id*.

As previously noted, Yale never mentioned Dongguk by name, nor did it ever expressly denounce as lies Dongguk's assertions that it had sent the Inquiry Letter and that Yale had replied to the letter with the Schirmeister Fax. However, Yale, through Reinstein, represented that it "never received" the Inquiry Letter and that the Schirmeister Fax was "false" and "fake." Def. Ex. 30 at Bates Stamp Number 4737; Def. Ex. 31 at 21; Def. Ex. 32 at Bates Stamp Number 708; Def. Ex. 132 at Bates Stamp Number 500; Def. Ex. 133 at Bates Stamp Number 513; Def. Ex. 135 at Bates Stamp

Number 567; Def. Rule 56(a)1 Stmt. ¶ 26.   Thus, any accusation of Dongguk's dishonesty was implicit, and the statements issued by Yale were not defamatory per se.   Therefore, in the event of a plaintiff's verdict after a trial on the merits, Dongguk may only recover actual damages under its claim for defamation–that is, damages that "are of a material and, generally, of a pecuniary nature." *Urban,* 139 Conn. at 308.

Based on its damages analysis submitted pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Dongguk alleges that it is entitled to damages for (1) lost government grants, (2) lost donations, (3) the Korean government's denial of its application to open a law school (in particular, the resulting lost revenue and the write-offs of outlaid expenditures), (4) brand rehabilitation costs, (5) denial of a customer satisfaction award, (6) the commencement of a criminal investigation of Dongguk regarding its role in the Shin scandal, (7) decreased student applications, (8) increased student rejection of admission offers, (9) decreased student satisfaction, (10) decreased faculty applications, (11) decreased faculty satisfaction, and (12) decreased employment opportunities for its students. Def. Ex. 74.

Of the damages sought by Dongguk, only the damages alleged for the (1) lost government grants, (2) lost donations, (3) denial of the application to open a law school, and (4) brand rehabilitation costs are of a "material and [] pecuniary nature." *Urban,* 139 Conn. at 308.   Indeed, in Dongguk's damages analysis, Dongguk described these four types of damages as "economic damages" and described the other eight types of damages as "non-economic damages." Def. Ex. 74. Thus, at trial, Dongguk may only seek, and in the event of a plaintiff's verdict may only recover damages for (1) lost government grants, (2) lost donations, (3) denial of the application to open a law school, and (4) brand rehabilitation costs under its defamation claim.   Despite Yale's assertions to

the contrary, Dongguk has produced competent summary judgment evidence of these damages. Byoung Geon Jeon Dep. at 66-67 (lost grants); Jin Shik Choi Decl. ¶¶ 5-10 (lost donations); Byoung Geon Jeon Decl. ¶¶ 18-25 (denial of law school application); Park Decl. ¶ 29-31 (retention of public relations firm); Def. Ex. 84 at 98-105, 130-32 (brand rehabilitation expenditures).

Yale objects to Dongguk's claim for brand rehabilitation costs because the amount claimed is in part comprised of projected, unrealized costs based on a public relations firm's future fee estimates. Dongguk responds that it is entitled to these future damages because the process of rehabilitating its reputation will extend beyond this litigation. Neither party cites any Connecticut state court jurisprudence, and the Court could find none that addressed whether future consulting costs of the nature alleged by Dongguk are recoverable in tort. The Court notes that while damages, future or otherwise, need not be proven with mathematical certainty, they must be based on more than mere speculation. *Beverly Hills Concepts, Inc. v. Schatz & Schatz*, 247 Conn. 48, 78 (1998). Under the particular circumstances of this case, the Court concludes based on the record before it that Dongguk's asserted future consulting costs are tantamount to mere speculation. At trial, Dongguk may only seek, and in the event of a plaintiff's verdict may only recover those brand-rehabilitation costs that Dongguk has paid to third parties or will pay to third parties pursuant to contractual obligations that arose prior to the date of the entry of this ruling.

Lastly, as the Court has concluded that there is a genuine issue of material fact that must be decided by a jury as to whether Yale acted with actual malice, it follows that there is also a genuine issue of material fact as to whether Dongguk is entitled to recover punitive damages. *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 628 (2009) ("[T]o recover punitive damages [under a defamation claim], a plaintiff must prove actual malice . . . .").

21

In sum, Yale's motion for summary judgment on Dongguk's defamation claim is denied, however at trial Dongguk may only assert, and in the event of a plaintiff's verdict only recover the four economic-type damages and punitive damages under its defamation claim as set forth hereinabove.

## V. Negligence

Dongguk bases its negligence claim on five acts: (1) Yale's erroneous confirmation of Shin's purported Ph.D to Dongguk on September 22, 2005; (2) Yale's inaccurate public statements regarding the Inquiry Letter and the Schirmeister Fax on July 10, July 12, July 19, July 20, August 4, September 4, and September 21, 2007; (3) Yale's inaccurate statement made directly to Dongguk on July 10, 2007; (4) Yale's inaccurate statement made directly to Dongguk on August 31, 2007; and (5) Yale's decision to wait in excess of one month, or until November 29, 2007, to advise Dongguk of its discovery on October 18, 2007 that it had made inaccurate statements in 2005 and 2007. The Court will address each of these acts in turn in light of *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988).

### A. The *Hustler Magazine* Rule

A public figure cannot circumvent the strict "actual malice" standard imposed by the First Amendment by calling his claim for defamation by a different name (tort). *Hustler Magazine*, 485 U.S. at 57; *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997). Courts must therefore dismiss additional tort claims aimed at controlling the same speech that is the basis of the plaintiff's defamation claim. *Chaiken*, 119 F.3d at 1024 (dismissing intentional infliction of emotional distress claim); *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995) (dismissing intentional infliction of emotional distress and negligence claims); *Weber v. Multimedia Entm't, Inc.*,

No. 97-CV-0682, 2000 WL 526726, at *12 (S.D.N.Y. May 2, 2000) (dismissing negligence claim). For this reason, Dongguk's negligence claim must be dismissed to the extent it is predicated on the incorrect statements Yale published to third persons.

Yale asserts that *Hustler Magazine* requires this Court to dismiss the balance of Dongguk's negligence claim–namely, that portion of the claim based on Yale's inaccurate statements made directly to Dongguk and Yale's failure to timely correct those inaccuracies. The Court disagrees. *Hustler Magazine* is only applicable to a defendant's communications that are published to a third person. *See Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 520 (1st Cir. 1990) (rejecting argument that negligence claim was subsumed by defamation claim because "there [] must be a communication, defined as conduct that brings an idea to the perception of others")*; see also LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1096-97 (S.D.N.Y. 1996) (holding that the actual malice standard did not bar a negligent misrepresentation claim that was based on defendant's communications to the plaintiff himself).

### B.  The Elements of Negligence

Having concluded that the communications Yale made (and failed to make) directly to Dongguk are actionable under a negligence claim, the Court turns to the elements of such a claim under Connecticut state law.  "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Sturm v. Harb Dev.*, *LLC*, 298 Conn. 124, 139 (2010) (internal quotations marks omitted).

"[T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2)

a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." *Ryan Transp., Inc. v. M &G Assocs.*, 266 Conn. 520, 525-26 (2003) (internal quotation marks omitted) (alteration in original). "The existence of a duty . . . is a matter of law." *Murdock v. Croughwell*, 268 Conn. 559, 565 (2004).

The Court concludes that the first part of the test for imposing a legal duty on Yale to Dongguk is met. Yale, knowing what it knew through its agents and employees, would have reasonably anticipated that harm to Dongguk's reputation was likely to result from, first, its erroneous confirmation of Shin's fabricated degree and, second, its failure to acknowledge its mistake when Dongguk was eager to explain its hiring of Shin to the public. This is especially so because at the time Yale inaccurately responded to Dongguk's inquiries in July and August 2007 it knew Shin was at the center of a national scandal. *See* Pl. Ex. 61 at Bates Stamp Number 34 (July 9, 2007 email, sent from Yale Visiting Professor Yongsook Pak to Yale Art History Business Manager Nicole Chardiet and in turn forwarded to Reinstein, in which Professor Pak stated that the issue of whether Shin's Yale degree was authentic had "become a matter of national importance" in Korea); *see also* Pl. Ex. 77 at Bates Stamp Number 498 (July 17, 2007 email from Reinstein to Helaine Klasky, Yale's Associate Vice President and Director of Public Affairs, noting that Shin is "still on the front burner in the Korean media").

The Court concludes that the second part of the test for imposing a legal duty on Yale to Dongguk is also met. The legal issue before the Court is not whether public policy favors a duty on a university to respond accurately to inquiries from another university, but whether public policy favors a duty on a university to respond accurately *if the university chooses to respond.* The Court

concludes that it does.  This is so even though the imposition of such a duty may deter universities from responding to such inquiries.[7]

The Court finds as a matter of law that when it chose to respond to Dongguk's inquiries Yale owed a duty to Dongguk to exercise a degree of care that a university of "ordinary prudence would have exercised under the same or similar conditions." *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 381 (1982).  Specifically, Yale owed a duty of care to Dongguk when it (1) responded to the Inquiry Letter on September 22, 2005, (2) responded to Dongguk's inquiry on July 10, 2007, (3) responded to Dongguk's inquiry on August 31, 2007, and (4) discovered on October 18, 2007 that it had provided Dongguk with false information in 2005 and 2007.

A reasonable jury could conclude Yale failed to exercise the degree of care that a university of ordinary prudence would have exercised under similar circumstances at any one of or at all four of the points in time set out in the preceding paragraph, thus breaching the duty it owed to Dongguk. *Tryon v. Town of N. Branford*, 755 A.2d 317, 325 (Conn. App. Ct. 2000) (whether duty was breached is a question of fact). First, Schirmeister admitted she did not read the Certification Document carefully before erroneously verifying Shin's degree on September 22**,** 2005.  Second, Carney replied to President Oh on July 10, 2007 that the Schirmeister Fax was fake, although the record before the Court indicates that a careful search of Schirmeister's files would have revealed the Schirmeister Fax's authenticity. Pl.'s Rule 56(a)2 Stmt. ¶ 42; Grendziszewski Dep. at 32-33.

---

[7] The Court notes that the issue of whether Yale owed a duty to Dongguk was discussed extensively before then-Chief United States District Judge Robert N. Chatigny during the January 30, 2009 oral argument on Yale's Motion to Dismiss [Rec. Doc. 66 at 17-30, 56].  During oral argument, defense counsel informed Judge Chatigny, and plaintiff's counsel did not disagree, that there was no jurisprudence, state or federal, addressing the issue of a duty in the context of inter-university inquiries. *Id*. at 26, 56.

Third, after Carney received the tracking record of the Inquiry Letter on August 31, 2007, she failed to provide the tracking record to the Yale Central Mailroom and rather wrote to Cho that the tracking record "does not support the conclusion that any package from Dongguk University was ever delivered to Dean Schirmeister." Def. Ex. 126 at Bates Stamp Number 262930. Fourth, after Yale discovered on October 18, 2007 that it had made false representations to Dongguk and knew that the Shin scandal was garnering extensive media coverage in Korea, Yale waited until November 29, 2007 to advise Dongguk of its mistakes. Pl.'s Rule 56(a)2 Stmt. ¶¶ 40-44; Def. Second Interrogatory Response 1(b); Def. Ex. 24 at Bates Stamp Number 277532.

There is a genuine issue of material fact as to the third element of Dongguk's negligence claim, whether Yale's conduct was the cause of Dongguk's alleged injury. As Dongguk notes, if Schirmeister had not erroneously confirmed Shin's degree on September 22, 2005, "none of the events that thereafter transpired would have occurred." Pl. Mem. at 22.[8]    Additionally, Yale's inaccurate responses to Dongguk's inquiries in July and August 2007 and its failure to timely correct those inaccuracies left Dongguk powerless to correct the media's misperception that Dongguk had been less than candid about Shin's background check. Further, as set out above, the media stories in the record show that this misperception was a widely-covered aspect of the larger Shin scandal.

---

[8]At the January 30, 2009 oral argument on Yale's Motion to Dismiss, plaintiff's attorney stated that Schirmeister's mistake in 2005 gave rise to "not a lot [of damages] because maybe they could [just] recover for the wages they paid her," and that "if you're truly trying to analyze this case, the damages flow from the acts that occurred in 2007." [Rec. Doc. 66 at 36-37]. While the Court is somewhat perplexed by the inconsistent positions Dongguk's attorney has taken in this litigation, the Court cannot discern from the record before it any prejudice to Yale based on this inconsistency. Dongguk is therefore not estopped from asserting a causal connection between Schirmeister's mistake and Dongguk's alleged damages. *Cf. N. American Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 292 F. App'x. 73, 77 (2d Cir. 2008) (estopping party from taking a new position in litigation when opposing party showed prejudice).

As the Court has previously concluded Dongguk produced sufficient competent summary judgment evidence of an injury to its reputation to withstand summary judgment, it follows that there is genuine issue of material fact as to the fourth and final element of Dongguk's negligence claim, whether Dongguk suffered an "actual injury."

### C. Negligence Damages

Yale cites *DeVillegas v. Quality Roofing, Inc.*, No. 92-CV-0294190-S, 1993 WL 515671 (Conn. Super. Ct. Nov. 30, 1993) for the proposition that "in the absence of privity of contract between plaintiff and defendant, or of an injury to the plaintiff's person or property, a plaintiff may not recover in negligence for a purely economic loss." *Id.* at *3. Yale conceded in its Memorandum in Support of its Motion to Dismiss [Rec. Doc. 26 at 9 n.8] that the rule announced in *DeVillegas* has not been recognized by the Connecticut Supreme Court or the Connecticut Appellate Court, and that some Connecticut Superior Courts have declined to apply it.  In fact, numerous Connecticut Superior Courts have not applied *DeVillegas*, and in so doing, some have recognized that its holding resulted from a misinterpretation of precedent. *See, e.g.*, *Reynolds, Pearson & Co., LLC v. Miglietta*, No. 00-CV-0801247, 2001 WL 418574, at *4-6 (Conn. Super. Ct. Mar. 27, 2001).  This Court has previously declined to apply *DeVillegas*.  *See Ins. Co. of North America v. Town of Manchester*, 17 F.Supp.2d 81, 86 n.7 (D. Conn. 1998) (distinguishing *DeVillegas*) (Hall, J.).  The Court will not apply *DeVillegas* in this instance either.

Connecticut state law allows recovery of general reputational damages under a negligence claim. *See Collins v. City Nat. Bank & Trust Co. of Danbury*, 131 Conn. 167 (1944).  Thus, evidence of what Dongguk terms its "non-economic damages" may be introduced at trial as evidence of damages to its reputation under its negligence claim.

In sum, Yale's motion for summary judgment on Dongguk's negligence claim is granted as to the inaccurate statements Yale published to third persons.  The motion for summary judgment on Dongguk's negligence claim is denied as to the inaccurate statements Yale made directly to Dongguk and Yale's decision to wait over a month to advise Dongguk of its mistakes after it had learned of them.  Under its negligence claim, Dongguk will be permitted at trial to present evidence on the four economic-type damage claims,[9] as well as evidence on damages for the general harm to its reputation.

## VI. Conclusion

Yale's Motion for Summary Judgment [Rec. Doc. 249] on Dongguk's reckless and wanton conduct claim is **GRANTED**.

The Motion for Summary Judgment on Dongguk's defamation claim is **GRANTED IN PART** and **DENIED IN PART**.   As Yale's statements to the media were not defamatory per se, at trial Dongguk may only seek, and in the event of a plaintiff's verdict may only recover its alleged economic damages under its defamation claim–that is, damages for (1) lost government grants, (2) lost donations, (3) denial of the application to open a law school, and (4) brand rehabilitation costs.  As Dongguk's asserted future consulting costs are tantamount to mere speculation, Dongguk may only seek, and in the event of a plaintiff's verdict may only recover those brand-rehabilitation costs that Dongguk has paid to third parties or will pay to third parties pursuant to contractual obligations that arose prior to the date of the entry of this ruling.  Dongguk may recover punitive damages under

---

[9] As with Dongguk's defamation claim, under its negligence claim Dongguk may only seek, and in the event of a plaintiff's verdict may only recover those brand-rehabilitation costs that Dongguk has paid to third parties or will pay to third parties pursuant to contractual obligations that arose prior to the date of the entry of this ruling.

its defamation claim if the jury makes a finding of actual malice on the part of Yale and, after so finding, makes such an award.

The factual issues to be resolved at trial with respect to Dongguk's defamation claim are (1) whether Yale's statements were defamatory; (2) whether the allegedly defamatory statements identified Dongguk; (3) whether Dongguk's reputation suffered injury; (4) whether Yale's statements were the cause in fact and proximate cause of Dongguk's injury; (5) whether Yale acted with actual malice in publishing its statements; and (6) the quantum of damages, if any, to which Dongguk is entitled under its defamation claim.

Dongguk may be able to satisfy the actual malice requirement of its defamation claim at trial by proving the requisite mental state of any Yale employee who the jury finds (1) published an allegedly defamatory statement, (2) authored an allegedly defamatory statement, (3) offered input as to the contents of an allegedly defamatory statement, or (4) approved an allegedly defamatory statement prior to its publication.

The Motion for Summary Judgment on Dongguk's negligence claim is **GRANTED IN PART** and **DENIED IN PART**. *Hustler Magazine* requires the dismissal of Dongguk's negligence claim to the extent that claim is predicated on the statements Yale published to third persons. Yale's motion for summary judgment on Dongguk's negligence claim is denied as to the statements Yale made or failed to make directly to Dongguk. Yale's conduct that may serve as a basis for Dongguk's negligence claim at trial are (1) Schirmeister's erroneous confirmation of Shin's degree on September 22, 2005, (2) Carney's July 10, 2007 response to Dongguk's inquiry, (3) Carney's August 31, 2007 response to Dongguk's inquiry, and (4) Yale's discovery on October 18, 2007 that it had provided Dongguk false information in 2005 and 2007 and its waiting over a month

to advise Dongguk of its mistakes.  As the Court has concluded as a matter of law that Yale owed a duty of care to Dongguk at each of these points in time, it  will be for a jury to decide if Yale, in fact, breached its duty to Dongguk.

Dongguk will be permitted to present evidence at trial under its negligence claim of the four alleged economic-type damages–that is, damages for (1) lost government grants, (2) lost donations, (3) denial of the application to open a law school, and (4) brand rehabilitation costs.  As with its defamation claim, under its negligence claim Dongguk may only seek, and in the event of a plaintiff's verdict may only recover those brand-rehabilitation costs that Dongguk has paid to third parties or will pay to third parties pursuant to contractual obligations that arose prior to the date of the entry of this ruling.  Evidence of what Dongguk terms its "non-economic damages"–that is, (5) the denial of a customer satisfaction award, (6) the commencement of a criminal investigation of Dongguk regarding its role in the Shin scandal, (7) decreased student applications, (8) increased student rejection of admission offers, (9) decreased student satisfaction, (10) decreased faculty applications, (11) decreased faculty satisfaction, and (12) decreased employment opportunities for its students–may be introduced at trial under its negligence claim to attempt to establish damages for the general harm to its reputation.  The jury will be instructed that it may consider such evidence for the limited purpose of determining the amount of damages, if any, that Dongguk is entitled to recover under its negligence claim for the general harm to its reputation caused by the statements Yale made or failed to make through its employees directly to Dongguk.

The factual issues to be resolved at trial with respect to Dongguk's negligence claim are (1) whether Yale breached a duty it owed to Dongguk; (2) whether that breach was the cause in fact and proximate cause of Dongguk's injury; (3) whether Dongguk suffered an actual injury; and (4) the quantum of damages, if any, to which Dongguk is entitled under its negligence claim.

Tucker L. Melançon
United States District Judge

February 10, 2012
Bridgeport, CT

31