UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONGGUK UNIVERSITY            :
                             :
V.                           :   CIV. NO.  3:08CV441(TLM)
                             :
YALE UNIVERSITY              :
                             :
                             :

**RULING ON DEFENDANT'S MOTIONS IN LIMINE**

**[DOC. ##288 and 291**]

Pending before this Court are defendant Yale University's motions in limine to exclude two of plaintiff Dongguk University's experts. The first motion [doc. #288] seeks to exclude the survey and testimony of Jacob Jacoby, an expert in survey design. The second [doc. #291] challenges the testimony of Elaine Haikyung Kim, offered by plaintiff as a cultural expert.

The Court heard oral argument on December 20, 2011 and, after careful consideration, rules as follows.


I.   Background

This action concerns Dongguk's hiring and two-year employment of an art history professor, Jeong Ah Shin, who claimed to have earned a Ph.D. at Yale.  (Compl. ¶¶ 43-57, 66).  Dongguk alleges that, after it hired Shin in 2005 as a "special hiring candidate," it wrote to Yale to verify her Ph.D., and Yale improperly confirmed that Shin had received a Ph.D. from Yale.  (Id. ¶¶ 44, 58-65).

1

Dongguk further alleges that, when Shin attracted attention from the Korean media in 2007, Yale wrongly told the media that it had not verified her Ph.D. two years earlier.  (Id. ¶¶ 89-97).  Dongguk alleges that Yale's statements to the Korean media "[d]estroyed" Dongguk's reputation, "publicly humiliated and deeply shamed" Dongguk, and caused it $50 million in damages.  (Id. ¶¶ 179, 190, 196, 204).

II. Legal Standard

Motions in limine allow the Court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. See Luce v. United States, 469 U.S. 38, 41 n. 4 (1984); Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996). With regard to the admissibility of Dr. Kim's and Dr. Jacoby's testimony, the Court is guided by the Daubert standard.

Federal Rule of Evidence 702 provides that,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. A district court is assigned a "gatekeeping" role in determining whether expert testimony is permitted under the federal rules. See United States v. Farhane, 634 F.3d 127, 158 (2d

Cir. 2011). And, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court clarified that the gatekeeping function applies to all expert testimony, not just scientific testimony. Thus, the trial court is tasked with ensuring "'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Williams, 506 F.3d 151, 160 (2d Cir.2007) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).

With regard to the first issue, reliability, the Supreme Court established four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. Daubert, 509 U.S. at 593–94. As Daubert recognizes, and Kumho emphasizes, the Court's analysis under Rule 702 is "a flexible one" where the Daubert factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. Kumho, 526 U.S. at 150 (quoting Daubert, 509 U.S. at 593).

In this and other circuits it has been recognized that such flexibility is particularly necessary in the case of expert

3

testimony based on "social sciences". See E.E.O.C. v. Bloomberg L.P., No. 07 Civ. 8383(LAP), 2010 WL 3466370, (S.D.N.Y. Aug. 31, 2010) (quoting United States v. Simmons, 470 F.3d 1115, 1123 (5th Cir. 2006)). See also Bowers v. NCAA, 564 F. Supp. 2d 322, 360 (D.N.J. 2008) (reiterating that reliability analysis under Rule 702 must be sufficiently flexible to account for different types of expertise, including social sciences).

The second part of the Daubert inquiry, relevance, asks whether the expert testimony will assist the trier of fact to understand the evidence or determine a fact in issue. See Daubert, 509 U.S. at 591-93. Expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not aid the jury in making a decision. See United States v. Bilzerian 926 F.2d 1285 (2d Cir. 1991). Thus, an expert's testimony is admissible under Rule 702 if it is predicated upon a reliable foundation and is relevant.

The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

Finally, like all evidence, expert testimony may be excluded

4

under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. With these principles in mind, the Court turns to its analysis of the challenged experts.

III. <u>Discussion</u>

*Dr. Jacob Jacoby*

Dr. Jacoby was retained by Dongguk to design and implement a survey that would determine "the lingering impact of the Shin scandal on the Korean Public's perceptions of Dongguk University." [doc. #309-1, at 10]. Dr. Jacoby's expert report, by its title, "To what extent has Dongguk University's reputation been damaged by Yale University's actions in the Jeon Ah Shin Degree Forgery Incident? Report of a Nationwide Survey in South Korea", purports to analyze whether Dongguk's reputation suffered harm as a result of Yale's actions. Notwithstanding the pointed title and conclusions of the survey, Dr. Jacoby in his deposition and Dongguk at oral argument characterize the survey as a public opinion survey. Dongguk now concedes the survey is not meant to address causation, what caused the attitudes of the Korean people, but rather designed to find out whether people changed their view of Dongguk as a result of the publicity that occurred, and whether they believed that Dongguk lied about the fact that it sent a verification inquiry to Yale.

Yale argues Dr. Jacoby's survey and, consequently, any testimony based on the survey should be excluded because (1) it is not the product of reliable principles and methods, (2) it would not assist the jury, and (3) it fails to identify the basis for the causal connection.

"[T]he general trend has been toward the admission of surveys of various kinds". Schering Corp. v. Pfizer Inc., 189 F.3d 218, 225 (2d Cir. 1999). "Surveys are, for example, routinely admitted in trademark and false advertising cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain associations have been drawn in the public mind." Id. (citations omitted). As noted in Schering, the use of surveys is most prevalent in trademark cases, where they are used to prove consumer confusion.

"While errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Rule 403, Fed.R.Evid., when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury." Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) (citing MasterCard Int'l Inc. v. First Nat'l Bank of Omaha, No. 02 Civ. 3691, 2004 WL 326708, at *11 (S.D.N.Y. Feb. 23, 2004) (citing Schering, 189 F.3d at 228)). "Thus, a survey 'should be excluded under Rule 403 when it is so flawed in its methodology' that the survey proves little and the jury is very likely to be misled." Id.

(citing <u>Cache, Inc. v. M.Z. Berger & Co.</u>, 2001 WL 38283, at *6 (S.D.N.Y.). <u>See also</u> <u>Starter Corp. v. Converse, Inc.</u>, 170 F.3d 286, 297 (2d Cir. 1999) ("The District Court correctly found ... that a survey may be kept from the jury's attention entirely by the trial judge if it is irrelevant to the issues." (citation omitted))).

Rule 702 is applicable as well, because the result of a survey is essentially expert testimony, and Rule 702 requires that such testimony must be reliable. <u>See</u> <u>Malletier v. Donney & Bourke, Inc.</u>, 525 F. Supp. 2d 558, 563 (S.D.N.Y. 2007) ("the Second Circuit Court of Appeals and the lower courts within this Circuit provide support for the exclusion of survey evidence primarily under Rule 403 but also under Rule 702 where flaws are deemed to cumulatively undermine its relevance and reliability")(adopting special master's recommendation, *inter alia*, to exclude Jacoby trademark confusion survey under rule 702 and 403, stating "[i]n considering the cumulative effect of the numerous flaws identified by the Special Masters, it is clear that Dr. Jacoby's report and testimony on the issues of both trademark confusion and dilution are unreliable"). As such, if a survey suffers from substantial methodological flaws, it can be excluded under both Rule 403 and Rule 702.

The survey at issue was designed by Dr. Jacoby and implemented by telephone between November 28 and December 1, 2008, on a sample of 1,306 South Koreans 18 years or older, meant to be representative

of the entire adult population of South Korea.[1] The principal findings of the survey, which are said to be applicable to the entire adult population of South Korea, are summarized by Dr. Jacoby as follows:

- 96% have heard of Dongguk University;

- 80% were aware of the Jeong Ah Shin degree forgery incident;

- 79% said that some portion of what they knew regarding the incident came from reports they saw, heard or read in the mass media, and;

- 59% (767 respondents) said they thought that Dongguk University either did not contact Yale University and/or had not told the truth about contacting Yale.

The 767 respondents who said they thought that Dongguk either (1) did not contact Yale or (2) had not told the truth about contacting Yale, were asked follow-up questions regarding whether these "actions brought shame" on Dongguk, Dongguk faculty, Dongguk students, Dongguk alumni, and on Republic of Korea. Before being asked specific questions regarding shame, the respondents were instructed by the pollster:

From now on, I will ask you a few questions related to the effect Dongguk University's actions regarding the Shin Jung Ah incident[2] had on Dongguk University students, alumni, faculty

---

[1] Yale does not challenge Dr. Jacoby's qualifications or the sample size of the survey.

[2] In an earlier question, the "Shin Jung Ah incident" was defined to the respondents who had not heard of the incident as, "the incident where Dongguk University employed Shin Jung Ah as a professor after Dongguk University believed Shin Jung Ah's false claims and a forged document showing she received a doctorate

and the Republic of Korea.

[doc. #309-1, at 29]. Effectively, the respondent is prompted that the next set of questions more broadly concerns Dongguk's actions regarding the Shin Jung Ah incident generally. The question then asks:

> When you think about Dongguk University's actions in the Shin Jung Ah incident, which of the following do you think?

Then there are various response options as to whether the actions of Dongguk University did or did not bring shame upon various groups. The responses, although from a sample of 767, are extrapolated to the entire sample and resulted in the following results:

...brought shame on Dongguk University, 49.9%
...not brought shame on Dongguk University, 6.6%

...brought shame on Dongguk University students at the time, 47.1%
...not brought shame on Dongguk University students at the time, 8.9%

...brought shame on Dongguk University alumni and graduates, 45.8%
...not brought shame on Dongguk University alumni and graduates, 10.3%

...brought shame on Dongguk University faculty, 49.5%
...not brought shame on Dongguk University faculty, 6.5%

...brought shame on the Republic of Korea, 45.4%
...not brought shame on the Republic of Korea, 10.8%

From these results, Dr. Jacoby concludes that the

Jeong Ah Shin degree forgery incident has had a substantial,

---

degree from Yale University in the United States." [doc. #309-1, at 81, Q2a].

long-lasting harmful effect on the image and credibility of Dongguk University among the adult population of South Korea. Further, a full year after Yale University's admission and apology, more than one-third of all adults in Korea said their image of Dongguk University had become more negative as a result of the misstatements made by Yale University to the Korean press regarding the Jeong Ah Shin incident.

[doc. #309-1, at 34].

Yale's denial of having received an inquiry letter from Dongguk seeking to confirm Shin's degree and having sent to Dongguk a fax verifying Shin's degree, which is the basis for the instant action, was but one piece of the so called Shin scandal. As fully articulated in the ruling on summary judgment, "So too, however, were other aspects of the so-called "Shin scandal" [reported by the media]. Dongguk concedes that, in the Summer and Fall of 2007, the media reported that: all of Shin's three purported academic degrees (one from Yale and two from the University of Kansas) were fraudulent; Dongguk had failed to verify Shin's purported degrees from the University of Kansas; Shin had an affair with Yang Kyun Byeon, a senior official in the Korean government; Byeon had recommended Shin to President Oh; Byeon had pressured Dongguk Board Member Monk Jang Yoon to cover up Shin's fraud; and Byeon had illegally arranged for a government payment to the private temple of the Dongguk Board Chairman Yong Taek Lim." [doc. #324, at 6 ruling on summary judgment, citing Pl.'s Rule 56(a)2 Stmt. ¶¶ 30-33,35,36; Def. Ex. 45 at 1; Def. Ex. 35 at Bates Stamp Number 64]. As Dongguk admitted, "Shin's relationship with Byeon and their

10

corruption became a national scandal in Korea." [doc. #324, at 6, citing Pl.'s Rule 56(a)2 Stmt. ¶ 38]. The fact that the Shin Scandal was much broader than Yale's denial of having received and responded to an inquiry from Dongguk poses a particular challenge with respect to Dr. Jacoby's survey and its reliability.

Despite later representations by Dr. Jacoby and Dongguk that the survey was not intended to get at causation [doc. #290-2, Jacoby Depo. at 283], the title of the survey specifically identifies the goal of the survey as trying to measure the extent of damage to Dongguk's reputation caused by Yale's actions. (emphasis added). And the survey concludes that one third of all adults in Korea said their image of Dongguk had become more negative as a result of the misstatements made by Yale. (emphasis added). Yet, the survey never eliminates the other causes for this public conclusion[3] or inquires

---

[3]The following testimony from Dr. Jacoby reveals that at the time he designed the survey, he was not aware of the other developments surrounding the Shin incident:

    Q: Are you aware of whether there was any media coverage relating to the Shin incident but not relating to Yale that might have created negative impressions of Dongguk?
    A: I subsequently – to be precise– on this past Tuesday found out that she had an affair with a governmental official. I don't  know if that was reported in the press. It was not something I knew at the time. [. . .] [doc. #290-2, Jacoby Depo. at 190].

    [. . .]

    Q: So how do you know that the cause of the public's views was statements made by Yale as opposed to something else involved in this incident?
    A: Good, Let – let's – perhaps you can edify me. What other plausible explanations could there be? [...]

specifically about Yale's misstatements.

The only question that arguably measures the public's perception regarding Dongguk as a result of Yale's actions is question 5.a, addressing whether the respondent believed that Dongguk did or did not tell the truth about contacting Yale. The question is supposed to reveal whether, despite a later admission by Yale that Dongguk had contacted Yale, the public still believed Yale's original denial that Dongguk had contacted Yale to verify Shin's degree. However, the follow-up questions regarding damage to Dongguk's reputation do not limit the response to whether the respondent believed Dongguk did or did not contact Yale. Instead question 5.a. is followed by a series of broad questions about the respondents' view of Dongguk's reputation following the "Shin Jung Ah incident".

Further undermining the survey's conclusion is the fact that respondents were never asked about Yale's misstatements or told the substance of Yale's statements. Plaintiff argues that it was not necessary to specifically identify Yale's misstatements. Plaintiff argues that because respondents were asked (1) whether Dongguk told the truth or not about its attempts to contact Yale and verify Shin Jung Ah's degree, and (2), for those who believed Dongguk did not contact Yale, whether their belief that Dongguk did not contact Yale

---

Q: You're not aware of any?
A: I'm not. I'm asking you to edify me. [doc. #290-2, Jacoby Depo. at 198].

to verify Shin's degree affected their view of Dongguk, respondents in their responses indirectly considered Yale's misstatements that they never received an inquiry from Dongguk and never verified Shin's degree. Unfortunately, the questions as posed  refer to Dongguk's actions without any reference to whether Yale did or said anything in response to Dongguk's efforts to verify or not verify Shin's degree. Crafty, hind sight explanations for the survey's limitations cannot cure the fact that the survey measures nothing about Yale's misstatements.

The survey was designed to measure the harm to Dongguk's reputation caused by Yale's statements. Unfortunately, as Dr. Jacoby now acknowledges, the survey reveals nothing about causation and is more properly characterized as a public opinion poll. As a public opinion survey, it is also unreliable and would not aid the jury in this case because it does not eliminate the various other explanations for the public's more negative perception of Dongguk following the Shin scandal.

Thus, the Court finds that the survey and, by extension, Dr. Jacoby's[4] testimony regarding the survey to be (1) unreliable, in that it does not test or support the conclusions stated, and (2)

---

[4] As stated in <u>Malletier v. Dooney & Bourke, Inc.</u>, 525 F. Supp. 2d 558, n. 75 (S.D.N.Y. Dec. 13, 2007), the Court recognizes Dr Jacoby's stellar qualifications which have made him "responsible for numerous, highly significant publications in the area of consumer behavior". However, as in <u>Malletier</u>, the fundamental flaws in Dr. Jacoby's survey are too great to be overcome by his qualifications.

irrelevant, in that it would not aid the jury to understand the evidence or determine a fact in issue.

### *Dr. Elaine Kim*

Dr. Elaine Haikyung Kim is offered by Dongguk as an expert "concerning various facets of Korean culture and its effects on reputation" as it relates to this case. [doc. #306-1, expert report, ¶16]. Dongguk expects that Dr. Kim's testimony will describe "notions of reputation, social hierarchy, shame, and education so that an American jury can understand why Shin and her hiring by Dongguk was such a significant story in 2007 and why the Korean population reacted in such a negative way to Dongguk." [Id. ¶25]. In her report, Dr. Kim describes generally how the Confucian values of social class distinctions, rank, reputation, honor and education continue to be ingrained in the culture and impact Korean society. In detail, Dr. Kim describes the concept of "Che-myun", which emanates from Koreans' self-identification with the collective, and results in a concern over what others think of one's actions and how these actions reflect on one's family or group. Dr. Kim also describes what she titles, "The Korean Obsession with Education". She states that this "obsession" derives not only from the emphasis on education in the Confucian system, but from the parent-child relationship. Essentially, Dr. Kim describes a relationship through which parents impart to their children that social status is

determined by the amount and quality of education and, in turn, children respond by striving to achieve academic success and attain an education from a top university. Dr. Kim further describes how the emphasis on education and higher learning causes Korean universities to be particularly concerned about developing and maintaining a good reputation. Finally, in her report, Dr. Kim opines that a "colonial mentality" still exists in South Korean society, cultivating an admiration for American standards and higher learning institutions in the United States.

Dr. Kim states that these principles explain the results of Dr. Jacoby's public perception survey, opining that the survey respondents believed Yale over Dongguk and that a majority of the respondents believed South Korea was shamed by Dongguk's actions.[5] Dr. Kim further concludes that these principles, unique to Korean culture, explain why Dongguk donors would have rescinded their pledged donations, why Korean companies would not want to provide Dongguk with donations or hire Dongguk graduates and why the government did not give Dongguk certain grants. Dr. Kim concludes "that Yale's false statements regarding Dongguk resulted in significant and concrete material damage to Dongguk's reputation." [doc. #306-1, ¶ 99].

Yale's first argument is that Dr. Kim's opinion is not based

---

[5] However, Dr. Kim will be precluded from testifying concerning Dr. Jacoby's survey.

upon sufficient facts or data because her opinion (1) relies on information that Dongguk's attorneys instructed her to assume as true; (2) relies only on a selection of documents handpicked by Dongguk's attorneys; (3) adopts Dr. Jacoby's survey conclusion as her own, and (4) neglects to take into consideration relevant documents and facts that provide a more complete picture. Further, Yale argues that her opinion is unreliable because it is not the product of reliable principles and methods in that it is based on sweeping assumptions and generalizations about Korean culture. Alternatively, Yale argues that exclusion is also appropriate under Rule 403, because the risk of unfair prejudice, confusion of the issues or misleading the jury due to the stereotypical nature of the testimony substantially outweighs any probative value.

The Court begins with reliability. As stated, supra, the Court's inquiry into the reliability of an expert's testimony is "a flexible one". At the outset, the Court finds that Dr. Kim is qualified on the subject of Asian studies, and Korean culture, in particular. Dr. Kim's curriculum vitae, 38 pages long, tracks Dr. Kim's impressive career from 1963 to the present day as a recognized scholar in the United States and abroad in the field of Asian American Studies. Further, the Court rejects any argument[6] that Dr.

---

[6] It should be noted that in its papers Yale did not object to Dr. Kim's qualifications  and Yale acknowledged this at oral argument in response to the Court's inquiry.
THE COURT: Do you take issue though, with Dr. Kim's qualifications as an expert in the field of Korean culture?

Kim is not qualified to opine on Korean culture in particular, noting, among other things, that Dr. Kim was a Fulbright scholar in South Korea where, for over 15 months, she "conducted survey research and field interviews on contemporary social mores and cultural practices in Seoul" [doc. #306, Aff. Kim ¶21]; that she has published writings, given lectures, and produced documentaries about Korean and/or Korean American culture, and even received a Fulbright Award for lecturing in Korea. In addition to universities in the United States, Dr. Kim has lectured at Korean universities on various topics related to Asian and Asian American culture. [doc. #306, Ex. 1, ¶7]. Dr. Kim's education, background and experience render her qualified to testify as an expert on Korean culture.

Dr. Kim's expert report can be divided into two substantive categories. The first concerns her opinions regarding Korean culture in general, divided into sub-topics titled: South Korea Today, South Korea's Confucian Roots, Che-myun and Perceived Imputability of One's Disgrace on Other Group Member, The Korean Obsession with Education. These points draw on her experience and knowledge of Korean culture generally and are not dependent on any of the allegations of damages in this case.

The second portion of her opinion tries to link these values

_____

MR. FETNER: We haven't moved to exclude Dr. Kim on that basis, and not having made that argument in our briefs, I'm not going to ask the Court to exclude her on that basis now. Since you've raised the question, I do think her credentials are wanting [. . .]. [doc. #317, at 19].

to Dongguk's argument that in South Korea, the reaction to Yale's statements vis-à-vis Dongguk was very negative, causing significant damage to Dongguk's reputation, more so than would have been the case had this occurred in the United States. This second portion relies on and references Dr. Jacoby's survey and conclusions. In arriving at her conclusions, Dr. Kim discusses the "facets of Korean culture" in the context of higher education. She argues that a "colonial mentality" leads Koreans to aspire to American standards which, coupled with the "obsession about education", causes Koreans to venerate top universities in the United States. She also concludes that Korean universities value reputation more than U.S. universities. Dr. Kim ultimately concluded that, "in light of the above, it is my opinion that Yale's false statements regarding Dongguk resulted in significant and concrete material damage to Dongguk's reputation" [doc. #305-1, ¶ 99].

At the heart of Yale's arguments is concern over the unreliability of Dr. Kim's conclusion that, because of certain cultural traits, people in South Korea believed Yale's statements, resulting in material damage to Dongguk's reputation, more so than would have been the case if the events had taken place in the United States. If there were empirical evidence -for example, a reliable survey- which linked Dongguk's claimed economic losses causally to the Yale misstatements, then Dr. Kim's expertise might be valuable to the jury in understanding why the South Korean public, or donors,

or another subset of the Korean population reacted the way they did; or valuable in explaining why the losses were larger than might have been expected to result from a similar wrong in the United Stated. But, Dr. Kim's general knowledge of Korean culture cannot substitute for causation evidence, and the Court having precluded Dr. Jacoby's report, its flaws are necessarily fatal to Dr. Kim's damages conclusion.[7]

Having concluded that the "second portion" of Dr. Kim's opinion lacks reliability, the Court turns to the relevance of the "first portion" of the report, providing general cultural background.

Expert testimony on cultural issues is permitted when relevant. See Vang v. Toyed, 944 F.2d 476, 481 (9th Cir. 1991) (holding that the district court properly admitted expert testimony about the "general explanation of Hmong culture and role of women in that culture"). Expert testimony on background material is particularly appropriate "when cultures or locations would be foreign to a jury." See U.S. v. Zakaria, No. WDQ-10-0043, 2010 WL 3895383, at *2 (D. Md. Oct. 1, 2010) (admitting testimony where "'cultural norms' of Ghana may be outside the purview and common experience of the jury") (quoting Bowoto v. Chevron Corp., No. C 99-02506 SI, 2006 WL 2604592, at *3 (N.D. Cal. Aug. 23, 2006)). The Court believes that the general cultural testimony of Dr. Kim would aid the jury in

---

[7] Specifically, the Court excludes testimony regarding the statements set forth in paragraphs 23, 24, 26, 27, 72, 77, 80, 81, 93, 94, 95, 96, 97, 98 and 99 of Dr. Kim's report.

19

understanding the cultural context in which the facts of this case unfolded. For example, this background testimony may help the jury better understand statements made in the Korean media, or the lens through which the Korean media portrayed these events. Further, Dr. Kim's background testimony, without more, may also aid the jury in understanding evidence Dongguk proposes to present regarding its non-economic damages, as described in Dongguk's damages analysis. [doc. #315-2].

Yale conceded at oral argument that, "experts may very well be able to testify about cultural issues, but they can't do so simply by stereotyping an entire nationality or culture, and saying, 'Korean people think in this way, therefore it's my opinion that people chose not to recruit Dongguk students must have thought in that way, and must have made that choice because they think in that way.'". As stated earlier, the Court will not permit Dr. Kim to give abstract opinions or conclusions about Koreans' reaction to Yale's statements and the resulting harm to Dongguk. The Court believes that with this safeguard in place, the more general cultural testimony is appropriate and relevant.

IV. <u>Conclusion</u>

For the reasons stated herein, the defendant's motion to exclude the survey and expert testimony of Jacob Jacoby **[doc. #288]** is **GRANTED** and the defendant's motion to exclude the expert

testimony of Elaine Haikyung Kim **[doc. #291]** is **GRANTED IN PART AND DENIED IN PART.**

This is not a Recommended Ruling. This is a discovery ruling or order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

ENTERED at Bridgeport this 1st day of June 2012.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

21